James H.M. Sprayregen, P.C.
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

 - and -

Anup Sathy, P.C. (*pro hac vice* pending)
Ray C. Schrock (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Proposed Counsel to the Debtors and Debtors in
Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-_____(____) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
AND LETTERS OF CREDIT (B) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS, AND (D) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined herein); (c) granting adequate protection to certain Prepetition Secured Lenders (as defined in the DIP Orders) for the priming of their existing liens on the Prepetition Collateral (as defined herein) and the Debtors' use of the Cash Collateral; and (d) scheduling a final hearing to consider entry of the Final DIP Order.  In support of the Motion, the Debtors respectfully state as follows:[2]

### Preliminary Statement

1.  Prior to filing their "prearranged" chapter 11 cases, the Debtors pre-negotiated the terms of a chapter 11 plan (the "Plan") with affiliates of holders of approximately 67 percent of the Debtors' first lien term loan (collectively, the "Plan Sponsors").  In conjunction with the Plan, the Debtors have obtained commitments for the $175.0 million postpetition financing (that converts to exit financing) contemplated in this Motion pursuant to the DIP Credit Agreement (as defined herein) and the Commitment Letter (as defined below).  This financing, together with

---

[2]  The facts and circumstances supporting this Motion are set forth in the Irion Declaration (as defined below) and the Declaration of Ronen Bojmel in Support of the Motion of the Debtor's for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing And Letters Of Credit, and to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Lenders, (C) Scheduling a Final Hearing, and (D) granting related relief, attached hereto as **Exhibit B** (the "Bojmel Declaration").

cash flow from operations, will enable the Debtors to fund the administration of these cases and help pave the way to an expeditious and smooth exit from chapter 11.

2.     The DIP Facility (as defined below) will provide the working capital necessary to allow the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies.  Once the DIP Facility is approved, the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, suppliers, employees, vendors and service providers, will be substantially enhanced.  As a result, approval of the DIP Facility is necessary for the Debtors' to seamlessly transition their business through chapter 11 and ultimately to reorganize in a successful and expedient manner.

3.     The Debtors' need for the liquidity provided by the DIP Facility is also particularly acute given their current liquidity position.  Since April 2009, the ABL Lenders (as defined below) have exercised dominion over the Debtors' cash pursuant to their rights under the First Lien Credit Documents, and as a result, the Debtors have *de minimis* cash on hand. Accordingly, the Debtors will have insufficient liquidity to operate their business absent access to the DIP Facility as provided herein.

## Jurisdiction

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1408.

6.     The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the

Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>").

**<u>Relief Requested</u>**

7. By this Motion, the Debtors request entry of the DIP Orders, which among other

things, provide the Debtors with the following relief:

- <u>Cash Collateral</u>: authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral, and other cash that constitutes the Prepetition Secured Lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>");

- <u>DIP Facility</u>: authority to obtain postpetition loans in a principal amount not to exceed $35 million on an interim basis, and $175 million on a final basis (the "<u>DIP Facility</u>") and other financial accommodations, pursuant to the terms and conditions of the Senior Secured Debtor-In-Possession Credit Agreement, dated as of May 16, 2010 (the "<u>DIP Credit Agreement</u>"), substantially in the form attached hereto as **<u>Exhibit C</u>**;

- <u>LC Facility</u>: authority to (a) cause the issuance and cash collateralization of supplemental and new letters of credit (in an aggregate face amount not to exceed $30,000,000, in each case such cash collateralization to be to the extent of 105% of the outstanding face amount thereof (the "<u>LC Facility</u>") and (b) cause certain letters of credit issued prior to the Closing Date pursuant to the First Lien Credit Agreement (collectively, the "<u>Prepetition Letters of Credit</u>") to be automatically and without further action by the parties thereto converted to letters of credit issued pursuant to the DIP Facility.

- <u>DIP Documents</u>: authority to execute and deliver the DIP Credit Agreement and all agreements, documents and instruments contemplated by each, including that certain Commitment Letter (the "<u>Commitment Letter</u>"), dated as of April 9, 2010 between the Debtor, the DIP Agent and certain other DIP Lenders (as defined below) (collectively, the "<u>DIP Documents</u>"), and to take all actions necessary, appropriate or required to comply with the Debtors' obligations thereunder and under the DIP Orders;

- <u>DIP Liens and Claims</u>: authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP Liens on the DIP Collateral securing, and the Superpriority Claims in respect of, the DIP Obligations (in each case, as defined herein);

- <u>Adequate Protection</u>:  approval of the Adequate Protection Liens, 507(b) Claims and other Adequate Protection Obligations (in each case, as defined herein) to be provided to the Prepetition Agents (as defined herein) and/or certain of the other Prepetition Secured Lenders, to protect the Prepetition Secured Lenders' interests in the Prepetition Collateral, including the Cash Collateral, and approval of the Adequate Protection Payments (as defined herein) to be provided to the Prepetition Agents; and

- <u>Final Hearing</u>:  a date for a hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 14 days after the date of service of this Motion, and no later than 45 days after the Petition Date; and

### Concise Statement Pursuant to Local Bankruptcy Rule 4001-2

8.       Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Documents and DIP Orders:[3]

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **DIP Credit Agreement Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>Borrower:       Neff Corp. and all of its subsidiaries as debtors-in-possession in cases to be filed under the Bankruptcy Code (collectively, the "<u>Borrower</u>")<br><br>Guarantors:    Neff Holdings Corp. (the "<u>Guarantor</u>," and together with the Borrower, the "<u>Loan Parties</u>")<br><br>DIP Lead Arrangers:  Banc of America Securities LLC ("<u>BAS</u>"), Wells Fargo Capital Finance, LLC ("<u>Wells</u>") and GE Capital Markets, Inc. ("<u>GECM</u>").<br><br>Administrative Agent:      Bank of America, N.A. ("<u>Bank of America</u>") (in such capacity, the "<u>DIP Agent</u>")<br><br>DIP Lenders:    Bank of America, Wells and Bank of America, Wells and General Electric Capital Corporation ("<u>GECC</u>"), and a syndicate of financial institutions (collectively with the DIP Agent, the "<u>DIP Lenders</u>") |

---

[3]    Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable.  This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents or the DIP Orders, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

| | |
|---|---|
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The earliest to occur of: (a) 285 days after the Petition Date; (b) 45 days after the Petition Date (as defined herein) if a final order has not been entered approving the terms of the DIP Facility; (c) acceleration of the obligations under the DIP Facility and (d) the effective date of a confirmed plan of reorganization of the Debtors under chapter 11 that has been submitted to the Bankruptcy Court that provides for indefeasible payment in full, in cash, of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Lenders. **(DIP Credit Agreement, § 1.6)** |
| **Exit Facility** | Upon (a) entry of the Final DIP Order and (b) satisfaction of the conditions set forth in the DIP Credit Agreement and the Commitment Letter, and otherwise in accordance with the terms thereof (including the completion of documentation governing the proposed exit facility in form and substance satisfactory to a majority of the DIP Lenders), the DIP Facility shall be continued as or converted into exit financing for the Debtors (the "Exit Facility"). **(DIP Credit Agreement, § 11.24))** |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Facility**.  The DIP Facility will be used to provide working capital and for other general corporate purposes of the Borrower materially consistent with the initial cash flow budget attached to the Bojmel Declaration as Exhibit 1 (the "Budget") and (i) upon the entry of the Interim DIP Order (as defined herein) but prior to entry of the Final DIP Order, will be utilized for any post-petition expenditures permitted pursuant to the DIP Credit Agreement, and any cash collateral or proceeds from any collateral provided pursuant to the First Lien Credit Agreement shall be applied to reduce the revolving portion of the First Lien Credit Agreement on a permanent basis until repaid in full, and (ii) upon entry of the Final DIP Order, will be used to repay the remaining amounts under the Revolving Obligations (as defined in the First Lien Credit Agreement) on a permanent basis and for post-petition expenditures permitted pursuant to the DIP Credit Agreement.  **(DIP Credit Agreement, § 5.11)**<br><br>**Cash Collateral**.  The Debtors are authorized to use up to $50,000 of Cash Collateral without the consent of the holders of at least 51% of the commitments under the DIP Facility (the "Required DIP Lenders"). **(DIP Credit Agreement, §§ 3.23)** |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Interest Rate**.  London Inter-Bank Offer Rate ("LIBOR") + 4.5%, with a LIBOR floor of 1.5%.<br><br>**Default Interest Rate**.  2.0% *per annum* above the then applicable rate.<br><br>**(DIP Credit Agreement, § 1.2)** |
| **DIP Commitments**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(1)* | **DIP Credit Agreement**.  Total aggregate revolving loan commitment of $175,000,000 to be disbursed as:<br><br>•   Initial DIP Loan:     $35 million (or lesser amount approved by the Court and set forth in the Interim DIP order)<br><br>•   Final DIP Loan:     $175,000,000 (less the amount of the initial DIP Loan actually borrowed)<br><br>**(DIP Credit Agreement, § 1.1)**<br><br>**Borrowing Base Formula**.  Advances under the DIP Facility will be limited to the sum of: (i) 85% of Eligible Accounts (as defined in the First Lien Credit Agreement); plus (ii) 65% of Eligible Parts Inventory (as defined in the First Lien Credit Agreement), plus (iii) the lesser of (a) 85% of net orderly liquidation value or (b) 95% of the net book value of Rental Fleet and Equipment (as defined in the First Lien Credit |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | Agreement), plus (iv) the lesser of (a) $15,000,000 and (b) 85% of the net orderly liquidation value of the rolling stock, minus (v) a reserve of $3,500,000 related to the Carve-Out (as defined below) plus additional discretionary reserves if clause (a) of the Carve-Out exceeds $2,000,000, minus (vi) amounts outstanding under the revolving portion of the First Lien Credit Agreement (for the avoidance of doubt excluding any amounts outstanding on any swap obligations), minus (vii) such reserves as the DIP Agent and GECC (collectively, the "<u>Decision Agents</u>") may establish in their Permitted Discretion.<br><br>**(Annex A to DIP Credit Agreement, DIP Credit Agreement, §§ 1.7-1.10)**<br><br><u>**Estimated Availability**</u>. $18.5 million. |
| <u>**Letters of Credit**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(1);* | • **Existing Letters of Credit**: Prepetition Letters of Credit will be automatically and without further action by the parties thereto converted to letters of credit issued pursuant to the DIP Facility.<br><br>• **New Letters of Credit**: Up to $30,000,000 in the aggregate face amount of new letters of credit, including new letters of credit replacing the Prepetition Letters of Credit, will be issued by the DIP Lenders up on the Debtors' request.<br><br>**(DIP Credit Agreement, § 1.1(c))** |
| <u>**Funding Conditions**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(2); LBR 4001-2(h);* | <u>**Initial Availability**</u>. Conditions precedent to all borrowings under the DIP Facility include: (i) all representations and warranties are true and correct in all material respects as of the date of each borrowing; (ii) no Default or Event of Default under the DIP Facility has occurred and is continuing, or would result from such borrowing; and (iii) the aggregate principal amount of all outstanding advances under the DIP Facility and the aggregate undrawn amount of all outstanding letters of credit on such date, after giving effect to such borrowing or the issuance or renewal of such letter of credit, shall not exceed the Borrowing Base on such date, as well as other conditions precedent customary for financings of this type.<br><br><u>**Full Availability**</u>. Usual and customary for financings of this type including: (i) all representations and warranties are true and correct in all material respects as of the date of each borrowing; (ii) no Default or Event of Default under the DIP Facility has occurred and is continuing, or would result from such borrowing; and (iii) the aggregate principal amount of all outstanding advances under the DIP Facility and the aggregate undrawn amount of all outstanding letters of credit on such date, after giving effect to such borrowing or the issuance or renewal of such letter of credit, shall not exceed the Borrowing Base on such date, as well as other conditions precedent customary for financings of this type.<br><br>**(DIP Credit Agreement, §§ 7.1, 7.2)** |
| <u>**Fees**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(3)* | <u>**Unused Commitment**</u>. The Debtors have agreed, subject to Court approval, to pay a monthly fee in arrears equal to the following percentages of the unused portion of each Lender's commitments under the DIP Facility: (i) .50% if the Debtors have drawn more than 2/3 of the aggregate amount available under the DIP Facility; (ii) .75% if the Debtors have drawn more than less than 2/3 but more than 1/3 of the aggregate amount available under DIP Facility; and (iii) 1.00% if the Debtors have drawn more than less 1/3 of the aggregate amount available under DIP Facility.<br><br><u>**Upfront and other Arrangement Fees**</u>. As set forth in separate fee letters in favor of |

7

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

<table>
<tr><td></td><td>certain of the initial Lenders.<br><br><u>**Exit**</u>.  Upon entry of the Final DIP Order, the Debtors have also agreed to pay fees related to the Exit Facility pursuant to confidential fee letters.<br><br><u>**Administrative Agency Fee**</u>.  As set forth in a separate letter in favor of the DIP Agent.<br><br>**(DIP Credit Agreement, § 1.3)**</td></tr>
<tr><td><u>**Liens, Priorities and Adequate Protection**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii); LBR 4001-2(a)(4);*</td><td>To the extent not rolled up by the DIP Facility, as adequate protection for the use of the collateral (including cash collateral) (the "<u>Revolving Loan Collateral</u>") securing the Revolving Loans (as defined in the Pre-Petition First Lien Credit Agreement) during the Cases, the holders of claims arising from the Revolving Loans (the "<u>Revolving Loan Claims</u>") shall receive, in each case subject to the Carve-Out:  (i) payment in cash on a monthly basis of all interest accruing on the Revolving Loans at the non-default contract rate; (ii) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Existing Administrative Agent (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any); (iii) replacement liens to the extent of post-petition diminution in value of the Revolving Loan Collateral, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility; and (iv) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition diminution in value of the Revolving Loan Collateral, which claims will be junior to the DIP Obligations (as defined below) and be payable from and have recourse to all assets and property of the Debtors.<br><br>As adequate protection for the use of the collateral (including cash collateral) (the "<u>Related Swap Contract Collateral</u>") securing the Related Swap Contracts (as defined in the Pre-Petition First Lien Credit Agreement) during the Cases, the holders of claims arising from the Related Swap Contracts (the "<u>Related Swap Contract Claims</u>") shall receive, in each case subject to the Carve-Out:  (i) payment in cash on a monthly basis of all interest accruing on the Related Swap Contract Claims at a rate of 5.0% per annum based on the mark-to-market value of such holder's Related Swap Contract Claims as of the business date immediately preceding the Petition Date (as determined in accordance with the Related Swap Contracts or as otherwise agreed to in writing by the applicable counterparty and the Debtors); (ii) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the holders of Related Swap Contract Claims (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any); (iii) replacement liens to the extent of post-petition diminution in value of the Related Swap Contract Collateral, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and also shall be junior to the replacement liens provided as adequate protection to holders of the Revolving Loan Claims; and (iv) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition diminution in value of the Related Swap Contract Collateral, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to holders of Revolving Loan Claims.<br><br>As adequate protection for the use of the collateral (including cash collateral) (the "<u>Term Loan Collateral</u>") securing the Term Loan (as defined in the Pre-Petition First Lien Credit Agreement) during the Cases, the holders of claims arising from the Term</td></tr>
</table>

Loan (the "Term Loan Claims") shall receive, in each case subject to the Carve-Out: (i) replacement liens to the extent of post-petition diminution in value of the Term Loan Collateral, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and shall also be junior to the replacement liens provided as adequate protection to holders of the Revolving Loan Claims and Related Swap Contract Claims; (ii) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Term Loan lenders (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any) up to $475,000 per month so long as there is a Reserve for such the amount of such professional fees accrued at such time, less the amount, if any, advanced to the relevant professionals or otherwise on retainer with such professionals and (iii) superiority administrative expense claims with respect to the foregoing and to the extent of post-petition diminution in value of the Term Loan Collateral, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to holders of Revolving Loan Claims and Related Swap Contract Claims; provided, that to the extent the Cases include a Plan of Reorganization (as defined herein) satisfactory to the Decision Agents for which an equity commitment letter satisfactory to the Decision Agents has been executed and which provides, *inter alia*, for the payment in full, in cash, of the Term Loan Claims, the DIP Lenders shall not oppose adequate protection payments in the form of cash payments on a monthly basis of all interest accruing on the Term Loan Claims at the non-default contract rate.

As adequate protection for the use of the collateral securing the Second Lien Obligations (as defined herein) (including cash collateral) (the "Second Lien Term Loan Collateral") securing the Second Lien Term Loan (as defined in the Second Lien Credit Agreement) during the Cases, the holders of claims arising from the Second Lien Term Loan shall receive, in each case subject to the Carve-Out: in accordance of section 6.4(a) and 6.4(b) of the Intercreditor Agreement, (a) replacement liens only to the extent of post-petition diminution in value of the DIP Collateral securing the Second Lien Term Loan, including replacement liens on all unencumbered assets of the Debtors, which liens shall be junior to the liens of the ABL Lenders under the First Lien Credit Documents, shall be junior to the liens of the DIP Lenders under the DIP Documents, and shall also be junior to the replacement liens provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders; and (b) superpriority administrative expense claims only to the extent of post-petition Diminution in Value of the DIP Collateral securing the Second Lien Term Loan, which claims shall be junior to the claims of the ABL Lenders under the First Lien Credit Documents, junior to the DIP Obligations, shall be payable from and have recourse to all assets and property of the Debtors, and also shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders. For the avoidance of doubt, all claims related to the adequate protection granted to the Second Lien Lenders pursuant to paragraph 12(iv) of the Interim DIP Order are junior to (shall be paid after ) all claims of the First Lien Lenders.

**(Interim DIP Order, ¶ 12)**

K&E 16239413

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Carve-Out**<br><br>*LBR 4001-2(a)(5)* | The payment of (i) accrued but unpaid professional fees, costs, expenses and disbursements (the "Professional Fees") incurred by the Debtors and any official committee of unsecured creditors (the "Professional Persons") appointed in the Cases (the "Committee") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (it being understood that amounts accrued under this clause (i) shall be reported to the DIP Agent on a bi-weekly basis if in excess of $2,000,000); (ii) after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by Interim Order, procedural order or otherwise, the payment of Professional Fees of Professional Persons, only to the extent all such fees or disbursements set forth in this clause (ii) do not exceed an aggregate amount of $2,000,000 (such amount, the "Carve-Out Trigger Notice Cap"), and (iii) the payment of United States Trustee fees, pursuant to 28 U.S.C. § 1930 (collectively, the "Carve-Out"); provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement, or compensation sought by any such Professional Persons.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following termination of the commitments under the DIP Facility. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) securing the DIP Obligations, the Debtors' pre-petition obligations, adequate protection liens, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens, or claims (including administrative and superpriority claims) securing the DIP Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted to the DIP Lenders.<br><br>**(Interim DIP Order, ¶ 31, Annex A to DIP Credit Agreement)** |
| **Payments on Prepetition Debt; Cross Collateralization**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); LBR 4001-2(a)(7)* | According to the terms of the DIP Credit Agreement, the Debtors shall pay, in each case subject to the Carve-Out, in cash on a monthly basis of all interest accruing on (i) the Revolving Loans at the non-default contract rate; and (ii) Related Swap Contract Claims at a rate of 5.0% per annum based on the mark-to-market value of such holder's Related Swap Contract Claims as of the business date immediately preceding the Petition Date (as determined in accordance with the Related Swap Contracts or as otherwise agreed to in writing by the applicable counterparty and the Debtors)<br><br>**(Interim DIP Order, ¶ 12(i) & (ii))** |
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(8)* | **Affirmative Covenants**.  Usual and customary for financings of this type, including, without limitation, delivery of financial statements, cash flow forecasts, variance reports, hosting of lender conference calls, preservation of corporate existence, maintenance of properties, insurance, corporate books and records and facility ratings, compliance with laws, further assurances with respect to collateral, certain bankruptcy related deadlines and restrictions on the use of proceeds of the DIP Facility.<br><br>**(DIP Credit Agreement, §§ 2.1-2.16)**<br><br>**Negative Covenants**.  Usual and customary for financings of this type, including, without limitation: restrictions on liens, investments, indebtedness (including guarantees), fundamental changes, changes to the nature of the business, dispositions, |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | dividends and distributions, affiliate transactions, sale and leaseback transactions, swap contracts, prepayment of indebtedness other than the DIP Loans and capital expenditures, minimum liquidity and compliance with the Budget.<br><br>**(DIP Credit Agreement, §§ 3.1-3.23)** |
| **Limitations**<br><br>*LBR 4001-2(a)(9)* | No portion of the Carve-Out, any cash collateral, or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in (i) challenging, or in relation to the challenge of, (1) any liens or claims of the lenders under the First Lien Credit Agreement or (2) the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any lender under the Debtors prepetition credit facilities (collectively, the "<u>Prepetition Lenders</u>"), including any causes of action under chapter 5 of the Bankruptcy Code, and state law, or (ii) bringing or asserting any claims or causes of actions against the Prepetition Lenders or the DIP Lenders under the First Lien Credit Agreement or the DIP Facility (as the case may be), or their respective advisors, agents (including the administrative agent under the First Lien Credit Agreement or the DIP Agent), and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien (as such term is defined in the First Lien Credit Agreement) of the Prepetition Lenders under the First Lien Credit Agreement.  No more than $50,000 of the Carve-Out, any cash collateral, or proceeds of the DIP Facility may be used by any Committee or any other representative of the Debtors' estates to investigate claims and/or liens of the Prepetition Lenders under the First Lien Credit Agreement.<br><br>**(Interim DIP Order, ¶ 31(iii), DIP Credit Agreement, §§ 3.22, 5.11)** |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(10)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, bankruptcy of non-debtors, judgment defaults, cross defaults, failure to comply with ERISA rules and regulations, change of control, dismissal or conversion of the bankruptcy cases, entry of an order granting superpriority claims to other creditors, non-permitted prepetition debt payments, relief from automatic stay, failure to comply with bankruptcy orders and certain milestones, invalidation of superpriority claims, timing for the filing and confirmation of a bankruptcy plan, liens and guarantees.<br><br>**(DIP Credit Agreement, § 6.1, Interim DIP Order, ¶ 24)** |
| **Change of Control**<br><br>*LBR 4001-2(a)(11)* | "<u>Change of Control</u>" means any event, transaction or occurrence as a result of which: (i) at any time prior to the consummation of a Qualifying IPO (as defined in the DIP Credit Agreement), the Permitted Holders (as defined in the DIP Credit Agreement) cease to "beneficially own" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) and control all of the voting rights associated with ownership of more than fifty percent (50%) of the outstanding stock of Neff Holdings Corp. ("<u>Holdings</u>") having ordinary voting power on a fully diluted basis; or (ii) at any time as of or after the consummation of a Qualifying IPO, (A) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Holders) shall become the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, directly or indirectly, of outstanding Stock having more than thirty-five percent (35%) of the ordinary voting power of the Qualifying IPO Issuer (as defined in the DIP Credit Agreement) and (B) the Permitted Holders shall own outstanding Stock having a |

K&E 16239413

| | |
|---|---|
| | lesser percentage of the ordinary voting power of the Qualifying IPO Issuer at such time; or (c) during any period of twelve (12) consecutive months, the board of directors of Holdings (or, after the consummation of a Qualifying IPO, the Qualifying IPO Issuer) shall not, for any reason other than death or disability, consist of a majority of the Continuing Directors  (as defined in the DIP Credit Agreement); or (d) Holdings ceases to own and control all of the voting rights associated with all of the outstanding stock of Neff Corp.<br><br>**(Annex A to DIP Credit Agreement)** |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v-vi); LBR 4001-2(a)(12)* | The DIP Credit Agreement contains the following deadlines relating to the filing of the chapter 11 plan (a "Plan") and disclosure statement, including:<br><br>• **Filing**.  Plan and related disclosure statement shall be filed on or before 120 days from the Petition Date.<br><br>• **Hearing**. A hearing on confirmation of the Plan shall be held on or before 270 days from the Petition Date<br><br>• **Effective Date**.  The effective date of the Plan shall occur on or before 285 from the Petition Date.<br><br>**(DIP Credit Agreement, § 2.15)** |
| **Repayment**<br>*LBR 4001-2(a)(13)* | **Optional Repayment**.  Upon not less than three (3) Business Days irrevocable prior written notice to Agent, Parent Borrower on behalf of Borrowers may at any time (i) terminate in whole the Revolving Loan Commitment (as defined in the DIP Credit Agreement) and on the date specified in such notice the Revolving Loan Commitment shall terminate and all Obligations shall become immediately due and payable or (ii) reduce in part ratably the Revolving Loan Commitments of the Lenders; provided that each partial reduction shall be in an aggregate amount of not less than $1,000,000 or an integral multiple of 500,000 in excess thereof; and provided, further, that no such partial reduction shall be permitted if, after giving effect to such reduction, if any, the then outstanding Revolving Loan (including any outstanding Swing Line Loans and Letter of Credit Obligations) (each as defined in the DIP Credit Agreement) would exceed the Revolving Loan Commitments unless Borrowers shall have prepaid such outstanding Revolving Loans and/or Swing Line Loans or shall have provided cash or a standby letter of credit (in form and substance and from an issuer reasonably satisfactory to Agent) as collateral for such outstanding Letter of Credit Obligations (in an amount equal to 105% of such outstanding Letter of Credit Obligations) in excess of the Revolving Loan Commitments then in effect.<br><br>**Mandatory Repayment**.<br><br>Prepayments from Asset Dispositions.  Within five (5) Business Days of receipt by Holdings or any of its Subsidiaries of any Net Proceeds in respect of Asset Disposition(s) pursuant to Sections 3.7(b)(ii) and (d) in excess of $5,000,000, individually or in the aggregate, during any Fiscal Year, Borrowers shall repay the Revolving Credit Advances (without reduction of the Revolving Loan Commitment) by an amount equal to the amount of any reduction in the Borrowing Base attributable to the Asset Disposition giving rise to such Net Proceeds to the extent that any such reduction would result in the outstanding principal balance of the Revolving Loans (including, without duplication, Swing Line Loans and Letter of Credit Obligations) exceeding the Borrowing Base, in effect at such time, determined based upon the most |

recent Borrowing Base Certificate delivered (or required to be delivered) by Parent Borrower to Agent pursuant to <u>Section 3.7</u> or <u>Section 4.1(e)</u>, as applicable.

<u>Other Mandatory Prepayments</u>.  In the event that the sum of all Lenders' Revolving Loans (including, without duplication, Swing Line Loans and Letter of Credit Obligations) exceeds the Borrowing Base then in effect other than as permitted pursuant to <u>Section 1.1(a)(ii)</u>, Borrowers shall, without notice or demand, repay Revolving Loans in an aggregate amount sufficient to eliminate such excess.

In the event that the aggregate Letter of Credit Obligations exceeds the L/C Sublimit then in effect Borrowers shall, without notice or demand, within two (2) Business Days cancel outstanding Letters of Credit or cash collateralize outstanding Letter of Credit Obligations in an aggregate amount sufficient to eliminate such excess in an amount equal to 105% of the aggregate of such outstanding Letter of Credit Obligations.

In the event that the outstanding Swing Line Loans exceeds, other than as permitted pursuant to <u>Section 1.1(a)(ii)</u>, the Swing Line Commitment then in effect,  Borrowers shall, without notice or demand, within one (1) Business Day repay or prepay Swing Line Loans in an aggregate amount sufficient to eliminate such excess.

**(DIP Credit Agreement, § 1.5)**

| | |
|---|---|
| **Joint Liability**<br>*LBR 4001-2(a)(14);*<br>*LBR 4001-2(e)* | In order to induce Agent and Lenders to enter into this Agreement and other Loan Documents and to induce Lenders to make the Loans and to incur Letter of Credit Obligations as provided for in this Agreement, Holdings hereby unconditionally guarantees to Agent and Lenders, and their respective successors, endorsees, transferees and assigns, for the benefit of Secured Parties, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations (other than such Person's own Obligations under this Agreement) (hereinafter the "Guaranteed Obligations").  Holdings agrees that this guaranty (the terms of Section 9 collectively, this "Guaranty") is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:  (a) the validity, regularity, enforceability or any future amendment of, or change in this Guaranty, any other Loan Document or any other agreement, document or instrument to which any Credit Party is or may become a party; (b) the absence of any action to enforce this Guaranty or any other Loan Document or the waiver or consent by Agent, Lenders or any other Secured Party with respect to any of the provisions thereof; (c) the existence, value or condition of, or failure to perfect its Lien against, any Collateral for the Guaranteed Obligations or any action, or the absence of any action, by Agent in respect thereof (including, without limitation, the release of any such security);  (d) the insolvency of a Borrower or any other Credit Party;  or (e) any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being agreed by Holdings that its obligations under this Guaranty shall not be discharged until the Termination Date, on which date, Holdings shall be automatically released from its obligations hereunder.  Holdings shall be regarded, and shall be in the same position, as the principal debtor with respect to the Guaranteed Obligations.  Holdings agrees that any notice or directive given at any time to Agent which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by Agent and the Secured Parties and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless Agent |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | and the Requisite Lenders have specifically agreed otherwise in writing. It is agreed among Holdings, Agent and Secured Parties that the foregoing waivers are of the essence of the transaction contemplated by the Loan Documents and that, but for this Guaranty and such waivers, Agent and Lenders would decline to enter into this Agreement and Secured Parties would decline to enter into the applicable documents governing the Obligations. **(DIP Credit Agreement, § 9.1)** |
| **Non-Debtor Affiliates** <br><br> *LBR 4001-2(a)(15)* | None. |
| **Acknowledgements** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iii); LBR 4001-2(f)* | The Debtors make certain customary admissions and stipulations with respect to (a) the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Lenders, (b) the validity, enforceability and priority of the liens and security interests granted to the Prepetition Agent to secure the Prepetition Obligations, (c) the binding nature of the Prepetition Obligations in respect of the Debtors, and (d) the waiving of claims and defenses against the Prepetition Secured Lenders regarding the Prepetition Obligations **(Interim DIP Order, ¶ E)**; _provided_ that the above shall not be binding on any other party in interest if and to the extent such party (x) duly files an adversary proceeding with respect to all or a portion of the above on or before the later of (i) 90 days after entry of the Interim DIP Order, and (ii) with respect to a Committee, 75 days after formation of the Committee, and (y) is successful in such adversary proceeding. **(Interim DIP Order, ¶ 33)** |
| **Automatic Stay** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | **DIP Facility.** Five (5) days' prior notice to the Debtors, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and the DIP Lenders to the extent set forth in the DIP Orders. **(Interim DIP Order, ¶ 24)** |
| **Waivers and Consents** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(v); Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | **Non-Bankruptcy Law.** The DIP Liens, Adequate Protection Liens and other interests granted to the DIP Agent, the DIP Lenders or the Prepetition Agent are deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of the Interim DIP Order. **(Interim DIP Order, E(v), ¶ )** <br><br> **Estate Claims.** The Debtors admit, stipulate, and agree that the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the First Lien Agent, the Second Lien Agent, the First Lien Lenders (including both the ABL Lenders and the First Lien Term Loan Lenders), and the Second Lien Lenders (collectively, the "Pre-Petition Secured Parties"), and/or any of the Pre-Petition Secured Parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directs, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to Sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the First Lien Credit Documents or Second Lien Credit Documents (or the transaction contemplated thereunder), the obligations under the First Lien Credit Facilities and the Second Lien Term Loan, or the security interests and liens in the Pre-Petition Collateral **(Interim DIP Order, ¶E(iii))**; _provided_ that the above shall not be binding on any other party in interest if and to the extent such party (a) duly files an adversary proceeding with respect to all or a portion the above on or before the later of (i) 75 calendar days from the appointment of the Committee and (ii) 90 calendar days following the date of entry of this Interim Order, |

| | and (b) is successful in such adversary proceeding. **(Interim DIP Order, ¶ 33)** |
|---|---|
| | **Indemnification**. Usual and customary for financings of this type, including that Borrower shall indemnify and hold harmless the DIP Agent and DIP Lenders and their respective agents, representatives and professionals from and against any and all liabilities, claims and customary actions of this nature, in any way relating to the DIP Credit Agreement and related transactions and negotiations. **(DIP Credit Agreement, § 11.1)** |
| | **Section 506(c)**. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties or any of their respective claims, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. **(Interim DIP Order, ¶ 35)** |

## **Extraordinary Provisions**

9. As a condition to obtaining the proposed financing, the DIP Lenders have required and the Debtors have agreed to certain provisions that may be considered "extraordinary provisions" under the Court's General Order No. M-274. These provisions include the following:

- Avoidance Actions. Obligations under the DIP Facility will be secured by priming first-priority security interests and liens granted pursuant to Section 364(c)(2) and (d)(1) of the Bankruptcy Code, with priority over all valid and perfected existing and future security interests, liens, claims and encumbrances other than valid and enforceable Liens (other than Liens securing Indebtedness) (each as defined in the First Lien Credit Agreement) existing on the Petition Date (the "Excepted Liens"), in any avoidance claims or causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof, and subject to the Carve-Out.

- Waiver of 506(c) Claims. Subject to the entry of the Final DIP Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Lenders' collateral under Section 506(c) of the Bankruptcy Code or otherwise and any right to assert the "equities of the case" exception in Section 552 of the Bankruptcy Code shall be waived.

- Termination upon Relief from Stay. The DIP Agent may accelerate the DIP Loans and terminate the DIP Lenders' commitments under the DIP Agreement based on, among other things: (i) any of the debtors file a pleading seeking to vacate or modify

any of the DIP Orders over the objection of a majority of the DIP Lenders; or (ii) entry of an order or orders granting relief from the automatic stay provided under section 362 of the Bankruptcy Code with respect to Debtors' assets having a value, in the aggregate, in excess of $2,500,000.

- Rollups. The DIP Facility contains a "creeping rollup" feature: after entry of the Interim DIP Order, proceeds of cash collateral, other than loans made under the DIP Facility, will be used to permanently reduce the ABL. Upon entry of the Final DIP Order, proceeds of the DIP Facility will be used to repay the remaining amounts under the revolving portion of the Pre-Petition First Lien Credit Agreement on a permanent basis.

- Carve Outs. The Carve-Out includes: (i) the accrued but unpaid Professional Fees incurred by the Debtors and any Committee at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (ii) after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, the payment of Professional Fees, only to the extent all such fees or disbursements set forth in this clause (ii) do not exceed the Carve-Out Trigger Notice Cap; and (iii) the payment of United States Trustee fees, pursuant to 28 U.S.C. § 1930. The Carve-Out is senior to all liens and claims (including administrative and superpriority claims) securing the DIP Obligations, the Debtors' pre-petition obligations, adequate protection liens, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens, or claims (including administrative and superpriority claims) securing the DIP Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted to the DIP Lenders.

  No portion of the Carve-Out, any cash collateral, or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in (i) challenging, or in relation to the challenge of, (1) any liens or claims of the Pre-Petition Lenders or (2) the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any Pre-Petition Lender, including any causes of action under chapter 5 of the Bankruptcy Code, and state law, or (ii) bringing or asserting any claims or causes of actions against the Pre-Petition Lenders or the DIP Lenders under the Lien Credit Agreement or the DIP Facility (as the case may be), or their respective advisors, agents (including the Existing Administrative Agent or the DIP Agent), and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien (as such term is defined in the Pre-Petition First Lien Credit Agreement) of the Pre-Petition Lenders under the First Lien Credit Agreement. No more than $50,000 of the Carve-Out, any cash collateral, or proceeds of the DIP Facility may be used by any Committee or any other representative of the Debtors' estates to investigate claims and/or liens of the Pre-Petition Lenders under the Pre-Petition First Lien Credit Agreement.

- Relief from the Automatic Stay. The Debtors have agreed to a modification of the automatic stay as follows: within 5 days from the date of the DIP Agent or Lenders file a notice of an event of default is filed with the Bankruptcy Court with respect to the Cases, the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted without further order of the Bankruptcy Court to allow the DIP Agent to take any and all actions, as if no case were pending under the Bankruptcy Code unless within such five-day period of time the Bankruptcy Court determines that no event of default has occurred and is continuing.

- Fees. The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the Postpetition Facilities. Specifically, the Debtors will pay to the DIP Lenders certain up front and other arrangement fees in favor of certain of the DIP Lenders, and an administrative agency fee in favor of the DIP Agent, in each case as set forth in a confidential side letter. The Debtors have provided or will provide copies of these confidential side letters to the United States Trustee for the Southern District of New York (the "U.S. Trustee"), to the Court, and to any committee appointed in the Debtors' chapter 11 cases. The Debtors request that these side letters and their contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for any committee), in order to protect the sensitive commercial information of the DIP Agent and the DIP Lenders contained therein.

  Additionally, the Debtors have agreed, subject to Court approval, to pay a monthly fee in arrears equal to the following percentages of the unused portion of each DIP Lender's commitments under the DIP Facility: (a) .50% if the Debtors have drawn more than 2/3 of the aggregate amount available under the DIP Facility; (b) .75% if the Debtors have drawn more than less than 2/3 but more than 1/3 of the aggregate amount available under DIP Facility; and (c) 1.00% if the Debtors have drawn more than less 1/3 of the aggregate amount available under DIP Facility. The Debtors have also agreed to pay fees related to the Exit Facility pursuant to confidential fee letters.

- Commitment Letter. The Debtors are seeking Court approval of the Commitment Letter, including the portions thereof related to the Exit Facility.

- Credit Bidding. The Debtors have agreed to allow the DIP Lenders to credit bid the amount of their claims during any sale of all or substantially all of the Debtors' assets, including a sale under section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

K&E 16239413

## Certification of Budget Pursuant to Local Bankruptcy Rule 4001-2(h)

10.     As set forth more fully in the DIP Documents, the Debtors' access to Cash Collateral and availability under the DIP Facility will be subject to the Budget.  The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Budget.

## Background

11.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code in furtherance of their prearranged chapter 11 plan of reorganization.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested joint administration of these chapter 11 cases and no official committees have been formed.

12.     As set forth in the Declaration of Mark Irion (A) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2 (the "Irion Declaration") filed with the Court, the Debtors have been in the rental business for more than 20 years and remain one of the largest and leading equipment rental companies in the United States.  Through 63 branches located across 14 states, the Debtors rent a broad variety of construction and industrial equipment, including earthmoving, material handling, aerial, and compaction equipment.  During the twelve month period ended December 31, 2009, the Debtors generated approximately $191.7 million in revenues.  Of this amount, approximately 86 percent was generated from equipment rentals, 9 percent was generated from the sale of new and used construction equipment, and 5 percent was generated from parts sales and service revenues.

13.     The Debtors' business remains operationally sound and generates significant EBITDA and positive cash flow before debt service.  However, with approximately $580 million in funded debt, the Debtors' business is over-leveraged.  The Debtors' leverage issue surfaced as a result of the severe downturn in the United States economy and the resultant decrease in nonresidential construction activity, which negatively impacted customer demand for rental equipment and the value of the Debtors' rental fleet.  As a result, over the past few years, the Debtors have experienced lower equipment rental volumes, operating cash flows, and borrowing capacity.  The Debtors' operational performance, however, has recently begun to improve.

14.     Recognizing the challenges facing them, the Debtors proactively sought and obtained a comprehensive solution that would strengthen their financial position for long term success.  After a comprehensive marketing and sales effort spanning several months, the Debtors have successfully negotiated a prearranged chapter 11 plan with holders of approximately 67 percent of the Debtors' prepetition first lien term loan and counterparties to the Debtors' swap agreements, which have agreed, among other things, to vote in favor of the prearranged plan.

15.     The prearranged plan includes, among other things, an exchange of the first lien term debt for equity and a backstopped equity commitment of up to $119 million to recapitalize the Debtors' business and provide for future capital needs.  The lenders under the Debtors' prepetition revolving credit facility have agreed to provide $175 million in debtor-in-possession financing and exit financing.  Under the plan, the Debtors' revolving and first lien term loan lenders will be paid in full and the Debtors' second lien lenders will receive a significant recovery.[4]

---

[4]     More details regarding the Debtors' plan may be found in the chapter 11 plan filed with the Court or on the Debtors' restructuring web site, maintained at **http://www.kccllc.net/neff**.

16.     Finally and notably, the Debtors' plan includes a "topping" mechanism, which allows other potential investors to propose alternatives to the plan that could result in increased value for stakeholders prior to confirmation of the plan.

## A.     Prepetition Indebtedness

17.     As of March 31, 2010, the Debtors reported $298.9 million in total assets and approximately $609.3 million in total liabilities.   As of the Petition Date, the Debtors have approximately $598.5 million in indebtedness and related obligations, consisting of their First Lien Credit Facilities, secured Swap Obligations, a Second Lien Term Loan, and certain 10% Senior Notes (each as defined herein).  These obligations are discussed in turn.

### 1.     First Lien Credit Facilities

18.     Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Neff Holdings Corp., as guarantor, Bank of America, N.A., as administrative agent (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), are parties to that certain Credit Agreement, dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement").

19.     The First Lien Credit Agreement provides the Debtors with an asset-based credit facility (the "ABL," with the lenders thereunder the "ABL Lenders") with $250.0 million of maximum availability.  Specifically, availability under the ABL is determined by a borrowing base formula calculated by reference to the appraised value of the Debtors' accounts receivable, parts inventory, and rental equipment.[5]   As of the Petition Date, approximately $153.3 million was outstanding under the ABL.

---

[5]     The Debtors reduced commitments under the ABL from $325.0 million to $250.0 million in connection with an October 2009 agreement with the First Lien Agent to increase availability under the ABL by reducing reserves.

20.     The First Lien Credit Agreement also provides for an $87.9 million "last out" term loan (the "First Lien Term Loan," and the lenders thereunder the "First Lien Term Loan Lenders").  The First Lien Term Loan was created through an exchange offer undertaken by the Debtors in December 2008, through which approximately $195.7 million of the Debtors' 10% Senior Notes (as defined herein) were tendered for obligations under the First Lien Term Loan.

21.     The ABL and the First Lien Term Loan (collectively, with the Swap Obligations (as defined herein), the "First Lien Credit Facilities") are secured by a first priority lien on substantially all of the Debtors' assets (the "Prepetition Collateral") pursuant to that certain First Lien Security Agreement between Neff Corp., certain Debtors as parties thereto, and Bank of America, N.A., as agent, dated as of May 31, 2007 (the "First Lien Security Agreement," and, together with the First Lien Credit Agreement, the "First Lien Credit Documents").   Among other things, the First Lien Credit Documents provide that claims arising under the ABL hold seniority over the First Lien Term Loan.  As of the Petition Date, interest accrued on the First Lien Credit Facilities at LIBOR plus 350 bps.   The First Lien Credit Facilities mature on May 31, 2013.

22.     Under Section 6.8(a) and Section 6.8(d) of the First Lien Credit Agreement, the First Lien Term Loan Lenders have agreed, among other things, (a) not to object to the use of Cash Collateral or postpetition financing permitted by the Revolving Lenders (as defined in the First Lien Credit Agreement) and (b) not to request any form of adequate protection except as agreed to by the First Lien Agent or as otherwise specifically permitted by the First Lien Credit Agreement and (c) to subordinate their liens in any Prepetition Collateral to the such postpetition financing and any adequate protection liens provided to the ABL Lenders.  Specifically, Section

6.8(a) provides that if one or more of the ABL Lenders are providing post-petition financing, and the ABL Lenders have consented to the use of Cash Collateral:

> [First Lien Term Loan Lenders] and the [First Lien] Agent, acting on behalf of the [First Lien Term Loan Lenders], agree that they will raise no objection to such use of cash collateral or [debtor in possession f]inancing nor support any other [p]erson objecting to, such sale, use, or lease of cash collateral or debtor in possession f]inancing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the [First Lien] Agent, acting on behalf of the [ABL Lenders], or to the extent expressly permitted by Section 6.8(d)) and, to the extent the Liens securing the [ABL] are subordinated to or pari passu with any such DIP Financing provided by the [ABL] Lenders, the [First Lien Term Loan Lenders] will subordinate their Liens in the [Prepetition Collateral] to (x) the Liens securing such [debtor in possession f]inancing (and all obligations relating thereto), (y) any adequate protection Liens provided to the [ABL] Lenders and (z) any "carve-out" for professional or United States Trustee fees agreed to by the [ABL] Lenders or the [First Lien] Agent, acting on behalf of the [ABL Lenders].

See First Lien Credit Agreement, § 6.8(a).

23.     In addition, the First Lien Term Loan Lenders have further agreed not to seek adequate protection without the consent of a majority of the ABL Lenders (which the First Lien Term Loan Lenders have obtained here).  Id. at § 6.8(d)(i) ("[t]he [First Lien Term Lenders] may not, without the express written consent of, or joinder by, [the majority of the ABL Lenders], independently seek adequate protection in respect of the [First Lien Term Loan].").  Moreover, the First Lien Term Loan Lenders have agreed that, if the ABL Lenders receive adequate protection in the form of replacement liens or additional collateral, that liens on any such collateral shall be junior to such adequate protection provided to the ABL Lenders or the Swap Counterparties (as defined herein).  See id. at § 6.8(d)(i).  Similarly, the First Lien Term Loan Lenders have also agreed that any superpriority claim received as adequate protection in a bankruptcy proceeding shall be junior, in all respects, to any superpriority claim provided as adequate protection by the ABL Lenders or the Swap Counterparties.  See id. at § 6.8(d)(ii).

22

## 2.      Swap Obligations

24.     Neff Corp. is a party to two interest rate swaps with Bank of America, N.A., and UBS AG (collectively, their capacities as such, the "Swap Counterparties"), pursuant to certain ISDA Master Agreements dated as of June 14, 2007, and June 20, 2007, respectively. Obligations arising under the swaps (collectively, the "Swap Obligations") are treated as obligations arising under the First Lien Credit Agreement.    Under the First Lien Credit Documents, Swap Obligations are junior to claims arising under the ABL but are senior to claims arising under the First Lien Term Loan.[6]  The Swap Obligations are also secured by liens granted pursuant to the First Lien Security Agreement.  As of the Petition Date, the Swap Obligations totaled approximately $22.4 million.

## 3.      Second Lien Term Loan

25.     Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantors, Wilmington Trust FSB, as administrative agent (the "Second Lien Agent"),[7] and the lenders party thereto (collectively, the "Second Lien Lenders," and together with the First Lien Lenders the "Prepetition Secured Lenders") are parties to that certain Credit Agreement, dated as of May 31, 2007 (the "Second Lien Credit Agreement").

26.     The Second Lien Credit Agreement provides for a $290.0 million term loan, which remains fully outstanding as of the Petition Date (the "Second Lien Term Loan"). Generally, outstanding borrowings under the Second Lien Term Loan (the "Second Lien Obligations") accrue interest at either Prime plus 300 bps or LIBOR plus 350 bps.  As of the Petition Date, interest accrued on the Second Lien Term Loan at LIBOR plus 350 bps.  The

---

[6]    The Swap Obligations also constitute "Revolving Obligations" under the terms of the First Lien Credit Agreement.

[7]    Wilmington Trust FSB is the successor in interest to Bank of America, N.A. as Second Lien Agent.

Second Lien Term Loan matures on November 30, 2014. The Second Lien Term Loan is secured by a second priority lien on the Prepetition Collateral pursuant to a security agreement (the "Second Lien Security Agreement," and together with the Second Lien Credit Agreement, the "Second Lien Loan Documents") between Neff Corp. and the Debtors as parties thereto and the Second Lien Agent, dated as of May 31, 2007.

### 4. Intercreditor Agreement

27. On May 31, 2008, the applicable Debtors, the collateral agent under the First Lien Security Agreement (the "First Lien Collateral Agent"), and the collateral agent under the Second Lien Security Agreement (the "Second Lien Collateral Agent") entered into an agreement that, among other things, assigned relative priorities to claims arising under the First Lien Credit Facilities (including the Swap Obligations) and the Second Lien Term Loan (the "Intercreditor Agreement"), attached hereto as **Exhibit D**.

28. The Intercreditor Agreement provides that claims arising under the Second Lien Term Loan are junior to claims arising under the First Lien Credit Facilities. The Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Second Lien Lenders in an event of default under the Second Lien Credit Agreement; (b) the Second Lien Lenders' ability to challenge the validity or priority of liens arising under the First Lien Credit Facilities; (c) the Second Lien Lenders' ability to object to debtor in possession financing under section 363 or section 364 of the Bankruptcy Code provided by one or more of the lenders under the First Lien Credit Facilities (collectively, the "First Lien Lenders"); and (d) the extent to which the Second Lien Lenders may be entitled to request adequate protection during a bankruptcy proceeding.

29. In a bankruptcy proceeding, the Second Lien Lenders have agreed not to object to certain uses of Prepetition Collateral permitted by the First Lien Lenders and to subordinate their

liens in the Prepetition Collateral to secure postpetition financing provided by one or more of the

First Lien Lenders. Specifically, Section 6.1 of the Intercreditor Agreement provides that:

> [T]he Second Lien Collateral Agent, on behalf of itself and the Second Lien [Lenders], (A) agrees that it will raise no objection to such use of cash collateral or [debtor in possession f]inancing nor support any other [p]erson objecting to, such sale, use, or lease of cash collateral or [debtor in possession f]inancing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4 [of the Intercreditor Agreement]) and, to the extent the [l]iens securing the [First Lien Credit Facilities] are subordinated to or pari passu with such [debtor in possession f]inancing, the Second Lien Collateral Agent will subordinate its [l]iens in the [Prepetition Collateral] to (x) the [l]iens securing such [debtor in possession f]inancing (and all [o]bligations relating thereto), (y) any adequate protection [l]iens provided to the First Lien [Lenders] and (z) any "carve-out" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent.

See Intercreditor Agreement, § 6.1. Thus, the Second Lien Lenders have effectively consented

to the Debtors' access to DIP Facility and the Debtors' use of cash collateral as described

herein.[8]

> 30. In addition, Section 6.4(a) of the Intercreditor Agreement provides that the

Second Lien Lenders shall not contest to the First Lien Lenders' ability to request adequate

protection in a bankruptcy proceeding. Specifically, the Second Lien Lenders have agreed "none

of them shall contest (or support any other person contesting) (i) any request by [the First Lien

Lenders] for adequate protection." See id. at § 6.4(a)(i).

---

[8] The Second Lien Lenders' consent to the Debtors' use of cash collateral and the DIP Facility as described herein under Section 6.1 of the Intercreditor Agreement requires that indebtedness under the DIP Facility shall not exceed "Maximum First Lien Indebtedness" (as defined in the Intercreditor Agreement) plus $50.0 million. See Intercreditor Agreement, at § 6.1. Maximum First Lien Indebtedness is defined by the Intercreditor Agreement as the greater of (a) indebtedness under the First Lien Facilities of $467.5 million (exclusive of any Swap Obligations) or (b) the sum specified percentages of the book values of accounts receivable, inventory, and equipment. See id. at p. 4 (defining Maximum First Lien Indebtedness). Since drawn indebtedness under the DIP Facility plus outstanding indebtedness under the First Lien Facilities (exclusive of Swap Obligations) will not exceed the sum of Maximum First Lien Indebtedness and $50.0 million, this requirement is satisfied here.

**5.     10% Senior Notes**

31.     Neff Corp., as issuer, and Neff Rental LLC, Neff Finance Corp., and Neff Rental, Inc., as guarantors, and Wells Fargo Bank, N.A., as indenture trustee, are parties to that certain indenture dated May 31, 2007 (the "10% Senior Notes Indenture").  Under the 10% Senior Notes Indenture, Neff Corp. issued $230.0 million in 10% senior notes due June 1, 2015 (collectively, the "10% Senior Notes," and together with the First Lien Credit Facilities and the Second Lien Obligations, the "Prepetition Facilities").  The 10% Senior Notes are unsecured obligations of the applicable Debtors.  As noted above, approximately $195.7 million in 10% Senior Notes were exchanged for obligations under the First Lien Term Loan in December 2008.  Approximately $35.9 million in 10% Senior Notes remain outstanding as of the Petition Date.

**6.     Other Liens**

32.     In the ordinary course of business, the Debtors have incurred certain secured indebtedness, including purchase money security interests, as permitted by their prepetition credit facilities (collectively, the "Permitted Encumbrances").  As described more fully below, the Permitted Encumbrances are not subject to the first priority priming liens granted pursuant to the Interim DIP Order.

**B.     The Debtors' Marketing Efforts for Postpetition Financing[9]**

33.     As described in the Bojmel Declaration, in June 2009, the Debtors retained Miller Buckfire & Co. LLC ("Miller Buckfire") as their financial advisor to assist with their evaluation of strategic alternatives, including a potential restructuring transaction.  In the months prior to the Petition Date, the Debtors worked closely with their advisors to identify potential sources of postpetition financing.

---

[9]     Pursuant to Local Bankruptcy Rule 4001-2(b), this subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available and the material facts bearing on the issue of whether the credit is being extended in good faith.

34.     In light of the Debtors' imminent liquidity needs, commencing in October 2009, the Debtors and their advisors entered into extensive, arm's length negotiations with the First Lien Agent and certain prepetition lenders regarding the terms of potential debtor in possession financing to ensure that they have sufficient liquidity to continue operations and to preserve the value of their estates.

35.     In addition, commencing in November 2009 the Debtors, through Miller Buckfire, contacted a universe of approximately 13 other institutions, hedge funds, and traditional DIP lenders on a "no names" basis to gauge their interest in providing debtor in possession financing.[10]  The potential lenders were informed of the Debtors' liquidity needs and the Debtors' desire to obtain postpetition financing either through a "take out" of the Debtors' existing prepetition debt or on a junior basis.   After negotiating customary confidentiality agreements and due diligence conducted by certain potential lenders, only three potential lenders/lender groups; the Debtors' ABL lenders, a third party commercial lender and certain of the Debtors' First Lien Term Loan Lenders provided preliminary financing proposals.   The proposal received from the Debtors' existing ABL Lenders offered DIP financing on a senior basis as well as exit financing. The proposal from the third party commercial lender contained significantly less beneficial economic terms, provided the Debtors with less overall liquidity and contained requirements that the Debtors pay higher fees than the Debtors' existing ABL Lenders' proposed DIP Facility.  In addition, the proposal did not incorporate an exit facility into its proposed financing structure.  The proposal received from the First Lien Term Loan Lenders would have involved a "junior" DIP structure.  Notably, the junior DIP proposal received from the Debtors' First Lien Term Loan Lenders would have effectively required certain consents

---

[10]   The universe of potential third party lenders was limited by the fact that many lenders with experience in the equipment rental space are already ABL Lenders.

from the Debtors' prepetition ABL Lenders as a condition to effectiveness and would not have provided the Debtors with committed exit financing. The relevant First Lien Term Loan Lenders eventually withdrew their proposal for DIP financing when they learned that the existing ABL lenders were offering both DIP and exit financing. Moreover, in March and April 2010, the Debtors held an auction between, and negotiated with, two competing plan sponsors, both of whom secured financing through Bank of America, including the DIP Facility and Exit Facility, on substantially similar terms.

36.     The Debtors, with the assistance of their advisors, have fully considered the various financing proposals received from the potential lenders and those proposed in connection with each potential plan sponsor's bid. Among other things, the Debtors and their advisors considered the potential availability provided by each proposal, the pricing and fees associated with each proposal, as well as the benefits associated with accepting a debtor in possession financing proposal coupled with committed exit financing. The Debtors and their advisors also considered the difficulties associated with implementing a "junior DIP" structure that could have potentially primed certain of the Debtors' prepetition secured creditors without the benefit of certain protections provided by either the Intercreditor Agreement or the First Lien Credit Agreement. The Debtors have determined that the financing proposal provided by the DIP Lenders provided the most advantageous terms under the circumstances and in light of the Debtors' liquidity needs. Significantly, the exit facility combined with the DIP proposal is a key element of the Debtors' plan to restructure their financial obligations and emerge from bankruptcy on an expedited basis. Conversely, the Debtors determined that, despite substantial efforts by the Debtors and their advisors to develop the alternative proposals, these proposals did not present a comparable opportunity to maximize stakeholder value.

K&E 16239413

## Basis for Relief

### A.   The Debtors Should be Authorized to Obtain
###       Postpetition Financing through the DIP Documents

#### 1.   Entering into the DIP Documents Is an
####        Exercise of the Debtors' Sound Business Judgment

37.   For the reasons set forth in greater detail below, the Court should authorize the Debtors to enter into the DIP Documents, and obtain access to the DIP Facility and the Cash Collateral, as an exercise of the Debtors' sound business judgment.

38.   Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  See, e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

K&E 16239413

39.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court should consider the economic terms of the Postpetition Facilities in light of current market conditions.  See Transcript of Record at 734 35:24, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as in the past).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in In re ION Media Networks, Inc., the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

40.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of a chapter 11 case, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Accordingly, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's-length, and

with the assistance of their advisors, in order to obtain the required postpetition financing on terms favorable to the Debtors. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.

41. Specifically, as noted above, the DIP Facility will provide the Debtors with access to up to $35 million immediately after entry of the Interim DIP Order and up to an aggregate amount of $175 million after entry of the Final DIP Order, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the DIP Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Finally, the DIP Facility is provided through a package providing a commitment for exit financing that will satisfy any amounts outstanding under the DIP Facility, which ensures that the Debtors will have an adequate source of liquidity to successfully emerge from chapter 11.

42. As importantly, the Debtors negotiated the DIP Facility as an integral part of a consensual restructuring of the Debtors' principal prepetition obligations with the Plan Sponsors according to the Plan. As detailed in the Bojmel Declaration, the Plan Sponsors support the DIP Facility, which resulted from numerous discussions regarding the Plan and the Debtors' restructuring objectives. The DIP Documents are a reflection of the Plan Sponsors' support for the Debtors' restructuring plans, which is critical to the Debtors' ability to expeditiously and successfully conclude these chapter 11 cases. Accordingly, entering into the DIP Documents

31

constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

> **2.**     **The Debtors Should be Authorized to Obtain**
> **Postpetition Financing on a Senior Secured and Superpriority Basis**

43.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

44.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

45.    As described above, Miller Buckfire, on behalf of the Debtors, contacted 14 institutions, hedge funds, and traditional DIP lenders on a "no names" basis to gauge their interest in providing debtor in possession financing. The 14 potential lenders were informed of the Debtors' liquidity needs and the Debtors' desire to obtain postpetition financing either through a "take out" of the Debtors' existing prepetition debt or on a junior basis. After negotiating customary confidentiality agreements and due diligence conducted by certain potential lenders, only one potential lender provided a preliminary financing proposal. This proposal contained significantly less beneficial economic terms, provided the Debtors with less overall liquidity and contained requirements that the Debtors pay higher fees than the proposed DIP Facility. In addition, the proposal did not incorporate an exit facility into the proposed financing structure. Moreover, in March and April 2009, the Debtors held an auction between, and negotiated with, two competing plan sponsors, both of whom secured financing through Bank of America, including the DIP Facility and Exit Facility, on substantially similar terms.

46.    The Debtors' significant secured debt and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis. The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Debtors'

unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date (other than the Excepted Liens) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the Bankruptcy Code; as well as to grant the Debtors' repayment obligations under the DIP Documents superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

### 3. The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens

47.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienhonders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).

48.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including, without limitation:

(a)     whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

(b)     whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c)     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

> (d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., Ames Dep't Stores, 115 B.R. at 37–39; Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); Farmland Indus., 294 B.R. at 862–79, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); Barbara K. Enters., 2008 WL 2439649 at *10; see also 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008). The DIP Documents satisfy each of these factors.

49. First, as described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing the Debtors require. The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

50. Second, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the Postpetition Facilities and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases, and may be required to immediately shut down their operations, which will threaten the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

51. Third, upon entry of the Final DIP Order, the DIP Facility will provide the Debtors with access to $175 million in postpetition financing, which the Debtors and their

advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. Further, the DIP Facility provides the Debtors with use of the Cash Collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings. Accordingly, the terms of the Prepetition Financing Agreements are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

52.     _Fourth_, as described in greater detail above and in the Bojmel Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

53.     _Fifth_, as described below, the Debtors will provide adequate protection for certain of the Prepetition Secured Lenders' interests in the Prepetition Collateral in a manner consistent with the terms agreed to by such parties pursuant to the Intercreditor Agreement and the First Lien Credit Agreement, respectively, and that certain Plan Support Agreement, dated as of May 16, 2010, by and between the Debtors and the Plan Sponsors.

**4.      The Interests of the Prepetition Secured Lenders Are Adequately Protected**

54.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. _See_ 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of

interest, or granting of replacement liens or administrative claims. See, e.g., In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

55. The Adequate Protection summarized above and set forth in the DIP Orders is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code. And significantly: (a) the First Lien Agent has consented to the Adequate Protection to be provided to the First Lien Term Loan Lenders pursuant to the applicable provisions of the First Line Credit Agreement; and (b) the Second Lien Agent has consented to such treatment according to the terms of the applicable provisions of the Intercreditor Agreement. Accordingly, the Court should find that the Adequate Protection Obligations are fair and reasonable, and satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.      The Debtors Should be Authorized to Use the Cash Collateral**

56. Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

57.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.   First, pursuant to the DIP Documents, the Prepetition Agent and the DIP Lenders have consented to the Debtors' use of the Cash Collateral. In addition, the First Lien Term Loan Lenders and Second Lien Agent has effectively consented to the use of the Cash Collateral according to the terms of the First Lien Credit Agreement and the Intercreditor Agreement.   <u>See</u> First Lien Credit Agreement at § 6.8(a); Intercreditor Agreement at § 6.1.

58.     Second, the Prepetition Secured Lenders' interests in the Cash Collateral are adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.[11]   As described above, the Debtors are providing certain of the Prepetition Secured Lenders with the Adequate Protection Obligations, which are fair and reasonable, and adequately protect the Prepetition Secured Lenders' interests in the Prepetition Collateral from diminution caused by the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the terms thereof. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.   In addition, the First Lien Term Loan Lenders are prohibited from objecting to the use of Cash Collateral because the ABL Lenders have consented to such use on the terms provided herein.   <u>See</u> First Lien Credit Agreement at § 6.8(a). Similarly, the Second Lien Lenders cannot object to the use of Cash Collateral because the ABL Lenders have consented to such use.  <u>See</u> Intercreditor Agreement at § 6.1.

---

[11]   The Debtors are not aware of any entity other than the Debtors and the Prepetition Secured Lenders that has or purports to have an interest in the Cash Collateral.

K&E 16239413

**C.     The Debtors Should be Authorized to Pay the Fees Required
          by the DIP Lenders and Honor Obligations Under the Commitment Letter**

59.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the Postpetition Facilities. Specifically, the Debtors will pay to the DIP Lenders (a) certain up front and other arrangement fees in favor of certain of the DIP Lenders, (b) an administrative agency fee in favor of the DIP Agent, in each case as set forth in a confidential side letter, (c) a monthly fee in arrears for the unused portion of each Lender's commitment under the DIP Facility and (d) fees related to the Exit Facility.  In addition, prior to the Petition Date, the Debtors entered into the Commitment Letter, which formalized the DIP Lenders' commitment to provide the DIP Facility provided that the Debtors fulfilled certain obligations, including seeking Court approval to pay the fees described above.  The Commitment Letter also contains the DIP Lenders' obligation to provide the Exit Facility, subject to the payment of fees related to the Exit Facility and certain other obligations on behalf of the Debtors.

60.     The fees the Debtors have agreed to pay to the DIP Lenders and other obligations under the Commitment Letter, together with the other provisions of the DIP Financing Agreements, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the Postpetition Facilities available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the Postpetition Facilities and the commitment from the DIP Lenders to provide the Exit Facility, is in the best interests of the Debtors' estates, creditors and other parties in interest.

K&E 16239413

61.     Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates.[12]     See, e.g., In re The Reader's Digest Assoc., No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. August 4, 2009) (approving 5.0% up front fee and a 1.0% exit/conversion fee); In re Gen. Growth Prop., Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); In re Aleris Int'l. Inc., No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); In re Dura Auto. Sys., Inc., No. 06-11202 (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); In re DJK Residential, Inc., No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**D.     The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e)**

62.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

---

[12]   Because of the voluminous nature of the orders cited herein, they are not attached to the motion. Copies of these orders are available on request of the Debtors' counsel.

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

63.     As explained in detail herein and in the Bojmel Declaration and the Irion Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## E.     Modification of the Automatic Stay is Warranted

64.     The DIP Documents and the proposed Interim DIP Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court. The DIP Documents provide, however, that the DIP Lenders must provide the Debtors with five (5) business days prior written notice before

41

exercising any enforcement rights or remedies, which will allow the Debtors to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

65. Stay modification provisions of this sort are ordinary features of DIP facilities and, in the Debtors' business judgment, are reasonable under the circumstances. See, e.g., In re The Reader's Digest Assoc., No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009), In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. August 4, 2009); In re Gen. Growth Props. Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); In re Chemtura Corp., No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009); In re Wellman, Inc., No. 08-10595 (Bankr. S.D.N.Y. Apr. 7, 2008).

## F. The Debtors Require Immediate Access to the Cash Collateral and DIP Facility

66. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. See Ames Dep't Stores, 115 B.R. at 36.

67. The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to $35 million under the DIP Facility is not granted promptly after the Petition Date. The Debtors have no material source of liquidity other than the DIP Documents. To operate their business in the ordinary course, the Debtors require access to the DIP Facility to maintain operations and fund their cash management system to a level sufficient to support their business activities. However, substantially all of the Debtors' cash is subject to the dominion of

their prepetition lenders. Thus, the Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility. Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

68. The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. See, e.g., In re The Reader's Digest Assoc., No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (order approving postpetition financing on an interim basis); In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., No. 08-14679 (S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., No. 08-10595 (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

K&E 16239413

## Request for a Final Hearing

69.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 45 days after the Petition Date, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[13]   The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## Motion Practice

70.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

71.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## Notice

72.     Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to

---

[13]    The DIP Documents require that the Final DIP Order be entered no later than 45 days after the Petition Date.

Bankruptcy Rule 1007(d); (c) Bank of America, N.A., as administrative agent for the Debtors'

first lien credit facilities and proposed postpetition credit facility; (d) counsel to Wilmington

Trust FSB as administrative agent for the Debtors' second lien credit facility; (e) Bank of

America, N.A. and UBS AG as counterparties under certain ISDA Master Agreements dated as

of June 14, 2007, and June 20, 2007, respectively; (f) Wells Fargo Bank, N.A., as indenture

trustee for the Debtors' 10% senior notes due 2015; (g) counsel to the ad hoc group of the

Debtors' first lien term loan lenders; (h) counsel to certain of the Debtors' second lien lenders;

(i) the Internal Revenue Service; and (j) all parties known to have liens against the Debtors

appearing on a lien search.[14]   The Debtors submit that, in light of the nature of the relief

requested, no other or further notice need be given.

### No Prior Request

73.     No prior motion for the relief requested herein has been made to this or any other

court.

---

[14]   Out of an abundance of caution, the Debtors have served all the parties that appeared on a lien search.  The Debtors do not concede that any liens (whether contractual, possessory, common law, statutory or otherwise) appearing on such lien search are valid, and the Debtors expressly reserve the right to contest the priority, extent, validity or perfection or seek the avoidance of all such liens.

45

WHEREFORE, for the reasons set forth herein and in the Irion Declaration and the Bojmel Declaration, the Debtors respectfully request that the Court enter the DIP Orders as provided herein, granting the relief requested herein and such other and further relief as the Court deems appropriate.

New York, New York
Dated:  May 16, 2010

*/s/ Brian S. Lennon*

James H.M. Sprayregen, P.C.
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

Anup Sathy, P.C. (*pro hac vice* pending)
Ray C. Schrock (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

K&E 16239413

**Exhibit A**

**Proposed Interim DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                           :    Chapter 11

In re:                                          :

NEFF CORP., *et al.*,[1]                         :    Case No. 10-_____ (___)
                                  :
                       Debtors.     :    (Jointly Administered)
                                               :
------------------------------------------------------------- x

## INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND LETTERS OF CREDIT (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, AND (D) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion") dated May 16, 2010 of Neff Corp., as borrower ("Neff Corp.," or the "Parent Borrower"), Neff Holdings Corp. ("Holdings"), and other persons designated as credit parties (the "Credit Parties"), as such Credit Parties are listed on the signature pages of the DIP Agreement (as defined below), each as a debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases, pursuant to Bankruptcy Code §§ 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 362(c)(3), 364(d), and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001-2, seeking entry of an interim order (the "Interim Order"), *inter alia*:

          (i)         authorizing the Debtors to obtain senior secured post-petition financing on a super-priority basis (the "DIP Facility"), pursuant to the terms and conditions of that

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

certain Senior Secured Debtor-in-Possession Credit Agreement dated May 17, 2010 (as the same may be amended, supplemented, restated, or otherwise modified, the "DIP Agreement"), by and among the Credit Parties, Bank of America, N.A. ("Bank of America"), as agent, swingline lender, and L/C issuer (the "Agent") for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the Agent, the "DIP Lenders"), and Bank of America Securities LLC, Wells Fargo Capital Finance LLC ("Wells Fargo"), and GE Capital Markets, Inc. ("GE"), as joint lead arrangers and joint book runners, substantially in the form annexed as Exhibit C to the Motion;

(ii)     authorizing the Debtors (a) to execute and deliver the DIP Agreement and all other related documents (collectively with the DIP Agreement, the "DIP Documents"), (b) to honor that certain Commitment Letter dated as of April 9, 2009 (the "Commitment Letter") between the Debtors, the Agent, and the DIP Lenders signatory thereto,[2] and (c) to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)     granting an automatically perfected first-priority security interest and lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, on all DIP Collateral (as defined herein), whether now existing or hereafter acquired, of the Parent Borrower and the other Credit Parties that was unencumbered by any security interest or lien as of the Petition Date (as defined below);

---

[2]     For the avoidance of doubt, the Commitment Letter is one of the DIP Documents.

(iv)    granting an automatically perfected junior lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to Permitted Liens, as defined in the DIP Agreement (other than Permitted Liens in favor of the Pre-Petition Secured Parties, as defined in the DIP Agreement);

(v)    granting an automatically perfected first priority, senior priming lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to a valid and perfected lien securing all obligations owed to the Pre-Petition Secured Parties (as defined herein);

(vi)    granting, with respect to the obligations of the Parent Borrower and the other Credit Parties hereunder and under the other DIP Documents, an allowed administrative expense claim in each Bankruptcy Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses (subject to the Carve-Out) of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) or 726 thereof), but in all respects subject to the Carve-Out (as defined herein);

(vii)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the Agent's attorneys, advisers, accountants, and other consultants, and the reasonable legal expenses

of the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Agreement and DIP Documents;

(viii)      authorizing the use of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code and/or under the DIP Documents, as applicable), subject to the restrictions set forth in the DIP Documents, and providing adequate protection to certain of the Pre-Petition Secured Parties for any Diminution in Value of their interests in the Pre-Petition Collateral (each as defined herein) to the extent any pre-petition secured indebtedness remains outstanding;

(ix)      vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as limited pursuant hereto; and

(x)      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the Declaration of Mark Irion (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2, the Declaration of Ronen Bojmel in Support of the Motion, the exhibits attached thereto, the DIP Documents, and the evidence submitted at the interim hearing to consider the interim relief requested in the Motion (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On the date of the Motion (the "Petition Date"), each of the Debtors filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing these cases.

B. *Debtors-in-Possession*. The Debtors continue to operate their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

C. *Jurisdiction and Venue*. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for these cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D. *Committee Formation*. As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors (the "Committee") in these cases pursuant to Section 1102 of the Bankruptcy Code.

E. *Debtors' Stipulations*. After consultation with their attorneys and financial advisors, the Debtors (on behalf of and for themselves) admit, stipulate, acknowledge, and agree that:

(i) *First Lien Credit Facilities*. Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Holdings, as guarantor, Bank of America, as administrative agent (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), are parties to that certain Credit Agreement, dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement"). The First Lien Credit Agreement provides the Debtors with an asset-based credit facility (the "ABL," with the lenders thereunder, the "ABL Lenders") with $250.0 million of maximum availability. As of the Petition Date, approximately $153.3 million was outstanding under the ABL. The First Lien Credit Agreement also provides for an $87.9 million "last out" term loan (the "First Lien Term Loan," with the lenders thereunder, the "First Lien Term Loan Lenders"),[3] which First Lien Term Loan remains fully drawn as of the Petition Date. The ABL and the First Lien Term Loan (collectively, with the Swap Obligations (as defined herein), the "First Lien Credit Facilities") are secured by a first priority lien on substantially all of the Debtors' assets (subject to certain

---

[3] For the avoidance of doubt, the term "First Lien Lenders" includes both the ABL Lenders and the First Lien Term Loan Lenders.

exceptions with respect to real property) (the "Pre-Petition Collateral") pursuant to that certain First Lien Security Agreement between Neff Corp., certain of the Debtors as parties thereto, and Bank of America, as agent, dated as of May 31, 2007 (the "First Lien Security Agreement," and, together with the First Lien Credit Agreement, the "First Lien Credit Documents"). Pursuant to the First Lien Credit Documents, claims arising under the ABL are payable prior to claims arising under the First Lien Term Loan.

(ii) *Swap Obligations.* Neff Corp. is a party to two interest rate swaps with (i) Bank of America, pursuant to that certain ISDA 2002 Master Agreement dated June 14, 2007, as amended in that certain Amendment dated May 14, 2010, and (ii) UBS AG ("UBS," and, UBS and Bank of America together in their capacities as such, the "Swap Counterparties"), pursuant to that certain ISDA Master Agreement dated as of June 20, 2007. Obligations arising under the swaps (collectively, the "Swap Obligations") are secured to the same extent as obligations arising under the First Lien Credit Agreement pursuant to the liens granted under the First Lien Security Agreement. Under the First Lien Credit Documents, claims arising under the Swap Obligations are payable junior to claims arising under the ABL but are payable prior to claims arising under the First Lien Term Loan. As of the Petition Date, the Swap Obligations totaled approximately $22.4 million.

(iii) *Second Lien Term Loan.* Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantors, Wilmington Trust FSB, successor to Bank of America, as administrative agent (the "Second Lien Agent"), and the lenders party thereto (collectively, the "Second Lien Lenders," and together with the First Lien Lenders, the "Pre-Petition Secured Lenders")

are parties to that certain Credit Agreement, dated as of May 31, 2007 (the "Second Lien Credit Agreement").  The Second Lien Credit Agreement provides for a $290.0 million term loan, which remains fully outstanding as of the Petition Date (the "Second Lien Term Loan").  The Second Lien Term Loan is secured by a second priority lien on the Pre-Petition Collateral pursuant to a security agreement (the "Second Lien Security Agreement," and together with the Second Lien Credit Agreement, the "Second Lien Loan Documents") between Neff Corp. and the Debtors as parties thereto and the Second Lien Agent, dated as of May 31, 2007.

(iv)     *Intercreditor Agreement.*  On May 31, 2008, the applicable Debtors, the collateral agent under the First Lien Security Agreement (the "First Lien Collateral Agent"), and the collateral agent under the Second Lien Security Agreement (the "Second Lien Collateral Agent") entered into an agreement that, among other things, assigned relative priorities to claims arising under the First Lien Credit Facilities (including the Swap Obligations) and the Second Lien Term Loan (the "Intercreditor Agreement").

(v)     *Validity and Priority of Pre-Petition Indebtedness and Liens.*  After consultation with their attorneys and financial advisors, the Debtors, the First Lien Agent, and the Second Lien Agent acknowledge and agree that (a) the liens on the Pre-Petition Collateral granted pursuant to the First Lien Security Agreement and the Second Lien Security Agreement, respectively, are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including, without limitation, avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy

Code or applicable non-bankruptcy law; (b) subject to "Permitted Encumbrances" (as such term is defined and as set forth in the First Lien Credit Agreement), the liens granted pursuant to the First Lien Security Agreement are senior to all security interests and liens in the Pre-Petition Collateral; (c) the liens securing the Second Lien Term Loan are senior to all security interests and liens in the Pre-Petition Collateral, subordinated only to the liens granted pursuant to the First Lien Security Agreement and "Permitted Encumbrances" (as such term is defined and as set forth in the First Lien Credit Agreement); (d) the First Lien Credit Documents are valid and enforceable by the First Lien Lenders against each of the Debtors; (e) the obligations under the First Lien Credit Facilities and the obligations under the Second Lien Term Loan constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the First Lien Credit Documents and the Second Lien Loan Documents; (f) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the First Lien Credit Facilities or to any of the obligations under the Second Lien Term Loan exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the Pre-Petition Loan Documents or the Intercreditor Agreement; (g) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the First Lien Agent, the Second Lien Agent, the First Lien Lenders (including both the ABL Lenders and the First Lien Term Loan Lenders), and the Second Lien Lenders (collectively, the "<u>Pre-Petition Secured Parties</u>"), and/or any of the Pre-

Petition Secured Parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directs, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to Sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the First Lien Credit Documents or Second Lien Credit Documents (or the transaction contemplated thereunder), the obligations under the First Lien Credit Facilities and the Second Lien Term Loan, or the security interests and liens in the Pre-Petition Collateral; (h) as of the Petition Date, the obligations under the First Lien Credit Facilities constitute allowed, secured claims within the meaning of Section 506(c) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including, without limitation, attorneys' fees and related expenses, and other charges of whatever nature owing in respect thereof;[4] (i) the Debtors have waived, discharged, and released any right to challenge any of the obligations under the First Lien Credit Facilities, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, and/or any of their respective officers, directors, or employees; and (j) any payments made on account of the obligations under the First Lien Credit Facilities and the obligations under the Second

---

[4] Until the expiration of the Challenge Period (defined below), the amounts of obligations under the First Lien Credit Facilities and the Swap Obligations that are owing are subject to change to reflect contingent amounts that subsequently become liquidated.

Lien Term Loan to or for the benefit of the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties prior to the Petition Date were on account of amounts in respect of which the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties were oversecured, were payments out of the Pre-Petition Collateral in accordance with the Intercreditor Agreement, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(vi) *Cash Collateral*. The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Pre-Petition Collateral, constitutes cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code, of the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Agent, and the Pre-Petition Secured Parties.

(vii) *Default by the Debtors*. The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the First Lien Credit Documents and the Second Lien Loan Documents.

F. *First Lien Agent Consent to Adequate Protection*. The First Lien Agent has provided its consent to the adequate protection provided in paragraph 12.(iii) of this Interim Order.

G. *Findings Regarding the Post-Petition Financing*.

(i) *Request for Post-Petition Financing*. The Debtors seek authority (a) to enter into the DIP Facility on the terms described herein and in the DIP Documents and (b) to use cash collateral on the terms described herein and therein to administer their Cases and fund their operations. At the Final Hearing, the Debtors will seek final

approval of the proposed post-petition financing arrangements and use of cash collateral arrangements pursuant to a proposed final order, which proposed final order shall be in accordance with the DIP Documents (the "Final Order"), and notice of the Final Hearing will be provided in accordance with this Interim Order.

(ii)     *Priming of Certain Pre-Petition Liens.*   The priming of the liens of the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties on the Pre-Petition Collateral, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.   But, the First Lien Agent and certain of the Pre-Petition Secured Parties, subject to the terms of the First Lien Credit Documents and the Intercreditor Agreement, are entitled to receive adequate protection as set forth in this Interim Order pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any diminution in the value of each of their respective interests in the Pre-Petition Collateral (including cash collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the Pre-Petition Liens, and the subordination to the Carve-Out and the DIP Liens (as defined herein) (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(iii)     *Need for Post-Petition Financing and Use of Cash Collateral.*   The Debtors' need to use cash collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of

their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers and customers to pay their employees and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of cash collateral.  Without the ability to access the DIP Facility or cash collateral,  the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of cash collateral.

(iv)      *No Credit Available on More Favorable Terms.*   Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.   The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims and liens, and (c) the other protections set forth in this Interim

Order. The DIP Lenders would be unwilling to provide financing under the DIP Facility absent the requirements that (i) after entry of the Interim Order proceeds of cash collateral, other than loans made under the DIP Facility, be used to reduce the ABL on a permanent basis until repaid in full; and (ii) immediately upon entry of the Final Order, proceeds of the DIP Facility be used to repay the remaining amounts outstanding under the ABL.

(v)     *Adequacy of the Budget.* As set forth in the DIP Documents, the Debtors have prepared and delivered an initial budget (the "Agreed Budget"), to the Agent and DIP Lenders. Such Agreed Budget has been thoroughly reviewed by the Debtors, their management and their advisors. The Agreed Budget is adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Agreed Budget. Such Agreed Budget may be updated from time to time in accordance with Section 4.1(e)(ii) of the DIP Agreement.

H.     *Sections 506(c) and 552(b).* In exchange for (i) the Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the First Lien Agent's, the Second-Lien Agent's, and the Pre-Petition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out and the DIP Liens, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties shall each receive, subject to the entry of the Final Order, (i) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

I.     *Good Faith of the Agent and the DIP Lenders.*

(i)     *Willingness to Provide Financing.*  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to (a) the entry by this Court of this Interim Order and the Final Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e).*  The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents as they relate to the Interim Financing (as defined herein), and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility and the use of cash collateral were negotiated in good faith and at arms' length among the Debtors, the Agent, the DIP Lenders and the First Lien Agent.  The use of cash collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the Agent and the DIP Lenders are therefore entitled

to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

J.     *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including, (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iv) counsel to the First Lien Agent for itself and for the Pre-Petition First Lien Lenders; (v) counsel to the *ad hoc* group of the First Lien Term Loan Lenders; (vi) counsel to the Second Lien Agent for itself and for the Pre-Petition Second Lien Lenders; (vii) counsel to the indenture trustee under that certain 10% senior notes indenture, (viii) counsel to the Agent for itself and for the DIP Lenders; (ix) all parties holding security interests in any of the Debtors' assets; (x) counsel to GE; and (xi) counsel to Wells Fargo. The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>Interim Financing Approved</u>. The Interim Financing (as defined herein) is authorized and approved, and the use of cash collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.     <u>Objections Overruled</u>. All objections to the Interim Financing (as defined herein) and/or the entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

3. <u>Authorization of the DIP Financing</u>. The DIP Facility and the DIP Documents are hereby approved for the Interim Financing. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, to incur and to perform the DIP Obligations (as defined herein) in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, including, without limitation, with regard to the proposed exit financing contemplated in the DIP Documents, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Agreement and other of the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4. <u>Authorization to Borrow</u>. During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to request extensions of credit pursuant to the terms herein and the terms of the DIP Documents (the "<u>Interim Financing</u>").

5.     DIP Obligations.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, the other DIP Documents, and this Interim Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in these cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the Agent or to any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.     Post-Petition Liens.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition priming, first-priority security interests in and liens upon (collectively, the "DIP Liens") each of the Credit Parties' right, title, and interest in, to, and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Parties (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Credit Parties, and

regardless of where located (all of which being hereinafter collectively referred to as the "DIP Collateral"),[5] as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the DIP Obligations, including (as each such term is defined in the DIP Agreement) (i) all Accounts; (ii) all Chattel Paper; (iii) all Documents; (iv) all General Intangibles (including Payment Intangibles and Software); (v) all Goods (including Inventory, Equipment, Fixtures, and Titled Collateral); (vi) all Instruments; (vii) all Investment Property; (viii) all Deposit Accounts; (ix) all money, cash, or Cash Equivalents; (x) all Supporting Obligations and Letter-of-Credit Rights; (xii) the Commercial Tort Claims described on Schedule 8.1(a) to the DIP Agreement and on any supplement thereto received by the Agent pursuant to Section 8.5(a)(ix) of the DIP Agreement; and (xiii) to the extent not otherwise included, all proceeds of the DIP Collateral (including, subject to entry of the Final Order, any proceeds or property recovered in respect of Avoidance Actions or causes of action under Chapter 5 of the Bankruptcy Code), tort claims, insurance claims, and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing; *provided*, *however*, that "DIP Collateral" shall not include, nor shall security interests granted under Section 8.1(a) of the DIP Credit Agreement, or attach to, any Excluded Property (as defined in the DIP Agreement); and *provided*, *further*, that if and when any property shall cease to be Excluded Property, immediately at and from such time, the DIP Collateral shall include, and the security interest granted by each Credit Party shall attach to, such property.

---

[5]     For the avoidance of doubt, the DIP Collateral includes the Pre-Petition Collateral.

7.     _DIP Lien Priority._  Except as provided under _Section 8.1(a)_ of the DIP Agreement, the DIP Liens securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the DIP Collateral, but shall be subject to the Carve-Out in all respects.  The DIP Liens shall not otherwise be made subject to or _pari passu_ with any lien or security interest and shall be valid and enforceable against any trustee appointed in these cases or any Successor Cases, and/or upon the dismissal of any of these cases or Successor Cases.  Subject to entry of the Final Order, the DIP Liens shall not be subject to Sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

8.     _Superpriority Claims._  Subject to the Carve-Out, upon entry of this Interim Order, the Agent and the DIP Lenders are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (collectively, the "_DIP Superpriority Claim_") in each of these cases and any Successor Cases for all of the DIP Obligations,  (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of these cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; _provided_, _however_, that for purposes of this Interim Order, the DIP Superpriority Claim shall not attach to Avoidance

Actions or the proceeds thereof. Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject only to the Carve-Out.

9.     <u>Extension of Credit</u>.   The Agent and the DIP Lenders shall have no obligation to make any loan or advance, or to issue any letters of credit under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of such letter of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Agent in its sole discretion.

10.     <u>Use of DIP Facility Proceeds</u>.   From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents. A copy of an initial budget is annexed hereto as Exhibit 1. The Debtors are authorized to use the proceeds of the DIP Facility to make the adequate protection payments provided for in paragraph 12 of this Interim Order. Immediately upon entry of the Final Order, the Debtors shall use proceeds of the DIP Facility to repay the remaining amounts under the ABL on a permanent basis in accordance with the DIP Documents.

**Authorization to Use Cash Collateral and Adequate Protection**

11.     <u>Authorization to Use Cash Collateral</u>.   Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, the Debtors are authorized to use cash collateral in accordance with the DIP Documents and this Interim Order. For the avoidance of doubt, any cash collateral (other than proceeds of the DIP Facility prior to the entry of the Final Order) or proceeds from the Pre-Petition Collateral shall be applied to reduce the ABL on a permanent basis until repaid in full. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any cash collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, and the DIP Documents. Further, upon the occurrence of an

-21-

Event of Default (as defined herein and in the DIP Documents), the Debtors shall not seek to use cash collateral over the objection of the Agent.

12.     <u>Adequate Protection</u>.

(i)     To the extent not rolled up by the DIP Facility, and subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the ABL, the ABL Lenders shall receive (a) payment in cash on a monthly basis of all interest accruing on the ABL at the non-default contract rate until the ABL is paid in full; (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Agent (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any) no later than 10 business days after invoices for such fees and expenses shall have been submitted to the Debtors; (c) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the ABL, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility; and (d) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the ABL, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors.

(ii)     Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the Swap Obligations during these cases, the Swap Counterparties shall receive (a) payment in cash on a monthly basis of all interest accruing on the Swap Obligations at a rate of 5.0% per annum based on the mark-to-market value of such claims of the Swap Counterparties as of the business date

immediately preceding the Petition Date (as determined in accordance with the contracts underlying the Swap Obligations or as otherwise agreed to in writing by the each of the applicable Swap Counterparties and the Debtors); (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Swap Counterparties (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any) no later than 10 business days after invoices for such fees and expenses shall have been submitted to the Debtors; (c) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the Swap Obligations, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and also shall be junior to the replacement liens provided as adequate protection to the ABL Lenders; and (d) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the Swap Obligations, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders.

(iii)      Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the First Lien Term Loan during these cases, the First Lien Term Loan Lenders shall receive (a) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the First Lien Term Loan, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and shall also be junior to

the replacement liens provided as adequate protection to the ABL Lenders and the Swap Counterparties; (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the *ad hoc* group of First Lien Term Loan Lenders (including the reasonable and documented out-of-pocket fees, costs and expenses of Stroock & Stroock & Lavan LLP ("Stroock") as its counsel, and Houlihan Lokey Howard & Zukin ("Houlihan") as its financial advisor) no later than ten business days after invoices (redacted to remove confidential or attorney-client privileged information) for such fees and expenses shall have been submitted to the Debtors, up to $475,000 per month so long as there is such a reserve for the amount of such professional fees accrued at such time, less the amount, if any, advanced to the relevant professionals or otherwise on retainer with such professionals, *provided*, that none of such fees and expenses of Stroock or Houlihan as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application; (c) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the First Lien Term Loan, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders and the Swap Counterparties; *provided*, that to the extent these cases include a plan of reorganization satisfactory to the Decision Agents for which an equity commitment letter satisfactory to the Decision Agents has been executed and which provides, *inter alia*, for the payment in full, in cash, of the First Lien Term Loan, the DIP

Lenders shall not oppose adequate protection payments in the form of cash payments on a monthly basis of all interest accruing on the First Lien Term Loan at the non-default contract rate; and (d) copies of the materials provided to the Agent in accordance with Section 4.1 of the DIP Agreement.

(iv)         Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the Second Lien Term Loan during these cases, the Second Lien Term Loan Lenders shall receive, in accordance with section 6.4(a) and (b) of the Intercreditor Agreement, (a) replacement liens only to the extent of post-petition Diminution in Value of the DIP Collateral securing the Second Lien Term Loan, including replacement liens on all unencumbered assets of the Debtors, which liens shall be junior to the liens of the First Lien Lenders under the First Lien Credit Documents, shall be junior to the liens of the DIP Lenders under the DIP Documents, and shall also be junior to the replacement liens provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders; and (b) superpriority administrative expense claims only to the extent of post-petition Diminution in Value of the DIP Collateral securing the Second Lien Term Loan, which claims shall be junior to the claims of the First Lien Lenders under the First Lien Credit Documents, shall be junior to the DIP Obligations, and shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders, and also shall be payable from and have recourse to all assets and property of the Debtors.  For the avoidance of doubt, all claims related to the adequate protection granted to the Second Lien Lenders pursuant

to this paragraph 12.(iv) are junior to (shall be paid after) all claims of the First Lien Lenders.

13.     Section 507(b) Reservation.   Nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate for any Diminution in Value of their respective interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral during these cases or any Successor Cases.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.     Amendment of the DIP Documents.  Except for actions expressly permitted to be taken by the Agent, no amendment, modification, termination, or waiver of any provision of the DIP Agreement or any other of the DIP Documents, or any consent to any departure by any of the Credit Parties therefrom, shall in any event be effective unless the same shall be in writing (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver) and (i) in the case of an amendment to cure any ambiguity, omission, defect or inconsistency, signed by the Agent and the Parent Borrower and (ii) in the case of any other amendment, modification, termination or waiver, signed by the Parent Borrower, the Agent and by the Requisite Lenders (as defined in the DIP Agreement), and to the extent required in the DIP Documents, Supermajority Lenders (as defined in the DIP Agreement) or all affected DIP Lenders.

15.     Budget Compliance.   Except as otherwise provided in the DIP Credit Agreement or approved by the Agent and the Requisite Lenders, the Credit Parties will not, and will not permit any subsidiary to directly or indirectly, to use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents and this Interim Order.

16.	_Modification of Automatic Stay_.  The automatic stay imposed by Section 362(a) of the Bankruptcy Code is hereby modified to permit (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claim, and to perform such acts as the Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens, (ii) the Debtors to take all appropriate action to grant the adequate protection set forth in paragraph 12.(i)-(iv), above (the "_Replacement Liens_"), and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (iii) the Debtors to incur all liabilities and obligations to the Agent as contemplated under the DIP Agreement and the other DIP Documents, (iv) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order, and (iv) the implementation of the terms of this Interim Order.

17.	_Perfection of DIP Liens and Adequate Protection Liens_.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Replacement Liens, or to entitle the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the Agent, the First Lien Agent, and the Second Lien Agent each are authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable

non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Agent all such financing statements, mortgages, notices, and other documents as the Agent may reasonably request. The Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

18.     <u>After-Acquired Property</u>. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all DIP Collateral pledged or otherwise granted to the Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

19.     <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with enlarged powers, or any  responsible officer subsequently appointed in these cases or any Successor Cases, shall obtain credit or incur debt pursuant to Sections 364(b), (c), or (d)

in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then all of the cash proceeds derived from such credit or debt shall (i) immediately be turned over first to the Agent and (b) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the First Lien Agent and the Second Lien Agent, as applicable, to satisfy outstanding pre-petition secured indebtedness in accordance with the Pre-Petition Loan Documents and the Intercreditor Agreement.

20. <u>Maintenance of DIP Collateral</u>. Until the indefeasible payment in full of all DIP Obligations, all Pre-Petition Indebtedness in accordance with the Pre-Petition Loan Documents and the Intercreditor Agreement, the cancellation, backing, or cash collateralization of letters of credit under the DIP Facility, and the termination of the Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility and the Pre-Petition Loan Documents, as applicable and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

21. <u>Insurance Policies</u>. Upon entry of this Interim Order, the Agent and DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.      Disposition of DIP Collateral.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the Decision Agents (and no such consent shall be implied from any other action, inaction or acquiescence by the Agent or the DIP Lenders), except as otherwise provided for in the DIP Documents.

23.      Events of Default.  The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents.

24.      Rights and Remedies Upon Event of Default.  Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the sixth business day after the date Agent files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "Default Notice Period"), the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the Agent to take any and all actions, as if no case were pending under the Bankruptcy Code; *provided*, that the sole basis on which the Debtors can contest the automatic lifting of the automatic stay pursuant to this paragraph is on the grounds that an Event of Default has not occurred.  The Debtors and other parties-in-interest may request an expedited hearing on any motion seeking such a finding, and the Agent and Pre-Petition Secured Parties shall consent to such expedited hearing.  In the event the automatic stay is lifted in accordance with this paragraph, any further order of this Court authorizing (i) the use of cash collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtors in which the Agent or any of the DIP Lenders has an interest, or (ii) under Section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by the Agent or which is entitled to priority

administrative status which is equal or superior to that granted to the Agent for the benefit of the DIP Lenders or the Pre-Petition Lenders, as the case may be, shall be prohibited. The Debtors and/or the Committee shall have the initial burden of proof at any hearing with respect to whether an Event of Default has occurred. In accordance with <u>Section 6.2</u> of the DIP Agreement, upon the occurrence of any Event of Default, the Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans under the DIP Facility shall become due and payable in accordance with <u>Section 6.3(b)</u> of the DIP Agreement. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in <u>Section 6</u> of the DIP Agreement.

25.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. The Agent, the DIP Lenders, the First Lien Agent, and the Second Lien Agent have acted in good faith in connection with the Interim Financing and with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and/or the Pre-Petition Secured Parties arising prior to

the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

26.     DIP and Other Expenses.  The Debtors are authorized and directed to pay all reasonable out-of-pocket expenses of the Agent and the DIP Lenders in connection with the DIP Facility, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination and monitoring fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses.  Payment of all such fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines; however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its fee and expense statements (redacted to remove confidential or attorney-client privileged information) to the U.S. Trustee and counsel for the Committee contemporaneously with the delivery of such fee and expense statements to the Debtors.  To the extent that the U.S. Trustee or the Committee has an objection to the fees and expenses of any such professional, they shall be afforded 10 days after receipt of such fee and expense statement to raise a specific objection, including quantification of the disputed amount, with the applicable professional.

27.     Indemnification.  The Debtors shall indemnify and hold harmless the Agent,  the DIP Lenders, and their respective shareholders, directors, agents, officers, subsidiaries, and affiliates, successors and assigns, attorneys, and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments,

obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the Agent's and any of the DIP Lenders' exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the Agent and the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

28. <u>Proofs of Claim</u>. The Agent, the DIP Lenders, and the First Lien Agent shall not be required to file proofs of claim in any of these cases or Successor Cases for any claim allowed herein. Any proof of claim filed by the Agent and the First Lien Agent shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the Agent, the DIP Lenders and the First Lien Agent.

29. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Agent and the DIP Lenders under the DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the Agent reasonable access to the Debtors' premises and their books and records in accordance with

the DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the Agent (and so long as an Event of Default has occurred and is continuing, each of the DIP Lenders) all such information as may be reasonably requested with respect to the business, results of operations, and financial condition any of the Credit Parties.

30. <u>Access to Collateral/No Landlord's Liens</u>. Upon entry of a Final Order providing for such relief and subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent, for the benefit of the DIP Lenders, contained in this Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the Agent may, subject to any separate agreement by and between such landlord and the Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; *provided*, that, subject to such Separate Agreement, the Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent, calculated on a per diem basis. Nothing herein shall require the Agent to assume any lease as a condition to the rights afforded to the Agent in this paragraph.

31. <u>Carve-Out</u>.

(i) For the purposes of this Interim Order, the "Carve-Out" shall mean the sum of (a) accrued but unpaid professional fees, costs, expenses, and disbursements (the "<u>Professional Fees</u>") incurred by the Debtors and the Committee (the "<u>Professional Persons</u>") appointed in these cases at any time before or on the first business day following delivery by the Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (it being understood that amounts accrued under this clause (a) shall be reported to the Agent in accordance with the DIP Documents; (b) after the first business day following delivery by the Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by this Interim Order, procedural order, or otherwise, the payment of the Professional Fees, only to the extent all such fees or disbursements set forth in this clause (b) do not exceed an aggregate amount of $2,000,000 (such amount, the "<u>Carve-Out Trigger Notice Cap</u>"); (c) United States Trustee fees, pursuant to 28 U.S.C. § 1930; and (d) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $100,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement, or compensation sought by any of the Professional Persons. For purposes hereof, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by the Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following termination of the commitments under the DIP Facility.

(ii)     For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) securing the DIP Obligations, the Debtors' pre-petition obligations, the Replacement Liens, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) securing the DIP Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted herein or pursuant to the DIP Documents to the DIP Lenders.

(iii)     No portion of the Carve-Out, any cash collateral, or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in (a) challenging, or in relation to the challenge of, (y) any liens or claims of the First Lien Lenders or (z) the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any of the Pre-Petition Secured Parties, including any causes of action under Chapter 5 of the Bankruptcy Code or state law, or (b) bringing or asserting any claims or causes of actions against the Pre-Petition Lenders or the DIP Lenders under the Pre-Petition First Lien Credit Agreement or the DIP Facility (as the case may be), or their respective advisors, agents (including the Agent), including formal discovery proceedings in anticipation thereof, and/or challenging any Lien (as such term is defined in the Pre-Petition First Lien Credit Agreement) of the Pre-Petition Lenders under the Pre-Petition First Lien Credit Agreement.   No more than $50,000 in the aggregate of the Carve-Out, any cash

collateral, or proceeds of the DIP Facility may be used to investigate claims and/or liens of the Pre-Petition Lenders under the Pre-Petition First Lien Credit Agreement.

32. <u>Payment of Compensation</u>. So long as an unwaived Event of Default has not occurred, and to the extent permitted under the DIP Documents, the Debtors shall be permitted to pay fees and expenses allowed and payable, as applicable, by any interim, procedural, or final order of this Court (that has not been vacated or stayed, unless the stay has been vacated) under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable.

33. <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>. Any party (other than the Debtors, which have waived all such rights), including the Committee, if appointed, must commence, as appropriate, a contested matter or adversary proceeding raising any objection or challenge (a "<u>Challenge</u>") with respect to any claim, security interest, or any other rights of the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties under the First Lien Credit Documents or the Second Lien Loan Documents, as applicable, including, without limitation, in the nature of a setoff, counterclaim, or defense on or before sixty (60) calendar days following the date of entry of the Final Order (the "<u>Challenge Period</u>"). The Challenge Period may only be extended with the prior written consent of the Decision Agents. Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge, (a) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (b) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the First Lien

Agent's, Second Lien Agent's, and/or the Pre-Petition Secured Parties' claims, liens, and interests, of any nature, under the First Lien Credit Documents and the Second Lien Loan Documents, respectively, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (c) the liens granted pursuant to the First Lien Security Agreement shall be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (d) without further order of the Court, the obligations under the First Lien Credit Documents shall be allowed as fully secured claims within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with these cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, or otherwise. If a Challenge is properly asserted during the Challenge Period, parties to that litigation will be bound by any consensual settlement thereof or a final order of the Court that ultimately determines the merits of such Challenge. Nothing in this Interim Order vests or confers on any person, including the Committee or any other statutory committee that may be appointed in these cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

34. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

35.     Section 506(c) Claims.  Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties or any of their respective claims, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

36.     Section 552(b).  The First Lien Agent shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the First Lien Agent (on behalf of itself and the First Lien Lenders), with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral.

37.     No Marshaling/Application of Proceeds.  The Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents.

38.     Right to Credit Bid.  The DIP Lenders shall have the right to "credit bid" the amount of their claims during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or

included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

39.     <u>Joint and Several Liability</u>.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

40.     <u>Discharge Waiver</u>.    The DIP Obligations and the Pre-Petition Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the Agent) on or before the effective date of such confirmed plan of reorganization.    None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the Agent) on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

41.     <u>Rights Preserved</u>.    Notwithstanding anything herein to the contrary, the entry of  this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the Agent's, the DIP Lenders', the First Lien Agent's, the Second Lien Agent's, or the Pre-Petition Secured Parties' right, subject to the First Lien Credit Agreement and the Intercreditor Agreement, to seek any other or supplemental relief in respect of the Debtors; (b) subject to the First Lien Credit Agreement and the Intercreditor Agreement, any of the rights of

any of the Agent, the DIP Lenders, the First Lien Agent, and/or the Pre-Petition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of any of these cases or Successor Cases, conversion of any of these cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans of reorganization; or (c) subject to the First Lien Credit Agreement and/or the Intercreditor Agreement, any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the Agent, DIP Lenders, First Lien Agent, Second Lien Agent, and the Pre-Petition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

42.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the First Lien Credit Documents, the Second Lien Loan Documents, the Intercreditor Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, the Indenture Trustee, the Committee, or any party-in-interest.

43.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, all other creditors of the Debtors, the Committee, any other committee appointed in these cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

44.     <u>Effect on Certain Pre-Petition Agreements</u>.  Except as specifically set forth in this Interim Order, the terms and conditions, validity, and enforceability of the First Lien Credit Documents, the Second Lien Loan Documents, and the Intercreditor Agreement shall not be affected by this Interim Order.

45.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

46.     <u>No Right to Seek Modification</u>.  Unless requested by the Agent, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior consent of the Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the Agent or the DIP Lenders.

47.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these cases, (ii) converting any of these cases to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing any of these cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these cases or Successor Cases.  The

terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full or, with respect to letters of credit, all such letters of credit under the DIP Facility shall have been cancelled or cash collateralized or other arrangements satisfactory to the issuer of such letters of credit in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated, (ii) in respect of the First Lien Credit Facility, all of the Pre-Petition Obligations pursuant to the First Lien Credit Documents and this Interim Order, have been indefeasibly paid in full, and (iii) in respect of the Second Lien Term Loan, all of the Second Lien Loan Obligations and this Interim Order have been indefeasibly paid in full, subject to the Intercreditor Agreement. The terms and provisions concerning the indemnification of the Agent and the DIP Lenders shall continue in these cases, in any Successor Cases, following dismissal of these cases or any Successor Cases, termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

48. <u>Waiver of Applicable Stay</u>. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

49.     Final Hearing.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2010 at ___:___ a.m. before the Honorable _____, United States Bankruptcy Judge, in Courtroom ____ at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004.  On or before _____, 2010, the  Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on (a) the parties having been given notice of the Interim Hearing, (b) any party which has filed prior to such date a request for notices with this Court, (c) counsel for the Committee (once designated), and (d) the Internal Revenue Service.  The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, 2010 at 4:00 p.m. (prevailing Eastern time), which objections shall be served so as to be received on or before such date on (i) counsel to the Debtors, attn: James H.M. Sprayregen, Esq. and Brian S. Lennon, Esq., Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022; (ii) counsel to the Committee; (iii) counsel to the Agent, attn:  Joel H. Levitin, Esq. and Michael R. Carney, Esq., Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005; (iv) counsel to the *ad hoc* group of First Lien Term Loan Lenders, attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq., Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038; (v) counsel to Wells Fargo, attn: Jesse H. Austin III, Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308; and (vi) counsel to GE, attn: Michael C. Rupe, Esq., King & Spalding, 1185 Avenue of the Americas, New York, New York 10036; counsel to Wells

Fargo, attn: Jesse H. Austin III, Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308.

50. *Nunc Pro Tunc* Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

51. Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

SO ORDERED by the Court this _____day of _____, 2010.

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Bojmel Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-_____(____) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF RONEN BOJMEL IN SUPPORT OF THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND LETTERS OF CREDIT (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, AND (D) SCHEDULING A FINAL HEARING

I, Ronen Bojmel, Managing Director of Miller Buckfire & Co., LLC, ("Miller Buckfire"), hereby declare under penalty of perjury:

1.      The DIP Motion seeks approval of a $175 million postpetition financing facility on a superpriority administrative claim and first priority priming lien basis (the "DIP Facility"), pursuant to that certain credit agreement dated as of May 16, 2010, a copy of which is attached to the DIP Motion as **Exhibit C**, (the "DIP Agreement"), by and among Neff Corp., as borrower, and certain other Debtors as co-borrowers and guarantors (collectively, the "Loan Parties"), Bank of America, N.A., as administrative agent (the "DIP Agent"), and certain lenders from time to time party thereto (collectively, in their capacities as such, the "DIP Lenders").  It is also my

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

understanding, that the DIP Motion seeks authority allowing the Debtors to use the Prepetition Secured Parties' cash collateral ("Cash Collateral").

2.     The statements in this Declaration are, except where specifically noted, based on either my personal knowledge or opinion, on information received from the Debtors' management, advisors, or employees of Miller Buckfire working directly with me or under my supervision, or from the Debtors' records maintained in the ordinary course of their business. I am not being compensated specifically for this testimony other than through payments received by Miller Buckfire as a professional proposed to be retained by the Debtors.

3.     As noted above, I am a Managing Director at Miller Buckfire, a financial advisory and investment banking firm, and the proposed financial advisor and investment banker in the Debtors' chapter 11 cases. Prior to joining Miller Buckfire in 2002, I was formerly a member of the financial restructuring group of Dresdner Kleinwort Wasserstein since 1996. Accordingly, I have more than a decade of experience in providing financial advisory services to distressed companies like the Debtors, including, among others: General Growth Properties, Simmons Bedding Company, Questex Media Group, Inc., Standard Pacific Corp., Foamex, JL French, Autocam, Progressive Moulded Products, Vulcan on Charter Communications, Grupo TMM, Independence Air, Brokat, Crown Cork & Seal, Telenet, Gilat Satellite Networks, CRIIMI MAE, and Avianca. I have also represented companies in various leveraged finance and M&A transactions involving Philip Morris Companies, Inc., Rohm & Haas Co., Imax Corporation, Power Bar, Inc., Washington Homes, Inc., BCP Management, Anvil Knitwear, Nortek Inc., Casino Magic, Keystone Consolidated Industries, and Shoppers Food Warehouse Corporation. In addition, I have been recognized by the Turnaround Management Association,

receiving the first place award in the mid-size company transaction category in 2004 for the Grupo TMM restructuring.

4.        Since June 2009, I and other professionals of Miller Buckfire have rendered various financial advisory and investment banking services to the Debtors, including, but not limited to, the following: (a) familiarizing ourselves with the Debtors' assets and operations; (b) analyzing the Debtors' current liquidity and projected cash flows; (c) reviewing the Debtors' five year business plan and aided in the preparation of related presentation materials; (d) preparing various analyses regarding the Debtors' liquidity and debt capacity; (e) examining and assisted in the implementation of potential restructuring alternatives; (f) assisting the Debtors in negotiating with the agent for the prepetition revolving credit facility for additional liquidity through a reduction of the reserve amount placed on the Debtors' borrowing base for liabilities related to its swaps; (g) coordinating, participating in, and preparing presentation materials for meetings with the Debtors' board of directors, regular meetings of the Restructuring Advisory Committee, and the various parties in interest regarding both in-court and out-of-court alternatives; (h) assisting the Debtors in negotiating confidentiality agreements, gathering and developing due diligence information, organizing and participating in due diligence meetings and conference calls with parties in interest and their respective advisors; (i) preparing marketing materials for purposes of conducting a new money investment/sale process and alternative debt capital raise; (j) assisting the Debtors in the identification of potential alternative debt and equity financing sources; (k) engaging in negotiations with the Debtors' stakeholders and sponsors regarding the terms of a potential balance sheet restructuring and new money investment; (l) providing financial advice and assistance to the Debtors in negotiating, structuring, and effecting the proposed debtor in possession financing and exit financing;

K&E 15735904

(m) advising the Debtors in connection with various agreements necessary to launch the pre-arranged bankruptcy process, including: restructuring support agreements, financing commitment letters, backstop commitment letters, and the Debtors' prearranged plan of reorganization and disclosure statement; and (n) assisting the Debtors and their advisors with developing the process and procedures for a chapter 11 filing. Accordingly, I am familiar with the Debtors' liquidity needs, efforts to obtain postpetition financing, and the negotiations culminating in execution of the DIP Agreement with the DIP Lenders. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## A. The Debtors' Liquidity Needs and Their Immediate Need for Relief

5. Over the past year, a series of events have placed a significant strain on the Debtors' liquidity and ability to service their highly leveraged capital structure, ultimately leading to the filing of the chapter 11 cases. Non-residential construction activity, a key driver of the Debtors' revenues, is experiencing a cyclical downturn. Customer demand and equipment rental volumes have declined significantly since 2007. The effects of reduced demand have, in turn, been exacerbated by rental rate reductions across the equipment rental industry. Widespread rental equipment sell-offs also have lowered equipment values, causing an adverse drop in the level at which the Debtors can borrow against their rental fleet and severely restricting their available liquidity.[2] Availability under the Company's prepetition credit facilities has been further reduced by a swap reserve. Lastly, the Company has a relatively fixed cost structure that made it difficult to reduce costs at the same pace as the aforementioned

---

[2] The facts and circumstances regarding the Debtors' operations and the events leading to the commencement of these chapter 11 cases are set forth more fully in the Declaration of Mark Irion (A) In Support of Debtors' Chapter 11 Petitions and First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2, filed contemporaneously herewith.

decline in revenue. All of the aforementioned factors have resulted in the Debtors' being unable to support the leveraged balance sheet and significant debt service obligations.

6. Specifically, a report dated March 30, 2010, from the Debtors' independent auditor contained a "going concern" qualification relating to the Debtors' financial position for the periods ended December 31, 2009 and 2008. Such "going concern" qualification resulted in an event of default under the Debtors' First Lien Credit Agreement, which is the Debtors' primary source of liquidity. Additionally, due to liquidity limitations, the Debtors have not made interest payments on their Second Lien Term Loan in either January or April 2010. A missed interest payment under the Second Lien Term Loan triggers and event of default under the First Lien Credit Agreement. The Debtors received a waiver from the ABL Lenders and Swap Counterparties for the January interest payment, and received a temporary waiver for the April interest payment. The temporary waiver expired on May 14, 2010.

7. Prior to the Petition Date, the Debtors and their advisors considered multiple restructuring alternatives to reduce leverage and align the Debtors' capital structure with their current operating environment. In particular, Miller Buckfire analyzed the Debtors' near-term liquidity position to determine the liquidity necessary for the Debtors to maintain business operations during a restructuring under chapter 11. In undertaking this analysis, Miller Buckfire adopted a conservative approach while analyzing the Debtors' operating cash flows, working capital needs, and the impact of the current economic outlook on the Debtors' near-term financial performance. As part of Miller Buckfire's financial analysis and projections, Miller Buckfire also reviewed and analyzed a 13-week cash flow forecast (the "Initial Cash Flow Budget") attached hereto as **Exhibit 1**, which was prepared by the Debtors with the assistance of

Alix Partners and which takes into account the Debtors' anticipated cash receipts and disbursements during that time.

8.     Absent approval of the DIP Facility and the Debtors' use of Cash Collateral as set forth in the DIP Motion, an Initial Cash Flow Budget indicates that the Debtors' current cash on hand and cash generated from their postpetition operations will be insufficient to continue operating their business during their chapter 11 cases. As set forth more fully in the First Day Declaration, the Debtors' prepetition asset based lending facility (the "ABL") incorporates a "lockbox" arrangement under which customer receipts are automatically applied to the Debtors' outstanding balance under the ABL if availability falls below $35.0 million. Availability, in turn, is determined by reference to the appraised value of the Debtors' rental equipment, accounts receivable and parts inventory. Based on the Debtors' semiannual equipment appraisal conducted as of March 31, 2009, the Debtors determined that their availability as of April 30, 2009 was $21.1 million, triggering the lockbox. As a result, the Debtors have had limited cash on hand since April 2009, and the ABL has been the Debtors' primary source of liquidity since that time. Thus, without immediate interim access to the DIP Facility, I believe the Debtors likely will have to severely curtail—if not terminate—their business operations which will severely impact the going-concern value of their business to the detriment of creditors, employees, and other parties in interest.

9.     It is my opinion that the Debtors have a need for additional liquidity which can only be obtained through the DIP Facility. The DIP Facility will allow the Debtors to continue operations in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the going-concern value of the Debtors' business.

Accordingly, I believe the Debtors must be granted authority to use Cash Collateral and to obtain DIP Financing in light of the immediate and irreparable harm the Debtors' estates will suffer if they are unable to sustain their business as a going concern.

**B. The Debtors' Efforts to Obtain Postpetition Financing**

10.     In light of the Debtors' imminent liquidity needs, commencing in October 2009, the Debtors and their advisors entered into extensive, arm's length negotiations with the First Lien Agent and certain prepetition lenders regarding the terms of potential debtor in possession financing to ensure that they have sufficient liquidity to continue operations and to preserve the value of their estates.

11.     In addition, commencing in November 2009 the Debtors, through Miller Buckfire, contacted a universe of approximately 13 other institutions, hedge funds, and traditional DIP lenders on a "no names" basis to gauge their interest in providing debtor in possession financing.[3] The potential lenders were informed of the Debtors' liquidity needs and the Debtors' desire to obtain postpetition financing either through a "take out" of the Debtors' existing prepetition debt or on a junior basis. After negotiating customary confidentiality agreements and due diligence conducted by certain potential lenders, only three potential lenders/lender groups provided preliminary financing proposals: (a) the Debtors' ABL lenders; (b) a third party commercial lender; and (c) certain of the Debtors' First Lien Term Loan Lenders.

12.     The proposal received from the Debtors' existing ABL Lenders offered DIP financing on a senior basis as well as exit financing. The proposal from the third party

---

[3]     The universe of potential third party lenders was limited by the fact that many lenders with experience in the equipment rental space are already ABL Lenders.

commercial lender contained significantly less beneficial economic terms, provided the Debtors with less overall liquidity and contained requirements that the Debtors pay higher fees than the Debtors' existing ABL Lenders' proposed DIP Facility. In addition, the proposal did not incorporate an exit facility into its proposed financing structure. The proposal received from the First Lien Term Loan Lenders would have involved a complex "junior" DIP structure. Notably, the junior DIP proposal received from the Debtors' First Lien Term Loan Lenders would have effectively required certain consents from the Debtors' prepetition ABL Lenders as a condition to effectiveness and would not have provided the Debtors with committed exit financing. The relevant First Lien Term Loan Lenders eventually withdrew their proposal for DIP financing when they learned that the ABL Lenders were offering both DIP and exit financing. Moreover, in March and April 2010, the Debtors held an auction between, and negotiated with, two competing plan sponsors, both of whom secured financing through Bank of America, including the DIP Facility and Exit Facility, on substantially similar terms.

13.     The Debtors, with the assistance of their advisors, have fully considered the various financing proposals received from the potential lenders and those proposed in connection with each potential plan sponsor's bid. Among other things, the Debtors and their advisors considered the potential availability provided by each proposal, the pricing and fees associated with each proposal, as well as the benefits associated with accepting a debtor in possession financing proposal coupled with committed exit financing. The Debtors and their advisors also considered the difficulties associated with implementing a "junior DIP" structure that could have potentially primed certain of the Debtors' prepetition secured creditors without the benefit of certain protections provided by either the Intercreditor Agreement or the First Lien Credit Agreement.

K&E 15735904

14.     The Debtors have determined that the financing proposal provided by the DIP Lenders provided the most advantageous terms under the circumstances and light of the Debtors' liquidity needs.  Significantly, the exit facility combined with the DIP Facility is a key element of the Debtors' plan to restructure their financial obligations and emerge from bankruptcy on an expedited basis.  Conversely, the Debtors determined that, despite substantial efforts by the Debtors and their advisors to develop the alternative proposals, these proposals did not present a comparable opportunity to efficiently restructure the Debtors' business while maximizing stakeholder value.

**C.     The Proposed DIP Facility Presents the Best Financing Proposal Available to Under the Circumstances**

15.     I believe that accepting the financing proposal from the Debtors' ABL Lenders also allows the Debtors to avoid the costs and risks associated with any attempt to prime existing indebtedness over their lenders' likely objection.  Moreover, the mechanism through which the Debtors' proposed postpetition facility will be refinanced through an exit facility is crucial given ongoing challenges in the commercial credit markets and the difficulties many debtors have had in obtaining exit financing on reasonable terms — let alone the attractive terms provided by the current proposal.  I believe this mechanism can significantly shorten the duration of these chapter 11 cases provide the Debtors with the financing necessary to maintain go-forward operations upon emergence from chapter 11.  I further believe the financing proposal provided by their ABL Lenders provides advantageous terms to the Debtors and their estates and is the best available financing proposal under the circumstances.

16.     I also believe that the Debtors have an immediate need to access the DIP Facility and use cash collateral to permit them, among other things, to continue to operate their businesses, to maintain business relationships with vendors, suppliers and customers, to pay

9

employee wages in the ordinary course, to make necessary capital expenditures and to satisfy other working capital and operational needs, all of which are necessary to preserve the Debtors' going-concern values and maximize recoveries for the Debtors' stakeholders.  I believe that without immediate access to the DIP Facility and the use of cash collateral as provided in the DIP Motion, the Debtors may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest and it is likely the Plan would be delayed or even entirely disrupted.

17.     I believe that the terms of the DIP Credit Agreement negotiated with the ABL Lenders, the Debtors' use of the cash collateral as provided by the DIP Orders and all other financial accommodations provided under the DIP Agreements are fair and reasonable and are supported by reasonably equivalent value and fair consideration.  The Debtors could not have obtained postpetition financing on the terms and of the type and magnitude required in the chapter 11 cases on an unsecured basis, or without offering terms largely similar to those of the DIP Facility.  In particular, I believe that the rollup of prepetition indebtedness under the ABL is a critical element necessary for the Debtors to obtain the postpetition financing as provided by the DIP Facility.  Without this accommodation, I do not believe the ABL Lenders would provide the DIP Facility on the advantageous terms discussed in the DIP Motion or otherwise have been willing to provide an exit facility on the advantageous terms available to the Debtors.

18.     Further, I believe that it is imperative that the Debtors obtain postpetition financing with the consent of their ABL Lenders.  A contested proceeding to use cash collateral, obtain non-consensual priming debtor in possession financing, or to otherwise implement a "junior" DIP structure at the inception of the chapter 11 cases could delay the Debtors' restructuring, incur significant costs, and erode the confidence of employees, vendors, and

10

creditor constituencies, endangering the long-term viability of the Debtors, regardless of the ultimate outcome. Due to the interest that the ABL Lenders have in maintaining the value of the Debtors' estates, I believe the DIP Facility provides significant advantages that the Debtors believe would be unavailable from other lenders, and that the DIP Facility will meet the Debtors' projected financing needs during the brief duration these chapter 11 cases.

19.     In addition, it is my understanding that the Debtors' access to Cash Collateral and availability under the DIP Facility will be subject to the Budget. I have reviewed the Budget and I believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Budget.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

New York, New York
Date: May 16, 2010

*/s/ Ronen Bojmel*
Ronen Bojmel

**Exhibit 1**

**Initial Cash Flow Budget**

**Exhibit 1**

**Initial Cash Flow Budget**

**NEFF RENTAL - DIP Forecast**
**13-Week DIP Cash Flow Forecast**
**For the Week Ending**
**May 14, 2010**

|  |  |  |  |  |  | Week Ending |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in 000s) | May-14 | May-21 | May-28 | Jun-04 | Jun-11 | Jun-18 | Jun-25 | Jul-02 | Jul-09 | Jul-16 | Jul-23 | Jul-30 | Aug-06 | Total |
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |  |
| **Cash receipts:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Trade receivables (lockbox deposits) | $ 3,169 | $ 3,411 | $ 4,021 | $ 3,630 | $ 3,546 | $ 3,966 | $ 5,047 | $ 4,260 | $ 3,508 | $ 3,508 | $ 3,508 | $ 3,834 | $ 3,834 | $ 49,242 |
| **Cash disbursements:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Operating expenses | (1,794) | (2,395) | (1,869) | (3,139) | (2,081) | (4,254) | (2,755) | (3,830) | (3,052) | (3,830) | (2,380) | (4,080) | (1,905) | (37,365) |
| Pre-Petition ABL Interest | - | - | - | (434) | - | - | - | - | - | - | - | - | - | (434) |
| Post-Petition DIP Interest | - | - | - | (560) | - | - | - | (750) | - | - | - | - | (942) | (2,252) |
| Swap Payment | - | - | (93) | - | - | - | (93) | - | - | - | - | (93) | - | (280) |
| Term Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2nd Lien | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senior Notes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fees (3) | - | (700) | (8) | - | - | - | (8) | - | - | - | - | (8) | - | (725) |
| **Total Interest** | - | (700) | (102) | (994) | - | - | (102) | (750) | - | - | - | (102) | (942) | (3,691) |
| Investment Sold / (Purchased) - Overnight MM Transfer | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales tax and other taxes | - | (900) | (150) | - | - | (900) | (150) | - | - | - | (900) | (150) | - | (3,150) |
| Professional fees | (2,160) | - | (725) | (1,750) | - | - | (1,918) | - | - | - | - | (1,565) | - | (8,118) |
| **Other expenses** | (2,160) | (900) | (875) | (1,750) | - | (900) | (2,068) | - | - | - | (900) | (1,715) | - | (11,268) |
| **Total cash disbursements** | (3,954) | (3,995) | (2,846) | (5,883) | (2,081) | (5,154) | (4,925) | (4,581) | (3,052) | (3,830) | (3,280) | (5,897) | (2,847) | (52,324) |
| **Net weekly cash flow** | $ (785) | $ (585) | $ 1,175 | $ (2,253) | $ 1,465 | $ (1,188) | $ 123 | $ (321) | $ 456 | $ (322) | $ 228 | $ (2,063) | $ 987 | $ (3,082) |
| Forecasted Revolver/DIP balance at beginning of week | $ (150,600) | $ (151,386) | $ (151,970) | $ (150,795) | $ (153,048) | $ (151,583) | $ (152,771) | $ (152,648) | $ (152,969) | $ (152,513) | $ (152,835) | $ (152,607) | $ (154,669) | $ (150,600) |
| Forecasted Revolver/DIP balance at end of week | $ (151,386) | $ (151,970) | $ (150,795) | $ (153,048) | $ (151,583) | $ (152,771) | $ (152,648) | $ (152,969) | $ (152,513) | $ (152,835) | $ (152,607) | $ (154,669) | $ (153,682) | $ (153,682) |

[1] Includes utility escrow amount of $107.5K (half month of utility expenses)
[2] Includes 503(b)(9), Critical Vendor and Shippers payments requested in 1st Day Motions
[3] Includes $700K of DIP facility fee and $8.3K monthly administrative agency fee

**Exhibit C**

**DIP Credit Agreement**

K&E 16239413

$175,000,000

SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DATED AS OF MAY 17, 2010
by and among

NEFF CORP.,
as Parent Borrower,

NEFF HOLDINGS CORP.

THE OTHER PERSONS PARTY HERETO THAT ARE
DESIGNATED AS CREDIT PARTIES,

BANK OF AMERICA, N.A.,
as Agent, Swing Line Lender, and L/C Issuer,

THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,

BANK OF AMERICA, N.A.
and
WELLS FARGO CAPITAL FINANCE, LLC,
as Co-Collateral Agents,

WELLS FARGO CAPITAL FINANCE, LLC
and
GE CAPITAL MARKETS, INC.,
as Co-Syndication Agents,

GMAC COMMERCIAL FINANCE LLC
and
UBS SECURITIES LLC,
as Co-Documentation Agents

and

BANC OF AMERICA SECURITIES LLC,
WELLS FARGO CAPITAL FINANCE, LLC
and
GE CAPITAL MARKETS, INC.,
as Joint Lead Arrangers and Joint Book Runners

Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005

# TABLE OF CONTENTS

## SECTION 1.

## AMOUNTS AND TERMS OF LOANS

| | | |
|---|---|---|
| 1.1 | Loans | 2 |
| 1.2 | Interest | 8 |
| 1.3 | Fees | 10 |
| 1.4 | Payments | 12 |
| 1.5 | Prepayments | 12 |
| 1.6 | Maturity | 14 |
| 1.7 | Eligible Accounts | 14 |
| 1.8 | Eligible Parts Inventory | 17 |
| 1.9 | Eligible Rental Fleet and Equipment | 18 |
| 1.10 | Eligible Rolling Stock | 20 |
| 1.11 | Loan Accounts | 20 |
| 1.12 | Yield Protection; Illegality | 20 |
| 1.13 | Taxes | 22 |

## SECTION 2.

## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| 2.1 | Compliance with Laws and Contractual Obligations | 25 |
| 2.2 | Insurance; Damage to or Destruction of Collateral | 25 |
| 2.3 | Inspection | 26 |
| 2.4 | Organizational Existence | 27 |
| 2.5 | Environmental Matters | 27 |
| 2.6 | Landlords' Agreements, Bailee Letters and Real Estate Purchases | 27 |
| 2.7 | Conduct of Business | 28 |
| 2.8 | Further Assurances | 28 |
| 2.9 | Control Agreements | 29 |
| 2.10 | Business and Properties | 30 |
| 2.11 | Bankruptcy Cases Filings, Documents, Etc | 30 |
| 2.12 | Additional Borrowers | 31 |
| 2.13 | Compliance with Financing Orders. | 31 |
| 2.14 | Retention of Financial Advisor; Executives. | 31 |
| 2.15 | Bankruptcy Cases Related Matters and Deadlines. | 31 |
| 2.16 | Post-Closing Matters | 31 |

## SECTION 3.

## NEGATIVE COVENANTS

| | | |
|---|---|---|
| 3.1 | Indebtedness | 31 |
| 3.2 | Liens and Related Matters | 32 |
| 3.3 | Investments | 33 |
| 3.4 | Contingent Obligations | 34 |

| | | |
|---|---|---|
| 3.5 | Restricted Payments | 35 |
| 3.6 | Amendments to Constituent Documents; Restriction on Fundamental Changes | 35 |
| 3.7 | Disposal of Assets or Subsidiary Stock | 36 |
| 3.8 | Transactions with Affiliates | 36 |
| 3.9 | Conduct of Business | 37 |
| 3.10 | Changes Relating to Indebtedness | 37 |
| 3.11 | Fiscal Year | 37 |
| 3.12 | [Reserved] | 37 |
| 3.13 | [Reserved] | 38 |
| 3.14 | Bank Accounts; Securities Accounts; Commodities Accounts | 38 |
| 3.15 | Hazardous Materials | 38 |
| 3.16 | [Reserved] | 38 |
| 3.17 | Lease Limits | 38 |
| 3.18 | Prepayments of Indebtedness | 38 |
| 3.19 | [Reserved] | 38 |
| 3.20 | [Reserved] | 38 |
| 3.21 | Compliance with Agreed Budget | 38 |
| 3.22 | Chapter 11 Claims | 39 |
| 3.23 | Revision of Orders; Applications to Bankruptcy Court | 39 |

## SECTION 4.

## FINANCIAL AND OTHER REPORTING COVENANTS

| | | |
|---|---|---|
| 4.1 | Financial Statements and Other Reports | 39 |
| 4.2 | Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement | 44 |

## SECTION 5.

## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 5.1 | Disclosure | 44 |
| 5.2 | No Material Adverse Effect | 45 |
| 5.3 | No Conflict; Compliance with Laws | 45 |
| 5.4 | Organization, Powers, Capitalization and Good Standing | 45 |
| 5.5 | Financial Statements | 46 |
| 5.6 | Intellectual Property | 46 |
| 5.7 | Investigations, Audits, Etc | 46 |
| 5.8 | Employee Matters | 47 |
| 5.9 | [Reserved] | 47 |
| 5.10 | Litigation; Adverse Facts | 47 |
| 5.11 | Use of Proceeds; Margin Regulations | 47 |
| 5.12 | Ownership of Property; Liens | 48 |
| 5.13 | Environmental Matters | 48 |
| 5.14 | ERISA | 49 |
| 5.15 | Brokers | 50 |
| 5.16 | Deposit Accounts; Securities Accounts; Other Accounts | 50 |
| 5.17 | [Reserved] | 50 |
| 5.18 | Insurance | 50 |

5.19    Investment Company Act ................................................................................................. 50
5.20    No Setoff or Counterclaims under Guaranty ................................................................. 50
5.21    Taxes .............................................................................................................................. 50
5.22    Collateral Documents..................................................................................................... 51
5.23    Agreed Budget ............................................................................................................... 52
5.24    Financing Orders............................................................................................................ 52

## SECTION 6.

## DEFAULT, RIGHTS AND REMEDIES

6.1    Event of Default.............................................................................................................. 52
6.2    Suspension or Termination of Revolving Loan Commitments....................................... 56
6.3    Acceleration and Other Remedies ................................................................................. 56
6.4    Performance by Agent .................................................................................................... 57
6.5    Application of Proceeds .................................................................................................. 58
6.6    Certain Bankruptcy Matters........................................................................................... 58

## SECTION 7.

## CONDITIONS TO LOANS

7.1    Conditions to Initial Loans............................................................................................. 60
7.2    Conditions to All Loans ................................................................................................. 60

## SECTION 8.

## SECURITY

8.1    Security .......................................................................................................................... 61
8.2    Perfection of Security Interests ..................................................................................... 62
8.3    Pledged Collateral ......................................................................................................... 63
8.4    Agent's and Secured Parties' Rights; Limitations on Agent's and Secured Parties'
        Obligations ................................................................................................................ 64
8.5    Covenants of the Credit Parties with Respect to Collateral ........................................... 65
8.6    Bank Accounts; Collection of Accounts and Payments................................................. 68
8.7    Agent's Appointment as Attorney-In-Fact .................................................................... 69
8.8    Remedies; Rights Upon Default .................................................................................... 71
8.9    Grant of License to Use Property.................................................................................... 74
8.10    Limitation on Agent's and Secured Parties' Duty in Respect of Collateral.................. 74
8.11    Authorized Terminations ............................................................................................... 74
8.12    Modifications ................................................................................................................. 75

## SECTION 9.

## GUARANTY

9.1    Guaranty of Guaranteed Obligations of the Borrowers ................................................. 75
9.2    Demand by Agent or Lenders ........................................................................................ 76
9.3    Enforcement of Guaranty............................................................................................... 76

9.4     Waiver...........................................................................................................................77
9.5     Modification of Guaranteed Obligations, Etc............................................................77
9.6     Reinstatement..............................................................................................................78
9.7     Waiver of Subrogation, Etc.........................................................................................78
9.8     Election of Remedies...................................................................................................78
9.9     Continuation of Guaranty ...........................................................................................79

## SECTION 10.

## ASSIGNMENT AND PARTICIPATION

10.1    Assignment and Participations.....................................................................................79
10.2    Agent............................................................................................................................81
10.3    Set Off and Sharing of Payments ...............................................................................85
10.4    Disbursement of Funds ...............................................................................................86
10.5    Disbursements of Advances; Payment.......................................................................86
10.6    Related Obligations Matters .......................................................................................88
10.7    Other Agents ...............................................................................................................88

## SECTION 11.

## MISCELLANEOUS

11.1    Indemnities..................................................................................................................88
11.2    Amendments and Waivers ..........................................................................................89
11.3    Notices ........................................................................................................................91
11.4    Failure or Indulgence Not Waiver; Remedies Cumulative ........................................94
11.5    Marshaling; Payments Set Aside ................................................................................94
11.6    Severability..................................................................................................................94
11.7    Lenders' Obligations Several; Independent Nature of Lenders' Rights .....................94
11.8    Headings ......................................................................................................................94
11.9    Applicable Law ...........................................................................................................94
11.10   Successors and Assigns................................................................................................95
11.11   No Advisory or Fiduciary Responsibility ..................................................................95
11.12   Construction.................................................................................................................95
11.13   Confidentiality.............................................................................................................95
11.14   CONSENT TO JURISDICTION.................................................................................96
11.15   WAIVER OF JURY TRIAL.......................................................................................96
11.16   Survival of Warranties and Certain Agreements .......................................................96
11.17   Entire Agreement.........................................................................................................96
11.18   Counterparts; Effectiveness ........................................................................................96
11.19   Replacement of Lenders..............................................................................................97
11.20   Patriot Act Notice .......................................................................................................98
11.21   Joint and Several Liability ..........................................................................................98
11.22   Contribution and Indemnification Among Borrowers ................................................99
11.23   Agency of Parent Borrower for Each Other Borrower ...............................................99
11.24   Affirmation of Commitment Letter.............................................................................99
11.25   Reinstatement............................................................................................................100
11.26   Express Waivers by Borrowers in Respect of Cross Guaranties and Cross
            Collateralization ......................................................................................................100

# INDEX OF APPENDICES

Annexes

Annex A          -          Definitions
Annex B          -          Pro Rata Shares and Commitment Amounts
Annex C          -          Closing Checklist
Annex D          -          Lenders' Bank Accounts

Exhibits

Exhibit 1.1(a)(i)     -     Form of Revolving Note
Exhibit 1.1(a)(ii)    -     Form of Notice of Revolving Credit Advance
Exhibit 1.1(b)(i)     -     Form of Notice of Swing Line Advance
Exhibit 1.1(b)        -     Form of Swing Line Note
Exhibit 1.2(e)        -     Form of Notice of Conversion/Continuation
Exhibit 4.1(e)        -     Form of Borrowing Base Certificate
Exhibit 4.1(m)        -     Compliance and Pricing Certificate
Exhibit 10.1          -     Assignment Agreement
Exhibit A             -     Form of Joinder Agreement
Exhibit B             -     [RESERVED]
Exhibit C             -     [RESERVED]
Exhibit D             -     Interim Order
Exhibit E             -     Agreed Budget
Exhibit F             -     [RESERVED]
Exhibit G             -     Form of Intellectual Property Security Agreement
Exhibit H             -     Form of Deposit Account Control Agreement
Exhibit I-1           -     Form of Opinion of Kirkland & Ellis LLP

Schedules

Schedule 1.1(c)         -     Pre-Petition Letters of Credit
Schedule 2.7            -     Corporate and Trade Names
Schedule 3.2            -     Existing Liens
Schedule 3.3            -     Existing Investments
Schedule 3.4            -     Existing Contingent Obligations
Schedule 3.8            -     Affiliate Transactions
Schedule 3.9            -     Business Description
Schedule 5.4(a)         -     Jurisdictions of Organization and Qualifications
Schedule 5.4(b)         -     Pledged Stock and Pledged Notes
Schedule 5.6            -     Intellectual Property
Schedule 5.8            -     Employee Matters
Schedule 5.10           -     Litigation; Adverse Facts
Schedule 5.12           -     Real Estate
Schedule 5.13           -     Environmental Matters
Schedule 5.16           -     Bank Accounts, Securities Accounts; Other Accounts
Schedule 5.18           -     Insurance
Schedule 5.22(a)(ii)    -     Location Information
Schedule 8.1(a)         -     Commercial Tort Claims
Schedule 8.5(a)(iv)     -     Pledge Amendment
Schedule 8.5(a)(x)      -     Titled Collateral

# SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of May 17, 2010, as amended, restated, supplemented or otherwise modified from time to time, and entered into by and among Neff Corp., a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) ("Parent Borrower"), Neff Holdings Corp., a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("Holdings"), and the other persons designated as "Credit Parties" on the signature pages hereof and each other person which becomes party hereto as a Credit Party pursuant to Section 2.8 below, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the financial institutions who are or hereafter become parties to this Agreement as Lenders, BANK OF AMERICA, N.A. as Agent, Swing Line Lender and L/C Issuer, BANK OF AMERICA, N.A. and WELLS FARGO CAPITAL FINANCE, LLC, as Co-Collateral Agents, WELLS FARGO CAPITAL FINANCE, LLC and GE CAPITAL MARKETS, INC., as Co-Syndication Agents, GMAC COMMERCIAL FINANCE LLC and UBS SECURITIES LLC, as Co-Documentation Agents and BANC OF AMERICA SECURITIES LLC, WELLS FARGO CAPITAL FINANCE, LLC and GE CAPITAL MARKETS, INC., as joint lead arrangers and joint book runners.

## R E C I T A L S:

WHEREAS, all capitalized terms used herein shall have the meanings ascribed thereto in Annex A hereto which is incorporated herein by reference;

WHEREAS, on May 17, 2010 (the "Petition Date"), the Parent Borrower, Holdings and each of Parent Borrower's Subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (collectively, the "Bankruptcy Cases" and, individually, a "Bankruptcy Case");

WHEREAS, each of the Credit Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Parent Borrower has requested that the Lenders make available to the Borrowers a working capital revolving credit facility in an amount not to exceed $175,000,000, extensions of credit under which the Borrowers will use for the purposes described herein during the pendency of the Bankruptcy Cases;

WHEREAS, the Lenders have agreed to make available to the Borrowers a working capital revolving loan facility upon the terms and conditions set forth in this Agreement and Holdings has agreed to guarantee such facility; and

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Parent Borrower and the other Credit Parties under the Loan Documents, the Parent Borrower and the other Credit Parties have agreed to provide the Agent and the Lenders, in each case, subject to the Carve-Out, with the following:

(a)     a perfected first-priority security interest and Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, on all Collateral, whether now existing or hereafter acquired, of the Parent Borrower and the other Credit Parties which was unencumbered by any security interest or Lien as of the Petition Date (including subject to the Final Order, Avoidance Actions and any proceeds or property recovered in respect of such Avoidance Actions, subject to the Carve-Out);

(b)        a perfected junior lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to Permitted Liens (other than in favor of the Pre-Petition Secured Parties);

(c)        a perfected first priority, senior priming Lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to a Lien securing any obligations owed to the Pre-Petition Secured Parties; and

(d)        with respect to the obligations of the Parent Borrower and the other Credit Parties hereunder and under the other Loan Documents, an allowed administrative expense claim in each Bankruptcy Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses (subject to the Carve-Out) of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) or 726 thereof), and including the proceeds or property recovered in respect of Avoidance Actions.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## SECTION 1.

## AMOUNTS AND TERMS OF LOANS

1.1        <u>Loans</u>.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Parent Borrower and the other Credit Parties contained herein:

(a)        Revolving Loans.

(i)        Subject to the terms and conditions set forth herein and in the Financing Orders, each Lender agrees, severally and not jointly, to make available to Parent Borrower on behalf of Borrowers from time to time until the Commitment Termination Date its Pro Rata Share of advances (each a "<u>Revolving Credit Advance</u>") requested by Parent Borrower hereunder.  The Pro Rata Share of the Revolving Loan of any Lender (including, without duplication, Swing Line Loans and Letter of Credit Obligations) shall not at any time exceed its separate Revolving Loan Commitment.  Revolving Credit Advances may be repaid and reborrowed; <u>provided</u> that the amount of any Revolving Credit Advance to be made at any time shall not exceed Excess Availability.  All Revolving Loans shall be repaid in full on the Commitment Termination Date.  Promptly upon request by a Lender, Parent Borrower on behalf of Borrowers shall execute and deliver to such Lender a note to evidence the Revolving Loan Commitment of such Lender.  Each note shall be in the principal amount of the Revolving Loan Commitment of the applicable Lender, dated the Closing Date (or, if later, as of the date on which such Person became a Lender under this Agreement pursuant to an Assignment Agreement) and substantially in the form of <u>Exhibit 1.1(a)(i)</u> (each a "<u>Revolving Note</u>" and, collectively, the "<u>Revolving Notes</u>").  Other than pursuant to <u>Section 1.1(a)(ii)</u>, if at any time the outstanding Revolving Loans (including the outstanding Swing Line Loans and Letter of Credit Obligations) exceed the Borrowing Base (any such excess Revolving Loans are herein referred to collectively as "<u>Overadvances</u>"), Lenders shall not be obligated to make Revolving Credit Advances, no additional Letters of Credit shall be issued and, except as provided in <u>Section 1.1(a)(ii)</u>, Revolving Loans must be repaid immediately and, if necessary, Letters of

Credit cash collateralized in an amount sufficient to eliminate any Overadvances. All Overadvances shall constitute Base Rate Loans. Revolving Loans which are Base Rate Loans may be requested in any amount with one (1) Business Day's prior written notice required for funding requests equal to or greater than $5,000,000. For funding requests for such Revolving Loans less than $5,000,000, written notice must be provided by 12:00 p.m. (noon) (New York time) on the Business Day on which the Revolving Loan is to be made. All LIBOR Loans require three (3) Business Days prior written notice. Written notices for funding requests shall be in the form attached as <u>Exhibit 1.1(a)(ii)</u> ("<u>Notice of Revolving Credit Advance</u>").

(ii)     If Parent Borrower on behalf of Borrowers requests that Lenders make, or permit to remain outstanding any Overadvances, Agent may, in its sole discretion, elect to make, or permit to remain outstanding such Overadvances; <u>provided</u>, <u>however</u>, that Agent may not require Lenders to make, or permit to remain outstanding, (a) aggregate Revolving Loans (including, without duplication, Swing Line Loans) in excess of the Maximum Amount or (b) Overadvances in an aggregate amount in excess of $7,000,000. If an Overadvance is made, or permitted to remain outstanding, pursuant to the preceding sentence, then all Lenders shall be bound to make, or permit to remain outstanding, such Overadvance based upon their Pro Rata Shares of the Revolving Loan Commitments in accordance with the terms of this Agreement. If an Overadvance remains outstanding for more than thirty (30) consecutive days during any one hundred eighty (180) day period, Revolving Loans must be repaid immediately in an amount sufficient to eliminate all of such Overadvances; <u>provided</u> that the Requisite Lenders may prospectively revoke Agent's ability to make or permit Overadvances by written notice to Agent. Any Overadvance may be made as a Swing Line Advance; and <u>provided</u>, <u>further</u>, that if an Event of Default shall have occurred and be continuing, no Overadvance may be made unless such Overadvance constitutes a "<u>Protective Advance</u>."

(b)     Swing Line Facility.

(i)     Subject to the terms and conditions hereof, the Swing Line Lender may, in its discretion, make available from time to time until the Commitment Termination Date revolving advances under the Swing Line Commitment (each, a "<u>Swing Line Advance</u>") in accordance with a "<u>Notice of Swing Line Advance</u>" substantially in the form of <u>Exhibit 1.1(b)(i)</u>. Notwithstanding anything herein to the contrary, the Swing Line Lender shall not be obligated to fund the percentage of any Swing Line Advance allocable to any Non-Funding Lender and with respect to any portion of a Swing Line Advance so not funded such Non-Funding Lender shall not have any obligation to make Revolving Credit Advances in accordance with <u>Section 1.1(b)(iii)</u> or to purchase participation interests in accordance with <u>Section 1.1(b)(iv)</u> and any pro rata calculations related to such Swing Line Advance for purposes of such sections shall disregard such Non-Funding Lender. Except as provided in <u>Section 1.1(a)(ii)</u> above, the aggregate amount of Swing Line Advances outstanding shall not exceed at any time the lesser of (A) the Swing Line Commitment and (B) Excess Availability ("<u>Swing Line Availability</u>"). Moreover, except for Overadvances, the Swing Line Loan outstanding to Parent Borrower on behalf of Borrowers shall not exceed at any time the Borrowing Base <u>less</u> the Revolving Loans (including the outstanding Letter of Credit Obligations) then outstanding. Until the Commitment Termination Date, Parent Borrower may from time to time borrow, repay and reborrow under this <u>Section 1.1(b)</u>. Each Swing Line Advance shall be made pursuant to a Notice of Swing Line Advance delivered by Parent Borrower

to the Swing Line Lender no later than 2:00 p.m. (New York time) on the date on which the Swing Line Advance is to be made requesting a Swing Line Advance in an integral multiple of $100,000. Unless the Swing Line Lender has received at least one (1) Business Day's prior written notice from Requisite Lenders instructing it not to make a Swing Line Advance, the Swing Line Lender shall, notwithstanding the failure of any condition precedent set forth in <u>Section 7.2</u>, be entitled to fund that Swing Line Advance, and to have each Lender make Revolving Credit Advances in accordance with <u>Section 1.1(b)(iii)</u> or purchase participating interests in accordance with <u>Section 1.1(b)(iv)</u>. Notwithstanding any other provision of this Agreement or the other Loan Documents, the Swing Line Loan shall constitute a Base Rate Loan. Borrowers shall repay the aggregate outstanding principal amount of the Swing Line Loan upon demand therefor by Agent. The entire unpaid balance of the Swing Line Loan and all other noncontingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date if not sooner paid in full.

(ii)     Borrowers shall execute and deliver to the Swing Line Lender a promissory note to evidence the Swing Line Commitment, which promissory note shall be in the principal amount of the Swing Line Commitment of the Swing Line Lender, dated the Closing Date (or, in the case of any successor Swing Line Lender, the date on which such Person becomes the Swing Line Lender pursuant to this Agreement) and substantially in the form of <u>Exhibit 1.1(b)</u> (the "<u>Swing Line Note</u>"). The Swing Line Note shall represent the obligation of Borrowers to pay the amount of the Swing Line Commitment or, if less, the aggregate unpaid principal amount of all Swing Line Advances made to Borrowers together with interest thereon as prescribed in <u>Section 1.2</u>.

(iii)     The Swing Line Lender, at any time and from time to time in its sole and absolute discretion but no less frequently than once weekly, will on behalf of Borrowers (and Borrowers hereby irrevocably authorize the Swing Line Lender to so act on its behalf) request each Lender (including the Swing Line Lender) to make a Revolving Credit Advance to Parent Borrower on behalf of Borrowers (which shall be a Base Rate Loan) in an amount equal to that Lender's Pro Rata Share of the principal amount of the Swing Line Loan (the "<u>Refunded Swing Line Loan</u>") outstanding on the date such notice is given. Unless any of the events described in <u>Section 6.1(g)</u> has occurred (in which event the procedures of <u>Section 1.1(b)(iv)</u> shall apply) and regardless of whether the conditions precedent set forth in this Agreement to the making of a Revolving Credit Advance are then satisfied, each Lender shall disburse directly to Agent, its Pro Rata Share of a Revolving Credit Advance on behalf of the Swing Line Lender, prior to 3:00 p.m. (New York time), in immediately available funds on the Business Day next succeeding the date that notice is given. The proceeds of such Revolving Credit Advances shall be immediately paid to the Swing Line Lender and applied to repay the Refunded Swing Line Loan of Parent Borrower.

(iv)     If, prior to refunding a Swing Line Loan with a Revolving Credit Advance pursuant to <u>Section 1.1(b)(iii)</u>, one of the events described in <u>Section 6.1(g)</u> has occurred, then, subject to the provisions of <u>Section 1.1(b)(v)</u> below, each Lender shall, on the date such Revolving Credit Advance was to have been made for the benefit of Borrowers, purchase from the Swing Line Lender an undivided participation interest in the Swing Line Loan to Parent Borrower in an amount equal to its Pro Rata Share (determined with respect to Revolving Loans) of such Swing Line Loan. Upon request, each

Lender shall promptly transfer to the Swing Line Lender, in immediately available funds, the amount of its participation interest.

(v)     Each Lender's obligation to make Revolving Credit Advances in accordance with Section 1.1(b)(iii) and to purchase participation interests in accordance with Section 1.1(b)(iv) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Lender may have against the Swing Line Lender, Borrowers or any other Person for any reason whatsoever; (B) the occurrence or continuance of any Default or Event of Default; (C) any inability of any Borrower to satisfy the conditions precedent to borrowing set forth in this Agreement at any time or (D) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. Swing Line Lender shall be entitled to recover, on demand, from each Lender the amounts required pursuant to Section 1.1(b)(iii) or 1.1(b)(iv), as the case may be. If any Lender does not make available such amounts to Agent or the Swing Line Lender, as applicable, the Swing Line Lender shall be entitled to recover, on demand, such amount on demand from such Lender, together with interest thereon for each day from the date of non-payment until such amount is paid in full at the Federal Funds Rate for the first two (2) Business Days and at the Base Rate thereafter.

(c)     Letters of Credit. The Revolving Loan Commitment may, in addition to Advances under the Revolving Loan, be utilized, upon the request of any Borrower, for the issuance of Letters of Credit. Immediately upon the issuance by an L/C Issuer of a Letter of Credit, and without further action on the part of Agent or any of the Lenders, each Lender shall be deemed to have purchased from such L/C Issuer a participation in such Letter of Credit (or in its obligation under a risk participation agreement with respect thereto) equal to such Lender's Pro Rata Share of the maximum aggregate amount available to be drawn under each such Letter of Credit.

(i)     L/C Sublimit. The aggregate amount of Letter of Credit Obligations with respect to all Letters of Credit outstanding at any time shall not exceed $30,000,000 (the "L/C Sublimit").

(ii)     Reimbursement. Each Borrower shall be irrevocably and unconditionally obligated forthwith without presentment, demand, protest or other formalities of any kind, to reimburse each L/C Issuer on demand in immediately available funds for any amounts paid by such L/C Issuer with respect to a Letter of Credit, including all reimbursement payments, Fees, Charges, costs and expenses paid or incurred by such L/C Issuer. Each Borrower hereby authorizes and directs Agent, at Agent's option, to debit such Borrower's account (by increasing the outstanding principal balance of the Revolving Credit Advances) in the amount of (A) any payment made by an L/C Issuer with respect to any Letter of Credit and (B) the amount of any fees payable to an L/C Issuer pursuant to Section 1.3(c). All amounts paid by an L/C Issuer with respect to any Letter of Credit that are not immediately repaid by Borrowers with the proceeds of a Revolving Credit Advance or otherwise shall bear interest at the interest rate applicable to Revolving Loans which are Base Rate Loans plus, at the election of Agent (or upon the written request of the Requisite Lenders), an additional two percent (2.00%) per annum. Each Lender agrees to fund its Pro Rata Share of any Revolving Loan made pursuant to this Section 1.1(c)(ii). In the event Agent elects not to debit a Borrower's account and Borrowers fail to reimburse the L/C Issuer in full on the date of any payment in respect of a Letter of Credit, Agent shall promptly notify each Lender of the amount of such unreim-

bursed payment and the accrued interest thereon and each Lender, on the next Business Day prior to 3:00 p.m. (New York time), shall deliver to Agent an amount equal to its Pro Rata Share thereof in same day funds. Each Lender hereby absolutely and unconditionally agrees to pay to the L/C Issuer upon demand by the L/C Issuer such Lender's Pro Rata Share of each payment made by the L/C Issuer in respect of a Letter of Credit and not immediately reimbursed by Borrowers or satisfied through a debit of a Borrower's account. Each Lender acknowledges and agrees that its obligations pursuant to this subsection in respect of Letters of Credit are absolute and unconditional and shall not be affected by any circumstance whatsoever, including setoff, counterclaim, the occurrence and continuance of a Default or an Event of Default or any failure by a Borrower to satisfy any of the conditions set forth in Section 7.2. If any Lender fails to make available to the L/C Issuer the amount of such Lender's Pro Rata Share of any payments made by the L/C Issuer in respect of a Letter of Credit as provided in this Section 1.1(c)(ii), the L/C Issuer shall be entitled to recover such amount on demand from such Lender together with interest at the Base Rate.

(iii)    Request for Letters of Credit. Each Borrower shall give Agent at least three (3) Business Days prior written notice specifying the date a Letter of Credit is requested to be issued, the amount and the name and address of the beneficiary and a description of the transactions proposed to be supported thereby. If Agent informs a Borrower that the L/C Issuer cannot issue the requested Letter of Credit directly, such Borrower may request that L/C Issuer arrange for the issuance of the requested Letter of Credit under a risk participation agreement with another financial institution reasonably acceptable to Agent, L/C Issuer and Parent Borrower. The issuance of any Letter of Credit under this Agreement shall be subject to the conditions that the Letter of Credit is in a form, is for an amount and contains such terms and conditions as are reasonably satisfactory to the L/C Issuer and Agent. If L/C Issuer receives written notice from Agent or the Requisite Lenders on or before the Business Day preceding issuance of a Letter of Credit that any conditions set forth in Section 7.2 have not been satisfied, L/C Issuer shall have no obligation to issue and, upon direction by the Agent or the Requisite Lenders shall not issue, the requested Letter of Credit or any other Letter of Credit until such direction is withdrawn in writing by Agent or the Requisite Lenders, as applicable. Prior to its receipt of such notice from Agent or the Requisite Lenders, L/C Issuer shall not be deemed to have notice or knowledge of any Default, Event of Default or failure of such conditions. The initial notice requesting the issuance of a Letter of Credit shall be accompanied by the form of the Letter of Credit and the L/C Issuer's reimbursement agreement and an application for a letter of credit, if any, then required by the L/C Issuer completed in a manner reasonably satisfactory to such L/C Issuer. If any provision of any application or reimbursement agreement is inconsistent with the terms of this Agreement, then the provisions of this Agreement, to the extent of such inconsistency, shall control. L/C Issuer shall have no obligation to issue the requested Letter of Credit or any other Letter of Credit if at such time any Lender is a Non-Funding Lender, unless the L/C Issuer has entered into arrangements satisfactory to the L/C Issuer with the Borrower or such Lender to eliminate the L/C Issuer's risk with respect to such Lender or the L/C Issuer has received Cash Collateral from either the Borrower or such Non-Funding Lender in relation to an amount equal to such Non-Funding Lender's obligation to fund under Section 1.1(c)(ii). The Borrower and/or such Non-Funding Lender hereby grants to the Agent, for the benefit of the L/C Issuer, a security interest in all such Cash Collateral and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked, deposit accounts at Bank of America and may be invested in Cash Equivalents reasona-

bly acceptable to the Agent. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable laws, to reimburse the L/C Issuer.

(iv)    Expiration Dates of Letters of Credit. The expiration date of each Letter of Credit shall be no later than one year from its date of issuance. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiration date for one (1) or more successive one (1) year periods, provided that the L/C Issuer has the right to terminate such Letter of Credit on each such annual expiration date; provided, further, that in the event that any Letter of Credit as issued or extended will be outstanding after the date that is two-hundred eighty (280) days after the date hereof, Borrowers shall provide cash as collateral for such outstanding Letter of Credit Obligations (in an amount equal to 105% of such outstanding Letter of Credit Obligations) on terms reasonably satisfactory to the L/C Issuer or make other substitute arrangements satisfactory to the L/C Issuer on such two-hundred eightieth (280th) day. The L/C Issuer may elect not to renew any such Letter of Credit and, upon direction by Agent or Requisite Lenders, shall not renew any such Letter of Credit, in each case, at any time during the continuance of an Event of Default, provided that, in the case of a direction by Agent or Requisite Lenders, the L/C Issuer receives such directions prior to the date notice of non-renewal is required to be given by the L/C Issuer and the L/C Issuer has had a reasonable period of time to act on such notice.

(v)    Obligations Absolute. The obligation of each Borrower to reimburse the L/C Issuer, Agent and Lenders for payments made in respect of Letters of Credit issued by the L/C Issuer shall be unconditional and irrevocable and shall be paid under all circumstances strictly in accordance with the terms of this Agreement, including the following circumstances: (a) any lack of validity or enforceability of any Letter of Credit; (b) any amendment or waiver of or any consent or departure from all or any of the provisions of any Letter of Credit or any Loan Document; (c) the existence of any claim, setoff, defense or other right which Parent Borrower, any of its Subsidiaries or Affiliates or any other Person may at any time have against any beneficiary of any Letter of Credit, Agent, any L/C Issuer, any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreements or transactions; (d) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (e) payment under any Letter of Credit against presentation of a draft or other document that does not substantially comply with the terms of such Letter of Credit; or (f) any other act or omission to act or delay of any kind of any L/C Issuer, Agent, any Lender or any other Person or any other event or circumstance whatsoever that might, but for the provisions of this Section 1.1(c)(v), constitute a legal or equitable discharge of any Borrower's obligations hereunder.

(vi)    Obligations of L/C Issuers. Each L/C Issuer (other than Bank of America) hereby agrees that it will not issue a Letter of Credit hereunder until it has provided Agent with written notice specifying the amount and intended issuance date of such Letter of Credit and Agent has returned a written acknowledgment of such notice to L/C Issuer. Each L/C Issuer (other than Bank of America) further agrees to provide to Agent: (a) a copy of each Letter of Credit issued by such L/C Issuer promptly after its issuance, amendment, extension or renewal; (b) a monthly report summarizing available amounts under Letters of Credit issued by such L/C Issuer, the dates and amounts of any draws

under such Letters of Credit, the effective date of any increase or decrease in the face amount of any Letters of Credit during such month and the amount of any unreimbursed draws under such Letters of Credit; and (c) such additional information reasonably requested by Agent from time to time with respect to the Letters of Credit issued by such L/C Issuer. Without limiting the generality of the foregoing, it is expressly understood and agreed by Borrowers that the absolute and unconditional obligation of Borrowers to Agent and Lenders hereunder to reimburse payments made under a Letter of Credit will not be excused by the gross negligence or willful misconduct of the L/C Issuer. However, the foregoing shall not be construed to excuse an L/C Issuer from liability to Borrowers for gross negligence, willful misconduct, material breach of its obligations under this Agreement or otherwise to the extent of any direct damages (as opposed to consequential damages, with Borrowers hereby waiving all claims for any consequential damages to the extent permitted by applicable law) suffered by any Borrower that are subject to indemnification under the L/C Issuer's reimbursement agreement.

(vii)     Pre-Petition Letters of Credit.  Schedule 1.1 (c) contains a schedule of the letters of credit issued prior to the Closing Date pursuant to the Pre-Petition First Lien Credit Agreement (collectively, the "Pre-Petition Letters of Credit") by the Pre-Petition L/C Issuer for the account of Parent Borrower or the applicable Subsidiary of Parent Borrower as specified on such Schedule 1.1(c).  Upon entry of the Final Order (i) such Pre-Petition Letters of Credit, to the extent outstanding, shall be automatically and without further action by the parties thereto converted to Letters of Credit issued pursuant to this Section 1.1(c) for the account of Borrowers and subject to the provisions hereof, and for this purpose the fees specified in Section 1.3 shall be payable (in substitution for any fees set forth in the applicable letter of credit reimbursement agreements or applications relating to such Pre-Petition Letters of Credit) as if such Pre-Petition Letters of Credit had been issued pursuant to this Agreement on the Closing Date, (ii) the face amount of such Pre-Petition Letters of Credit shall be included in the calculation of Letter of Credit Obligations and (iii) all liabilities of Parent Borrower or any of its Subsidiaries, as the case may be, with respect to such Pre-Petition Letters of Credit shall constitute Obligations.

(d)     Funding Authorization.  The proceeds of all Loans made pursuant to this Agreement subsequent to the Closing Date are to be funded by Agent by wire transfer to the account designated by Parent Borrower on behalf of Borrowers below (the "Disbursement Account"):

| | |
|---|---|
| Bank: | Bank of America, N.A. |
| Bank Address: | Atlanta, Georgia |
| ABA No.: | 0260-0959-3 |
| Account No.: | 4426828095 |
| Reference: | Bank of America Business Capital- Neff Rental Master Operating Account |

Parent Borrower shall provide Agent with written notice of any change in the foregoing instructions at least three (3) Business Days before the desired effective date of such change.

1.2     Interest.

(a)     Borrowers shall pay interest to Agent, for the benefit of Lenders based on their respective Pro Rata Shares, in accordance with the various Loans being made by each Lender, in arrears on each applicable Interest Payment Date, at the following rates:  (i) with respect to the Revolving Credit Advances which are designated as Base Rate Loans (and for all other Obligations not otherwise set forth

below), the Base Rate plus the Applicable Revolver Base Rate Margin per annum; (ii) with respect to Revolving Credit Advances which are designated as LIBOR Loans at the election of Parent Borrower, the applicable LIBOR Rate plus the Applicable Revolver LIBOR Margin per annum; and (iii) with respect to any Swing Line Loans, the Base Rate plus the Applicable Revolver Base Rate Margin per annum.

(b)       If any payment on any Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day (except as set forth in the definition of LIBOR Period) and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)       All computations of interest for Base Rate Loans when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for each day on which the Loan is made or outstanding, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day (with all day determinations pursuant to this sentence being made pursuant to Section 1.4).  Each determination by Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)       So long as any Event of Default has occurred and is continuing, and without notice of any kind, the interest rates applicable to Loans shall be increased by two percent (2%) per annum above the rates of interest otherwise applicable hereunder ("Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest and Letter of Credit Fees at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

(e)       Parent Borrower on behalf of Borrowers shall have the option to (i) request that any Revolving Credit Advance be made as a LIBOR Loan, (ii) convert at any time all or any part of outstanding Revolving Loans from Base Rate Loans to LIBOR Loans, (iii) convert any LIBOR Loan that is a Revolving Loan to a Base Rate Loan, subject to payment of the LIBOR Breakage Fee in accordance with Section 1.3(d) if such conversion is made prior to the expiration of the LIBOR Period applicable thereto, or (iv) continue all or any portion of any Revolving Loan as a LIBOR Loan upon the expiration of the applicable LIBOR Period and the succeeding LIBOR Period of that continued Loan shall commence on the first day after the last day of the LIBOR Period of the Loan to be continued.  Any Loan or group of Loans having the same proposed LIBOR Period to be made or continued as, or converted into a LIBOR Loan must be in a minimum amount of $5,000,000 and integral multiples of $500,000 in excess of such amount.  Any such election must be made by 12:00 p.m. (noon) (New York time) on the third Business Day prior to (1) the date of any proposed Revolving Credit Advance which is to bear interest at the LIBOR Rate, (2) the end of each LIBOR Period with respect to any LIBOR Loans to be continued as such, or (3) the date on which Parent Borrower wishes to convert any Base Rate Loan (other than a Swing Line Loan) to a LIBOR Loan for a LIBOR Period designated by Parent Borrower in such election.  If no election is received with respect to a LIBOR Loan by 12:00 p.m. (noon) (New York time) on the third Business Day prior to the end of the LIBOR Period with respect thereto, that LIBOR Loan shall be converted to a Base Rate Loan at the end of its LIBOR Period.  Parent Borrower must make such election by notice to Agent in writing, by fax or other similar form of transmission or overnight courier.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "Notice of Conversion/Continuation") substantially in the form of Exhibit 1.2(e).  No Loan shall be made, converted into or continued as a LIBOR Loan, if an Event of Default has occurred and is continuing and Agent or Requisite

Lenders have determined not to make or continue any Loan as a LIBOR Loan as a result thereof. Notwithstanding anything herein to the contrary (other than Section 1.12(b) and the cross reference to this sentence in Section 1.2(g)), at any time the Applicable Revolver Base Rate Margin plus the Base Rate is less than the Applicable Revolver LIBOR Margin plus the LIBOR Rate, the Parent Borrower shall not have the option to request that any Revolving Credit Advances be made as Base Rate Loans and the Parent Borrower agrees to deliver a Notice of Conversion/Continuation converting any then existing Base Rate Loans into LIBOR Rate Loans promptly upon the request of Agent.

(f)     Notwithstanding anything to the contrary set forth in this Section 1.2, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate or rates of interest and in the manner provided in Sections 1.2(a) through (e), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply. In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 1.2(f), a court of competent jurisdiction shall determine by a final, non-appealable order that a Lender has received interest hereunder in excess of the Maximum Lawful Rate, Agent shall, to the extent permitted by applicable law, promptly apply such excess as specified in Section 1.5(d) and thereafter shall refund any excess to Parent Borrower on behalf of Borrowers or as such court of competent jurisdiction may otherwise order.

(g)     If the Requisite Lenders determine that for any reason in connection with any request for a Loan or a conversion (if such Loan may be converted) to or continuation thereof that (i) Dollar deposits are not being offered to banks in London interbank eurodollar market for the applicable amount and LIBOR Period of such Loan, (ii) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested LIBOR Period with respect to a proposed LIBOR Loan, or (iii) the LIBOR Rate for any requested LIBOR Period or in connection with a LIBOR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Parent Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBOR Loans as to which the interest rate is determined with reference to LIBOR Rate shall be suspended until the Agent (upon instruction of the Requisite Lenders) revokes such notice. Upon receipt of such notice, the Parent Borrower may revoke any pending request for a borrowing of, conversion (if applicable) or continuation of LIBOR Loans or, failing that, will, notwithstanding anything to the contrary in the last sentence of Section 1.2(e) (if applicable), be deemed to have converted such request into a request for a Base Rate Loan in the amount specified therein.

1.3     Fees.

(a)     Fee Letter. Holdings and Parent Borrower shall pay the Fees specified in the Fee Letters to the parties specified therein.

(b)     Unused Line Fee.  As additional compensation for the Lenders, Parent Borrower on behalf of Borrowers shall pay to Agent, for the benefit of the Lenders based on their respective Pro Rata Shares, in arrears, on the first Business Day of each Fiscal Month prior to the Commitment Termination Date and on the Commitment Termination Date, a fee (the "Unused Line Fee") for Borrowers' non-use of available funds in an amount equal to the Applicable Unused Line Fee Margin per annum for such period multiplied by the difference between (i) the Maximum Amount (as it may be adjusted from time to time) and (ii) the average for the period of the daily closing balances of the Revolving Loan (including, without duplication, outstanding Swing Line Loans and Letter of Credit Obligations) outstanding during the period for which such Fee is due.

(c)     Letter of Credit Fee.  Parent Borrower on behalf of itself and the other Borrowers agrees to pay to Agent for the benefit of Lenders based on their respective Pro Rata Shares, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) all reasonable costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each Fiscal Month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "Letter of Credit Fee") in an amount equal to the Applicable L/C Margin from time to time in effect multiplied by the maximum amount available from time to time to be drawn under the applicable Letter of Credit.  Such fee shall be paid to Agent for the benefit of the Lenders based on their respective Pro Rata Shares monthly in arrears, on the first Business Day of each Fiscal Month and on the Commitment Termination Date.  Parent Borrower on behalf of Borrowers shall pay directly to L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by L/C Issuer pursuant to this Agreement equal to one-fourth of one percent (0.25%) per annum of the daily maximum amount then available to be drawn under such Letter of Credit.  Such fee shall be paid to L/C Issuer monthly in arrears on the first Business Day of each Fiscal Quarter and on the Commitment Termination Date.  In addition, Parent Borrower on behalf of Borrowers shall pay to any L/C Issuer, on demand, such fees (including all per annum fees), charges and expenses of such L/C Issuer in respect of the issuance, negotiation, acceptance, amendment, transfer and payment of such Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued.

(d)     LIBOR Breakage Fee.  Upon (i) any default by any Borrower in making any borrowing of, conversion into or continuation of any LIBOR Loan following such Borrower's delivery to Agent of any LIBOR Loan request in respect thereof or (ii) any payment of a LIBOR Loan on any day that is not the last day of the LIBOR Period applicable thereto (regardless of the source of such prepayment and whether voluntary, by acceleration or otherwise), such Borrower shall pay Agent, for the benefit of all Lenders that funded or were prepared to fund any such LIBOR Loan, the LIBOR Breakage Fee.

(e)     Expenses and Attorneys' Fees.  Parent Borrower on behalf of itself and the other Borrowers agrees to promptly (and in any event no less than on a monthly basis, ten (10) Business Days after submission of invoices documenting out-of-pocket expenses, subject to the Financing Orders or other order of the Bankruptcy Court) pay all reasonable and documented out-of-pocket expenses (including reasonable and documented attorneys' fees and expenses of one counsel for the Agent and each of the other Decision Agents and Wells Fargo Capital Finance, LLC, i.e. 3 counsels total) incurred by Agent, the Decision Agents and the Arrangers in connection with any matters contemplated by or arising out of the Loan Documents or in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated herein and in connection with the continued administration of the Loan Documents, including any amendments, modifications, consents and waivers.  Parent Borrower on behalf of itself and the other Borrowers agrees to promptly pay reasonable and documented out-of-pocket expenses incurred by Agent for amendments, waivers, consents and any of the documentation prepared by Agent's external legal counsel.  Borrowers agree to promptly pay all reasonable documented out-of-pocket expenses (including those listed in Section 4.1(e), reasonable

documented out-of-pocket fees and expenses of attorneys, auditors (whether internal or external), appraisers (including with respect to the field audits and appraisals contemplated by Section 4.1(e) which may be conducted by agents of the Agent), consultants and advisors) incurred by Agent, the Decision Agents or the Arrangers in connection with any Event of Default, work-out or action to enforce any Loan Document or to collect any payments due from Parent Borrower or any other Credit Party.  In addition, in connection with any work-out or action to enforce any Loan Document or to collect any payments due from Parent Borrower or any other Credit Party, Borrowers agree to promptly pay all fees, charges, costs and expenses incurred by Lenders for (i) one (1) counsel acting for all Lenders other than Agent or the Arrangers unless (A) the interests of the Lenders are sufficiently divergent, in which case one additional counsel may be appointed, or (B) if the interests of any Lender or group of Lenders (other than all of the Lenders) are distinctly or disproportionately affected, one additional counsel for such Lender or group of Lenders and (ii) such other local counsel in each appropriate jurisdiction as the Agent reasonably determines are necessary or advisable in connection with the creation, perfection, priority and/or enforcement of the Liens granted to the Agent for the benefit of the Secured Parties.  All fees, charges, costs and expenses for which Borrowers are responsible under this Section 1.3(e) shall be deemed part of the Obligations when incurred, payable upon demand or by the making of a Revolving Credit Advance or Swing Line Advance in accordance with the final sentence of Section 1.4 and secured by the Collateral.

       1.4     Payments.  All payments by Borrowers of the Obligations shall be without deduction, defense, setoff or counterclaim and shall be made in same day funds and delivered to Agent, for the benefit of Agent and the Secured Parties, as applicable, by wire transfer to the following account or such other place as Agent may from time to time designate in writing.

Bank of America, NA
New York, NY
ABA# 0260-0959-3
Account Name:  Bank of America Business Capital
Account: #9369337536
Reference:  Bank of America Business Capital - Neff Corp.

Borrowers shall receive credit on the day of receipt for funds received by Agent by 2:00 p.m. (New York time).  In the absence of timely receipt, such funds shall be deemed to have been paid on the next Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and Fees due hereunder.

       Borrowers hereby authorize Lenders to make Revolving Credit Advances or Swing Line Advances, on the basis of their Pro Rata Shares, for the payment of interest, Fees and expenses (but only if such expenses have been unpaid for six Business Days or more after Parent Borrower has been provided an invoice therefor), Letter of Credit reimbursement obligations and any amounts required to be deposited with respect to outstanding Letter of Credit Obligations pursuant to Section 1.5(f) or Section 6.3.

       1.5     Prepayments.

       (a)     Voluntary Prepayments of Loans.  At any time, Borrowers may prepay the Loans, in whole or in part, without premium or penalty subject to the payment of LIBOR Breakage Fees, if applicable.  Unless a Borrower shall otherwise elect in accordance with clause (b) below, a prepayment of Loans shall not constitute or result in a reduction of the Revolving Loan Commitments.

(b)     <u>Voluntary Termination and Reduction of Revolving Loan Commitment</u>.  Upon not less than three (3) Business Days irrevocable prior written notice to Agent, Parent Borrower on behalf of Borrowers may at any time (i) terminate in whole the Revolving Loan Commitment and on the date specified in such notice the Revolving Loan Commitment shall terminate and all Obligations shall become immediately due and payable or (ii) reduce in part ratably the Revolving Loan Commitments of the Lenders; <u>provided</u> that each partial reduction shall be in an aggregate amount of not less than $1,000,000 or an integral multiple of 500,000 in excess thereof; and <u>provided</u>, <u>further</u>, that no such partial reduction shall be permitted if, after giving effect to such reduction, if any, the then outstanding Revolving Loan (including any outstanding Swing Line Loans and Letter of Credit Obligations) would exceed the Revolving Loan Commitments unless Borrowers shall have prepaid such outstanding Revolving Loans and/or Swing Line Loans or shall have provided cash or a standby letter of credit (in form and substance and from an issuer reasonably satisfactory to Agent) as collateral for such outstanding Letter of Credit Obligations (in an amount equal to 105% of such outstanding Letter of Credit Obligations) in excess of the Revolving Loan Commitments then in effect.

(c)     <u>Mandatory Prepayments</u>.

(i)     Prepayments from Asset Dispositions.

Within five (5) Business Days of receipt by Holdings or any of its Subsidiaries of any Net Proceeds in respect of Asset Disposition(s) pursuant to <u>Sections 3.7(b)(ii)</u> and <u>(d)</u> in excess of $5,000,000, individually or in the aggregate, during any Fiscal Year, Borrowers shall repay the Revolving Credit Advances (without reduction of the Revolving Loan Commitment) by an amount equal to the amount of any reduction in the Borrowing Base attributable to the Asset Disposition giving rise to such Net Proceeds to the extent that any such reduction would result in the outstanding principal balance of the Revolving Loans (including, without duplication, Swing Line Loans and Letter of Credit Obligations) exceeding the Borrowing Base, in effect at such time, determined based upon the most recent Borrowing Base Certificate delivered (or required to be delivered) by Parent Borrower to Agent pursuant to <u>Section 3.7</u> or <u>Section 4.1(e)</u>, as applicable.

(ii)     Other Mandatory Prepayments.

(A)     In the event that the sum of all Lenders' Revolving Loans (including, without duplication, Swing Line Loans and Letter of Credit Obligations) exceeds the Borrowing Base then in effect other than as permitted pursuant to <u>Section 1.1(a)(ii)</u>, Borrowers shall, without notice or demand, repay Revolving Loans in an aggregate amount sufficient to eliminate such excess.

(B)     In the event that the aggregate Letter of Credit Obligations exceeds the L/C Sublimit then in effect Borrowers shall, without notice or demand, within two (2) Business Days cancel outstanding Letters of Credit or cash collateralize outstanding Letter of Credit Obligations in an aggregate amount sufficient to eliminate such excess in an amount equal to 105% of the aggregate of such outstanding Letter of Credit Obligations.

(C)     In the event that the outstanding Swing Line Loans exceeds, other than as permitted pursuant to <u>Section 1.1(a)(ii)</u>, the Swing Line Commitment then in effect, Borrowers shall, without notice or demand, within one (1) Business Day repay or prepay Swing Line Loans in an aggregate amount sufficient to eliminate such excess.

(d)     Application of Proceeds.  With respect to any prepayments made by Borrowers pursuant to Sections 1.5(a), 1.5(b) or 1.5(c)(i) (other than any amount applied to the Revolving Credit Advances as a result of the reduction of the Borrowing Base as specified therein or as otherwise stated in Section 1.5(c)(ii)), such prepayments shall be applied as follows:  first, to interest then due and payable on the Swing Line Loan; second, to reduce the outstanding principal balance of the Swing Line Loan until the same has been repaid in full; third, pro rata among Lenders to interest then due and payable on Revolving Credit Advances; and fourth, pro rata among Lenders to the outstanding Revolving Credit Advances until the same has been repaid in full.  Considering each type of Revolving Loan being prepaid separately, any such prepayment shall be applied first to Base Rate Loans before application to LIBOR Loans in a manner which minimizes any resulting LIBOR Breakage Fee.

(e)     Notice of Prepayment.  Parent Borrower shall notify the Agent by irrevocable written notice of any prepayment hereunder (i) in the case of prepayment of a Base Rate Loan, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment and (ii) in the case of prepayment of a LIBOR Loan, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment. Such notice shall be irrevocable. Each such notice shall specify the prepayment date, the principal amount of each Loan prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Agent shall advise the Lenders of the contents thereof.

(f)     Letter of Credit Obligations.  In the event any Letters of Credit are outstanding at the time that the Revolving Loan Commitment is terminated, Borrowers shall (1) deposit with Agent for the benefit of all Lenders cash in an amount equal to 105% of the aggregate outstanding Letter of Credit Obligations or provide a standby letter of credit (in form and substance and from an issuer reasonably satisfactory to Agent) in a face amount equal to 105% of the aggregate outstanding Letter of Credit Obligations, in each case to be available to Agent to reimburse payments of drafts drawn under such Letters of Credit and pay any Fees and expenses related thereto and (2) prepay the fee payable under Section 1.3(c) with respect to such Letters of Credit for the full remaining terms of such Letters of Credit.  Upon termination of any such Letter of Credit, the unearned portion of such prepaid fee attributable to such Letter of Credit shall be refunded to Parent Borrower on behalf of Borrowers.

1.6     Maturity.  All of the Obligations shall become due and payable as otherwise set forth herein, but in any event all of the remaining Obligations (other than contingent indemnification Obligations to the extent no unsatisfied claim has been asserted) under this Agreement and the Loan Documents shall become due and payable upon termination of this Agreement or the Agreement on the Commitment Termination Date or otherwise.  Until all Obligations have been fully paid and satisfied (other than contingent indemnification obligations to the extent no unsatisfied claim has been asserted), the Revolving Loan Commitment has been terminated, all Letters of Credit have been terminated or otherwise secured to the reasonable satisfaction of Agent, Agent shall be entitled to retain the security interests in the Collateral granted under the Collateral Documents and the ability to exercise all rights and remedies available to Agent and the Secured Parties under the Loan Documents and applicable laws.  Notwithstanding anything contained in this Agreement to the contrary, upon any termination of the Revolving Loan Commitment, all of the Obligations shall be due and payable.

1.7     Eligible Accounts.  All of the Accounts (other than Ineligible Accounts) owned by any Borrower reflected in the most recent Borrowing Base Certificate delivered by Parent Borrower to Agent shall be "Eligible Accounts" for purposes of this Agreement.  The Decision Agents shall have the right to establish, modify or eliminate Reserves against Eligible Accounts from time to time in their Permitted Discretion.  An "Ineligible Account" shall mean an Account of any Borrower as to which any of the exclusionary criteria set forth below applies:

(a)     that does not arise from the sale or lease of goods or the performance of services by such Borrower in the ordinary course of its business;

(b)     (i) upon which the right of such Borrower to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever or (ii) as to which such Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process, or (iii) if the Account represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract (other than a lease or rental agreement for Rental Fleet and Equipment in the ordinary course of business) under which the Account Debtor's obligation to pay that invoice is subject to such Borrower's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

(c)     to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account but only to the extent of such offset;

(d)     that is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for merchandise sold or leased to or services rendered and accepted by the applicable Account Debtor;

(e)     with respect to which an invoice, in form and substance reasonably acceptable to Agent, has not been sent to the applicable Account Debtor; provided that it is understood and agreed that Parent Borrower's standard form invoice previously provided to Agent is acceptable;

(f)     that (i) is not owned by such Borrower or (ii) is subject to any right, claim, security interest or other interest of any other Person, other than (A) Liens in favor of Agent, on behalf of itself and the Secured Parties or (B) Permitted Encumbrances that are junior in priority to the Liens of the Agent securing the Obligations, provided that, with respect to any tax Lien having such priority, eligibility of such Accounts shall, without duplication, be reduced only by the amount of such tax Lien;

(g)     that arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity that has any common officer or director with any Credit Party;

(h)     that is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof unless Agent, in its sole discretion, has agreed to the contrary in writing and such Borrower, if necessary or desirable, has complied with respect to such obligation with the Federal Assignment of Claims Act of 1940, or any applicable state, county or municipal law restricting the assignment thereof with respect to such obligation;

(i)     that is the obligation of an Account Debtor located (i) in a foreign country other than Canada unless payment thereof is assured by a letter of credit assigned and delivered to Agent, reasonably satisfactory to Agent as to form, amount and issuer or (ii) in a state in which such Borrower is deemed to be doing business under the laws of such state and which denies creditors access to its courts in the absence of a qualification to transact business in such state or of the filing of any reports with such state, unless such Borrower has qualified as a foreign entity authorized to transact business in such state or has filed all required reports, except in the case of clause (ii) to the extent such Borrower may qualify subsequently as a foreign entity authorized to transact business in such state and gain access to such courts, without incurring any cost or penalty reasonably viewed by the Agent to be material in amount, and such later qualification cures any access to such courts to enforce payment of such Accounts;

(j) to the extent such Borrower is liable for goods sold or services rendered by the applicable Account Debtor to such Borrower or any of its Subsidiaries but only to the extent of the potential offset;

(k) that arises with respect to goods that are delivered on a bill-and-hold basis, arises as a result of any consideration consisting of a credit received by such Borrower or any of its Subsidiaries in connection with any Trade-In Transaction, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional;

(l) that is in default; <u>provided</u> that, without limiting the generality of the foregoing, an Account shall be deemed in default upon the occurrence of any of the following:

> (i) the Account is not paid within the earlier of sixty (60) days following its due date or ninety (90) days following its original invoice date;

> (ii) the Account Debtor obligated upon such Account suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or

> (iii) a petition is filed by or against any Account Debtor obligated upon such Account under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

(m) that is the obligation of an Account Debtor if 50% or more of the Dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth in this <u>Section 1.7</u>;

(n) as to which Agent's Lien thereon, on behalf of itself and Lenders, is not a first priority perfected Lien;

(o) as to which any of the representations or warranties in the Loan Documents are untrue;

(p) to the extent such Account is evidenced by a judgment, Instrument or Chattel Paper (other than any Account evidenced by a lease or rental agreement for Rental Fleet and Equipment unless (i) such Chattel Paper or Instrument is not required to be delivered to Agent pursuant to this Agreement or (ii) if such Chattel Paper or Instrument is required to be delivered to Agent pursuant to this Agreement, such Chattel Paper or Instrument has been so delivered);

(q) to the extent that such Account, together with all other Accounts owing to such Account Debtor and its Affiliates as of any date of determination exceeds 15% of all Eligible Accounts of such Borrower except as may otherwise be agreed to by Agent in its sole discretion;

(r) that is payable in any currency other than Dollars;

(s) in the case of any Rental Payment, is not subject to a written lease agreement;

(t) in the case of any Rental Payment, is not subject to a first priority security interest in favor of Agent for the benefit of the Secured Parties, perfected by possession of all Chattel Paper related to such Rental Payment (to the extent possession of such Chattel Paper is required by this Agreement) or by the filing of a financing statement, which financing statement indicates that a purchase of or

security interest in such Chattel Paper by or in favor of any Person other than Agent is in violation of the rights of Agent;

(u)      with respect to which such Borrower has made an agreement with the Account Debtor to extend the time of payment thereof; or

(v)      that represents, in whole or in part, a billing for interest, fees or late charges, provided that such Account shall be ineligible only to the extent of the amount of such billing.

1.8     Eligible Parts Inventory.  All of the Parts Inventory (other than Ineligible Parts Inventory) owned by any Borrower and reflected in the most recent Borrowing Base Certificate delivered by Parent Borrower to Agent shall be "Eligible Parts Inventory" for purposes of this Agreement.  The Decision Agents shall have the right to establish, modify, or eliminate Reserves against Eligible Parts Inventory from time to time in their Permitted Discretion.  "Ineligible Parts Inventory" shall mean Parts Inventory as to which any of the exclusionary criteria set forth below applies:

(a)      [reserved];

(b)      is not owned by such Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure performance by such Borrower with respect to that Inventory), except the Liens in favor of Agent, on behalf of itself and the Secured Parties, and Permitted Encumbrances that are junior in priority to the Liens of Agent securing the Obligations (other than any bailee, warehouseman, landlord or similar non-consensual Liens having priority by operation of law to the extent subclauses (ii) or (iii) of clause (c) below is satisfied with respect to the relevant Parts Inventory), provided that, with respect to any tax Lien having priority, eligibility of such Parts Inventory shall, without duplication, be reduced only by the amount of such tax Lien;

(c)      (i) is not located on premises owned, leased or rented by such Borrower located in a state of the United States of America or the District of Columbia; (ii) is stored at a leased location, unless Agent has given its prior consent thereto or unless (A) a reasonably satisfactory landlord waiver has been delivered to Agent or (B) a Rent Reserve has been established with respect thereto; or (iii) is stored with a bailee or warehouseman or is in a processor or converter facility unless a reasonably satisfactory, acknowledged bailee letter or other agreement waiving or subordinating all Liens and claims by such Person to the Liens of Agent or a Rent Reserve has been established with respect thereto;

(d)      is placed on consignment or is in transit, except for Inventory in transit in the United States of America or the District of Columbia as to which Agent's Liens in such Inventory remain perfected without any further action by Agent;

(e)      is covered by a negotiable document of title, unless such document has been delivered to Agent with all necessary endorsements, free and clear of all Liens except those in favor of Agent, on behalf of itself and the Secured Parties, and Permitted Encumbrances that are junior in priority to the Liens of Agent securing the Obligations (other than any bailee, warehouseman, landlord or similar non-consensual Liens having priority by operation of law to the extent subclauses (ii) or (iii) of clause (c) above is satisfied with respect to the relevant Parts Inventory), provided that, with respect to any tax Lien having priority, eligibility of such Parts Inventory shall, without duplication, be reduced only by the amount of such tax Lien;

(f)      is excess, obsolete, unsaleable, shopworn, seconds, damaged or unfit for sale;

(g)      consists of display items or packing or shipping materials, manufacturing supplies, work-in-process Inventory;

(h)      consists of goods which have been returned by the buyer;

(i)      is not held for sale, lease or use in the ordinary course of business of such Borrower;

(j)      is not subject to a first priority Lien in favor of Agent on behalf of itself and the Secured Parties, subject to no other Liens, other than Permitted Liens that are junior in priority to the Liens of the Agent securing the Obligations;

(k)      breaches any of the representations or warranties pertaining to Inventory set forth in the Loan Documents;

(l)      consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(m)      is not covered by casualty insurance (subject to customary deductibles);

(n)      is held by such Borrower under a Vendor Lease;

(o)      is being leased to a third party as lessee (i) which has commenced a voluntary case or has consented to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under the Bankruptcy Code or (ii) with respect to which a court has entered a decree or order for relief in an involuntary case under the Bankruptcy Code; or

(p)      is subject to a third party's trademark or other proprietary right which renders such Parts Inventory non-marketable.

1.9     Eligible Rental Fleet and Equipment. All of the Rental Fleet and Equipment (other than Ineligible Rental Fleet and Equipment) owned by any Borrower and reflected in the most recent Borrowing Base Certificate delivered by Parent Borrower to Agent shall be "Eligible Rental Fleet and Equipment" for purposes of this Agreement. The Decision Agents shall have the right to establish, modify, or eliminate Reserves against Eligible Rental Fleet and Equipment from time to time in their Permitted Discretion. "Ineligible Rental Fleet and Equipment" shall mean Rental Fleet and Equipment as to which any of the exclusionary criteria set forth below applies:

(a)      is not Rental Fleet and Equipment;

(b)      is not classified as "rental equipment, net" on Holdings' balance sheet;

(c)      is not owned by such Borrower free and clear of all Liens (including Lien securing Purchase Money Obligations) and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure performance by such Borrower with respect to that Inventory), except the Liens in favor of Agent, on behalf of itself and the Secured Parties, and Permitted Encumbrances that are junior in priority to the Liens of Agent securing the Obligations (other than any bailee, warehouseman, landlord or similar non-consensual Liens having priority by operation of law to the extent subclauses (ii) or (iii) of clause (d) below is satisfied with respect to the relevant Rental Fleet and Equipment), provided that, with respect to any tax Lien having priority,

eligibility of such Rental Fleet and Equipment shall, without duplication, be reduced only by the amount of such tax Lien;

(d)        (i) is not (A) located on premises owned, leased or rented by such Borrower located in a state of the United States of America or the District of Columbia or (B) being leased by a customer of such Borrower and used by such customer at a location of such customer in a state of the United States of America or the District of Columbia pursuant to the terms of a rental agreement entered into between such customer and such Borrower; (ii) is stored at a leased location, unless Agent has given its prior consent thereto or unless (A) a reasonably satisfactory landlord waiver has been delivered to Agent or (B) a Rent Reserve has been established with respect thereto; or (iii) is stored with a bailee or warehouseman or is in a processor or converter facility unless a reasonably satisfactory, acknowledged bailee letter or other agreement waiving or subordinating all Liens and claims by such Person to the Liens of Agent or a Rent Reserve has been established with respect thereto;

(e)        is placed on consignment or is in transit or is being serviced, except for Rental Fleet and Equipment in transit or being serviced in the United States of America or the District of Columbia as to which Agent's Liens in such Inventory remain perfected without any further action by Agent;

(f)        is covered by a negotiable document of title, unless such document has been delivered to Agent with all necessary endorsements, free and clear of all Liens except those in favor of Agent and the Secured Parties, and Permitted Encumbrances that are junior in priority to the Liens of the Agent securing the Obligations (other than any bailee, warehouseman, landlord or similar non-consensual Liens having priority by operation of law to the extent subclauses (ii) or (iii) of clause (d) above is satisfied with respect to the relevant Rental Fleet and Equipment), provided that, with respect to any tax Lien having priority, eligibility of such Rental Fleet and Equipment shall, without duplication, be reduced only by the amount of such tax Lien;

(g)        is excess, obsolete, unsaleable, shopworn, seconds, damaged or unfit for sale;

(h)        is not held for sale, lease or use in the ordinary course of business of such Borrower;

(i)        is not subject to a first priority Lien in favor of Agent on behalf of itself and the Secured Parties, subject to no other Liens, and Permitted Liens that are junior in priority to the Liens of the Agent securing the Obligations;

(j)        breaches any of the representations or warranties pertaining to Rental Fleet and Equipment set forth in the Loan Documents;

(k)        consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(l)        is not covered by casualty insurance (subject to customary deductibles);

(m)        is held by such Borrower under a Vendor Lease or any other lease where a Credit Party is a lessee;

(n)        is being leased to a third party as lessee (i) which has commenced a voluntary case or has consented to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under the Bankruptcy Code or (ii) with respect to which a court has entered a decree or order for relief in an involuntary case under the Bankruptcy Code;

(o)    is non-serialized Rental Fleet and Equipment;

(p)    which is not segregated or separated identifiably from goods or third parties stored on the same premises as such Rental Fleet and Equipment; or

(q)    which does not meet the applicable standards imposed by any Governmental Authority.

1.10    <u>Eligible Rolling Stock</u>.  All of the Rolling Stock owned by any Borrower and reflected in the most recent Borrowing Base Certificate delivered by Parent Borrower to Agent shall be "<u>Eligible Rolling Stock</u>" for purposes of this Agreement so long as (a) the ownership thereof is evidenced by a Certificate of Title that has the name of a Borrower noted thereon as the owner of it or is otherwise properly registered in one of the States or territories of the United States to such Borrower that is entitled to operate such Rolling Stock in the state or territory that has issued such Certificate of Title in accordance with all applicable laws (other than any Rolling Stock the ownership of which is not required to be evidenced by a Certificate of Title under the laws applicable to it) and Agent has received such evidence thereof as it may reasonably require; (b) the name of the Agent is noted on the Certificate of Title therefor as lienholder (or Agent shall have received evidence, reasonably satisfactory to it, that Agent has a first priority, valid and perfected security interest in such Rolling Stock, except as to priority, subject to Permitted Liens hereof); (c) the Certificate of Title is held by Corporation Service Company for the benefit of the Agent; (d) such Rolling Stock meets, in all material respects, all applicable material safety and other standards of all motor vehicle laws or other statutes and regulations established by any Governmental Authority and is not subject to any licensing or similar requirement that would materially limit the right of Agent to sell or otherwise dispose of such Rolling Stock; and (e) is used or usable in the ordinary course of a Borrower's business or is expected to be used or usable and in operable condition within sixty (60) days.

The Decision Agents shall have the right to establish, modify, or eliminate Reserves against Eligible Rolling Stock from time to time in their Permitted Discretion.

If Rolling Stock is included in the Collateral, Agent is hereby authorized by the Credit Parties to execute and deliver in such Credit Party's name, Agent's name or the name of Agent's designee, to any Department of Motor Vehicles or other Governmental Authority powers of attorney in such Credit Party's name, and to complete in such Credit Party's name, any application or other document or instrument required, in each case, in order to have the lien and security interest of Agent with respect to any Rolling Stock noted on any Certificate of Title with respect to such Rolling Stock.

1.11    <u>Loan Accounts</u>.  Agent shall maintain a loan account (the "<u>Loan Account</u>") on its books to record:  all Advances, all payments made by Borrowers, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations.  All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Agent's most recent printout or other written statement, shall, absent manifest error, be conclusive evidence of the amounts due and owing to Agent and Lenders by Borrowers; <u>provided</u> that any failure to so record or any error in so recording shall not limit or otherwise affect Borrowers' duty to pay the Obligations.  Notwithstanding any provision herein contained to the contrary, any Lender may elect (which election may be revoked) to dispense with the issuance of Notes to that Lender and may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

1.12    <u>Yield Protection; Illegality</u>.

(a) <u>Capital Adequacy and Other Adjustments</u>. In the event that any Lender shall have reasonably determined that the adoption after the date hereof of any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) from any central bank or governmental agency or body having jurisdiction does or shall have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender or any corporation controlling such Lender and thereby reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder, then Borrowers shall from time to time within fifteen (15) days after notice and demand from such Lender (together with the certificate referred to in the next sentence and with a copy to Agent) pay to Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender for such reduction; <u>provided</u>, <u>however</u>, that Borrowers shall not be required to compensate any Lender pursuant to this paragraph for any amounts incurred more than 90 days prior to the date that such Lender notifies Parent Borrower of such Lender's intention to claim compensation therefor, and <u>provided</u>, <u>further</u>, that if the circumstances giving rise to such claim have a retroactive effect, then such 90-day period shall be extended to include the period of such retroactive effect. A certificate as to the amount of such cost and showing the basis of the computation of such cost submitted by such Lender to Parent Borrower and Agent shall, absent manifest error, be final, conclusive and binding for all purposes.

(b) <u>Increased LIBOR Funding Costs; Illegality</u>. Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law, rule, regulation, treaty or directive (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any LIBOR Loan, then, unless that Lender is able to make or to continue to fund or to maintain such LIBOR Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Parent Borrower through Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain LIBOR Loans shall terminate and (ii) Borrowers shall forthwith prepay in full all outstanding LIBOR Loans owing by Borrowers to such Lender, together with interest accrued thereon, unless Parent Borrower on behalf of Borrowers, within five (5) Business Days after the delivery of such notice and demand, converts (to the extent such LIBOR Loans may be converted) all such LIBOR Loans into Base Rate Loans. If, after the Closing Date, the introduction of, change in or interpretation of any law, rule, regulation, treaty or directive would impose or increase reserve requirements (other than as taken into account in the definition of LIBOR) or otherwise increase the cost (except for any taxes that are neither Excluded Taxes or Other Taxes) to any Lender of making or maintaining a LIBOR Loan, then Borrowers shall from time to time within fifteen (15) days after notice and demand from Agent to Parent Borrower (together with the certificate referred to in the next sentence) pay to Agent, for the account of all such affected Lenders, additional amounts sufficient to compensate such Lenders on an after tax basis for such increased cost; <u>provided</u>, <u>however</u>, that Borrowers shall not be required to compensate any Lender pursuant to this paragraph for any amounts incurred more than 90 days prior to the date that such Lender notifies Parent Borrower of such Lender's intention to claim compensation therefor, and <u>provided</u>, <u>further</u>, that if the circumstances giving rise to such claim have a retroactive effect, then such 90-day period shall be extended to include the period of such retroactive effect. A certificate as to the amount of such cost and showing the basis of the computation of such cost submitted by Agent on behalf of all such affected Lenders to Parent Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)     Change of Lending Office.  Each Lender agrees that upon the occurrence of any event giving rise to the operation of clauses (a) and (b) above with respect to such Lender, it will, if requested by Parent Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office no economic, legal or regulatory disadvantage; and provided, further, that nothing in this clause (c) shall affect or postpone any of the obligations of Parent Borrower or the other Borrowers or the rights of any Lender pursuant to clauses (a) and (b) above.

1.13     Taxes.

(a)     No Deductions.  Subject to the immediately succeeding sentences and Section 1.13(e) below, any and all payments or reimbursements by any Credit Party made hereunder, under the Notes or under any other Loan Document shall be made free and clear of and without deduction for any and all Taxes, and all liabilities with respect thereto of any nature whatsoever imposed by any taxing authority, excluding (i) such Taxes to the extent imposed on Agent's or a Lender's net income (including franchise taxes imposed in lieu of net income taxes) by the jurisdiction in which Agent or such Lender is organized or is engaged in business (including the jurisdiction in which a principal office or applicable lending office is located) or as a result of a present connection between the Lender or Agent and the jurisdiction of a taxing authority (other than any business or connection arising solely from having executed, delivered, been a party to or performed its obligations or received any payments under, enforced or engaged in any other transactions pursuant to any Loan Document), (ii) any United States federal withholding tax that would not have been imposed but for a failure by a Lender (or any financial institution through which any payment is made to such Lender) to comply with the procedures, certifications, information reporting, disclosure, or other related requirements of Sections 1471-1474 of the Code, (iii) any United States federal backup withholding Tax imposed under Section 3406 of the Code and (iv) any United States federal withholding tax resulting from a Lender's failure to comply with Section 1.13(c) (the Taxes described in clauses (i)-(iv) collectively "Excluded Taxes").  Except as otherwise provided in this Section 1.13, if any Credit Party or the Agent shall be required by current or future law to deduct any such amounts from or in respect of any sum payable hereunder or under any other Loan Document to any Lender or Agent, then the sum payable by the applicable Credit Party shall be increased as may be necessary so that, after making all required deductions, such Lender or Agent receives an amount equal to the sum it would have received had no such deductions been made.  All required deductions shall be complied with and paid over to the relevant taxing authority or other Governmental Authority in accordance with applicable law.  Notwithstanding the foregoing, no Credit Party shall have any obligation to increase the sum payable hereunder or under any other Loan Document (or pay additional amounts) pursuant to this Section 1.13(a) with respect to any United States federal withholding taxes that would apply to a payment hereunder or under any other Loan Document made to any Lender (or to the Agent on behalf of such Lender) that are required by any applicable law in effect (i) when such Lender became a Lender or (ii) immediately after such Lender changes its applicable lending office, except to the extent that (x) where the Lender is an assignee, such Lender's assignor was entitled, immediately prior to the assignment to such Lender, to additional amounts in respect of such taxes or (y) where the Lender changes its applicable lending office, such Lender was entitled to additional amounts in respect of such taxes immediately prior to such change in lending office.

(b)     Changes in Laws.  In the event that, subsequent to the Closing Date, any changes in any existing law, regulation, treaty or directive or in the interpretation or application thereof or any new law, regulation, treaty or directive enacted or any interpretation or application thereof:

(i)     does or shall subject Agent or any Lender to any Tax of any kind whatsoever with respect to this Agreement, the other Loan Documents or any Loans made or Letters of Credit issued hereunder or thereunder, or change the basis of taxation of payments to Agent or such Lender of principal, fees, interest or any other amount payable under any Loan Document (except, in each case, for Excluded Taxes and any changes with respect thereto and Taxes that are covered by <u>Section 1.13(a)</u>, <u>1.13(f)</u> or <u>1.13(g)</u>); or

(ii)     does or shall impose on Agent or any Lender any other condition or increased cost (other than Taxes) in connection with the transactions contemplated hereby or participations herein;

and the result of any of the foregoing is to increase the cost to Agent or any such Lender of issuing any Letter of Credit or making or continuing any Loan hereunder, as the case may be, or to reduce any amount receivable hereunder or under any Loan Document, then, in any such case, subject to <u>Section 1.13(c)</u> below and without duplication, Borrowers shall promptly pay to Agent or such Lender, upon its demand, any additional amounts necessary to compensate Agent or such Lender, on an after-tax basis, for such additional cost or reduced amount receivable, as determined by Agent or such Lender with respect to this Agreement or the other Loan Documents.  If Agent or such Lender becomes entitled to claim any additional amounts pursuant to this <u>Section 1.13(b)</u>, it shall promptly notify Parent Borrower of the event by reason of which Agent or such Lender has become so entitled.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or such Lender to Parent Borrower (with a copy to Agent) shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)     <u>Tax Documentation</u>.

(i)     Prior to becoming a Lender under this Agreement and from time to time thereafter upon the reasonable request of Parent Borrower or Agent, each Lender organized under the laws of a jurisdiction outside the United States (a "<u>Foreign Lender</u>"), to the extent it is legally entitled to do so, shall provide to Parent Borrower and Agent any of the following forms applicable to such Lender (i) a properly completed and executed IRS Form W-8BEN (claiming a complete exemption or a reduction under an applicable treaty) or Form W-8ECI plus any additional form, certificate or document or a successor form prescribed by the IRS of the United States, certifying as to such Foreign Lender's entitlement to a complete exemption from or a reduction in United States federal withholding tax with respect to payments to be made to such Foreign Lender under any Loan Document, (ii) in the case of a Foreign Lender that is not a "bank" (within the meaning of Section 881(c)(3)(A) of the IRC) and meets the qualifications under the "portfolio interest" exemption rules, a properly completed and executed IRS Form W-8BEN and a written certificate to the effect that such Foreign Lender is eligible for a complete exemption with respect to payments of interest under Section 871(h) or 881(c) of the IRC (in each case, a "<u>Certificate of Exemption</u>") or (iii) where the Lender is not the beneficial owner for tax purposes (e.g., where the Lender is a partnership or has sold a participation), a properly completed and executed IRS Form W-8IMY, together with all required attachments with respect to the beneficial owners (including applicable IRS Forms W-8 and W-9) and, where one or more of the beneficial owners is claiming  the "portfolio interest" exemption, Certificates of Exemption from each such beneficial owner (provided that, where the Lender is a partnership and not a participating lender, the Lender may provide any applicable Certificates of Exemption on behalf of its partners).  In addition, each Lender shall from time to time, upon the reasonable written request of any Credit Party or Agent, provide other certificates or forms that are necessary in order for payments made

hereunder or under the Notes to be qualified for an exemption from, or a reduction in, withholding taxes or deductions.

(ii)     To the extent it is legally entitled to do so, each Lender that is a United States person within the meaning of Section 7701(a)(30) shall provide to Parent Borrower and Agent, prior to becoming a Lender under this Agreement and from time to time therafter upon the reasonable request of Parent Borrower or Agent, a properly completed and executed IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.

(iii)     Upon the occurrence of any event that renders any prior documentation provided by a Lender obsolete, inaccurate or invalid, or upon the expiration of any such prior documentation, such Lender shall promptly provide Parent Borrower and Agent with updated documentation or promptly notify Parent Borrower and Agent that such Lender is unable to do so.

(iv)     For the avoidance of doubt, no Lender shall be required to deliver any documentation under this Section 1.13(c) that such Lender is not legally eligible to deliver.

(d)     If a Credit Party is required to increase the sum payable hereunder (or pay additional amounts) to any Lender or Agent pursuant to this Section 1.13, such Lender or Agent shall, at the request and expense of the Credit Party, change the jurisdiction of its applicable lending office if such change (i) will eliminate or reduce any such increase in the payment obligation (or additional amounts) and (ii) is, in such Lender's reasonable judgment, determined not to be materially disadvantageous to such Lender.

(e)     To the extent any Lender has received (as determined by such Lender in its reasonable judgment) any refund of any taxes with respect to which any Credit Party paid an increased sum or additional amounts pursuant to this Section 1.13, such Lender shall pay the amount of such tax refund (net of any expenses) to such Credit Party; provided that such Credit Party shall repay such amount to such Lender (with any interest and penalties charged by the taxing authority) if the amount of the refund is required to be repaid to the relevant taxing authority.

(f)     In addition, the Credit Parties agree to pay any current or future stamp or documentary taxes or any other excise or property taxes, charges, assessments or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement, the other Loan Documents or any Loans made or Letters of Credit issued hereunder ("Other Taxes").

(g)     Each Credit Party agrees to indemnify each Lender and Agent for the full amount of non-Excluded Taxes and Other Taxes paid by such Lender or Agent, as the case may be, and any liability (including penalties, interest and expenses other than penalties, interest and expenses resulting from the Lender's gross negligence or willful misconduct) arising therefrom or with respect thereto. Such indemnification shall be made within thirty (30) days after the date any Lender or Agent, as the case may be, makes written demand therefor. Notwithstanding the foregoing, the Credit Parties shall not be required to provide any indemnity pursuant to the preceding sentence with respect to any Taxes for which additional amounts would not be payable by virtue of the final sentence of Section 1.13(a).

(h)     Within thirty (30) days after the date of any payment of Taxes or Other Taxes withheld or paid by a Credit Party in respect of any payment to any Lender (or assignee Lender) or Agent,

the Credit Party will furnish to Agent, at its address for notices specified in <u>Section 11.3</u> hereof, the original or a certified copy of any available receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Agent.

**SECTION 2.**

**<u>AFFIRMATIVE COVENANTS</u>**

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

2.1     <u>Compliance with Laws and Contractual Obligations</u>.  Each Credit Party will (a) comply with and shall cause each of its Subsidiaries to comply with (i) the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, including the Bankruptcy Court or other court with jurisdiction over the Bankruptcy Cases (including, without limitation, laws, rules, regulations and orders relating to taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters and employee health and safety) as now in effect and which may be imposed in the future in all jurisdictions in which any Credit Party or any of its Subsidiaries is now doing business or may hereafter be doing business and (ii) to the extent permitted by the Bankruptcy Court, the obligations, covenants and conditions contained in all Contractual Obligations arising after the Petition Date or Contractual Obligations of such Credit Party or any of its Subsidiaries other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with which could not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect and except for such Contractual Obligations being diligently contested in good faith, and (b) maintain or obtain and shall cause each of its Subsidiaries to maintain or obtain all rights, franchises, licenses, qualifications and permits now held or hereafter required to be held by such Credit Party or any of its Subsidiaries, for which the loss, suspension, revocation or failure to obtain or renew, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  This <u>Section 2.1</u> shall not preclude any Credit Party or its Subsidiaries from contesting any taxes or other payments, if they are being diligently contested in good faith in a manner which stays enforcement thereof and if appropriate expense provisions have been recorded in conformity with GAAP, subject in the case of any Lien in connection therewith, to the terms and conditions of <u>Section 3.2</u>.

2.2     <u>Insurance; Damage to or Destruction of Collateral</u>.

(a)     The Credit Parties shall, at their sole cost and expense, maintain with financially sound and reputable insurance companies, or through self-insurance, insurance on all their property in at least such amounts and against at least such risks (but including in any event public liability coverage) as are usually insured against in the same general area by companies engaged in the same or a similar business; <u>provided</u>, notwithstanding any industry standard, any amount of self insurance shall be commercially reasonable and must be reasonably satisfactory to Agent.  Such policies of insurance shall contain provisions pursuant to which the insurer agrees to (i) name Agent, for its benefit and the benefit of the Secured Parties, as additional insured, (ii) in the case of all property insurance policies, name the Agent as lender loss payee, (iii) in the case of all property insurance policies, provide a breach of warranty in favor of Agent and the Secured Parties, (iv) provide for a waiver of subrogation in favor of Agent and the Secured Parties and (v) provide 30 days prior written notice to Agent in the event of any non-renewal, cancellation or amendment of any such insurance policy.  If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay all premiums relating thereto, Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Agent deems advisable.  Agent

shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor.  By doing so, Agent shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor.  All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrowers to Agent and shall be additional Obligations hereunder secured by the Collateral.  Without limiting the generality of the foregoing, Borrowers will maintain or cause to be maintained flood insurance with respect to each Mortgaged Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System.

(b)     Upon the reasonable request of Agent, each Credit Party shall deliver to Agent from time to time a report of a reputable insurance broker, reasonably satisfactory to Agent, with respect to its insurance policies.

(c)     Each Credit Party shall deliver to Agent, at the time of the applicable policy renewal, in form and substance reasonably satisfactory to Agent, certificates of insurance evidencing (i) all "All Risk" policies naming Agent, on behalf of itself and the Secured Parties, as additional insured and loss payee, with a breach of warranty in favor of Agent and the Secured Parties, (ii) all general liability and other liability policies naming Agent, for the benefit of itself and the Secured Parties, as additional insured and (iii) waiver of subrogation and thirty (30) days notice of cancellation for all insurance policies.  Each Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as (i) any Event of Default has occurred and is continuing or the casualty giving rise to such insurance proceeds could reasonably be expected to result in a Material Adverse Effect and (ii) the anticipated insurance proceeds exceed $5,000,000 (an "Insurance Trigger Event"), as each Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such "All Risk" policies of insurance, endorsing the name of each Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance.  Agent shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power of attorney.  Parent Borrower shall promptly notify Agent of any loss, damage or destruction to the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance.  If the applicable Credit Party receives insurance proceeds as a result of a casualty which does not result in an Insurance Trigger Event, or, with the consent of Agent, otherwise, such Credit Party shall replace, restore, repair or rebuild the property; provided that if such Credit Party has not completed or entered into binding agreements to complete such replacement, restoration, repair or rebuilding within one hundred eighty (180) days of such casualty, Agent may apply such insurance proceeds to the Obligations in accordance with Section 1.5(d).  If the Agent receives any insurance proceeds following an Insurance Trigger Event, after deducting from any insurance proceeds the expenses, if any, incurred by Agent in the collection or handling thereof, Agent may, at its option, apply such proceeds to the reduction of the Obligations in accordance with Section 1.5(d).

2.3     Inspection.  Each Credit Party shall permit any authorized representatives of Agent to visit, audit and inspect any of the properties of such Credit Party and its Subsidiaries, including its and their financial and accounting records, and to make copies and take extracts therefrom, and to discuss its and their affairs, finances and business with its and their officers and certified public accountants, at such reasonable times during normal business hours and upon reasonable notice to the applicable Credit Party, and as often as may be reasonably requested.  Representatives of each Lender will be permitted to accompany representatives of Agent during each visit, inspection and discussion referred to in the immediately preceding sentence, at the expense of such Lender or, following an Event of Default, at the expense of such Credit Party.

2.4     Organizational Existence.  Except as a result  of the filing of the Bankruptcy Cases or as otherwise permitted by Section 3.6, each Credit Party will and will cause its Subsidiaries to at all times preserve and keep in full force and effect its organizational existence.

2.5     Environmental Matters.  Each Credit Party (a) shall and shall cause its Subsidiaries and shall take commercially reasonable steps to cause each tenant, subtenant contractor, subcontractor and invitee of any of them to conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, including without limitation perform all investigation, remediation, removal and response actions that are necessary to comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate; and (b) shall notify Agent promptly after such Credit Party or any of its Subsidiaries becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities to a Credit Party or its Subsidiaries in excess of $5,000,000. If Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Subsidiary, tenant, subtenant, contractor, subcontractor or invitee of such Credit Party or any Subsidiary or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, then Parent Borrower shall, upon Agent's written request cause the performance of such environmental assessments reasonably necessary to evaluate the alleged noncompliance or Release (which in the event of a potential Release may include subsurface sampling of soil and groundwater) and preparation of such environmental reports, at Borrowers' expense, as Agent may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent.  If an environmental assessment requested by Agent pursuant to the preceding sentence is not initiated within thirty (30) Business Days following receipt of Agent's request therefor, then each Credit Party and its Subsidiaries shall permit Agent or its representatives to have access to the parcel of Real Estate where the alleged violation or Release occurred for the purpose of conducting such environmental assessments and sampling; provided that any such environmental assessment or sampling shall be conducted in such a manner as to minimize interference with the conduct of the Credit Parties' operations and Agent shall use commercially reasonable efforts to conduct such environmental assessment or sampling in such a manner that would not result in a material violation of any lease relating to such Real Estate.  Borrowers shall reimburse Agent for the costs of such assessments and samples and the same will constitute a part of the Obligations secured hereunder. The Credit Parties may require that prior to entry on any Real Estate any representative of Agent that will conduct sampling shall present evidence of reasonable general liability and professional liability insurance.

2.6     Landlords' Agreements, Bailee Letters and Real Estate Purchases.

(a)     Each Credit Party shall use commercially reasonable efforts to obtain a landlord's waiver and consent agreement or bailee letter, as applicable, from the lessor of each leased property, mortgagee of owned property or bailee with respect to any warehouse, processor or converter facility or other location where Collateral is stored or located in a Landlord Lien State, which agreement or letter shall be reasonably satisfactory in form and substance to the Decision Agents (any such agreement or letter delivered prior to the Closing Date shall be deemed reasonably satisfactory in form and substance to the Decision Agents).  Without limiting any other rights Decision Agents may have to establish Reserves with respect to such locations or warehouse space leased or owned as of the Original Closing Date, if the

Decision Agents have not received a landlord's agreement or bailee letter as of the Original Closing Date (or such later date as may be agreed to by Agent in its sole discretion), the Collateral at that location in a Landlord Lien State shall, in the Decision Agents' Permitted Discretion, be subject to a Rent Reserve (without duplication of existing reserves).

(b)    If after the Closing Date, any Credit Party or any of its Subsidiaries (i) enters into a lease for real property or warehouse space or (ii) establishes arrangements or enters into Contractual Obligations pursuant to which Parts Inventory or Rental Fleet and Equipment shall be shipped to a processor or converter, such Credit Party or Subsidiary, as the case may be, shall use commercially reasonable efforts to cause a landlord's waiver and consent agreement or bailee letter, as appropriate, to be obtained with respect to such location in a Landlord Lien State in form and substance reasonably satisfactory to Decision Agents; provided that unless and until such time as such landlord's waiver and consent agreement or bailee letter, as appropriate, shall be obtained and delivered to Agent, each of the Credit Parties agrees that the Decision Agents shall be permitted (i) in the case of any leased real property, to establish a Rent Reserve in respect of such location and (ii) in the case of Parts Inventory or Rental Fleet and Equipment located at any warehouse facility or shipped to any processor or converter, to exclude such Parts Inventory or Rental Fleet and Equipment from the Borrowing Base or establish a Rent Reserve (but not both). Each Credit Party shall and shall cause its Subsidiaries to timely and fully pay and perform their material obligations under all leases and other agreements with respect to each leased location or public warehouse where any Parts Inventory or Rental Fleet and Equipment is or may be located.

2.7    Conduct of Business.  Each Credit Party shall at all times maintain, preserve and protect all of its assets and properties necessary for the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and transact business only in such corporate and trade names as are set forth in Schedule 2.7 (as amended) or other names notified to Agent in accordance with the Loan Documents.

2.8    Further Assurances.

(a)    Borrowers and Holdings shall, from time to time, execute such guaranties, financing statements, documents, security agreements and reports as any Decision Agent at any time may reasonably request to evidence, perfect or otherwise implement the guaranties and security for repayment of the Obligations contemplated by the Loan Documents and the Related Swap Contracts.

(b)    In the event a Borrower or Holdings acquires an interest in real property after the Closing Date, within ninety (90) days of the acquisition thereof (or such later date as may be agreed to by the Decision Agents) such Person shall deliver to Agent a fully executed mortgage or deed of trust over such real property in form and substance reasonably satisfactory to Decision Agents, together with such title insurance policies, surveys, evidence of insurance, legal opinions and other documents and certificates as shall be reasonably required by Decision Agents.

(c)    Parent Borrower and each other Credit Party shall (i) cause each Person, upon its becoming a Wholly Owned Domestic Subsidiary of Parent Borrower (other than a Subsidiary that is a Subsidiary of a Foreign Subsidiary), promptly to execute and deliver to Agent a Joinder Agreement and (A) become party to this Agreement as a Credit Party pursuant to such Joinder Agreement and (B) to grant to Agent, for the benefit of Agent and the Secured Parties, a security interest in the real, personal and mixed property of such Person to secure the Obligations, and take all actions required hereby to perfect such security interest and (ii) pledge, or cause to be pledged, to Agent all of the Stock of such Subsidiary, in each case, to secure the Obligations.  The documentation required pursuant to the foregoing sentence

shall be accompanied by such certificates, legal opinions and other documents as may be reasonably requested by the Decision Agents. Notwithstanding the foregoing, the provisions of this clause (c) shall not apply to assets as to which the Decision Agents shall have determined in writing in their reasonable discretion, after consultation with Parent Borrower, that the costs and burdens of obtaining a security interest are excessive in relation to the value of the security afforded thereby.

(d) After the acquisition by Parent Borrower or any of its Subsidiaries of assets or personal property of the type that would have constituted Collateral on the Closing Date, including investments of the type that would have constituted Collateral on the Closing Date, Parent Borrower will take, or will cause their Subsidiaries to take, all necessary action, including (i) the filing of appropriate financing statements under the applicable provisions of the Code, applicable domestic or local laws, rules or regulations in each of the offices where such filing is necessary or appropriate, (ii) to the extent required by Section 2.9, the execution and delivery of Control Agreements and (iii) to the extent required by this Agreement, the notation of the Lien of Agent on any certificate of title for Collateral constituting Eligible Rental Fleet or Equipment, in each case, to create and perfect a first priority Lien on such Collateral pursuant to and to the full extent required by this Agreement or any of the Collateral Documents. Notwithstanding the foregoing, the provisions of this clause (d) shall not apply to assets as to which the Decision Agents shall determined in writing in their reasonable discretion, after consultation with Parent Borrower, that the costs and burdens of obtaining a security interest are excessive in relation to the value of the security afforded thereby.

(e) Notwithstanding anything to the contrary in this Section 2.8, with respect to any Subsidiary of Parent Borrower which becomes a Credit Party at any time after the Closing Date, the Accounts, Parts Inventory and Rental Fleet and Equipment of such new Credit Party or in respect of such newly acquired assets, as applicable, shall not be included in the Borrowing Base until (i) Agent shall have conducted such appraisals, audits, evaluations and/or inspections of such Collateral as the Decision Agents shall deem reasonably necessary or advisable with respect to such Collateral and (ii) Holdings, Parent Borrower and such Subsidiary shall have complied with the requirements of this Section 2.8.

2.9    Control Agreements.

(a) Each of Holdings and Parent Borrower shall, and shall cause each other Credit Party by the date of the Final Order to (or such later date chosen in the sole discretion of Decision Agents) (i) enter into Control Agreements granting the Agent full cash dominion at all times during the term of this Agreement with respect to each deposit account, securities account and commodities account maintained by Holdings, Parent Borrower or any such Credit Party as of or after the Closing Date, (ii) deposit in a deposit account subject to a Control Agreement all cash received on each Business Day and (iii) not establish or maintain any deposit account, securities account or commodities account unless such deposit account, securities account or commodities account is subject to a Control Agreement as provided in Section 3.14, in each case, other than (A) any payroll account so long as such payroll account is a zero balance account, (B) any disbursement account so long as the cash and Cash Equivalents on deposit in such disbursement account shall not exceed $100,000 at any time and (C) cash and Cash Equivalents on deposit in or credited to the balance of withholding tax, trust and other fiduciary accounts. Each such Control Agreement shall be in form and substance reasonably satisfactory to the Decision Agents (it being understood that the control agreements of the Credit Parties currently in place are in form and substance reasonably satisfactory except that full dominion will be established). Each Credit Party shall enter into and maintain with one or more banks and pursuant to agreements in form and substance reasonably satisfactory to the Decision Agents, lock box arrangements.

(b)     Each of Holdings and Parent Borrower shall, and shall cause each Credit Party, to (i) direct each Account Debtor or other Person obligated to make a payment to any of them under any Account or General Intangible to make payment to the applicable Credit Party directly to a lockbox account or other deposit account subject to a Control Agreement and (ii) deposit in a deposit account or securities account (as applicable) subject to a Control Agreement promptly (but in any event within three (3) Business Days) upon receipt all Proceeds (as defined in the Code) of such Accounts and General Intangibles received by Holdings, Parent Borrower or any such Credit Party from any other Person.

(c)     It is understood and agreed that amounts deposited in or credited to deposit accounts, securities accounts or commodities accounts subject to Control Agreements or credited to the lock-box account will be transferred on a daily basis to the Concentration Account and shall not be available to the applicable Credit Party.

2.10     <u>Business and Properties</u>.  To the extent permitted by the Bankruptcy Court, the Credit Parties shall do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, Patents, Copyrights, Trademarks and trade names reasonably useful to the conduct of their business except where the failure to do so could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable requirements of law and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property reasonably useful to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times except where the failure to do so could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

2.11     <u>Bankruptcy Cases Filings, Documents, Etc</u>.  The Parent Borrower will use commercially reasonable efforts to furnish to the Decision Agents:

(i)     At least two (2) Business Days prior to the filing thereof in the Bankruptcy Court, all pleadings, motions or filings related to this Agreement and the other Loan Documents and/or any Asset Disposition permitted pursuant to Section 3.7(g) hereunder (including motions or other filings relating to the use of cash collateral);

(ii)     At least two (2) Business Days prior to the filing thereof in the Bankruptcy Court, all other pleadings, motions, applications, financial information and other papers and documents filed by any of the Credit Parties in the Bankruptcy Cases; and

(iii)     At least two (2) Business Days prior to the filing thereof in the Bankruptcy Court, all written reports given by the Credit Parties or their respective attorneys, accountants, or advisors to the Creditors' Committee (or any other committee appointed by the debtors in the Bankruptcy Cases) in the Bankruptcy Cases;

(iv)     and shall in the case of items provided under clause (i), give the Agent a meaningful opportunity to comment thereon during such two Business Day period.

2.12    Additional Borrowers.  The Parent Borrower will promptly notify the Agent at the time that any Person becomes a Subsidiary, and (a) if applicable, promptly thereafter (and in any event within five days), file a motion seeking an order of the Bankruptcy Court authorizing such Person to become a Borrower hereunder and (b) cause or, if applicable, immediately upon the entry of such order cause, (i) such Person to become a Borrower by executing and delivering to the Agent a counterpart of the Joinder Agreement in the form attached as Exhibit A hereto, and (ii) deliver to the Agent documents of the types referred to in clauses (1), (2) and (3) of Section D of the Closing Checklist in Annex C hereto all in form, content and scope reasonably satisfactory to the Decision Agents.

2.13    Compliance with Financing Orders. The Parent Borrower and Holdings shall comply, and shall cause each of their Subsidiaries to comply, with the Interim Order and the Final Order.

2.14    Retention of Financial Advisor; Executives. The Parent Borrower shall allow access to, upon reasonable notice during normal business hours in a time and manner to minimize disruption to the Credit Parties, and pay the reasonable and out-of-pocket documented fees and reasonable and out-of-pocket documented expenses of, one consultant hired by the Lenders, such retention to be on terms and conditions reasonably satisfactory to the Decision Agents and Parent Borrower.

2.15    Bankruptcy Cases Related Matters and Deadlines.  The Parent Borrower shall cause (a) the Plan of Reorganization, together with a disclosure statement related thereto, to be filed with the Bankruptcy Court on or prior to 120 days from the Petition Date, (b) a confirmation hearing with the Bankruptcy Court relating to the Plan of Reorganization to be held on or prior to 270 days from the Petition Date, and (c) the Plan Effective Date to have occurred on or prior to 285 days from the Petition Date.

2.16    Post-Closing Matters.  Notwithstanding anything herein to the contrary, the Credit Parties shall not be required to comply with Section 2.6(a), Section 2.9(a) or Section 2.9(b) until the date of the Final Order, or such later date as may be consented to by the Decision Agents.

## SECTION 3.

## NEGATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof until the Termination Date:

3.1    Indebtedness.  The Credit Parties shall not and shall not cause or permit their Subsidiaries directly or indirectly to create, incur, assume, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness except:

(a)    the Obligations;

(b)    intercompany Indebtedness to the extent permitted pursuant to Sections 3.3(b);

(c)    Indebtedness existing prior to the date hereof and permitted by the Pre-Petition First Lien Credit Agreement;

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)     Contingent Obligations permitted pursuant to Section 3.4 of this Agreement;

(h)     Any unsecured Indebtedness not to exceed $1,000,000 in the aggregate at any one time outstanding;

(i)     Indebtedness in respect of overdraft facilities, employee credit card programs and other cash management arrangements in the ordinary course of business; and

(j)     Indebtedness consisting of insurance premiums due or financed in the ordinary course of business over the course of the year.

3.2     Liens and Related Matters.

(a)     No Liens.  Subject to the Financing Orders, the Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any property or asset of such Credit Party or any such Subsidiary, whether now owned or hereafter acquired, or any income or profits therefrom, except (collectively, the "Permitted Encumbrances"):

(i)     Permitted Liens;

(ii)     Liens existing on the Petition Date as set forth on Schedule 3.2 (so long as they are junior in priority to the Liens securing the Obligations unless otherwise expressly noted on such Schedule);

(iii)     [Reserved];

(iv)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by Parent Borrower or any of the other Credit Parties in the ordinary course of business permitted by this Agreement;

(v)     Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Parent Borrower or any of the other Credit Parties to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Parent Borrower and the other Credit Parties or (iii) relating to purchase orders and other agreements entered into with customers of Parent Borrower or any of the other Credit Parties in the ordinary course of business;

(vi)     additional Liens granted by the Bankruptcy Court to the Pre-Petition Secured Parties and junior creditors pursuant to the Financing Orders;

(vii)     any other Lien created, incurred, assumed or suffered by a Credit Party on or after the Petition Date, if such Lien is (A) junior to the Liens of the Agent and the Lenders hereunder and junior to any adequate protection Liens granted to the Pre-Petition Secured Parties in accordance with the Financing Orders and (B) approved by the Bankruptcy Court with the prior written consent of the Decision Agents in their sole and absolute discretion;

(viii)     the Carve-Out;

(ix)     any Lien arising in connection with the financing of insurance premiums not otherwise prohibited hereunder;

(x)     Liens arising from the filing of precautionary financing statements under the Code by lessors with respect to operating leases; and

(xi)     Liens not otherwise permitted by clauses (i) through (x) above securing obligations not constituting Indebtedness in an aggregate principal amount not to exceed $2,000,000 at any time outstanding.

(b)     <u>No Negative Pledges</u>.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly enter into or assume any agreement (other than the Loan Documents, the Pre-Petition Loan Documents and any Capital Lease (but solely with respect to the assets subject to such Capital Lease) to the extent that such documents permit Liens securing the Obligations) in each case, to the extent the relevant Indebtedness is permitted under <u>Section 3.1</u>) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

(c)     <u>No Restrictions on Subsidiary Distributions to Parent Borrower</u>.  Subject to the Financing Orders and <u>Section 3.5</u> and except as provided herein or pursuant to the Senior Notes Indenture and the Pre-Petition Loan Documents (in each case, to the extent the relevant Indebtedness is permitted under <u>Section 3.1</u>), the Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual Lien, encumbrance or restriction of any kind on the ability of any such Subsidiary to:  (i) pay dividends or make any other distribution on any of such Subsidiary's Stock owned by Parent Borrower or any other Subsidiary; (ii) pay any Indebtedness owed to Parent Borrower or any other Subsidiary; (iii) make loans or advances to Parent Borrower or any other Subsidiary; or (iv) transfer any of its property or assets to Parent Borrower or any other Subsidiary.

3.3     <u>Investments</u>.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly make or own any Investment in any Person except:

(a)     Parent Borrower and its Subsidiaries may make and own Investments in cash and Cash Equivalents; provided that to the extent required by <u>Section 2.9</u>, such Investments shall be permitted only to the extent such cash and Cash Equivalents are maintained in a deposit account or securities account (as applicable) subject to a Control Agreement;

(b)     Investments consisting of intercompany loans, advances or capital contributions made by (i) any Borrower to another Borrower and (ii) any Subsidiary of Holdings that is not a Credit Party to (A) a Credit Party or (B) any other Subsidiary of Holdings that is not a Credit Party;

(c)     Parent Borrower and its Subsidiaries may make loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business not to exceed $1,000,000 in the aggregate at any time outstanding;

(d)     [reserved];

(e)     Investments by Parent Borrower and its Subsidiaries in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or in good faith settlement of delinquent obligations of such trade creditors or customers;

(f)     [reserved];

(g)     (i) accounts receivable and extended payment terms of Parent Borrower and its Subsidiaries provided to customers that are made, created or acquired in the ordinary course of business and (ii) Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(h)     Investments consisting of deposits, prepayments and other credits to suppliers made in the ordinary course of business of Parent Borrower and its Subsidiaries;

(i)     Investments existing on the Petition Date and set forth on <u>Schedule 3.3</u>;

(j)     [reserved];

(k)     [Reserved];

(l)     [reserved];

(m)     the formation of and Investments in new Domestic Subsidiaries of the Parent Borrower that are Credit Parties in compliance with Section 2.12; and

(n)     Investments not otherwise prohibited pursuant to the terms of this Agreement and provided for and disclosed in the Agreed Budget (and Permitted Variances thereto), <u>provided</u> that no such Investments shall be made if immediately prior to making such Investment, or after giving effect thereto, there shall exist an Event of Default.

3.4     <u>Contingent Obligations</u>.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly create or become or be liable with respect to any Contingent Obligation except:

(a)     guarantees by Parent Borrower or a Subsidiary of Parent Borrower of Indebtedness or other obligations permitted to be incurred under this Agreement; <u>provided</u> that no guarantee may be made by any Subsidiary of any Indebtedness unless such Subsidiary also guarantees the Obligations;

(b)     [reserved];

(c)     those resulting from endorsement of negotiable instruments for collection in the ordinary course of business;

(d)     those existing on the Petition Date and described in <u>Schedule 3.4</u>;

(e)     those arising under indemnity agreements to title insurers to cause such title insurers to issue (i) to Agent mortgagee title insurance policies and (ii) to the Credit Parties owner's title insurance policies;

(f)     those arising with respect to customary indemnification obligations incurred in connection with Asset Dispositions permitted hereunder;

(g)     those incurred with respect to Indebtedness permitted by <u>Section 3.1</u>; <u>provided</u> that in the case of any Contingent Obligation with respect to subordinated Indebtedness, any such Contin-

gent Obligation is subordinated to the Obligations to the same extent as the Indebtedness to which it relates is subordinated to the Obligations;

(h)     any other Contingent Obligations not expressly permitted by clauses (a) through (g) above, so long as any such other Contingent Obligations, in the aggregate at any time outstanding, do not exceed $2,000,000; and

(i)     those arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is extinguished within five (5) Business Days of incurrence.

3.5     Restricted Payments.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly declare, order, pay, make or set apart any sum for any Restricted Payment (other than dividends payable solely in common stock of the Person making such dividend), except that:

(a)     Parent Borrower may make Restricted Payments to Holdings (and Holdings may make Restricted Payments to any parent corporation of Holdings) the proceeds of which shall be used by such entity to pay consolidated or combined federal, state and local income taxes then due and owing, franchise taxes and other similar licensing expenses incurred in the ordinary course of business; provided that Borrower's aggregate contribution to taxes and licensing expenses as a result of the filing of a consolidated or combined return by such entity shall not be greater, nor the aggregate receipt of tax benefits less, than they would have been had Parent Borrower not filed a consolidated or combined return with such entity;

(b)     any Subsidiary of Parent Borrower may make Restricted Payments to Parent Borrower or any other Borrower; and

(c)     Parent Borrower or Holdings may make Restricted Payments to pay as and when due all reasonable amounts required to be paid in connection with the preparation and filing of all reports that Holdings or any parent thereof is or will be required to file with or furnish to the U.S. Securities and Exchange Commission, including reasonable fees and disbursements of Holdings' or such Person's counsel, accountants, financial printers and other third parties that are customarily involved in such filings.

3.6     Amendments to Constituent Documents; Restriction on Fundamental Changes.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly:

(a)     amend, modify or waive any term or provision of its organizational documents, including its articles of incorporation, certificates of designations pertaining to preferred stock, by-laws, partnership agreement or operating agreement in a manner materially adverse to Agent or Lenders unless required by law;

(b)     enter into any transaction of merger or consolidation except any Wholly Owned Subsidiary of Parent Borrower may be merged with or into Parent Borrower (provided that Parent Borrower is the surviving entity) or any other Wholly Owned Subsidiary of Parent Borrower (provided that if either such Subsidiary is a Credit Party, the surviving entity shall also be a Credit Party);

(c)     liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution) except (i) if Parent Borrower determines in good faith that such liquidation or dissolution of a Credit Party other than Parent Borrower is in the best interests of Parent Borrower and is not materially disadvanta-

geous to the Lenders and (ii) to the extent such Person is a Credit Party, any assets or business not otherwise disposed of or transferred in accordance with Sections 3.3 and 3.7, or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, another Credit Party after giving effect to such liquidation or dissolution;

(d)     [reserved]; or

(e)     (i) enter into any transaction of merger or consolidation except any Subsidiary of Holdings that is not a Credit Party may be merged with or into any other Subsidiary of Holdings that is not a Credit Party or into any Credit Party (provided that if either such Subsidiary is a Credit Party, the surviving entity shall also be a Credit Party) or (ii) sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary dissolution or otherwise) except to any Credit Party.

3.7     Disposal of Assets or Subsidiary Stock.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly consummate any Asset Disposition, or grant any Person an option to acquire, in one transaction or a series of related transactions, any of its property, business or assets, whether now owned or hereafter acquired, except:

(a)     the sale, lease, rental, transfer or other disposition of Parts Inventory and Rental Fleet and Equipment or Rolling Stock in good faith for fair value in the ordinary course of business;

(b)     the sale, lease, transfer or other disposition of (i) obsolete, worn-out or surplus equipment or leased or owned real property not used or useful in the business or (ii) Investments in cash or Cash Equivalents;

(c)     [reserved];

(d)     losses or destruction of, or damage to, or condemnation of any property of Holdings or its Subsidiaries so long as the Net Proceeds thereof are applied in accordance with Section 1.5(c);

(e)     Asset Dispositions by Parent Borrower and its Subsidiaries (excluding sales of Accounts and Stock of any of Parent Borrower's Subsidiaries) to Parent Borrower or another Credit Party;

(f)     Asset Dispositions by any Subsidiary of Holdings that is not a Credit Party to any other Subsidiary of Holdings that is not a Credit Party or to a Credit Party; and

(g)     Asset Dispositions in an aggregate amount not to exceed $1,000,000 (calculated as the greater of book value or purchase price) over the term of this Agreement to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the following conditions precedent are met: (x) at least 75% of the consideration received is cash or Cash Equivalents, (y) no Default or Event of Default then exists or would result from such Asset Disposition and (z) the Net Proceeds thereof are applied in accordance with Section 1.5(c).

3.8     Transactions with Affiliates.

(a)     The Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any management, consulting, investment banking, advisory or other similar services) with any Affiliate or with any director, officer or employee of any Credit Party (an "Affiliate Transaction"), other than Affiliate Transactions pursuant to the reasonable requirements of the business of any such Credit Party or any of its Subsidiaries and upon terms which are not materially less

favorable than those that might reasonably have been obtained by such Credit Party in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of Holdings or such Subsidiary.

(b)　　The restrictions of <u>clause (a)</u> of this <u>Section 3.8</u> shall not apply to:

(i)　　reasonable fees and compensation paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of Holdings, Parent Borrower or any of its Subsidiaries as determined in good faith by Parent Borrower's Board of Directors or senior management;

(ii)　　transactions exclusively between or among Parent Borrower and any of its Subsidiaries or exclusively between or among Subsidiaries, <u>provided</u> such transactions are not otherwise prohibited by this Agreement;

(iii)　　Affiliate Transactions as set forth on <u>Schedule 3.8</u> (including pursuant to any amendment to such Contractual Obligations or documentation replacing such Contractual Obligations to the extent that such amendment or agreement is permitted hereunder and is not more disadvantageous to the applicable Credit Party or the Lenders in any material respect than the original Contractual Obligation);

(iv)　　Restricted Payments permitted by this Agreement; and

(v)　　sales of Qualified Stock of Holdings.

3.9　　<u>Conduct of Business</u>.

(a)　　Holdings shall not engage in any business or activity other than (i) being a guarantor with respect to the Obligations under the Loan Documents and performing its Obligations thereunder, (ii) holding shares in the Stock of Parent Borrower, (iii) performing its obligations under the Senior Notes Documents and the Pre-Petition Loan Documents, (iv) paying taxes, (v) preparing reports to Governmental Authorities and to its shareholders, (vi) holding meetings of its Board of Directors and/or shareholders, preparing corporate records and other corporate activities required to maintain its separate corporate structure and (vii) any activities reasonably related thereto.

(b)　　The Credit Parties shall not and shall not cause or permit their Subsidiaries to engage in any businesses a majority of whose revenues are not derived from businesses that are the same as or reasonably similar, ancillary or related to, or a reasonable extension, development or expansion of, the businesses in which the Credit Parties and their Subsidiaries are engaged on the Closing Date as set forth on <u>Schedule 3.9</u>.

3.10　　<u>Changes Relating to Indebtedness</u>.　Except in connection with the Confirmed Plan of Reorganization, the Credit Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly change or amend the terms of any Indebtedness of any of the Credit Parties arising prior to the Petition Date if any such amendment, taken as a whole, is materially adverse to the interests of the Lenders.

3.11　　<u>Fiscal Year</u>.　No Credit Party shall change its Fiscal Year or permit any of its Subsidiaries to change their respective Fiscal Years.

3.12　　[Reserved].

3.13    [Reserved].

3.14    <u>Bank Accounts; Securities Accounts; Commodities Accounts</u>.  The Credit Parties shall not:

(a)    establish any new bank accounts without prior written notice to Agent and unless Agent and the depository institution at which the account is to be opened enter into a Control Agreement if required by <u>Section 2.9</u>;

(b)    establish any new securities accounts without prior written notice to Agent and unless Agent and the securities intermediary at which the account is to be opened enter into a Control Agreement if required by <u>Section 2.9</u>; and

(c)    establish any new commodities accounts without prior written notice to Agent and unless Agent and the commodities intermediary at which the account is to be opened enter into a Control Agreement if required by <u>Section 2.9</u>.

3.15    <u>Hazardous Materials</u>.  The Credit Parties shall not and shall not cause or permit their Subsidiaries to cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities by the Credit Parties or any of their Subsidiaries under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities or impairment of the value or marketability of the Real Estate that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

3.16    [Reserved].

3.17    <u>Lease Limits</u>.  Holdings will not and will not permit any of its Subsidiaries directly or indirectly to become or remain liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any operating lease, synthetic lease or similar off balance sheet financing relating to Rental Fleet and Equipment, if the aggregate amount of all rents (or substantially equivalent payments) paid by Holdings and its Subsidiaries under all such leases would exceed $10,000,000 in any Fiscal Year of Parent Borrower.

3.18    <u>Prepayments of Indebtedness</u>.  The Credit Parties shall not, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness of any of the Credit Parties arising prior to the Petition Date, except as permitted pursuant to an order of the Bankruptcy Court and set forth in the Agreed Budget.

3.19    <u>[Reserved]</u>.

3.20    <u>[Reserved]</u>.

3.21    <u>Compliance with Agreed Budget</u>.  Except as otherwise provided herein or approved by the Agent and the Requisite Lenders, the Credit Parties will not, and will not permit any Subsidiary to directly or indirectly (a) use any cash or the proceeds of any Loans in a manner or for a purpose other than those materially consistent with this Agreement, the Financing Orders and the most recent Agreed Budget (and Permitted Variances related thereto) and (b) permit a disbursement causing any Variance other than Permitted Variances without the prior written consent of the Agent and the Requisite Lenders.

3.22　Chapter 11 Claims. Except for the Carve-Out, the Credit Parties will not, and will not permit any Subsidiary to, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim (including, without limitation, Claims or Super-Priority Claims) or Lien which is pari passu with or senior to the Claims or Liens, as the case may be, of the Agent and the Lenders against the Credit Parties hereunder or under the Financing Orders, or apply to the Bankruptcy Court for authority to do so. No portion of the Carve-Out, any cash collateral, or proceeds of the Loans or any other amounts may be used for the payment of the fees and expenses of any person incurred in (i) challenging, or in relation to the challenge of, (1) any liens or claims of the Pre-Petition Secured Parties or (2) the Lenders' liens or claims, or the initiation or prosecution of any claim or action against any Pre-Petition Secured Parties, including any causes of action under chapter 5 of the Bankruptcy Code, and state law, or (ii) bringing or asserting any claims or causes of actions against the Pre-Petition Secured Parties or the Lenders under this Agreement (as the case may be), or their respective advisors, agents (including the Agent), and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien of the Pre-Petition Secured Parties under the Pre-Petition First Lien Credit Agreement. Notwithstanding the foregoing, no more than $50,000 of the Carve-Out, any cash collateral, or proceeds of the Loans may be used by any committee or any other representative of the Parent Borrower or Credit Party's estates to investigate claims and/or liens of the Pre-Petition Secured Parties under the Pre-Petition First Lien Credit Agreement.

3.23　Revision of Orders; Applications to Bankruptcy Court. The Credit Parties will not, and will not permit any Subsidiary to, directly or indirectly (a) seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order (if applicable) or the Final Order except for any modifications and amendments agreed to in writing by the Agent and the Requisite Lenders, or (b) apply to the Bankruptcy Court for authority to take any action prohibited by this Article III (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Agent and the Requisite Lenders).

## SECTION 4.

## FINANCIAL AND OTHER REPORTING COVENANTS

Each Credit Party covenants and agrees that from and after the date hereof until the Termination Date, such Credit Party shall perform and comply with, and shall cause each of the other Credit Parties to perform and comply with, all covenants in this Section 4 applicable to such Person.

4.1　Financial Statements and Other Reports. Holdings and Parent Borrower will maintain, and cause each of their Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit Financial preparation of Financial Statements in conformity with GAAP (it being understood that monthly Financial Statements are not required to have footnote disclosures). Parent Borrower will deliver each of the Financial Statements and other reports described below to Agent:

(a)　Monthly Financial Operating Reports. As soon as available, but in any event not later than the earlier of (x) ten (10) Business Days after the end of any month and (y) three (3) Business Days in advance of submission to the United States Trustee and/or filing with the Bankruptcy Court, Parent Borrower will deliver (i) any and all monthly operating reports required to be submitted for such applicable period to the office of the United States Trustee or filed for such applicable period with the Bankruptcy Court pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, (ii) a monthly utilization report, (iii) a monthly report of any additions or deletions to Rental Fleet and Equipment and (iv) a Borrowing Base Certificate, with respect to Borrowers, executed by a Responsible Officer of the

Parent Borrower, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion, which shall be prepared by Parent Borrower as of the last day of the immediately preceding month, in each case, and related guidance.

(b)     Quarterly Financials.  As soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter (other than at the Fiscal Year end), Parent Borrower will deliver (i) the consolidated balance sheets of Parent Borrower and its Subsidiaries, as at the end of such Fiscal Quarter, and the related consolidated statements of income, stockholders' equity and cash flow for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year of Parent Borrower to the end of such Fiscal Quarter (which financial statements shall have been subject to a SAS 100 or other similar review by Borrower's Accountants if otherwise available) and (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year.

(c)     Year-End Financials.  As soon as available and in any event within ninety (90) days after the end of each Fiscal Year of Parent Borrower, Parent Borrower will deliver (i) the consolidated balance sheets of Parent Borrower and its Subsidiaries, as at the end of such year, and the related consolidated statements of income, stockholders' equity and cash flow for such Fiscal Year, and (ii) a report from Borrower's Accountants, which report shall be prepared in accordance with Statement of Auditing Standards No. 58 (the "Statement") "Reports on Audited Financial Statements" and such report shall be "Unqualified" (as such term is defined in such Statement).

(d)     Accountants' Reports.  Promptly upon receipt thereof, Parent Borrower will deliver copies of all significant reports submitted by Borrower's Accountants in connection with each annual, interim or special audit or review of any type of the Financial Statements or related internal control systems of Parent Borrower and its Subsidiaries made by such accountants.

(e)     Additional Deliveries.

(i)     To Agent, as soon as available and in any event no less frequently than 12:00 p.m. (noon) (New York time) on the on the third Business Day of each week, a Borrowing Base Certificate, with respect to Borrowers, executed by a Responsible Officer of the Parent Borrower, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion (in substantially the same form as Exhibit 4.1(e) (the "Borrowing Base Certificate"), which shall be prepared by Parent Borrower as of the last day of the immediately preceding week.

(ii)     To the Arrangers, (A) By no later than the third (3rd) Business Day of every second week, commencing June 16, 2010, a certificate of a Financial Officer of the Borrower, setting forth a thirteen (13)-week (or such other period mutually agreed by the Agent and the Parent Borrower) a detailed budget for the 13 weeks following such two-week period of the Credit Parties' cash receipts and disbursements (each, a "Proposed Budget") and (B) by no later than the third (3rd) Business Day of every second week, commencing June 2, 2010 a certificate of a Financial Officer of the Borrower, setting forth a comparison of actual results and Variance that is cumulative from the Petition Date to such date of each of the line items set forth in the Agreed Budget, in each case under clause (A) or delivered prior to the Closing Date, with supporting detail and descriptions consistent as provided by the Parent Borrower pursuant to the Pre-Petition Credit Agreement, and (C) at any time, the Borrower may furnish a Proposed Budget; provided, in each case under clauses (A) and (C), a Proposed Budget will be deemed an Agreed Budget for all purposes hereunder unless 2 of the 3 the Arrangers have notified the Parent Borrower in writing within three (3) Business Days after receipt of such Pro-

posed Budget that such Arrangers do not approve of such Proposed Budget. If an Arranger provides notice to Parent Borrower it will provide such notice concurrently to the other Arrangers.

(iii)     To Agent, at the time of delivery of each of the quarterly financial statements and the annual Financial Statements delivered pursuant to Section 4.1(a), (b) and (c) to the extent applicable, (i) a listing of government contracts of Parent Borrower or any other Credit Party subject to the Federal Assignment of Claims Act of 1940; and (ii) a list of any applications for the registration of any Patent, Trademark or Copyright filed by any Credit Party with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the prior Fiscal Quarter.

(iv)     To Agent at the time of delivery of the annual financial statements delivered pursuant to Section 4.1(c) an update to the Perfection Certificate bringing down the information therein as of the date of such delivery in form reasonably satisfactory to Agent.

(f)     Appraisals; Inspections.

(i)     Each Credit Party, at its sole cost and expense, shall promptly deliver to Agent the results of each physical verification, if any, which such Credit Party may, in its discretion have made, or caused any other Person to have made on its behalf, of all or any portion of its Inventory.

(ii)     If a Default or Event of Default has occurred and is continuing, Parent Borrower, at its own expense, shall deliver to Agent the results of any physical verification, as Agent may reasonably require.

(iii)     [Reserved]

(iv)     Parent Borrower shall permit Agent or a Person designated by Agent to conduct a field audit of the Accounts and Parts Inventory twice during each Fiscal Year (at the times during such Fiscal Year determined by Agent and at the cost and expense of Parent Borrower); provided that so long as any Event of Default has occurred and is continuing, Parent Borrower, at its own expense, shall permit Agent or a Person designated by Agent to perform such audits at such times as Agent shall require. For the purposes of this clause (iv), an audit initiated by Agent or such Person while an Event of Default is continuing, shall be required whether or not such Event of Default continues through the time of completion of such audit.

(g)     Projections. Within 30 days after the end of each month Parent Borrower shall deliver a comparison of actual results and cumulative variance analysis for the preceding months of each of the amounts in the line items set forth in the Projections, in form consistent as provided by the Parent Borrower pursuant to the Pre-Petition Credit Agreement.

(h)     SEC Filings and Press Releases. Promptly upon their becoming available, Parent Borrower will deliver copies of (i) all Financial Statements, reports, notices and proxy statements sent or made available by Holdings, Parent Borrower or any of their Subsidiaries to the holders of any Indebtedness, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings, Parent Borrower or any of their Subsidiaries with any securities exchange or with the Securities and Exchange Commission, and (iii) all press releases and other statements made available by Holdings,

Parent Borrower or any of their Subsidiaries to the public concerning developments in the business of any such Person.

(i)     Events of Default, Etc.  Promptly (but in any event within two (2) Business Days) upon any officer of any Credit Party obtaining knowledge of any of the following events or conditions, Parent Borrower or such Credit Party shall deliver copies of all notices given or received by Holdings, Parent Borrower or any of their Subsidiaries with respect to any such event or condition and a certificate of Parent Borrower's chief executive officer specifying the nature and period of existence of such event or condition and what action Holdings, Parent Borrower or any of their Subsidiaries has taken, is taking and proposes to take with respect thereto:  (i) any condition or event that constitutes an Event of Default or Default; (ii) any written notice that any Person has given to Holdings, Parent Borrower or any of their Subsidiaries or any other action taken with respect to a claimed default or event or condition of the type referred to in Section 6.1(b); or (iii) any event or condition that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(j)     Litigation.  Promptly upon any officer of any Credit Party obtaining knowledge of (i) the institution of any action, suit, proceeding, governmental investigation, tax audit or arbitration now pending or, to the best knowledge of such Credit Party after due inquiry, threatened against or adversely affecting any Credit Party or any of its Subsidiaries or any property of any Credit Party or any of its Subsidiaries ("Litigation") not previously disclosed by Parent Borrower or any other Credit Party to Agent or (ii) any material development in any action, suit, proceeding, governmental investigation or arbitration at any time pending against or affecting any Credit Party or any property of any Credit Party which, in each case, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, Parent Borrower will promptly give notice thereof to Agent and provide such other information as may be reasonably available to them to enable Agent and its counsel to evaluate such matter.

(k)     ERISA.  Promptly upon any officer of any Credit Party obtaining knowledge of (i) the occurrence of a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the IRC) with respect to any Plan that would result in the imposition on Parent Borrower or any of its Subsidiaries of a tax or penalty that could reasonably be expected individually or in the aggregate to result in a Material Adverse Effect; (ii) any reportable event as defined in Section 4043(c) of ERISA with respect to a Title IV Plan (for which the 30-day notice requirement has not been waived); (iii) the creation of any Lien in favor of the PBGC or a Title IV Plan; (iv) any withdrawal by a Credit Party from, or the termination reorganization or insolvency of any Multiemployer Plan to which any Credit Part is making or is obligated to make contributions; or (v) the institution or taking of any other action by the PBGC, Holdings or any of its Subsidiaries under ERISA to terminate or to partially terminate any Title IV Plan or appoint a trustee to administer any such plan or the commencement or threatened commencement of any litigation regarding any such Plan that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, any Credit Party shall provide a written notice specifying the nature of such event, what action the Credit Parties or any ERISA Affiliates have taken, are taking or propose to take with respect thereto, and, when known, any action taken or threatened by the IRS, Department of Labor, PBGC or Multiemployer Plan sponsor with respect thereto.

(l)     Notice of Corporate and Other Changes.  Parent Borrower shall provide prompt (and in any event within five (5) Business Days) written notice of (i) any change after the Closing Date in the legal name of any Credit Party, (ii) any change after the Closing Date in the authorized and issued Stock of any Credit Party or any Subsidiary of any Credit Party (other than any change in the authorized and issued Stock of Holdings issued in connection with the grant of Stock or stock options to employees of Holdings or any of its Subsidiaries) or any amendment to their articles or certificate of incorporation, by-laws, partnership agreement or other organizational documents, (iii) any change in the jurisdiction of

organization of any Credit Party and (iv) any Subsidiary created or acquired by any Credit Party or any of its Subsidiaries after the Closing Date, such notice, in each case, to identify the applicable jurisdictions, capital structures or Subsidiaries, as applicable.  The foregoing notice requirement shall not be construed to constitute consent by any of the Lenders to any transaction referred to above which is not expressly permitted by the terms of this Agreement.  Notwithstanding the foregoing Parent Borrower shall not make or allow to be made any of the changes described in clauses (i) or (iii) above unless the Credit Parties have done everything necessary to continue the perfection of the Agent's security interest in the Collateral.

(m)     _Compliance and Pricing Certificate_.  Together with each delivery of Financial Statements of Holdings and its Subsidiaries pursuant to Sections 4.1 (a), (b) and (c), Parent Borrower will deliver a fully and properly completed Compliance and Pricing Certificate (in substantially the same form as Exhibit 4.1(m) (the "_Compliance and Pricing Certificate_") signed by Parent Borrower's chief executive officer or chief financial officer.

(n)     _Progress Calls_.  Parent Borrower shall hold bi-weekly progress conference calls for the Lenders, starting on the third (3rd) Business Day after the first day of the second week following the Closing Date, until the Commitment Termination Date.  Such conference calls shall be held every two weeks as soon as a responsible officer of the Parent Borrower is reasonably available to have such conference call and in any event no later than the third (3rd) Business Day after the first day of each second week.  During such conference calls a responsible officer of the Parent Borrower shall provide the participating Lenders with a reasonably comprehensive update on the Bankruptcy Cases, Variances with respect to the Agreed Budget and any other material information relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Credit Parties and any other information's that may be reasonably requested by the Agent or any Lender.

(o)     _Other Information_.  With reasonable promptness, each Credit Party will deliver such other information and data with respect to such Credit Party or any Subsidiary of such Credit Party as from time to time may be reasonably requested by Agent.

(p)     _Carve-Out Notice_.  If the amounts accrued under clause (a) of the definition of the term "Carve-Out" exceed $2,000,000 such excess shall be reported to the Agent by Parent Borrower upon Parent Borrower learning of such occurrence and, until such amounts are less than $2,000,000, on the third Business Day of every other week thereafter.

(q)     _Other Debt Documents_.  Holdings and Parent Borrower shall promptly deliver any amendment or material notice, report, certificate, financial statement or other instrument or document delivered after the Closing Date in connection with or pursuant to the Senior Notes Documents or any Pre-Petition Loan Document, in each case, to the extent not already delivered pursuant hereto.

Documents required to be delivered pursuant to Section 4.1(a), (b), (c) or (h) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Parent Borrower posts such documents, or provides a link thereto on Parent Borrower's website on the Internet at the website address listed in Section 11.3; or (ii) on which such documents are posted on Parent Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); _provided_ that (i) Parent Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests Parent Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) any such posting shall only be deemed delivered when Parent Borrower shall notify the Agent (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (_i.e._, soft copies) of such documents.  Notwithstanding any-

thing contained herein, in every instance Parent Borrower shall be required to provide paper copies of the Compliance and Pricing Certificates required by Section 4.1(m) to the Agent. Except for such Compliance and Pricing Certificates, the Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by Parent Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Parent Borrower hereby acknowledges that (a) the Agent and/or other Persons named on the facing page hereof will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of Parent Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to Parent Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Parent Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," Parent Borrower shall be deemed to have authorized the Agent, the Arrangers, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to Borrowers or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent applicable such Borrower Materials shall be treated as set forth in Section 11.13); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent and all other Persons shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

4.2    Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement. For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to such terms in conformity with GAAP. Financial statements and other information furnished to Agent or Lenders pursuant to Section 4.1 or any other section (unless specifically indicated otherwise) shall be prepared in accordance with GAAP as in effect at the time of such preparation.

## SECTION 5.

## REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into the Loan Documents, to make Loans and to issue or cause to be issued Letters of Credit, Holdings, Parent Borrower and the other Credit Parties executing this Agreement, jointly and severally, represent and warrant to Agent and each Lender that, on and as of the Closing Date and after giving effect to the making of the Loans hereunder on the Closing Date and the other Related Transactions occurring on the Closing Date, and on and as of each date as required by Section 7.2, the following statements are true, correct and complete with respect to all Credit Parties:

5.1    Disclosure. No statement or information of any Credit Party contained in this Agreement, any other Loan Documents or any other document, certificate or written statement furnished to Agent or any Lender by or on behalf of any such Person for use in connection with the Loan Documents, when taken as a whole, contained, as of the date of such statement, information, document or certificate so furnished, any untrue statement of a material fact or omits or will omit to state a material fact necessary

in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which the same were made.

5.2     No Material Adverse Effect.  Since the Petition Date, there have been no events or changes in facts or circumstances affecting any Credit Party or any of its Subsidiaries which individually or in the aggregate have had or could reasonably be expected to result in a Material Adverse Effect except, (A) the commencement and continuation of Bankruptcy Cases and (B) the continuation of the circumstances giving rise to the filing thereof or caused thereby.

5.3     No Conflict; Compliance with Laws.  Subject to the entry of the Interim Order or Final Order, as applicable, the consummation of the Related Transactions do not and will not violate or conflict with any laws, rules, regulations or orders of any Governmental Authority (including the Bankruptcy Court) or violate, conflict with, result in a breach of, or constitute a default (with due notice or lapse of time or both) under any Contractual Obligation owed by it arising after the Petition Date or under executory contacts and unexpired leases that has been assumed with the consent of the Decision Agents in the Bankruptcy Cases pursuant to Section 365 of the Bankruptcy Code or organizational documents of any Credit Party or any of its Subsidiaries.

Subject to the entry of the Interim Order or Final Order, as applicable, the Related Transactions do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect.

Such Credit Party (i) is in compliance and each of its Subsidiaries is in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority and the obligations, covenants and conditions contained in all Contractual Obligations other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with which could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, and (ii) maintains and each of its Subsidiaries maintains all licenses, qualifications and permits referred to above other than those licenses, qualifications and permits the failure of which to maintain could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

5.4     Organization, Powers, Capitalization and Good Standing.

(a)     Organization and Powers.  Each of the Credit Parties and each of their Subsidiaries is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and qualified to do business in all states where such qualification is required except where failure to be so qualified could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  As of the Closing Date, the exact legal name, the jurisdiction of organization and all jurisdictions in which each Credit Party is qualified to do business are set forth on Schedule 5.4(a).  Each of the Credit Parties and each of their Subsidiaries has all requisite organizational power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, to enter into each Loan Document to which it is a party and to incur the Obligations, grant Liens and security interests in the Collateral and carry out the Related Transactions. Each Credit Party has rights in and the power to transfer, pledge, assign, deliver, deposit and set over each item of the Collateral upon which it purports to grant a Lien hereunder.

(b)     Capitalization.  (i) As of the Closing Date, the authorized Stock of each of the Credit Parties and each of their Subsidiaries as set forth on and as presently represented by the certificates listed on Part A of Schedule 5.4(b) hereto constitute all of the issued and outstanding shares of all classes of stock owned by the relevant Credit Party; (ii) all issued and outstanding Stock of each of the Credit Parties and each of their Subsidiaries is duly authorized and validly issued, fully paid, nonassessable; (iii)

the Pledged Notes have been duly authorized, authenticated or issued and delivered by, and are the legal, valid and binding obligations of, the issuer thereof, and no such issuer thereof is in default thereunder; (iv) each Credit Party is, and at the time of delivery of the Pledged Stock to Agent will be, the sole holder of record and the sole beneficial owner of such Pledged Collateral pledged by each Credit Party free and clear of any Lien thereon or affecting the title thereto, except for any Lien created by this Agreement in favor of the Agent for the benefit of the Agent and Lenders and the Permitted Liens existing prior to the Closing Date and permitted by the Pre-Petition First Lien Credit Agreement; (v) each Credit Party is and at the time of delivery of the Pledged Notes to Agent will be, the sole owner of such Pledged Collateral free and clear of any Lien thereon or affecting title thereto, except for any Lien created by this Agreement, in favor of the Agent for the benefit of the Agent and Lenders and the Permitted Liens existing prior to the Closing Date and permitted by the Pre-Petition First Lien Credit Agreement; (vi) none of the Stock of the Credit Parties or their Subsidiaries or the Pledged Notes was issued or transferred in violation of the securities registration, securities disclosure or any applicable state, federal and foreign laws concerning the issuance or transfer of securities; (vii) as of the Closing Date, the identity of the holders of the Stock of each of the Credit Parties and each of their Subsidiaries and the percentage of their fully-diluted ownership of the Stock of each of the Credit Parties and each of their Subsidiaries is set forth on Part A of Schedule 5.4(b); (viii) as of the Closing Date, no Stock of any Credit Party or any of their Subsidiaries, other than as described on Part A of Schedule 5.4(b), are issued and outstanding; (ix) the Pledged Stock constitutes 100% of the issued and outstanding shares of Stock of each Pledged Entity that is a Domestic Subsidiary of a Credit Party; and (x) except as disclosed on Part B of Schedule 5.4(b), none of the Pledged Notes are subordinated in right of payment to other Indebtedness (except for the Obligations and obligations under the Pre-Petition First Lien Credit Agreement). Except as provided in Part A of Schedule 5.4(b), as of the Closing Date, there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Credit Party or any of their Subsidiaries of any Stock of any such entity.

(c)     Binding Obligation. Subject to the entry of the Interim Order and/or Final Order, as applicable, this Agreement and the other Loan Documents have been duly authorized, executed and delivered and, upon entry of the Interim Order and/or the Final Order, as applicable, are the legally valid and binding obligations of each of the Credit Parties, each enforceable against each of such Credit Parties, as applicable, in accordance with their respective terms.

5.5     Financial Statements. All Financial Statements concerning Holdings, Parent Borrower and its Subsidiaries which have been or will hereafter be furnished to Agent pursuant to this Agreement, have been or will be prepared in accordance with GAAP consistently applied (except as disclosed therein) and do or will present fairly in all material respects the financial condition of the entities covered thereby as at the dates thereof and the results of their operations for the periods then ended, subject to, in the case of unaudited Financial Statements, the absence of footnotes and normal year-end adjustments.

5.6     Intellectual Property. Each of the Credit Parties and their Subsidiaries owns, is licensed to use or otherwise has the right to use all Intellectual Property necessary for the conduct of its business as currently conducted that is material to the financial condition, business or operations of such Credit Party and its Subsidiaries. All such Intellectual Property owned by or licensed to the Credit Parties as of the Closing Date is identified on Schedule 5.6. The use of such Intellectual Property by the Credit Parties and their Subsidiaries and the conduct of their businesses does not and has not been alleged by any Person to infringe on the rights of any Person except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

5.7     Investigations, Audits, Etc. To the best knowledge of each Credit Party, no Credit Party or any of their Subsidiaries is the subject of any review or audit by the IRS or any investigation by any

other Governmental Authority concerning the violation or possible violation of any law that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

5.8    Employee Matters.  Except as set forth on Schedule 5.8, (a) as of the Closing Date, no Credit Party or Subsidiary of a Credit Party nor any of their respective employees is subject to any collective bargaining agreement, (b) as of the date hereof, no petition for certification or union election is pending with respect to the employees of any Credit Party or any of their Subsidiaries and no union or collective bargaining unit has sought such certification or recognition with respect to the employees of any Credit Party or any of their Subsidiaries, (c) there are no strikes, slowdowns, work stoppages or controversies pending or, to the best knowledge of any Credit Party after due inquiry, threatened between any Credit Party or any of their Subsidiaries and its respective employees, other than employee grievances arising in the ordinary course of business which could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect and (d) hours worked by and payment made to employees of each Credit Party and each of their Subsidiaries comply in all material respects with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters.

5.9    [Reserved].

5.10    Litigation; Adverse Facts.  Other than the Bankruptcy Cases and except as set forth on Schedule 5.10, there are no judgments outstanding against any Credit Party or any of its Subsidiaries or affecting any property of any Credit Party or any of its Subsidiaries that constitute an Event of Default, nor is there any Litigation pending, or to the best knowledge of any Credit Party threatened, against any Credit Party or any of its Subsidiaries which Litigation could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

5.11    Use of Proceeds; Margin Regulations.

(a)    No part of the proceeds of any Loan will be used for "buying" or "carrying" "margin stock" within the respective meanings of such terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect or for any other purpose that violates the provisions of the regulations of the Board of Governors of the Federal Reserve System.

(b)    Borrowers shall utilize the proceeds of the Loans to (i) pay fees and expenses in connection with the Loan Documents, (ii) support the ongoing working capital and other general corporate purposes of the Credit Parties, in each case, materially consistent with the Agreed Budget, (iii) make any other payments permitted to be made in the Interim Order (if applicable), the Final Order or any other order of the Bankruptcy Court to the extent not prohibited by this Agreement, (iv) pay fees and expenses of up to $175,000 a month to Houlihan, Lokey, Howard & Zukin, Inc. and up to $300,000 a month to Stroock & Stroock & Lavan LLP, in each case, as advisors to the term lenders under the Pre-Petition First Lien Credit Agreement, without any requirement for the filing of a retention or fee application unless the Bankruptcy Court orders otherwise, or (v) make any other payment otherwise consented to by the Requisite Lenders; provided, however, that (i) upon entry of the Interim Order but prior to entry of the Final Order proceeds of the Loans shall be utilized for post-petition expenditures permitted pursuant to this Agreement including those listed above in this subsection (b), and any cash collateral or proceeds from any collateral provided pursuant to the Pre-Petition First Lien Credit Agreement shall be applied to reduce the Revolving Obligations (as defined in the Pre-Petition First Lien Credit Agreement) on a permanent basis until repaid in full and (ii) upon entry of the Final Order, proceeds of the Loans shall be used to repay the remaining amounts under the Revolving Obligations (as defined in the Pre-Petition First Lien Credit Agreement) on a permanent basis and for post-petition expenditures permitted pursuant to this Agreement including those listed above in this subsection (b).  Nothing herein shall in any way prejudice

or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 328, 330 or 331 of the Bankruptcy Code, by any party in interest. No portion of the Loans may be used for the payment of the fees and expenses of any person incurred in (i) challenging, or in relation to the challenge of, (1) any liens or claims of the lenders under the Pre-Petition First Lien Credit Agreement or (2) the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any Pre-Petition First Lien Lender, including any causes of action under chapter 5 of the Bankruptcy Code, and state law, or (ii) bringing or asserting any claims or causes of actions against the Pre-Petition First Lien Lenders or the Lenders, or their respective advisors, agents (including the Pre-Petition First Lien Agent or the DIP Agent), and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien of the Pre-Petition First Lien Lenders under the Pre-Petition First Lien Credit Agreement. Notwithstanding the foregoing, no more than $50,000 of the Carve-Out, any cash collateral, or proceeds of the Loans may be used by any committee or any other representative of the Parent Borrower or Credit Party's estates to investigate claims and/or liens of the Pre-Petition Secured Parties under the Pre-Petition First Lien Credit Agreement.

5.12    Ownership of Property; Liens. As of the Closing Date, the real property (together with any real property acquired by any Credit Party after the Closing Date, collectively, the "Real Estate") listed in Schedule 5.12 constitutes all of the real property owned, leased, subleased or used by any Credit Party or any of its Subsidiaries. Each of the Credit Parties and each of its Subsidiaries owns good and marketable fee simple title to all of its owned Real Estate, and valid and marketable leasehold interests in all of its leased material Real Estate. Schedule 5.12 further describes any material Real Estate with respect to which any Credit Party or any of its Subsidiaries is a lessor as of the Closing Date. Each of the Credit Parties and each of its Subsidiaries also has good and marketable title to, or valid leasehold interests in, all of its material personal property and assets. None of the properties and assets of any Credit Party or any of its Subsidiaries are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to Parent Borrower or any other Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Permitted Encumbrances against the properties or assets of any Credit Party or any of its Subsidiaries. As of the Closing Date, no portion of any Credit Party's or any of its Subsidiaries' Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. All material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

5.13    Environmental Matters. Except as set forth in Schedule 5.13:

(a)    the Real Estate is free of contamination from any Hazardous Material except for such contamination that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(b)    no Credit Party and no Subsidiary of a Credit Party has caused or suffered to occur any Release of Hazardous Materials on, at, in, under, from or about any of their Real Estate, except for such Releases that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)    the Credit Parties and their Subsidiaries are and have been in compliance with all Environmental Laws, except for such noncompliance that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(d)     the Credit Parties and their Subsidiaries have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted, except where the failure to so obtain or comply with such Environmental Permits could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, and all Environmental permits are valid, uncontested and in good standing, except where the failure to be valid, uncontested or in good standing could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(e)     there are no Releases of Hazardous Materials on, at, in, under, from or about any formerly owned or leased property of any Credit Party that are likely to result in any Environmental Liabilities of such Credit Party or Subsidiary which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(f)     there is no pending or, to the actual knowledge of the Credit Parties, threatened Litigation (including any that alleges criminal misconduct by any Credit Party or any Subsidiary of a Credit Party) arising under any Environmental Laws or related to any Environmental Permits or the Release of Hazardous Materials which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; and

(g)     except for such matters that have been resolved or could not reasonably be expected to result in Environmental Liabilities which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no written notice has been received by any Credit Party or any Subsidiary of a Credit Party identifying any of them as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and (ii) to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any of the Credit Parties or their Subsidiaries being identified as a "potentially responsible party" under CERCLA or analogous state statutes.

(h)     the Credit Parties have made available to Agent copies of all material environmental reports, reviews and audits and all material written information pertaining to actual or potential Environmental Liabilities, in each case existing as of the Closing Date and relating to any of the Credit Parties or their Subsidiaries.

5.14     ERISA.

(a)     Except with respect to Multiemployer Plans, each Qualified Plan has received a determination or opinion letter from the IRS pursuant to which the IRS has determined or opined that such Qualified Plan is qualified under Section 401 of the IRC and that the trust created under such Qualified Plan is exempt from tax under the provisions of Section 501 of the IRC. To the knowledge of each Credit Party, nothing has occurred that would cause the loss of such qualification or tax-exempt status. Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect: (i) each Plan is in compliance with the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23; (ii) neither any Credit Party nor ERISA Affiliate has failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan and (iii) to the knowledge of each Credit Party, neither any Credit Party nor ERISA Affiliate has engaged in a "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject any Credit Party to a tax on prohibited transactions imposed by Section 502(1) of ERISA or Section 4975 of the IRC.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no Title IV Plan has any Unfunded Pension Liability; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or could reasonably be expected to occur; (iii) there are no pending, or to the knowledge of Borrowers, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; and (iv) within the last five years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 404(b)(1) of ERISA, nor has any Title IV Plan of any Credit Party or ERISA Affiliate (determined at any time within the past five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate.

5.15    Brokers.  No broker or finder acting on behalf of any Credit Party or Affiliate thereof brought about the obtaining, making or closing of the Loans or the Related Transactions, and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.16    Deposit Accounts; Securities Accounts; Other Accounts.  Schedule 5.16 lists all banks and other financial institutions at which any Credit Party maintains deposit accounts, securities accounts or other accounts (including any commodities accounts) as of the Closing Date, including the Disbursement Account and any other disbursement accounts, and such Schedule 5.16 correctly identifies the name, address and telephone number of each depository institution, securities intermediary or other financial institution as of the Closing Date, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

5.17    [Reserved].

5.18    Insurance.  Schedule 5.18 lists (i) all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, and (ii) a summary of the key business terms of each such policy such as deductibles, coverage limits and term of policy.

5.19    Investment Company Act.  None of the Credit Parties is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5.20    No Setoff or Counterclaims under Guaranty. Subject to the Financing Orders, Holdings hereby represents, warrants, and agrees that, as of the Closing Date, its obligations under the Guaranty herein are not subject to any setoffs, counterclaims or defenses against Agent or any Secured Party or any Credit Party of any kind.  Holdings further agrees that its obligations under the Guaranty shall not be subject to any counterclaims, setoffs or defenses against Agent or any Secured Party or against any Credit Party of any kind which may arise in the future.

5.21    Taxes.  Each of Holdings, Parent Borrower and each of its Subsidiaries has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns or materials required to have been filed by it and all such Tax Returns are true and correct in all material respects and (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Person has set aside on its books adequate reserves in accordance with GAAP and (ii) which could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  Each of Holdings, Parent Borrower and each of its Subsidiaries has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  Each of Hold-

ings, Parent Borrower and each of its Subsidiaries is unaware of any proposed or pending tax assessments, deficiencies or audits that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. <u>Collateral Documents</u>.

        (a)     <u>Security Interest</u>.

        (i)     This Agreement, taken together with the Interim Order (if applicable) and/or the Final Order are effective to create in favor of the Agent for the benefit of the Secured Parties, legal, valid, enforceable and continuing first priority Liens on, and security interests in, the Collateral pledged thereunder, in each case subject to no Liens other than Permitted Encumbrances. Pursuant to the terms of the Interim Order (if applicable) and Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order (if applicable) and the Final Order, the Indebtedness of the Credit Parties under this Agreement will constitute allowed administrative expense claims in the Bankruptcy Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Credit Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including Avoidance Actions and the Proceeds thereof), subject only to the Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) securing the Obligations, the Credit Parties' pre-petition obligations, adequate protection liens, and all other liens or claims (including administrative and superiority claims), including all other forms of adequate protection, liens, or claims (including administrative and superpriority claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted to the Lenders.

        (ii)     Set forth on <u>Schedule 5.22(a)(ii)</u> hereto is (x) offices and other premises where Inventory or Equipment is stored or located whether or not owned or leased by such Credit Party, and (y) the locations of each Credit Party's books and records concerning the Collateral, in each case as of the date hereof.

        (iii)     <u>PTO Filing; Copyright Office Filing</u>. This Agreement is effective to create a valid and continuing perfected Lien on, and security interests in, each Credit Party's right, title and interest of the grantors thereunder in Patents and Trademarks registered or applied for with the United States Patent and Trademark Office or Copyrights registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Permitted Encumbrances and, such Liens are enforceable as such as against any and all creditors of and purchasers from any Credit Party. Pursuant to the terms of the Interim Order (if applicable) and Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.

        (b)     <u>Mortgages</u>. Each Mortgage is effective to create, in favor of the Agent, for its benefit and the benefit of the Secured Parties, legal, valid and enforceable first priority Liens on, and security interests in, all of the Credit Parties' right, title and interest in and to the Real Estate thereunder and the proceeds thereof, subject only to Permitted Liens or other Liens acceptable to the Decision Agents, and when the Mortgages are filed in the offices specified on Schedule 8(a) to the Perfection Certificate (or, in the case of any Mortgage executed and delivered after the date thereof in accordance with the provisions of <u>Section 2.8</u>, when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of <u>Sections 2.8</u>), the Mortgages shall constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of the

Credit Parties in such Real Estate and the proceeds thereof, in each case prior and superior in right to any other Person, other than Liens permitted by such Mortgage.

(c)   Valid Liens.  Each Collateral Document delivered pursuant to Section 2.8 will, upon execution and delivery thereof, be effective to create in favor of the Agent, for the benefit of the Secured Parties, legal, valid, enforceable and continuing first priority Liens on, and security interests in, all of the Credit Parties' right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of the Credit Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Encumbrances.

5.23   Agreed Budget.  A true and complete copy of the initial thirteen (13)-week detailed budget (such initial budget, as updated in accordance with the provisions of Section 4.1(e)(ii), the "Agreed Budget") is attached as Exhibit E hereto.

5.24   Financing Orders.  The Credit Parties are in compliance with the terms and conditions of the Interim Order and the Final Order, as applicable.

Each of the Interim Order (to the extent necessary, with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Decision Agents, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

## SECTION 6.

## DEFAULT, RIGHTS AND REMEDIES

6.1   Event of Default.  "Event of Default" shall mean the occurrence or existence of any one or more of the following:

(a)   Payment.  (i) Failure to pay any installment or other payment of principal of any Loan when due, or to repay Revolving Loans to reduce their balance to the maximum amount of Revolving Loans then permitted to be outstanding or to reimburse any L/C Issuer for any payment made by such L/C Issuer under or in respect of any Letter of Credit when due or (ii) failure to pay, within five (5) days after the due date, any interest on any Loan, any Fee or any other amount due under this Agreement or any of the other Loan Documents; or

(b)   Default in Other Agreements.  (i) Any Credit Party or any of its Subsidiaries fails to pay when due (after giving effect to any applicable grace period) any principal or interest on postpetition Indebtedness (other than the Loans) or any post-petition Contingent Obligations having a principal or face amount in excess of $1,000,000 in the aggregate; or (ii) breach or default of any Credit Party or any of its Subsidiaries, or the occurrence of any condition or event, with respect to any post-petition Indebtedness (other than the Loans) or any post-petition Contingent Obligations, if the effect of such breach, default or occurrence is to cause or to permit the holder or holders then to cause, Indebtedness and/or Contingent Obligations having a principal amount in excess of $1,000,000 in the aggregate to become or be declared due prior to their stated maturity; or

(c)    <u>Breach of Certain Provisions; Breach of Warranty</u>.

(i)    Failure of any Credit Party to perform or comply with any term, condition or covenant contained in <u>Section 2.4</u> (with respect to Parent Borrower only), <u>Sections 2.11</u> thru<u>2.16</u>, <u>Section 3</u> or <u>Section 4.1(a)</u> and <u>4.1(e)(i)</u>; or

(d)    <u>Borrowing Base Certificate; Breach of Warranty</u>.

(i)    Any information contained in any Borrowing Base Certificate is untrue or incorrect in any respect (other than inadvertent, immaterial errors not exceeding $1,000,000 in the aggregate in any Borrowing Base Certificate) and such information is not corrected within five (5) Business Days after the date on which notice thereof shall have been given to Parent Borrower by Agent or any Lender; or

(ii)    Any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate (other than a Borrowing Base Certificate) made or delivered to Agent or any Lender by any Credit Party is untrue or incorrect in any material respect as of the date when made or deemed made; or

(e)    <u>Other Defaults Under Loan Documents</u>.  Any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or the other Loan Documents (other than occurrences described in other provisions of this <u>Section 6.1</u>, for which a different grace or cure period is specified, or for which no cure period is specified and which constitute immediate Events of Default) and such default is not remedied or waived within thirty (30) days after the earlier of (i) receipt by Parent Borrower of notice thereof from Agent or the Requisite Lenders of such default or (ii) actual knowledge of Parent Borrower or any other Credit Party of such default; or

(f)    <u>Judgment and Attachments</u>.  After the Petition Date, any uninsured money judgment, writ or warrant of attachment, or similar process (other than those described elsewhere in this <u>Section 6.1</u>) with respect to post-petition liabilities involving an amount in excess of $1,000,000 in the aggregate (to the extent not adequately covered by insurance as to which the insurance company has acknowledged coverage) is entered or filed against one or more of the Credit Parties or any of their respective assets and remains undischarged, unvacated, unbonded or unstayed for a period of forty-five (45) days; or

(g)    Bankruptcy.

(i)    (A) the Bankruptcy Court fails to enter the Final Order (in form and substance substantially similar to the Interim Order with such changes as are acceptable to the Decision Agents and the Requisite Lenders, in their sole discretion) by the date that is 45 days after the Petition Date unless such date is extended by agreement with the Agent and the Requisite Lenders, (B) any violation of the terms of the Interim Order or the Final Order by a Credit Party occurs, or (C) the Bankruptcy Court reverses, vacates or stays the effectiveness of either the Interim Order (if applicable) or the Final Order without the written consent of the Requisite Lenders;

(ii)    an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (or any of the Credit Parties shall file an application or motion for entry of an order) (A) appointing a trustee under Section 1104 of the Bankruptcy Code without the prior written consent of the Requisite Lenders, (B) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bank-

ruptcy Code without the prior written consent of the Requisite Lenders, or (C) dismissing or converting any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

(iii)     any Credit Party (A) fails to comply with any provision of the Interim Order or the Final Order, as applicable, or any order of the Bankruptcy Court governing the Credit Parties' use of cash collateral, or (B) seeks to, or shall support any other Person's motion to, whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Credit Party or by oral argument before the Bankruptcy Court, vacate or modify any of the Financing Orders over the objection of the Requisite Lenders (it being understood that complying with information requests shall not constitute support);

(iv)     (A) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Bankruptcy Cases which does not (x) contain a provision for termination of all of the Lenders' Revolving Loan Commitments and indefeasible payment in full in cash of all Obligations on or before the date of effectiveness of such plan and (y) provide for the continuation of the Liens and priorities in favor of the Agent and the Secured Parties until such effective date or (B) any Credit Party (or by any party with the support of any of the Credit Parties) shall have filed a plan of reorganization in any of the Bankruptcy Cases that would violate clause (A) of this subparagraph if approved, and such filing of such plan is made without the prior written consent of the Agent and the Lenders;

(v)     an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court, without the consent of the Requisite Lenders and the Decision Agents, (A) to revoke, reverse, stay, vacate or rescind any provision of any Financing Order, (B) to modify, supplement or amend any provision of the Interim Order (if applicable) or the Final Order, (C) to permit any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Credit Parties, equal or superior to the priority of the Lenders' Claim in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations only to the extent set forth in the definition of Carve-Out, (D) to grant or permit the grant of a Lien on the Collateral (other than a Permitted Lien), (E) to dismiss any of the Bankruptcy Cases which does not contain a provision for termination of all of the Lenders' Revolving Loan Commitments and payment in full in cash of all Obligations in a manner satisfactory to the Agent and the Lenders upon such dismissal, or (F) to amend, supplement, stay, vacate or otherwise modify any of the Loan Documents or any order of the Bankruptcy Court governing the Credit Parties' use of cash collateral, or, in any case (A) thru (F), a motion for reconsideration shall be filed with respect thereto by or at the direction of, or in any way supported by, the Borrowers;

(vi)     the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to any Person with respect to any assets of the Credit Parties with a value in excess of $2,500,000 in the aggregate;

(vii)     any provision of the Interim Order (if applicable), the Final Order, this Agreement or any other Loan Document shall for any reason cease to be valid or binding or enforceable against any of the Credit Parties, or any of the Credit Parties shall so state

in writing; or any of the Credit Parties shall commence or join in any legal proceeding to contest in any manner that the Interim Order (if applicable), the Final Order, this Agreement or any other Loan Document constitutes a valid and enforceable agreement or any of the Credit Parties shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Interim Order (if applicable), the Final Order, this Agreement or any other Loan Document;

(viii) any of the Credit Parties shall seek to, or shall support any other Person's motion to, whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Credit Party or by oral argument before the Bankruptcy Court, (A) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document, (B) challenge the validity and enforceability of the Liens or security interests granted or confirmed herein or in the Interim Order (if applicable), or the Final Order in favor of the Secured Parties, or (C) approve payment of any Claim arising prior to the Petition Date;

(ix) any of the Credit Parties shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any Claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court in respect of (i) any such payments required and/or permitted in the First Day Orders, (ii) accrued payroll and related expenses as of the Petition Date or (iii) any such payments as described in and provided for in the Agreed Budget;

(x) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Agent or any of the Lenders of any amounts received in respect of the Obligations;

(xi) if any Credit Party is enjoined, restrained or is in any way prevented by court order (other than an order of the Bankruptcy Court approved by the Requisite Lenders) from continuing to conduct all or any material part of its business affairs;

(xii) absent the written consent of all of the Lenders, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code or otherwise authorizing or approving the sale or assignment of all or substantially all of any Credit Party's assets, or procedures in respect thereof that do not provide for the termination of the Revolving Loan Commitments and for the indefeasible payment in full in cash of the Obligations on or prior to the date of consummation thereof, with such indefeasible payment in full being in accordance with the Agent's and Lenders' rights under the Bankruptcy Code, the Loan Documents, the Interim Order (if applicable), the Final Order and the Financing Order, or any of the Credit Parties shall seek, support, or fail to contest in good faith, the entry of such an order in any of the Bankruptcy Cases;

(xiii) Permitted Variances under the Agreed Budget are exceeded for any applicable testing period;

(xiv) any of the Credit Parties shall assert any right of subrogation against any other Credit Party before termination of all of the Lenders' Revolving Loan Commitments and payment in full in cash of all Obligations in a manner satisfactory to the Requisite Lenders;

(xv)     any Credit Party uses cash collateral in an aggregate amount in excess of $50,000 without the consent of the Requisite Lenders;

(xvi)     any Credit Party creates or permits to exist any other Super-Priority Claim which is <u>pari passu</u> with or senior to the Super-Priority Claim of the Lenders, except for the Carve-Out;

(xvii)     any Credit Party prepays any Indebtedness existing prior to the Petition Date, except as approved by the Bankruptcy Court and agreed in writing in advance by the Decision Agents; or

(xviii)     before the ABL (as such term is defined in the Financing Orders) is paid in full, any Credit Party proposes a Plan of Reorganization that would prohibit or otherwise restrict in any way the right of the ABL Lenders (as such term is defined in the Financing Orders) to "credit bid" the amount of their claims.

(h)     <u>Invalidity of Loan Documents</u>.  Any of the Loan Documents for any reason, other than a partial or full release or termination in accordance with the terms thereof, ceases to be in full force and effect or is declared to be null and void, or any Credit Party denies that it has any further liability under any Loan Documents to which it is party, or gives notice to such effect, or the Loan Documents cease to create a perfected first priority Lien on a material portion of the Collateral or a Credit Party so asserts; or

(i)     <u>Change of Control</u>.  A Change of Control occurs; or

(j)     <u>ERISA</u>.  One or more ERISA Events shall have occurred that, in the reasonable opinion of the Requisite Lenders, when taken together with all other such ERISA Events, could reasonably be expected to result in (i) a Material Adverse Effect or (ii) the imposition of a Lien on any properties of Holdings or its Subsidiaries and such Lien will or could reasonably be expected to result in a Material Adverse Effect.

6.2     <u>Suspension or Termination of Revolving Loan Commitments</u>.  Upon the occurrence of any Default or Event of Default, Agent may, and at the request of Requisite Lenders, Agent shall, without notice or demand, immediately suspend or terminate all or any portion of Lenders' obligations to make additional Loans or issue or cause to be issued Letters of Credit under the Revolving Loan Commitment; <u>provided</u> that, in the case of a Default, if the subject condition or event is waived by Requisite Lenders or cured within any applicable grace or cure period, the Revolving Loan Commitment shall be reinstated.

6.3     <u>Acceleration and Other Remedies</u>.

(a)     [Reserved].

(b)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Financing Orders, upon the occurrence and during the continuance of any other Event of Default, Agent may, and at the request of the Requisite Lenders, Agent shall, by written notice to Parent Borrower (i) reduce the aggregate amount of the Revolving Loan Commitments from time to time, (ii) declare all or any portion of the Revolving Loans, the Swing Line Loans and all or any portion of the other Obligations to be, and the same shall forthwith become, immediately due and payable together with accrued interest thereon, (iii) terminate all or any portion of the obligations of Agent, L/C Issuers and Lenders to make Revolving Credit Advances and issue Letters of Credit, (iv) demand that Borrowers immediately deliver cash collateral or a standby letter of credit (in form and substance and from an issuer reasonably

satisfactory to Agent) to Agent for the benefit of L/C Issuers (and Borrowers shall then immediately so deliver) in an amount equal to 105% of the aggregate outstanding Letter of Credit Obligations, (v) set-off against any outstanding Obligations amounts held in the accounts of any Credit Party maintained by or with the Agent, any Lender or their respective Affiliates and (vi) exercise any other remedies which may be available under the Loan Documents or applicable law. Borrowers hereby grant to Agent, for the benefit of L/C Issuers and each Lender with a participation in any Letters of Credit then outstanding, a security interest in such cash collateral to secure all of the Letter of Credit Obligations. Any such cash collateral shall be made available by Agent to L/C Issuers to reimburse L/C Issuers for payments of drafts drawn under such Letters of Credit and any Fees, Charges and expenses of L/C Issuers with respect to such Letters of Credit and the unused portion thereof, after all such Letters of Credit shall have expired or been fully drawn upon, shall be applied to repay any other Obligations. After all such Letters of Credit shall have expired or been fully drawn upon and all Obligations shall have been satisfied and paid in full, the balance, if any, of such cash collateral shall be returned to Parent Borrower on behalf of Borrowers. Borrowers shall from time to time execute and deliver to Agent such further documents and instruments as the Decision Agents may request with respect to such cash collateral.

(c)     After 5 days from the date the Agent files a notice of an Event of Default, the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with, and subject to the terms of, the Interim Order or the Final Order, as applicable, so as to permit the Agent and the Secured Parties full exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral. With respect to the Agent's and the Secured Parties' exercise of their rights and remedies, each of the Credit Parties agree and warrant as follows:

(i)     the Credit Parties waive and, release, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by the Agent or the Secured Parties of their rights and remedies before the Bankruptcy Court or otherwise, except only as expressly stated in subparagraph (ii) of this paragraph; and

(ii)     when the Agent or the Secured Parties seek to enforce their rights and remedies based on an Event of Default, and if any Credit Party disputes that an Event of Default has occurred, a Credit Party may file an emergency motion with the Bankruptcy Court disputing whether an Event of Default has occurred. Unless otherwise agreed in writing by the Agent, any such motion shall be heard within five (5) Business Days after it is filed, subject to the availability of the Bankruptcy Court. Unless otherwise determined by the Bankruptcy Court, at the hearing on the emergency motion, the only issue that will be heard by the Bankruptcy Court (or that the Credit Parties will seek to be heard by the Bankruptcy Court) will be whether an Event of Default has occurred and has not been cured, and, if an Event of Default has occurred and has not been cured, the Agent and the Secured Parties will be entitled to continue to exercise all of their rights and remedies without the necessity of any further notice or order. Furthermore, nothing herein shall be construed to impose or re-impose any stay or injunction of any kind against the Agent or the Secured Parties, in all cases subject to the Financing Orders.

(d)     If an Event of Default has occurred and is continuing, the Agent shall have for the benefit the Secured Parties, in addition to all other rights of the Agent and the Secured Parties, the rights and remedies of a secured party under the Code.

6.4     <u>Performance by Agent</u>. If any Credit Party shall fail to perform any covenant, duty or agreement contained in any of the Loan Documents, Agent may perform or attempt to perform such co-

venant, duty or agreement on behalf of such Credit Party after the expiration of any cure or grace periods set forth herein. In such event, such Credit Party shall, at the request of Agent, promptly pay any amount reasonably expended by Agent in such performance or attempted performance to Agent, together with interest thereon at the highest rate of interest in effect upon the occurrence of an Event of Default as specified in Section 1.2(d) from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly agreed that Agent shall not have any liability or responsibility for the performance of any obligation of any Credit Party under this Agreement or any other Loan Document.

6.5  Application of Proceeds. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default:

(a)  Borrowers irrevocably waive the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of Borrowers, and Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent; and

(b)  the proceeds of any sale of, or other realization upon, all or any part of the Collateral, any other amounts received under the Guaranty or enforcement of the Loan Documents or any proceeds of the foregoing otherwise received by Agent shall be applied:

first, to all Fees, costs and expenses incurred by or owing to Agent and thereafter any Lender with respect to this Agreement, the other Loan Documents or the Collateral;

second, to accrued and unpaid interest on the Obligations (including any interest which but for the provisions of the Bankruptcy Code, would have accrued on such amounts);

third, to the principal amount of the Obligations outstanding (other than Cash Management Obligations and Obligations pursuant to Related Swap Contracts); and

fourth to any other Obligations of Borrowers owing to Agent or any Lender under the Loan Documents or to any Secured Party in respect of Cash Management Obligations and/or Related Swap Contracts.

The Credit Parties shall remain liable for any deficiency.

Any balance remaining shall be delivered to Parent Borrower on behalf of Borrowers or to whomever may be lawfully entitled to receive such balance or as the Bankruptcy Court may direct.

6.6  Certain Bankruptcy Matters.

(a)  Except to the extent provided otherwise in the Interim Order or the Final Order, as applicable, the Credit Parties hereby agree that, subject as to priority, only to the Carve-Out, the Obligations shall (i) constitute super-priority allowed administrative expense claims in the Bankruptcy Cases having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Credit Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of

the Bankruptcy Code and, to the extent provided in any of the Financing Orders, shall not be subject to any Claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)     In the event of a conflict between , or inconsistency among, the Interim Order (if applicable) or the Final Order, on the one hand, and any other Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     The Agent's Liens on Collateral of the Credit Parties shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be, which entry of the Interim Order (to the extent necessary) shall have occurred on or prior to the Closing Date.  The Agent and the Lenders shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on Collateral granted by or pursuant to this Agreement, the Interim Order (if applicable), the Final Order or any other Loan Document.  If the Agent or the Requisite Lenders shall, in its or their sole discretion, from time to time elect to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Agent's Liens on Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that, to the extent that (x) an Interim Order is entered, the date in which such Interim Order is entered, and (y) no Interim Order is entered, the date in which the Final Order is entered, and (B) shall not negate or impair the validity or effectiveness of this <u>Section 6.6(c)</u> or of the perfection of any other Liens in favor of the Agent, for the benefit of the Secured Parties, on the Collateral.

(ii)     Except as otherwise agreed to by the Lenders, the Liens, lien priorities, Super-Priority Claims and other rights and remedies granted to the Agent and the Secured Parties pursuant to this Agreement, the Interim Order (if applicable), the Final Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the administrative expense claim super-priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Bankruptcy Cases, or by any other act or omission whatsoever.

Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(A)     except for the Carve-Out and to the extent provided in any of the Financing Orders and subject to the Financing Orders, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Cases or any conversion of the same or in any other proceedings related thereto, and no priority Claims, are or will be prior to or on a parity with any Claim of any Secured Party or the Agent against the Borrower in respect of any Obligations;

(B)    other than as provided in the Financing Orders or the Loan Documents, the Agent's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(C)    the Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Agent or any Secured Party to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Agent's Liens under applicable non-bankruptcy law.

## SECTION 7.

## CONDITIONS TO LOANS

The obligations of Lenders and L/C Issuers to make Loans and to issue or cause to be issued Letters of Credit are subject to satisfaction of all of the applicable conditions set forth below.

7.1    <u>Conditions to Initial Loans</u>.  The obligations of Lenders and L/C Issuers to make the initial Loans and to issue or cause to be issued Letters of Credit on the Closing Date are, in addition to the conditions precedent specified in <u>Section 7.2</u>, subject to the delivery of all documents listed on, the taking of all actions set forth on and the satisfaction of all other conditions precedent listed in the Closing Checklist attached hereto as <u>Annex C</u>.

7.2    <u>Conditions to All Loans</u>.  Except as otherwise expressly provided herein, no Lender or L/C Issuer shall be obligated to fund any Advance or incur any Letter of Credit Obligation, if, as of the date thereof (the "<u>Funding Date</u>"):

(a)    any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect as of such date, except to the extent that such representation or warranty expressly relates to an earlier date, in which case, as of such earlier date, and Agent or Requisite Lenders have determined not to make such Advance or incur such Letter of Credit Obligation as a result of the fact that such warranty or representation is untrue or incorrect;

(b)    with respect to any Advances to be made or Letters of Credit to be issued after the Closing Date, any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance (or the incurrence of any Letter of Credit Obligation), and Agent or Requisite Lenders shall have determined not to make any Advance or incur any Letter of Credit Obligation as a result of that Default or Event of Default;

(c)    after giving effect to any Advance (or the incurrence or renewal of any Letter of Credit Obligations), the outstanding amount of the Revolving Loans (including, without duplication, Swing Line Loans and Letter of Credit Obligations) would exceed the Borrowing Base (except as provided in <u>Section 1.l(a)(ii)</u>);

(d)    the purpose of each Advance, or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, is not consistent with, and for a purpose permitted under, the Agreed Budget (and Permitted Variances related thereto) in accordance with <u>Section 3.21</u>; or

(e)     the Interim Order or, following the entry of the Final Order, the Final Order is not in full force and effect or, without the prior written consent of the Requisite Lenders, such order has been amended or modified.

The request and acceptance by a Borrower of the proceeds of any Advance, the incurrence of any Letter of Credit Obligations or the conversion or continuation of any Loan into, or as, a LIBOR Loan shall be deemed to constitute, as of the date thereof, a representation and warranty by Borrowers that the conditions in this Section 7.2 have been satisfied.

**SECTION 8.**

**SECURITY**

8.1     Security.

(a)     To induce Agent and Lenders to enter into this Agreement and the other Loan Documents and to induce Lenders to make the Loans and to incur Letter of Credit Obligations and to secure the prompt and complete payment, performance and observance of all of the Obligations, each Credit Party hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to Agent, for itself and the benefit of Secured Parties, a Lien upon and a continuing priming first-priority security interest (subject only to (i) valid, perfected, nonavoidable and enforceable Liens existing as of the Petition Date, other than the Liens on the Collateral securing Indebtedness under the Pre-Petition Loan Documents, (ii) the Carve-Out, (iii) Liens permitted under Section 3.2(a)(iii) and (iv) post-petition Liens permitted under Section 3.2(a)(i)) in accordance with sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code) in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Party (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Credit Party, and regardless of where located (all of which being hereinafter collectively referred to as the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity by acceleration or otherwise) of the Obligations, including:

(i)      all Accounts;

(ii)     all Chattel Paper;

(iii)    all Documents;

(iv)    all General Intangibles (including Payment Intangibles and Software);

(v)     all Goods (including Inventory, Equipment and Fixtures and Titled Collateral);

(vi)    all Instruments;

(vii)   all Investment Property;

(viii)  all Deposit Accounts;

(ix)    all money, cash or Cash Equivalents of such Credit Party;

(x)　　all Supporting Obligations and Letter-of-Credit Rights of such Credit Party;

(xi)　　the Commercial Tort Claims described on <u>Schedule 8.1(a)</u> and on any supplement thereto received by the Agent pursuant to <u>Section 8.5(a)(ix)</u>; and

(xii)　　to the extent not otherwise included, all Proceeds (including any proceeds or property recovered in respect of Avoidance Actions or causes of action under Chapter 5 of the Bankruptcy Code), tort claims, insurance claims and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing;

<u>provided</u>, <u>however</u>, that "Collateral" shall not include, nor shall security interest granted under <u>Section 8.1(a)</u> hereof attach to, any Excluded Property; and <u>provided</u>, <u>further</u>, that if and when any property shall cease to be Excluded Property, immediately at and from such time, the Collateral shall include, and the security interest granted by each Credit Party shall attach to, such property.

(b)　　In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce Agent and Lenders as aforesaid, each Credit Party hereby grants to Agent, for itself and the benefit of Secured Parties, a right of setoff against the property of such Credit Party held by Agent or any Secured Party, consisting of Collateral now or hereafter in the possession or custody of or in transit to Agent or any Secured Party, for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party, or as to which such Credit Party may have any right or power.

(c)　　For purposes of this <u>Section 8</u> and other definitions used herein, the following terms shall have the meanings assigned thereto in the Code: commercial tort claim, commodities intermediary, deposit account, documents, electronic chattel paper, financial asset, goods, letter-of-credit right, payment intangibles, proceeds, securities intermediary, supporting obligation and uncertificated securities.

8.2　　<u>Perfection of Security Interests</u>.

(a)　　Each Credit Party hereby irrevocably authorizes Agent and its Affiliates, counsel and other representatives, at any time and from time to time, to file or record financing statements, amendments to financing statements and, with notice to the Borrowers, other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Decision Agents reasonably determine appropriate to perfect the security interests of Agent under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets" or "all personal property" or words of similar effect, whether now owned or hereafter acquired. Each Credit Party hereby also authorizes Agent and its Affiliates, counsel and other representatives, at any time and from time to time, to file continuation statements with respect to previously filed financing statements. A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction to Agent.

(b)　　The Liens are granted as security only and shall not subject Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Credit Party with respect to or arising out of the Collateral.

(c)     Notwithstanding subsections (a) and (b) of this Section 8.2, or any failure on the part of any Credit Party or the Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable.  No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or the Final Order.

8.3     Pledged Collateral.

(a)     Delivery of Pledged Collateral. All certificates and all promissory notes and Instruments evidencing the Pledged Collateral shall be delivered to and held by or on behalf of Agent, for itself and the benefit of Secured Parties, pursuant hereto.  All Pledged Stock shall be accompanied by duly executed stock powers or other instruments of transfer or assignment in blank, all in form and substance satisfactory to the Agent and all promissory notes or other Instruments evidencing the Pledged Notes shall be endorsed by the applicable Credit Party or accompanied by a duly executed instrument of transfer or assignment in blank.  Notwithstanding the foregoing, for so long as the Pledged Collateral existing prior to the date hereof is held by the Pre-Petition First Lien Agent there shall be no delivery requirement under this Section 8.3(a) with respect to such Pledged Collateral.

(b)     Rights of Credit Parties with Respect to Pledged Collateral.  As long as no Default or Event of Default shall have occurred and be continuing and until written notice shall be given by the Agent to the relevant Credit Parties of its intent to exercise its corresponding rights in accordance with Section 8.8 hereof:

(i)     (A)  Each Credit Party shall be entitled to vote, give consents and have all other consensual rights with respect to the Pledged Collateral, or any part thereof for all purposes not inconsistent with the provisions of this Agreement or any other Loan Document;

(B)     Agent shall execute and deliver (or cause to be executed and delivered) to the relevant Credit Party all such proxies and other instruments as such Credit Party may reasonably request for the purpose of enabling such Credit Party to exercise the voting and other rights that it is entitled to exercise pursuant to clause (i) above; and

(ii)     (A)  As long as no Event of Default shall have occurred and be continuing each Credit Party shall be entitled, from time to time, to collect, receive and retain for its own use, free and clear of the Lien created by this Agreement, any and all cash dividends, distributions, principal and interest paid in respect of the Pledged Stock or Pledged Notes to the extent permitted in this Agreement other than any and all dividends, interest, principal or other distributions paid or payable other than in cash in respect of any Pledged Collateral, and Instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral whether resulting from a subdivision, combination or reclassification of the outstanding Stock of the issuer of any Pledged Stock or received in exchange for Pledged Stock or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise; and

(B)     upon the occurrence and during the continuance of an Event of Default, all dividends and interest and all other distributions in respect of any of the Pledged Stock or Pledged Notes, whenever paid or made, shall be delivered to Agent to hold as Pledged

Collateral and shall, if received by any Credit Party, be received in trust for the benefit of Agent, be segregated from the other property or funds of such Credit Party, and be forthwith delivered to Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

8.4    Agent's and Secured Parties' Rights; Limitations on Agent's and Secured Parties' Obligations.

(a)    Subject to each Credit Party's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by each Credit Party that, anything herein or in any other Loan Document to the contrary notwithstanding, each Credit Party shall remain liable under each of its respective Contractual Obligations incurred after the Petition Date or assumed with the consent of the Agent and Bankruptcy Court approval (which may be pursuant to a Plan confirmed by the Bankruptcy Court) to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Neither Agent nor any Secured Party shall have any obligation or liability under any Contractual Obligation by reason of or arising out of this Agreement or any other Loan Document or the granting herein of a Lien thereon or the receipt by Agent or any Secured Party of any payment relating to any Contractual Obligation pursuant hereto. Neither Agent nor any Secured Party shall be required or obligated in any manner to perform or fulfill any of the obligations of any Credit Party under or pursuant to any Contractual Obligation, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contractual Obligation, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)    At any time after an Event of Default has occurred and is continuing, after giving notice to the relevant Credit Party of its intent to do so, Agent may notify each of such Credit Party's Account Debtors and all other Persons obligated on any of the Collateral that Agent has a security interest therein, and that payments shall be made directly to Agent, for itself and the benefit of Secured Parties. At any time after an Event of Default has occurred and is continuing, upon the written request of Agent, each Credit Party shall so notify its Account Debtors and other Persons obligated on the Collateral. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, none of the Credit Parties shall give any contrary instructions to such Account Debtor or other Person without the Decision Agents' prior written consent.

(c)    At any time after an Event of Default has occurred and is continuing, Agent may in Agent's own name, in the name of a nominee of Agent or in the name of any Credit Party communicate (by mail, telephone, facsimile or otherwise) with Account Debtors, parties to Contractual Obligations and obligors in respect of Instruments to verify with such Persons, to the Decision Agents' reasonable satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper and/or payment intangibles. If an Event of Default shall have occurred and be continuing, at Credit Party's sole expense, Agent shall have the right to engage a consultant for, and each Credit Party shall fully cooperate with such consultant in, the preparation and delivery to Agent and each Secured Party at any time and from time to time the following reports with respect to such Credit Party: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as the Decision Agents may request.

(d)    It is understood and agreed that the security interests in cash and Investment Property created hereunder shall not prevent the Credit Parties from using such assets in the ordinary

course of their respective businesses, subject to the provisions of the Control Agreements with respect to such cash and Investment Property.

8.5    Covenants of the Credit Parties with Respect to Collateral.  Without limiting any Credit Party's covenants and agreements contained in this Agreement and the other Loan Documents, each Credit Party covenants and agrees with Agent, for the benefit of Agent and Secured Parties, that from and after the date of this Agreement and until the Termination Date:

(a)    Further Assurances; Pledge of Instruments; Chattel Paper; Titled Collateral.

(i)    At any time and from time to time, upon the reasonable written request of Agent and at the sole expense of such Credit Party, such Credit Party shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions (including the filing and recording of financing statements and other documents) as the Decision Agents may reasonably deem necessary to obtain the full benefits of this Agreement and of the rights and powers herein granted with respect to the Collateral, including (A) using its commercially reasonable efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of Agent of any Contractual Obligation held by such Credit Party and to enforce the security interests granted hereunder; and (B) filing any financing or continuation statements under the Code in effect in any jurisdiction with respect to the Liens granted hereunder or under any other Loan Document.

(ii)    (A)  Without the prior written consent of the Decision Agents, such Credit Party will not (x) sell, assign, transfer, pledge the Pledged Collateral (except pursuant to a transaction permitted by this Agreement) or (y) otherwise encumber any of its rights in or to the Pledged Collateral (except for Liens permitted under this Agreement), or any unpaid dividends, interest or other distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral, unless otherwise expressly permitted by this Agreement;

(B)    Upon the written request of Agent, each Credit Party will, at its expense, promptly execute and deliver all such further instruments and take all such further actions as the Decision Agents from time to time may reasonably request in order to ensure to Agent and Secured Parties the security interests to the Pledged Collateral granted hereby are perfected, including the filing of any necessary Code financing statements, which may be filed by Agent with or (to the extent permitted by law) without the signature of each Credit Party; and

(C)    In the case of each Credit Party which is an issuer of Pledged Collateral, such Credit Party agrees that after an Event of Default it will comply with instructions of the Agent with respect to the Stock of such issuer without further consent by the applicable Credit Party.

(iii)    Unless such Collateral has been delivered to the Agent pursuant to Section 8.3 above, such Credit Party shall deliver to Agent all Collateral consisting of the following negotiable Documents, certificated Stock, Chattel Paper and Instruments (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank) promptly (and in any event within 20 Business Days) after such Credit Party receives the same: (A) any negotiable Document or Instrument having a value in excess of $1,000,000, (B) any certificated Stock (other than certificated Pledged Stock of

Subsidiaries of such Credit Party delivered to Agent pursuant to Section 8.3 above) or (C) any Chattel Paper (other than Chattel Paper (I) the value of which, in the aggregate for all such Chattel Paper, does not exceed $1,000,000 or (II) which evidences leases of Inventory for a period of time that is less than one month), and such Credit Party will provide prompt written notice of receipt thereof to Agent.

(iv)    Each Credit Party will, upon obtaining ownership of any additional Stock or promissory notes or Instruments of a Pledged Entity or any Stock or promissory notes or Instruments required to be pledged to Agent pursuant to clause (iii) above, which Stock, notes or Instruments are not listed on Schedule 5.4(b) on the date hereof, promptly deliver to Agent a pledge amendment, duly executed by such Credit Party, in substantially the form of Schedule 8.5(a)(iv) hereto (a "Pledge Amendment") in respect of any such additional Stock, notes or Instruments. Each Credit Party hereby authorizes Agent to attach each Pledge Amendment to this Agreement and agrees that all Pledged Stock and Pledged Notes listed on any Pledge Amendment delivered to Agent shall for all purposes hereunder be considered Collateral.

(v)    Such Credit Party shall, in accordance with the terms of this Agreement, obtain waivers or subordinations of Liens from landlords, bailees and mortgagees, and such Credit Party shall to the extent required by this Agreement, in all instances obtain signed acknowledgements of Agent's Liens from bailees having possession of such Credit Party's Goods that they hold for the benefit of Agent.

(vi)    Such Credit Party, as required by Section 3.14 of this Agreement, shall obtain authenticated Control Agreements from (A) each securities intermediary issuing or holding any Financial Assets to or for such Credit Party and (B) each commodities intermediary holding commodities for such Credit Party; and such Credit Party shall within twenty (20) Business Days after acquiring any uncertificated securities that are not credited to a Securities Account obtain from each issuer of such uncertificated securities an acknowledgment of the pledge of such uncertificated securities to the Agent granting "control" (within the meaning of Section 8-106 of the Code) over such uncertificated securities to the Agent and in a form that is reasonably satisfactory to the Decision Agents. As required by Section 3.14, such Credit Party shall obtain a Control Agreement with each bank or financial institution holding a Deposit Account for such Credit Party.

(vii)    If such Credit Party is or becomes the beneficiary of a letter of credit, such Credit Party shall promptly, and in any event within twenty (20) Business Days after becoming a beneficiary, notify Agent thereof and, unless otherwise consented by the Decision Agents, cause the issuer and/or confirmation bank to consent to the assignment of any Letter-of-Credit Rights to Agent and agree to direct all payments thereunder to a Deposit Account subject to a Control Agreement, all in form and substance reasonably satisfactory to the Decision Agents.

(viii)    At any time (A) upon Agent's reasonable written request, (B) unless Agent has otherwise consented in writing (which consent may be revoked), after an Event of Default has occurred and is continuing or (C) if an Event of Default has occurred and is continuing, unless Agent has otherwise consented in writing (which consent may be revoked), such Credit Party shall take all steps necessary to grant Agent control of all Electronic Chattel Paper in accordance with the Code and all "transferable records" as

defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(ix)     Such Credit Party shall promptly, and in any event within twenty (20) Business Days after the same is acquired by it, notify Agent of Commercial Tort Claims in excess of $2,000,000, individually or in the aggregate, acquired by it and unless otherwise consented by Agent, such Credit Party shall enter into a supplement to this Agreement, granting to Agent a Lien in such Commercial Tort Claim. Any supplement to Schedule 8.1(a) delivered pursuant to this Section 8.5 (a)(viii) shall, after the receipt thereof by Agent, become part of Schedule 8.1(a) for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

(x)     In connection with this Agreement, in no event shall Parent Borrower (A) include Titled Collateral which is not listed on Schedule 8.5(a)(x) in the calculation of Eligible Rental Fleet and Equipment or Eligible Rolling Stock or (B) otherwise include such Titled Collateral in the calculation of the Borrowing Base, in each case, unless and until the applicable Credit Party supplements Schedule 8.5(a)(x) hereto.

(b)     Asset Dispositions.  Except for Asset Dispositions of Collateral permitted pursuant to Section 3.7, no Credit Party shall sell, assign, transfer or otherwise dispose of to any Person (other than another Credit Party) any Collateral in its possession.

(c)     Maintenance of Records.  Such Credit Party shall keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, including a record of any and all payments received and any and all credits granted with respect to the Collateral and all other dealings with the Collateral.  Such Credit Party shall mark its books and records pertaining to the Collateral to evidence this Agreement and the Liens granted hereby.  Upon (A) Agent's reasonable written request or (B) unless Agent shall otherwise consent in writing (which consent may be revoked), the occurrence and during the continuance of an Event of Default, such Chattel Paper (other than Chattel Paper the value of which, in the aggregate for all such Chattel Paper, does not exceed $1,000,000) and Instruments (other than Instruments the value of which, in the aggregate for all such Instruments, does not exceed $1,000,000) shall be marked by Credit Party with a legend, in form and substance reasonably satisfactory to the Agent; provided that each Credit Party shall be required to so mark each such Chattel Paper or Instrument only to the extent that the same is in such Credit Party's possession.

(d)     Covenants Regarding Patent, Trademark and Copyright Collateral.

(i)     In no event shall such Credit Party, either directly or through any agent, employee, licensee or designee, file an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Agent prior written notice thereof, and, upon request of Agent, such Credit Party shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements or Trademark Security Agreements as the Decision Agents may request to evidence Agent's Lien on such Patent, Trademark or Copyright, and the General Intangibles of Credit Party relating thereto or represented thereby.

(ii)     Such Credit Party shall take all actions necessary or reasonably requested by the Decision Agents to maintain and pursue (and not abandon) each application, to obtain the relevant registration and to maintain the registration of each of the Patents, Trademarks and Copyrights (now or hereafter existing that is material to the conduct of

-67-

any Credit Party's business or operations), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings, unless such Credit Party shall determine that such Patent, Trademark or Copyright is not material to the conduct of its business or operations.

(iii)     In the event that any of the Patent, Trademark or Copyright Collateral that is material to the conduct of any Credit Party's business or operations is infringed upon, or misappropriated or diluted by a third party, each Credit Party shall promptly notify Agent and, if applicable, comply with Section 8.5(a)(viii). Such Credit Party shall, unless it shall reasonably determine that such Patent, Trademark or Copyright Collateral is not material to the conduct of its business or operations, promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Decision Agents shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright Collateral.

(e)     <u>Notices</u>. Such Credit Party will advise Agent, Lenders and L/C Issuer promptly, in reasonable detail, (i) of any Lien (other than Permitted Encumbrances) on or claim made or asserted against a material portion of the Collateral of which it has knowledge, which could reasonably be expected to have a material adverse effect on the Collateral or the ability of Agent to exercise any of its remedies hereunder.

(f)     <u>Organizational/Collateral Location Changes; No Reincorporation</u>. Such Credit Party will give Agent at least fifteen (15) days prior written notice of any change to the information set forth on Schedule I or Schedule 1 to the Perfection Certificate, as applicable to the extent needed to make Schedule I or Schedule 1 to the Perfection Certificate up to date and accurate. Such Credit Party shall not affect any such change unless it has taken all steps necessary or reasonably required by the Decision Agents to maintain continued perfection of the Agent's security interest in the Collateral with the same priority as prior to such change. Without limiting the prohibitions on mergers involving any Credit Party as contained in this Agreement, none of the Credit Parties shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the date hereof without the prior written consent of the Decision Agents.

(g)     <u>Use of Collateral</u>. Such Credit Party will do nothing to impair the rights of Agent in any of the Collateral, it being understood and agreed that permitted uses hereunder shall not impair the rights of the Agent in any of the Collateral. Such Credit Party will not use or permit any Collateral to be used unlawfully or in violation of any provision of applicable law, or any insurance policy covering any of the Collateral. Without limiting the foregoing, such Credit Party will not permit the production of Inventory (including Parts Inventory and Rental Fleet and Equipment) in violation of any provision of the Fair Labor Standards Act and such Credit Party will not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor thereof or allow any credit or discount thereon (other than credits and discounts in the ordinary course of business).

(h)     <u>Federal and State Claims</u>. Such Credit Party shall notify Agent promptly of any of the Collateral which constitutes a claim against the United States government or any instrumentality or agent thereof or any state thereof, the assignment of which claim is restricted by federal law or state law as the case may be. Upon the request of the Decision Agents, such Credit Party shall take such steps as may be reasonably necessary to comply with any applicable federal assignment of claims laws or other comparable laws.

8.6     <u>Bank Accounts; Collection of Accounts and Payments</u>.

(a) Each Credit Party, and any of its Affiliates, employees, agents and other Persons acting for or in concert with any Credit Party shall, acting as trustee for Agent and Secured Parties, receive, as the sole and exclusive property of Secured Parties, any moneys, checks, notes, drafts or other payments relating to and/or constituting proceeds of Accounts or other Collateral which come into the possession or under the control of such Credit Party or any Affiliates, employees, agent, or other Persons acting for or in concert with any Credit Party, and immediately upon receipt thereof, such Credit Party or such Persons shall, only to the extent required by Section 2.9, deposit the same or cause the same to be deposited in kind, in a Deposit Account with any financial institution or other account with a financial institution subject to a Control Agreement entered into prior to such deposit by Agent and the applicable Credit Party with such financial institution.

(b) If at any time a Blocked Account Bank is obligated to transfer to Agent or any Concentration Account, all amounts held or deposited in the Blocked Accounts held by such Blocked Account Bank, no Credit Party shall and no Credit Party shall permit any Subsidiary to, accumulate or maintain cash in any disbursement or payroll account, as of any date, in an amount in excess of checks outstanding against such account as of such date and amounts necessary to meet minimum balance requirements.

8.7 Agent's Appointment as Attorney-In-Fact.

(a) Each Credit Party hereby appoints, which appointment is irrevocable and coupled with an interest, effective upon and during the occurrence of an Event of Default, Agent, and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Credit Party and in the name of such Credit Party or otherwise, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Credit Party hereby gives Agent the power and right, on behalf of such Credit Party, either in Agent's name or in the name of such Credit Party or otherwise, without assent by such Credit Party, to do any or all of the following, in each case after and during the occurrence of an Event of Default and after written notice by Agent of its intent to do so:

(i) take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Account or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Decision Agents for the purpose of collecting any and all such moneys due under any Account or with respect to any other Collateral whenever payable;

(ii) pay or discharge taxes and Liens levied or placed on or threatened against the Collateral;

(iii) execute, in connection with any sale provided for in Section 8.8, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral;

(iv) obtain and adjust insurance maintained by such Credit Party or paid to Agent;

(v)     direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to Agent or as Agent shall direct;

(vi)     ask or demand for, collect and receive payment of and receipt of, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral;

(vii)     sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral;

(viii)     commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral;

(ix)     defend any suit, action or proceeding brought against such Credit Party with respect to any Collateral (with such Credit Party's consent (not to be unreasonably withheld or delayed) to the extent such action or its resolution could materially affect such Credit Party or any of its affiliates in any manner other than with respect to its continuing rights in such Collateral);

(x)     settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Decision Agents may deem appropriate (with such Credit Party's consent (not to be unreasonably withheld or delayed) to the extent such action or its resolution could materially affect such Credit Party or any of its affiliates in any manner other than with respect to its continuing rights in such Collateral);

(xi)     credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Agent under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law; and

(xii)     generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Agent were the absolute owner thereof for all purposes, and do, at Agent's option and such Credit Party's expense, at any time, or from time to time, all acts and things that the Decision Agents deem necessary to protect, preserve or realize upon the Collateral and Agent's and Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Credit Party might do.

Anything in this <u>Section 8.7(a)</u> to the contrary notwithstanding, the Agent agrees that it will not exercise any rights under the power of attorney provided for in this <u>Section 8.7(a)</u> unless an Event of Default shall have occurred and be continuing.

(b)     If any Credit Party fails to perform or comply with any of its agreements contained herein, Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.  Performance of such Credit Party's obliga-

tions as permitted under this Section 8.7 shall in no way constitute a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party hereby waives applicability thereof. Moreover, the Agent shall in no way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

(c)     The expenses of Agent incurred in connection with actions undertaken as provided in this Section 8.7, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Base Rate Loans under this Agreement, from the date of payment by Agent to the date reimbursed by the relevant Credit Party, shall be payable by such Credit Party to Agent on demand.

(d)     Each Credit Party hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. Exercise by the Agent of the powers granted herein is not a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party waives applicability thereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

(e)     All Obligations shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, claims against each Credit Party in its Bankruptcy Case which are administrative expense claims having priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

8.8     Remedies; Rights Upon Default.

(a)     In addition, subject to all other rights and remedies granted to it under this Agreement, the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Obligations, if any Event of Default shall have occurred and be continuing the Agent may for the benefit of Secured Parties exercise all rights and remedies of a secured party in respect of the Collateral under the Code as enacted in any such jurisdiction in effect at that time. Without limiting the generality of the foregoing, each Credit Party expressly agrees that in any such event Agent, without demand of performance or other demand, advertisement or notice of any kind (except as required by the Interim Order or Final Order, such notice as may be specifically required by law and the notice specified below of time and place of public or private sale) to or upon any Credit Party or any other Person (all and each of which demands, advertisements and notices (except any notice required by the Interim Order or Final Order, such notice as may be specifically required by law and the notice specified below of time and place of public or private sale) are hereby expressly waived to the maximum extent permitted by the Code and other applicable law), may forthwith (personally or through its agents or attorneys) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help or otherwise, and may take possession of, collect, receive, assemble, process, appropriate, remove and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, license, assign, give an option or options to purchase, or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or sales, at any exchange at such prices as it may deem acceptable, for cash or on credit or for future delivery without assumption of any credit risk. To facilitate the foregoing, the Agent shall have the right to use each Credit Party's books and records, to obtain access to each Credit Party's data processing equipment, computer hardware and Software and the information contained therein in any manner which the Agent deems appropriate. Agent or any Secured Parties shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of Agent and Secured Parties, the whole or any

part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Credit Party hereby releases.  Such sales may be adjourned and continued from time to time or times as Agent deems necessary or advisable with or without notice. Agent shall have the right to conduct such sales on each Credit Party's premises or at its offices or elsewhere as permitted by applicable law and shall have the right to use each Credit Party's premises without charge for such time or times as Agent deems necessary or advisable.

(b)     Upon the occurrence of an Event of Default and during the continuation of such Event of Default, and upon advance written notice by Agent to each Credit Party, Agent (personally or through an agent or designee) is hereby authorized and empowered (i) to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, (ii) to exchange certificates or Instruments representing or evidencing Pledged Collateral for certificates or Instruments of smaller or larger denominations, (iii) to exercise the voting and all other rights as a holder with respect thereto, and (iv) to collect and receive all cash dividends, interest, principal and other distributions made thereon.

Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent will give each Credit Party reasonable notice of the time and place of any public sale thereof or of the time on or after which any private sale thereof is to be made. The requirement of reasonable notice conclusively shall be met if such notice is mailed, certified mail, postage prepaid, to each Credit Party at its address set forth on the signature pages hereto or delivered or otherwise sent to each Credit Party, at least ten (10) days before the date of the sale.  Each Credit Party expressly waives, to the fullest extent permitted by applicable law, any right to receive notice of any public or private sale of any Collateral or other security for the Obligations except as expressly provided for in this paragraph.  The Agent shall not be obligated to make any sale of the Collateral if they shall determine not to do so regardless of the fact that notice of sale of the Collateral may have been given.  Agent may, without notice or publication, except as required by applicable law, adjourn the sale from time to time by announcement at the time and place fixed for sale; and such sale may, without further notice (except as required by applicable law), be made at the time and place to which the same was so adjourned. Notwithstanding any such notice of sale, the Agent shall not be obligated to make any sale of Collateral.

If any Event of Default shall have occurred and be continuing, each Credit Party further agrees, at Agent's request, to assemble the Collateral and make it available to Agent at a place or places designated by the Agent which are reasonably convenient to the Agent and such Credit Party, whether at such Credit Party's premises or elsewhere.  Without limiting the foregoing, the Agent shall also have the right to require that each Credit Party store and keep any Collateral pending further action by the Agent, and while Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain Collateral in good condition.  Until Agent is able to effect a sale, lease, license or other disposition of Collateral, Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Agent.  Agent shall not have any obligation to any Credit Party to maintain or preserve the rights of any Credit Party as against third parties with respect to Collateral while Collateral is in the possession of Agent.  The Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of Agent's remedies (for the benefit of Agent and Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Agent shall apply the net proceeds of any sale, lease, license, other disposition of, or any collection, recovery, receipt, or realization on, the Collateral to the Obligations as provided in this Agreement, and only after so paying over such net proceeds, and after the payment by Agent of any other amount required by any provision of law, need Agent account for the surplus, if any, to any Credit Party.  To the maximum extent permitted by applicable law, each Credit Party waives all claims, damages, and demands against Agent or any Secured Parties arising out of the repos-

session, retention or sale of the Collateral, except such as arise solely out of the gross negligence or willful misconduct of Agent or such Secured Party as finally determined by a court of competent jurisdiction. In connection with any sale, lease, license or other disposition of Collateral, the Agent may disclaim any warranties that might arise in connection therewith and the Agent shall have no obligation to provide any warranties at such time. Each Credit Party shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations or to cover reasonable and documented costs and expenses of such sale or disposition.

(c)     To the extent that applicable law imposes duties on Agent to exercise remedies in a commercially reasonable manner, each Credit Party acknowledges and agrees that it is not commercially unreasonable for Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Credit Party, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of Collateral or to provide to Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral. Each Credit Party acknowledges that the purpose of this Section 8.8(c) is to provide non-exhaustive indications of what actions or omissions by Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 8.8(c). Without limitation upon the foregoing, nothing contained in this Section 8.8(c) shall be construed to grant any rights to any Credit Party or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 8.8(c).

(d)     Neither Agent nor any Secured Parties shall be required to make any demand upon, or pursue or exhaust any of their rights or remedies against, any Credit Party, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof. Neither Agent nor any Secured Parties shall be required to marshal the Collateral or any guarantee of the Obligations or to resort to the Collateral or any such guarantee in any particular order, and all of its and their rights hereunder or under any other Loan Document shall be cumulative. To the extent it may lawfully do so, each Credit Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Agent or any Secured Parties, any valuation, stay, appraisal, extension, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Col-

lateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

(e)     The Agent shall take any action allowed by it to be taken pursuant to this Section 8.8 if the Requisite Lenders direct and it receives satisfactory indemnity, if applicable.

8.9     Grant of License to Use Property.  For the purpose of enabling Agent to exercise rights and remedies under Section 8.8 hereof (including, without limiting the terms of Section 8.8 hereof, in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, lease, license, assign, give an option or options to purchase or otherwise dispose of Collateral) at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Credit Party hereby grants to Agent, for the benefit of Agent and Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Credit Party) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by such Credit Party, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all Software and programs used for the compilation or printout thereof and an irrevocable license (exercisable without payment of rent or other compensation to such Credit Party) to use and occupy all real estate owned or leased by such Credit Party.

8.10     Limitation on Agent's and Secured Parties' Duty in Respect of Collateral.  Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar property for its own account.  Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control.  Neither Agent nor any Secured Parties shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property. Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other agent or bailee selected by the Agent in good faith. The powers conferred on Agent, the other Decision Agents, and Secured Parties hereunder are solely to protect Agent's and Secured Parties' interests in the Collateral and shall not impose any duty upon Agent or any Secured Party to exercise any such powers.  Agent and Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Credit Party for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

8.11     Authorized Terminations.

(a)     Each Credit Party shall automatically be released from its obligations hereunder and the security interest in the Collateral of such Credit Party shall be automatically released upon the consummation of any transaction permitted under this Agreement as a result of which such Credit Party ceases to be a Credit Party.

(b)     Upon any sale or other transfer by any Credit Party (other than any sale or transfer to another Credit Party) of any Collateral that is permitted under this Agreement or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Section 11.2, the security interest in such Collateral shall be automatically released and such Collateral sold free and clear of the Lien and security interests created hereby.

(c)     Following the Termination Date or the release pursuant to clause (a) or (b) above, Agent shall promptly, at the expense of the relevant Credit Party or Parent Borrower, execute and deliver to such Credit Party all documents that such Credit Party shall reasonably request to evidence such termination or release, including authorization to file termination statements and releases in accordance with Section 9-513(c) of the Code.  Any execution and delivery of documents pursuant to this Section 8.11 shall be without recourse to or warranty by Agent.

8.12    Modifications.

(a)     The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent for the benefit of the Secured Parties pursuant to this Agreement, the Interim Order and/or the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Credit Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Bankruptcy Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except for the Carve-Out having priority over the Obligations, no costs or expenses of administration which have been or may be incurred in any of the Bankruptcy Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Agent or the Secured Parties against the Credit Parties in respect of any Obligation;

(ii)    the liens and security interests granted herein shall constitute valid and perfected first priority liens and security interests (subject only to (i) valid, perfected, nonavoidable and enforceable Liens existing as of the Petition Date, other than the Liens on the Collateral securing Indebtedness under the Pre-Petition Loan Documents, (ii) the Carve-Out and (iii) post-petition Liens permitted under Section 3.2(a)(i) in accordance with sections 364(c)(2) and (3) of the Bankruptcy Code), and shall be prior to all other liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)   the liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable nonbankruptcy law.

(b)     Notwithstanding any failure on the part of any Credit Party or the Agent or the Secured Parties to perfect, maintain, protect or enforce the liens and security interests in the Collateral granted hereunder, the Interim Order and the Final Order (when entered) shall automatically, and without further action by any Person, perfect such liens and security interests against the Collateral.

## SECTION 9.

## GUARANTY

9.1     Guaranty of Guaranteed Obligations of the Borrowers.  In order to induce Agent and Lenders to enter into this Agreement and other Loan Documents and to induce Lenders to make the Loans and to incur Letter of Credit Obligations as provided for in this Agreement, Holdings hereby unconditionally guarantees to Agent and Lenders, and their respective successors, endorsees, transferees and assigns,

for the benefit of Secured Parties, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations (other than such Person's own Obligations under this Agreement) (hereinafter the "<u>Guaranteed Obligations</u>"). Holdings agrees that this guaranty (the terms of Section 9 collectively, this "<u>Guaranty</u>") is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:

        (a)      the validity, regularity, enforceability or any future amendment of, or change in this Guaranty, any other Loan Document or any other agreement, document or instrument to which any Credit Party is or may become a party;

        (b)      the absence of any action to enforce this Guaranty or any other Loan Document or the waiver or consent by Agent, Lenders or any other Secured Party with respect to any of the provisions thereof;

        (c)      the existence, value or condition of, or failure to perfect its Lien against, any Collateral for the Guaranteed Obligations or any action, or the absence of any action, by Agent in respect thereof (including, without limitation, the release of any such security);

        (d)      the insolvency of a Borrower or any other Credit Party;  or

        (e)      any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor,

it being agreed by Holdings that its obligations under this Guaranty shall not be discharged until the Termination Date, on which date, Holdings shall be automatically released from its obligations hereunder. Holdings shall be regarded, and shall be in the same position, as the principal debtor with respect to the Guaranteed Obligations. Holdings agrees that any notice or directive given at any time to Agent which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by Agent and the Secured Parties and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless Agent and the Requisite Lenders have specifically agreed otherwise in writing. It is agreed among Holdings, Agent and Secured Parties that the foregoing waivers are of the essence of the transaction contemplated by the Loan Documents and that, but for this Guaranty and such waivers, Agent and Lenders would decline to enter into this Agreement and Secured Parties would decline to enter into the applicable documents governing the Obligations.

        9.2    <u>Demand by Agent or Lenders</u>.  In addition to the terms of the Guaranty set forth in <u>Section 9.1</u> hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding principal amount of the Guaranteed Obligations under this Agreement (including all accrued interest thereon) is declared to be immediately due and payable, then Holdings shall, without demand, pay to the holders of the Guaranteed Obligations the entire outstanding Guaranteed Obligations due and owing to such holders.  Payment by Holdings shall be made to Agent in Dollars in immediately available funds to an account designated by Agent or at any other address that may be specified in writing from time to time by Agent, and shall be credited and applied to the Guaranteed Obligations.

        9.3    <u>Enforcement of Guaranty</u>.  In no event shall Agent have any obligation (although it is entitled, at its option in its sole discretion) to proceed against Borrower or any other Credit Party or any Collateral pledged to secure the Guaranteed Obligations before seeking satisfaction from Holdings, and Agent may proceed, prior or subsequent to the enforcement of Agent's rights hereunder, to exercise any

right or remedy which it may have against any Collateral, as a result of any Lien it may have as security for all or any portion of the Guaranteed Obligations.

9.4     <u>Waiver</u>.

(a)     In addition to the waivers contained in <u>Section 9.1</u> hereof, Holdings hereby waives to the fullest extent permitted by law, and Holdings hereby agrees that is shall not at any time insist upon, plead or in any manner whatsoever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by Holdings of its Guaranteed Obligations under, or the enforcement by Agent, Lenders or other Secured Parties of, this Guaranty.

(b)     Holdings hereby waives diligence and presentment (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Guaranteed Obligations, notice of adverse change in Parent Borrower's or Holdings' financial condition or any other fact which might increase the risk to Holdings) with respect to any of the Guaranteed Obligations or all other demands whatsoever and waive the benefit of all provisions of law which are or might be in conflict with the terms of this Guaranty.

9.5     <u>Modification of Guaranteed Obligations, Etc</u>.  Holdings hereby acknowledges and agrees that Agent and Secured Parties may at any time or from time to time, with or without the consent of, or notice to, Holdings:

(a)     change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Guaranteed Obligations;

(b)     take any action under or in respect of the Loan Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(c)     amend or modify, in any manner whatsoever, the Loan Documents (in accordance with the terms thereof);

(d)     extend or waive the time for any Credit Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Loan Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(e)     (i) subject to this Agreement, take and hold Collateral for the payment of the Guaranteed Obligations guaranteed hereby or (ii) upon the occurrence and during the continuance of an Event of Default or otherwise in accordance with the Loan Documents, sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which Agent or any Secured Party has been granted a Lien, to secure any of the Obligations;

(f)     release any Person who may be liable in any manner for the payment of any amounts owed by Holdings or any Credit Party to Agent or any Secured Party;

(g)     modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of Holdings or any Credit Party are subordinated to the claims of Agent and Secured Parties; and/or

(h)     subject to this Agreement, apply any sums by whomever paid or however realized to any amounts owing by Holdings or any Credit Party to Agent or any Secured Party in such manner as Agent or any Lender shall determine in its discretion;

and none of Agent or any Secured Party shall incur any liability to Holdings as a result thereof, and no such action shall impair or release the Guaranteed Obligations of Holdings under this Guaranty (unless, subject to Section 9.6 below, such action results in the payment in full and satisfaction of the Obligations).

9.6     Reinstatement.  This Guaranty shall remain in full force and effect and continue to be effective, or be reinstated, should any petition be filed by or against any Borrower or Holdings for liquidation or reorganization, should any Borrower or Holdings become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of such Borrower's or Holdings' assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Agent or any Secured Party, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made and such Guaranteed Obligations shall be deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

9.7     Waiver of Subrogation, Etc.  Notwithstanding anything to the contrary in this Guaranty, or in any other Loan Document, Holdings hereby expressly and irrevocably waives, to the fullest extent permitted by law, on behalf of itself and its successors and assigns (including any surety), any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Holdings may have or hereafter acquire against any Credit Party in connection with or as a result of Holdings' execution, delivery and/or performance of this Guaranty, or any other documents to which Holdings is a party or otherwise.

9.8     Election of Remedies.  If Agent may, under applicable law, proceed to realize benefits under any of the Loan Documents giving Agent and Secured Parties a Lien upon any Collateral of any Credit Party, either by judicial foreclosure or by non-judicial sale or enforcement, Agent may, at its sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty.  If, in the exercise of any of its rights and remedies, Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Credit Party, whether because of any applicable laws pertaining to "election of remedies" or the like, Holdings hereby consents to such action by Agent and waives, to the fullest extent permitted by law, any claim based upon such action, even if such action by Agent shall result in a full or partial loss of any rights of subrogation which Holdings might otherwise have had but for such action by Agent.  Any election of remedies which results in the denial or impairment of the right of Agent to seek a deficiency judgment against any Credit Party shall not impair Holdings' obligation to pay the full amount of the Guaranteed Obligations.  In the event Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent may bid all or less than the amount of the Guaranteed Obligations and the amount of such bid need not be paid by Agent but shall be credited against the Guaranteed Obligations.

Any difference between such bid amount and the remaining balance of the Guaranteed Obligations shall be deemed to be the amount of the Guaranteed Obligations guaranteed under this Guaranty; provided, any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent and Secured Parties might otherwise be entitled but for such bidding at any such sale.

9.9     Continuation of Guaranty.  This Guaranty is a continuing guaranty and shall remain in full force and effect until the Termination Date.  Upon payment and performance in full of the Guaranteed Obligations, Agent shall deliver to Holdings such documents as Holdings may reasonably request to evidence such termination in accordance with this Agreement. This Guaranty shall be binding on Holdings regardless of whether the Bankruptcy Case with respect to Holdings is dismissed.

## SECTION 10.

## ASSIGNMENT AND PARTICIPATION

10.1     Assignment and Participations.

(a)     Subject to the terms of this Section 10.1, any Lender may make an assignment to a Qualified Assignee of, or sale of participation in, at any time or times, the Loan Documents, Loans, Letter of Credit Obligations and any Revolving Loan Commitment or any portion thereof or interest therein, including any Lender's rights, title, interests, remedies, powers or duties thereunder.  Any assignment by a Lender shall:  (i) require the consent of Agent (and, if different, the L/C Issuer and the Swing Line Lender) (which consent shall not be unreasonably withheld or delayed with respect to a Qualified Assignee) only if such assignment is not to an existing Lender and the execution of an assignment agreement (an "Assignment Agreement" substantially in the form attached hereto as Exhibit 10.1 and otherwise in form and substance reasonably satisfactory to, and acknowledged by, Agent); (ii) be conditioned on such assignee Lender representing to the assigning Lender and Agent that it is purchasing the applicable Loans to be assigned to it for its own account, for investment purposes and not with a view to the distribution thereof; (iii) any such partial assignment of the Revolving Loan Commitments shall be in a minimum of $5,000,000 and in an amount equal to a multiple of $1,000,000 in excess thereof; provided that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Qualified Assignee (or to a Qualified Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met; (iv) require a payment to Agent of an assignment fee of $3,500; provided however that the Agent may, in its sole discretion, elect to waive such assignment fee; provided further that no such assignment fee shall be paid by any Lender assigning Loans or Commitments to an Affiliate; and (v) so long as no Event of Default under Section 6.1(a), (f) or (g) has occurred and is continuing, require the consent of Parent Borrower, which shall not be unreasonably withheld or delayed; provided that no such consent of Parent Borrower shall be required for an assignment to a Lender meeting the requirements of clause (a) of the definition of Qualified Assignee that does not result in immediate increased costs to Parent Borrower under Section 1.12.  In the case of an assignment by a Lender under this Section 10.1 the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as all other Lenders hereunder.  The assigning Lender shall be relieved of its obligations hereunder with respect to its Revolving Loan Commitments or assigned portion thereof from and after the date of such assignment.  Borrowers hereby acknowledge and agree that any assignment shall give rise to a direct obligation of Borrowers to the assignee and that the assignee shall be considered to be a "Lender."  In all instances, each Lender's liability to make Loans hereunder shall be several and not joint and shall be limited to such Lender's Pro Rata Share of the Revolving Loan Commitment.  In the event Agent or any Lender assigns or otherwise transfers all or any part of the Obligations, Agent or any such Lender shall so notify Parent Borrower and

Borrowers shall, upon the request of Agent or such Lender, execute new Notes in exchange for the Notes, if any, being assigned. Notwithstanding the foregoing provisions of this Section 10.1(a), (a) any Lender may at any time pledge the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank, (b) any Lender that is an investment fund may assign the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to another investment fund managed by the same investment advisor or pledge such Obligations and rights to a trustee for the benefit of its investors or holders of obligations of such Lender and (c) the Agent shall acknowledge each assignment for it to be effective even if its consent thereto is not required.

(b)     Any participation by a Lender (which Lenders shall be free to make) of all or any part of its Revolving Loan Commitments shall be made with the understanding that all amounts payable by Borrowers hereunder shall be determined as if that Lender had not sold such participation, and that the holder of any such participation shall not be entitled to require such Lender to take or omit to take any action hereunder except actions directly affecting (i) any reduction in the principal amount of, or interest rate or Fees payable with respect to, any Loan in which such holder participates, (ii) any extension of the scheduled amortization of the principal amount of any Loan in which such holder participates or the final maturity date thereof, and (iii) any release of all or substantially all of the Collateral (other than in accordance with the terms of this Agreement, the Collateral Documents or the other Loan Documents). Solely for purposes of Sections 1.12, 1.13, 10.3 and 11.1, Borrowers acknowledge and agree that a participation shall give rise to a direct obligation of Borrowers to the participant and the participant shall be considered to be a "Lender." Borrowers further acknowledge and agree that each participant shall be entitled to the benefits of Section 1.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (a) of this Section; provided that a participant shall not be entitled to receive any greater payment under Section 1.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with the Borrowers' prior written consent or the higher amount results from a change in law as described in Section 1.13(b); provided further that no participant shall be entitled to the benefits of Section 1.13 to the extent that the tax in question results from a failure by such participant to comply with Section 1.13(c) as if such participant were a Lender. Except as set forth in the two preceding sentences no Borrower or any other Credit Party shall have any obligation or duty to any participant. Neither Agent nor any Lender (other than the Lender selling a participation) shall have any duty to any participant and may continue to deal solely with the Lender selling a participation as if no such sale had occurred.

(c)     Except as expressly provided in this Section 10.1, no Lender shall, as between Borrowers and that Lender, or Agent and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of participation in, all or any part of the Loans, the Notes or other Obligations owed to such Lender.

(d)     Agent shall maintain, on behalf of Borrowers, at the Agent's Office a "register" for recording the name, address, commitment and Loans owing to each Lender (including assignees) and the assignment of the Loan Documents, Loans, Letter of Credit Obligations, any Revolving Loan Commitment or any portion thereof or interest therein, including any Lender's rights, title, interests, remedies, powers or duties thereunder. The entries in such register shall be presumptive evidence of the amounts due and owing to each Lender in the absence of manifest error. Borrowers, Agent and each Lender shall treat each Person whose name is recorded in such register pursuant to the terms hereof as a Lender for all purposes of this Agreement, notwithstanding notice to the contrary. The register described herein shall be available for inspection by Borrowers and any Lender (with respect to itself only), at any reasonable time upon reasonable prior notice.

(e)     A Lender may furnish any information concerning Credit Parties in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants); provided that such Lender shall obtain from assignees or participants confidentiality covenants substantially equivalent to those contained in Section 11.13.

(f)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the applicable Credit Party, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

10.2     Agent.

(a)     Appointment and Authority.  Each of the Lenders and the L/C Issuer hereby irrevocably appoints Bank of America to act on its behalf and on behalf of its Affiliates as the Agent hereunder and under the other Loan Documents, the Cash Management Documents and the Related Swap Contracts and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Section 10.2 are solely for the benefit of the Agent, the Lenders and the L/C Issuer, and no Borrower have rights as a third party beneficiary of any of such provisions.

The Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders on their behalf and on behalf of their respective Affiliates (in their capacities as a Lender, Swing Line Lender (if applicable), or party to a Cash Management Document or Related Swap Contract) and the L/C Issuer hereby irrevocably appoints and authorizes the Agent to act as the agent of such Lender and the L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to Section 10.2(e) for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Section 10.2, Section 1.3(e) and Section 11 (including Section 11.1, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(b)     Rights as a Lender.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

(c)     Exculpatory Provisions.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(i)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)        shall not have any duty to take any discretionary action or exercise any discretionary rights and powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(iii)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Parent Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Subsidiaries in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 6 and 11.2) or (ii) in the absence of its own gross negligence or willful misconduct. The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent by a Borrower, a Lender or the L/C Issuer.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Section 7 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(d)        Reliance by Agent.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Agent shall have received notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for a Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(e)    <u>Delegation of Duties</u>.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(f)    <u>Resignation of Agent</u>.  The Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and Parent Borrower.  Upon receipt of any such notice of resignation, the Requisite Lenders, shall have the right, in consultation with the Parent Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Agent meeting the qualifications set forth above; <u>provided</u> that if the Agent shall notify Parent Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Requisite Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by Parent Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Parent Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Section 10.2</u>, <u>Section 1.3(e)</u> and <u>Section 11.1</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Any resignation by Bank of America as Agent pursuant to this <u>Section 10.2</u> shall also constitute its resignation as L/C Issuer and Swing Line Lender.  Upon the acceptance of a successor's appointment as Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer and Swing Line Lender, (ii) the retiring L/C Issuer and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

(g)    <u>Non-Reliance on Agent and Other Lenders</u>.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of

their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(h) <u>No Other Duties, Etc</u>. Anything herein to the contrary notwithstanding, none of the Persons listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Agent, a Lender or the L/C Issuer hereunder.

(i) <u>Agent May File Proofs of Claim.</u> The Agent (irrespective of whether the principal of any Loan or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on a Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Agent under <u>Sections 1.3</u> and <u>11.1</u>) allowed in such judicial proceeding; and

(ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under <u>Sections 1.3</u> and <u>11.1</u>.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer to authorize the Agent to vote in respect of the claim of any Lender or the L/C Issuer or in any such proceeding.

(j) <u>Collateral and Guaranty Matters</u>. The Lenders and the L/C Issuer irrevocably authorize the Agent, at its option and in its discretion,

(i) to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Revolving Loan Commitments and payment in full of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 11.2</u>;

(ii)     to release any Borrower from its obligations hereunder if such Person ceases to be a Subsidiary of Parent Borrower as a result of a transaction permitted hereunder; and

(iii)     to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 3.2(a)(iii).

Upon request by the Agent at any time, the Requisite Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Borrower from its obligations hereunder. In each case as specified in this Section 10.2(j), the Agent will, at Borrowers' expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Borrower from its obligations, in each case in accordance with the terms of the Loan Documents and this Section 10.2(j).

(k)     Withholding Tax. To the extent required by law (as determined by the Agent in its good faith discretion), the Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Without limiting or expanding the obligations of the Credit Parties under Section 1.13, each Lender shall indemnify the Agent, and shall make payable in respect thereof within 30 calendar days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Agent) incurred by or asserted against the Agent by the IRS or any other Governmental Authority as a result of the failure of the Agent to properly withhold tax from amounts paid to or for the account of such Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Agent under this Section 10.2(k). The agreements in this Section 10.2(k) shall survive the resignation and/or replacement of the Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of any Loans and all other amounts payable under the Loan Documents.

10.3     Set Off and Sharing of Payments. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, during the continuance of any Event of Default, each Lender and each Affiliate of a Lender is hereby authorized by Borrowers at any time or from time to time, with reasonably prompt subsequent notice to Parent Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (i) balances held by such Lender or Affiliate of a Lender at any of its offices for the account of Parent Borrower or any of its Subsidiaries (regardless of whether such balances are then due to Parent Borrower or its Subsidiaries), and (ii) other property at any time held or owing by such Lender or Affiliate of a Lender to or for the credit or for the account of Parent Borrower or any of its Subsidiaries, against and on account of any of the Obligations; except that no Lender or Affiliate of a Lender shall exercise any such right without the prior written consent of Agent. Any Lender exercising a right to set off (including any setoff by an Affiliate of such Lender) shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender or Affiliate of a Lender in accordance with their respective Pro Rata Shares.

10.4    Disbursement of Funds.  Agent may, on behalf of Lenders, disburse funds to Parent Borrower for Loans requested.  Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Pro Rata Share of any Loan before Agent disburses same to Borrowers.  If Agent elects to require that each Lender make funds available to Agent prior to a disbursement by Agent to Borrowers, Agent shall advise each Lender by telephone or fax or other similar form of transmission of the amount of such Lender's Pro Rata Share of the Loan requested by a Borrower no later than 1:00 p.m.  (New York time) on the Funding Date applicable thereto, and each such Lender shall pay Agent such Lender's Pro Rata Share of such requested Loan, in same day funds, by wire transfer to Agent's account specified on Annex D on such Funding Date.  If any Lender fails to pay the amount of its Pro Rata Share within one (1) Business Day after Agent's demand, Agent shall promptly notify the Borrowers, and the Borrowers shall immediately repay such amount to Agent.  Any repayment required pursuant to this Section 10.4 shall be without premium or penalty.  Nothing in this Section 10.4 or elsewhere in this Agreement or the other Loan Documents, including the provisions of Section 10.5, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or a Borrower may have against any Lender as a result of any default by such Lender hereunder.

10.5    Disbursements of Advances; Payment.

(a)    Advances; Payments.

(i)    Lenders shall refund or participate in the Swing Line Loan in accordance with clauses (iii) and (iv) of Section 1.1(b).  If the Swing Line Lender declines to make a Swing Line Loan or if Swing Line Availability is zero, Agent shall notify Lenders, promptly after receipt of a Notice of Credit Advance and in any event prior to 1:00 p.m. (New York time) on the date such Notice of a Credit Advance is received, by fax, telephone or other similar form of transmission.  Each Lender shall make the amount of such Lender's Pro Rata Share of a Credit Advance available to Agent in same day funds by wire transfer to Agent's account as set forth in Annex D not later than 3:00 p.m.  (New York time) on the requested Funding Date in the case of a Base Rate Loan and not later than 11:00 a.m.  (New York time) on the requested Funding Date in the case of a LIBOR Loan.  After receipt of such wire transfers (or, in the Agent's sole discretion, before receipt of such wire transfers), subject to the terms hereof, Agent shall make the requested Credit Advance to a Borrower as designated by such Borrower in the Notice of Credit Advance.  All payments by each Lender shall be made without setoff, counterclaim or deduction of any kind.

(ii)    To the extent that any Lender (a "Non-Funding Lender") has failed to fund any payment owed by it to Agent under this Agreement or Advances or failed to fund the purchase of any participation required to be purchased by it under this Agreement, Agent shall be entitled to set off the funding shortfall against that Non-Funding Lender's Pro Rata Share of all payments received from Borrowers.

(b)    Availability of Lender's Pro Rata Share.  Agent may assume that each Lender will make its Pro Rata Share of each Revolving Credit Advance available to Agent on each Funding Date. If such Pro Rata Share of each Revolving Credit Advance, is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind.  If any Lender fails to pay the amount of its Pro Rata Share forthwith upon Agent's demand, Agent shall promptly notify Parent Borrower and Borrowers shall immediately repay such amount to Agent.  Nothing in this Section 10.5(b) or elsewhere in this Agreement or the

other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Revolving Loan Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder.  To the extent that Agent advances funds to Borrowers on behalf of any Lender and is not reimbursed therefor on the same Business Day as such Advance is made, Agent shall be entitled to retain for its account all interest accrued on such Advance until reimbursed by the applicable Lender.

(c)      <u>Return of Payments</u>.

(i)      If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)      If Agent determines at any time that any amount received by Agent under this Agreement must be returned to Parent Borrower on behalf of Borrowers or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Parent Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)      <u>Non-Funding Lenders</u>.  The failure of any Non-Funding Lender to make any Revolving Credit Advance or any payment required by it hereunder, or to purchase any participation in any Swing Line Loan to be made or purchased by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "<u>Other Lender</u>") of its obligations to make such Advance, purchase such participation on such date, but neither any Other Lender nor Agent shall be responsible for the failure of any Non-Funding Lender to make an Advance, purchase a participation or make any other payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Lender" (or be included in the calculation of "Requisite Lenders" or "Supermajority Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document.

(e)      <u>Dissemination of Information</u>.  Agent shall use reasonable efforts to provide Lenders with any notice of Default or Event of Default received by Agent from, or delivered by Agent to, any Credit Party, with notice of any Event of Default of which Agent has become actually aware and with notice of any action taken by Agent following any Event of Default; <u>provided</u> that Agent shall not be liable to any Lender for any failure to do so.

(f)      <u>Actions in Concert</u>.  Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Notes (including exercising any rights of setoff) without first obtaining the prior written consent of Agent and the Requisite Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of Agent and the Requisite Lenders.  Agent is authorized to issue all notices to be issued by or on behalf of the Lenders with respect to any subordinated Indebtedness.

10.6     Related Obligations Matters.  The benefit of this Agreement and the other Loan Documents relating to the Collateral shall extend to and be available in respect of any Obligation arising under any Related Swap Contract or any Cash Management Obligation that is otherwise owed to Persons other than Agent, Lenders and L/C Issuer (collectively, "Related Obligations") solely on the condition and understanding, as among the Agent and all Secured Parties, that (a) the Related Obligations shall be entitled to the benefit of the Loan Documents and the Collateral to the extent expressly set forth in this Agreement and the other Loan Documents and to such extent Agent shall hold, and have the right and power to act with respect to, the Guaranty and the Collateral on behalf of and as agent for the holders of the Related Obligations, but Agent is otherwise acting solely as agent for Lenders and L/C Issuer and shall have no fiduciary duty, duty of loyalty, duty of care, duty of disclosure or other obligation whatsoever to any holder of Related Obligations, (b) all matters, acts and omissions relating in any manner to the Guaranty, the Collateral, or the omission, creation, perfection, priority, abandonment or release of any Lien, shall be governed solely by the provision of this Agreement and the other Loan Documents and no separate Lien, right, power or remedy shall arise or exist in favor of any Secured Party under any separate instrument or agreement or in respect of any Related Obligation, (c) each Secured Party shall be bound by all actions taken or omitted, in accordance with the provisions of this Agreement and the other Loan Documents, by the Agent and the Requisite Lenders, each of whom shall be entitled to act at its sole discretion and exclusively in its own interest given its own Revolving Loan Commitments and its own interest in the  Loans, Letter of Credit Obligations and other Obligations to it arising under this Agreement or the other Loan Documents, without any duty or liability to any other Secured Party or as to any Related Obligation and without regard to whether any Related Obligation remains outstanding or is deprived of the benefit of the Collateral or becomes unsecured or is otherwise affected or put in jeopardy thereby, (d) no holder of Related Obligations and no other Secured Party (except Agent, Lenders and L/C Issuer, to the extent set forth in this Agreement) shall have any right to be notified of, or to direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under this Agreement or the Loan Documents and (e) no holder of any Related Obligation shall exercise any right of setoff, banker's lien or similar right except to the extent provided in Section 10.3 and then only to the extent such right is exercised in compliance with Section 10.3.

10.7     Other Agents.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "collateral agent," "documentation agent," "syndication agent," "arranger" or "co-manager" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, in the case of such Persons in their respective capacities as Lenders, those applicable to all Lenders as such.  Without limiting the foregoing, no Lender or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any other Lender or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

## SECTION 11.

## MISCELLANEOUS

11.1     Indemnities.  Borrowers shall indemnify the Agent (and any sub-agent thereof), each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by a Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consumma-

tion of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any re-fusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under or from any property owned, leased or operated by Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to Parent Borrower or any of its Subsidiaries and (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Credit Party or any of a Credit Party's directors, share-holders or creditors, and regardless of whether any Indemnitee is a party thereto; provided that such in-demnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, li-abilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonap-pealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Credit Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if Parent Borrower or such Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  The Borrowers' obligations to pay all of the payment obligations under this Section 11.1 include, without limitation, any such payment obligations that accrue after any conversion of the Bankruptcy Cases to proceedings administered under Chapter 7 of the Bankruptcy Code.

To the extent that any Borrower for any reason fails to indefeasibly pay any amount re-quired under the paragraph above or Section 1.3(e) to be paid by it to the Agent (or any sub-agent the-reof), the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such Lend-er's Pro Rata Share of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) or L/C Issuer in connection with such capacity.

11.2     Amendments and Waivers.

(a)     Except for actions expressly permitted to be taken by Agent, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing (it being understood that any necessary signatures may be on a document consent-ing to such amendment, modification, termination or waiver) and:

(i)     in the case of an amendment to cure any ambiguity, omission, defect or inconsistency, signed by Agent and Parent Borrower;

(ii)     [Reserved];

(iii)     [Reserved];

(iv)     in the case of any other amendment, modification, termination or waiver, signed by Parent Borrower, Agent and by Requisite Lenders, and to the extent required below, Supermajority Lenders or all affected Lenders.

(b)     No amendment, modification, termination or waiver of or consent with respect to any provision of this Agreement that (i) increases the percentage of the advance rates set forth in the definitions of Eligible Accounts Formula, Eligible Parts Inventory Formula, Eligible Rental Fleet and Equipment Formula or the Eligible Rolling Stock Formula, (ii) makes less restrictive the nondiscretionary criteria for exclusion from Eligible Accounts, Eligible Parts Inventory, Eligible Rental Fleet and Equipment or the Eligible Rolling Stock set forth in <u>Section 1.7</u>, <u>1.8</u>, <u>1.9</u> or <u>1.10</u> or (iii) modifies the definition of Excess Availability, shall be effective unless the same shall be in writing and signed by Agent, Supermajority Lenders and Parent Borrower.

(c)     No amendment, modification, termination or waiver of or consent with respect to any provision of this Agreement that waives compliance with the conditions precedent set forth in <u>Section 7.2</u> to the making of any Loan or the incurrence of any Letter of Credit Obligations shall be effective unless the same shall be in writing and signed by Agent, Supermajority Lenders and Parent Borrower.  Notwithstanding anything contained in this Agreement to the contrary, no waiver or consent with respect to any Default or any Event of Default shall be effective for purposes of the conditions precedent to the making of Loans or the incurrence of Letter of Credit Obligations set forth in <u>Section 7.2</u> unless the same shall be in writing and signed by Agent, Supermajority Lenders and Parent Borrower.

(d)     No amendment, modification, termination or waiver of or consent with respect to any provision of this Agreement shall, unless in writing and signed by Agent and each Lender directly affected thereby:  (i) increase the principal amount of any Lender's Revolving Loan Commitment (which action shall be deemed to directly affect only those Lenders providing such increased Revolving Loan Commitments); (ii) reduce the principal of, rate of interest on or Fees payable with respect to any Loan or Letter of Credit Obligations of any affected Lender; (iii) extend any scheduled payment date or final maturity date of the principal amount of any Loan of any affected Lender; (iv) waive, forgive, defer, extend or postpone any payment of interest or Fees as to any affected Lender (which action shall be deemed only to affect those Lenders to whom such payments are made); (v) except in connection with an Asset Disposition expressly permitted pursuant to this Agreement, release the Guaranty or, except as otherwise permitted in <u>Section 3.7</u>, release all or substantially all of the Collateral (which action shall be deemed to directly affect all Lenders); (vi) change the definition of Requisite Lenders or Supermajority Lenders to decrease the percentage of the Revolving Loan Commitments or of the aggregate unpaid principal amount of the Loans specified therein; (vii) subordinate the Obligations or the Liens securing them; (viii) change the definition of LIBOR Period to permit the availability of interest periods in excess of six months without the agreement of all Lenders; or (ix) alter the pro rata sharing provisions herein.

(e)     No amendment, modification, termination or waiver affecting the rights or duties of Agent, the Swing Line Lender or L/C Issuers under this Agreement or any other Loan Document shall be effective unless in writing and signed by Agent, the Swing Line Lender or L/C Issuers, as the case may be, in addition to Lenders required hereinabove to take such action.  Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.

(f)     No amendment, modification, termination or waiver shall be required for Agent to take additional Collateral pursuant to any Loan Document.

(g)     No notice to or demand on any Credit Party in any case shall entitle such Credit Party or any other Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 11.2</u> shall be binding upon each holder of the Revolving Loan Commitments and the Notes at the time outstanding and each future holder of the Revolving Loan Commitments and the Notes.

11.3 <u>Notices</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

| | |
|---|---|
| If to Parent Borrower: | Neff Corp.<br>3750 N.W. 87th Avenue<br>Suite 400<br>Miami, Florida  33178<br>ATTN:  Mark Irion, Chief Financial Officer<br>Phone: (305) 901-2280<br>Fax:  (305) 513-4156<br>Email:  MIrion@Neffcorp.com<br>Website:  www.neffcorp.com<br><br>With a copy to:<br><br>Kirkland & Ellis LLP<br>300 N. LaSalle<br>Chicago, IL 60654<br>ATTN: Ray Schrock<br>Phone: (312) 862-2413<br>Fax: (312) 862-2200<br>Email: ray.schrock@kirkland.com<br><br>With a copy to:<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>ATTN: Leonard Klingbaum<br>Phone: (212) 446-4792<br>Fax: (212) 446-6460<br>Email: leonard.klingbaum@kirkland.com |
| If to Holdings<br>or any other Credit<br>Party (other than<br>Parent Borrower): | To such Credit Party<br>c/o NEFF Corp.<br>3750 N.W. 87th Avenue<br>Suite 400<br>Miami, Florida  33178<br>ATTN:  Mark Irion, Chief Financial Officer<br>Phone: (305) 901-2280<br>Fax:  (305) 513-4156<br>Email:  MIrion@Neffcorp.com<br><br>With a copy to: |

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
ATTN: Ray Schrock
Phone: (312) 862-2413
Fax: (312) 862-2200
Email: ray.schrock@kirkland.com

With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
ATTN: Leonard Klingbaum
Phone: (212) 446-4792
Fax: (212) 446-6460
Email: leonard.klingbaum@kirkland.com

| | |
|---|---|
| If to Agent, L/C Issuer or Swing Line Lender: | BANK OF AMERICA, N.A.<br>One Bryant Park,<br>New York, New York 10036<br>ATTN:  Robert Anchundia, VP<br>Phone:  646-556-0843<br>Fax:   312-453-2487<br>Email:  robert.anchundia@baml.com |
| If to the Arrangers: | Wells Fargo Capital Finance, LLC<br>2450 Colorado Avenue<br>Suite 3000 West<br>Santa Monica, CA 90404<br>ATTN: Michael Baranowski-Syndicated Finance<br>Phone: 310-453-7308<br>Email: michael.p.baranowski@wellsfargo.com<br><br>GE Capital Markets, Inc.<br>201 Merritt 7<br>Norwalk, CT 06851<br>ATTN: Amit Bafna/Joseph Catarina<br>Phone: (203) 229-1897/(203) 229-1893<br>Email: amit.bafna@ge.com/joseph.catarina@ge.com |
| If to a Lender: | To the address set forth on the signature page hereto or in the applicable Assignment Agreement |

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided herein shall be effective as provided herein.

Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Section 1 if such Lender or the L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent or any Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Credit Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of a Credit Party's or the Agent's transmission of Borrower Materials through the internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Credit Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

Each Credit Party, the Agent, each Arranger, the L/C Issuer and the Swing Line Lender may change its address, email address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, email address, telecopier or telephone number for notices and other communications hereunder by notice to Parent Borrower, the Agent, the L/C Issuer and the Swing Line Lender. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information"

portion of the Platform and that may contain material non-public information with respect to Parent Borrower or its securities for purposes of United States Federal or state securities laws.

The Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of a Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify the Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Borrower.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

11.4  <u>Failure or Indulgence Not Waiver; Remedies Cumulative</u>.  No failure or delay on the part of Agent or any Lender to exercise, nor any partial exercise of, any power, right or privilege hereunder or under any other Loan Documents shall impair such power, right, or privilege or be construed to be a waiver of any Default or Event of Default.  All rights and remedies existing hereunder or under any other Loan Document are cumulative to and not exclusive of any rights or remedies otherwise available.

11.5  <u>Marshaling; Payments Set Aside</u>.  Neither Agent nor any Lender shall be under any obligation to marshal any assets in payment of any or all of the Obligations.  To the extent that a Borrower makes payments or Agent enforces its Liens or Agent or any Lender exercises its right of setoff, and such payments or the proceeds of such enforcement or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

11.6  <u>Severability</u>.  The invalidity, illegality, or unenforceability in any jurisdiction of any provision under the Loan Documents shall not affect or impair the remaining provisions in the Loan Documents.

11.7  <u>Lenders' Obligations Several; Independent Nature of Lenders' Rights</u>.  The obligation of each Lender hereunder is several and not joint and no Lender shall be responsible for the obligation or commitment of any other Lender hereunder.  In the event that any Lender at any time should fail to make a Loan as herein provided, the Lenders, or any of them, at their sole option, may make the Loan that was to have been made by the Lender so failing to make such Loan.  Nothing contained in any Loan Document and no action taken by Agent or any Lender pursuant hereto or thereto shall be deemed to constitute Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt.

11.8  <u>Headings</u>.  Section and subsection headings are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes or be given substantive effect.

11.9  <u>Applicable Law</u>.  THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

11.10    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except that neither Parent Borrower nor any other Credit Party may assign its rights or obligations hereunder without the written consent of Agent and all Lenders.

11.11    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Credit Party acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Agent and the other Persons named on the facing page hereof are arm's-length commercial transactions between the Credit Parties, on the one hand, and the Agent and such other Persons, on the other hand, (B) each Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agent and each other Person named on the facing page hereof is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Credit Party, or any other Person and (B) neither the Agent nor any other Person on the facing page hereof has any obligation to a Credit Party with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agent, the other Persons named on the facing page hereof and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Credit Parties and their Affiliates, and neither the Agent nor any other Person on the facing page hereof has any obligation to disclose any of such interests to any Credit Party or its Affiliates.  To the fullest extent permitted by law, each Credit Party hereby waives and releases any claims that it may have against the Agent and all other Persons on the facing page hereof with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

11.12    Construction.  Agent, each Lender, Parent Borrower and each other Credit Party acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the Loan Documents with its legal counsel and that the Loan Documents shall be construed as if jointly drafted by Agent, each Lender, Parent Borrower and each other Credit Party.

11.13    Confidentiality.  Agent and each Lender agree to use commercially reasonable efforts (equivalent to the efforts Agent or such Lender applies to maintaining the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to them by the Credit Parties and designated as confidential for a period of two (2) years following receipt thereof, except that Agent and any Lender may disclose such information (a) to Persons employed or engaged by Agent, such Lender or such Lender's Affiliates; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 11.13 (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in the foregoing clause (a)); (c) as required or requested by any Governmental Authority, including any self-regulatory authority, or reasonably believed by Agent or such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Agent's or such Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which Agent or such Lender is a party; (f) that ceases to be confidential through no fault of Agent or any Lender; (g) to any party hereto; (h) with the consent of Parent Borrower; or (i) that become available to such Person or its Affiliates on a non-confidential basis.

11.14   CONSENT TO JURISDICTION.  PARENT BORROWER AND EACH CREDIT PAR-
TY HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FED-
ERAL COURT LOCATED WITHIN NEW YORK COUNTY, STATE OF NEW YORK AND IR-
REVOCABLY AGREE THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEED-
INGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCU-
MENTS SHALL BE LITIGATED IN SUCH COURTS.  PARENT BORROWER AND EACH CREDIT
PARTY EXPRESSLY SUBMIT AND CONSENT TO THE JURISDICTION OF THE AFORESAID
COURTS AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS.  PARENT BORROWER
AND EACH CREDIT PARTY HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROC-
ESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON PARENT
BORROWER AND SUCH CREDIT PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN
RECEIPT REQUESTED, ADDRESSED TO PARENT BORROWER, AT THE ADDRESS SET
FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10)
DAYS AFTER THE SAME HAS BEEN POSTED.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 11.14, THE
BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR
DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE
OTHER LOAN DOCUMENTS.

11.15   WAIVER OF JURY TRIAL.  PARENT BORROWER, EACH CREDIT PARTY,
AGENT AND EACH LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRI-
AL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS
AGREEMENT AND THE OTHER LOAN DOCUMENTS.  PARENT BORROWER, EACH CREDIT
PARTY, AGENT AND EACH LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL
INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON
THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS
AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN ITS RELATED FUTURE
DEALINGS.

11.16   Survival of Warranties and Certain Agreements.  All agreements, representations and
warranties made herein shall survive the execution and delivery of this Agreement, the making of the
Loans, issuances of  Letters of Credit and the execution and delivery of the Notes.  Notwithstanding any-
thing in this Agreement or implied by law to the contrary, the agreements of Borrowers set forth in Sec-
tions 1.3(e), 1.12, 1.13 and 11.1 (including with respect to assignees and participants to the extent pro-
vided in Section 10.1) shall survive the repayment of the Obligations and the termination of this Agree-
ment.

11.17   Entire Agreement.  This Agreement, the Notes and the other Loan Documents embody
the entire agreement among the parties hereto and supersede all prior commitments, agreements, repre-
sentations, and understandings, whether oral or written, relating to the subject matter hereof, and may not
be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or dis-
cussions of the parties hereto.  All Exhibits, Schedules and Annexes referred to herein are incorporated in
this Agreement by reference and constitute a part of this Agreement.

11.18   Counterparts; Effectiveness.  This Agreement and any amendments, waivers, consents or
supplements may be executed in any number of counterparts and by different parties hereto in separate
counterparts, each of which when so executed and delivered shall be deemed an original, but all of which
counterparts together shall constitute but one in the same instrument.  This Agreement shall become ef-

fective upon the execution of, and provision to the Agent of, a counterpart hereof by each of the parties hereto.

11.19    Replacement of Lenders.

(a)    Within fifteen (15) days after receipt by Parent Borrower of written notice and demand from any Lender for payment pursuant to Section 1.12 or 1.13 and such Lender being unable to change its lending office after a request therefor pursuant to Section 1.12(c) or, as provided in Section 11.19(c), after certain refusals by any Lender to consent to certain proposed amendments, modifications, terminations or waivers with respect to this Agreement that have been approved by Requisite Lenders (any such Lender demanding such payment or refusing to so consent being referred to herein as an "Affected Lender"), Parent Borrower may, at its option, notify Agent and such Affected Lender of its intention to obtain, at Parent Borrower's expense, a replacement Lender ("Replacement Lender") for such Affected Lender, which Replacement Lender shall be reasonably satisfactory to Agent.  In the event Parent Borrower obtains a Replacement Lender that will purchase all outstanding Obligations owed to such Affected Lender and assume its Revolving Loan Commitments hereunder within ninety (90) days following notice of Parent Borrower's intention to do so, the Affected Lender shall sell and assign all of its rights and delegate all of its obligations under this Agreement to such Replacement Lender in accordance with the provisions of Section 10.1 for an amount equal to the principal balance of all Loans held by such Affected Lender and all accrued interest and Fees with respect thereto through the date of sale, provided that Parent Borrower has reimbursed such Affected Lender for any administrative fee payable pursuant to Section 10.1 and, in any case where such replacement occurs as the result of a demand for payment pursuant to Section 1.12 or 1.13, paid all amounts required to be paid to such Affected Lender pursuant to Section 1.12 or 1.13 through the date of such sale and assignment.

(b)    In the case of a Non-Funding Lender pursuant to Section 10.5(a), at Parent Borrower's request, Agent or a Person acceptable to Agent shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from any Non-Funding Lender, and each Non-Funding Lender agrees that it shall, at Agent's request, sell and assign to Agent or such Person, all of the Loans and Revolving Loan Commitments of that Non-Funding Lender for an amount equal to the principal balance of all Loans held by such Non-Funding Lender and all accrued interest and Fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.  Assignments effected pursuant to this clause (b) or clause (a) above or (c) below shall be effective even if the Affected Lender, Non-Consenting Lender or Non-Funding Lender, as applicable, does not sign an Assignment Agreement.

(c)    If, in connection with any proposed amendment, modification, waiver or termination pursuant to Section 11.2 (a "Proposed Change"):

(i)    requiring the consent of all affected Lenders, the consent of Requisite Lenders is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this clause (i) and in clause (ii) below being referred to as a "Non-Consenting Lender"), or

(ii)    requiring the consent of Supermajority Lenders, the consent of Requisite Lenders is obtained, but the consent of Supermajority Lenders is not obtained,

then, so long as Agent is not a Non-Consenting Lender, at Parent Borrower's written request, Agent, or a Person reasonably acceptable to Agent, shall have the right with Agent's consent (but shall have no obligation) to purchase from such Non-Consenting Lenders, and such Non-Consenting Lenders agree that they shall, upon Agent's request, sell and assign to Agent or such Person, all of the Loans and Revolving

Loan Commitments of such Non-Consenting Lenders for an amount equal to the principal balance of all Loans and held by the Non-Consenting Lenders and all accrued interest and Fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement (notwithstanding anything in the foregoing to the contrary, Non-Consenting Lenders shall only be required to assign under this <u>Section 11.19</u> so long as all Non-Consenting Lenders are replaced and the Proposed Change is thus approved.

      11.20   <u>Patriot Act Notice</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Agent, as applicable, to identify each Credit Party in accordance with the Act.

      11.21   <u>Joint and Several Liability</u>.  All Loans and other extensions of credit, upon funding, shall be deemed to be jointly funded to and received by Borrowers.  Each Borrower is jointly and severally liable under this Agreement for all Obligations, regardless of the manner or amount in which proceeds of Loans are used, allocated, shared or disbursed by or among Borrowers themselves, or the manner in which the Agent and/or any Lender accounts for such Loans or other extensions of credit on its books and records.  Each Borrower shall be liable for all amounts due to the Agent and/or any Lender from Borrowers under this Agreement, regardless of which Borrower actually receives Loans or other extensions of credit hereunder or the amount of such Loans and extensions of credit received or the manner in which such Agent and/or such Lender accounts for such Loans or other extensions of credit on its books and records.  Each Borrower's Obligations with respect to Loans and other extensions of credit made to it, and such Borrower's Obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Loans made to the other Borrowers hereunder shall be separate and distinct obligations, but all such Obligations shall be primary obligations of such Borrower.  Borrowers acknowledge and expressly agree with the Agent and each Lender that the joint and several liability of each Borrower is required solely as a condition to, and is given solely as inducement for and in consideration of, credit or accommodations extended or to be extended under the Loan Documents to any or all of the other Borrowers and is not required or given as a condition of extensions of credit to such Borrower.  Each Borrower's Obligations under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the validity or enforceability, avoidance, or subordination of the Obligations of any other Borrower or of any promissory note or other document evidencing all or any part of the Obligations of any other Borrower, (ii) the absence of any attempt to collect the Obligations from any other Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance, or granting of any indulgence by the Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any other Borrower, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to the Agent and/or any Lender, (iv) the failure by the Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any other Borrower, (v) the Agent's and/or any Lender's election, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, (vi) any borrowing or grant of a security interest by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code, (vii) the disallowance of all or any portion of the Agent's and/or any Lender's claim(s) for the repayment of the Obligations of any other Borrower under Section 502 of the Bankruptcy Code, or (viii) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower.  With respect to any Borrower's Obligations arising as a result of the joint and several liability of Borrowers hereunder with respect to Revolving Loans or other extensions of credit made to any of the other Borrowers hereunder, such Borrower waives, until the Obligations shall have

been paid in full and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which the Agent and/or any Lender now has or may hereafter have against any other Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Agent and/or any Lender to secure payment of the Obligations or any other liability of any Borrower to the Agent and/or any Lender. Upon any Event of Default, the Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that the Agent shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations. Notwithstanding anything to the contrary in the foregoing, none of the foregoing provisions of this Section 11.21 shall apply to any Person released from its Obligations as a Borrower in accordance with this Agreement.

11.22   Contribution and Indemnification Among Borrowers. Each Borrower is obligated to repay the Obligations as a joint and several obligor under this Agreement. To the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount (as defined below) and the denominator of which is the sum of the Allocable Amounts of all of Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101(31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA. All rights and claims of contribution, indemnification, and reimbursement under this Section shall be subordinate in right of payment to the prior payment in full of the Obligations. The provisions of this Section shall, to the extent expressly inconsistent with any provision in any Loan Document, supersede such inconsistent provision.

11.23   Agency of Parent Borrower for Each Other Borrower. Each of the other Borrowers irrevocably appoints Parent Borrower as its agent for all purposes relevant to this Agreement, including the giving and receipt of notices and execution and delivery of all documents, instruments, and certificates contemplated herein (including, without limitation, execution and delivery to the Agent of all financial certificates, compliance certificates and borrowing related notices) and all modifications hereto. Any acknowledgment, consent, direction, certification, or other action which might otherwise be valid or effective only if given or taken by all or any of Borrowers or acting singly, shall be valid and effective if given or taken only by Parent Borrower, whether or not any of the other Borrowers join therein, and the Agent and the Lenders shall have no duty or obligation to make further inquiry with respect to the authority of Parent Borrower under this Section 11.23; provided that nothing in this Section 11.23 shall limit the effectiveness of, or the right of the Agent and the Lenders to rely upon, any notice (including without limitation a borrowing and conversion notices), document, instrument, certificate, acknowledgment, consent, direction, certification or other action delivered by any Borrower pursuant to this Agreement.

11.24   Affirmation of Commitment Letter. Each of the Administrative Agent, the Decision Agents, Lenders and Credit Parties agree and acknowledge that the Commitment Letter dated April 9,

2010 (the "Commitment Letter") remains in full and effect with respect to the Exit Facility (as defined therein). The execution of this Agreement shall not operate as a waiver of any obligations or rights thereunder, including, without limitation, the commitment of the Initial Exit Lenders (as defined therein) to fund the Exit Facility on the terms and conditions set forth in the Commitment Letter.

11.25   Reinstatement.  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Parent Borrower or any other Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

11.26   Express Waivers by Borrowers in Respect of Cross Guaranties and Cross Collateralization.  Each Borrower agrees as follows:

(a)     Each Borrower hereby waives:  (i) notice of acceptance of this Agreement; (ii) notice of the making of any Loans, the issuance of any Letter of Credit or any other financial accommodations made or extended under the Loan Documents or the creation or existence of any Obligations; (iii) notice of the amount of the Obligations, subject, however, to such Borrower's right to make inquiry of the Agent to ascertain the amount of the Obligations at any reasonable time; (iv) notice of any adverse change in the financial condition of any other Borrower or of any other fact that might increase such Borrower's risk with respect to such other Borrower under the Loan Documents; (v) notice of presentment for payment, demand, protest, and notice thereof as to any promissory notes or other instruments among the Loan Documents; and (vi) all other notices (except if such notice is specifically required to be given to such Borrower hereunder or under any of the other Loan Documents to which such Borrower is a party) and demands to which such Borrower might otherwise be entitled.

(b)     Each Borrower hereby waives the right by statute or otherwise to require the Agent or any Lender to institute suit against any other Borrower or to exhaust any rights and remedies which the Agent or any Lender has or may have against any other Borrower. Each Borrower further waives any defense arising by reason of any disability or other defense of any other Borrower (other than the defense of payment in full) or by reason of the cessation from any cause whatsoever of the liability of any such Borrower in respect thereof.

(c)     Each Borrower hereby waives and agrees not to assert against the Agent, any Lender, or any Letter of Credit Issuer:  (i) any defense (legal or equitable) other than a defense of payment, set-off, counterclaim, or claim which such Borrower may now or at any time hereafter have against any other Borrower or any other party liable under the Loan Documents; (ii) any defense, set-off, counterclaim, or claim of any kind or nature available to any other Borrower (other than a defense of payment) against the Agent, any Lender, or any Letter of Credit Issuer, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Obligations or any security therefor; (iii) any right or defense arising by reason of any claim or defense based upon an election of remedies by the Agent, any Lender, or any Letter of Credit Issuer under any applicable law; (iv) the benefit of any statute of limitations affecting any other Borrower's liability hereunder.

(d)     Each Borrower consents and agrees that, without notice to or by such Borrower and without affecting or impairing the obligations of such Borrower hereunder, the Agent may (subject to any requirement for consent of any of the Lenders to the extent required by this Agreement), by action or inaction: (i) compromise, settle, extend the duration or the time for the payment of, or discharge the performance of, or may refuse to or otherwise not enforce the Letter of Credit documents; (ii) release all or

-100-

any one or more parties to any one or more of the Letter of Credit documents or grant other indulgences to any other Borrower in respect thereof; (iii) amend or modify in any manner and at any time (or from time to time) any of the Letter of Credit documents; or (iv) release or substitute any Person liable for payment of the Obligations, or enforce, exchange, release, or waive any security for the Obligations.

(e)     Each Borrower represents and warrants that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower agrees that neither the Agent, any Lender, nor any L/C Issuer has any responsibility to inform any Borrower of the financial condition of any other Borrower or of any other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

NEFF CORP., a Debtor and Debtor in Possession, as Parent Borrower

By: _____
       Name:  Mark Irion
       Title:   Chief Financial Officer

NEFF HOLDINGS CORP., a Debtor and Debtor in Possession, as Holdings, a Holdings and a Credit Party

By: _____
       Name:  Mark Irion
       Title:   Chief Financial Officer

NEFF RENTAL, INC.,
NEFF RENTAL LLC,
NEFF FINANCE CORP., each a Debtor and Debtor in Possession, as a Borrower

By: _____
       Name:  Mark Irion
       Title:   Chief Financial Officer

BANK OF AMERICA, N.A.,
as Agent, Co-Collateral Agent, L/C Issuer, Swing Line
Lender and a Lender

By: _____

Name:   Robert Anchundia
Title:    Vice President

**Credit Contact: Robert Anchundia**
Address:     335 Madison Avenue, New York, NY 10017
Office:  646-556-0483  Fax:  312-453-2487
email:  robert.anchundia@baml.com

**Operations Contact: Jonah Vogt**

Address:     20975 Swanson Drive, Waukesha, WI 53186
Office: 262-207-3307  Fax: 312-453-2074
email:  jonah.vogt@bankofamerica.com

BANK OF AMERICA SECURITIES LLC,
as Joint Lead Arranger and Joint Book Runner

By: _____

  Name:  JANET JARRETT
  Title:  MANAGING DIRECTOR

WELLS FARGO CAPITAL FINANCE, LLC,
as Co-Collateral Agent, Co-Syndication Agent, Joint
Lead Arranger, Joint Book Runner and a Lender

By: _____

    Name:  Michael Baranowski
    Title:    Vice President

**Credit Contact:**          **Michael Baranowski**
                            Loan Portfolio Manager
                            Syndication Finance
                            Wells Fargo Capital Finance, LLC
                            2450 Colorado Avenue
                            Suite 3000
                            Santa Monica, CA 90404
                            (310) 453-7308
                            michael.p.baranowski@wellsfargo.com

**Operations Contact:**      **Dave Warga**
                            Senior Account Analyst
                            Wells Fargo Capital Finance
                            2450 Colorado Avenue
                            Suite 3000 West
                            Santa Monica, CA 90404
                            (310) 453-7215 (phone)
                            (866) 615-7803 (fax)
                            dave.warga@wellsfargo.com

GE CAPITAL MARKETS, INC.,
as Co-Syndication Agent, Joint Lead
Arranger, Joint Book Runner and a Lender

By: _____
Name: Thomas Krele
Title: Managing Director

GMAC COMMERCIAL FINANCE LLC,
as Co-Documentation Agent and a Lender

By: _____
     Name:   Dennis Baelis
     Title:    Managing Director

**Credit Contact:** Dennis Baelis
Address:    1290 Avenue of the Americas
               New York, NY 10104

**Operations Contact:** Christy Bell/Joan Sargol
Address:    3000 Town Center, Suite 280
               Southfield, MI 48075

UBS SECURITIES LLC,
as Co-Documentation Agent

By: _____
    Name:  Irja R. Otsa
    Title:  Associate Director


By: _____
    Name:  April Varner - Nanton
    Title:  Director

**Credit Contact:  Suzanne Cozine**
Address:    677 Washington Blvd.
               Stamford, CT  06901

**Operations Contact:  Daniel Goldenberg**
Address:    677 Washington Blvd.
               Stamford, CT  06901

GENERAL ELECTRIC CAPITAL CORPORATION,
as a Lender

By: _A. Bafna_
Name: AMIT BAFNA
Title: DULY AUTHORIZED SIGNATORY

Credit Contact: AMIT BAFNA
Address: 201 MERRITT 7, NORWALK CT 06851

Operations Contact: SAMEEKSHA KHANDELWAL
Address: 201 MERRITT 7, NORWALK CT 06851

UBS LOAN FINANCE LLC,
as a Lender

By: _____
Name: Irja R. Otsa
Title: Associate Director

By: _____
Name: Mary E. Evans
Title: Associate Director

**Credit Contact: Suzanne Cozine**
Address: 677 Washington Blvd.
Stamford, CT 06901

**Operations Contact: Daniel Goldenberg**
Address: 677 Washington Blvd.
Stamford, CT 06901

UNION BANK, N.A.,
as a Lender

By: _____

Name: Brent Housteau
Title: Vice President

**Credit Contact:** Brent Housteau
**Address:** 400 California Street, 8th Floor
San Francisco, CA 94104
**Phone:** (415) 765-2254
**Email:** brent.housteau@unionbank.com

**Operations Contact:** Commercial Loan Operations
**Address:** 1980 Saturn Street
Monterey Park, CA 91754
**Phone:** (323) 720-2870
**Fax:** (800) 446-9951
**Email:** #clo synd@unionbank.com

PNC BANK, NATIONAL ASSOCIATION,
as a Lender

By: _____
      Name:  Dorneth Weir
      Title:   Vice President

**Credit Contact: Dorneth Weir**
Address:    205 Datura Street
             West Palm Beach, FL 33401

**Operations Contact: Nisha Desai**
Address:    Two Tower Center Blvd.
             East Brunswick, NJ 08816

RBS BUSINESS CAPITAL, A DIVISION OF RBS
ASSET FINANCE, INC.,
as a Lender

By: _____
Name:   Paul M. Mongeau
Title:   Senior Vice President

**Credit Contact:** Paul M. Mongeau
Address:   One Citizens Plaza RC 0490
            Providence, RI 02903

**Operations Contact:** Merilyn Sicard
                        Matthew Rodrigues
Address:   One Citizens Drive RDC 160
            Riverside, RI 02915

REGIONS BANK,
as a Lender

By: _____

Name: George Louis McKinley
Title: Attorney in Fact

**Credit Contact:**
Address: George Louis McKinley
         599 Lexington Avenue
         New York NY 10022
         212 935 0685
         louis.mckinley@regions.com


**Operations Contact:**
Address: Anna Isbell
1900 Fifth Avenue North 23rd Floor
Birmingham, Al 35203
Phone: (205) 264-5594
Fax:    (205) 264-5282
anna.isbell@regions.com

CIBC, INC.,
as a Lender

By: _____
     Name:  Lindsay Gordon
     Title:   Agent

**Credit Contact:**
Address: CIBC, 425 Lexington ave., New York, NY 10017

**Operations Contact:** Sana Waheed
Address: CIBC 595 Bay St. West, 5th floor, Toronto,
Ontario, Canada M5G 2C2

**DEFINITIONS**

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to this Agreement:

"Accommodation Payment" has the meaning specified in Section 11.22.

"Account Debtor" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Accounts" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, such term to include (a) all accounts receivable, other receivables, book debts, Rental Payments and other forms of obligations (other than, except in the case of Rental Payments, forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to any Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party) and (e) all collateral security of any kind, now or hereafter in existence, given by any Account Debtor or other Person with respect to any of the foregoing.

"Acquisition Pro Forma" has the meaning specified in the definition of "Permitted Acquisition."

"Act" has the meaning specified in Section 11.20.

"Advances" means any Revolving Credit Advance or Swing Line Advance, as the context may require.

"Affected Lender" has the meaning specified in Section 11.19(a).

"Affiliate" means, with respect to any Person, each Person that controls, is controlled by or is under common control with such Person; provided that for purposes of Section

<u>3.8</u>, the term "Affiliate" shall include each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 10% or more of the Stock having ordinary voting power in the election of directors of such Person; <u>provided</u>, <u>however</u>, that the term "Affiliate" shall specifically exclude Agent and each Lender.  For the purposes of this definition, "<u>control</u>" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise.

"<u>Affiliate Transaction</u>" has the meaning specified in <u>Section 3.8(a)</u>.

"<u>Agent</u>" means Bank of America, N.A., in its capacity as administrative, collateral agent for the Lenders, L/C Issuers and any other Secured Parties, or its successor appointed pursuant to <u>Section 10.2</u>.

"<u>Agent Parties</u>" has the meaning specified in <u>Section 11.3</u>.

"<u>Agent's Office</u>" means the Agent's offices located at One Bryant Park, New York, New York 10036 or such other office designated in writing by Agent to Parent Borrower and the Lenders.

"<u>Agreed Budget</u>" means the budget approved by the Agent and the Requisite Lenders and defined in <u>Section 5.23</u>, as such budget may be updated from time to time in accordance with the provisions of <u>Section 4.01(e)(ii)</u>.  The Initial Budget is attached as <u>Exhibit E</u>.

"<u>Agreement</u>" means, on any date, this Credit Agreement (including all schedules, subschedules, annexes and exhibits hereto), as the same may be amended, supplemented, restated or otherwise modified from time to time.

"<u>Allocable Amount</u>" has the meaning specified in <u>Section 11.22</u>.

"<u>Applicable L/C Margin</u>" means the per annum fee, from time to time in effect, payable with respect to outstanding Letter of Credit Obligations as determined by reference to the definition of "Applicable Margins."

"<u>Applicable Margins</u>" means collectively the Applicable L/C Margin, the Applicable Unused Line Fee Margin, the Applicable Revolver Base Rate Margin and the Applicable Revolver LIBOR Margin.  The Applicable Margins are as follows:

| Applicable Revolver Base Rate Margin | 3.50% |
|---|---|
| Applicable Revolver LIBOR Margin | 4.50% |
| Applicable L/C Margin | 4.50% |
| Applicable Unused Line Fee Margin | |

| | Drawn Amount | Margin |
|---|---|---|
| | > 66% | 0.50% |
| | ≤ 66% but > 33% | 0.75% |
| | ≤ 33% | 1.00% |

"Applicable Revolver Base Rate Margin" means the per annum interest rate margin from time to time in effect and payable in addition to the Base Rate applicable to the Revolving Loans, as determined by reference to the definition of "Applicable Margins."

"Applicable Revolver LIBOR Margin" means the per annum interest rate from time to time in effect and payable in addition to the LIBOR Rate applicable to the Revolving Loans, as determined by reference to the definition of "Applicable Margins."

"Applicable Unused Line Fee Margin" means the per annum fee, from time to time in effect, payable in respect of Borrowers' non-use of committed funds pursuant to Section 1.3(b), which fee is determined by reference to the definition of "Applicable Margins."

"Approved Appraiser" means Rouse Asset Services, Inc., Hunyady Appraisal Services, Ritchie Brothers Auctioneers or such other appraisal company of similar qualifications and standing acceptable to Agent in its sole discretion.

"Approved Fund" has the meaning specified in the definition of "Qualified Assignee".

"Arranger Fee Letter" means that certain DIP Facility Arranger Fee Letter, dated as of April 9, 2010, among Neff Corp., Bank of America, N.A., Banc of America Securities LLC, Wells Fargo Capital Finance, LLC, General Electric Capital Corporation, GE Capital Markets, Inc., UBS Loan Finance LLC and GMAC Commercial Finance LLC, relating to certain fees payable in connection with this Agreement, and any other fee letter replacing or supplementing such DIP Facility Arranger Fee Letter and relating to fees payable to the Arrangers.

"Arrangers" shall mean, collectively, Banc of America Securities LLC, Wells Fargo Capital Finance, LLC and GE Capital Markets, Inc., or their respective successors.

"Asset Disposition(s)" means (a) the disposition, whether by sale, lease, transfer, rental, conveyance, license or otherwise, of (i) any of the Stock or other equity or ownership interest of any direct or indirect Subsidiary of Holdings or (ii) any or all of the assets of Holdings or any of its Subsidiaries, (b) any loss or destruction of, or damage to, any or all of the assets of Holdings or any of its Subsidiaries that results in the receipt by such Person of insurance proceeds and/or (c) any loss of property of Holdings or any of its Subsidiaries by condemnation, taking of such property or otherwise, that results in the receipt by such Person of a compensation payment in respect thereof.

"Assignee Group" means two or more Qualified Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment Agreement" has the meaning specified in Section 10.1(a).

"Avoidance Actions" means causes of action arising under the Bankruptcy Code, including all of the Credit Parties' rights in and claims and causes of action under Sections 541, 542, 544, 545, 547, 548, 549, 550, 551, 552(b) and 553 of the Bankruptcy Code.

"Bank of America" means Bank of America, N.A.

"Bank Products" means (a) Related Swap Contracts, (b) products and services under Cash Management Documents and (c) to the extent not otherwise included in the foregoing, any or all types of banking products, services or facilities (other than Letters of Credit) extended to any Borrower by Agent or any Person that was a Lender or an Affiliate of Agent or any Lender at the time it entered into such banking products, services or facilities, including credit card services, merchant card services and such other banking products or services as may be requested by any Borrower (on behalf of itself or its Subsidiaries).

"Banking Relationship Debt" means Indebtedness or other obligations of any Borrower owing (a) to Agent, any Lender or any of their respective Affiliates or (b) to Agent in connection with its having provided any guaranty or indemnity on behalf of any such Person with respect to any Bank Products.

"Bankruptcy Case" or "Bankruptcy Cases" has the meaning assigned to each such term in the recitals.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., or other applicable bankruptcy, insolvency or similar laws, as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Rate plus ½ of 1%; (ii) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate"; and (iii) 2.50%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan(s)" means a Loan or portion thereof bearing interest by reference to the Base Rate.

"Blocked Account" means each Deposit Account that is subject to a Control Agreement.

"Blocked Account Bank" means each depositary bank that is party to a Control Agreement.

"Borrower Materials" has the meaning specified in Section 4.1.

"Borrowers" means Parent Borrower and each Domestic Subsidiary of Parent Borrower.

"Borrower's Accountants" means Deloitte & Touche LLP or such other independent certified public accountants of nationally recognized standing reasonably acceptable to Agent.

"Borrowing Base" means, with respect to the Credit Parties, as of any date of determination, from time to time, an amount equal to, without duplication, the lesser of (a) the Maximum Amount and (b) (i) the sum of (A) the Eligible Accounts Formula, (B) Eligible Parts Inventory Formula, (C) the Eligible Rental Fleet and Equipment Formula and (D) the Eligible Rolling Stock Formula less (ii) (A) a reserve of $3,500,000 related to the Carve-Out plus additional discretionary reserves if clause (a) of the Carve-Out exceeds $2,000,000, (B) the aggregate principal amount of Revolving Loans and Swing Line Loans and the aggregate face amount of Letters of Credit outstanding under the Pre-Petition First Lien Credit Agreement, and (C) any Reserves established by the Decision Agents in their Permitted Discretion (it being understood that no Reserves may be imposed with respect to Hedging Agreements existing on the Closing Date and obligations under Hedging Agreements existing on the Closing Date); provided, that with respect to any Subsidiary of Parent Borrower which becomes a Credit Party at any time after the Closing Date, the Accounts, Parts Inventory, Rental Fleet and Equipment and Rolling Stock of such new Credit Party shall not be included in the Borrowing Base until (x) Agent shall have conducted such audits, evaluations and/or inspections of such Collateral as Agent shall deem reasonably necessary or advisable with respect to such Collateral and (y) Parent Borrower and such Subsidiary shall have complied with the requirements of Section 2.8. Borrowing Base reserve determinations and decisions will be made by the Decision Agents in their Permitted Discretion.

"Borrowing Base Certificate" has the meaning specified in Section 4.1(e).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBOR Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Lease(s)" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a Capital Lease on a balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"Carve-Out" means sums having priority ahead of the Liens securing the Obligations and the Super-Priority Claims for (a) Professional Fees incurred at any time before or on the first business day following delivery by the Agent of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (b) after the first business day following delivery by the Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by Interim Order, procedural order or otherwise, the payment of Professional Fees, only to the extent all such fees or disbursements set forth in this clause do not in the aggregate exceed the Carve-Out Trigger Notice Cap, and (c) the payment of United States Trustee fees, pursuant to 28 U.S.C. § 1930; provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement, or compensation sought by the Credit Parties or the Creditors' Committee.

"Carve-Out Trigger Notice" shall mean a written notice delivered by the Agent to the Borrowers and Holdings and their counsel, the United States Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered following termination of the commitments under this Agreement.

"Carve-Out Trigger Notice Cap" shall mean $2,000,000.

"Cash Collateral" means cash or deposit account balances pledged and deposited with or delivered to Agent, for the benefit of the L/C Issuer, as collateral for the Letter of Credit Obligations, in an amount equal to 105% of such Letter of Credit Obligations, pursuant to documentation in form and substance reasonably satisfactory to the L/C Issuer (which documents are hereby consented to by the Lenders to the extent applicable).

"Cash Equivalents" means:

(a)     marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (ii) issued by any agency of the United States government the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after acquisition thereof;

(b)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after acquisition thereof and having, at the time of acquisition, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(c)     commercial paper maturing no more than one year from the date of acquisition and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(d)      certificates of deposit or bankers' acceptances issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $250,000,000, in each case maturing within one year after issuance or acceptance thereof; and

(e)      shares of any money market mutual or similar fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) through (d) above, (ii) has net assets of not less than $500,000,000 and (iii) has the highest rating obtainable from either S&P or Moody's.

"Cash Management Document" means any certificate, agreement or other document executed by any Borrower in respect of the Cash Management Obligations of any such Person.

"Cash Management Obligation(s)" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person in respect of cash management services (including treasury, depository, return item, overdraft, controlled disbursement, credit, merchant store value or debit card, purchase card, electronic funds transfer, interstate depository network, automatic clearing house transfer and other cash management arrangements) provided after the date hereof (regardless of whether these or similar services were provided prior to the date hereof by Agent, any Lender or any Affiliate of any of them) by Agent or any Person that was a Lender or Agent or an Affiliate of Agent or any Lender at the time the applicable Cash Management Documents were entered into, including obligations for the payment of fees, interest, charges, expenses, attorneys' fees and disbursements in connection therewith.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.).

"Certificate of Exemption" has the meaning specified in Section 1.13(c).

"Certificates of Title" means any certificates of title, certificates of ownership or any other registration certificates issued under the laws of any State or Commonwealth of the United States of America or any political subdivision thereof with respect to motor vehicles or other vehicles.

"Change of Control" means any event, transaction or occurrence as a result of which:

(a)      at any time prior to the consummation of a Qualifying IPO, the Permitted Holders cease to "beneficially own" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) and control all of the voting rights associated with ownership of more than fifty percent (50%) of the outstanding Stock of Holdings having ordinary voting power on a fully diluted basis; or

(b)     at any time as of or after the consummation of a Qualifying IPO, (A) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Holders) shall become the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of outstanding Stock having more than thirty-five percent (35%) of the ordinary voting power of the Qualifying IPO Issuer and (B) the Permitted Holders shall own outstanding Stock having a lesser percentage of the ordinary voting power of the Qualifying IPO Issuer at such time; or

(c)     during any period of twelve (12) consecutive months, the board of directors of Holdings (or, after the consummation of a Qualifying IPO, the Qualifying IPO Issuer) shall not, for any reason other than death or disability, consist of a majority of the Continuing Directors; or

(d)     Holdings ceases to own and control all of the voting rights associated with all of the outstanding Stock of Parent Borrower.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including premiums and other amounts owed to the PBGC at the time due and payable), levies, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"Chattel Paper" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Credit Party, wherever located.

"Claim" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with this Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex C.

"Closing Date" means the first date on which any Loan is made or any Letter of Credit is issued or deemed issued pursuant to Section 7.1.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 shall govern; provided, further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's or any Secured

Party's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" has the meaning specified in Section 8.1(a) but for purposes of Sections other than Section 8 shall also include any property subject to Mortgages.

"Collateral Documents" means the Mortgages, the Patent Security Agreements, the Trademark Security Agreements, the Copyright Security Agreements, the Control Agreements and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations or any portion thereof.

"Committee" means any official committee of unsecured creditors appointed in the Bankruptcy Cases.

"Commitment Termination Date" means the earliest to occur of (i) February 28, 2011, (ii) the date that is 45 calendar days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court prior to the date that is 45 calendar days after the Petition Date, (iii) the date that the Revolving Loan Commitments terminate and/or the Obligations are accelerated, in each case, by Agent or Lenders upon the occurrence of an Event of Default and in accordance with Sections 6.2 and 6.3, and (iv) the Plan Effective Date, unless terminated earlier in accordance with the terms of this Agreement.

"Compliance and Pricing Certificate" has the meaning specified in Section 4.1(m).

"Concentration Account" means any cash collateral account (which may be a deposit account or a securities account) that is (a) established by Agent from time to time in its sole discretion to receive cash and Cash Equivalents (or purchase cash or Cash Equivalents with funds received) from the Credit Parties or Persons acting on their behalf pursuant to the Loan Documents, (b) with such depositaries and securities intermediaries as Agent may determine in its sole discretion, (c) in the name of Agent (although such account may also have words referring to a Borrower and the account's purpose), (d) under the control of Agent and (e) in the case of a securities account, with respect to which Agent shall be the Entitlement Holder (as defined in the Code) and the only Person authorized to give Entitlement Orders (as defined in the Code).

"Confirmed Plan of Reorganization" means a plan of reorganization of the Credit Parties under the Bankruptcy Cases which has been confirmed by the Bankruptcy Court and which (a) provides for the payment in full in cash of all Indebtedness under this Agreement on the Plan Effective Date or (b) is otherwise satisfactory to Agent and the Lenders.

"Contingent Obligation(s)" means, as applied to any Person, any direct or indirect liability of that Person: (a) with respect to Guaranteed Indebtedness and with respect to any Indebtedness, lease, dividend or other obligation of another Person if the purpose or intent of the Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such

liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (c) pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed.

"Continuing Directors" shall mean the directors of Holdings on the Closing Date, after giving effect to the transactions contemplated hereby, and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings (or the Qualifying IPO Issuer after a Qualifying IPO) is recommended by at least a majority of the then Continuing Directors or such other director is approved by, or receives the vote of, the Permitted Holders in his or her election by the Stockholders of Holdings (or the Qualifying IPO Issuer after a Qualifying IPO).

"Contractual Obligations" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Control Agreements" means:

(a)     in the case of any bank account, a deposit account control agreement by and among the applicable Credit Party, Agent and the depository, in form customarily signed by Agent and otherwise in form and substance reasonably satisfactory in all respects to Agent (it being understood a form customarily signed by Agent is reasonably satisfactory) pursuant to which such depository acknowledges the security interest of Agent in the deposit account, agrees to comply with instructions originated by Agent directing disposition of the funds in the bank account without further consent from such Credit Party or Subsidiary, and agrees to subordinate and limit any security interest the bank may have in such bank account on terms reasonably satisfactory to Agent;

(b)     in the case of any securities account, a securities account control agreement by and among the applicable Credit Party, Agent and the securities intermediary, in form customarily signed by Agent and otherwise in form and substance reasonably satisfactory in all respects to Agent (it being understood a form customarily signed by Agent is reasonably satisfactory) pursuant to which such securities intermediary acknowledges the security interest of Agent in the securities account, agrees to comply with instructions originated by Agent directing disposition of the funds in the securities account without further consent from such Credit Party or Subsidiary, and agrees to subordinate and limit any security interest the securities intermediary may have in such securities account on terms reasonably satisfactory to Agent; and

(c)     in the case of any commodities account, a commodities account control agreement by and among the applicable Credit Party, Agent and the commodities intermediary, in form customarily signed by Agent and otherwise in form and substance reasonably satisfactory in all respects to Agent (it being understood a form customarily signed by Agent is reasonably satisfactory) pursuant to which such commodities intermediary acknowledges the security interest of Agent in the commodities account, agrees to comply with instructions originated by Agent directing disposition of the funds in the commodities account without further consent from such Credit Party or Subsidiary, and agrees to subordinate and limit any security interest the commodities intermediary may have in such commodities account on terms reasonably satisfactory to Agent.

"Copyright License" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyright Security Agreements" means the Copyright Security Agreements made in favor of Agent, on behalf of itself and the Secured Parties, by each applicable Credit Party.

"Copyrights" means all of the following now owned or hereafter adopted or acquired by any Credit Party:  (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; and (b) all reissues, extensions or renewals thereof.

"Cost" means, in respect of the cost of acquisition by any Borrower of any Rental Fleet and Equipment, the net cost of such Rental Fleet and Equipment to such Person after all cash and other discounts, premiums, rebates, advertising and other allowances and all other discounts or other allowances which may be allowed or taken by such Person against the purchase price of such Rental Fleet and Equipment.

"Credit Parties" means Holdings, Parent Borrower, each of Parent Borrower's Subsidiaries and each other Person, in each case, who executes this Agreement as a "Credit Party" or who executes a Joinder Agreement or who grants a Lien on all or part of its assets to secure all of part of the Obligations.

"Creditors' Committee" means any official committee of unsecured creditors appointed by the United States Trustee in the Bankruptcy Cases.

"Currency Agreement" means any foreign exchange contracts, currency swap agreements or other similar agreements or arrangements designed to protect Parent Borrower or any Subsidiary of Borrower against fluctuations in currency values.

"Decision Agents" shall mean, collectively, Bank of America, N.A. and General Electric Capital Corporation, in each case, for so long as a Lender hereunder and thereafter in

replacement of either such Lender (i) in the event a Decision Agent assigns all of its commitments to a Person who is a Lender on the Closing Date (other than the other Decision Agents), the assignee with respect to such commitment or (ii) in the event a Decision Agent assigns all of its commitments but assigns any commitment to a Person who is not a Lender on the Closing Date (or is the other Decision Agent), the Lender with the next largest commitment after giving effect to such assignment who was a Lender on the Closing Date and is not already a Decision Agent. There shall be two Decision Agents at any time. For the avoidance of doubt, a Person that is not a Lender on the Closing Date shall not be eligible to become a Decision Agent.

"<u>Default</u>" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"<u>Default Rate</u>" has the meaning specified in <u>Section 1.2(d)</u>.

"<u>Disbursement Account</u>" has the meaning specified in <u>Section 1.1(d)</u>.

"<u>Disqualified Stock</u>" means that portion of any Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute a Change of Control), matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of a Change of Control) on or prior to the date that is the fifth (5th) anniversary of the Closing Date.

"<u>Documents</u>" means any "document," as such term is defined in the Code, including electronic documents, now owned or hereafter acquired by any Credit Party, wherever located.

"<u>Dollars</u>" or "<u>$</u>" means lawful currency of the United States of America.

"<u>Domestic Person</u>" means any "United States person" under and as defined in Section 7701(a)(30) of the IRC.

"<u>Domestic Subsidiary</u>" means each Subsidiary of Parent Borrower that is organized under the laws of a State of the United States of America or under the laws of the United States of America.

"<u>Drawn Amount</u>" means for any quarterly or other period the average for such period of the daily closing balances of the Revolving Loan (including, without duplication, outstanding Swing Line Loans and Letter of Credit Obligations) outstanding during such period divided by the Maximum Amount (as it may be adjusted from time to time).

"<u>Eligible Accounts</u>" has the meaning specified in <u>Section 1.7</u>.

"<u>Eligible Accounts Formula</u>" means, on any date of determination, 85% of the net amount of Eligible Accounts at such time.

"Eligible Parts Inventory" has the meaning specified in <u>Section 1.8</u>.

"Eligible Parts Inventory Formula" means, on any date of determination, 65% of the value of Eligible Parts Inventory valued at the lower of cost (determined on a first-in, first-out basis in accordance with GAAP) or market (determined in accordance with GAAP).

"Eligible Rental Fleet and Equipment" has the meaning specified in <u>Section 1.9</u>.

"Eligible Rental Fleet and Equipment Formula" means, on any date of determination, the lesser of (i) the Rental Fleet and Equipment NOLV Amount and (ii) 95% of the Net Book Value of Eligible Rental Fleet and Equipment.

"Eligible Rolling Stock" has the meaning specified in <u>Section 1.10</u>.

"Eligible Rolling Stock Formula" means, on any date of determination, the lesser of (i) $15,000,000 and (ii) 85% of the Net Orderly Liquidation Value of Rolling Stock at such time.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules and regulations, now or hereafter in effect, and any applicable and legally enforceable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of (i) human health and safety (to the extent related to exposure to Hazardous Materials) and (ii) the environment and natural resources (including ambient air, indoor air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include CERCLA; the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 <u>et</u> <u>seq</u>.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 <u>et seq</u>.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 <u>et seq</u>.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 <u>et seq</u>.); the Clean Air Act (42 U.S.C. §§ 7401 <u>et seq</u>.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 <u>et seq</u>.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 <u>et seq</u>.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) <u>et seq</u>.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any environmental transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil liability or common law arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located and, in any event, including all such Credit Party's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Credit Party, any trade or business (whether or not incorporated) that, together with such Credit Party, are treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any event described in Section 4043(c) of ERISA with respect to a Title IV Plan; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan; (g) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (i) the loss of a Qualified Plan's qualification or tax exempt status; or (j) the termination of a Plan described in Section 4064 of ERISA.

"Event of Default" has the meaning specified in Section 6.1.

"Excess Availability" means as of any date of determination (a) the Borrowing Base less (b) the Revolving Loans then outstanding (including, without duplication, the then outstanding balance of Swing Line Loans and Letter of Credit Obligations (other than Letter of Credit Obligations that are secured by cash collateral or a standby letter of credit (in form and

substance and from an issuer satisfactory to Agent) in an amount equal to 105% of such Letter of Credit Obligations)).

"Excluded Equity" means any Voting Stock in excess of 65% of the total outstanding Voting Stock of any direct Subsidiary of any Credit Party that is a Non-U.S. Person. For the purposes of this definition, "Voting Stock" means, as to any issuer, the issued and outstanding shares of each class of stock of such issuer entitled to vote (within the meaning of Treasury Regulations § 1.956-2(c)(2)).

"Excluded Property" means, collectively, (i) Excluded Equity, (ii) only to the extent, if any, that notwithstanding the Bankruptcy Cases and the Financing Orders, creation by such Credit Party of a Lien thereon would cause such Credit Party to lose the rights under such permit, lease, license, contract, Instrument or other agreement, (x) any permit, lease, license, contract, Instrument or other agreement held by any Credit Party that prohibits or requires the consent of any Person other than Holdings, Parent Borrower or their respective Affiliates as a condition to the creation by such Credit Party of a Lien thereon, or (y) any permit, lease, license, contract or other agreement held by any Credit Party to the extent that any laws applicable thereto prohibit the creation of a Lien thereon, but only, in each case, to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the Code (including, without limitation, pursuant to Sections 9-406, 9-407, 9-408 and 9-409 of the Code) or any other laws (including, without limitation, the Bankruptcy Code), (iii) [reserved], (iv) assets sold to a Person that is not a Credit Party in compliance with this Agreement, (v) any letter of credit to the extent any Credit Party is required by applicable law to apply the Proceeds of a drawing of such letter of credit for a specified purpose; and (vi) any "intent-to-use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of said Act has been filed, to the extent that any assignment of an "intent-to-use" application prior to such filing would violate then Lanham Act; provided, however, that "Excluded Property" shall not include any Proceeds, substitutions or replacements of Excluded Property (unless such Proceeds, substitutions or replacements would constitute Excluded Property).

"Excluded Taxes" has the meaning specified in Section 1.13(a).

"Fair Labor Standards Act" means the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by Agent.

"Fee Letters" means, collectively, the Arranger Fee Letter and the Lender Fee Letter.

"Fees" means any and all fees payable to Agent, Arrangers, the Decision Agents, L/C Issuer or any Lender pursuant to this Agreement or any of the other Loan Documents.

"Final Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court approving this Agreement and the other Loan Documents, in form and substance satisfactory to Agent and the Requisite Lenders, which order or judgment is in effect and not stayed, reversed, modified, or amended in any respect without consent of the Decision Agents and the Requisite Lenders, and as to which the time to appeal, petition for certiorari or move for re-argument or re-hearing has expired and as to which no appeal, petition for certiorari or other proceeding for re-argument or re-hearing shall then be pending.

"Financial Statements" means the consolidated and consolidating income statements, statements of cash flows and balance sheets of Holdings and its Subsidiaries delivered in accordance with Sections 4.1(a), 4.1(b), and 5.5.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"First Day Orders" means all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date. For the avoidance of doubt, the term "First Day Orders" includes such orders granting relief on both interim and final bases.

"Fiscal Month" means any of the monthly accounting periods of Parent Borrower.

"Fiscal Quarter" means any of the quarterly accounting periods of Parent Borrower, ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of Parent Borrower ending on December 31 of each year.

"Fixtures" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Foreign Lender" has the meaning specified in Section 1.13(c).

"Foreign Subsidiary" means each Subsidiary of Parent Borrower other than a Domestic Subsidiary.

"Funded Debt" means, with respect to any Person on any date of determination, without duplication, (a) all Indebtedness of the type described in clauses (a), (c), and (e) of the definition thereof, in the amount set forth therefor on the then applicable balance sheet of such Person and (b) all Guaranteed Indebtedness consisting of guaranties of Indebtedness of the type specified in the preceding clause (a).

"Funding Date" has the meaning specified in Section 7.2.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"General Intangibles" means "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contractual Obligation, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Goods" means any "goods," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including embedded software to the extent included in "goods" as defined in the Code, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means, as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (i) the stated or

determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (ii) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.1.

"Guaranty" has the meaning assigned to such term in Section 9.1.

"Hazardous Material" means any chemical, compound, substance, material or waste or constituent thereof in any form that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCBs), or any radioactive substance.

"Hedging Agreement" means any agreement with respect to the hedging of price risk associated with the purchase of commodities used in the business of Parent Borrower and its Subsidiaries, as such agreements may be amended, amended and restated, or supplemented from time to time.

"Holdings" has the meaning specified in the introductory paragraph to this Agreement.

"Indebtedness" means, with respect to any Person, without duplication (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six (6) months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are not overdue by more than six (6) months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value (discounted at the Base Rate as in effect on the Closing Date) of future rental payments under all synthetic leases, (f) all net obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, (g) all net obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person,

even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) "earnouts" and similar payment obligations.

"Indemnitee" has the meaning specified in Section 11.1.

"Ineligible Accounts" has the meaning specified in Section 1.7.

"Ineligible Parts Inventory" has the meaning specified in Section 1.8.

"Ineligible Rental Fleet and Equipment" has the meaning specified in Section 1.9.

"Initial Budget" means the budget attached hereto as Exhibit E.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Insurance Trigger Event" has the meaning specified in Section 2.2(c).

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Intercompany Note" means any promissory note evidencing loans made by any Grantor to Parent Borrower or any of its Subsidiaries.

"Intercreditor Agreement" means that certain lien subordination and intercreditor agreement, dated as of May 31, 2007, among Bank of America, N.A. and the Pre-Petition Second Lien Agent as in effect on the date hereof.

"Interest Expense" means, with reference to any period, total cash interest expense (including that attributable to Capital Lease Obligations) of Parent Borrower and its Subsidiaries for such period with respect to all outstanding Indebtedness of Parent Borrower and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedging Agreements in respect of interest rates), calculated on a consolidated basis for Parent Borrower and its Subsidiaries for such period in accordance with GAAP.

"Interest Payment Date" means (a) as to any Base Rate Loan, the first Business Day of each month to occur while such Loan is outstanding, and (b) as to any LIBOR Loan, the last day of the applicable LIBOR Period; provided that, in addition to the foregoing, each of (i) the date upon which all of the Revolving Loan Commitments have terminated and the Loans have been paid in full, and (ii) the Commitment Termination Date, shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under this Agreement or any other Loan Document.

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or similar agreement or arrangement designed to protect Parent Borrower against fluctuations in interest rates.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Cases substantially in the form and substance of Exhibit D hereto, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Credit Parties of interim secured indebtedness in accordance with this Agreement, (b) approving the payment by the Credit Parties of the fees contemplated by this Agreement and the Fee Letters, and (c) providing adequate protection to the Pre-Petition First Lien Lenders in a manner satisfactory to the Agent.

"Inventory" means any "inventory," as such term is defined in the Code, including Parts Inventory and Rental Fleet and Equipment, now owned or hereafter acquired by any Credit Party, wherever located, including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, supplies or materials of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"Investment" means (a) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of any Stock, or other ownership interest in, any other Person, and (b) any direct or indirect loan, advance or capital contribution by Holdings or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the initial amount of such Investment and any addition thereto, as reduced by any repayment of principal (in the case of an Investment constituting Indebtedness) or any distribution constituting a return of capital (in the case of any other Investment).

"Investment Property" means all "investment property," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including: (a) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (b) all securities entitlements of any Credit Party, including the rights of such Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (c) all securities accounts of any Credit Party; (d) all commodity contracts of any Credit Party; and (e) all commodity accounts held by any Credit Party.

"IRC" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"IRS" means the Internal Revenue Service.

"Joinder Agreement" means a joinder agreement, in substantially the form of Exhibit A hereto or such other documentation acceptable to Agent pursuant to which any Subsidiary of Parent Borrower becomes a party to this Agreement after the Closing Date.

"Landlord Lien State" means such state(s) or jurisdictions in which a landlord's claim for rent or other obligations has priority over the Lien of Agent in any of the Collateral.

"L/C Issuer" means (i) solely in the case of any Pre-Petition Letters of Credit and any amendment, extension or renewal thereof in accordance with Section 1.1(c), the Pre-Petition L/C Issuer and (ii) in all other cases, Bank of America or a Subsidiary thereof or a bank or other legally authorized Person selected by or reasonably acceptable to Agent, in such Person's capacity as an issuer of Letters of Credit hereunder.

"L/C Sublimit" has the meaning specified in Section 1.1(c)(i).

"Lender Fee Letter" means that certain DIP Facility Lender Fee Letter, dated as of April 9, 2010, among Neff Corp., Bank of America, N.A., Banc of America Securities LLC, Wells Fargo Capital Finance, LLC, General Electric Capital Corporation, GE Capital Markets, Inc., UBS Loan Finance LLC, GMAC Commercial Finance LLC, Union Bank, N.A., PNC Bank, National Association, RBS Business Capital, a division of RBS Asset Finance, Inc., Regions Bank and CIBC, Inc. relating to certain fees payable in connection with this Agreement, and any other fee letter replacing or supplementing such DIP Facility Lender Fee Letter and relating to fees payable to the Lenders.

"Lenders" means Bank of America and the other Lenders named on the signature pages of this Agreement, and, if any such Lender shall decide to assign all or any portion of the Obligations as provided in Section 10.1, such term shall include any Qualified Assignees of such Lender and each other assignee of such Lender permitted under Section 10.1(a).

"Letter of Credit Fee" has the meaning specified in Section 1.3(c).

"Letter of Credit Obligations" means all outstanding obligations incurred by Agent and Lenders at the request of a Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 1.1(c) with respect to any Letter of Credit. The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto.

"Letters of Credit" means standby letters of credit issued for the account of a Borrower by L/C Issuers for which Agent and Lenders have incurred Letter of Credit Obligations.

"LIBOR Breakage Fee" means an amount equal to the amount of any losses, expenses, liabilities (excluding loss of profit) that any Lender may sustain as a result of (a) any default by a Borrower in making any borrowing of, conversion into or continuation of any LIBOR Loan following a Borrower's delivery to Agent of any LIBOR Loan request in respect thereof or (b) any payment of a LIBOR Loan on any day that is not the last day of the LIBOR Period applicable thereto (regardless of the source of such prepayment and whether voluntary, by accelera-

tion or otherwise). For purposes of calculating amounts payable to a Lender under <u>Section 1.3(d)</u>, each Lender shall be deemed to have actually funded its relevant LIBOR Loan through the purchase of a deposit bearing interest at LIBOR in an amount equal to the amount of that LIBOR Loan and having a maturity and repricing characteristics comparable to the relevant LIBOR Period; <u>provided</u>, <u>however</u>, that each Lender may fund each of its LIBOR Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under <u>Section 1.3(d)</u>.

"<u>LIBOR Loans</u>" means a Loan or any portion thereof bearing interest by reference to the LIBOR Rate.

"<u>LIBOR Period</u>" means, with respect to any LIBOR Loan, each period commencing on a Business Day selected by a Borrower pursuant to this Agreement and ending one month thereafter; <u>provided</u> that the foregoing provision relating to LIBOR Periods is subject to the following:

(a)    if any LIBOR Period would otherwise end on a day that is not a Business Day, such LIBOR Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such LIBOR Period into another calendar month in which event such LIBOR Period shall end on the immediately preceding Business Day;

(b)    any LIBOR Period that would otherwise extend beyond the date set forth in <u>clause (a)</u> of the definition of "Commitment Termination Date" shall end two (2) Business Days prior to such date;

(c)    any LIBOR Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such LIBOR Period) shall end on the last Business Day of a calendar month;

(d)    Borrowers shall select LIBOR Periods so as not to require a payment or prepayment of any LIBOR Loan during a LIBOR Period for such Loan; and

(e)    Borrowers shall select LIBOR Periods for so that there shall be no more than 8 separate LIBOR Loans in existence at any one time.

"<u>LIBOR Rate</u>" means, for any LIBOR Period with respect to a LIBOR Loan, the greater of (a) the rate per annum equal to the British Bankers Association LIBOR Rate ("<u>BBA LIBOR</u>"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by the Agent from time to time) at approximately 11:00 a.m., London time, two London Business Days prior to the commencement of such LIBOR Period, for Dollar deposits (for delivery on the first day of such LIBOR Period) with a term equivalent to such LIBOR Period, and (b) 1.50%. If such rate is not available at such time for any reason, then the "LIBOR Rate" for such LIBOR Period shall be the greater of (a) the rate per annum determined by Agent to be the rate at which deposits in Dollars for delivery on the first day of such LIBOR Period in same day funds in the approximate amount of the LIBOR Loan being made,

continued or converted and with a term equivalent to such LIBOR Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two London Business Days prior to the commencement of such LIBOR Period and (b) 1.50%. A "London Business Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by any Credit Party.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Litigation" has the meaning specified in Section 4.1(j).

"Loan Account" as the meaning specified in Section 1.11.

"Loan Documents" means this Agreement, the Notes, the Collateral Documents, the Fee Letters, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Agent or any Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Credit Party, or any employee of any Credit Party, and delivered to Agent or any Lender in connection with this Agreement or the transactions contemplated thereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loans" means the Revolving Loan and the Swing Line Loan.

"Material Adverse Effect" means a material adverse effect on, or material adverse developments with respect to, (a) the business operations, properties, assets or condition (financial or otherwise) of Holdings and its Subsidiaries, taken as a whole, (b) the legality, validity, binding effect or enforceability against a Credit Party of any Loan Document to which it is a party, (c) the ability of any Credit Party to fully and timely perform its Obligations and (d) the rights, remedies and benefits available to, or conferred on, Agent, any Lender or any Secured Party under any Loan Document. For the avoidance of doubt, the (i) events leading up to the filing of the Bankruptcy Cases disclosed to the Lenders and the consequences that customarily result from such a filing and (ii) commencement and continuation of the Bankruptcy Cases shall not be deemed a Material Adverse Effect.

"Maximum Amount" means, as of any date of determination, an amount equal to the Revolving Loan Commitments of all Lenders as of that date. The Maximum Amount in effect on the Closing Date is equal to $175,000,000.

"Maximum Lawful Rate" has the meaning specified in Section 1.2(f).

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means each of the mortgages, deeds of trust, leasehold mortgages, leasehold deeds of trust, collateral assignments of leases or other real estate security documents delivered by any Credit Party to Agent on behalf of itself and the Secured Parties with respect to the Real Estate.

"Mortgaged Property" means all property that is subject to the Mortgages.

"Multiemployer Plan" means a "multiemployer plan," as defined in Section 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"Net Book Value" means Cost minus accumulated depreciation that is calculated in accordance with GAAP.

"Net Orderly Liquidation Value" means, with respect to any Rental Fleet and Equipment or Rolling Stock and as determined by an Approved Appraiser, a net expected dollar amount to be realized at an orderly negotiated sale of such Rental Fleet and Equipment or Rolling Stock held within a reasonable period of time (but in any event within 180 days) as of the date of such opinion.

"Net Proceeds" means cash proceeds received by Holdings or any of its Subsidiaries from any Asset Disposition (including insurance proceeds, awards of condemnation, and payments under notes or other debt securities received in connection with any Asset Disposition), net of (i) the costs of such Asset Disposition (including taxes attributable thereto) and (ii) amounts applied to repayment of Indebtedness (other than the Obligations) secured by a Lien on the asset or property disposed.

"NOLV Appraisal" means an appraisal, in form and substance reasonably satisfactory to the Decision Agents, conducted by an Approved Appraiser pursuant to which such Approved Appraiser determines the net expected dollar amount be realized at an orderly negotiated sale of the Rental Fleet and Equipment held within a reasonable period of time.

"NOLV Appraisal Presentment Date" means the date on which an NOLV Appraisal is conducted or performed, which date shall in any event be as of the last day of each Fiscal Quarter of Holdings and its Subsidiaries.

"Non-Consenting Lender" has the meaning specified in Section 11.19(c)(i).

"Non-Funding Lender" has the meaning specified in Section 10.5(a)(ii).

"Non-U.S. Person" means any Person that is not a Domestic Person.

"Notes" means, collectively, the Revolving Notes and the Swing Line Notes.

"Notice of Borrowing" has the meaning specified in Section 1.1(d).

"Notice of Conversion/Continuation" has the meaning specified in Section 1.2(e).

"Notice of Revolving Credit Advance" has the meaning specified in Section 1.1(a)(i).

"Notice of Swing Line Advance" has the meaning specified in Section 1.1(b)(i).

"Obligations" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), including Cash Management Obligations, obligations pursuant to Related Swap Contracts and Letter of Credit Obligations, owing by any Credit Party to Agent or any Lender or, solely to the extent arising in respect of any Cash Management Obligation or Related Swap Contract, to any Affiliate of any Lender or Agent or to a Person who was an Affiliate of, or an, Agent or Lender, at the time such item was entered into, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Agreement or any of the other Loan Documents, Cash Management Documents or any Related Swap Contract. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed or allowable in such case or proceeding), Fees, Charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under this Agreement or any of the other Loan Documents.

"Original Closing Date" means March 31, 2007, the date of the initial extension of credit under the Pre-Petition First Lien Credit Agreement.

"Other Lender" has the meaning specified in Section 10.5(d).

"Other Taxes" has the meaning specified in Section 1.13(f).

"Overadvance" has the meaning specified in Section 1.1(a)(i).

"Parent Borrower" has the meaning specified in the introductory paragraph to this Agreement.

"Parts Inventory" means Inventory owned by any Borrower which consists of parts for Rental Fleet and Equipment and parts to be sold or leased by such Person in the ordinary course of business of such Person, which parts are not incorporated or installed in or on, or affixed or appurtenant to, any such Inventory or to any other property and which parts are new, unused, in good condition and are resalable as new products without repackaging or recondition-

ing, including Inventory any Borrower currently describes as "inventory (including whole goods)" but excluding any Inventory that constitutes Rental Fleet and Equipment.

"Parts Inventory Reserve" means a Reserve to reflect changes in the saleability of any Eligible Parts Inventory in the ordinary course of business of Parent Borrower or the applicable Credit Party or such other factors as may negatively impact the value of any Eligible Parts Inventory, including, without limitation, Reserves based on obsolescence, seasonality, theft or other shrinkage, imbalance, change in composition or mix or markdowns.

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patent Security Agreements" means the Patent Security Agreements made in favor of Agent, on behalf of itself and the Secured Parties, by each applicable Credit Party.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest:  (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a Plan described in Section 3(2) of ERISA.

"Perfection Certificate" means the Perfection Certificate delivered pursuant to the Pre-Petition First Lien Credit Agreement as updated through the date hereof.

"Permitted Discretion" means, on three Business Days prior notice, discretional changes in Reserves based on events or conditions or other circumstances arising after the Closing Date or based on facts not known to the Decision Agents as of the Closing Date (i) that, in the Decision Agents' commercially reasonable judgment exercised in good faith in accordance with customary business practices for comparable asset-based lending transactions, have a reasonable relationship to the event, condition or other circumstance that caused such change and (ii) will be eliminated when, in each such Decision Agent's commercially reasonable judgment exercised in good faith in accordance with customary business practices for comparable asset-based lending transactions, the event, condition or other circumstance causing the establishment thereof no longer exists or is no longer relevant to Parent Borrower's business (and in the case of both (i) and (ii) above, in the event of a disagreement amongst the Decision Agents in respect of Reserves the most Lender friendly stance shall prevail).  The Decision Agents will use their respective commercially reasonable efforts to consult with Parent Borrower when establishing new or increasing existing Reserves.

"Permitted Earnout Obligations" means an unsecured obligation to pay the seller in a Permitted Acquisition a future payment that is contingent upon the financial performance of

the business acquired in such Permitted Acquisition exceeding a specified benchmark level, which payment becomes payable when such excess financial performance is achieved.

"Permitted Encumbrances" has the meaning specified in Section 3.2(a).

"Permitted Holders" means Lightyear, Norwest Equity Partners VIII LP, General Electric Pension Trust, their respective Affiliates (other than portfolio companies) and any members of Lightyear as of the Closing Date.

"Permitted Liens" means the following Liens, security interests or other encumbrances to the extent incurred on or after the Petition Date:

(a)     Liens for taxes or assessments or other governmental Charges not yet due and payable;

(b)     pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA);

(c)     pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Credit Party is a party as lessee made in the ordinary course of business;

(d)     inchoate and unperfected workers', mechanics' or similar Liens arising in the ordinary course of business, so long as such Liens attach only to Equipment, Fixtures and/or Real Estate;

(e)     subject to Section 2.6, statutory Liens of landlords for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP has been made in respect thereof;

(f)     subject to Section 2.6 and solely to the extent that such Liens attach only to Inventory, Liens of carriers, warehousemen, suppliers or other similar possessory Liens arising in the ordinary course of business to the extent such amounts are for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP has been made in respect thereof;

(g)     deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Credit Party is a party;

(h)     any attachment or judgment Lien not constituting an Event of Default under Section 6.1;

(i)     zoning restrictions, easements, licenses, or other restrictions on the use of any Real Estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such Real Estate;

(j)     Liens, presently existing or hereafter created, in favor of Agent, for the benefit of the Secured Parties, securing the Obligations;

(k)     leases and subleases of property granted by a Credit Party to other Persons in the ordinary course and consistent with past practice so long as such lease or sublease does not materially interfere with the conduct of such Credit Party's business or adversely affect the Liens granted to Agent pursuant to the Collateral Documents;

(l)     Liens (i) of a collection bank arising under Section 4-210 of the Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; and

(m)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of Parent Borrower or any of its Subsidiaries, including rights of offset and set-off.

"Permitted Variance" means a Variance within the most recent Agreed Budget on a cumulative basis from the Closing Date through and including the last day of the relevant period (the "Testing Period") that (i) does not exceed the total aggregate amount in such Agreed Budget of disbursements for the Testing Period by more than 15% or (ii) is not less than the total aggregate amount in such Agreed Budget of cash receipts for the Testing Period by more than 15%, tested in each case bi-weekly, it being understood that the first such variance will be tested at the end of the fourth week after the Closing Date and that the variance for such first test only shall be 25% and not 15%.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning assigned to such term in the recitals.

"Plan" means, at any time, an "employee benefit plan," as defined in Section 3(3) of ERISA, that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to or with respect to which any Credit Party or ERISA Affiliate could reasonably expect to incur liability.

"Plan Effective Date" means the date on which the Confirmed Plan of Reorganization becomes effective as a result of confirmation by the Bankruptcy Court.

"Plan of Reorganization" means a plan of reorganization that has been filed with the Bankruptcy Court but has not been confirmed by the Bankruptcy Court.

"Platform" has the meaning specified in Section 4.1.

"Pledge Amendment" has the meaning specified in Section 8.5(a)(iv).

"Pledged Collateral" means the first priority security interest granted by each Credit Party to Agent for itself and the benefit of Secured Parties in all of the following:

(a)    the Pledged Stock and the certificates representing the Pledged Stock, and all dividends, distributions, cash, Instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Stock;

(b)    any additional Stock of a Pledged Entity from time to time acquired by each Credit Party in any manner (which shares shall be deemed to be part of the Pledged Stock), and the certificates representing such additional Stock, and all dividends, distributions, cash, Instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Stock;

(c)    the Pledged Notes and the promissory notes or Instruments evidencing the Pledged Notes, and all interest, cash, Instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of the Pledged Notes; and

(d)    all additional Indebtedness arising after the date hereof and owing to each Credit Party, together with any promissory notes and Instruments evidencing such Indebtedness, and all interest, cash, Instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of that Pledged Notes;

provided that Pledged Collateral shall not include any Excluded Equity.

"Pledged Entity" means an issuer of Pledged Stock or any other Wholly Owned Subsidiary of Holdings.

"Pledged Note(s)" means, with respect to any Credit Party, all promissory notes listed on Part B of Schedule 5.4(b), all Intercompany Notes at any time issued to any Credit Party and all other promissory notes issued to or held by any Credit Party in excess of $1,000,000 individually (other than promissory notes issued in connection with extensions of trade credit by any Credit Party in the ordinary course of business).

"Pledged Stock" means the shares of Stock listed on Part A of Schedule 5.4(b) hereto, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Stock of any Borrower or Subsidiary that may be issued or granted to, or held by, any Credit Party while this Agreement is in effect; provided that Pledged Stock shall not include, to the extent applicable law requires that a Subsidiary of such Credit Party issue directors' qualifying shares, such shares or nominee or other similar shares.

"Pre-Petition First Lien Agent" means Bank of America, or any successor thereto, in its capacity as "Agent" under the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Credit Agreement**" means the Amended and Restated Credit Agreement, dated as of December 16, 2008, among Parent Borrower, Holdings, the Subsidiaries of Parent Borrower party thereto, the Pre-Petition First Lien Lenders and the Pre-Petition First Lien Agent, as amended, supplemented or otherwise modified prior to the date hereof.

"**Pre-Petition First Lien Lenders**" means the "Lenders" under the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition L/C Issuer**" means Bank of America, in its capacity as issuer of letters of credit under the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition Letters of Credit**" has the meaning specified in Section 1.1(c)(vii).

"**Pre-Petition Loan Documents**" means, collectively, all "Loan Documents" under and as defined in (a) the Pre-Petition First Lien Credit Agreement and (b) the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Agent**" means Wilmington Trust FSB, as successor to Bank of America, or any successor thereto, in its capacity as "Agent" under the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Credit Agreement**" means the Second Lien Term Loan Agreement, dated as of the Original Closing Date, among Parent Borrower, Holdings, the Subsidiaries of Parent Borrower party thereto, the Pre-Petition Second Lien Lenders and the Pre-Petition Second Lien Agent, as amended, supplemented or otherwise modified prior to the date hereof.

"**Pre-Petition Second Lien Financing**" means the Indebtedness under the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Financing Documentation**" means any documentation governing the Pre-Petition Second Lien Financing.

"**Pre-Petition Second Lien Lenders**" means the "Lenders" under the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Secured Indebtedness**" means, collectively, all "Indebtedness" under and as defined in (a) the Pre-Petition First Lien Credit Agreement and (b) the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Secured Parties**" means, collectively the Pre-Petition First Lien Agent, each Pre-Petition First Lien Lender, the Pre-Petition Second Lien Agent and each Pre-Petition Second Lien Lender.

"**Pro Rata Share**" means, with respect to all matters relating to any Lender, (i) with respect to the Revolving Loan, the percentage obtained by dividing (x) the Revolving Loan

Commitment of that Lender by (y) the aggregate Revolving Loan Commitments of all Lenders, and (ii) with respect to all Loans on and after the Commitment Termination Date, the percentage obtained by dividing (x) the aggregate outstanding principal balance of the Loans held by that Lender by (y) the outstanding principal balance of the Loans held by all Lenders, as such percentages may be adjusted by assignments pursuant to <u>Section 10.1</u>.

"<u>Professional Fees</u>" means accrued but unpaid professional fees, costs, expenses and disbursements incurred by the by the Borrowers and Holdings or the Creditors' Committee.

"<u>Projections</u>" means Parent Borrower's forecasted consolidated and consolidating (a) balance sheets; (b) profit and loss statements; (c) cash flow statements; and (d) capitalization statements.

"<u>Proposed Budget</u>" has the meaning assigned to such term in <u>Section 4.1(e)(ii)</u>.

"<u>Proposed Change</u>" has the meaning specified in <u>Section 11.19(c)</u>.

"<u>Protective Advance</u>" means all expenses, disbursements and advances made or incurred by Agent pursuant to the Loan Documents after the occurrence and during the continuance of an Event of Default that Agent, in its sole discretion, deems necessary or desirable to (a) preserve or protect the Collateral or any portion thereof, (b) enhance the likelihood, or maximize the amount, of repayment of the Obligations or (c) provide for the payment of unanticipated liabilities of any Credit Party arising after the Closing Date.

"<u>Public Lender</u>" has the meaning specified in <u>Section 4.1</u>.

"<u>Purchase Money Obligation</u>" has the meaning specified in Section 9-103 of the Code.

"<u>Qualified Assignee</u>" means (a) (i) any Lender, (ii) any Affiliate of any Lender and (iii) with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor (each such Person described in this <u>clause (iii)</u>, an "<u>Approved Fund</u>"), and (b) any other Person other than (i) Parent Borrower or any of Parent Borrower's Affiliates or Subsidiaries or (ii) any natural person.

"<u>Qualified Plan</u>" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"<u>Qualified Stock</u>" means Stock that is not Disqualified Stock.

"<u>Qualifying IPO</u>" means the issuance by the Qualifying IPO Issuer of its common Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act of 1933 (whether alone or in connection with a secondary public offering).

"Qualifying IPO Issuer" means Holdings or a corporation or other legal entity which owns, directly or indirectly, 100% of the outstanding Stock of Holdings.

"Real Estate" has the meaning specified in Section 5.12.

"Refinance" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Refunded Swing Line Loan" has the meaning specified in Section 1.1(b)(iii).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Related Swap Contracts" means each Interest Rate Agreement entered into between the Parent Borrower or any other Credit Party with Agent or any Person that was a Lender or Agent or an Affiliate of Agent or any Lender at the time it entered into such Interest Rate Agreement.

"Related Obligations" has the meaning specified in Section 10.6.

"Related Transactions" means (a) the execution, delivery and performance by the Borrowers of this Agreement and each other Loan Document to which they are a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrowers on Mortgaged Properties and other properties pursuant to this Agreement and the Collateral Documents, the Interim Order, if applicable, and the Final Order, (b) the execution, delivery and performance by Holdings of this Agreement and each of the other Loan Document to which it is a party, the guaranteeing of the Obligations by Holdings and the grant of Liens by Holdings on Mortgaged properties and other Collateral pursuant to this Agreement and the Collateral Documents, the Interim Order, if applicable, and the Final Order, (c) the commencement and filing of the Bankruptcy Cases and (d) the payment of all Fees, costs and expenses associated with all of the foregoing.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping or leaching of Hazardous Material in the indoor or outdoor environment.

"Rent Reserve" means, with respect to any property of any Credit Party in any Landlord Lien State at which any Collateral is located but for which such Credit Party has not obtained a landlord's agreement, mortgagee agreement or bailee letter, as applicable, in accordance with Section 2.6 of the Pre-Petition First Lien Credit Agreement, an amount equal to three (3) months estimated mortgage or rental payments for such property plus any other fees or charges owing by such Credit Party to each applicable landlord, mortgagee or bailee, as applicable, that has not duly executed and delivered to Agent a landlord's agreement, mortgagee agreement or bailee letter or other subordination of security interest, in form and substance reasonably

satisfactory to the Decision Agents; provided, however, that any of the foregoing amount shall be adjusted from time to time hereafter upon (a) delivery to Agent of any such acceptable waiver or subordination, (b) the opening or closing of a Collateral location and/or (c) any change in the amount of rental, storage or processor payments or similar charges.

"Rental Fleet and Equipment" means Inventory which is of a type offered for sale or lease by any Borrower in the ordinary course of business of any Borrower including Inventory of any Borrower currently described as "rental equipment, net" but excluding any Inventory that constitutes Parts Inventory.

"Rental Fleet and Equipment NOLV Amount" means (a) on any NOLV Appraisal Presentment Date, 85% of the Net Orderly Liquidation Value of Eligible Rental Fleet and Equipment and (b) on any date following the most recent NOLV Appraisal Presentment Date, 85% of the Rental Fleet and Equipment NOLV Adjusted Amount.

"Rental Fleet and Equipment NOLV Adjusted Amount" means, on any date of determination, (a) the Net Book Value of Eligible Rental Fleet and Equipment multiplied by (b) the Rental Fleet and Equipment NOLV Adjustment Percentage.

"Rental Fleet and Equipment NOLV Adjustment Percentage" means, on any date of determination, a percentage equal to (a) the Net Orderly Liquidation Value of Rental Fleet and Equipment as of the most recent NOLV Appraisal Presentment Date divided by (b) the Net Book Value of Rental Fleet and Equipment as of the most recent NOLV Appraisal Presentment Date.

"Rental Payments" means rental payments due to Parent Borrower or any other Subsidiary from the rental of Parts Inventory or Rental Fleet and Equipment owned by such Person.

"Replacement Lender" has the meaning specified in Section 11.19(a).

"Requisite Lenders" means Lenders having (a) more than 50% of the Revolving Loan Commitments of all Lenders, or (b) if the Revolving Loan Commitments have been terminated, more than 50% of the aggregate outstanding amount of the Revolving Loans.

"Reserves" means, on any date of determination, with respect to the Borrowing Base, reserves established by the Decision Agents, from time to time against the Borrowing Base or any component thereof in an amount equal to the sum of, without duplication, the following:

      (a)      the Parts Inventory Reserve;

      (b)      all amounts of past due rent, fees or other charges owing at such time by any Credit Party to any landlord of any premises where any of the Collateral is located or to any processor, repairman, mechanic or other Person who is in possession of any Collateral or has asserted any Lien or claim thereto;

      (c)      the aggregate amount of reserves established by the Decision Agents in respect of Banking Relationship Debt;

(d)     any Rent Reserve; and

(e)     such additional reserves in respect of events, conditions or other circumstances arising after the Closing Date, in each case, in such amounts as the Decision Agents may elect to impose from time to time in their Permitted Discretion (and in the event of a disagreement amongst the Decision Agents the most Lender friendly stance shall prevail); provided, however, in no event shall Reserves be imposed with respect to Hedging Agreements existing on the Closing Date and obligations under Hedging Agreements existing on the Closing Date.

Notwithstanding anything in the Loan Documents to the contrary, Reserves shall not be established to the extent that such Reserves would be duplicative of any specific item excluded as ineligible in the definitions of "Eligible Accounts," "Eligible Parts Inventory," "Eligible Rental Fleet and Equipment" or "Eligible Rolling Stock," but the Decision Agents shall retain the right, subject to the requirements set forth above, to establish Reserves with respect to prospective changes in eligible Collateral in its Permitted Discretion.

"Restricted Payment" means, with respect to any Credit Party, (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; and (c) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding.

"Revolving Credit Advance" has the meaning specified in Section 1.1(a)(i).

"Revolving Loan" means, at any time, the sum of (a) the aggregate amount of Revolving Credit Advances outstanding to a Borrower (including Swing Line Advances) at any time plus (b) the aggregate Letter of Credit Obligations incurred on behalf of a Borrower. Unless the context otherwise requires, references to the outstanding principal balance of the Revolving Loan shall include the outstanding balance of Letter of Credit Obligations.

"Revolving Loan Commitment" means (a) as to any Lender, the commitment of such Lender to make its Pro Rata Share of Revolving Credit Advances or incur its Pro Rata Share of Letter of Credit Obligations (including, in the case of the Swing Line Lender, its commitment to make Swing Line Advances as a portion of its Revolving Loan Commitment) as set forth on Annex B or in the most recent Assignment Agreement, if any, executed by such Lender and (b) as to all Lenders, the aggregate commitment of all Lenders to make the Revolving Credit Advances (including, in the case of the Swing Line Lender, Swing Line Advances) or incur Letter of Credit Obligations, which aggregate commitment shall be one hundred seventy five million dollars ($175,000,000) on the Closing Date, as such amount may be adjusted, if at all, from time to time in accordance with this Agreement.

"Revolving Notes" has the meaning specified in Section 1.1(a)(i).

"Rolling Stock" shall mean all transportation equipment owned on the Closing Date used to transport Rental Fleet and Equipment including all trucks, trailers, tractors, service vehicles, vans, pick up trucks, forklifts, wheel loaders and other mobile equipment and other vehicles, wherever located, which in each case is covered by a Certificate of Title under applicable state law, other than in each case Rental Fleet and Equipment.

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"Secured Parties" means, collectively, Agent, Lenders, L/C Issuers and any other holder of an Obligation, including holders of Cash Management Obligations or Obligations under Related Swap Contracts.

"Senior Notes" means $230,000,000 aggregate original principal amount of Parent Borrower's 10% Senior Notes due 2015 and notes issued in exchange therefor pursuant to a customary registration rights agreement.

"Senior Notes Documents" means (a) the Senior Notes Indenture, (b) the Senior Notes, (c) any guaranty agreement given by any Credit Party in respect of the Senior Notes and (d) all other documents, agreements and instruments relating to the Senior Notes, in each case, as in effect on the date hereof.

"Senior Notes Indenture" means that certain Indenture dated as of May 31, 2007, by and among Parent Borrower, as issuer, the Credit Parties party thereto as guarantors, and Wells Fargo, National Association, as trustee, governing the terms of the Senior Notes, as in effect on the date hereof.

"Software" means all "software," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Statement" has the meaning specified in Section 4.1(c).

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"Stockholder" means, with respect to any Person, each holder of Stock of such Person.

"Subsidiary" means, with respect to any Person, (a) any corporation of which an aggregate of more than 50% of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock

of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than 50% of such Stock whether by proxy, agreement, operation of law or otherwise, (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than 50% or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Parent Borrower and (c) any other Person the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date.

"Supermajority Lenders" means Lenders having (a) 75% or more of the Revolving Loan Commitments of all Lenders, or (b) if the Revolving Loan Commitments have been terminated, 75% or more of the aggregate outstanding amount of the Revolving Loans (with the Swing Line Loan being attributed to the Lender making such Loan).

"Super-Priority Claim" means, in relation to the Credit Parties, a claim in the Bankruptcy Cases which is an administrative expense claim authorized and established by the Bankruptcy Court pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code and having priority over any or all administrative expenses of the kind specified in Sections 503(b), 507(b) and 546(c) of the Bankruptcy Code.

"Swing Line Advance" has the meaning specified in Section 1.1(b)(i).

"Swing Line Availability" has the meaning specified in Section 1.1(b)(i).

"Swing Line Commitment" means the commitment of the Swing Line Lender to make Swing Line Advances as set forth on Annex B to this Agreement, which commitment constitutes a subfacility of the Revolving Loan Commitment of the Swing Line Lender. As of the Closing Date, the Swing Line Commitment is equal to $10,000,000.

"Swing Line Lender" means Bank of America.

"Swing Line Loan" means, at any time, the aggregate amount of Swing Line Advances outstanding to Borrower.

"Swing Line Note" has the meaning specified in Section 1.1(b)(ii).

"Tax Return" means all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Termination Date</u>" means the date on which (a) the Loans have been repaid in full, (b) all other Obligations under this Agreement and the other Loan Documents (other than contingent indemnification Obligations to the extent no claim has been asserted) have been completely discharged, (c) all Letter of Credit Obligations have been cash collateralized in the amount set forth in <u>Section 1.5(f)</u>, cancelled or backed by standby letters of credit acceptable to Agent and (d) no Borrower shall have any further right to borrow any monies or request any other extensions of credit under this Agreement or the other Loan Documents.

"<u>Title IV Plan</u>" means a Pension Plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that Parent Borrower, any other Credit Party or any of their respective ERISA Affiliates maintains, contributes to or has an obligation to contribute to or with respect to which any Credit Party or ERISA Affiliate could incur liability.

"<u>Titled Collateral</u>" means any motor vehicles and other goods covered by certificate of title.

"<u>Trade-In Transaction</u>" means a transaction in which Parent Borrower or any of its Subsidiaries trades in Inventory or Equipment to a dealer or an original equipment manufacturer in consideration for cash, credit or similar Inventory or Equipment or a combination thereof.

"<u>Trademark License</u>" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"<u>Trademark Security Agreements</u>" means the Trademark Security Agreements made in favor of Agent, on behalf of itself and the Secured Parties, by each applicable Credit Party.

"<u>Trademarks</u>" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, internet domain names, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"<u>Transaction and Advisory Fee Agreement</u>" means that certain Transaction and Advisory Fee Agreement, dated as of the Original Closing Date, among Parent Borrower, Lightyear, Norwest Equity Partners VIII, LP and General Electric Pension Trust.

"<u>UFCA</u>" has the meaning specified in <u>Section 11.22</u>.

"<u>UFTA</u>" has the meaning specified in <u>Section 11.22</u>.

"Unfunded Pension Liability" means, at any time, the aggregate amount, if any, of the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan.

"Uniform Commercial Code Jurisdiction" means any jurisdiction that has adopted all or substantially all of Article 9 of the Code.

"Unused Line Fee" has the meaning specified in Section 1.3.

"Variance" means a difference in the amount contained in an Agreed Budget with respect to aggregate receipts and aggregate disbursements on a per line-item basis, compared to the actual aggregate receipts and/or actual aggregate disbursements, as applicable, with respect to such line-item amount.

"Vendor Lease" means a lease pursuant to which any Person leases Parts Inventory or Rental Fleet and Equipment from a Vendor Lessor, whether or not such lease constitutes an operating lease or a Capital Lease under GAAP and whether or not such lease constitutes a true lease or a secured transaction under the Code or other applicable law.

"Vendor Lessor" means any Person who leases Parts Inventory or Rental Fleet and Equipment to a Credit Party pursuant to a Vendor Lease.

"Wholly Owned" means with respect to any Person, a Subsidiary of such Person all the outstanding Stock of which (other than (x) directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) is owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

Rules of construction with respect to accounting terms used in this Agreement or the other Loan Documents shall be as set forth or referred to in this Annex A. All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in this Agreement or any other Loan Document or any of the Appendices, Section, subsection or clause hereof or thereof refer to such Section, subsection or clause as contained in this Agreement or such Loan Documents, as applicable. The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as applicable, as a whole, including all Annexes, Exhibits and Schedules hereto or thereto, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement, such other Loan Document or any such Annex, Exhibit or Schedule, as the case may be.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine,

feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**Exhibit D**

**Intercreditor Agreement**

Exhibit 10.20

EXECUTION COPY

INTERCREDITOR AGREEMENT

among

NEFF CORP.,
as Parent Borrower,

Holdings and the Subsidiaries of Parent Borrower party hereto,

BANK OF AMERICA, N.A.,
as First Lien Collateral Agent,

BANK OF AMERICA, N.A.,
as Second Lien Collateral Agent,

and

BANK OF AMERICA, N.A.,
as Control Agent

Dated as of May 31, 2007

**Page**

SECTION 1        DEFINITIONS.

| **1.1** | Defined Terms | 2 |
| **1.2** | Terms Generally | 7 |

SECTION 2        LIEN PRIORITIES.

| **2.1** | Relative Priorities | 7 |
| **2.2** | Failure to Perfect | 8 |
| **2.3** | Nature of First Lien Obligations | 8 |
| **2.4** | Prohibition on Contesting Liens | 8 |
| **2.5** | No New Liens | 8 |
| **2.6** | Similar Liens and Agreements | 9 |

SECTION 3        ENFORCEMENT.

| **3.1** | Exercise of Remedies | 10 |
| **3.2** | Actions Upon Breach | 12 |

SECTION 4        PAYMENTS.

| **4.1** | Application of Proceeds | 13 |
| **4.2** | Payment Turnover | 13 |
| **4.3** | Permitted Mandatory Prepayments of Second Lien Obligations | 13 |

SECTION 5        OTHER AGREEMENTS.

| **5.1** | Releases | 13 |
| **5.2** | Insurance | 15 |
| **5.3** | Amendments to First Lien Credit Documents and Second Lien Credit Documents | 15 |
| **5.4** | Rights As Unsecured Creditors | 17 |
| **5.5** | Control Agent for Perfection | 18 |
| **5.6** | When Discharge of First Lien Obligations Deemed to Not Have Occurred | 20 |
| **5.7** | Purchase Right | 20 |

SECTION 6        INSOLVENCY OR LIQUIDATION PROCEEDINGS.

| **6.1** | Use of Cash Collateral and Financing Issues | 21 |
| **6.2** | Sale Issues | 21 |

| **6.3** | Relief from the Automatic Stay | 22 |
| **6.4** | Adequate Protection | 22 |
| **6.5** | No Waiver | 23 |
| **6.6** | Avoidance Issues | 23 |
| **6.7** | Separate Grants of Security and Separate Classification | 23 |
| **6.8** | Reorganization Securities | 24 |
| **6.9** | Post–Petition Claims | 24 |
| **6.10** | Waiver | 24 |
| **6.11** | Expense Claims | 25 |
| **6.12** | Other Matters | 25 |
| **6.13** | Effectiveness in Insolvency or Liquidation Proceedings | 25 |

SECTION 7     RELIANCE; WAIVERS; ETC.

| **7.1** | Non–Reliance | 25 |
| **7.2** | No Warranties or Liability | 26 |
| **7.3** | No Waiver of Lien Priorities | 26 |
| **7.4** | Obligations Unconditional | 28 |
| **7.5** | Certain Notices | 29 |

SECTION 8     MISCELLANEOUS.

| **8.1** | Conflicts | 29 |
| **8.2** | Effectiveness; Continuing Nature of this Agreement; Severability | 29 |
| **8.3** | Amendments; Waivers | 30 |
| **8.4** | Information Concerning Financial Condition of Company and its Subsidiaries | 30 |
| **8.5** | Subrogation | 31 |
| **8.6** | Application of Payments | 31 |
| **8.7** | **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL** | 31 |
| **8.8** | Notices | 32 |
| **8.9** | Further Assurances | 32 |
| **8.10** | **APPLICABLE LAW** | 32 |
| **8.11** | Binding on Successors and Assigns | 32 |
| **8.12** | Specific Performance | 32 |
| **8.13** | Headings | 33 |
| **8.14** | Counterparts | 33 |
| **8.15** | Authorization | 33 |
| **8.16** | No Third Party Beneficiaries | 33 |
| **8.17** | Provisions Solely to Define Relative Rights | 33 |

# INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of May 31, 2007, and entered into by and among Neff Corp., a Delaware corporation ("**Company**"), Holdings and each of the Borrowers party hereto (each as defined below), and Bank of America, N.A., in its capacity as agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**"), and Bank of America, N.A., in its capacity as agent for the Second Lien Obligations under the Second Lien Credit Agreement (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**") and Bank of America, N.A., in its capacity as control agent for the First Lien Collateral Agent and the Second Lien Collateral Agent, including its successors and assigns from time to time (the "**Control Agent**"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 or in the First Lien Credit Agreement (as defined below) as in effect on the date hereof (in each case unless the context requires otherwise).

## RECITALS

**WHEREAS**, Company, as Parent Borrower, LYN Holdings Corp., as guarantor ("**Holdings**"), each Domestic Subsidiary of Company as borrower (the "**Subsidiary Borrowers**", and, together with the Parent Borrower, the "**Borrowers**"), the lenders and other persons party thereto, and Bank of America, N.A., as Agent, have entered into that certain Credit Agreement dated as of the date hereof providing for a revolving credit facility to the Borrowers (as amended, restated, supplemented or modified from time to time, the "**Initial First Lien Credit Agreement**");

**WHEREAS**, Company, as Parent Borrower, Holdings, the Subsidiary Borrowers, as guarantors, the lenders and other persons party thereto, and Bank of America, N.A., as Agent, have entered into that certain Second Lien Credit Agreement dated as of the date hereof providing for a term loan to Company (as amended, restated, supplemented or modified from time to time, the "**Initial Second Lien Credit Agreement**");

**WHEREAS**, the obligations of the Borrowers and Holdings under the Initial First Lien Credit Agreement and Cash Management Obligations and any obligations under Related Swap Contracts in each case owed to any First Lien Claimholders will be secured by substantially all of the assets of the Borrowers and Holdings pursuant to the terms of the First Lien Collateral Documents;

**WHEREAS**, the obligations of Company, the Subsidiary Borrowers (as guarantors) and Holdings under the Initial Second Lien Credit Agreement will be secured by substantially all of the assets of Company, such guarantors and Holdings pursuant to the terms of the Second Lien Collateral Documents;

**WHEREAS**, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

**WHEREAS**, in order to induce the First Lien Collateral Agent and the First Lien Claimholders to consent to the Grantors' incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Company, or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders has agreed to the lien subordination, intercreditor and other provisions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1** <u>Definitions.</u>

**1.1** <u>Defined Terms</u>. As used in the Agreement, the following terms shall have the following meanings:

"**Agreement**" means this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Collateral**" means all of the assets and property of any Grantor, whether tangible or intangible, constituting both First Lien Collateral and Second Lien Collateral.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Control Collateral**" means any Collateral consisting of any Titled Collateral, Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the Uniform Commercial Code), cash and any other Collateral as to which a first priority Lien shall or may be perfected through possession or control by the secured party or any agent therefor.

"**Controlled Account**" means those certain Deposit Accounts (as defined in the Uniform Commercial Code) of any Grantor subject to Liens under the terms of the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**DIP Financing**" has the meaning set forth in <u>Section 6.1.</u>

"**Discharge of First Lien Obligations**" means, except to the extent otherwise provided in <u>Section 5.6,</u> (i) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First Lien Credit Documents and termination of all commitments to lend or otherwise extend credit under the First Lien Credit Documents, (ii) payment in full in cash of all other First Lien Obligations that are outstanding and unpaid at the time such principal and interest are paid in full (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding and other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other

liabilities in respect of which no claim or demand for payment has been made), (iii) termination, cancellation or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent but in no event greater than 105% of the aggregate undrawn face amount) of, all letters of credit issued under the First Lien Credit Documents and (iv) termination or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent but in no event greater than 105% of the aggregate face amount) of any Related Swap Contract with a First Lien Claimholder and the payment in full in cash of all obligations pursuant to any such Related Swap Contract, subject, with respect to the aggregate amount of the items set forth in the foregoing clauses (i) through (iii), to the limitations set forth in the definition of Maximum First Lien Indebtedness.

"**Disposition**" has the meaning set forth in <u>Section 5.1(a)(ii)</u>.

"**Exercise of Remedies**" has the meaning set forth in <u>Section 5.1(a)(i)</u>.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at such time, including without limitation the First Lien Lenders and any agent under the First Lien Credit Agreement.

"**First Lien Collateral Agent**" has the meaning set forth in the introductory paragraph of this Agreement.

"**First Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means the Collateral Documents (as defined in the First Lien Credit Agreement as amended from time to time in accordance herewith) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" means (i) the Initial First Lien Credit Agreement and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase (subject to the limitations set forth herein), Refinance in whole or in part the indebtedness and other obligations outstanding under the (x) Initial First Lien Credit Agreement or (y) any subsequent First Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a First Lien Credit Agreement hereunder. Any reference to the First Lien Credit Agreement hereunder shall be deemed a reference to any First Lien Credit Agreement then in existence.

"**First Lien Credit Documents**" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement as amended from time to time in accordance herewith) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**First Lien Lenders**" means the "Lenders" under and as defined in the First Lien Credit Agreement.

"**First Lien Obligations**" means (all terms used in this definition and not defined herein have the meanings assigned to such terms in the First Lien Credit Agreement) all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), including Cash Management Obligations, obligations pursuant to Related Swap Contracts and Letter of Credit Obligations, owing by any Credit Party to Agent or any Lender or, solely to the extent arising in respect of any Cash Management Obligation or Related Swap Contract, to any Affiliate of any Lender or Agent or to a Person who was an Affiliate of, or an, Agent or Lender at the time such item was entered into, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the First Lien Credit Agreement or any of the other First Lien Credit Documents, Cash Management Documents or any Related Swap Contract; this term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed or allowable in such case or proceeding), Fees, Charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under the First Lien Credit Agreement or any of the other First Lien Credit Documents; <u>provided</u> that the aggregate principal amount of, without duplication, any revolving credit commitments, loans, letters of credit, bonds, debentures, notes or similar instruments (excluding, in any event, obligations pursuant to any Cash Management Obligations or Related Swap Contracts) provided for under the First Lien Credit Agreement or any other First Lien Credit Document (or any Refinancing thereof) in excess of the greater of (1) $467,500,000 or (2) the sum of 90% of the book value of accounts receivable, 70% of the book value of inventory and 105% of the book value of equipment (the "**Maximum First Lien Indebtedness**", shall not constitute First Lien Obligations for purposes of this Agreement. "First Lien Obligations" shall include (x) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) in accordance with the rate specified in the relevant First Lien Credit Document and (y) all fees, costs and charges incurred in connection with the First Lien Credit Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding, irrespective of whether any claim for such interest, fees, costs or charges is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Grantors**" means the Borrowers, the Holdings and each of Parent Borrower's Domestic Subsidiaries that have executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document.

"**Guaranty Obligations**" means, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including without limitation

any obligation, whether or not contingent, (i) to purchase any such Indebtedness or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including without limitation keep well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (iii) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (iv) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof.

"**Holdings**" has the meaning set forth in the recitals hereto.

"**Initial First Lien Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Initial Second Lien Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Insolvency or Liquidation Proceeding**" means (i) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Bankruptcy Law with respect to any Grantor, (ii) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets, (iii) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (iv) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Recovery**" has the meaning set forth in <u>Section 6.5</u>.

"**Requisite Lenders**" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at such time, including without limitation the Second Lien Lenders and any agent under the Second Lien Credit Agreement.

"**Second Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Second Lien Collateral Documents**" means the Collateral Documents (as defined in the Second Lien Credit Agreement as amended from time to time in accordance herewith) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" means (i) the Initial Second Lien Credit Agreement, (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, Refinance in whole or in part the indebtedness and other obligations outstanding under the Initial Second Lien Credit Agreement or other agreement or instrument referred to in this clause (ii), subject to the limitations set forth herein and only to the extent permitted hereby. Any reference to the Second Lien Credit Agreement hereunder shall be deemed a reference to any Second Lien Credit Agreement then in existence.

"**Second Lien Credit Documents**" means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, as the same may be modified from time to time, including any intercreditor or joinder agreement among holders of Second Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**Second Lien Enforcement Date**" means the date which is 180 days after the occurrence of (i) an Event of Default (under and as defined in the Second Lien Credit Agreement) <u>and</u> (ii) the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Credit Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Second Lien Credit Agreement; <u>provided</u> that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the First Lien Collateral Agent or the First Lien Claimholders have commenced and be diligently pursuing any enforcement action with respect to the Collateral, (2) the First Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the First Lien Credit Agreement, (3) at any time any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (4) if the acceleration of the Second Lien Obligations (if any) is rescinded in accordance with the terms of the Second Lien Credit Agreement.

"**Second Lien Lenders**" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means (all terms used in this definition and not defined herein have the meanings assigned to such terms in the Second Lien Credit Agreement) all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), owing by any Credit Party to Agent or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Second Lien Credit Agreement or any of the other Second Lien Credit Documents; this term

includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed or allowable in such case or proceeding), Fees, Charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under the Second Lien Credit Agreement or any of the other Second Lien Credit Documents. "Second Lien Obligations" shall include (i) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) in accordance with the rate specified in the relevant Second Lien Credit Document and (ii) all fees, costs and charges incurred in connection with the Second Lien Credit Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding irrespective of whether any claim for such interest, fees, costs or charges is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Subsidiary Borrowers**" has the meaning set forth in the recitals hereto.

"**Titled Collateral**" means any motor vehicles and other goods covered by certificate of title.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

**1.2** <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2 <u>Lien Priorities.</u>

**2.1** <u>Relative Priorities</u>. Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the First Lien Credit Documents or the Second Lien Credit Documents or any defects or deficiencies in, or failure to perfect, the Liens securing the First Lien Obligations or the Second Lien Obligations or any other circumstance whatsoever, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby each agrees that: (a) any Lien on the Collateral securing any First Lien

Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations; and (b) any Lien on the Collateral now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.

**2.2** <u>Failure to Perfect</u>. All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, notwithstanding any failure of the First Lien Collateral Agent or the First Lien Claimholders to adequately perfect its security interests in the Collateral, the subordination of any Lien on the Collateral securing any First Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the Collateral securing any First Lien Obligations.

**2.3** <u>Nature of First Lien Obligations</u>. The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that (a) a portion of the First Lien Obligations are revolving in nature, (b) the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (c) the terms of the First Lien Obligations may be modified, extended or amended from time to time, and (d), subject to the limitations on the aggregate principal amount of First Lien Obligations set forth in the definition of "First Lien Obligations" or in <u>Section 5.3</u>, the aggregate amount of the First Lien Obligations may be increased or Refinanced, in either event, without notice to or consent by the Second Lien Claimholders and without affecting the provisions hereof. The lien priorities provided in <u>Sections 2.1</u> and <u>2.2</u> shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or Refinancing of either the First Lien Obligations or the Second Lien Obligations, or any portion thereof.

**2.4** <u>Prohibition on Contesting Liens</u>. Each of the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; <u>provided that</u> nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in <u>Sections 2.1</u> and <u>3.1</u>.

**2.5** <u>No New Liens</u>.

(a) <u>Limitation on other Collateral for First Lien Claimholders</u>. So long as any Second Lien Obligations remain outstanding, and subject to <u>Section 6</u>, (i) the First Lien Collateral

Agent agrees that, after the date hereof, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien Claimholders. If the First Lien Collateral Agent or any First Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, then the First Lien Collateral Agent (or the relevant First Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other First Lien Document (x) hold and be deemed to have held such Lien and security interest for the benefit of the Second Lien Collateral Agent as security for the Second Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4 or (y) release such Lien.

(b) <u>Limitation on other Collateral for Second Lien Claimholders.</u> Until the date upon which the Discharge of First Lien Obligations shall have occurred, (i) the Second Lien Collateral Agent agrees that, after the date hereof, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Borrower, any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the Second Lien Collateral Agent or the Second Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the First Lien Collateral Agent or the First Lien Claimholders. If the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, then the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Second Lien Document (x) hold and be deemed to have held such Lien and security interest for the benefit of the First Lien Collateral Agent as security for the First Lien Obligations or (y) release such Lien. To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Collateral Agent and/or the First Lien Claimholders, the Second Lien Collateral Agent, on behalf of the Second Lien Claimholders, agrees that any amounts received by it or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.5(b) shall be subject to Section 4.2.

**2.6** <u>Similar Liens and Agreements</u>. The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical. In furtherance of the foregoing and of <u>Section 8.9</u>, the parties hereto agree, subject to the other provisions of this Agreement:

(a) upon request by the First Lien Collateral Agent or the Second Lien Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Credit Documents and the Second Lien Credit Documents; and

(b) that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral shall be in all material respects the same forms of documents other than with respect to the senior and subordinate nature of the security interests in the Collateral securing the respective obligations thereunder.

**SECTION 3 <u>Enforcement</u>.**

**3.1** <u>Exercise of Remedies</u>.

(a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against Company or any other Grantor:

(i) the Second Lien Collateral Agent and the Second Lien Claimholders:

(A) from the date hereof until the occurrence of the Second Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set–off or recoupment) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or proceeding (including, without limitation, any Insolvency or Liquidation Proceeding) with respect to any Lien held by it under the Second Lien Collateral Documents or any other Second Lien Credit Document or otherwise; and

(B) will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder, of any rights and remedies relating to the Collateral under the First Lien Credit Documents or otherwise, provided that the respective interests of the Second Lien Claimholders attach to the proceeds thereof, subject to the relative priorities described in <u>Section 2</u> and <u>Section 4</u>; and

(C) subject to the rights of the Second Lien Collateral Agent under clause (i)(A) above, will not object to the forbearance by the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and

(ii) subject to <u>Section 5.1</u> and <u>Section 6</u>, the First Lien Collateral Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set–off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; <u>provided</u>, <u>that</u>

(A) in any Insolvency or Liquidation Proceeding commenced by or against Company or any other Grantor, the Second Lien Collateral Agent may file a claim or statement of interest with respect to the Second Lien Obligations,

(B) the Second Lien Collateral Agent may take any action (not adverse to the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Collateral,

(C) the Second Lien Claimholders shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement,

(D) in any Insolvency or Liquidation Proceeding, the Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either Bankruptcy Law or applicable non–bankruptcy law, in each case in accordance with the terms of this Agreement,

(E) in any Insolvency or Liquidation Proceeding, the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, to the extent consistent with the provisions hereof, and

(F) the Second Lien Collateral Agent or any Second Lien Claimholder may exercise any of its rights or remedies with respect to the Collateral upon the occurrence and during the effective continuation of the Second Lien Enforcement Date.

In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the First Lien Collateral Agent and the First Lien Claimholders to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set–off or recoupment) with respect to any Collateral, and that any Collateral or proceeds taken or received by it will be paid over to the First Lien Collateral Agent pursuant to Section 4.2, unless and until the Discharge of First Lien Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a)(ii), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein.

(c) Subject to the proviso in clause (ii) of Section 3.1(a) and Section 6.4, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that (i) the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, and (ii) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral.

(d) The Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Credit Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

**3.2** Actions Upon Breach.

(a) If any Second Lien Claimholder, contrary to this Agreement, commences or participates in any action or proceeding against Company, any other Grantor or the Collateral, the First Lien Collateral Agent may interpose in the name of the First Lien Claimholders or in the name of Company or such Grantor the making of this Agreement as a defense or dilatory plea.

(b) Should any Second Lien Claimholder, contrary to this Agreement, in any way take, or attempt or threaten to take, any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, the First Lien Collateral Agent (in its own name or in the name of a Grantor) may obtain relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Collateral Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (ii) the Second Lien Collateral Agent on behalf of each Second Lien Claimholder waives any defense that the First Lien Claimholders cannot demonstrate damage or can be made whole by the awarding of damages.

# SECTION 4 **Payments.**

**4.1** <u>Application of Proceeds</u>. So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Parent Borrower or any other Borrower, all Collateral or proceeds thereof received in connection with the sale or other disposition of such Collateral, or collection or realization on such Collateral upon the exercise of remedies as well as amounts received by the First Lien Collateral Agent pursuant to <u>Section 4.2</u>, shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the relevant First Lien Credit Documents. Upon the Discharge of the First Lien Obligations, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any remaining Collateral or any proceeds thereof held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

**4.2** <u>Payment Turnover</u>. So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Parent Borrower or any other Borrower, and except as specifically permitted by <u>Section 4.3</u>, any Collateral or proceeds thereof received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set−off or recoupment) in respect of the Collateral shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

**4.3** <u>Permitted Mandatory Prepayments of Second Lien Obligations</u>. Notwithstanding the foregoing provisions of this <u>Section 4</u>, mandatory prepayments required under Section 1.5(c) of the Second Lien Credit Agreement may be made and applied to the Second Lien Obligations (A) if (i) the payment is permitted by the First Lien Credit Agreement or (ii) if applicable, the corresponding mandatory prepayment of the First Lien Credit Documents is waived by the Requisite Lenders under the First Lien Credit Agreement) or (B) at all times following the Discharge of the First Lien Obligations.

# SECTION 5 **Other Agreements.**

**5.1** <u>Releases</u>.

(a) If, in connection with:

(i) the exercise of any First Lien Collateral Agent's remedies in respect of the Collateral, including any sale, lease, exchange, transfer or other disposition of any such Collateral (an "**Exercise of Remedies**"); or

(ii) any sale, lease, exchange, transfer or other disposition of any Collateral permitted under the terms of the First Lien Credit Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing) (a "**Disposition**") other than an Exercise of Remedies, or

(iii) any release of Liens on the assets of any Grantor, all of the Stock of which is being released pursuant to any other provision of this Section 5.1(a);

the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the First Lien Obligations, in each case other than in connection with the Discharge of the First Lien Obligations, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and, if applicable, the obligations of such Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**Second Lien Release**") and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided, however, that the Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Collateral the net proceeds of the disposition of which will not be applied to repay (and, to the extent applicable, to reduce permanently commitments with respect to) the First Lien Obligations or (y) in the case of a Disposition, if the Disposition is prohibited by any provision of the Second Lien Credit Agreement.

(b) Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney–in–fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(c) Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders (i) has released any Lien on Collateral or any Grantor from its obligation under its guaranty or agreement to be a borrower and any such Liens or guaranty or agreement are later reinstated or (ii) obtains any new Liens or additional guaranties or agreements from Grantors, then the Second Lien Collateral

–14–

Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in Section 2.

**5.2** <u>Insurance</u>. The First Lien Collateral Agent and the Second Lien Collateral Agent shall be named as additional insureds and the Control Agent shall be named as loss payee (on behalf of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent and the Second Lien Claimholders) under any insurance policies maintained from time to time by any Grantor. Until the date upon which the Discharge of First Lien Obligations shall have occurred, as between the First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right (a) to adjust or settle any insurance policy or claim covering any Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting any Collateral. Until the date upon which the Discharge of First Lien Obligations shall have occurred, all proceeds of any such policy and any such award in respect of any Collateral that are payable to the First Lien Collateral Agent and the Second Lien Collateral Agent shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders to the extent required under the First Lien Credit Documents and thereafter to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the applicable Second Lien Credit Documents and then to the owner of the subject property or as a court of competent jurisdiction may otherwise direct. If the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of Section 4.2.

**5.3** <u>Amendments to First Lien Credit Documents and Second Lien Credit Documents.</u>

(a) The First Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced in each case, without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders; <u>provided, however,</u> that the holders of such Refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not: (i) provide for a principal amount of, without duplication, term loans, revolving loan commitments, letters of credit, bonds, debentures, notes or similar instruments (but excluding obligations pursuant to any Related Swap Contract and Cash Management Obligations) in excess of the Maximum First Lien Indebtedness in the aggregate; (ii) increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations by more than 2.0% from the rates in effect on the date hereof (excluding increases (A) resulting from application of the pricing grid set forth in the First Lien Credit Agreement as in effect on the date hereof or (B) resulting from the accrual of interest at the default rate); or (iii) increase (or have the effect of increasing) the amount of, or the type of, dispositions of Collateral, the proceeds of which are not required to be used to prepay the First Lien Obligations and which may be retained by the Loan Parties to an amount greater than that permitted under the Second Lien Credit Agreement.

(b) Until the Discharge of First Lien Obligations occurs, the Second Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Lien Credit Agreement may be Refinanced in each case, without the consent of the First Lien Collateral Agent or the First Lien Claimholders provided, however, that the holders of such Refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not: (i) increase the maximum principal amount of the Second Lien Obligations or the rate of interest on any of the Second Lien Obligations, other than (A) to the extent of any increase in the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations or (B) in connection with the imposition of the default rate of interest in accordance with the Second Lien Credit Documents as in effect on the date hereof; (ii) change the dates upon which payments of principal or interest on the Second Lien Obligations are due; provided, however that the Term Loan Maturity Date (as defined in the Second Lien Credit Agreement) may be extended, (iii) change or add any event of default or any covenant with respect to the Second Lien Obligations, (iv) change any prepayment provisions of the Second Lien Obligations, or (v) change or amend any other term of the Second Lien Credit Documents if such change or amendment would result in a default under the First Lien Credit Agreement, increase the obligations of any Grantor or confer additional material rights on any Second Lien Claimholder in a manner adverse in any material respect to any Grantor or any of the First Lien Claimholders.

(c) Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, without the prior written consent of the First Lien Collateral Agent, no Second Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Credit Agreement or Second Lien Collateral Document, would contravene any of the terms of this Agreement.

(d) The Second Lien Collateral Agent agrees that each Second Lien Collateral Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of May 31, 2007 as the same may be amended, supplemented, modified or replaced from time to time (the "**Intercreditor Agreement**") among Bank of America, N.A., as First Lien Collateral Agent, Bank of America, N.A., as Second Lien Collateral Agent, Bank of America, N.A., as Control Agent, and the Grantors (as defined therein) from time to time a party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern."

In addition, the Second Lien Collateral Agent agrees that each Second Lien Collateral Document under which any Lien on real property owned by any Loan Party is granted to secure the Second Lien Obligations covering any Collateral shall contain such other language as the First Lien Collateral Agent may reasonably request to reflect the priority of the First Lien Collateral Document covering such Collateral over such Second Lien Collateral Document.

(e) Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, in the event the First Lien Collateral Agent or the First Lien Claimholders enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Collateral Document or changing in any manner the rights of the First Lien Collateral Agent, the First Lien Claimholders, the Grantors thereunder, then such amendment, waiver or consent shall automatically apply in a comparable manner to any comparable provision of the Second Lien Collateral Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any Grantor; provided, however, (A) that no such amendment, waiver or consent shall be effective to (i) release any Lien of the Second Lien Collateral Documents, (ii) remove assets subject to the Lien of the Second Lien Collateral Documents, (iii) adversely affect the perfection or priority of any such Lien, (iv) reduce the principal of, or interest or other amounts payable on, any amount payable under the Second Lien Credit Agreement or any Second Lien Credit Document, (v) postpone any date fixed for any payment of principal of, or interest or other amounts payable on, any amounts payable under the Second Lien Credit Agreement or any Second Lien Credit Document, (vi) permit any Liens on the Collateral not permitted under the Second Lien Credit Documents or Section 6, or (vii) impose duties on the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i), (ii) and (iii), to the extent that a release of, or adverse effect on the perfection or priority of, such Lien is permitted by Section 5.1 or Section 6, and (B) notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent no later than 10 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness or validity thereof; and provided further that this paragraph is intended solely to set forth provisions by which the Second Lien Collateral Documents shall be automatically affected by amendments, waivers and consents given by the First Lien Collateral Agent and First Lien Claimholders under the First Lien Credit Agreement and the First Lien Collateral Documents and is not intended to impose any liability on the First Lien Collateral Agent or First Lien Claimholders.

**5.4** Rights As Unsecured Creditors. Except as otherwise set forth in Section 2.1 or Section 3.1 or Section 6, the Second Lien Collateral Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against any Grantor in accordance with the terms of the Second Lien Credit Documents and applicable law. Except as otherwise set forth in Section 2.1 and Section 4, nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any Second Lien Claimholders of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Collateral Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set–off or recoupment) or enforcement of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the Collateral. In the event that any Second Lien Claimholder becomes a judgment Lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the Second Lien Obligations subject to this Agreement.

**5.5** <u>Control Agent for Perfection</u>.

(a) The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby appoint Bank of America, N.A. as its collateral agent (in such capacity, together with any successor in such capacity appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the "**Control Agent**") for the limited purpose of acting as the agent on behalf of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) with respect to the Control Collateral for purposes of perfecting the Liens of such parties on the Control Collateral. The Control Agent accepts such appointment and agrees to hold the Control Collateral in its possession or control (or in the possession or control of its agents or bailees) as Control Agent for the benefit of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) and any permitted assignee of any thereof solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral, subject to the terms and conditions of this <u>Section 5.5</u>. The First Lien Collateral Agent and the Second Lien Collateral Agent hereby acknowledge that the Control Agent will obtain "control" under the UCC over each Controlled Account as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of both the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) pursuant to the control agreements relating to each respective Controlled Account. The First Lien Collateral Agent and the Second Lien Collateral Agent hereby also acknowledge and agree that the Control Agent will obtain landlord lien waivers as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of (i) the First Lien Collateral Agent for the benefit of the First Lien Claimholders and (ii) the Second Lien Collateral Agent for the benefit of Second Lien Claimholders. The First Lien Collateral Agent and the Second Lien Collateral Agent hereby also acknowledge and agree that each certificate of title with respect to any Titled Collateral (a security interest in which is required to be perfected under the applicable security documents) will name the Control Agent as secured party and such notation shall be intended to perfect the security interest of the First Lien Collateral Agent for the benefit of the First Lien Claimholders and the security interest of the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders in such Titled Collateral.

(b) The Control Agent, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby agrees that the First Lien Collateral Agent shall have the sole and exclusive right and authority to give instructions to, and otherwise direct, the Control Agent in respect of the Control Collateral or any control agreement with respect to any Control Collateral until the earlier of (i) the date upon which the Discharge of First Lien Obligations shall have occurred and (ii) the Second Lien Enforcement Date and neither the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise

of such rights by the First Lien Collateral Agent in any respect. The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the Grantors are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement. The First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the First Lien Claimholders are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Credit Agreement.

(c) Except as set forth below, the Control Agent shall have no obligation whatsoever to the Second Lien Collateral Agent or any Second Lien Claimholder including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5. In acting on behalf of the Second Lien Collateral Agent and the Second Lien Claimholders and the First Lien Collateral Agent and the First Lien Claimholders, the duties or responsibilities of the Control Agent under this Section 5.5 shall be limited solely (i) to physically holding the Control Collateral delivered to the Control Agent by any Grantor as agent for the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) for purposes of perfecting the Lien held by the First Lien Collateral Agent and the Second Lien Collateral Agent and (ii) delivering such collateral as set forth in Section 5.5(d).

(d) The rights of the Second Lien Collateral Agent shall at all times be subject to the terms of this Agreement and to the First Lien Collateral Agent's rights under the First Lien Credit Documents.

(e) Neither the Control Agent nor the First Lien Collateral Agent shall have by reason of the Second Lien Credit Documents or this Agreement or any other document a fiduciary relationship in respect of the Second Lien Collateral Agent or any Second Lien Claimholder.

(f) Upon the Discharge of First Lien Obligations (other than in connection with a Refinancing of the First Lien Obligations), the Control Agent shall deliver to the Second Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the Second Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the Second Lien Collateral Agent shall accept and succeed to the role of perfecting the Control Agent as the agent for perfection on the Control Collateral. Upon the Discharge of First Lien Obligations, (i) in the event the Control Agent and the Second Lien Collateral Agent are not the same entity, at the cost and expense of the Grantors all certificates of title with respect to Titled Collateral naming Control Agent shall be re–submitted in order to remove the Control Agent and (if any Second Lien Obligations are then outstanding) to name the Second Lien Collateral Agent as secured party thereon (it being understood that the Control Agent shall continue to hold the security interest in the Titled Collateral granted to it pursuant to the Second Lien Collateral Documents until such titles are so amended) and (ii) in the event the Control Agent and the Second Lien Collateral Agent are the same entity, the Control Agent's interest in all entries on the certificates of title shall be automatically deemed assigned to the Second Lien Collateral Agent.

(g) The Control Agent shall have an unfettered right to resign as Control Agent upon 30 days notice to the First Lien Collateral Agent and the Second Lien Collateral Agent. If upon the effective date of such resignation no successor to the Control Agent has been appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the Control Agent shall deliver to the First Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the First Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the First Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

**5.6** <u>When Discharge of First Lien Obligations Deemed to Not Have Occurred.</u> If at any time after the Discharge of First Lien Obligations has occurred, Company thereafter enters into any Refinancing of any First Lien Credit Document evidencing a First Lien Obligation which Refinancing is permitted hereby and by the terms of the Second Lien Credit Documents, then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such Refinancing as a result of the occurrence of such first Discharge of First Lien Obligations), and the obligations under such Refinancing First Lien Credit Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Credit Documents shall be a First Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that Company has entered into a new First Lien Credit Document (which notice shall include the identity of the new collateral agent, such agent, the "**New Agent**"), the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as Company or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement. If the new First Lien Obligations under the new First Lien Credit Documents are secured by assets of the Grantors of the type constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents.

**5.7** <u>Purchase Right</u>. Without prejudice to the enforcement of the First Lien Claimholders' remedies, the First Lien Claimholders agree that at any time following (a) acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within sixty (60) days of the occurrence thereof or (c) the commencement of an Insolvency or Liquidation Proceeding (each, a "**Purchase Event**"), one or more of the Second Lien Claimholders may request, and the First Lien Claimholders hereby offer the Second Lien Claimholders the option, to purchase all, but not less than all, of the aggregate amount of outstanding First Lien Obligations outstanding at the time of purchase at par, without warranty or representation or recourse (except for representations and warranties

required to be made by assigning lenders pursuant to the Assignment Agreement (as such term is defined in the First Lien Credit Agreement)). If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request. If one or more of the Second Lien Claimholders exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent. If none of the Second Lien Claimholders exercise such right, the First Lien Claimholders shall have no further obligations pursuant to this Section 5.7 for such Purchase Event and may take any further actions in their sole discretion in accordance with the First Lien Credit Documents and this Agreement.

**SECTION 6  Insolvency or Liquidation Proceedings.**

**6.1** Use of Cash Collateral and Financing Issues. Until the Discharge of First Lien Obligations has occurred, if Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Collateral Agent shall desire to permit the use of cash collateral on which the First Lien Collateral Agent or any other creditor has a Lien or to permit Company or any other Grantor to obtain financing, from one or more of the First Lien Claimholders (including under the First Lien Credit Agreement) under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a "**DIP Financing**"), then, so long as the maximum amount of Indebtedness that may be outstanding from time to time in connection with such DIP Financing (including any such portion thereof that constitutes rollover of loans and/or letters of credit under the First Lien Credit Agreement) plus the aggregate principal amount of, without duplication, any revolving credit commitments, loans, letters of credit, bonds, debentures, notes or similar instruments (excluding, in any event, obligations pursuant to any Cash Management Obligations or Related Swap Contracts) provided for under the First Lien Credit Agreement or any other First Lien Credit Document (or any Refinancing thereof) shall not exceed an amount equal to the Maximum First Lien Indebtedness plus $50,000,000 then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, (A) agrees that it will raise no objection to such use of cash collateral or DIP Financing nor support any other Person objecting to, such sale, use, or lease of cash collateral or DIP Financing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4) and, to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all Obligations relating thereto), (y) any adequate protection Liens provided to the First Lien Claimholders and (z) any "carve–out" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent; and (B) agrees that notice received two (2) calendar days prior to the entry of an order approving such usage of cash collateral or approving such DIP Financing shall be adequate notice; provided that the foregoing shall not prohibit the Second Lien Collateral Agent or the Second Lien Claimholders from objecting solely to any provisions in any DIP Financing relating to, describing or requiring any provision or content of a plan of reorganization other than any provisions requiring that the DIP Financing be paid in full in cash.

**6.2** Sale Issues. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not raise any objection to or oppose a sale or other disposition of

any Collateral (and any post–petition assets subject to adequate protection liens in favor of the First Lien Collateral Agent) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Requisite Lenders under the First Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the Second Lien Claimholders in the Collateral (and any post–petition assets subject to adequate protection liens, if any, in favor of the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement. If requested by the First Lien Collateral Agent in connection therewith, the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

**6.3** Relief from the Automatic Stay. Until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Collateral Agent, or (ii) oppose any request by the First Lien Collateral Agent or any First Lien Claimholder to seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral.

**6.4** Adequate Protection.

(a) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting) (i) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection. In any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, may seek adequate protection in respect of the Second Lien Obligations, subject to the provisions of this Agreement, only if (A) the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral including replacement liens on post–petition collateral and (B) such additional protection requested by the Second Lien Collateral Agent is in the form of a Lien on such additional collateral, which Lien, if granted, will be subordinated to the adequate protection Liens securing the First Lien Obligations and the Liens securing any DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any such DIP Financing. In the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a Lien on such additional collateral as security for the First Lien Obligations and for any DIP Financing and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any DIP Financing (and all obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any DIP Financing.

(b) Similarly, if the First Lien Claimholders are granted adequate protection in the form of a superiority claim, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request a superiority claim, which superiority claim will be junior in all respects to the superiority claim granted to the First Lien Collateral Agent and the First Lien Claimholders, and, in the event that the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of a superiority claim, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent and the providers of any DIP Financing also shall be granted a superiority claim, which superiority claim will be senior in all respects to the superiority claim granted to the Second Lien Collateral Agent and the Second Lien Claimholders.

(c) Notwithstanding the foregoing, if the First Lien Claimholders are deemed by a court of competent jurisdiction to be fully secured on the petition date of any Insolvency or Liquidation Proceeding, then the Second Lien Collateral Agent and the Second Lien Claimholders shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post–petition interest, incurred fees and expenses or other cash payments.

**6.5** <u>No Waiver</u>. Nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Credit Documents or otherwise; <u>provided</u>, <u>however</u>, that this <u>Section 6.5</u> shall not limit the rights of the Second Lien Claimholders under the proviso in <u>Section 3.1(a)(ii)</u> or under <u>Section 6.4</u> or <u>Section 6.9</u>.

**6.6** <u>Avoidance Issues</u>. If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding, or otherwise, to turn over or otherwise pay to the estate of Company or any other Grantor any amount in respect of a First Lien Obligation (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. Collateral or proceeds thereof received by the Second Lien Collateral Agent or any Second Lien Claimholder after a Discharge of First Lien Obligations and prior to the reinstatement of such First Lien Obligations shall be delivered to the First Lien Collateral Agent upon such reinstatement in accordance with <u>Section 4.2.</u>

**6.7** <u>Separate Grants of Security and Separate Classification</u>. Each of the Grantors, the First Lien Claimholders and the Second Lien Claimholders acknowledges and agrees that (i) the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally

different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, pre–petition interest and other claims, all amounts owing in respect of post–petition interest, fees, costs, premium and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency or Liquidation Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the Second Lien Claimholders), with the Second Lien Claimholders hereby acknowledging and agreeing to turn over to the First Lien Claimholders amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders.

**6.8** <u>Reorganization Securities</u>. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.9** <u>Post–Petition Claims</u>.

(a) Neither the Second Lien Collateral Agent nor any other Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post–petition interest, fees, costs, charges or expenses to the extent of the value of the First Lien Collateral Agents Lien held for the benefit of the First Lien Claimholders, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

(b) Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post–petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Obligations).

**6.10** <u>Waiver</u>. The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the First Lien Collateral Agent or any First Lien Claimholder arising out of the election of the First Lien Collateral Agent or any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

**6.11** <u>Expense Claims</u>. Neither Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the First Lien Collateral Agent or any First Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the First Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Discharge of First Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

**6.12** <u>Other Matters</u>. To the extent that the Second Lien Collateral Agent or any Second Lien Claimholder has or acquires rights under Section 361, Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Collateral Agent agrees, on behalf of itself and the Second Lien Claimholders not to assert any of such rights without the prior written consent of the First Lien Collateral Agent; <u>provided</u> that if requested by the First Lien Collateral Agent, the Second Lien Collateral Agent shall timely exercise such rights in the manner requested by the First Lien Collateral Agent, including any rights to payments in respect of such rights.

**6.13** <u>Effectiveness in Insolvency or Liquidation Proceedings</u>. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding. All references in this Agreement to any Grantor shall include such Person as a debtor–in–possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

**SECTION 7** <u>Reliance; Waivers; Etc.</u>

**7.1** <u>Non–Reliance</u>

(a) The consent by the First Lien Claimholders to the execution and delivery of the Second Lien Credit Documents and the grant to the Second Lien Collateral Agent on behalf of the Second Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the First Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Second Lien Credit Agreement, the other Second Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Credit Agreement, the other Second Lien Credit Documents or this Agreement.

(b) The consent by the Second Lien Claimholders to the execution and delivery of the First Lien Credit Documents and the grant to the First Lien Collateral Agent on behalf

of the First Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and the First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the First Lien Credit Agreement, the other First Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement, the other First Lien Credit Documents or this Agreement.

**7.2** <u>No Warranties or Liability</u>. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges and agrees that each of the Second Lien Collateral Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with Company or any Grantor (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

**7.3** <u>No Waiver of Lien Priorities</u>.

(a) No right of the First Lien Claimholders, the Control Agent, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Company or any other Grantor or by any act or failure to act by the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the Control Agent, the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

–26–

(b) Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of Company and the other Grantors under the First Lien Credit Documents and subject to the provisions of <u>Section 5.3(a)</u>), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents or applicable law, without the consent of, or notice to, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i) make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing (subject, in each case, to the limits set forth in the definition of "First Lien Obligations" and <u>Section 5.3</u>);

(ii) change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension, subject to the limits set forth in the definition of "First Lien Obligations") or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents; <u>provided</u>, <u>however</u>, the foregoing shall not prohibit the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the Second lien Credit Agreement as a result of any Grantor's violation of the terms thereof;

(iii) subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of Company or any other Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv) settle or compromise any First Lien Obligation or any other liability of Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

(v) exercise or delay in or refrain from exercising any right or remedy against Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

(vi) take or fail to take any Lien securing the First Lien Obligations or any other collateral security for any First Lien Obligations or take or fail to take any action which may be necessary or appropriate to ensure that any Lien securing First Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any First Lien Obligation or any obligation secured thereby; or

(vii) otherwise release, discharge or permit the lapse of any or all Liens securing the First Lien Obligations or any other Liens upon any property at any time securing any First Lien Obligations.

(c) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the Control Agent, the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against the Control Agent, any First Lien Claimholder and the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to: (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any Collateral (including, without limitation, the Control Collateral, as applicable). The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the Collateral, the First Lien Obligations or otherwise.

(d) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4** <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents or any setting aside or avoidance of any Lien;

(b) except as otherwise set forth in the Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document;

(c) any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guarantee thereof;

(d) the commencement of any Insolvency or Liquidation Proceeding in respect of Company or any other Grantor; or

(e) any other circumstances which otherwise might constitute a defense available to, or a discharge of, Company or any other Grantor in respect of the First Lien Obligations, or of the Second Lien Collateral Agent or any Second Lien Claimholder in respect of this Agreement.

**7.5** Certain Notices.

(a) Promptly upon the satisfaction of the conditions set forth in clauses (i), (ii), (iii) and (iv) of the definition of Discharge of First Lien Obligations, the First Lien Collateral Agent shall deliver written notice confirming same to the Second Lien Collateral Agent; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(b) Promptly upon (or as soon as practicable following) the commencement by the First Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any Collateral (including by way of a public or private sale of Collateral), the First Lien Collateral Agent shall notify the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

**SECTION 8 Miscellaneous.**

**8.1** Conflicts. In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control. The parties hereto acknowledge that the terms of this Agreement are not intended to negate any specific rights granted to Company in the First Lien Credit Documents and the Second Lien Credit Documents.

**8.2** Effectiveness; Continuing Nature of this Agreement; Severability. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any

time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Credit Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of Company or any Grantor constituting First Lien Obligations in reliance hereof. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to Company or any other Grantor shall include Company or such Grantor as debtor and debtor–in–possession and any receiver or trustee for Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate and payment has been made in full in cash of all other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate and (ii) with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 5.6 and Section 6.5.

**8.3** <u>Amendments; Waivers</u>. No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, neither Company nor any Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights or obligations are directly and adversely affected.

**8.4** <u>Information Concerning Financial Condition of Company and its Subsidiaries</u>.

(a) The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations. The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Collateral

Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

(b) The Grantors agree that any information provided to the First Lien Collateral Agent, the Second Lien Collateral Agent, the Control Agent, any First Lien Claimholder or any Second Lien Claimholder may be shared by such Person with any First Lien Claimholder, any Second Lien Claimholder, the Control Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent notwithstanding any request or demand by such Grantor that such information be kept confidential; provided, that such information shall otherwise be subject to the respective confidentiality provisions in the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable.

**8.5** <u>Subrogation</u>. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred.

**8.6** <u>Application of Payments</u>. All payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Credit Documents. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**8.7** <u>SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>**.**

**(a) EACH PARTY HERETO HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS. EACH PARTY HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON IT BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO IT, IN ACCORDANCE WITH SECTION 8.8 AND SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.**

**(b) EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING**

OUT OF THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE FIRST LIEN CREDIT DOCUMENTS AND THE SECOND LIEN CREDIT DOCUMENTS, AS APPLICABLE, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

**8.8** Notices. All notices to the Control Agent, the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9** Further Assurances. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Credit Documents, and Company and each Grantor, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

**8.10 APPLICABLE LAW.** THIS AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

**8.11** Binding on Successors and Assigns. This Agreement shall be binding upon the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and their respective successors and assigns.

**8.12** Specific Performance. Each of the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Collateral Agent or the Second Lien Collateral Agent, as the case may be.

**8.13** <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.14** <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15** <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16** <u>No Third Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders and the Control Agent. No other Person shall have or be entitled to assert rights or benefits hereunder.

**8.17** <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand. Nothing in this Agreement is intended to or shall impair the rights of Company or any other Grantor, or the obligations of Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

BANK OF AMERICA, N.A.,
as First Lien Collateral Agent,

By: _/s/_____
Name:
Title:

<u>Notice Address:</u>

Principal Office:

_____
Attention:
Telecopier:
Telephone:

with a copy to:

_____
Attention:
Telecopier:
Telephone:

BANK OF AMERICA, N.A.,
as Second Lien Collateral Agent,

By: _____/s/_____
Name:
Title:

<u>Notice Address:</u>

Principal Office:

_____
Attention:
Telecopier:
Telephone:

with a copy to:

_____
Attention:
Telecopier:
Telephone:

*[Signature Page to Intercreditor Agreement]*

BANK OF AMERICA, N.A.,
as Control Agent,

By:     <u>/s/</u>
Name:
Title:

<u>Notice Address:</u>

Principal Office:

Attention:
Telecopier:
Telephone:

with a copy to:

Attention:
Telecopier:
Telephone:

*[Signature Page to Intercreditor Agreement]*

NEFF CORP.,
as Company

By:    /s/ Mark Irion
Name: Mark Irion
Title:  Chief Financial Officer

LYN HOLDINGS CORP.,
NEFF RENTAL, INC.,
NEFF RENTAL LLC,
NEFF FINANCE CORP.,
each as a Grantor

By:    /s/ Mark Irion
Name: Mark Irion
Title:  Chief Financial Officer

Notice Address:

*[Signature Page to Intercreditor Agreement]*