James H.M. Sprayregen, P.C.
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

Anup Sathy, P.C. (*pro hac vice* pending)
Ray C. Schrock (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Proposed Counsel to the Debtors and Debtors in
Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NEFF CORP., et al.,[1] | ) | Case No. 10-_____(____) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

## DECLARATION OF MARK IRION (A) IN SUPPORT OF DEBTORS'
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND
## (B) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

I, Mark Irion, hereby declare under penalty of perjury.

1.      I am the Chief Financial Officer of Neff Corp., one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have served in this capacity since 1999 and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.[2]  I am above 18 years of age, and I am competent to testify.

2.      I submit this Declaration (this "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), and I am authorized to submit this Declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

## Preliminary Statement

3.      The Debtors comprise one of the leading construction and earthmoving equipment rental companies in the United States with approximately 11,000 separate pieces of equipment located across the country.  The Debtors' equipment provides critical support to and is intertwined with the general construction and building industries in the United States.  As is well known, over the past 24 months, these industries have experienced a material slowdown in

---

[2]    Prior to joining Neff in 1998, I was the chief financial officer of Markvision Holdings, Inc., a computer distribution company, I served in that position from 1994 to 1998.  Prior to 1994, I was employed by Deloitte & Touche LLP.

K&E 15702716

activity that has had ripple effects through the rest of the U.S. economy. This slowdown in construction and building activity left the Debtors with reduced revenues and a balance sheet no longer in-line with current market conditions.

4.      Proactively exploring their options, the Debtors undertook extensive efforts to right-size their capital structure and position themselves for ongoing success in the current industry environment. The Debtors considered all available strategic alternatives to ensure that they were maximizing stakeholder value. To this end, the Debtors determined it was in their best interests to explore debt restructuring options with their major creditor constituents and on a parallel path, conduct a third party sale and investment process.

5.      Over the course of more than five months, the Debtors engaged in discussions with more than twenty parties, and received multiple indications of interest that led to certain alternative restructuring proposals (including, a proposal from certain of the Debtors' existing first lien lenders). Presented with two proposals, the Debtors negotiated with interested parties, and through such negotiations, increased the value the Debtors would receive under these proposals. The concurrent filing of these prearranged chapter 11 cases and the *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") is the culmination of those fruitful efforts.

6.      The Plan, which will eliminate more than $400 million in debt, is based on a proposal received from affiliates of holders of approximately 67 percent of the Debtors' first lien term loan (collectively, the "Plan Sponsors"). Such holders have agreed to support the Plan

K&E 15702716

through confirmation in the form of a $119 million backstopped rights offering, plan support agreement, and various other documents related to the Plan.[3]

7.     The Plan provides full recoveries to the Debtors' first lien lenders in the form of cash or stock (at the lender's election).  The Plan also provides meaningful recoveries to the Debtors' second lien lenders and unsecured creditors and will preserve the jobs of the Debtors' approximately 900 employees.  Moreover, the Debtors have the right to continue developing alternative proposals that may provide higher or better recoveries for the Debtors' creditors. Specifically, the Plan incorporates a "payout event" mechanism, under which any party may present a proposal that provides higher or better recoveries to the Debtors' creditors prior to confirmation, provided that such proposal provides for payment in full in cash to the first lien lenders and otherwise treats creditors no less favorably than the Plan.

8.     In conjunction with the Plan, the Debtors have obtained commitments for a $175 million DIP Facility that converts into the Exit Facility on the Effective Date and a backstopped rights offering of up to approximately $119 million which, together with cash on hand and the Plan Sponsors' agreement to assume all liability for distributions provided under the Plan, provides the Debtors with sufficient liquidity to fund the administration and paves a clear path to emergence.

9.     The Debtors seek authority to move forward with the solicitation and confirmation process swiftly.  Accordingly, the Debtors will request that this Court schedule a

---

[3]     On April 14, 2010 the Debtors entered into a plan support agreement (the "First Lien Term Loan Plan Support Agreement"), whereby certain consenting First Lien Term Loan Lenders (as defined below) have agreed to support the Plan.  The First Lien Term Loan Plan Support Agreement is attached hereto as **Exhibit B**.  On May 14, 2010 the Debtors entered into additional plan support agreements (collectively, the "Swap Counterparty Plan Support Agreements"), whereby certain Swap Counterparties have agreed to support the Plan.  The Swap Counterparty Plan Support Agreements are attached hereto as **Exhibit C**.

K&E 15702716

hearing to approve the disclosure statement for the Plan in early July 2010, and schedule a hearing to consider confirmation of the Plan by late August 2010. Given the lengthy sales and marketing process already undertaken by the Debtors prior to the filing of these cases and the "payout event" mechanism provided by the Plan, the Debtors believe their estates, their creditors, and all parties in interest will benefit from the swift consummation of their financial restructuring.

10.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized as follows. Part I of this Declaration describes the Debtors' business, their capital structure. Part II of this Declaration details the circumstances surrounding the commencement of these chapter 11 cases. Part III of this Declaration sets forth the relevant facts in support of each First Day Motion. Part IV of this Declaration provides information required by Local Bankruptcy Rule 1007-2.

## Part I.

## The Debtors

**A.     Overview of the Debtors' Corporate History and Business Operations**

**1.     The Debtors' Corporate History**

11.     Neff Corp. was formed in 1995 to serve as a holding company for its wholly-owned subsidiaries, Neff Rental, Inc. ("Neff Rental") and Neff Machinery, Inc. ("Neff Machinery") which were previously incorporated in 1988 and 1989, respectively. Neff Rental was primarily a lessor of heavy construction equipment and tools. Neff Machinery operated heavy construction equipment dealerships, serving primarily as a John Deere distributor. Subsequent to the formation of Neff Corp. in 1995, Neff Rental and Neff Machinery continued to operate as its wholly-owned subsidiaries.

K&E 15702716

12.    Neff Rental then began to strategically acquire equipment rental companies throughout the Sunbelt states and opened new rental branches in high-growth markets.  The rate of acquisition and opening of new branches accelerated after the Debtors became a public company in 1998.  In 1999, the Debtors sold their interest in Neff Machinery to Nortrax, a John Deere subsidiary and used the proceeds to pay outstanding debt.  Following the economic downturn and subsequent slowdown in non-residential construction during the early 2000s, the Debtors once again became a private company.  During this time, the Debtors restructured their operations, increased operating efficiencies, invested in sales and training, and remixed their rental equipment fleet to focus more acutely on the earthmoving sector, as described more fully below.  As non-residential construction expanded in 2004, the Debtors were well-positioned for growth, and their sound operational discipline led to significant expansion in revenue and operating cash flow.

13.    In June 2005, the Debtors were purchased by affiliates of Odyssey Investment Partners, a financial sponsor ("Odyssey").  In May 2007, Odyssey sold their interests in the Debtors to a consortium of financial sponsors led by affiliates of Lightyear Capital LLC (collectively, "Lightyear").

**2.    The Debtors' Operations**

14.    Currently, the Debtors are the 13th largest equipment rental company in the United States as measured by equipment rental revenues.  Through 63 branches located across 14 states, primarily in the Sunbelt region, the Debtors rent a broad variety of construction and industrial equipment, including earthmoving, material handling and aerial compaction equipment.  The Debtors' branches are located in key strategic markets that exhibit year round construction activity and favorable economic and demographic trends.  The corporate

6

headquarters for the Debtors other than Neff Holdings LLC is located in Miami, Florida; Neff

Holdings LLC is headquartered in New York City, New York.

**The Debtors' Branch Locations**



15.    For the twelve months ended March 31, 2010, the Debtors generated

approximately $187.4 million in total revenues.  Equipment rentals accounted for approximately

86 percent of the Debtors' total revenues over the twelve months ended March 31, 2010, or

approximately $161.1 million.  The Debtors' remaining revenues are derived primarily from

equipment sales (generating approximately $16.1 million in revenues over the twelve months

ended March 31, 2010), as well as equipment maintenance, supply and repair operations

(generating approximately $10.2 million in revenues over the twelve months ended

March 31, 2010).

16.    The Debtors' rental equipment fleet includes approximately 11,000 separate

pieces of equipment.  Earthmoving equipment, including backhoes, bulldozers, and excavators,

account for approximately one-half of the Debtors' rental equipment fleet as measured by

original equipment cost.   In addition, the Debtors' rental equipment fleet includes aerial

equipment, material handling equipment, concrete and compaction equipment, forklifts, trucks, generators, and compressors.

**Illustrative Rental Equipment**

  

17.     Rental and sales operations are conducted primarily through the Debtors' 63 branches, which are organized into five geographic regions:  Atlantic (17 branches); Central (12 branches); Florida (13 branches); Southeast (8 branches); and Western (13 branches).  Each branch is a full service rental operation, which offers customers 24/7 equipment support, including supply, repair, and maintenance services.   Rental rates,[4] inventory, and supply decisions may be made at the branch level, although significant pricing and equipment allocation decisions are made at regional or corporate levels.   Branch staffing typically includes a combination of managers, sales staff, mechanics, drivers, and support personnel.  The Debtors currently employ approximately 900 full time employees.  None of the Debtors' employees are represented by a union or covered by a collective bargaining agreement.

### 3.       The Debtors' Customers

18.     The Debtors' customer base includes more than 14,000 customers.  The Debtors' customers are typically mid-sized, regional, and local construction firms.   Although these

---

[4]     In the equipment rental industry, "rate" or "rental rate" generally refers to the pricing at which equipment rental companies such as the Debtors are able to rent their equipment to a particular customer.

K&E 15702716

customers are diversified across a variety of industries, including manufacturing, civil construction and military construction, non-residential construction activity remains a significant component of the Debtors' revenue stream. The Debtors focus primarily on providing exceptional equipment service, delivery, and reliability to their rental customers and do not typically compete for less profitable, national rental accounts that emphasize volume discounts or individual "do-it-yourself" customers for whom price is the primary decision-making factor.

19.    Customers rent the Debtors' equipment on a daily, weekly, and monthly basis. The Debtors determine rental rates for each type of equipment based on a combination of factors, including the cost and expected utilization of their rental equipment, and adjust rental rates at each branch based on customer demand, length of rental, volume of equipment rented, and other competitive considerations. The Debtors believe their commitment to high levels of service, on-time delivery, order accuracy, and equipment reliability are essential to maintaining existing customer relationships and driving new business.

### 4.    Fleet Management

20.    To maintain the safety and functionality of their rental equipment fleet, the Debtors regularly acquire new and used rental equipment in the ordinary course of business. Over the twelve months ended December 31, 2009, the Debtors acquired approximately $11.7 million in rental equipment, although the Debtors have significantly reduced rental equipment acquisitions since the downturn in response to reduced customer demand and equipment usage.

21.    The Debtors ordinarily purchase new or used rental equipment and replacement parts from a variety of original equipment manufacturers ("OEMs"), dealers, and auctioneers in the ordinary course of business. During the year ended December 31, 2009, rental equipment purchased from seven OEMs accounted for approximately 66 percent of the Debtors' total rental

K&E 15702716

equipment purchases.  The Debtors utilize particular equipment vendors, including OEMs, based on the particular vendor's ability to meet the Debtors' high standards for product quality and support services.  The Debtors believe that their ability to quickly obtain "in demand" parts and rental equipment provides them with a competitive advantage to meet customer rental equipment and maintenance needs on a real time basis.

22.     The Debtors also engage in a regular program of selling new and used rental equipment to adjust the size and composition of their rental fleet.  This program allows the Debtors to adjust to changing market conditions and to maintain the quality and average age of their rental fleet at desirable levels.  The Debtors sell rental equipment to various parties, including their rental customers, used equipment buyers, and OEMs.  The Debtors' rental equipment sales program allows them to maximize rental equipment utilization rates and take advantage of favorable pricing when compared with the estimated rental revenue available from a particular asset.  Rental equipment sales accounted for approximately nine percent of the Debtors' total revenues over the twelve months ended December 31, 2009, or approximately $16.3 million.  On average, the Debtors will sell approximately 2,500 pieces equipment in a given year.

### 5.     Competition

23.     The equipment rental industry is both fragmented and highly competitive. Competitors include small, independent operators with one or two rental locations, as well as regional and national equipment rental companies, including public companies and divisions thereof.  The Debtors' national competitors include United Rental, RSC, Hertz Equipment, and Sunbelt Rentals.  Large regional competitors include Ahern Rental, Sunstate, and NES Rental, as well as numerous smaller regional equipment rental companies.  The Debtors also compete with equipment vendors and dealers that both sell and rent equipment to customers.

10

K&E 15702716

24.    The general downturn in the equipment rental market has exacerbated existing competitive pressures by, among other things, causing industry-wide rental rate reductions. The Debtors have also seen industry-wide reductions in rental equipment prices on the secondary market caused by, among other things, increased equipment supply and significantly reduced customer demand.

**B.    Overview of the Debtors' Capital Structure**

25.    As of March 31, 2010, the Debtors reported approximately $298.9 million in total assets and approximately $612.7 million in total liabilities. As of the date hereof, the Debtors have approximately $598.6 million in indebtedness and related obligations, consisting of their First Lien Credit Facilities, secured Swap Obligations, a Second Lien Term Loan, and certain 10% Senior Notes (each as defined herein). These obligations are discussed in turn.

**1.    First Lien Credit Facilities**

26.    Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Neff Holdings Corp., as guarantor, Bank of America, N.A., as administrative agent (the "First Lien Agent"), and the lenders party thereto, are parties to that certain Credit Agreement, dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement").

27.    The First Lien Credit Agreement provides the Debtors with an asset based revolving credit facility (the "ABL" and the lenders thereunder the "ABL Lenders") with $250.0 million of maximum availability. Availability under the ABL is determined by a borrowing base formula calculated by reference to the appraised value of the Debtors' accounts

K&E 15702716

receivable, parts inventory, and rental equipment, subject to discretionary reserves.[5]  As of the date hereof, approximately $153.3 million was outstanding under the ABL.

28.    The First Lien Credit Agreement also provides for an $87.9 million "last out" term loan (the "First Lien Term Loan," and the lenders thereunder the "First Lien Term Loan Lenders").  The First Lien Term Loan was created through an exchange offer undertaken by the Debtors in December 2008, through which approximately $195.7 million of the Debtors' 10% Senior Notes were tendered for obligations under the First Lien Term Loan.  At the time of the Exchange, the First Lien Credit Agreement was amended and restated to, among other things, limit the First Lien Term Loan Lenders' ability to, among other things: (a) exercise rights or remedies in an event of default; (b) oppose the Debtors' use of cash collateral or borrowings under a DIP facility absent consent from the ABL Lenders; and (c) request adequate protection during a bankruptcy proceeding (absent the consent of the First Lien Agent).  In addition, in connection with the amendment of the First Lien Credit Agreement, the interest rate was increased by 200 bps and the size of the facility was reduced by $25 million.

29.    The ABL and the First Lien Term Loan (collectively, with the Swap Obligations, the "First Lien Credit Facilities") are secured by a first priority lien on substantially all of the Debtors' assets pursuant to that certain First Lien Security Agreement between Neff Corp., certain Debtors as parties thereto, and Bank of America, N.A., as agent, dated as of May 31, 2007 (the "First Lien Security Agreement," and, together with the First Lien Credit Agreement, the "First Lien Credit Documents").  Among other things, the First Lien Credit Documents provide that claims arising under the ABL hold seniority over the First Lien Term

---

[5]    As discussed more fully below, the Debtors reduced commitments under the ABL from $325.0 million to $250.0 million in connection with an October 2009 agreement with the First Lien Agent to increase availability under the ABL by reducing reserves.

Loan.  As of the date hereof, interest accrued on the First Lien Credit Facilities at LIBOR plus

350 bps.  The First Lien Credit Facilities mature on May 31, 2013.

### 2.    Swap Obligations

30.    Neff Corp. is a party to two interest rate swaps with Bank of America, N.A., and

UBS AG, respectively (collectively, the "Swap Counterparties").  Obligations arising under the

swaps (collectively, the "Swap Obligations") are treated as first lien claims under the terms of

the First Lien Credit Agreement.  Swap Obligations are junior to Claims arising under the ABL,

but are senior to Claims arising under the First Lien Term Loan.  The Swap Obligations are also

secured by liens granted pursuant to the First Lien Security Agreement.  As of the Petition Date,

the Swap Obligations totaled approximately $22.4 million.[6]

### 3.    Second Lien Term Loan

31.    Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff

Rental LLC, and Neff Finance Corp., as guarantors, Wilmington Trust FSB, as administrative

agent (the "Second Lien Agent"),[7] and the lenders party thereto (collectively, the "Second Lien

Lenders") are parties to that certain Credit Agreement, dated as of May 31, 2007 (the "Second

Lien Credit Agreement").

32.    The Second Lien Credit Agreement provides for a $290.0 million term loan,

which remains fully outstanding as of the Date hereof (the "Second Lien Term Loan").  As of the

Date hereof, interest accrued on the Second Lien Term Loan at LIBOR plus 550 bps.[8]  The

---

[6]    Pursuant to the Swap Counterparty Plan Support Agreements, the Swap Counterparties executed amendments to
their respective swap agreements under which the Swap Counterparties have agreed not to terminate their swaps
as a result of the filing of these chapter 11 cases and to otherwise support the Plan.

[7]    Wilmington Trust FSB is the successor in interest to Bank of America, N.A. as Second Lien Agent.

[8]    Interest accrual is based on LIBOR plus a base rate of 350 basis points plus a default rate of 200 basis points.

Second Lien Term Loan matures on November 30, 2014.  The Second Lien Term Loan is secured by a second priority lien on substantially all of the applicable Debtors' assets pursuant to that certain "<u>Second Lien Security Agreement</u>," between Neff Corp. and the Debtors as parties thereto and the Second Lien Agent, dated as of May 31, 2007.

### 4.    Intercreditor Agreement

33.    On May 31, 2007, the applicable Debtors, the collateral agent under the First Lien Security Agreement, and the collateral agent under the Second Lien Security Agreement entered into an agreement that, among other things, assigned relative priorities to claims arising under the First Lien Credit Facilities (including the Swap Obligations) and the Second Lien Term Loan (the "<u>Intercreditor Agreement</u>").  Among other things, the Intercreditor Agreement provides that claims arising under the Second Lien Term Loan are subordinate to claims arising under the First Lien Credit Facilities.  The Intercreditor Agreement also imposes certain limitations on:  (a) the rights and remedies available to the Second Lien Lenders in an event of default under the Second Lien Credit Agreement; (b) the Second Lien Lenders' ability to challenge the validity or priority of liens arising under the First Lien Credit Facility; and (c) the extent to which the Second Lien Lenders may be entitled to request adequate protection during a bankruptcy proceeding.

### 5.    10% Senior Notes

34.    Neff Corp., as issuer, and Neff Rental LLC, Neff Finance Corp., and Neff Rental, Inc., as guarantors, and Wells Fargo Bank, N.A., as indenture trustee, are parties to that certain indenture dated May 31, 2007 (the "<u>Senior Notes Indenture</u>"), pursuant to which Neff Corp. issued $230.0 million in Senior Notes due June 1, 2015 (collectively, the "<u>Senior Notes</u>").  The Senior Notes are unsecured obligations of the relevant Debtors.  Approximately $195.7 million in Senior Notes were exchanged for obligations under the First Lien Term Loan in December 2008.  Additionally, pursuant to the Exchange, the Senior Notes Indenture was amended to

14

eliminate certain restrictive covenants, certain events of default, and Neff Corp.'s SEC public reporting requirements.  The Debtors are no longer a public filer.  See Neff Corp., Form 15 (Dec. 29, 2008).  Approximately $35.9 million in Senior Notes remain outstanding as of the Petition Date.

### 6.    Equity

35.    The Debtors are privately held.  Neff Holdings LLC is owned by a consortium of financial sponsors, including affiliates of Lightyear, Norwest Equity Partners, and General Electric Pension Trust.  Lightyear is the largest equity holder in Neff Holdings LLC.  Lightyear indirectly owns approximately 50 percent of the equity units of Neff Holdings LLC.  Neff Holdings LLC, in turn, owns approximately 100 percent of the shares in Neff Holdings Corp. on an undiluted basis, and Neff Holdings Corp. directly or indirectly owns the remaining Debtors.[9]  A summary chart depicting the Debtors' corporate and capital structure is attached hereto as **Exhibit A.**

## Part II.

## Events Leading to the Chapter 11 Cases

### A.    Challenging Operating Environment

36.    The prolonged contraction of domestic credit markets and the corresponding slowdown in non-residential construction activity over the last 24 months have significantly impacted the Debtors' revenues and severely reduced their available liquidity.  Domestic construction activity—a key driver of the Debtors' revenues—is still in the midst of a well-documented downturn.

---

[9]    Certain individuals, including certain of the Debtors' directors and managers, own options representing approximately 16 percent of the shares in Neff Holdings Corp. on a fully diluted basis.

K&E 15702716

37.      This industry-wide downturn has significantly impacted the Debtors' revenue stream.  Notably, the Debtors' revenues for the twelve months ended December 31, 2008 and December 31, 2009 were approximately $277.1 million and $191.7 million, respectively, representing a 30.8 percent decline.  Meanwhile, competitors in the equipment rental industry have sought to maintain market share and equipment utilization rates by drastically lowering rental rates across the country.  The combination of reduced customer demand, rate reductions, diminished fleet sizes (and corresponding equipment sell-offs) has also negatively impacted the Debtors' equipment value in the secondary market.

38.      In response to the challenging operating environment, the Debtors have undertaken multiple cost-cutting and marketing initiatives to reduce expenses and stabilize revenues, respectively.  Cost-cutting initiatives included branch closures, headcount reductions, salary freezes, and across-the-board expense reductions focusing on, among other things, reduced repair and supply costs.  The Debtors have also made significant efforts to improve sales efficiency and incentivize key sales personnel to drive new business and to leverage existing accounts.  These initiatives have enabled the Debtors to maintain relatively healthy margins amidst the ongoing construction slowdown.

39.      Additionally, pursuant to the Exchange in December 2008, the Debtors reduced their leverage and interest expense by exchanging approximately $195.7 million of their Senior Notes for approximately $87.9 million in their newly-created First Lien Term Loan under the First Lien Credit Agreement.  Pursuant to the Exchange, each participating Senior Notes holder was entitled to receive a share of the First Lien Term Loan in an amount equal to 45 percent of

the face value of its tendered 10% Senior Notes.[10]   The Exchange closed on December 16, 2008. As a result, the Debtors were able to reduce overall indebtedness by $107.8 million, which resulted in an annual reduction in net cash interest expense of approximately $13 million.

## B.    Liquidity Constraints

40.    Despite the Debtors' prepetition restructuring initiatives, ongoing challenges in the Debtors' operating environment have continued to impose severe limitations on the Debtors' available liquidity.   The prolonged decline in construction spending has presented ongoing demand and pricing challenges for the Debtors.   Given the reduction in customer demand, rental rates, and secondary equipment prices, the Debtors' business operations have generated reduced revenues triggering a "lockbox" arrangement under their ABL facility causing customer receipts to be automatically applied to the Debtors' outstanding ABL balance.

41.    Additionally, due to liquidity limitations, the Debtors have not made interest payments on their Second Lien Term Loan in either January or April 2010.   However, the Debtors received a waiver from the ABL Lenders and Swap Counterparties for the missed January Second Lien Term Loan interest payment and received a temporary waiver for the missed April Second Lien Term Loan interest payment.   The April waiver expired on May 14, 2010.

42.    Availability under the prepetition ABL was calculated by a borrowing base formula determined by reference to the appraised value of the Debtors' accounts receivable, parts inventory, and rental equipment.   Based on the Debtors' semiannual equipment appraisal conducted as of March 31, 2009, the Debtors determined that their availability as of

---

[10]   Late tendering Holders of the Debtors' Senior Notes were subsequently permitted to exchange their Senior Notes for a share of First Lien Term Loan in an amount equal to 40 percent of the face value of the tendered notes.

K&E 15702716

April 30, 2009 was $21.1 million, triggering the lockbox.  Given that all cash receipts generated

by the Debtors were automatically applied to the Debtors' outstanding ABL balance as of the

Petition Date, the ABL was in effect the Debtors' remaining primary source of liquidity.

Availability under the ABL has been further impacted by a swap reserve and the continued

decline in equipment pricing.

## C.     Prepetition Negotiations

43.     In August 2009 the Debtors began taking additional steps to develop a long term

balance sheet solution with the goal of bringing the Debtors' capital structure in line with current

market conditions.   Among other things, the Debtors' Board of Directors established the

Restructuring Advisory Committee to provide strategic oversight regarding the restructuring

process.   The Debtors and their advisors also began discussions with the First Lien Agent to

increase availability under the ABL by reducing certain reserves taken with respect to the Swap

Obligations.   Through these negotiations, the Debtors obtained an immediate reduction of the

reserve from approximately $25.6 to approximately $16.0 million, with the reserve reducing to

$5.5 million over time.   In exchange, the Debtors agreed to, among other things, voluntarily

terminate $75.0 million in commitments otherwise available under the ABL, transmit titles to

facilitate the perfection of existing liens in the Debtors' rolling stock, deliver a preliminary

balance sheet restructuring plan to the First Lien Agent by October 31, 2009, and to commence

negotiations around such a plan by December 31, 2009.

44.     Beginning in September 2009, the Debtors and their investment banker, Miller

Buckfire & Co., LLC ("Miller Buckfire"), began an extensive review of strategic alternatives

available in light of the Debtors' current operating environment and leverage constraints.  To this

end, the Debtors contacted approximately five original equipment manufacturers in the earth

moving equipment industry (the "OEMs") to gauge their interest in a potential equity investment

in the form of cash or equipment.  Of these entities, only one OEM was willing to engage in discussions regarding a potential investment.  However, this OEM was ultimately unwilling to invest in the Debtors outside a significant restructuring event.

45.     Shortly thereafter, the Debtors and their advisors began discussing the preliminary terms of a potential restructuring with their major stakeholders, including the First Lien Credit Facility Agent, certain First Lien Term Loan Lenders, certain Second Lien Term Loan Lenders, and their respective advisors.  Upon execution of customary confidentiality agreements, the Debtors provided parties with information regarding the Debtors' operations, projections, and business plan to facilitate their ability to develop a potential restructuring plan or to otherwise constructively participate in the process.

46.     Additionally, in December 2009, the Debtors and their advisors began a parallel "third party" sales and investment process through which Miller Buckfire solicited interest in the Debtors from a broad universe of strategic and financial investors regarding a potential acquisition or investment in the Debtors in conjunction with a deleveraging event. Miller Buckfire contacted approximately 40 parties (including financial and strategic investors) and more than 20 of these interested parties executed confidentiality agreements and were provided with additional information regarding the Debtors.  After initial indications of interest were due on January 19, 2010, the Debtors received multiple indications of interest from financial investors for a potential sale transaction.  However, several parties declined to provide a written expression of interest because the values associated with a potential transaction were insufficient to allow execution of the transaction.  Further, some parties indicated a desire to potentially participate after the Debtors' commenced these Chapter 11 Cases as a potential topping bidder through the Payout Event.  Miller Buckfire subsequently requested interested

K&E 15702716

parties to provide binding commitments to sponsor a plan by February 22, 2010.  The Debtors

received a final bid from certain funds managed by Wayzata Investment Partners, LLC

("Wayzata") and Apollo Capital Management ("Apollo"), the Debtors' current Plan Sponsors.

47.    The Debtors subsequently received an alternative proposal from a third party

investor in March 2010 (the "Alternative Proposal").  The Debtors and their advisors worked

diligently to develop various aspects of the Alternative Proposal prior to the date hereof, while

seeking additional concessions and increased value on their proposal from the Plan Sponsors.

After exhaustive negotiations in April 2010 with the Plan Sponsors and the third-party investor

regarding the Alternative Proposal, and after analyzing, among other things, the relative values

provided by each proposal, the execution risk associated with each proposal, and other factors

associated with the assumption of liabilities, the Debtors' Board of Directors, in consultation

with their advisors and the consideration of such proposals by their Restructuring Advisory

Committee, selected the Plan Sponsors as their *de facto* stalking horse bidder for the

restructuring process.  However, as noted above, the Plan's "Payout Event" mechanism ensures

that alternative bidders, including the third-party investor who submitted the Alternative

Proposal, have an opportunity to top the stalking horse proposal submitted by the Plan Sponsors

currently embodied by the Plan.

20

D.    **Summary of the Plan**

48.    As noted above, the Debtors have filed these chapter 11 cases to implement their

prearranged Plan.  Among other things, the Plan provides that:[11]

- First Lien Term Loan Lenders other than the Plan Sponsors (who hold, collectively, approximately 67 percent of the First Lien Term Loan) have the option to be paid in full in cash or receive their pro rata share of 100 percent of the reorganized equity (as further described in the Plan, subject to dilution by the rights offering units, the second lien term loan equity election, the warrants, if issued, and the management equity incentive plan) and participation in a rights offering for up to approximately $119 million;[12]

- provided that their class accepts the plan, Second Lien Term Loan Lenders will receive (a) at such holder's option, either their pro rata share of $10.0 million in cash or their pro rata share of approximately 5.6 percent of the reorganized equity; and (b) co-investment rights to purchase up to $7.5 million of reorganized equity on a pro rata basis in conjunction with the rights offering;[13]

- provided that their respective classes vote in favor of the Plan, unsecured creditors will receive their pro rata share of a $365,000 as a cash gift;

- the Plan Sponsors have also committed to fully backstop the rights offered to the First Lien Term Loan Lenders to fund certain recoveries under the Plan and significantly de-leverage the Debtors' balance sheet; and

- the Plan Sponsors have agreed that the Purchaser (as defined in the Plan) will assume all liability for distributions provided under the Plan (including liability for all allowed administrative claims) to the extent not satisfied by the Debtors on or prior to the Effective Date to avoid the risk of an administratively insolvent, post-sale estate.

---

[11]    The following summary is provided for convenience only and is qualified in its entirety by reference to the Plan.  In the event of an inconsistency between this summary and the Plan, the Plan shall control in all respects.

[12]    Pursuant to the First Lien Term Loan Plan Support Agreement executed with the Plan Sponsors, the Plan Sponsors are not eligible to select the cash payment option with respect to their respective claims under the First Lien Term Loan.

[13]    Second Lien Lenders will receive warrants for approximately 5 percent of the reorganized equity if their class votes to reject the Plan.

K&E 15702716

The Plan is supported by the ABL Lenders (who are providing the Debtors' proposed DIP and exit financing) and the Swap Counterparties. The Swap Counterparties have in fact executed both plan support agreements and amendments to their swap agreements under which they have agreed not to terminate their swap agreements on account of these chapter 11 cases and to otherwise support the Plan.

49.    And as noted above, the Plan incorporates a "Payout Event" feature, under which any party may present a proposal that provides higher or better recoveries to the Debtors' creditors prior to confirmation, provided that such proposal has sufficient cash or financing to pay out the First Lien Term Loan in full in cash and otherwise treat creditors no less favorably than as provided by the Plan.[14]  The Debtors believe that this mechanism, in conjunction with their previous and continued efforts to engage stakeholders and potential third party investors, provide parties with higher and better recoveries without unduly jeopardizing the benefits currently offered through the Plan.

## Part III.

## First Day Motions

50.    To minimize the adverse effects of the commencement of these chapter 11 cases on their business, the Debtors have requested various types of relief in their "first day" motions and applications filed contemporaneously herewith (collectively, the "First Day Motions").[15] The First Day Motions seek relief intended to allow the Debtors to effectively transition into

---

[14]    The Plan Sponsors are not prohibited from presenting for consideration by the Debtors a counterproposal to a Payout Event that such Plan Sponsor or Plan Sponsors reasonably believes provides higher or better recoveries than such Payout Event as set forth more fully in the "Payout Event Procedures" filed contemporaneously herewith.

[15]    Capitalized terms used but not defined herein shall have the meanings set forth in the relevant First Day Motion.

22

chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  The following paragraphs describe the factual bases for the relief requested in each of the First Day Motions:

## A.    Matters Requested to Be Heard at First Day Hearing

### 1.    Joint Administration Motion

51.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of lead Debtor Neff Corp.  Further, the Debtors request that an entry be made on the docket of each of the cases of the Debtors other than Neff Corp., to indicate the joint administration of these chapter 11 cases.

52.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in these chapter 11 cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

K&E 15702716

53.    The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

**2.    DIP Motion**

54.    The Debtors request entry of interim and final orders approving post-petition debtor in possession financing, which among other things, provides the Debtors with the following relief: (a) authority to obtain postpetition loans in a principal amount not to exceed $30 million on an interim basis, and $175 million on a final basis (the "<u>DIP Facility</u>") and other financial accommodations, pursuant to the terms and conditions of the Senior Secured Debtor-In-Possession Credit Agreement, dated as of May 16, 2010 (the "<u>DIP Credit Agreement</u>"), substantially in the form attached to the DIP Motion.

55.    The Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders (as defined in the DIP Motion) offered the best option for obtaining the postpetition financing the Debtors require.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing.  It is my understanding that the Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens. Moreover, I believe the Debtors and the DIP Lenders negotiated the DIP Documents (as defined in the DIP Motion) in good faith and at arm's-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

24

56.     The Debtors need the funds provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest.   Absent the Postpetition Facilities (as defined in the DIP Motion) and use of the cash collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases, and may be required to immediately shut down their operations, which I believe will threaten the Debtors' significant going concern value.   Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

57.     It is my understanding that the DIP Facility will provide the Debtors with immediate access to $175 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases.   Further, the DIP Facility provides the Debtors with use of the cash collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings.   Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

58.     The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining immediate access to financing under the DIP Facility.   The Debtors have no material source of liquidity other than the DIP Facility.   To operate their business in the ordinary course, the Debtors require access to the DIP Facility to

25

maintain operations and fund their cash management system to a level sufficient to support their business activities. However, substantially all of the Debtors' cash is subject to the dominion of their prepetition lenders. Thus, the Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility. Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest. Therefore, at this time, I believe that to prevent immediate and irreparable harm, to fully satisfy the Debtors' liquidity needs, and to satisfy their ordinary course obligations, the Debtors require authority to borrow immediately under the proposed DIP Facility on an interim basis, and use such proceeds to fund their operations.

59. Thus to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Motion should be granted.

K&E 15702716

### 3.    Cash Management Motion

60.    By the Cash Management Motion, the Debtors request the entry of an order granting authority to:  (a) continue to use their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor in possession accounts or close existing Bank Accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including, letterhead, blank check stock, purchase orders, and invoices), and other documents related to the Bank Accounts existing immediately before the date hereof, without reference to their status as debtors in possession.

61.    The Debtors further request that the Court authorize the Banks at which they maintain the Bank Accounts to:  (a) continue to maintain, service, and administer the Bank Accounts; (b) debit or credit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashiers' checks prior to the Petition Date, and (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date.

62.    Given the complexity of the Cash Management System, I believe that if the Debtors were required to comply with the guidelines established by the Office of the United States Trustee, the burden of opening new bank accounts, revising cash management procedures, and the immediate ordering of new business forms with a "Debtor In Possession" legend, would severely disrupt the Debtors' businesses and cause additional confusion, delay, and cost at this critical time.

63.    The Debtors utilize an integrated, centralized Cash Management System under which the Debtors collect and disburse funds in the ordinary course of business.  As of the

27

Petition Date, the Cash Management System consists of 23 Bank Accounts, 21 of which are held

at Bank of America, and two of which are held at Wachovia.  Other than two de minimis petty

cash accounts, the Debtors' Bank Accounts are all held at Bank of America.  All but one of the

Bank Accounts is held in the name of Neff Rental, Inc.  Neff Rental Inc.'s Bank Accounts

include the following:

> a. **Main Operating Account**:  The Debtors maintain a main operating account at Bank of America.  The Main Operating Account is the central account in the Cash Management System and funds, directly or indirectly, all disbursement accounts as described below.  Funds from the Debtors' prepetition asset based lending facility are manually deposited into the Main Operating Account through an internal Bank of America money transfer.  Additional borrowings under the Prepetition ABL can be requested and authorized only by myself and the Corporate Controller.  Excess cash balances in the Main Operating Account can also be used to pay down the Prepetition ABL through a wire transfer initiated by the Debtors' senior accountant, Controller or myself and approved by the Controller or me.

> b. **Lock Box Accounts**:  The Debtors maintain two lock box depository accounts with Bank of America to receive customer payments, one of which is linked to physical lock boxes located in Atlanta and Los Angeles.  Customer payments in the form of physical checks or electronic transfers are sent directly to one of the Lock Boxes, one of five Bank of America regional deposit branches, or are received by the Debtors who send them directly to one of the Lock Boxes.  These payments are deposited into a Lock Box Account on a daily basis.  The Debtors do not make any disbursements from the Lock Box Accounts.  Prior to the Petition Date, funds maintained in the Lock Box Accounts were swept daily to pay down obligations under the Prepetition ABL.  In connection with the Debtors' proposed DIP Facility, the Debtors will draw on such facility to fund their daily expenses.  Any postpetition collections received through the Lock Box Accounts shall be used to pay down the debtor in possession revolving loan facility.

> c. **Accounts Payable Account**:  The Debtors maintain an accounts payable account and an associated controlled disbursement account at Bank of America to pay, among other things, vendors and other payables.  The A/P Account is automatically funded by the Main Operating Account when checks are presented for payment.  Funds are then transferred from the A/P Account to the A/P Disbursement Account for disbursement.

d.  Payroll Account:  The Debtors maintain an account that records cash transactions relating to payroll and an associated controlled disbursement account at Bank of America.  The Payroll Account funds employee salaries and expenses, and payments to benefits providers, insurance providers, and taxing authorities.  The Payroll Account is automatically funded by the Main Operating Account once checks are presented for payment.  Funds are then transferred from the Payroll Account to the Payroll Disbursement Account for disbursement.  In addition, the Debtors' third-party payroll processor will initiate an automated clearing house payment from the Payroll Account to fund direct deposits for each pay period.

e.  Purchase Card Account:  The Debtors maintain a purchase card account at Bank of America.  The Purchase Card Account funds certain expenses incurred by the Debtors' personnel, such as employee travel expenses.  Charges to the Purchase Card Account are paid monthly from the Main Operating Account.

f.  Petty Cash Accounts:  The Debtors maintain four regional petty cash accounts, two each with Bank of America and Wachovia to fund the daily cash needs of each of the regional offices.  The Petty Cash Accounts each hold approximately $2,000 at any given time and are funded through a draw on the A/P Account after each region submits petty cash requests to the corporate accounts payable department and such requests are reviewed and approved.

g.  UHC Funding Account:  The Debtors periodically fund a restricted account at Bank of America that is held and administered by United Health Care as part of the Debtors' self-insured health care policy.  The UHC Funding Account is automatically funded by the Main Operating Account on a weekly basis to ensure that a continual reserve of approximately $160,000 is available for health insurance claims.  On average, the UHC Funding Account funds approximately $90,000 in weekly disbursements.  Funds are distributed to health care providers from the UHC Funding Account when claims are processed.

h.  Flexible Spending Account:  The Debtors maintain a restricted account at Bank of America for qualified employee medical and/or dependent care expenses.  The FSA Account holds voluntary pre-tax withholdings by each of the Debtors' participating employees and is manually funded through the A/P Account.  The Debtors do not contribute matching funds into an employee's FSA Account.  Checks are sent from the FSA Account directly to employees when the Debtors' third-party FSA Account administrator initiates payment based on an employee claim.

29

Each of Neff Rental, Inc.'s Bank Accounts, with the exception of the UHC Funding Account, the FSA Account, and the Petty Cash Accounts are zero balance accounts and are directly or indirectly linked to a master operating account as part of a sweep and concentration account arrangement.  Notably, the Debtors do not presently maintain any investment accounts.

64.    The Bank Accounts held at Bank of America have been in place for over five years and were originally held at Fleet Bank prior to Bank of America's 2004 acquisition of Fleet Bank.  As part of Bank of America's effort to migrate customers from the legacy Fleet Bank system to the Bank of America system, in March 2010, Bank of America requested that the Debtors migrate their existing accounts to new Bank of America accounts.  Importantly, the account structure and control procedures utilized for the New Accounts are substantially similar to those used by the Legacy Accounts.  The Legacy Accounts will remain open, at least initially, during the course of these chapter 11 cases to allow third parties (such as taxing authorities) to access the relevant accounts if such third parties have not yet transitioned their own systems to access the New Accounts and to ensure that the Debtors continue to honor such obligations during this transition period.  Notably, approximately $900,000 is directly withdrawn from the Main Operating Account by taxing authorities through ACH transactions on a monthly basis.

65.    As of the Petition Date, the Debtors do not believe that any funds remain in the Legacy Accounts apart from approximately $50,000 that remains on account of outstanding checks and other obligations payable from such Legacy Accounts.  Checks presented for payment under the Legacy Accounts have been funded by daily draws on the Prepetition ABL and will be funded by the debtor in possession revolving credit facility after the Petition Date. The Debtors are working diligently to complete the account transition as quickly and efficiently

30

as possible without adversely affecting their business operations and anticipate that the Legacy Accounts will be closed by July 2010.

66.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted**.**

### 4.     KCC Retention Application[16]

67.     The Debtors seek to retain Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent.  I believe that by retaining KCC in the chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from KCC's service.  KCC has developed efficient and cost-effective methods in its area of expertise.  It is my understanding that KCC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the chapter 11 cases and, therefore, I respectfully submit that the KCC Retention Application should be approved.

### 5.     Creditor Matrix Motion

68.     Pursuant to the Creditors Matrix Motion, the Debtors propose to retain a notice and claims agent in connection with these chapter 11 cases who will prepare a computer-readable consolidated list of creditors and a list of equity security holders, available to all parties in interest.  Additionally, the Debtors seek authority to file a consolidated list of the Debtors'

---

[16]    Other than their notice and claims agent, the Debtors do not seek authority to retain their professionals on a first day basis.

creditors holding the 30 largest unsecured claims.  Finally, the Debtors propose that the notice and claims agent undertake all mailings directed by the Court, the U.S. Trustee, or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of these chapter 11 cases.

69.    I believe that consolidation of the Debtors' computer records, as requested in the Creditors Matrix Motion, into a creditor database for the mailing of notices to all applicable parties in such database will be sufficient to permit the Debtors' notice and claims agent to promptly notice those parties.  It will also avoid the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents that may arise from maintaining a separate mailing matrix with the Court.  Additionally, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices likely will maximize efficiency and reduce costs.

70.    Further, because the top 30 lists of several of the Debtors would overlap and because the exercise of compiling separate top 30 creditor lists for each individual Debtor would consume an excessive amount of the Debtors' scarce time and resources, I believe that allowing the Debtors to file a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will promote efficiency and better aid the U.S. Trustee in its efforts to communicate with these creditors.

71.    Finally, the notice and claims agent's assistance with mailing and preparation of creditor lists and notices will ease administrative burdens that otherwise would fall upon the Court and the U.S. Trustee.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted.

K&E 15702716

### 6.    Case Management Motion

72.    The Debtors request that the Court enter an order providing for certain notice, case management, and administrative procedures in these chapter 11 cases.  Given the number of parties in interest in these chapter 11 cases, requiring that service be made upon each of these parties would waste the Debtors' limited resources.  Thus, the Debtors believe that requiring paper service of certain pleadings only upon the main parties in interest, as well as authorizing service on all parties by e-mail, will be efficient and save the estates significant time and expense.  Additionally, due to the likely volume of motions and other pleadings that will be filed in these cases, the Debtors have proposed that such special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtors, and other parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.

73.    I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Case Management Motion should be granted.

### 7.    Wages Motion[17]

74.    The Debtors request the entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay prepetition claims, to honor obligations, and to continue programs,

---

[17]    The Debtors intend to file a motion seeking approval of a valued employee program and a key employee incentive plan.

K&E 15702716

in the ordinary course of business and consistent with past practices, relating to the Employee Obligations.

75.    I believe that as of the Petition Date, the Debtors employ approximately 900 employees.  Although the Debtors have paid their wages, salary, and other Employee Obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employees Obligations may nevertheless be due and owing.

76.    I believe the majority of the Debtors' Employees rely exclusively on their compensation, benefits, employee programs, and reimbursement of expenses provided by the Debtors to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations to the Employees for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  In the absence of such payments, the Debtors' Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations, and likely diminishing customer confidence in the Debtors.  It is my opinion that the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors must focus on restructuring their operations and balance sheets.

77.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Thus, to prevent

34

immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the Wages Motion should be granted.

### 8.    Customer and Rental Programs Motion

78.    The Debtors seek entry of interim and final orders authorizing the Debtors to maintain and administer the Customer and Rental Programs (as defined in the Customer and Rental Programs Motion) and to honor, in the ordinary course of business, approximately $1.42 million in prepetition commitments owing on account of the Customer and Rental Programs, including Rebates, Re-Rentals, Rental Splits, Credits and similar programs (in each case, as defined in the Customer and Rental Programs Motion).    The Debtors operate in a highly competitive industry and must actively cultivate customer support and ensure that they are able to respond to their customers' rental equipment needs.

79.    The Customer and Rental Programs generate customer loyalty and goodwill, increase the Debtors' competitive position and ensure customer satisfaction.    Similarly, the Customer and Rental Programs enable the Debtors to utilize their equipment fleet in an efficient manner in response to customer demand.    The loyalty and continued patronage of the Debtors' customers is critical to the Debtors' financial health and their ability to reorganize as a going concern.    Absent authority to continue the Customer and Rental Programs in the ordinary course of business, customers may feel that the Debtors are no longer offering a level of service and a product portfolio on par with that of the Debtors' competitors, inevitably leading to customer attrition due to the highly competitive business in which the Debtors operate.    Additionally, I believe these programs help stave off fierce competition from local, regional, and national equipment rental companies, all of whom have and likely will continue to pursue relationships with the Debtors' customers.    Moreover, any loss of customers caused by failure to honor the

35

Customer and Rental Programs will damage the Debtors' core businesses to a far greater extent than the costs associated with honoring prepetition obligations and continuing such practices.

80.    Thus, to prevent immediate and irreparable harm to the Debtors' customer base, I believe that the relief requested in the Customer and Rental Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Customer and Rental Programs Motion should be granted.

## 9.    Taxes Motion

81.    By the Taxes Motion, the Debtors request the entry of an order granting the Debtors the authority to pay any Taxes and Fees, in an amount up to approximately $4.1 million, that accrued or arose in the ordinary course of business prior to the Petition Date.  In the ordinary course of business, the Debtors incur and collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, attempt to file liens, or seek to lift the automatic stay.  In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

82.    Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to

K&E 15702716

operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors,

I respectfully submit that the relief requested in the Taxes Motion should be granted

> **10.** **Section 503(b)(9) Claims, Lien Claims, and Critical Vendor Claims Motion**

83.    The Debtors request the entry of an order authorizing them to pay, in their sole

discretion, (a) Section 503(b)(9) Claims in an amount not to exceed $300,000 on an interim basis

and $950,000 on a final basis; (b) Lien Claims in an amount not to exceed $450,000 on an

interim basis and $1,000,000 million on a final basis; and (c) Critical Vendor Claims in an

amount not to exceed $250,000 on an interim basis and $850,000 on a final basis.  To be clear,

the Debtors are not seeking authority to pay all prepetition trade claims.  Rather, the Debtors

seek authority by this Motion to pay only certain prepetition trade claims which are necessary to

maintain business operations without interruption while in chapter 11 and to ensure the Debtors'

survival as a going concern.

84.    In the ordinary course of business, the Debtors rely heavily on certain suppliers

and vendors, who provide the parts and maintenance services necessary to keep the Debtors'

rental fleet in good working repair and, thus, safe for customers to use.  Among other things,

these vendors provide the rental equipment itself, replacement parts, and transportation-related

goods such as tires, fuel, oils, lubricants, and hydraulic fluids.  These vendors can be categorized

as follows:

K&E 15702716

a.    Equipment Suppliers:   In the ordinary course of business, the Debtors purchase new and used rental equipment from a variety of original equipment manufacturers and third parties (collectively, the "Equipment Suppliers"), which provide the Debtors with the branded or specialty equipment requested by customers, and which, in turn, the Debtors must be able to provide to compete with other rental equipment businesses.  In addition, certain customers will have specific product or service needs that require the Debtors to acquire rental equipment from a core group of Equipment Suppliers.

b.    Parts Suppliers:  The Debtors also rely on a core group of parts suppliers in the primary and secondary market (collectively, the "Parts Suppliers") for various equipment parts that enable the Debtors to maintain the safety and functionality of their equipment fleet.  Additionally, Parts Suppliers provide inventory for the Debtors' own sales operations.  Generally, the Debtors purchase multiple replacement parts from a single Parts Supplier at a time to reduce transaction and freight costs by allowing for the consolidation of shipments.  While the Debtors may be able to obtain a particular part from another vendor, the time and additional transaction and shipping costs involved in such fragmented purchasing would significantly impede the Debtors' ability to respond to customer demand in a timely and efficient manner.  Furthermore, quality specifications or other requirements of the Debtors' customers may prevent the Debtors from obtaining a Parts Suppliers' products or services from alternative sources within a reasonable timeframe.

c.    Repair and Service Providers:   Although the Debtors perform routine maintenance and repair work on their rental equipment and delivery vehicles at their branches, the Debtors also rely heavily on other essential vendors for more extensive repair and maintenance services that the Debtors are unable to perform in a cost-efficient manner (the "Repair and Service Providers").  Additionally, Repair Vendors and Service Providers supply the Debtors with tires and related equipment required for the Debtors' rental equipment, as well as the Debtors' own transport and delivery vehicles.  Repair and Service Providers also perform on-site tire repair and related services for the Debtors and their customers.

85.    It is my belief that the Equipment and Parts Suppliers and Repair and Service Providers are critical to the Debtors' operations, particularly, in connection with the Debtors' efforts to ensure their aging rental equipment fleet remains safe to operate.    The Debtors' relationships with the Equipment and Part Suppliers and the Repair and Service Providers are not generally governed by long term contracts.  Instead, the Debtors typically do business with these

38

vendors on an order-by-order basis.  Thus, it is my understanding that the Debtors' failure to honor obligations currently owed to these vendors could cause the Equipment and Parts Suppliers to refuse to continue to do business with these vendors.  Further, given the constraints imposed by the Debtors' wide-spread geographic locations, the Debtors believe it may be difficult or impossible to locate alternative vendors within a particular geographic region in a timely or cost-effective manner.  In addition, it is my understanding that many Repair Vendors and Service Providers have small operations and rely primarily on a limited number of their own customers for their continued viability.  Such vendors have limited access to capital and can ill afford their own loss of operating revenues.  Such parties may have little choice but to demand that the Debtors satisfy their prepetition obligations in order to survive.

86.     Moreover, the Debtors know the importance of these vendors to the continuing function of the business all too well from previous experience.  Indeed, during the recession of the early 2000s, the Debtors experienced a liquidity contraction which left the Debtors unable to meet certain trade obligations in a timely fashion.  Many vendors refused to deliver supplies or provide services without immediate payment of outstanding trade balances.  Other vendors demanded that the Debtors either prepay purchase orders or make cash payments upon delivery. As a result, the Debtors operations and cash flows suffered greatly.  The Debtors can ill-afford to repeat this experience as they transition their operations into chapter 11.  Well aware of these potential issues, the plan sponsors and the proposed postpetition lenders have consented to the payment of certain trade claims as requested herein outside the context of a confirmed chapter 11 plan.

87.     I believe that if the Debtors fail to honor their prepetition obligations to the Critical Vendors, they may be permanently denied access to essential goods or services or be

K&E 15702716

forced to locate alternative sources of such (which may not be readily available), thereby incurring additional expenses and delays and jeopardizing key customer relationships. Payments for the essential goods and services provided by the Critical Vendors are currently due, and indeed more will fall due over the next 21 days. It is imperative that the Debtors send a clear message to their essential business partners and customers by paying the Critical Vendor Claims as provided herein in order to secure their access to the goods and services upon which the Debtors rely, thereby preserving the Debtors' ability to retain customers and maintain the safety and reliability of their rental fleet. Non-payment of Critical Vendor Claims that are currently outstanding or will become due and payable could jeopardize key relationships and undermine the Debtors' restructuring efforts before they have a chance to even begin.

88.    Thus to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Section 503(b)(9) Claims, Lien Claims, and Trade Claims Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Section 503(b)(9) Claims, Lien Claims, and Trade Claims Motion should be granted.

## 11.    NOL Motion

89.    The Debtors have incurred significant net operating losses ("NOLs"). As of the Petition Date, the Debtors believe they have NOLs of approximately $140 million. The Debtors' NOLs are an extremely valuable asset which the Debtors can use to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations. In this case, the Debtors' NOLs could translate into a potential future tax savings of approximately $56 million. Unrestricted trading of the Debtors' equity securities could, however, severely limit or even eliminate the Debtors' ability to use their NOLs. Thus, to prevent immediate and

irreparable harm to the Debtors' tax attributes, I believe it is necessary to establish certain procedures that will enable the Debtors to closely monitor certain transfers of equity securities. I believe these procedures will allow the Debtors to act expeditiously to prevent such transfers (if necessary) and will help the Debtors maximize future tax savings. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the NOL Motion should be granted.

**B.    Matters Requested to be Scheduled For Future Hearing**

**1.    Contract Rejection Motion**

90.    The Debtors request entry of an order authorizing the rejection of an unexpired lease and an executory contract (the "Contracts"). Absent rejection, the Contracts impose ongoing obligations of the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources compared to the benefits associated with the Contracts. Accordingly, to avoid incurring unnecessary administrative expense claims with respect to the Contracts, the Debtors seek to reject the Contracts effective *nunc pro tunc* to the Petition Date. Rejecting the Contracts is appropriate under the circumstances and reflects the Debtors' sound business judgment. Therefore, on behalf of the Debtors, I respectfully submit that the relief requested in the Contract Rejection Motion should be granted.

**2.    K&E Retention Application**

91.    The Debtors seek to retain Kirkland & Ellis LLP ("K&E") as their restructuring attorneys. K&E has extensive experience and knowledge in, and an excellent reputation for providing high-quality legal services in the field of debtor protections, creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, K&E has become familiar with the Debtors' business and the legal issues that may arise in these chapter 11 cases. I believe that K&E is well qualified and uniquely able to

41

represent the Debtors in these chapter 11 cases and respectfully submit that the K&E Retention

Application should be approved.

### 3. Miller Buckfire Retention Application

92.     The Debtors seek to retain and employ Miller Buckfire & Co., LLC

("Miller Buckfire") as their financial advisor and investment banker based upon, among other

things, (a) the Debtors' need to retain a financial advisory firm to provide advice with respect to

the Debtors' restructuring efforts and (b) Miller Buckfire's extensive experience and excellent

reputation in providing financial advisory and investment banking services in complex

restructurings.  Miller Buckfire has been providing the Debtors with financial advisory services

since June 2009, and has played a key role in negotiations with the Debtors' key creditor

constituencies in preparation for the chapter 11 cases.  I believe that Miller Buckfire is uniquely

qualified to address the complex financial issues that the Debtors are likely to confront during

the chapter 11 cases and respectfully submit that the Miller Buckfire Retention Application

should be approved.

### 4. AlixPartners Retention Application

93.     The Debtors seek to retain and employ AlixPartners LLP ("AlixPartners") as their

restructuring advisor based upon, among other things, (a) the Debtors' need to retain a

restructuring advisory firm to provide advice with respect to the Debtors' restructuring efforts

and (b) AlixPartners's professional standing, excellent reputation, and wealth of experience in

providing restructuring advisory services in complex restructurings.   AlixPartners has been

providing the Debtors with restructuring advisory services since December 2009 and has led

operational preparations for the chapter 11 cases.  I believe that AlixPartners is well qualified to

address the complex issues that the Debtors are likely to confront during the chapter 11 cases and

respectfully submit that the AlixPartners Retention Application should be approved.

K&E 15702716

### 5.    Deloitte Tax Retention Application

94.    The Debtors seek to retain and employ Deloitte Tax LLP ("Deloitte Tax") as their tax advisors based upon, among other things, Deloitte Tax's considerable expertise and Deloitte Tax's prior work for the Debtors.  I believe that Deloitte Tax is well qualified to perform the tax advisory services needed by the Debtors and respectfully submit that the Deloitte Tax Retention Application should be approved.

### 6.    Deloitte & Touche Retention Application

95.    The Debtors seek to retain and employ Deloitte & Touche LLP ("Deloitte & Touche") as their independent auditor based upon, among other things, Deloitte & Touche's considerable expertise and Deloitte & Touche's prior work for the Debtors.  I believe that Deloitte & Touche is well qualified to perform the auditor services needed by the Debtors and respectfully submit that the Deloitte & Touche Retention Application should be approved.

### 7.    Hilco Retention Application

96.    The Debtors seek to retain and employ Hilco Real Estate, LLC ("Hilco") as real estate advisors for the Debtors based upon, among other things, Hilco's considerable expertise and Hilco's prior work for the Debtors.  I believe that Hilco is well qualified to perform the real estate advisory services needed by the Debtors and respectfully submit that the Hilco Retention Application should be approved.

### 8.    Togut Firm Retention Application

97.    The Debtors seek to retain and employ Togut, Segal & Segal LLP (the "Togut Firm") as conflicts counsel for the Debtors based upon, among other things, the Togut Firm's considerable expertise in chapter 11 cases.  I believe that the Togut Firm is well qualified to perform the services needed by the Debtors and respectfully submit that the Togut Retention Application should be approved.

43

## 9.    Contract Rejection and Assumption Procedures Motion

98.    The Debtors request that the Court enter an order authorizing and approving expedited procedures to reject or assume executory contracts and unexpired leases (collectively, the "Contract Procedures").    Establishing the Contract Procedures will streamline the administration of these cases and help the Debtors increase the efficiency and overall cost-effectiveness of their reorganization.    The Contract Procedures are fair and reasonable to Contract counterparties because they afford parties in interest the opportunity to appear and be heard with respect to the assumption or rejection of Contracts.    Further, the Contract Procedures will save substantial legal expense and Court time that would otherwise be incurred if multiple hearings were held on separate motions with respect to every Contract that the Debtors seek to assume or reject.    Additionally, due to the likely volume of motions and other pleadings that will be filed in these cases, the Debtors have proposed that such special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtors, and other parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.

99.    I believe that the relief requested in the Contract Rejection and Assumption Procedures Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.    Thus, to prevent immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the Case Management Motion should be granted.

## 10.    OCP Motion

100.    The Debtors request authority to retain and compensate professionals used in the ordinary course of their businesses.    The Debtors retain various attorneys in the ordinary course of their businesses (each, an "OCP," and collectively, the "OCPs").    The OCPs provide legal

services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including providing legal services related to specialized areas of the law.

101.    Due to the number of OCPs that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and this Court to request each such OCP to apply separately for approval of its employment and compensation.  While I believe that some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.  Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

102.    I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and that the Ordinary Course Professionals Motion should be granted.  Thus, to prevent immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the Case Management Motion should be granted.

**11.    Utilities Motion**

103.    By the Utilities Motion, the Debtors request the entry of a final order: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering,

45

refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the final order; and (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.

104.    In the ordinary course of business, the Debtors incur utility expenses for electric, gas, water, telephone, Internet, and other similar utility services provided by approximately 178 utility providers.    I believe that uninterrupted utility services are essential to the Debtors' ongoing operations.    Additionally, any interruption of utility services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.    Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

105.    I believe that the proposed procedures are necessary in these chapter 11 cases because, if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers for adequate security in a disorganized manner during the critical first weeks of these chapter 11 cases.    Moreover, absent the relief sought in the Utilities Motion, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service. Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put these chapter 11 cases in jeopardy.

106.    Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to

46

K&E 15702716

operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the relief requested in the Utilities Motion should be granted.

### 12.    Interim Compensation Procedures Motion

107.    The Debtors request authority to establish procedures for the interim compensation and reimbursement of expenses for Professionals and Committee Members.  I believe that establishing orderly procedures for addressing issues related to payment of Professionals and Committee Members will streamline the administration of chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee, and all parties in interest.  I also believe that the Compensation Procedures Motion will permit the Debtors to manage payments efficiently to the Professionals and Committee Members and will allow all parties to monitor appropriately the cost of administration of these chapter 11 cases.  Accordingly, I believe the approval of the Compensation Procedures Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest and respectfully submit that the relief requested in the Compensation Procedures Motion should be granted.

### Part IV.

### Overview of Local Bankruptcy Rule 1007-2 Schedules

108.    Local Bankruptcy Rule 1007-2 requires that certain information about the Debtors be provided in this declaration.  This required information is provided in the schedules attached to **Exhibit D** of this declaration.  Specifically, the schedules attached to **Exhibit D** contain the following information with respect to the Debtors:[18]

---

[18]    The information contained in the schedules attached to **Exhibit D** of this declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as
(Continued…)

K&E 15702716

- Pursuant to Local Bankruptcy Rule 1007-2(a)(3), <u>Schedule 1</u> provides contact information for legal representatives of the ad hoc committee of first lien term loan lenders organized prior to the commencement of the Debtors' chapter 11 cases.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), <u>Schedule 2</u> provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Schedule 3</u> provides information with respect to the holders of the five largest secured claims against the Debtors on a consolidated basis.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> provides a summary of the Debtors' assets and liabilities on a consolidated basis.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Schedule 5</u> provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 6</u> provides information on the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor or agent for any such entity.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 7</u> provides information on the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 8</u> lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 9</u> lists the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 10</u> provides the names of the individuals who comprise the Debtors' existing senior

---

brief summaries. Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in the preceding paragraphs of this declaration.

management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), <u>Schedule 11</u> lists the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of these cases.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 12</u> provides the Debtors' estimated cash receipts and disbursements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

K&E 15702716

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Miami, Florida

Dated:      May 16, 2010

By:        */s/ Mark Irion*
           Mark Irion
           Chief Financial Officer
           Neff Corp.

## __EXHIBIT A__

**Corporate and Capital Structure Chart**

# Neff Corporate and Capital Structure Chart



**First Lien Facilities**

Revolving Credit Facility: $153.3 million drawn as of the petition date.

Maturity: May 31, 2013

Swap Liability: $22.4 million as of the petition date (counterparties: Bank of America, N.A. and UBS AG).

First Lien Term Loan: $88.5 million as of the petition date.

Collateral: First priority lien on substantially all the present and future property and assets of Borrowers and Guarantor.

Payment Waterfall: Generally, proceeds in the event of default are applied: _first_ to the ABL; _second_ to the Swap Liability; and _third_ to the First Lien Term.

Administrative Agent: Bank of America, N.A.

**Second Lien Facility**

Second Lien Term Loan: $298.5 million as of the petition date.

Maturity: November 30, 2014

Collateral: Second priority lien on substantially all the present and future property and assets of Borrower and Guarantors.

Administrative Agent: Wilmington Trust Co.

**10% Unsecured Notes Due 2015**

Amount outstanding: $35.8 million as of the petition date.

Maturity: June 1, 2015

Coupon: 10% per annum, payable June 1 and December 1.

Issuer: Neff Corp.

Guarantors: Neff Rental LLC, Neff Finance Corp., Neff Rental, Inc.

Indenture Trustee: Wells Fargo Bank, N.A.

**Debt Summary**

$ millions

| | |
|---|---|
| Revolving Credit Facility: | $153.3 |
| Swap Liability: | 22.4 |
| First Lien Term Loan: | 88.5 |
| Second Lien Term Loan: | 298.5 |
| 10% Notes Due 2015: | 35.8 |
| **Total** | **$598.5** |



Borrowers and/or Guarantor under First Lien Facilities

Borrower and/or Guarantors under Second Lien Facility

Issuer and/or Guarantors under 10% Notes Due 2015

## EXHIBIT B

**First Lien Term Loan Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of April 12, 2010, is entered into by and among Neff Corp. ("Neff" and together with its parent company (Neff Holdings LLC) and subsidiaries parties hereto, collectively the "Company" or the "Debtors"),[1] and certain holders of the First Lien Term Loans (as defined below) (the "First Lien Term Loan Lenders") parties hereto from time to time (together with their respective successors and permitted assigns, the "Consenting Lenders"). The Company, each Consenting Lender and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "Parties" and individually as a "Party". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Plan Term Sheet (as defined below).

## PRELIMINARY STATEMENTS

WHEREAS, as of the date hereof, the Consenting Lenders hold, in the aggregate, in excess of 67% of the aggregate outstanding principal amount of the first lien term loans (the "First Lien Term Loans") under that certain Credit Agreement (as amended, modified or otherwise supplemented from time to time, the "First Lien Credit Agreement"), dated as of May 31, 2007 and amended and restated as of December 16, 2008, by and among Neff, Neff Holdings Corp., certain of its subsidiaries, Bank of America, N.A., as administrative agent, and the other parties signatory thereto;

WHEREAS, the Company and the Consenting Lenders have agreed to implement a restructuring of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as Exhibit A (including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof, the "Plan Term Sheet"), which Plan Term Sheet is the product of arm's length good faith discussions between the Company and members of an ad hoc group of certain holders of the First Lien Term Loan Lenders (the "Ad Hoc Group");

WHEREAS, it is anticipated that, subject to the terms of this Agreement, the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), which plan of reorganization shall be consistent in all material respects with the terms of the Plan Term Sheet (a "Qualified Plan") and provide for, among other things, certain distributions on account of the First Lien Term Loan Lenders' claims under the First Lien Credit Agreement (the "First Lien Term Loan Lender Claims");

WHEREAS, the Company has agreed to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Debtors (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District

---

[1]   The Neff entities that will be filing a voluntary petition for relief in connection with the Chapter 11 Cases are Neff Holdings LLC, Neff Holdings Corp., Neff Corp., Neff Rental LLC, Neff Finance Corp. and Neff Rental, Inc.

of New York (the "<u>Bankruptcy Court</u>") to effect the Restructuring Transactions and, subject to the terms and conditions of this Agreement, to (i) file (a) a Qualified Plan and (b) a disclosure statement that is materially consistent with a Qualified Plan (the "<u>Disclosure Statement</u>"), and (ii) use commercially reasonable efforts to have the Disclosure Statement approved and a Qualified Plan confirmed by the Bankruptcy Court; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan Term Sheet.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>**Plan.**</u>

The Plan Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Plan Term Sheet sets forth the material terms and conditions of the Restructuring Transactions; however, the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Plan Term Sheet and this Agreement, this Agreement shall control.

2.    <u>**Certain Definitions.**</u>

As used in this Agreement, the following terms have the following meanings:

(a)    "<u>Definitive Documents</u>" means the documents implementing, achieving and relating to a Qualified Plan and the Plan Term Sheet and the Restructuring Transactions, including any first day motions, other than any administerial first day motions or retention applications (the "<u>First Day Motions</u>"), the Disclosure Statement and any motion seeking the approval thereof, the order of the Bankruptcy Court confirming a Qualified Plan, and definitive documentation relating to the Company's debtor-in-possession financing, use of cash collateral, any exit financing, organizational documents, shareholder and member related agreements or other related documents, which shall contain terms and conditions consistent in all material respects with this Agreement and the Plan Term Sheet and shall otherwise be reasonably satisfactory in all respects to the Company and Requisite Lenders, in accordance with Section 7 hereof.

(b)    "<u>Material Adverse Effect</u>" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Company, taken as a whole; <u>provided</u>, <u>however</u>, that "Material Adverse Effect" shall not include any event, effect, occurrence, development, circumstance or change of fact arising out of or resulting from (A) conditions or effects that generally affect persons or entities engaged in the industries and markets in which the Company operates, (B) general economic conditions in the United States or globally, (C) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national

2

emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (D) financial, banking, securities, credit or commodities markets, prevailing interest rates, or general capital markets conditions in the United States or globally, (E) changes in U.S. generally accepted accounting principles, (F) changes in laws, rules, regulations, orders, or other binding directives issued by any governmental entity, or (G) the taking of any action expressly contemplated by this Agreement, including the filing of the Chapter 11 Cases (but not defaults or violations of the terms of this Agreement); except in each of clauses (A), (B), (C) and (D) above, if the Company is disproportionately affected thereby relative to other persons or entities engaged in the industry in which the Company operates.

(c)    "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by the Company and the Consenting Lenders holding at least 66-⅔% in aggregate principal amount of the First Lien Term Loans.

(d)    "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(e)    "Requisite Lenders" means, as of any date of determination, Consenting Lenders holding at least 66-⅔% in outstanding principal amount of the First Lien Term Loans held by the Consenting Lenders in the aggregate as of such date.

3.    **Agreements of the Consenting Lenders.**

(a)    Voting.  Subject to the satisfaction of the conditions contained in Section 3(c) hereof, each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall:

(i)    subject to the receipt by such Consenting Lender of the Disclosure Statement, (A) timely vote or cause to be voted its First Lien Term Loan Lender Claims to accept a Qualified Plan (including, for the avoidance of doubt, a Qualified Plan that includes a Payout Event) by delivering its duly executed and completed ballot or ballots, as applicable, accepting a Qualified Plan on a timely basis following commencement of the solicitation of acceptances of a Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement, such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Lender at any time following the expiration of the Plan Support Period;

(ii)    support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby;

3

(iii)    timely vote or cause to be voted its First Lien Term Loan Lender Claims against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(iv)    not directly or indirectly seek, solicit, vote its First Lien Term Loan Lender Claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, or take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the First Lien Term Loans, that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes in connection with a Qualified Plan (the "Solicitation") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and a Qualified Plan, or take any other action that is inconsistent with, or that would delay the solicitation, confirmation or consummation of, a Qualified Plan or the Restructuring Transactions; provided, however, that any Backstop Party or combination of Backstop Parties shall not be prohibited from presenting for consideration by the Debtors a counterproposal to a Payout Event at any time up to ten (10) business days after receiving notice of such Payout Event (unless such date is extended by the Debtors) that such Backstop Party or Parties reasonably believes provides higher and better recoveries than that provided by such Payout Event; and

(v)    support the customary mutual release and exculpation provisions contained in a Qualified Plan.

(b)    <u>Acknowledgement of Payout Event</u>.  For the avoidance of doubt, each Consenting Lender agrees and acknowledges that a Payout Event shall constitute a Qualified Plan for the purposes of this Agreement.

(c)    <u>Certain Conditions</u>.  The obligations of each Consenting Lender set forth in Section 3(a) hereof are subject to the following conditions:

(i)    this Agreement shall have become effective in accordance with the provisions of Section 11; and

(ii)    this Agreement shall not have terminated in accordance with the terms of Section 5 hereof.

(d)    <u>Rights of Consenting Lenders Unaffected</u>.  Nothing contained herein shall (i) limit (A) the ability of a Consenting Lender to consult with other Consenting Lenders or the Company or (B) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with the Consenting Lender's obligations hereunder or under the terms of a Qualified Plan or under any other Definitive Document to which such Consenting Lender is a party and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of a Qualified

4

Plan; (ii) limit the ability of a Consenting Lender to sell or enter into any transactions in connection with the First Lien Term Loans or any other claims against or interests in the Company, subject to the terms of Sections 3(e) and 3(f) hereof; or (iii) limit the rights of any Consenting Lender under the First Lien Credit Agreement or constitute a waiver or amendment of any provision of the First Lien Credit Agreement, subject to the terms of Section 3(a) hereof.

(e)    Transfers. Each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall not sell, transfer, loan, issue, pledge (except for blanket security interests of lenders to the Consenting Lenders), hypothecate, assign or otherwise dispose of (including by participation) (each, a "Transfer"), directly or indirectly, in whole or in part, any of the First Lien Term Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any First Lien Term Loans or any other claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such First Lien Term Loans or such other claims against or interests in the Company), unless the transferee thereof either (i) is a Consenting Lender or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement applicable to Consenting Lenders (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing the joinder attached hereto as Exhibit B (the "Joinder Agreement"), and delivering an executed copy thereof, within three (3) business days of such execution, to Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Ad Hoc Group, and Kirkland & Ellis LLP, as counsel to the Company, in which event (a) the transferee (including the Consenting Lender transferee, if applicable) shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided, however, that such Transfer shall not, in and of itself, release any Consenting Lender who is also a Backstop Party from its obligations under such Backstop Party's Backstop Commitment (the Transfer of Backstop Commitments being governed by the Commitment Letter or, to the extent in effect, the Backstop Unit Purchase Agreement). Each Consenting Lender agrees that any Transfer of any First Lien Term Loans that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company and each other Consenting Lender shall have the right to enforce the voiding of such Transfer. Notwithstanding anything contained herein to the contrary, during the Plan Support Period, a Consenting Lender may offer, sell or otherwise Transfer any or all of its holdings of First Lien Term Loans to any entity that, as of the date of Transfer, controls, is controlled by or is under common control with such Consenting Lender; provided, however, that such entity shall automatically be subject to the terms of this Agreement and deemed a Party hereto and shall execute a Joinder Agreement hereto.

(f)    Additional Claims or Equity Interests.  To the extent any Consenting Lender (a) acquires additional First Lien Term Loans, (b) holds or acquires any other claims against the Company, or (c) holds or acquires any equity interests in the Company, each such Consenting Lender agrees that such First Lien Term Loans or other claims or equity interests shall be subject to this Agreement and that, so long as this Agreement has not been terminated as provided herein, it shall vote (or cause to be voted) any such additional First Lien Term Loans or other

5

claims or equity interests entitled to vote on a Qualified Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Section 3(a) hereof.

      (g)    <u>Distributions on Allowed First Lien Term Loan Claims</u>. Each of the Consenting Lenders party hereto on the Plan Support Effective Date (the "<u>Original Consenting Lenders</u>") shall be required to elect, in exchange for such Original Consenting Lender's Allowed First Lien Term Loan Claim(s), the First Lien Equity Election in addition to such Original Consenting Lender's *pro rata* share of the Rights and the Cash Payment, as set forth in the Plan Term Sheet. For the avoidance of doubt, the Original Consenting Lenders shall not be entitled to elect the First Lien Cash Payment Option on account of such Original Consenting Lender's Allowed First Lien Term Loan Claim(s).

    **4.**    **<u>Agreements of the Company.</u>**

      (a)    <u>Affirmative Covenants</u>. The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall, and shall cause each of its direct and indirect subsidiaries to, directly or indirectly, do the following:

        (i)    complete the preparation, as soon as reasonably practicable after the Plan Support Effective Date, of each of a Qualified Plan, the Disclosure Statement and the other Definitive Documents, which documents shall contain terms and conditions consistent in all material respects with the Plan Term Sheet and shall otherwise be acceptable to the Requisite Lenders, and distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Consenting Lenders in advance of any filing thereof;

        (ii)    (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Lenders to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (B) not take any action that is inconsistent with, or that would delay or impede the solicitation, confirmation or consummation of a Qualified Plan or the Restructuring Transactions, and (C) support the customary mutual release and exculpation provisions contained in the Plan Term Sheet and a Qualified Plan;

        (iii)    (A) commence the Chapter 11 Cases (such date, the "<u>Filing Date</u>") and file the First Day Motions; (B) obtain approval on a final basis of the DIP Facility by entry of an order of the Bankruptcy Court, as soon as reasonably practicable and in no event later than on the date that is forty-five (45) calendar days after the Filing Date; (C) file a Qualified Plan and Disclosure Statement as soon as reasonably practicable and in any event no later than on the date that is fifteen (15) calendar days after the Filing Date; (D) obtain approval of the Disclosure Statement (including authorization for the Debtors to perform their obligations under the Commitment Letter and the Backstop Unit Purchase Agreement, including payment of any fees and expenses arising under the Commitment Letter and the Backstop Unit Purchase Agreement as provided therein) and authorization for the solicitation of approval of a Qualified Plan by

NY 72674526v4

entry of an order of the Bankruptcy Court as soon as reasonably practicable and in any event no later than on the date (the "Disclosure Statement Approval Date") that is ninety (90) calendar days after the Filing Date; (E) commence the Solicitation as soon as reasonably practicable and in no event later than on the date (the "Solicitation Commencement Date") that is five (5) calendar days after the Disclosure Statement Approval Date; (F) obtain confirmation of a Qualified Plan by entry of an order of the Bankruptcy Court, which order shall not be the subject of any stay, as soon as reasonably practicable and in no event later than on the date (the "Confirmation Date") that is two-hundred fifty-five (255) calendar days after the Filing Date; and (G) consummate a Qualified Plan as soon as reasonably practicable and in no event later than on the date that is two-hundred seventy (270) calendar days after the Filing Date; and provided, that the Debtors shall not be in default under Sections 4(a)(iii)(D) or (E) of this Agreement if (1) material changes to a Qualified Plan (which material changes are consistent with the Plan Term Sheet and are otherwise reasonably acceptable to the Consenting Lenders and the Debtors) require the Debtors to seek approval by the Bankruptcy Court of a revised Disclosure Statement and re-solicit such Qualified Plan, (2) the subsequent Disclosure Statement Approval Date related to such revised Disclosure Statement occurs more than ninety (90) days after the Filing Date and (3) the confirmation and consummation by the Debtors of such revised Qualified Plan otherwise complies with the milestones set forth in Sections 4(a)(iii)(F) and (G), respectively, of this Agreement (as such milestones may be extended as provided herein pursuant to the Commitment Letter);

(iv)    except where not practicable, exercise commercially reasonable efforts to provide draft copies of all motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Ad Hoc Group within a reasonable period of time prior to the date the Company intends to file any such document and consult in advance in good faith with counsel to the Ad Hoc Group regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(vi)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(vii)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(viii)    provide to the Consenting Lenders, Stroock (as counsel to the Ad Hoc Group), Houlihan Lokey (as financial advisors to the Ad Hoc Group) and such other professionals as may be retained by the Ad Hoc Group (collectively, the "Ad Hoc Group Advisors"), and cause its employees, officers, advisors and other representatives to provide the Consenting Lenders and the Ad Hoc Group Advisors, subject to such confidentiality restrictions as reasonably required by the Company (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's

7

books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the Restructuring Transactions, (C) timely and reasonable responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(ix)    to the extent permitted by the Bankruptcy Court and under the DIP Facility, timely and fully discharge all of its obligations then due and owing under any existing agreements of the Company regarding the payment of the reasonable fees and expenses of the Ad Hoc Group Advisors in connection with the Restructuring Transactions;

(x)    on the date that is at least one (1) day prior to the Filing Date, pay to Stroock and Houlihan Lokey all reasonable amounts then due and outstanding as provided in an invoice supplied to the Company containing a summary of hours and services provided;

(xi)    to the extent the reasonable fees and expenses of Stroock exceed the amount of the retainer as of the date of confirmation of a Qualified Plan, pay to Stroock under such Qualified Plan its outstanding reasonable fees and expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise;

(xii)    promptly notify the other Parties of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which could reasonably be anticipated to have a Material Adverse Effect;

(xiii)    comply in all material respects with the covenants contained in the DIP Facility;

(xiv)    reject each of the Company's employment agreements other than those listed in Section "B" on Exhibit 4 of the Plan Term Sheet and such other employment agreements as may be agreed-to by the Debtors and the Ad Hoc Group (subject to the assumption of any such employment agreement listed in Section "B" on Exhibit 4 of the Plan Term Sheet being expressly conditioned upon the employee counterparty to such employment agreement (A) having executed and delivered to the Debtors an amendment, consent and acknowledgement agreement addressing the matters set forth in Section "C" of Exhibit 4 of the Plan Term Sheet and being in form and substance acceptable to the Ad Hoc Group, and such amendment, consent and acknowledgement agreement being in full force and effect), and (B) being actively employed by the Debtors on the Effective Date (unless otherwise agreed to by the Ad Hoc Group);

(xv)    provide the Ad Hoc Group with three (3) business days prior written notice of the settlement of any claim or pending litigation not otherwise insured under the Debtors' insurance policies and not otherwise paid for by the Debtors' applicable insurance carrier for more than $500,000 per claim or pending litigation individually (each an "Uninsured Claim Settlement") and seek Bankruptcy Court approval of each Uninsured Claim Settlement

8

pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, applicable local rules and the Bankruptcy Code; and

(xvi) provided, that a Payout Event has not occurred such that all allowed First Lien Term Loan Claims have been indefeasibly paid in full in cash on the Effective Date as provided in the Plan Term Sheet, (A) take all such actions as are reasonably necessary to cause the acquisition by one or more limited liability companies (the "LLCs"), formed or caused to be formed to acquire substantially all of the assets of the Debtors in connection with a Qualified Plan, to be structured and treated as a taxable transaction for United States federal income tax purposes, including the making of any appropriate elections under Subchapter K of the Internal Revenue Code and the imposition of reasonable trading restrictions to ensure that the LLCs are not treated as corporations for federal income tax purposes, (B) agree to report such acquisition as a taxable transaction for all financial accounting and income tax purposes, (C) ensure that any Qualified Plan provides that any Debtors that are to be liquidated or are to cease operations pursuant to the Qualified Plan shall receive the benefit of a discharge under section 1141 of the Bankruptcy Code or such equivalent injunctive relief as is necessary to (a) ensure that such Debtors' prepetition liabilities are discharged as if they had been reorganized pursuant to a Qualified Plan and/or (b) preclude successor liability from attaching to the LLCs; provided, that notwithstanding anything herein to the contrary, the Ad Hoc Group (whether in their capacities as Backstop Parties or otherwise) and the Debtors agree and acknowledge that the LLCs shall explicitly assume all liability for the distributions or treatment provided on account of all claims against, obligations of, or interests in the Debtors as set forth in the Plan Term Sheet, (D) take, and shall cooperate with the Ad Hoc Group in taking, all actions reasonably necessary to minimize federal, state and local income and other taxes of the Debtors, including, but not limited to, the filing of notices and clearance certificates with applicable taxing authorities; and (E) ensure that the Debtors will be wound-up, dissolved and liquidated concurrently with or promptly following the Effective Date, subject to the closing of the Chapter 11 Cases.

(b)      Negative Covenants.  The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders or Stroock, as counsel for the Ad Hoc Group (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall not, and shall cause each of its direct and indirect subsidiaries not to, directly or indirectly, do or permit to occur any of the following:

(i)      propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(ii)      modify a Qualified Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

(iii)      withdraw or revoke a Qualified Plan or publicly announce its intention not to pursue a Qualified Plan;

9

NY 72674526v4

(iv)     file any motion or pleading or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that is not consistent in any material respect with this Agreement, the Plan Term Sheet or a Qualified Plan;

(v)     move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan;

(vi)     issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)     amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)     split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)     redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)     acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(xi)     incur any capital expenditures in excess of the amounts permitted under the DIP Facility in the ordinary course of business and in amounts consistent with historical business practices;

(xii)     enter into any commitment or agreement with respect to debtor-in-possession financing, cash collateral and/or exit financing other than the DIP Facility and the Exit Facility;

(xiii)     enter into any executive employment agreements (other than those executive employment agreements assumed pursuant to a Qualified Plan and that have been identified on an exhibit to the Plan Term Sheet, subject to the amendments, consents and acknowledgements to be made and/or given with respect to such executive employment agreements as described in the Plan Term Sheet) or hire any executive or employee for whom total annual compensation is greater than $200,000 or enter into any collective bargaining agreements or materially modify any existing employment agreements or benefit plans; or

(xiv)     increase the compensation for any executive or employee whose total annual compensation is greater than $200,000; provided that such restriction shall not prohibit

10

the Debtors from making payments pursuant to a postpetition bonus or incentive plan, including a key employee retention plan, a key employee incentive plan or such other plans expressly provided by, and described in, the Plan Term Sheet and, as applicable, approved by the Bankruptcy Court.

(c)    Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

(d)    Payout Proposal Information.  Notwithstanding anything herein or in the Plan Term Sheet to the contrary, the Company may furnish or cause to be furnished information concerning the Company in connection with a proposal, offer, or indication of interest for a Payout Event (each a "Payout Proposal") received by the Company from a party that the Company's board of directors believes in good faith has expressed a legitimate interest in, and has the financial ability (based on financial statements and/or such other financial information deemed reasonably acceptable to the Debtors) to consummate, a Payout Event within the timeframe set forth in Section 4(a)(iii) of this Agreement (each an "Alternative Sponsor"); provided, that such Alternative Sponsor shall enter into, as a condition to its receipt of information, a confidentiality and non-disclosure agreement that is (x) substantially in the form attached hereto as Exhibit C or (y) in form and substance reasonably acceptable to the Debtors and the Requisite Lenders.  Subject to the proviso in the immediately preceding sentence, following receipt of a Payout Proposal the Debtors may negotiate and discuss such Payout Proposal with the Alternative Sponsor.

5.    **Termination of Agreement.**

(a)    Consenting Lenders' Termination Events.  The Requisite Lenders may terminate this Agreement as to all Parties upon three (3) business days' written notice (the "Notice"), delivered in accordance with Section 20 hereof, at any time after the occurrence of, and during the continuation of, any of the following events (each, a "Consenting Lenders' Termination Event"), unless waived in writing by the Requisite Lenders in their sole discretion (it being understood that the three (3) business days notice period referred to above shall not extend or be in addition to, and shall run concurrently with, any cure or remedy period set forth in this Section 5(a)); provided that this Agreement shall terminate automatically and without further action upon the occurrence of a Consenting Lenders' Termination Event contemplated by Section 5(a)(iv), Section 5(a)(ix), or Section 5(a)(xii) of this Agreement:

(i)    the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; provided, however, the Company shall have three (3) business days from the receipt of the Notice to cure such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

11

consummation of a material portion of the Restructuring Transactions; provided, however, that the Company shall have three (3) business days from such issuance to effectuate a complete reversal or dismissal, as applicable, of such ruling, judgment or order;

(iii)   any event, change, effect, occurrence, development, circumstance or change of fact occurs that has or would reasonably be expected to have a Material Adverse Effect; provided, however, that the Company shall have three (3) business days from the receipt of the Notice to remedy such event, change, effect, occurrence, development, circumstance or change of fact so that it no longer has or would reasonably be expected to have a Material Adverse Effect;

(iv)   the Bankruptcy Court enters an order terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(v)   the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $2,500,000 in the aggregate; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Debtors' use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Debtors' employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a Consenting Lenders' Termination Event;

(vi)   the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan or as otherwise approved in writing by the Requisite Lenders or counsel to the Ad Hoc Group (such approval not to be unreasonably withheld);

(vii)   the Bankruptcy Court enters an order materially amending, supplementing, staying, vacating or otherwise modifying (A) the credit documents relating to the First Lien Term Loans (except as may be reasonably necessary to implement the DIP Facility or permit the Company's use of cash collateral) or (B) the order of the Bankruptcy Court authorizing the Debtors' use of cash collateral to the detriment of the Consenting Lenders, in each case without the written consent of the Requisite Lenders or counsel to the Ad Hoc Group (such consent not to be unreasonably withheld);

(viii)   an Event of Default (as defined in the applicable order of the Bankruptcy Court approving the DIP Facility or credit agreement governing the DIP Facility) shall have occurred and be continuing and not waived under the DIP Facility after expiration of any applicable cure period provided therein and the Company's obligations shall have been accelerated thereunder;

NY 72674526v4

(ix)    the Bankruptcy Court having entered an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(x)    the failure to satisfy any of the conditions to effectiveness set forth in a Qualified Plan by the deadlines set forth in such Qualified Plan;

(xi)    the termination of the Commitment Letter or the Backstop Unit Purchase Agreement in accordance with their respective terms; and

(xii)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the First Lien Credit Agreement is involuntarily dismissed.

(b)    Company Termination Events.  The Company may terminate this Agreement as to all Parties upon three (3) business days prior written notice, delivered in accordance with Section 20 hereof, upon the occurrence of any of the following events (each a "Company Termination Event"):

(i)    the (A)(1) breach by one or more of the Consenting Lenders representing in excess of one-third (1/3) of the aggregate principal amount of the First Lien Term Loans held by the Consenting Lenders (the "One-Third Consenting Lender Group") of any of their obligations pursuant to Section 3(a)(i) of this Agreement, (2) material breach by the One-Third Consenting Lender Group of their obligations or covenants set forth in this Agreement (other than the covenants set forth in Section 3(a)(i) of this Agreement) and (3) material breach by the One-Third Consenting Lender Group of any of the representations or warranties made by the One-Third Consenting Lender Group set forth in this Agreement on the date such representations are made, or (B) breach by any Backstop Party of its Backstop Commitment pursuant to the terms of the Commitment Letter and the Backstop Unit Purchase Agreement (provided, however, that such breach shall not be deemed to be a Company Termination Event if one or more Non-Defaulting Backstop Parties purchases the Unsubscribed Units not purchased by the Defaulting Backstop Party pursuant to the Commitment Letter or, if in effect, the Backstop Unit Purchase Agreement); in each such case of clause (A) or clause (B), where such breach remains uncured for a period of three (3) business days after the receipt by the applicable Consenting Lender(s) from the Company of written notice of such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions; provided, however, that the Consenting Lenders shall have three (3) business days after receiving notice of such ruling or order to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement; or

(iii)    the board of directors of the Company reasonably determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

13

(c)    Mutual Termination.    This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company and the Requisite Lenders.

(d)    Effect of Termination.    Upon the termination of this Agreement in accordance with this Section 5, and except as provided in Section 14 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the First Lien Term Loans, the First Lien Credit Agreement and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept a Qualified Plan, the Company shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement.

6.    **Good Faith Cooperation; Further Assurances; Acknowledgement.**

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, (b) all matters concerning the implementation of the Plan Term Sheet and a Qualified Plan, and (c) the pursuit and support of the Restructuring Transactions. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring Transactions in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.    This Agreement is not, and shall not be deemed, a solicitation for consents to a Qualified Plan or a solicitation to tender or exchange of any of the First Lien Term Loans.    The acceptance of the First Lien Term Loan Lenders will not be solicited until the First Lien Term Loan Lenders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

7.    **Definitive Documents.**

Each Party hereby covenants and agrees (a) to negotiate in good faith the Definitive Documents and (b) to execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents.    For the avoidance of doubt, each Party agrees to (i) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation and the implementation of the Plan Term Sheet and a Qualified Plan in accordance with the

14

terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by, this Agreement and (iii) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transactions as contemplated by the Plan Term Sheet, a Qualified Plan and this Agreement.

8.    **Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases, the discharge of claims as a result thereof, or related restructuring transactions;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Chapter 11 Cases, a Qualified Plan and the Disclosure Statement; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender (i) is the beneficial owner of the aggregate principal amount of First Lien Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such First

15

Lien Term Loans, (A) sole investment or voting discretion with respect to such First Lien Term Loans, (B) full power and authority to vote on and consent to matters concerning such First Lien Term Loans or to exchange, assign and transfer such First Lien Term Loans or (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, such Consenting Lender has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any First Lien Term Loans that are inconsistent with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

9.     **Disclosure; Publicity.**

(a)     Not later than one (1) business day after the Filing Date, subject to the provisions set forth in Section 9(b) hereof, the Company shall disseminate a press release disclosing the existence of this Agreement and the terms hereof and of the Plan Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the date the Chapter 11 Cases are commenced) with such redactions as may be reasonably requested by any Consenting Lender's counsel to maintain the confidentiality of the items identified in Section 9(b) hereof, except as otherwise required by law. In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by this Section 9), and the Company hereby waives any claims against the Consenting Lenders arising as a result of such disclosure by a Consenting Lender in compliance with this Agreement.

(b)     The Company shall submit drafts to the Ad Hoc Committee Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Lender, no Party or its advisors shall (i) use the name of any Consenting Lender in any public manner or (ii) disclose to any person (including, for the avoidance of doubt, any other Consenting Lender), other than advisors to the Company, the principal amount or percentage of any First Lien Term Loans or any other securities of the Company held by any Consenting Lender, in each case, without such Consenting Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Term Loans held by all the Consenting Lenders collectively. Notwithstanding the provisions in this Section 9, (i) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a

16

result of any breaches hereof and (ii) any Party hereto may disclose, to the extent consented to in writing by a Consenting Lender, such Consenting Lender's identity and individual holdings.

### 10.   Amendments and Waivers.

This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Company and the Requisite Lenders; provided, however, that any modification of, or amendment or supplement to, this Section 10 shall require the written consent of all of the Parties. A Consenting Lenders' Termination Event may not be waived except in a writing signed by the Requisite Lenders.

### 11.   Effectiveness.

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Lenders shall be delivered to (a) other Consenting Lenders in a redacted form that removes such Consenting Lenders' holdings of the First Lien Term Loans and (b) the Company and advisors to the Consenting Lenders in an unredacted form. Upon the Plan Support Effective Date, the Plan Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

### 12.   GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.   NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

17

13.    **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.    Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity.

14.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 14, the proviso set forth in Section 3(a)(i), and in Sections 5(d), 9(b), 10, 12, 13, 16, 17, 18, 20, 21, 22, 23 and 26 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Lenders in accordance with the terms hereof; provided, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

15.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit sales, assignments or other Transfers of the First Lien Term Loans or claims arising under the First Lien Term Loans other than in accordance with this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18

17.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof, other than any No Recourse Party with respect to Section 26 herein.

18.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (and including the Plan Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect.

19.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(1)    If to the Company, to:

Neff Corp.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attention:  Graham Hood
            Chief Executive Officer
            -and-
            Mark Irion
            Chief Financial Officer

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Fax: (312) 862-2200
Attention:  Ray C. Schrock, Esq.
            -and-
            Ryan Preston Dahl, Esq.

19

(2)    If to a Consenting Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention:  Kristopher M. Hansen, Esq.
            - and -
            Jayme T. Goldstein, Esq.

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

### 21.    Reservation of Rights; No Admission.

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by this Agreement or in a Qualified Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. This Agreement and the Plan Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22.    Prevailing Party.

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

20

23.   **Relationship Among Parties.**

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Lender may trade in the First Lien Term Loans or other debt or equity securities of the Company without the consent of the Company or any other Consenting Lender, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

24.   **Committee Membership.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Lender or representative of a Consenting Lender that becomes a member of a statutory committee that may be established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member to the extent required to comply with fiduciary obligations applicable under the Bankruptcy Code; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any statutory committee in the Chapter 11 Cases. Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 24.

25.   **Representation by Counsel.**

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the transactions contemplated herein. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26.   **No Recourse.**

Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, the Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Party or any former, current or future directors, officers, agents, affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such person or entity, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any

21

obligation of any Party under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEFF CORP. (on behalf of itself and all other Debtors)**

By: _____

Name: MARC IAlION

Title: CFO

*[Signature Page to Plan Support Agreement – Neff Corp]*

**By:** ████████████████ **its investment Manager**

By: _____

Name: __**AVI KATZ**_____

Title: __**Vice President**_____

Principal Amount of First Lien Term Loans: ████████████.

<u>Notice Address</u>:

*[Signature Page to Plan Support Agreement – Neff Corp.]*

██████████████████████████

By: ████████████████ **its investment Manager**

By: _____

Name: **AVI KATZ**_____

Title: _____
**Vice President**

Principal Amount of First Lien Term Loans: ████████

Notice Address:

██████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

███████████████████████████

**By:** ████████████████ **its investment manager**

By: _____

Name: **AVI KATZ** _____

Title: **Vice President** _____

Principal Amount of First Lien Term Loans: ████████████

**Notice Address:**

███████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

███████████████████████████

By: ████████████████, its investment adviser

By: █████████████████ its general partner

By: _____

Name: __AVI KATZ__

Title: __Vice President__

Principal Amount of First Lien Term Loans: ███████████

Notice Address:

████████████████████

████████████████████

By: ████████████ its general partner

By: ████████████ its general partner

By: _____

Name: _____
       Joseph M. Deignan
       Authorized Signatory

Title: _____

Principal Amount of First Lien Term Loans: ████████████

<u>Notice Address</u>:

████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

**EXHIBIT C**

**Swap Counterparty Plan Support Agreements**

EXECUTION VERSION

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 14, 2010

To Bank of America, N.A., in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Neff Corp. ("Neff") and certain of its affiliates (together with Neff, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of Bank of America, N.A., in its capacity as counterparty (in such capacity, "BofA" or the "Swap Counterparty") pursuant to that certain ISDA Master Agreement with Neff dated June 14, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "Swap Agreement"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.     Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "Swap Counterparty Claims").

2.     Representations and Warranties of the Swap Counterparty

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

   (a)     Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to

EXECUTION VERSION

bind the beneficial owner(s) of such Swap Counterparty Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Swap Counterparty Claims and to dispose of, exchange, assign and transfer such Swap Counterparty Claims.

(b)     Such Swap Counterparty has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Swap Counterparty Claims or the Swap Agreement that are inconsistent with the representations and warranties of such Swap Counterparty herein or would render such Swap Counterparty otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)     Such Swap Counterparty (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 promulgated under the Securities Act of 1933, as amended).

3.     Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Neff, the Swap Counterparty shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its representatives to) (a) (i) vote all of its Swap Counterparty Claims to accept any Plan proposed by the Debtors incorporating (A) the terms and conditions set forth on the term sheet annexed hereto as **Exhibit 1**, which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Restructuring Term Sheet") and (B) the treatment of the Swap Counterparty Claims as provided for in an amendment to the Swap Agreement to be executed contemporaneously with this Agreement and which is annexed hereto as **Exhibit 2**, which amendment is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Swap Amendment"), consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment, and in form and substance reasonably satisfactory to the Debtors and otherwise containing terms no less favorable to the Swap Counterparty Claims than the proposal set forth in the Restructuring Term Sheet (a "Qualified Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Swap Counterparty Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose

2

EXECUTION VERSION

or to seek any modification of a Qualified Plan, the related disclosure statement, in form and substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees.  For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.      Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors.  The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer.  Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void ab initio.  This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

3

EXECUTION VERSION

5.    <u>The Debtors' Covenants</u>

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "<u>Confirmation Order</u>") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    <u>Termination of Obligations</u>

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Neff and the Swap Counterparty;

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "<u>Termination Event</u>"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

(A)    a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "<u>Petition Date</u>") (or such later date as may be agreed by Neff and the Swap Counterparty);

(B)    the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(C)    the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(D)    the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

4

EXECUTION VERSION

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)    the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)    Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)    an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)    upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

5

EXECUTION VERSION

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7.    Specific Performance/Remedies

(a)    It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b)    The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9.    Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10.    Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

6

EXECUTION VERSION

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    Plan Support Agreement Effective Date

      Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date"). Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.    Third-Party Beneficiary

      This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.    Counterparts

      This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.    Headings

      The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.    Acknowledgment

      This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

17.    Settlement Discussions

      This Agreement, the Restructuring Term Sheet and the Swap Amendment are part of a proposed settlement of matters that could otherwise be the subject of litigation among the

EXECUTION VERSION

parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.    <u>Further Agreements</u>

The Swap Counterparty agrees that, to the extent a Qualified Plan is consummated through the acquisition of all or substantially all of the Debtors' assets or any comparable transaction through which the Debtors' obligations under the Swap Agreement (as amended) shall be undertaken by a third party (each, a "<u>Third Party</u>"), the Swap Counterparty: (a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations under the Swap Agreement to such Third Party; and (b) shall take such further actions requested by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.    <u>No Waiver of Participation and Preservation of Rights</u>

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEFF CORP. (on behalf of itself and all other Debtors)**

By: _____

Name:

Title:

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

Bank of America, N.A., in its capacity as Swap Counterparty

Authorized Signatory:

By: _____

Name:

Title: **Ana Morales Gillard**
**Vice President**

[Signature Page for BofA Swap Counterparty Plan Support Agreement]

**PLAN SUPPORT AGREEMENT**

**Exhibit 2**

**Swap Amendment**

EXECUTION VERSION

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between Bank of America, N.A. ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA 2002 Master Agreement dated as of June 14, 2007 (together with the Schedule thereto and each Confirmation of the Transaction entered into thereunder with a Trade Date of June 14, 2007, Reference No. 2831884, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1    Conflicts.

(a)    Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)    Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2    Agreement Not to Terminate.

(a)    For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the

EXECUTION VERSION

Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b)    For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c)    Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3      Payments.

(a)    Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b)    For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement:  (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, the Calculation Agent shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or

---

[1]    "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

EXECUTION VERSION

withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)    In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below).  "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)    Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4    Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect.  For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5    Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

    Bank of America, N.A.
    Sears Tower
    233 South Wacker Drive, Suite 2800
    Chicago, IL 60606
    Attention:  Swap Operations
    Telephone No.: 312-234-2732
    Facsimile No.: 866-255-1444

4

EXECUTION VERSION

with a copy to:

      Bank of America, N.A.
      One Bryant Park, NY1-100-05-01
      New York, New York 10036

      Attention: Client Integration and Documentation
      Facsimile No.: 212-548-8622

Address for notice or communications to Party B:

      Neff Corp.
      3750 N.W. 87th Street, Suite 400
      Miami, Florida 33178 Attention: Chief Financial Officer
      Telephone No.: 305-921-2280
      Facsimile No.: 305-921-4156

with copies to:

      Kirkland & Ellis LLP
      Attention:  Ray Schrock and Ryan Preston Dahl
      300 North LaSalle
      Chicago, Illinois 60654
      Telephone No.: 312-862-2000
      Facsimile No.: 312-862-2200

      and

      Kirkland & Ellis LLP
      Attention:  Leonard Klingbaum and Brian S. Lennon
      601 Lexington Avenue
      New York, New York
      Telephone No.: 212-446-4800
      Facsimile No.: 212-446-6460

6      <u>Governing Law</u>.

      THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7      <u>Consent to Jurisdiction</u>.

      PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS.  NOTWITHSTANDING THE FOREGOING, PARTY A AND

EXECUTION VERSION

PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT.  PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXECUTION VERSION

        IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

                              Bank of America, N.A., as Party A to the ISDA
                              Agreement

                              By:    **Ana Morales Gillard**
                              Its:   **Vice President**


                              Neff Corp., as Party B. to the ISDA Agreement

                              By:
                              Its:   CFO


                    [Signature Page for BofA Swap Amendment]

7

EXECUTION VERSION

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 14, 2010

To UBS AG, in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "<u>Agreement</u>") sets forth certain terms and conditions pursuant to which Neff Corp. ("<u>Neff</u>") and certain of its affiliates (together with Neff, collectively the "<u>Debtors</u>") will propose their jointly filed chapter 11 plan of reorganization (a "<u>Plan</u>") on a consensual basis with the support of UBS AG, in its capacity as counterparty (in such capacity, "<u>UBS</u>" or the "<u>Swap Counterparty</u>") pursuant to that certain ISDA Master Agreement with Neff dated June 20, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "<u>Swap Agreement</u>"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    <u>Proposed Plan of Reorganization</u>

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") to be jointly administered.  As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "<u>Swap Counterparty Claims</u>").

2.    <u>Representations and Warranties of the Swap Counterparty</u>

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to bind the beneficial owner(s) of such Swap Counterparty Claims to the terms of

EXECUTION VERSION

this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Swap Counterparty Claims and to dispose of, exchange, assign and transfer such Swap Counterparty Claims.

(b)     Such Swap Counterparty has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Swap Counterparty Claims or the Swap Agreement that are inconsistent with the representations and warranties of such Swap Counterparty herein or would render such Swap Counterparty otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)     Such Swap Counterparty (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 promulgated under the Securities Act of 1933, as amended).

3.     Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Neff, the Swap Counterparty shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its representatives to) (a) (i) vote all of its Swap Counterparty Claims to accept any Plan proposed by the Debtors incorporating (A) the terms and conditions set forth on the term sheet annexed hereto as **Exhibit 1**, which term sheet is expressly incorporated by reference herein and made a part of  this Agreement as if fully set forth herein (the "Restructuring Term Sheet") and (B) the treatment of the Swap Counterparty Claims as provided for in an amendment to the Swap Agreement to be executed contemporaneously with this Agreement and which is annexed hereto as **Exhibit 2**, which amendment is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Swap Amendment"), consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment, and in form and substance reasonably satisfactory to the Debtors and otherwise containing terms no less favorable to the Swap Counterparty Claims than the proposal set forth in the Restructuring Term Sheet (a "Qualified Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Swap Counterparty Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Plan, the related disclosure statement, in form and

2

EXECUTION VERSION

substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees. For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.    Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors. The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void ab initio. This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

3

EXECUTION VERSION

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Neff and the Swap Counterparty;

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

(A)    a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Neff and the Swap Counterparty);

(B)    the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(C)    the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(D)    the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

4

EXECUTION VERSION

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)    the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)    Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)    an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)    upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

5

EXECUTION VERSION

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7.    Specific Performance/Remedies

(a)    It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b)    The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9.    Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10.    Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

EXECUTION VERSION

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    Plan Support Agreement Effective Date

        Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date").  Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.    Third-Party Beneficiary

        This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.    Counterparts

        This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.    Headings

        The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.    Acknowledgment

        This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.  For the avoidance of doubt, the obligations of UBS are the obligations solely of the Derivatives Credit Exposure Management business group within UBS AG in respect of the Swap Counterparty Claims.

7

EXECUTION VERSION

17.    Settlement Discussions

This Agreement, the Restructuring Term Sheet and the Swap Amendment are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.    Further Agreements

The Swap Counterparty agrees that, to the extent a Qualified Plan is consummated through the acquisition of all or substantially all of the Debtors' assets or any comparable transaction through which the Debtors' obligations under the Swap Agreement (as amended) shall be undertaken by a third party (each, a "Third Party"), the Swap Counterparty: (a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations under the Swap Agreement to such Third Party; and (b) shall take such further actions requested by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.    No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

8

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEFF CORP. (on behalf of itself and all other Debtors)**

By: _____
Name: Mark Irion
Title: CFO.

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

UBS AG, in its capacity as Swap Counterparty

Authorized Signatory:

By: _____
Name:       James B. Fuqua
Title:       Managing Director and Counsel
            Region Americas Legal

By: _____
Name: Thomas D. Frawley
Title: Managing Director

[Signature Page for UBS Swap Counterparty Plan Support Agreement]

**PLAN SUPPORT AGREEMENT**

**Exhibit 2**

**Swap Amendment**

EXECUTION VERSION

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between UBS AG ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA Master Agreement dated as of June 20, 2007 (together with the Schedule thereto and each Confirmation entered into thereunder, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1       Conflicts.

(a)     Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)     Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2       Agreement Not to Terminate.

(a)     For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it

shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b)     For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c)     Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3     Payments.

(a)     Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b)     For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement:  (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, each party shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to

---

[1]     "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

EXECUTION VERSION

the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)    In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below). "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)    Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4    Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect. For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5    Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

> UBS AG, Stamford Branch
> 677 Washington Boulevard
> Stamford, Connecticut 06901
> Attention: Legal Affairs
> Facsimile No.: 203-719-0680

Address for notice or communications to Party B:

4

EXECUTION VERSION

> Neff Corp.
> 3750 N.W. 87th Street, Suite 400
> Miami, Florida 33178 Attention: Chief Financial Officer
> Telephone No.: 305-921-2280
> Facsimile No.: 305-921-4156

with copies to:

> Kirkland & Ellis LLP
> Attention: Ray Schrock and Ryan Preston Dahl
> 300 North LaSalle
> Chicago, Illinois 60654
> Telephone No.: 312-862-2000
> Facsimile No.: 312-862-2200

> and

> Kirkland & Ellis LLP
> Attention: Leonard Klingbaum and Brian S. Lennon
> 601 Lexington Avenue
> New York, New York
> Telephone No.: 212-446-4800
> Facsimile No.: 212-446-6460

6    Governing Law.

THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7    Consent to Jurisdiction.

PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS. NOTWITHSTANDING THE FOREGOING, PARTY A AND PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT. PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

EXECUTION VERSION

IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

UBS AG, as Party A to the ISDA Agreement

By:
Its:

Kiya Sakai
Executive Director and Counsel
Region Americas Legal
Fixed Income Section

By:
Its:

Maria Iacomino-Murphy
Director
Region Americas Legal
Fixed Income Section

Neff Corp., as Party B. to the ISDA Agreement

By:
Its:

CFO.

[Signature Page for UBS Swap Amendment]

6

## **EXHIBIT D**

**Local Bankruptcy Rule 1007-2 Schedules**

## SCHEDULE 1[1]

## Committee Organized Prepetition

**Ad Hoc Committee of First Lien Term Loan Lenders**

There is an informal committee of lenders under the First Lien Term Loan represented by Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attn.: Kristopher Hansen and Jayme T. Goldstein, tel. (212) 806-5400.

---

[1]    The Debtors will update and supplement these schedules as necessary during the Chapter 11 Cases.

## SCHEDULE 2

## **Unsecured Creditors**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), contemporaneously with the filing of their petitions, the Debtors filed a motion requesting, among other things, authority to file a consolidated list of the 30 largest unsecured creditors (the "Top 30 List") in lieu of separate lists of each Debtor's 20 largest unsecured creditors.  Attached hereto is the Top 30 List which is based on the Debtors' books and records estimated as of the Petition Date.  The Top 30 List was prepared in accordance with Local Bankruptcy Rule 1007(d) for filing in the Chapter 11 Cases.  The Top 30 List does not include:  (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(3); or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is binding on, the debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| (1)<br>Name of creditor | (2)<br>Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contracts, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed or subject to set off | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Wells Fargo Bank, N.A., as Indenture Trustee | 213 Court St., Suite 703<br>Middletown, CT  06457<br>Attention: Corporate Trust Department<br>Phone: (860) 704-6217<br>Fax: (860) 704-6219 | Bond Debt | Unliquidated | $34,286,000.00 |
| Genie Industries | 12506 Collections Center Dr.<br>Chicago, IL  60693<br>Phone: (877) 897-7536<br>Fax: (425) 883-3475 | Trade Payable | Unliquidated | $165,815.58 |
| Clark Equipment Company d/b/a Bobcat | 75 Remittance Dr., Suite 1130<br>Chicago, IL  60675<br>Phone: (704) 655-4326<br>Fax: (866) 365-2960 | Trade Payable | Unliquidated | $125,144.25 |
| Compact Excavator Sales, Inc. | 400 Production Ct.<br>Elizabethtown, KY  42701<br>Phone: (270) 737-1447<br>Fax: (270) 737-0419 | Trade Payable | Unliquidated | $98,349.02 |
| Case Machines/CNH Capital | 700 State St.<br>Racine, WI  53404<br>Phone: (414) 636-6562<br>Fax: (262) 636-6078 | Trade Payable | Unliquidated | $72,045.00 |
| Sullivan-Palatek, Inc. | 1201 W. US Hwy. 20<br>Michigan City, IN  46360<br>Phone: (603) 543-3131<br>Fax: (219) 872-5043 | Trade Payable | Unliquidated | $65,914.17 |

| (1)<br>Name of creditor | (2)<br>Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contracts, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed or subject to set off | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| JLG Equipment Services Inc. | 13712 Crayton Blvd.<br>Hagerstown, MD  21742<br>Phone: (770) 795-0451<br>Fax: (240) 420-8719 | Trade Payable | Unliquidated | $59,212.56 |
| Wacker Neuson Corporation | N92 W115000 Anthony Ave.<br>Menomonee Falls, WI 53051<br>Phone: (800) 770-0957<br>Fax: (262) 502-6540 | Trade Payable | Unliquidated | $56,584.80 |
| Excel Equipment LLC | 2220 Prestwick Rd.<br>Lake Oswego, OR  97034<br>Phone: (503) 636-6444<br>Fax: (503) 699-9582 | Litigation Claim | Disputed | $52,852.00 |
| Multiquip, Inc. | 23688 Network Pl.<br>Chicago, IL  60673-1633<br>Phone: (866) 247-9496<br>Fax: (310) 537-3927 | Trade Payable | Unliquidated | $47,167.34 |
| Cintas Corporation | 6800 Cintas Blvd.<br>Cincinnati, OH  45262<br>Phone: (513) 754-3575<br>Fax: (513) 573-4837 | Trade Payable | Unliquidated | $46,733.11 |
| Great Lakes Petroleum | 5001 Wilkinson Blvd.<br>Charlotte, NC  28208<br>Phone: (800) 686-3455<br>Fax: (704) 357-6876 | Trade Payable | Unliquidated | $39,761.96 |
| Haulotte U.S. Inc. | 7135 Standard Dr.<br>Hanover MD  21076<br>Phone: (410) 712-4403<br>Fax: (419) 445 0367 | Trade Payable | Unliquidated | $36,747.32 |
| Nortrax Southeast | 24766 Network Pl.<br>Chicago, IL  60673-1247<br>Phone: (813) 635-2328<br>Fax: (309) 765-1655 | Trade Payable | Unliquidated | $36,564.82 |
| BP Lubricants USA Inc. | 1500 Valley Rd.<br>Atlanta, GA  30384<br>Phone: (800) 777-1466<br>Fax: (410) 780-8631 | Trade Payable | Unliquidated | $35,372.86 |
| Wilson-Finley Co. | 5901 Chapel Hill Rd.<br>Raleigh, NC  27636-3549<br>Phone: (804) 798-0552<br>Fax: (919) 878-3501 | Trade Payable | Unliquidated | $32,912.31 |
| A-1 Transportation Services | 172 W. 9400 South<br>Sandy, UT  84070<br>Phone: (801) 352-7666<br>Fax: (800) 535-6269 | Trade Payable | Unliquidated | $26,250.00 |
| H&E Equipment Services Inc. | 4010 S. 22nd St.<br>Phoenix, AZ 85040<br>Phone: (602) 232-0600<br>Fax: (602) 232-0620 | Trade Payable | Unliquidated | $26,246.61 |
| Hertz Equipment Rental | 225 Brae Blvd.<br>Park Ridge, NJ  07656<br>Phone: (800) 654-4740<br>Fax: (866) 777-9470 | Trade Payable | Unliquidated | $23,925.29 |

| (1)<br>Name of creditor | (2)<br>Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contracts, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed or subject to set off | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Duhon Machinery Co., Inc. | 10460 West Airline Hwy.<br>Kenner, LA  70063<br>Phone: (504) 466-5495<br>Fax: (504) 466-5450 | Trade Payable | Unliquidated | $23,518.93 |
| Kobelco America Inc. | 311 W. Monroe St., 7th Floor<br>Chicago, IL  60606<br>Phone: (630) 260-4343<br>Fax: (281) 240-4906 | Trade Payable | Unliquidated | $22,136.95 |
| Husqvarna Construction Products | 920 Central Ave.<br>Roselle, IL  60172<br>Phone: (800) 288-5040<br>Fax: (913) 438-7951 | Trade Payable | Unliquidated | $21,313.72 |
| JLG Industries Inc. | 1 JLG Dr.<br>McConnellsburg, PA  17234<br>Phone: (717) 485-5161<br>Fax: (717) 485-6417 | Trade Payable | Unliquidated | $20,664.87 |
| Tag Manufacturing Inc. | 6989 Discovery Dr.<br>Chattanooga, TN  37416<br>Phone: (888) 490-0501<br>Fax: (423) 893-3385 | Trade Payable | Unliquidated | $20,526.41 |
| Aflac | 1932 Wynnton Rd.<br>Columbus, GA  3199-90797<br>Phone: (800) 992-3522<br>Fax: (877) 442-3522 | Trade Payable | Unliquidated | $19,694.34 |
| DSI (Data Supplies Inc.) | 3967 Commerce Pkwy.<br>Miramar, FL  33025-4000<br>Phone: (305) 625-8017<br>Fax: (305) 621-2152 | Trade Payable | Unliquidated | $17,373.51 |
| Worldwide Express | 9150 S. Dadeland Blvd. #1510<br>Miami, FL  33156<br>Phone: (305) 670-2888<br>Fax: (214) 720-2446 | Trade Payable | Unliquidated | $17,360.65 |
| Brunner & Lay Inc. | 1510 N. Old Missouri Rd.<br>Springdale, AR  72765<br>Phone: (800) 872-6899<br>Fax: (214) 638-8712 | Trade Payable | Unliquidated | $16,985.81 |
| Transport Specialists Inc. | 305 Hwy. 6 South<br>Houston, TX  77077<br>Phone: (281) 597-8118<br>Fax: (281) 597-8319 | Trade Payable | Unliquidated | $16,885.00 |
| Sullair Corporation | 1625 E. 2nd St. # 4<br>Michigan City, IN  46360<br>Phone: (800) 785-5247<br>Fax: (219) 874-1273 | Trade Payable | Unliquidated | $16,623.98 |

# SCHEDULE 3

## Secured Creditors

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following provides information regarding the five largest secured claims for the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, perfection, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of March 31, 2010.

| No. | Creditor | Contact; Mailing Address & Telephone Number and Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | Bank of America, N.A. | Attn.:  Robert Anchundia, VP<br>Bank of America, N.A.<br>335 Madison Avenue, 6th Floor<br>New York, NY 10017<br>Phone:  212-503-7483<br>Fax:  212-503-7330 | $152,800,000 (asset based loan) | Certain material assets of the Debtors. |
| 2. | Bank of America, N.A.<br><br>and<br><br>UBS AG | Attn.:  Swap Operations<br>Bank of America, N.A.<br>Sears Tower<br>233 South Wacker Drive, Suite 2800<br>Chicago, IL 60606<br>Phone:  312-234-2732<br>Fax:  866-255-1444<br><br>With a copy to:<br><br>Attn.:  Global Markets Trading Agreements<br>Bank of America, N.A.<br>100 N. Tryon St., NC1-007-23-16<br>Charlotte, NC 28255<br>Fax:  980-387-9566<br><br>and<br><br>Attn.:  Legal Affairs<br>UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Fax:  203-719-0680 | $22,400,000 (swap liability) | Certain material assets of the Debtors. |
| 3. | Bank of America, N.A. | Attn.:  Robert Anchundia, VP<br>Bank of America, N.A.<br>335 Madison Avenue, 6th Floor<br>New York, NY 10017<br>Phone:  212-503-7483<br>Fax:  212-503-7330 | $87,900,000 (first lien term loan) | Certain material assets of the Debtors. |

| 4. | Wilmington Trust FSB | Attn.: Jeffery Rose, VP<br>Wilmington Trust FSB<br>50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402<br>Phone: 612-217-5630<br>Fax: 612-217-5651 | $290,000,000<br>(second lien term loan) | Certain material assets of the Debtors. |

**SCHEDULE 4**

**<u>Summary of the Debtors' Assets and Liabilities</u>**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), this schedule sets forth the Debtors' total assets and liabilities as of March 31, 2010.  The financial data in this schedule shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to challenge the priority, nature, amount or status of any liability included herein.

|  |  |
|---|---|
| Total Assets (Book Value): | $298,932,000 |
| Total Liabilities: | $609,333,000 |

## SCHEDULE 5

### Neff Corp.'s Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following table sets forth information, as of March 31, 2010, concerning ownership of Neff Corp.'s publicly traded securities. Upon information and belief, no Neff Corp. officers or directors maintain ownership of Neff Corp.'s publicly traded securities.

| Class | Value Outstanding | Number of Record Holders | Current Officer and Director Holders |
|---|---|---|---|
| Public Bonds | $34,286,000 | 29 | - |

## SCHEDULE 6

## <u>Debtors' Property Held By Third-Parties</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor.

| Property | Entity Holding Property |
|---|---|
| Various units of equipment and machinery and other property rented in the ordinary course of business. | At any given time, customers of the Debtors are in possession of equipment and machinery and other property owned by the Debtors. |
| Various security deposits. | Certain of the Debtors' lessors, utility companies, regulatory agencies and others. |

## SCHEDULE 7

### Debtors' Facilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased or held under other arrangements from which the Debtors operate their businesses.

| Debtor | Building Type | Location | Owned or Leased |
|--------|---------------|----------|-----------------|
| Neff Rental, Inc. | Headquarters | Miami, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Spokane, WA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Escondido, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | San Bernardino, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Sacramento, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | San Diego, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Anaheim, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Roseville, CA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Las Vegas, NV | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Phoenix, AZ | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Tucson, AZ | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Denver, CO | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Odessa, TX | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Austin, TX | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Houston, TX | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Texas City, TX | Owned |
| Neff Rental, Inc. | Equipment Rental Branch | Fort Worth, TX | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Lafayette, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Morgan City, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | St. Rose, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Lake Charles, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Baton Rouge, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Houma, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | New Iberia, LA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Washington, DC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Fredericksburg, VA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Norfolk, VA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Newport News, VA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Richmond, VA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Raleigh, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Fayetteville, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Greensboro, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Durham, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Wilmington, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Charlotte, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Greenville, NC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Knoxville, TN | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Nashville, TN | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Sumter, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Charleston, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Florence, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Columbia, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Myrtle Beach, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Greer, SC | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Doraville, GA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Forest Park, GA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Marietta, GA | Leased |

| Debtor | Building Type | Location | Owned or Leased |
|---|---|---|---|
| Neff Rental, Inc. | Equipment Rental Branch | Athens, GA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Augusta, GA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Macon, GA | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Ft. Myers, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Merritt Island, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Pompano Beach, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Miami, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Jacksonville, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Orlando, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Sarasota, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Tallahassee, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Sanford, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Tampa, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Port St. Lucie, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | West Palm Beach, FL | Leased |
| Neff Rental, Inc. | Equipment Rental Branch | Brunswick, FL | Leased |

## SCHEDULE 8

### Debtors' Books, Records, and Assets

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtors' books and records, the locations of their substantial assets and the nature, location and value of any assets held by the Debtors outside of the territorial limits of the United States.

### Location of Debtors' Books and Records

The books and records for Neff Holdings LLC are located 375 Park Avenue, New York, New York 10152.  The books and records of all other Debtors are located at Neff corporate headquarters at 3750 N.W. 87th Avenue, Suite 400, Miami, Florida.

### U.S. Location of Debtors' Substantial Assets

The Debtors maintain approximately 23 bank accounts at the following institutions: Bank of America and Wachovia.  In addition, the Debtors have assets at each of the domestic facilities listed on Schedule 7, attached hereto and incorporated herein by this reference.

### Location of Debtors' Assets Outside Territorial Limits of the U.S.

None.

## SCHEDULE 9

### Threatened and Pending Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists actions and proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Debtor Entity(ies) | Name of Case | Case Number | Type of Proceeding | Court and Location | Status |
|---|---|---|---|---|---|
| Neff Rental, Inc. | Jose Fernandez v. Timothy J. Chapman and Neff Rental, Inc. | 07-008694 | Accident (vicarious liability) | 13th Judicial Circuit in Hillsborough County, FL | Pending |
| Neff Rental, Inc. | Andrea Hawco v. Neff Rental, Inc. | 410-2007-06504 | EEOC Claim of Wage Discrimination | EEOC | Pending |
| Neff Rental, Inc. | Patrick Sperduto v. Juan Luis Ramos and Neff Rental, Inc. | 2008 CA 33581 | Accident (AIG) | 9th Judicial Circuit in Orange County, FL | Pending |
| Neff Rental, Inc. | Thomas Kenny v. Neff Rental, Inc. | 2007 CA 9446 | Accident (AIG) | 9th Judicial Circuit in Orange County, FL | Pending |
| Neff Rental, Inc. | Donnie Delatte v. Neff Rental, Inc. | 3:09-cv-00380 | Non-compete (retaliation) | U.S.D.C. for Middle District of LA (RET-DLD) | Pending |
| Neff Rental, Inc. | Denise Molina, as legal guardian for Jessica Toresco, incompetent  v. Jose G. Serna Quezada and Neff Rental, Inc. | 2009 CA 025793 | Accident (AIG) | 15th Judicial Circuit in Palm Beach County, FL | Pending |
| Neff Rental, Inc. | Ronald Chapell Jr. v. Neff Rental, Inc. | 126428 | Unfair Trade Practice | 21st Judicial Circuit in Livingston Parish, LA | Pending |
| Neff Rental, Inc. | Brian Hinesley v. Neff Rental, Inc. | C584983 | Unfair Trade Practice | 19th Judicial Circuit in East Baton Rouge, LA | Pending |
| Neff Rental, Inc. | Mark Abshire v. Neff Rental, Inc. | 75769 | Unfair Trade Practice | 16th Judicial Circuit in St. Martin, LA | Pending |
| Neff Rental, Inc. | Philadelphia Indemnity Insurance Co. v. Neff Rental, Inc. | 09-11766 | Subrogation Claim | 6th Judicial Circuit in Pinellas County, FL | Pending |
| Neff Rental, Inc. | Excel Equipment LLC v. Neff Rental, Inc. | 2010-00075453 | Unlawful Detainer - Commercial | Superior Court of California, County of Sacramento | Pending |
| Neff Rental, Inc. | Colonial Ford Truck Sales, Inc. v. Neff Rental, Inc. | 10020909 | Warrant in Debt | City of Richmond, General District Court | Pending |
| Neff Rental, Inc. | Joshua Bain v. John B. Ricker and Neff Rental, Inc. | CV-2010-0223 | General Litigation | State Court of Glynn County, Georgia | Pending |

## SCHEDULE 10

### <u>Senior Management</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following sets forth the names of the individuals who comprise the Debtors' existing senior management, their tenure at Neff Corp. in the positions set forth below and a brief summary of their relevant responsibilities and experience.

| Name | Position, Relevant Responsibilities and Prior Experience | Tenure |
|---|---|---|
| Hood, Graham | CEO & President | 2003 to present |
|  | Responsible for strategic direction and operational leadership. |  |
|  | Previously served as a regional vice president for Neff in the Southeastern Region and spent 17 years working for Hertz Equipment Rental Corporation. |  |
| Irion, Mark | Chief Financial Officer | 1999 to present |
|  | Responsible for financial reporting and management. |  |
|  | Previously employed as chief financial officer at Markvision Holdings, Inc., a computer distribution company.  Prior to that was employed by Deloitte & Touche LLP. |  |

## SCHEDULE 11

### Payroll & Payments For 30-Day Period Postpetition

Pursuant to Local Bankruptcy Rule 1007-2(b), the following provides estimated the consolidated amount of payroll to all employees and financial and business consultants of the Debtors and non-debtor domestic affiliates for the 30-day period following the filing of the Chapter 11 Cases.

| Group | Estimated Amount |
|---|---|
| Employees (excluding officers, directors, stockholders) | $3,998,000 |
| Officers, Directors, Stockholders | $81,300 |
| Financial and Business Consultants | $2,475,000 |

## SCHEDULE 12

### Estimated Financial Data For 30-Day Period Postpetition

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Chapter 11 Cases, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the Debtors on a consolidated basis.

| Description | Amount |
|---|---|
| **Cash Receipts** | $16,987,000 |
| **Cash Disbursements** | $15,422,000 |
| **Net Cash Gain** | $1,565,000 |
| **Unpaid Obligations** (excluding professional fees) | $14,470,000 |
| **Unpaid Receivables** (excluding professional fees) | $29,181,000 |