James H.M. Sprayregen, P.C.
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

    - and -

Anup Sathy, P.C. (*pro hac vice* pending)
Ray C. Schrock (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Counsel to the Debtors and Debtors in
Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-_____(____) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

## SUPPLEMENT TO DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11
## OF THE UNITED STATES BANKRUPTCY CODE

Dated: May 16, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

# TABLE OF CONTENTS

**Document**[2]

**Exhibit Number**

Backstop Unit Purchase Agreement ................................................................. 1

Description of Exit Facility Terms ................................................................. 2

Form of Warrant Agreement................................................................. 3

Payout Event Procedures ................................................................. 4

Plan Support Agreement ................................................................. 5

Purchase Agreement ................................................................. 6

Swap Plan Support Agreements................................................................. 7

Schedule of Cure Costs[3]................................................................. 8

Schedule of Rejected Executory Contracts and Unexpired Leases[4]................................ 9

Composition of the New Board[5] ................................................................. 10

Form of Amended and Restated LLC Operating Agreement[5]........................................ 11

Form of Liquidator Agreement[5]................................................................. 12

Form of Management Equity Incentive Plan Agreement[5]............................................. 13

List of Non-Released Parties[5] ................................................................. 14

Schedule of Causes of Action to Be Retained by the Purchaser[5] ................................... 15

---

[2]  **The Debtors reserve the right, in their sole discretion, to amend, modify, or supplement this supplement to the Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") at any time prior to the hearing to confirm the Plan.**

[3]  The Debtors intend to file this document prior to or on the date that is fourteen (14) days after date on which the Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") is approved.

[4]  The Debtors intend to file this document prior to the entry of the order approving the Disclosure Statement.

[5]  The Debtors intend to file this document prior to the hearing to confirm the Plan.

K&E 16825627

**PLAN SUPPLEMENT**
**<u>EXHIBIT 1</u>**

**Backstop Unit Purchase Agreement**

**NEFF CORP.**


**BACKSTOP UNIT PURCHASE AGREEMENT**




**Dated as of [_____], 2010**

# TABLE OF CONTENTS

Page

1.    Rights Offering and Backstop............................................................................2

    1.1.    The Rights Offering. .........................................................................2
    1.2.    Backstop Commitment.......................................................................3
    1.3.    Commitment Fee................................................................................4
    1.4.    Transaction Expenses........................................................................5
    1.5.    Break-Up Fee ....................................................................................5

2.    Representations and Warranties of the Debtors ...............................................6

    2.1.    Organization of the Debtors ..............................................................6
    2.2.    Authority; No Conflict. .....................................................................6
    2.3.    Proceedings.......................................................................................8
    2.4.    Brokers or Finders............................................................................8
    2.5.    Exemption from Registration............................................................8
    2.6.    Issuance............................................................................................8
    2.7.    No Violation or Default ....................................................................8
    2.8.    Title to Intellectual Property ............................................................9
    2.9.    Licenses and Permits........................................................................9
    2.10.    Compliance With Environmental Laws ...........................................10
    2.11.    Compliance With ERISA................................................................10
    2.12.    No Unlawful Payments ...................................................................11
    2.13.    Absence of Certain Changes or Events............................................11
    2.14.    Title to Property; Leases .................................................................11
    2.15.    Financial Statements ......................................................................11
    2.16.    Tax Matters. ...................................................................................12
    2.17.    Labor and Employment Compliance ...............................................13
    2.18.    Product Liability ............................................................................13
    2.19.    Owned and Leased Real Property ...................................................13
    2.20.    Arm's Length .................................................................................14

3.    Representations and Warranties of the Backstop Parties ................................14

    3.1.    Organization of Such Backstop Party .............................................14
    3.2.    Authority; No Conflict. ...................................................................14
    3.3.    Backstop Units Not Registered .......................................................15
    3.4.    Acquisition for Own Account ..........................................................15
    3.5.    Accredited Investor ........................................................................15
    3.6.    Access to Information ......................................................................16
    3.7.    Brokers or Finders..........................................................................16
    3.8.    Proceedings.....................................................................................16
    3.9.    Sufficiency of Funds ......................................................................16
    3.10.    Arms Length ..................................................................................16

4.    Covenants of the Debtors...............................................................................17

    4.1.    Agreement Motion and Agreement Order .......................................17

    4.2.    Rights Offering ........................................................................................17
    4.3.    Conditions Precedent ..............................................................................18
    4.4.    Notification .............................................................................................18
    4.5.    Use of Proceeds.......................................................................................18
    4.6.    Access .....................................................................................................18
    4.7.    HSR Act ..................................................................................................18
    4.8.    DIP Facility .............................................................................................19
    4.9.    Exit Facility ............................................................................................19
    4.10.  Acquisition .............................................................................................19
    4.11.  Specified Issuances ................................................................................19
    4.12.  Debtors Plan Support Agreement Covenants .........................................20

5.      Covenants of the Backstop Parties ....................................................................20

    5.1.    Conditions Precedent ..............................................................................20
    5.2.    HSR Act ..................................................................................................20
    5.3.    Backstop Plan Support Agreement Covenants .....................................21
    5.4.    Financing.................................................................................................21

6.      Conditions to Closing. .......................................................................................21

    6.1.    Conditions Precedent to Obligations of the Backstop Parties ...............21
    6.2.    Conditions Precedent to Obligations of Reorganized Neff....................25

7.      Termination.........................................................................................................26

8.      Indemnification. .................................................................................................27

9.      Survival of Representations and Warranties......................................................28

10.    Amendments and Waivers .................................................................................29

11.    Notices, etc.........................................................................................................29

12.    Miscellaneous. ...................................................................................................30

    12.1.  Assignments............................................................................................30
    12.2.  Severability .............................................................................................31
    12.3.  Entire Agreement ....................................................................................31
    12.4.  Counterparts ............................................................................................31
    12.5.  Governing Law ........................................................................................31
    12.6.  Submission to Jurisdiction.......................................................................31
    12.7.  Waiver of Trial by Jury; Waiver of Certain Damages ..........................31
    12.8.  Further Assurances..................................................................................32
    12.9.  Specific Performance ..............................................................................32
    12.10. Headings .................................................................................................32
    12.11. Interpretation; Rules of Construction.....................................................32
    12.12. Several, Not Joint, Obligations ..............................................................33
    12.13. Disclosure ..............................................................................................33
    12.14. No Recourse Party .................................................................................33
    12.15. Settlement Discussions ..........................................................................33
    12.16. No Third Party Beneficiaries .................................................................34

NY 72739029v7

13.    Definitions..............................................................................................................34

        13.1.    Certain Defined Terms.........................................................................34

**Schedules**

1              Backstop Parties
2              Backstop Party Affiliates
2.2(b)         No Conflicts
2.2(c)         Consents
2.3            Proceedings
2.4            Brokers or Finders
2.7            Certain Violations and Defaults
2.8(a)         IP Title
2.8(b)         Invalid or Infringed IP Rights
2.9            Missing Licenses and Permits
2.10           Environmental
2.11(a)        Benefit Plans
2.11(b)        Certain Benefit Plans and Multiemployer Plans
2.11(c)        Benefit Plan Penalties
2.13           Certain Changes or Events
2.14           Title to Property
2.15           Financial Statements
2.16(a)        Tax Returns
2.16(b)        Compliance with Tax Laws
2.16(c)        Material Deficiencies
2.17(a)        Compliance with Labor Laws
2.17(b)        Labor Proceedings
2.17(c)        Labor Organizing
2.18           Product Liability
2.19           Takings
3.2(b)         Backstop Party Conflicts

**Exhibits**

A              Plan of Reorganization
B              Rights Offering Procedures

NY 72739029v7

**THIS BACKSTOP UNIT PURCHASE AGREEMENT** (as amended, supplemented or otherwise modified from time to time, together with any schedules, exhibits and annexes hereto, this "<u>Agreement</u>") is entered into as of [_____], 2010, by and among (a) Neff Corp., a Delaware corporation (as in existence on the date hereof, as a debtor-in-possession in the Chapter 11 Cases (as defined below) and as a reorganized debtor, as applicable, the "<u>Company</u>"), (b) each of the Affiliates (as defined below) of the Company listed on the signature pages hereto under the title "Debtors" (such Affiliates, each as in existence on the date hereof, as a debtor-in-possession in the Chapter 11 Cases and as a reorganized debtor, as applicable, together with the Company, each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), (c) each of the undersigned entities and/or their investment advisors, managers, managed funds or accounts, intermediaries or nominees set forth on <u>Schedule 1</u> hereto (each, a "<u>Backstop Party</u>" and, collectively, the "<u>Backstop Parties</u>"), and (d) solely for purposes of <u>Section 1.2(d)</u> hereof, Reorganized Neff, L.L.C., a newly formed Delaware limited liability company ("<u>Reorganized Neff</u>").  Capitalized terms used in this Agreement are defined in <u>Section 13.1</u> hereof.

## RECITALS

**WHEREAS**, the Debtors intend to restructure pursuant to a plan under Chapter 11 of the Bankruptcy Code in the form attached hereto as <u>Exhibit A</u> (as it may be amended, supplemented or otherwise modified from time to time, together with the Plan Supplement, the "<u>Plan</u>") which will be filed by the Debtors in connection with contemplated voluntary filings (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

**WHEREAS**, pursuant to the terms of the Plan, the Debtors will effect a restructuring pursuant to, *inter alia*, an asset purchase agreement (the "<u>Asset Purchase Agreement</u>") to be entered into between the Debtors and Reorganized Neff and/or one or more of its wholly-owned Affiliates (such Affiliates, together with Reorganized Neff, the "<u>Acquisition Entities</u>") pursuant to which the Acquisition Entities will acquire (the "<u>Acquisition</u>") substantially all of the assets of the Debtors in exchange for, among other things, (a) cash received by Reorganized Neff from the Rights Offering, (b) Warrants (if required to be issued by Reorganized Neff under the Plan) and (c) New Common Units;

**WHEREAS**, pursuant to (and subject to the terms and conditions set forth in) the Plan, (a) each holder of an Allowed First Lien Term Loan Claim as of the Voting Record Date that is an accredited investor or qualified institutional buyer, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively (such holders, the "<u>First Lien Term Loan Rights Offering Participants</u>"), and (b) each holder of an Allowed Second Lien Term Loan Claim as of the Voting Record Date that is an accredited investor or qualified institutional buyer, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively (such holders, the "<u>Second Lien Term Loan Rights Offering Participants</u>" and, together with the First Lien Term Loan Rights Offering Participants, the "<u>Rights Offering Participants</u>"), will be offered the opportunity to subscribe for New Common Units (the "<u>Rights Offering Units</u>");

**WHEREAS**, the amount of the Rights Offering shall be an amount equal to (the "Rights Offering Amount"): (a) $118.9 million minus (b) an amount equal to (x) the total amount of cash that would be paid by the Debtors in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims if all of the holders of such claims (other than the Initial Consenting Holders) elected to receive the First Lien Term Loan Cash Payment and the Second Lien Term Loan Cash Payment pursuant to the Plan minus (y) the total amount of cash that will actually be paid by the Debtors in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims as a result of the holders of such claims electing to receive the First Lien Term Loan Cash Payment and the Second Lien Term Loan Cash Payment pursuant to the Plan;

**WHEREAS**, the purchase price per Rights Offering Unit in connection with the Rights Offering shall be an amount equal to (the "Exercise Price"): (A) the Rights Offering Amount, divided by (B) the total number of Rights Offering Units offered for sale in connection with the Rights Offering; and

**WHEREAS**, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, each of the Backstop Parties, severally and not jointly, has agreed to purchase on the Effective Date, at the Exercise Price, such Backstop Party's Backstop Commitment Percentage of the Rights Offering Units that have not been subscribed for by the Rights Offering Participants by the Cash Election/Rights Offering Termination Date (including any Rights Offering Units that are not subscribed for by (x) a First Lien Term Loan Rights Offering Participant on account of such First Lien Term Loan Rights Offering Participant electing the First Lien Term Loan Equity Election with respect to First Lien Term Loan Claims held by such First Lien Term Loan Rights Offering Participant and (y) a Second Lien Term Loan Rights Offering Participant on account of the holders of the Second Lien Term Loan Claims not voting to accept the Plan) (the "Unsubscribed Units").

**NOW, THEREFORE,** in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Debtors, the Backstop Parties and, solely for purposes of Section 1.2(d) hereof, Reorganized Neff agree as follows:

1.  **Rights Offering and Backstop**.

    1.1. **The Rights Offering**.

    (a)     The Company will commence the Rights Offering contemporaneously with, and as part of, the solicitation process for the Plan. The Rights Offering shall be conducted by the Company and consummated on the terms, subject to the conditions and in accordance with the procedures set forth in Exhibit B hereto (the "Rights Offering Procedures") and otherwise on the terms set forth in this Agreement. The total number of Rights Offering Units offered for sale in connection with the Rights Offering shall be subject to the approval of the Backstop Parties (in consultation with the Debtors).

    (b)     The Company hereby agrees and undertakes to give to each of the Backstop Parties, by facsimile transmission, a certification by an executive officer of the

Company of either (i) a true and accurate calculation of the number of Unsubscribed Units, and the aggregate Exercise Price therefor (a "Purchase Notice"), or (ii) in the absence of any Unsubscribed Units, the fact that there are no Unsubscribed Units and that the Backstop Commitments are terminated (a "Satisfaction Notice"), in either case as soon as practicable after the Cash Election/Rights Offering Termination Date and, in any event, at least seven (7) Business Days prior to the anticipated Effective Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "Determination Date").

1.2. <strong>Backstop Commitment</strong>.

(a)     On the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement (including, without limitation, the entry of the Agreement Order by the Bankruptcy Court and the Agreement Order becoming a Final Order), each of the Backstop Parties hereby agrees, severally and not jointly, to purchase on the Effective Date, at the aggregate Exercise Price therefor, its Backstop Commitment Percentage of all Unsubscribed Units as of the Cash Election/Rights Offering Termination Date. The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party. The Unsubscribed Units that each of the Backstop Parties is required to purchase pursuant to this Section 1.2(a) are referred to herein as such Backstop Party's "Backstop Commitment Units".

(b)     At least five (5) Business Days prior to the Effective Date (the "Deposit Deadline"), each Backstop Party shall, severally and not jointly, deposit into an escrow account (the "Escrow Account") with a bank or trust company approved by the Company and each of the Backstop Parties (the "Escrow Agent"), by wire transfer of immediately available funds, an amount equal to the product of (i) the Exercise Price and (ii) such Backstop Party's Backstop Commitment Units (such Backstop Party's "Backstop Commitment Unit Purchase Price") pursuant to an escrow agreement, in form and substance reasonably satisfactory to each of the Backstop Parties and the Company (the "Escrow Agreement").

(c)     In the event that a Backstop Party defaults (a "Backstop Default") on its obligation to deposit its Backstop Commitment Unit Purchase Price in the Escrow Account by the Deposit Deadline pursuant to Section 1.2(b) hereof (each such Backstop Party, a "Defaulting Backstop Party"), then each Backstop Party that is not a Defaulting Backstop Party (each, a "Non-Defaulting Backstop Party") shall have the right (the "Default Purchase Right"), but not the obligation, to commit to purchase, at the aggregate Exercise Price therefor, up to its Adjusted Commitment Percentage of all Backstop Commitment Units required to be purchased by the Defaulting Backstop Party pursuant to Section 1.2(a) but with respect to which such Defaulting Backstop Party did not make the required deposit in accordance with Section 1.2(b). As soon as practicable after a Backstop Default, the Company shall send a written notice to each Non-Defaulting Backstop Party, specifying (i) the number of Backstop Commitment Units subject to the Backstop Default (the "Default Units") and (ii) the maximum number of Default Units such Non-Defaulting Backstop Party is entitled to purchase (determined in accordance with the first sentence of this Section 1.2(c)). Each Non-Defaulting Backstop Party will have three (3) Business Days after receipt of such notice to elect to exercise its Default Purchase Right by notifying the Company and Reorganized Neff in writing of its election and specifying the

3

maximum number of Default Units that it is electing to purchase (up to the maximum number of Default Units such Non-Defaulting Backstop Party is entitled to purchase pursuant to the first sentence of this Section 1.2(c)). If any Non-Defaulting Backstop Party wishes to purchase less than the maximum number of Default Units such Non-Defaulting Backstop Party is entitled to purchase pursuant to the first sentence of this Section 1.2(c), then the Default Units that such Non-Defaulting Backstop Party does not elect to purchase shall be allocated among the Non-Defaulting Backstop Parties who wish to commit to purchase such Default Units on a *pro rata* basis based on the respective Adjusted Commitment Percentages of such Non-Defaulting Backstop Parties (such allocation and commitment to purchase to be made by utilizing the same procedures set forth in the two immediately preceding sentences). Each Non-Defaulting Backstop Party hereby agrees, severally and not jointly, to deposit into the Escrow Account pursuant to the Escrow Agreement, by wire transfer of immediately available funds, an amount equal to the product of (x) the Exercise Price and (y) the Default Units that each of the Non-Defaulting Backstop Parties commits to purchase in accordance with this Section 1.2(c), no later than one (1) Business Day after the day that all Default Units are subscribed for by the Non-Defaulting Backstop Parties or the Non-Defaulting Backstop Parties do not elect to subscribe for additional Default Units. The Default Units with respect to which each of the Backstop Parties deposits funds into the Escrow Account pursuant to this Section 1.2(c), if any, are referred to herein as such Backstop Party's "Additional Units" and, together with its Backstop Commitment Units, such Backstop Party's "Backstop Units".

(d)     The closing of the purchase and sale of Backstop Units (including with respect to the Additional Units) hereunder (the "Closing") will occur at 10:00 a.m., New York City time, on the Effective Date. At the Closing, (i) the Escrow Agent shall distribute the funds held in the Escrow Account to Reorganized Neff in accordance with the terms of the Escrow Agreement by wire transfer of immediately available funds to an account designated by Reorganized Neff pursuant to wire instructions previously provided by Reorganized Neff to the Escrow Agent no later than at least two (2) Business Days prior to the anticipated Effective Date, and (ii) each of the Debtors and Reorganized Neff (as applicable) shall deliver to each Backstop Party (A) a certificate or certificates duly executed on behalf of Reorganized Neff registered in the name of such Backstop Party (or its designee) representing the number of Backstop Units to be issued to such Backstop Party by Reorganized Neff pursuant to this Agreement and (B) such other certificates, counterparts to agreements, documents or instruments required by it to be delivered to such Backstop Party pursuant to Section 6.1 hereof. The agreements, instruments, certificates and other documents to be delivered on the Effective Date by or on behalf of the Debtors and/or Reorganized Neff will be delivered to the Backstop Parties at the offices of Kirkland & Ellis LLP, Citigroup Center, 601 Lexington Avenue, New York, New York 10022.

(e)     Anything in this Agreement to the contrary notwithstanding (but without limiting the provisions of Section 12.1 hereof), any Backstop Party, in its sole discretion, may designate that some or all of the Backstop Units be issued in the name of, and delivered to, one or more of its controlled Affiliates or Related Funds.

1.3.     **Commitment Fee**. The Debtors and the Backstop Parties hereby acknowledge that, in consideration for the Backstop Commitments, the Debtors have paid to the Backstop Parties, on the effective date of the Commitment Letter, a non-refundable upfront commitment fee in the aggregate amount of $1,500,000 (the "Commitment Fee"). The Debtors

hereby further acknowledge and agree that the Commitment Fee (a) was earned in full on the date the Commitment Letter was executed by the parties thereto, (b) will not be refundable under any circumstance or creditable against any other fee or other amount paid or to be paid in connection with this Agreement or the Commitment Letter (or any of the transactions contemplated hereby or thereby) or otherwise, and (c) shall not be subject to defense or offset on account of any claim, defense or counterclaim.

1.4.     **Transaction Expenses.**  Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated, the Debtors hereby agree to reimburse or pay, as the case may be, the Transaction Expenses as follows:  (a) all accrued and unpaid Transaction Expenses incurred up to (and including) the date (the "Execution Date") this Agreement is duly executed and delivered by the parties hereto (the "Initial Transaction Expenses") shall be paid in full on the Execution Date, (b) prior to the Petition Date and after the Execution Date, all accrued and unpaid Transaction Expenses shall be paid on a regular and continuing basis promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors, (c) after the Petition Date, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of the entry by the Bankruptcy Court of the Agreement Order shall be paid in full on the date of the entry by the Bankruptcy Court of the Agreement Order, (d) after the date of the entry by the Bankruptcy Court of the Agreement Order, all accrued and unpaid Transaction Expenses shall be paid on a regular and continuing basis promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors without Bankruptcy Court review or further Bankruptcy Court order, and (e) upon termination of this Agreement, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors without Bankruptcy Court review or further Bankruptcy Court order; provided, however, that the payment of the Transaction Expenses under the circumstances set forth in clauses (c), (d) and (after the Petition Date) (e) above shall be subject to the terms of the Agreement Order and to the extent permitted under the DIP Facility.  All Transaction Expenses of a Backstop Party shall be paid to such Backstop Party (or its designee) by wire transfer of immediately available funds to the account(s) specified by such Backstop Party.  The Transaction Expenses constitute allowed administrative expenses against the Debtors' estates under the Bankruptcy Code.  The terms set forth in this Section 1.4 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The obligations set forth in this Section 1.4 are in addition to, and do not limit, the Debtors' obligations under Sections 1.5 and 8 hereof.

1.5.     **Break-Up Fee**.  The Debtors hereby acknowledge and agree that the Backstop Parties have expended, and will continue to expend, considerable time and expense in connection with this Agreement and the negotiation hereof, and that this Agreement provides value to, is beneficial to, and is necessary to preserve, the Debtors' estates.  If any Debtor (a) enters into an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement) with respect to any Alternative Transaction or (b) consummates any Alternative Transaction (any of the events described in clause (a) or clause (b), a "Triggering Event"), in any such case described in clause (a) or clause (b), at any time (x) prior to the termination of this Agreement and the Backstop Commitments in accordance with the terms hereof or (y) within twelve (12) months following the termination of

this Agreement and the Backstop Commitments in accordance with the terms hereof (including a termination on account of the occurrence of the Termination Date), then the Debtors will pay to the Non-Defaulting Backstop Parties a cash fee in the aggregate amount of $3,000,000 (the "Break-Up Fee"). The payment of the Break-Up Fee shall be made by the Debtors upon the consummation of the Alternative Transaction. The Debtors will not be required to pay the Break-Up Fee if (i) this Agreement and the Backstop Commitments are not terminated and (ii) the transactions contemplated by this Agreement, the Plan Support Agreement and the Term Sheets are consummated. The Break-Up Fee (A) shall be deemed earned in full on the date of the occurrence of the Triggering Event, (B) will be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis (based on their respective Adjusted Commitment Percentages) by wire transfer of immediately available funds to the same accounts to which the Commitment Fee was paid to the Non-Defaulting Backstop Parties and (C) shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim. The terms set forth in this Section 1.5 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated. The parties acknowledge that the agreements contained in this Section 1.5 are an integral part of the transactions contemplated by this Agreement, are actually necessary to preserve the value of the Debtors' estates and constitute liquidated damages and not a penalty, and that, without these agreements, the Backstop Parties would not have entered into this Agreement. The Break-Up Fee shall be payable without Bankruptcy Court review or further Bankruptcy Court order. The Break-Up Fee constitutes an allowed administrative expense against the Debtors' estates under the Bankruptcy Code. The obligations set forth in this Section 1.5 are in addition to, and do not limit, the Debtors' obligations under Sections 1.4 and 8 hereof.

2.      **Representations and Warranties of the Debtors**. The Debtors hereby, jointly and severally, represent and warrant to the Backstop Parties as set forth below. Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Effective Date:

2.1.    **Organization of the Debtors.** Each Debtor is a corporation or limited liability company (as the case may be) duly organized or formed (as applicable), validly existing and in good standing under the Laws of the State of Delaware or Florida, as applicable, and has full corporate or limited liability company (as applicable) power and authority to conduct its business as it is now conducted. Each Debtor is duly qualified or registered to do business as a foreign corporation or limited liability company (as the case may be) and is in good standing under the Laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

2.2.    **Authority; No Conflict**.

(a)     Each Debtor (i) has the requisite corporate or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement and the Debtor Ancillary Agreements to which it is (or will be) a party, and to enter into, execute and file with the Bankruptcy Court the Plan and (B) subject to the entry by the Bankruptcy Court of the

Agreement Order and the Confirmation Order, to perform and consummate the Contemplated Transactions and the transactions contemplated under the Plan, and (ii) has taken all necessary corporate or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of this Agreement and the Debtor Ancillary Agreements to which it is (or will be) a party, (y) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (z) the performance and consummation of the Contemplated Transactions and the transactions contemplated under the Plan. This Agreement has been (or, in the case of each Debtor Ancillary Agreement to be entered into by a Debtor at or prior to the Closing and the Plan, will be) duly executed and delivered by each Debtor (or, in the case of a Debtor Ancillary Agreement, the Debtor party thereto). Subject to the entry of the Agreement Order, this Agreement constitutes (or, in the case of each Debtor Ancillary Agreement to be entered into by a Debtor at or prior to the Closing, subject to the entry of the Confirmation Order, will constitute) the legal, valid and binding obligation of each Debtor (or, in the case of a Debtor Ancillary Agreement, the Debtor party thereto), enforceable against such Debtor in accordance with its terms. Subject to entry of the Confirmation Order and the expiration or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), the Plan constitutes the legal, valid and binding obligation of each Debtor, enforceable against such Debtor in accordance with its terms.

(b)     Except as set forth on <u>Schedule 2.2(b)</u> hereto, neither the execution and delivery by the Debtors of this Agreement or any of the Debtor Ancillary Agreements, the execution or filing with the Bankruptcy Court of the Plan nor the performance or consummation by the Debtors of any of the Contemplated Transactions or any of the transactions contemplated under the Plan will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with or result in a violation of any provision of the Organizational Documents of any Debtor;

(ii)     contravene, conflict with or result in a violation of any existing Law or Order as in effect on the date of this Agreement and/or as in effect on the Effective Date to which any Debtor or any of its Subsidiaries, or any of the properties, assets, rights or interests owned or used by any Debtor or any of its Subsidiaries, may be subject;

(iii)     contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which any Debtor or any of its Subsidiaries is a party or which any Debtor's or any of its Subsidiaries' properties, assets, rights or interests are bound as in effect on the date of this Agreement and/or as in effect on the Effective Date; or

(iv)     result in the imposition or creation of any Encumbrance upon or with respect to any of the assets, properties, rights, interests or businesses owned or used by any Debtor or any of its Subsidiaries that will not be released and discharged pursuant to the Plan;

except, in the case of <u>clauses (ii)</u> and <u>(iii)</u> above, where such occurrence, event or result (x) would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries, or (y) arises as a result of the filing of the Chapter 11 Cases or the discharge or compromise of claims as a result thereof.

(c)     Subject to the Approvals and except as set forth on <u>Schedule 2.2(c)</u>, none of the Debtors will be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery of this Agreement or any Debtor Ancillary Agreement, or the execution and filing with the Bankruptcy Court of the Plan, or the performance or consummation of any of the Contemplated Transactions or any of the transactions contemplated under the Plan, except any of the foregoing that are required to be given, made or obtained under Law in connection with the Chapter 11 Cases.

2.3.     **Proceedings.**  Except as set forth on <u>Schedule 2.3</u> hereto, there are no pending, outstanding or, to the knowledge of the Debtors, threatened Proceedings to which any Debtor or any of its Subsidiaries is a party or to which any properties, assets, rights or interests of any of them are subject, except for (a) following the Petition Date, claims of creditors or parties in interest in the Chapter 11 Cases and (b) Proceedings that if adversely determined to such Debtor or any of its Subsidiaries would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Debtor or any of its Subsidiaries.

2.4.     **Brokers or Finders.**  Except as set forth on <u>Schedule 2.4</u> hereto, neither any Debtor, any of its Subsidiaries nor any of their respective Representatives has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the Ancillary Agreements, the Plan or any of the Contemplated Transactions or any of the transactions contemplated under the Plan.

2.5.     **Exemption from Registration.**  Assuming the accuracy of the Backstop Parties' representations set forth in <u>Section 3</u> hereof and assuming the accuracy of all of the representations, warranties and certifications made by all of the Rights Offering Participants in their respective Accredited Investor, Qualified Institutional Buyer Questionnaires, each of the Specified Issuances will be exempt from the registration and prospectus delivery requirements of the Securities Act.

2.6.     **Issuance.**  The Backstop Units issued and delivered to the Backstop Parties pursuant to this Agreement will be free and clear of all taxes, liens, Encumbrances, pre-emptive rights, rights of first refusal, subscription and similar rights.

2.7.     **No Violation or Default**.  Neither any Debtor nor any of its Subsidiaries is in violation of its Organizational Documents.  Except as set forth on <u>Schedule 2.7</u> hereto, neither any Debtor nor any of its Subsidiaries is:  (a) as of the date of this Agreement, and except for any defaults arising as a result of the Chapter 11 Cases and except for any defaults existing on the date hereof under the Second Lien Credit Agreement, in default, and no event has occurred that, with notice or lapse of time or both, would constitute a default, in the performance or observance of any term, covenant or condition contained in any Contract to which such Debtor or any of its Subsidiaries is a party or by which such Debtor or any of its Subsidiaries is

bound or to which any of the properties, assets, rights or interests of such Debtor or any of its Subsidiaries is subject; or (b) in violation of any Law or Order, except, in the case of clauses (a) and (b) above, for any such default or violation that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries.

2.8. **Title to Intellectual Property**. After giving effect to the transactions contemplated by the Plan and the Acquisition Documentation, subject to the entry by the Bankruptcy Court of the Confirmation Order and except as set forth on Schedule 2.8(a) hereto, the Acquisition Entities will own or possess adequate rights to use all patents, inventions and discoveries (whether patentable or not), trademarks, service marks, trade names, trade dress, internet domain names, copyrights, published and unpublished works of authorship (including software), and all registrations, recordations and applications of the foregoing and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and licenses related to any of the foregoing ("IP Rights") owned by or used in the conduct of the businesses of each Debtor and its Subsidiaries ("Debtor IP Rights"), except where the failure to own or possess such rights to (or have licenses related to) any such IP Rights would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any of the Acquisition Entities; and, to the knowledge of the Debtors, the conduct of the businesses of each Debtor and its Subsidiaries does not infringe or misappropriate in any material respect with any IP Rights of others, and each Debtor and its Subsidiaries have not received any written notice of any claim of infringement or misappropriation of any IP Rights of others. The Debtor IP Rights comprise all IP Rights that are necessary to conduct the businesses of each Debtor and its Subsidiaries as such businesses are conducted on the date of this Agreement. Except as set forth on Schedule 2.8(b) hereto, (a) none of the Debtor IP Rights owned by any Debtor and/or any of its Subsidiaries have been adjudged invalid or unenforceable, and the Debtors have maintained all registered patents, trademarks and copyrights in full force and effect and used commercially reasonable efforts to protect all trade secrets; and (b) to the knowledge of the Debtors, no third party has infringed or misappropriated any Debtor IP Rights, except where such infringement or misappropriation of any such IP Rights would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries.

2.9. **Licenses and Permits**. Except as set forth on Schedule 2.9 hereto, (a) each Debtor and its Subsidiaries possess all licenses, certificates, permits, and other authorizations issued by, have made all declarations and filings with, and have given all notices to, the appropriate Governmental Bodies that are necessary or required for the ownership or lease of their respective properties or assets, or the conduct or operation of their respective businesses, as owned, leased, conducted or operated as of the date of this Agreement and as of the Effective Date, except where the failure to possess, make or give any of the foregoing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries; and (b) neither any Debtor nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit, or authorization, or has any reason to believe that any such license, certificate, permit, or authorization will not be renewed in the ordinary course, or that any such renewal will be materially impeded, delayed, hindered or burdensome to obtain, except to the extent that any of

the foregoing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries.

2.10. **Compliance With Environmental Laws**. Except as set forth on Schedule 2.10 hereto, each Debtor and its Subsidiaries: (a) is in compliance with any and all applicable Environmental Laws; (b) have received and are in compliance with all permits, licenses, approvals or other Consents required of them under applicable Environmental Laws to conduct their respective businesses as conducted as of the date of this Agreement and as of the Effective Date; and (c) has no knowledge and have not received written notice from any Governmental Body or any third party of (i) any violations of, or liability under, Environmental Laws with respect to the presence of any hazardous or toxic substances or wastes, pollutants or contaminants at, on, under, or emanating from any of their respective businesses and (ii) any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants at, on, under or emanating from any of their respective currently owned or leased real properties or tangible personal properties, or any of their respective formerly owned, operated or leased assets, or any of their respective divested businesses or predecessors in interest, except in the case of any exceptions to the forgoing that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. Each Debtor and its Subsidiaries have made available to the Backstop Parties true, correct and complete copies of all environmental reports, studies, investigations or correspondence concerning the presence of any hazardous or toxic substances or wastes, pollutants or contaminants at, on, under, or emanating from any of their respective currently owned or leased real properties or tangible personal properties, or any of their respective formerly owned, operated or leased assets, or any of their respective divested businesses or predecessors in interest, to the extent such reports, studies, investigations or correspondence are in the possession or control of such Debtor or any of its Subsidiaries. For purposes of this Section 2.10, "Disposal" and "Release" shall have the same meanings as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.).

2.11. **Compliance With ERISA**. Schedule 2.11(a) hereto sets forth a complete and accurate list of all material employee benefit, compensation and incentive plans, arrangements and agreements (including, but not limited to, employee benefit plans within the meaning of Section 3(3) of ERISA) (all such plans, arrangements and agreements, whether or not material, the "Benefit Plans") maintained, administered or contributed to by any Debtor or any of its Subsidiaries for or on behalf of any employees or former employees of such Debtor or any of its Affiliates. Each Benefit Plan has been maintained in compliance in all material respects with its terms and the requirements of any applicable Laws or Orders, including, but not limited to, ERISA and the Internal Revenue Code of 1986, as amended (the "Code"), except where the failure to comply with such applicable Laws or Orders would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. Except as set forth on Schedule 2.11(b) hereto, none of the Benefit Plans are, and neither the Debtors, any of their respective Subsidiaries nor any of their respective ERISA Affiliates maintain, contribute to, or have an obligation to contribute to, or in the past six (6) years has maintained, contributed to, or had an obligation to contribute to, or have any liability with respect to, (i) a plan subject to Title IV of ERISA or Sections 412 or 4971 of the Code or

(ii) a multiemployer plan (within the meaning of Section 4001(3) of ERISA or 413(c) of the Code).

Except as set forth on <u>Schedule 2.11(c)</u> hereto, neither the Debtors nor any of their respective Subsidiaries or ERISA Affiliates, any Benefit Plan, any trust created thereunder, nor, to the knowledge of the Debtors, any trustee, fiduciary or administrator thereof has engaged in a transaction in connection with which any of the Debtors or any of its Subsidiaries or ERISA Affiliates, any Benefit Plan, any such trust, or any trustee, fiduciary or administrator thereof, or any party dealing with any Benefit Plan or any such trust could be subject to a civil penalty or tax under ERISA or the Code, including but not limited to, a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a tax imposed pursuant to Section 4975 or 4976 of the Code, except any of the foregoing that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries.

2.12. **No Unlawful Payments**. To the knowledge of the Debtors, neither any Debtor nor any of its Subsidiaries nor any Debtor, any current or former director, officer or management employee of any Debtor or any of its Subsidiaries has, directly or indirectly: (a) offered, paid, delivered or otherwise used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (b) offered, delivered or made any direct or indirect unlawful payment to any official or employee of a Governmental Body; or (c) offered, delivered, made or received any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

2.13. **Absence of Certain Changes or Events**. Except as set forth on <u>Schedule 2.13</u> hereto, since December 31, 2009, and excluding any transactions effected in connection with the Chapter 11 Cases, (a) each Debtor and its Subsidiaries have conducted their respective businesses in the ordinary course of business consistent with past practices; (b) there has not been any change with respect to any finance or tax accounting elections, methods, principles or practices of any Debtor or any of its Subsidiaries; and (c) neither any Debtor nor any of its Subsidiaries has incurred any damage, destruction, loss or casualty (not covered by insurance) to its property or assets with a value, individually or in the aggregate, in excess of $350,000. Since December 31, 2009, there has not been any Material Adverse Effect.

2.14. **Title to Property; Leases**. Except as set forth on <u>Schedule 2.14</u> hereto and subject to the entry by the Bankruptcy Court of the Confirmation Order, immediately after the Effective Date (after giving effect to the transactions contemplated by the Plan and the Acquisition Documentation), the Acquisition Entities will have, good, valid and marketable title to (or, (a) in the case of leased assets or property (including, without limitation, all real property leased by each Debtor or any of its Subsidiaries (the "<u>Leased Real Property</u>")), a valid and subsisting leasehold interest in, or (b) in the case of real property owned by each Debtor or any of its Subsidiaries (the "<u>Owned Real Property</u>"), good, valid and marketable title to) all assets and properties that, individually or in the aggregate, are material to the conduct of the business of each Debtor and its Subsidiaries as conducted on the date of this Agreement and as of the Effective Date, free and clear of all Encumbrances other than Permitted Encumbrances.

2.15. **Financial Statements**. Each of (a) the audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2009, and the related consolidated

statements of operations, stockholders' (deficiency) equity and cash flows for the twelve-month period then ended (the "2009 Financial Statements"), and (b) the audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2008, and the related consolidated statements of operations, stockholders' (deficiency) equity and cash flows for the twelve-month period then ended (the "2008 Financial Statements" and, together with the 2009 Financial Statements, the "Financial Statements"), (i) have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby; and (ii) fairly present in all material respects the consolidated financial condition, stockholders' equity and results of operations and cash flows of the Company and its Subsidiaries as of the respective dates thereof and for the periods referred to therein.

### 2.16. **Tax Matters**.

(a)     Except as set forth on Schedule 2.16(a) hereto, (i) all tax returns required to be filed by or on behalf of any Debtor or any of its Subsidiaries, or any Affiliated Group of which any Debtor or any of its Subsidiaries is or was a member, have been properly prepared and duly and timely filed with the appropriate taxing authorities in all jurisdictions in which such tax returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings); (ii) all material taxes payable by or on behalf of any Debtor or any of its Subsidiaries either directly, as part of the consolidated tax return of another taxpayer, or otherwise, have been fully and timely paid, and adequate reserves or accruals for taxes have been provided in the balance sheet included as part of the 2009 Financial Statements in respect of any period for which tax returns have not yet been filed or for which taxes are not yet due and owing; and (iii) no agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of a material amount of taxes (including any applicable statute of limitations) has been executed or filed with the IRS or any other Governmental Body by or on behalf of any Debtor or any of its Subsidiaries and no power of attorney in respect of any tax matter is currently in force.

(b)     Except as set forth on Schedule 2.16(b) hereto, each Debtor and its Subsidiaries have complied in all material respects with all applicable Laws relating to the payment and withholding of taxes and have duly and timely withheld from employee salaries, wages, and other compensation and have paid over to the appropriate taxing authorities or other applicable Governmental Bodies all amounts required to be so withheld and paid over for all periods under all applicable Laws.

(c)     Except as set forth on Schedule 2.16(c) hereto, (i) all material deficiencies asserted or assessments made as a result of any examinations by the IRS or any other Governmental Body of the tax returns of or covering or including any Debtor or any of its Subsidiaries have been fully paid, and there are no other material audits or investigations by any taxing authority or any other Governmental Body in progress, nor has any Debtor or any of its Subsidiaries received notice from any taxing authority or other applicable Governmental Body that it intends to conduct such an audit or investigation; (ii) no issue has been raised by a federal, state, local, or foreign taxing authority or other applicable Governmental Body in any current or prior examination that, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period; and (iii) there are no Encumbrances for taxes with respect to any Debtor or any of its Subsidiaries, or with respect

to the assets or business of any Debtor or any of its Subsidiaries, nor is there any such Encumbrance that is pending or threatened, other than Permitted Encumbrances.

2.17. **Labor and Employment Compliance**. Except as set forth on Schedule 2.17(a) hereto, each Debtor and each of its Subsidiaries is in compliance with all applicable Laws or Orders respecting employment and employment practices, except where the failure to comply with such applicable Laws or Orders would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. Except as set forth on Schedule 2.17(b) hereto, there is no Proceeding pending or, to the Debtors' knowledge, threatened against any Debtor or any of its Subsidiaries alleging unlawful discrimination in employment before any Governmental Body and there is no Proceeding with regard to any unfair labor practice against any Debtor or any of its Subsidiaries pending before the National Labor Relations Board or any other Governmental Body, except for any such Proceedings that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. Except as set forth on Schedule 2.17(c) hereto, there is no union organizing, labor strike, dispute, slow-down or work stoppage actually pending or, to the Debtors' knowledge, threatened against or involving any employees of any Debtor or any of its Subsidiaries. None of the employees of any Debtor or any of its Subsidiaries is covered by any collective bargaining agreement, and no collective bargaining agreement is currently being negotiated by any Debtor or any of its Subsidiaries.

2.18. **Product Liability**. Except as set forth on Schedule 2.18 hereto, neither any Debtor nor any of its Subsidiaries has received any notice relating to any claim involving use of or exposure to any of the products (or any part or component) designed, manufactured, serviced or sold, or services performed, by such Debtor or any of its Subsidiaries, including for negligence, strict liability, design or manufacturing defect, conspiracy, failure to warn, or breach of express or implied warranties of merchantability or fitness for any purpose of use, or from any alleged breach of implied warranties or representations, or any alleged noncompliance with any applicable Laws pertaining to products liability matters, other than any such notice relating to claim that would not, individually or in the aggregate with other notices of claims, reasonably be expected to be adverse in any material respect to such Debtor or any of its Subsidiaries.

2.19. **Owned and Leased Real Property**. Immediately after the Effective Date (after giving effect to the transactions contemplated by the Plan and the Acquisition Documentation), all leases relating to the Leased Real Property shall be in full force and effect and enforceable by the Acquisition Entities in accordance with their respective terms. To the knowledge of the Debtors, none of the buildings or structures situated on or forming part of the Owned Real Property or the Leased Real Property, or the operation or maintenance thereof, encroaches on any property owned by others, other than any such encroachments that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. To the knowledge of the Debtors, the Owned Real Property and the Leased Real Property and the current uses thereof by the Debtors and their respective Subsidiaries comply in all respects with applicable Laws, other than any such noncompliance that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries. Except as set forth on Schedule 2.19 hereto, no taking has been commenced or, the knowledge of the Debtors, is contemplated with respect to all or any portion of any Owned Real Property or Leased Real

NY 72739029v7

Property, other than any taking that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Debtor or any of its Subsidiaries.

2.20. **Arm's Length.** Each Debtor acknowledges and agrees that the Backstop Parties are acting solely in the capacity of arm's length contractual counterparties to the Debtors with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as financial advisors or fiduciaries to, or agents of, the Debtors or any other Person. Additionally, the Backstop Parties are not advising the Debtors or any other Person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. Each Debtor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and the Backstop Parties shall have no responsibility or liability to any Debtor with respect thereto. Any review by the Backstop Parties of the Debtors, the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Backstop Parties and shall not be on behalf of the Debtors.

3. **Representations and Warranties of the Backstop Parties**. Each Backstop Party, severally and not jointly, hereby represents and warrants to the Debtors as set forth below. Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Effective Date:

3.1. **Organization of Such Backstop Party.** Such Backstop Party is duly organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now conducted.

3.2. **Authority; No Conflict**.

(a) Such Backstop Party (i) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement and the Backstop Party Ancillary Agreements to which it is (or will be) a party, and (B) to perform and consummate the transactions contemplated hereby and thereby, and (ii) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of this Agreement and the Backstop Party Ancillary Agreements to which it is (or will be) a party and (y) the performance and consummation of the transactions contemplated hereby and thereby. This Agreement has been (or, in the case of each Backstop Party Ancillary Agreement to be entered into by such Backstop Party at or prior to the Closing, will be) duly executed and delivered by such Backstop Party. This Agreement constitutes (or, in the case of each Backstop Party Ancillary Agreement to be entered into by such Backstop Party at or prior to the Closing, will constitute) the legal, valid and binding obligation of such Backstop Party, enforceable against such Backstop Party in accordance with its terms.

(b) Except as set forth on Schedule 3.2(b), neither the execution and delivery by such Backstop Party of this Agreement, any of the Backstop Party Ancillary Agreements nor

14

the performance or consummation by such Backstop Party of any of the transactions contemplated hereby or thereby will, directly or indirectly (with or without notice or lapse of time or both):

> (i)    contravene, conflict with, or result in a violation of any provision of the Organizational Documents of such Backstop Party;

> (ii)   contravene, conflict with, or result in a violation of, any pending or existing Law or Order to which such Backstop Party, or any of the properties, assets, rights or interests owned or used by such Backstop Party, may be subject; or

> (iii)  contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which such Backstop Party is a party or which any of such Backstop Party's properties, assets, rights or interests are bound;

except, in the case of clauses (ii) and (iii) above, where such occurrence, event or result would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

Except (x) for Consents which have been obtained, notices which have been given and filings which have been made, (y) where the failure to give any notice, obtain any Consent or make any filing would not reasonably be expected to prevent or materially delay the consummation of any of the transactions contemplated by this Agreement and (z) compliance with the applicable requirements of the HSR Act, if required, such Backstop Party is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery by such Backstop Party of this Agreement, any of the Backstop Party Ancillary Agreements to which it is (or will be) a party or the consummation or performance by such Backstop Party of any of the transactions contemplated hereby or thereby.

3.3.    **Backstop Units Not Registered.**  Such Backstop Party understands that the Backstop Units have not been registered under the Securities Act.  Such Backstop Party also understands that the Backstop Units are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration provided under Section 4(2) of the Securities Act, based in part upon such Backstop Party's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

3.4.    **Acquisition for Own Account.**  Such Backstop Party is acquiring the Backstop Units for its own account (or for the accounts for which it is acting as investment advisor or manager) for investment and not with a present view toward distribution, within the meaning of the Securities Act.

3.5.    **Accredited Investor.**  Such Backstop Party is an "accredited investor" as that term is defined in Regulation D promulgated under the Securities Act and has such knowledge and experience in financial and business matters that such Backstop Party is capable

of evaluating the merits and risks of its investment in the Backstop Units.  Such Backstop Party understands and is able to bear any economic risks of such investment.

3.6.  **Access to Information.**  Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Debtors and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

3.7.  **Brokers or Finders**.  Such Backstop Party has not, and its Representatives have not, incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement or the Ancillary Agreements, for which the Debtors may be liable.

3.8.  **Proceedings.**  There is no pending, outstanding or, to the knowledge of such Backstop Party, threatened Proceedings against such Backstop Party that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of such Backstop Party to consummate the transactions contemplated by this Agreement.

3.9.  **Sufficiency of Funds.**  On the Effective Date, such Backstop Party will have available funds sufficient to pay the aggregate Exercise Price for the Backstop Units to be purchased by such Backstop Party hereunder.

3.10.  **Arms Length**.  Each Backstop Party acknowledges and agrees that the Debtors are acting solely in the capacity of arm's length contractual counterparties to the Backstop Parties with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as financial advisors or fiduciaries to, or agents of, the Backstop Parties or any other Person.  Additionally, the Debtors are not advising the Backstop Parties or any other Person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Backstop Parties shall consult with their own advisors concerning such matters and shall be responsible for making their own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and, except for the indemnification provisions set forth in Section 8 hereof, the Debtors shall have no responsibility or liability to the Backstop Parties with respect thereto.  Any review by the Debtors of the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Debtors and shall not be on behalf of the Backstop Parties.

Anything herein to the contrary notwithstanding, nothing contained in any of the representations, warranties or acknowledgments made by any Backstop Party in this Section 3 or elsewhere in this Agreement will operate to modify or limit in any respect the representations and warranties of the Debtors or to relieve the Debtors from any obligations to the Backstop Parties for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated herein.

NY 72739029v7

4. **Covenants of the Debtors.** The Debtors hereby, jointly and severally, agree with the Backstop Parties as set forth in this Section 4.

4.1. **Agreement Motion and Agreement Order.** Prior to or concurrently with the filing by the Debtors of a motion seeking entry of the Disclosure Statement Order (the "Disclosure Statement Motion"), the Debtors shall file a motion and supporting papers (the "Agreement Motion") seeking an order of the Bankruptcy Court, in form and substance acceptable to each of the Backstop Parties, approving the execution and delivery of this Agreement and the Commitment Letter, and the consummation of the transactions contemplated hereby and thereby (the "Agreement Order"), including without limitation, the payment by the Debtors of the Commitment Fee, the Break-Up Fee and the Transaction Expenses on the terms set forth herein and therein, and the indemnification provisions in favor of the Indemnified Parties set forth herein and therein; provided, that the signature pages, exhibits and schedules to any copy of this Agreement and/or the Commitment Letter that is filed with the Bankruptcy Court shall, subject to Bankruptcy Court approval, be subject to redaction as the Backstop Parties determine to be reasonably necessary and appropriate, including, without limitation, redacting the names of the Backstop Parties and the Backstop Commitment and the Backstop Commitment Percentage of each Backstop Party; provided, that the Debtors may refer generally to Affiliates of each of the entities listed on Schedule 2 hereto as being the Backstop Parties in pleadings filed with the Bankruptcy Court if, and only if, in each case, the Debtors obtain the prior written consent of the applicable entity listed on Schedule 2 hereto to the disclosure of the identity of its Affiliates. The Debtors agree that they shall use their commercially reasonable efforts to (a) obtain a waiver of Bankruptcy Rule 6004(h) and request that the Agreement Order be effective immediately upon its entry by the Bankruptcy Court, which Agreement Order shall not be revised, modified, or amended by the Confirmation Order or any other further order of the Bankruptcy Court, (b) fully support the Agreement Motion and any application seeking Bankruptcy Court approval and authorization to pay the fees and expenses under this Agreement and/or the Commitment Letter, including the Transaction Expenses, the Commitment Fee and the Break-Up Fee, as an administrative expense of the Debtors' estates, and (c) obtain approval of the Agreement Order as soon as practicable after the Petition Date. The Debtors may, and shall be permitted to, (i) file the Agreement Motion as part of, and include the Agreement Motion directly in, the Disclosure Statement Motion, and (ii) seek to have the Agreement Order be part of, and be included directly in, the Disclosure Statement Order, and, in any such case of clause (i) or clause (ii), all provisions of this Agreement that apply to the Agreement Motion or the Agreement Order shall be deemed to apply to the Disclosure Statement Motion or the Disclosure Statement Order, respectively.

4.2. **Rights Offering.** The Debtors shall promptly provide copies of all documents, instruments, agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with the Rights Offering (the "Rights Offering Documentation") for review and comment by the Backstop Parties. Any comments received by the Debtors from the Backstop Parties or their respective Representatives with respect to the Rights Offering Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties prior to entering into, delivering, distributing or any such Rights Offering Documentation.

17

4.3.    **Conditions Precedent.**  The Debtors shall use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent set forth in Section 6.1 hereof (including, without limitation, procuring and obtaining all Consents, authorizations and waivers of, making all filings with, and giving all notices to, third parties (including Governmental Bodies) which may be necessary or required on its part in order to effect the transactions contemplated herein).

4.4.    **Notification**.  The Debtors shall: (a) on request by any of the Backstop Parties, notify such Backstop Party, or cause the applicable subscription agent for the Rights Offering (the "Subscription Agent") to notify such Backstop Party, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be, and (b) following the Cash Election/Rights Offering Termination Date, timely comply with its obligations under Section 1.1(b) hereof.

4.5.    **Use of Proceeds.**  The Debtors shall use the Proceeds received from the Acquisition Entities pursuant to the Acquisition Documentation to, among other things, fund the payment of distributions to be made on the Effective Date pursuant to the Plan and funding fees and/or expenses related to the Chapter 11 Cases, and, to the extent not so used on the Effective Date, shall be transferred to the Acquisition Entities pursuant to the Acquisition Documentation and the Plan.

4.6.    **Access**.  Promptly following the Execution Date, each of the Debtors will, and will use commercially reasonable efforts to cause its employees, officers, directors, accountants, attorneys and other advisors (collectively, "Representatives") to, provide each of the Backstop Parties and its Representatives with reasonable access, upon reasonable prior notice, during normal business hours, and without any material disruption to the conduct of the Debtors' business, to officers, management and key employees and other Representatives of any of the Debtors and to assets, properties, contracts, books, records and any other information concerning the business and operations of any of the Debtors as any of the Backstop Parties or any of its Representatives may reasonably request.

4.7.    **HSR Act.**  The Debtors shall promptly prepare and file all necessary documentation and effect all applications that are necessary under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Backstop Units hereunder, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  Anything herein to the contrary notwithstanding, none of the Backstop Parties (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to (a) disclose to any other party hereto or any other Person any information contained in its HSR Notification and Report Form which such party, in its sole discretion, deems confidential, except as may be required by applicable Laws as a condition to the expiration or termination of the applicable waiting period under the HSR Act with respect to the purchase of the Backstop Units hereunder, (b) agree to any condition, restraint or limitation relating to its ability to freely own or operate all or a portion of its businesses or assets or (c) hold separate (including by trust or otherwise) or divest any assets or businesses of

such Backstop Party or any of its Affiliates, the Debtors or the Acquisition Entities. Without limiting the provisions of Section 1.4 hereof, the Debtors shall bear all costs and expenses of the Debtors, the Acquisition Entities and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act (including any filing fees thereunder).

4.8. **DIP Facility.** The Debtors shall promptly provide copies of all drafts and final execution copies of all documents, instruments, agreements and other materials to be entered into, delivered or otherwise used in connection with the DIP Facility (the "DIP Facility Documentation") for review and comment by the Backstop Parties. Any comments received by the Debtors from the Backstop Parties or their respective Representatives with respect to the DIP Facility Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties prior to entering into, delivering or using any such DIP Facility Documentation. The Debtors shall comply, in a timely manner, with all of the terms, conditions and covenants contained in the DIP Facility Documentation (including the Financing Letter).

4.9. **Exit Facility.** The Debtors shall promptly provide copies of all drafts and final execution copies of all documents, instruments, agreements and other materials to be entered into, delivered or otherwise used in connection with the Exit Facility (the "Exit Facility Documentation") for review and comment by the Backstop Parties. Any comments received by the Debtors from the Backstop Parties or their respective Representatives with respect to the Exit Facility Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties prior to entering into, delivering or using any such Exit Facility Documentation. The Debtors shall comply, in a timely manner, with all of the terms, conditions and covenants contained in the Exit Facility Documentation (including, without limitation, the Financing Letter).

4.10. **Acquisition**. The Debtors shall take all such actions as are reasonably necessary to cause the Acquisition to be treated as a taxable transaction for United States federal income tax purposes, including the making of any appropriate elections under Subchapter K of the Code, and the imposition of reasonable trading restrictions to ensure that none of the Acquisition Entities is treated as a corporation for federal income tax purposes. The Debtors shall treat the Acquisition, and shall not take any position inconsistent with the treatment of the Acquisition, as a taxable transaction for all financial accounting and income tax purposes. The Debtors shall be wound-up, dissolved and liquidated concurrently with or promptly following the Effective Date, subject to the closing of the Chapter 11 Cases. The Debtors shall take, and shall cooperate with the Backstop Parties in taking, all actions reasonably necessary to minimize federal, state and local income and other taxes of the Debtors, including, but not limited to, the filing of notices and clearance certificates with applicable taxing authorities.

4.11. **Specified Issuances**. The Debtors shall (a) consult with the Backstop Parties with respect to the steps (the "Specified Issuance Steps") to be taken by the Debtors to ensure that (i) each of the Specified Issuances described in clauses (a)-(f) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code and/or Section 4(2) of the Securities Act and (ii) the Specified Issuances described in clause (g) of the

definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 4(2) of the Securities Act, and (b) promptly provide copies of all documents, instruments, questionnaires, agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with the Specified Issuances (the "Specified Issuance Documentation") for review and comment by the Backstop Parties. Any comments received by the Debtors from the Backstop Parties or their respective Representatives with respect to the Specified Issuance Steps or the Specified Issuance Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties prior to taking such Specified Issuance Steps or entering into, delivering, distributing or using any such Specified Issuance Documentation.

4.12. **Debtors Plan Support Agreement Covenants.** Each of the covenants and agreements set forth in Sections 4(a) and 4(b) of the Plan Support Agreement, in each case as in effect on the date of this Agreement (collectively, the "Debtors Plan Support Agreement Covenants"), is hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the Debtors Plan Support Agreement Covenants shall be made so that the Debtors Plan Support Agreement Covenants can be applied in a logical manner in this Agreement), and the Debtors shall perform, abide by and observe, for the benefit of the Backstop Parties, all of the Debtors Plan Support Agreement Covenants as incorporated herein and modified hereby.

5. **Covenants of the Backstop Parties**. Each of the Backstop Parties hereby agrees, severally and not jointly, with the Debtors as set forth in this Section 5.

5.1. **Conditions Precedent**. Each Backstop Party shall use its commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent applicable to such Backstop Party set forth in Section 6.2 hereof; provided, however, that nothing contained in this Section 5.1 shall obligate the Backstop Parties to waive any right or condition under this Agreement.

5.2. **HSR Act**. Each Backstop Party shall promptly prepare and file all necessary documentation and effect all applications that are necessary under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Backstop Units hereunder, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement. Anything herein to the contrary notwithstanding, none of the Backstop Parties (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to (a) disclose to any other party hereto or any other Person any information contained in its HSR Notification and Report Form which such party, in its sole discretion, deems confidential, except as may be required by applicable Laws as a condition to the expiration or termination of the applicable waiting period under the HSR Act with respect to the purchase of the Backstop Units hereunder, (b) agree to any condition, restraint or limitation relating to its ability to freely own or operate all or a portion of its businesses or assets or (c) hold separate (including by trust or otherwise) or divest any assets or businesses of such Backstop Party or any of its Affiliates, the Debtors or the Acquisition Entities. Without

limiting the provisions of Section 1.4 hereof, the Debtors shall bear all costs and expenses of the Debtors, the Acquisition Entities and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act (including any filing fees thereunder).

5.3. **Backstop Plan Support Agreement Covenants.** Each of the covenants and agreements set forth in Sections 3(a) and 3(b) of the Plan Support Agreement (to the extent applicable to such Backstop Party in its capacity as a holder of the First Lien Term Loan Claims), in each case as in effect on the date of this Agreement (collectively, the "Backstop Plan Support Agreement Covenants"), is hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the Backstop Plan Support Agreement Covenants shall be made so that the Backstop Plan Support Agreement Covenants can be applied in a logical manner in this Agreement), and such Backstop Party (to the extent applicable to such Backstop Party in its capacity as a holder of the First Lien Term Loan Claims) shall perform, abide by and observe, for the benefit of the Debtors, all of the Backstop Plan Support Agreement Covenants as incorporated herein and modified hereby.

5.4. **Financing**. Each Backstop Party shall use its commercially reasonable efforts, at the sole cost and expense of the Sellers, to assist in the documentation and consummation of the Exit Facility; provided, however, that no Backstop Party shall be required to (a) disclose to any Person any information which such Backstop Party, in its sole and reasonable discretion, deems confidential or (b) expend any funds, make any payments or provide any indemnities, reimbursement obligations, commitments, guarantees or any other form of credit support. Notwithstanding the foregoing, each Debtor acknowledges and agrees that neither the Backstop Parties nor any of their respective Affiliates or Representatives shall have any responsibility for the Exit Facility and shall not be liable or otherwise responsible for any statements, assertions, facts, projections, forecasts, data or other information contained or referred to in any offering memorandum, bankers' book or other materials prepared by or on behalf of the Debtors, the agents or lenders under the Exit Facility, or any of their respective Affiliates or Representatives in connection with the Exit Facility.

6. **Conditions to Closing**.

6.1. **Conditions Precedent to Obligations of the Backstop Parties.** The obligations of the Backstop Parties to subscribe for and purchase Backstop Units pursuant to their respective Backstop Commitments are subject to the satisfaction (or waiver by each of the Non-Defaulting Backstop Parties) of each of the following conditions prior to or on the Effective Date:

(a) Plan Support Agreement. The Plan Support Agreement shall not have been terminated.

(b) Plan. The Plan, as confirmed by the Bankruptcy Court, shall be consistent with the Exhibit Plan and otherwise reasonably acceptable to the Debtors and the Backstop Parties.

21

(c)     Disclosure Statement.  The Disclosure Statement shall be consistent in all material respects with the terms set forth in the Term Sheets and otherwise reasonably acceptable to each of the Backstop Parties.

(d)     Disclosure Statement Order.  The Bankruptcy Court shall have entered the order approving the Disclosure Statement (the "Disclosure Statement Order"), the Disclosure Statement Order shall be in form and substance reasonably acceptable to each of the Backstop Parties, and the Disclosure Statement Order shall be a Final Order.

(e)     Agreement Order.  The Bankruptcy Court shall have entered the Agreement Order, the Agreement Order shall be consistent with this Agreement and otherwise be in form and substance reasonably acceptable to each of the Backstop Parties, and the Agreement Order shall be a Final Order.

(f)     Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall be in form and substance consistent with this Agreement, the Term Sheets and the Exhibit Plan and otherwise reasonably acceptable to each of the Backstop Parties, and the Confirmation Order shall be a Final Order.  Without limiting the generality of the foregoing, the Confirmation Order shall contain the following specific findings of fact, conclusions of law and orders:  (i) each of the Specified Issuances described in clauses (a)-(f) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code; (ii) the Specified Issuances described in clause (g) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 4(2) of the Securities Act; (iii) the solicitation of acceptance or rejection of the Plan by the Backstop Parties, the Acquisition Entities and/or any of their respective Related Persons (if any such solicitation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties, the Acquisition Entities and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code; and (iv) the participation by the Backstop Parties, the Acquisition Entities and/or any of their respective Related Persons in the offer, issuance, sale or purchase of any security offered or sold under the Plan (if any such participation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties, the Acquisition Entities and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

(g)     Conditions to Confirmation.  The conditions to confirmation of the Plan and the conditions to the Effective Date set forth in the Plan shall have been satisfied (or waived with the prior written consent of each of the Backstop Parties) in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

(h)     Rights Offering.  The Rights Offering shall have been conducted and consummated in accordance with the Plan and this Agreement.

(i)     Definitive Documents.  All Definitive Documents (including, without limitation, all documents relating to the Exit Facility and the DIP Facility, and the Organizational

Documents of the Debtors and the Acquisition Entities (including, without limitation, the Operating Agreement)) shall have been executed and delivered by the parties thereto, and such Definitive Documents shall be materially consistent with the terms set forth in this Agreement and the Term Sheets and otherwise reasonably acceptable to each of the Backstop Parties.

(j)     No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties, the Debtors or the Acquisition Entities which makes the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including, without limitation, each of the Specified Issuances) illegal, void or rescinded.

(k)     Notices and Consents.  All governmental and third party notifications, filings, waivers, authorizations and Consents necessary or required for the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions, if any, shall have been made or received and shall be in full force and effect.

(l)     Representations and Warranties.  (i) Each of the representations and warranties of the Debtors in this Agreement and the Debtor Ancillary Agreements shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) at and as of the date of this Agreement (or the date of the applicable Debtor Ancillary Agreement) (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each of (A) the representations and warranties of the Debtors in Sections 2.1, 2.2(a), 2.4 and 2.5 hereof shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) and (B) the other representations and warranties of the Debtors in this Agreement and the Debtor Ancillary Agreements shall be true and correct in all respects (without regard for any "materiality" or "Material Adverse Effect" qualifiers set forth therein) except where the failure of such representations and warranties referred to in this clause (B) to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, in each case of clauses (A) and (B), at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(m)     Covenants.  Each of the Debtors shall have complied in all material respects with all covenants in this Agreement and the Debtor Ancillary Agreements to which it is a party.

(n)     Acquisition Structure.  Each of the following shall have occurred:  (i) the Acquisition shall have been structured as a taxable transaction for United States federal income tax purposes, (ii) the Debtors shall have taken all such actions as are reasonably necessary to cause the Acquisition to be treated as a taxable transaction for United States federal income tax

purposes, including the making of any appropriate elections under Subchapter K of the Code, and the imposition of reasonable trading restrictions to ensure that none of the Acquisition Entities is treated as a corporation for federal income tax purposes, (iii) the Debtors shall have not taken any position inconsistent with the treatment of the Acquisition as a taxable transaction for all financial accounting and income tax purposes, (iv) the Acquisition shall be consummated simultaneously with the Closing pursuant to documentation and otherwise be on terms and in a manner that is reasonably acceptable to each of the Backstop Parties (the "Acquisition Documentation") (it being agreed that, pursuant to the Acquisition Documentation, the Acquisition Entities shall have acquired substantially all of the assets of the Debtors and shall have assumed all liability for Administrative Claims against the Debtors), (v) none of the Acquisition Entities shall have assumed any prepetition liabilities of the Debtors other than those liabilities explicitly agreed to in writing in advance by each of the Backstop Parties in its sole discretion, (vi) the Plan shall provide that any Debtors that are to be liquidated or are to cease operations pursuant to the Plan shall receive the benefit of a discharge under section 1141 of the Bankruptcy Code or such equivalent injunctive relief as is necessary to (A) ensure that such Debtors' prepetition liabilities are discharged as if they had been reorganized pursuant to the Plan and/or (B) preclude successor liability from attaching to any of the Acquisition Entities (it being understood, however, that the Backstop Parties and the Debtors agree and acknowledge that the Acquisition Entities shall assume all liability for the distributions or treatment provided on account of all claims against, obligations of, or interests in the Debtors as set forth in the Plan) and (vii) the Debtors shall have taken, and shall have cooperated with the Backstop Parties in taking, all actions reasonably necessary to minimize federal, state and local income and other taxes of the Debtors, including, but not limited to, the filing of notices and clearance certificates with applicable taxing authorities.

(o)     Commitment Fee.  No portion of the Commitment Fee shall have been required to be repaid or otherwise disgorged to the Debtors or any other Person.

(p)     Transaction Expenses.  The Debtors shall have paid all Transaction Expenses that have accrued and remain unpaid as of the Effective Date in accordance with the terms of this Agreement and the Commitment Letter, and no Transaction Expenses shall be required to be repaid or otherwise disgorged to the Debtors or any other Person.

(q)     Material Adverse Effect.  Since the date of the Commitment Letter, there shall not have occurred any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a Material Adverse Effect; provided, however, that the Debtors shall have three (3) Business Days after delivery of written notice from the Backstop Parties or their counsel to remedy such event, change, effect, occurrence, development, circumstance or change of fact so that it no longer has or would reasonably be expected to have a Material Adverse Effect.

(r)     Purchase Notice.  The Backstop Parties shall have received a Purchase Notice in accordance with Section 1.1(b) hereof from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Units to be purchased pursuant to Section 1.2(a) hereof.

(s)     HSR Act.  If the purchase of the Backstop Units by the Backstop Parties pursuant to this Agreement is subject to the terms of the HSR Act, the applicable waiting period shall have expired or been terminated thereunder with respect to such purchase.

(t)     No Registration; Compliance with Securities Laws.  No Proceeding shall be pending or threatened by any Governmental Body or other Person that alleges that any of the Specified Issuances is not exempt from the registration requirements of Section 5 of the Securities Act.

(u)     Officer's Certificate.  The Backstop Parties shall have received on and as of the Effective Date a certificate of the chief financial officer or chief accounting officer of the Debtors confirming that the conditions set forth in Sections 6.1(l), 6.1(m) and 6.1(q) hereof have been satisfied.

(v)     Exit Facility.  The Debtors shall have entered into and consummated the transactions contemplated by the Exit Facility and the Exit Facility Documentation shall contain terms and conditions materially consistent with the terms and conditions set forth in Exhibit 3 attached to the Plan Term Sheet and shall otherwise be in form and substance reasonably satisfactory to the Backstop Parties.

(w)     Assumption of Agreement.  The Debtors shall have assumed this Agreement pursuant to section 365 of the Bankruptcy Code.

(x)     Debtor Ancillary Agreements.  Each of the Debtors shall have executed and delivered to the Backstop Parties each Debtor Ancillary Agreement to which it is (or is required to be) a party and each certificate, agreement or document (other than this Agreement) that any Debtor is required to execute and/or deliver pursuant to the terms of this Agreement or any Debtor Ancillary Agreement, and each such Debtor Ancillary Agreement, certificate, agreement or document shall be materially consistent with this Agreement and the Term Sheets and otherwise reasonably acceptable to each of the Backstop Parties.

6.2.     **Conditions Precedent to Obligations of Reorganized Neff.**  The obligations of Reorganized Neff to issue and sell the Backstop Units to each of the Backstop Parties pursuant to Section 1.2(d) hereof are subject to the following conditions precedent, each of which may be waived in writing by Reorganized Neff:

(a)     Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order.

(b)     Agreement Order.  The Bankruptcy Court shall have entered the Agreement Order and the Agreement Order shall be a Final Order.

(c)     Conditions to Confirmation.  The conditions to confirmation of the Plan and the conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

(d)     Rights Offering.  The Rights Offering shall have been consummated.

NY 72739029v7

(e)     No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties, the Debtors or the Acquisition Entities which makes the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including, without limitation, each of the Specified Issuances) illegal, void or rescinded.

(f)     Representations and Warranties and Covenants.  (i) Each of the representations and warranties of each of the Backstop Parties in this Agreement and the Backstop Party Ancillary Agreements shall be true and correct in all material respects at and as of the date of this Agreement (or the date of the applicable Backstop Party Ancillary Agreement) and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each of the Backstop Parties shall have complied in all material respects with all covenants in this Agreement and the other Backstop Party Ancillary Agreements to which it is a party, except, in each case, to the extent that Non-Defaulting Backstop Parties purchase any Default Units as a result of any breach of representations, warranties or covenants by a Defaulting Backstop Party pursuant to Section 1.2(c) hereof.

7.     **Termination**.

(a)     Unless earlier terminated in accordance with the terms of this Agreement, this Agreement and the Backstop Commitments contemplated hereby shall terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any Person, upon the earliest to occur of:

(i)     January 7, 2011 (the "Termination Date");

(ii)     the date of termination of the Plan Support Agreement; and

(iii)     the occurrence of a Payout Event such that all Allowed First Lien Term Loan Claims have been indefeasibly paid in full in cash on the Effective Date as provided in the Exhibit Plan.

(b)     This Agreement and the Backstop Commitments contemplated hereby may be terminated and the transactions contemplated hereby may be abandoned at any time by the Backstop Parties upon the giving of three (3) Business Days' written notice of termination to the Debtors at any time following the happening, the existence or the occurrence of:

(i)     a material breach by any Debtor of its obligations under this Agreement which remains uncured for three (3) Business Days following written notice from the Backstop Parties or their counsel; or

(ii)     the occurrence of a Consenting Lenders' Termination Event without giving effect to any waivers of a Consenting Lenders' Termination Event

provided under the Plan Support Agreement (all such Consenting Lenders' Termination Events being incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the Consenting Lenders' Termination Events shall be made so that the Consenting Lenders' Termination Events can be applied in a logical manner in this Agreement)).

(c)      This Agreement and the Backstop Commitments contemplated hereby may be terminated at any time by written consent of the Debtors and each of the Backstop Parties.

(d)      In the event of termination of this Agreement in accordance with this Section 7, the provisions of this Agreement shall immediately become void and of no further force or effect (other than Sections 1.3, 1.4, 1.5, 7, 8, 10, 11, 12 and 13 hereof (and any defined terms used in any such Sections), and other than in respect of any liability of any party for any breach of this Agreement prior to such termination, which shall in each case expressly survive any such termination).

(e)      Each Debtor hereby acknowledges and agrees and shall not dispute that after the Petition Date, the giving of notice of termination by the Backstop Parties pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Debtor hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

8.      **Indemnification**.

(a)      Whether or not the transactions contemplated by this Agreement are consummated, the Debtors hereby agree, jointly and severally, to indemnify and hold harmless each of the Backstop Parties and each of their respective Affiliates, stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling persons (each, in such capacity, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, imposed on, sustained, incurred or suffered by, or asserted against, any Indemnified Party as a result of or arising out of or related to this Agreement, the Commitment Letter, the Backstop Commitments, the Rights Offering and/or any of the transactions contemplated by this Agreement, the Commitment Letter, the Backstop Commitments or the Rights Offering, or any breach by any Debtor of any of its representations, warranties and/or covenants set forth in this Agreement or the Commitment Letter, or any claim, litigation, investigation or Proceeding relating to any of the foregoing, regardless of whether any such Indemnified Party is a party thereto, and to reimburse each such Indemnified Party for the reasonable and documented legal or other out-of-pocket costs and expenses as they are incurred in connection with investigating, monitoring, responding to or defending any of the foregoing; provided, that the foregoing indemnification will not, as to any Indemnified Party, apply to (i) losses, claims, damages, liabilities or expenses to the extent that they result from a material breach by the Backstop Parties of the Backstop Parties' obligations under this Agreement or the Commitment Letter, or any act by the Backstop Parties of bad faith, gross negligence or willful

NY 72739029v7

misconduct, each as determined by a final, non-appealable decision by a court of competent jurisdiction, and (ii) any punitive, exemplary or special damages unless such Indemnified Party is required to pay such damages to a third party, as determined by a final, non-appealable decision by a court of competent jurisdiction. The terms set forth in this <u>Section 8</u> shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated. The indemnity and reimbursement obligations of the Debtors under this <u>Section 8</u> are in addition to, and do not limit, the Debtors' obligations under <u>Sections 1.4</u>, and <u>1.5</u> hereof.

(b)     Promptly after receipt by an Indemnified Party of notice of the commencement of any claim, litigation, investigation, Proceeding or other action with respect to which such Indemnified Party may be entitled to indemnification hereunder ("<u>Actions</u>"), such Indemnified Party will, if a claim is to be made hereunder against the Debtors in respect thereof, notify the Debtors in writing of the commencement thereof; <u>provided</u>, that (i) the omission so to notify the Debtors will not relieve the Debtors from any liability that they may have hereunder except to the extent they have been actually and materially prejudiced by such failure and (ii) the omission so to notify the Debtors will not relieve the Debtors from any liability that they may have to an Indemnified Party otherwise than on account of this <u>Section 8</u>. In case any such Actions are brought against any Indemnified Party and such Indemnified Party notifies the Debtors of the commencement thereof, the Debtors will be entitled to participate in such Actions, and, to the extent that Debtors elect by written notice delivered to such Indemnified Party, to assume the defense thereof, with counsel satisfactory to such Indemnified Party, <u>provided</u>, that if the defendants in any such Actions include both such Indemnified Party and the Debtors and such Indemnified Party shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Debtors, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Actions on behalf of such Indemnified Party. Following the date of receipt of such indemnification commitment from the Debtors and notice from the Debtors to such Indemnified Party of its election so to assume the defense of such Actions and approval by such Indemnified Party of counsel, the Debtors shall not be liable to such Indemnified Party for expenses incurred by such Indemnified Party in connection with the defense thereof after such date (other than reasonable costs of investigation and monitoring) unless (x) such Indemnified Party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence or (y) the Debtors shall have authorized in writing the employment of counsel for such Indemnified Party.

(c)     The Debtors shall not, without the prior written consent of an Indemnified Party, effect any settlement of any pending or threatened Actions in respect of which indemnity has been sought hereunder by such Indemnified Party unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability on the claims that are the subject matter of such Actions and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

9.     **Survival of Representations and Warranties**. Notwithstanding any investigation at any time made by or on behalf of any party hereto with respect to, or any knowledge acquired (or capable of being acquired) about, the accuracy or inaccuracy of or

NY 72739029v7

compliance with, any representation or warranty made by or on behalf of any party hereto, all representations and warranties contained in this Agreement and in the certificate delivered pursuant to Section 6.1(u) hereof shall survive the execution, delivery and performance of this Agreement.

10.  **Amendments and Waivers**.  Any term of this Agreement may be amended or modified and the compliance with any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only if such amendment, modification or waiver is signed, in the case of an amendment or modification, by the Backstop Parties and the Debtors, or in the case of a waiver, by the party waiving compliance; provided, however, that Schedule 1 hereto may be amended in accordance with the terms of Section 12.1 hereof.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, or any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

11.  **Notices, etc**.  Except as otherwise provided in this Agreement, all notices, demands and other communications hereunder shall be in writing or by written telecommunication (including by facsimile), and shall be deemed to have been duly given or provided if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication (including by facsimile transmission), as follows:

(a)  if to a Backstop Party, to the mailing address or facsimile number set forth on Schedule 1 hereto or to such other mailing address or facsimile number as such Backstop Party shall have furnished to the Debtors in writing,

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038

| Attention: | Kristopher M. Hansen, Esq. |
| | Matthew A. Schwartz, Esq. |
| | -and- |
| | Jayme T. Goldstein, Esq. |
| Fax: | (212) 806-6006 |

(b)  If to the Debtors at:

Neff Corp.
3750 N.W. 87th Avenue, Suite 400

Miami, Florida 33178

|            |                         |
|------------|-------------------------|
| Attention: | Graham Hood             |
|            | Chief Executive Officer |
|            | -and-                   |
|            | Mark Irion              |
|            | Chief Financial Officer |

Fax:            (305) 513-4156

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Attention:      Brian S. Lennon, Esq.
Fax:            (212) 446-4900

and

Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, Illinois 60654

Attention:      Ray Schrock, Esq., Henry Kleeman, Esq.
Fax:            (312) 862-2200

Any such notice, demand or other communication shall be effective (i) if delivered personally, when received, (ii) if sent by overnight courier, when receipted for, (iii) if mailed, three (3) days after being mailed as described above, and (iv) if sent by written telecommunication (including by facsimile transmission), when dispatched.

12.    **Miscellaneous**.

12.1.    **Assignments.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any of the parties (whether by operation of Law or otherwise) without the prior written consent of the other parties.  Notwithstanding the immediately preceding sentence, any Backstop Party's rights, obligations or interests hereunder may be freely assigned, delegated or transferred, in whole or in part, by such Backstop Party, with prior written notice given to (but not the consent of) the Debtors, to (a) any Backstop Party, (b) any controlled Affiliate of a Backstop Party or (c) any Related Fund of a Backstop Party; provided, that any such assignee assumes the obligations of the assigning Backstop Party hereunder and agrees in writing prior to such assignment to be bound by the terms hereof in the same manner as the assigning Backstop Party. Following any assignment described in the immediately preceding sentence, Schedule 1 hereto

NY 72739029v7

shall be updated by the Debtors (in consultation with the assigning Backstop Party and the assignee) solely to reflect the name and address of the applicable assignee or assignees and the Backstop Commitment Percentage that shall apply to such assignee or assignees, and any changes to the Backstop Commitment Percentage applicable to the assigning Backstop Party. Any update to Schedule 1 hereto described in the immediately preceding sentence shall not be deemed an amendment to this Agreement.

12.2.    **Severability.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by Law) not invalidate or render unenforceable such provision in any other jurisdiction.

12.3.    **Entire Agreement.**  Except as expressly set forth herein, this Agreement, the Ancillary Agreements and the Plan Support Agreement constitute the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings (including the Commitment Letter, except as expressly set forth herein), both written and oral, among the parties hereto with respect to the subject matter hereof.

12.4.    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

12.5.    **Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.**

12.6.    **Submission to Jurisdiction.**  Each party to this Agreement hereby (a) consents to submit itself to the personal jurisdiction of the federal court of the Southern District of New York or any state court located in New York County, State of New York in the event any dispute arises out of or relates to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, including, without limitation, a motion to dismiss on the grounds of forum non conveniens, and (c) agrees that it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the federal court of the Southern District of New York or any state court located in New York County, State of New York; provided, however, that during the pendency of the Chapter 11 Cases, all such actions shall be brought in the Bankruptcy Court.

12.7.    **Waiver of Trial by Jury; Waiver of Certain Damages.**  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY

ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.  Except as prohibited by Law, each party hereto hereby waives any right which it may have to claim or recover in any action or claim referred to in the immediately preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages unless such party is required to pay such damages to a third party.  Each of the Debtors (a) certifies that none of the Backstop Parties nor any Representative of any of the Backstop Parties has represented, expressly or otherwise, that the Backstop Parties would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that, in entering into this Agreement, the Backstop Parties are relying upon, among other things, the waivers and certifications contained in this Section 12.7.  Each of the Backstop Parties (i) certifies that none of the Debtors nor any Representative of any of the Debtors has represented, expressly or otherwise, that the Debtors would not, in the event of litigation, seek to enforce the foregoing waivers and (ii) acknowledges that, in entering into this Agreement, the Debtors are relying upon, among other things, the waivers and certifications contained in this Section 12.7.

12.8.  **Further Assurances.**  From time to time after the date of this Agreement, the parties hereto will execute, acknowledge and deliver to the other parties hereto such other documents, instruments and certificates, and will take such other actions, as any other party hereto may reasonably request in order to consummate the transactions contemplated by this Agreement.

12.9.  **Specific Performance.**  The Debtors and the Backstop Parties acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and (b) remedies at law would not be adequate to compensate the non-breaching party.  Accordingly, the Debtors and the Backstop Parties agree that each of them shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the Debtors and the Backstop Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

12.10.  **Headings.**  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

12.11.  **Interpretation; Rules of Construction.**  When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or Exhibit or Schedule to, this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire

Agreement; and (d) the words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation".  The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any regulation, holding,  rule of construction or Law providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

      12.12.  **Several, Not Joint, Obligations**.  The representations, warranties, covenants and other obligations of the Backstop Parties under this Agreement are, in all respects, several and not joint, such that no Backstop Party shall be liable or otherwise responsible for any representations, warranties, covenants or other obligations of any other Backstop Party, or any breach or violation thereof.

      12.13.  **Disclosure**.  Unless otherwise required by applicable Law, the Debtors will not, without each of the Backstop Parties' prior written consent, disclose to any Person any of the information set forth on Schedule 1 hereto (including the identities of the Backstop Parties and the Backstop Commitment Percentage of each Backstop Party), other than to the Debtors' Representatives, in each case in connection with the transactions contemplated hereby and subject to their agreement to be bound by the confidentiality provisions hereof; provided, however, that (a) each Backstop Party agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors with the Bankruptcy Court regarding the aggregate Backstop Commitments and (b) the Debtors may disclose the identities of the parties hereto in any action to enforce this Agreement and the Debtors may refer generally to Affiliates of each of the entities listed in Schedule 2 hereto as being the Backstop Parties in pleadings filed with the Bankruptcy Court if, and only if, in each case, the Debtors obtain the prior written consent of the applicable entity listed in Schedule 2 hereto to the disclosure of the identity of its Affiliates.

      12.14.  **No Recourse Party**.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Backstop Parties and the Debtors may be partnerships or limited liability companies, the Debtors and the Backstop Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, Affiliates, limited partners, general partners (other than general partners, if any, of the Backstop Parties, but not any other general partner of any other Person), members, managers, employees, stockholders or equity holders of any Backstop Party or the Debtors, or any former, current or future directors, officers, agents, Affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such Person, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any obligation of any Backstop Party or any Debtor under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation; provided, that nothing in this Section 12.14 shall relieve the Debtors or the Backstop Parties of their obligations under this Agreement.

      12.15.  **Settlement Discussions**.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence,

this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce the terms of this Agreement.

12.16. **No Third Party Beneficiaries**. This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and other than (a) the Indemnified Parties with respect to <u>Section 8</u> hereof and (b) the No Recourse Parties with respect to <u>Section 12.14</u> hereof.

13. **Definitions**.

13.1. **Certain Defined Terms.** As used in this Agreement the following terms have the following respective meanings:

Acquisition:  has the meaning given to such term in the recitals hereof.

Acquisition Documentation:  has the meaning given to such term in <u>Section 6.1(n)</u> hereof.

Acquisition Entity(ies):  has the meaning given to such term in the recitals hereof.

Actions:  has the meaning given to such term in <u>Section 8(b)</u> hereof.

Ad Hoc Group Advisors:  has the meaning given to such term in the Plan Term Sheet.

Additional Units:  has the meaning given to such term in <u>Section 1.2(c)</u> hereof.

Adjusted Commitment Percentage:  means, with respect to any Non-Defaulting Backstop Party, a percentage expressed as a fraction, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

Administrative Claims:  has the meaning given to such term in the Plan.

Affiliate:  means, with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

Affiliated Group: has the meaning given to such term in Section 1504(a) of the Code.

Agreement:  has the meaning given to such term in the preamble hereof.

Agreement Motion:  has the meaning given to such term in <u>Section 4.1</u> hereof.

NY 72739029v7

Agreement Order: has the meaning given to such term in Section 4.1 hereof.

Allowed First Lien Term Loan Claim: has the meaning given to such term in the Plan.

Allowed Second Lien Term Loan Claim: has the meaning given to such term in the Plan.

Alternative Transaction: means (a) a Payout Event or (b) any restructuring transaction that is inconsistent with this Agreement, the Plan Support Agreement (or the Term Sheets), including without limitation, (i) a merger, consolidation, business combination, recapitalization or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Term Sheets or the Plan Support Agreement, (ii) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Term Sheets or the Plan Support Agreement, or (iii) a plan of reorganization that does not contemplate a reorganization of the Debtors on the terms set forth in the Term Sheets or the Plan Support Agreement.

Ancillary Agreements: means, collectively, the Debtor Ancillary Agreements and the Backstop Party Ancillary Agreements.

Approvals: means all approvals and authorizations that are required under the Bankruptcy Code for the Debtors to take corporate action.

Backstop Commitment: means, with respect to any Backstop Party, the commitment of such Backstop Party, subject to the terms and conditions set forth in this Agreement, to purchase Backstop Commitment Units pursuant to, and on the terms set forth in, Section 1.2(a) hereof.

Backstop Commitment Percentage: means, with respect to any Backstop Party, the percentage set forth opposite the name of such Backstop Party under the heading "Backstop Commitment Percentage" on Schedule 1 hereto, as such percentage may be modified from time to time in accordance with the terms hereof.

Backstop Commitment Units: has the meaning given to such term in Section 1.2(a) hereof.

Backstop Commitment Unit Purchase Price: has the meaning given to such term in Section 1.2(b) hereof.

Backstop Default: has the meaning given to such term in Section 1.2(c) hereof.

Backstop Party(ies): has the meaning given to such term in the preamble hereof.

Backstop Party Ancillary Agreements: means, collectively, the Asset Purchase Agreement and the Escrow Agreement.

Backstop Plan Support Agreement Covenants: has the meaning given to such term in Section 5.3 hereof.

Backstop Units: has the meaning given to such term in Section 1.2(c) hereof.

Bankruptcy Code: has the meaning given to such term in the recitals hereof.

Bankruptcy Court: has the meaning given to such term in the recitals hereof.

Bankruptcy Rules: means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases and/or the transactions contemplated by this Agreement, and any Local Rules of the Bankruptcy Court.

Benefit Plan(s): has the meaning given to such term in Section 2.11 hereof.

Break-Up Fee: has the meaning given to such term in Section 1.5 hereof.

Business Day: means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

Cash Election/Rights Offering Termination Date: has the meaning given to such term in the Rights Offering Procedures.

Cash Payment Option: has the meaning given to such term in the Plan.

Chapter 11 Cases: has the meaning given to such term in the recitals hereof.

Closing: has the meaning given to such term in Section 1.2(d) hereof.

Code: has the meaning given to such term in Section 2.11 hereof.

Commitment Fee: has the meaning given to such term in Section 1.3 hereof.

Commitment Letter: means that certain Commitment Letter, dated as of April 12, 2010, from the Backstop Parties and accepted and agreed to by the Debtors, as amended, supplemented or otherwise modified from time to time.

Company: has the meaning given to such term in the preamble hereof.

Confirmation Hearing: means a hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

Confirmation Order: means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

NY 72739029v7

Consent:  means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

Consenting Lenders' Termination Event:  has the meaning given to such term in the Plan Term Sheet as in effect on the date of this Agreement.

Contemplated Transactions:  means the transactions contemplated by this Agreement and the Debtor Ancillary Agreements.

Contract:  means any agreement, contract, obligation, promise, undertaking or understanding, whether written or oral.

Debtor Ancillary Agreements:  means, collectively, the Asset Purchase Agreement, the Escrow Agreement, the Bill of Sale (as defined in the Asset Purchase Agreement), the Assignment and Assumption Agreement (as defined in the Asset Purchase Agreement) and the certificate described in Section 6.1(u) hereof.

Debtor IP Rights:  has the meaning given to such term in Section 2.8 hereof.

Debtors:  has the meaning given to such term in the recitals hereof.

Debtors Plan Support Agreement Covenants:  has the meaning given to such term in Section 4.12 hereof.

Default Purchase Right:  has the meaning given to such term in Section 1.2(c) hereof.

Default Units:  has the meaning given to such term in Section 1.2(c) hereof.

Defaulting Backstop Party:  has the meaning given to such term in Section 1.2(c) hereof.

Definitive Documents:  has the meaning given to such term in the Plan Support Agreement as in effect on the date of this Agreement.

Deposit Deadline: has the meaning given to such term in Section 1.2(b) hereof.

Determination Date:  has the meaning given to such term in Section 1.1(b) hereof.

DIP Facility:  means a debtor-in-possession revolving credit facility to be entered into by the Debtors in the principal amount not to exceed $175.0 million on terms and conditions materially consistent with the term sheet set forth in Exhibit 2 attached to the Plan Term Sheet and are otherwise in form and substance reasonably satisfactory to the Debtors and the Backstop Parties.

DIP Facility Documentation:  has the meaning given to such term in Section 4.8 hereof.

Disclosure Statement:  means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

Disclosure Statement Hearing:  means the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

Disclosure Statement Motion:  has the meaning given to such term in Section 4.1 hereof.

Disclosure Statement Order:  has the meaning given to such term in Section 6.1(d) hereof.

Effective Date:  means the first Business Day on which all conditions to the "Effective Date" set forth in Article IX.A of the Plan have been satisfied or waived, and no stay of the Confirmation Order is in effect.

Encumbrance:  means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

Environmental Laws:  means all applicable Laws and Orders relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Uniform Safety Act, as amended (49 U.S.C. 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 et seq.); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 et seq.); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f et seq.); and their state, municipal and local counterparts or equivalents and any transfer of ownership notification or approval statutes.

ERISA:  means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate(s):  means any entity which is a member of any Debtor or its Subsidiaries' controlled group, or under common control with any Debtor or its Subsidiaries, within the meaning of Section 414 of the Code.

Escrow Account:  has the meaning given to such term in Section 1.2(b) hereof.

Escrow Agreement:  has the meaning given to such term in Section 1.2(b) hereof.

Execution Date:  has the meaning given to such term in <u>Section 1.4</u> hereof.

Exercise Price:  has the meaning given to such term in the recitals hereof.

Exhibit Plan:  means the form of the Plan attached as <u>Exhibit A</u> hereto.

Exit Facility:  means an asset based revolving loan/letter of credit facility to be entered into by the Debtors on the Effective Date in the amount of approximately $175.0 million from Bank of America, N.A. or such other similar institution on terms and conditions materially consistent with the terms and conditions set forth in Exhibit 3 attached to the Plan Term Sheet and are otherwise in form and substance reasonably satisfactory to the Backstop Parties.

Exit Facility Documentation:  has the meaning given to such term in <u>Section 4.9</u> hereof.

Final Order:  has the meaning given to such term in the Plan.

Financial Statements:  has the meaning given to such term in <u>Section 2.15</u> hereof.

Financing Letter:  means that certain commitment letter, dated April 9, 2010, from Banc of America Securities LLC, Wells Fargo Capital Finance, LLC, GE Capital Markets, Inc., Bank of America, N.A., General Electric Capital Corporation and the other lenders listed on the signature pages thereto and accepted and agreed to by the Company which contemplates the DIP Facility and the Exit Facility, as amended, supplemented or otherwise modified from time to time.

First Lien Term Loan Cash Payment:  has the meaning given to such term in the Plan.

First Lien Term Loan Claims:  has the meaning given to such term in the Plan.

First Lien Term Loan Equity Election:  has the meaning given to such term in the Plan.

First Lien Term Loan Rights Offering Participants:  has the meaning given to such term in the recitals hereof.

Governmental Body:  means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body.

HSR Act:  means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

Indemnified Party:  has the meaning given to such term in <u>Section 8(a)</u> hereof.

Initial Consenting Holders: means the holders of First Lien Term Loan Claims that were parties to the Plan Support Agreement on the effective date of the Plan Support Agreement.

Initial Transaction Expenses: has the meaning given to such term in Section 1.4 hereof.

IP Rights: has the meaning given to such term in Section 2.8 hereof.

IRS: means the Internal Revenue Service and any Governmental Body succeeding to the functions thereof.

Law: means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Body.

Leased Real Property: has the meaning given to such term in Section 2.14 hereof.

Material Adverse Effect: means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Debtors, taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, effect, occurrence, development, circumstance or change of fact arising out of or resulting from (a) conditions or effects that generally affect Persons engaged in the industries and markets in which the Debtors operate, (b) general economic conditions in the United States or globally, (c) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (d) financial, banking, securities, credit or commodities markets, prevailing interest rates, or general capital markets conditions in the United States or globally, (e) changes in U.S. generally accepted accounting principles, (f) changes in laws, rules, regulations, orders, or other binding directives issued by any Governmental Body, or (g) the taking of any action expressly contemplated by this Agreement, including the filing of the Chapter 11 Cases (but not defaults or violations of the terms of this Agreement); except in each of clauses (a), (b), (c) and (d) above, if any of the Debtors is disproportionately affected thereby relative to other Persons engaged in the industry in which such Debtor operates.

New Common Units: has the meaning given to such term in the Plan.

No Recourse Party: has the meaning given to such term in Section 12.14 hereof.

Non-Defaulting Backstop Party: has the meaning given to such term in Section 1.2(c) hereof.

Operating Agreement: means a limited liability company agreement to be entered into on the Effective Date by and among Reorganized Neff and the holders of the New Common Units and other interests in Reorganized Neff (if any), which limited liability company agreement shall contain terms and conditions acceptable to each of the Backstop Parties.

Order: means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Body, whether preliminary, interlocutory or final.

Organizational Documents: means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

Owned Real Property: has the meaning given to such term in Section 2.14 hereof.

Payout Event: has the meaning given to such term in the Exhibit Plan.

Permitted Encumbrances: means (a) Encumbrances for utilities and current taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the purchased assets which do not, individually or in the aggregate, adversely affect the operation of the business, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course of business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and do not result from a breach, default or violation by a Debtor or any of its Subsidiaries of any Contract or Law, (e) such other Encumbrance or title exceptions as the Backstop Parties may approve in writing in their sole discretion or which do not, individually or in the aggregate, materially adversely affect the operation of the business in any material respect and (f) any obligations, liabilities or duties created by this Agreement or any of the Ancillary Agreements.

Person: means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a Governmental Body.

Petition Date: means the date that the Chapter 11 Cases are commenced.

Plan: has the meaning given to such term in the recitals hereof.

Plan Supplement: has the meaning given to such term in the Plan.

Plan Support Agreement: means the Plan Support Agreement, dated as of April 12, 2010, by and among the Company (on behalf of itself and the other Debtors) and the holders

of the First Lien Term Loan Claims parties thereto from time to time as "Consenting Lenders" thereunder, as amended, supplemented or otherwise modified from time to time.

Plan Term Sheet:  means the Joint Plan of Reorganization Term Sheet attached as Exhibit A to the Plan Support Agreement, as amended, supplemented or otherwise modified from time to time with the prior written consent of each of the Backstop Parties.

Proceeds:  means the net cash proceeds from the sale of the Rights Offering Units from the Rights Offering and the sale of the Backstop Units pursuant to this Agreement.

Proceeding:  means any action, arbitration, audit, hearing, investigation, inquiry, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

Pro Rata:  has the meaning given to such term in the Plan.

Purchase Notice:  has the meaning given to such term in Section 1.1(b) hereof.

Related Fund:  means, with respect to any Backstop Party, any fund, account or investment vehicle that is controlled or managed by (a) such Backstop Party, (b) a controlled Affiliate of such Backstop Party or (c) the same investment manager or advisor as such Backstop Party or an Affiliate of such investment manager or advisor.

Related Person:  means, with respect to any Person, such Person's current and former Affiliates, members, partners, controlling persons, subsidiaries, officers, directors, managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective successors and assigns.

Reorganized Neff: has the meaning given to such term in the preamble hereof.

Representatives:  has the meaning given to such term in Section 4.6 hereof.

Rights:  has the meaning given to such term in the recitals hereof.

Rights Offering:  has the meaning given to such term in the recitals hereof.

Rights Offering Amount:  has the meaning given to such term in the recitals hereof.

Rights Offering Documentation:  has the meaning given to such term in Section 4.2 hereof.

Rights Offering Participants:  has the meaning given to such term in the recitals hereof.

Rights Offering Procedures:  has the meaning given to such term in Section 1.1(a) hereof.

<u>Rights Offering Term Sheet</u>:  means the Terms of a Rights Offering attached as Exhibit 1 to the Plan Term Sheet, as amended, supplemented or otherwise modified from time to time with the prior written consent of each of the Backstop Parties.

<u>Rights Offering Units</u>:  has the meaning given to such term in the recitals hereof.

<u>Satisfaction Notice</u>:  has the meaning given to such term in <u>Section 1.1(b)</u> hereof.

<u>Second Lien Credit Agreement</u>:  has the meaning given to such term in the Plan.

<u>Second Lien Term Loan Cash Payment</u>: has the meaning given to such term in the Plan.

<u>Second Lien Term Loan Rights Offering Participants</u>:  has the meaning given to such term in the recitals hereof.

<u>Securities Act</u>:  means the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

<u>Specified Issuance Documentation</u>:  has the meaning given to such term in <u>Section 4.11</u> hereof.

<u>Specified Issuance Steps</u>:  has the meaning given to such term in <u>Section 4.11</u> hereof.

<u>Specified Issuances</u>:  means, collectively, (a) the issuance and sale by Reorganized Neff of the New Common Units and (to the extent required under the Plan) the Warrants to the Debtors pursuant to the Asset Purchase Agreement, (b) the distribution by Reorganized Neff of the Rights to the Rights Offering Participants pursuant to the Plan, (c) the distribution by the Debtors of the New Common Units to (subject to the terms of the Plan) the holders of Allowed First Lien Term Loan Claims and (subject to the terms of the Plan) the holders of Allowed Second Lien Term Loan Claims as of the Voting Record Date pursuant to the Plan, (d) (if applicable) the distribution by the Debtors of the Warrants to the holders of Allowed Second Lien Term Loan Claims as of the Voting Record Date pursuant to the Plan, (e) the issuance and sale by Reorganized Neff of Rights Offering Units to the holder of a Right upon exercise of such Right, (f) the issuance and sale by Reorganized Neff of New Common Units to the holder of a Warrant upon exercise of such Warrant, and (g) the issuance and sale by Reorganized Neff of the Backstop Units to the Backstop Parties pursuant to this Agreement.

<u>Subsidiary</u>:  means, with respect to any Person (the "<u>Owner</u>"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

<u>Subscription Agent</u>:  has the meaning given to such term in <u>Section 4.4</u> hereof.

NY 72739029v7

Term Sheets:  means, collectively, the Plan Term Sheet and the Rights Offering Term Sheet.

Termination Date:  has the meaning given to such term in Section 7(a)(i) hereof.

Transaction Expenses:  means the reasonable and documented fees (other than the Commitment Fee and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Commitment Letter, the Term Sheets, the Backstop Commitments, the Rights Offering, this Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Commitment Letter and/or this Agreement, including but not limited to, (a) the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and any other advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the HSR Act and any expenses related thereto.

Triggering Event:  has the meaning given to such term in Section 1.5 hereof.

2008 Financial Statements:  has the meaning given to such term in Section 2.15 hereof.

2009 Financial Statements:  has the meaning given to such term in Section 2.15 hereof.

Unsubscribed Units:  has the meaning given to such term in the recitals hereof.

Voting Record Date:  has the meaning given to such term in the Plan.

Warrants:  has the meaning given to such term in the Plan.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

NY 72739029v7

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**<u>DEBTORS</u>:**

**NEFF CORP.**

By: _____
     Name:
     Title:

**NEFF HOLDINGS CORP.**

By: _____
     Name:
     Title:

**NEFF RENTAL, INC.**

By: _____
     Name:
     Title:

**NEFF RENTAL LLC**

By: _____
     Name:
     Title:

**NEFF FINANCE CORP.**

By: _____
     Name:
     Title:

**NEFF HOLDINGS LLC**

By: _____
Name:
Title:

**BACKSTOP PARTIES:**

████████████████████████
████████

By:  ████████████████████ its
investment manager

By:  _____
Name:
Title:

████████████████████████
████████████████

By:  ████████████████████ its
investment manager

By:  _____
Name:
Title:

████████████████████████
████████

By:  ████████████████████ its
investment manager

By:  _____
Name:
Title:

████████████████████████

By: ██████████████████ its
investment advisor

By: ██████████████████ its
general partner

By: _____
Name:
Title:

███████████████████████████

By: ████████████ its general partner

By: ████████████ its general partner

By: _____
   Name:
   Title:

**<u>REORGANIZED NEFF</u>:**

**REORGANIZED NEFF, L.L.C.**

By: _____
     Name:
     Title:

**Schedule 1**
<u>Backstop Parties</u>

| Name and Address of <br> <u>Backstop Party</u> | Backstop <br> Commitment <br> <u>Percentage</u> | Mailing Address <br> <u>and Fax Number</u> |
|---|---|---|



## Schedule 2

- 
- 

NY 72739029v7

Plan of Reorganization

Rights Offering Procedures

**PLAN SUPPLEMENT**
<u>**EXHIBIT 2**</u>

**Description of Exit Facility Terms**

**NEFF CORP.**
**Summary of Terms and Conditions**
**of Exit Facility**

All capitalized terms used herein but not defined shall have the meanings provided in the Commitment Letter.

| | |
|---|---|
| Borrower/Co-Borrowers: | Neff Corp. (the "***Borrower***") and all of its subsidiaries (collectively, the "***Co-Borrowers***" and together with the Borrower, the "***Borrowers***"). |
| Holdings Guarantor: | All obligations under the Exit Facility will be unconditionally guaranteed (the "***Guarantee***") by Neff Holdings Corp. |
| Exit Facility: | The Exit Facility shall be an asset-based revolving credit facility in an aggregate total principal amount of $175 million (the "***Exit Commitment***") to be allocated among the Exit Lenders. Advances under the Exit Facility ("***Exit Advances***") shall be limited by the Borrowing Base (as defined below). The Exit Facility shall have swingline and letter of credit subfacilities in the same amounts as and on substantially similar terms as the Pre-Petition First Lien Credit Agreement. The Exit Facility shall not contain any uncommitted incremental facility concept. |
| | To the extent not otherwise specified herein, the terms of the Exit Facility as set forth in the credit agreement relating to the Exit Facility (the "***Exit Agreement***"), will be substantially similar to those of the Pre-Petition First Lien Credit Agreement; it being understood that the covenants of the Exit Agreement will be the same as those in the Pre-Petition First Lien Credit Agreement unless expressly stated herein but that the baskets and exceptions thereto will be tighter and fewer than those in the Pre-Petition First Lien Credit Agreement and that the Exit Agreement will not contain term loans. The Exit Facility will have monthly financial reporting. |
| Use of Proceeds of Exit Facility: | The Exit Facility will be used to provide working capital and for other general corporate purposes of the Borrower. |
| Exit Lenders: | Bank of America, N.A., and a syndicate of financial institutions. |
| Exit Agent: | Bank of America, N.A. |
| Exit Lead Arrangers: | Bank of America Securities LLC ("***BAS***"), Wells Fargo Capital Finance, LLC ("***Wells***") and GE Capital Markets, Inc. ("***GECM***") |
| Exit Facility Borrowing Base: | Advances under the Exit Facility will be limited to the sum of: |

(a)    85% of Eligible Accounts (as such term is defined in the Pre-Petition First Lien Credit Agreement); plus

(b)    the lesser of (i) 85% of net orderly liquidation value or (ii) 95% of the net book value of Rental Fleet and Equipment (as such term is defined in the Pre-Petition First Lien Credit Agreement), plus

(c)    the lesser of (i) $5,000,000 upon the Plan Effective Date (as defined below) minus $625,000 on a quarterly basis thereafter and (ii) 85% of the net orderly liquidation value of the rolling stock (the "*Rolling Stock Prong*"), minus

(d)    such reserves as the Exit Agent and GECC (collectively, the "*Decision Agents*") may establish in their Permitted Discretion; provided, that at no time shall there be any reserves with respect to swap obligations existing on the date of consummation of the Exit Facility (the "*Borrowing Base*").

"*Permitted Discretion*" means, on three Business Days' prior notice, discretional changes in Reserves based on events, conditions or other circumstances arising after the Exit Facility Closing Date or based on facts not known to the Decision Agents as of the Exit Facility Closing Date (i) that, in the Decision Agents' commercially reasonable judgment exercised in good faith in accordance with customary business practices for comparable asset-based lending transactions, have a reasonable relationship to the event, condition or other circumstance that caused such change and (ii) will be eliminated when, in the Decision Agents' commercially reasonable judgment exercised in good faith in accordance with customary business practices for comparable asset-based lending transactions, the event, condition or other circumstance causing the establishment thereof no longer exists or is no longer relevant to Borrower's business. The Decision Agents will use their commercially reasonable efforts to consult with Borrower when establishing new or increasing existing Reserves.
Further, in the Exit Facility the Borrower will have the ability in a one time transaction to (a) refinance the rolling stock so long as the financing amount exceeds the amount attributed to the rolling stock for borrowing base purposes as in effect on the Plan Effective Date or (b) sell rolling stock for any business purpose.

Reserves:    "**Reserves**" means, on any date of determination, with respect to the Borrowing Base, reserves established by the Decision Agents from time to time against the Borrowing Base or any component thereof in an amount equal to the sum of, without duplication, the

following: (a) all amounts of past due rent, fees or other charges owing at such time by any Debtor to any landlord of any premises where any of the Collateral is located or to any processor, repairman, mechanic or other person who is in possession of any Collateral or has asserted any lien or claim thereto; (b) any amounts which any Debtor is obligated to pay pursuant to the provisions of any of the Exit Credit Documentation that the Decision Agents or any Exit Lender elects to pay for the account of such Debtor in accordance with authority for such election contained in any of the loan documents; (c) the aggregate amount of reserves established by Decision Agents in respect of banking relationship debt; (d) any Rent Reserve; and (e) such additional reserves in respect of events, conditions or other circumstances arising after the Exit Facility Closing Date, in each case, in such amounts as Decision Agents may elect to impose from time to time in their Permitted Discretion. Notwithstanding anything in the loan documents to the contrary, Reserves shall not be established to the extent that such Reserves would be duplicative of any specific item excluded as ineligible in the definitions of Eligible Accounts or Eligible Rental Fleet and Equipment, but Decision Agents shall retain the right, subject to the requirements set forth above, to establish Reserves with respect to prospective changes in eligible Collateral in their Permitted Discretion.

| | |
|---|---|
| Sections 1.7, 1.8 and 1.9 of the Pre-Petition First Lien Credit Agreement: | Sections 1.7, 1.8 and 1.9 of the Pre-Petition First Lien Credit Agreement shall be incorporated into the Exit Credit Documentation as modified to be consistent with this paragraph. In such Sections as incorporated in the Exit Credit Documentation, the definitions of Eligible Accounts, Eligible Parts Inventory and Eligible Rental Fleet and Equipment (as defined therein) shall mean all Accounts, Parts Inventory and Rental Fleet and Equipment in each case as defined in the Pre-Petition First Lien Credit Agreement, respectively, of the Debtors, except to the extent any of the specifically-enumerated ineligibility standards set forth in the Pre-Petition First Lien Credit Agreement, applies to such Accounts, Parts Inventory and Rental Fleet and Equipment. However, the current language in each such Section of the Pre-Petition First Lien Credit Agreement regarding the Decision Agents ability to adjust the advance rate or to create new criteria or adjust existing criteria shall be deleted. The Decision Agents shall retain the ability to establish Reserves as set forth above. |
| Section 2.6 of the Pre-Petition First Lien Credit Agreement: | Section 2.6 of the Pre-Petition First Lien Credit Agreement shall be incorporated into the Exit Credit Documentation as modified to be consistent with this paragraph. Without limiting any other rights Decision Agents may have to establish Reserves with respect to such locations or warehouse space leased or owned as of the |

Original Closing Date (as defined in the Pre-Petition First Lien Credit Agreement), if Decision Agents have not received a landlord's agreement or bailee letter as of the Original Closing Date (or such later date as may be agreed to by Exit Agent in its sole discretion), the Collateral at that location shall, in Decision Agents Permitted Discretion, be subject to a Rent Reserve (without duplication of existing reserves).

"*Rent Reserve*" means, with respect to any property of any Debtor in any Landlord Lien State at which any Collateral is located but for which such Debtor has not obtained a landlord's agreement, mortgagee agreement or bailee letter, as applicable, in accordance with Section 2.6 of the Pre-Petition First Lien Credit Agreement, an amount equal to three (3) months estimated mortgage or rental payments for such property plus any other fees or charges owing by such Debtor to each applicable landlord, mortgagee or bailee, as applicable, that has not duly executed and delivered to Exit Agent a landlord's agreement, mortgagee agreement or bailee letter or other subordination of security interest, in form and substance reasonably satisfactory to Decision Agents; provided, however, that any of the foregoing amount shall be adjusted from time to time hereafter upon (a) delivery to the Exit Agent of any such acceptable waiver or subordination, (b) the opening or closing of a Collateral location and/or (c) any change in the amount of rental, storage or processor payments or similar charges.

"*Landlord Lien State*" means such state(s) or jurisdictions in which a landlord's claim for rent or other obligations has priority over the Lien of Exit Agent in any of the Collateral.

Excess Availability:

The Borrower will be required to have Excess Availability (as defined below) on the closing date, with all of the Borrower's obligations current in accordance with historical practices, of at least $50.0 million (without taking into account any swap reserves or any new categories of discretionary reserves not existing as of the date hereof). "*Excess Availability*" will be defined as (a) the lesser of the aggregate commitments in respect of the Exit Facility and the aggregate Borrowing Base as of the last day of any fiscal month or as of any date of determination, as applicable (such day, the "*Test Date*") minus (b) the aggregate amount of loans and the maximum face value of letters of credit outstanding under the Exit Facility as of such date. Borrowing Base reserve determinations and decisions, for the Exit Facility, customarily made by a "collateral agent" (as determined in the definitive documentation) will be made by the Decision Agents and the determination shall reflect Credit Judgment.

| Priority: | Obligations under the Exit Facility will be secured by perfected first-priority liens in or on all assets, including, without limitation, all real property, fixtures, accounts, inventory, equipment, documents, general intangibles, payment intangibles, contract rights, chattel paper, instruments, investment property, commercial tort claims, trademarks, copyrights, patents, and other intellectual property, deposit accounts, cash and cash equivalents, and all other assets and property of the Borrowers and their estates, real and personal, tangible and intangible, and all proceeds thereof (the "**Collateral**"), whether now existing or hereafter acquired. |
|---|---|
| Maturity Date: | The Exit Facility shall have a maturity of four years from the Petition Date. |
| Prepayments: | Optional and mandatory prepayments on terms consistent with those of the Pre-Petition First Lien Credit Agreement. |
| Interest Rates: | The Exit Facility will initially bear interest (payable quarterly) at a rate equal to LIBOR plus 450 bps or Base Rate plus 350 bps and such rates will be subject to a grid based on the following pricing and metrics: |

| Average Availability | Base Rate Margin | LIBOR Margin |
|---|---|---|
| Level I - Less than $75.0 million | 350 bps | 450 bps |
| Level II - Equal to or greater than $75.0 million but less than $125.0 million | 325 bps | 425 bps |
| Level III - Equal to or greater than $125.0 million | 300 bps | 400 bps |

LIBOR and Base Rate will be defined similarly to the definitions in the Pre-Petition First Lien Credit Agreement. There will be no LIBOR floor or Base Rate floor in the Exit Facility.

| Default Interest: | Upon the occurrence and during the continuance of an Event of Default, interest shall be payable on demand on the amounts outstanding under the Exit Facility at the non-default interest rate |
|---|---|

plus 2% per annum.

| Letter of Credit Fees: | Borrower will pay (a) a letter of credit fee equal to the applicable per annum LIBOR margin (calculated on the basis of actual number of days elapsed in a year of 360 days) monthly in arrears on all letters of credit, (b) a 25.0 bps fronting fee to the Exit Agent upon the issuance of each letter of credit, and (c) the Exit Agent's customary fees and charges in connection with all amendments, extensions, draws and other actions with respect to letters of credit. |

| Unused Line Fee: | The Borrower will pay a monthly fee in arrears equal to the following percentages of the unused portion of each Exit Lender's commitments under the Exit Facility: |

| Average Daily Drawn Commitments as a Percentage of the Total Commitment | Unused Line Fee |
|---|---|
| 2/3% or more | 50 bps |
| Less than 2/3% and greater than 1/3% | 75 bps |
| Less than or equal to 1/3% | 100 bps |

| Exit Lender Voting Rights: | Voting shall be based upon the Exit Lenders' total commitments under the Exit Facility, and the holders of at least 51% of such commitments shall constitute the "***Required Exit Lenders***". The approval of the Required Exit Lenders will be required for all matters unless otherwise specified. Matters requiring the vote of all Exit Lenders shall include, without limitation, those items that would require the vote of all revolving lenders under the Pre-Petition First Lien Credit Agreement. |

| | |
|---|---|
| Reimbursement of Expenses: | The Exit Agent shall be entitled to reimbursement of its fees and expenses incurred in the discharge of its duties as Exit Agent, including all professional fees and expenses incurred during the term of the Exit Facility. The Borrowers will pay all such amounts monthly upon submission of invoices within 10 business days. To the extent not timely paid by the Borrowers, each Exit Lender agrees that such amounts shall be drawn from the Exit Facility by the Exit Agent (without need to meet borrowing conditions) and shall constitute Exit Advances (together with the other outstanding Exit Advances and any other obligations under the credit documents relating to the Exit Facility, collectively, the "*Exit Obligations*") and will count against, the Exit Commitment. |
| Conditions Precedent to All Borrowings: | Include: (i) all representations and warranties are true and correct in all material respects as of the date of each borrowing; (ii) no Default or Event of Default under the Exit Facility has occurred and is continuing, or would result from such borrowing; and (iii) the aggregate principal amount of all outstanding advances under the Exit Facility and the aggregate undrawn amount of all outstanding letters of credit on such date, after giving effect to such borrowing or the issuance or renewal of such letter of credit, shall not exceed the Borrowing Base on such date, as well as other conditions precedent customary for financings of this type. |
| Representations and Warranties, Affirmative and Negative Covenants: | Substantially consistent with the Pre-Petition First Lien Credit Agreement, together with covenants requiring delivery of monthly financial statements within 3 Business Days after each month, periodic delivery of reconciliation of the Projections, and other representations, warranties and covenants customary for financings of this type. |
| Appraisals: | During the term of the Exit Facility, the Borrower shall provide three appraisals per year (including one appraisal as a condition precedent to borrowings under the Exit Facility (which appraisal shall be commenced no later than September 1, 2010) but that shall not affect availability under the DIP Facility unless otherwise agreed-to by the Borrower) plus an additional appraisal at the sole option of the administrative agent under the Exit Facility if an Event of Default has occurred and is continuing. |
| Cash Dominion: | The Borrowers shall enter into cash management arrangements reasonably acceptable to the Exit Agent (the "*Exit Control Agreements*") (it being understood that existing agreements under the Pre-Petition First Lien Credit Agreement are acceptable). During the term of the Exit Facility, all cash of the Borrowers shall be deposited directly into accounts with the Exit Agent covered by Exit Control Agreements (except for payroll, trust and accounts not |

exceeding $100,000 in the aggregate at any time). During the term of the Exit Facility, as long as Excess Availability is more than $40.0 million, the Borrowers shall have full control of all cash deposited into any accounts.

Financial Covenants:  If at any time Excess Availability is less than $30.0 million, then for the period ending on the last day of the most recent fiscal month ending prior to such Excess Availability falling below $30.0 million and until such time as Excess Availability has been equal to or greater than $30.0 million for 90 consecutive days, the Exit Financing will have the following covenants: (x) adjusted EBITDA as of the last day of each fiscal month for the trailing twelve month period then ended shall be in excess of the following threshold (the "EBITDA Threshold"), and (y) capital expenditures net of proceeds from asset dispositions ("Net Capex") as of the last day of each fiscal month for the trailing twelve month period then ended shall be no greater than the following threshold (the "Net Capex Threshold"):

| Year | EBITDA Threshold | Net Capex Threshold |
|------|------------------|---------------------|
| 2010 | $30.0 million | $20.0 million |
| 2011 | $35.0 million | $60.0 million |
| 2012 | $50.0 million | $90.0 million |
| 2013 | $60.0 million | $85.0 million |

The Net Capex Threshold applicable in any year shall be increased by 50% of the amount by which the Borrower's actual Net Capex during the prior calendar year was less than the Net Capex Threshold applicable during such prior calendar year without giving effect to any carryover.

Events of Default:  Events of Default substantially consistent with the Pre-Petition First Lien Credit Agreement but potentially with different baskets and grace periods.

| | |
|---|---|
| Assignments and Participations: | Assignment and participation provisions substantially consistent with the Pre-Petition First Lien Credit Agreement. |
| Waivers and Amendments: | Amendment and waiver provisions substantially consistent with the Pre-Petition First Lien Credit Agreement. |
| Indemnification: | Substantially consistent with the Pre-Petition First Lien Credit Agreement.. |
| Fees and Expenses: | Reasonable fees and documented out-of-pocket expenses of the Exit Agent and the Exit Lenders (including, without limitation, fees and expenses of attorneys to each of the Exit Agent, Wells and GECC), in each case, shall be paid by the Borrowers monthly upon submission of invoices within 15 days. |
| Governing Law, Miscellaneous: | New York. New York exclusive jurisdiction and waiver of jury trial. |
| Counsel to the Exit Agent: | Cahill Gordon & Reindel LLP. |

**PLAN SUPPLEMENT**
<u>**EXHIBIT 3**</u>

**Form of Warrant Agreement**

<u>REORGANIZED NEFF, L.L.C.</u>

<u>[CLASS [__] UNIT] PURCHASE WARRANT</u>

Date of Issuance: _____              Certificate No. W-__

**REORGANIZED NEFF, L.L.C.**

THIS WARRANT WAS ORIGINALLY ISSUED ON [•], 2010 PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>") PURSUANT TO SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101-1532 (THE "<u>BANKRUPTCY CODE</u>"), AND NEITHER THIS WARRANT NOR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW.  TO THE EXTENT THE REGISTERED HOLDER OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT IS AN "<u>UNDERWRITER</u>" (AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE), SUCH SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT ARE SUBJECT TO CERTAIN TRANSFER AND OTHER RESTRICTIONS SET FORTH HEREIN AND IN THE ISSUER'S AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF [_____], 20__ (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "<u>OPERATING AGREEMENT</u>"). THE ISSUER HEREOF (AS DEFINED BELOW, THE "<u>COMPANY</u>") RESERVES THE RIGHT TO REFUSE THE TRANSFER OF THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT EXCEPT IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS WARRANT AND THE OPERATING AGREEMENT, COPIES OF WHICH SHALL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE REGISTERED HOLDER HEREOF UPON WRITTEN REQUEST.

FOR VALUE RECEIVED, Reorganized Neff, L.L.C., a Delaware limited liability company (the "<u>Company</u>"), hereby grants to _____ (together with its successors and permitted assigns, the "<u>Registered Holder</u>") the right to purchase from the Company _____ [Class [__] Units] (the "<u>Units</u>"), as shall from time to time be reduced or increased in accordance with the terms of this Reorganized Neff, L.L.C. [Class [__] Unit] Purchase Warrant (this "<u>Warrant</u>"), less the number of Units already issued in connection with partial exercises of this Warrant, at a per Unit purchase price equal to $_____ (the "<u>Exercise</u>

Price")[1].  This Warrant is issued pursuant to the terms of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated as of May [__], 2010 (as may be amended from time to time, the "Plan").  Certain capitalized terms used herein are defined in Section 3 hereof.  The amount and kind of securities obtainable pursuant to the rights granted hereunder and the purchase price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant.

For tax purposes, the value of this Warrant as of the date hereof is $_____.

This Warrant is subject to the following provisions:

**[PROVISIONS REGARDING (1) RESTRICTIONS ON TRANSFER AND (2) BOOK-ENTRY WARRANTS TO BE PROVIDED]**

Section 1.    Exercise of Warrant.

1A.    Exercise Period.  Subject to Section 1B hereof, the Registered Holder may exercise, in whole or in part (but not as to a fractional number of Units), the purchase rights represented by this Warrant at any time and from time to time after the Date of Issuance through 5:00 p.m. prevailing Eastern time on the earlier of (a) the first Business Day that is three (3) years after the Effective Date (as defined in the Plan) and (b) the occurrence of a Change of Control (the "Exercise Period").

1B.    Exercise Procedure.

(i)    This Warrant shall be deemed to have been exercised when the Company has received all of the following items (the "Exercise of the Warrant"):

(a)    a completed Exercise Agreement, as described in Section 1C below (an "Exercise Agreement") executed by the Registered Holder;

(b)    this Warrant;

(c)    either the Aggregate Exercise Price, in lawful currency of the United States of America either by certified or official bank check made payable to the order of the Company (or if agreed to in the sole and absolute discretion of the Company, by wire transfer in immediately available funds to an account arranged with the Company prior to exercise);

(d)    an investment letter in the form reasonably required by the Company for purposes of complying with applicable securities laws; and

(e)    a counterpart of, or an instrument of accession to, the Operating Agreement duly executed by the Registered Holder.

---

[1] The Exercise Price will be set based on an implied total equity value of the New Common Units equal to $224.0 million.

(ii)     Certificates for Units purchased upon exercise of this Warrant shall be delivered by the Company to the Registered Holder within five (5) Business Days after the date of the Exercise of this Warrant.  Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the Company shall prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and shall, within such five (5) Business-Day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iii)     The Units issuable upon the exercise of this Warrant shall be deemed to have been issued to the Registered Holder at the time of the Exercise of this Warrant (the "Exercise Time"), and the Registered Holder shall be deemed for all purposes to have become the record holder of such Units at the Exercise Time.

(iv)     Each Unit issuable upon exercise of this Warrant shall, upon payment of the Exercise Price therefor, be validly issued, fully paid and nonassessable and free from all preemptive rights, taxes, liens and charges with respect to the issuance thereof, except for any taxes that are the responsibility of the Registered Holder as set forth in clause (vii) below.

(v)     The Company shall not close its books against the transfer of this Warrant or any Unit issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant.

(vi)     The Company shall at all times reserve and keep available out of its authorized but unissued Units solely for the purpose of issuance upon the exercise of this Warrant, such number of Units issuable upon the exercise of this Warrant.  The Company shall not take any action which would (a) cause the number of authorized but unissued Units to be less than the number of Units required to be reserved hereunder for issuance upon exercise of this Warrant, or (b) prevent the Company from lawfully issuing such Units. Nothing in this subsection shall be read to prevent any transaction described in Section 2A or to prevent the consummation of a Change of Control.

(vii)     The Company shall pay all expenses, taxes and other charges payable in connection with the preparation, execution and delivery of Unit certificates and new Warrants pursuant to this Section 1, except that, in case such Unit certificates or new Warrants shall be registered in a name or names other than the name of the Registered Holder, funds sufficient to pay all taxes which shall be payable upon the execution and delivery of such Unit certificate or certificates or new Warrants shall be paid by the Registered Holder to the Company at the time this Warrant is delivered to the Company upon exercise.

(viii)     Upon exercise of this Warrant, the Registered Holder shall have a capital account with respect to such exercise equal to the Aggregate Exercise Price and shall be allocated profits and losses, and entitled to distributions, with respect to the Units issued upon such exercise in accordance with the terms set forth in the Operating Agreement.

1C.     Exercise Agreement.  Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form set forth in Exhibit I hereto.  Such Exercise Agreement shall be dated the actual date of execution thereof.

NY 72760714v2

1D.     Fractional Units.   If a fractional number of Units would, but for the provisions of Section 1A hereof, be issuable upon exercise of the rights represented by this Warrant, the Company shall, within ten (10) Business Days after the date of the Exercise Time, deliver to the Registered Holder a check payable to the Registered Holder in lieu of such fractional Unit in an amount equal to the difference between the Fair Value of such fractional Unit as of the date of the Exercise Time and the Exercise Price of such fractional Unit.

Section 2.     Adjustment of Exercise Price and Number of Units Issuable.   The Exercise Price and the number of Units issuable upon the exercise of this Warrant are subject to adjustment from time to time upon the occurrence of the events enumerated in this Section 2, without duplication.

2A.     Subdivision or Combination of Units.   If the Company at any time subdivides (by any unit split, unit dividend, recapitalization or otherwise) its outstanding Common Units (as defined in the Operating Agreement) into a greater number of Common Units, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of Units obtainable upon exercise of this Warrant shall be proportionately increased.   If the Company at any time combines (by reverse unit split or otherwise) its outstanding Common Units into a smaller number of Common Units, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of Units obtainable upon exercise of this Warrant shall be proportionately decreased.

2B.     Reorganization, Reclassification, Consolidation, Merger or Sale.   Any recapitalization, reorganization, reclassification, consolidation, merger or other transaction (other than (x) any subdivision or combination to which Section 2A hereof applies or (y) any Change of Control), in each case which is effected in such a way that the holders of Units are entitled to receive stock, securities or assets with respect to or in exchange for Units is referred to herein as an "Organic Change."   Prior to the consummation of any Organic Change, the Company shall make appropriate provision to insure that each of the Registered Holders of the Warrants shall thereafter have the right to acquire and receive, in lieu of or addition to (as the case may be) the Units immediately theretofore acquirable and receivable upon the exercise of such holder's Warrant, such shares of stock, securities or assets as would have been issued or payable in such Organic Change (if the holder had exercised this Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of Units immediately theretofore acquirable and receivable upon exercise of such holder's Warrant had such Organic Change not taken place.   In any such case, the Company shall make appropriate provision with respect to such holders' rights and interests to insure that the provisions of this Section 2A shall thereafter be applicable to this Warrant.   The Company shall not effect any such Organic Change, unless prior to the consummation thereof, the successor entity (if other than the Company) resulting from consolidation or merger assumes by written instrument, the obligation to deliver to the Registered Holder such shares of stock or securities as, in accordance with the foregoing provisions, the Registered Holder may be entitled to acquire.

2C.     When No Adjustment Required.   No adjustment need be made to the Exercise Price except as expressly provided in Section 2A hereof and no adjustment need to be made to the number of Units issuable upon exercise of this Warrant except as expressly provided in Sections 2A and 2B hereof.   Without limiting the generality of the foregoing, no adjustment

- 4 -

need be made to the Exercise Price, the number of Units issuable upon exercise of this Warrant or any other aspect of this Warrant for any of the following:

(i)     the issuance of securities by the Company on or after the Effective Date or pursuant to the Plan; or

(ii)     the issuance of options, equity or equity-based grants or other securities in connection with any equity incentive plan.

2D.     The Company Determination Final.  Any determination that the Company must make pursuant to this Section 2 is (absent manifest error) conclusive if such determination is made in good faith.

2E.     Notice of Certain Transactions.  If:

(i)     the Company proposes to take any action that would require an adjustment to the Exercise Price or the number of Units issuable upon exercise of this Warrant pursuant to Section 2A or 2B hereof; or

(ii)     there is a proposed liquidation or dissolution of the Company,

then the Company shall use its reasonable efforts to mail to the Registered Holder a notice stating the proposed record date for a dividend or distribution or the proposed effective date of a subdivision, combination, Organic Change, liquidation or dissolution.  The Company shall mail the notice at least fifteen (15) days before such date.  Failure to mail the notice or any defect in it shall not affect the validity of the transaction.

Section 3.     Definitions.  The following terms have meanings set forth below:

"Affiliate" shall have the meaning ascribed to such term in Rule 12b−2 promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

"Aggregate Exercise Price" means, with respect to any exercise of the purchase rights represented by this Warrant, an amount equal to the product of the Exercise Price multiplied by the number of Units being purchased upon such exercise.

"Change of Control" means the occurrence of (i) any consolidation or merger of the Company with or into any other Person, or any other reorganization, transaction or transfer of securities of the Company by its members, or series of related transactions (including the acquisition of limited liability company interests of the Company), whether or not the Company is a party thereto, in which the members of the Company immediately prior to such consolidation, merger, reorganization, transaction or transfer, own, directly or indirectly, limited liability company interests representing directly, or indirectly through one or more entities, less than fifty percent (50%) of the equity (measured by economic value or voting power) of the Company or other surviving entity immediately after such consolidation, merger, reorganization, transaction or transfer, (ii) a sale, lease or other disposition, in one transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company, and (iii)

the liquidation or dissolution of the Company or the adoption of a plan by the members of the Company relating to the liquidation or dissolution of the Company.

"Fair Value" means the value of a Unit to be issued pursuant to the exercise of this Warrant as determined in good faith by the board of directors, board of managers or other governing body of the Company.

"Ownership or Control" (and derivatives thereof) shall mean (i) ownership of record, (ii) "beneficial ownership" as defined in Rule 13d−3 or Rule 16a−1(a)(2) promulgated by the SEC under the Exchange Act and/or (iii) the power to direct and manage, by agreement, contract, agency or other manner, the voting or management rights or disposition of securities of the Company.

"Person" shall mean an individual, partnership, corporation, limited liability company, trust or other entity.

Other capitalized terms used in this Warrant but not defined herein shall have the meanings set forth in the Plan.

Section 4.    No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the Registered Holder hereof to any voting rights or other rights as a member of the Company, or any rights, powers or privileges under the Operating Agreement.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Units, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such Registered Holder for the Exercise Price of Units acquirable by exercise hereof or as a member of the Company.

Section 5.    Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for two or more new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each such new Warrant shall represent such portion of such rights as is designated by the Registered Holder at the time of such surrender, subject to the Denomination Restrictions described below.  The date the Company initially issues this Warrant shall be deemed to be the "Date of Issuance" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.  All Warrants representing portions of the rights hereunder are referred to herein as the "Warrant." In no event shall new Warrants be issued (a) if such issuance would result in the Company having 300 or more holders of equity securities of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder), (b) representing less than the right to purchase [100] Units, or (c) representing the right to purchase fractional Units, unless the old Warrant being exchanged represented the right to purchase such fractional Units, in which case one new Warrant may represent the right to purchase the same number of fractional Units as the old Warrant (together, these are the "Denomination Restrictions").

Section 6.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the Registered Holder shall be satisfactory) of the ownership and

the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company (provided that if the Registered Holder is a financial institution or other institutional investor its own agreement shall be satisfactory), or, in the case of any such mutilation upon surrender of such certificate, the Company shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 7.    Notices.  Except as otherwise expressly provided herein, all notices referred to in this Warrant shall be in writing and shall be delivered personally, sent by reputable overnight courier service (charges prepaid) or sent by registered or certified mail, return receipt requested, postage prepaid and shall be deemed to have been given when so delivered, sent or deposited in the U.S. Mail (i) to the Company, at its principal executive offices, and (ii) to the Registered Holder of this Warrant, at such Registered Holder's address as it appears in the records of the Company (unless otherwise indicated by any such Registered Holder).

Section 8.    Amendment and Waiver.  This Warrant is one of a series of warrants originally exercisable for an aggregate of [•] Units issued by the Company on [•], 2010 (the "Reorganization Warrants").  The provisions of this Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of either (a) the Registered Holder of this Warrant or (b) the Registered Holders of Reorganization Warrants representing at least 50.1% of the Units issuable upon exercise of the Reorganization Warrants; provided, that no such action may change the Exercise Price of this Warrant or the number or class of Units obtainable upon exercise of this Warrant without the written consent of the Registered Holder of this Warrant.

Section 9.    Descriptive Headings; Governing Law.  The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant.    ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS WARRANT SHALL BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTIONS) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTIONS OTHER THAN THE STATE OF NEW YORK.

Section 10.    <u>Acknowledgment; Securities Law Compliance</u>.    The Registered Holder, by its acceptance of this Warrant, acknowledges and agrees that this Warrant (including any Units issued upon exercise of this Warrant) were issued pursuant to an exemption from the registration requirement of Section 5 of the Securities Act provided by section 1145 of the Bankruptcy Code or Section 4(2) of the Securities Act, and to the extent that the Registered Holder is an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, the Registered Holder may not be able to sell or transfer this Warrant or any Units issued upon exercise of this Warrant in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.

* * * *

NY 72760714v2

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed and attested by its duly authorized officers and to be dated the Date of Issuance hereof.

By _____

Its _____

Attest:

_____
Secretary

EXHIBIT I

## <u>EXERCISE AGREEMENT</u>

To:                                        Dated:


       The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-____), hereby agrees to subscribe for the purchase of [_____] Units covered by such Warrant and makes payment herewith in full therefor at the price per share provided by such Warrant.

Signature  _____

Address  _____

**PLAN SUPPLEMENT**
**EXHIBIT 4**

**Payout Event Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-_____(____) |
| Debtors. | Joint Administration Requested |

## PAYOUT EVENT PROCEDURES

On [_____], 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Disclosure Statement Order") approving, among other things, (a) the *Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented or modified from time to time, the "Disclosure Statement"), as containing adequate information, as required under section 1125(a) of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), (b) the procedures for soliciting votes with respect to the *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented or modified from time to time, the "Plan"); and (c) these procedures through which parties may submit proposals for a Payout Event (collectively, these "Payout Event Procedures").[2]

## 1. Payout Event Procedures

Any proposal, solicitation or offer for a Payout Event (each, a "Bid") by a potential bidder (each, a "Bidder") must be submitted in writing and determined by the Debtors to have satisfied the following conditions (collectively, the "Bid Conditions"):

a) <u>Payout Event</u>: Such Bid shall provide the Debtors with sufficient cash and/or committed financing to: (i) indefeasibly pay all allowed First Lien Term Loan Claims in full in cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate); and (ii) treat all other creditors no less favorably than as provided by the Plan;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Plan.

b) <u>Deposit</u>:  Each Bid must be accompanied by a deposit in the amount equal to the greater of (x) 10 percent of the Bidder's equity commitment or (y) $25 million in cash to an interest bearing escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

c) <u>Minimum Overbid</u>:  The aggregate consideration proposed by the Bid must equal or exceed the sum of:

    (i)    sufficient cash to indefeasibly pay all allowed First Lien Term Loan Claims in full in cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate), and treat all other creditors no less favorably than as provided by the Plan; plus

    (ii)    cash in an amount equal to the Break-Up Fee and Transaction Expenses (each as defined in the Backstop Unit Purchase Agreement) (collectively, the "<u>Bid Protections</u>"); plus

    (iii)    $3.0 million (the "<u>Initial Minimum Overbid Increment</u>").

d) <u>Co-Investment Right</u>:  The Bid must provide for a co-investment right of at least $7.5 million to Holders of Second Lien Term Loan Claims.

e) <u>Assumption of Liabilities</u>:  The Bid must expressly assume all liabilities assumed by the Purchaser pursuant to the terms and conditions of the Plan and/or the Purchase Agreement (including all liability for allowed administrative claims against the Debtors and the costs and expenses associated with the wind-down of the Debtors' estates).

f) <u>Minimum Liquidity</u>:  The Bid and related financing commitments must provide at least $40.0 million in excess available liquidity at all times.

g) <u>The Same or Better Terms</u>:  The Bid must be, in the Debtors' reasonable business judgment, substantially on the same or better terms than the terms of the Purchase Agreement and the Plan.  A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Payout Event (the "<u>Payout Event Documents</u>").  The Payout Event Documents shall include a copy of the Plan, the Purchase Agreement, the Schedule of Rejected Executory Contracts and Unexpired Leases and, if applicable, the Backstop Unit Purchase Agreement clearly marked to show all changes requested by the Bidder (including those related to purchase price).

h) <u>Committed Financing</u>:  The Bid must include committed financing documented to the Debtors' reasonable satisfaction that demonstrates the Bidder has (1) received sufficient debt and/or equity funding commitments and (2) adequate working capital financing or resources to finance going concern operations and the proposed Payout Event transaction.  Such funding commitments or other financing shall not be subject to any conditions, internal approvals, syndication

3

requirements, diligence, credit committee approvals, or contingencies and shall have covenants and conditions reasonably acceptable to the Debtors.

i) <u>Identity</u>: All Bids must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Payout Event transaction), and the complete terms of any such participation.

j) <u>Contingencies; No Financing or Diligence Outs</u>: A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the material satisfaction at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Plan or the Purchase Agreement.

k) <u>Demonstrated Financial Capacity</u>: A Bidder must have, in the Debtors' reasonable business judgment, the necessary financial capacity to consummate the proposed Payout Event transactions required by its Bid and provide adequate assurance of future performance under all Executory Contracts and Unexpired Leases to be assumed pursuant to such Bid.

l) <u>Irrevocable</u>: A Bid shall be irrevocable until and unless the Debtors accept a higher Qualified Bid and the Bidder is not selected as the Backup Bidder (as defined herein).

m) <u>Expenses; No Fees Payable to Bidder</u>: Any Bidders presenting Bids shall bear their own expenses in connection with the proposed transaction, whether or not such transaction is ultimately approved. A Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment; <u>provided</u> that the Purchaser shall be entitled to the Bid Protections under the Backstop Unit Purchase Agreement and the Commitment Letter. Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the marketing or auction process.

n) <u>Authorization</u>: Bids must contain evidence that the Bidder has obtained authorization or approval from its Board of Directors (or comparable governing body) with respect to the submission of its Bid.

o) <u>Bid Deadline</u>: A Bid must be transmitted via email (in .pdf or similar format) to: (i) Miller Buckfire & Co. LLC, the Debtors' proposed investment bankers, 153 East 53rd Street, 22nd Floor, New York, New York 10022, Attn.: Ronen Bojmel (ronen.bojmel@millerbuckfire.com) and Adam Fitzner (adam.fitzner@millerbuckfire.com) and (ii) Kirkland & Ellis LLP, the Debtors' proposed counsel, 601 Lexington Avenue, New York, New York 10022, Attn.:

Ray C. Schrock (ray.schrock@kirkland.com) and Brian S. Lennon (brian.lennon@kirkland.com), so as to be **actually received** on or before July 26, 2010 at 5:00 p.m. (prevailing Eastern Time) the ("Payout Event Deadline").

A Bid received on before the Payout Event Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall be a "Qualified Bidder." The Debtors shall provide the Purchaser and its legal and financial advisors with copies of all Qualified Bids. For the avoidance of doubt, the Plan, Purchase Agreement, Backstop Unit Purchase Agreement and Commitment Letter negotiated with the Purchaser documenting the transaction set forth in the Plan shall constitute a Qualified Bid by the Purchaser (who shall also be deemed to be a Qualified Bidder); provided that the Purchaser shall be required to notify the Debtors no later than August 3, 2010 at 5:00 p.m. (prevailing Eastern Time) (the "Counterproposal Deadline") as to whether one or more of the members of the Purchaser will submit a counterproposal to any other Qualified Bid received by the Debtors that they reasonably believe provides higher and better recoveries than that provided by such other Qualified Bid. If less than all of the members of the Purchaser elect to participate in the Auction, such remaining participating member or members shall only be required to demonstrate (in order to satisfy the Bid Conditions) such member's or members' financial capacity to consummate the transactions required by such member's or members' Bid by the Counterproposal Deadline.

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Deposit and all accumulated interest thereon within three (3) business days after the Payout Event Deadline.

The Debtors shall: (i) determine whether any person is a Qualified Bidder; (ii) receive offers from Qualified Bidders; and (iii) negotiate any offer made for a Payout Event together or separately by a Qualified Bidder.

## 2. Auction

If (a) one or more Qualified Bids are received by the Bid Deadline and/or (b) one or more members of the Purchaser has elected to participate in the Auction on or prior to the Counterproposal Deadline, the Debtors will conduct an auction (the "Auction") to determine the Successful Bidder (as defined herein). If no Qualified Bids (other than the Qualified Bid received from the Backstop Parties) are received by the Bid Deadline, the Debtors will not conduct the Auction and shall designate the Purchaser's Qualified Bid as the Successful Bid for the purposes of these Payout Event Procedures.

No later than August 4, 2010, the Debtors will notify all Qualified Bidders of the highest and best Qualified Bid, as determined in the Debtors' discretion (the "Baseline Bid"), and provide copies of all Qualified Bids to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to their estates, including, *inter alia*: (a) the amount and nature of the consideration; (b) certainty of closing; (c) the net economic effect of any changes from the transaction currently set forth in the Plan, if any, contemplated by

the Payout Event Documents, and (d) tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at 10:00 a.m. (Eastern Time) on August 5, 2010, at the offices of Debtors' counsel, Kirkland & Ellis LLP, at 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

(a)     The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(b)     Bid Protections.

The willingness of the Purchaser to proceed with the transactions contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement and the Commitment Letter is expressly conditioned upon, and being done in reliance upon, the right of the Purchaser to receive payment of the Bid Protections under the Backstop Unit Purchase Agreement and the Commitment Letter.

(c)     Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment.

Any Overbid after the Baseline Bid shall be made in increments of at least $3.0 million.

(ii)     Remaining Terms Are the Same as for Qualified Bids.

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; provided that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid shall remain open and binding on the Bidder until and unless (A) the Debtors accept a higher Qualified Bid as an Overbid and (B) such Overbid is not selected as the Backup Bid.

To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors demonstrating such Qualified Bidder's ability to close the Payout Event transaction proposed by such Overbid.

K&E 16853038

(iii)     Announcing Overbids.

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each participant which Overbid reflects, in the Debtors' view, the highest or otherwise best offer.

(iv)     Consideration of Overbids.

The Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things: facilitate discussions between the Debtors and Qualified Bidders; allow Qualified Bidders to consider how they wish to proceed, and provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(v)     Purchaser Overbids.

Any Overbid made by the Purchaser shall be deemed to have been made in an amount equal to the Overbid plus the Bid Protections (solely for purposes of determining the highest or otherwise best Bid).

(d)     Additional Procedures.

The Debtors may announce at the Auction additional procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction provided such additional rules are not inconsistent with these Payout Event Procedures.

(e)     Consent to Jurisdiction as Condition to Bidding.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Payout Event Procedures, and/or Payout Event Documents, as applicable.

(f)     Closing the Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment is the highest and best Qualified Bid (such Qualified Bid, the "Successful Bid," and such Qualified Bidder the "Successful Bidder").  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed Payout Event Documents memorializing the terms of the Successful Bid; provided, however, the Purchaser shall always have the right to make the final

7

Overbid (to the extent that the Purchaser had not made the then-existing Overbid) prior to the closing of the Auction.

Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of the Confirmation Order.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(g)     No Collusion; Good Faith Bona Fide Offer.

Each Qualified Bidder participating at the Auction will be required to confirm that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

## 3.     Backup Bidder

Notwithstanding anything in these Payout Event Procedures to the contrary, if an Auction is conducted, the party with the next-highest or otherwise second best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (the "Backup Bidder").  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern time) on the first business day that is sixty (60) days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder.

Following the Confirmation Hearing, if the Successful Bidder fails to consummate an approved Payout Event transaction, the Debtors may select the Backup Bidder as the Successful Bidder.  The Debtors will be authorized, but not required, to consummate the Payout Event transaction of such Backup Bidder without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.  The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date.

## 4.     Highest or Otherwise Best Bid

Whenever these Payout Event Procedures refer to the highest or otherwise best offer, as compared to the Bid of the Purchaser, the Debtors may, in their discretion, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type and nature of any changes to the Purchase Agreement requested by the Qualified Bidder, and whether such Bid is for different assets than those proposed to be purchased by the

Purchaser or on different terms from those contained in the Purchaser Agreement; (b) the extent to which such requested modifications to the Purchaser Agreement are likely to delay the confirmation and consummation of the Plan and the cost to the Debtors of any such delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the Qualified Bidder's ability to timely consummate the Plan; and (e) the net benefit to the Debtors' estates.

### 5.     Backstop Unit Purchase Agreement and Purchase Agreement

Notwithstanding anything in these Payout Event Procedures to the contrary the Backstop Unit Purchase Agreement, the Asset Purchase Agreement and related transaction documents shall remain in full force and effect until such agreements have terminated in accordance with their respective terms and regardless of whether the Backstop Parties are the Successful Bidder or the Backup Bidder.

### 6.     Return of Deposit

The Deposits of each Qualified Bidder shall be held in one or more interest-bearing escrow accounts by the Debtors and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) upon or within two (2) business days after the Auction.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Successful Bidder (or the Backup Bidder, if applicable) timely closes the winning Payout Event transaction, its Deposit shall be credited towards its purchase price.

If a Successful Bidder fails to consummate a proposed Payout Event transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies and/or causes of action that may be available to the Debtors and the Successful Bidder, and the Debtors shall be free to consummate the proposed Payout Event transaction with the Backup Bidder without the need for an additional hearing or Order of the Bankruptcy Court.

### 7.     Purchaser Information Rights

The Debtors shall provide the Purchaser, with respect to every Qualified Bid, with sufficient information as to allow the Purchaser to assess such Qualified Bid in its totality.

### 8.     No Modification of Payout Event Procedures

These Payout Event Procedures may not be modified except with the Debtors' express written consent (in consultation with the Purchaser).


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

K&E 16853038

Dated:  May 16, 2010                    Respectfully submitted,

_____

James H.M. Sprayregen, P.C.
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

Anup Sathy, P.C. (*pro hac vice* pending)
Ray C. Schrock (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Albert Togut
Neil Berger
TOGUT, SEGAL & SEGAL, LLP
One Penn Plaza
New York, New York  10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258

Proposed Counsel to the Debtors and Debtors in
Possession

**PLAN SUPPLEMENT**
**EXHIBIT 5**

**Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of April 12, 2010, is entered into by and among Neff Corp. ("Neff" and together with its parent company (Neff Holdings LLC) and subsidiaries parties hereto, collectively the "Company" or the "Debtors"),[1] and certain holders of the First Lien Term Loans (as defined below) (the "First Lien Term Loan Lenders") parties hereto from time to time (together with their respective successors and permitted assigns, the "Consenting Lenders"). The Company, each Consenting Lender and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "Parties" and individually as a "Party". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Plan Term Sheet (as defined below).

## PRELIMINARY STATEMENTS

WHEREAS, as of the date hereof, the Consenting Lenders hold, in the aggregate, in excess of 67% of the aggregate outstanding principal amount of the first lien term loans (the "First Lien Term Loans") under that certain Credit Agreement (as amended, modified or otherwise supplemented from time to time, the "First Lien Credit Agreement"), dated as of May 31, 2007 and amended and restated as of December 16, 2008, by and among Neff, Neff Holdings Corp., certain of its subsidiaries, Bank of America, N.A., as administrative agent, and the other parties signatory thereto;

WHEREAS, the Company and the Consenting Lenders have agreed to implement a restructuring of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as Exhibit A (including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof, the "Plan Term Sheet"), which Plan Term Sheet is the product of arm's length good faith discussions between the Company and members of an ad hoc group of certain holders of the First Lien Term Loan Lenders (the "Ad Hoc Group");

WHEREAS, it is anticipated that, subject to the terms of this Agreement, the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), which plan of reorganization shall be consistent in all material respects with the terms of the Plan Term Sheet (a "Qualified Plan") and provide for, among other things, certain distributions on account of the First Lien Term Loan Lenders' claims under the First Lien Credit Agreement (the "First Lien Term Loan Lender Claims");

WHEREAS, the Company has agreed to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Debtors (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District

---

[1] The Neff entities that will be filing a voluntary petition for relief in connection with the Chapter 11 Cases are Neff Holdings LLC, Neff Holdings Corp., Neff Corp., Neff Rental LLC, Neff Finance Corp. and Neff Rental, Inc.

of New York (the "<u>Bankruptcy Court</u>") to effect the Restructuring Transactions and, subject to the terms and conditions of this Agreement, to (i) file (a) a Qualified Plan and (b) a disclosure statement that is materially consistent with a Qualified Plan (the "<u>Disclosure Statement</u>"), and (ii) use commercially reasonable efforts to have the Disclosure Statement approved and a Qualified Plan confirmed by the Bankruptcy Court; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan Term Sheet.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Plan.**

The Plan Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Plan Term Sheet sets forth the material terms and conditions of the Restructuring Transactions; however, the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Plan Term Sheet and this Agreement, this Agreement shall control.

2.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "<u>Definitive Documents</u>" means the documents implementing, achieving and relating to a Qualified Plan and the Plan Term Sheet and the Restructuring Transactions, including any first day motions, other than any administerial first day motions or retention applications (the "<u>First Day Motions</u>"), the Disclosure Statement and any motion seeking the approval thereof, the order of the Bankruptcy Court confirming a Qualified Plan, and definitive documentation relating to the Company's debtor-in-possession financing, use of cash collateral, any exit financing, organizational documents, shareholder and member related agreements or other related documents, which shall contain terms and conditions consistent in all material respects with this Agreement and the Plan Term Sheet and shall otherwise be reasonably satisfactory in all respects to the Company and Requisite Lenders, in accordance with Section 7 hereof.

(b)    "<u>Material Adverse Effect</u>" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Company, taken as a whole; <u>provided</u>, <u>however</u>, that "Material Adverse Effect" shall not include any event, effect, occurrence, development, circumstance or change of fact arising out of or resulting from (A) conditions or effects that generally affect persons or entities engaged in the industries and markets in which the Company operates, (B) general economic conditions in the United States or globally, (C) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national

2

emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (D) financial, banking, securities, credit or commodities markets, prevailing interest rates, or general capital markets conditions in the United States or globally, (E) changes in U.S. generally accepted accounting principles, (F) changes in laws, rules, regulations, orders, or other binding directives issued by any governmental entity, or (G) the taking of any action expressly contemplated by this Agreement, including the filing of the Chapter 11 Cases (but not defaults or violations of the terms of this Agreement); except in each of clauses (A), (B), (C) and (D) above, if the Company is disproportionately affected thereby relative to other persons or entities engaged in the industry in which the Company operates.

(c)     "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by the Company and the Consenting Lenders holding at least 66-⅔% in aggregate principal amount of the First Lien Term Loans.

(d)     "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(e)     "Requisite Lenders" means, as of any date of determination, Consenting Lenders holding at least 66-⅔% in outstanding principal amount of the First Lien Term Loans held by the Consenting Lenders in the aggregate as of such date.

### 3.    Agreements of the Consenting Lenders.

(a)     Voting. Subject to the satisfaction of the conditions contained in Section 3(c) hereof, each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall:

(i)     subject to the receipt by such Consenting Lender of the Disclosure Statement, (A) timely vote or cause to be voted its First Lien Term Loan Lender Claims to accept a Qualified Plan (including, for the avoidance of doubt, a Qualified Plan that includes a Payout Event) by delivering its duly executed and completed ballot or ballots, as applicable, accepting a Qualified Plan on a timely basis following commencement of the solicitation of acceptances of a Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement, such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Lender at any time following the expiration of the Plan Support Period;

(ii)     support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby;

3

(iii)     timely vote or cause to be voted its First Lien Term Loan Lender Claims against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(iv)     not directly or indirectly seek, solicit, vote its First Lien Term Loan Lender Claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, or take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the First Lien Term Loans, that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes in connection with a Qualified Plan (the "Solicitation") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and a Qualified Plan, or take any other action that is inconsistent with, or that would delay the solicitation, confirmation or consummation of, a Qualified Plan or the Restructuring Transactions; provided, however, that any Backstop Party or combination of Backstop Parties shall not be prohibited from presenting for consideration by the Debtors a counterproposal to a Payout Event at any time up to ten (10) business days after receiving notice of such Payout Event (unless such date is extended by the Debtors) that such Backstop Party or Parties reasonably believes provides higher and better recoveries than that provided by such Payout Event; and

(v)     support the customary mutual release and exculpation provisions contained in a Qualified Plan.

(b)     <u>Acknowledgement of Payout Event</u>.  For the avoidance of doubt, each Consenting Lender agrees and acknowledges that a Payout Event shall constitute a Qualified Plan for the purposes of this Agreement.

(c)     <u>Certain Conditions</u>.  The obligations of each Consenting Lender set forth in Section 3(a) hereof are subject to the following conditions:

(i)     this Agreement shall have become effective in accordance with the provisions of Section 11; and

(ii)     this Agreement shall not have terminated in accordance with the terms of Section 5 hereof.

(d)     <u>Rights of Consenting Lenders Unaffected</u>.  Nothing contained herein shall (i) limit (A) the ability of a Consenting Lender to consult with other Consenting Lenders or the Company or (B) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with the Consenting Lender's obligations hereunder or under the terms of a Qualified Plan or under any other Definitive Document to which such Consenting Lender is a party and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of a Qualified

4

Plan; (ii) limit the ability of a Consenting Lender to sell or enter into any transactions in connection with the First Lien Term Loans or any other claims against or interests in the Company, subject to the terms of Sections 3(e) and 3(f) hereof; or (iii) limit the rights of any Consenting Lender under the First Lien Credit Agreement or constitute a waiver or amendment of any provision of the First Lien Credit Agreement, subject to the terms of Section 3(a) hereof.

(e) Transfers. Each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall not sell, transfer, loan, issue, pledge (except for blanket security interests of lenders to the Consenting Lenders), hypothecate, assign or otherwise dispose of (including by participation) (each, a "Transfer"), directly or indirectly, in whole or in part, any of the First Lien Term Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any First Lien Term Loans or any other claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such First Lien Term Loans or such other claims against or interests in the Company), unless the transferee thereof either (i) is a Consenting Lender or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement applicable to Consenting Lenders (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing the joinder attached hereto as Exhibit B (the "Joinder Agreement"), and delivering an executed copy thereof, within three (3) business days of such execution, to Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Ad Hoc Group, and Kirkland & Ellis LLP, as counsel to the Company, in which event (a) the transferee (including the Consenting Lender transferee, if applicable) shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided, however, that such Transfer shall not, in and of itself, release any Consenting Lender who is also a Backstop Party from its obligations under such Backstop Party's Backstop Commitment (the Transfer of Backstop Commitments being governed by the Commitment Letter or, to the extent in effect, the Backstop Unit Purchase Agreement). Each Consenting Lender agrees that any Transfer of any First Lien Term Loans that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company and each other Consenting Lender shall have the right to enforce the voiding of such Transfer. Notwithstanding anything contained herein to the contrary, during the Plan Support Period, a Consenting Lender may offer, sell or otherwise Transfer any or all of its holdings of First Lien Term Loans to any entity that, as of the date of Transfer, controls, is controlled by or is under common control with such Consenting Lender; provided, however, that such entity shall automatically be subject to the terms of this Agreement and deemed a Party hereto and shall execute a Joinder Agreement hereto.

(f) Additional Claims or Equity Interests. To the extent any Consenting Lender (a) acquires additional First Lien Term Loans, (b) holds or acquires any other claims against the Company, or (c) holds or acquires any equity interests in the Company, each such Consenting Lender agrees that such First Lien Term Loans or other claims or equity interests shall be subject to this Agreement and that, so long as this Agreement has not been terminated as provided herein, it shall vote (or cause to be voted) any such additional First Lien Term Loans or other

5

claims or equity interests entitled to vote on a Qualified Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Section 3(a) hereof.

(g)     Distributions on Allowed First Lien Term Loan Claims. Each of the Consenting Lenders party hereto on the Plan Support Effective Date (the "Original Consenting Lenders") shall be required to elect, in exchange for such Original Consenting Lender's Allowed First Lien Term Loan Claim(s), the First Lien Equity Election in addition to such Original Consenting Lender's *pro rata* share of the Rights and the Cash Payment, as set forth in the Plan Term Sheet. For the avoidance of doubt, the Original Consenting Lenders shall not be entitled to elect the First Lien Cash Payment Option on account of such Original Consenting Lender's Allowed First Lien Term Loan Claim(s).

## 4.     Agreements of the Company.

(a)     Affirmative Covenants. The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall, and shall cause each of its direct and indirect subsidiaries to, directly or indirectly, do the following:

(i)     complete the preparation, as soon as reasonably practicable after the Plan Support Effective Date, of each of a Qualified Plan, the Disclosure Statement and the other Definitive Documents, which documents shall contain terms and conditions consistent in all material respects with the Plan Term Sheet and shall otherwise be acceptable to the Requisite Lenders, and distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Consenting Lenders in advance of any filing thereof;

(ii)     (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Lenders to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (B) not take any action that is inconsistent with, or that would delay or impede the solicitation, confirmation or consummation of a Qualified Plan or the Restructuring Transactions, and (C) support the customary mutual release and exculpation provisions contained in the Plan Term Sheet and a Qualified Plan;

(iii)     (A) commence the Chapter 11 Cases (such date, the "Filing Date") and file the First Day Motions; (B) obtain approval on a final basis of the DIP Facility by entry of an order of the Bankruptcy Court, as soon as reasonably practicable and in no event later than on the date that is forty-five (45) calendar days after the Filing Date; (C) file a Qualified Plan and Disclosure Statement as soon as reasonably practicable and in any event no later than on the date that is fifteen (15) calendar days after the Filing Date; (D) obtain approval of the Disclosure Statement (including authorization for the Debtors to perform their obligations under the Commitment Letter and the Backstop Unit Purchase Agreement, including payment of any fees and expenses arising under the Commitment Letter and the Backstop Unit Purchase Agreement as provided therein) and authorization for the solicitation of approval of a Qualified Plan by

6

entry of an order of the Bankruptcy Court as soon as reasonably practicable and in any event no later than on the date (the "Disclosure Statement Approval Date") that is ninety (90) calendar days after the Filing Date; (E) commence the Solicitation as soon as reasonably practicable and in no event later than on the date (the "Solicitation Commencement Date") that is five (5) calendar days after the Disclosure Statement Approval Date; (F) obtain confirmation of a Qualified Plan by entry of an order of the Bankruptcy Court, which order shall not be the subject of any stay, as soon as reasonably practicable and in no event later than on the date (the "Confirmation Date") that is two-hundred fifty-five (255) calendar days after the Filing Date; and (G) consummate a Qualified Plan as soon as reasonably practicable and in no event later than on the date that is two-hundred seventy (270) calendar days after the Filing Date; and provided, that the Debtors shall not be in default under Sections 4(a)(iii)(D) or (E) of this Agreement if (1) material changes to a Qualified Plan (which material changes are consistent with the Plan Term Sheet and are otherwise reasonably acceptable to the Consenting Lenders and the Debtors) require the Debtors to seek approval by the Bankruptcy Court of a revised Disclosure Statement and re-solicit such Qualified Plan, (2) the subsequent Disclosure Statement Approval Date related to such revised Disclosure Statement occurs more than ninety (90) days after the Filing Date and (3) the confirmation and consummation by the Debtors of such revised Qualified Plan otherwise complies with the milestones set forth in Sections 4(a)(iii)(F) and (G), respectively, of this Agreement (as such milestones may be extended as provided herein pursuant to the Commitment Letter);

    (iv) except where not practicable, exercise commercially reasonable efforts to provide draft copies of all motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Ad Hoc Group within a reasonable period of time prior to the date the Company intends to file any such document and consult in advance in good faith with counsel to the Ad Hoc Group regarding the form and substance of any such proposed filing with the Bankruptcy Court;

    (v) maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

    (vi) timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

    (vii) timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

    (viii) provide to the Consenting Lenders, Stroock (as counsel to the Ad Hoc Group), Houlihan Lokey (as financial advisors to the Ad Hoc Group) and such other professionals as may be retained by the Ad Hoc Group (collectively, the "Ad Hoc Group Advisors"), and cause its employees, officers, advisors and other representatives to provide the Consenting Lenders and the Ad Hoc Group Advisors, subject to such confidentiality restrictions as reasonably required by the Company (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's

NY 72674526v4

books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the Restructuring Transactions, (C) timely and reasonable responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(ix)    to the extent permitted by the Bankruptcy Court and under the DIP Facility, timely and fully discharge all of its obligations then due and owing under any existing agreements of the Company regarding the payment of the reasonable fees and expenses of the Ad Hoc Group Advisors in connection with the Restructuring Transactions;

(x)    on the date that is at least one (1) day prior to the Filing Date, pay to Stroock and Houlihan Lokey all reasonable amounts then due and outstanding as provided in an invoice supplied to the Company containing a summary of hours and services provided;

(xi)    to the extent the reasonable fees and expenses of Stroock exceed the amount of the retainer as of the date of confirmation of a Qualified Plan, pay to Stroock under such Qualified Plan its outstanding reasonable fees and expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise;

(xii)    promptly notify the other Parties of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which could reasonably be anticipated to have a Material Adverse Effect;

(xiii)    comply in all material respects with the covenants contained in the DIP Facility;

(xiv)    reject each of the Company's employment agreements other than those listed in Section "B" on Exhibit 4 of the Plan Term Sheet and such other employment agreements as may be agreed-to by the Debtors and the Ad Hoc Group (subject to the assumption of any such employment agreement listed in Section "B" on Exhibit 4 of the Plan Term Sheet being expressly conditioned upon the employee counterparty to such employment agreement (A) having executed and delivered to the Debtors an amendment, consent and acknowledgement agreement addressing the matters set forth in Section "C" of Exhibit 4 of the Plan Term Sheet and being in form and substance acceptable to the Ad Hoc Group, and such amendment, consent and acknowledgement agreement being in full force and effect), and (B) being actively employed by the Debtors on the Effective Date (unless otherwise agreed to by the Ad Hoc Group);

(xv)    provide the Ad Hoc Group with three (3) business days prior written notice of the settlement of any claim or pending litigation not otherwise insured under the Debtors' insurance policies and not otherwise paid for by the Debtors' applicable insurance carrier for more than $500,000 per claim or pending litigation individually (each an "Uninsured Claim Settlement") and seek Bankruptcy Court approval of each Uninsured Claim Settlement

8

pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, applicable local rules and the Bankruptcy Code; and

(xvi)  provided, that a Payout Event has not occurred such that all allowed First Lien Term Loan Claims have been indefeasibly paid in full in cash on the Effective Date as provided in the Plan Term Sheet, (A) take all such actions as are reasonably necessary to cause the acquisition by one or more limited liability companies (the "LLCs"), formed or caused to be formed to acquire substantially all of the assets of the Debtors in connection with a Qualified Plan, to be structured and treated as a taxable transaction for United States federal income tax purposes, including the making of any appropriate elections under Subchapter K of the Internal Revenue Code and the imposition of reasonable trading restrictions to ensure that the LLCs are not treated as corporations for federal income tax purposes, (B) agree to report such acquisition as a taxable transaction for all financial accounting and income tax purposes, (C) ensure that any Qualified Plan provides that any Debtors that are to be liquidated or are to cease operations pursuant to the Qualified Plan shall receive the benefit of a discharge under section 1141 of the Bankruptcy Code or such equivalent injunctive relief as is necessary to (a) ensure that such Debtors' prepetition liabilities are discharged as if they had been reorganized pursuant to a Qualified Plan and/or (b) preclude successor liability from attaching to the LLCs; provided, that notwithstanding anything herein to the contrary, the Ad Hoc Group (whether in their capacities as Backstop Parties or otherwise) and the Debtors agree and acknowledge that the LLCs shall explicitly assume all liability for the distributions or treatment provided on account of all claims against, obligations of, or interests in the Debtors as set forth in the Plan Term Sheet, (D) take, and shall cooperate with the Ad Hoc Group in taking, all actions reasonably necessary to minimize federal, state and local income and other taxes of the Debtors, including, but not limited to, the filing of notices and clearance certificates with applicable taxing authorities; and (E) ensure that the Debtors will be wound-up, dissolved and liquidated concurrently with or promptly following the Effective Date, subject to the closing of the Chapter 11 Cases.

(b)  Negative Covenants. The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders or Stroock, as counsel for the Ad Hoc Group (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall not, and shall cause each of its direct and indirect subsidiaries not to, directly or indirectly, do or permit to occur any of the following:

(i)  propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(ii)  modify a Qualified Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

(iii)  withdraw or revoke a Qualified Plan or publicly announce its intention not to pursue a Qualified Plan;

9

(iv)    file any motion or pleading or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that is not consistent in any material respect with this Agreement, the Plan Term Sheet or a Qualified Plan;

(v)    move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan;

(vi)    issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)    amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)    split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(xi)    incur any capital expenditures in excess of the amounts permitted under the DIP Facility in the ordinary course of business and in amounts consistent with historical business practices;

(xii)    enter into any commitment or agreement with respect to debtor-in-possession financing, cash collateral and/or exit financing other than the DIP Facility and the Exit Facility;

(xiii)    enter into any executive employment agreements (other than those executive employment agreements assumed pursuant to a Qualified Plan and that have been identified on an exhibit to the Plan Term Sheet, subject to the amendments, consents and acknowledgements to be made and/or given with respect to such executive employment agreements as described in the Plan Term Sheet) or hire any executive or employee for whom total annual compensation is greater than $200,000 or enter into any collective bargaining agreements or materially modify any existing employment agreements or benefit plans; or

(xiv)    increase the compensation for any executive or employee whose total annual compensation is greater than $200,000; provided that such restriction shall not prohibit

10

the Debtors from making payments pursuant to a postpetition bonus or incentive plan, including a key employee retention plan, a key employee incentive plan or such other plans expressly provided by, and described in, the Plan Term Sheet and, as applicable, approved by the Bankruptcy Court.

(c)　　Automatic Stay.　The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

(d)　　Payout Proposal Information.　Notwithstanding anything herein or in the Plan Term Sheet to the contrary, the Company may furnish or cause to be furnished information concerning the Company in connection with a proposal, offer, or indication of interest for a Payout Event (each a "Payout Proposal") received by the Company from a party that the Company's board of directors believes in good faith has expressed a legitimate interest in, and has the financial ability (based on financial statements and/or such other financial information deemed reasonably acceptable to the Debtors) to consummate, a Payout Event within the timeframe set forth in Section 4(a)(iii) of this Agreement (each an "Alternative Sponsor"); provided, that such Alternative Sponsor shall enter into, as a condition to its receipt of information, a confidentiality and non-disclosure agreement that is (x) substantially in the form attached hereto as Exhibit C or (y) in form and substance reasonably acceptable to the Debtors and the Requisite Lenders.　Subject to the proviso in the immediately preceding sentence, following receipt of a Payout Proposal the Debtors may negotiate and discuss such Payout Proposal with the Alternative Sponsor.

## 5.　　Termination of Agreement.

(a)　　Consenting Lenders' Termination Events.　The Requisite Lenders may terminate this Agreement as to all Parties upon three (3) business days' written notice (the "Notice"), delivered in accordance with Section 20 hereof, at any time after the occurrence of, and during the continuation of, any of the following events (each, a "Consenting Lenders' Termination Event"), unless waived in writing by the Requisite Lenders in their sole discretion (it being understood that the three (3) business days notice period referred to above shall not extend or be in addition to, and shall run concurrently with, any cure or remedy period set forth in this Section 5(a)); provided that this Agreement shall terminate automatically and without further action upon the occurrence of a Consenting Lenders' Termination Event contemplated by Section 5(a)(iv), Section 5(a)(ix), or Section 5(a)(xii) of this Agreement:

(i)　　the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; provided, however, the Company shall have three (3) business days from the receipt of the Notice to cure such breach;

(ii)　　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

11

consummation of a material portion of the Restructuring Transactions; provided, however, that the Company shall have three (3) business days from such issuance to effectuate a complete reversal or dismissal, as applicable, of such ruling, judgment or order;

(iii)    any event, change, effect, occurrence, development, circumstance or change of fact occurs that has or would reasonably be expected to have a Material Adverse Effect; provided, however, that the Company shall have three (3) business days from the receipt of the Notice to remedy such event, change, effect, occurrence, development, circumstance or change of fact so that it no longer has or would reasonably be expected to have a Material Adverse Effect;

(iv)    the Bankruptcy Court enters an order terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(v)    the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $2,500,000 in the aggregate; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Debtors' use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Debtors' employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a Consenting Lenders' Termination Event;

(vi)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan or as otherwise approved in writing by the Requisite Lenders or counsel to the Ad Hoc Group (such approval not to be unreasonably withheld);

(vii)    the Bankruptcy Court enters an order materially amending, supplementing, staying, vacating or otherwise modifying (A) the credit documents relating to the First Lien Term Loans (except as may be reasonably necessary to implement the DIP Facility or permit the Company's use of cash collateral) or (B) the order of the Bankruptcy Court authorizing the Debtors' use of cash collateral to the detriment of the Consenting Lenders, in each case without the written consent of the Requisite Lenders or counsel to the Ad Hoc Group (such consent not to be unreasonably withheld);

(viii)    an Event of Default (as defined in the applicable order of the Bankruptcy Court approving the DIP Facility or credit agreement governing the DIP Facility) shall have occurred and be continuing and not waived under the DIP Facility after expiration of any applicable cure period provided therein and the Company's obligations shall have been accelerated thereunder;

12

(ix)    the Bankruptcy Court having entered an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(x)    the failure to satisfy any of the conditions to effectiveness set forth in a Qualified Plan by the deadlines set forth in such Qualified Plan;

(xi)    the termination of the Commitment Letter or the Backstop Unit Purchase Agreement in accordance with their respective terms; and

(xii)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the First Lien Credit Agreement is involuntarily dismissed.

(b)    Company Termination Events. The Company may terminate this Agreement as to all Parties upon three (3) business days prior written notice, delivered in accordance with Section 20 hereof, upon the occurrence of any of the following events (each a "Company Termination Event"):

(i)    the (A)(1) breach by one or more of the Consenting Lenders representing in excess of one-third (1/3) of the aggregate principal amount of the First Lien Term Loans held by the Consenting Lenders (the "One-Third Consenting Lender Group") of any of their obligations pursuant to Section 3(a)(i) of this Agreement, (2) material breach by the One-Third Consenting Lender Group of their obligations or covenants set forth in this Agreement (other than the covenants set forth in Section 3(a)(i) of this Agreement) and (3) material breach by the One-Third Consenting Lender Group of any of the representations or warranties made by the One-Third Consenting Lender Group set forth in this Agreement on the date such representations are made, or (B) breach by any Backstop Party of its Backstop Commitment pursuant to the terms of the Commitment Letter and the Backstop Unit Purchase Agreement (provided, however, that such breach shall not be deemed to be a Company Termination Event if one or more Non-Defaulting Backstop Parties purchases the Unsubscribed Units not purchased by the Defaulting Backstop Party pursuant to the Commitment Letter or, if in effect, the Backstop Unit Purchase Agreement); in each such case of clause (A) or clause (B), where such breach remains uncured for a period of three (3) business days after the receipt by the applicable Consenting Lender(s) from the Company of written notice of such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions; provided, however, that the Consenting Lenders shall have three (3) business days after receiving notice of such ruling or order to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement; or

(iii)    the board of directors of the Company reasonably determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

13

(c)    <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company and the Requisite Lenders.

(d)    <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this Section 5, and except as provided in Section 14 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the First Lien Term Loans, the First Lien Credit Agreement and any ancillary documents or agreements thereto; <u>provided, however</u>, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept a Qualified Plan, the Company shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement.

6.      **<u>Good Faith Cooperation; Further Assurances; Acknowledgement.</u>**

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, (b) all matters concerning the implementation of the Plan Term Sheet and a Qualified Plan, and (c) the pursuit and support of the Restructuring Transactions. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring Transactions in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. This Agreement is not, and shall not be deemed, a solicitation for consents to a Qualified Plan or a solicitation to tender or exchange of any of the First Lien Term Loans. The acceptance of the First Lien Term Loan Lenders will not be solicited until the First Lien Term Loan Lenders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

7.      **<u>Definitive Documents.</u>**

Each Party hereby covenants and agrees (a) to negotiate in good faith the Definitive Documents and (b) to execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents. For the avoidance of doubt, each Party agrees to (i) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation and the implementation of the Plan Term Sheet and a Qualified Plan in accordance with the

14

terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by, this Agreement and (iii) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transactions as contemplated by the Plan Term Sheet, a Qualified Plan and this Agreement.

8.    **Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases, the discharge of claims as a result thereof, or related restructuring transactions;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Chapter 11 Cases, a Qualified Plan and the Disclosure Statement; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender (i) is the beneficial owner of the aggregate principal amount of First Lien Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such First

NY 72674526v4

Lien Term Loans, (A) sole investment or voting discretion with respect to such First Lien Term Loans, (B) full power and authority to vote on and consent to matters concerning such First Lien Term Loans or to exchange, assign and transfer such First Lien Term Loans or (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, such Consenting Lender has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any First Lien Term Loans that are inconsistent with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

9.      **Disclosure; Publicity.**

(a)     Not later than one (1) business day after the Filing Date, subject to the provisions set forth in Section 9(b) hereof, the Company shall disseminate a press release disclosing the existence of this Agreement and the terms hereof and of the Plan Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the date the Chapter 11 Cases are commenced) with such redactions as may be reasonably requested by any Consenting Lender's counsel to maintain the confidentiality of the items identified in Section 9(b) hereof, except as otherwise required by law. In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by this Section 9), and the Company hereby waives any claims against the Consenting Lenders arising as a result of such disclosure by a Consenting Lender in compliance with this Agreement.

(b)     The Company shall submit drafts to the Ad Hoc Committee Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Lender, no Party or its advisors shall (i) use the name of any Consenting Lender in any public manner or (ii) disclose to any person (including, for the avoidance of doubt, any other Consenting Lender), other than advisors to the Company, the principal amount or percentage of any First Lien Term Loans or any other securities of the Company held by any Consenting Lender, in each case, without such Consenting Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Term Loans held by all the Consenting Lenders collectively. Notwithstanding the provisions in this Section 9, (i) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a

16

result of any breaches hereof and (ii) any Party hereto may disclose, to the extent consented to in writing by a Consenting Lender, such Consenting Lender's identity and individual holdings.

**10.** **Amendments and Waivers.**

This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Company and the Requisite Lenders; _provided, however_, that any modification of, or amendment or supplement to, this Section 10 shall require the written consent of all of the Parties. A Consenting Lenders' Termination Event may not be waived except in a writing signed by the Requisite Lenders.

**11.** **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; _provided, however_, that signature pages executed by Consenting Lenders shall be delivered to (a) other Consenting Lenders in a redacted form that removes such Consenting Lenders' holdings of the First Lien Term Loans and (b) the Company and advisors to the Consenting Lenders in an unredacted form. Upon the Plan Support Effective Date, the Plan Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

**12.** **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

NY 72674526v4

13.     **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity.

14.     **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 14, the proviso set forth in Section 3(a)(i), and in Sections 5(d), 9(b), 10, 12, 13, 16, 17, 18, 20, 21, 22, 23 and 26 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Lenders in accordance with the terms hereof; provided, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

15.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit sales, assignments or other Transfers of the First Lien Term Loans or claims arising under the First Lien Term Loans other than in accordance with this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18

17. **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof, other than any No Recourse Party with respect to Section 26 herein.

18. **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (and including the Plan Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect.

19. **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20. **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(1)     If to the Company, to:

Neff Corp.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attention:  Graham Hood
            Chief Executive Officer
            -and-
            Mark Irion
            Chief Financial Officer

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Fax: (312) 862-2200
Attention:  Ray C. Schrock, Esq.
            -and-
            Ryan Preston Dahl, Esq.

19

(2)     If to a Consenting Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention:  Kristopher M. Hansen, Esq.
          - and -
          Jayme T. Goldstein, Esq.

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

21.     **Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by this Agreement or in a Qualified Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  This Agreement and the Plan Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22.     **Prevailing Party.**

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

20

23.    **Relationship Among Parties.**

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Lender may trade in the First Lien Term Loans or other debt or equity securities of the Company without the consent of the Company or any other Consenting Lender, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

24.    **Committee Membership.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Lender or representative of a Consenting Lender that becomes a member of a statutory committee that may be established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member to the extent required to comply with fiduciary obligations applicable under the Bankruptcy Code; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any statutory committee in the Chapter 11 Cases. Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 24.

25.    **Representation by Counsel.**

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the transactions contemplated herein. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26.    **No Recourse.**

Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, the Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Party or any former, current or future directors, officers, agents, affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such person or entity, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any

21

obligation of any Party under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

NEFF CORP. (on behalf of itself and all other Debtors)

By: _____

Name: MARK IRION

Title: CFO

**By:** ██████████████████ **its investment Manager**

By: _____

Name: **AVI KATZ**

Title: **Vice President** _____

Principal Amount of First Lien Term Loans: ████████████

<u>Notice Address:</u>

████████████████████████
████████████████████████
████████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

██████████████████████████

**By:** ██████████████████ **its investment Manager**

By: _____

Name: ___AVI KATZ_____

Title: ___Vice President_____

Principal Amount of First Lien Term Loans: ████████

<u>Notice Address:</u>

████████████████████████
████████████████████████
████████████████████████
████████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

**████████████████████████████**

**By:** ████████████████ **its investment manager**

By: _____

Name:   **AVI KATZ**

Title:   **Vice President**

Principal Amount of First Lien Term Loans: ████████

<u>Notice Address:</u>

████████████████████████

███████████████████████████████

**By:** ██████████████████████, its investment adviser

**By:** ████████████████ its general partner

By: _____

Name: **AVI KATZ**

Title: **Vice President**

Principal Amount of First Lien Term Loans: ████████

<u>Notice Address:</u>

████████████████████
████████████████████
████████████████████
████████████████████

███████████████████████

**By:** ██████████ **its general partner**

**By:** ██████████ **its general partner**

By: _____

Name: _____
Joseph M. Deignan
~~Authorized Signatory~~

Title: _____

Principal Amount of First Lien Term Loans: ██████████

<u>Notice Address</u>:

██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████

**PLAN SUPPLEMENT**
**EXHIBIT 6**

**Purchase Agreement**

ASSET PURCHASE AGREEMENT

dated as of [_____], 2010

by and among

REORGANIZED NEFF, L.L.C.,

as Buyer

and

NEFF HOLDINGS CORP.,
NEFF HOLDINGS LLC, NEFF CORP.,
NEFF RENTAL LLC, NEFF FINANCE CORP.,
AND NEFF RENTAL, INC.,

as Sellers

ASET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement") is dated as of [_____], 2010 (the "Agreement Date"), by and among (a)(i) Neff Corp., a Delaware corporation (the "Company"), (ii) Neff Holdings Corp., a Delaware corporation ("Holdings"), (iii) Neff Holdings LLC, a Delaware limited liability company ("Holdings LLC"), (iv) Neff Rental LLC, a Delaware limited liability company ("Neff Rental"), (v) Neff Finance Corp., a Delaware corporation ("Neff Finance"), and (vi) Neff Rental, Inc., a Delaware corporation ("Neff Rental Inc." and, together with the Company, Holdings, Holdings LLC, Neff Rental and Neff Finance, the "Sellers" and each a "Seller"), and (b) Reorganized Neff, L.L.C., a Delaware limited liability company (together with its successors and permitted assigns, the "Buyer").

WITNESSETH:

WHEREAS, each of the Sellers has filed a voluntary petition under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on May [__], 2010 (the date of the commencement of such filing, the "Petition Date"); and

WHEREAS, pursuant to the terms of the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code to which this Agreement is attached as Exhibit [__] (as amended, revised, modified or supplemented from time to time, the "Plan"), and subject to the terms and conditions set forth in this Agreement, the Buyer desires to acquire from the Sellers and, subject to the entry of the Confirmation Order, the Sellers desire to sell to the Buyer the assets of the Sellers as are specified herein under the Plan (such acquisition and sale, the "Plan Sale");

NOW, THEREFORE, in consideration of the premises, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Defined Terms.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings given to such terms in the Plan or, if not so defined in the Plan, in the Backstop Unit Purchase Agreement (as defined in the Plan).

1.2    Plan Controlling.  In the event of any inconsistency between the terms of this Agreement and the Plan, the Plan shall control in all respects (unless otherwise stated in the Plan).

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1    Assets to be Acquired.  Subject to the entry of the Confirmation Order, and the terms and conditions of this Agreement and the Confirmation Order, and on the basis of the

representations, warranties, covenants and agreements herein contained (including the representations and warranties of the Sellers referred to in Article 4), at the Closing (as defined below), the Sellers shall sell, convey, assign, transfer and deliver to the Buyer, and the Buyer shall purchase, acquire and accept (from the Sellers), all of the right, title and interest, free and clear of all Claims and Liens (other than Liens that constitute Assumed Liabilities (as defined below) and Permitted Liens (as defined below)), of the Sellers in each and all of the Acquired Assets (as defined below). "Acquired Assets" shall mean all properties, assets, rights and interests of the Sellers, of every nature, tangible and intangible, real or personal, wherever located, now existing or hereafter acquired, whether or not reflected on the books or financial statements of the Sellers, as the same shall exist on the Closing Date (as defined below) after giving effect to the distributions required to be made by the Sellers under the Plan on the Effective Date, other than the Excluded Assets, and including, without limitation, the following assets (except to the extent that any of the following is an Excluded Asset):

(a)     all right, title and interest of the Sellers in the real property (including, without limitation, the real property set forth on Schedule 2.1(a)(i)), together with all buildings, structures, fixtures, and improvements erected thereon, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "Owned Real Property"), and all right, title and interest of the Sellers in leases and subleases for real property (including, without limitation, the real property set forth on Schedule 2.1(a)(ii)), together with all buildings, structures, fixtures, and improvements erected thereon, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "Leased Real Property" and collectively with the Owned Real Property, the "Acquired Real Property");

(b)     all of (i) the Sellers' owned equipment (including rental fleet and other equipment), machinery, furniture, fixtures, improvements and tooling, and all other personal property (the "Owned Machinery and Equipment"), (ii) the rights of the Sellers to equipment, machinery, furniture, fixtures, improvements and tooling, and all other personal property which are leased, licensed or otherwise in which the Sellers have any right to use pursuant to an Assumed Contract (as defined below) (the "Leased Machinery and Equipment" and collectively with the Owned Machinery and Equipment, the "Machinery and Equipment"), and (iii) the rights of the Sellers to the warranties (express or implied), indemnities, guarantees and licenses received from manufacturers and sellers of the Machinery and Equipment or any other Person;

(c)     all rights of the Sellers under Contracts of each Seller, together with all of any Seller's deposits thereunder (collectively, the "Assumed Contracts");

(d)     all of the Sellers' inventories of goods, spare parts, replacement and component parts, and office and other supplies (the "Inventory"); and

(e)     all Benefit Plans of the Sellers that are specifically set forth on Schedule 2.1(e) hereto (each without giving effect to any amendments, supplements or modifications made thereto, except for any amendments, supplements or modifications that are (x) set forth on Schedule 2.1(e) hereto or (y) approved in writing by the Backstop Parties) and any associated funding media, assets, reserves, credits and service agreements and all documents created, filed or maintained in connection with such Benefit Plans and any applicable insurance policies related thereto (collectively, the "Assumed Plans"); provided, however, that, with respect to each

employment agreement listed in Section "B" on <u>Schedule 2.1(e)</u> hereto, unless otherwise agreed to by the Buyer in writing, the employee counterparty to such employment agreement shall (i) have executed and delivered to the Sellers and the Buyer prior to the Closing an amendment, consent and acknowledgement agreement addressing the matters set forth in Section "C" on <u>Schedule 2.1(e)</u> hereto, and such agreement shall be in form and substance reasonably acceptable to the Buyer and in full force and effect of the Closing Date, and (ii) be actively employed by a Seller on the Closing Date (it being understood that if the conditions set forth in clauses (i) and (ii) of this proviso are not satisfied with respect to any such employment agreement, such employment agreement shall constitute an Excluded Asset unless otherwise agreed to by the Buyer in writing);

(f)     all of the Sellers' accounts receivable, trade accounts and other amounts receivable and any other rights of any Seller to payment from third parties, including, without limitation, those reflected (or required to be reflected under United States generally accepted accounting principles) in the books and records of any of the Sellers, and the full benefit of all security for such accounts or rights to payment, together with any interest or unpaid financing charges accrued thereon;

(g)     all of the Sellers' cash and cash equivalents (including marketable securities and short-term investments, checking account balances, certificates of deposit and other time deposits and petty cash), whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto;

(h)     all of the Sellers' transferable rights under any licenses, permits, authorizations and approvals, both governmental and private;

(i)     all of the Sellers' books and records, files, data, reports, lists, documents, instruments and other materials used in or relating to the business of any of the Sellers or in respect of the Acquired Assets or the Assumed Liabilities, including, without limitation, all supplier lists, vendor lists, literature and correspondence;

(j)     all of the Sellers' deposits and all prepaid charges, taxes and expenses of any of the Sellers, including, without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, and (ii) prepaid taxes (including ad valorem taxes, personal property taxes and real estate taxes);

(k)     all of the Sellers' IP Rights (including, without limitation, the name "Neff", the names of the Sellers and, in all cases, any derivations thereof (the "<u>Assumed Names</u>")) and all other intangible assets of the Sellers (collectively, "<u>Assumed Intellectual Property</u>");

(l)     all of the Sellers' rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements;

(m)     all of the Sellers' rights, claims, credits, Causes of Action or rights of set off against third parties, including, without limitation, rights under vendors' and manufacturers'

warranties, indemnities, guaranties and avoidance claims and Causes of Action under the Bankruptcy Code or applicable state Law, including, without limitation, all rights and avoidance claims of any Seller arising under Chapter 5 of the Bankruptcy Code;

(n)     subject to Section 6.6, all of the Sellers' insurance policies and rights and benefits thereunder (including, without limitation, (i) all rights pursuant to and proceeds from such insurance policies and (ii) all claims, demands, proceedings and Causes of Action asserted by any Seller under such insurance policies), and any letters of credit related thereto;

(o)     any claim, right or interest of any of the Sellers in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom; and

(p)     all goodwill and other intangible assets associated with, or relating to, the business of any of the Sellers or any of the Acquired Assets.

For purposes this Agreement:

"Liens" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include any Claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.  For the avoidance of doubt, "Lien" shall not include any license (or sublicense) of intellectual property, including with respect to the rights of any licensee under section 365(n) of the Bankruptcy Code.

"Permitted Liens" shall mean: (i) Liens for taxes not yet due and payable; (ii) easements, licenses or similar non-monetary liens or non-monetary matters of record on Acquired Real Property or any zoning and other restrictions imposed by a Governmental Unit that do not, individually or in the aggregate, materially adversely impact (A) the operation of the business conducted by the Sellers on or prior to the Agreement Date or at any time through (and including) the Closing Date (the "Business"), or (B) the use, occupancy or value of the Acquired Assets; (iii) encumbrances arising under leases or subleases of Acquired Real Property, which do not materially detract from the value or occupancy of such Acquired Real Property or interfere with the use of or conduct of the Business on the Acquired Real Property; (iv) such other Liens or title exceptions as the Buyer may approve in writing in its sole discretion; (v) Liens arising from the filing of precautionary financing statements under the Code by lessors with respect to operating leases; and (vi) Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the issuance of indebtedness, (B) relating to pooled deposit or sweep accounts of any Seller to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Sellers or (C) relating to purchase orders and other agreements entered into with customers of the Sellers in the ordinary course of business.

2.2     Excluded Assets.  The Acquired Assets do not include the Sellers' right, title or interest in or to any of the following properties and assets of the Sellers (collectively, the "Excluded Assets"):

(a)     each Seller's rights under this Agreement (including the right to receive the Purchase Price; provided, however, that any portion of the Cash Proceeds (as defined below) that is not used by the Sellers to make distributions under the Plan on the Effective Date shall constitute Acquired Assets hereunder);

(b)     all Benefit Plans (including any employment agreements) of the Sellers (other than the Assumed Plans, including, without limitation, the River City Connections, Inc. 401(k) Profit Plan and Trust), and any associated funding media, assets, reserves, credits and service agreements and all documents created, filed or maintained primarily in connection with such Benefit Plans (it being understood that, with respect to each employment agreement listed in Section "B" on Schedule 2.1(e) hereto, unless otherwise agreed to by the Buyer in writing, if the employee counterparty to such employment agreement shall not (i) have executed and delivered to the Sellers and the Buyer prior to the Closing an amendment, consent and acknowledgement agreement addressing the matters set forth in Section "C" on Schedule 2.1(e) hereto in form and substance acceptable to the Buyer and in full force and effect of the Closing Date, or (ii) be actively employed by the Sellers on the Closing Date, such employment agreement shall constitute an Excluded Asset);

(c)     shares of capital stock or other equity interests of any Seller, or securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(d)     all documents, agreements, certificates, instruments, notices, filings, submissions, materials and other Contracts (whether copies or originals) relating to incorporation or formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, certificates of incorporation or formation, by-laws, limited liability company agreements or operating agreements, and other documents relating to the organization and existence of any of the Sellers as a corporation or other legal entity, as applicable (together with analogous documentation);

(e)     all documents, agreements, certificates, instruments, notices, filings, submissions, materials and other Contracts or arrangements relating to the offer, subscription, issuance, sale, registration or distribution of, or rights (including voting rights), restrictions or obligations relating to, shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profits interests or units in) any of the Sellers, and all warrants, options, rights or other securities for the purchase, acquisition or exchange from any of the Sellers of any shares of capital stock of (or other ownership, equity or profits interests or units in) any Seller(including through any convertible securities);

(f)     any Contracts excluded from the definition of Acquired Assets by the Buyer pursuant to Section 2.5 hereof; and

(g)     any cash funded into the Professional Fee Escrow Account; provided, however, that when all Accrued Professional Compensation Claims have been paid in full,

amounts remaining in the Professional Fee Escrow Account, if any, shall be an Acquired Asset and shall be distributed to the Buyer.

        2.3    <u>Liabilities to be Assumed by Buyer</u>.  Subject to the entry of the Confirmation Order, and the terms and conditions of this Agreement and the Confirmation Order and on the basis of the representations, warranties, covenants and agreements herein contained (including the representations and warranties of the Sellers referred to in Article 4), at the Closing, the Sellers shall assign to the Buyer and the Buyer shall assume from the Sellers, without duplication, any and all of the Claims, liabilities and obligations of the Sellers arising after the Petition Date, other than the Excluded Liabilities (as defined below), after giving effect to the releases, discharges, compromises, settlements, injunctions and restructurings of Claims, liabilities and obligations of the Sellers contemplated under the Plan and all distributions made by the Sellers under the Plan on or about the Effective Date on account of Claims, liabilities and obligations of the Sellers (collectively, the "<u>Assumed Liabilities</u>"), including the following (except to the extent that any of the following is an Excluded Liability):

        (a)    [Intentionally Deleted.]

        (b)    all liabilities of the Sellers arising after the Petition Date under each of the Assumed Contracts;

        (c)    [Intentionally Deleted.]

        (d)    all trade accounts payable of the Sellers arising after the Petition Date;

        (e)    all liabilities and Claims with respect to any hedging agreements related to the First Lien Credit Agreement (the "<u>Secured Swap Claims</u>"), all of the documentation which relates thereto being listed on <u>Schedule 2.3(e)</u> hereto;  <u>provided</u>, <u>however</u>, that the Assumed Liabilities shall only include Secured Swap Claims pursuant to, and on the terms and conditions, set forth in the Secured Swap Agreements, as amended by the Swap Amendments;

        (f)    all liabilities of the Sellers arising after the Petition Date relating to any environmental matter arising out of or relating to the Sellers' operation of their respective businesses or their leasing, ownership or operation of real property;

        (g)    all liabilities arising after the Petition Date related to (i) the termination of any employee of any Seller or any of its subsidiaries on or following the Closing Date, including without limitation, any such individual who is on any approved leave of absence, is absent from work due to short term disability, military leave, vacation or illness, or has the right to re-employment under any applicable law (collectively, the "<u>Employees</u>"), other than any Employee that is party to a written employment Contract with a Seller on the date hereof that is not set forth on <u>Schedule 2.1(e)</u> hereto (an "<u>Excluded Individual</u>"), and (ii) earned but unpaid salary, bonuses, accrued but unpaid vacation days, accrued but unpaid medical and dental expenses, accrued and unpaid other forms of compensation and all other accrued welfare benefits of all Employees (other than the Excluded Individuals) under the Assumed Plans;

        (h)    all liabilities arising after the Petition Date with respect to Assumed Plans assumed pursuant to <u>Section 2.1(e)</u> hereto, including any obligations any Seller may have to

provide continuation health coverage due to a "qualifying event" (as such term is defined under Consolidated Budget Reconciliation Act of 1985, as amended) occurring prior to, on or after the Closing Date;

(i)     all liabilities for distributions related to Priority Tax Claims, Secured Tax Claims and any General Unsecured Claims that arise out of or relate to a tax;

(j)     all liabilities arising after the Petition Date for damages to persons or property for product liability arising out of equipment sold or leased by the Sellers, or arising under warranties, express or implied, issued by the Sellers prior to the Closing;

(k)     all liabilities of the Sellers arising after the Petition Date with respect to any infringement, misappropriation or other violation of any IP Rights;

(l)     all costs and expenses arising from or relating to the Wind Down (the "Wind Down Costs");

(m)     all liabilities arising after the Petition Date to repair or replace, or to refund the purchase price of, plus related expenses of, products rented and delivered by the Sellers prior to the Closing Date; and

(n)     any and all professional fees and expenses (including out of pocket expenses) incurred by or otherwise due from any Seller (whether or not billed) with respect to professionals retained by the Sellers to act on behalf of the Sellers or the Buyer that are related to any Chapter 11 Case or the Sellers' refinancing, restructuring or sale efforts and that have not previously been paid by the Sellers on or about the Effective Date, including the fees and expenses of any of the following: (i) counsel for the Sellers, (ii) financial advisors to the Sellers and (iii) any other professionals retained by the Sellers to act on behalf of the Sellers in any Chapter 11 Case.

In addition to the foregoing, Assumed Liabilities shall include (x) any liabilities or obligations of the Sellers that arise on or prior to the Petition Date solely to the extent that (and only to the extent that) the Buyer expressly agrees to assume such liability or obligation in a writing delivered by the Buyer to the Sellers (and only to the extent such liability or obligation is expressly assumed by the Buyer as set forth in such writing), (y) liabilities for the distributions or treatment provided on account of all Claims against, Interests in, or obligations of the Sellers as provided by the Plan (including all liabilities for Administrative Claims against the Sellers) (other than any such distributions that are made by the Sellers on the Effective Date pursuant to the Plan), and (z) all Cure Costs with respect to any Assumed Contracts.  Except for the Assumed Liabilities (which shall, in no event, include Excluded Liabilities), the Buyer shall not assume, or become liable for the payment or performance of, any liabilities or obligations of any Seller of any nature whatsoever.

2.4     Excluded Liabilities.  The Buyer shall not and does not assume any liabilities or obligations of the Sellers whatsoever relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)     all notes, bonds or other evidences of, or Claims or Causes of Action arising from, connected with, related to or with respect to, any indebtedness (excluding the Secured Swap Claims) of the Sellers, including any of the foregoing entered into with respect to the DIP Claims, the Revolving Credit Facility Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims and the Senior Notes Claims;

(b)     all liabilities, obligations, Claims and Causes of Action that are settled, compromised, released and/or discharged pursuant to the Plan and/or the Confirmation Order;

(c)     all liabilities or obligations associated with any Benefit Plan of the Sellers (except as specifically set forth in Section 2.3(h) hereof);

(d)     all liabilities and obligations of any of the Sellers that arise on or prior to the Petition Date, except (i) any Cure Costs with respect to any Assumed Contracts and (ii) as specifically agreed to in writing by the Buyer; and

(e)     all liabilities and obligations relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets, to the extent such liabilities and obligations are not Assumed Liabilities.

2.5     Changes in List of Assumed Contracts.  From time to time after the Agreement Date and prior to the Closing, the Buyer and the Sellers, by mutual agreement, may include in the definition of Acquired Assets (and exclude from the definition of Excluded Assets) or exclude from the definition of Acquired Assets (and include in the definition of Excluded Assets) any Contract of any of the Sellers; provided, that no such change to the definitions of Acquired Assets or Excluded Assets shall reduce or increase the amount of the Purchase Price.  If any Contract is excluded from the definition of Acquired Assets, the Sellers shall promptly include such Contract on the Schedule of Rejected Executory Contracts and Unexpired Leases.  If any Contract is included in the definition of Acquired Assets, the Sellers shall take such steps as are necessary to cause such Contract to be assumed by the applicable Seller party thereto and assigned to the Buyer.  The Buyer and the Sellers shall work together in good faith to determine which Contracts shall be included in the definition of Acquired Assets (and excluded from the definition of Excluded Assets) or excluded from the definition of Acquired Assets (and included in the definition of Excluded Assets).  If the Buyer desires to exclude any Contract from the definition of Acquired Assets (and include such Contract in the definition of Excluded Assets) and the Sellers do not desire to exclude such Contract from the definition of Acquired Assets (and include such Contract in the definition of Excluded Assets) (any such Contract, a "Disputed Contract"), then the Sellers shall, prior to the Confirmation Date, include such Disputed Contract on the Schedule of Rejected Executory Contracts and Unexpired Leases and such Disputed Contract shall not constitute an Acquired Asset nor be assumed by the Sellers or assumed and assigned to the Buyer unless the Buyer and the Sellers otherwise mutually agree.  The Buyer and the Sellers shall continue to work together in good faith to resolve any disputes with respect to the exclusion of any Disputed Contract from the definition of Acquired Assets (and inclusion of such Disputed Contract in the definition of Excluded Assets).  For the avoidance of doubt, any Contract that is excluded from the definition of Acquired Assets (including any Contract that is included on the Schedule of Rejected Executory Contracts and Unexpired Leases) shall cease to be, and shall not constitute, an Assumed Contract.  If any Contract is excluded from the

definition of Acquired Assets, the Sellers shall timely give notice to the counterparties to any Contract of the rejection thereof. Any Contract that is assumed subject to Bankruptcy Court approval shall constitute an Acquired Asset.

2.6     Cure of Defaults. The Sellers shall be responsible for the verification of all Cure Costs for each Assumed Contract and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assumed Contract prior to the Closing Date. To the extent that any Assumed Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing the Cure Costs related to such Assumed Contract shall be paid by the Buyer (after giving effect to the consummation of the transactions contemplated hereby); provided, however, that with respect to any Cure Costs that are not finally determined as of the Closing in accordance with the Plan, by court order or by agreement of the Buyer and the counterparty to the applicable Contract, such Cure Costs shall be paid by the Buyer as such Cure Costs become finally established in accordance with the Plan, by Final Order or by agreement of the Buyer and the counterparty to such Contract. Each Seller agrees that it will promptly take such actions as are reasonably necessary or desirable to obtain a Final Order of the Bankruptcy Court providing for the assumption by such Seller of the Assumed Contracts of such Seller and the assignment to the Buyer of such Assumed Contracts.

## ARTICLE 3
## CLOSING; PURCHASE PRICE

3.1     Closing; Transfer of Possession; Certain Deliveries.

(a)     The consummation of the transactions contemplated herein (the "Closing") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 herein (or the waiver thereof by the party entitled to waive that condition) (other than conditions that by their nature are to be satisfied at the Closing) or on such other date as the parties hereto shall mutually agree. The Closing shall be held at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, at 10:00 a.m., local time, unless the parties hereto otherwise agree. The actual date of the Closing is herein called the "Closing Date." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 11:59 P.M., local time, on the Closing Date (after giving effect to the releases, discharges, compromises, settlements, injunctions and restructurings of Claims, Interests, Causes of Action, liabilities and obligations contemplated under the Plan).

(b)     At the Closing, the Sellers shall deliver to the Buyer:

(i)     a true and correct copy of the Confirmation Order, which shall be a Final Order;

(ii)     duly executed bills of sale, substantially in the form of Exhibit A attached hereto (the "Bill of Sale"), transferring the Acquired Assets to the Buyer;

(iii)     duly executed real property quit claim deeds (or the equivalent) in recordable form, in form and substance acceptable to the Buyer, to effect the sale, transfer, assignment and delivery of the Owned Real Property;

(iv)     the Assignment and Assumption Agreement, in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by the Sellers;

(v)     a properly executed affidavit of each Seller, dated as of the Closing Date, prepared in accordance with Treasury Regulations section 1.1445-2(b), certifying as to such Seller's non-foreign status;

(vi)     such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Acquired Assets;

(vii)     evidence of the required changes to the Company Names (as defined below), as more fully set forth in Section 6.2;

(viii)     certificates of title and title transfer documents to all titled motor vehicles;

(ix)     such other bills of sale, deeds, endorsements, assignments (including assignments with respect to the Leased Real Property and the Assumed Intellectual Property), acknowledgments and other good and sufficient instruments of conveyance and transfer that are necessary to vest in the Buyer all of the right, title and interest of the Sellers in, to and under any of the Acquired Assets (subject to any Permitted Liens or Liens that constitute Assumed Liabilities); and

(x)     all other previously undelivered certificates, agreements and other documents required to be delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement (the "Contemplated Transactions").

(c)     At the Closing, the Buyer shall deliver to the Sellers:

(i)     the Cash Proceeds (as defined below) in accordance with the provisions of Section 3.2;

(ii)     a number of New Common Units equal to (A) all of the New Common Units that will be issued and outstanding on the Closing Date (after giving effect to the distributions to be made under the Plan on the Effective Date) minus (B) the number of Rights Offering Units (the "Buyer Equity");

(iii)     in the event that the Payout Event does not occur and Class 7 Second Lien Term Loan Claims do not vote to accept the Plan in accordance with the terms of the Plan, the Warrants;

(iv)     a duly executed Bill of Sale, acknowledging the transfer of the Acquired Assets to the Buyer;

(v)     the Assignment and Assumption Agreement, duly executed by the Buyer; and

(vi)    all other previously undelivered certificates, agreements and other documents required to be delivered by the Buyer at or prior to the Closing in connection with the Contemplated Transactions.

3.2    Purchase Price.  In consideration of the Acquired Assets, and subject to the terms and conditions of this Agreement, the Buyer shall assume the Assumed Liabilities as provided in Section 2.3 and at the Closing shall pay to the Sellers an aggregate purchase price (the "Purchase Price") of: (a) the cash proceeds received by the Buyer in connection with the Rights Offering and pursuant to the Backstop Unit Purchase Agreement (the "Cash Proceeds"), by wire transfer to an account or accounts designated by the Sellers, (b) the Buyer Equity and (c) in the event that Class 7 Second Lien Term Loan Claims do not vote to accept the Plan in accordance with the terms of the Plan, the Warrants.  Immediately following receipt of the Buyer Equity and the Warrants (if required to be issued pursuant to the Plan), the Sellers shall distribute the Buyer Equity and (if applicable) the Warrants under (and pursuant to) the Plan to certain holders of Claims against the Sellers in exchange for such Claims.  The Sellers acknowledge that the Buyer Equity and (if applicable) the Warrants have not been registered under the Securities Act and the distributions to be made by the Sellers pursuant to the immediately preceding sentence will be made pursuant to section 1145 of the Bankruptcy Code.

3.3    Allocation of Purchase Price.  The Purchase Price and the Assumed Liabilities (to the extent properly taken into account under the Internal Revenue Code of 1986, as amended (the "Code")), shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state or local Law, as appropriate, the "Allocation").  The Allocation shall be delivered by the Buyer to the Sellers within 120 days after the Closing Date.  The Buyer and the Sellers shall report and file all tax returns (including amended tax returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Unit or any other proceeding).  The Buyer and the Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

3.4    Designation of Affiliates by Buyer.  Prior to the Closing, the Buyer may designate one or more of its wholly-owned Affiliates to acquire at the Closing all or part of the Acquired Assets or to assume all or part of the Assumed Liabilities, in which event all references to "Buyer" shall be deemed to refer to each such wholly-owned Affiliate with respect to the Acquired Assets to be acquired by such Affiliate and/or the Assumed Liabilities to be assumed by such Affiliate; provided, however, that no designation otherwise permitted by this Section 3.4 shall relieve the Buyer from any of its liabilities or obligations hereunder.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

The Sellers jointly and severally hereby ratify, confirm and reaffirm the representations and warranties made by the Sellers contained in Section 2 of the Backstop Unit Purchase

Agreement as of the Agreement Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) as if such representations and warranties were set forth in this Agreement in their entirety.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Sellers as set forth below. Except for representations and warranties that are expressly limited as to a particular date (which shall be deemed to be made only as of such date), each representation and warranty is made by the Buyer as of the Agreement Date and as of the Closing Date:

5.1     Organization of the Buyer.  The Buyer is duly organized or formed (as applicable), validly existing and in good standing under the laws of its jurisdiction of incorporation or formation (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now conducted.

5.2     Authority.  The Buyer (a) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (i) to enter into, execute and deliver this Agreement and (ii) to perform and consummate the Contemplated Transactions, and (b) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (A) the due authorization, execution and delivery of this Agreement and (B) the performance and consummation of the Contemplated Transactions.  This Agreement has been duly executed and delivered by the Buyer.  This Agreement constitutes the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms.

5.3     No Conflict.  Except as set forth on Schedule 5.3, neither the execution and delivery by the Buyer of this Agreement nor the performance and consummation by the Buyer of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time or both): (a) contravene, conflict with, or result in a violation of any provision of the certificate of formation or operating agreement of the Buyer; (b) contravene, conflict with or result in a violation of any pending or existing law or order to which the Buyer, or any of the properties, assets, rights or interests owned or used by the Buyer, may be subject; or (c) contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any contract, agreement or instrument to which the Buyer is a party or to which any of the Buyer's properties, assets, rights or interests are bound, except where such contravention, conflict or result would not reasonably be expected to prohibit, materially delay or materially and adversely impact the Buyer's performance or consummation of its obligations contemplated by this Agreement.

5.4     Proceedings.  There are no pending, outstanding or, to the knowledge of the Buyer, threatened proceedings against the Buyer that challenge, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of the Buyer to consummate the Contemplated Transactions.

NY 72739031v9

5.5     Brokers or Finders.  The Buyer has not, and its representatives (excluding the managing member of the Buyer) have not, incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, for which the Sellers may be liable.

5.6     Access to Information.  The Buyer acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Sellers and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

5.7     Arms' Length.  The Buyer acknowledges and agrees that the Sellers are acting solely in the capacity of arms' length contractual counterparties to the Buyer with respect to the Contemplated Transactions and not as financial advisors or fiduciaries to, or agents of, the Buyer or any other person.  Additionally, the Sellers are not advising the Buyer as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Buyer shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the Contemplated Transactions, and the Sellers shall have no responsibility or liability to the Buyer with respect thereto.  Any review by the Sellers of the Contemplated Transactions or other matters related hereto will be performed solely for the benefit of the Sellers and shall not be on behalf of the Buyer.

Anything herein to the contrary notwithstanding, nothing contained in any of the representations, warranties or acknowledgments made by the Buyer in this Article 5 or elsewhere in this Agreement will operate to modify or limit in any respect the representations and warranties of the Sellers or to relieve the Sellers from any obligations to the Buyer for breach thereof.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1     Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, the Sellers shall (a) execute and deliver to the Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to the Buyer, and (b) do such other acts and things, all as the Buyer may reasonably request, to vest in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets.  The Sellers shall take such reasonable steps as may be reasonably necessary or appropriate at and after the Closing, so that the Buyer shall be placed in actual possession and operating control of the Acquired Assets.

6.2     Post-Closing Wind Down.  After the Closing, the Sellers shall take such actions as may be required or advisable to avoid the use of any trade names or other property that is an Acquired Asset (including amending the Sellers' corporate charters to change their corporate names).  The Buyer and the Sellers shall cooperate to accomplish the liquidation and winding down of the Sellers' estates, including any Claims resolution process (the "Wind Down"), as expeditiously and as efficiently as reasonably possible; provided, that all Wind Down Costs shall constitute Assumed Liabilities and shall be borne exclusively by the Buyer in accordance with the terms of this Agreement.  At the request of the Buyer, the Sellers will keep the Buyer apprised of all material developments with respect to the Acquired Assets and the Assumed

Liabilities (including the Wind Down Costs) in the course of the Wind Down and will promptly comply with any reasonable request by the Buyer for information relating thereto.

6.3    Name Change.  On or prior to the Closing, each Seller shall take or cause to be taken all necessary action (including filing with appropriate Governmental Units amendments to its Organizational Documents) to change its corporate or limited liability company name, "doing business as" name, trade name, and any other similar corporate or limited liability company identifier (each, a "Company Name") to a Company Name that does not contain the word "Neff", any of the other Assumed Names or any of the other trademarks or trade names comprising the Assumed Intellectual Property, or any translations, adaptations, derivations or combinations of any of the foregoing or any name or mark confusingly similar thereto.

6.4    Financing.  The Buyer shall use its commercially reasonable efforts to, at the sole cost and expense of the Sellers, (i) assist in the documentation and consummation of the Exit Facility, (ii) enter into definitive agreements (the "Debt Definitive Documents") with respect to the Exit Facility on the terms and conditions set forth in the Plan Term Sheet (including Exhibit 3 thereto), and (iii) satisfy all conditions applicable to the Buyer in the Debt Definitive Documents that is within its control.  Notwithstanding the foregoing, each Seller acknowledges and agrees that neither the Buyer nor any of its Affiliates or Representatives shall have any responsibility for the Exit Facility and shall not be liable or otherwise responsible for any statements, assertions, facts, projections, forecasts, data or other information contained or referred to in any offering memorandum, bankers' book or other materials prepared by or on behalf of the Sellers, the agents or lenders under the Exit Facility, or any of their respective Affiliates or Representatives in connection with the Exit Facility, except with respect to any statements, assertions, facts, projections, forecasts, data or other information that directly relates to the Buyer provided by the Buyer or any of its Affiliates or Representatives for inclusion in any such offering memorandum, bankers' book or other materials.

6.5    Employees and Employee Benefits.

(a)    Prior to or as of the Closing Date, the Buyer or one of its subsidiaries agrees to offer each Employee (other than any Excluded Individual) immediate employment (on an "at will" basis), effective on the Closing Date, at a comparable job and at a comparable salary or rate of pay, employee benefits that are comparable in the aggregate (excluding performance-based or incentive compensation, bonuses and any equity-based compensation, as applicable, except with respect to any Assumed Plans (and as the same may be modified from time to time) that the Employee was eligible to receive immediately prior to the Closing Date) and at the same employment location where the Employee worked immediately prior to the Closing Date with the applicable Seller so that no period of unemployment would occur between employment with such Seller prior to the Closing Date and employment with the Buyer or one of its subsidiaries on or after the Closing Date; provided, however, that with respect to Transferred Employees (as defined below) whose written employment Contracts with a Seller have been assumed by such Seller and assigned to the Buyer in accordance with the terms of this Agreement, the terms of such employment Contracts (subject to any amendments made to such employment Contracts as contemplated hereby) shall govern such Transferred Employee's employment.  Each such Employee who accepts the Buyer's or its subsidiary's offer of employment shall be referred to herein as a "Transferred Employee"; for avoidance of doubt, each such Employee who reports

for work at the Buyer or its subsidiary shall be deemed to have accepted the Buyer's or such subsidiary's offer of employment.

(b)     The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by the Buyer of the Assumed Plans.  The Sellers agree to cooperate with the Buyer in adopting and effectuating any plan amendments to the Assumed Plans reasonably desired by the Buyer, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law.

(c)     The Buyer and the Sellers will cooperate with each other with respect to, and endeavor in good faith to agree in advance upon the method and content of, all written or oral communications or disclosure to Employees with respect to the Contemplated Transactions.

(d)     Nothing in this <u>Section 6.5(d)</u> or any other provision of this Agreement shall be construed to modify, amend or establish any benefit plan, program or arrangement or affect the ability of the parties hereto or any other Person to modify, amend or terminate any of its benefit plans, programs or arrangements.  This <u>Section 6.5</u> is not intended to, and shall not be construed to, confer upon any Person other than the parties to this Agreement any rights or remedies hereunder or is intended to confer upon any Transferred Employee or any  other current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, any right to a particular term or condition of employment or affect the ability of the Buyer to terminate any Transferred Employee at any time in its sole discretion.

6.6     <u>Assignability of Certain Contracts, Etc</u>.  To the extent that the assignment to the Buyer of any Acquired Asset (including any insurance policy) pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such restriction cannot be effectively overridden or canceled by the Confirmation Order or other related order of the Bankruptcy Court (such Acquired Assets, the "<u>Nonassignable Assets</u>"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived; <u>provided</u>, <u>however</u>, that if any such consents, waivers, confirmations or other approvals are not obtained prior to the Closing Date, then the applicable Nonassignable Asset shall be held, as of and from and after the Closing, by the applicable Seller (or a designee appointed by such applicable Seller) in trust for the Buyer and the covenants and obligations thereunder shall be performed by the Buyer in such Seller's name and all benefits and Assumed Liabilities (but not Excluded Liabilities) thereunder shall be for the Buyer's account.  At the request of the Buyer, each of the Sellers (or any designee(s) appointed by the Sellers) shall take or cause to be taken such actions, and shall otherwise cooperate with the Buyer in any arrangement, so as to provide the Buyer with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and each Seller (or designee, as applicable) shall hold all money and other consideration received by it in respect of the Nonassignable Assets as trustee for the Buyer, and shall promptly turn the same over to the Buyer, together with any necessary endorsements or assignments, without set-off, counterclaim or reduction of any kind.  Any costs or expenses incurred by the Buyer or the Sellers (or its designee(s), as applicable) in connection

with fulfilling the obligations, or implementing or consummating the arrangements, described in the immediately preceding sentence shall be borne solely by the Buyer.

6.7 <u>Rejected Contracts</u>. No Seller shall reject any Contract in the Chapter 11 Cases or any other bankruptcy proceeding following the Agreement Date without the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed).

6.8 <u>Regulatory and Other Authorizations; Notices and Consents</u>. The Buyer and each of the Sellers shall each use their commercially reasonable efforts to promptly obtain all consents of all Governmental Units and other Persons, make all required filings, applications and petitions with, and give all required notices to, the applicable Governmental Units and other Persons that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement, and will cooperate fully with the other parties in promptly seeking to obtain all such consents and making all such filings, applications, petitions and notices.

6.9 <u>Parties' Access to Records After Closing</u>. The Sellers and the Buyer agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Acquired Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Cases and the completion of the liquidation and Wind Down of the Sellers' Estates (but in no event later than three (3) years after the Closing Date except, in the case of tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or the Buyer or any of their respective Affiliates, or in order to enable the Sellers or the Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby.

6.10 <u>Tax Matters</u>.

(a) Following the Closing, the Sellers shall timely file all tax returns for the Sellers for taxable periods ending on or before the Closing Date that are required to be filed by them after the Closing Date. All such tax returns shall be prepared in a manner consistent with prior practice. The Sellers shall provide the Buyer with copies of such completed tax returns at least twenty (20) days prior to the due date for filing thereof, along with supporting workpapers, for the Buyer's review and approval. The Sellers and the Buyer shall attempt in good faith to resolve any disagreements regarding such tax returns prior to the due date for filing. Not later than ten (10) days prior to the due date for the payment of taxes on any tax returns, the Buyer shall pay to the Sellers, for payment to the respective taxing authorities, the amount of taxes shown on such tax returns.

(b) Upon receipt of any notice of any audit, proceeding or other legal action by the Seller's with respect to taxes ("<u>Tax Claim</u>"), the Sellers shall immediately notify the Buyer of such Tax Claim, and the Buyer shall have the sole right to represent the Sellers in defense of any such Tax Claims. The Sellers shall cooperate with the Buyer in the conduct of

any such defense, and shall not settle any Tax Claims without the consent of the Buyer, which consent may be withheld in Buyer's sole discretion.

(c)        The Sellers shall cooperate with the Buyer in the making of any tax elections and the filing of any tax certificates requested by the Buyer, including, but not limited to, (i) any election under Section 754 of the Code with respect to the distribution of interests in the Buyer pursuant to the Plan and (ii) any federal, state or local tax compliance forms or certificates.

6.11    Further Action.  Each party hereto shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions.

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

7.1    Conditions Precedent to Obligations of Buyer.  The obligation of the Buyer to consummate the Contemplated Transactions is subject to the satisfaction (or waiver by the Buyer in the Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)        Backstop Unit Purchase Agreement.  All conditions precedent set forth in Section 6.1 of the Backstop Unit Purchase Agreement shall have been satisfied (or will be satisfied contemporaneously with the Closing);

(b)        No Prohibition.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of the Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any proceeding brought by a Governmental Unit seeking any of the foregoing be pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties, the Sellers or the Buyer which makes the consummation of the Contemplated Transactions illegal, void or rescinded; and

(c)        Notices and Consents.  All governmental and third party notifications, filings, waivers, authorizations and Consents necessary or required for the consummation of the transactions contemplated hereby or any of the other Contemplated Transactions, including those contemplated by HSR Act, shall have been made or received and shall be in full force and effect.

7.2    Conditions Precedent to the Obligations of Sellers.  The obligation of the Sellers to consummate the Contemplated Transactions is subject to the satisfaction (or waiver by the Sellers in the Sellers' sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)        Backstop Unit Purchase Agreement.  All conditions precedent set forth in Section 6.2 of the Backstop Unit Purchase Agreement shall have been satisfied (or will be satisfied contemporaneously with the Closing);

(b)     No Prohibition.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of the Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any proceeding brought by a Governmental Unit seeking any of the foregoing be pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties, the Sellers or the Buyer which makes the consummation of the Contemplated Transactions illegal, void or rescinded; and

(c)     Notices and Consents.  All governmental and third party notifications, filings, waivers, authorizations and Consents necessary or required for the consummation of the transactions contemplated hereby or any of the other Contemplated Transactions, including those contemplated by HSR Act, shall have been made or received and shall be in full force and effect.

## ARTICLE 8
## TERMINATION

8.1     Termination of Agreement.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing by either party if the Plan Support Agreement or the Backstop Unit Purchase Agreement is terminated in accordance with their respective terms. In the event any party hereto elects to terminate this Agreement, written notice of such termination shall forthwith be given to the other party and, effective upon giving such notice, this Agreement shall terminate without further action by any of the parties hereto.

8.2     Consequences of Termination.  In the event that this Agreement is terminated in accordance with Section 8.1, then this Agreement shall become void and of no further force and effect (other than this Section 8.2 and Article 9), and the Contemplated Transactions shall be abandoned without further action of the parties hereto, except that such termination shall not relieve any party hereto of any liability for breach of this Agreement; provided, that in connection with any termination of this Agreement by the Sellers or any automatic termination of the Backstop Unit Purchase Agreement in connection with the occurrence of a Payout Event, the Sellers shall have paid the Break-Up Fee and all accrued and unpaid Transaction Expenses as of such date in accordance with the Backstop Unit Purchase Agreement prior to (or contemporaneously with) any such termination; provided that such Transaction Expenses shall not include any Initial Transaction Expenses previously paid by the Company in accordance with the Backstop Unit Purchase Agreement.

## ARTICLE 9
## MISCELLANEOUS

9.1     Expenses.  Whether or not the Contemplated Transactions are consummated, the Sellers hereby agree to reimburse or pay, as the case may be, all of the accrued and unpaid Transaction Expenses (as defined in the Backstop Unit Purchase Agreement) of the Buyer (it being understood, however, that for purposes of this Agreement the definition of Transaction Expenses shall include this Agreement and the Contemplated Transactions).     Such reimbursement and payment shall be made in the same manner, and subject to the same limitations and procedures, as applicable to the obligation of the Sellers to reimburse or pay Transaction Expenses of the Backstop Parties pursuant to the provisions of the Backstop Unit

Purchase Agreement by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in such provisions shall be made so that such provisions can be applied in a logical manner in this Agreement).

      9.2    <u>Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer, or by the Buyer without the prior written consent of the Sellers, <u>provided</u>, <u>however</u>, that the Buyer (and, in the case of <u>clause (b)</u>, any of its subsidiaries) may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations and/or interests hereunder, without the consent of the Sellers, (a) to any subsidiary of the Buyer and/or (b) to any Person as security for any obligations arising in connection with the Buyer's or any of its subsidiary's financing in connection with the Contemplated Transactions (including, without limitation, the Exit Facility).  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment to a subsidiary of the Buyer, the references in this Agreement to the Buyer shall also apply to any such assignee.

      9.3    <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed or to the facsimile number or electronic mail address as set forth below, or to such other address, facsimile number or electronic mail address as such party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. (local time from the place the Notice is being delivered to), notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to any Seller: | Neff Corp. |
| | 3750 N.W. 87th Avenue |
| | Miami, FL 33178 |
| | Attention:  Mark Irion |
| | Chief Financial Officer |
| | Fax.: 305-513-4156 |
| | Email:  mirion@neffcorp.com |
| | |
| With copies to: | Kirkland & Ellis LLP |
| | 300 North LaSalle Street |
| | Chicago, IL 60654 |
| | Attention:  Ray Schrock, Esq., Henry Kleeman, Esq. |
| | Fax.: 305-513-4156 |
| | Email:  ray.schrock@kirkland.com; |
| | henry.kleeman@kirkland.com |

|                    |                                                              |
|--------------------|--------------------------------------------------------------|
| If to the Buyer:   | Reorganized Neff, L.L.C.                                      |
|                    | 3750 N.W. 87th Avenue                                        |
|                    | Miami, FL 33178                                              |
|                    | Attention:  Mark Irion                                       |
|                    | Chief Financial Officer                                      |
|                    | Fax.: 305-513-4156                                          |
|                    | Email:  mirion@neffcorp.com                                 |
|                    |                                                              |
| With copies to:    | Kirkland & Ellis LLP                                         |
|                    | 300 North LaSalle Street                                    |
|                    | Chicago, IL 60654                                           |
|                    | Attention:  Ray Schrock, Esq., Henry Kleeman, Esq.          |
|                    | Fax.: 305-513-4156                                          |
|                    | Email:  ray.schrock@kirkland.com;                           |
|                    | henry.kleeman@kirkland.com;                                 |
|                    |                                                              |
| With copies to:    | Each of the parties, and at the mailing address, facsimile number and electronic mail address, set forth on Schedule 9.3 hereto; and |
|                    |                                                              |
| With copies to:    | Stroock & Stroock & Lavan LLP                                |
|                    | 180 Maiden Lane                                             |
|                    | New York, NY 10038                                          |
|                    | Attention: Kristopher M. Hansen, Esq., Matthew A. Schwartz, Esq., and Jayme T. Goldstein, Esq. |
|                    | Fax: 212-806-6006                                           |
|                    | Email:  khansen@stroock.com; mschwartz@stroock.com; jgoldstein@stroock.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address, facsimile number and/or electronic mail address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.4    Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

9.5    Entire Agreement; Amendments and Waivers.    This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be

waived, only by a written instrument executed by the Buyer, the Backstop Parties and the Sellers, or in the case of a waiver, by the party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.6     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or portable document format (PDF).  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

9.7     Invalidity.  If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the Agreement Date.

9.8     Headings.  The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.9     Exclusive Jurisdiction.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.3.

9.10     WAIVER OF RIGHT TO TRIAL BY JURY.  THE SELLERS AND THE BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.11     Specific Performance.  The Sellers and the Buyer acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and (b) remedies at law would not be adequate to compensate the non-breaching party.  Accordingly, the Sellers and the Buyer agree that each of them shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance,

injunctive and/or other equitable relief. The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Sellers and the Buyer hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

9.12    No Recourse Party. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Sellers and the Buyer may be partnerships or limited liability companies, the Sellers and the Buyer covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, Affiliates, limited partners, general partners, members, managers, employees, stockholders or equity holders of any Seller or the Buyer, or any former, current or future directors, officers, agents, Affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such Person, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any obligation of any Seller or the Buyer under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation; provided, that nothing in this Section 9.12 shall relieve the Sellers or the Buyer of their obligations under this Agreement.

9.13    Settlement Discussions. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

9.14    No Third Party Beneficiaries. This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and other than the No Recourse Parties with respect to Section 9.12 hereof.

9.15    Disclosure. Unless otherwise required by applicable law, the Sellers will not, without the Buyer's prior written consent, disclose to any Person the identities of the members of the Buyer or any of the entities listed on Schedule 9.3 hereof, other than to the Sellers' Representatives, in each case in connection with the Contemplated Transactions and subject to their agreement to be bound by the confidentiality provisions hereof; provided, however, that the Sellers may refer generally to Affiliates of each of the entities listed on Schedule 9.3 as being members of the Buyer in pleadings filed with the Bankruptcy Court if, and only if, in each case, the Sellers obtain the prior written consent of the applicable entity listed on Schedule 9.3 to the disclosure of the identity of its Affiliates. The exhibits and schedules to any copy of this Agreement that is filed with the Bankruptcy Court shall, subject to Bankruptcy Court approval, be subject to redaction as the Buyer determines to be reasonably necessary and appropriate.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of the Sellers and the Buyer as of the date first above written.

BUYER

REORGANIZED NEFF, L.L.C.

By: _____
Name:
Title:

<u>DEBTORS</u>

NEFF HOLDINGS CORP.


By: _____
Name:
Title:



NEFF CORP.


By: _____
Name:
Title:



NEFF RENTAL LLC


By: _____
Name:
Title:



NEFF FINANCE CORP.


By: _____
Name:
Title:

NEFF RENTAL, INC.


By: _____
Name:
Title:


NEFF HOLDINGS LLC


By: _____
Name:
Title:

<u>EXHIBIT A</u>

<u>BILL OF SALE</u>

See attached.

NY 72739031v9

<u>EXHIBIT B</u>

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

See attached.

NY 72739031v9

SCHEDULE 2.3(e)

SWAP DOCUMENTATION

NY 72739031v9

1. 

2. 

NY 72739031v9

**PLAN SUPPLEMENT**
**<u>EXHIBIT 7</u>**

**Swap Plan Support Agreement**

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 14, 2010

To Bank of America, N.A., in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Neff Corp. ("Neff") and certain of its affiliates (together with Neff, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of Bank of America, N.A., in its capacity as counterparty (in such capacity, "BofA" or the "Swap Counterparty") pursuant to that certain ISDA Master Agreement with Neff dated June 14, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "Swap Agreement"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "Swap Counterparty Claims").

2.    Representations and Warranties of the Swap Counterparty

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to

or to seek any modification of a Qualified Plan, the related disclosure statement, in form and substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees. For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.    Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors. The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void ab initio. This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Neff and the Swap Counterparty;

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

(A)    a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Neff and the Swap Counterparty);

(B)    the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(C)    the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(D)    the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)     (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)     the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)     the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)     Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)     an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)     upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)     Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7. Specific Performance/Remedies

(a) It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b) The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8. Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9. Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10. Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11. Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.     Plan Support Agreement Effective Date

        Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date"). Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.     Third-Party Beneficiary

        This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.     Counterparts

        This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.     Headings

        The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.     Acknowledgment

        This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

17.     Settlement Discussions

        This Agreement, the Restructuring Term Sheet and the Swap Amendment are part of a proposed settlement of matters that could otherwise be the subject of litigation among the

parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.    Further Agreements

The Swap Counterparty agrees that, to the extent a Qualified Plan is consummated through the acquisition of all or substantially all of the Debtors' assets or any comparable transaction through which the Debtors' obligations under the Swap Agreement (as amended) shall be undertaken by a third party (each, a "Third Party"), the Swap Counterparty: (a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations under the Swap Agreement to such Third Party; and (b) shall take such further actions requested by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.    No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

NEFF CORP. (on behalf of itself and all other Debtors)

By: _____
Name:
Title: Marc Irion
CFO

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

Bank of America, N.A., in its capacity as Swap Counterparty

Authorized Signatory:

By: _____
Name:
Title: Ana Morales Gillard
Vice President

[Signature Page for BofA Swap Counterparty Plan Support Agreement]

PLAN SUPPORT AGREEMENT

**Exhibit 2**

**Swap Amendment**

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between Bank of America, N.A. ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA 2002 Master Agreement dated as of June 14, 2007 (together with the Schedule thereto and each Confirmation of the Transaction entered into thereunder with a Trade Date of June 14, 2007, Reference No. 2831884, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1    Conflicts.

(a)    Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)    Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2    Agreement Not to Terminate.

(a)    For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the

Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b) For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c) Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3 Payments.

(a) Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b) For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement: (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, the Calculation Agent shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or

---

[1] "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)     In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below). "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)     Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4     Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect. For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5     Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

> Bank of America, N.A.
> Sears Tower
> 233 South Wacker Drive, Suite 2800
> Chicago, IL 60606
> Attention:  Swap Operations
> Telephone No.: 312-234-2732
> Facsimile No.: 866-255-1444

with a copy to:

> Bank of America, N.A.
> One Bryant Park, NY1-100-05-01
> New York, New York 10036
>
> Attention: Client Integration and Documentation
> Facsimile No.: 212-548-8622

Address for notice or communications to Party B:

> Neff Corp.
> 3750 N.W. 87th Street, Suite 400
> Miami, Florida 33178 Attention: Chief Financial Officer
> Telephone No.: 305-921-2280
> Facsimile No.: 305-921-4156

with copies to:

> Kirkland & Ellis LLP
> Attention: Ray Schrock and Ryan Preston Dahl
> 300 North LaSalle
> Chicago, Illinois 60654
> Telephone No.: 312-862-2000
> Facsimile No.: 312-862-2200
>
> and
>
> Kirkland & Ellis LLP
> Attention: Leonard Klingbaum and Brian S. Lennon
> 601 Lexington Avenue
> New York, New York
> Telephone No.: 212-446-4800
> Facsimile No.: 212-446-6460

6       Governing Law.

THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7       Consent to Jurisdiction.

PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS. NOTWITHSTANDING THE FOREGOING, PARTY A AND

PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT. PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

Bank of America, N.A., as Party A to the ISDA Agreement

By: **Ana Morales Gillard**
Its: **Vice President**

Neff Corp., as Party B. to the ISDA Agreement

By: Marc Irion
Its: CFO

[Signature Page for BofA Swap Amendment]

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 14, 2010

To UBS AG, in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Neff Corp. ("Neff") and certain of its affiliates (together with Neff, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of UBS AG, in its capacity as counterparty (in such capacity, "UBS" or the "Swap Counterparty") pursuant to that certain ISDA Master Agreement with Neff dated June 20, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "Swap Agreement"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "Swap Counterparty Claims").

2.    Representations and Warranties of the Swap Counterparty

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to bind the beneficial owner(s) of such Swap Counterparty Claims to the terms of

this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Swap Counterparty Claims and to dispose of, exchange, assign and transfer such Swap Counterparty Claims.

(b)     Such Swap Counterparty has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Swap Counterparty Claims or the Swap Agreement that are inconsistent with the representations and warranties of such Swap Counterparty herein or would render such Swap Counterparty otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)     Such Swap Counterparty (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 promulgated under the Securities Act of 1933, as amended).

3.     Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Neff, the Swap Counterparty shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its representatives to) (a) (i) vote all of its Swap Counterparty Claims to accept any Plan proposed by the Debtors incorporating (A) the terms and conditions set forth on the term sheet annexed hereto as **Exhibit 1**, which term sheet is expressly incorporated by reference herein and made a part of  this Agreement as if fully set forth herein (the "Restructuring Term Sheet") and (B) the treatment of the Swap Counterparty Claims as provided for in an amendment to the Swap Agreement to be executed contemporaneously with this Agreement and which is annexed hereto as **Exhibit 2**, which amendment is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Swap Amendment"), consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment, and in form and substance reasonably satisfactory to the Debtors and otherwise containing terms no less favorable to the Swap Counterparty Claims than the proposal set forth in the Restructuring Term Sheet (a "Qualified Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Swap Counterparty Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Plan, the related disclosure statement, in form and

2

substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees. For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.    Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors. The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void *ab initio*. This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

5.     <u>The Debtors' Covenants</u>

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)     file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)     obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "<u>Confirmation Order</u>") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)     effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.     <u>Termination of Obligations</u>

(a)     This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

    (i)     by the mutual written consent of Neff and the Swap Counterparty;

    (ii)     on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "<u>Termination Event</u>"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

        (A)     a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "<u>Petition Date</u>") (or such later date as may be agreed by Neff and the Swap Counterparty);

        (B)     the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

        (C)     the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

        (D)     the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)    the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)    Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)    an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)    upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7. Specific Performance/Remedies

(a) It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b) The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8. Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9. Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10. Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11. Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.     Plan Support Agreement Effective Date

        Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date"). Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.     Third-Party Beneficiary

        This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.     Counterparts

        This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.     Headings

        The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.     Acknowledgment

        This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court. For the avoidance of doubt, the obligations of UBS are the obligations solely of the Derivatives Credit Exposure Management business group within UBS AG in respect of the Swap Counterparty Claims.

17.  Settlement Discussions

This Agreement, the Restructuring Term Sheet and the Swap Amendment are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.  Further Agreements

The Swap Counterparty agrees that, to the extent a Qualified Plan is consummated through the acquisition of all or substantially all of the Debtors' assets or any comparable transaction through which the Debtors' obligations under the Swap Agreement (as amended) shall be undertaken by a third party (each, a "Third Party"), the Swap Counterparty: (a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations under the Swap Agreement to such Third Party; and (b) shall take such further actions requested by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.  No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEFF CORP. (on behalf of itself and all other Debtors)**

By: _____
Name: Mark Irion
Title: CFO.

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

UBS AG, in its capacity as Swap Counterparty

Authorized Signatory:

By: _____
Name: James B. Fuqua
Title: Managing Director and Counsel
Region Americas Legal

By: _____
Name: Thomas D. Frawley
Title: Managing Director

[Signature Page for UBS Swap Counterparty Plan Support Agreement]

PLAN SUPPORT AGREEMENT

**Exhibit 2**

**Swap Amendment**

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between UBS AG ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA Master Agreement dated as of June 20, 2007 (together with the Schedule thereto and each Confirmation entered into thereunder, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1    Conflicts.

(a)    Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)    Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2    Agreement Not to Terminate.

(a)    For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it

shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b) For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c) Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3    Payments.

(a) Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b) For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement: (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, each party shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to

---

[1] "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)     In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below). "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)     Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4     Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect. For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5     Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Legal Affairs
Facsimile No.: 203-719-0680

Address for notice or communications to Party B:

Neff Corp.
3750 N.W. 87th Street, Suite 400
Miami, Florida 33178 Attention: Chief Financial Officer
Telephone No.: 305-921-2280
Facsimile No.: 305-921-4156

with copies to:

Kirkland & Ellis LLP
Attention: Ray Schrock and Ryan Preston Dahl
300 North LaSalle
Chicago, Illinois 60654
Telephone No.: 312-862-2000
Facsimile No.: 312-862-2200

and

Kirkland & Ellis LLP
Attention: Leonard Klingbaum and Brian S. Lennon
601 Lexington Avenue
New York, New York
Telephone No.: 212-446-4800
Facsimile No.: 212-446-6460

6      Governing Law.

THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7      Consent to Jurisdiction.

PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS. NOTWITHSTANDING THE FOREGOING, PARTY A AND PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT. PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

UBS AG, as Party A to the ISDA Agreement

By:
Its:

Kiya Sakai
Executive Director and Counsel
Region Americas Legal
Fixed Income Section

By:
Its:

Maria Iacontino-Murphy
Director
Region Americas Legal
Fixed Income Section

Neff Corp., as Party B. to the ISDA Agreement

By:
Its: CFO.

[Signature Page for UBS Swap Amendment]

**PLAN SUPPLEMENT**
**EXHIBIT 8**

**Schedule of Cure Costs**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO OR ON THE DATE
THAT IS FOURTEEN (14) DAYS AFTER THE DATE ON WHICH THE DISCLOSURE
STATEMENT IS APPROVED.

**PLAN SUPPLEMENT**
**EXHIBIT 9**

**Schedule of Rejected Executory Contracts and Unexpired Leases**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE ENTRY OF THE ORDER APPROVING THE DISCLOSURE STATEMENT.

**PLAN SUPPLEMENT**
**EXHIBIT 10**

**Composition of New Board**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO CONFIRM THE PLAN.

**PLAN SUPPLEMENT**
**<u>EXHIBIT 11</u>**

**Form of Amended and Restated LLC Operating Agreement**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO CONFIRM THE PLAN.

**PLAN SUPPLEMENT**
**EXHIBIT 12**

**Form of Liquidator Agreement**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO CONFIRM THE PLAN.

**PLAN SUPPLEMENT**
**<u>EXHIBIT 13</u>**

**Form of Management Equity Incentive Plan Agreement**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO CONFIRM THE PLAN.

**PLAN SUPPLEMENT**
**EXHIBIT 14**

**List of Non-Released Parties**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO CONFIRM THE PLAN.

**PLAN SUPPLEMENT**
**EXHIBIT 15**

**Schedule of Causes of Action to Be Retained by the Purchaser**


THE DEBTORS INTEND TO FILE THIS DOCUMENT PRIOR TO THE HEARING TO
CONFIRM THE PLAN.