**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                         :    Chapter 11
In re:                   :
                         :    Case No. 10-12610 (SCC)
NEFF CORP., *et al.*,[1]    :
                  Debtors.  :
                         :    Jointly Administered
-------------------------------------------------------------- x

## INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND LETTERS OF CREDIT (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, AND (D) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion") dated May 16, 2010 of Neff Corp., as borrower ("Neff Corp.," or the "Parent Borrower"), Neff Holdings Corp. ("Holdings"), and other persons designated as credit parties (the "Credit Parties"), as such Credit Parties are listed on the signature pages of the DIP Agreement (as defined below), each as a debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases, pursuant to Bankruptcy Code §§ 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 362(c)(3), 364(d), and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001-2, seeking entry of an interim order (the "Interim Order"), *inter alia*:

(i)        authorizing the Debtors to obtain senior secured post-petition financing on a super-priority basis (the "DIP Facility"), pursuant to the terms and conditions of that

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

certain Senior Secured Debtor-in-Possession Credit Agreement dated May 16, 2010 (as the same may be amended, supplemented, restated, or otherwise modified, the "DIP Agreement"), by and among the Credit Parties, Bank of America, N.A. ("Bank of America"), as agent, swingline lender, and L/C issuer (the "Agent") for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the Agent, the "DIP Lenders"), and Bank of America Securities LLC, Wells Fargo Capital Finance LLC ("Wells Fargo"), and GE Capital Markets, Inc. ("GE"), as joint lead arrangers and joint book runners, substantially in the form annexed as Exhibit C to the Motion;

(ii)     authorizing the Debtors (a) to execute and deliver the DIP Agreement and all other related documents (collectively with the DIP Agreement, the "DIP Documents"), (b) to honor that certain Commitment Letter dated as of April 9, 2009 (the "Commitment Letter") between the Debtors, the Agent, and the DIP Lenders signatory thereto,[2] and (c) to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)     granting an automatically perfected first-priority security interest and lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, on all DIP Collateral (as defined herein), whether now existing or hereafter acquired, of the Parent Borrower and the other Credit Parties that was unencumbered by any security interest or lien as of the Petition Date (as defined below);

---

[2]     For the avoidance of doubt, the Commitment Letter is one of the DIP Documents.

(iv)     granting an automatically perfected junior lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to Permitted Liens, as defined in the DIP Agreement (other than Permitted Liens in favor of the Pre-Petition Secured Parties, as defined in the DIP Agreement);

(v)     granting an automatically perfected first priority, senior priming lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, upon all property of the Parent Borrower and the other Credit Parties that is subject to a valid and perfected lien securing all obligations owed to the Pre-Petition Secured Parties (as defined herein);

(vi)     granting, with respect to the obligations of the Parent Borrower and the other Credit Parties hereunder and under the other DIP Documents, an allowed administrative expense claim in each Bankruptcy Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses (subject to the Carve-Out) of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) or 726 thereof), but in all respects subject to the Carve-Out (as defined herein);

(vii)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the Agent's attorneys, advisers, accountants, and other consultants, and the reasonable legal expenses

of the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Agreement and DIP Documents;

(viii) authorizing the use of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code and/or under the DIP Documents, as applicable), subject to the restrictions set forth in the DIP Documents, and providing adequate protection to certain of the Pre-Petition Secured Parties for any Diminution in Value of their interests in the Pre-Petition Collateral (each as defined herein) to the extent any pre-petition secured indebtedness remains outstanding;

(ix) vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as limited pursuant hereto; and

(x) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the Declaration of Mark Irion (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2, the Declaration of Ronen Bojmel in Support of the Motion, the exhibits attached thereto, the DIP Documents, and the evidence submitted at the interim hearing to consider the interim relief requested in the Motion (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     *Petition Date*.   On the date of the Motion (the "Petition Date"), each of the Debtors filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing these cases.

B.     *Debtors-in-Possession*.   The Debtors continue to operate their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

C.     *Jurisdiction and Venue*.   This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   Venue for these cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Committee Formation*.  As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors (the "Committee") in these cases pursuant to Section 1102 of the Bankruptcy Code.

E.    *Debtors' Stipulations*.    After consultation with their attorneys and financial advisors, the Debtors (on behalf of and for themselves) admit, stipulate, acknowledge, and agree that:

(i)    *First Lien Credit Facilities*.   Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Holdings, as guarantor, Bank of America, as administrative agent (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), are parties to that certain Credit Agreement, dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement").  The First Lien Credit Agreement provides the Debtors with an asset-based credit facility (the "ABL," with the lenders thereunder, the "ABL Lenders") with $250.0 million of maximum availability.  As of the Petition Date, approximately $153.3 million was outstanding under the ABL.  The First Lien Credit Agreement also provides for an $87.9 million "last out" term loan (the "First Lien Term Loan," with the lenders thereunder, the "First Lien Term Loan Lenders"),[3] which First Lien Term Loan remains fully drawn as of the Petition Date.  The ABL and the First Lien Term Loan (collectively, with the Swap Obligations (as defined herein), the "First Lien Credit Facilities") are secured by a first priority lien on substantially all of the Debtors' assets (subject to certain

---

[3]    For the avoidance of doubt, the term "First Lien Lenders" includes both the ABL Lenders and the First Lien Term Loan Lenders.

exceptions with respect to real property) (the "<u>Pre-Petition Collateral</u>") pursuant to that certain First Lien Security Agreement between Neff Corp., certain of the Debtors as parties thereto, and Bank of America, as agent, dated as of May 31, 2007 (the "<u>First Lien Security Agreement</u>," and, together with the First Lien Credit Agreement, the "<u>First Lien Credit Documents</u>"). Pursuant to the First Lien Credit Documents, claims arising under the ABL are payable prior to claims arising under the First Lien Term Loan.

(ii) *Swap Obligations.* Neff Corp. is a party to two interest rate swaps with (i) Bank of America, pursuant to that certain ISDA 2002 Master Agreement dated June 14, 2007, as amended in that certain Amendment dated May 14, 2010, and (ii) UBS AG ("<u>UBS</u>," and, UBS and Bank of America together in their capacities as such, the "<u>Swap Counterparties</u>"), pursuant to that certain ISDA Master Agreement dated as of June 20, 2007. Obligations arising under the swaps (collectively, the "<u>Swap Obligations</u>") are secured to the same extent as obligations arising under the First Lien Credit Agreement pursuant to the liens granted under the First Lien Security Agreement. Under the First Lien Credit Documents, claims arising under the Swap Obligations are payable junior to claims arising under the ABL but are payable prior to claims arising under the First Lien Term Loan. As of the Petition Date, the Swap Obligations totaled approximately $22.4 million.

(iii) *Second Lien Term Loan.* Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantors, Wilmington Trust FSB, successor to Bank of America, as administrative agent (the "<u>Second Lien Agent</u>"), and the lenders party thereto (collectively, the "<u>Second Lien Lenders</u>," and together with the First Lien Lenders, the "<u>Pre-Petition Secured Lenders</u>")

are parties to that certain Credit Agreement, dated as of May 31, 2007 (the "Second Lien Credit Agreement").  The Second Lien Credit Agreement provides for a $290.0 million term loan, which remains fully outstanding as of the Petition Date (the "Second Lien Term Loan").  The Second Lien Term Loan is secured by a second priority lien on the Pre-Petition Collateral pursuant to a security agreement (the "Second Lien Security Agreement," and together with the Second Lien Credit Agreement, the "Second Lien Loan Documents") between Neff Corp. and the Debtors as parties thereto and the Second Lien Agent, dated as of May 31, 2007.

(iv)     *Intercreditor Agreement.*  On May 31, 2008, the applicable Debtors, the collateral agent under the First Lien Security Agreement (the "First Lien Collateral Agent"), and the collateral agent under the Second Lien Security Agreement (the "Second Lien Collateral Agent") entered into an agreement that, among other things, assigned relative priorities to claims arising under the First Lien Credit Facilities (including the Swap Obligations) and the Second Lien Term Loan (the "Intercreditor Agreement").

(v)     *Validity and Priority of Pre-Petition Indebtedness and Liens.*  After consultation with their attorneys and financial advisors, the Debtors, the First Lien Agent, and the Second Lien Agent acknowledge and agree that (a) the liens on the Pre-Petition Collateral granted pursuant to the First Lien Security Agreement and the Second Lien Security Agreement, respectively, are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including, without limitation, avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy

Code or applicable non-bankruptcy law; (b) subject to "Permitted Encumbrances" (as such term is defined and as set forth in the First Lien Credit Agreement), the liens granted pursuant to the First Lien Security Agreement are senior to all security interests and liens in the Pre-Petition Collateral; (c) the liens securing the Second Lien Term Loan are senior to all security interests and liens in the Pre-Petition Collateral, subordinated only to the liens granted pursuant to the First Lien Security Agreement and "Permitted Encumbrances" (as such term is defined and as set forth in the First Lien Credit Agreement); (d) the First Lien Credit Documents are valid and enforceable by the First Lien Lenders against each of the Debtors; (e) the obligations under the First Lien Credit Facilities and the obligations under the Second Lien Term Loan constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the First Lien Credit Documents and the Second Lien Loan Documents; (f) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the First Lien Credit Facilities or to any of the obligations under the Second Lien Term Loan exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the Pre-Petition Loan Documents or the Intercreditor Agreement; (g) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the First Lien Agent, the Second Lien Agent, the First Lien Lenders (including both the ABL Lenders and the First Lien Term Loan Lenders), and the Second Lien Lenders (collectively, the "Pre-Petition Secured Parties"), and/or any of the Pre-

Petition Secured Parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directs, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to Sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the First Lien Credit Documents or Second Lien Credit Documents (or the transaction contemplated thereunder), the obligations under the First Lien Credit Facilities and the Second Lien Term Loan, or the security interests and liens in the Pre-Petition Collateral; (h) as of the Petition Date, the obligations under the First Lien Credit Facilities constitute allowed, secured claims within the meaning of Section 506(c) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including, without limitation, attorneys' fees and related expenses, and other charges of whatever nature owing in respect thereof;[4] (i) the Debtors have waived, discharged, and released any right to challenge any of the obligations under the First Lien Credit Facilities, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, and/or any of their respective officers, directors, or employees; and (j) any payments made on account of the obligations under the First Lien Credit Facilities and the obligations under the Second

---

[4] Until the expiration of the Challenge Period (defined below), the amounts of obligations under the First Lien Credit Facilities and the Swap Obligations that are owing are subject to change to reflect contingent amounts that subsequently become liquidated.

Lien Term Loan to or for the benefit of the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties prior to the Petition Date were on account of amounts in respect of which the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties were oversecured, were payments out of the Pre-Petition Collateral in accordance with the Intercreditor Agreement, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(vi)      *Cash Collateral*.      The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Pre-Petition Collateral, constitutes cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code, of the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Agent, and the Pre-Petition Secured Parties.

(vii)      *Default by the Debtors*.  The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the First Lien Credit Documents and the Second Lien Loan Documents.

F.      *First Lien Agent Consent to Adequate Protection*.  The First Lien Agent has provided its consent to the adequate protection provided in paragraph 12.(iii) of this Interim Order.

G.      *Findings Regarding the Post-Petition Financing*.

(i)      *Request for Post-Petition Financing*.  The Debtors seek authority (a) to enter into the DIP Facility on the terms described herein and in the DIP Documents and (b) to use cash collateral on the terms described herein and therein to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final

-11-

approval of the proposed post-petition financing arrangements and use of cash collateral arrangements pursuant to a proposed final order, which proposed final order shall be in accordance with the DIP Documents (the "Final Order"), and notice of the Final Hearing will be provided in accordance with this Interim Order.

(ii)     *Priming of Certain Pre-Petition Liens.*   The priming of the liens of the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties on the Pre-Petition Collateral, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.   But, the First Lien Agent and certain of the Pre-Petition Secured Parties, subject to the terms of the First Lien Credit Documents and the Intercreditor Agreement, are entitled to receive adequate protection as set forth in this Interim Order pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any diminution in the value of each of their respective interests in the Pre-Petition Collateral (including cash collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the Pre-Petition Liens, and the subordination to the Carve-Out and the DIP Liens (as defined herein) (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(iii)    *Need for Post-Petition Financing and Use of Cash Collateral.*   The Debtors' need to use cash collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of

their estates. The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers and customers to pay their employees and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of cash collateral. Without the ability to access the DIP Facility or cash collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of cash collateral.

(iv) *No Credit Available on More Favorable Terms.* Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims and liens, and (c) the other protections set forth in this Interim

Order.  The DIP Lenders would be unwilling to provide financing under the DIP Facility absent the requirements that (i) after entry of the Interim Order proceeds of cash collateral, other than loans made under the DIP Facility, be used to reduce the ABL on a permanent basis until repaid in full; and (ii) immediately upon entry of the Final Order, proceeds of the DIP Facility be used to repay the remaining amounts outstanding under the ABL.

(v)      *Adequacy of the Budget*.  As set forth in the DIP Documents, the Debtors have prepared and delivered an initial budget (the "Agreed Budget"), to the Agent and DIP Lenders.  Such Agreed Budget has been thoroughly reviewed by the Debtors, their management and their advisors.  The Agreed Budget is adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Agreed Budget.  Such Agreed Budget may be updated from time to time in accordance with <u>Section 4.1(e)(ii)</u> of the DIP Agreement.

H.      <u>*Sections 506(c) and 552(b)*</u>.  In exchange for (i) the Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the First Lien Agent's, the Second-Lien Agent's, and the Pre-Petition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out and the DIP Liens, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties shall each receive, subject to the entry of the Final Order, (i) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

I.      <u>*Good Faith of the Agent and the DIP Lenders*</u>.

(i)     *Willingness to Provide Financing*.   The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to (a) the entry by this Court of this Interim Order and the Final Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.   The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents as they relate to the Interim Financing (as defined herein), and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.   The DIP Facility and the use of cash collateral were negotiated in good faith and at arms' length among the Debtors, the Agent, the DIP Lenders and the First Lien Agent.   The use of cash collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the Agent and the DIP Lenders are therefore entitled

to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

J.      *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including, (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iv) counsel to the First Lien Agent for itself and for the Pre-Petition First Lien Lenders; (v) counsel to the *ad hoc* group of the First Lien Term Loan Lenders; (vi) counsel to the Second Lien Agent for itself and for the Pre-Petition Second Lien Lenders; (vii) counsel to the indenture trustee under that certain 10% senior notes indenture, (viii) counsel to the Agent for itself and for the DIP Lenders; (ix) all parties holding security interests in any of the Debtors' assets; (x) counsel to GE; and (xi) counsel to Wells Fargo.  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Interim Financing Approved.  The Interim Financing (as defined herein) is authorized and approved, and the use of cash collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.      Objections Overruled.  All objections to the Interim Financing (as defined herein) and/or the entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

3.      <u>Authorization of the DIP Financing</u>.    The DIP Facility and the DIP Documents are hereby approved for the Interim Financing.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, to incur and to perform the DIP Obligations (as defined herein) in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, including, without limitation, with regard to the proposed exit financing contemplated in the DIP Documents, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Agreement and other of the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.      <u>Authorization to Borrow</u>.    During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to request extensions of credit pursuant to the terms herein and the terms of the DIP Documents (the "<u>Interim Financing</u>").

5.     DIP Obligations.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, the other DIP Documents, and this Interim Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in these cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the Agent or to any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.     Post-Petition Liens.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition priming, first-priority security interests in and liens upon (collectively, the "DIP Liens") each of the Credit Parties' right, title, and interest in, to, and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Parties (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Credit Parties, and

regardless of where located (all of which being hereinafter collectively referred to as the "DIP Collateral"),[5] as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the DIP Obligations, including (as each such term is defined in the DIP Agreement) (i) all Accounts; (ii) all Chattel Paper; (iii) all Documents; (iv) all General Intangibles (including Payment Intangibles and Software); (v) all Goods (including Inventory, Equipment, Fixtures, and Titled Collateral); (vi) all Instruments; (vii) all Investment Property; (viii) all Deposit Accounts; (ix) all money, cash, or Cash Equivalents; (x) all Supporting Obligations and Letter-of-Credit Rights; (xii) the Commercial Tort Claims described on Schedule 8.1(a) to the DIP Agreement and on any supplement thereto received by the Agent pursuant to Section 8.5(a)(ix) of the DIP Agreement; and (xiii) to the extent not otherwise included, all proceeds of the DIP Collateral (including, subject to entry of the Final Order, any proceeds or property recovered in respect of Avoidance Actions or causes of action under Chapter 5 of the Bankruptcy Code), tort claims, insurance claims, and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing; *provided*, *however*, that "DIP Collateral" shall not include, nor shall security interests granted under Section 8.1(a) of the DIP Credit Agreement, or attach to, any Excluded Property (as defined in the DIP Agreement); and *provided*, *further*, that if and when any property shall cease to be Excluded Property, immediately at and from such time, the DIP Collateral shall include, and the security interest granted by each Credit Party shall attach to, such property.

---

[5]     For the avoidance of doubt, the DIP Collateral includes the Pre-Petition Collateral.

7.     <u>DIP Lien Priority</u>.  Except as provided under <u>Section 8.1(a)</u> of the DIP Agreement, the DIP Liens securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the DIP Collateral, but shall be subject to the Carve-Out in all respects.  The DIP Liens shall not otherwise be made subject to or *pari passu* with any lien or security interest and shall be valid and enforceable against any trustee appointed in these cases or any Successor Cases, and/or upon the dismissal of any of these cases or Successor Cases.  Subject to entry of the Final Order, the DIP Liens shall not be subject to Sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

8.     <u>Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Interim Order, the Agent and the DIP Lenders are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (collectively, the "<u>DIP Superpriority Claim</u>") in each of these cases and any Successor Cases for all of the DIP Obligations,  (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of these cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; *provided*, *however*, that for purposes of this Interim Order, the DIP Superpriority Claim shall not attach to Avoidance

Actions or the proceeds thereof. Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject only to the Carve-Out.

9.    Extension of Credit.  The Agent and the DIP Lenders shall have no obligation to make any loan or advance, or to issue any letters of credit under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of such letter of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Agent in its sole discretion.

10.    Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents.  A copy of an initial budget is annexed hereto as Exhibit 1.  The Debtors are authorized to use the proceeds of the DIP Facility to make the adequate protection payments provided for in paragraph 12 of this Interim Order.  Immediately upon entry of the Final Order, the Debtors shall use proceeds of the DIP Facility to repay the remaining amounts under the ABL on a permanent basis in accordance with the DIP Documents.

**Authorization to Use Cash Collateral and Adequate Protection**

11.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, the Debtors are authorized to use cash collateral in accordance with the DIP Documents and this Interim Order.  For the avoidance of doubt, any cash collateral (other than proceeds of the DIP Facility prior to the entry of the Final Order) or proceeds from the Pre-Petition Collateral shall be applied to reduce the ABL on a permanent basis until repaid in full.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any cash collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, and the DIP Documents.  Further, upon the occurrence of an

Event of Default (as defined herein and in the DIP Documents), the Debtors shall not seek to use cash collateral over the objection of the Agent.

12.     <u>Adequate Protection</u>.

(i)     To the extent not rolled up by the DIP Facility, and subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the ABL, the ABL Lenders shall receive (a) payment in cash on a monthly basis of all interest accruing on the ABL at the non-default contract rate until the ABL is paid in full; (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Agent (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any) no later than 10 business days after invoices for such fees and expenses shall have been submitted to the Debtors, the U.S. Trustee, and the Committee; (c) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the ABL, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility; and (d) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the ABL, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors.

(ii)     Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the Swap Obligations during these cases, the Swap Counterparties shall receive (a) payment in cash on a monthly basis of all interest accruing on the Swap Obligations at a rate of 5.0% per annum based on the mark-to-market value of such claims of the Swap Counterparties as of the business date

immediately preceding the Petition Date (as determined in accordance with the contracts underlying the Swap Obligations or as otherwise agreed to in writing by the each of the applicable Swap Counterparties and the Debtors); (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Swap Counterparties (including the reasonable and documented out-of-pocket fees and expenses of its professional advisors, if any) no later than 10 business days after invoices for such fees and expenses shall have been submitted to the Debtors, the U.S. Trustee, and the Committee; (c) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the Swap Obligations, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and also shall be junior to the replacement liens provided as adequate protection to the ABL Lenders; and (d) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the Swap Obligations, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders.

(iii)    Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the First Lien Term Loan during these cases, the First Lien Term Loan Lenders shall receive (a) replacement liens to the extent of post-petition Diminution in Value of the DIP Collateral securing the First Lien Term Loan, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens of the DIP Lenders under the DIP Facility and shall also be junior to

the replacement liens provided as adequate protection to the ABL Lenders and the Swap Counterparties; (b) payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the *ad hoc* group of First Lien Term Loan Lenders (including the reasonable and documented out-of-pocket fees, costs and expenses of Stroock & Stroock & Lavan LLP ("Stroock") as its counsel, and Houlihan Lokey Howard & Zukin ("Houlihan") as its financial advisor) no later than ten business days after invoices (redacted to remove confidential or attorney-client privileged information) for such fees and expenses shall have been submitted to the Debtors, the U.S. Trustee, and the Committee, up to $475,000 per month so long as there is such a reserve for the amount of such professional fees accrued at such time, less the amount, if any, advanced to the relevant professionals or otherwise on retainer with such professionals, *provided*, that none of such fees and expenses of Stroock or Houlihan as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application; (c) superpriority administrative expense claims with respect to the foregoing and to the extent of post-petition Diminution in Value of the DIP Collateral securing the First Lien Term Loan, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors and also shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders and the Swap Counterparties; *provided*, that to the extent these cases include a plan of reorganization satisfactory to the Decision Agents for which an equity commitment letter satisfactory to the Decision Agents has been executed and which provides, *inter alia*, for the payment in

full, in cash, of the First Lien Term Loan, the DIP Lenders shall not oppose adequate protection payments in the form of cash payments on a monthly basis of all interest accruing on the First Lien Term Loan at the non-default contract rate; and (d) copies of the materials provided to the Agent in accordance with <u>Section 4.1</u> of the DIP Agreement.

(iv)        Subject to the Carve-Out in all respects, as adequate protection for the use of the DIP Collateral securing the Second Lien Term Loan during these cases, the Second Lien Term Loan Lenders shall receive, in accordance with section 6.4(a) and (b) of the Intercreditor Agreement, (a) replacement liens only to the extent of post-petition Diminution in Value of the DIP Collateral securing the Second Lien Term Loan, including replacement liens on all unencumbered assets of the Debtors, which liens shall be junior to the liens of the First Lien Lenders under the First Lien Credit Documents, shall be junior to the liens of the DIP Lenders under the DIP Documents, and shall also be junior to the replacement liens provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders; and (b) superpriority administrative expense claims only to the extent of post-petition Diminution in Value of the DIP Collateral securing the Second Lien Term Loan, which claims shall be junior to the claims of the First Lien Lenders under the First Lien Credit Documents, shall be junior to the DIP Obligations, and shall be junior to the superpriority administrative expense claims provided as adequate protection to the ABL Lenders, the Swap Counterparties, and the First Lien Term Loan Lenders, and also shall be payable from and have recourse to all assets and property of the Debtors.  For the avoidance of doubt, all claims related to the adequate protection granted to the Second Lien Lenders pursuant

to this paragraph 12.(iv) are junior to (shall be paid after) all claims of the First Lien Lenders.

13.     Section 507(b) Reservation.   Nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate for any Diminution in Value of their respective interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral during these cases or any Successor Cases.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.     Amendment of the DIP Documents.   Except for actions expressly permitted to be taken by the Agent, no amendment, modification, termination, or waiver of any provision of the DIP Agreement or any other of the DIP Documents, or any consent to any departure by any of the Credit Parties therefrom, shall in any event be effective unless the same shall be in writing (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver) and (i) in the case of an amendment to cure any ambiguity, omission, defect or inconsistency, signed by the Agent and the Parent Borrower and (ii) in the case of any other amendment, modification, termination or waiver, signed by the Parent Borrower, the Agent and by the Requisite Lenders (as defined in the DIP Agreement), and to the extent required in the DIP Documents, Supermajority Lenders (as defined in the DIP Agreement) or all affected DIP Lenders.

15.     Budget Compliance.   Except as otherwise provided in the DIP Credit Agreement or approved by the Agent and the Requisite Lenders, the Credit Parties will not, and will not permit any subsidiary to directly or indirectly, to use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents and this Interim Order.

16.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed by Section 362(a) of the Bankruptcy Code is hereby modified to permit (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claim, and to perform such acts as the Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens, (ii) the Debtors to take all appropriate action to grant the adequate protection set forth in paragraph 12.(i)-(iv), above (the "<u>Replacement Liens</u>"), and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (iii) the Debtors to incur all liabilities and obligations to the Agent as contemplated under the DIP Agreement and the other DIP Documents, (iv) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order, and (iv) the implementation of the terms of this Interim Order.

17.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Replacement Liens, or to entitle the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the Agent, the First Lien Agent, and the Second Lien Agent each are authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable

non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Agent all such financing statements, mortgages, notices, and other documents as the Agent may reasonably request. The Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

18. <u>After-Acquired Property</u>. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all DIP Collateral pledged or otherwise granted to the Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

19. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these cases or any Successor Cases, shall obtain credit or incur debt pursuant to Sections 364(b), (c), or (d)

in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then all of the cash proceeds derived from such credit or debt shall (i) immediately be turned over first to the Agent and (b) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the First Lien Agent and the Second Lien Agent, as applicable, to satisfy outstanding pre-petition secured indebtedness in accordance with the Pre-Petition Loan Documents and the Intercreditor Agreement.

20.  <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations, all Pre-Petition Indebtedness in accordance with the Pre-Petition Loan Documents and the Intercreditor Agreement, the cancellation, backing, or cash collateralization of letters of credit under the DIP Facility, and the termination of the Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility and the Pre-Petition Loan Documents, as applicable and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

21.  <u>Insurance Policies</u>.  Upon entry of this Interim Order, the Agent and DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.	Disposition of DIP Collateral.	The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the Decision Agents (and no such consent shall be implied from any other action, inaction or acquiescence by the Agent or the DIP Lenders), except as otherwise provided for in the DIP Documents.

23.	Events of Default.	The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents.

24.	Rights and Remedies Upon Event of Default.	Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the sixth business day after the date Agent files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "Default Notice Period"), the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the Agent to take any and all actions, as if no case were pending under the Bankruptcy Code; *provided*, that the sole basis on which the Debtors can contest the automatic lifting of the automatic stay pursuant to this paragraph is on the grounds that an Event of Default has not occurred.	The Debtors and other parties-in-interest may request an expedited hearing on any motion seeking such a finding, and the Agent and Pre-Petition Secured Parties shall consent to such expedited hearing.	In the event the automatic stay is lifted in accordance with this paragraph, any further order of this Court authorizing (i) the use of cash collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtors in which the Agent or any of the DIP Lenders has an interest, or (ii) under Section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by the Agent or which is entitled to priority

administrative status which is equal or superior to that granted to the Agent for the benefit of the DIP Lenders or the Pre-Petition Lenders, as the case may be, shall be prohibited.  The Debtors and/or the Committee shall have the initial burden of proof at any hearing with respect to whether an Event of Default has occurred.  In accordance with <u>Section 6.2</u> of the DIP Agreement, upon the occurrence of any Event of Default, the Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility.  Upon the occurrence of an Event of Default, all loans under the DIP Facility shall become due and payable in accordance with <u>Section 6.3(b)</u> of the DIP Agreement.  Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in <u>Section 6</u> of the DIP Agreement.

25.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  The Agent, the DIP Lenders, the First Lien Agent, and the Second Lien Agent have acted in good faith in connection with the Interim Financing and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and/or the Pre-Petition Secured Parties arising prior to

the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

26. <u>DIP and Other Expenses</u>. The Debtors are authorized and directed to pay all reasonable out-of-pocket expenses of the Agent and the DIP Lenders in connection with the DIP Facility, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination and monitoring fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses. Payment of all such fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines; however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its fee and expense statements (redacted to remove confidential or attorney-client privileged information) to the U.S. Trustee and counsel for the Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. To the extent that the U.S. Trustee or the Committee has an objection to the fees and expenses of any such professional, they shall be afforded 10 days after receipt of such fee and expense statement to raise a specific objection, including quantification of the disputed amount, with the applicable professional.

27. <u>Indemnification</u>. The Debtors shall indemnify and hold harmless the Agent, the DIP Lenders, and their respective shareholders, directors, agents, officers, subsidiaries, and affiliates, successors and assigns, attorneys, and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments,

obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the Agent's and any of the DIP Lenders' exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the Agent and the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

28. <u>Proofs of Claim</u>. The Agent, the DIP Lenders, and the First Lien Agent shall not be required to file proofs of claim in any of these cases or Successor Cases for any claim allowed herein. Any proof of claim filed by the Agent and the First Lien Agent shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the Agent, the DIP Lenders and the First Lien Agent.

29. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Agent and the DIP Lenders under the DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the Agent reasonable access to the Debtors' premises and their books and records in accordance with

the DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the Agent (and so long as an Event of Default has occurred and is continuing, each of the DIP Lenders) all such information as may be reasonably requested with respect to the business, results of operations, and financial condition any of the Credit Parties.

30. <u>Access to Collateral/No Landlord's Liens</u>. Upon entry of a Final Order providing for such relief and subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent, for the benefit of the DIP Lenders, contained in this Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the Agent may, subject to any separate agreement by and between such landlord and the Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; *provided*, that, subject to such Separate Agreement, the Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent, calculated on a per diem basis. Nothing herein shall require the Agent to assume any lease as a condition to the rights afforded to the Agent in this paragraph.

31.    Carve-Out.

(i)    For the purposes of this Interim Order, the "Carve-Out" shall mean the sum of (a) accrued but unpaid professional fees, costs, expenses, and disbursements (the "Professional Fees") incurred by the Debtors and the Committee (the "Professional Persons") appointed in these cases at any time before or on the first business day following delivery by the Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (it being understood that amounts accrued under this clause (a) shall be reported to the Agent in accordance with the DIP Documents; (b) after the first business day following delivery by the Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by this Interim Order, procedural order, or otherwise, the payment of the Professional Fees, only to the extent all such fees or disbursements set forth in this clause (b) do not exceed an aggregate amount of $2,000,000 (such amount, the "Carve-Out Trigger Notice Cap"); (c) United States Trustee fees, pursuant to 28 U.S.C. § 1930; and (d) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $100,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement, or compensation sought by any of the Professional Persons.   For purposes hereof, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following termination of the commitments under the DIP Facility.

(ii)     For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) securing the DIP Obligations, the Debtors' pre-petition obligations, the Replacement Liens, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) securing the DIP Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted herein or pursuant to the DIP Documents to the DIP Lenders.

(iii)     No portion of the Carve-Out, any cash collateral, or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in (a) challenging, or in relation to the challenge of, (y) any liens or claims of the First Lien Lenders or (z) the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any of the Pre-Petition Secured Parties, including any causes of action under Chapter 5 of the Bankruptcy Code or state law, or (b) bringing or asserting any claims or causes of actions against the Pre-Petition Lenders or the DIP Lenders under the Pre-Petition First Lien Credit Agreement or the DIP Facility (as the case may be), or their respective advisors, agents (including the Agent), including formal discovery proceedings in anticipation thereof, and/or challenging any Lien (as such term is defined in the Pre-Petition First Lien Credit Agreement) of the Pre-Petition Lenders under the Pre-Petition First Lien Credit Agreement.    No more than $50,000 in the aggregate of the Carve-Out, any cash

collateral, or proceeds of the DIP Facility may be used to investigate claims and/or liens of the Pre-Petition Lenders under the Pre-Petition First Lien Credit Agreement.

32.     <u>Payment of Compensation</u>.  So long as an unwaived Event of Default has not occurred, and to the extent permitted under the DIP Documents, the Debtors shall be permitted to pay fees and expenses allowed and payable, as applicable, by any interim, procedural, or final order of this Court (that has not been vacated or stayed, unless the stay has been vacated) under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable.

33.     <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.  Any party (other than the Debtors, which have waived all such rights), including the Committee, if appointed, must commence, as appropriate, a contested matter or adversary proceeding raising any objection or challenge (a "<u>Challenge</u>") with respect to any claim, security interest, or any other rights of the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties under the First Lien Credit Documents or the Second Lien Loan Documents, as applicable, including, without limitation, in the nature of a setoff, counterclaim, or defense on or before sixty (60) calendar days following the date of entry of the Final Order (the "<u>Challenge Period</u>").  The Challenge Period may only be extended with the prior written consent of the Decision Agents.  Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge, (a) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (b) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the First Lien

Agent's, Second Lien Agent's, and/or the Pre-Petition Secured Parties' claims, liens, and interests, of any nature, under the First Lien Credit Documents and the Second Lien Loan Documents, respectively, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (c) the liens granted pursuant to the First Lien Security Agreement shall be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (d) without further order of the Court, the obligations under the First Lien Credit Documents shall be allowed as fully secured claims within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with these cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, or otherwise. If a Challenge is properly asserted during the Challenge Period, parties to that litigation will be bound by any consensual settlement thereof or a final order of the Court that ultimately determines the merits of such Challenge. Nothing in this Interim Order vests or confers on any person, including the Committee or any other statutory committee that may be appointed in these cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

34. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

35.     Section 506(c) Claims.  Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties or any of their respective claims, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

36.     Section 552(b).  The First Lien Agent shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the First Lien Agent (on behalf of itself and the First Lien Lenders), with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral.

37.     No Marshaling/Application of Proceeds.  The Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, and the Pre-Petition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents.

38.     Right to Credit Bid.  The DIP Lenders shall have the right to "credit bid" the amount of their claims during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or

included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

39.     <u>Joint and Several Liability</u>.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

40.     <u>Discharge Waiver</u>.    The DIP Obligations and the Pre-Petition Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the Agent) on or before the effective date of such confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the Agent) on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

41.     <u>Rights Preserved</u>.    Notwithstanding anything herein to the contrary, the entry of  this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the Agent's, the DIP Lenders', the First Lien Agent's, the Second Lien Agent's, or the Pre-Petition Secured Parties' right, subject to the First Lien Credit Agreement and the Intercreditor Agreement, to seek any other or supplemental relief in respect of the Debtors; (b) subject to the First Lien Credit Agreement and the Intercreditor Agreement, any of the rights of

any of the Agent, the DIP Lenders, the First Lien Agent, and/or the Pre-Petition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of any of these cases or Successor Cases, conversion of any of these cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans of reorganization; or (c) subject to the First Lien Credit Agreement and/or the Intercreditor Agreement, any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the Agent, DIP Lenders, First Lien Agent, Second Lien Agent, and the Pre-Petition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

42.    No Waiver by Failure to Seek Relief.  The failure of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the First Lien Credit Documents, the Second Lien Loan Documents, the Intercreditor Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, the Indenture Trustee, the Committee, or any party-in-interest.

43.     Binding Effect of Interim Order.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, all other creditors of the Debtors, the Committee, any other committee appointed in these cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

44.     Effect on Certain Pre-Petition Agreements.  Except as specifically set forth in this Interim Order, the terms and conditions, validity, and enforceability of the First Lien Credit Documents, the Second Lien Loan Documents, and the Intercreditor Agreement shall not be affected by this Interim Order.

45.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

46.     No Right to Seek Modification.  Unless requested by the Agent, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior consent of the Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the Agent or the DIP Lenders.

47.     Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these cases, (ii) converting any of these cases to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing any of these cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these cases or Successor Cases.  The

terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full or, with respect to letters of credit, all such letters of credit under the DIP Facility shall have been cancelled or cash collateralized or other arrangements satisfactory to the issuer of such letters of credit in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated, (ii) in respect of the First Lien Credit Facility, all of the Pre-Petition Obligations pursuant to the First Lien Credit Documents and this Interim Order, have been indefeasibly paid in full, and (iii) in respect of the Second Lien Term Loan, all of the Second Lien Loan Obligations and this Interim Order have been indefeasibly paid in full, subject to the Intercreditor Agreement. The terms and provisions concerning the indemnification of the Agent and the DIP Lenders shall continue in these cases, in any Successor Cases, following dismissal of these cases or any Successor Cases, termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

48.     <u>Waiver of Applicable Stay</u>.     Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

49.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for June 8, 2010 at 2:00 p.m. before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 610 at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004.  On or before May 20, 2010, the  Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on (a) the parties having been given notice of the Interim Hearing, (b) any party which has filed prior to such date a request for notices with this Court, (c) counsel for the Committee (once designated), and (d) the Internal Revenue Service.  The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on June 1, 2010 at 4:00 p.m. (prevailing Eastern time), which objections shall be served so as to be received on or before such date on (i) counsel to the Debtors, attn: James H.M. Sprayregen, Esq. and Brian S. Lennon, Esq., Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022; (ii) counsel to the Committee; (iii) counsel to the Agent, attn:  Joel H. Levitin, Esq. and Michael R. Carney, Esq., Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005; (iv) counsel to the *ad hoc* group of First Lien Term Loan Lenders, attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq., Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038; (v) counsel to Wells Fargo, attn: Jesse H. Austin III, Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308; and (vi) counsel to GE, attn: Michael C. Rupe, Esq., King & Spalding, 1185 Avenue of the Americas, New York, New York 10036; counsel to Wells

Fargo, attn: Jesse H. Austin III, Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308.

50.     *Nunc Pro Tunc* Effect of this Interim Order.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

51.     Retention of Jurisdiction.   The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

SO ORDERED by the Court this 17th day of May, 2010.


_/s/Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE