Joel H. Levitin
Kevin J. Burke
Michael R. Carney
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
E-mail: jlevitin@cahill.com
E-mail: kburke@cahill.com
E-Mail: mcarney@cahill.com

*Attorneys for Bank of America, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., *et al.*, | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

**RESPONSE OF BANK OF AMERICA, N.A., TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND LETTERS OF CREDIT, (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS, AND (D) SCHEDULING A FINAL HEARING**

Bank of America, N.A., in its capacity as the administrative and collateral agent (the "Agent") for the lenders (the "DIP Lenders") under that certain senior secured debtor-in-possession credit agreement dated as of May 17, 2010, by and among the above-captioned debtors and debtors-in-possession (the "Debtors") and the DIP Lenders (as amended or otherwise modified from time to time, together with all schedules, exhibits, annexes, and addenda thereto, the "DIP Agreement"), hereby responds to the objection (the "Objection") of the official committee of unsecured creditors (the "Committee") to the Motion of the Debtors for Entry of

Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Pre-Petition Secured Lenders, and (D) Scheduling a Final Hearing [Docket No. 24] (the "DIP Motion").[1] In response to the Objection, and in further support of entry of an order granting the DIP Motion on a final basis (the "Final Order"), the Agent respectfully represents as follows:

## RESPONSE

1. The Objection mischaracterizes the eight-month negotiation process underlying the DIP Motion and relies upon, and is replete with, baseless misrepresentations and innuendo surrounding, among other things, the nature of (and history behind) the post-petition financing (the "DIP Financing") provided for under the DIP Agreement and related documents (the "DIP Documents"). The terms of the DIP Financing were extensively negotiated at arms' length. The Committee's suggestion that any party involved in negotiating the terms and conditions of the DIP Financing conspired (i) to take control of the company at unsecured creditors' expense and (ii) to prevent the avoidance of liens granted to various lenders is simply wrong. In addition to the utter lack of any evidence whatsoever to substantiate a conspiracy or other scheme asserted in the Objection, the Committee does not allege (nor does it even allude to) any law or facts to support its assertion that any transactions could be avoided as fraudulent transfers or otherwise, let alone that such purported avoidance actions are worth "hundreds of millions of dollars," as the Committee purports to believe. (Objection ¶ 26.)

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

2.      For all the hyperbole in the Objection, the reality here is that unsecured creditors are likely out of the money, and the Objection is nothing more than a misguided attempt by the Committee to use the approval process for the DIP Financing to garner for its constituents a recovery in these cases to which they are not entitled. This Court should not countenance such behavior and should enter the proposed Final Order.

**The DIP Lenders Are Not a Party to Any Scheme to Launch
a Takeover of the Debtors at the Unsecured Creditors' Expense**

3.      The crux of the Objection is the Committee's assertion that the DIP Financing is part of a scheme by the ABL Lenders, the First Lien Term Loan Lenders, the DIP Lenders, and the Debtors' management team to engineer a takeover of the Debtors, while at the same time protecting the ABL Lenders and First Lien Term Loan Lenders from having their first-priority, senior liens avoided pursuant to purported facts theories of law the Committee never articulates. (*E.g.*, Objection ¶¶ 1, 2, 41, and 58.) In an effort to sidestep the fact that the arguments in the Objection are thin to the point of invisibility, the Committee resorts to inflammatory and unsupported allegations designed to paint the ABL Lenders, the First Lien Term Loan Lenders, and the DIP Lenders as grasping, overreaching, and in complete control of the Debtors and this Chapter 11 process. (*E.g.*, Objection ¶¶ 1, 4, 5, 41, and 56.) The Committee's accusations in that regard are unsupported and entirely untrue.

4.      In reality, on account of the Debtors' severe liquidity problems, the Debtors, in late autumn of 2009, approached the Agent (which also serves as the agent under the First Lien Credit Agreement) to explore the possibility of obtaining debtor-in-possession financing for a potential Chapter 11 reorganization. (Levenson Dep. 64:23-65:13; 65:18-25;

66:6-15; 67:11-22, June 25, 2010.)[2] The Debtors' approach initiated a lengthy series of arms' length negotiations to reach the current terms of the DIP Financing among the Debtors, the Agent, and the DIP Lenders—each acting in their own best interests—to reach a deal. (Levenson Dep. 68:2-9.) The DIP Financing and the form and substance of the DIP Documents were thoroughly negotiated by all parties thereto over the course of nearly a year. (Levenson Dep. 89:10-80:17.) All the terms and conditions of the DIP Financing—including, without limitation, the roll-up, the Section 506(c) waiver, the liens on proceeds of avoidance actions, the adequate protection, and the DIP Financing fees—reflect a hard-fought, heavily negotiated consensus among all interested parties, including among the Debtors and the DIP Lenders, as well as among the syndicate of the DIP Lenders themselves. (*See* Levenson Dep. 68:1-69:13.) The Committee's flawed business judgment should not be substituted for the Debtors' business judgment.

5. The sheer length of the negotiations and the myriad drafts of the DIP Documents are all indicative that this process was anything but the far-flung conspiracy the Committee alleges, and the Committee offers no evidence—nor can it—to the contrary. This Court should not permit the Committee, on account of the unsupported allegations set forth in the Objection, to hold up final approval of a transaction that will enable the Debtors to begin the difficult process of restructuring so that they can emerge from Chapter 11 successfully.[3]

---

[2] Relevant pages from the June 25, 2010, deposition of Richard Levenson are attached hereto as Exhibit A.

[3] Notably, the Committee has failed to consider what would likely actually transpire if this Court sustained the Objection. The Debtors have no independent motion to use cash collateral pending, and any such motion would likely be opposed by, at the very least, the ABL Lenders, resulting in a highly contested hearing. Even if the Committee prevailed

(continued)

## The Committee Has Not Demonstrated the Viability of Any Avoidance Actions

6. Apparently in recognition that unsecured creditors are out of the money, the Committee implicitly pins any hopes of a recovery to its constituency on the avoidance of the liens granted to the ABL Lenders and the First Lien Term Loan Lenders on account of the 2007 leveraged buyout and the 2008 exchange offer, respectively.

7. Without citation to any facts or law, the Committee apparently takes it as a given that such transactions are avoidable. The Committee has not alleged in the Objection any basis for the avoidance of either transaction. The Committee merely rests on the perceived rhetorical weight of the terms "LBO" and "exchange offer," presuming that all such transactions implicate avoidable transfers. They do not. *See Kipperman v. Onex Corp.*, No. 05-cv-01242, 2010 WL 761227, at *7-8 (N.D. Ga. March 2, 2010) (leveraged buyouts are not per se fraudulent); *see also, Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 325-26 (Bankr. D. Del. 2007) (dismissing complaint to avoid LBO as fraudulent transfer).

8. It is also presumptuous for the Committee to seek automatic standing to initiate any such causes of action without first establishing a basis for doing so. *See, e.g., In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985) ("The Bankruptcy Code . . . contains no explicit authority for creditors' committees to initiate adversary proceedings."); *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002) ("a finding that allowing a committee to pursue a debtor's claim would

---

on its Objection, it would take weeks for the Debtors to have access to cash that they need *today* to fund their operations, which is assuming that the Debtors could provide adequate protection to the DIP Lenders for amounts advanced during the interim period or to the First Lien Lenders—open questions in the context of an independent cash collateral motion.

be necessary and beneficial to the resolution of the bankruptcy proceeding is required in all instances."). Before bringing any adversary proceeding to prosecute actions belonging to the Debtors' estates, the Committee would be required to move for leave to file such proceeding and make the requisite showing that "the Debtors unjustifiably failed to bring suit or abused its discretion in not suing on colorable claims likely to benefit the . . . estate." *Official Comm. Of Equity Sec. Holders of Adelphia Commc'ns Corp. v. Official Comm. Of Unsecured Creditors of Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420, 424 (2d Cir. 2008) (citations omitted). The Committee has not, and likely could not, satisfy such standard.

**The Challenge Period and Funds Available in Connection Therewith Are Adequate**

9. As mentioned above, the goal underlying the Objection and the Committee's conduct in these cases to date is to garner for its constituents a recovery in these cases to which they are not entitled. The Committee will likely attempt to wreak havoc (indeed, it already has) in these cases to achieve that goal. The Committee's strategy, though ill-conceived, is not unusual in cases where unsecured creditors are out of the money, although it is somewhat atypical (and dangerous) for unsecured creditors to employ this strategy at the very beginning of a case, as the Committee has chosen to do here. *See U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 124 n.16 (Bankr. D. Del. 2010) ("It has been said that in such vigorously disputed cases, '[j]unior creditors invoke expensive and time-consuming procedures merely to extract a payout exceeding their entitlements.'") (citation omitted).

10. Given the Committee's wasteful use of estate assets to date, the DIP Lenders are reluctant to agree to additional time or funds (beyond the existing $50,000) to be set aside for the Committee to "investigate" possible avoidance actions related to the 2007 leveraged

buyout or the 2008 exchange offer, and the DIP Lenders are under no obligation to do so. The Committee has demonstrated that it cannot use the funds available to it to fulfill its duties to the unsecured creditor body responsibly, and the Committee should not be given a free hand to engage in a quixotic pursuit of potentially baseless avoidance actions with the DIP Lenders' money. Indeed, if there actually is a viable claim as the Committee asserts, then it should not need funding to pursue such claim on account of the presumably extensive proceeds that would be available.

11.     If the Committee's behavior in these cases thus far is indicative of things to come, this case will focus less on the critical restructuring of the Debtors and their successful emergence from Chapter 11 as a reorganized going concern, and more on the Debtors', the DIP Lenders', and the Agents' defending themselves in the wake of scattergun litigation designed to accomplish little more than to further the Committee's goal of extracting an undeserved and unwarranted recovery for its constituents at any cost. This Court should not permit the realization of such a scenario. The DIP Lenders agreed to fund a reorganization, not potentially open-ended and frivolous litigation brought by out-of-the-money unsecured creditors who have nothing left to lose.

## JOINDER

12.     The Agent also hereby joins the Debtors' reply to the Objection [Docket No. 196] and paragraphs 3 and 4 of the response of Wayzata Investment Partners and Apollo Capital Management to the Objection [Docket No. 198].

WHEREFORE, the Agent respectfully requests that the Court (i) overrule the Objection, (ii) enter an order granting the relief sought in the DIP Motion on a final basis, and (iii) grant such other and further relief as may be just and proper under the circumstances.

Dated: New York, New York  
      June 29, 2010

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

/s/ Michael R. Carney
_____
Joel H. Levitin  
Kevin J. Burke  
Michael R. Carney  
Eighty Pine Street  
New York, New York 10005  
Telephone: (212) 701-3000  
Facsimile: (212) 269-5420  
E-mail: jlevitin@cahill.com  
E-mail: mcarney@cahill.com

*Attorneys for Bank of America, N.A.*

**EXHIBIT A**

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3
 4
    In re:                    )
 5                            ) Chapter 11
    NEFF CORP., et al,        )
 6                            ) Case No.
                 Debtors.     ) 10-12610 (SCC)
 7  ------------------------- )
 8
 9  ** CONFIDENTIAL - PROFESSIONAL EYES ONLY **
10
11         30(b)(6) DEPOSITION OF
12           BANK OF AMERICA, N.A.
13                    by
14           RICHARD LEVENSON
15            New York, New York
16          Friday, June 25, 2010
17
18
19
20
21
22
23  Reported by:
24  MAYLEEN CINTRON, RMR, CRR, CLR
25  JOB NO. 31501
```

## Page 2

June 25, 2010
1:11 p.m.

30(b)(6) DEPOSITION OF BANK OF AMERICA, N.A. by RICHARD LEVENSON, taken by the Official Committee of Unsecured Creditors, held at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, before MayLeen Cintron, a Registered Merit Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

## Page 3

APPEARANCES:

KIRKLAND & ELLIS LLP
Attorneys for Debtors
   601 Lexington Avenue
   New York, New York 10022
BY: BRIAN S. LENNON, ESQ.
   -and-
   555 California Street
   San Francisco, California 94104
BY: MARK E. McKANE, ESQ.

PACHULSKI STANG ZIEHL & JONES LLP
Attorneys for Official
Committee of Unsecured Creditors
   780 Third Avenue
   New York, New York 10017
BY: ILAN D. SCHARF, ESQ.

## Page 4

APPEARANCES: (Cont'd)

STROOCK & STROOCK & LAVAN LLP
Attorneys for Wayzata Investment Partners and Apollo Capital Management
   180 Maiden Lane
   New York, New York 10038
BY: KENNETH PASQUALE, ESQ.
   JAYME T. GOLDSTEIN, ESQ.

CAHILL GORDON & REINDEL LLP
Attorneys for Agent: Bank of America
   80 Pine Street
   New York, New York 10005
BY: KEVIN J. BURKE, ESQ.

ALSO PRESENT:
Michael Thatcher, Mesirow Financial
Ofir Nitzan, Miller Buckfire & Co.

---

## Page 5

R. LEVENSON - PROFESSIONAL EYES ONLY

RICHARD LEVENSON,
   called as a witness, having been duly
   sworn by a Notary Public, was examined
   and testified as follows:
      THE REPORTER: Please state your
   full name for the record.
      THE WITNESS: Richard Levenson.
EXAMINATION BY
MR. SCHARF:
   Q. Good morning, Mr. Levenson. My name is Ilan Scharf, I'm an attorney at Pachulski Stang Ziehl & Jones and we represent the Official Committee of Unsecured Creditors in the Neff Corporation Chapter 11 case.
      I'm sure you have been prepared by counsel yesterday. Did you meet with counsel to prepare for this deposition?
   A. We spoke.
   Q. Did you speak yesterday?
   A. We spoke briefly yesterday.
   Q. Have you ever been deposed?
   A. Yes.
   Q. How many times?

2 (Pages 2 to 5)

TSG Reporting 877-702-9580

| Page 62 | Page 63 |
|---|---|
| 1  R. LEVENSON - PROFESSIONAL EYES ONLY<br>2  That weekend, when we interacted<br>3  with Houlihan specifically as advisors for<br>4  Apollo and Wayzata, I'm aware that we went to<br>5  our control room and formed trees. Now, I<br>6  assumed trees were formed because other<br>7  parties, other interested parties in the<br>8  Company might continue to seek financing from<br>9  Bank of America. But from that moment in<br>10 time on, I was on the Apollo/Wayzata tree.<br>11    Q.  When you're talking about that<br>12 weekend, is that the March 22nd weekend?<br>13    A.  That's correct.<br>14    Q.  When you say you "formed trees,"<br>15 can you please clarify that?<br>16    A.  When you are providing this kind<br>17 of financing, there is potential for<br>18 conflicts if multiple parties are involved.<br>19 When we were dealing with the Company in<br>20 Miller Buckfire, the Company's advisors, we<br>21 were aware that there was more than one party<br>22 looking at this transaction. And the<br>23 negotiation did not assume that there was a<br>24 specific party that was going to be chosen as<br>25 the Plan sponsor. | 1  R. LEVENSON - PROFESSIONAL EYES ONLY<br>2     Had they chosen another party,<br>3  we -- we would have, again, formed trees. I<br>4  guess I have to be specific about "formed<br>5  trees."<br>6     Because of conflicts, when you get<br>7  to a certain point in time, you cannot be<br>8  offering financing to multiple parties once<br>9  you enter into direct conversations with<br>10 those parties or their advisors. Does that<br>11 satisfactorily answer what forming trees is?<br>12    Q.  Yes. Thank you.<br>13       As of that March 22nd conference<br>14 call, would you characterize that conference<br>15 call as a direct negotiations with Apollo and<br>16 Wayzata?<br>17       MR. BURKE:  Objection to form.<br>18       MR. SCHARF:  Withdrawn.<br>19    Q.  You said that once you had direct<br>20 negotiations with a potential party --<br>21       MR. BURKE:  He said discussions.<br>22 You're trying to make it negotiations.<br>23    Q.  When you have direct discussions<br>24 with another party, you can't talk to other<br>25 parties because of conflicts, correct? |

| Page 64 | Page 65 |
|---|---|
| 1  R. LEVENSON - PROFESSIONAL EYES ONLY<br>2    A.  That's correct.<br>3    Q.  And that decision was made with<br>4  respect to Wayzata and Apollo after the<br>5  March 22nd phone call?<br>6    A.  I think the call was actually the<br>7  19th. It was a long weekend for me.<br>8       But yes, that was the call that<br>9  resulted in the formation of trees.<br>10   Q.  Prior to that call, had you had<br>11 any preliminary discussions or meetings with<br>12 any other parties?<br>13   A.  No.<br>14   Q.  Prior to that call, had the<br>15 Debtors explored any restructuring<br>16 alternatives with Bank of America?<br>17   A.  I'm not certain what you're<br>18 referring to. Are you talking about capital<br>19 infusions, seeking additional capital or<br>20 something like that?<br>21   Q.  Let's start with those.<br>22   A.  Okay.<br>23   Q.  Had the Company sought additional<br>24 capital from Bank of America?<br>25   A.  We -- we had provided the Company | 1  R. LEVENSON - PROFESSIONAL EYES ONLY<br>2  with the opportunity to deal with what I<br>3  would call the onset of liquidity issues with<br>4  a variety of potential solutions, one of<br>5  which would have been the raising of capital.<br>6       I was not directly involved to<br>7  know if they had any such discussions.<br>8    Q.  When did the Company experience an<br>9  onset of liquidity issues?<br>10   A.  I don't recall specifically.<br>11   Q.  Was it after the 2008 exchange?<br>12   A.  Yes, it was subsequent to the 2008<br>13 exchange, yes.<br>14   Q.  Was it during 2009?<br>15   A.  I just don't recall.<br>16   Q.  Was it prior to 2010?<br>17   A.  It was prior to 2010, yes.<br>18   Q.  Prior to the March 19th phone<br>19 call, had the Company approached you about<br>20 providing DIP financing?<br>21   A.  Yes.<br>22   Q.  Who approached you on behalf of<br>23 the Company?<br>24   A.  It would have been Mark Irion and<br>25 the gentlemen from Miller Buckfire. |

Page 66

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2      Q. Who from Miller Buckfire?
3      A. Who specifically approached me?
4  I'm not sure. But my dealings were with
5  Ronen Bojmel and Fitzner and Ofir.
6      Q. And when did the Company approach
7  you?
8      A. Sorry. I got to add another name.
9  Lloyd Sprung (ph).
10         I don't recall specifically. It
11 probably would have been around the fall,
12 late summer, fall of '09. It might have been
13 as late as December, it might have been as
14 early as September. I don't specifically
15 recall.
16     Q. Do you recall what the Company was
17 looking for at the time?
18     A. When these discussions started,
19 the Company was looking for relief under the
20 swap reserve that had been imposed, and the
21 time necessary to deal with their -- their
22 oncoming liquidity concerns.
23     Q. Had the Company's onset of
24 liquidity concerns occurred before they
25 approached you?

Page 67

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2      A. Again, it's -- it was like seeing
3  a train coming. The liquidity problems had
4  not unearthed themselves to the point that
5  they were out of money. But it was apparent
6  that if operations continued, performance
7  continued at its current level and there was
8  no economic rebound, that the Company was
9  going to run out of liquidity in the
10 foreseeable future.
11     Q. At the time, late fall of 2009
12 when the Company approached you, did they
13 broach the topic of Bank of America providing
14 DIP financing for a Chapter 11 case?
15     A. Yes, they did.
16     Q. Did they present specific terms
17 that they were looking for?
18     A. I would say I don't recall. I
19 would say in general, they described the
20 desire, if other solutions were not achieved,
21 to have a Debtor-in-Possession facility that
22 would allow them to reorganize.
23     Q. Did they present any information
24 in connection with this request for DIP
25 financing?

Page 68

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2      A. Again, I don't specifically
3  recall. I just don't recall how the process
4  got started, whether we put forth a proposal,
5  they put forth a presentation. I don't
6  recall. I know that we put forth a proposal
7  and they put forth presentations, but I don't
8  remember how -- who started the formal
9  delivery process.
10     Q. The original proposal, regardless
11 of who it came from, did that involve a DIP
12 Facility and an Exit Facility?
13     A. I am not certain. It is possible
14 that it did not, but it did move to that
15 stage reasonably quickly.
16     Q. At what point were you negotiating
17 for both a DIP and an Exit Facility?
18     A. We were -- we were negotiating
19 with the Company and their advisors. They
20 advised us that they had a commitment for a
21 junior DIP financing from the First Lien Term
22 Loan Lenders.
23         That's not something that
24 asset-based lenders like to see happen. It
25 causes us to really lose control of the

Page 69

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  matter. So us, it is almost the equivalent
3  of a priming DIP financing. So to be more
4  compelling to the Company, we thought it made
5  sense to combine a DIP Facility and an Exit
6  Facility.
7          It also allowed us to put pressure
8  on the Banks within the Syndicate who
9  really -- many of whom expressed a lack of
10 desire to participate in the exit financing
11 by tying the DIP financing and the exit
12 together, it allowed us to motivate the Banks
13 to be on both sides of the transaction.
14     Q. Which of the members of the
15 Syndicate expressed a lack of desire to
16 participate in the exit financing?
17     A. Any lack of desire; in other
18 words, a reluctance at any point in the
19 process? Certainly, Union Bank of
20 California, certainly Regents Bank, I'll call
21 it raw Bank of Scotland/Citizens, GMAC.
22     Q. Did Wells Fargo express a lack of
23 desire to participate in the exit financing?
24     A. I think not. I think they got it.
25     Q. Did any members of the Syndicate

## Page 86

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2        MR. BURKE: Yes.
3     A. Same thing as Wells.
4     Q. Are there any records or documents
5  that indicate the amount of participation
6  that GE and Wells had in negotiating this
7  loan?
8     A. I'm not sure what you mean by
9  records and documents.
10    Q. You testified that they were
11 active participants in negotiating this loan,
12 correct?
13    A. Yes.
14    Q. Are there any documents, including
15 an e-mail, that would reflect how active they
16 were?
17    A. Sure.
18    Q. Did GE Capital have more
19 involvement in negotiating this loan than
20 Wells Fargo?
21    A. I would say no.
22    Q. So GE had less involvement in
23 negotiating than Wells Fargo, correct?
24    A. No.
25    Q. No? They had the same --

## Page 87

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2     A. Equal involvement.
3     Q. Did members of Wells Fargo attend
4  meetings with the Debtors?
5     A. I don't believe that they
6  physically attended, but they would have
7  participated by phone.
8     Q. Did representatives of GE Capital
9  participate by phone?
10    A. I don't recall if they
11 participated by phone or in person. But
12 clearly Wells is in California, GE is in
13 Connecticut. We had really a limited number
14 of face-to-face meetings. I don't remember
15 who the attendees were and who dialed in and
16 who showed up.
17    Q. Did BAS have a more active role
18 than Wells and GE?
19    A. I don't think it is a valid
20 question. I don't think I can make that
21 assessment. It is a valid question; I don't
22 think I can answer it.
23    Q. Why is this arranger fee being
24 paid to Banc of America Securities as opposed
25 to Bank of America NA?

## Page 88

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2     A. It is really internal bookkeeping.
3     Q. When you were negotiating the
4  terms of this loan, were you acting as a
5  representative of Bank of America NA and Banc
6  of America Securities?
7     A. I am a dual employee, but
8  functionally I was representing Bank of
9  America NA.
10    Q. And Bank of America NA is not
11 collecting an arranger fee, correct?
12    A. That's correct.
13    Q. Will Bank of America's arranger
14 fee be rolled up or accounted for as part of
15 BAS' arranger fee?
16    A. That's correct.
17    Q. Bank of America N.A. and BAS
18 negotiated the terms of this loan with the
19 Debtor, correct?
20    A. They were amongst the parties that
21 negotiated the agreement with the Debtor and
22 certainly would be described as the leader.
23    Q. Did representatives of Bank of
24 America and BAS spend more time negotiating
25 the terms of this loan than the other lenders

## Page 89

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  in the Syndicate?
3     A. Absolutely.
4     Q. How much more time?
5     A. Substantially more time.
6     Q. Double?
7     A. I would think yes, yes.
8     Q. Triple?
9     A. Possibly.
10    Q. And Bank of America and BAS
11 representatives were the only lender that had
12 face-to-face or direct communications with
13 the Debtors and its advisors with respect to
14 this loan, correct?
15    A. No.
16       MR. BURKE: Objection to form.
17       THE WITNESS: Sorry.
18       MR. BURKE: You can answer.
19    A. No.
20    Q. Which other lenders had direct
21 communications?
22    A. Wells Fargo and GE.
23    Q. Were these verbal communications?
24    A. Yes.
25    Q. How many of those communications

## Page 90

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  did they have?
3  A. A number of, you know, conference
4  calls where, you know, documents are
5  presented and turned and renegotiated.
6  Q. More than 10 conference calls?
7  A. Certainly.
8  Q. More than 20 conference calls?
9  A. Probably.
10  Q. More than 30?
11  A. Possibly.
12  Q. More than 50?
13  A. Now you're getting to the outside
14  limit. But possible.
15  Q. Over the course of how many weeks
16  is this?
17  A. Probably eight months.
18  Q. What type of role did UBS and GMAC
19  take in negotiating this loan?
20  A. Much less so. And their
21  negotiations were through Bank of America
22  rather than directly.
23  Q. Are these five institutions, BAS,
24  Wells Fargo, GE, GMAC and UBS, the five
25  largest members of the Syndicate?

## Page 91

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  A. Yes.
3  Q. Is it your understanding that
4  these letters are confidential?
5  A. Yes.
6  Q. Is it your understanding that the
7  United States Trustee has asked that they be
8  provided to the Court?
9  MR. McKANE: Objection to form.
10  Q. You can answer.
11  MR. BURKE: You can answer if you
12  know.
13  A. Yes, I'm not aware.
14  Q. At whose request have these
15  letters been kept confidential?
16  A. I do not know specifically. I
17  believe it is Bank of America, Wells and GE.
18  Certainly Bank of America is one of the
19  parties that asked that they be kept
20  confidential.
21  Q. Why does Bank of America want
22  these documents to be kept confidential?
23  A. Because we don't like the market
24  to know what arrangement fees we and the
25  other syndicate leaders are being paid. It's

## Page 92

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  common practice.
3  Q. Are you concerned that the amount
4  of the Syndicate fees has already been
5  disclosed?
6  A. I'm not sure I understand the
7  question.
8  Q. Withdrawn.
9  Exhibit 8 Paragraph 4, discloses
10  the amount of these fees, correct?
11  A. Correct.
12  Q. Are you still concerned that the
13  market should not be aware of the fee
14  letters?
15  A. Yes.
16  Q. Why?
17  A. Because the fee letters describe
18  specifically the arrangement fees paid to the
19  three co-arrangers and then specifically to
20  BAS.
21  Q. So it is not the amount of the
22  fees, it is who the fees are being paid to?
23  A. No. It is the amount of the fees
24  and who they're being paid to. And it is not
25  a function of the size of the fees that they

## Page 93

1  R. LEVENSON - PROFESSIONAL EYES ONLY
2  are unusually high or embarrassingly low, but
3  it is just market practice not to disclose
4  those fees.
5  (Committee Exhibit 13, 5/14/2010
6  e-mail chain Re: Neff,
7  BofA0006296-6300, marked for
8  identification, as of this date.)
9  MR. SCHARF: I have marked as an
10  exhibit a multipage document bearing
11  Bates numbers BofA 6296 through 6300.
12  These documents were produced to
13  the committee under the proviso they be
14  kept Attorneys Eyes Only, and we have
15  not shared them with our financial
16  advisors or investment bankers or
17  anybody else prior to today.
18  However, since there are
19  non-attorneys who are Committee
20  professionals in this deposition,
21  Mr. Burke has agreed that any of the
22  exhibits that we use in today's
23  deposition can be kept as Professional
24  Eyes' Only subject to execution of a
25  confidentiality agreement between Bank