PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
Ilan D. Scharf, Esq.

Proposed Counsel for the Official Committee
of Unsecured Creditors of Neff Corp., et al.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

### *EX PARTE* MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 DIRECTING EXAMINATIONS AND PRODUCTION OF DOCUMENTS

The Official Committee of Unsecured Creditors (the "Committee") of Neff Corporation

("Neff") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned cases (the "Cases") under chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code"), by and through its proposed counsel, hereby moves (the "Motion") this

Court, on an *ex parte* basis, for entry of an order pursuant to Rule 2004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the examination pursuant to

Bankruptcy Rule 2004 of (1) the Debtors and their current and former directors and officers, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).

(2) certain Third Parties (as defined below).  In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.     Bankruptcy Rule 2004 authorizes the Court to order the examination of any entity on a motion of a party in interest.  Through this Motion, the Committee requests entry of an order authorizing the Committee to seek documents and oral examinations pursuant to Bankruptcy Rule 2004 without further order of the Court.

2.     The Committee was given 60 days after entry of the DIP Financing Order to investigate the validity of the DIP Lenders' liens and claims.  Moreover, also pursuant to the DIP Financing Order, the Committee must move for standing to pursue any claims against the Prepetition Lenders by August 18, 2010.  This is an extremely short period under the circumstances of these Cases, where any investigation will require more than a mere lien search to investigate the facts and circumstances of liens granted to the Prepetition Lenders pursuant to the 2007 LBO and the 2008 Exchange.  Finally, the Debtors have put their Cases on a fast-track to confirmation and the Committee must quickly assess the availability and viability of any claims that Debtors may have against various parties with respect to the 2007 LBO, the 2008 Exchange, and the Debtors slide into chapter 11.

3.     Given the extremely short time available for the Committee to investigate the potential claims and draft any complaint(s) with respect thereto the Committee respectfully requests that the Court enter an order on an *ex parte* basis[3] authorizing the Committee to seek the examination, pursuant to Bankruptcy Rule 2004, of the Debtors (including their current and

---

[2] Capitalized terms used but not defined in the Preliminary Statement are as defined below.

[3] The Committee has provided a copy of this Motion to the Debtors contemporaneously with submitting it to the Court.

former officers and directors), as well as third parties who are involved in or are knowledgeable about the Debtors' prepetition financial condition, the validity of the Prepetition Lenders' liens, the 2007 LBO, the 2008 Exchange, and the events leading up to the Debtors' slide into chapter 11.

## JURISDICTION

4.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicate for the relief sought herein is Bankruptcy Rule 2004.

## RELEVANT FACTS

### A.     Background

5.     On May 16, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On May 17, 2010, this Court entered an order jointly administering these Cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these Cases.

7.     On May 28, 2010, the United States Trustee for Region 2 (the "U.S. Trustee"), pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to represent the interests of all unsecured creditors in these Cases.

### B.     The Debtors' Funded Indebtedness

8.     The Debtors estimate they have liabilities of approximately $609.3 million, including $598.5 million of funded debt, against $298.9 million of assets. For the

twelve months ended March 31, 2010, the Debtors generated approximately $187.4 million in total revenues. *See Declaration of Mark Irion (A) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2* dated May 16, 2010 (the "Irion Decl.") at ¶15 [Docket No. 32].

        9.      As of the Petition Date, the Debtors were allegedly obligated on approximately $550 million of secured indebtedness, consisting of indebtedness under (a) a first lien revolving credit facility; (b) secured swap obligations; (c) a first lien term loan; and (d) a second lien term loan.

**1.**      **First Lien Credit Agreement**

        10.      Debtors Neff Rental, Inc., Neff Rental LLC, Neff Finance (as borrowers), and Neff Holdings Corp. (as guarantor), Bank of America, N.A. (as administrative agent), and various lenders (the "First Lien Lenders") are parties to a credit agreement dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement"). The First Lien Credit Agreement provides both an asset based revolving credit facility and a term loan facility.

        **a.**      **Asset Based Lending Facility**

        11.      The First Lien Credit Agreement provides the Debtors with an asset based revolving credit facility (the "ABL Facility") from various lenders (the "ABL Lenders"). Maximum availability under the ABL Facility is $250 million, and availability is determined by a borrowing base formula calculated by the appraised value of the Debtors' accounts receivable, parts inventory, and rental equipment. As of the Petition Date, $153.3 million was outstanding under the ABL Facility.

## b.     Term Loan Facility

12.     The First Lien Credit Agreement also provides a term loan in the amount of $87.9 million (the "First Lien Term Loan") from various lenders (the "First Lien Term Lenders"). The First Lien Term Loan is subordinate to the Swap Obligations (described below), even though it is an obligation of the Debtors pursuant to the First Lien Credit Agreement.

## c.     Swap Obligations

13.     Neff is party to two interest rate swap agreements (the "Swap Agreements") with Bank of America and UBS AG (the "Swap Counterparties," and collectively with the ABL Lenders and the First Lien Term Lenders, the "First Lien Lenders"). As of the Petition Date, the Debtors' obligations (the "Swap Obligations") under the Swap Agreements totaled $22.4 million.

## d.     First Lien Security Agreement

14.     Pursuant to a First Lien Security Agreement dated as of May 31, 2007 (the "First Lien Security Agreement"), the Debtors' obligations under the ABL Facility, the First Lien Term Loan and the Swap Obligations are secured by a first priority lien on substantially all of the Debtors' assets (other than the Debtors' real property). The Swap Agreements are junior to claims arising under the ABL Facility, but senior to claims arising under the First Lien Term Loan.

## 2.     Second Lien Term Loan

15.     Debtors Neff (as borrower), Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance (as guarantors), Wilmington Trust FSB (as administrative agent), and various lenders (the "Second Lien Lenders," and collectively with the First Lien Lenders, the "Prepetition Lenders") are parties to a second lien credit agreement dated as of May 31, 2007 (the "Second Lien Credit Agreement").

16.     The Second Lien Credit Agreement provides for a $290 million second lien term loan ("Second Lien Term Loan"), which was fully outstanding as of the Petition Date.

17.     Pursuant to a Second Lien Security Agreement dated as of May 31, 2007 (the "Second Lien Security Agreement"), the Second Lien Term Loan is secured by a second priority lien on substantially all of the Debtors' assets.

**3.      10% Senior Notes**

18.     Debtors Neff (as issuer), Neff Rental LLC, Neff Finance, and Neff Rental, Inc. (as guarantors), and Wells Fargo Bank, N.A. (as predecessor indenture trustee)[4] are parties to an indenture dated May 31, 2007, pursuant to which Neff issued $230.0 million in Senior Notes due June 1, 2015 (collectively, the "Senior Notes"). The Senior Notes are unsecured obligations of the Debtors party to the indenture.

**C.      The 2007 Leveraged Buyout**

19.     In June 2005, the Debtors were acquired by an affiliate of Odyssey Investment Partners ("Odyssey"), a New York-based private equity firm, in a leveraged buyout valued at approximately $510 million in cash and assumed debt.

20.     On March 31, 2007, Neff Corporation ("NeffCo") entered into a "merger agreement" (the "2007 LBO") pursuant to which a consortium (the "2007 Purchasers") led by affiliates of Lightyear Capital LLC ("Lightyear") purchased NeffCo from Odyssey for approximately $935.9 million, including almost $25 million in fees and $366.8 million in payments to then-existing stockholders. The 2007 Purchasers used the Debtors' assets as collateral for approximately $710 million of loans that were used to fund the 2007 Purchasers' payment of the purchase price to Odyssey. *See* Neff Corp. SEC Form 10-K at p. 43, available at

---

[4] Law Debenture Trust Company of New York is now serving as successor indenture under the Senior Notes indenture.

www.neffcorp.com/portals/o/12-31-07-10-Q.pdf (last viewed on July 6, 2010). Most

significantly, the 2007 LBO added almost $210 million of funded debt to the Debtors' balance

sheet. *Id.* at p. 38. The 2007 LBO may be subject to legal challenge under, among other things,

applicable fraudulent conveyance laws.

**D.     The 2008 Exchange**

21.     The 2007 LBO left the Debtors financially weak and, as such, the Debtors

undertook an exchange offer in December 2008 (the "2008 Exchange") through which

approximately $195.7 million of the then outstanding $230 million of the unsecured Senior

Notes were exchanged and converted into First Lien Term Loan debt. *See* Irion Decl. at ¶ 28.

The original debt was issued in the 2007 LBO, and the 2008 Exchange offer was only open to

"qualified" or institutional investors who received approximately 45 cents on the dollar for their

notes and secured creditor status. The remaining $34.3 million of Senior Notes that were not

eligible to participate in the 2008 Exchange comprise the majority of the general unsecured

claims in these Cases. The 2008 Exchange may also be subject to legal challenge under, among

other things, applicable fraudulent conveyance laws.

**E.     The DIP Financing Order**

22.     On June 30, 2010, the Court entered the *Final Order (A) Authorizing the

Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to

Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders*

(the "DIP Financing Order") [Docket No. 207]. The DIP Financing Order provides, among other

things, that the Debtors shall release "any right to challenge any of the obligations under the First

Lien Credit Facilities, the priority of the Debtors' obligations thereunder, and the security for

(and the priority of the liens securing) such obligations, and to assert any offsets, defenses,

claims, objections, challenges, causes of action, and/or choses in action against the First Lien

Agent, the Second Lien Agent, the Pre-Petition Secured Parties, and/or any of their respective officers, directors, or employees."[5] DIP Financing Order at ¶ G(v). The DIP Financing Order also provides a 60 day deadline from the entry of the DIP Financing Order (the "Challenge Period") for the Committee to commence a "contested matter or adversary proceeding raising any objection or challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the First Lien Agent, the Second Lien Agent, or the Pre-Petition Secured Parties under the First Lien Credit Documents or the Second Lien Loan Documents, as applicable, including, without limitation, in the nature of a setoff, counterclaim, or defense."[6] DIP Financing Order at ¶ 33.

23.     The DIP Financing Order further provides that the Committee must file a motion for standing to commence a Challenge on or before August 18, 2010, unless such deadline is extended by the Court for cause shown. *Id.*

## RELIEF REQUESTED

24.     The Committee is investigating whether the Debtors have valuable claims or counterclaims (the "Potential Claims"), including by way of a Challenge, against the DIP Lenders, the Prepetition Lenders, Lightyear, and the 2007 Purchasers, and any of their respective officers, directors, or employees, as well as the Debtors' officers and directors with respect to the 2007 LBO, the 2008 Exchange and the Debtors' slide into chapter 11. The Committee believes that it must quickly seek formal discovery in order to timely complete its investigation because of (a) the short 60 day Challenge Period, (b) the August 18, 2010 deadline to move for standing, and (c) the Debtors' efforts to quickly confirm their plan of reorganization.

---

[5] Capitalized terms not defined in this paragraph shall have the meanings ascribed to them in the DIP Financing Order.

[6] The Challenge Period may only be extended with the consent of the lenders or by consent of the Court for good cause shown.

25.     Given the extremely short time available for the Committee to investigate the Potential Claims, move for standing, and draft any appropriate complaint(s), the Committee respectfully requests that the Court enter an order on an *ex parte* basis authorizing the Committee to seek the examination, pursuant to Bankruptcy Rule 2004, of the Debtors (including their current and former officers directors and advisors), as well as third parties (collectively, the "Third Parties") that are likely to have information about the Debtors' prepetition financial condition with respect to 2007 LBO, the 2008 Exchange, and the Debtors slide into chapter 11, including, but not limited to, Bank of America N.A., Wilmington Trust FSB, UBS AG, Wayzata Investment Partners, Apollo Capital Management, Miller Buckfire & Co., Odyssey, Lightyear, and their respective affiliates, advisors, professionals, officers, directors, and employees.

26.     Pursuant to Bankruptcy Rule 2004, the Committee seeks the entry of an order on an *ex parte* basis, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing it to conduct certain discovery (the "Requested Relief") of (1) the Debtors (and their current and former officers, directors, and advisors) and (2) the Third Parties.

27.     A draft of the Committee's form of document request is attached hereto as <u>Exhibit B</u>.  The Committee will modify the form of request as appropriate for each party in order to avoid burdening parties with unnecessary document requests.

### BASIS FOR RELIEF

28.     Bankruptcy Rule 2004 (a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity."  Bankruptcy Rule 2004(a). Bankruptcy Rule 2004 is primarily used for "revealing the nature and extent of the bankruptcy estate, and for discovering assets, examining transactions, and determining what wrongdoing occurred." *In re Kelton*, 389 B.R. 812, 820 (Bankr. S.D. Ga. 2008); *see also In re Lufkin*, 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000) (purpose of Rule 2004 is to "determine the condition,

extent, and location of the debtor's estate in order to maximize distribution to unsecured creditors") *In re The Bennet Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (purpose of Rule 2004 is to assist in "revealing the nature and extent of the estate, and to discover assets of the debtor which may have been intentionally or unintentionally concealed"). Pursuant to Bankruptcy Rule 2004, a party in interest may seek both document and oral discovery related to "acts, conduct, or property of the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Bankruptcy Rule 2004(b). Under Bankruptcy Rule 2004(c), the "attendance of an entity for examination and the production of documents ... may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial." In turn, Bankruptcy Rule 9016 makes Rule 45 of the Federal Rules of Civil Procedure (governing subpoenas) applicable in cases under the Bankruptcy Code. Bankruptcy Rule 9016.

29.     Unlike discovery under the Federal Rules of Civil Procedure (the "<u>Civil Rules</u>"), discovery under Bankruptcy Rule 2004 can be used as a "pre-litigation discovery device." *In re Wilson*, 2009 WL 304672, at *5 (Bankr. E.D. La. 2009). As such, a Bankruptcy Rule 2004 motion need not be tied to specific factual allegations at issue between parties. *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997) (Bankruptcy Rule 2004 permits "examination of any party without the requirement of a pending adversary proceeding or contested matter").

30.     Moreover, the scope of a Bankruptcy Rule 2004 examination is broader than that of discovery under the Civil Rules. *In re Ecam Publications, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991); *see also In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("[T]he scope of a Rule 2004 examination is very broad. Rule 2004

discovery is broader than discovery under the Federal Rules of Civil Procedure."). In fact, courts have recognized that Bankruptcy Rule 2004 examinations may be "broad, unfettered," and can legitimately be in the nature of a "fishing expedition." *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008). *See also In re Lev*, 2008 WL 207523, at *3 (Bankr. D.N.J. 2008); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996); *In re The Bennet Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (purpose of Rule 2004 is to assist in "revealing the nature and extent of the estate, and to discover assets of the debtor which may have been intentionally or unintentionally concealed"); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (E.D. Pa. 1990). "Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432, (Bankr. S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

31.     The decision whether to authorize the requested discovery rests within the sound discretion of the bankruptcy court. *See, e.g., In re Hammond*, 140 B.R. 197, 200 (Bankr. S.D. Ohio 1992). Courts authorize discovery under Bankruptcy Rule 2004 to assist in recovering assets for the benefit of a debtor's creditors. *See In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) (allowing discovery under Rule 2004 to help the debtor "discover and recover assets for benefit of creditors of the debtor").

32.     Here, the Requested Relief is well within the scope of Bankruptcy Rule 2004. The Committee has been allotted a very short amount of time to investigate the Prepetition Lenders' liens and examine whether there are additional causes of action that may be available to satisfy unsecured creditors' claims on accordance to the 2007 LBO and the 2008

Exchange. To that end, the evaluation and prosecution of the Potential Claims is vitally important to ensuring that available sources of significant value are identified and pursued.

33. In addition, section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order... that is necessary or appropriate to carry out provisions of this title." The Committee's investigation of the Potential Claims will, among other things, assist the Committee to fulfill its statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the [D]ebtor[s]." 11 U.S.C. § 1104(c)(2). The relief requested in this Motion will help the Committee perform this and other statutory functions more efficiently by reducing the burden and cost to the Court, the Committee, the Debtors and all other parties in interest in this case were the Committee to be required to move for entry of individual orders for each necessary request for discovery pursuant to Bankruptcy Rule 2004. Moreover, the substantive rights of any party will not be reduced or expanded by the relief requested.

34. The Court has authority to grant a Bankruptcy Rule 2004 motion *ex parte*. In these cases, there is an urgent need for the Court to grant the Motion on an *ex parte* basis because the Committee needs to obtain document discovery and conduct depositions before the Challenge Period expires on August 29, 2010. *See, e.g., In re Old Carco LLC (f/k/a Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y., June 17, 2009 [Docket No. 4062] (*ex parte* order authorizing Committee to seek discovery pursuant to Bankruptcy Rule 2004 from various parties related to, among other things, a prepetition leveraged buyout); *see also In re Salander-O'Reilly Galleries, LLC*, Case No. 07-30005 (CGM) (Bankr. S.D.N.Y., May 15, 2008) [Docket No. 385] (authorizing the Committee to issue subpoenas and seek discovery through Bankruptcy Rule 2004 without seeking entry of individual orders for each subpoena). The Committee will suffer immediate and irreparable harm if the Motion is heard according to the regular noticed

motion procedures, which would not allow sufficient time for the Committee to investigate the

Potential Claims. Accordingly, a hearing to authorize Rule 2004 discovery would serve little

purpose.

35.     The Requested Relief would allow the Committee to (a) evaluate the

Debtors' relationships and transactions with the Third Parties; (b) evaluate the validity of the

Prepetition Lenders' claims and liens against the Debtors; (c) investigate the facts, circumstances

and events that led to these Cases; and (d) determine whether the Debtors have viable claims

against any of the parties involved in the 2007 LBO, 2008 Exchange, and the Debtors' decline

into  chapter 11.  Accordingly, the Requested Relief is authorized by Bankruptcy Rule 2004.

## NO PRIOR REQUEST

36.     No prior request for the relief sought in this Motion has been made to this

or any other Court.

WHEREFORE, the Committee respectfully requests that this Court: (i) enter an order

substantially in the form attached hereto as Exhibit A, granting the relief sought herein; and (ii)

grant such other and further relief to the Committee as the Court may deem proper.

Dated:  New York, New York
        July 8, 2010

                                    PACHULSKI STANG ZIEHL & JONES LLP


                                    /s/ Ilan D. Scharf
                                    Robert J. Feinstein, Esq.
                                    Bradford J. Sandler, Esq.
                                    Ilan D. Scharf, Esq.
                                    780 Third Avenue, 36th Floor
                                    New York, NY 10017
                                    Telephone: (212) 561-7700
                                    Facsimile:  (212) 561-7777

                                    Proposed Counsel for the
                                    Official Committee of Unsecured Creditors

requested information against (a) the Debtors and their affiliates, and each of their respective current and former directors and officers and (b) any Third Parties.

3.      The Debtors and their current and former directors and officers, and Third Parties are ordered to produce documents and respond to written and oral discovery requests in substantially the form attached to the Motion as <u>Exhibit B</u> within ten (10) business days of service of such requests by the Committee.

4.      Service by the Committee of any subpoenas or discovery requests on the Third Parties may be properly and completely effected by serving its counsel in these chapter 11 proceedings.

5.      The Committee may issue other discovery requests and subpoenas as may be necessary to accomplish the discovery authorized by this Order.

6.      Nothing contained herein shall prejudice the Committee's rights under Bankruptcy Rule 2004 and other applicable laws to seek further document productions and written and oral examinations in connection with these Cases.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.


Dated: New York, New York
     July __, 2010              ————————————————————
                              THE HONORABLE SHELLEY C. CHAPMAN
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

## ORDER, PURSUANT TO BANKRUPTCY RULE 2004, AUTHORIZING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OBTAIN DISCOVERY

This matter coming before the Court on the Motion of the Official Committee of

Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-

possession for an Order, pursuant to Bankruptcy Rule 2004, authorizing the Committee to obtain

discovery from (1) the Debtors and their affiliates, and each of their respective current and

former directors and officers and (2) certain Third Parties (the "Motion");[2] the Court having

reviewed and considered the Motion and accompanying papers; the Court having found that (i)

the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (iii) notice of the Motion and a hearing

were not required under the circumstances; and the Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein;

HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Committee may, in its discretion, and is authorized to, conduct written

discovery and take oral examinations pursuant to Bankruptcy Rule 2004 concerning the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

**Exhibit B**

## SCHEDULE A TO RULE 2004 SUBPOENA TO THE DEBTORS

## DEFINITIONS[1]

Unless otherwise stated, the following definitions shall apply to these Requests:

1.     "2007 LBO" means that series of transactions completed on or about May 31, 2007 pursuant to which affiliates of Odyssey Investment Partners sold their interests in the Debtors to a consortium of financial sponsors led by affiliates of Lightyear.

2.     "2008 Exchange" means that series of transactions completed on or about December 16, 2008 pursuant to which approximately $195.7 million of the Debtors' 10% Senior Notes were tendered for obligations under the First Lien Term Loan.

3.     "All" shall be construed as "all" and "each."

4.     "Bank of America, N.A." means Bank of America, N.A., including its respective parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on its behalf.

5.     "Chapter 11 Cases" means the jointly administered chapter 11 cases commenced by the Debtors and captioned In re Neff Corp., et al., Chapter 11 Case No. 10-12610 (SCC), which are currently pending before the United States Bankruptcy Court for the Southern District of New York.

6.     "Communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any Documents, telephone conversations, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

---

[1]  These definitions comply with LBR 7026-1.

7. "Debtors" means, collectively, Neff Corp., Neff Finance Corp., Neff Holdings Corp., Neff Holdings LLC, Neff Rental, Inc., and Neff Rental LLC, including their respective parents, subsidiaries, predecessors, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on their behalf.

8. "DIP Agreement" means that certain debtor in possession credit agreement, dated as of May 16, 2010, between and among Neff Corp., the DIP Agent, the DIP Lenders named therein, and the other parties thereto, attached as Exhibit C to the DIP Motion, as amended, supplemented or otherwise modified from time to time.

9. "DIP Facility" means that certain $175.0 million debtor in possession credit facility entered into pursuant to the DIP Agreement.

10. "DIP Facility Collateral" means any collateral provided as security to any Person pursuant to the DIP Agreement, including without limitation, the Causes of Action.

11. "DIP Lenders" means the DIP Agent and the banks, financial institutions, and other lender parties under the DIP Facility, including their respective and collective parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on their behalf.

12. "DIP Motion" means and refers to the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting*

*Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final*

*Hearing* filed on May 16, 2010 (Docket No. 24).

13.     The term "Document" is used herein in the broadest possible sense as

specified in and interpreted under Rule 34 of the Federal Rules of Civil Procedure, and

includes, without limitation, all originals and copies, duplicates, drafts, and recordings of

any written, graphic or otherwise recorded matter, however produced, reproduced, or

stored, and all "writings" as defined in Rule 1001 of the Federal Rules of Evidence, and

all other tangible things by which human communication is transmitted or stored,

meaning any kind of printed, electronic, recorded, graphic, or photographic matter,

however printed, produced, reproduced, copies, reproductions, facsimiles, drafts and both

sides thereof, including without limitation any kind of written, typewritten, graphic,

photographic, printed, taped or recorded material whatsoever, regardless whether the

same is an original, a copy, a reproduction, a facsimile, telex or telefax, and regardless of

the source or author thereof, including without limitation, any writing filed for reporting

or other purposes with any state, federal or local agency; notes; memoranda, including

but not limited to memoranda of telephone conversations; letters; audited financial

statements; unaudited financial statements; financial ledgers; intra-office or inter-office

communications; circulars; bulletins; manuals; results of investigations; progress reports;

study made by or for business or personal use; financial reports and data of any kind;

working papers; contracts; agreements; affidavits; declarations; statements; bills; books

of accounts; vouchers; transcriptions of conversations or tape recordings; desk calendars;

bank checks; purchase orders; invoices; charge slips; receipts; expense accounts;

statistical records; cost sheets; journals; diaries; time sheets or logs; computer data; job or

transaction files; appointment books; books, records, and copies; electronic mail messages; extracts and summaries of other documents; drafts of any of the above, whether used or not; and any other writing or recording; computer and other business machine printouts, programs, listings, projections, as well as any carbon or photographic or copies, reproductions or facsimiles thereof and all copies which differ in any way from the original, including without limitation, all forms of electronic media, data, data storage and other forms of electronic or computer-stored or computer-generated communications, data, or representations. This includes, but is not limited to, such material in the form of Electronically Stored Information: that is, any data present in memory or on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), saved in an archive, present as "deleted" but recoverable electronic files in memory or on any media, and, present in any electronic file fragments (files that have been deleted and partially overwritten with new data) from files containing such material. Where any otherwise duplicate document contains any marking not appearing on the original or is altered from the original, then such item shall be considered to be a separate original document. Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

14. "Each" shall be construed as "all" and "each."

15. "Electronically Stored Information" or "ESI" means, without limitation, all information contained on any computing device owned, maintained, or otherwise controlled by YOU, including, but not limited to, mainframe, desktop, laptop, tablet, or palmtop computers, network servers, telephone voicemail servers, employees' employer-

provided home computers, and the personal digital assistants (PDAs), digital cell phones, telephone answering machines, pagers, or other information-storing electronic devices of YOU and YOUR employees, or on associated external storage media, backup tapes, and other archival copies of same. Unless otherwise specified, documents, reports, and other Electronically Stored Information created using any version of Microsoft Word, Powerpoint, Excel, Visio, or Access, Word Perfect, Oracle, or any other Microsoft, Adobe, or other currently available "off-the-shelf" application shall be produced in native form; that is, the form in which the document is currently stored on whatever media it currently resides. The document should not be locked, resaved, restructures, "scrubbed" of unapparent or hidden content or any other data or metadata, but rather should be produced in a copy precisely reproducing its entire state as present in Your systems. Unless otherwise specified, electronic mail (e-mail) should be produced in native form; that is, in whatever database and/or file/directory structures are used by Your mail processing software. All metadata and other unapparent or hidden data related to mail messages shall be produced, including, but not limited to, any file attachments, message priority flags, message read/access timestamps, and, in the case of e-mail sent to distribution lists, information on the membership of such lists at the time the e-mail was sent.

16.     "First Lien Credit Agreement" means that certain Credit Agreement, dated as of May 31, 2007, and amended and restated as of December 16, 2008, by and among Neff Corp., Neff Holdings Corp. and certain of its subsidiaries, as borrowers, the First lien Credit Facility Agents, and the First Lien Credit Facility Lenders referred to in Article I.A.70 of the Plan.

17.     "First Lien Credit Facility Agents" shall have the meaning ascribed to it in Article I.A.72 of the Plan.

18.     "First Lien Credit Facility Lenders" means collectively, the First Lien Term Loan Lenders and the Revolving Credit Facility Lenders.

19.     "First Lien Security Agreement" means that certain Security Agreement, dated as of May 31, 2007, as amended and modified from time to time, by and among Neff Corp., LYN Holdings Corp., as grantors and Bank of America, N.A., as agent for the secured parties referred to in Article I.A.74 of the Plan.

20.     "First Lien Term Loan" means the approximately $87.9 million secured term loan provided under the First Lien Credit Agreement referred to in Article I.A.75 of the Plan.

21.     "First Lien Term Loan Lenders" means those financial institutions and other lender parties to the First Lien Credit Agreement from time to time as "Term Loan Lenders" thereunder, including their respective and collective parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on their behalf.

22.     "Identify" (with respect to documents). When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

23.     "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of May 31, 2007, by and among Neff Corp., the First Lien Collateral Agent, and the Second Lien Collateral Agent, (and as the same may have been modified, amended, or restated) referred to in Article I.A.90 of the Plan.

24.     "Lightyear" means the consortium of financial sponsors led by Lightyear Capital LLC that purchased interests in the Debtor pursuant to the 2007 LBO.

25.     "Person" is defined as any natural person or any business, legal, or governmental entity or association.

26.     "Petition Date" means May 16, 2010.

27.     "Plan" means and refers to *Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code*, which was filed on May 17, 2010 at Docket No. 4 in the Chapter 11 Cases.

28.     "Plan Support Agreement" means that certain plan support agreement dated as of April 12, 2010, by and between the Debtors and certain Holders of First Lien Term Loan Claims, as may be amended, supplemented, or otherwise modified from time to time, and which shall be included (with the principal amount of percentage of any First Lien Term Loans or any other securities of any of the Debtors held by such Holders of First Lien Term Loan Claims redacted) as an exhibit to the Plan Supplement referred to in Article I.A.115 of the Plan.

29.     "Prepetition Collateral" means any collateral provided as security to any Person pursuant to any of the Prepetition Loan Documents.

30.     "Prepetition Lenders" means all Persons who were Lenders pursuant to any of the Prepetition Loan Documents.

31.     "Prepetition Loans" means the Revolving Credit Facility, the First Lien Term Loan, the Second Lien Term Loan and the Swap Agreements.

32. "Prepetition Loan Documents" means the First Lien Security Agreement, the First Lien Credit Agreement, the Intercreditor Agreement, the Swap Agreements and the Second Lien Credit Agreement.

33. The term "Relating To" shall mean describing, discussing, evidencing, referring to, Concerning constituting, regarding, bearing upon, supporting, summarizing, pertaining to, alluding to, depicting, summarizing, involving, embodying, containing, suggesting, mentioning, arising out of, in connection with, or having any logical or factual connection with the matter in question.

34. "Revolving Credit Facility" means the $250.0 million secured revolving credit facility provided under the First Lien Credit Agreement, together with all documents related thereto referred to in Article I.A.126 of the Plan.

35. "Revolving Credit Facility Lenders" means those banks, financial institutions, and other lender parties to the Revolving Credit Facility from time to time, each in their capacity as such including their respective and collective parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on its behalf.

36. "Second Lien Credit Agreement" means that certain Credit Agreement, dated as of May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp., LYN Holdings Corp., and certain of its subsidiaries, as borrowers, the Second Lien Term Loan Agents, and the Second Lien Term Loan Lenders referred to it in Article I.A.140 of the Plan.

37. "Second Lien Term Loan" s means the $290.0 million secured term loan provided under the Second Lien Credit Agreement.

38. "Second Lien Term Loan Administrative Agent" means Wilmington Trust FSB, in its capacity as administrative agent under the Second Lien Credit Agreement or any successor thereto, including its parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on its behalf.

39. "Second Lien Term Loan Agents" means, collectively, (a) the Second Lien Term Loan Administrative Agent, (b) Wilmington Trust FSB, in its capacity as second lien collateral agent under the Intercreditor Agreement, (c) CIBC Inc. and UBS Securities LLC, in their capacity as documentation agents under the Second Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the Second Lien Credit Agreement, including their respective and collective affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on their behalf.

40. "Second Lien Term Loan Lenders means those banks, financial institutions, and other lender parties to the Second Lien Credit Agreement from time to time, each in their capacity as such, including their respective and collective parents, subsidiaries, predecessors, parents, subsidiaries, predecessors, affiliates, members, employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on their behalf.

41. "Swap Agreements" means the interest rate swaps between Neff Corporation and Bank of America, N.A. and UBS AG, pursuant to those certain ISDA

Master Agreements dated as of June 14, 2007, and June 20, 2007, respectively (as the same may have been amended, modified or supplemented).

42.    "You," "Your," and "Yours" mean and refer to the Debtors, collectively and individually.

## INSTRUCTIONS

A.    You are required to conduct a thorough investigation and produce all Documents in your possession, custody, and control including all Documents in the possession, custody and control of your attorneys, investigators, experts, officers, directors, employees, agents, representatives, and anyone acting on your behalf.

B.    No later than ___ days after service of this Subpoena you are required to serve a written response to the Request in compliance with Federal Rule of Civil Procedure 45.  The response shall state, with respect to each category below, that the document production will occur requested unless the request is objected to, in which event the reasons for the objection shall be stated.  If objection is made to a part of an item or category, that part shall be specified and inspection permitted of the remaining parts.

C.    The use of the singular form of any word includes the plural, and vice versa.

D.    The connectives "and," and "or," shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

E.    If You are unable to comply with a particular category(ies) of the requests below and Documents responsive to the category are in existence, Identify the following information:

1.    The date of the Document;

2.    The type of Document (e.g., letter, memorandum, report, etc.);

3.    The general subject matter of the Document;

4.    The name, address, telephone number and title of the author(s) of the Document;

5.    The name, address, telephone number and title of each recipient and/or addressee of the Document;

6.    The number of pages in the Document;

7.    The document control number, if any;

8.    The present location(s) of the Document and the name, address and telephone number of the person(s) who has (have) possession of the Document;

9.    A specific description of the subject matter of the Document;

10.   The reason why the Document cannot be produced or why you are unable to comply with the particular category of request.

F.    You are under a continuing duty to seasonably amend your written response and to produce additional Documents if you learn that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the Plaintiff during the discovery process or in writing.

G.     You are required to produce the full and complete originals, or copies if the originals are unavailable, of each Document responsive to the categories below along with all non-identical copies and drafts in its or their entirety, without abbreviations, excerpts, or redactions.  Copies may be produced in lieu of originals if the entirety (front and back where appropriate) of the Document is reproduced and the Responding Party or its authorized agent or representative states by declaration or affidavit under penalty of perjury that the copies provided are true, correct, complete, and an accurate duplication of the original(s).

H.     You are required to produce the Documents as they are kept in the usual course of business, or to organize and label them to correspond with each category in these requests.

I.     You are required to produce Electronically Stored Information in searchable form on DVDs, CD-ROMs, or any other medium that is acceptable to counsel to the Committee.  If necessary, all Electronically Stored Information shall be translated before production into reasonably usable form.

J.     If You withhold or redact a portion of any Document under a claim of privilege or other protection, each such Document must be identified on a privilege log, which shall be produced contemporaneously with the non-privileged Documents responsive to this Request for Production, and which privilege log shall Identify the following information:

    1.     The date of the Document;

    2.     The type of Document (e.g., letter, memorandum, report, etc.);

    3.     The general subject matter of the Document;

4.    The name, address, telephone number and title of the author(s) of the Document;

5.    The name, address, telephone number and title of each recipient and/or addressee of the Document;

6.    The number of pages in the Document;

7.    The document control number, if any;

8.    The present location(s) of the Document and the name, address and telephone number of the person(s) who has (have) possession of the Document;

9.    A general description of the subject matter of the Document or the portion redacted without disclosing the asserted privileged or protected communication;

10.    The specific privilege(s) or protection(s) that you contend applies.

K.    Requests Relating To any Person shall include such Person's employees, agents, attorneys, investigators, experts, professionals, officers, directors, representatives, and anyone acting on such Person's behalf.

L.    Unless specified otherwise, the relevant time period for each of the Requests shall be January 1, 2007 to the date upon which You produce documents responsive to these requests.

## REQUESTS FOR PRODUCTION

**Request No. 1:**

All Documents Concerning the Prepetition Loan Documents.

**Request No. 2:**

All Documents and Communications Concerning the perfection of any liens and/or security interests in the Prepetition Collateral, including but not limited to the loss,

transfer, supplementation, or expansion of the Prepetition Collateral and any attendant rights to the Collateral.

**Request No. 3:**

All Documents and Communications Relating To any fees, expenses, principal, and/or interest received directly or indirectly from the Debtors by or on behalf of any of the Prepetition Lenders or any equity sponsor of the Debtors' equity sponsors.

**Request No. 4:**

All valuation reports or other analyses of the value of any or all of the Debtors or their assets.

**Request No. 5:**

All Documents Relating To minutes of any meeting of the Debtors' board(s) of directors (or any subcommittee(s) thereof) and any presentations made to or by the Debtors' board(s) of directors (or any subcommittee(s) thereof).

**Request No. 6:**

All Documents and Communications Relating To the 2007 LBO, including without limitation: (i) copies of all fairness and solvency opinions and all communications and documents Relating To such opinions; (ii) appraisals, valuations and financial analyses or projections and all Communications and Documents Relating To such appraisals, valuations, analyses and projections; (iii) Communications between the Debtor and any financial advisor or consultant or other professional Relating To the 2007 LBO, and all Documents, including, but not limited to, agreements, Relating To the services performed or to be performed by such advisors, consultants and professionals; (iv) any consideration or fees that were received by, were paid to, are owed to or were paid by the Debtor; (v) materials created for or provided to Lightyear and other potential

buyers of the Debtors; and (vi) closing documents, funds flow memoranda and any other final documentation of the 2007 LBO.

**Request No. 7:**

All Documents and Communications Relating To the 2008 Exchange, including without limitation: (i) copies of all fairness and solvency opinions and all communications and documents Relating To such opinions; (ii) appraisals, valuations and financial analyses or projections and all Communications and Documents Relating To such appraisals, valuations, analyses and projections; (iii) Communications between the Debtor and any financial advisor or consultant or other professional Relating To the 2008 Exchange, and all Documents, including, but not limited to, agreements, Relating To the services performed or to be performed by such advisors, consultants and professionals; (iv) any consideration or fees that were received by, were paid to, are owed to or were paid by the Debtor; (v) materials created for or provided to holders of the Debtors' 10% Senior Notes; and (vi) closing documents, funds flow memoranda and any other final documentation of the 2008 Exchange.

**Request No. 8:**

All Documents and Communications Concerning any business plans, projections, forecasts, strategic plans and operating plans, including underlying assumptions for the Debtors.

**Request No. 9:**

All Documents and Communications concerning any valuations or appraisals of the Debtors.

**Request No. 10:**

All Documents and Communications concerning the Debtors' liquidity and

capital, including but not limited to revolver availability, undrawn credit facilities, ability to refinance, maturing debt, unencumbered and/or non-core assets and the ability to monetize those assets, and the ability to raise equity or debt capital.

**Request No. 11:**

Documents sufficient to reflect the financial condition of each of the Debtors for each month, quarter and year, including but not limited to: (i) audited financial statements; (ii) balance sheet, income statement, cash flow statement and supporting notes to financial statements; (iii) off-balance sheet debt, including but not limited to, contingent liabilities, leases, receivable securitizations and guaranties; and (iv) tax returns.

**Request No. 12:**

All solicitation or offering memoranda distributed for the purposes of (i) raising debt or equity capital for the Debtors; (ii) refinancing the Debtors; or (iii) the sale of the Debtors.

**Request No. 13:**

All offers, letters of intent, or terms sheets Relating To an acquisition of the Debtors or their major assets.

**Request No. 14:**

Accounts payable agings and related summaries or documentation Relating To vendor payment status.

**Request No. 15:**

All Documents and Communications provided to the lenders and credit rating agencies Relating To the financial condition of the Debtors.

**Request No. 16:**

Documents evidencing dividends and/or management fees paid by the Debtors.

**Request No. 17:**

All Documents and Communications Relating To the Debtors' intercompany activity, including without limitation, balances, transactions, reconciliations, dividends, distributions, guarantees and indemnifications.

**Request No. 18:**

All Documents and Communications Relating To any directors and officers liability insurance policies held by or on behalf of the Debtors or any of their officers and directors.