**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' AMENDED JOINT PLAN
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

James H.M. Sprayregen, P.C.
Ray C. Schrock (admitted *pro hac vice*)
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

Anup Sathy, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Counsel for the Debtors and Debtors in Possession

Dated:  July 13, 2010

PLEASE NOTE THAT THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, AND HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF VOTES WITH RESPECT TO THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH SOLICITATION OR OFFER WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  ACCEPTANCES OR REJECTIONS OF THE DEBTORS' PLAN MAY NOT, AND WILL NOT, BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCORDINGLY, THE INFORMATION CONTAINED HEREIN IS SUBJECT TO CHANGE.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Holdings LLC (0571); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND TO EXERCISE SUBSCRIPTION RIGHTS UNDER THE RIGHTS OFFERING IN CONNECTION THEREWITH. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE LIKELIHOOD THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW. THE DEBTORS WILL INSTEAD RELY UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT

THE EXEMPTION PROVIDED BY SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER.  NO LEGAL OR TAX ADVICE IS PROVIDED BY THIS DISCLOSURE STATEMENT.  THE DEBTORS ARE NOT CURRENTLY A REPORTING CORPORATION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "<u>EXCHANGE ACT</u>") AND THE PURCHASER MAY NOT BE A REPORTING CORPORATION AS OF THE EFFECTIVE DATE UNDER THE EXCHANGE ACT AND THE NEW COMMON UNITS WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE.  THE DEBTORS DO NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES ISSUED HEREUNDER.   THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED.  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.   <u>MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.</u>  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR EXPECTED FUTURE RESULTS AND OPERATIONS.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.   THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR THE PURCHASER MAY SEEK TO INVESTIGATE, FILE, AND, PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE

DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS OR MASTER BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

K&E 17316187

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................1

II.     TREATMENT OF CLAIMS AND INTERESTS ..............................................................3

III.    PAYOUT EVENT PROCEDURES ..................................................................................4

        A.      OVERVIEW OF PAYOUT EVENT ................................................................4
        B.      PAYOUT EVENT PROCEDURES ..................................................................5
        C.      AUCTION .........................................................................................................8

IV.     SOLICITATION AND VOTING PROCEDURES ...........................................................8

        A.      SOLICITATION PROCEDURES ....................................................................8
        B.      VOTING RIGHTS ..........................................................................................10
        C.      VOTING PROCEDURES ...............................................................................10
        D.      CONFIRMATION HEARING ........................................................................11

V.      CASH ELECTION AND RIGHTS OFFERING PROCEDURES .................................12

        A.      CASH ELECTION AND RIGHTS OFFERING OVERVIEW ......................12

VI.     THE DEBTORS' BACKGROUND .................................................................................13

        A.      THE DEBTORS' BUSINESSES ....................................................................13
        B.      SUMMARY OF PREPETITION INDEBTEDNESS .....................................16
        C.      MANAGEMENT OF THE DEBTORS ..........................................................18

VII.    THE CHAPTER 11 CASES .............................................................................................19

        A.      EVENTS LEADING TO THE CHAPTER 11 CASES ..................................20
        B.      PREPETITION NEGOTIATIONS .................................................................21

VIII.   EVENTS OF THE CHAPTER 11 CASES ......................................................................24

        A.      FIRST DAY PLEADINGS AND OTHER CASE MATTERS ......................24
        B.      CLAIMS BAR DATE ......................................................................................27
        C.      EXCLUSIVITY ...............................................................................................27
        D.      PENDING LITIGATION PROCEEDINGS ...................................................27
        E.      POSTPETITION MARKETING EFFORTS ..................................................27

IX.     SUMMARY OF THE PLAN ...........................................................................................28

        A.      ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS,
                DIP CLAIMS, AND PRIORITY TAX CLAIMS ...........................................28
        B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ..........30
        C.      MEANS FOR IMPLEMENTATION OF THE PLAN .....................................36
        D.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................44
        E.      PROVISIONS GOVERNING DISTRIBUTIONS ..........................................46
        F.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED
                CLAIMS ...........................................................................................................49
        G.      DISALLOWANCE OF CLAIMS ....................................................................50
        H.      AMENDMENTS TO CLAIMS........................................................................51
        I.      SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ....................51
        J.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN
                ..........................................................................................................................55
        K.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................56
        L.      RETENTION OF JURISDICTION...................................................................57
        M.      MISCELLANEOUS PROVISIONS ................................................................59

**X.        VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ................................................**60**

   A.        VALUATION OF THE DEBTORS ....................................................................................60
   B.        FINANCIAL PROJECTIONS .........................................................................................61

**XI.       STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ..................................**62**

   A.        CONFIRMATION HEARING ........................................................................................62
   B.        CONFIRMATION STANDARDS ....................................................................................63
   C.        ACCEPTANCE BY IMPAIRED CLASSES ......................................................................65
   D.        CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES ....................65

**XII.      CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ..................................**66**

   A.        CERTAIN BANKRUPTCY LAW CONSIDERATIONS ......................................................66
   B.        RISK FACTORS THAT MAY AFFECT RECOVERY AVAILABLE TO HOLDERS OF
            ALLOWED CLAIMS AND THE VALUE OF SECURITIES TO BE ISSUED UNDER THE
            PLAN .......................................................................................................................68
   C.        RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESSES ....69
   D.        RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS .....................................73
   E.        DISCLOSURE STATEMENT DISCLAIMER ...................................................................73
   F.        LIQUIDATION UNDER CHAPTER 7 ............................................................................75

**XIII.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ................................**75**

   A.        CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            HOLDERS OF ALLOWED CLAIMS ...............................................................................76
   B.        CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            DEBTORS .................................................................................................................78
   C.        CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            PURCHASER AND HOLDERS OF NEW COMMON UNITS IN THE PURCHASER ...............79

**XIV.     GLOSSARY OF DEFINED TERMS AND RULES OF INTERPRETATION** ...................................**79**

   A.        RULES OF INTERPRETATION .....................................................................................79
   B.        GLOSSARY OF TERMS ..............................................................................................79

**XV.       CONCLUSION AND RECOMMENDATION** ...................................................................**93**

K&E 17316187

## <u>EXHIBITS</u>

**Exhibit A**          Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code

**Exhibit B**          First Lien Term Loan Plan Support Agreement

**Exhibit C**          Swap Counterparty Plan Support Agreement

**Exhibit D**          Corporate Structure as of the Petition Date

**Exhibit E**          Financial Projections

**Exhibit F**          Liquidation Analysis

K&E 17316187

# I.    INTRODUCTION

The Debtors operate the thirteenth largest equipment rental company in the United States as measured by equipment rental revenues.  On May 16, 2010, Neff Corp. and each of its Debtor Affiliates filed voluntary petitions for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.[2]  Contemporaneous with the filing of the petitions, the Debtors filed the Plan, a copy of which is attached hereto as **Exhibit A**.

Over the past year, a series of events have placed a significant strain in the Debtors' liquidity and ability to service their highly leveraged capital structure, ultimately leading to the filing of these chapter 11 cases.  As discussed in more detail herein, the abrupt decline in non-residential construction activity has adversely affected customer demand and equipment rental volumes, which in turn has exacerbated systemic rental rate reductions and lead to a corresponding decline in revenue.  Recognizing that additional challenges may lay ahead and aware that their business remains operationally sound, the Debtors proactively undertook extensive efforts to right-size their capital structure and position themselves for long-term success in the current industry environment.  The Debtors considered all available strategic alternatives to ensure that they would maximize stakeholder value.  To this end, the Debtors determined it was in their best interests to explore debt restructuring options with their major creditor constituents, and on a parallel path, conduct a third-party sale and investment process.

Over the course of more than five months, the Debtors engaged in discussions with more than twenty parties, and received multiple indications of interest that led to certain alternative restructuring proposals (including, a proposal from certain of the Debtors' existing first lien lenders).  Presented with two proposals, the Debtors negotiated with interested parties, and through such negotiations were able to increase the value the Debtors would receive under these proposals.  The filing of these prearranged chapter 11 cases and the Debtors' Plan is the culmination of those fruitful efforts.  Specifically, the Plan is based on a proposal received from certain funds managed by Holders of approximately 67 percent of the Debtors' First Lien Term Loan Claims (collectively, the "Plan Sponsors").  Certain Holders of First Lien Term Loan Claims (including the Plan Sponsors) have agreed to support the Plan through Confirmation in the form of the First Lien Term Loan Plan Support Agreement, a copy of which is attached hereto as **Exhibit B** and various other documents related to the Plan.  The Debtors have also executed the Swap Counterparty Plan Support Agreement, a copy of which is attached hereto as **Exhibit C**, with certain Holders of Secured Swap Claims, whereby such Holders have also agreed to support the Plan through Confirmation.

The primary purpose of the Plan is to effectuate a balance sheet restructuring and deleveraging of the Debtors' current capital structure.  The restructuring will be effectuated through various Restructuring Transactions, including, among other things, consummating a sale of substantially all of the Debtors' assets and postpetition liabilities to the Purchaser through the Sale Transaction.  Additionally, the Debtors will also effectuate the Rights Offering under the Plan for up to $119 million in New Common Units of the Purchaser to Eligible Holders of Class 6 First Lien Term Loan Claims and Class 7 Second Lien Term Loan Claims, as applicable.  The Rights Offering will be fully backstopped by the Plan Sponsors, in their capacity as the Backstop Parties.  The Debtors have also entered into a $175 million DIP Facility, allowing them to fund ongoing business operations and the administrative costs of these chapter 11 cases.  Ultimately, the Plan allows the Debtors to continue operating their businesses in the ordinary course, preserves their going-concern value, and brings their capital structure into alignment with their current and future operating prospects by eliminating more than $400 million in prepetition debt.

As set forth in more detail in Article III of the Plan, Holders of Allowed Revolving Credit Facility Claims will be paid in full in Cash on account of their Claims and the Debtors' First Lien Term Loan Lenders will receive a full recovery under the Plan in the form of cash or New Common Units in the Purchaser (at their election).  Under the Plan, the Second Lien Term Loan Lenders and General Unsecured Creditors will also be afforded meaningful recoveries and the jobs of the Debtors' approximately 900 employees will be preserved.

---

[2]    All capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in Article XI below entitled, "*Glossary of Defined Terms*" which are the same definitions used in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "*Glossary of Defined Terms*" are inconsistent, the definition included in the "*Glossary of Defined Terms*" shall control.

Although the Debtors believe that the Plan as currently structured maximizes recoveries for Holders of Allowed Claims, the Plan incorporates a "Payout Event" feature which allows other potential bidders to present a topping proposal prior to the Confirmation Hearing. Any such proposal must provide for payment in full in Cash of the Allowed First Lien Term Loan Claims (including any accrued prepetition interest and/or postpetition interest at the default contract date), in addition to providing all other creditors with recoveries that are no less favorable than those currently contemplated under the Plan. Accordingly, consistent with their fiduciary duties, the Debtors will continue to execute their prepetition sale and marketing process during these Chapter 11 Cases to ensure maximum value for all stakeholders.

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Articles II and IX.B);

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article VI);

- events leading to the Chapter 11 Cases, including the Debtors' prepetition restructuring negotiations, including information regarding the Plan Support Agreements (Article VII);

- significant events in the Debtors' Chapter 11 Cases (Article VIII);

- how distributions under the Plan will be made, the manner in which disputed claims will be resolved, and other significant aspects of the Plan including the Rights Offering and the Sale Transaction (Article IX.G);

- certain financial information about the Debtors, including their Financial Projections for calendar years 2010 through 2014 (Article X);

- the statutory requirements for confirming the Plan (Article XI);

- certain risk factors creditors should consider before voting and information regarding alternatives to Confirmation of the Plan (Article XII); and

- certain U.S. federal income tax consequences of the Plan (Article XIII).

In light of the foregoing, the Debtors believe that the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' Boards of Directors have approved the Plan and the Restructuring Transactions contemplated therein and believe it is in the best interests of the Debtors' Estates. As such, the Debtors' Boards of Directors recommend that all Holders entitled to vote, accept the Plan by returning their Ballots or Master Ballots (as defined herein), so as to be **actually received** by the Debtors' Notice and Claims Agent no later than September 1, 2010. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the Consummation of the Plan, including, the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan and Plan Support Agreement).

K&E 17316187

## II.    TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant hereto.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan.  The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only.  To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Unclassified Claim | Plan Treatment | Range of Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|
| Administrative Claims | Unimpaired | $6,000,000 | 100% | 100% |
| Accrued Professional Compensation Claims | Unimpaired | $1,700,000 | 100% | 100% |
| DIP Claims | Unimpaired | $148,700,000 | 100% | 100% |
| Priority Tax Claims | Unimpaired | N/A | 100% | 100% |

The table below summarizes the classification and treatment of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only.  The projected recoveries are based upon certain assumptions contained in the Valuation Analysis (defined below) prepared by the Debtors and their Professionals.  As more fully described in this Disclosure Statement, the Debtors' assumed value of the New Common Units was derived from commonly accepted valuation techniques and is not an estimate of the trading value for such securities, nor is it anticipated that there will be a public market for the New Common Units.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests[3] | Estimated Range of % Recovery Under Plan[4] | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | N/A | 0% | 0% |
| 2 | Secured Tax Claims | Unimpaired | N/A | 0% | 0% |
| 3 | Other Secured Claims | Unimpaired | N/A | 0% | 0% |
| 4 | Revolving Credit Facility Claims | Unimpaired | $153,271,700 | 100% | 100% |
| 5 | Secured Swap Claims | Impaired | $22,393,400 | 100% | 0%–100% |
| 6 | First Lien Term Loan Claims | Impaired | $90,019,200 | 100% | 0%–12% |

---

[3]    Amounts in the table above represent the estimated amount of Allowed Claims on the Effective Date (assumed to be August 31, 2010), including accrued unpaid prepetition interest and accrued unpaid postpetition interest, where applicable.

[4]    The estimated recovery to Holders of Allowed First Lien Term Loan Claims is based upon the result of the Debtors' extensive sales/investment and marketing process as set forth in Article VII.B.2 and X.A herein.

K&E 17316187

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests[3] | Estimated Range of % Recovery Under Plan[4] | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 7 | Second Lien Term Loan Claims | Impaired | $298,504,500 | 3% | 0% |
| 8 | Senior Notes Claims | Impaired | $35,867,000 | 1% | 0% |
| 9 | General Unsecured Claims | Impaired | $1,100,000 | 1% | 0% |
| 10 | Intercompany Claims | Unimpaired | N/A | 0% | 0% |
| 11 | Section 510(b) Claims | Impaired | N/A | 0% | 0% |
| 12 | Intercompany Interests | Unimpaired | N/A | 0% | 0% |
| 13 | Equity Interests | Impaired | N/A | 0% | 0% |

The Committee asserts that the Plan is not confirmable because it does not satisfy the best interests of creditors test. Specifically, the Committee asserts that the Debtors' Estates have potential fraudulent transfer claims under the Bankruptcy Code to, among other things, avoid the liens securing Revolving Credit Facility Claims, First Lien Term Loan Claims, and Second Lien Term Loan Claims which, if successfully prosecuted, could materially enhance the recoveries of Holders of Class 8 Senior Notes Claims and Holders of Class 9 General Unsecured Claims relative to the approximately one percent distribution conditionally offered to them under the Plan. Also, the Committee believes that the recoveries of Holders of Class 8 Senior Notes Claims and Holders of Class 9 General Unsecured Claims would be materially enhanced by the successful prosecution of breach of fiduciary duty claims against the Debtors' directors and officers who are to receive blanket releases from the Debtors and certain third parties under the Plan.

The Committee believes that the basis for these claims is that the Debtors' assets were encumbered in the 2007 LBO to secure loans that provided no economic benefit to the Debtors and left them insolvent and without adequate capital. The Committee urges unsecured creditors in Classes 8 and 9, as well as Holders Second Lien Term Loan Claims whose debts are undersecured, to vote to REJECT the Plan as, in the Committee's view, such creditors stand to receive far greater recoveries if (a) the Debtors' assets were sold for their fair market value, (b) the proceeds thereof were shared ratably among all creditors after the avoidance of potentially infirm liens held by DIP Lenders, Holders of Revolving Credit Facility Claims, Holders of First Lien Term Loan Claims, and Holders of Second Lien Term Loan Claims, and (c) potential affirmative monetary recoveries are obtained for the benefit of all unsecured creditors from (i) the foregoing lenders and (ii) the Debtors' officers, directors, D&O insurers, professionals, and other third parties. The Committee is continuing to investigate these claims as well as potential avoidance and other claims arising from the 2008 Exchange for the Senior Notes, preference claims, and other claims to the benefit of general unsecured creditors.

The Debtors have analyzed these claims and disagree with the Committee's contentions.

### III.    PAYOUT EVENT PROCEDURES

### A.    OVERVIEW OF PAYOUT EVENT

As noted earlier, the Plan incorporates a Payout Event feature under which an alternative bidder may provide a higher or better recovery to the Debtors' creditors prior to the Confirmation Hearing, provided that such recovery provides sufficient Cash or committed financing to indefeasibly pay out the Debtors' First Lien Term Loan in full in Cash and otherwise treat all other creditors no less favorably than as currently provided by the Plan. Thus, the Payout Event feature is structured to allow third-party Entities an opportunity to provide the Debtors and their creditors with higher or better recoveries than those contemplated by the present transaction under the Plan. Similarly, the Plan Sponsors may submit a counterproposal at any time up to three (3) Business Days after receiving notice from the Debtors' of a Qualified Bid.

## B.    PAYOUT EVENT PROCEDURES[5]

To facilitate the process of receiving and evaluating competing bids, the Debtors have developed the Payout Event Procedures governing the process by which third parties may submit a binding proposal for a Payout Event, and through which the Debtors may ultimately conduct an auction to maximize the value of their Estates and creditor recoveries. Under the Payout Event Procedures, any proposal, solicitation, or offer for a Payout Event (each a "Bid") by a potential bidder (each, a "Bidder") must be submitted in writing and determined by the Debtors to have satisfied the following conditions (collectively, the "Bid Conditions"):

(a)    Payout Event:  Such Bid shall provide the Debtors with sufficient cash and/or committed financing to: (i) indefeasibly pay all allowed First Lien Term Loan Claims in full in cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate); and (ii) treat all other creditors no less favorably than as provided by the Plan.  For the avoidance of doubt, a Bid may provide that Secured Swap Claims are reinstated in accordance with the applicable Swap Amendment.

(b)    Deposit:  Each Bid must be accompanied by a deposit in the amount equal to the greater of (x) 10 percent of the Bidder's equity commitment and (y) $25 million in cash to an interest bearing escrow account to be identified and established by the Debtors (the "Deposit").

(c)    Initial Minimum Overbid:  The aggregate consideration[6] proposed by the Bid must equal or exceed the sum of:

(1)    sufficient cash to indefeasibly pay all allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate), and treat all other creditors no less favorably than as provided by the Plan; plus

(2)    cash in an amount equal to the Break-Up Fee (as defined in the Backstop Unit Purchase Agreement) and $1.0 million on account of estimated unpaid Transaction Expenses (as defined in the Backstop Unit Purchase Agreement and the Purchase Agreement) (collectively, the "Bid Protections"); plus

(3)    $3.0 million (the "Initial Minimum Overbid Increment"). Bids must specify the manner in which their Initial Minimum Overbid Increments are allocated among the Debtors' classes of creditors.

(d)    Co-Investment Right:  The Bid must provide for a co-investment right of at least $7.5 million to Holders of Second Lien Term Loan Claims.

(e)    Assumption of Liabilities:  The Bid must expressly assume all liabilities assumed by the Purchaser pursuant to the terms and conditions of the Plan and/or the Purchase Agreement (including all liability for allowed administrative

---

[5]    The summary of the Payout Event Procedures provided herein is qualified in its entirety by reference to the Payout Event Procedures.  In the event of an inconsistency between the Payout Event Procedures and the summary provided herein, the Payout Event Procedures shall control in all respects.

[6]    If, as part of a Qualified Bid, creditors of the Debtors agree to waive undisputed, liquidated and  non-contingent claims against the Debtors (or agree to waive distributions on account of such undisputed, liquidated and non-contingent claims against the Debtors), the Debtors shall, in determining the aggregate consideration provided by such Bid and in evaluating whether the Qualified Bid has satisfied the Initial Minimum Overbid Increment, consider the monetary benefit such waiver creates for creditors of the Debtors (other than such Bidder and creditors affiliated with such Bidder).

K&E 17316187

claims against the Debtors and the costs and expenses associated with the wind-down of the Debtors' Estates).

(f)     <u>Minimum Liquidity:</u>  The Bid and related financing commitments must provide at least $40.0 million in excess available liquidity at all times.

(g)     <u>The Same or Better Terms</u>: The Bid must be, in the Debtors' reasonable business judgment, substantially on the same or better terms than the terms of the Purchase Agreement and the Plan.  A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Payout Event (the "<u>Payout Event Documents</u>").  The Payout Event Documents shall, to the extent applicable to the Bid, include a copy of the Plan, the Purchase Agreement, the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Backstop Unit Purchase Agreement, each clearly marked to show all changes requested by the Bidder (including those related to purchase price) as well as all other material documents integral to such bid.

(h)     <u>Committed Financing</u>:  The Bid must include committed financing documented to the Debtors' reasonable satisfaction that demonstrates the Bidder has (i) received sufficient debt and/or equity funding commitments and (ii) adequate working capital financing or resources to finance going concern operations and the proposed Payout Event transaction.  Such funding commitments or other financing shall not be subject to any internal approvals, syndication requirements, diligence or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors.  With respect to any equity financing commitments, such equity financing commitments shall not (x) contain any conditions or contingencies that are not contained in the Backstop Unit Purchase Agreement or (y) contain any conditions or contingencies that are more conditional or otherwise beneficial to the provider of the financing than the corresponding condition or contingency contained in the Backstop Unit Purchase Agreement.

(i)     <u>Identity:</u>  All Bids must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Payout Event transaction), and the complete terms of any such participation.

(j)     <u>Contingencies; No Financing or Diligence Outs:</u>  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment, than those set forth in the Plan or the Purchase Agreement.

(k)     <u>Demonstrated Financial Capacity:</u> A Bidder must have, in the Debtors' reasonable business judgment, the necessary financial capacity to consummate the proposed Payout Event transactions required by its Bid and provide adequate assurance of future performance under all Executory Contracts and Unexpired Leases to be assumed pursuant to such Bid.

(l)     <u>Irrevocable:</u> A Bid shall be irrevocable until and unless the Debtors accept a higher Qualified Bid and the Bidder is not selected as the Backup Bidder (as defined herein).

K&E 17316187

(m)    <u>Expenses:</u> Any Bidders presenting Bids shall bear their own expenses in connection with the proposed transaction, <u>provided</u> <u>that</u> the Successful Bidder's reasonable and documented fees and expenses (including those of its advisors) may be reimbursed pursuant to such Successful Bid.  Under no circumstances may a Bid request or entitle the Bidder to any break-up fee, termination fee, or similar type of payment, <u>provided</u> <u>that</u> the Purchaser shall be entitled to the Bid Protections under the Backstop Unit Purchase Agreement, the Purchase Agreement, and the Commitment Letter.  The Purchaser, however, shall not be entitled to the reimbursement of any Transaction Expenses incurred after the Debtors choose a Successful Bidder or a Backup Bidder that is not the Purchaser.[7]  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the marketing or auction process.

Any Qualified Bidder (including the Purchaser) seeking to have its reasonable and documented fees and expenses reimbursed if it is the Successful Bidder shall provide the Debtors with its estimated total amount of such fees and expenses at the beginning of the Auction so that the Debtors can take the payment of such amount into account in determining whether the Bid of such Bidder is the Successful Bid, including with respect to creditor recoveries.

(n)    <u>Authorization:</u> Bids must contain evidence that the Bidder has obtained authorization or approval from its Board of Directors (or comparable governing body) with respect to the submission of its Bid.

(o)    <u>Bid Deadline:</u>  A Bid must be transmitted via email (in .pdf or similar format) to:  (i) Miller Buckfire & Co. LLC, the Debtors' proposed investment bankers, 153 East 53rd Street, 22nd Floor, New York, New York 10022, Attn.: Ronen Bojmel (ronen.bojmel@millerbuckfire.com) and Adam Fitzner (adam.fitzner@millerbuckfire.com) and (ii) Kirkland & Ellis LLP, the Debtors' proposed counsel, 601 Lexington Avenue, New York, New York 10022, Attn.: Ray C. Schrock (ray.schrock@kirkland.com) and Brian S. Lennon (brian.lennon@kirkland.com), so as to be **actually received** on or before July 26, 2010 (the "<u>Payout Event Deadline</u>").

A Bid received on before the Payout Event Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," and such Bidder shall be a "<u>Qualified Bidder</u>."  For the avoidance of doubt, the Plan, Purchase Agreement, Backstop Unit Purchase Agreement and Commitment Letter negotiated with the Purchaser documenting the transaction set forth in the Plan shall constitute a Qualified Bid by the Purchaser (who shall also be deemed to be a Qualified Bidder).

The Debtors shall provide the Purchaser and its legal and financial advisors with information regarding the highest and best Qualified Bid (the "<u>Initial Baseline Bid</u>") no later than July 29, 2010 at 5:00 p.m. prevailing Eastern Time.  The Purchaser shall then have the opportunity to submit a counterproposal it reasonably believes provides higher and better economic recoveries than that provided by the Initial Baseline Bid and notify the Debtors no later than August 3, 2010 at 5:00 p.m. prevailing Eastern Time (the "<u>Counterproposal Deadline</u>") as to whether one or more of the members of the Purchaser will submit such a counterproposal to the Initial Baseline Bid.  If less than all of the members of the Purchaser elect to participate in the Auction, such remaining participating member or members shall only be required to demonstrate (in order to satisfy the Bid Conditions) such member's or members' financial capacity to consummate the transactions required by such member's or members' Bid by the Counterproposal Deadline.

---

[7]    Nothing in these Payout Event Procedures shall affect the First Lien Term Loan Lenders' ability to receive adequate protection payments pursuant to the Final DIP Order.

K&E 17316187

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Deposit and all accumulated interest thereon within three (3) business days after the Payout Event Deadline. The Debtors shall: (i) determine whether any person is a Qualified Bidder; (ii) receive offers from Qualified Bidders; and (iii) negotiate any offer made for a Payout Event together or separately by a Qualified Bidder.

## C.    AUCTION[8]

If (a) one or more Qualified Bids are received by the Bid Deadline and/or (b) one or more members of the Purchaser has elected to participate in the Auction on or prior to the Counterproposal Deadline, the Debtors will conduct an auction (the "Auction") to determine the Successful Bidder (as defined below). If no Qualified Bids (other than the Qualified Bid received from the Backstop Parties) are received by the Bid Deadline, the Debtors will not conduct the Auction and shall designate the Purchaser's Qualified Bid as the Successful Bid for the purposes of these Payout Event Procedures.

No later than August 4, 2010 at 12:00 p.m. prevailing Eastern Time, the Debtors will notify all Qualified Bidders of the highest and best Qualified Bid, as determined in the Debtors' discretion (the "Baseline Bid"), and provide copies of the Baseline Bid to all Qualified Bidders; provided that no Qualified Bidder's financing commitment and fee letters (and associated schedules and annexes) shall be provided by the Debtors to any other Qualified Bidder unless the Purchaser delivers its financing commitment and fee letters (and associated schedules and annexes) to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to their Estates, including, *inter alia*: (a) the amount and nature of the consideration; (b) certainty of closing; (c) the net economic effect of any changes to the value to be received by each of the Debtors' classes of creditors from the transaction currently set forth in the Plan, if any, contemplated by the Payout Event Documents, and (d) tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place on August 5, 2010 at 10:00 a.m. prevailing Eastern Time, at the offices of Debtors' counsel, Kirkland & Ellis LLP, at 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the procedures approved by the Court pursuant to the Disclosure Statement Order. The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment is the highest and best Qualified Bid (such Qualified Bid, the "Successful Bid," and such Qualified Bidder the "Successful Bidder") at which point, the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid. Acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of the Confirmation Order. For the purpose of clarity, nothing in these Payout Event Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law. The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

## IV.    SOLICITATION AND VOTING PROCEDURES

## A.    SOLICITATION PROCEDURES

### 1.    Solicitation Package

The solicitation package (the "Solicitation Package") shall include paper copies of the following materials:

- the Disclosure Statement, as approved by the Court (with all exhibits thereto, including the Plan and the exhibits to the Plan);

---

[8]    Parties interested in obtaining additional information regarding the Auction procedures should refer to the Payout Event Procedures attached as Exhibit M to the Disclosure Statement Order.

K&E 17316187

- the Disclosure Statement Order and the Solicitation Procedures annexed thereto as Exhibit 1;

- notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the appropriate ballot ("Ballot") or master ballot ("Master Ballot"), as applicable, with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a letter from the Debtors recommending that Holders accept the Plan, if they are entitled to vote on the Plan; and

- any supplemental documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

### 2.    Distribution of the Solicitation Package

Through the Notice and Claims Agent, the Debtors intend to distribute the Solicitation Packages to Holders of Claims entitled to vote as of the Voting Record Date in accordance with the Solicitation Procedures.  The Solicitation Package (except the Ballots and Master Ballots) may also be obtained (a) from the Debtors' Notice and Claims Agent (i) by visiting http://www.kccllc.net/neff; (ii) by writing to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, or (iii) by calling (877) 499-4518; or (b) for a fee via PACER at http://www.nysb.uscourts.gov.  An appropriate return envelope, postage prepaid, will be included with each Ballot and Master Ballot.  Ballots and Master Ballots must be received by the Notice and Claims Agent by the Voting Deadline, whether by first class mail, overnight courier, or personal delivery.

Certain Holders of Claims are not entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  Such Holders will receive only the Confirmation Hearing Notice and a non-voting status notice.

### 3.    No Resolicitation if Payout Event Occurs

Pursuant to the Plan, potential bidders may present to the Debtors a topping proposal that provides higher or better recoveries to creditors than those contemplated by the present transaction under the Plan prior to the Confirmation Hearing (the "Payout Event Deadline"), provided that such topping proposal provides the Debtors with sufficient Cash or committed financing to (a) indefeasibly pay all First Lien Credit Facility Lenders in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in the Plan; and provided further that any Backstop Party or combination of Backstop Parties shall be permitted to present for consideration by the Debtors a counterproposal to a Payout Event at any time up to three (3) Business Days after receiving notice from the Debtors of the occurrence of the Payout Event (unless such date is extended by the Debtors) that such Backstop Party or Backstop Parties reasonably believes provides higher and better recoveries that that provided by such Payout Event.

The Debtors will also make conforming changes to the Plan as may be necessary to reflect the occurrence of the Payout Event, as applicable.  However, the Debtors will not resolicit Holders of Claims entitled to vote on the Plan given that such Holders will be treated no less favorably than as otherwise provided in the Plan.  Section 1127 of the Bankruptcy Code authorizes the modification of a chapter 11 plan by its proponent at any time before Confirmation, as long as the plan as modified satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Bankruptcy Rule 3019(a) further provides that "[i]n a chapter 9 or chapter 11 case, after a plan has been accepted and before its Confirmation, the proponent may file a modification of the plan."  Plan modifications implemented through Bankruptcy Rule 3019(a) do not require resolicitation if the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification.  Because a Payout Event will occur only where Holders of Claims are treated no less favorably than as currently provided by the Plan, a Payout Event would not constitute a materially adverse change of the Plan requiring resolicitation pursuant to Bankruptcy Rule 3019(a).

**B.    VOTING RIGHTS**

**1.    Classes Entitled to Vote**

The following Classes for each Debtor, as applicable, are the only Classes entitled to vote to accept or reject the Plan.  If your Claim or Interest is not included in one of these Classes, you are not entitled to vote and you will not receive a Solicitation Package.  Each of these Classes entitled to vote on the Plan, will have accepted the Plan if:  (1) the Holders of at least two thirds (2/3) in dollar amount of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan; and (2) the Holders of more than one half (1/2) in number of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan.

| CLASS | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|---|---|---|---|
| 5 | Secured Swap Claims | Impaired | Entitled to Vote |
| 6 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 7 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 8 | Senior Notes Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |

**2.    Classes Not Entitled to Vote**

Under the Bankruptcy Code, Holders of Claims are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan.  Based on this standard, the following Classes of Claims for each Debtor, as applicable, will not be entitled to vote on the Plan and the Holders of such Claims will not be solicited to vote on the Plan.

| CLASS | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 4 | Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 10 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 13 | Equity Interests in the Debtors | Impaired | Deemed to Reject |

**C.    VOTING PROCEDURES**

The Bankruptcy Court has established the Voting Record Date for purposes of determining, among other things, which Holders of Claims are eligible to vote on the Plan.  The Bankruptcy Court has also approved September 1, 2010 prevailing Pacific Time as the deadline for submitting Ballots and Master Ballots, as applicable (the "Voting Deadline").  To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, must be properly executed, completed, and delivered by using the return envelope provided or by delivery by:  (a) first class mail; (b) overnight courier; or (c) personal delivery, so that such Ballots are **actually received** no later than the Voting Deadline by the Notice and Claims Agent.  The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of the beneficial holders of the Debtors' Senior Notes (the "Beneficial Holders") who hold their position through a nominee (the "Nominee"), such Beneficial Holders will be instructed to comply with the return instructions provided by the Nominee).  It is important to follow the specific instructions provided on each Ballot or Master Ballot.  Ballots and Master Ballots should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

| BALLOTS AND MASTER BALLOTS | |
|---|---|
| **Neff Corp., Balloting Center**<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, California 90245<br>**Email:** NeffCorpInfo@kccllc.com<br>**Web:** http://www.kccllc.net/neff<br>**Phone:** (877) 499-4518<br><br>(for Holders of Class 5 and 9 Claims) | **Neff Corp., Balloting Center**<br>c/o Kurtzman Carson Consultants LLC<br>599 Lexington Avenue, 39th Floor<br>New York, New York 10022<br>**Email:** NeffCorpInfo@kccllc.com<br>**Web:** http://www.kccllc.net/neff<br>**Phone:** (877) 833-4150<br><br>(for Holders of Class 6, 7, and 8 Claims) |

**TO BE COUNTED, ALL BALLOTS AND MASTER BALLOTS MUST BE RECEIVED BY THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE. BALLOTS AND MASTER BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ATTACHED TO THE DISCLOSURE STATEMENT ORDER.**

**BALLOTS AND/OR MASTER BALLOTS RECEIVED _AFTER_ THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTORS. ANY BALLOT OR MASTER BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS AND/OR MASTER BALLOTS RECEIVED BY FACSIMILE OR BY ELECTRONIC MEANS WILL NOT BE COUNTED.**

## D.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of a plan filed under chapter 11 of the Bankruptcy Code after proper notice to all parties in interest. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims presumed to reject the Plan or that votes to reject the Plan. The Debtors also reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on September 14, 2010, at 11:00 a./p.m., prevailing Eastern time, before the Honorable Shelley Chapman, United States Bankruptcy Judge for the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Master Service List (as defined in the Debtors' Case Management Procedures) and the Entities who have filed objections to the Plan, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Bankruptcy Court has established September 1, 2010 at 4:00 p.m. prevailing Eastern Time as the deadline for objecting to the Plan (the "Plan Objection Deadline"). All Objections to the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the objections to the Plan prior to the Confirmation Hearing.

K&E 17316187

## V.    CASH ELECTION AND RIGHTS OFFERING PROCEDURES

### A.    CASH ELECTION AND RIGHTS OFFERING OVERVIEW

The Plan provides all Holders of Class 6 First Lien Term Loan Claims and Class 7 Second Lien Term Loan Claims with, among other things, certain cash and equity election rights and for such Holders that are Accredited Investors and/or Qualified Institutional Buyers (the "Eligible Holders")[9], certain rights to participate in the Rights Offering, subject to the terms and conditions set forth in the Plan.  The Debtors intend to effectuate the Rights Offering by soliciting Eligible Holders as of July 12, 2010.  Each Holder's status as an Eligible Holder will be determined based on such Holder's responses to a questionnaire provided to such Holders by the Debtors following the Petition Date but prior to the distribution of the Solicitation Package.[10]

### 1.    First Lien Term Loan Cash Election/First Lien Term Loan Equity Election

Pursuant to Article III.B of the Plan, all Holders of Class 6 Allowed First Lien Term Loan Claims may elect to receive either:

- the First Lien Term Loan Cash Payment (the "First Lien Term Loan Cash Election"); or

- such Holder's (a) *Pro Rata* share of 100% of the New Common Units (the "First Lien Term Loan Equity Election"), subject to dilution by the Rights Offering Units, the Second Lien Term Loan Equity Election, the Warrants, if issued, and the Management Equity Incentive Plan and (b) *Pro Rata* share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Rights Offering Amount less the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants in connection with the Rights Offering.

Holders of First Lien Term Loan Claims that are not Eligible Holders will not be entitled to participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights such Holders would have been eligible to purchase if they were First Lien Term Loan Rights Offering Participants (as reasonably determined by the Debtors and the Ad Hoc Group).  If any Holder of a Class 6 First Lien Term Loan Claim (whether such Holder is an Eligible Holder or otherwise) makes the First Lien Term Loan Cash Election, such Holder will receive only the First Lien Term Loan Cash Payment and will not receive either the New Common Units or Rights on account of its First Lien Term Loan Claims.

### 2.    Second Lien Term Loan Cash Election/Second Lien Term Loan Equity Election

Pursuant to Article III.B of the Plan, and if the Class of Second Lien Term Loan Claims votes to accept the Plan, Holders of Second Lien Term Loan Claims may elect to receive either:

- such Holder's *pro rata* share of (i) $10.0 million in cash (the "Second Lien Term Loan Cash Election," and, together with the First Lien Cash Payment Election, the "Cash Elections") or such Holder's *pro rata* share of 5.6% of New Common Units (the "Second Lien Term Loan Equity Election"); and

- such Holder's *pro rata* share of Rights to purchase up to $7.5 million of New Common Units (the "Second Lien Term Loan Rights Offering Amount").

If Class 7 Second Lien Term Loan Claims does not vote to accept the Plan, each Holder of a Class 7 Second Lien Term Loan Claim will receive its *pro rata* share of the Warrants and will not be eligible to receive the

---

[9]    "Accredited Investor" shall have the meaning set forth in Rule 501 Regulation D promulgated under the Securities Act, and "Qualified Institutional Buyer" shall have meaning set forth by Rule 144A promulgated under the Securities Act.

[10]    The Debtors reserve the right to send out additional questionnaires to the extent composition of the Holders changes at any time prior to the Cash Election/Rights Offering Expiration Date.

Second Lien Term Loan Cash Payment, the Second Lien Term Loan Equity Distribution, or participate in the Rights Offering (as discussed below).

Pursuant to the Cash Election and Rights Offering Procedures, Eligible Holders receiving Rights will be entitled to subscribe for and purchase New Common Units to be issued under the Plan on the Effective Date (collectively, the "Rights Offering Units") at the exercise price up to, and solely to the extent of their *pro rata* share of the Rights Offering Amount or the Second Lien Term Loan Rights Offering Amount, as applicable. The proceeds generated from the Rights Offering will be contributed to the Debtors on the Effective Date. The Rights Offering is fully backstopped by the Backstop Parties on a several (but not joint) basis.

## VI.    THE DEBTORS' BACKGROUND

### A.    THE DEBTORS' BUSINESSES

#### 1.    Corporate History and Structure

Neff Corp. was formed in 1995 to serve as a holding company for its wholly owned subsidiaries, Neff Rental, Inc. ("Neff Rental") and Neff Machinery, Inc. ("Neff Machinery") which were previously incorporated in 1988 and 1989, respectively. Neff Rental was primarily a lessor of heavy construction equipment and tools. Neff Machinery operated heavy construction equipment dealerships, serving primarily as a John Deere distributor. Subsequent to the formation of Neff Corp. in 1995, Neff Rental and Neff Machinery continued to operate as its wholly-owned subsidiaries. Neff Rental then began to strategically acquire equipment rental companies throughout the sunbelt states and opened new rental branches in high-growth markets. The rate of acquisition and opening of new branches accelerated after the Debtors became a public company in 1998. In 1999, the Debtors sold their interest in Neff Machinery to Nortrax, a John Deere subsidiary and used the proceeds to pay outstanding debt. Following the economic downturn and subsequent slowdown in non-residential construction during the early 2000s, the Debtors once again became a private company. During this time, the Debtors consolidated certain locations, increased operating efficiencies, invested in sales and training programs, and remixed their rental equipment fleet to focus more acutely on the earthmoving sector, as described more fully below. As non-residential construction expanded in 2004, the Debtors were well-positioned for growth, and their sound operational discipline led to significant expansion in revenue and operating cash flow.

In June 2005, the Debtors were purchased by affiliates of Odyssey Investment Partners, a New York-based private equity firm. In May 2007, a consortium of private equity sponsors led by affiliates of Lightyear Capital ("Lightyear") acquired the Debtors through a leveraged buyout (the "2007 LBO"). As of the Petition Date, the Debtors consist of Neff Holdings LLC, a Delaware limited liability company and 5 direct and indirect subsidiaries, all of which are privately held entities organized under the laws of the United States, and all of which, collectively, comprise the Debtors. Neff Holdings LLC, is owned by a consortium of financial sponsors, including affiliates of Lightyear, Norwest Equity Partners, and General Electric Pension Trust. Lightyear is the largest equity holder in Neff Holdings LLC, indirectly owning approximately 50 percent of the equity units of that entity. Neff Holdings LLC, in turn, owns approximately 100 percent of the shares in Neff Holdings Corp. on an undiluted basis. Neff Corp., Neff Rental LLC, Neff Finance Corp., and Neff Rental, Inc. are all wholly-owned subsidiaries of Neff Holdings Corp. An organizational chart reflecting the Debtors' corporate structure as of the Petition Date is attached hereto as **Exhibit D**.

#### 2.    Debtors' Business Operations

The Debtors are the thirteenth largest equipment rental companies in the United States as measured by equipment rental revenues in 2008. Through 63 branches located across 14 states, primarily in the Sunbelt region, the Debtors rent a broad variety of construction and industrial equipment, including earthmoving, material handling, aerial, and compaction equipment. The Debtors believe branches are located in key strategic markets that exhibit year round construction activity and favorable economic and demographic trends. The corporate headquarters for the Debtors other than Neff Holdings LLC is located in Miami, Florida; the business of Neff Holdings LLC is conducted through offices located in New York City, New York.

The Debtors' rental equipment fleet includes approximately 11,000 separate pieces of equipment. Earthmoving equipment, including backhoes, bulldozers, and excavators, account for approximately one-half of the

Debtors' equipment fleet as measured by original equipment cost. In addition, the Debtors' rental fleet includes aerial equipment, concrete and compaction equipment, forklifts, trucks, generators, and compressors.

To maintain the safety and functionality of their equipment fleet, the Debtors regularly acquire new and used equipment in the ordinary course of business to respond to customer demand. Over the twelve months ended December 31, 2009, the Debtors acquired approximately $11.7 million in equipment, although the Debtors have significantly reduced near term equipment acquisitions in response to reduced customer demand and equipment usage.

The Debtors ordinarily purchase new or used equipment and replacement parts from a variety of original equipment manufacturers (collectively, the "OEMs"), dealers, or auctioneers in the ordinary course of business. During the year ended December 31, 2009, equipment purchased from seven OEMs accounted for approximately 66 percent of the Debtors' total rental equipment purchases. The Debtors utilize particular equipment and parts vendors, including OEMs, based on the particular vendor's ability to meet the Debtors' high standards for product quality and support services. The Debtors believe that their ability to quickly obtain "in demand" parts and equipment provides them with a competitive advantage in order to meet customer equipment and maintenance needs on a real time basis.

The Debtors also engage in a regular program of selling new and used equipment and parts to adjust the size and composition of their rental fleet. This program allows the Debtors to respond to changing market conditions and to maintain the quality and average age of their rental fleet at desirable levels. The Debtors sell used rental equipment to various parties, including their rental customers, used equipment buyers, and OEMs. The Debtors' equipment sale program allows them to maximize equipment utilization rates and take advantage of favorable pricing when compared with the estimated rental revenue available from a particular asset. Equipment sales accounted for approximately nine percent of the Debtors' total revenues over the twelve months ended December 31, 2009, or approximately $16.3 million. On average, the Debtors will sell approximately 2,500 pieces equipment in a given year.

The Debtors' corporate headquarters is located in Miami, Florida. Rental and sales operations are conducted primarily through the Debtors' 63 branches, which are organized into five geographic regions: Atlantic (17 branches), Central (12 branches), Florida (13 branches), Southeast (8 branches), and Western (13 branches). Each branch is a full service rental operation, which offers customers 24/7 equipment support, including supply, repair, and maintenance services. Rental rates, inventory, and supply decisions may be made at the branch level, although significant pricing and equipment allocation decisions will be made at regional or corporate levels. Branch staffing typically includes a combination of managers, sales staff, mechanics, drivers, and support personnel. The Debtors currently employ approximately 900 full time employees. None of the Debtors' employees are represented by a union or covered by a collective bargaining agreement.

**Location of Neff's Branches**



The Debtors' facilities and operations are subject to federal, state, and local environmental and occupational safety and health requirements, including those relating to discharges of substances to the air, water

14

and land, the handling, storage, use, and disposal of hazardous materials and wastes and the cleanup of properties affected by pollutants. In connection with the Debtors' vehicle and equipment fueling and maintenance, repair, and washing operations, the Debtors use regulated substances such as petroleum products and solvents and generate small quantities of regulated waste such as used oil, radiator fluid, and spent solvents. Most of the Debtors' properties contain, and others previously contained, aboveground or underground storage tanks and/or oil-water separators. The Debtors have made, and will continue to make, capital and other expenditures to comply with environmental requirements, and do not anticipate that compliance with such requirements will have a material adverse effect on the Debtors' business or financial condition or competitive position.

Most, but not all, of the Debtors' current properties have been the subject of an environmental site assessment to identify conditions that may cause the debtors to incur obligations or liabilities (including remediation costs) under applicable environmental laws. In addition, all but one of the Debtors' properties are leased. The Debtors' lease agreements often provide that the site owner has responsibility for the pre-existing environmental condition of the property, and that the Debtors are only liable for contamination caused by them or that occurs during the term of the lease. The Debtors are not aware of any existing conditions at their properties or at off-site locations that are likely to result in material remediation costs or liabilities.

### 3. The Debtors' Customers

The Debtors' customer base includes approximately 14,000 separate customers. The Debtors' customers are typically mid-sized, regional, and local construction firms. Although these customers are diversified across a variety of industries, including manufacturing, civil construction, and military construction, non-residential construction activity remains a significant component of the Debtors' revenue stream. The Debtors focus primarily on providing exceptional equipment service, delivery, and reliability to their rental customers and do not typically compete for less profitable, "do-it-yourself" customers for whom price is the primary decision-making factor.

Customers have the option of renting the Debtors' equipment on a daily, weekly, and monthly basis. The Debtors determine rental rates for each type of equipment based on the cost and expected utilization of the equipment and adjust rental rates at each branch based on customer demand, length of rental, volume of equipment rented and other competitive considerations. The Debtors believe their commitment to high levels of service, delivery, order accuracy, and equipment reliability are essential to maintaining existing customer relationships and driving new business.

### 4. Sales and Marketing

The Debtors maintain a strong sales and marketing program to help bolster their customer base and better understand and serve their customers. Managers develop relationships with local customers and assist them in planning their equipment rental requirements. Managers are also responsible for managing the mix of equipment at their locations, keeping current on local construction activity and monitoring competitors in their respective markets. To stay informed about their local markets, salespeople track rental opportunities and construction projects in the area through Equipment Data Reports, F.W. Dodge Reports, PEC (Planning, Engineering and Construction) Reports and local contacts.

The Debtors' sales training program emphasizes customer service and focuses on sales generation. Additionally, the Debtors' customer relationship management system helps maximize sales and revenue opportunities. As part of this system, the sales force is automatically updated regarding new construction projects in their territories. The Debtors believe that this ability to track, manage, and share recent account activity enables them to maximize their rental success. The Debtors also believe that their customer relationship management system helps identify opportunities that might otherwise go undetected by their sales force and that such opportunities help create company-wide sales synergies.

### 5. Management Information Systems

The Debtors have developed customized management information systems, capable of monitoring branch operations on a real-time basis, which management believes can support the Debtors' current and future needs. These systems link all of the Debtors' rental locations and allow management to track customer and sales information, as well as the location, rental status and maintenance history of every major piece of equipment in the

rental fleet.  Using these systems, branch managers can search the entire rental fleet for needed equipment, quickly determine the closest location of such equipment and arrange for delivery to the customer's work site.  This practice helps diminish lost opportunities, improves utilization and makes equipment available in markets where it can maximize revenue potential.  The Debtors use these systems to optimize fleet utilization and determine the optimal fleet composition by market.

### 6.    Competition

The equipment rental industry is both fragmented and highly competitive.  The Debtors' competitors include small, independent operators with one or two rental locations, as well as, regional and national equipment rental companies, including public companies and divisions thereof.  The Debtors' national competitors include United Rental, RSC, Hertz Equipment, and Sunbelt Rentals.  Large regional competitors include Ahern Rental, Sunstate, and NES Rental, as well as numerous smaller regional equipment rental companies.  The Debtors also compete with equipment vendors and dealers that both sell and rent equipment to customers.

The general downturn in the equipment rental market has exacerbated existing competitive pressures by, among other things, causing industry-wide rental rate reductions.  The Debtors have also seen industry-wide reductions in rental equipment prices on the secondary market caused by, among other things, increased rental equipment supply and significantly reduced customer demand.

### 7.    Overall Revenue

For the twelve months ended March 31, 2010, the Debtors generated approximately $187.4 million in total revenues.  Equipment rentals accounted for approximately 86 percent of the Debtors' total revenues over the twelve months ended March 31, 2010, or approximately $161.1 million.  The Debtors' remaining revenues are derived primarily from equipment sales (generating approximately $16.1 million in revenues over the twelve months ended March 31, 2010), as well as equipment maintenance, supply and repair operations (generating approximately $10.2 million in revenues over the twelve months ended March 31, 2010).  As of March 31, 2010, the Debtors reported approximately $298.9 million in total assets and approximately $609.3 million in total liabilities.

## B.    SUMMARY OF PREPETITION INDEBTEDNESS

As of the Petition Date, the Debtors had approximately $598.5 million in indebtedness and related obligations, consisting of indebtedness under their First Lien Credit Agreement, secured Swap Obligations, a Second Lien Term Loan, and certain Senior Notes(each as defined herein).

### 1.    First Lien Credit Agreement

Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Neff Holdings Corp., as guarantor, Bank of America, N.A., as administrative agent (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), are parties to that certain credit agreement, dated as of May 31, 2007 (as amended and restated as of December 16, 2008, the "First Lien Credit Agreement").

The First Lien Credit Agreement provides the Debtors with an asset based lending facility (the "ABL") with $250.0 million of maximum availability.  Availability under the ABL is determined by a borrowing base formula calculated by reference to the appraised value of the Debtors' accounts receivable, parts inventory, and rental equipment.  As of the Petition Date, approximately $153.3 million was outstanding under the ABL.

The First Lien Credit Agreement also provides for a $87.9 million "last out" term loan (the "First Lien Term Loan," and the lenders thereunder, collectively, the "First Lien Term Loan Lenders").  The First Lien Term Loan was issued through an exchange offer undertaken by the Debtors in December 2008, through which approximately $195.7 million of the Debtors' Senior Notes were tendered for obligations under the First Lien Term Loan (the "2008 Exchange").  At the time of the 2008 Exchange, the First Lien Credit Agreement was amended and restated to, among other things, limit the First Lien Term Loan Lenders' ability to, among other things: (a) exercise rights or remedies in an event of default; (b) oppose the Debtors' use of cash collateral or borrowings under a DIP facility absent consent from the ABL Lenders; and (c) request adequate protection during a bankruptcy proceeding (absent the consent of the First Lien Agent).  In addition, in connection with the amendment of the First Lien Credit Agreement, the interest rate was increased by 200 bps and the size of the facility was reduced by $25 million.

16

The ABL and the First Lien Term Loan (together with the Swap Obligations as defined below, collectively, the "First Lien Credit Facilities") are secured by a first priority lien on substantially all of the Debtors' assets (other than the Debtors' real property) pursuant to that certain First Lien Security Agreement, between Neff Corp., various Debtors as parties thereto and Bank of America, N.A., as agent, dated as of May 31, 2007 (the "First Lien Security Agreement," and, together with the First Lien Credit Agreement, the "First Lien Credit Documents"). Among other things, the First Lien Credit Documents provide that claims arising under the ABL hold seniority over the First Lien Term Loan and the Swap Obligations (as defined below). As of the Petition Date, interest accrued on the First Lien Credit Facilities at LIBOR plus 350 bps. The First Lien Credit Facilities mature on May 31, 2013.

### 2.      Swap Obligations

Neff Corp. is a party to two interest rate swaps with Bank of America, N.A., and UBS AG, respectively (collectively, the "Swap Counterparties"). Obligations arising under the swaps (collectively, the "Swap Obligations") are treated as first lien claims under the terms of the First Lien Credit Agreement. Swap Obligations are junior to Claims arising under the ABL, but are senior to Claims arising under the First Lien Term Loan. The Swap Obligations are also secured by liens granted pursuant to the First Lien Security Agreement. As of the Petition Date, the Swap Obligations totaled approximately $22.4 million. Prior to the Petition Date, the Swap Counterparties executed plan support agreements and amendments to their respective swap agreements under which the Swap Counterparties have agreed not to terminate their swaps and to otherwise support the Plan.

### 3.      Second Lien Term Loan

Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantors, Wilmington Trust FSB, as administrative agent (the "Second Lien Agent"), and the lenders party thereto (collectively, the "Second Lien Lenders") are parties to that certain second lien credit agreement, dated as of May 31, 2007 (the "Second Lien Credit Agreement").

The Second Lien Credit Agreement provides for a $290.0 million second lien term loan, which remains fully outstanding as of the Petition Date (the "Second Lien Term Loan"). As of the Petition Date, interest accrued on the Second Lien Term Loan at LIBOR plus 350 bps plus the default rate of 200 bps . The Second Lien Term Loan matures on November 30, 2014. The Second Lien Term Loan is secured by a second priority lien on substantially all of the Debtors' assets pursuant to that certain "Second Lien Security Agreement," between Neff Corp. and the Debtors as parties thereto and the Second Lien Agent, dated as of May 31, 2007.

### 4.      Intercreditor Agreement

Also on May 31, 2007, the applicable Debtors, the collateral agent under the First Lien Security Agreement, and the collateral agent under the Second Lien Security Agreement entered into an agreement that, among other things, assigned relative priorities to claims arising under the First Lien Credit Facilities (including the Swap Obligations) and the Second Lien Term Loan (the "Intercreditor Agreement"). The Intercreditor Agreement provides that claims arising under the Second Lien Term Facilities are subordinate to claims arising under the First Lien Credit Facilities. The Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Second Lien Lenders in an event of default under the Second Lien Credit Agreement; (b) the Second Lien Lenders' ability to challenge the validity or priority of liens arising under the First Lien Credit Facility; and (c) the extent to which the Second Lien Lenders may be entitled to request adequate protection during a bankruptcy proceeding.

### 5.      10% Senior Notes

Neff Corp., as issuer, and Neff Rental LLC, Neff Finance Corp., and Neff Rental, Inc., as guarantors, and Wells Fargo Bank, N.A., as indenture trustee, are parties to that certain indenture dated May 31, 2007 (the "Senior Notes Indenture"), pursuant to which Neff Corp. issued $230.0 million in Senior Notes due June 1, 2015 (collectively, the "Senior Notes"). The Senior Notes are unsecured obligations of the relevant Debtors. Approximately $195.7 million in Senior Notes were exchanged for obligations under the First Lien Term Loan in December 2008. Additionally, pursuant to the Exchange, the Senior Notes Indenture was amended to eliminate certain restrictive covenants, certain events of default, and Neff Corp.'s SEC public reporting requirements. Approximately $35.9 million remains outstanding on account of the Senior Notes as of the Petition Date.

17

C.    **MANAGEMENT OF THE DEBTORS**

1.    **Board of Directors and Executive Officers**

Set forth below are the names, position(s), and biographical information of the current board of directors (each a "Director" and, collectively, the "Board of Directors") of Neff Holdings Corp. and current key executive officers.  The Board of Directors oversees the business and affairs of each of Neff Holdings Corp and its subsidiaries.

| Name | Position |
| --- | --- |
| J.C. Mas | Director (Chairman) |
| Graham Hood | President, Chief Executive Officer, and Director |
| Mark Irion | Vice President, Chief Financial Officer and Secretary |
| Frederic F. Brace | Director |
| David H. Cynn | Director |
| Kenneth M. Duberstein | Director |
| Kevin A. Landgraver | Director |
| Hugh E. Sawyer | Director |
| Mark F. Vassallo | Director |

*J.C. Mas*—Mr. Mas has served as Chairman of the Board of Directors since May 2007.  Prior to that time, Mr. Mas served as President and Chief Executive Officer since 2002.  Prior to joining Neff, Mr. Mas served in a variety of executive positions at MasTec, Inc., including as President of MasTec International.  Mr. Mas is also on the board of directors of Miami Children's Hospital.

*Graham Hood*—Mr. Hood has served as Neff's Chief Executive Officer and President and as a director on Neff Holding Corp.'s Board of Directors since May 2007.  Mr. Hood is also a member of the Board of Directors' Restructuring Advisory Committee (as defined below).  Mr. Hood joined Neff in 1995 as a Regional Vice President for the Southeastern Region and became Chief Operating Officer in 2003.  Mr. Hood has 29 years of industry experience, 17 years of which were with Hertz Equipment Rental Corporation.

*Mark Irion*—Mr. Irion has served as Neff's Chief Financial Officer since 1999.  He joined Neff in 1998 after being employed as Chief Financial Officer of Markvision Holdings, Inc., a computer distribution company, from 1994 to 1998.  Prior to 1994, Mr. Irion was employed by Deloitte & Touche LLP.

*Frederic F. Brace*—Mr. Brace has served as a member of the Board of Directors since 2009.  Mr. Brace is also a member of the Board of Directors' Audit Committee, Compensation Committee (each as defined below), and the Restructuring Advisory Committee.  Mr. Brace has been an Advisor of UAL Corporation since October 31, 2008.  Previously, Mr. Brace served as an Executive Vice President of UAL Corp. and its subsidiary United Air Lines Inc. from August 2002 to November 1, 2008 and its Chief Financial Officer from September 2001 to November 1, 2008.  He served as Chief Restructuring Officer of United Air Lines Inc. from May 2004 to November 1, 2008.  He joined United Air Lines in May 1988.

*David H. Cynn*—Mr. Cynn has served as a member of the Board of Directors since May 2007.  Mr. Cynn is also a member of the Board of Directors' Audit Committee and Compensation Committee.  Mr. Cynn is currently a Managing Director at Lightyear Capital and currently serves on the boards of directors of BakerCorp. and a non-public affiliate of New Flyer Industries.  Prior to joining Lightyear Capital in 2002, Mr. Cynn worked as a mergers and acquisitions specialist at Morgan Stanley.

*Kenneth M. Duberstein*—Mr. Duberstein has served as a member of the Board of Directors since August 2007.  Mr. Duberstein has also served as Chairman and Chief Executive Officer of The Duberstein Group (consulting firm) since 1989.  He was formerly White House Chief of Staff in 1988 and 1989.  Mr. Duberstein also serves on the boards of the following public companies:  The Boeing Company, ConocoPhillips, Mack-Cali Realty Corporation, and The Travelers Companies, Inc.

18

*Kevin A. Landgraver*—Mr. Landgraver has served as member of the Board of Directors since August 2007. Since 2007, Mr. Landgraver has been the Chief Financial Officer of Argus Software, Inc., which is controlled by affiliates of Lightyear Capital LLC and Insight Venture Partners, a private equity firm focused on software and Internet services. In 2006 and 2007, Mr. Landgraver provided consulting services to Lightyear Capital LLC and other private equity firms. From 2001 to 2006, Mr. Landgraver was the Chief Financial Officer of Collegiate Funding Services, Inc., or CFS, an education finance company.

*Hugh E. Sawyer*—Mr. Sawyer has served as a member of the Board of Directors since 2009. Mr. Sawyer is also a member of the Board of Directors' Restructuring Advisory Committee. Mr. Sawyer also serves as a Managing Director for Huron Consulting Group where he provides strategic consulting services with respect to corporate turnarounds and restructurings. Prior to joining Huron Consulting Group, Mr. Sawyer successfully managed the turnaround efforts of Legendary, Inc., privately held hospitality, resort, and marine business, Allied Holdings, Inc., a publicly traded specialized transporter of vehicles, and Aegis Communications Group, Inc., a portfolio holding of AlixPartners' Questor Management.

*Mark F. Vassallo*—Mr. Vassallo has served as a member of the Board of Directors since May 2007. Mr. Vassallo is currently a Managing Director at Lightyear Capital and currently serves on the boards of directors of Athilon Group Holdings, Antares Holdings Limited, BakerCorp, Delos Insurance Company, and The NAU Group. Prior to joining Lightyear Capital in 2003, Mr. Vassallo spent nearly 20 years at PaineWebber Group Inc. in a variety of positions.

## 2.    Board of Directors' Committees

### (a)    Audit Committee

Neff Holdings Corp. maintains an Audit Committee (the "Audit Committee"), consisting of three members. These members are: Frederic F. Brace, David H. Cynn, and Kevin A. Landgraver. Mr. Landgraver serves as the chairman of the Audit Committee. The duties and responsibilities of the Audit Committee include, among other responsibilities, recommending the appointment or termination of the engagement of independent auditors, otherwise overseeing the independent auditor relationship and reviewing significant accounting policies and controls.

### (b)    Compensation Committee

Neff Holdings Corp. maintains a Compensation Committee (the "Compensation Committee") consisting of three members. These members are: Frederic F. Brace, David H. Cynn, and Hugh E. Sawyer. Mr. Cynn serves as the chairman of the Compensation Committee. The duties and responsibilities of the Compensation Committee include, among other things, setting the executive compensation policy, and reviewing and approving the compensation of Neff Corp.'s executive officers.

### (c)    Restructuring Advisory Committee

In August 2009, Neff Holdings Corp. formed a Restructuring Advisory Committee (the "Restructuring Advisory Committee") to explore various restructuring and recapitalization alternatives. The members of the Restructuring Advisory Committee are Frederic F. Brace, Graham Hood, and Hugh E. Sawyer. The duties and responsibilities of the Restructuring Advisory Committee include: (1) informing itself generally of Neff's financial condition and prospects and of the terms of agreements and instruments setting forth Neff's debt obligations; (2) reviewing the qualifications of and making recommendations on the retention of restructuring counsel; (4) identifying, analyzing, and evaluating various restructuring and recapitalization proposals; (3) communicating with Neff's various boards, management, outside advisors and other key constituencies; and (5) providing strategic advice and recommendations to the Board of Directors.

## VII.    THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including the events leading up to the filing of the Chapter 11 Cases and the anticipated events that will take place during the Chapter 11 Cases.

## A.    EVENTS LEADING TO THE CHAPTER 11 CASES

### 1.    Challenging Operating Environment

The prolonged contraction of domestic credit markets and the corresponding slowdown in non-residential construction activity over the last 24 months have significantly impacted the Debtors' revenues and severely reduced their available liquidity. Domestic construction activity—a key driver of the Debtors' revenues—is still in the midst of a well-documented downturn. This industry-wide downturn has significantly impacted the Debtors' revenue stream. Notably, the Debtors' revenues for the twelve months ended December 31, 2008 and December 31, 2009 were approximately $277.1 million and $191.7 million, respectively, representing a 30.8 percent decline. Meanwhile, competitors in the equipment rental industry have sought to maintain market share and equipment utilization rates by drastically lowering rental rates across the country. The combination of reduced customer demand, rate reductions, diminished fleet sizes (and corresponding equipment sell-offs) has also negatively impacted the Debtors' equipment value in the secondary market.

### 2.    Restructuring Initiatives

In response to the challenging operating environment, the Debtors have undertaken multiple cost-cutting and marketing initiatives to reduce expenses and stabilize revenues, respectively. Cost-cutting initiatives included branch closures, headcount reductions, salary freezes, and across-the-board expense reductions focusing on, among other things, reduced repair and supply costs. The Debtors have also made significant efforts to improve sales efficiency and incentivize key sales personnel to drive new business and to leverage existing accounts. These initiatives have enabled the Debtors to maintain relatively healthy margins amidst the ongoing construction slowdown.

Additionally, pursuant to the 2008 Exchange, the Debtors reduced their leverage and interest expense by exchanging approximately $195.7 million of their Senior Notes for approximately $87.9 million in the newly issued First Lien Term Loan under the First Lien Credit Agreement. Pursuant to the 2008 Exchange, each participating Senior Notes holder was entitled to receive a share of the First Lien Term Loan in an amount equal to 45 percent of the face value of its tendered 10% Senior Notes.[11] The 2008 Exchange closed on December 16, 2008. As a result, the Debtors were able to reduce overall indebtedness by $107.8 million which resulted in an annual reduction in net cash interest expense of approximately $13 million.

### 3.    Liquidity Constraints

Despite the Debtors' prepetition restructuring initiatives, ongoing challenges in the Debtors' operating environment have continued to impose severe limitations on the Debtors' available liquidity. The prolonged decline in construction spending has presented ongoing demand and pricing challenges for the Debtors, thereby reducing their liquidity. Additionally in January 2009, the Debtors' ABL lenders implemented a swap reserve that grew to $25 million, further reducing the Debtors' liquidity.

Availability under the prepetition ABL was calculated by a borrowing base formula determined by reference to the appraised value of the Debtors' accounts receivable, parts inventory, and rental equipment. Based on the Debtors' semiannual equipment appraisal conducted as of March 31, 2009, the Debtors determined that their availability as of April 30, 2009 was $21.1 million, which triggered a lockbox arrangement where all cash receipts were automatically applied to outstanding ABL indebtedness. As of the Petition Date, the ABL was in effect the Debtors' remaining primary source of liquidity.

In light of these liquidity limitations, the Debtors did not make interest payments due under the Second Lien Term Loan on January 2010 and April 2010. However, the Debtors received a waiver from the First Lien Term Loan Lenders and Swap Counterparties for the missed January 2010 Second Lien Term Loan interest payment and received a temporary waiver for the missed April 2010 Second Lien Term Loan interest payment. The April waiver expires on May 14, 2010.

---

[11] Late tendering Holders of the Debtors' Senior Notes were subsequently permitted to exchange their Senior Notes for shares of the First Lien Term Loan in an amount equal to 40 percent of the face value of the tendered notes.

## B.    PREPETITION NEGOTIATIONS

### 1.    Initial Examination of Alternative Transactions

In August 2009 the Debtors began taking additional steps to develop a long term balance sheet solution with the goal of bringing the Debtors' capital structure in line with current market conditions. Among other things, the Debtors' Board of Directors established the Restructuring Advisory Committee, as noted above, to provide strategic oversight regarding the restructuring process. The Debtors and their advisors also began discussions with the First Lien Credit Facility Agent to increase availability under the ABL by reducing certain reserves taken with respect to the Swap Obligations. Through these negotiations, the Debtors obtained an immediate reduction of the reserve from approximately $25.6 to approximately $16.0 million, with the reserve reducing to $5.5 million over time. In exchange, the Debtors agreed to, among other things, voluntarily terminate $75.0 million in commitments otherwise available under the ABL, transmit titles to facilitate the perfection of existing liens in the Debtors' rolling stock, deliver a preliminary balance sheet restructuring plan to the First Lien Credit Facility Agent by October 31, 2009, and to commence negotiations around such a plan by December 31, 2009.

Beginning in September 2009, the Debtors and their investment banker Miller Buckfire & Co., LLC ("Miller Buckfire") began an extensive review of strategic alternatives available in light of the Debtors' current operating environment and leverage constraints. To this end, the Debtors contacted approximately five original equipment manufacturers in the earth moving equipment industry (the "OEMs") to gauge their interest in a potential equity investment in the form of cash or equipment. Of these entities, only one OEM was willing to engage in discussions regarding a potential investment. However, this OEM was ultimately unwilling to invest in the Debtors outside a significant restructuring event.

### 2.    Restructuring Negotiations and Sales/Investment Process

Shortly thereafter, the Debtors and their advisors began discussing the preliminary terms of a potential restructuring with their major stakeholders, including the First Lien Credit Facility Agent, certain First Lien Term Loan Lenders, certain Second Lien Term Loan Lenders, and their respective advisors. Upon execution of customary confidentiality agreements, the Debtors provided parties with information regarding the Debtors' operations, projections, and business plan to facilitate their ability to develop a potential restructuring plan or to otherwise constructively participate in the process.

Additionally, in December 2009, the Debtors and their advisors began a parallel "third party" sales and investment process through which Miller Buckfire solicited interest in the Debtors from a broad universe of strategic and financial investors regarding a potential acquisition or investment in the Debtors in conjunction with a deleveraging event. Miller Buckfire contacted approximately 40 parties (including financial and strategic investors) and more than 20 of these interested parties executed confidentiality agreements and were provided with additional information regarding the Debtors. After initial indications of interest were due on January 19, 2010, the Debtors received multiple indications of interest from financial investors for a potential sale transaction. However, several parties declined to provide a written expression of interest because the values associated with a potential transaction were insufficient to support execution of the transaction. Further, some parties indicated a desire to potentially participate after the Debtors' commenced these Chapter 11 Cases as a potential topping bidder through the Payout Event. Miller Buckfire subsequently requested such parties to provide binding commitments to sponsor a plan by February 22, 2010. The Debtors received a final proposal from certain funds managed by Wayzata Investment Partners, LLC ("Wayzata") and Apollo Capital Management ("Apollo")—the Debtors' current Plan Sponsors.

The Debtors subsequently received an alternative proposal from a third party investor in March 2010 (the "Alternative Proposal"). The Debtors and their advisors worked diligently to develop various aspects of the Alternative Proposal prior to the Petition Date, while seeking additional concessions and increased value on their proposal from the Plan Sponsors. After exhaustive negotiations in April 2010 with the Plan Sponsors and the third-party investor regarding the Alternative Proposal, which proposed, among other things, (a) full cash recoveries for First Lien Term Loan Lenders, (b) a coinvestment right and either a $6.0 million cash or equity recovery for Second Lien Term Loan Lenders (at such Holder's election), and (c) a $300,000 cash gift shared among Holders of General Unsecured Claims and Senior Notes Claims (provided such Classes voted in favor of the Alternative Proposal). In addition, the Alternative Proposal would have "left behind" certain excluded liabilities with the post-transaction Debtors and capped other liabilities assumed by the third party investor. As a result, the Debtors

could have potentially been required bear the costs of a post-transaction wind down or claims administration process without assurances of sufficient funding to meet such obligations.

After analyzing, among other things, the relative values provided by each proposal, the execution risk associated with each proposal, and other factors associated with the assumption or exclusion of liabilities, the Debtors' Board of Directors, in consultation with their advisors and the consideration of such proposals by their Restructuring Advisory Committee, selected the Plan Sponsors as their *de facto* stalking horse bidder for the restructuring process.  However, as noted above, the Plan's "Payout Event" mechanism ensures that alternative bidders, including the third-party investor who submitted the Alternative Proposal, have an opportunity to top the stalking horse proposal submitted by the Plan Sponsors currently embodied by the Plan.

### 3.    Plan Support Agreements

To reach a consensual resolution of Plan issues with the Debtors' major constituents, the Debtors engaged in discussions with the First Lien Term Loan Lenders, the Swap Counterparties, and the Second Lien Term Loan Lenders to build consensus around the Plan.  As a result of these discussions, the Debtors entered into various plan support agreements (collectively, the "Plan Support Agreements") with certain First Lien Term Loan Lenders (including the Plan Sponsors) and the Swap Counterparties, pursuant to which such creditors have agreed to support the Plan.

### (a)    First Lien Term Loan Plan Support Agreement

On April 14, 2010, the Debtors entered into a plan support agreement (the "First Lien Term Loan Plan Support Agreement"), whereby certain consenting First Lien Term Loan Lenders (collectively, the "Consenting First Lien Term Loan Lenders") have agreed to support the Plan.[12]  Specifically, pursuant to the terms of the First Lien Term Loan Plan Support Agreement, each Consenting First Lien Term Loan Lender has agreed, in sum and substance, that it will, among other things:

- vote or cause to be voted all of its Class 6 First Lien Term Loan Claims in favor of the Plan and not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn);

- support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, Confirmation, and Consummation of the Plan and the transactions contemplated thereby;

- timely vote or cause to be voted all of its Class 6 First Lien Term Loan Claims and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit, or support of, any restructuring or reorganization of the Debtors other than the Plan;

- not directly or indirectly seek, solicit, vote its Class 6 First Lien Term Loan Claims for, support or encourage the termination or modification of the Debtors' exclusive period for filing any alternative restructuring proposal or any other action that is inconsistent with, or that could, prevent, interfere with, delay or impede the proposal, solicitation, Confirmation, or consummation of the Plan; and

- support customary mutual release and exculpation provisions contained in the Plan.

- in addition, the original Consenting First Lien Term Loan Lenders have agreed, among other things, that so long as the First Lien Term Loan Plan Support Agreement has not been terminated (a) they will not elect to receive the First Lien Term Loan Cash Payment and (b) they will be required to make the First Lien Term Loan Equity Election.

---

[12]    The summary description of the Term Loan Plan Support Agreement is qualified in its entirety by reference thereto.  To the extent that the following summary and the terms of the Term Loan Plan Support Agreement differ, the terms of the Term Loan Plan Support Agreement shall control.

K&E 17316187

In consideration for the Consenting First Lien Term Loan Lenders' support of the Plan, the Debtors have also agreed, in sum and substance, that they will, among other things:

- support and take all reasonable actions necessary or reasonably requested by the Consenting First Lien Term Loan Lenders to facilitate the solicitation, Confirmation, and Consummation of the Plan and the transactions contemplated thereby, including, the filing of the Chapter 11 Cases;

- not take any action that is inconsistent with, or that would delay or impede the solicitation, Confirmation, or Consummation of the Plan or the Restructuring Transactions;

- support the customary mutual release and exculpation provisions contained in the Plan;

- obtain entry of the Confirmation Order approving the Plan, which order shall not be the subject of any stay, as soon as reasonably practicable and in no event later than on the date that is two-hundred fifty-five (255) calendar days after the Petition Date; and

- consummate the Plan as soon as reasonably practicable and in no event later than on the date that is two-hundred seventy (270) calendar days after the Petition Date.

The Debtors' failure to comply with various agreement, obligations, and milestones set forth in the Plan Support Agreement may permit the Consenting First Lien Term Loan Lenders to terminate their obligations under the First Lien Term Loan Plan Support Agreement.

(b)     **Swap Counterparty Plan Support Agreement**

On May 14, 2010, the Debtors entered into an additional plan support agreement (the "Swap Counterparty Plan Support Agreement"), whereby certain Swap Counterparties (collectively, the "Consenting Swap Counterparties") have agreed to support the Plan.[13]  Specifically, pursuant to the terms and conditions of the Swap Counterparty Plan Support Agreement, each of the Consenting Swap Counterparties has agreed, in sum and substance, that it will, among other things:

- vote all of its Secured Swap Claims in favor of the Plan and not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn);

- support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, Confirmation, and Consummation of the Plan and the transactions contemplated thereby;

- not object to, or vote any of its Secured Swap Claims to reject the Plan or otherwise take any action or commence any proceeding to oppose or seek any modification of the Plan, the Disclosure Statement, and any related documents or exhibits;

- not directly or indirectly seek, solicit, support, encourage, or vote any of its Secured Swap Claims or otherwise consent to, encourage, or participate in any discussions regarding the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors other than the Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, Confirmation, or Consummation of the Plan;

- support customary release and exculpation provisions contained in the Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors, and employees; and

---

[13]   The summary description of the Swap Counterparty Plan Support Agreement is qualified in its entirety by reference thereto.  To the extent that the following summary and the terms of the Swap Counterparty Plan Support Agreement differ, the terms of the Swap Counterparty Plan Support Agreement shall control.

- not sell or otherwise transfer or grant any right to acquire any interest in any Secured Swap Claim except in accordance with the terms of the Swap Amendments and to a transferee who agrees to be bound by the terms of the Swap Counterparty Plan Support Agreement.

In consideration for the Consenting Swap Counterparties support of the Plan, the Debtors have agreed to use, to the extent not inconsistent with their fiduciary obligations under applicable law, commercially reasonable efforts to, among other things:

- obtain entry of the Confirmation Order within the time periods specified in the Swap Counterparty Plan Support Agreement, which Confirmation Order must be in form and substance reasonably satisfactory to the Consenting Swap Counterparties and the Debtors and consistent in all material respects with the terms of the Swap Counterparty Plan Support Agreement and the Plan; and

- effectuate and consummate the Plan within the time periods specified in the Swap Counterparty Plan Support Agreement.

The Debtors' failure to achieve these milestones within the specified time period may terminate the Consenting Swap Counterparties' obligations under the Swap Counterparty Plan Support Agreement.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    FIRST DAY PLEADINGS AND OTHER CASE MATTERS

#### 1.    First Day Motions

To facilitate the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors' filed certain motions with the Bankruptcy Court on the Petition Date (collectively, the "First Day Motions") seeking certain relief summarized below.  The relief sought in the First Day Motions has facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value, and will aid in the administration of the Chapter 11 Cases.  The First Day Motions include the following:

- Cash Management Motion.  On June 9, 2010, the Court entered a Final Order authorizing the Debtors to continue using their existing cash management system, bank accounts, and business forms in an effort to avoid administrative inefficiencies and burdens and authorizing the Debtors to maintain and continue using their prepetition bank accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date.

- Contract Rejection Motion.  On June 8, 2010, the Court entered an Order authorizing the Debtors to reject certain executory contracts and unexpired leases.

- Customer and Rental Programs Motion.  On June 9, 2010, the Court entered a Final Order authorizing the Debtors to honor certain prepetition obligations to their customers and to otherwise continue a number of programs that help develop customer loyalty and maximize efficient use of their assets, including: rebates, re-rentals, rental splits, and credits in the ordinary course of business.

- NOLs Motion.  On June 9, 2010, the Court entered a Final Order establishing procedures allowing the Debtors to monitor, and possibly object to, certain changes in ownership of the Debtors' common stock and certain claims of worthless stock deductions.  These procedures will enable the Debtors to maximize the value of their net operating losses and other tax attributes.

- Section 503(b)(9) Claims, Lien Claims, and Critical Vendor Claims Motion.  On June 8, 2010, the Court entered a Final Order authorizing the Debtors to satisfy the prepetition claims of certain critical vendors and suppliers of goods and services that are essential to the Debtors' day to day business operations and pay certain prepetition claims of shippers, lien claimants, and claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.

- Taxes Motion.  On June 9, 2010, the Court entered a Final Order authorizing the Debtors to pay certain sales, use, franchise and other taxes in the ordinary course of business.

- Utilities Motion.  On June 8, 2010, the Court entered an Order authorizing the Debtors to establish procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Debtors are not required to provide any additional adequate assurance.

- Wages Motion.  On June 9, 2010, the Court entered a Final Order authorizing the Debtors to (a) pay all employees their wage Claims in the ordinary course of business, (b) pay and honor employee medical and similar benefits, and (c) continue all their prepetition benefit programs, including, among others, medical, dental, 401(k), employee incentive and severance plans to the extent applicable.

## 2.  Procedural and Administrative Motions

To facilitate the efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Debtors' Chapter 11 Cases;

- approving notice, case management, and administrative procedures to govern these Chapter 11 Cases (the "Case Management Procedures");

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases;

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business;

- allowing the Debtors to prepare a list of creditors and File a consolidated list of the Debtors' 30 largest unsecured creditors; and

- establishing procedures for assuming or rejecting executory contracts and unexpired leases.

## 3.  Retention of Chapter 11 Professionals

The Debtors obtained authority to retain various Professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases, including: (a) Kirkland & Ellis LLP, as counsel to the Debtors; (b) Deloitte & Touche LLP as independent auditors and accountants; (c) Kurtzman Carson Consultants, LLC as the Notice and Claims Agent for the Debtors; (d) Togut, Segal & Segal LLP as conflicts counsel to the Debtors; and (e) Hilco Real Estate, LLC as real estate consultants to the Debtors.  The Debtors have also applied to retain (i) Miller Buckfire, as investment banker to the Debtors; (ii) AlixPartners LLC, as restructuring advisor to the Debtors; and (iii) Deloitte Tax LLP as tax advisors to the Debtors.

## 4.  Approval of Disclosure Statement and Confirmation Hearing

On the Petition Date, the Debtors filed a motion seeking an order (a) approving the adequacy of the Disclosure Statement, (b) approving the Solicitation Procedures for voting on the Plan, (c) setting dates with respect to the Voting Record Date, the Voting Deadline, the Plan Objection Deadline, and date for the Confirmation Hearing, and (d) granting related relief.  The Court set July 12, 2010, as the date for the hearing to approve the Disclosure Statement.

## 5.  Appointment of the Committee and Committee Professionals

On May 28, 2010, the United States Trustee appointed an official committee of unsecured creditors in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code (as amended from time to time, the "Committee").  The Committee members are:  (a) Footprints Asset Management; (b) Ms. Shirley L. Wong; (c) Mr. Richard D. Almandi; (d) Mr. Allen Daniel Barnett; (e) the Indenture Trustee; (f) Mr. Dan Camphausen; and (g) Mr.

K&E 17316187

Alan P. Nieman.  Other than the Indenture Trustee, each member of the Committee is a Holder of the Debtors' Senior Notes.

The Committee has applied to retain Pachulski Stang Ziehl & Jones LLP as counsel in these Chapter 11 Cases.  In addition, the Committee has applied to retain Mesirow Financial Consulting LLC, as its financial advisor, and Gleacher & Company Securities LLC as its investment banker.

### 6.     Key Employee Incentive Program and Valued Employee Incentive Program

On June 8, 2010, the Bankruptcy Court entered that certain *Order Authorizing the Debtors to Implement a Valued Employee Program for Certain Non-Insider Employees* [Docket No. 124] authorizing the Debtors to implement certain retention-based program for "non-insider" employees (the "Valued Employee Incentive Program").  On June 30, 2010, the Bankruptcy Court entered that certain *Order Approving the Debtors' Key Employee Incentive Plan* [Docket No. 211], authorizing the Debtors to provide certain performance-based incentive payments to "insider" employees (the "Key Employee Incentive Plan").  The Debtors believe that both the Valued Employee Incentive Program and the Key Employee Incentive Plan are critical aspects of their ability to stabilize their operations and maintain a highly motivated workforce for the duration of these Chapter 11 Cases.

The Debtors resolved the limited objection raised by the Committee with respect to the Key Employee Incentive Plan by removing certain incentive payments related to the timing by which the Debtors emerge from bankruptcy (the "Emergence Awards") from the relief requested in the motion.[14]  The Debtors will seek approval of the Emergence Awards in connection with confirmation of their Plan.

### 7.     Final DIP Order

On June 30, 2010, the Court entered the Final DIP Order that, among other things, approved the terms of the DIP Facility.  The DIP Facility will be used to fund the Debtors' operational needs and to refinance all outstanding Revolving Credit Facility Claims (the "Rollup").  Consequently, the Debtors do not believe any Revolving Credit Facility Claims will remain outstanding as of the Effective Date.  However, the Final DIP Order permits the Rollup to be unwound if the Liens securing the Revolving Credit Facility Claims are invalidated, avoided, subordinated, impaired, or compromised by an Order of the Bankruptcy Court or by settlement.

The Committee does not have standing or authority to pursue any Cause of Action on behalf of the Debtors or their Estates (with respect to Revolving Credit Facility Claims or otherwise) unless standing is granted by Final Order of the Bankruptcy Court upon a motion Filed by the Committee.  Under the Final DIP Order, any such motion must be filed on or before August 18, 2010, unless this deadline is extended by the Bankruptcy Court for cause shown.  Although the Committee is continuing its investigation of potential Causes of Action, the Debtors do not believe that any Causes of Action exist that would justify a grant of independent standing to the Committee given the circumstances of these Chapter 11 Cases and applicable law.  To the extent the Committee seeks standing, the Debtors would likely oppose any such request.

The Final DIP Order also granted the Debtors authority to pay certain fees necessary to secure commitments under the Exit Facility.  The Debtors believe the Exit Facility will expedite their swift exit from chapter 11 and among other things, fund distributions provided by the Plan without the delays associated with obtaining financing amidst the overhang of chapter 11 cases.

### 8.     Plan Supplement

On May 17, 2010, the Debtors filed as part of the Plan Supplement, among other things:  (a) the Backstop Unit Purchase Agreement; (b) the description of their Exit Facility; (c) the form of Warrant Agreement; (d) the First Lien Term Loan Plan Support Agreement; (f) the Purchase Agreement; and (g) the Swap Counterparty Plan Support Agreement and Swap Amendments.  The Debtors will file additional components of the Plan Supplement with the Bankruptcy Court prior to the Voting Deadline, including without limitation:  (i) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an

---

[14]  The Emergence Awards are described more fully in the *Motion of the Debtors for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan* [Docket No. 73].

"insider" under section 101(31) of the Bankruptcy Code; (ii) the Schedule of Rejected Executory Contracts and Unexpired Leases (to be filed on or prior to the Contract Rejection Deadline); (iii) a list of Non-Released Parties; (iv) the Plan Support Agreement; (v) a schedule of Causes of Action to be retained by the Purchaser; (vi) the form of the Exit Facility Documents; (vii) the form of the Management Equity Incentive Plan Agreement; (viii) a Schedule of Cure Costs; and (ix) the form of Liquidator Agreement, if applicable. The Debtors reserve the right to modify and supplement the Plan Supplement through and including the Effective Date.

**B.    CLAIMS BAR DATE**

On June 1, 2010, the Debtors filed their Schedules with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code. The Bankruptcy Code provides for a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose Claim is not scheduled in the Debtors' Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a Proof of Claim.

On June 8, 2010, the Court entered a Final Order approving (a) July 19, 2010 at 5:00 p.m. (prevailing Pacific Time) as the deadline for filing Claims in these Chapter 11 Cases, including claims under section 503(b)(9) of the Bankruptcy Code (the "Claims Bar Date"); (b) November 12, 2010 at 5:00 p.m. (prevailing Pacific Time) as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in these Chapter 11 Cases (the "Government Bar Date"); (c) the manner for Filing Proofs of Claim; and (d) procedures for giving notice of the Claims Bar Date and the Governmental Bar Date (collectively, the "Bar Dates").

**C.    EXCLUSIVITY**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Court for a period of up to 18 months from the petition date). If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Court for a period of up to 20 months from the petition date). During these exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may extend these periods upon request of a party in interest and "for cause." The Debtors filed the Plan and Disclosure Statement within the initial exclusivity period, but reserve the right to seek an extension of their exclusive right to file a plan and solicit votes thereon should the circumstances of the Chapter 11 Cases change.

**D.    PENDING LITIGATION PROCEEDINGS**

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their respective businesses. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, they do not believe that the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their businesses, financial condition, or results of operations.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases is subject to compromise, settlement, and release upon Confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with the Chapter 11 Cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

**E.    POSTPETITION MARKETING EFFORTS**

Following the Petition Date, Miller Buckfire continued their prepetition marketing efforts to solicit higher and better bids for the Debtors' business. Among other things, Miller Buckfire communicated with 56 parties during the postpetition period, including parties previously contacted through the Debtors' prepetition sales and marketing efforts, to determine (1) whether such parties could be willing to provide an indication of interest in sponsoring a Payout Event and (2) whether such parties would be willing to execute customary confidentiality

agreements (to the extent parties had not already executed confidentiality agreements) as a condition to receiving additional information about the Debtors.  As of the date hereof, approximately 40 parties have executed confidentiality agreements.  The Debtors and their advisors have also spent significant time and effort engaging various stakeholders regarding such parties' diligence, analysis, and evaluation of potential opportunities to top the de facto stalking horse bid provided by the Debtors' Plan Sponsors.  The Debtors cannot state with any certainty whether alternative bidders will seek to fund a Payout Event.

## IX.    SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Company, the Debtors' Estates, the Purchaser, all parties receiving property under the Plan and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

## A.    ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, and Priority Tax Claims, have not been classified and are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Purchaser, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date, as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims.

Except as otherwise provided in Article II.A of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Purchaser no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Purchaser or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

K&E 17316187

In the case of the Ad Hoc Group Advisor Fee Claims, such Ad Hoc Group Advisor Fee Claims will be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) for all reasonable and documented fees and expenses incurred up to the Effective Date, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

### 2.    Accrued Professional Compensation Claims

(a)    Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than 60 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

(b)    Professional Fee Escrow Account

In accordance with Article II.B.3 of the Plan, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or Acquired Assets, as applicable. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals by the Purchaser from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Accrued Professional Compensation Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Purchaser.

(c)    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than 5 days prior to the anticipated Effective Date, provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors (in consultation with the Purchaser) may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(d)    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or Purchaser, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Purchaser, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Purchaser may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    DIP Claims

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be paid in full in Cash by the Debtors on the Effective Date.

### 4.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim, (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the Debtors (on the Effective Date) or paid by the Purchaser (after the Effective Date), and such Holder,

29

provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective Date) or the Purchaser (after the Effective Date), Cash paid by the Purchaser in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than 5 years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Purchaser (after the Effective Date) and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**[15]

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth below and in Article III of the Plan. The treatment and voting rights provided to each Class for distribution purposes is specified below:

**1.    Class 1—Other Priority Claims**

(a)    *Classification*: Class 1 consists of all Other Priority Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

(i)    be paid in full in Cash in an amount equal to such Allowed Other Priority Claim by the Debtors on the Effective Date or by the Purchaser in the ordinary course of business after the Effective Date; or

(ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)    *Voting*: Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**2.    Class 2—Secured Tax Claims**

(a)    *Classification:* Class 2 consists of all Secured Tax Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Tax Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchasers, as applicable:

(i)    be paid in full in Cash by the Debtors on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or

(ii)    be paid by the Debtors or the Purchaser (as applicable), commencing on the Effective Date and continuing over a period not exceeding 5 years from the

---

[15]    Please take notice that in the event a Payout Event is triggered under the Plan, all Holders of Allowed Claims will be treated no less favorably than as provided herein.

Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Purchaser to prepay the entire amount of such Allowed Secured Tax Claim during such time period; or

(iii)    be paid regular Cash payments by the Debtors (on the Effective Date) or the Purchaser (in the ordinary course of business after the Effective Date), in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

(c)    *Voting:* Class 2 is Unimpaired, and Holders of Class 2 Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

**3.    Class 3—Other Secured Claims**

(a)    *Classification:*  Class 3 consists of all Other Secured Claims.

(b)    *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

(i)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by the Debtors on the Effective Date; or

(ii)    receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

(c)    *Voting:* Class 3 is Unimpaired, and Holders of Class 3 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

**4.    Class 4—Revolving Credit Facility Claims**

(a)    *Classification*:  Class 4 consists of all Revolving Credit Facility Claims.

(b)    *Allowance*:  The Revolving Credit Facility Claims shall be Allowed as of the Petition Date in the amount of $152.8 million, plus interest and fees due and owing under the Revolving Credit Facility both prior to and after the Petition Date through the Effective Date, subject to such Claims being partially paid in Cash with certain proceeds of the DIP Facility, and such Claims shall not be subject to any request for setoff or recoupment.

(c)    *Treatment*: Except to the extent that (i) a Holder of an Allowed Revolving Credit Facility Claim agrees to a less favorable treatment or (ii) such Revolving Credit Facility Claims have been paid in full with proceeds from the DIP Facility or otherwise, in exchange for the full and final satisfaction, settlement, release, and compromise of each and every Allowed Revolving Credit Facility Claim, each Holder of such Claim shall be paid in full

31

in Cash by the Debtors in respect of such Allowed Revolving Credit Facility Claim on the Effective Date, or as soon as reasonably practicable thereafter by the Purchaser or Disbursing Agent.

(d)    *Voting*: Class 4 is Unimpaired, and Holders of Class 4 Revolving Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Revolving Credit Facility Claims are not entitled to vote to accept or reject the Plan.

**5.    Class 5—Secured Swap Claims**

(a)    *Classification*: Class 5 consists of all Secured Swap Claims.

(b)    *Allowance*: The Secured Swap Claims shall be Allowed in an aggregate amount equal to $22.4 million.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Secured Swap Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Swap Claim, each Holder of such remaining Allowed Secured Swap Claim shall be entitled to the treatment set forth in the applicable Swap Amendment.

(d)    *Voting*: Class 5 is Impaired. Therefore, Holders of Allowed Class 5 Secured Swap Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

**6.    Class 6—First Lien Term Loan Claims**

(a)    *Classification*: Class 6 consists of all First Lien Term Loan Claims.

(b)    *Allowance*: The First Lien Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $90.0 million, including interest and fees due and owing under the First Lien Term Loan as of the Effective Date pursuant to the terms of the First Lien Credit Agreement and related documents.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Term Loan Claim, each Holder of such Allowed First Lien Term Loan Claim shall receive:

(i)    **If the Payout Event occurs:** Payment in full in Cash in respect of such Allowed First Lien Term Loan Claim, including payment on account of any accrued but unpaid prepetition interest and postpetition interest at the default contract rate.

(ii)    **If the Payout Event does not occur:**

(A)    At the election of such Holder, either:

(I)    the First Lien Term Loan Cash Payment; <u>or</u>

(II)    such Holder's (x) Pro Rata share of 100% of the New Common Units (subject to dilution by the Rights Offering Units, the Second Lien Term Loan Equity Election, the Warrants, if issued, and the Management Equity Incentive Plan) and (y) Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Rights Offering Amount less the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants in

32

connection with the Rights Offering; <u>provided</u> <u>that</u> Holders of First Lien Term Loan Claims that are not First Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were First Lien Term Loan Rights Offering Participants; <u>and</u>

(B)     if Class 8 Senior Notes Claims or Class 9 General Unsecured Claims votes in favor of the Plan, the Cash Payment; <u>provided</u> <u>that</u> the Cash Payment shall be transferred by gift for distribution to the Holders of Class 8 Senior Notes Claims and/or Class 9 General Unsecured Claims on a Pro Rata basis if such Class or Classes vote to accept the Plan.

(d)     *Voting*: Class 6 is Impaired. Therefore, Holders of Class 6 First Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)     *Distributions*: Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Cash Payment shall receive its Plan distribution in Cash from the Debtors on the Effective Date. Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

**7.     Class 7—Second Lien Term Loan Claims**

(a)     *Classification*: Class 7 consists of all Second Lien Term Loan Claims.

(b)     *Allowance*: The Second Lien Term Loan Claims shall be Allowed in the amount of $298.5 million including accrued but unpaid interest as of the Petition Date.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Term Loan Claim, each Holder of such Allowed Second Lien Term Loan Claim shall receive:

(i)     **If the Payout Event occurs:** Holders of Allowed Class 7 Second Lien Term Loan Claims shall be treated no less favorably than if the Payout Event did not occur.

(ii)    **If the Payout Event does not occur and Class 7 votes to accept the Plan:**

(A)     At the election of each Holder, such Holder's Pro Rata share of either:

(I)     the Second Lien Term Loan Cash Payment; <u>or</u>

(II)    the Second Lien Term Loan Equity Election; <u>and</u>

(B)     such Holder's Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Second Lien Term Loan Rights Offering Amount; <u>provided</u> <u>that</u> Holders of Second Lien Term Loan Claims that are not Second Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the

33

Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were Second Lien Term Loan Rights Offering Participants.

(2) **If the Payout Event does not occur and Class 7 votes to reject the Plan:** Such Holder's Pro Rata share of the Warrants to purchase 5.0% of the New Common Units to be issued and outstanding on the Effective Date.

(d) *Voting*: Class 7 is Impaired. Therefore, Holders of Class 7 Second Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e) *Distributions*: Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Cash Payment shall receive its Plan distribution in Cash and Rights from the Debtors on the Effective Date. Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

**8. Class 8—Senior Notes Claims**

(a) *Classification*: Class 8 consists of all Senior Notes Claims.

(b) *Allowance*: The Senior Notes Claims shall be Allowed in the aggregate amount of $35.9 million including accrued but unpaid interest as of the Petition Date.

(c) *Treatment*: Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim, each Holder of such Allowed Senior Notes Claim shall receive from the Debtors, on the Effective Date, or the Purchaser or Disbursing Agent, as soon after the Effective Date as reasonably practicable:

(i) **If Class 8 votes to accept the Plan:** No recovery on account of such Claims; provided that Holders of Allowed Class 8 Senior Notes Claims shall receive by gift their Pro Rata share of the Cash Payment.

(ii) **If Class 8 votes to reject the Plan:** No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(d) *Voting*: Class 8 is Impaired. Therefore, Holders of Allowed Class 8 Senior Notes Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

**9. Class 9—General Unsecured Claims**

(a) *Classification*: Class 9 consists of all General Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive from the Debtors, on the Effective Date, or the Purchaser or the Disbursing Agent, as soon after the Effective Date as reasonably practicable:

(i) **If Class 9 votes to accept the Plan:** No recovery on account of such Claims; provided that Holders of Allowed Class 9 General Unsecured Claims shall receive by gift their Pro Rata Share of the Cash Payment.

(ii)     **If Class 9 votes to reject the Plan:**  No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(c)     *Voting*.  Class 9 is Impaired.  Therefore, Holders of Allowed Class 9 General Unsecured Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

10.     **Class 10—Intercompany Claims**

(a)     *Classification*:  Class 10 consists of all Intercompany Claims.

(b)     *Treatment*:  Holders of Allowed Class 10 Intercompany Claims shall not receive any distribution on account of such Claims; provided that the Debtors or the Purchaser reserve the right to reinstate any Class 10 Intercompany Claims in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 10 is Unimpaired, and Holders of Class 10 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.     **Class 11—Section 510(b) Claims**

(a)     *Classification*:  Class 11 consists of all Section 510(b) Claims.

(b)     *Treatment*:  Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims, and Section 510(b) Claims shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

(c)     *Voting*:  Class 11 is Impaired, and Holders of Class 11 Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 11 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

12.     **Class 12—Intercompany Interests**

(a)     *Classification*:  Class 12 consists of all Intercompany Interests.

(b)     *Treatment*:  Holders of Allowed Class 12 Intercompany Interests shall not receive any distributions on account of such Interests; provided that the Debtors or the Purchaser reserve the right to reinstate any or all Class 12 Intercompany Interests on or after the Effective Date.

(c)     *Voting*:  Class 12 is Unimpaired, and Holders of Class 12 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 12 Intercompany Interests are not entitled to vote to accept or reject the Plan.

13.     **Class 13—Equity Interests in the Debtors**

(a)     *Classification*:  Class 13 consists of all Equity Interests in the Debtors.

(b)     *Treatment*:  Holders of Equity Interests in the Debtors will not receive any distribution on account of such Equity Interests, and Equity Interests in the Debtors shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

(c)     *Voting*:  Class 13 is Impaired, and Holders of Class 13 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 13 Equity Interests are not entitled to vote to accept or reject the Plan.

35

### 14.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Purchaser, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 15.    Class Acceptance Requirement

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

### 16.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 17.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### 18.    Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 19.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## C.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    Sources of Consideration for Plan Distributions

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions. All amounts and securities necessary for the Debtors (on the Effective Date) or the Purchaser or Disbursing Agent (after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the liabilities assumed or consideration paid by the Purchaser to the Debtors in the Sale Transaction (including the Cash proceeds received by the Purchaser in connection with the Rights Offering and/or pursuant to the Backstop Unit Purchase Agreement, and the New Common Units and Warrants (if required) issued by the Purchaser to the Debtors), the Exit Facility and Cash of the Debtors.  Notwithstanding anything herein to the contrary or in the Purchase Agreement, the Purchaser shall assume all liability for the distributions provided on account of all Allowed Claims against the Debtors as provided herein that are not satisfied by a distribution made by the Debtors on the Effective Date.

K&E 17316187

The sources and uses of consideration for Plan Distributions as of a hypothetical Effective Date can be illustrated as follows:[16]

**$ millions**

| Transaction Sources | | Transaction Uses | |
|---|---|---|---|
| *Cash Sources* | | *Cash Uses* | |
| Initial Draw on Exit Facility | $84.4 | Repayment of DIP Facility | $146.4 |
| Rights Offering Amount | 118.9 | Swap Payment | 7.5 |
| | | First Lien Term Lender Distribution | 30.3 |
| | | Second Lien Term Lender Distribution | 10.0 |
| | | Unsecured Creditors' Gift | 0.4 |
| | | Fees and Expenses | 8.9 |
| *Non-Cash Sources* | | *Non-Cash Uses* | |
| Conversion of First Lien Term Loan | 61.4 | Conversion of First Lien Term Loan | 61.4 |
| Remaining Swap Liability | 14.9 | Remaining Swap Liability | 14.9 |
| **Total Sources** | **$279.7** | **Total Uses** | **$279.7** |

2.      **Rights Offering**

The Plan contemplates that the Debtors shall raise the Rights Offering Amount of up to $118.9 million through the Rights Offering. The actual Rights Offering Amount may be less than $118.9 million if First Lien Term Loan Lenders (other than the Plan Sponsors) and/or eligible Second Lien Term Loan Lenders elect to receive distributions in the form of equity rather than cash. In no event will the Rights Offering Amount be less than approximately $80 million; provided that if a Payout Event occurs such that all Allowed First Lien Term Loan Claims have been indefeasibly paid in full in Cash on the Effective Date, then there shall be no Rights Offering and the Rights Offering Participants and the Backstop Parties shall be relieved of any obligations related thereto and under the Commitment Letter and the Backstop Unit Purchase Agreement.

On the Effective Date, the Debtors shall consummate the Rights Offering, through which each Rights Offering Participant, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, shall have the opportunity to purchase Rights Offering Units pursuant to the Rights Offering Documents. The Rights Offering will dilute the New Common Units issued on account of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election pursuant to Article III.B.6 of the Plan and Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election pursuant to Article III.B.7 of the Plan. The Rights Offering will be backstopped by the Backstop Parties on a several (not joint) basis in accordance with the terms and conditions of the Backstop Unit Purchase Agreement. The Rights Offering shall be conducted and implemented in accordance with the Rights Offering Procedures.

3.      **Exit Facility**

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Purchaser in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Purchaser to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents. The Purchaser may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs. To the extent Revolving Credit Facility Claims are not rolled up or

---

[16]    This presentation is set forth for illustrative purposes only. The analysis assumes the following: (a) a December 2010 exit; (b) all First Lien Term Loan Lenders other than the Plan Sponsors elect to receive the First Lien Term Loan Cash Payment; and (c) all Second Lien Term Loan Lenders elect to receive the Second Lien Term Loan Cash Payment. Figures may not total due to rounding. This presentation is set forth for illustrative purposes only. Actual transaction sources and uses may differ materially from this illustrative scenario.

K&E 17316187

otherwise satisfied by the DIP Facility as of the Effective Date, the remaining Revolving Credit Facility Claims shall be paid in full in Cash with the proceeds from the Exit Facility.

Upon the Confirmation Date, (1) the Purchaser is authorized to execute and deliver the Exit Facility Documents and perform its obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (2) subject to the occurrence of the Effective Date the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Purchaser enforceable in accordance with their respective terms.

### 4.        The Purchase Agreement

The Plan contemplates that Plan distributions will be funded by, among other things, proceeds available to the Debtors under the Purchase Agreement.  Under the Purchase Agreement, sale proceeds include:  (a) the cash proceeds received by the Purchaser in connection with the Rights Offering and pursuant to the Backstop Unit Purchase Agreement, (b) New Common Units in the Purchaser (other than New Common Units issued pursuant to the Rights Offering), and (c) in the event that Class 7 Second Lien Term Loan Claims do not vote to accept the Plan in accordance its terms, the Warrants.  The Debtors believe the transaction structure contemplated by the Plan in conjunction with the Purchase Agreement provides more favorable tax consequences than alternative structures.  This structure is also available to alternative bidders, regardless of whether such alternative bidders are existing creditors, third parties, or a combination thereof.

(a)        Issuance of New Common Units

The Purchaser shall issue the New Common Units to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election in accordance with Article III.B.6 of the Plan and/or Holders of Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election in accordance with Article III.B.7 of the Plan.  New Common Units shall also be (1) offered and sold pursuant to the Rights Offering and (2) reserved for the Management Equity Incentive Plan.

Each of the New Common Units issued and distributed pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(b)        Warrants

If the Payout Event does not occur and provided, that Class 7 does not vote to accept the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Purchaser shall issue the Warrants to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed Class 7 Second Lien Term Loan Claims as of the Voting Record Date in accordance with Article III.B.7 of the Plan.

(c)        Vesting of Assets in the Purchaser

Except as otherwise provided herein or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities shall vest in the Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility).  On and after the Effective Date, except as otherwise provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(d)        Assumption of Liabilities by the Purchaser

The Purchaser shall assume the Assumed Liabilities pursuant to Section 2.3 of the Purchase Agreement, including all (a) distributions under the Plan (other than those distributions made by the Debtors on the Effective Date or the Liquidator on or after the Effective Date) and (b) costs associated with the Wind Down.  For the avoidance of doubt, and notwithstanding anything herein or in the Purchase Agreement to the contrary, the

38

Purchaser assumes and shall be deemed to assume all liability for the distributions or treatment provided on account of all Claims against, obligations of, or Interests in the Debtors as set forth herein, and the Purchaser shall assume all liability for Administrative Claims and the costs and expenses associated with the Wind Down, including any distributions on account of Allowed Claims thereunder.

(e)     Powers of the Purchaser

From and after the Effective Date and continuing through the date of entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear, be heard on and participate in matters brought before the Bankruptcy Court or any other court with jurisdiction over the Chapter 11 Cases; (2) be entitled to notice and opportunity for hearing on all such issues; (3) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; and (4) have the right to object to any and all Claims or Interests.

**5.      General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

**6.      Exemption from Section 1145 of the Bankruptcy Code, Section 5 and Section 4(2) of the Securities Act**

Except as set forth in the immediately succeeding paragraph, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Rights, the New Common Units, and the Warrants, shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.

The New Common Units to be issued to the Backstop Parties in connection with the Backstop Unit Purchase Agreement shall be exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities pursuant to the exemptions set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder.  In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including, the Rights, the New Common Units, and the Warrants shall be subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions, if any, on the transferability of such securities and instruments; and (d) applicable regulatory approval, if any.

The Securities and Exchange Commission (the "SEC") has provided guidance to determine whether an entity constitutes a "successor" pursuant to section 1145 of the Bankruptcy Code.  For example, the SEC has previously concluded that a purchaser acquiring substantially all of a debtor's assets may issue securities as a successor under the section 1145 exemption—even if the purchaser only assumes post-closing liabilities of the debtor.  See 8 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1145.02[1][a][ii] (16th rev. ed.).  The SEC has also determined that an affiliated entity acquiring a debtor's assets may issue its own securities as a successor.  Id.  As a result, the Debtors believe New Common Units issued pursuant to the Plan should be exempt from registration under section 1145 of the Bankruptcy Code.

**7.      Listing of New Common Units**

None of the New Common Units (including the Rights Offering Units and any New Common Units issuable upon exercise of the Warrants), the Rights, or the Warrants will be listed on a national securities exchange and the Purchaser will not be a reporting company under the Securities Exchange Act.

8.        **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Purchase Agreement, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Purchaser and its successors and assigns.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Claims, encumbrances or Interests pursuant to the applicable sections of the Bankruptcy Code.

9.        **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtors under the Senior Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; (b) the obligations of the Debtors under the DIP Facility, the Revolving Credit Facility, the First Lien Term Loan and the Second Lien Term Loan, shall be fully released, settled, and compromised as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; and (c) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; <u>provided that</u> notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including the Senior Notes Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, settled, and compromised.

10.        **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Purchaser may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan and the Purchase Agreement.  For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein or in the Purchase Agreement shall constitute a change of control under any agreement, contract or document of the Debtors or the Purchaser, as applicable.

11.        **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan and the Purchase Agreement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers or officers of the Debtors or the Purchaser, or any other Entity or Person, including: (a) entry into the Purchase Agreement; (b) adoption or assumption, as applicable, and assignment to the Purchaser of Executory Contracts and Unexpired Leases; (c) selection of the managers and officers for the Purchaser; (d) the execution of and entry into the Exit Facility Documents; (e) the issuance and distribution of the Rights as provided herein; (f) the issuance and distribution of the New Common

Units as provided herein; (g) the issuance and distribution of the Warrants, if applicable, as provided herein; (h) adoption of the Management Equity Incentive Plan; and (i) all other actions contemplated by the Plan and the Purchase Agreement (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or the Purchase Agreement involving the company structure of the Debtors or the Purchaser, and any company action required by the Debtors or the Purchaser in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors or the Purchaser. Consequently, Intercompany Interests shall be retained, and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers or authorized persons of the Debtors or the Purchaser (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan and the Purchase Agreement (or necessary or desirable to effect the transactions contemplated by the Plan or the Purchase Agreement) in the name of and on behalf of the Debtors or the Purchaser, as applicable, including (a) the Exit Facility and the other Exit Facility Documents and (b) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K of the Plan be effective notwithstanding any requirements under non-bankruptcy law.

### 12.        Effectuating Documents and Further Transactions

On and after the Effective Date, the Purchaser and the managers, officers, authorized persons and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, and the securities issued pursuant to the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, in the name of and on behalf of the Purchaser, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement.

### 13.        Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Purchase Agreement shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (a) the Sale Transaction; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) any Restructuring Transaction; (e) the issuance, distribution and/or sale of any of the New Common Units, the Rights, the Warrants (if issued) and any other securities of the Debtors or the Purchaser; or (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Purchase Agreement, including: (i) any merger agreements; (ii) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (iii) deeds; (iv) bills of sale; or (v) assignments executed in connection with any Restructuring Transaction occurring under the Plan or the Purchase Agreement.

### 14.        D&O Liability Insurance Policies

In the ordinary course of business, the Debtors maintain customary insurance coverage for current and former directors and officers, including excess directors' and officers' liability and side-A coverage, employment practice liability coverage, and fiduciary liability coverage. Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations

assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

### 15.    Board Representation

The Purchaser shall be managed by the New Board which will consist of 5 members.  The Backstop Parties described in clause (a) of the definition of "Backstop Parties" shall have the right to appoint 2 members of the New Board as of the Effective Date and the Backstop Parties described in clause (b) of the definition of "Backstop Parties" shall have the right to appoint 2 members of the New Board as of the Effective Date.  The fifth member of the New Board shall be the Chief Executive Officer of the Purchaser.  To the extent known, the Plan Supplement will list the members of the New Board identified as of the date of the filing thereof.

### 16.    Indemnification Provisions

Notwithstanding anything herein to the contrary or pursuant to the termination, dissolution, or wind down of the Debtors, the Debtors (if necessary to continue all Indemnification Provisions in full force) as of the Effective Date, shall be deemed to have assumed all Indemnification Provisions and assigned such provisions to the Purchaser as though such Indemnification Provisions were to have full force and effect; provided that the assumption by the Debtors of the Indemnification Provisions and the assignment thereof to the Purchaser shall not be deemed to be an assumption or assignment of the contract, agreement, resolution, instrument or document in which such Indemnification Provisions are contained, memorialized, agreed to, embodied, or created (or any of the other terms or provisions thereof) unless, and only to the extent that, such contract, agreement, resolution, instrument, or document is an Acquired Asset  All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers, and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions or transactions occurring prior to the Effective Date; provided that notwithstanding anything herein to the contrary, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter.

### 17.    Management Equity Incentive Plan

On or before the Effective Date, the Purchaser shall execute the Management Equity Incentive Plan Agreement which will provide that, among other things, 10% of the New Common Units, on a fully-diluted basis, shall be reserved for issuance in the form of unit options, of which, (a) options to purchase 8% of the New Common Units on a fully diluted basis will be allocated and issued to participants, as such participants are determined by the Debtors and (b) options to purchase 2% of the New Common Units on a fully diluted basis will be reserved for future issuances as determined by the New Board in its sole discretion.  Although the terms of the Management Equity Incentive Plan have not been finalized, the Debtors anticipate that participants will include their senior management, including the Debtors' current chief executive officer, chief financial officer, and certain senior executives.  The Debtors shall File the Management Equity Incentive Plan Agreement as part of the Plan Supplement.

### 18.    Emergence Awards

On the Effective Date, the Emergence Awards will be deemed approved in their entirety without any further action by the Debtors or the Purchaser and the Debtors will be authorized to make all payments with respect to the Emergence Awards on the Effective Date.

### 19.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Release provided by Article VIII.C and Article VIII.E of the Plan), the Purchaser shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Purchaser's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Purchaser may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Purchaser.  No Entity may

K&E 17316187

rely on the absence of a specific reference in the Plan, the Plan Supplement, the Purchase Agreement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Purchaser, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Purchaser have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Purchaser, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Purchaser expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### 20.    Wind-Down and Dissolution of the Debtors

On and after the Effective Date, the Liquidator will implement, and the Purchaser will oversee and fund, the Wind Down pursuant to the Liquidator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Liquidator shall: (a) change the business and corporate names of each of the Debtors to new names bearing no resemblance to any of the present names of such Debtor so as to permit the use of such names by the Purchaser, (b) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement, (c) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (d) complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (e) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of this Plan.  The filing by the Liquidator of each Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members, the board of directors or board of managers of each such Debtor.  Notwithstanding anything herein or in the Purchase Agreement, to the contrary, the Purchaser shall assume all liability for all costs, expenses, or claims arising from or related to the Wind Down, including the costs and expenses associated with any Claims resolution or similar process following the Effective Date (whether undertaken pursuant to Article VII of the Plan or otherwise).  Notwithstanding anything herein to the contrary, the Purchaser or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.

### 21.    Liquidator

Prior to or on the Effective Date, the Liquidator may be designated by the Debtors pursuant to the terms of the Liquidator Agreement for purposes of conducting the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders (subject, at all times, to the oversight of the Purchaser), and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidator.  All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date, or transferred pursuant to the Purchase Agreement, shall be transferred to the Liquidator and managed and distributed by the Liquidator pursuant to the terms of the Liquidator Agreement and shall be held in the name of the Debtors free and clear of all Claims against the Debtors and Interests in the Debtors except for rights to such distributions provided to Holders of Allowed Claims as provided herein.  Any and all costs and expenses incurred by the Liquidator in connection with the Wind Down shall be paid by the Purchaser.

As provided in the Liquidator Agreement, the Entity chosen to be the Liquidator shall have such qualifications and experience to enable the Liquidator to perform its obligations under this Plan and under the Liquidator Agreement.  Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Liquidator, the Purchaser shall designate another Entity to become Liquidator and such Entity will become the successor Liquidator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidator.  The Liquidator shall be compensated and

43

reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidator Agreement by the Purchaser.

## D.        TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.        Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected, as mutually agreed upon by the Debtors and the Purchaser; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject, as mutually agreed upon by the Debtors and the Purchaser, of a motion to reject filed on or before the Confirmation Date; (4) is identified as an Executory Contract or Unexpired Lease to be rejected, as mutually agreed upon by the Debtors and the Purchaser, pursuant to the Plan Supplement; (5) is not an Acquired Asset; or (6) without limiting the generality of clause (5), is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Prior to entry of the Disclosure Statement Order, the Debtors shall file the Schedule of Rejected Executory Contracts and Unexpired Leases. The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Rejected Executory Contracts and Unexpired Leases in the manner set forth in the Purchase Agreement. Notwithstanding anything to the contrary in the Plan, unless otherwise approved in advance by the Purchaser, the Debtors shall not assume and assign to the Purchaser any employment agreement and employee benefit plan except for those employment agreements and employee benefit plans specifically set forth on Schedule 2.1(e) to the Purchase Agreement and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Purchaser an amendment, consent and acknowledgment agreement described in Section "C" on Schedule 2.1(e) to the Purchase Agreement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date. Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph and or anything contrary herein, the Debtors and/or the Purchaser reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date. Moreover, notwithstanding the foregoing paragraph, after the Effective Date, the Purchaser shall have the right to terminate, amend, or modify any Executory Contracts, Unexpired Leases, leases, or other agreements without approval of the Bankruptcy Court.

### 2.        Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan or the Purchase Agreement that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Cost or by an agreed-upon waiver of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Purchaser and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

On or prior to the fourteenth (14th) day following approval of the Disclosure Statement Order, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be sent to applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be filed, served and actually received by the Debtors by the Confirmation Objection Deadline. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such matters.

K&E 17316187

In the event of a dispute regarding: (1) the amount of any Cure Cost; (2) the ability of the Purchaser to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Purchaser, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or after the Effective Date, the Purchaser, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

### 3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) the Claims Bar Date established in the Chapter 11 Cases.

Any Claims arising from the rejection of an Executory Contract or Unexpired Leases for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

### 4.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Purchaser expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or goods previously received, by the contracting Debtors or the Purchaser, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### 5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or the Purchase Agreement, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan or the Purchase Agreement. Nothing in the immediately preceding sentence shall be deemed to limit, supersede or change the provisions set forth in Article V.G of the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 6.    Insurance Policies

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the applicable Debtor under the Plan and the Bankruptcy Code and shall be assumed by the applicable Debtor and assigned to the Purchaser in accordance with the terms of the Purchase Agreement and the Plan.

### 7.    Compensation and Benefit Programs

All employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their respective employees, retirees and directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases and will be rejected unless any of the foregoing is an Acquired Asset in accordance with the Purchase Agreement, in which case the same shall be assumed and assigned to the Purchaser pursuant to the terms of the Purchase Agreement and the Plan.

### 8.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan or in the Purchase Agreement, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 9.    Non-Occurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming and assigned or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## E.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan.

K&E 17316187

2.      **Distributions Generally; Disbursing Agent**

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Purchaser as Disbursing Agent, the Liquidator, or such other Entity designated by the Purchaser as a Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3.      **Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement**

Notwithstanding anything to the contrary contained herein: (a) the Purchase Price (as such term is defined in the Purchase Agreement) shall be used solely to make distributions under the Plan, whether or not such distributions are made on the Effective Date or thereafter; and (b) for purposes of distributions to be made of Estate assets received or receivable from the Purchaser pursuant to the Purchase Agreement in the form of the Purchase Price as provided herein, such assets shall be distributed solely by (i) prior to or on the Effective Date, the Debtors and (ii) following the Effective Date, the Liquidator on behalf of the Debtors.

4.      **Rights and Powers of Disbursing Agent**

        (a)      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Purchase Agreement; (2) make all distributions contemplated hereby; (3) employ professionals to represent it with respect to its responsibilities; and (4) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Purchase Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        (b)      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Purchaser.

5.      **Distributions on Account of Claims Allowed After the Effective Date**

        (a)      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

        (b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Purchasers, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

        (a)      Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the

47

address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

Distributions to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims shall (1) be made to the First Lien Credit Facility Administrative Agent and/or the Second Lien Term Loan Administrative Agent, as applicable, for the benefit of the respective Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively, as provided herein and under the Purchase Agreement and (2) be deemed completed when made to the First Lien Credit Facility Administrative Agent and the Second Lien Term Loan Administrative Agent, as applicable.  Distributions to Holders of Senior Notes Claims shall (i) be made to the Indenture Trustee for the benefit of Holders of Senior Notes Claims and (ii) be deemed completed when made to the Indenture Trustee.

Under the Second Lien Credit Agreement, distributions provided on account of Second Lien Term Loan Claims are required to be applied:  first, to all fees, costs, and expenses incurred by or owing to the Second Lien Agent and thereafter any Second Lien Term Loan Lender; second, to accrued and unpaid interest due on account of Second Lien Term Loan Claims; third, to the principal amount of outstanding Second Lien Term Loan Claims; and fourth to any other obligations of the Debtors.  Accordingly, the recoveries to Holders of Second Lien Term Loan Claims may be less than as set forth in Article IX.B herein.

(b)        Minimum Distributions; De Minimis Distributions

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Common Units and such fractions shall be deemed to be zero.  No cash payment of less than $50.00 dollars shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

(c)        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 6 months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Purchasers (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released, settled, compromised, and forever barred.

(d)        Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

(e)        Surrender of Cancelled Instruments or Securities Relating to Senior Notes Claims

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Senior Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.  The Indenture Trustee may (but shall not be required to) request registered Holders to surrender their Senior Notes for cancellation.

7.        **Compliance with Tax Requirements and Allocations**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of

48

information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

8.      **Claims Paid or Payable by Third Parties**

(a)      Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Purchaser after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Allowed Claim receives payment in full on account of such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Liquidator, the Disbursing Agent, or the Purchaser on account of such Claim, such Holder shall, within 2 weeks of receipt thereof, repay or return the distribution to the Purchaser or the Liquidator, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan.

(b)      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Purchaser, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.      **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

1.      **Allowance of Claims**

On or after the Effective Date, the Purchaser shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan, in the Purchase Agreement or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.      **Prosecution of Objection to Claims**

The Debtors prior to and on the Effective Date and the Purchaser after the Effective Date, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Purchaser may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  From and after the Effective Date, the Purchaser shall have the sole authority to

49

administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

### 3. Claims Estimation

The Debtors prior to and on the Effective Date and the Purchaser after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Purchaser have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Purchaser, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Purchaser, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Expungement or Adjustments to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Debtors or the Purchaser, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Purchaser, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 5. Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

## G. DISALLOWANCE OF CLAIMS

All Claims of any Entity from which property is sought by the Debtors or the Purchaser under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Purchaser allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Purchaser, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS OR THE PURCHASER, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

K&E 17316187

## H.    AMENDMENTS TO CLAIMS

On or after the Effective Date, except as provided in Article II.A of the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Purchaser, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## I.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Purchaser may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

### 2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Purchaser, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III.B.11 of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

### 3.    Summary of Releases[17]

As set forth more fully below and in the Plan, the Plan provides customary releases for certain Entities.  Generally, the Debtors will release Claims and Causes of Action against, among others, the Debtors' current and former directors and officers, and the First Lien Term Loan Lenders, Second Loan Term Loan Lenders, and the Backstop Parties.  Similarly, the Plan provides that certain stakeholders (including First Lien Term Loan Lenders, Second Loan Term Loan Lenders, and the Backstop Parties) will provide releases to one another and those parties to whom the Debtors have provided a release.  However, no party will be deemed to provide a release if such party (a) votes to reject the Plan, (b) does not vote to accept or reject the Plan but opts out of providing a release, or (c) is in a Class that is deemed to reject the Plan.

### 4.    Debtor Release

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE PURCHASER WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING:

---

[17]    The foregoing summary of the releases provided by the Plan is qualified in its entirety by reference to the Plan.  Creditors considering whether to vote to accept or reject the Plan should carefully review the Debtor Release and Third Party Release provisions set forth at Article VIII.C and Article VIII.D of the Plan, respectively.

(1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, EACH OF THE DEBTORS AND THE DEBTORS' ESTATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS UNDER THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE PURCHASER HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE PURCHASER ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

5.    **Third Party Releases**

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES

(REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A DEBTOR RELEASEE OR A THIRD PARTY RELEASEE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY; (2) ARISING UNDER THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE PURCHASER MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

6.    **Exculpation**

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Plan Support Agreement, the Disclosure Statement, the Restructuring Transactions, the Rights Offering, the Backstop Unit Purchase Agreement, the issuance, distribution and/or sale of any of the New Common Units

(including Rights Offering Units and New Common Units issuable upon exercise of the Warrants), the Rights, the Warrants (if issued) or any other security, Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

7.    **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OF THE PLAN; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OF THE PLAN; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.E); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, THE BACKSTOP PARTIES, THE AD HOC GROUP, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED HEREIN SHALL BE

CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

### 8.    Setoffs

Except as otherwise provided herein, the Debtors or the Purchaser, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Purchaser, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Purchaser of any such Claims, rights, and Causes of Action that the Purchaser may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Purchaser, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

## J.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

(a)    The Plan Support Agreement shall be in full force and effect;

(b)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Ad Hoc Group and such Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

(c)    The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be in form and substance reasonably acceptable to the Debtors and to the Ad Hoc Group;

(d)    The Backstop Party Fees shall have been paid in full in Cash in accordance with the Backstop Unit Purchase Agreement, the Plan Support Agreement, the Plan, and the interim and final orders approving the DIP Facility;

(e)    The Exit Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facility shall have occurred;

(f)    The Debtors shall have assumed the Backstop Unit Purchase Agreement and the Commitment Letter;

(g)    All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

(h)     The Debtors shall have paid in full in Cash all reasonable and documented Ad Hoc Group Advisor Fee Claims; and

(i)     All conditions to closing under the Backstop Unit Purchase Agreement and the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

### 2.     Waiver of Conditions Precedent

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan may be waived only by consent of the Debtors and the Purchaser.

### 3.     Effective Date

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A of the Plan have been satisfied or waived.

### 4.     Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## K.     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 1.     Payout Event

The Plan contemplates the possibility of obtaining higher or better distributions to all Classes receiving distributions under the Plan pursuant to the Payout Event.  If the Payout Event occurs, the Debtors shall File a modified Plan (including any necessary conforming and immaterial changes thereto) evidencing the Payout Event and shall not be required to make additional disclosures or resolicit votes for such modified Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Pursuant to and as more fully detailed in the Payout Event Procedures, potential bidders of a Payout Event may present to the Debtors a topping proposal that provides higher or better recoveries to creditors than those contemplated by the Sale Transaction under the Plan at any time up to the Payout Event Deadline; provided that such topping proposal provides the Debtors with sufficient Cash or committed financing to (a) indefeasibly pay all First Lien Credit Facility Lenders in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in the Plan.  If at least one such topping proposal is received by the Debtors prior to the Payout Event Deadline, the Debtors will file and serve a notice of the highest or best bid received, no later than three (3) Business Days following the Payout Event Deadline and otherwise in accordance with the Payout Event Procedures.  Please refer to Article III.B hereof for a detailed discussion of the Payout Event Procedures.

### 2.     Modification and Amendments

Subject to the limitations contained herein, and in the Plan Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

K&E 17316187

3.      **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

4.      **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

L.      **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Purchaser amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action and Insider Causes of Action;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or this Disclosure Statement;

57

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 of the Plan;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Plan Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to payments or distributions under the Plan or any transaction contemplated therein;

16.     Consider any and all modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Final Order, including the Confirmation Order;

17.     Determine requests for the payment or distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine any and all disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine any and all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     Enforce any orders previously entered by the Bankruptcy Court;

22.     Resolve any disputes arising under the Purchase Agreement, the Backstop Unit Purchase Agreement, the Warrant Agreement, the Liquidator Agreement, or the Plan Support Agreement;

23.     Hear any other matter not inconsistent with the Bankruptcy Code;

24.     Enter an order concluding or closing the Chapter 11 Cases; and

25.     Enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

58

**M.**     **MISCELLANEOUS PROVISIONS**

**1.**     **Immediate Binding Effect**

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether any such Holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or in the Purchase Agreement, each Entity acquiring property under the Plan or the Confirmation Order, and any and all Non-Debtor parties to executory contracts and unexpired leases with the Debtors.  All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**2.**     **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement.  The Debtors or the Purchasers, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Purchase Agreement.

**3.**     **Payment of Statutory Fees**

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Purchaser (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**4.**     **Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases.

**5.**     **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**6.**     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

**7.**     **Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Purchaser shall be served on:

59

Neff Corp.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attn.: Mark Irion

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Attn.: Anup Sathy, P.C.

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn.: Ray C. Schrock and Brian S. Lennon

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn.:  Kristopher M. Hansen and Jayme T. Goldstein

**8.      Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**9.      Entire Agreement**

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Backstop Unit Purchase Agreement, and the Purchase Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**10.      Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

## X.      VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## A.      VALUATION OF THE DEBTORS

The proposal set forth by the Plan Sponsors is the culmination of a five-month marketing process during which Miller Buckfire contacted approximately 40 parties (including financial and strategic investors) and more

than 20 of these interested parties executed confidentiality agreements and were provided with additional information regarding the Debtors.  After initial indications of interest were due on January 19, 2010, the Debtors received multiple indications of interest for a potential sale/investment transaction.  The Debtors and their advisors worked diligently to develop various aspects of the proposals received and had several rounds of active bidding by a third party investor and the Plan Sponsors which generated concessions and increased the value of the third party investor and Plan Sponsors' proposals.  After exhaustive negotiations in April 2010 with the Plan Sponsors and the third party investor regarding the Alternative Proposal, and after analyzing, among other things, the relative values provided by each proposal, the execution risk associated with each proposal, and other factors associated with the assumption of liabilities, the Debtors' Board of Directors, in consultation with their advisors and the consideration of such proposals by their Restructuring Advisory Committee, selected the Plan Sponsors as their *de facto* stalking horse bidder for the restructuring process.  A detailed description of the sales/investment and marketing process is set forth in Article VI.B above.

In conjunction with the Sale Transaction, the Debtors will effectuate the Rights Offering under the Plan for approximately $119 million of New Common Units, backstopped by the Plan Sponsors.  The Plan Sponsors have agreed to convert approximately $60 million of First Lien Term Loan Claims into equity.  Upon consummation of the Plan, the Debtors intend to enter into an Exit Facility of $175 million, of which approximately $86 million is expected to be outstanding, including approximately $15 million in existing swap obligations.[18]  Thus, Miller Buckfire estimates the implied consideration to be approximately $280 million which consists of approximately $101 million of assumed debt and swap liabilities and approximately $179 million of equity value.

Miller Buckfire believes the value provided under the Plan is currently the best measure of the Debtors' value in light of, among other things, (1) the robust and exhaustive nature of the sale/investment process, which benefited from the Debtors having more liquidity than forecasted prior to commencing the process and creditor support and (2) the active bidding that took place in April 2010 with the Plan Sponsors and the third party investor regarding the Alternative Proposal.  Miller Buckfire believes that the extensive sale/investment process and active bidding undertaken in this case resulted in the highest value for the Debtors.  However, as noted earlier, the Plan incorporates a Payout Event feature which allows an alternative bidder to present a topping proposal prior to the Confirmation Date, <u>provided that</u> such proposal provides the Debtors with sufficient Cash or committed financing, documented to the satisfaction of the Debtors, to (a) indefeasibly pay all of the Allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid (including postpetition interest at the default contract rate) and (b) treat all other Claims Holders no less favorably than as otherwise provided under the Plan.  Accordingly, a topping proposal with a higher or better recovery may be accepted subject to the conditions of the Payout Event.

The valuation described herein does not constitute a recommendation to any Holder of Claims against the Debtors as to how to vote on the Plan.  The estimated reorganized value also does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## B.    FINANCIAL PROJECTIONS

As further discussed in Article VII.B.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for the financial reorganization of the Purchaser.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years of 2010 through 2014 as attached hereto as **Exhibit E** (the "Financial Projections"), analyzed the Purchaser's ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.  In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure following consummation of the Plan, the Debtors' business will be a viable business with long-term prospects.  The Debtors believe that the Purchaser will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the

---

[18]    For illustrative purposes, assumes actual results through April 2010 and emergence from chapter 11 on August 31, 2010.

61

Bankruptcy Code.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

THE FINANCIAL PROJECTIONS ASSUME THAT THE PLAN WILL BE CONSUMMATED IN ACCORDANCE WITH ITS TERMS AND THAT ALL TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BE CONSUMMATED BY THE ASSUMED EFFECTIVE DATE.  ANY DELAY IN THE ASSUMED EFFECTIVE DATE OF THE PLAN MAY HAVE A NEGATIVE IMPACT ON THE OPERATIONS AND FINANCIAL PERFORMANCE OF THE DEBTORS INCLUDING, BUT NOT LIMITED TO, AN INCREASED RISK OF INABILITY TO MEET SALES FORECASTS AND HIGHER REORGANIZATION EXPENSES. ADDITIONALLY, THE ESTIMATES AND ASSUMPTIONS IN THE FINANCIAL PROJECTIONS, WHILE CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND CONTINGENCIES.  THESE ESTIMATES AND ASSUMPTIONS ALSO ARE BASED ON FACTORS SUCH AS INDUSTRY PERFORMANCE, GENERAL BUSINESS, ECONOMIC, COMPETITIVE, REGULATORY, MARKET, AND FINANCIAL CONDITIONS, ALL OF WHICH ARE SUBJECT TO CHANGE AND BEYOND THE DEBTORS' CONTROL. GIVEN THAT FUTURE EVENTS AND CIRCUMSTANCES MAY AFFECT THE DEBTORS' ESTIMATES AND ASSUMPTIONS, THE DEBTORS EXPECT THAT ACTUAL RESULTS WILL DIFFER FROM PROJECTED RESULTS IN SOME WAY AND THAT ACTUAL RESULTS MAY BE MATERIALLY GREATER OR LESS THAN THOSE CONTAINED IN THE FINANCIAL PROJECTIONS.  ACCORDINGLY, NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE PURCHASER'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.  THE FINANCIAL PROJECTIONS CONTAINED HEREIN MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS.  THE INCLUSION OF THE FINANCIAL PROJECTIONS HEREIN SHOULD NOT BE REGARDED AS AN INDICATION THAT THE DEBTORS CONSIDERED OR CONSIDER THE FINANCIAL PROJECTIONS TO RELIABLY PREDICT FUTURE PERFORMANCE.  THE FINANCIAL PROJECTIONS ARE SUBJECTIVE IN MANY RESPECTS, AND THUS ARE SUSCEPTIBLE TO INTERPRETATIONS AND PERIODIC REVISIONS BASED ON ACTUAL EXPERIENCE AND RECENT DEVELOPMENTS.  THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT THE OCCURRENCE OF FUTURE EVENTS, EVEN IN THE EVENT THAT ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE NOT BORNE OUT.  THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS AND QUALIFICATIONS SET FORTH HEREIN.

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided herein.

## A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  The Confirmation Hearing will commence on September 14, 2010 at 11:00 a.m. prevailing Eastern Time.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), (3) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such Entity, (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth below no later than the Plan Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

| Counsel to the Debtors | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>Anup Sathy, P.C.<br>300 North LaSalle<br>Chicago, Illinois 60654 | **KIRKLAND & ELLIS LLP**<br>James H.M. Sprayregen, P.C.<br>Ray C. Schrock<br>Brian S. Lennon<br>601 Lexington Avenue<br>New York, New York 10022 |
| *Counsel to the Ad Hoc Committee of*<br>*First Lien Term Loan Lenders* | *Counsel to Certain of the*<br>*Second Lien Term Loan Lenders* |
| **STROOCK & STROOCK & LAVAN LLP**<br>Kristopher M. Hansen<br>Jayme T. Goldstein<br>180 Maiden Lane<br>New York, New York 10038 | **MILBANK, TWEED, HADLEY & MCLCOY LLP**<br>Dennis F. Dunne<br>Abhilash M. Raval<br>One Chase Manhattan Plaza<br>New York, New York 10005 |
| *Proposed Counsel to the Committee* | *Counsel to the DIP Lenders* |
| **PACHULSKI STANG ZIEHL & JONES LLP**<br>Robert J. Feinstein<br>Bradford J. Sandler<br>Ilan Scharf<br>780 Third Avenue 36th Floor<br>New York, NY 10017 | **CAHILL GORDON & REINDEL LLP**<br>Jonathan J. Frankel<br>Adam D. Summers<br>80 Pine Street<br>New York, New York 10005-1702 |
| *Bankruptcy Court Clerk* | *Office of the United States Trustee* |
| The Clerk of the Court<br>United States Bankruptcy Court<br>for the Southern District of New York<br>One Bowling Green<br>New York, New York 10004 | **OFFICE OF THE UNITED STATES TRUSTEE**<br>Paul K. Schwartzberg<br>Andrea B. Schwartz<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004 |

## B.     CONFIRMATION STANDARDS

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan, on account of such Claim, property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the

63

Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (a) Holders of Administrative Claims and Other Priority Claims specified in section 507(a)(2) and 507(a)(3) of the Bankruptcy Code, respectively, will receive on account of such Claims Cash equal to the allowed amount of such Claim on the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; (b) Holders of Claims specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive deferred Cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim if such Holders of Claims vote to accept the Plan, and will receive Cash on the Effective Date of the Plan equal to the allowed amount of such Claim; and (c) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

## 1.    Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to Confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation in their liquidation analysis attached hereto as **Exhibit F** (the "Liquidation Analysis"). In the Liquidation Analysis, the Debtors determined a hypothetical liquidation value of their businesses if a chapter 7 trustee were appointed and charged with reducing to cash any and all of the Debtors' assets. The Debtors compared the potential liquidation value of the Debtors assets under a hypothetical chapter 7 liquidation to the potential value of the Debtors' assets under the Plan. As reflected in more detail in the Liquidation Analysis and in Article IX herein, the Debtors believe that the value of the distributions provided to Holders of Allowed Claims under the Plan would be greater than under a hypothetical chapter 7 liquidation.

The Committee has alleged that certain Causes of Action arising under chapter 5 of the Bankruptcy Code may provide recoveries to the Debtors' unsecured creditors and are not fully represented in the Liquidation Analysis. In particular, the Committee has alleged that hypothetical proceeds from avoidance actions or related Causes of Action potentially arising from the 2007 LBO and the 2008 Exchange may potentially provide recoveries to unsecured creditors in a chapter 7 liquidation in excess of recoveries provided to such creditors under the Plan. The Debtors disagree with this contention.

### 2. Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization.  The Plan contemplates a Sale Transaction whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the Acquired Assets.  On the Effective Date or as soon thereafter as reasonably practicable, the proceeds from the Sale Transaction will be distributed to Creditors pursuant to the terms of the Plan and the Debtors' Estates will be wound-up, dissolved, and liquidated.  Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan.  The Debtors have already secured a commitment for the Exit Facility and believe that they will have sufficient availability under the Exit Facility to provide for the distributions under the Plan.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## C. ACCEPTANCE BY IMPAIRED CLASSES

The Bankruptcy Code requires, as a condition to Confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## D. CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to reject the Plan, provided that the plan is accepted by at least one Impaired Class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1. No Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (e.g., classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

### 2. Fair and Equitable Test

This test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such

class. As to the non-accepting Class, the test sets different standards depending on the type of Claims or Interests in such Class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that Classes 11 and 13 are deemed to reject the Plan. There is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting class that will receive or retain any property on account of the Claims or Interests in such Class.

        (a)      Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

        (b)      Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

        (c)      Equity Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## XII.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no

assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Claims and the expiration of the Exit Facility financing commitments.

### 5. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the Purchaser reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

7.       **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.       **RISK FACTORS THAT MAY AFFECT RECOVERY AVAILABLE TO HOLDERS OF ALLOWED CLAIMS AND THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN**

1.       **Actual Amounts of Allowed Claims May Differ From Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Creditors.**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan and the Purchaser's ability to meet the Debtors' Financial Projections.

2.       **The Plan Support Agreements May Terminate, Thereby Preventing the Debtors From Consummating the Plan.**

To the extent that the terms or conditions of the Plan Support Agreements are not satisfied, or to the extent events giving rise to termination of the Plan Support Agreements occur, the Plan Support Agreements may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3.       **The Purchaser May Not Be Able to Meet the Projected Financial Results.**

The Purchaser may not be able to meet the Debtors' current projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects.  To the extent the Purchaser does not meet the Debtors' projected financial results, the Purchaser may lack sufficient liquidity to continue operating as planned, may be unable to service its debt obligations, and may not be able to meet its working capital and operational needs.  Any one of these failures may preclude the Purchaser from, among other things: (a) increasing current customer offerings, (b) increasing the size of the rental equipment fleet; (c) maintaining the age of the rental equipment fleet at competitive levels; (d) taking advantage of future business opportunities; and (e) responding to competitive pressures.  While the Financial Projections represent management's view based on current known facts and assumptions about future operations, there is no guarantee that the Financial Projections will be realized.

4.       **A Small Number of Holders or Voting Blocks May Control the Purchaser.**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the outstanding the New Common Units in the Purchaser.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Purchaser and have the power to elect directors or managers and approve significant mergers, other material corporate transactions.

5.       **The Issuance of New Common Units Under the Management Equity Incentive Plan Will Dilute the New Common Units.**

On the Effective Date, 10% of the New Common Units will be reserved for issuance as grants of options in connection with the Management Equity Incentive Plan.  If the Purchaser distributes such equity-based awards to management pursuant to the Management Equity Incentive Plan, it is contemplated that such distributions will dilute

68

the New Common Units issued through the Rights Offering and on account of Claims under the Plan and the ownership percentage represented by the New Common Units distributed under the Plan.

> **6.** **Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Purchaser.**

Holders of Allowed Claims should carefully review Article XIII herein, *"Certain United States Federal Tax Income Consequences"* to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Purchaser.

## C.   RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESSES

The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors. Any or all such factors, which are enumerated below, could have a materially adverse effect on the businesses, financial condition, or results of operations of the Debtors. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial may also materially adversely affect the Debtors' businesses, financial condition, or results of operations. Any of the following risks could materially adversely affect the Debtors' businesses, financial condition, or results of operations.

> **1.** **Bankruptcy Related Risk Factors**

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' businesses prospects and/or their ability to operate while in chapter 11.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the businesses in bankruptcy may make it more difficult to maintain and promote the Debtors' rental services and attract customers to their branches.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for professional fees and other expenses associated with the Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their businesses (including their rental equipment fleet) and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake in the Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- The Debtors may be unable to maintain satisfactory employee relations through the sale process.

K&E 17316187

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their businesses and meet future obligations. The Debtors currently are financing their operations during their reorganization using funds from operations and borrowings under the DIP Facility. The Debtors may be unable to operate pursuant to the terms of their DIP Facility, including the financial covenants and restrictions contained therein, or to negotiate and obtain necessary approvals, amendments, waivers, or other types of modifications, and to otherwise fund and execute the Debtors' business plans throughout the duration of the Chapter 11 Cases.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate one or more chapter 11 plans with respect to these Chapter 11 Cases that are acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders, and other parties in interest. Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm one or more plans of reorganization, to appoint a chapter 11 trustee, or to convert the cases to chapter 7 cases.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a going-concern basis is dependent upon, among other things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control. Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, prepetition liabilities and postpetition liabilities must be satisfied in full before Holders of Interests are entitled to receive any distribution or retain any property under the Plan or an alternative plan under chapter 11. The ultimate recovery to Holders of Claims or Interests, if any, will not be determined until Confirmation of the Plan or an alternative a chapter 11 plan. No assurance can be given as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive.

2.      **General Business and Financial Risk Factors**

(a)      **The Debtors' revenues and operating results will fluctuate, which could affect revenues and operating results.**

The Debtors' revenues and operating results fluctuate from quarter to quarter due to various factors, including, among others: (1) changes in rental rates or changes in demand for equipment due to economic conditions, competition, weather, or other factors; (2) seasonal rental and purchasing patterns of customers, with rental and purchasing activity tending to be lower in the winter due to weather and the holiday season; (3) the cyclical nature of the businesses of the construction industry customers; (4) the timing of capital expenditures for rental fleet expansion; (5) changes in the cost and availability of equipment purchased, including changes in manufacturer incentive programs; (6) increased costs, including fuel costs and other raw material costs such as the price of steel; (7) the timing and cost of opening new rental or customer repair center locations or acquiring new locations; and (8) the Debtors effectiveness in integrating new or acquired rental or customer repair center locations, or in integrating acquisitions with existing operations. Any of these factors could decrease the Debtors' revenue and profitability, which may adversely affect the Debtors' financial condition.

(b)      **Decreases in construction or industrial activities could adversely affect the Debtors' revenues and operating results by decreasing the demand for the Debtors' equipment and/or the Debtors' rental rates.**

The equipment rental industry is highly cyclical and its revenues are closely tied to general economic conditions and to conditions within the non-residential construction industry in particular. The Debtors' products and services are used primarily in non-residential construction and, to a lesser extent, in industrial activity. Weakness in these end markets has led, and may in the future lead, to a decrease in the demand for Debtors' equipment and/or the rental rates or prices the Debtors can charge.

For example, feeling the effects of the struggling overall U.S. economy, the Debtors faced a challenging environment in a number of key markets, particularly in Florida and California, leading to decreased demand for the

70

Debtors' rental equipment and lower rental rates. Future declines in non-residential construction and industrial activity could adversely affect the Debtors' operating results by decreasing their revenues and profit margins. Despite signs that the overall U.S. economy is beginning to improve, non-residential construction spending is expected to decrease by 13.4% in 2010 with a marginal increase of 1.8% in 2011 in inflation adjusted terms, according to the latest American Institute of Architects semi-annual Consensus Construction Forecast. Factors that may cause weakness in the non-residential construction industry include but are not limited to, (1) weakness in the economy or the effects of a recession; (2) continued slowdowns in construction in the geographic regions in which the Debtors operate; (3) oversupply of available commercial real estate in the markets the Debtors serve; (4) decreases in available financing for investment in non-residential construction; and (5) increases in interest rates.

(c)      **The equipment rental industry is highly competitive and competitive pressures could lead to a decrease in the Debtors' market share or in equipment rental rates.**

The equipment rental industry is highly fragmented and very competitive. As previously mentioned, the Debtors' primary competitors include: (1) a few large national companies, including public companies and divisions of public companies; (2) several regional competitors that operate in multiple states; (3) thousands of small, independent businesses with only one or a few rental locations; and (4) hundreds of equipment manufacturers and dealers that both sell and rent equipment directly to customers.

Some of the Debtors' competitors are significantly larger and have greater financial and marketing resources. Further, some of the Debtors' competitors have greater technical resources, longer operating histories, lower cost structures, and better relationships with equipment manufacturers. In addition, certain of the Debtors' competitors are more geographically diverse and have greater name recognition among customers. As a result, these competitors may be able to provide their products and services at lower costs compared to the Debtors. Thus, the Debtors may in the future encounter increased competition in the equipment rental market, equipment sales market, or in the equipment repair and services market from existing competitors or from new market entrants. In particular, the current decrease in demand for equipment in certain key regions in which the Debtors operate has created a downward pressure on the rental rates.

The Debtors believe that rental rates, fleet size, and quality are the primary competitive factors in the equipment rental industry. From time to time, the Debtors or their competitors may attempt to compete aggressively by lowering rental rates or prices. Competitive pressures could adversely affect the Debtors' revenues and operating results by decreasing the Debtors' market share or equipment rental rates. To the extent the Debtors lower rental rates or increase their fleet to retain or increase their market share, the Debtors' operating margins would be adversely impacted.

(d)      **The Debtors may recognize significantly higher maintenance costs in connection with increases in the weighted average age of the rental fleet.**

As the Debtors' fleet of rental equipment ages, the cost of maintaining such equipment, if not replaced, will likely increase. In the past, the Debtors have allowed the average age of the rental equipment fleet to increase, which generally requires an investment of more capital in maintenance, parts and repair. The Debtors manage the average age of different types of equipment according to the expected wear-and-tear that a specific type of equipment is expected to experience over its useful life. As of December 31, 2009, the average age of the Debtors' rental equipment fleet was approximately 51 months. As of December 31, 2009, approximately 47.8% of the original cost of the Debtors' rental fleet consisted of earthmoving equipment, which generally has higher maintenance costs than similar-sized aerial or material handling equipment. There is no assurance that maintenance costs will not materially increase in the future. As such, any material increase in such costs could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

(e)      **The Purchaser may not be able to fund the capital outlays required for the success of the business, including those relating to purchasing equipment, opening new rental locations, making acquisitions and refinancing existing indebtedness.**

The Debtors' business has significant capital requirements. As such, the Purchaser's ability to remain competitive, sustain growth and expand operations largely depends on access to capital. For example, in 2007, 2008, and 2009, the Debtors invested approximately $54.0 million, $13.4 million, and ($4.0) million, respectively, in new and used equipment and other capital expenditures, net of equipment sales. If the cash generated from

71

business operations, together with cash on hand and borrowings under the Exit Facility, to the extent available, are not sufficient to meet the Purchaser's capital needs and maintain the functionality of its equipment rental fleet, the Purchaser will require additional financing. Moreover, the availability of working capital may be limited as a result of increased capital expenditures incurred in the ordinary course of business to maintain fleet value. However, the Purchaser may not succeed in obtaining additional financing on satisfactory terms or at all. The credit market may make it more difficult for the Purchaser to obtain any additional financing. If the Purchaser is unable to obtain sufficient additional capital in the future, it may be unable to fund the capital outlays required for the success and growth of the business, including those relating to purchasing rental equipment, opening new rental locations and customer repair centers, and completing acquisitions. Any additional indebtedness that the Purchaser incurs will make it more vulnerable to economic downturns and may limit its ability to withstand competitive pressures.

> (f)    **Termination of one or more of the Debtors' relationships with any of their equipment manufacturers could have a material adverse effect on the Debtors' business.**

The Debtors purchase most of the rental and sales equipment from a limited number of OEMs. For example, as of December 31, 2009, equipment from Genie, Kobelco, and John Deere represented 38.6% of the original cost of the rental fleet. Termination of one or more of the Debtors' relationships with any of these or other major suppliers could have a material adverse effect on the Debtors' business operations and financial condition if they are unable to obtain adequate equipment for rental and sale from other sources in a timely manner. Because the Debtors' major suppliers also sell equipment to their competitors, the Debtors' relationships with their suppliers do not provide them any particular competitive advantage in the equipment manufacturing industry.

Further consolidation in the equipment manufacturing industry could result in a decrease in the number of the Debtors' major suppliers or a decrease in the number of alternative supply sources available to them, which could make it more likely that termination of one or more of the Debtors' relationships with major suppliers would result in a material adverse effect on the Debtors' business, financial condition or results of operations. Consolidation could also result in price increases for the equipment they purchase, which could adversely affect the Debtors' business.

> (g)    **The Debtors' rental fleet is subject to residual value risk upon disposition.**

The market value of any given piece of rental equipment could be less than its net book value at the time it is sold. The market value of used rental equipment depends on several factors, including: (1) the market price for new equipment of a like kind; (2) wear and tear on the equipment relative to its age; (3) the time of year that it is sold (generally prices are higher during the peak construction season); (4) worldwide and domestic demand for used equipment; and (5) general economic conditions. If prices the Debtors are able to obtain for their used rental equipment decline as a result of these or other factors, the Debtors' operating results may be materially adversely affected thereby adversely impacting the Debtors' liquidity.

> (h)    **The cost of new equipment the Debtors use in the rental fleet could increase, which may cause them to spend significantly more for replacement equipment, and in some cases the Debtors may not be able to procure equipment at all due to supplier constraints.**

The Debtors operate in a capital intensive business environment. The cost of new equipment used in the rental fleet has increased steadily since 2004. Price increases could materially adversely impact the Debtors' financial condition and business operations. While the Debtors can manage the size and aging of the fleet generally over time, eventually they must retire older equipment and either allow their fleet to shrink or replace the older equipment in their fleet with newer models. The Debtors will likely need to purchase additional equipment in 2010 and beyond in order to supplement and replace the current fleet as it continues to age.

> (i)    **The Debtors depend on key personnel whom they may not be able to retain.**

The Debtors' operations are managed by a small number of key executive officers and the Debtors' future performance depends on the continued contributions of these key employees. A loss of one or more of these key people could harm the Debtors' business and prevent them from implementing their business strategy. The Debtors

do not maintain "key man" life insurance on the lives of any members of senior management. The Debtors have existing employment agreements of limited duration with certain key executives and managers. However, each of the employment agreements is of limited duration. There is no assurance that these executives will remain employed with the Debtors for the full term of their agreements or that the term of their agreements will be extended beyond the current term.

The success of the Debtors' operations also depends in part on their ability to attract, hire, train and retain qualified managerial, sales and marketing personnel. Competition for these types of personnel is high. The Debtors may be unsuccessful in attracting and retaining the personnel they require to conduct operations successfully and, in such an event, the Debtors' business could be materially and adversely affected.

## D.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

### 1.    Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the financial results of the Purchaser's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Purchaser may turn out to be different from the Financial Projections.  The Financial Projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Purchaser, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Purchaser, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) customer preferences continuing to support the Debtors' operations.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

## E.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

73

2.  **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission**

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.  **Reliance on Exemptions from Registration Under the Securities Act**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. Neither the offer of New Common Units nor the Warrants has been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Units and the Warrants, including the shares reserved for issuance under the Management Equity Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act or Regulation D promulgated thereunder, Rule 701 of the Securities Act or a "no sale" under the Securities Act as described herein.

4.  **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.  **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Purchaser, Holders of Allowed Claims or Interests, or any other parties in interest.

6.  **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Purchaser may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

7.  **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, Insider Causes of Action, or rights of the Debtors or the Purchaser (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action, or Insider Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8.  **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Professionals**

The Professionals have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Professionals have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

K&E 17316187

9.      **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee, and counsel to Committee, if any.

F.      **LIQUIDATION UNDER CHAPTER 7**

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is set forth in Article V herein, *"Statutory Requirements for Confirmation of the Plan"* and the Liquidation Analysis attached hereto as **Exhibit F**.

XIII.   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations thereunder (the "Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims that are not "United States persons" (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

HOLDERS ACQUIRING NEW COMMON UNITS IN THE PURCHASER ARE ADVISED THAT THE OPERATIONS OF THE PURCHASER WILL BE CONDUCTED THROUGH PASS-THROUGH ENTITIES FOR INCOME TAX PURPOSES. ACCORDINGLY, SUCH HOLDERS THAT ARE NOT "UNITED STATES PERSONS" OR ARE TAX-EXEMPT ORGANIZATIONS MAY BE TREATED AS BEING ENGAGED IN A UNITED STATES TRADE OR BUSINESS AND SUBJECT TO U.S. FEDERAL INCOME TAX AND TAX

75

FILING OBLIGATIONS.  IN ADDITION, ALL HOLDERS ACQUIRING NEW COMMON UNITS IN THE PURCHASER WILL BE SUBJECT, WHERE APPLICABLE, TO STATE AND LOCAL INCOME TAX AND TAX FILING OBLIGATIONS.

THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

---

### IRS CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

## A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF ALLOWED CLAIMS

As described below, the Debtors believe that the transaction undertaken pursuant to the Plan constitutes a taxable sale of substantially all of the Debtors' assets to the Purchaser.  As a consequence, Holders of certain Claims will be considered to be exchanging such Claims for New Common Units, Equity Rights, and Cash, if any, in a taxable exchange.

### 1.    Consequences to Holders of Class 1, Class 2, Class 3, Class 4, Class 8, and Class 9 Claims

Pursuant to the Plan, Holders of Class 1 Other Priority Claims, Class 2 Secured Tax Claims, Class 3 Other Secured Claims, Class 4 Revolving Credit Facility Claims, Class 8 Senior Notes Claims, and Class 9 General Unsecured Claims will receive Cash in full or partial satisfaction of their Claims.  A Holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim not allocable to accrued interest and (b) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.

Holders of Class 8 Senior Notes Claims and Class 9 General Unsecured Claims, if they vote to approve the Plan, will receive their Pro Rata share of the Cash Payment.  The characterization of this Cash Payment is unclear, given that Holders of these Claims will receive the Cash Payment as a gift from Class 6 First Lien Term Loan Claims, but only if Class 8 and Class 9 each vote to approve the Plan.  The receipt of the Cash Payment could be treated as cash received in exchange for Claims and treated in the same manner as the immediately preceding paragraph.  Alternatively, it is possible that such Holders could be treated as receiving ordinary income in the full amount of their share of such Cash Payment, regardless of the character of the loss they may recognize with respect to their Claim.

### 2.    Consequences to Holders of Class 5 Claims

Pursuant to the Plan, Class 5 Secured Swap Claims will be amended pursuant to the Swap Amendments. The treatment of interest rate swap for U.S. federal income tax purposes is unclear, and the tax treatment of an

amendment to a swap agreement in a bankruptcy case is particularly ambiguous.  Holders of Class 5 Secured Swap Claims should consult their own tax advisors concerning the tax treatment of the Swap Amendments.

### 3.    Consequences to Holders of Class 6 and Class 7 Claims

Pursuant to the Article III.B of the Plan, Holders of Class 6 First Lien Term Loan Claims and Class 7 Second Lien Term Loans Claims will receive either (i) Cash in the form of the First Lien Term Loan Cash Payment or the Second Lien Term Loan Cash Payment, as applicable; (ii) their Pro Rata share of the New Common Units pursuant to the First Lien Term Loan Equity Election or the Second Lien Term Loan Equity Election, as applicable; (iii) such Holder's Pro Rata share of the Rights issued pursuant to the Rights Offering; and/or (iv) such Holder's Pro Rata share of the Warrants.  A Holder that receives Cash, New Common Units, Warrants and/or Rights should be treated as exchanging its Claims for such consideration in a fully taxable exchange.  In that case, such Holder should recognize a gain or loss equal to the difference between (a) the amount of Cash and the fair market value as of the Effective Date of the New Common Units, Warrants and Rights received that are not allocable to accrued interest and (b) such Holder's tax basis in the Claims surrendered by the Holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.  To the extent that a portion of the Cash, New Common Units, Warrants and/or Rights received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income.  A Holder's tax basis in the New Common Units, Warrants and Equity Rights should equal their fair market value as of the Effective Date.  A Holder's holding period for the New Common Units, Warrants and Rights should begin on the day following the Effective Date.

### 4.    Accrued but Untaxed Interest

A portion of the consideration received by Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest.  The Internal Revenue Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 5.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for the New Common Units, Cash and/or Rights on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Claim.  In general, a debt instrument (other than an obligation with a fixed maturity date not exceeding 6 months from the date of issue) is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such

77

Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 6. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) falls within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the Internal Revenue Service.

The Debtors will, through the Distribution Agent, withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Service.

> **THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## B. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1. Sale of Assets

The Debtors believe that the transfer of the Debtors' assets to Purchaser and the subsequent distribution of the New Common Units and Rights Offering Units to certain Holders of Claims should constitute a taxable asset sale for U.S. federal and state income tax purposes. The Debtors believe that their existing net operating losses ("NOLs")will be sufficient to offset any gain recognized on the sale and therefore do not expect to owe any material U.S. federal or state income taxes as a result of the sale.

### 2. Cancellation of Debt and Reduction of Tax Attributes

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets, by the amount of any cancellation of indebtedness ("COD") realized upon consummation of the Plan. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). The reduction of tax attributes occurs at the beginning of the taxable year following the taxable year in which the COD was realized. Because the Debtors will have transferred all of their assets to Purchaser, and all of the consideration received from the Purchaser to Holders of Claims, the only tax attributes that will be subject to reduction will be the Debtors' NOLs and tax credits that remain following the asset sale. The Debtors expect that any such remaining NOLs and tax credits will be reduced or eliminated, but that the Debtors will not have any U.S. federal income tax liability as a result of the COD.

C.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE PURCHASER AND HOLDERS OF NEW COMMON UNITS IN THE PURCHASER**

1.    **Cancellation of Debt and Reduction of Tax Attributes**

Assuming that the transaction is treated as a taxable purchase of the Debtors' assets by the Purchaser, the COD and attribute reduction should not result in any U.S. federal income tax liability for the Purchaser or any reduction in any of the Purchaser's tax attributes.

2.    **Tax Distributions**

The Purchaser is a Delaware limited liability that will be classified as a partnership for U.S. federal income tax purposes. Accordingly, Holders of Claims that acquire New Common Units will be treated as partners in the Purchaser. As partners, such Holders will be allocated their respective shares of items of income, gain, loss, and deduction derived from the Partnership's operations, and such allocations could result in the incurrence of federal income tax, regardless of whether actual cash distributions are made from the Purchaser. The tax treatment of holding interests in a partnership is very complex, and Holders acquiring New Common Units in the Purchaser are strongly urged to consult their own tax advisors for the tax consequences of holding the New Common Units to them.

XIV.    **GLOSSARY OF DEFINED TERMS AND RULES OF INTERPRETATION**

A.    **RULES OF INTERPRETATION**

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (4) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (5) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (6) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

B.    **GLOSSARY OF TERMS**

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.    "*Acquired Assets*" shall have the meaning set forth in Section 2.1 of the Purchase Agreement.

3.    "*Ad Hoc Group*" means that certain ad hoc group of certain holders of First Lien Term Loans.

79

4.        "*Ad Hoc Group Advisors*" means Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Group, and Houlihan Lokey Howard & Zukin, as financial advisor to the Ad Hoc Group.

5.        "*Ad Hoc Group Advisor Fees*" means all Claims for: (a) the reasonable documented out-of-pocket costs, fees, expenses, disbursements and charges of the Ad Hoc Group Advisors, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases; and (b) reasonable out-of-pocket expenses incurred by members of the Ad Hoc Group in connection with the Chapter 11 Cases.

6.        "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) the Backstop Party Fees; (e) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; (f) the Ad Hoc Group Advisor Fee Claims, without any requirement for filing fee applications in the Chapter 11 Cases, and (g) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

7.        "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

8.        "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

9.        "*Agreement Order*" means the order of the Bankruptcy Court approving, among other things, the execution and delivery by the Debtors of the Commitment Letter and the Backstop Unit Purchase Agreement, and the performance by the Debtors of their obligations thereunder.

10.        "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

11.        "*Alternative Transaction*" means (a) a Payout Event or (b) any restructuring transaction that is inconsistent with the Backstop Unit Purchase Agreement or the Plan Support Agreement, including without limitation, (i) a merger, consolidation, business combination, recapitalization or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Plan Support Agreement, (ii) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Plan Support Agreement, or (iii) a plan of reorganization that does not contemplate a reorganization of the Debtors on the terms set forth in the Plan Support Agreement.

12.        "*Assumed Liabilities*" shall have the meaning set forth in Section 2.3 of the Purchase Agreement.

13.        "*Backstop Commitment Percentage*" means, with respect to any Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment of such Backstop Party and the denominator of which is the aggregate Backstop Commitments of all Backstop Parties.

14.        "*Backstop Commitments*" means, with respect to any Backstop Party, the commitment, on the terms set forth in the Commitment Letter and in the Backstop Unit Purchase Agreement, of such Backstop Party to

K&E 17316187

fund a portion of the Rights Offering Amount to the extent that the Rights Offering is not fully subscribed pursuant to the Plan. The Backstop Commitment for each Backstop Party shall be equal to the product of (a) the Rights Offering Amount and (b) such Backstop Parties' Backstop Commitment Percentage. The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.

15.    "*Backstop Parties*" means certain funds managed by (a) Wayzata Investment Partners and (b) Apollo Capital Management (holding, in the aggregate, in excess of 67% of the aggregate principal amount of the First Lien Term Loans).

16.    "*Backstop Party Fees*" means all Transaction Expenses, the Break-Up Fee, and all Claims for all other amounts that are contemplated to be paid by the Debtors to the Backstop Parties pursuant to the Backstop Unit Purchase Agreement.

17.    "*Backstop Unit Purchase Agreement*" means that certain Backstop Unit Purchase Agreement, dated as of May 16, 2010, by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, as amended, supplemented or otherwise modified from time to time, to be included as an exhibit to the Plan Supplement.

18.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

19.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

20.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.    "*Break-Up Fee*" means a Cash fee in the aggregate amount of $3,000,000 payable by the Debtors to the Backstop Parties that have not defaulted on its Backstop Commitment if the Debtors (a) enter into an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement) with respect to an Alternative Transaction or (b) consummates any Alternative Transaction, in any such case described in clause (a) or clause (b), at any time (x) prior to the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof or (y) within twelve (12) months following the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof.

22.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

23.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

24.    "*Cash Payment*" means Cash in the amount of $365,000.

25.    "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

26.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Neff Corp., et al., Chapter 11 Case No. 10-12610 (SCC), which are currently pending before the Bankruptcy Court.

27.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

28.      "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by a Final Order of the Bankruptcy Court.

29.      "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 270 days after the Claims Bar Date or (b) such other period of limitation as may be specifically fixed by the Debtors or the Purchaser, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

30.      "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

31.      "*Class*" means a category of Holders of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

32.      "*Commitment Letter*" means that certain Commitment Letter, dated as of April 12, 2010, by and between the Backstop Parties and the Debtors pursuant to which the Backstop Parties provided their respective Backstop Commitments on the terms, and subject to the conditions, set forth therein.

33.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

35.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

36.      "*Confirmation Objection Deadline*" means the deadline for Filing objections to the Plan, which date shall in no event be less than seven (7) days prior to the Confirmation Hearing.

37.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38.      "*Consummation*" means the occurrence of the Effective Date.

39.      "*Cure Cost*" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

40.      "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Effective Date.

41.      "*Debtor Release*" means the release given by the Debtors to the Debtor Releasees as set forth in Article VIII.C of the Plan.

42.      "*Debtor Releasee*" means, collectively, each Debtor and the Debtors' current and former Affiliates, partners, Shareholders, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

43.      "*Debtors*" means, collectively: Neff Corp.; Neff Finance Corp.; Neff Holdings Corp.; Neff Holdings LLC; Neff Rental, Inc.; and Neff Rental LLC.

44.      "*DIP Agent*" means Bank of America, N.A. in its capacity as administrative agent under the DIP Agreement, or any successor agent appointed in accordance with such agreement.

45.     "*DIP Agreement*" means that certain debtor in possession credit agreement, dated as of May 16, 2010, by and among Neff Corp., as borrower, and the DIP Agent, the DIP Lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time.

46.     "*DIP Claims*" means any and all Claims arising under or related to the DIP Facility as of the Effective Date.

47.     "*DIP Facility*" means that certain $175.0 million debtor in possession credit facility entered into pursuant to the DIP Agreement.

48.     "*DIP Lenders*" means the DIP Agent and the banks, financial institutions, and other lender parties under the DIP Facility.

49.     "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

50.     "*Disbursing Agent*" means, on the Effective Date, the Debtors or their Agent and, after the Effective Date, the Purchaser, the Liquidator or any other Entity or Entities designated by the Purchaser to make or facilitate distributions that are to be made after the Effective Date pursuant to the Plan.

51.     "*Disclosure Statement*" means this *Amended Disclosure Statement for the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of July 13, 2010, as amended, supplemented, or modified from time to time, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

52.     "*Disclosure Statement Order*" means a Final Order entered by the Bankruptcy Court approving the Disclosure Statement and granting related relief.

53.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

54.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived (in accordance with Article IX.B of the Plan).

55.     "*Emergence Awards*" shall have the meaning set forth in the *Motion of the Debtors for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan* filed on May 25, 2010 [Docket No. 73].

56.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

57.     "*Equity Interest*" means the common stock, limited liability company interests and any other equity, ownership or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, limited liability company interests or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

58.     "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

59.     "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Purchaser; (c) the Debtor Releasees; (d) the Third Party Releasees; (e) the Exit Facility Agent; (f) the lenders under the Exit Facility; and (g) all of the current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives and successors and assigns of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided that no Non Released Party will be an Exculpated Party.

K&E 17316187

60.    "*Exculpation*" means the exculpation provision set forth in Article VIII.E of the Plan.

61.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

62.    "*Exit Facility*" means that new asset based revolving credit facility in the amount of $175 million to be entered into by the Debtors pursuant to the agreement to be executed on or before and subject to the occurrence of the Effective Date, including any agreements, amendments, supplements or documents related thereto, on terms reasonably satisfactory to the Debtors and the Purchaser and materially consistent with the Exit Facility Documents, which Exit Facility may be assigned and transferred on the Effective Date by the Debtors to the Purchaser.

63.    "*Exit Facility Agent*" means Bank of America, N.A. in its capacity as administrative agent under the Exit Facility, or any successor thereto.

64.    "*Exit Facility Agreement*" means that certain credit agreement to be entered into as of and subject to the occurrence of the Effective Date by and among Neff Corp., as borrower, and the Exit Facility Agent, the Exit Facility lenders named therein, and the parties thereto, as amended, supplemented or otherwise modified from time to time.

65.    "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility, to be included as an exhibit to the Plan Supplement.

66.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

67.    "*Final DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders*, entered on June 30, 2010 [Docket No. 207], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

68.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or the Purchaser, as applicable, reserve the right to waive any appeal period.

69.    "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, and amended and restated as of December 16, 2008, by and among Neff Corp., Neff Holdings Corp. and certain of its subsidiaries, as borrowers, the First Lien Credit Facility Agents, and the First Lien Credit Facility Lenders.

70.    "*First Lien Credit Facility Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent under the First Lien Credit Agreement.

71.    "*First Lien Credit Facility Agents*" means, collectively, (a) the First Lien Credit Facility Administrative Agent, (b) Bank of America, N.A., in its capacity as first lien collateral agent and control agent under the Intercreditor Agreement and agent under the First Lien Security Agreement, or any successor-in-interest thereto, (c) CIBC Inc. and UBS Securities LLC, each in their capacity as co-documentation agents under the First Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the First Lien Credit Agreement.

72.    "*First Lien Credit Facility Lenders*" means collectively the First Lien Term Loan Lenders and the Revolving Credit Facility Lenders.

73. "*First Lien Security Agreement*" means that certain Security Agreement, dated as of May 31, 2007, as amended and modified from time to time, by and among Neff Corp., LYN Holdings Corp., as grantors and Bank of America, N.A., as agent for the secured parties.

74. "*First Lien Term Loan*" means the approximately $87.9 million secured term loan provided under the First Lien Credit Agreement.

75. "*First Lien Term Loan Cash Payment*" means Cash in an amount equal to a Holder's Allowed First Lien Term Loan Claim, including any accrued and unpaid prepetition interest and postpetition interest at the default contract rate; provided that for so long as the Plan Support Agreement has not been terminated, any Original Consenting Lender may not elect to take and shall not receive the First Lien Term Loan Cash Payment on account of any or all of such Original Consenting Lender's Allowed First Lien Term Loan Claim(s).

76. "*First Lien Term Loan Claim*" means any Claim against any Debtor arising under or related to the First Lien Term Loan.

77. "*First Lien Term Loan Equity Election*" means the election of a Holder of an Allowed First Lien Term Loan Claim set forth in Article III.B.6(c)(ii)(A) of the Plan.

78. "*First Lien Term Loan Lenders*" means those financial institutions and other lender parties to the First Lien Credit Agreement from time to time as "Term Loan Lenders" thereunder, each in their capacity as such.

79. "*First Lien Term Loan Rights Offering Participants*" means all Holders of First Lien Term Loan Claims that are accredited investors or qualified institutional buyers (as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively), as of the Voting Record Date.

80. "*General Unsecured Claim*" means any unsecured Claim against any Debtor that is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Senior Notes Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.

81. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

82. "*Holder*" means any Entity holding a Claim or an Interest.

83. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

84. "*Indemnification Provision*" means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

85. "*Indenture Trustee*" means Law Debenture Trust Company of New York, in its capacity as indenture trustee under the Senior Notes Indenture.

86. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

87. "*Intercompany Contracts*" means any Executory Contract, Unexpired Lease, agreement, contract, or lease between one or more Debtors.

88. "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor. For the avoidance of doubt, Intercompany Interests excludes Equity Interests in any Debtor held by non-Debtors.

89. "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of May 31, 2007, by and among Neff Corp., Bank of America, N.A., as First Lien Collateral Agent, and Wilmington Trust FSB as successor Second Lien Collateral Agent, governing, among other things, the respective rights, remedies, and

priorities of Claims and Liens held by such parties, or any similar or related agreement (and as the same may have been modified, amended or restated).

90.    "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

91.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees* [Docket No. 140, filed on June 9, 2010, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

92.    "*Interim DIP Order*" means the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing*, entered May 17, 2010 [Docket No. 41], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

93.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

94.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

95.    "*Liquidator*" means such Entity as may be designated by the Debtors as liquidator pursuant to the Liquidator Agreement and Article IV.U of the Plan to effectuate the Wind Down.  For the avoidance of doubt, all costs, liabilities, and expenses incurred by the Liquidator shall be paid by the Purchaser.

96.    "*Liquidator Agreement*" means the agreement governing, among other things, the retention and duties of the Liquidator, if applicable, as described in Article IV.U of the Plan, which shall be in form and substance reasonably acceptable to the Debtor and the Purchaser and to be included as an exhibit to the Plan Supplement.

97.    "*Management Equity Incentive Plan*" means that certain post-Effective Date management equity incentive plan governed by the terms and conditions set forth in the Management Equity Incentive Plan Agreement which provides that, among other things, 10% of the New Common Units, on a fully-diluted basis, shall be reserved for issuance in the form of unit options, of which, (x) options to purchase 8% of the New Common Units on a fully diluted basis will be allocated and issued to participants, as such participants are determined by the Debtors and (y) options to purchase 2% of the New Common Units on a fully diluted basis will be reserved for future issuances as determined by the New Board in its sole discretion.

98.    "*Management Equity Incentive Plan Agreement*" means that agreement to be executed by the Purchaser on or before the Effective Date, including any agreements, amendments, supplements or documents related thereto, documenting the terms and conditions of the Management Equity Incentive Plan in form and substance reasonably acceptable to the Debtors and the Purchaser.

99.    "*Neff Corp.*" means Neff Corp., a Delaware corporation and one of the Debtors in the Chapter 11 Cases.

100.    "*New Board*" means the initial board of managers of the Purchaser as of the Effective Date.

101.    "*New Common Units*" means one or more classes of newly-issued units of common equity of the Purchaser.  As used in this Plan, New Common Units shall include the Rights Offering Units, the New Common Units issuable upon exercise of the Warrants (if issued), and the New Common Units issued under the Management Equity Incentive Plan.

102.    "*Non-Released Parties*" means those Entities to be identified in the Plan Supplement as Non-Released Parties; provided that Non-Released Parties shall not include the First Lien Credit Facility Lenders, the DIP Lenders, the First Lien Credit Facility Agents, the DIP Agent, the Purchaser, the Backstop Parties or the Ad Hoc Group.

103.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and claims agent for the Debtors.

86

104.    "*Original Consenting Lenders*" means those certain First Lien Term Loan Lenders that were party to the Plan Support Agreement at the time such agreement was executed.

105.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim.

106.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not:  (a) a Revolving Credit Facility Claim; (b) a Secured Swap Claim; (c) a First Lien Term Loan Claim; (d) a Second Lien Term Loan Claim; (e) a DIP Claim; or (f) a Secured Tax Claim.

107.    "*Payout Event*" means an event on or before the Payout Event Deadline where any or all of the Second Lien Term Loan Lenders or any other party have provided the Debtors with sufficient Cash or committed financing, documented to the satisfaction of the Debtors, to (a) indefeasibly pay all of the Allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in Article III.B of the Plan.

108.    "*Payout Event Deadline*" means thirty (30) days prior to the Confirmation Hearing.

109.    "*Payout Event Procedures*" means those procedures governing the process by which Entities may propose higher or better recoveries than those provided under the Plan and any counterproposals thereto in connection with the Payout Event as approved by the Bankruptcy Court in the Disclosure Statement Order.

110.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

111.    "*Petition Date*" means May 16, 2010, the date on which the Debtors File their petitions for relief commencing the Chapter 11 Cases.

112.    "*Plan*" means the *Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of July 12, 2010, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

113.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) a list of Non-Released Parties; (d) the Plan Support Agreement; (e) a schedule of Causes of Action to be retained by the Purchaser; (f) a description of the terms of the Exit Facility; (g) the form of the Management Equity Incentive Plan Agreement; (h) the form of the Warrant Agreement; (i) the Swap Plan Support Agreements and the Swap Amendments; (j) the Backstop Unit Purchase Agreement; (k) a Schedule of Cure Costs; and (l) the form of Liquidator Agreement, if applicable; and (m) the Payout Event Procedures.

114.    "*Plan Support Agreement*" means that certain plan support agreement dated as of April 12, 2010, by and between the Debtors and certain Holders of First Lien Term Loan Claims, as may be amended, supplemented, or otherwise modified from time to time, and which shall be included (with the principal amount or percentage of any First Lien Term Loans or any other securities of any of the Debtors held by such Holders of First Lien Term Loan Claims redacted) as an exhibit to the Plan Supplement.

115.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

116.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.  For the purposes of clarity, with respect to clause (x) of

Article III.B.6(c)(ii)(A)(II) of the Plan, the term Pro Rata shall mean the proportion that an Allowed First Lien Term Loan Claim of a Holder that elects the First Lien Term Loan Equity Election bears to the aggregate amount of Allowed First Lien Term Loan Claims of all Holders that elect the First Lien Term Loan Equity Election.

117.    "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief.

118.    "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

119.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 of the Plan.

120.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

121.    "*Purchase Agreement*" means that certain Asset Purchase Agreement dated as of May 16, 2010, by and between the Debtors and Purchaser, attached to the Plan as <u>Exhibit A</u>.

122.    "*Purchaser*" means the Buyer, as defined in the Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Purchase Agreement).

123.    "*Releasing Parties*" means, collectively: (a) the First Lien Credit Facility Agents; (b) the Revolving Credit Facility Lenders; (c) the First Lien Term Loan Agents; (d) the Second Lien Term Loan Agents; (e) the Second Lien Term Loan Lenders; (f) the DIP Agent; (g) the DIP Lenders; (h) the counterparties to the Secured Swap Agreements; (i) the Indenture Trustee; (j) the Shareholders; (k) the Backstop Parties; and (l) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D of the Plan, or (z) who are in a Class that is deemed to reject the Plan.

124.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Purchase Agreement including, without limitation, (a) the consummation of the Sale Transaction pursuant to the Purchase Agreement whereby the Purchaser will acquire the Acquired Assets (including assuming certain of the Executory Contracts and Unexpired Leases pursuant to Article V.A of the Plan) and shall assume all liability for the distributions that are not made by the Debtors on the Effective Date or treatment provided to Holders of Allowed Claims on account of their Claims as set forth in the Plan, including, without limitation, all liability for Allowed Administrative Claims against the Debtors that are not satisfied by a distribution made by the Debtors on the Effective Date; (b) the execution and delivery of appropriate agreements or other documents of merger, consolidation, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Purchase Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Purchase Agreement; and (d) all other actions that the Purchaser determines are necessary or appropriate.

125.    "*Revolving Credit Facility*" means the $250.0 million secured revolving credit facility provided under the First Lien Credit Agreement, together with all documents related thereto.

126.    "*Revolving Credit Facility Claim*" means any Claim against any Debtor arising under or related to the Revolving Credit Facility; provided that Secured Swap Claims, First Lien Term Loan Claims and any letters of credit which are intended to be reinstated and continue post-petition rather than be paid in full (pursuant to the terms of the DIP Agreement and/or Exit Facility Agreement) shall not constitute Revolving Credit Facility Claims.

127.    "*Revolving Credit Facility Lenders*" means those banks, financial institutions, and other lender parties to the Revolving Credit Facility from time to time, each in their capacity as such.

128.    "*Rights*" means the non-transferable, non-certificated rights distributed to Rights Offering Participants to purchase New Common Units on the Effective Date at the Rights Exercise Price in an amount equal to the Rights Offering Amount pursuant to the terms and conditions of the Rights Offering, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan and the Warrants, if issued.

129.    "*Rights Exercise Price*" means the purchase price per Rights Offering Unit in connection with the Rights Offering equal to (a) the Rights Offering Amount, divided by (b) the total number of Rights Offering Units offered for sale in connection with the Rights Offering.

130.    "*Rights Offering*" means that certain offering of Rights to (a) the First Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Rights Offering Amount, which amount shall be reduced on a dollar-for-dollar basis by the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants pursuant to the Rights Offering, and (b) in the event that Class 7 Second Lien Term Loan Claims votes to accept the Plan, the Second Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Second Lien Term Loan Rights Offering Amount.

131.    "*Rights Offering Amount*" means Cash in an amount equal to (a) $118.9 million minus (b) an amount equal to (i) the total amount of Cash that would be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims if all of the Holders of such Claims (other than the Original Consenting Lenders) elected to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, pursuant to the Plan, minus (ii) the total amount of Cash that will actually be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims as a result of the Holders of such Claims electing to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, which will, after receipt thereof by the Purchaser, be paid by the Purchaser to the Debtors as a portion of the purchase price under the Purchase Agreement.

132.    "*Rights Offering Documents*" means, collectively, all related agreements, documents or instruments in connection with the Rights Offering and the Backstop Unit Purchase Agreement.

133.    "*Rights Offering Participants*" means, collectively, the First Lien Term Loan Rights Offering Participants and the Second Lien Term Loan Rights Offering Participants.

134.    "*Rights Offering Procedures*" means the procedures governing the Rights Offering, to be included as an exhibit to the Plan Supplement.

135.    "*Rights Offering Units*" means the New Common Units offered for sale in connection with the Rights Offering.

136.    "*Sale Transaction*" means that certain transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement that contemplates a taxable transaction whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the Acquired Assets in exchange for (a) the assumption of the Assumed Liabilities, (b) 100% of the New Common Units (subject to dilution by the Rights Offering, the Management Equity Incentive Plan and the Warrants, if issued), (c) the Warrants, if issued, and (d) the Cash proceeds received by the Purchaser in connection with the Rights Offering and pursuant to the Backstop Unit Purchase Agreement.

137.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as amended, modified, or supplemented from time to time, a copy of which will be annexed to the Plan Supplement, and which

K&E 17316187

schedule will be subject to the consent of the Purchaser (including with respect to any amendment, modification, or supplement).

138.      "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

139.      "*Second Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp., LYN Holdings Corp. (d/b/a Neff Holdings Corp.), and certain of its subsidiaries, as borrowers, the Second Lien Term Loan Agents, and the Second Lien Term Loan Lenders.

140.      "*Second Lien Term Loan*" means the $290.0 million secured term loan provided under the Second Lien Credit Agreement.

141.      "*Second Lien Term Loan Administrative Agent*" means Wilmington Trust FSB, in its capacity as administrative agent under the Second Lien Credit Agreement.

142.      "*Second Lien Term Loan Agents*" means, collectively, (a) the Second Lien Term Loan Administrative Agent, (b) Wilmington Trust FSB, in its capacity as second lien collateral agent under the Intercreditor Agreement, (c) CIBC Inc. and UBS Securities LLC, in their capacity as documentation agents under the Second Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the Second Lien Credit Agreement.

143.      "*Second Lien Term Loan Cash Payment*" means Cash in an amount equal to $10.0 million.

144.      "*Second Lien Term Loan Claim*" means any Claim of a Second Lien Term Loan Lender against any Debtor related to the Second Lien Term Loans and arising under the Second Lien Credit Agreement, together with all of the security and other documents related thereto.

145.      "*Second Lien Term Loan Equity Election*" means 5.6% of the New Common Units issued and outstanding on the Effective Date (subject to dilution by the Management Equity Incentive Plan).

146.      "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lender parties to the Second Lien Credit Agreement from time to time, each in their capacity as such.

147.      "*Second Lien Term Loan Rights Offering Amount*" means $7.5 million.

148.      "*Second Lien Term Loan Rights Offering Participants*" means all Holders of Second Lien Term Loan Claims that are accredited investors or qualified institutional buyers, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, as of the Voting Record Date.

149.      "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

150.      "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

151.      "*Secured Swap Agreements*" means that certain ISDA Master Agreement with Bank of America, N.A. dated June 14, 2007, and that certain ISDA Master Agreement with UBS AG dated June 20, 2007, and each related to the First Lien Credit Agreement.

K&E 17316187

152.    "*Secured Swap Claims*" means Claims against any Debtor arising from amounts due under the Secured Swap Agreements.

153.    "*Secured Tax Claims*" means any secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

154.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

155.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

156.    "*Senior Notes*" means those 10% Senior Notes due 2015, issued under the Senior Notes Indenture.

157.    "*Senior Notes Claim*" means any Claim against any Debtor arising from or based upon the Senior Notes or the Senior Notes Indenture; provided that Senior Notes Claims shall not include Section 510(b) Claims.

158.    "*Senior Notes Indenture*" means that certain indenture dated May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp. as issuer, and certain Affiliates of Neff Corp. as guarantors, and Law Debenture Trust Company of New York, as successor indenture trustee.

159.    "*Shareholders*" means Lightyear Capital, LLC, General Electric Pension Trust, and Norwest Equity Partners VIII, LP, and each of their current and former affiliates, officers, directors, managers, members, professionals, and general and limited partners, in their capacity as members of Neff Holdings, LLC.

160.    "*Swap Amendments*" means amendments to the Secured Swap Agreements dated May 14, 2010, attached as exhibits to the Swap Plan Support Agreements.

161.    "*Third Party Release*" means the release provision set forth in Article VIII.D of the Plan.

162.    "*Third Party Releasees*" means, collectively, (a) the First Lien Credit Facility Agents; (b) the First Lien Credit Facility Lenders; (c) provided that the Class 6 Second Lien Term Loan Claims vote to accept the Plan, (i) the Second Lien Term Loan Agents and (ii) the Second Lien Term Loan Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the counterparties to the Secured Swap Agreements; (g) the Indenture Trustee; (h) the Shareholders; (i) the Backstop Parties; (j) the Ad Hoc Group; (k) the Purchaser; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), all such Entities' respective current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives, and successors and assigns of each of the foregoing in their respective capacities as such; provided that any Holder of a Claim who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee.

163.    "*Transaction Expenses*" mean the reasonable and documented fees (other than the Commitment Fee and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Commitment Letter, the Backstop Commitments, the Rights Offering, the Backstop Unit Purchase Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Commitment Letter and/or the Backstop Unit Purchase Agreement, including but not limited to, (a) the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and any other advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 and any expenses related thereto.

164.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

165.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

166.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

167.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

168.    "*Voting Record Date*" means the close of business on July 12, 2010.

169.    "*Warrants*" means warrants to purchase New Common Units representing up to 5% of issued and outstanding New Common Units on the Effective Date (immediately after giving effect to the consummation of the Rights Offering and the other transactions contemplated by the Plan) exercisable in Cash at an exercise price implied by a total equity value of the New Common Units equal to $224.0 million pursuant to the Warrant Agreement, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan.

170.    "*Warrant Agreement*" means that certain agreement, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Group, setting forth the terms and conditions of the Warrants, to be included in the Plan Supplement.

171.    "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates following the Effective Date as set forth in Article IV.T of the Plan.

K&E 17316187

## XV.    CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots or Master Ballots, as applicable, so they will be received by the Debtors' Notice and Claims Agent by the Voting Deadline.

Dated:  July 13, 2010

Respectfully submitted,

NEFF CORP. (on behalf of itself and all other Debtors)

*/s/ Mark Irion*
Name:  Mark Irion
Title:  Chief Financial Officer

**Prepared by:**

James H.M. Sprayregen, P.C.
Ray C. Schrock (admitted *pro hac vice*)
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Anup Sathy, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to the Debtors and Debtors in Possession

K&E 17316187

# EXHIBIT A

K&E 17309966

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DEBTORS' AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**Nothing contained herein shall constitute an offer, acceptance or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval of the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  This is not a solicitation of acceptances or rejections of the Plan.  Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the United States Bankruptcy Court for the Southern District of New York.  Such a solicitation will only be made in compliance with applicable provisions of securities and/or bankruptcy laws.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Anup Sathy, P.C. (admitted *pro hac vice*) |
| Ray C. Schrock (admitted *pro hac vice*) | KIRKLAND & ELLIS LLP |
| Brian S. Lennon | 300 North LaSalle Drive |
| KIRKLAND & ELLIS LLP | Chicago, Illinois  60654 |
| 601 Lexington Avenue | Telephone:  (312) 862-2000 |
| New York, New York  10022 | |
| Telephone:  (212) 446-4800 | |

Counsel to the Debtors and Debtors in Possession

Dated:  July 12, 2010

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

## TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** .......................................................................................................... 1
    A.    Defined Terms ........................................................................................................ 1
    B.    Rules of Interpretation ......................................................................................... 14
    C.    Computation of Time ........................................................................................... 15
    D.    Governing Law .................................................................................................... 15
    E.    Reference to Monetary Figures ........................................................................... 15
    F.    Controlling Document .......................................................................................... 15

**ARTICLE II. DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS** .................... 15
    A.    Administrative Claims ......................................................................................... 15
    B.    Accrued Professional Compensation Claims ...................................................... 16
    C.    DIP Claims .......................................................................................................... 17
    D.    Priority Tax Claims ............................................................................................. 17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................ 17
    A.    Summary of Classification .................................................................................. 17
    B.    Treatment of Claims and Interests ...................................................................... 18
    C.    Special Provision Governing Unimpaired Claims ............................................... 24
    D.    Class Acceptance Requirement ........................................................................... 24
    E.    Elimination of Vacant Classes ............................................................................ 24
    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes ......................... 24
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 24
    H.    Controversy Concerning Impairment .................................................................. 24

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................................ 25
    A.    Sources of Consideration for Plan Distributions ................................................. 25
    B.    Rights Offering .................................................................................................... 25
    C.    Exit Facility ......................................................................................................... 25
    D.    The Purchase Agreement ..................................................................................... 26
    E.    General Settlement of Claims .............................................................................. 27
    F.    Section 1145 Exemption ..................................................................................... 27
    G.    Listing of New Common Units ........................................................................... 27
    H.    Release of Liens .................................................................................................. 27
    I.    Cancellation of Securities and Agreements ........................................................ 27
    J.    Restructuring Transactions .................................................................................. 28
    K.    Corporate Action ................................................................................................. 28
    L.    Effectuating Documents; Further Transactions ................................................... 29
    M.    Exemption from Certain Taxes and Fees ............................................................ 29
    N.    D&O Liability Insurance Policies ....................................................................... 29
    O.    Board Representation ........................................................................................... 29
    P.    Indemnification Provisions .................................................................................. 29
    Q.    Management Equity Incentive Plan ..................................................................... 30
    R.    Emergence Awards .............................................................................................. 30
    S.    Preservation of Rights of Action ......................................................................... 30
    T.    Wind Down and Dissolution of the Debtors ....................................................... 30
    U.    Liquidator ............................................................................................................ 31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................... 31
    A.    Assumption and Assignment of Executory Contracts and Unexpired Leases ................ 31
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................... 32
    C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ................... 32

D.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........... 33
E.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................ 33
F.   Insurance Policies ............................................................................................................. 33
G.   Compensation and Benefit Programs ................................................................................... 33
H.   Reservation of Rights ......................................................................................................... 33
I.   Nonoccurrence of Effective Date ........................................................................................ 34

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................................... **34**
A.   Timing and Calculation of Amounts to Be Distributed ......................................................... 34
B.   Distributions Generally; Disbursing Agent ......................................................................... 34
C.   Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement ...................... 34
D.   Rights and Powers of Disbursing Agent .............................................................................. 34
E.   Distributions on Account of Claims Allowed After the Effective Date ..................................... 35
F.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ............................... 35
G.   Compliance with Tax Requirements/Allocations ................................................................... 36
H.   Claims Paid or Payable by Third Parties .............................................................................. 36

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS** ....................................................................................................................... **37**
A.   Resolution of Disputed Claims ........................................................................................... 37
B.   Disallowance of Claims ..................................................................................................... 38
C.   Amendments to Claims ...................................................................................................... 38

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................... **39**
A.   Compromise and Settlement of Claims, Interests, and Controversies ..................................... 39
B.   Subordinated Claims ......................................................................................................... 39
C.   Debtor Release ................................................................................................................. 39
D.   Third Party Release ........................................................................................................... 40
E.   Exculpation ...................................................................................................................... 41
F.   Injunction ........................................................................................................................ 41
G.   Setoffs ............................................................................................................................. 42

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
THE PLAN** .................................................................................................................................... **43**
A.   Conditions Precedent to the Effective Date ......................................................................... 43
B.   Waiver of Conditions ......................................................................................................... 43
C.   Effective Date .................................................................................................................. 43
D.   Effect of Non-Occurrence of Conditions to the Effective Date ............................................... 44

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............................. **44**
A.   Payout Event .................................................................................................................... 44
B.   Modification and Amendments ........................................................................................... 44
C.   Effect of Confirmation on Modifications .............................................................................. 44
D.   Revocation or Withdrawal of the Plan ................................................................................. 45

**ARTICLE XI. RETENTION OF JURISDICTION** ............................................................................... **45**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ............................................................................. **47**
A.   Immediate Binding Effect ................................................................................................... 47
B.   Additional Documents ....................................................................................................... 47
C.   Payment of Statutory Fees ................................................................................................. 47
D.   Dissolution of Committees ................................................................................................. 47
E.   Reservation of Rights ......................................................................................................... 47
F.   Successors and Assigns ...................................................................................................... 47
G.   Service of Documents ........................................................................................................ 47
H.   Term of Injunctions or Stays .............................................................................................. 48

I.      Entire Agreement ........................................................................................................................48
J.      Nonseverability of Plan Provisions ...........................................................................................48

## INTRODUCTION

Neff Corp. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following joint plan for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.   To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "*Acquired Assets*" shall have the meaning set forth in Section 2.1 of the Purchase Agreement.

3.      "*Ad Hoc Group*" means that certain ad hoc group of certain holders of First Lien Term Loans.

4.      "*Ad Hoc Group Advisors*" means Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Group, and Houlihan Lokey Howard & Zukin, as financial advisor to the Ad Hoc Group.

5.      "*Ad Hoc Group Advisor Fees*" means all Claims for:  (a) the reasonable documented out-of-pocket costs, fees, expenses, disbursements and charges of the Ad Hoc Group Advisors, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases; and (b) reasonable out-of-pocket expenses incurred by members of the Ad Hoc Group in connection with the Chapter 11 Cases.

6.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) the Backstop Party Fees; (e) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; (f) the Ad Hoc Group Advisor Fee Claims, without any requirement for filing fee applications in the Chapter 11 Cases; and (g) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

7.      "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

8.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

9.      "*Agreement Order*" means the order of the Bankruptcy Court approving, among other things, the execution and delivery by the Debtors of the Commitment Letter and the Backstop Unit Purchase Agreement, and the performance by the Debtors of their obligations thereunder.

10.      "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the

Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

11.    "*Alternative Transaction*" means (a) a Payout Event or (b) any restructuring transaction that is inconsistent with the Backstop Unit Purchase Agreement or the Plan Support Agreement, including (i) a merger, consolidation, business combination, recapitalization or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Plan Support Agreement, (ii) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Plan Support Agreement, or (iii) a plan of reorganization that does not contemplate a reorganization of the Debtors on the terms set forth in the Plan Support Agreement.

12.    "*Assumed Liabilities*" shall have the meaning set forth in Section 2.3 of the Purchase Agreement.

13.    "*Backstop Commitment Percentage*" means, with respect to any Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment of such Backstop Party and the denominator of which is the aggregate Backstop Commitments of all Backstop Parties.

14.    "*Backstop Commitments*" means, with respect to any Backstop Party, the commitment, on the terms set forth in the Commitment Letter and in the Backstop Unit Purchase Agreement, of such Backstop Party to fund a portion of the Rights Offering Amount to the extent that the Rights Offering is not fully subscribed pursuant to the Plan.  The Backstop Commitment for each Backstop Party shall be equal to the product of (a) the Rights Offering Amount and (b) such Backstop Parties' Backstop Commitment Percentage.  The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.

15.    "*Backstop Parties*" means certain funds managed by (a) Wayzata Investment Partners and (b) Apollo Capital Management (holding, in the aggregate, in excess of 67% of the aggregate principal amount of the First Lien Term Loan).

16.    "*Backstop Party Fees*" means all Transaction Expenses, the Break-Up Fee, and all Claims for all other amounts that are contemplated to be paid by the Debtors to the Backstop Parties pursuant to the Backstop Unit Purchase Agreement.

17.    "*Backstop Unit Purchase Agreement*" means that certain Backstop Unit Purchase Agreement, dated as of May 16, 2010, by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, as amended, supplemented or otherwise modified from time to time, to be included as an exhibit to the Plan Supplement.

18.    "*Ballot*" means the form distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan approved by the Bankruptcy Court.

19.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

2

20.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

21.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

22.    "*Break-Up Fee*" means a Cash fee in the aggregate amount of $3,000,000 payable by the Debtors to the Backstop Parties that have not defaulted on its Backstop Commitment if the Debtors (a) enter into an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement) with respect to an Alternative Transaction or (b) consummates any Alternative Transaction, in any such case described in clause (a) or clause (b), at any time (x) prior to the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof or (y) within twelve (12) months following the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof.

23.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

25.    "*Cash Payment*" means Cash in the amount of $365,000.

26.    "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

27.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Neff Corp., et al., Chapter 11 Case No. 10-12610 (SCC), which are currently pending before the Bankruptcy Court.

28.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

29.    "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by a Final Order of the Bankruptcy Court.

30.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 270 days after the Claims Bar Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Purchaser, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

31.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

32.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Commitment Letter*" means that certain Commitment Letter, dated as of April 12, 2010, by and between the Backstop Parties and the Debtors pursuant to which the Backstop Parties provided their respective Backstop Commitments on the terms, and subject to the conditions, set forth therein.

34. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on May 28, 2010 and as amended on June 17, 2010.

35. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

38. "*Confirmation Objection Deadline*" means the deadline for Filing objections to the Plan, which date shall in no event be less than seven (7) days prior to the Confirmation Hearing.

39. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

40. "*Consummation*" means the occurrence of the Effective Date.

41. "*Cure Cost*" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

42. "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Effective Date.

43. "*Debtor Release*" means the release given by the Debtors to the Debtor Releasees as set forth in Article VIII.C hereof.

44. "*Debtor Releasee*" means, collectively, each Debtor and the Debtors' current and former Affiliates, partners, Shareholders, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

45. "*Debtors*" means, collectively:  Neff Corp.; Neff Finance Corp.; Neff Holdings Corp.; Neff Holdings LLC; Neff Rental, Inc.; and Neff Rental LLC.

46. "*DIP Agent*" means Bank of America, N.A. in its capacity as administrative agent under the DIP Agreement, or any successor agent appointed in accordance with such agreement.

47. "*DIP Agreement*" means that certain debtor in possession credit agreement, dated as of May 16, 2010, by and among Neff Corp., as borrower, and the DIP Agent, the DIP Lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time.

48. "*DIP Claims*" means any and all Claims arising under or related to the DIP Facility as of the Effective Date.

49. "*DIP Facility*" means that certain $175.0 million debtor in possession credit facility entered into pursuant to the DIP Agreement.

4

50.    "*DIP Lenders*" means the DIP Agent and the banks, financial institutions, and other lender parties under the DIP Facility.

51.    "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

52.    "*Disbursing Agent*" means, on the Effective Date, the Debtors or their agent and, after the Effective Date, the Purchaser, the Liquidator or any other Entity or Entities designated by the Purchaser to make or facilitate distributions that are to be made after the Effective Date pursuant to the Plan.

53.    "*Disclosure Statement*" means the *Amended Disclosure Statement for the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 13, 2010, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

54.    "*Disclosure Statement Order*" means a Final Order entered by the Bankruptcy Court approving the Disclosure Statement and granting related relief.

55.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

56.    "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

57.    "*Emergence Awards*" shall have the meaning set forth in the *Motion of the Debtors for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan* filed on May 25, 2010 [Docket No. 73].

58.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

59.    "*Equity Interest*" means the common stock, limited liability company interests and any other equity, ownership or profits interests of any Debtor and options, warrants, rights or other securities or agreements to acquire the common stock, limited liability company interests or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

60.    "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

61.    "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Purchaser; (c) the Debtor Releasees; (d) the Third Party Releasees; (e) the Exit Facility Agent; (f) the lenders under the Exit Facility; and (g) all of the current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives and successors and assigns of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided that no Non-Released Party will be an Exculpated Party.

62.    "*Exculpation*" means the exculpation provision set forth in Article VIII.E hereof.

63.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exit Facility*" means that new asset based revolving credit facility in the amount of $175 million to be entered into by the Debtors pursuant to the agreement to be executed on or before and subject to the occurrence

of the Effective Date, including any agreements, amendments, supplements or documents related thereto, on terms reasonably satisfactory to the Debtors and the Purchaser and materially consistent with the Exit Facility Documents, which Exit Facility may be assigned and transferred on the Effective Date by the Debtors to the Purchaser.

65.     "*Exit Facility Agent*" means Bank of America, N.A. in its capacity as administrative agent under the Exit Facility, or any successor thereto.

66.     "*Exit Facility Agreement*" means that certain credit agreement to be entered into as of and subject to the occurrence of the Effective Date by and among Neff Corp., as borrower, and the Exit Facility Agent, the Exit Facility lenders named therein, and the parties thereto, as amended, supplemented or otherwise modified from time to time.

67.     "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility, to be included as an exhibit to the Plan Supplement.

68.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

69.     "*Final DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders*, entered June 30, 2010 [Docket No. 207], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

70.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or the Purchaser, as applicable, reserve the right to waive any appeal period.

71.     "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, and amended and restated as of December 16, 2008, by and among Neff Corp., Neff Holdings Corp. and certain of its subsidiaries, as borrowers, the First Lien Credit Facility Agents, and the First Lien Credit Facility Lenders.

72.     "*First Lien Credit Facility Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent under the First Lien Credit Agreement.

73.     "*First Lien Credit Facility Agents*" means, collectively, (a) the First Lien Credit Facility Administrative Agent, (b) Bank of America, N.A., in its capacity as first lien collateral agent and control agent under the Intercreditor Agreement and agent under the First Lien Security Agreement, or any successor-in-interest thereto, (c) CIBC Inc. and UBS Securities LLC, each in their capacity as co-documentation agents under the First Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the First Lien Credit Agreement.

74.     "*First Lien Credit Facility Lenders*" means collectively, the First Lien Term Loan Lenders and the Revolving Credit Facility Lenders.

75.     "*First Lien Security Agreement*" means that certain Security Agreement, dated as of May 31, 2007, as amended and modified from time to time, by and among Neff Corp., LYN Holdings Corp., as grantors and Bank of America, N.A., as agent for the secured parties.

76.     "*First Lien Term Loan*" means the approximately $87.9 million secured term loan provided under the First Lien Credit Agreement.

77.     "*First Lien Term Loan Cash Payment*" means Cash in an amount equal to a Holder's Allowed First Lien Term Loan Claim, including any accrued and unpaid prepetition interest and postpetition interest at the default contract rate; provided that for so long as the Plan Support Agreement has not been terminated, any Original Consenting Lender may not elect to take and shall not receive the First Lien Term Loan Cash Payment on account of any or all of such Original Consenting Lender's Allowed First Lien Term Loan Claim(s).

78.     "*First Lien Term Loan Claim*" means any Claim against any Debtor arising under or related to the First Lien Term Loan.

79.     "*First Lien Term Loan Equity Election*" means the election of a Holder of an Allowed First Lien Term Loan Claim set forth in Article III.B.6(c)(ii)(A)(II) hereof.

80.     "*First Lien Term Loan Lenders*" means those financial institutions and other lender parties to the First Lien Credit Agreement from time to time as "Term Loan Lenders" thereunder, each in their capacity as such.

81.     "*First Lien Term Loan Rights Offering Participants*" means all Holders of First Lien Term Loan Claims that are accredited investors or qualified institutional buyers (as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively), as of the Voting Record Date.

82.     "*General Unsecured Claim*" means any unsecured Claim against any Debtor that is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Senior Notes Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.

83.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

84.     "*Holder*" means any Entity holding a Claim or an Interest.

85.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

86.     "*Indemnification Provision*" means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

87.     "*Indenture Trustee*" means Law Debenture Trust Company of New York as successor in interest to Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Senior Notes Indenture.

88.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

89.     "*Intercompany Contracts*" means any Executory Contract, Unexpired Lease, agreement, contract, or lease between one or more Debtors.

90.     "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.  For the avoidance of doubt, Intercompany Interests excludes Equity Interests in any Debtor held by non-Debtors.

91.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of May 31, 2007, by and among Neff Corp., Bank of America, N.A., as First Lien Collateral Agent, and Wilmington Trust FSB as successor Second Lien Collateral Agent, governing, among other things, the respective rights, remedies, and priorities of Claims and Liens held by such parties, or any similar or related agreement (and as the same may have been modified, amended, or restated).

92.     "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

93.     "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees* [Docket No. 140], entered on June 9, 2010, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

94.     "*Interim DIP Order*" means the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing*, entered May 17, 2010 [Docket No. 41], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

95.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

96.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

97.     "*Liquidator*" means such Entity as may be designated by the Debtors as liquidator pursuant to the Liquidator Agreement and Article IV.U hereof to effectuate the Wind Down.  For the avoidance of doubt, all costs, liabilities, and expenses incurred by the Liquidator shall be paid by the Purchaser.

98.     "*Liquidator Agreement*" means the agreement governing, among other things, the retention and duties of the Liquidator, if applicable, as described in Article IV.U hereof, which shall be in form and substance reasonably acceptable to the Debtor and the Purchaser and to be included as an exhibit to the Plan Supplement.

99.     "*Management Equity Incentive Plan*" means that certain post-Effective Date management equity incentive plan governed by the terms and conditions set forth in the Management Equity Incentive Plan Agreement which provides that, among other things, 10% of the New Common Units, on a fully-diluted basis, shall be reserved for issuance in the form of unit options, of which, (x) options to purchase 8% of the New Common Units on a fully diluted basis will be allocated and issued to participants, as such participants are determined by the Debtors and (y) options to purchase 2% of the New Common Units on a fully diluted basis will be reserved for future issuances as determined by the New Board in its sole discretion.

100.    "*Management Equity Incentive Plan Agreement*" means that agreement to be executed by the Purchaser on or before the Effective Date, including any agreements, amendments, supplements or documents related thereto, documenting the terms and conditions of the Management Equity Incentive Plan in form and substance reasonably acceptable to the Debtors and the Purchaser.

101.    "*Neff Corp.*" means Neff Corp., a Delaware corporation and one of the Debtors in the Chapter 11 Cases.

102.    "*New Board*" means the board of managers of the Purchaser as of the Effective Date.

103.    "*New Common Units*" means one or more classes of newly-issued units of common equity of the Purchaser.  As used in this Plan, New Common Units shall include the Rights Offering Units, the New Common Units issuable upon exercise of the Warrants (if issued), and the New Common Units issued under the Management Equity Incentive Plan.

104.    "*Non-Released Parties*" means those Entities to be identified in the Plan Supplement as Non-Released Parties; provided that Non-Released Parties shall not include the First Lien Credit Facility Lenders, the DIP Lenders, the First Lien Credit Facility Agents, the DIP Agent, the Purchaser, the Backstop Parties or the Ad Hoc Group.

105.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and claims agent for the Debtors.

106.    "*Original Consenting Lenders*" means those certain First Lien Term Loan Lenders that were party to the Plan Support Agreement at the time such agreement was executed.

107.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim.

108.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not:  (a) a Revolving Credit Facility Claim; (b) a Secured Swap Claim; (c) a First Lien Term Loan Claim; (d) a Second Lien Term Loan Claim; (e) a DIP Claim; or (f) a Secured Tax Claim.

109.    "*Payout Event*" means an event on or before the Payout Event Deadline where any or all of the Second Lien Term Loan Lenders or any other party have provided the Debtors with sufficient Cash or committed financing, documented to the satisfaction of the Debtors, to (a) indefeasibly pay all of the Allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in Article III.B hereof.

110.    "*Payout Event Deadline*" means thirty (30) days prior to the Confirmation Hearing.

111.    "*Payout Event Procedures*" means those procedures governing the process by which Entities may propose higher or better recoveries than those provided under the Plan and any counterproposals thereto in connection with the Payout Event as approved by the Bankruptcy Court in the Disclosure Statement Order.

112.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

113.    "*Petition Date*" means May 16, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

114.    "*Plan*" means this *Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

115.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Purchase Agreement; (b) to the extent known, the identity of the members of the New Board and the nature and compensation of any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) a list of Non-Released Parties; (e) the Plan Support Agreement; (f) a schedule of Causes of Action to be retained by the Purchaser; (g) a description of the terms of the Exit Facility; (h) the form of the Management Equity Incentive Plan Agreement; (i) the form of the Warrant Agreement; (j) the Swap Plan Support Agreements and the Swap Amendments; (k) the Backstop Unit Purchase Agreement; (l) a Schedule of Cure Costs; (m) the form of Liquidator Agreement; and (n) the Payout Event Procedures.

116.    "*Plan Support Agreement*" means that certain plan support agreement dated as of April 12, 2010, by and between the Debtors and certain Holders of First Lien Term Loan Claims, as may be amended, supplemented, or otherwise modified from time to time, and which shall be included (with the principal amount or percentage of any First Lien Term Loans or any other securities of any of the Debtors held by such Holders of First Lien Term Loan Claims redacted) as an exhibit to the Plan Supplement.

117.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

118.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.  For the purposes of clarity, with respect to clause (x) of Article III.B.6(c)(ii)(A)(II) herein, the term Pro Rata shall mean the proportion that an Allowed First Lien Term Loan Claim of a Holder that elects the First Lien Term Loan Equity Election bears to the aggregate amount of Allowed First Lien Term Loan Claims of all Holders that elect the First Lien Term Loan Equity Election.

119.    "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief.

120.    "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

121.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

122.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

123.    "*Purchase Agreement*" means that certain asset purchase agreement included in the Plan Supplement.

124.    "*Purchaser*" means the Buyer, as defined in the Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Purchase Agreement).

125.    "*Releasing Parties*" means, collectively: (a) the First Lien Credit Facility Agents; (b) the Revolving Credit Facility Lenders; (c) the First Lien Term Loan Lenders; (d) the Second Lien Term Loan Agents; (e) the Second Lien Term Loan Lenders; (f) the DIP Agent; (g) the DIP Lenders; (h) the counterparties to the Secured Swap Agreements; (i) the Indenture Trustee; (j) the Shareholders; (k) the Backstop Parties; (l) the Purchaser; and (m) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (z) who are in a Class that is deemed to reject the Plan.

126.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Purchase Agreement including (a) the consummation of the Sale Transaction pursuant to the Purchase Agreement whereby the Purchaser will acquire the Acquired Assets (including assuming certain of the Executory Contracts and Unexpired Leases pursuant to Article V.A hereof) and shall assume all liability for the distributions that are not made by the Debtors on the Effective Date or treatment provided to Holders of Allowed Claims on account of their Claims as set forth herein, including all liability for Allowed Administrative Claims against the Debtors that are not satisfied by a distribution made by the Debtors on the Effective Date; (b) the execution and delivery of appropriate agreements or other documents of merger, consolidation, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Purchase Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of

the Plan and the Purchase Agreement; and (d) all other actions that the Purchaser determines are necessary or appropriate.

127.    "*Revolving Credit Facility*" means the $250.0 million secured revolving credit facility provided under the First Lien Credit Agreement, together with all documents related thereto.

128.    "*Revolving Credit Facility Claim*" means any Claim against any Debtor arising under or related to the Revolving Credit Facility; provided that Secured Swap Claims, First Lien Term Loan Claims and any letters of credit which are intended to be reinstated and continue post-petition rather than be paid in full (pursuant to the terms of the DIP Agreement and/or Exit Facility Agreement) shall not constitute Revolving Credit Facility Claims.

129.    "*Revolving Credit Facility Lenders*" means those banks, financial institutions, and other lender parties to the Revolving Credit Facility from time to time, each in their capacity as such.

130.    "*Rights*" means the non-transferable, non-certificated rights distributed to Rights Offering Participants to purchase New Common Units on the Effective Date at the Rights Exercise Price in an amount equal to the Rights Offering Amount pursuant to the terms and conditions of the Rights Offering, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan and the Warrants, if issued.

131.    "*Rights Exercise Price*" means the purchase price per Rights Offering Unit in connection with the Rights Offering equal to (a) the Rights Offering Amount, divided by (b) the total number of Rights Offering Units offered for sale in connection with the Rights Offering.

132.    "*Rights Offering*" means that certain offering of Rights to (a) the First Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Rights Offering Amount, which amount shall be reduced on a dollar-for-dollar basis by the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants pursuant to the Rights Offering, and (b) in the event that Class 7 Second Lien Term Loan Claims votes to accept the Plan, the Second Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Second Lien Term Loan Rights Offering Amount.

133.    "*Rights Offering Amount*" means Cash in an amount equal to (a) $118.9 million minus (b) an amount equal to (i) the total amount of Cash that would be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims if all of the Holders of such Claims (other than the Original Consenting Lenders) elected to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, pursuant to the Plan, minus (ii) the total amount of Cash that will actually be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims as a result of the Holders of such Claims electing to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, which will, after receipt thereof by the Purchaser, be paid by the Purchaser to the Debtors as a portion of the purchase price under the Purchase Agreement.

134.    "*Rights Offering Documents*" means, collectively, all related agreements, documents or instruments in connection with the Rights Offering and the Backstop Unit Purchase Agreement.

135.    "*Rights Offering Participants*" means, collectively, the First Lien Term Loan Rights Offering Participants and the Second Lien Term Loan Rights Offering Participants.

136.    "*Rights Offering Procedures*" means the procedures governing the Rights Offering, to be included as an exhibit to the Plan Supplement.

137.    "*Rights Offering Units*" means the New Common Units offered for sale in connection with the Rights Offering.

138.    "*Sale Transaction*" means that certain transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement that contemplates a taxable transaction whereby the Purchaser and/or one or more

of its wholly-owned Affiliates will acquire the Acquired Assets in exchange for (a) the assumption of the Assumed Liabilities, (b) 100% of the New Common Units (subject to dilution by the Rights Offering, the Management Equity Incentive Plan and the Warrants, if issued), (c) the Warrants, if issued, and (d) the Cash proceeds received by the Purchaser in connection with the Rights Offering and pursuant to the Backstop Unit Purchase Agreement.

139.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as amended, modified or supplemented from time to time, a copy of which will be included in the Plan Supplement, and which schedule will be subject to the consent of the Purchaser (including with respect to any amendment, modification or supplement).

140.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

141.    "*Second Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp., LYN Holdings Corp., and certain of its subsidiaries, as borrowers, the Second Lien Term Loan Agents, and the Second Lien Term Loan Lenders.

142.    "*Second Lien Term Loan*" means the $290.0 million secured term loan provided under the Second Lien Credit Agreement.

143.    "*Second Lien Term Loan Administrative Agent*" means Wilmington Trust FSB, in its capacity as administrative agent under the Second Lien Credit Agreement.

144.    "*Second Lien Term Loan Agents*" means, collectively, (a) the Second Lien Term Loan Administrative Agent, (b) Wilmington Trust FSB, in its capacity as second lien collateral agent under the Intercreditor Agreement, (c) CIBC Inc. and UBS Securities LLC, in their capacity as documentation agents under the Second Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the Second Lien Credit Agreement.

145.    "*Second Lien Term Loan Cash Payment*" means Cash in an amount equal to $10.0 million.

146.    "*Second Lien Term Loan Claim*" means any Claim of a Second Lien Term Loan Lender against any Debtor related to the Second Lien Term Loans and arising under the Second Lien Credit Agreement, together with all of the security and other documents related thereto.

147.    "*Second Lien Term Loan Equity Election*" means 5.6% of the New Common Units issued and outstanding on the Effective Date (subject to dilution by the Management Equity Incentive Plan).

148.    "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lender parties to the Second Lien Credit Agreement from time to time, each in their capacity as such.

149.    "*Second Lien Term Loan Rights Offering Amount*" means $7.5 million.

150.    "*Second Lien Term Loan Rights Offering Participants*" means all Holders of Second Lien Term Loan Claims that are accredited investors or qualified institutional buyers, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, as of the Voting Record Date.

151.    "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

152.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

153.    "*Secured Swap Agreements*" means that certain ISDA Master Agreement with Bank of America, N.A. dated June 14, 2007, and that certain ISDA Master Agreement with UBS AG dated June 20, 2007, and each related to the First Lien Credit Agreement.

154.    "*Secured Swap Claims*" means Claims against any Debtor arising from amounts due under the Secured Swap Agreements.

155.    "*Secured Tax Claims*" means any secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

156.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

157.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

158.    "*Senior Notes*" means those 10% Senior Notes due 2015, issued under the Senior Notes Indenture.

159.    "*Senior Notes Claim*" means any Claim against any Debtor arising from or based upon the Senior Notes or the Senior Notes Indenture; provided that Senior Notes Claims shall not include Section 510(b) Claims.

160.    "*Senior Notes Indenture*" means that certain indenture dated May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp. as issuer, and certain Affiliates of Neff Corp. as guarantors, and Law Debenture Trust Company of New York, as successor indenture trustee.

161.    "*Shareholders*" means Lightyear Capital, LLC, General Electric Pension Trust, and Norwest Equity Partners VIII, LP, and each of their current and former affiliates, officers, directors, managers, members, professionals, and general and limited partners, in their capacity as members of Neff Holdings, LLC.

162.    "*Swap Amendments*" means amendments to the Secured Swap Agreements dated May 14, 2010, attached as exhibits to the Swap Plan Support Agreements.

163.    "*Swap Plan Support Agreements*" means those certain plan support agreements dated May 14, 2010, by and between the Debtors and the counterparties to the Secured Swap Agreements, as may be amended, supplemented, or otherwise modified from time to time, to be included in the Plan Supplement.

164.    "*Third Party Release*" means the release provision set forth in Article VIII.D hereof.

165.    "*Third Party Releasees*" means, collectively, (a) the First Lien Credit Facility Agents; (b) the First Lien Credit Facility Lenders; (c) provided that the Class 7 Second Lien Term Loan Claims vote to accept the Plan, (i) the Second Lien Term Loan Agents and (ii) the Second Lien Term Loan Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the counterparties to the Secured Swap Agreements; (g) the Indenture Trustee; (h) the Shareholders; (i) the Backstop Parties; (j) the Ad Hoc Group; (k) the Purchaser; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), all such Entities' respective current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives, and successors and assigns of each of the foregoing in their

respective capacities as such; provided that any Holder of a Claim who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee.

166.     "*Transaction Expenses*" mean the reasonable and documented fees (other than the Commitment Fee and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Commitment Letter, the Backstop Commitments, the Rights Offering, the Backstop Unit Purchase Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Commitment Letter and/or the Backstop Unit Purchase Agreement, including (a) the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and any other advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 and any expenses related thereto.

167.     "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

168.     "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

169.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

170.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

171.     "*Voting Record Date*" means the close of business on July 12, 2010.

172.     "*Warrants*" means warrants to purchase New Common Units representing up to 5% of issued and outstanding New Common Units on the Effective Date (immediately after giving effect to the consummation of the Rights Offering and the other transactions contemplated by the Plan) exercisable in Cash at an exercise price implied by a total equity value of the New Common Units equal to $224.0 million pursuant to the Warrant Agreement, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan.

173.     "*Warrant Agreement*" means that certain agreement, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Group, setting forth the terms and conditions of the Warrants, to be included in the Plan Supplement.

174.     "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates following the Effective Date as set forth in Article IV.T hereof.

B.     *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in

the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

        The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided that corporate or limited liability company governance matters relating to the Debtors or the Purchaser, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Purchaser, as applicable.

E.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Controlling Document*

        In the event of an inconsistency between the Plan and the Disclosure Statement or the Plan and the Purchase Agreement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Support document).

# ARTICLE II.
## DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS

A.      *Administrative Claims*

        Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Purchaser, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims.

        Except as otherwise provided in this Article II.A, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Purchaser no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Purchaser or their

property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

In the case of the Ad Hoc Group Advisor Fee Claims, such Ad Hoc Group Advisor Fee Claims will be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) for all reasonable and documented fees and expenses incurred up to the Effective Date, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than 60 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

2.    Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or Acquired Assets, as applicable. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals by the Purchaser from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Accrued Professional Compensation Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Purchaser.

3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 5 days prior to the anticipated Effective Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors (in consultation with the Purchaser) may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or Purchaser, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Purchaser, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Purchaser may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims*

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be paid in full in Cash by the Debtors on the Effective Date.

D.    *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim, (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the Debtors (on the Effective Date) or paid by the Purchaser (after the Effective Date), and such Holder, <u>provided</u> that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective Date) or the Purchaser (after the Effective Date), Cash paid by the Purchaser in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than 5 years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Purchaser (after the Effective Date) and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

A.    *Summary of Classification*

All Claims and Interests, other than DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 4 | Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 5 | Secured Swap Claims | Impaired | Entitled to Vote |
| 6 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 7 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 8 | Senior Notes Claims | Impaired | Entitled to Vote |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 13 | Equity Interests in the Debtors | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

The treatment and voting rights provided to each Class for distribution purposes is specified below:

1.    <u>Class 1 - Other Priority Claims</u>

    (a)    *Classification*:  Class 1 consists of all Other Priority Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

        (i)    be paid in full in Cash in an amount equal to such Allowed Other Priority Claim by the Debtors on the Effective Date or by the Purchaser in the ordinary course of business after the Effective Date; or

        (ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

    (c)    *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Secured Tax Claims</u>

    (a)    *Classification*:  Class 2 consists of all Secured Tax Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Tax Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

        (i)    be paid in full in Cash by the Debtors on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or

        (ii)    be paid by the Debtors or the Purchaser (as applicable), commencing on the Effective Date and continuing over a period not exceeding 5 years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Purchaser to prepay the entire amount of such Allowed Secured Tax Claim

during such time period; or

(iii)    be paid regular Cash payments by the Debtors (on the Effective Date) or the Purchaser (in the ordinary course of business after the Effective Date), in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

(c)    *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - Other Secured Claims</u>

(a)    *Classification*:  Class 3 consists of all Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

(i)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by the Debtors on the Effective Date; or

(ii)    receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

(c)    *Voting*:  Class 3 is Unimpaired, and Holders of Class 3 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 - Revolving Credit Facility Claims</u>

(a)    *Classification*:  Class 4 consists of all Revolving Credit Facility Claims.

(b)    *Allowance*:  The Revolving Credit Facility Claims shall be Allowed as of the Petition Date in the amount of $153.3 million, plus interest and fees due and owing under the Revolving Credit Facility both prior to and after the Petition Date through the Effective Date, subject to such Claims being partially paid in Cash with certain proceeds of the DIP Facility, and such Claims shall not be subject to any request for setoff or recoupment.

(c)    *Treatment*:  Except to the extent that (i) a Holder of an Allowed Revolving Credit Facility Claim agrees to a less favorable treatment or (ii) such Revolving Credit Facility Claims have been paid in full with proceeds from the DIP Facility or otherwise, in exchange for the full and final satisfaction, settlement, release, and compromise of each and every Allowed Revolving Credit Facility Claim, each Holder of such Claim shall be paid in full in Cash by the Debtors in respect of such Allowed Revolving Credit Facility Claim on

the Effective Date, or as soon as reasonably practicable thereafter by the Purchaser or Disbursing Agent.

(d)    *Voting*:  Class 4 is Unimpaired, and Holders of Class 4 Revolving Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 Revolving Credit Facility Claims are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 - Secured Swap Claims</u>

(a)    *Classification*:  Class 5 consists of all Secured Swap Claims.

(b)    *Allowance*:  The Secured Swap Claims shall be Allowed in an aggregate amount equal to $22.4 million.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Swap Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Swap Claim, each Holder of such remaining Allowed Secured Swap Claim shall be entitled to the treatment set forth in the applicable Swap Amendment.

(d)    *Voting*:  Class 5 is Impaired.  Therefore, Holders of Allowed Class 5 Secured Swap Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - First Lien Term Loan Claims</u>

(a)    *Classification*:  Class 6 consists of all First Lien Term Loan Claims.

(b)    *Allowance*:  The First Lien Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $87.9 million, plus interest and fees due and owing under the First Lien Term Loan as of the Effective Date pursuant to the terms of the First Lien Credit Agreement or related documents.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Term Loan Claim, each Holder of such Allowed First Lien Term Loan Claim shall receive:

(i)    **If the Payout Event occurs:** Payment in full in Cash in respect of such Allowed First Lien Term Loan Claim, including payment on account of any accrued but unpaid prepetition interest and postpetition interest at the default contract rate.

(ii)    **If the Payout Event does not occur:**

(A)    At the election of such Holder, either:

(I)    the First Lien Term Loan Cash Payment; or

(II)    such Holder's (x) Pro Rata share of 100% of the New Common Units (subject to dilution by the Rights Offering Units, the Second Lien Term Loan Equity Election, the Warrants, if issued, and the Management Equity Incentive Plan) <u>and</u> (y) Pro Rata share of 100% of the Rights to

purchase Rights Offering Units in an amount up to the Rights Offering Amount less the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants in connection with the Rights Offering; provided that Holders of First Lien Term Loan Claims that are not First Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were First Lien Term Loan Rights Offering Participants; and

(B)     if Class 8 Senior Notes Claims or Class 9 General Unsecured Claims votes in favor of the Plan, the Cash Payment; provided that the Cash Payment shall be transferred by gift for distribution to Holders of Allowed Class 8 Senior Notes Claims and/or Allowed Class 9 General Unsecured Claims on a Pro Rata basis if such Class or Classes vote to accept the Plan.

(d)     *Voting*:  Class 6 is Impaired.  Therefore, Holders of Class 6 First Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)     *Distributions*:  Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Cash Payment shall receive its Plan distribution in Cash from the Debtors on the Effective Date.  Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

7.    Class 7 - Second Lien Term Loan Claims

(a)     *Classification*:  Class 7 consists of all Second Lien Term Loan Claims.

(b)     *Allowance*:  The Second Lien Term Loan Claims shall be Allowed in the amount of $290.0 million plus accrued but unpaid interest as of the Petition Date.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Term Loan Claim, each Holder of such Allowed Second Lien Term Loan Claim shall receive:

(i)     **If the Payout Event occurs:**  Holders of Allowed Class 7 Second Lien Term Loan Claims shall be treated no less favorably than if the Payout Event did not occur.

(ii)    **If the Payout Event does not occur and Class 7 votes to accept the Plan**:

(A)     At the election of each Holder, such Holder's Pro Rata share of either:

(I)     the Second Lien Term Loan Cash Payment; or

(II)    the Second Lien Term Loan Equity Election; and

21

(B)    such Holder's Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Second Lien Term Loan Rights Offering Amount; provided that Holders of Second Lien Term Loan Claims that are not Second Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were Second Lien Term Loan Rights Offering Participants.

(iii)    **If the Payout Event does not occur and Class 7 votes to reject the Plan:** Such Holder's Pro Rata share of the Warrants to purchase 5.0% of the New Common Units to be issued and outstanding on the Effective Date.

(d)    *Voting*: Class 7 is Impaired. Therefore, Holders of Class 7 Second Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)    *Distributions*: Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Cash Payment shall receive its Plan distribution in Cash and Rights from the Debtors on the Effective Date. Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

8.   Class 8 - Senior Notes Claims

(a)    *Classification*: Class 8 consists of all Senior Notes Claims.

(b)    *Allowance*: The Senior Notes Claims shall be Allowed in the aggregate amount of $35.9 million.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim, each Holder of such Allowed Senior Notes Claim shall receive from the Debtors, on the Effective Date, or the Purchaser or Disbursing Agent, as soon after the Effective Date as reasonably practicable:

(i)    **If Class 8 votes to accept the Plan:** No recovery on account of such Claims; provided that Holders of Allowed Class 8 Senior Notes Claims shall receive by gift their Pro Rata share of the Cash Payment.

(ii)    **If Class 8 votes to reject the Plan:** No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(d)    *Voting*: Class 8 is Impaired. Therefore, Holders of Allowed Class 8 Senior Notes Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

9.   Class 9 - General Unsecured Claims

(a)    *Classification*: Class 9 consists of all General Unsecured Claims.

(b)    *Treatment*: Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction,

settlement, release, and compromise of each and every Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive from the Debtors, on the Effective Date, or the Purchaser or Disbursing Agent, as soon after the Effective Date as reasonably practicable:

(i)  **If Class 9 votes to accept the Plan:** No recovery on account of such Claims; provided that Holders of Allowed Class 9 General Unsecured Claims shall receive by gift their Pro Rata share of the Cash Payment.

(ii)  **If Class 9 votes to reject the Plan:** No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(c)  *Voting*:  Class 9 is Impaired.  Therefore, Holders of Allowed Class 9 General Unsecured Claims are entitled to vote to accept or reject the Plan.

10.  Class 10 - Intercompany Claims

(a)  *Classification*:  Class 10 consists of all Intercompany Claims.

(b)  *Treatment*:  Holders of Allowed Class 10 Intercompany Claims shall not receive any distribution on account of such Claims; provided that the Debtors or the Purchaser reserve the right to reinstate any Class 10 Intercompany Claims in accordance with section 1124 of the Bankruptcy Code.

(c)  *Voting*:  Class 10 is Unimpaired, and Holders of Class 10 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.  Class 11 - Section 510(b) Claims

(a)  *Classification*:  Class 11 consists of all Section 510(b) Claims.

(b)  *Treatment*:  Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims, and Section 510(b) Claims shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

(c)  *Voting*:  Class 11 is Impaired, and Holders of Class 11 Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 11 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

12.  Class 12 - Intercompany Interests

(a)  *Classification:*  Class 12 consists of all Intercompany Interests.

(b)  *Treatment:*  Holders of Allowed Class 12 Intercompany Interests shall not receive any distributions on account of such Interests; provided that the Debtors or the Purchaser reserves the right to reinstate any or all Class 12 Intercompany Interests on or after the Effective Date.

(c)  *Voting:*  Class 12 is Unimpaired, and Holders of Class 12 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 12 Intercompany Interests are not entitled to vote to accept or reject the Plan.

13. Class 13 - Equity Interests in the Debtors

    (a)    *Classification*:  Class 13 consists of all Equity Interests in the Debtors.

    (b)    *Treatment*:  Holders of Equity Interests in the Debtors will not receive any distribution on account of such Equity Interests, and Equity Interests in the Debtors shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

    (c)    *Voting*:  Class 13 is Impaired, and Holders of Class 13 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 13 Equity Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Purchaser, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions. All amounts and securities necessary for the Debtors (on the Effective Date) or the Purchaser or Disbursing Agent (after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the liabilities assumed or consideration paid by the Purchaser to the Debtors in the Sale Transaction (including the Cash proceeds received by the Purchaser in connection with the Rights Offering and/or pursuant to the Backstop Unit Purchase Agreement, and the New Common Units and Warrants (if required) issued by the Purchaser to the Debtors), the Exit Facility and Cash of the Debtors.  Notwithstanding anything herein to the contrary or in the Purchase Agreement, the Purchaser shall assume all liability for the distributions provided on account of all Allowed Claims against the Debtors as provided herein that are not satisfied by a distribution made by the Debtors on the Effective Date.

B.      *Rights Offering*

The Plan contemplates that the Debtors shall raise the Rights Offering Amount through the Rights Offering; provided that if a Payout Event occurs such that all Allowed First Lien Term Loan Claims have been indefeasibly paid in full in Cash on the Effective Date, then there shall be no Rights Offering and the Rights Offering Participants and the Backstop Parties shall be relieved of any obligations related thereto and under the Commitment Letter and the Backstop Unit Purchase Agreement.  On the Effective Date, the Debtors shall consummate the Rights Offering, through which each Rights Offering Participant, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, shall have the opportunity to purchase Rights Offering Units pursuant to the Rights Offering Documents.  The Rights Offering will dilute the New Common Units issued on account of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election pursuant to Article III.B.6 hereof and Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election pursuant to Article III.B.7 hereof.  The Rights Offering will be backstopped by the Backstop Parties on a several (not joint) basis in accordance with the terms and conditions of the Backstop Unit Purchase Agreement.  The Rights Offering shall be conducted and implemented in accordance with the Rights Offering Procedures.

C.      *Exit Facility*

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Purchaser in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Purchaser to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents.  The Purchaser may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.  To the extent Revolving Credit Facility Claims are not rolled up or otherwise satisfied by the DIP Facility as of the Effective Date, the remaining Revolving Credit Facility Claims shall be paid in full in Cash with the proceeds from the Exit Facility.

Upon the Confirmation Date, (1) the Purchaser is authorized to execute and deliver the Exit Facility Documents and perform its obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, and (2) subject to the occurrence of the Effective Date the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Purchaser enforceable in accordance with their respective terms.

*D.*    *The Purchase Agreement*

1.    Issuance of New Common Units

The Purchaser shall issue the New Common Units to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election in accordance with Article III.B.6 and/or Holders of Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election in accordance with Article III.B.7 hereof. New Common Units shall also be (1) offered and sold pursuant to the Rights Offering and (2) reserved for the Management Equity Incentive Plan.

Each of the New Common Units issued and distributed pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.    Warrants

If the Payout Event does not occur and provided that Class 7 does not vote to accept the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Purchaser shall issue the Warrants to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed Class 7 Second Lien Term Loan Claims as of the Voting Record Date in accordance with Article III.B.7 hereof.

3.    Vesting of Assets in the Purchaser

Except as otherwise provided herein or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities shall vest in the Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility). On and after the Effective Date, except as otherwise provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.    Assumption of Liabilities by the Purchaser

The Purchaser shall assume the Assumed Liabilities pursuant to Section 2.3 of the Purchase Agreement, including all (a) distributions under the Plan (other than those distributions made by the Debtors on the Effective Date or the Liquidator on or after the Effective Date) and (b) costs associated with the Wind Down. For the avoidance of doubt, and notwithstanding anything herein or in the Purchase Agreement to the contrary, the Purchaser assumes and shall be deemed to assume all liability for the distributions or treatment provided on account of all Claims against, obligations of, or Interests in the Debtors as set forth herein, and the Purchaser shall assume all liability for Administrative Claims and the costs and expenses associated with the Wind Down, including any distributions on account of Allowed Claims thereunder.

5.    Powers of the Purchaser

From and after the Effective Date and continuing through the date of entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear, be heard on and participate in matters brought before the Bankruptcy Court or any other court with jurisdiction over the Chapter 11 Cases; (2) be entitled to notice and opportunity for hearing on all such issues; (3) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; and (4) have the right to object to any and all Claims or Interests.

E.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

F.    *Section 1145 Exemption*

Except as set forth in the immediately succeeding sentence, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Rights, the New Common Units, and the Warrants, shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.  The New Common Units to be issued to the Backstop Parties in connection with the Backstop Unit Purchase Agreement shall be exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities pursuant to the exemptions set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder.  In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including, the Rights, the New Common Units and the Warrants shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval, if any.

G.    *Listing of New Common Units*

None of the New Common Units (including the Rights Offering Units and any New Common Units issuable upon exercise of the Warrants), the Rights or the Warrants will be listed on a national securities exchange and the Purchaser will not be a reporting company under the Securities Exchange Act.

H.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Purchase Agreement, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Purchaser and its successors and assigns.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Claims, encumbrances or Interests pursuant to the applicable sections of the Bankruptcy Code.

I.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Senior Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; (2) the obligations of the Debtors under the

27

DIP Facility, the Revolving Credit Facility, the First Lien Term Loan and the Second Lien Term Loan, shall be fully released, settled, and compromised as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including the Senior Notes Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, settled, and compromised.

J.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Purchaser may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan and the Purchase Agreement.  For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein or in the Purchase Agreement shall constitute a change of control under any agreement, contract or document of the Debtors or the Purchaser, as applicable.

K.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan and the Purchase Agreement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers or officers of the Debtors or the Purchaser, or any other Entity or Person, including: (1) entry into the Purchase Agreement; (2) adoption or assumption, as applicable, and assignment to the Purchaser of Executory Contracts and Unexpired Leases; (3) selection of the managers and officers for the Purchaser; (4) the execution of and entry into the Exit Facility Documents; (5) the issuance and distribution of the Rights as provided herein; (6) the issuance and distribution of the New Common Units as provided herein; (7) the issuance and distribution of the Warrants, if applicable, as provided herein; (8) adoption of the Management Equity Incentive Plan; and (9) all other actions contemplated by the Plan and the Purchase Agreement (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or the Purchase Agreement involving the company structure of the Debtors or the Purchaser, and any company action required by the Debtors or the Purchaser in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors or the Purchaser.  Consequently, Intercompany Interests shall be retained, and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers or authorized persons of the Debtors or the Purchaser (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan and the Purchase Agreement (or necessary or desirable to effect the transactions contemplated by the Plan or the Purchase Agreement) in the name of and on behalf of the Debtors or the Purchaser, as applicable, including (1) the Exit Facility and the other Exit Facility Documents and (2) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

L.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Purchaser and the managers, officers, authorized persons and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, and the securities issued pursuant to the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, in the name of and on behalf of the Purchaser, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement.

M.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Purchase Agreement shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the Sale Transaction; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; (5) the issuance, distribution and/or sale of any of the New Common Units, the Rights, the Warrants (if issued) and any other securities of the Debtors or the Purchaser; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Purchase Agreement, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan or the Purchase Agreement.

N.      *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

O.      *Board Representation*

The Purchaser shall be managed by the New Board which will consist of 5 members. The Backstop Parties described in clause (a) of the definition of "Backstop Parties" shall have the right to appoint 2 members of the New Board as of the Effective Date and the Backstop Parties described in clause (b) of the definition of "Backstop Parties" shall have the right to appoint 2 members of the New Board as of the Effective Date. The fifth member of the New Board shall be the Chief Executive Officer of the Purchaser. To the extent known, the Plan Supplement will list the members of the New Board identified as of the date of the filing thereof.

P.      *Indemnification Provisions*

Notwithstanding anything herein to the contrary or pursuant to the termination, dissolution, or wind down of the Debtors, the Debtors (if necessary to continue all Indemnification Provisions in full force), as of the Effective Date, shall be deemed to have assumed all Indemnification Provisions and assigned such provisions to the Purchaser as though such Indemnification Provisions were to have full force and effect; provided that the assumption by the Debtors of the Indemnification Provisions and the assignment thereof to the Purchaser shall not be deemed to be an assumption or assignment of the contract, agreement, resolution, instrument or document in which such Indemnification Provisions are contained, memorialized, agreed to, embodied or created (or any of the other terms

or provisions thereof) unless, and only to the extent that, such contract, agreement, resolution, instrument or document is an Acquired Asset.  All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions or transactions occurring prior to the Effective Date; provided that notwithstanding anything herein to the contrary, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter.

Q.    *Management Equity Incentive Plan*

On or before the Effective Date, the Purchaser shall execute the Management Equity Incentive Plan Agreement.  The Plan Supplement will contain the Management Equity Incentive Plan Agreement.

R.    *Emergence Awards*

On the Effective Date, the Emergence Awards will be deemed approved in their entirety without any further action by the Debtors or the Purchaser and the Debtors will be authorized to make all payments with respect to the Emergence Awards on the Effective Date.

S.    *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article VIII.C and Article VIII.E hereof), the Purchaser shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Purchaser's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Purchaser may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Purchaser.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Purchase Agreement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Purchaser, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Purchaser have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Purchaser, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Purchaser expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

T.    *Wind Down and Dissolution of the Debtors*

On and after the Effective Date, the Liquidator will implement, and the Purchaser will oversee and fund, the Wind Down pursuant to the Liquidator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Liquidator shall:  (a) change the business and corporate names of each of the Debtors to new names bearing no resemblance to any of the present names of such Debtor so as to permit the use of such names by the Purchaser; (b) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement; (c) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (d) complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (e) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of this Plan.

The filing by the Liquidator of each Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members, the board of directors or board of managers of each such Debtor. Notwithstanding anything herein or in the Purchase Agreement, to the contrary, the Purchaser shall assume all liability for all costs, expenses, or claims arising from or related to the Wind Down, including the costs and expenses associated with any Claims resolution or similar process following the Effective Date (whether undertaken pursuant to Article VII hereof or otherwise).   Notwithstanding anything herein to the contrary, the Purchaser or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.

U.    *Liquidator*

Prior to or on the Effective Date, the Liquidator may be designated by the Debtors pursuant to the terms of the Liquidator Agreement for purposes of conducting the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders (subject, at all times, to the oversight of the Purchaser), and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidator. All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date, or transferred pursuant to the Purchase Agreement, shall be transferred to the Liquidator and managed and distributed by the Liquidator pursuant to the terms of the Liquidator Agreement and shall be held in the name of the Debtors free and clear of all Claims against the Debtors and Interests in the Debtors except for rights to such distributions provided to Holders of Allowed Claims as provided herein. Any and all costs and expenses incurred by the Liquidator in connection with the Wind Down shall be paid by the Purchaser.

As provided in the Liquidator Agreement, the Entity chosen to be the Liquidator shall have such qualifications and experience to enable the Liquidator to perform its obligations under this Plan and under the Liquidator Agreement. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Liquidator, the Purchaser shall designate another Entity to become Liquidator and such Entity will become the successor Liquidator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidator. The Liquidator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidator Agreement by the Purchaser.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Assignment of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected, as mutually agreed upon by the Debtors and the Purchaser; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject, as mutually agreed upon by the Debtors and the Purchaser, of a motion to reject filed on or before the Confirmation Date; (4) is identified as an Executory Contract or Unexpired Lease to be rejected, as mutually agreed upon by the Debtors and the Purchaser, pursuant to the Plan Supplement; (5) is not an Acquired Asset; or (6) without limiting the generality of clause (5), is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Prior to entry of the Disclosure Statement Order, the Debtors shall file the Schedule of Rejected Executory Contracts and Unexpired Leases.  The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Rejected Executory Contracts and Unexpired Leases in the manner set forth in the Purchase Agreement. Notwithstanding anything to the contrary in the Plan, unless otherwise approved in advance by the Purchaser, the Debtors shall not assume and assign to the Purchaser any employment agreement and employee benefit plan except for those employment agreements and employee benefit plans specifically set forth on Schedule 2.1(e) to the Purchase Agreement and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Purchaser an amendment, consent and acknowledgment agreement

described in Section "C" on Schedule 2.1(e) to the Purchase Agreement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date.  Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph and or anything contrary herein, the Debtors and the Purchaser reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date.  Moreover, notwithstanding the foregoing paragraph, after the Effective Date, the Purchaser shall have the right to terminate, amend, or modify any Executory Contracts, Unexpired Leases, leases, or other agreements without approval of the Bankruptcy Court.

B.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan or the Purchase Agreement that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Cost or by an agreed-upon waiver of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Purchaser and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

On or prior to the fourteenth (14th) day following approval of the Disclosure Statement Order, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be sent to applicable counterparties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be filed, served and actually received by the Debtors by the Confirmation Objection Deadline.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such matters.

In the event of a dispute regarding: (1) the amount of any Cure Cost; (2) the ability of the Purchaser to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Purchaser, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or after the Effective Date, the Purchaser, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) the Claims Bar Date established in the Chapter 11 Cases.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to

such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.F hereof, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Purchaser expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Purchaser, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan or the Purchase Agreement, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan or the Purchase Agreement.  Nothing in the immediately preceding sentence shall be deemed to limit, supersede or change the provisions set forth in Article V.G.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Insurance Policies*

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the applicable Debtor under the Plan and the Bankruptcy Code and shall be assumed by the applicable Debtor and assigned to the Purchaser in accordance with the terms of the Purchase Agreement and the Plan.

G.      *Compensation and Benefit Programs*

All employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their respective employees, retirees and directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases and will be rejected unless any of the foregoing is an Acquired Asset in accordance with the Purchase Agreement, in which case the same shall be assumed and assigned to the Purchaser pursuant to the terms of the Purchase Agreement and the Plan.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan or the Purchase Agreement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Purchaser has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or

rejection, the Debtors or the Purchaser, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

I.       Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan.

B.       Distributions Generally; Disbursing Agent

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Purchaser as Disbursing Agent, the Liquidator, or such other Entity designated by the Purchaser as a Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.       Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement

Notwithstanding anything to the contrary contained herein:  (1) the Purchase Price (as such term is defined in the Purchase Agreement) shall be used solely to make distributions under the Plan, whether or not such distributions are made on the Effective Date or thereafter; and (2) for purposes of distributions to be made of Estate assets received or receivable from the Purchaser pursuant to the Purchase Agreement in the form of the Purchase Price as provided herein, such assets shall be distributed solely by (a) prior to or on the Effective Date, the Debtors and (b) following the Effective Date, the Liquidator on behalf of the Debtors.

D.       Rights and Powers of Disbursing Agent

1.       Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Purchase Agreement; (b) make all distributions contemplated under the Plan and the Purchase Agreement; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested

in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Purchase Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Purchaser.

E.    *Distributions on Account of Claims Allowed After the Effective Date*

1.    <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.    <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Purchaser, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

F.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Delivery of Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; <u>provided</u> that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

Distributions to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims shall (a) be made to the First Lien Credit Facility Administrative Agent and/or the Second Lien Term Loan Administrative Agent, as applicable, for the benefit of the respective Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively, as provided herein and under the Purchase Agreement and (b) be deemed completed when made to the First Lien Credit Facility Administrative Agent and the Second Lien Term Loan Administrative Agent, as applicable. Distributions to Holders of Senior Notes Claims shall (x) be made to the Indenture Trustee for the benefit of Holders of Senior Notes Claims and (y) be deemed completed when made to the Indenture Trustee.

2.    <u>Minimum; De Minimis Distributions</u>

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Common Units and such fractions shall be deemed to be zero. No cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

3.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.    After such date, all unclaimed property or interests in property shall revert to the Purchaser (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

5.    Surrender of Cancelled Instruments or Securities Relating to Senior Notes Claims

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Senior Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be canceled, except to the extent otherwise provided herein.    The Indenture Trustee may (but shall not be required to) request registered Holders to surrender their Senior Notes for cancellation.

G.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.    Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    Claims Paid or Payable by Third Parties

1.    Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Purchaser after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim.    To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Liquidator, the Disbursing Agent or the Purchaser on account of such Claim, such Holder shall, within 2 weeks of receipt thereof, repay or return the distribution to the Purchaser or the Liquidator, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan.

2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Purchaser, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Resolution of Disputed Claims*

1.    Allowance of Claims

On or after the Effective Date, the Purchaser shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan, in the Purchase Agreement or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.    Prosecution of Objections to Claims

The Debtors prior to and on the Effective Date or the Purchaser after the Effective Date, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Purchaser may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  From and after the Effective Date, the Purchaser shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Claims Estimation

Prior to and on the Effective Date, the Debtors, and after the Effective Date, the Purchaser, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Purchaser have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court

estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Purchaser, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Purchaser, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Debtors or the Purchaser, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Purchaser, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

5.    Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

B.    Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtors or the Purchaser under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Purchaser allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Purchaser, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS OR THE PURCHASER, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

C.    Amendments to Claims

On or after the Effective Date, except as provided in Article II.A hereof, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Purchaser, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Purchaser may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Purchaser, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding anything herein to the contrary, and as provided in Article III.B.11 of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.      *Debtor Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE PURCHASER WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, EACH OF THE DEBTORS AND THE DEBTORS' ESTATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR ANY THIRD PARTY RELEASEE, THE

RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE PURCHASER HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE PURCHASER ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

D.      *Third Party Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED

AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A DEBTOR RELEASEE OR A THIRD PARTY RELEASEE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY; (2) ARISING UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE PURCHASER MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

E.    *Exculpation*

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Plan Support Agreement, the Disclosure Statement, the Restructuring Transactions, the Rights Offering, the Backstop Unit Purchase Agreement, the issuance, distribution and/or sale of any of the New Common Units (including Rights Offering Units and New Common Units issuable upon exercise of the Warrants), the Rights, the Warrants (if issued) or any other security, Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

F.    *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION

PROVIDED IN ARTICLE VIII.E); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, THE BACKSTOP PARTIES, THE AD HOC GROUP, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

G.      Setoffs

Except as otherwise provided herein, the Debtors or the Purchaser, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Purchaser, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Purchaser of any such Claims, rights, and Causes of Action that the Purchaser may possess against

such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Purchaser, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      The Plan Support Agreement shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Ad Hoc Group and such Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

3.      The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be in form and substance reasonably acceptable to the Debtors and to the Ad Hoc Group;

4.      The Backstop Party Fees shall have been paid in full in Cash in accordance with the Backstop Unit Purchase Agreement, the Plan Support Agreement, the Plan, and the interim and final orders approving the DIP Facility;

5.      The Exit Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facility shall have occurred;

6.      The Debtors shall have assumed the Backstop Unit Purchase Agreement and the Commitment Letter;

7.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

8.      The Debtors shall have paid in full in Cash all reasonable and documented Ad Hoc Group Advisor Fee Claims; and

9.      All conditions to closing under the Backstop Unit Purchase Agreement and the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

B.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Purchaser.

C.      *Effective Date*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A hereof have been satisfied or waived.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Payout Event*

The Plan contemplates the possibility of obtaining higher or better distributions to all Classes receiving distributions under the Plan pursuant to the Payout Event.  If the Payout Event occurs, the Debtors shall File a modified Plan (including any necessary conforming and immaterial changes thereto) evidencing the Payout Event and shall not be required to make additional disclosures or resolicit votes for such modified Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Pursuant to and as more fully detailed in the Payout Event Procedures, potential bidders of a Payout Event may present to the Debtors a topping proposal that provides higher or better recoveries to creditors than those contemplated by the Sale Transaction under the Plan at any time up to the Payout Event Deadline, provided that such topping proposal provides the Debtors with sufficient Cash or committed financing to (a) indefeasibly pay all First Lien Credit Facility Lenders in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in the Plan.  If at least one such topping proposal is received by the Debtors prior to the Payout Event Deadline, the Debtors will file and serve a notice of the highest or best bid received, no later than three (3) Business Days following the Payout Event Deadline and otherwise in accordance with the Payout Event Procedures.

The Purchaser (or any member thereof) shall be permitted to present for consideration by the Debtors a counterproposal to such highest or best bid at any time up to three (3) Business Days after receiving such notice from the Debtors of such highest or best bid (unless such date is extended by the Debtors), that the Purchaser or member thereof reasonably believes provides higher and better recoveries than that provided by such highest or best bid as set forth in the Payout Event Procedures.

B.      *Modification and Amendments*

Subject to the limitations contained herein and in the Plan Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

C.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

D.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Purchaser amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 hereof;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Plan Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     to resolve any disputes arising under the Purchase Agreement, the Backstop Unit Purchase Agreement, Warrant Agreement, Liquidator Agreement or Plan Support Agreement;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Immediate Binding Effect

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Purchaser, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan or the Purchase Agreement, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.  Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement.  The Debtors or the Purchaser, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Purchase Agreement.

### C.  Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Purchaser (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### D.  Dissolution of the Committee

On the Effective Date, the Committee shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases.

### E.  Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### F.  Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G.  Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Purchaser shall be served on:

Neff Corp.

47

3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attn.: Mark Irion

<u>with copies to:</u>

Kirkland & Ellis LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Attn.: Anup Sathy, P.C. and Paul Wierbicki

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn.: Ray C. Schrock and Brian S. Lennon

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn.:  Kristopher M. Hansen and Jayme T. Goldstein

H.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Backstop Unit Purchase Agreement and the Purchase Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

Respectfully submitted, as of the date first set forth above,

Neff Corp. (for itself and all Debtors)

By:      _____
Name:    Mark Irion
Title:    Chief Financial Officer of Neff Corp.

# EXHIBIT B

**First Lien Term Loan Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of April 12, 2010, is entered into by and among Neff Corp. ("Neff" and together with its parent company (Neff Holdings LLC) and subsidiaries parties hereto, collectively the "Company" or the "Debtors"),[1] and certain holders of the First Lien Term Loans (as defined below) (the "First Lien Term Loan Lenders") parties hereto from time to time (together with their respective successors and permitted assigns, the "Consenting Lenders"). The Company, each Consenting Lender and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "Parties" and individually as a "Party". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Plan Term Sheet (as defined below).

## PRELIMINARY STATEMENTS

WHEREAS, as of the date hereof, the Consenting Lenders hold, in the aggregate, in excess of 67% of the aggregate outstanding principal amount of the first lien term loans (the "First Lien Term Loans") under that certain Credit Agreement (as amended, modified or otherwise supplemented from time to time, the "First Lien Credit Agreement"), dated as of May 31, 2007 and amended and restated as of December 16, 2008, by and among Neff, Neff Holdings Corp., certain of its subsidiaries, Bank of America, N.A., as administrative agent, and the other parties signatory thereto;

WHEREAS, the Company and the Consenting Lenders have agreed to implement a restructuring of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as Exhibit A (including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof, the "Plan Term Sheet"), which Plan Term Sheet is the product of arm's length good faith discussions between the Company and members of an ad hoc group of certain holders of the First Lien Term Loan Lenders (the "Ad Hoc Group");

WHEREAS, it is anticipated that, subject to the terms of this Agreement, the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), which plan of reorganization shall be consistent in all material respects with the terms of the Plan Term Sheet (a "Qualified Plan") and provide for, among other things, certain distributions on account of the First Lien Term Loan Lenders' claims under the First Lien Credit Agreement (the "First Lien Term Loan Lender Claims");

WHEREAS, the Company has agreed to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Debtors (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District

---

[1] The Neff entities that will be filing a voluntary petition for relief in connection with the Chapter 11 Cases are Neff Holdings LLC, Neff Holdings Corp., Neff Corp., Neff Rental LLC, Neff Finance Corp. and Neff Rental, Inc.

of New York (the "Bankruptcy Court") to effect the Restructuring Transactions and, subject to the terms and conditions of this Agreement, to (i) file (a) a Qualified Plan and (b) a disclosure statement that is materially consistent with a Qualified Plan (the "Disclosure Statement"), and (ii) use commercially reasonable efforts to have the Disclosure Statement approved and a Qualified Plan confirmed by the Bankruptcy Court; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan Term Sheet.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Plan.**

The Plan Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Plan Term Sheet sets forth the material terms and conditions of the Restructuring Transactions; however, the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Plan Term Sheet and this Agreement, this Agreement shall control.

2.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "Definitive Documents" means the documents implementing, achieving and relating to a Qualified Plan and the Plan Term Sheet and the Restructuring Transactions, including any first day motions, other than any administerial first day motions or retention applications (the "First Day Motions"), the Disclosure Statement and any motion seeking the approval thereof, the order of the Bankruptcy Court confirming a Qualified Plan, and definitive documentation relating to the Company's debtor-in-possession financing, use of cash collateral, any exit financing, organizational documents, shareholder and member related agreements or other related documents, which shall contain terms and conditions consistent in all material respects with this Agreement and the Plan Term Sheet and shall otherwise be reasonably satisfactory in all respects to the Company and Requisite Lenders, in accordance with Section 7 hereof.

(b)    "Material Adverse Effect" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Company, taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, effect, occurrence, development, circumstance or change of fact arising out of or resulting from (A) conditions or effects that generally affect persons or entities engaged in the industries and markets in which the Company operates, (B) general economic conditions in the United States or globally, (C) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national

2

emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (D) financial, banking, securities, credit or commodities markets, prevailing interest rates, or general capital markets conditions in the United States or globally, (E) changes in U.S. generally accepted accounting principles, (F) changes in laws, rules, regulations, orders, or other binding directives issued by any governmental entity, or (G) the taking of any action expressly contemplated by this Agreement, including the filing of the Chapter 11 Cases (but not defaults or violations of the terms of this Agreement); except in each of clauses (A), (B), (C) and (D) above, if the Company is disproportionately affected thereby relative to other persons or entities engaged in the industry in which the Company operates.

(c)    "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by the Company and the Consenting Lenders holding at least 66-⅔% in aggregate principal amount of the First Lien Term Loans.

(d)    "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(e)    "Requisite Lenders" means, as of any date of determination, Consenting Lenders holding at least 66-⅔% in outstanding principal amount of the First Lien Term Loans held by the Consenting Lenders in the aggregate as of such date.

3.    **Agreements of the Consenting Lenders.**

(a)    Voting.  Subject to the satisfaction of the conditions contained in Section 3(c) hereof, each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall:

(i)    subject to the receipt by such Consenting Lender of the Disclosure Statement, (A) timely vote or cause to be voted its First Lien Term Loan Lender Claims to accept a Qualified Plan (including, for the avoidance of doubt, a Qualified Plan that includes a Payout Event) by delivering its duly executed and completed ballot or ballots, as applicable, accepting a Qualified Plan on a timely basis following commencement of the solicitation of acceptances of a Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement, such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Lender at any time following the expiration of the Plan Support Period;

(ii)    support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby;

3

(iii)    timely vote or cause to be voted its First Lien Term Loan Lender Claims against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(iv)    not directly or indirectly seek, solicit, vote its First Lien Term Loan Lender Claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, or take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the First Lien Term Loans, that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes in connection with a Qualified Plan (the "Solicitation") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and a Qualified Plan, or take any other action that is inconsistent with, or that would delay the solicitation, confirmation or consummation of, a Qualified Plan or the Restructuring Transactions; provided, however, that any Backstop Party or combination of Backstop Parties shall not be prohibited from presenting for consideration by the Debtors a counterproposal to a Payout Event at any time up to ten (10) business days after receiving notice of such Payout Event (unless such date is extended by the Debtors) that such Backstop Party or Parties reasonably believes provides higher and better recoveries than that provided by such Payout Event; and

(v)    support the customary mutual release and exculpation provisions contained in a Qualified Plan.

(b)    Acknowledgement of Payout Event.  For the avoidance of doubt, each Consenting Lender agrees and acknowledges that a Payout Event shall constitute a Qualified Plan for the purposes of this Agreement.

(c)    Certain Conditions.  The obligations of each Consenting Lender set forth in Section 3(a) hereof are subject to the following conditions:

(i)    this Agreement shall have become effective in accordance with the provisions of Section 11; and

(ii)    this Agreement shall not have terminated in accordance with the terms of Section 5 hereof.

(d)    Rights of Consenting Lenders Unaffected.  Nothing contained herein shall (i) limit (A) the ability of a Consenting Lender to consult with other Consenting Lenders or the Company or (B) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with the Consenting Lender's obligations hereunder or under the terms of a Qualified Plan or under any other Definitive Document to which such Consenting Lender is a party and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of a Qualified

4

Plan; (ii) limit the ability of a Consenting Lender to sell or enter into any transactions in connection with the First Lien Term Loans or any other claims against or interests in the Company, subject to the terms of Sections 3(e) and 3(f) hereof; or (iii) limit the rights of any Consenting Lender under the First Lien Credit Agreement or constitute a waiver or amendment of any provision of the First Lien Credit Agreement, subject to the terms of Section 3(a) hereof.

(e)     Transfers.  Each Consenting Lender agrees that, so long as this Agreement has not been terminated as provided herein, such Consenting Lender shall not sell, transfer, loan, issue, pledge (except for blanket security interests of lenders to the Consenting Lenders), hypothecate, assign or otherwise dispose of (including by participation) (each, a "Transfer"), directly or indirectly, in whole or in part, any of the First Lien Term Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any First Lien Term Loans or any other claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such First Lien Term Loans or such other claims against or interests in the Company), unless the transferee thereof either (i) is a Consenting Lender or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement applicable to Consenting Lenders (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing the joinder attached hereto as Exhibit B (the "Joinder Agreement"), and delivering an executed copy thereof, within three (3) business days of such execution, to Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Ad Hoc Group, and Kirkland & Ellis LLP, as counsel to the Company, in which event (a) the transferee (including the Consenting Lender transferee, if applicable) shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided, however, that such Transfer shall not, in and of itself, release any Consenting Lender who is also a Backstop Party from its obligations under such Backstop Party's Backstop Commitment (the Transfer of Backstop Commitments being governed by the Commitment Letter or, to the extent in effect, the Backstop Unit Purchase Agreement). Each Consenting Lender agrees that any Transfer of any First Lien Term Loans that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Lender shall have the right to enforce the voiding of such Transfer. Notwithstanding anything contained herein to the contrary, during the Plan Support Period, a Consenting Lender may offer, sell or otherwise Transfer any or all of its holdings of First Lien Term Loans to any entity that, as of the date of Transfer, controls, is controlled by or is under common control with such Consenting Lender; provided, however, that such entity shall automatically be subject to the terms of this Agreement and deemed a Party hereto and shall execute a Joinder Agreement hereto.

(f)     Additional Claims or Equity Interests.  To the extent any Consenting Lender (a) acquires additional First Lien Term Loans, (b) holds or acquires any other claims against the Company, or (c) holds or acquires any equity interests in the Company, each such Consenting Lender agrees that such First Lien Term Loans or other claims or equity interests shall be subject to this Agreement and that, so long as this Agreement has not been terminated as provided herein, it shall vote (or cause to be voted) any such additional First Lien Term Loans or other

5

claims or equity interests entitled to vote on a Qualified Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Section 3(a) hereof.

(g)     <u>Distributions on Allowed First Lien Term Loan Claims</u>.  Each of the Consenting Lenders party hereto on the Plan Support Effective Date (the "<u>Original Consenting Lenders</u>") shall be required to elect, in exchange for such Original Consenting Lender's Allowed First Lien Term Loan Claim(s), the First Lien Equity Election in addition to such Original Consenting Lender's *pro rata* share of the Rights and the Cash Payment, as set forth in the Plan Term Sheet. For the avoidance of doubt, the Original Consenting Lenders shall not be entitled to elect the First Lien Cash Payment Option on account of such Original Consenting Lender's Allowed First Lien Term Loan Claim(s).

4.     <u>Agreements of the Company.</u>

(a)     <u>Affirmative Covenants</u>.  The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall, and shall cause each of its direct and indirect subsidiaries to, directly or indirectly, do the following:

(i)     complete the preparation, as soon as reasonably practicable after the Plan Support Effective Date, of each of a Qualified Plan, the Disclosure Statement and the other Definitive Documents, which documents shall contain terms and conditions consistent in all material respects with the Plan Term Sheet and shall otherwise be acceptable to the Requisite Lenders, and distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Consenting Lenders in advance of any filing thereof;

(ii)     (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Lenders to facilitate the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (B) not take any action that is inconsistent with, or that would delay or impede the solicitation, confirmation or consummation of a Qualified Plan or the Restructuring Transactions, and (C) support the customary mutual release and exculpation provisions contained in the Plan Term Sheet and a Qualified Plan;

(iii)     (A) commence the Chapter 11 Cases (such date, the "<u>Filing Date</u>") and file the First Day Motions; (B) obtain approval on a final basis of the DIP Facility by entry of an order of the Bankruptcy Court, as soon as reasonably practicable and in no event later than on the date that is forty-five (45) calendar days after the Filing Date; (C) file a Qualified Plan and Disclosure Statement as soon as reasonably practicable and in any event no later than on the date that is fifteen (15) calendar days after the Filing Date; (D) obtain approval of the Disclosure Statement (including authorization for the Debtors to perform their obligations under the Commitment Letter and the Backstop Unit Purchase Agreement, including payment of any fees and expenses arising under the Commitment Letter and the Backstop Unit Purchase Agreement as provided therein) and authorization for the solicitation of approval of a Qualified Plan by

6

entry of an order of the Bankruptcy Court as soon as reasonably practicable and in any event no later than on the date (the "Disclosure Statement Approval Date") that is ninety (90) calendar days after the Filing Date; (E) commence the Solicitation as soon as reasonably practicable and in no event later than on the date (the "Solicitation Commencement Date") that is five (5) calendar days after the Disclosure Statement Approval Date; (F) obtain confirmation of a Qualified Plan by entry of an order of the Bankruptcy Court, which order shall not be the subject of any stay, as soon as reasonably practicable and in no event later than on the date (the "Confirmation Date") that is two-hundred fifty-five (255) calendar days after the Filing Date; and (G) consummate a Qualified Plan as soon as reasonably practicable and in no event later than on the date that is two-hundred seventy (270) calendar days after the Filing Date; and provided, that the Debtors shall not be in default under Sections 4(a)(iii)(D) or (E) of this Agreement if (1) material changes to a Qualified Plan (which material changes are consistent with the Plan Term Sheet and are otherwise reasonably acceptable to the Consenting Lenders and the Debtors) require the Debtors to seek approval by the Bankruptcy Court of a revised Disclosure Statement and re-solicit such Qualified Plan, (2) the subsequent Disclosure Statement Approval Date related to such revised Disclosure Statement occurs more than ninety (90) days after the Filing Date and (3) the confirmation and consummation by the Debtors of such revised Qualified Plan otherwise complies with the milestones set forth in Sections 4(a)(iii)(F) and (G), respectively, of this Agreement (as such milestones may be extended as provided herein pursuant to the Commitment Letter);

(iv)    except where not practicable, exercise commercially reasonable efforts to provide draft copies of all motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Ad Hoc Group within a reasonable period of time prior to the date the Company intends to file any such document and consult in advance in good faith with counsel to the Ad Hoc Group regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(vi)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(vii)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(viii)    provide to the Consenting Lenders, Stroock (as counsel to the Ad Hoc Group), Houlihan Lokey (as financial advisors to the Ad Hoc Group) and such other professionals as may be retained by the Ad Hoc Group (collectively, the "Ad Hoc Group Advisors"), and cause its employees, officers, advisors and other representatives to provide the Consenting Lenders and the Ad Hoc Group Advisors, subject to such confidentiality restrictions as reasonably required by the Company (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's

7

books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the Restructuring Transactions, (C) timely and reasonable responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(ix)    to the extent permitted by the Bankruptcy Court and under the DIP Facility, timely and fully discharge all of its obligations then due and owing under any existing agreements of the Company regarding the payment of the reasonable fees and expenses of the Ad Hoc Group Advisors in connection with the Restructuring Transactions;

(x)    on the date that is at least one (1) day prior to the Filing Date, pay to Stroock and Houlihan Lokey all reasonable amounts then due and outstanding as provided in an invoice supplied to the Company containing a summary of hours and services provided;

(xi)    to the extent the reasonable fees and expenses of Stroock exceed the amount of the retainer as of the date of confirmation of a Qualified Plan, pay to Stroock under such Qualified Plan its outstanding reasonable fees and expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise;

(xii)    promptly notify the other Parties of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which could reasonably be anticipated to have a Material Adverse Effect;

(xiii)    comply in all material respects with the covenants contained in the DIP Facility;

(xiv)    reject each of the Company's employment agreements other than those listed in Section "B" on Exhibit 4 of the Plan Term Sheet and such other employment agreements as may be agreed-to by the Debtors and the Ad Hoc Group (subject to the assumption of any such employment agreement listed in Section "B" on Exhibit 4 of the Plan Term Sheet being expressly conditioned upon the employee counterparty to such employment agreement (A) having executed and delivered to the Debtors an amendment, consent and acknowledgement agreement addressing the matters set forth in Section "C" of Exhibit 4 of the Plan Term Sheet and being in form and substance acceptable to the Ad Hoc Group, and such amendment, consent and acknowledgement agreement being in full force and effect), and (B) being actively employed by the Debtors on the Effective Date (unless otherwise agreed to by the Ad Hoc Group);

(xv)    provide the Ad Hoc Group with three (3) business days prior written notice of the settlement of any claim or pending litigation not otherwise insured under the Debtors' insurance policies and not otherwise paid for by the Debtors' applicable insurance carrier for more than $500,000 per claim or pending litigation individually (each an "Uninsured Claim Settlement") and seek Bankruptcy Court approval of each Uninsured Claim Settlement

8

pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, applicable local rules and the Bankruptcy Code; and

(xvi)    provided, that a Payout Event has not occurred such that all allowed First Lien Term Loan Claims have been indefeasibly paid in full in cash on the Effective Date as provided in the Plan Term Sheet, (A) take all such actions as are reasonably necessary to cause the acquisition by one or more limited liability companies (the "LLCs"), formed or caused to be formed to acquire substantially all of the assets of the Debtors in connection with a Qualified Plan, to be structured and treated as a taxable transaction for United States federal income tax purposes, including the making of any appropriate elections under Subchapter K of the Internal Revenue Code and the imposition of reasonable trading restrictions to ensure that the LLCs are not treated as corporations for federal income tax purposes, (B) agree to report such acquisition as a taxable transaction for all financial accounting and income tax purposes, (C) ensure that any Qualified Plan provides that any Debtors that are to be liquidated or are to cease operations pursuant to the Qualified Plan shall receive the benefit of a discharge under section 1141 of the Bankruptcy Code or such equivalent injunctive relief as is necessary to (a) ensure that such Debtors' prepetition liabilities are discharged as if they had been reorganized pursuant to a Qualified Plan and/or (b) preclude successor liability from attaching to the LLCs; provided, that notwithstanding anything herein to the contrary, the Ad Hoc Group (whether in their capacities as Backstop Parties or otherwise) and the Debtors agree and acknowledge that the LLCs shall explicitly assume all liability for the distributions or treatment provided on account of all claims against, obligations of, or interests in the Debtors as set forth in the Plan Term Sheet, (D) take, and shall cooperate with the Ad Hoc Group in taking, all actions reasonably necessary to minimize federal, state and local income and other taxes of the Debtors, including, but not limited to, the filing of notices and clearance certificates with applicable taxing authorities; and (E) ensure that the Debtors will be wound-up, dissolved and liquidated concurrently with or promptly following the Effective Date, subject to the closing of the Chapter 11 Cases.

(b)    Negative Covenants.  The Company agrees that, so long as this Agreement has not been terminated as provided herein, unless (x) otherwise expressly permitted or required by this Agreement or the Plan Term Sheet, or (y) otherwise consented to in writing by the Requisite Lenders or Stroock, as counsel for the Ad Hoc Group (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall not, and shall cause each of its direct and indirect subsidiaries not to, directly or indirectly, do or permit to occur any of the following:

(i)    propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than a Qualified Plan;

(ii)    modify a Qualified Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

(iii)    withdraw or revoke a Qualified Plan or publicly announce its intention not to pursue a Qualified Plan;

NY 72674526v4

(iv)    file any motion or pleading or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that is not consistent in any material respect with this Agreement, the Plan Term Sheet or a Qualified Plan;

(v)    move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan;

(vi)    issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)    amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)    split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(xi)    incur any capital expenditures in excess of the amounts permitted under the DIP Facility in the ordinary course of business and in amounts consistent with historical business practices;

(xii)    enter into any commitment or agreement with respect to debtor-in-possession financing, cash collateral and/or exit financing other than the DIP Facility and the Exit Facility;

(xiii)    enter into any executive employment agreements (other than those executive employment agreements assumed pursuant to a Qualified Plan and that have been identified on an exhibit to the Plan Term Sheet, subject to the amendments, consents and acknowledgements to be made and/or given with respect to such executive employment agreements as described in the Plan Term Sheet) or hire any executive or employee for whom total annual compensation is greater than $200,000 or enter into any collective bargaining agreements or materially modify any existing employment agreements or benefit plans; or

(xiv)    increase the compensation for any executive or employee whose total annual compensation is greater than $200,000; provided that such restriction shall not prohibit

10

the Debtors from making payments pursuant to a postpetition bonus or incentive plan, including a key employee retention plan, a key employee incentive plan or such other plans expressly provided by, and described in, the Plan Term Sheet and, as applicable, approved by the Bankruptcy Court.

(c)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

(d)    <u>Payout Proposal Information</u>.  Notwithstanding anything herein or in the Plan Term Sheet to the contrary, the Company may furnish or cause to be furnished information concerning the Company in connection with a proposal, offer, or indication of interest for a Payout Event (each a "<u>Payout Proposal</u>") received by the Company from a party that the Company's board of directors believes in good faith has expressed a legitimate interest in, and has the financial ability (based on financial statements and/or such other financial information deemed reasonably acceptable to the Debtors) to consummate, a Payout Event within the timeframe set forth in Section 4(a)(iii) of this Agreement (each an "<u>Alternative Sponsor</u>"); <u>provided, that</u> such Alternative Sponsor shall enter into, as a condition to its receipt of information, a confidentiality and non-disclosure agreement that is (x) substantially in the form attached hereto as <u>Exhibit C</u> or (y) in form and substance reasonably acceptable to the Debtors and the Requisite Lenders.  Subject to the proviso in the immediately preceding sentence, following receipt of a Payout Proposal the Debtors may negotiate and discuss such Payout Proposal with the Alternative Sponsor.

5.    <u>Termination of Agreement.</u>

(a)    <u>Consenting Lenders' Termination Events</u>.  The Requisite Lenders may terminate this Agreement as to all Parties upon three (3) business days' written notice (the "<u>Notice</u>"), delivered in accordance with Section 20 hereof, at any time after the occurrence of, and during the continuation of, any of the following events (each, a "<u>Consenting Lenders' Termination Event</u>"), unless waived in writing by the Requisite Lenders in their sole discretion (it being understood that the three (3) business days notice period referred to above shall not extend or be in addition to, and shall run concurrently with, any cure or remedy period set forth in this Section 5(a)); <u>provided</u> <u>that</u> this Agreement shall terminate automatically and without further action upon the occurrence of a Consenting Lenders' Termination Event contemplated by Section 5(a)(iv), Section 5(a)(ix), or Section 5(a)(xii) of this Agreement:

(i)    the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; <u>provided, however</u>, the Company shall have three (3) business days from the receipt of the Notice to cure such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

11

consummation of a material portion of the Restructuring Transactions; provided, however, that the Company shall have three (3) business days from such issuance to effectuate a complete reversal or dismissal, as applicable, of such ruling, judgment or order;

(iii)    any event, change, effect, occurrence, development, circumstance or change of fact occurs that has or would reasonably be expected to have a Material Adverse Effect; provided, however, that the Company shall have three (3) business days from the receipt of the Notice to remedy such event, change, effect, occurrence, development, circumstance or change of fact so that it no longer has or would reasonably be expected to have a Material Adverse Effect;

(iv)    the Bankruptcy Court enters an order terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(v)    the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $2,500,000 in the aggregate; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Debtors' use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Debtors' employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a Consenting Lenders' Termination Event;

(vi)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Plan Term Sheet or a Qualified Plan or as otherwise approved in writing by the Requisite Lenders or counsel to the Ad Hoc Group (such approval not to be unreasonably withheld);

(vii)    the Bankruptcy Court enters an order materially amending, supplementing, staying, vacating or otherwise modifying (A) the credit documents relating to the First Lien Term Loans (except as may be reasonably necessary to implement the DIP Facility or permit the Company's use of cash collateral) or (B) the order of the Bankruptcy Court authorizing the Debtors' use of cash collateral to the detriment of the Consenting Lenders, in each case without the written consent of the Requisite Lenders or counsel to the Ad Hoc Group (such consent not to be unreasonably withheld);

(viii)    an Event of Default (as defined in the applicable order of the Bankruptcy Court approving the DIP Facility or credit agreement governing the DIP Facility) shall have occurred and be continuing and not waived under the DIP Facility after expiration of any applicable cure period provided therein and the Company's obligations shall have been accelerated thereunder;

NY 72674526v4

(ix)    the Bankruptcy Court having entered an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(x)    the failure to satisfy any of the conditions to effectiveness set forth in a Qualified Plan by the deadlines set forth in such Qualified Plan;

(xi)    the termination of the Commitment Letter or the Backstop Unit Purchase Agreement in accordance with their respective terms; and

(xii)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the First Lien Credit Agreement is involuntarily dismissed.

(b)    <u>Company Termination Events</u>.  The Company may terminate this Agreement as to all Parties upon three (3) business days prior written notice, delivered in accordance with Section 20 hereof, upon the occurrence of any of the following events (each a "<u>Company Termination Event</u>"):

(i)    the (A)(1) breach by one or more of the Consenting Lenders representing in excess of one-third (1/3) of the aggregate principal amount of the First Lien Term Loans held by the Consenting Lenders (the "<u>One-Third Consenting Lender Group</u>") of any of their obligations pursuant to Section 3(a)(i) of this Agreement, (2) material breach by the One-Third Consenting Lender Group of their obligations or covenants set forth in this Agreement (other than the covenants set forth in Section 3(a)(i) of this Agreement) and (3) material breach by the One-Third Consenting Lender Group of any of the representations or warranties made by the One-Third Consenting Lender Group set forth in this Agreement on the date such representations are made, or (B) breach by any Backstop Party of its Backstop Commitment pursuant to the terms of the Commitment Letter and the Backstop Unit Purchase Agreement (<u>provided</u>, <u>however</u>, that such breach shall not be deemed to be a Company Termination Event if one or more Non-Defaulting Backstop Parties purchases the Unsubscribed Units not purchased by the Defaulting Backstop Party pursuant to the Commitment Letter or, if in effect, the Backstop Unit Purchase Agreement); in each such case of clause (A) or clause (B), where such breach remains uncured for a period of three (3) business days after the receipt by the applicable Consenting Lender(s) from the Company of written notice of such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions; <u>provided</u>, <u>however</u>, that the Consenting Lenders shall have three (3) business days after receiving notice of such ruling or order to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement; or

(iii)    the board of directors of the Company reasonably determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

13

(c)    <u>Mutual Termination</u>.    This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company and the Requisite Lenders.

(d)    <u>Effect of Termination</u>.    Upon the termination of this Agreement in accordance with this Section 5, and except as provided in Section 14 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the First Lien Term Loans, the First Lien Credit Agreement and any ancillary documents or agreements thereto; <u>provided, however</u>, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept a Qualified Plan, the Company shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13 of this Agreement.

6.    <u>**Good Faith Cooperation; Further Assurances; Acknowledgement.**</u>

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, (b) all matters concerning the implementation of the Plan Term Sheet and a Qualified Plan, and (c) the pursuit and support of the Restructuring Transactions. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring Transactions in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. This Agreement is not, and shall not be deemed, a solicitation for consents to a Qualified Plan or a solicitation to tender or exchange of any of the First Lien Term Loans. The acceptance of the First Lien Term Loan Lenders will not be solicited until the First Lien Term Loan Lenders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

7.    <u>**Definitive Documents.**</u>

Each Party hereby covenants and agrees (a) to negotiate in good faith the Definitive Documents and (b) to execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents. For the avoidance of doubt, each Party agrees to (i) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation and the implementation of the Plan Term Sheet and a Qualified Plan in accordance with the

14

terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by, this Agreement and (iii) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transactions as contemplated by the Plan Term Sheet, a Qualified Plan and this Agreement.

### 8.    Representations and Warranties.

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases, the discharge of claims as a result thereof, or related restructuring transactions;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Chapter 11 Cases, a Qualified Plan and the Disclosure Statement; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender (i) is the beneficial owner of the aggregate principal amount of First Lien Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such First

15

Lien Term Loans, (A) sole investment or voting discretion with respect to such First Lien Term Loans, (B) full power and authority to vote on and consent to matters concerning such First Lien Term Loans or to exchange, assign and transfer such First Lien Term Loans or (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, such Consenting Lender has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any First Lien Term Loans that are inconsistent with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

9.     **Disclosure; Publicity.**

(a)     Not later than one (1) business day after the Filing Date, subject to the provisions set forth in Section 9(b) hereof, the Company shall disseminate a press release disclosing the existence of this Agreement and the terms hereof and of the Plan Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the date the Chapter 11 Cases are commenced) with such redactions as may be reasonably requested by any Consenting Lender's counsel to maintain the confidentiality of the items identified in Section 9(b) hereof, except as otherwise required by law. In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by this Section 9), and the Company hereby waives any claims against the Consenting Lenders arising as a result of such disclosure by a Consenting Lender in compliance with this Agreement.

(b)     The Company shall submit drafts to the Ad Hoc Committee Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Lender, no Party or its advisors shall (i) use the name of any Consenting Lender in any public manner or (ii) disclose to any person (including, for the avoidance of doubt, any other Consenting Lender), other than advisors to the Company, the principal amount or percentage of any First Lien Term Loans or any other securities of the Company held by any Consenting Lender, in each case, without such Consenting Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Term Loans held by all the Consenting Lenders collectively. Notwithstanding the provisions in this Section 9, (i) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a

16

result of any breaches hereof and (ii) any Party hereto may disclose, to the extent consented to in writing by a Consenting Lender, such Consenting Lender's identity and individual holdings.

**10.    Amendments and Waivers.**

This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Company and the Requisite Lenders; provided, however, that any modification of, or amendment or supplement to, this Section 10 shall require the written consent of all of the Parties. A Consenting Lenders' Termination Event may not be waived except in a writing signed by the Requisite Lenders.

**11.    Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Lenders shall be delivered to (a) other Consenting Lenders in a redacted form that removes such Consenting Lenders' holdings of the First Lien Term Loans and (b) the Company and advisors to the Consenting Lenders in an unredacted form. Upon the Plan Support Effective Date, the Plan Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

**12.    GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.    NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

17

**13.    Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.    Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity.

**14.    Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 14, the proviso set forth in Section 3(a)(i), and in Sections 5(d), 9(b), 10, 12, 13, 16, 17, 18, 20, 21, 22, 23 and 26 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Lenders in accordance with the terms hereof; provided, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**15.    Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**16.    Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit sales, assignments or other Transfers of the First Lien Term Loans or claims arising under the First Lien Term Loans other than in accordance with this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18

17.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof, other than any No Recourse Party with respect to Section 26 herein.

18.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (and including the Plan Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect.

19.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(1)    If to the Company, to:

Neff Corp.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attention:  Graham Hood
            Chief Executive Officer
            -and-
            Mark Irion
            Chief Financial Officer

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Fax: (312) 862-2200
Attention:  Ray C. Schrock, Esq.
            -and-
            Ryan Preston Dahl, Esq.

19

(2)    If to a Consenting Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention:  Kristopher M. Hansen, Esq.
            - and -
            Jayme T. Goldstein, Esq.

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

### 21.    Reservation of Rights; No Admission.

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by this Agreement or in a Qualified Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  This Agreement and the Plan Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22.    Prevailing Party.

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

20

23.    **Relationship Among Parties.**

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Lender may trade in the First Lien Term Loans or other debt or equity securities of the Company without the consent of the Company or any other Consenting Lender, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

24.    **Committee Membership.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Lender or representative of a Consenting Lender that becomes a member of a statutory committee that may be established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member to the extent required to comply with fiduciary obligations applicable under the Bankruptcy Code; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any statutory committee in the Chapter 11 Cases. Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 24.

25.    **Representation by Counsel.**

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the transactions contemplated herein. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26.    **No Recourse.**

Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, the Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Party or any former, current or future directors, officers, agents, affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such person or entity, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any

21

obligation of any Party under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEFF CORP (on behalf of itself and all other Debtors)**

By: _____

Name: MARK IRION

Title: CFO

██████████████████████████

**By:** ████████████████ **its investment Manager**

By: _____

Name: **AVI KATZ** _____

Title: **Vice President** _____

Principal Amount of First Lien Term Loans: ████████████

<u>Notice Address</u>:

████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

████████████████████████

**By:** ██████████████████ **its investment Manager**

**By:** _____

**Name:** ___AVI KATZ_____

**Title:** ___Vice President_____

Principal Amount of First Lien Term Loans: ████████

<u>Notice Address</u>:

████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

██████████████████████████████

**By:** ██████████████████ **its investment manager**

By:    _____

Name:    **AVI KATZ** _____

Title:    **Vice President** _____

Principal Amount of First Lien Term Loans:    ████████████

**Notice Address:**

████████████████████

*[Signature Page to Plan Support Agreement – Neff Corp.]*

By: ████████████████, its investment adviser

By: ████████████████ its general partner

By: _____

Name: **AVI KATZ**

Title: **Vice President**

Principal Amount of First Lien Term Loans: ████████

Notice Address:

*[Signature Page to Plan Support Agreement – Neff Corp.]*

███████████████████████

**By:** ████████████ its general partner

**By:** ████████████ its general partner

By: _____

Name: _____
      Joseph M. Deignan
      Authorized Signatory

Title: _____

Principal Amount of First Lien Term Loans: ████████████

<u>Notice Address</u>:

████████████████████

*[Signature Page to Plan Support Agreement — Neff Corp.]*

# EXHIBIT C

**Swap Counterparty Plan Support Agreements**

EXECUTION VERSION

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 1₄, 2010

To Bank of America, N.A., in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Neff Corp. ("Neff") and certain of its affiliates (together with Neff, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of Bank of America, N.A., in its capacity as counterparty (in such capacity, "BofA" or the "Swap Counterparty") pursuant to that certain ISDA Master Agreement with Neff dated June 14, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "Swap Agreement"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "Swap Counterparty Claims").

2.    Representations and Warranties of the Swap Counterparty

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to

EXECUTION VERSION

bind the beneficial owner(s) of such Swap Counterparty Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Swap Counterparty Claims and to dispose of, exchange, assign and transfer such Swap Counterparty Claims.

(b)     Such Swap Counterparty has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Swap Counterparty Claims or the Swap Agreement that are inconsistent with the representations and warranties of such Swap Counterparty herein or would render such Swap Counterparty otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)     Such Swap Counterparty (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 promulgated under the Securities Act of 1933, as amended).

3.     Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Neff, the Swap Counterparty shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its representatives to) (a) (i) vote all of its Swap Counterparty Claims to accept any Plan proposed by the Debtors incorporating (A) the terms and conditions set forth on the term sheet annexed hereto as **Exhibit 1**, which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Restructuring Term Sheet") and (B) the treatment of the Swap Counterparty Claims as provided for in an amendment to the Swap Agreement to be executed contemporaneously with this Agreement and which is annexed hereto as **Exhibit 2**, which amendment is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Swap Amendment"), consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment, and in form and substance reasonably satisfactory to the Debtors and otherwise containing terms no less favorable to the Swap Counterparty Claims than the proposal set forth in the Restructuring Term Sheet (a "Qualified Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Swap Counterparty Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose

or to seek any modification of a Qualified Plan, the related disclosure statement, in form and substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees. For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.      Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors. The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void *ab initio*. This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Neff and the Swap Counterparty;

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

(A)    a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Neff and the Swap Counterparty);

(B)    the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(C)    the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(D)    the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

4

EXECUTION VERSION

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)    the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)    Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)    an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)    upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

5

EXECUTION VERSION

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7.    Specific Performance/Remedies

(a)    It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b)    The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9.    Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10.    Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

6

EXECUTION VERSION

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    Plan Support Agreement Effective Date

Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date"). Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.    Third-Party Beneficiary

This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.    Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.    Acknowledgment

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

17.    Settlement Discussions

This Agreement, the Restructuring Term Sheet and the Swap Amendment are part of a proposed settlement of matters that could otherwise be the subject of litigation among the

parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.    Further Agreements

The Swap Counterparty agrees that, to the extent a Qualified Plan is consummated through the acquisition of all or substantially all of the Debtors' assets or any comparable transaction through which the Debtors' obligations under the Swap Agreement (as amended) shall be undertaken by a third party (each, a "Third Party"), the Swap Counterparty: (a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations under the Swap Agreement to such Third Party; and (b) shall take such further actions requested by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.    No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

NEFF CORP. (on behalf of itself and all other Debtors)

By: _____
Name:
Title: Marc Irion
       CFO

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

Bank of America, N.A., in its capacity as Swap Counterparty

Authorized Signatory:

By: _____
Name:
Title: **Ana Morales Gillard**
       **Vice President**

[Signature Page for BofA Swap Counterparty Plan Support Agreement]

**PLAN SUPPORT AGREEMENT**

**<u>Exhibit 2</u>**

**Swap Amendment**

EXECUTION VERSION

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between Bank of America, N.A. ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA 2002 Master Agreement dated as of June 14, 2007 (together with the Schedule thereto and each Confirmation of the Transaction entered into thereunder with a Trade Date of June 14, 2007, Reference No. 2831884, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1    Conflicts.

(a)    Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)    Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2    Agreement Not to Terminate.

(a)    For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the

EXECUTION VERSION

Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b)     For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c)     Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3     Payments.

(a)     Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b)     For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement:  (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, the Calculation Agent shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or

---

[1]    "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

EXECUTION VERSION

withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)    In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below).  "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)    Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4    Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect.  For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5    Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

Bank of America, N.A.
Sears Tower
233 South Wacker Drive, Suite 2800
Chicago, IL 60606
Attention:  Swap Operations
Telephone No.: 312-234-2732
Facsimile No.: 866-255-1444

4

EXECUTION VERSION

with a copy to:

        Bank of America, N.A.
        One Bryant Park, NY1-100-05-01
        New York, New York 10036

        Attention: Client Integration and Documentation
        Facsimile No.: 212-548-8622

Address for notice or communications to Party B:

        Neff Corp.
        3750 N.W. 87th Street, Suite 400
        Miami, Florida 33178 Attention: Chief Financial Officer
        Telephone No.: 305-921-2280
        Facsimile No.: 305-921-4156

with copies to:

        Kirkland & Ellis LLP
        Attention:  Ray Schrock and Ryan Preston Dahl
        300 North LaSalle
        Chicago, Illinois 60654
        Telephone No.: 312-862-2000
        Facsimile No.: 312-862-2200

        and

        Kirkland & Ellis LLP
        Attention:  Leonard Klingbaum and Brian S. Lennon
        601 Lexington Avenue
        New York, New York
        Telephone No.: 212-446-4800
        Facsimile No.: 212-446-6460

6      Governing Law.

    THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7      Consent to Jurisdiction.

    PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS.  NOTWITHSTANDING THE FOREGOING, PARTY A AND

EXECUTION VERSION

PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT.  PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXECUTION VERSION

IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

Bank of America, N.A., as Party A to the ISDA Agreement

By:
Its:  **Ana Morales Gillard**
     **Vice President**

Neff Corp., as Party B to the ISDA Agreement

By:
Its:  CFO

[Signature Page for BofA Swap Amendment]

7

EXECUTION VERSION

NEFF CORP.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178

May 14, 2010

To UBS AG, in its capacity as the Counterparty
to that Certain Swap Agreement Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Neff Corp. ("Neff") and certain of its affiliates (together with Neff, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of UBS AG, in its capacity as counterparty (in such capacity, "UBS" or the "Swap Counterparty") pursuant to that certain ISDA Master Agreement with Neff dated June 20, 2007 (together with the Schedule, Confirmation (each as defined therein) and other agreements related thereto, the "Swap Agreement"), and related to that certain Credit Agreement dated as of May 31, 2007 and amended and restated as of December 16, 2008, among Neff, certain of its affiliates party thereto, Bank of America, N.A., in its capacity as administrative agent thereunder, and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will contemplate, among other things, certain distributions on account of the Swap Counterparty's claims arising from or related to the Swap Agreement (the "Swap Counterparty Claims").

2.    Representations and Warranties of the Swap Counterparty

The Swap Counterparty identified as a holder of Swap Counterparty Claims represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Swap Counterparty (i) either (A) is the sole beneficial owner of all of the Swap Counterparty Claims under its respective Swap Agreement, or (B) has sole investment or voting discretion with respect to all of the Swap Counterparty Claims under its respective Swap Agreement and has the power and authority to bind the beneficial owner(s) of such Swap Counterparty Claims to the terms of

EXECUTION VERSION

this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Swap Counterparty Claims and to dispose of, exchange, assign and transfer such Swap Counterparty Claims.

(b)    Such Swap Counterparty has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Swap Counterparty Claims or the Swap Agreement that are inconsistent with the representations and warranties of such Swap Counterparty herein or would render such Swap Counterparty otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)    Such Swap Counterparty (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 promulgated under the Securities Act of 1933, as amended).

3.    Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Neff, the Swap Counterparty shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its representatives to) (a) (i) vote all of its Swap Counterparty Claims to accept any Plan proposed by the Debtors incorporating (A) the terms and conditions set forth on the term sheet annexed hereto as **Exhibit 1**, which term sheet is expressly incorporated by reference herein and made a part of  this Agreement as if fully set forth herein (the "Restructuring Term Sheet") and (B) the treatment of the Swap Counterparty Claims as provided for in an amendment to the Swap Agreement to be executed contemporaneously with this Agreement and which is annexed hereto as **Exhibit 2**, which amendment is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (the "Swap Amendment"), consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment, and in form and substance reasonably satisfactory to the Debtors and otherwise containing terms no less favorable to the Swap Counterparty Claims than the proposal set forth in the Restructuring Term Sheet (a "Qualified Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Swap Counterparty Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Plan, the related disclosure statement, in form and

EXECUTION VERSION

substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Swap Counterparty Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release and exculpation provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective current and former officers, managers, directors and employees. For the avoidance of doubt, a Payout Event (as defined in the Restructuring Term Sheet) shall constitute a Qualified Plan for purposes of this Agreement.

The Swap Counterparty agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors regarding the contents of this Agreement, including, but not limited to, the aggregate Swap Counterparty Claims held by all holders of Secured Swap Claims (as defined in the Restructuring Term Sheet); provided that the Debtors shall not disclose the amount of Swap Counterparty Claims held by the Swap Counterparty, except as otherwise required by applicable law.

4.    Transfer of Swap Counterparty Claims

The Swap Counterparty agrees that so long as this Agreement has not been terminated as provided herein it shall not directly or indirectly (a) grant any proxies to any person in connection with its Swap Counterparty Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in (each, a "Transfer") any Swap Counterparty Claims, except in accordance with the terms of the Swap Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Swap Counterparty," which writing shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors. The Swap Counterparty agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Swap Counterparty Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Swap Counterparty Claims that does not comply with the foregoing shall be void and deemed void *ab initio*. This Agreement shall in no way be construed to preclude the Swap Counterparty from acquiring additional Swap Counterparty Claims after the date hereof; provided, however, that any such additional Swap Counterparty Claims shall, upon acquisition (whether acquired by purchase, assignment or otherwise), automatically be deemed to be subject to all the terms of this Agreement.

EXECUTION VERSION

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Swap Counterparty and the Debtors and consistent in all material respects with this Agreement, the Restructuring Term Sheet and the Swap Amendment; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Neff and the Swap Counterparty;

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived in writing by the Swap Counterparty within such five (5) business day period:

(A)    a Qualified Plan and the Disclosure Statement shall not have been filed within 120 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Neff and the Swap Counterparty);

(B)    the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Swap Counterparty, approving the adequacy of the Disclosure Statement within 200 days after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(C)    the Bankruptcy Court shall not have entered the Confirmation Order by the 270th day after the Petition Date (or such later date as may be agreed by Neff and the Swap Counterparty);

(D)    the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not

4

EXECUTION VERSION

to pursue a Qualified Plan, or (3) file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(E)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(F)    the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(G)    the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Swap Counterparty and approving a debtor in possession credit facility, as described in the Restructuring Term Sheet (the "DIP Facility");

(H)    Neff shall not have filed the Chapter 11 Cases by May 30, 2010; or

(I)    an Event of Default (and as defined in the definitive documents governing the DIP Facility) shall have occurred and be continuing under the DIP Facility and all of the obligations under such facility shall have been accelerated and declared due and payable prior to the stated maturity date thereof;

provided, that the Swap Counterparty shall promptly provide notice of any Termination Event to Neff (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

(iii)    upon delivery of written notice of termination to the Swap Counterparty by Neff (A) following any material breach of the Swap Counterparty's representations, warranties, covenants or agreements set forth in this Agreement or (B) at Neff's election, in the event that Neff's board of directors determines that continued performance of its obligations under this Agreement is inconsistent with its fiduciary duties.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all votes delivered by the Swap Counterparty prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors; provided that upon the occurrence of a termination of this Agreement pursuant to Section 6(a)(iii)(A) hereof, any and all votes delivered by the Swap Counterparty prior to such termination may

5

EXECUTION VERSION

be considered or used by the Debtors for any purpose in their sole discretion, including with respect to determining acceptances for a plan of reorganization.

7.    Specific Performance/Remedies

(a)    It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

(b)    The Swap Counterparty agrees that section 1126(e) of the Bankruptcy Code provides an appropriate (but not exclusive) remedy in the event of a breach of its obligations under this Agreement, including section 3 hereof, and hereby waives any objection to the designation of its vote for a Qualified Plan in the event of a breach of its obligations hereunder.

8.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Swap Counterparty (and their respective advisors), with respect to the subject matter hereof.

9.    Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Swap Counterparty.

For the purposes hereof, immaterial changes to the Swap Amendment shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Swap Counterparty.

10.    Independent Analysis

The Swap Counterparty hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such

6

action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    Plan Support Agreement Effective Date

Upon delivery of duly executed counterpart signature pages by the Swap Counterparty and the Debtors for (a) this Agreement and (b) the Swap Amendment, the Swap Counterparty shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and the Swap Counterparty (the "Plan Support Agreement Effective Date"). Upon the Plan Support Agreement Effective Date, this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.    Third-Party Beneficiary

This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.    Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.    Acknowledgment

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Swap Counterparty will not be solicited until the Swap Counterparty has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court. For the avoidance of doubt, the obligations of UBS are the obligations solely of the Derivatives Credit Exposure Management business group within UBS AG in respect of the Swap Counterparty Claims.

EXECUTION VERSION

17.     Settlement Discussions

        This Agreement, the Restructuring Term Sheet and the Swap Amendment are part
of a proposed settlement of matters that could otherwise be the subject of litigation among the
parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal
Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all
negotiations relating thereto shall not be admissible into evidence in any proceeding other than a
proceeding to enforce the terms of this Agreement.

18.     Further Agreements

        The Swap Counterparty agrees that, to the extent a Qualified Plan is
consummated through the acquisition of all or substantially all of the Debtors' assets or any
comparable transaction through which the Debtors' obligations under the Swap Agreement (as
amended) shall be undertaken by a third party (each, a "Third Party"), the Swap Counterparty:
(a) shall not object and hereby consents to the assignment of the Debtors' rights and obligations
under the Swap Agreement to such Third Party; and (b) shall take such further actions requested
by the Debtors to facilitate the transfer of the Debtors' rights and obligations under the Swap
Agreement to such Third Party (whether through transfer, assignment, novation or otherwise).

19.     No Waiver of Participation and Preservation of Rights

        Except as provided in this Agreement, nothing herein is intended to, does or shall
be deemed in any manner to waive, limit, impair or restrict the ability of the Swap Counterparty
to protect and preserve its rights, remedies and interests, including, but not limited to, its claims
against any of the Debtors, any liens or security interests it may have in any assets of any of the
Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence
in any way, if this Agreement is terminated in accordance with its terms for any reason, the
parties hereto each fully reserve any and all of their respective rights, remedies and interests,
subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to
termination.

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

NEFF CORP. (on behalf of itself and all other Debtors)

By: _____
Name: Mark Irion
Title: CFO.

AGREED BY THE FOLLOWING
SWAP COUNTERPARTY

UBS AG, in its capacity as Swap Counterparty

Authorized Signatory:

By: _____     James B. Fuqua
Name:                           Managing Director and Counsel
Title:                          Region Americas Legal

By: _____
Name: Thomas D. Frawley
Title: Managing Director

[Signature Page for UBS Swap Counterparty Plan Support Agreement]

**PLAN SUPPORT AGREEMENT**

**<u>Exhibit 2</u>**

**Swap Amendment**

EXECUTION VERSION

## AMENDMENT

This Amendment, dated as of May 14, 2010 (this "Amendment"), to the ISDA Agreement (as defined below) is entered into between UBS AG ("Party A") and Neff Corp. ("Party B")

WHEREAS, Party A and Party B are parties to that certain ISDA Master Agreement dated as of June 20, 2007 (together with the Schedule thereto and each Confirmation entered into thereunder, the "ISDA Agreement"). Capitalized terms used not defined herein shall have the meaning ascribed thereto in the ISDA Agreement;

WHEREAS, Party B and certain of its affiliates proposed to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered;

WHEREAS, in anticipation of the Chapter 11 Cases, Party A, among others, entered into that certain plan support agreement dated as of May 14, 2010 (as may be amended, waived or otherwise modified from time to time, the "PSA") together with Party B, pursuant to which Party A and Party B agreed to, among other things, amend certain terms and conditions of the ISDA Agreement in accordance with the terms hereof; and

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1    Conflicts.

(a)    Party A and Party B agree that to the extent of any conflict or actual inconsistency between the terms of the ISDA Agreement (as amended by this Amendment) and the PSA, the terms of the PSA shall govern.

(b)    Party A and Party B further agree that in the event of any ambiguous provisions herein, in the ISDA Agreement, or in the PSA, the parties shall resolve such ambiguity in a manner giving most weight to the purpose of the PSA and this Amendment, to wit, to permit the Transaction to remain outstanding during the pendency of the Chapter 11 Cases, to suspend payment obligations under the ISDA Agreement during the pendency of the Chapter 11 Cases other than the payments specifically set forth herein, and to enable Party B to emerge from the Chapter 11 Cases and restore the ISDA Agreement (including the Transactions) to their terms in effect immediately prior to the effectiveness of their Amendment and as if no Chapter 11 Cases or other defaults, events of default or Terminations Events had occurred.

2    Agreement Not to Terminate.

(a)    For so long as the PSA remains in effect, and unless a Termination Event (as defined in the PSA) has occurred and is continuing under the PSA and has not been waived, Party A hereby agrees that, notwithstanding Sections 560 or 561 of the Bankruptcy Code, or any other contractual, statutory, or equitable right to the contrary, it

shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of any event or condition with respect to which Party B would be, or is, the Defaulting Party or an Affected Party.

(b)    For so long as the PSA remains in effect, Party B hereby agrees that it shall not cause, or permit any of its assignees to cause, an Early Termination Date to occur, or to declare the existence of any Event of Default or Termination Event as a result of Party A's agreement to comply with the terms of the PSA or this Amendment, to the extent Party A would be, or is, a Defaulting Party or Affected Party.

(c)    Notwithstanding any contractual, statutory or equitable right to the contrary, Party A acknowledges that it may exercise any available rights or remedies (including any right of termination provided under Section 560 of the Bankruptcy Code or otherwise) during the Chapter 11 Cases in the event of a breach or termination of the PSA or otherwise only upon obtaining such authority by motion to the Bankruptcy Court upon no less than 14 days' written notice to Party B.

3      Payments.

(a)    Each of Party A and Party B agrees that the obligations arising under Section 2(a)(i) and 2(a)(ii) shall be replaced by the provisions of Section 3(b) of this Amendment from the date of commencement of the Chapter 11 Cases (the "Commencement Date") through the Effective Date under a Qualified Plan (as defined in the PSA) (the "Chapter 11 Period") and that, upon the Effective Date of a Qualified Plan, subject to the provisions of Section 3(b)(iv) of this Amendment, the obligations under Section 2(a)(i) and 2(a)(ii) shall apply from and after such date of effectiveness.[1]

(b)    For so long as the modifications set forth in Section 3(a) hereof are in effect, in lieu of (and in full satisfaction of) the obligation under Section 2(a)(i) and 2(a)(ii) of the Agreement: (i) amounts otherwise payable by Party B to Party A during such period shall accrue (the "Party B Accrued Amount") and amounts otherwise payable by Party A to Party B during such period shall accrue (the "Party A Accrued Amount"); (ii) on the 5th Business Day of each month during the Chapter 11 Period, the amount that would be the Party B Accrued Amount and the Party A Accrued Amount will be reported by the Calculation Agent to Party B and, after application of Section 2(c) of the ISDA Agreement, shall be reported by the Calculation Agent to Party B (the "Monthly Net Accrual") and shall be accrued until the end of the Chapter 11 Period; (iii) on the Effective Date of the Qualified Plan, each party shall determine the net amount and payment obligation in respect of all Monthly Net Accrual amounts calculated during the Chapter 11 Period and the party with the positive payment obligation shall pay such amount to the other party without regard to any other netting or setoff, gross-up or withholding; and (iv) (A) notwithstanding anything herein or in the ISDA Agreement to

---

[1]    "Effective Date" means the date on which the substantial consummation (as that term is used in section 1101(2) of the Bankruptcy Code) of a Qualified Plan occurs.

the contrary, the first payment date in respect of the ISDA Agreement after the Effective Date shall occur on the later of (x) the first Business Day that is three (3) months after the Effective Date and (y) December 31, 2010, and (B) any subsequent payment dates shall occur on the first Business Day every six (6) months thereafter.

(c)    In addition to the foregoing, Party B will use its commercially reasonable efforts to obtain from the Bankruptcy Court an order providing Party A with adequate protection including in the form of post-petition interest payable on a monthly basis at a rate of 5.0% per annum based on the Assumed Early Termination Amount (as defined below). "Assumed Early Termination Amount" means, and shall be calculated as, the Early Termination Amount determined in accordance with the provision of the ISDA Agreement for all of the Transactions as if all such Transactions had been terminated as of the same day (which day shall be deemed to be the Business Day immediately prior to the Commencement Date) with respect to Party B as the Defaulting Party.

(d)    Party A and Party B each agree that other than the foregoing payments and accruals, no other payments or accruals shall be required or made during the Chapter 11 Period for so long as this Amendment remains in effect.

4    Release.

Upon the Effective Date of a Qualified Plan, and without any further action required by the parties hereto, all defaults, Events of Default and Termination Events that arose as a result of or related to the PSA and modifications and obligations under this Amendment (but not, for the avoidance of doubt, Section 3(b)(iv) of this Amendment) and under the ISDA Agreement prior to and including the Effective Date shall be deemed forever waived and released and of no further force or effect. For the avoidance of doubt, following such Effective Date, the ISDA Agreement (as amended by Section 3(b)(iv) of this Amendment) shall be in full force and effect and the parties shall thereafter be subject to, and required to comply with, the terms and provisions thereof as therein effective.

5    Notices.

All notices required under this Amendment shall be sent to the addresses for Party A and Party B, respectively, by overnight delivery or hand delivery (including with respect to Section 2(c) hereof), with such notice being effective when actually received:

Address for notice or communications to Party A:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Legal Affairs
Facsimile No.: 203-719-0680

Address for notice or communications to Party B:

EXECUTION VERSION

> Neff Corp.
> 3750 N.W. 87th Street, Suite 400
> Miami, Florida 33178 Attention: Chief Financial Officer
> Telephone No.: 305-921-2280
> Facsimile No.: 305-921-4156

with copies to:

> Kirkland & Ellis LLP
> Attention: Ray Schrock and Ryan Preston Dahl
> 300 North LaSalle
> Chicago, Illinois 60654
> Telephone No.: 312-862-2000
> Facsimile No.: 312-862-2200

> and

> Kirkland & Ellis LLP
> Attention: Leonard Klingbaum and Brian S. Lennon
> 601 Lexington Avenue
> New York, New York
> Telephone No.: 212-446-4800
> Facsimile No.: 212-446-6460

6    <u>Governing Law</u>.

THIS AMENDMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

7    <u>Consent to Jurisdiction</u>.

PARTY A AND PARTY B HEREBY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK CITY, STATE OF NEW YORK, AND IRREVOCABLY THAT ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT SHALL BE LITIGATED IN SUCH COURTS. NOTWITHSTANDING THE FOREGOING, PARTY A AND PARTY B EACH SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT DURING THE PENDENCY OF THE CHAPTER 11 CASES FOR ANY AND ALL ACTIONS ARISING OUT OF OR RELATED TO THIS AMENDMENT. PARTY A AND PARTY B EACH EXPRESSLY SUBMITS AND CONSENTS TO THE FOREGOING JURISDICTION OF THE AFORESAID COURTS AND EACH WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.

EXECUTION VERSION

IN WITNESS HEREOF, the Parties have executed this Amendment as of the date first written above.

UBS AG, as Party A to the ISDA Agreement

By:
Its:

Kiya Sakai
Executive Director and Counsel
Region Americas Legal
Fixed Income Section

By:
Its:

Maria Iacomino-Murphy
Director
Region Americas Legal
Fixed Income Section

Neff Corp., as Party B. to the ISDA Agreement

By:
Its:

CFO.

[Signature Page for UBS Swap Amendment]

6

**EXHIBIT D**

## Neff Corporate and Capital Structure Chart

**First Lien Facilities**

Revolving Credit Facility: $153.3 million drawn as of the petition date.

Maturity: May 31, 2013

Swap Liability: $22.4 million as of the petition date (counterparties: Bank of America, N.A. and UBS AG).

First Lien Term Loan: $88.5 million as of the petition date.

Collateral: First priority lien on substantially all the present and future property and assets of Borrowers and Guarantor.

Payment Waterfall: Generally, proceeds in the event of default are applied: first to the ABL; second to the Swap Liability; and third to the First Lien Term.

Administrative Agent: Bank of America, N.A.

**Second Lien Facility**

Second Lien Term Loan: $298.5 million as of the petition date.

Maturity: November 30, 2014

Collateral: Second priority lien on substantially all the present and future property and assets of Borrower and Guarantors.

Administrative Agent: Wilmington Trust Co.

**10% Unsecured Notes Due 2015**

Amount outstanding: $35.8 million as of the petition date.

Maturity: June 1, 2015

Coupon: 10% per annum, payable June 1 and December 1.

Issuer: Neff Corp.

Guarantors: Neff Rental LLC, Neff Finance Corp., Neff Rental, Inc.

Indenture Trustee: Wells Fargo Bank, N.A.

**Debt Summary**

$ millions

| | |
|---|---|
| Revolving Credit Facility: | $153.3 |
| Swap Liability: | 22.4 |
| First Lien Term Loan: | 88.5 |
| Second Lien Term Loan: | 298.5 |
| 10% Notes Due 2015: | 35.8 |
| **Total** | **$598.5** |





Borrowers and/or Guarantor under First Lien Facilities

Borrower and/or Guarantors under Second Lien Facility

Issuer and/or Guarantors under 10% Notes Due 2015

**EXHIBIT E**

## FINANCIAL PROJECTIONS

As discussed in Article IX of the Disclosure Statement, the Debtors' management prepared financial projections for calendar years 2010 through 2014 (the "Financial Projections") to support the feasibility of the *Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan").

    *1.    Overview of Financial Projections*

As a condition to Confirmation of the Plan, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors.  In connection with developing the Plan and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of the Financial Projections, analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business in the ordinary course upon emergence from chapter 11.

The Financial Projections will also assist each Holder of a Claim in determining whether to accept or reject the Plan.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.  The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They are also based on factors such as industry performance, general business, economic, competitive, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that actual and projected results will differ and that actual results may be materially greater or less than those contained in the Financial Projections herein.  The Debtors make no representations as to the accuracy of the Financial Projections or the Purchaser's ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on ongoing and future developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  For the foregoing reasons, the Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly deleveraged capital structure following Consummation of the Plan, the Debtors' business will be a viable business with long-term prospects.  The Debtors believe that the Purchaser will have sufficient liquidity to fund obligations as they arise, thereby maintaining the value of their rental equipment business.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.  THE DEBTORS DID NOT PREPARE THE FINANCIAL PROJECTIONS WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS'**

**INDEPENDENT AUDITOR HAS NOT COMPILED OR EXAMINED THE FINANCIAL PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS, OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR THE PURCHASERS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated thereby will be consummated by December 31, 2010.[1] Any significant delay in the Effective Date may have a material adverse impact on the Debtors' business operations and financial performance, including, an increased risk of inability to meet revenue forecasts and the incurrence of higher restructuring expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors believe they have a reasonable basis), of the results of future operations, financial position, and cash flows of the Purchasers, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

2.      *General Assumptions and Methodology*

The Financial Projections consist of the selected income statement items and selected balance and cash flow items as of December 31 for each year for calendar years 2010 through 2014. The Debtors' Financial Projections set forth the projected consolidated financial position immediately after Consummation of the Plan. The projected consolidated statements of financial position were developed based upon the Debtors' balance sheet projections. The Financial Projections do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities. The Financial Projections are based on financial data derived from the Debtors' business planning process. The business planning process is undertaken annually by the Debtors to provide sales and cost projections which assist the Debtors in managing their working capital needs, planning for anticipated capital expenditures, and developing their capital structure.

The Financial Projections, among other things: (a) are based upon current and projected market conditions; (b) assume emergence from chapter 11 on the Effective Date under the terms expected in the

---

[1]    Although the Debtors' Financial Projections assume that the Plan will be consummated as of December 31, 2010, the Debtors' currently project that the Effective Date under the Plan will occur on August 31, 2010.

Plan; and (c) assume consummation of a $119 million Rights Offering and a $175 million senior secured revolving credit facility on the Effective Date.

3. *Income Statement Assumptions*

- <u>Rental Revenue.</u>  This category includes rental revenues and related revenues such as the fees the Debtors' charge for the pickup and delivery of equipment, damage waivers, and other surcharges.

- <u>Equipment Sales.</u>  This category includes revenues from the sale of the Debtors' used rental equipment as well as sales of new equipment to customers.

- <u>Parts and Service.</u>  This category includes revenues from customers for fuel and the repair of damaged rental equipment as well as from the sale of complementary parts, supplies, and merchandise to customers in connection with the Debtors' equipment rental and sales business.

- <u>Cost of Revenue.</u>  Cost of revenue expenditures primarily represent depreciation on the rental equipment and the costs of maintaining the equipment and delivering equipment to and from customer jobsites.

- <u>Selling, General, and Administrative Expenses ("SG&A").</u>  SG&A represents wages and commissions paid to the Debtor's sales force, the administrative expenses incurred at the Debtor's facilities and related facility expenses, to corporate office expenses.

4. *Balance Sheet Assumptions*

- <u>Current Assets.</u>  Current assets are comprised of accounts receivable and parts inventory.

- <u>Current Liabilities.</u>  Current liabilities are comprised of accounts payable and other accrued expenses.

- <u>Exit Revolver.</u>  Upon emergence the Purchaser is projected to have access to a $175 million revolving credit facility to fund working capital and fleet expansion needs.

- <u>Swap Liability.</u>  Upon emergence the Purchaser is projected to assume the existing swap liability. The swap liability is projected to be paid down through 2012.

5. *Cash Flow Assumptions*

- <u>Net Capital Expenditures.</u>  Net capital expenditures is comprised of the purchase and sale of rental equipment as well as other property, plant and equipment.

- <u>Gain on Sale of Equipment.</u>  Represents the gain, in excess of book value, recognized on the sale of new and used equipment.

| Selected Income Statement Items | | | | | |
|---|---|---|---|---|---|
| | **2010**[1] | **2011** | **2012** | **2013** | **2014** |
| Rental Revenue | $157.4 | $166.9 | $189.7 | $208.9 | $230.1 |
| Equipment Sales | 10.9 | 22.5 | 39.7 | 40.1 | 24.5 |
| Parts & Services | 9.6 | 9.7 | 10.2 | 11.2 | 12.4 |
| Total Revenues | $177.9 | $199.1 | $239.6 | $260.2 | $267.0 |
| | | | | | |
| Cost of Revenue | (129.9) | (143.5) | (162.8) | (169.4) | (164.3) |
| Gross Margin | $48.0 | $55.6 | $76.7 | $90.7 | $102.7 |
| | | | | | |
| Selling, General and Administrative | (63.1) | (66.6) | (70.7) | (73.0) | (74.1) |
| EBIT[2] | ($15.1) | ($11.0) | $6.0 | $17.7 | $28.6 |
| | | | | | |
| Addback: Depreciation | 61.7 | 63.4 | 66.1 | 69.3 | 71.2 |
| Addback: Amortization | 1.1 | 1.2 | 1.1 | 1.0 | 0.8 |
| **EBITDA**[2] | **$47.7** | **$53.6** | **$73.3** | **$88.0** | **$100.6** |

| Selected Balance Sheet & Cash Flow Items | | | | | |
|---|---|---|---|---|---|
| | **2010**[1] | **2011** | **2012** | **2013** | **2014** |
| Current Assets | 29.4 | 34.0 | 37.9 | 41.1 | 42.1 |
| Current Liabilities | 20.1 | 20.5 | 26.4 | 26.5 | 25.0 |
| | | | | | |
| Exit Revolver | 84.4 | 103.3 | 121.6 | 126.9 | 98.9 |
| Swap Liability | 14.9 | 5.1 | 1.7 | - | - |
| | | | | | |
| Net Capital Expenditures | 9.2 | 48.4 | 77.6 | 72.6 | 57.5 |
| Gain on Sale of Equipment | 0.6 | 2.2 | 5.8 | 7.6 | 4.5 |

_____
(1) Includes actual results through March 2010.
(2) Excludes all professional and transaction related fees.

**<u>EXHIBIT F</u>**

# LIQUIDATION ANALYSIS[1]

### 1.    Introduction

Pursuant to the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, a chapter 11 plan may not be confirmed unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value as of the effective date of the plan that is not less than the amount that such holder would receive or retain if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Debtors' Plan satisfies the "best interests" test with respect of each of the Debtor entities, the Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis (the "Liquidation Analysis").  The Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis set forth herein (the "Notes").  Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.  Although the Plan does not contemplate a substantive consolidation of the Debtors' estates, for purposes of the Liquidation Analysis it should be noted that Neff Rental, Inc. is the Debtors' primary operating entity and all assets are owned by Neff Rental, Inc.  As such, the Debtors have prepared the Liquidation Analysis for Neff Rental, Inc. assuming that creditors entitled to a recovery under a hypothetical chapter 7 liquidation would receive a distribution from the liquidation of Neff Rental, Inc.'s assets.

In the Liquidation Analysis, the Debtors determined a hypothetical liquidation value of their businesses if a chapter 7 trustee were appointed and charged with reducing to cash any and all of the Debtors' assets.  The Debtors compared the potential liquidation value of the Debtors' assets to the potential value of the Debtors' assets under the Plan.  As reflected in more detail in the Liquidation Analysis and in Article IX herein, the Debtors believe that the value of the distributions provided to Holders of Allowed Claims under the Plan would be greater than under a hypothetical chapter 7 liquidation, thus the Plan satisfies the "best interests" test with respect to each of the Debtors.  As set forth below, each Holder of an Allowed Impaired Class of Claims or Interests under the Plan, will receive the following percentages of their estimated aggregate Allowed Claims or Interests out of the Liquidation Proceeds (as defined below) in a chapter 7 liquidation:

| Class | Claim or Interest | Plan Treatment | Range of Claim or Interest | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|-------|-------------------|----------------|----------------------------|------------------------------------------|-----------------------------------------------|
| 5 | Secured Swap Claims | Impaired | $22,393,400 | 100% | 0%–100% |
| 6 | First Lien Term Loan Claims | Impaired | $88,499,000 | 100% | 0%–12% |
| 7 | Second Lien Term Loan Claims | Impaired | $298,505,000 | 3% | 0% |
| 8 | Senior Notes Claims | Impaired | $35,867,000 | 1% | 0% |
| 9 | General Unsecured Claims | Impaired | $1,100,000 | 1% | 0% |
| 11 | Section 510(b) Claims | Impaired | N/A | 0% | 0% |
| 13 | Equity Interests | Impaired | N/A | 0% | 0% |

---

[1]    Unless otherwise specifically set forth in the Liquidation Analysis, all capitalized terms used, but not defined herein, shall have the same meanings ascribed to them in the Plan and the Disclosure Statement.

As the Liquidation Analysis demonstrates, Holders of Allowed Class 5 Secured Swaps Claims will receive recoveries between 0% and 100% in a chapter 7 liquidation. Holders of Allowed Class 6 First Lien Term Loan Claims will receive at most a 12% recovery in a hypothetical chapter 7 liquidation. Under the Plan, Holders of Allowed Class 5 Secured Swaps Claims and Class 6 First Lien Term Claims stand to receive a 100% recovery. Further, under the Plan, Holders of Allowed Class 7 Second Lien Term Loan Claims stand to receive a 3% recovery, while Holders of Allowed Class 8 Senior Notes Claims and Class 9 General Unsecured Claims each stand to receive a 1% recovery. As the Liquidation Analysis demonstrates, Holders of Allowed Class 8 Senior Notes Claims and Allowed Class 9 General Unsecured will not likely receive any recoveries in a chapter 7 liquidation. Lastly, Holders of Allowed Claims in Classes 11 and 13 are not entitled to any distribution under the Plan or in a hypothetical chapter 7 liquidation. Accordingly, the Plan satisfies the "best interests" test.

2.      *Scope, Intent, and Purpose of the Liquidation Analysis*

The determination of the hypothetical proceeds from, and costs of the liquidation of the Debtors' assets, is an uncertain process involving the extensive use of estimates and assumptions that although considered reasonable by the Debtors, are inherently subject to significant business, and economic uncertainties and contingencies beyond the control of the Debtors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Debtors prepared the Liquidation Analysis for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code upon conversion of these Chapter 11 Cases. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. Accordingly, while deemed reasonable based on the facts currently available, neither the Debtors nor their advisors make any representations or warranties that the actual results would or would not approximate the estimates and assumptions represented in the Liquidation Analysis.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of their books and records as of the Petition Date. The Liquidation Analysis includes estimates for Claims which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, employee-related obligations, Liquidation Costs (as defined herein), trustee fees, tax liabilities, and other Allowed Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis reference specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to Holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. Therefore, the Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission of the Debtors.

The actual amount of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth in the Liquidation Analysis.

   3.      *Conversion Date and Appointment of a Chapter 7 Trustee*

   The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on September 30, 2010 (the "Conversion Date"), which is the presumed Effective Date of the Plan. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates.

   The Liquidation Analysis is based on estimates of each of the Debtors' projected assets and liabilities as of September 30, 2010 (the company is using unaudited April 30, 2010 balances as a proxy unless otherwise footnoted). Such estimates are derived from each Debtor's financial statements or more recent financial information, where available. The Debtors do not believe the use of such estimates will result in a material change to estimated recoveries on the Conversion Date unless otherwise noted. Because the Debtors do not maintain their books and records on an individual legal entity basis, the financial statements utilized for the Liquidation Analysis may not comply with generally accepted accounting principles.

   4.      *Debtors' Assets*

   The Liquidation Analysis assumes a liquidation of all of the Debtors' assets. As described in more detail below, the Debtors have eleven major categories of assets: (a) cash and equivalents; (b) accounts receivable; (c) parts inventory; (d) fleet equipment; (e) rolling stock equipment; (f) real property; (g) expensed equipment; (h) other long-term assets; (g) net operating losses; (h) state income tax refund; and (i) potential preference and fraudulent conveyance recoveries.

   Holders of the Class 5 Secured Swap Claims, Class 6 First Lien Term Loan Claims, and Class 7 Second Lien Term Loan Claims hold first-and second-priority liens against substantially all of the Debtors' assets (the "Collateral"). However, the Collateral does not include a certain piece of real property owned by the Debtors located in Galveston, Texas.

   5.      *Liquidation Process*

   The Liquidation Analysis assumes that the Trustee will attempt to maximize recoveries for Creditors by continuing to operate the Debtors' various businesses during the chapter 7 liquidation for a short period of time to maintain supply continuity to the Debtors' customers. In addition to any working capital contribution from the Debtors' customers, the Liquidation Analysis assumes that the Trustee will continue to fund the Debtors' operations during the liquidation process using cash generated from business operations.

   The Liquidation Analysis assumes an "orderly" liquidation, under which the liquidation of the Debtors' assets and the wind-down of their Estates would occur over a period of 8 months starting on the Conversion Date. However, the Trustee may not have sufficient funds to operate the Debtors' businesses long enough to conduct an orderly liquidation and maximize value, and thus may be forced to liquidate substantially all of the Debtors' assets immediately. In such an

**Neff Rental, Inc. - Liquidation Analysis** (estimated balances as of September 30, 2010)

**Table I: Assets Available for Distribution**

| ($ in thousands) | Notes | Estimated Balances (a) | Estimated Recovery Rate | | Estimated Liquidation Proceeds | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| Cash & Cash Equivalents | | $ 641 | 100% | 100% | $ 641 | $ 641 |
| Accounts Receivable | b | 28,700 | 44% | 58% | 12,628 | 16,646 |
| Parts Inventory | | 1,044 | 10% | 20% | 104 | 209 |
| Fleet Equipment | c | 190,800 | 74% | 90% | 140,400 | 172,300 |
| Rolling Stock | d | 14,423 | 86% | 105% | 12,400 | 15,200 |
| Other PP&E | e | 1,780 | 8% | 19% | 140 | 340 |
| Owned Real Estate | f | 25 | 200% | 280% | 50 | 70 |
| Expensed Equipment | g | 630 | 20% | 50% | 126 | 315 |
| Other Assets | | | | | | |
| Prepaid Assets - Insurance | | 869 | 0% | 10% | - | 87 |
| Prepaid Assets - Other | | 2,282 | 0% | 0% | - | - |
| Goodwill | | 9,852 | 0% | 0% | - | - |
| Intangible - Customer List | | 7,477 | 0% | 10% | - | 748 |
| Intangible - Trade Name | | 6,651 | 0% | 10% | - | 665 |
| Deferred Charges and Other Assets - Net | h | 12,046 | 0% | 0% | - | - |
| Federal and State Net Operating Losses | i | 282,100 | 0% | 0% | - | - |
| State Income Tax Refund | | 10 | 100% | 100% | 10 | 10 |
| Preference and Fraudulent Conveyance Recoveries | | 50 | 40% | 80% | 20 | 40 |
| **Total Assets and Net Proceeds Available for Distribution** | | **$ 559,379** | **30%** | **37%** | **$ 166,519** | **$ 207,270** |

**Table II: Estimated Chapter 7 Wind-Down Administrative Costs**

| ($ in 000's) | Notes | Fee % | Fees & Costs | | Estimated Costs | |
|---|---|---|---|---|---|---|
| | | | | | Low | High |
| Chapter 7 Trustee Fees | j | 3% | | | $ 4,996 | $ 6,218 |
| Chapter 7 Professional Fees & Costs | k | | 3,200 | | 3,200 | 3,200 |
| Wind-Down Costs | l | | 12,800 | | 12,800 | 12,800 |
| Carve-out for Chapter 11 Professional Fees | m | | 3,100 | | 3,100 | 3,100 |
| Total Chapter 7 Administrative Costs | | | | | 24,096 | 25,318 |
| **Net Proceeds after Chapter 7 Administrative Costs** | | | | | **$ 142,423** | **$ 181,952** |

**Table III: Estimated Creditor Recoveries**

| ($ in 000's) | Notes | Estimated Claims | | % Recovery | | Estimated Recovery Values | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| Super-Priority DIP Revolver | n | $ 149,000 | $ 149,000 | 96% | 100% | $ 142,423 | $ 149,000 |
| Secured Claims | | | | | | | |
| First Lien Revolver | | - | - | n/a | n/a | - | - |
| Swap Liability | | 22,393 | 22,393 | 0% | 100% | - | 22,393 |
| First Lien Term Loan | o | 88,499 | 88,499 | 0% | 12% | - | 10,558 |
| Second Lien Term Loan | o | 298,505 | 298,505 | 0% | 0% | - | - |
| Administrative Claims | | | | | | | |
| 503(b)(9) | | 675 | 675 | 0% | 0% | - | - |
| Unpaid General Administrative Expenses | p | 4,400 | 4,400 | 0% | 0% | - | - |
| Priority Tax Claims | q, r | 1,250 | 1,250 | 0% | 0% | - | - |
| Deferred Tax Liability | | 2,527 | 2,527 | 0% | 0% | - | - |
| Priority Unsecured Claims | | | | | | | |
| Wages | q | 2,700 | 2,700 | 0% | 0% | - | - |
| Taxes | q, s | 1,550 | 1,550 | 0% | 0% | - | - |
| General Unsecured Claims | | | | | | | |
| Class 1: Senior Notes | o | 35,867 | 35,867 | 0% | 0% | - | - |
| Class 2: General Unsecured Claims | | 1,100 | 1,100 | 0% | 0% | - | - |
| Total Claims | t | $ 608,467 | $ 608,467 | | | $ 142,423 | $ 181,952 |
| **Net Proceeds Available to Equityholders** | | | | | | **$ -** | **$ -** |

Notes:

a - All balances used herein are estimated net book values as of September 30, 2010 (using unaudited April 30, 2010 balances as a proxy unless otherwise footnoted).

b - Estimated accounts receivable balance on September 30, 2010, in accordance with company's business plan.

c - The Net Orderly Liquidation Value (NOLV) is based on an February 28, 2010 Rouse equipment appraisal (adjusted for assets sales, purchases and depreciation from 2/28 - 9/31) and the Net Forced Liquidation Value (NFLV) is in accordance with a Rouse industry report titled  *Monthly Analysis of Values 0309 to 0210. (Includes marketing costs, occupancy costs, supervision, labor and liquidators' fees related to liquidation).*

d - The Net Orderly Liquidation Value (NOLV) is based on a February 28, 2010 Rouse Rolling Stock appraisal (adjusted for assets sales, purchases and depreciation from 2/28 - 4/30) and the Net Forced Liquidation Value (NFLV) is in accordance with a Rouse industry report titled Monthly Analysis of Values 0309 to 0210. (Includes marketing costs, occupancy costs, supervision, labor and liquidators' fees related to liquidation).  NBV of Equipment is assumed to be constant from 4/30/10- 9/31/10.

e - Other PP&E includes buildings, improvements, office equipment, shop equipment and capitalized leased equipment (using unaudited April 30, 2010 balance as a proxy for September 30, 2010).

f - Amount listed on Deed for property in Galveston County, Texas.

g - Company estimates that buckets, hoses and other miscellaneous expensed parts are approximately $10K per each of the 63 branches.

h - Deferred charges include costs associated with first lien revolver, first lien term loan, second lien term loan and senior notes (using unaudited April 30, 2010 balance as a proxy for September 30, 2010).

i - Federal and State Net Operating Losses as of March 31, 2010.

j - Chapter 7 trustee fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are estimated based on historical experience in other similar cases and are calculated at 3% of the total liquidation value of the Debtor entities.

k - Chapter 7 Professional Fees assume an eight month wind-down period (four months at $600K and four months at $200K per month) to assist in winding down the estate and completing any necessary accounting work.

l - Wind-down costs assume six months of branch operating costs and eight months of corporate operating costs.

m - Estimated balance of fees earned but not yet paid as of September 30, 2010, plus one and a half months of fees for liquidation services.

n - Estimated balance as of September 30, 2010.

o - Includes accrued interest through May 16, 2010.

p - Estimated post-petition accounts payable balance per company's business plan as of September 30, 2010.

q - Assumes pre-petition obligations are approved to be paid (subject to court approval of First Day Orders).

r - Includes Sales and Use taxes, Vehicle Registration fees, Business License fees, Annual Report taxes and Other taxes and Franchise and Income taxes.

s - Includes Personal Property and Real Estate taxes associated with leased and owned land.

t - Does not include amounts associated with 507(b) claims.  The Debtors anticipate that such claims would be substantial.

event, the amount of Liquidation Proceeds realized would be materially lower than those assumed in the Liquidation Analysis.

      a.      <u>Factors Considered in Valuing Hypothetical Liquidation Proceeds</u>

The following include some, but not all, of the factors that could negatively impact the recoveries set forth in the Liquidation Analysis:  (a) turnover of key personnel; (b) challenging industry conditions; (c) customer setoffs; and (d) delays in the liquidation process.  These factors may limit the amount of the proceeds generated by the liquidation of the Debtors' assets (the "<u>Liquidation Proceeds</u>") available to the Trustee.  For example, it is possible that the liquidation would be delayed while the Trustee becomes familiar with the Debtors' Chapter 11 Cases and the Debtors' business operations.  This delay could materially reduce the value, on a present value basis, of the Liquidation Proceeds.  In addition, there is a risk that the Trustee would be unable to maximize the value of the Debtors' Estates in a controlled liquidation because the Bankruptcy Court may only allow the Trustee to operate the Debtors' business for a limited period under section 721 of the Bankruptcy Code.  While the Bankruptcy Code does not set forth a specific time period under which a chapter 7 trustee is allowed to operate a debtor's business, the Bankruptcy Court may conclude that the eight month period assumed in the Liquidation Analysis exceeds the time contemplated by the Bankruptcy Code.  Should the Bankruptcy Court limit the Trustee's operation of the Debtors' businesses, the Liquidation Proceeds generated from the sale of the Debtors' assets would likely decrease.

      b.      <u>Waterfall and Recovery Ranges</u>

The Liquidation Analysis assumes that the proceeds generated from the liquidation of all of the Debtors' assets plus Cash estimated to be held by the Debtors on the Conversion Date, will be reasonably available to the Trustee.  After deducting the costs of liquidation, including, the Trustee's fees and expenses and other administrative expenses incurred in the liquidation, the Trustee would allocate net Liquidation Proceeds to Holders of Claims and Interests at each Debtor entity in accordance with the priority scheme set forth in section 726 of the Bankruptcy Code.  The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds.  Specifically, these percentages reflect a high and low range of estimated Liquidation Proceeds.

The Debtors used the April 30, 2010 financial statements as a proxy for expected asset and liability values on the Conversion Date (unless otherwise footnoted) and made adjustments to those values to account for any known material changes expected to occur before the Conversion Date.  While the Debtors expect to continue to incur obligations in the ordinary course of business until the Conversion Date (which obligations have not been reflected herein), the ultimate inclusion of such additional obligations is not expected to change the results of these Liquidation Analyses in any material form or fashion.

The Debtors' Professionals (a) worked with the Debtors' operational, financial, and accounting personnel, (b) used industry knowledge, and (c) drew upon personal experiences to estimate ranges of recovery by asset class.  The Debtors do not provide any assurance of such recoveries but have given their best estimates in this scenario.  The table in the following page summarizes the low and high range estimates of the Liquidation Proceeds that would be available to Holders of Allowed Claims and Interests for distribution in a chapter 7 liquidation.

**Specific Notes to the Asset and Liability Assumptions
Contained in the Liquidation Analysis**

- <u>Cash and Equivalents.</u> Cash is based on the cash balance on the Debtors' financial statements as of April 30, 2010 and includes restricted and unrestricted Cash in any of the Debtors' bank, operating, and reserve accounts. The Liquidation Analysis assumes a 100% recovery rate for Cash based on the liquidity of such assets.

- <u>Accounts Receivable.</u> Accounts receivable include amounts owed to the Debtors by their customers and various other parties. Using the April 30, 2010 aging of the Debtors' accounts receivable as a proxy, and assuming that current accounts receivable are more likely to be collected in a liquidation than past due accounts, the Liquidation Analysis assumes a blended recovery rate of 44%-58% on account of accounts receivable. This recovery is due to the impact of the low return anticipated on accounts receivable in the event of a chapter 7 liquidation.

- <u>Parts Inventory.</u> The Liquidation Analysis assumes a 10%-20% recovery on account of parts Inventory, which includes spare parts and fuel inventory.

- <u>Fleet Equipment.</u> Fleet Equipment generally consists of a broad variety of construction and industrial equipment, including earthmoving, material handling, aerial, and compaction equipment. The Debtors' estimate that the Net Book Value (NBV) of this equipment will be approximately $194.8 million as of August 31, 2010. The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the Debtors' February 28, 2010 equipment appraisal conducted by Rouse Asset Services (the "<u>Rouse Appraisal</u>") as a proxy for estimated orderly liquidation values as a percentage of NBV and in accordance with a Rouse industry report titled "Monthly Analysis of Values 03/09 to 02/10" to determine the Net Forced Liquidation Value (NFLV). Included in both the high and low recovery scenarios is an 8.5% reduction for marketing costs, occupancy costs, supervision, labor, and liquidators' fees related to a liquidation of the Debtors' fleet equipment.

- <u>Rolling Stock Equipment.</u> Rolling stock equipment generally includes pick-up trucks, trailers, lowboys, and utility vehicles. The $144.4 million April 30, 2010 Net Book Value (NBV) of this equipment is used as a proxy for the estimated NBV on August 31, 2010. The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the Rouse Appraisal as a proxy for estimated orderly liquidation values as a percentage of NBV and in accordance with a Rouse industry report titled "Monthly Analysis of Values 03/09 to 02/10" to determine the Net Forced Liquidation Value (NFLV). Included in both the high and low recovery scenarios is an 8.5% reduction for marketing costs, occupancy costs, supervision, labor, and liquidators' fees related to a liquidation of the Debtors' rolling stock equipment.

- <u>Other Property, Plant, and Equipment.</u> Other property, plant, and equipment ("<u>PP&E</u>") generally includes buildings, improvements, office equipment, shop equipment and capitalized leased equipment. The $1.78 million value of these assets is based on unaudited April 30, 2010 balances as a proxy for September 30, 2010.

- <u>Real Property.</u> The Debtors' real property includes a parcel of real property located in Galveston, Texas. The assumed recovery value on such real property is between $50,000 and $70,000.

- <u>Expensed Equipment.</u> The Debtors' estimate that at any given time each of its 63 branches own approximately $10,000 of various pieces of previously expensed equipment (such as tires, buckets, hoses, and other miscellaneous parts). The Liquidation Analysis assumes a 20%-50% recovery on account of expensed equipment.

- <u>Other Assets.</u> Other assets primarily include prepaid assets, goodwill, customer lists, trade names, deferred chargers and other assets. The Liquidation Analysis assumes a 10% recovery on account of the Debtors' customer list and trade name, each respectively.

- <u>Net Operating Losses.</u> The Debtors have net operating loss carryforwards ("<u>NOLs</u>") for federal and state income tax purposes that are the result of reported losses in prior years. A NOL arising but not utilized in the current year may be carried back to generate a refund of taxes paid in previous years or carried forward to reduce taxes payable in future years. The Liquidation Analysis assumes no recovery for these amounts.

- <u>State Income Tax Refund.</u> This amount represents the Debtors' best estimate associated with the refund of pre-paid franchise taxes, with an estimated recovery of 100% on account of such potential refund(s).

- <u>Preference and Fraudulent Conveyance Recoveries.</u> In the ordinary course of business and prior to filing of the Chapter 11 Cases, the Debtors' continued to pay their accounts payables as accounts came due. Out of an abundance of caution, the estimated amount of these payments that may be considered a preference or fraudulent transfer is approximately $50,000 with an estimated recovery of 40%-80%.

### Liquidation Costs

To maximize recoveries on the Debtors' assets, minimize the amount of Claims, and generally ensure an orderly chapter 7 liquidation, the Trustee will need to continue to employ a number of the Debtors' employees for a limited amount of time during the chapter 7 liquidation process. These individuals will primarily be responsible for overseeing and maintaining the Debtors' operations, providing operational knowledge and insight to the Trustee regarding the Debtors' business operations, and concluding the administrative liquidation of the Debtors' equipment rental business after the sale of all the Debtors' assets. The Liquidation Analysis assumes that the Trustee would reduce employee headcount to minimal staff levels from the current staff levels over an eight month period.

Liquidation Costs primarily consist of: (a) the regularly occurring general and administrative costs required to operate the Debtors' businesses during the liquidation process; (b) the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors; and (c) the Trustee's fees (collectively, the "<u>Liquidation Costs</u>"). In addition, Liquidation Costs include the payment of $3.5 million on account of Professional Fees in accordance with the DIP Orders

7

(the "Carve-Out").  The Debtors project that during the initial 120-day period while the Trustee continues to operate the Debtors' business, the operational and overhead costs will equal approximately 80% of historical operating costs for comparable operational periods.  Once outside the initial 120-day period, the Debtors project that operational and overhead costs will equal approximately 20% of historical operating costs for comparable operational periods for the remaining transitional period leading to the final phase of the liquidation, during which, the Trustee will wind-down the Debtors' Estates, effect final distributions and dissolve legal entities.

## Claims and Interests

- DIP Claims.  The Liquidation Analysis assumes the DIP Facility will be fully drawn as of the Conversion Date.  Thus, there will be approximately $148.7 million outstanding on account of DIP Claims as of the Conversion Date, which are projected to be satisfied in full from the Liquidation Proceeds.

- Revolving Credit Facility Claims.  The Liquidation Analysis assumes that Revolving Credit Facility Claims will be fully repaid from the proceeds of the DIP Facility as of the Conversion Date in accordance with the terms of the DIP Agreement.

- Secured Swap Claims.  On the Conversion Date, the Debtors estimate there will be approximately $22.4 million outstanding on account of Secured Swap Claims.  Secured Swap Claims are secured by liens granted pursuant to the First Lien Security Agreement.  Further, Secured Swap Claims are junior to Revolving Credit Facility Claims, but are senior to First Lien Term Loan Claims.  Secured Swap Claims are only Secured to the extent that the value of the underlying Collateral equals or exceeds the value of such Secured Swap Claims.  Accordingly, on the Conversion Date, the Liquidation Analysis assumes that Holders of Secured Swap Claims will be entitled to a recovery ranging from 0%-100%.  Additionally, these claimants are assumed to have super-priority claims for any diminution in value in their collateral that occurs before the Conversion Date.

- First Lien Term Loan Claims.  On the Conversion Date, the Debtors estimate there will be approximately $88.5 million outstanding on account of First Lien Term Loan Claims.  Holders of First Lien Term Loan Claims are secured by a first priority lien on substantially all of the Debtors' assets (other than the Debtors' real property) pursuant to the First Lien Security Agreement.  The First Lien Term Loan Claims are only Secured to the extent that the value of the underlying Collateral equals or exceeds such First Lien Term Loan Claims.  Because the value of the Collateral will range from $169.7 to $211.1 million in a chapter 7 liquidation, the value of the First Lien Term Claims will likely exceed the value of the Collateral securing such First Lien Term Loan Claims.  As such, Holders of First Lien Term Loan Claims will not be entitled to any postpetition interest and will have an unsecured deficiency Claim against Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, Neff Holdings Corp., as guarantor under the First Lien Term Loan Facility.  Accordingly, on the Conversion Date, Holders of First Lien Term Loan Claims will likely be entitled to a 0%-12% recovery on account of such Claims.  Additionally, these claimants are assumed to have super-priority claims for any diminution in value in their collateral that occurs before the Conversion Date.

- Second Lien Term Loan Claims. On the Conversion Date, the Debtors estimate there will be approximately $298.5 million outstanding on account of Second Lien Term Loan Claims. Holders of Second Lien Term Loan Claims are secured by a second priority lien on substantially all of the Debtors' assets pursuant to the Second Lien Term Security Agreement. However, Second Lien Term Loan Claims are only Secured to the extent that the value of the underlying Collateral equals or exceeds such Second Lien Term Loan Claims. Because the value of the Collateral will range from $169.7 to $211.1 million in a chapter 7 liquidation, the value of the Second Lien Term Claims will exceed the value of the Collateral securing such Second Lien Term Loan Claims. As such, Holders of Second Lien Term Loan Claims will not be entitled to any postpetition interest and will have an unsecured deficiency Claim against Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantor under the Second Lien Credit Agreement. Accordingly, as reflected in the Liquidation Analysis, Holders of Second Lien Term Loan Claims will not be entitled to a recovery in a chapter 7 liquidation. Additionally, these claimants are assumed to have super-priority claims for any diminution in value in their collateral that occurs before the Conversion Date.

- Administrative and Priority Claims. Administrative and priority claims include estimated unpaid postpetition operating expenses of the Debtors' Chapter 11 Cases, estimated chapter 7 administrative claims, unpaid professional fees from the Debtors' chapter 11 estates, and estimated priority claims. Administrative Claims are assumed paid on a *pro rata* basis from the net proceeds, if any, remaining after the payment of Liquidation Costs, DIP Claims (including the Carve-Out), and all Secured Claims. Priority Claims include estimated unpaid payroll taxes and sales taxes of the Debtors' Chapter 11 Cases. Priority Claims are assumed to be paid on a *pro rata* basis from the net proceeds available, if any, after the payment of liquidation costs, DIP Facility Claims (including the Carve-Out), Secured Claims, and Administrative Claims. As reflected in the Liquidation Analysis, there are insufficient Liquidation Proceeds for Holders of Administrative Claims and Priority Claims to obtain any recovery in a chapter 7 liquidation. As noted, the Liquidation Analysis does not account for potential superpriority claims certain of the Debtors' prepetition secured lenders may have for the diminution in value of their collateral during the Chapter 11 Cases pursuant to section 507(b) of the Bankruptcy Code and the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders* [Docket No. 207]. The Debtors expect that such superpriority claims could be in the tens of millions of dollars and would have a material effect on recoveries in a chapter 7 liquidation.

- General Unsecured Claims and Senior Notes Claims. For purposes of the Liquidation Analysis, the Debtors have assumed that unsecured claims will consist of Senior Note Claims and General Unsecured Claims each as defined in the Plan. On the Conversion Date, the Debtors estimate there will be approximately $35.9 million outstanding on account of Senior Note Claims. The Debtors also estimate that there will be approximately $1.1 million outstanding on account of General Unsecured Claims. It should be noted that the Liquidation Analysis does not attempt to estimate potential

additional General Unsecured Claims that would likely arise as a result of the rejection of executory contracts and leases and the failure of the Debtors to perform under existing contracts with their customers. Such additional claims would likely result from a cessation of operations as contemplated herein and may be substantial. Moreover, General Unsecured Claims would also include the following deficiency Claims:

(i)     <u>First Lien Term Loan Deficiency Claim</u>:  On the Conversion Date, Holders of First Lien Term Loan Claims have an unsecured deficiency Claim to the extent that the value of the Collateral securing such Claims is less than the aggregate amount of the First Lien Term Loan Claims. These deficiency Claims would be asserted against Neff Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp. as borrowers, and Neff Holdings Corp., as guarantor under the First Lien Term Loan Facility.

(ii)    <u>Second Lien Term Loan Deficiency Claim</u>:  On the Conversion Date, Holders of Second Lien Term Loan Claims have an unsecured deficiency Claim to the extent that the value of the Collateral securing such Claims is less than the aggregate amount of the Second Lien Term Loan Claims. These deficiency Claims would be asserted against Neff Corp., as borrower, and Neff Holdings Corp., Neff Rental, Inc., Neff Rental LLC, and Neff Finance Corp., as guarantor under the Second Lien Credit Agreement.

General Unsecured Claims are assumed to be paid on a *pro rata* basis from the net Liquidation Proceeds available, if any, after the payment of all other Claims. As reflected in the Liquidation Analysis, there are insufficient Liquidation Proceeds for Holders of Senior Notes Claims and General Unsecured Claims (including deficiency Claims) to obtain any recovery in a chapter 7 liquidation.

- <u>Equity Interests.</u>    There are insufficient Liquidation Proceeds for Holders of Equity Interests to obtain any recovery in a chapter 7 liquidation.