PACHULSKI STANG ZIEHL & JONES LLP

780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Robert J. Feinstein, Esq.
Alan J. Kornfeld, Esq.
Ilan D. Scharf, Esq.
Beth E. Levine, Esq.

Counsel for the Official Committee
of Unsecured Creditors of Neff Corp., et al.

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

**NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE
COMMITTEE TO PROSECUTE CERTAIN CLAIMS
ON BEHALF OF THE BANKRUPTCY ESTATES**

**PLEASE TAKE NOTICE** that a hearing on the *Motion of the Official*

*Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to*

*Prosecute Certain Claims on Behalf of the Bankruptcy Estates* (the "Motion") filed herewith by

the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (collectively, the "Debtors"), will be held before the Honorable

Shelley C. Chapman, at the United States Bankruptcy Court, Alexander Hamilton Customs

House, One Bowling Green, New York, New York, 10004, Courtroom 610, **September 14, 2010**

**at 10:00 a.m.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the relief sought in the Motion must be filed with the Bankruptcy Court and served upon: (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 610; (ii) Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017 (Attn:  Robert J. Feinstein, Esq. and Ilan D. Scharf, Esq.), attorneys for the Committee; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY  10004 (Attn:  Paul K. Schwartzberg, Esq.); (iv) Kirkland & Ellis LLP, counsel to the debtors; 601 Lexington Ave, New York, NY 10022; and (v) any person or entity with a particularized interest in the subject matter of the Motion, on or before **September 3, 2010 at 5:00 p.m.**.

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the relief sought in the motion must be filed with the Court in the manner proscribed in the Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Scheduling Disclosure Statement Hearing and Approving Notice Thereof, entered on May 18, 2010 (the "Case Management Order") [Docket No. 49]) and must otherwise comply with the Case Management Order.

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE.**

Dated:    August 18, 2010            PACHULSKI STANG ZIEHL & JONES LLP
          New York, New York

_/s/ Robert J. Feinstein_
Robert J. Feinstein, Esq.
Alan J. Kornfeld, Esq.
Ilan D. Scharf, Esq.
Beth E. Levine, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

Counsel for the Official Committee
of Unsecured Creditors of Neff Corp., et al.

**REDACTED VERSION**

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Robert J. Feinstein, Esq.
Alan J. Kornfeld, Esq.
Ilan D. Scharf, Esq.
Beth E. Levine, Esq.

Counsel for the Official Committee
of Unsecured Creditors of Neff Corp., *et al.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO
PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES**

The Official Committee of Unsecured Creditors (the "Committee") of Neff Corporation

("Neff") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned cases (the "Cases") under chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code"), by and through its counsel, hereby moves this Court for entry of an order

authorizing the Committee to prosecute certain claims on behalf of the bankruptcy estates and

granting related relief (the "Motion"). In support of the Motion, the Committee respectfully

states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp.
(0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).

## PRELIMINARY STATEMENT[2]

1.      The liens held by the First Lien Agent, the Second Lien Agent and the Pre-Petition Secured Parties are the product of two heavily leveraged buyouts that, in a span of two years, increased Neff's debt load from $230 million to $734 million, <u>for virtually no consideration to the Debtors</u>.  The additional borrowing facilitated the purchase and sale of Neff by a private equity firm, Odyssey Investment Partners, LLC ("<u>Odyssey</u>"), and was expended almost entirely on payments to shareholders, including a 375% return on Odyssey's two year investment, as well as underwriting fees that between the two transactions totaled over $40 million, which were snapped up by accommodating lenders and investment bankers.

2.      The second of these leveraged buyouts closed on May 31, 2007 (the "<u>2007 LBO</u>").  Bank of America, N.A. ("<u>BofA</u>") was the First Lien Agent for $214.3 million drawn on a revolving asset-based credit facility (the "<u>First Lien Credit Facility</u>") and was also the original Second Lien Agent, succeeded by Wilmington Trust FSB ("<u>Wilmington Trust</u>"), for $290 million in term debt (the "<u>Second Lien Term Loan</u>").  The First Lien Credit Facility and the Second Lien Term Loan, together with $230 million in proceeds from an offering of 10% unsecured notes (the "Senior Notes"), comprised $734.3 million in new debt that refinanced only $501.8 million in debt.  The increased borrowings helped pay Odyssey and its co-investors $366.8 million (on a $97.1 million investment made two years earlier), $24.7 million in financing fees and expenses (of which nearly ███████ went to BofA), and $42.6 million in early payment premiums triggered unnecessarily by the refinancing.  The Debtors received nothing in exchange for incurring these obligations and granting liens to secure them for these purposes.

---

[2] Capitalized terms used but not defined in the Preliminary Statement are as defined below.

3.    The authority for applying fraudulent transfer laws to leveraged buyouts is well-established. It is beyond cavil that the Debtors did not receive reasonably equivalent value or fair consideration for granting the liens that secured the 2007 LBO financing. Whether the estates have colorable claims that the Committee should be authorized to prosecute, therefore, reduces to whether the 2007 LBO rendered the Debtors insolvent or undercapitalized. Based on the investigation and analysis undertaken by the Committee and its professionals, the Committee believes the answer is clearly "yes." A healthy company with $230 million of debt in June 2005 was saddled with $734 million in debt in June 2007. Barely a year later Neff's new owners were scrambling for means to reduce its debt load and affirmatively disclosing the risk of bankruptcy. In 2008, they solicited institutional holders of Senior Notes to convert Senior Notes into subordinated secured First Lien Term Loans (the "2008 Exchange"), at a significant discount to their face amount premium to their trading value. They did so notwithstanding BofA's imposition of a swap reserve that outweighed the benefits of the 2008 Exchange and rapidly eviscerated Neff's availability under the First Lien Credit Facility. As a further consequence of the 2008 Exchange, the holders of approximately $35 million in Senior Notes who did not participate – mostly smaller investors who did not qualify – were left holding the proverbial bag as unsecured creditors in these chapter 11 cases. For these creditors, the Debtors' proposed plan of reorganization (the "Plan") presently provides a one cent recovery, and then only if they accept the Plan.

4.    Eighteen months after the futile 2008 Exchange, Neff was in bankruptcy. The speed of Neff's collapse alone supports an inference that it was left with too thin a margin to survive the widely-anticipated economic slowdown, and the documentary evidence supports it. The post-LBO viability of the Debtors was premised on ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ Even before the transaction closed, the subprime mortgage crisis

had commenced and ████████████████████████████████████████████.

The Odyssey-controlled Board closed the transaction anyway. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

      5.      These facts support a determination that the 2007 LBO was a fraudulent

transfer, and that the assertion of such colorable claims would benefit the estates by bringing in

affirmative substantial monetary recoveries for the benefit of unsecured creditors and avoiding

infirm liens of the Debtors' assets.  The allegations and claims for relief are set forth in the

proposed complaint attached hereto as Exhibit "A" (the "Proposed Complaint").  In order to

achieve a comprehensive resolution of claims arising from the 2007 LBO, the claims in the

Complaint are not limited to claims against the Lien Agents, but include the customary array of

claims that arise from failed leveraged buyouts: (a) for lien avoidance in connection with the

LBO financing; (b) for recovery of the payments to exiting shareholders as fraudulent transfers

and unlawful distributions; (c) for breach of fiduciary duty against the directors, officers and

controlling shareholders that authorized the Debtors to enter the transaction and incur the

obligations, (d) for aiding and abetting breach of fiduciary duty and fraudulent transfer against

the private equity sponsors of the transaction, and (e) for equitable subordination of secured

claims so that all creditors that financed the fraudulent transfer may share *pari passu* in the

recovery from the sale of the company.  These claims arise from the same facts and require many

of the same determinations that must be made to resolve the claims against the First Lien Agent,

Second Lien Agent and other Pre-Petition Secured Creditors, and their separate litigation would

be both inefficient and prejudicial.

6.      The requirements for granting the Committee standing under applicable

Second Circuit authority to pursue the claims set forth in the Proposed Complaint (collectively,

the "LBO Claims") on behalf of the Debtors' estates have been satisfied.  The Debtors have

either waived the right to bring the LBO Claims, in the case of claims against the First Liens

Lenders and Second Lien Lenders and to the extent claims against other defendants have not

been waived, demand would be futile.[3]  The LBO Claims are plainly colorable, and it is likely

that their prosecution will benefit the estates.  Proceeds of the LBO Claims, which are the only

unencumbered assets of the estates, appear to be the only meaningful source of recovery in these

cases for unsecured creditors, who are otherwise slated to received a mere penny on the dollar

under the Plan.  Accordingly, the Committee seeks authority to prosecute the LBO Claims on

behalf of the Debtors' estates.

## JURISDICTION, VENUE
## AND STATUTORY PREDICATES

7.      This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue

is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for

the relief sought herein are Bankruptcy Code sections 105, 1103(c)(2) and (5), and 1109(b).

## PROCEDURAL BACKGROUND

8.      On May 16, 2010 (the "Petition Date"), each of the Debtors filed a

voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are

---

[3] With respect to the claims against Odyssey described below, contemporaneously with the filing of this Motion, the Committee has made demand upon the Debtors to bring such claims.

operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.    On May 17, 2010, this Court entered an order jointly administering these Cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Cases.

10.    On May 28, 2010, the United States Trustee for Region 2 (the "U.S. Trustee"), pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to represent the interests of all unsecured creditors in these Cases.

## THE FINAL DIP FINANCING ORDER

11.    On June 30, 2010, the Court entered the Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders (the "Final DIP Order") [Docket No. 207].  The Final DIP Order provides, among other things, that the Debtors shall release "any right to challenge any of the obligations under the First Lien Credit Facilities, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the First Lien Agent, the Second Lien Agent, the Pre-Petition Secured Parties, and/or any of their respective officers, directors, or employees."[4]  Final DIP Order at ¶ G(v).  The Final DIP Order also provides a 60 day deadline from the entry of the Final DIP Order (the "Challenge Period") for the Committee to commence a "contested matter or adversary proceeding raising any objection or challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the First Lien

---

[4] Capitalized terms not defined in this paragraph shall have the meanings ascribed to them in the DIP Financing Order.

Agent, the Second Lien Agent, or the Pre-Petition Secured Parties under the First Lien Credit

Documents or the Second Lien Loan Documents, as applicable, including, without limitation, in

the nature of a setoff, counterclaim, or defense."[5]  Final DIP Order at ¶ 33.

12.     The Final DIP Order further provides that the Committee must file a

motion for standing to commence a Challenge on or before August 18, 2010, unless such

deadline is extended by the Court for cause shown.  *Id.*

13.     The filing of this Motion satisfies the requirement of the filing of a motion

for standing to commence a Challenge.

### THE COMMITTEE'S INVESTIGATION OF THE LBO CLAIMS AGAINST THE LIEN AGENTS AND OTHER PARTIES

14.     Since its formation but primarily during July 2010, the Committee and its

professionals have been conducting an investigation of the existence and viability of claims

against the Lien Agents and Pre-Petition Secured Parties, and other potential claims and causes

of action arising out the 2007 LBO and the 2008 Exchange.  Over the course of its investigation,

the Committee reviewed publicly available information and, on a consensual basis under

Bankruptcy Rule 2004, the Committee has requested, received and reviewed thousands of pages

of documents from the Debtors and other parties who were involved in the 2007 LBO and the

2008 Exchange, including Lightyear Capital, LLC ("Lightyear"), and Miller Buckfire & Co.,

LLC ("Miller Buckfire"), which acted as the Debtors' financial advisor in connection with the

2008 Exchange.  The Committee also conducted oral examinations on consent pursuant to

Bankruptcy Rule 2004 of Mark Irion, the Debtors' Chief Financial Officer and Ronen Bojmel, a

---

[5] The Challenge Period may only be extended with the consent of the lenders or by consent of the Court for good cause shown.

managing director at Miller Buckfire, who led Miller Buckfire's engagement in connection with the 2008 Exchange. The Committee's investigation is continuing.

15.    The Committee concluded that valuable claims exist against a number of targets, and thus determined to seek standing to assert the Claims set forth in the Proposed Complaint. As set forth below in detail, the Committee believes that there is substantial evidence to establish that (a) the 2007 LBO rendered the Debtors insolvent and/or undercapitalized; (b) the Debtors did not receive reasonably equivalent value or fair consideration in exchange for the liens on the Debtors' assets that were granted to the First Lien Agent and Second Lien Agent to secure the financing for the 2007 LBO; (c) that the liens are therefore avoidable; (d) that payments made to BofA in respect of such unsecured obligations within 90 days prior to the bankruptcy are avoidable as preferences; (e) that the Debtors received no consideration for and may recover as fraudulent transfers or unlawful dividends the payments made to shareholders in the 2007 LBO; (f) that Neff's directors and officers and controlling officers breached their fiduciary duties to the company by authorizing the Debtors to enter into the 2007 LBO and incur obligations in connection therewith; (g) that the private equity funds that sponsored the buyouts aided and abetted such breaches of fiduciary duty and that fraudulent transfers were made for their benefit; and (h) that secured lender claims should be equitably subordinated so that all parties that financed the 2007 LBO, including Senior Noteholders whose claims were secured *post facto* via the 2008 Exchange, may share *pari passu* from the Debtors' sale proceeds.

## FACTUAL BACKGROUND AND THE LBO CLAIMS

16.    The facts underlying the LBO Claims are set forth in the Proposed Complaint, which is incorporated herein by this reference and summarized as follows:

A.    **The 2005 Leveraged Buyout**

17.    On June 3, 2005, Neff executed a leveraged with an affiliate of Odyssey, a New York-based private equity firm (the "2005 LBO"). Following the 2005 LBO, Neff became a majority owned subsidiary of an Odyssey affiliate, Iron Merger Partnership. Iron Merger Partnership owned 62.6% of the Neff's common stock, various subsidiaries of New York Life Insurance Company owned 17.4%, Juan Carlos Mas, Neff's CEO, owned 9.8%, and other directors and officers owned the remaining 11.2%.

18.    Distributions of $225.1 million were made to exiting shareholders. Neff also paid $18.8 million in fees and costs and refinanced $230 million in existing indebtedness. Odyssey and co-investors invested only $97.3 million; the balance came from new financing that increased Neff's debt load from approximately $230,000,000 to approximately $403,700,000. The increase of approximately $173.7 million represented a 75% increase in Neff's debt load. Neff's capital surplus of $306,000 as of December 31, 2004 became a gaping capital deficit of $128,100,000 as of December 31, 2005.

19.    Neff's Form 10-K for the year ended December 31, 2006 contained extensive warnings concerning its heavy leverage, including that "[o]ur substantial indebtedness could adversely affect our financial health, our cash flow and our ability to operate our business, and prevent us from fulfilling our obligations under our indebtedness."

B.    **The 2007 Leveraged Buyout**

20.    Less than a year and a half after acquiring Neff, Odyssey set about doing what private equity funds do – harvesting its investment. ███████████████

███████████████████████████

21.    ███████████████████████████

███████████████████████████████████



22.



23.     Odyssey found a buyer – another private equity fund intent on maximizing leverage to facilitate its acquisition. Despite Neff's heavy existing debt load, the economic storm clouds and disappointing first quarter performance, Odyssey and the Odyssey-controlled Board of Directors directed Neff to take on substantial additional leverage, for the sole purpose of financing a lucrative buyout of its interests. An agreement on the terms of the 2007 LBO was executed on March 31, 2007 and the transaction closed on May 31, 2007.

24.     The principal purchaser in the 2007 LBO was Lightyear Capital LLC ("Lightyear"), joined by minority co-investors Norwest Equity Partners VIII, LP ("Norwest") and General Electric Pension Trust ("GEPC") (collectively, the "Sponsors").

25.     The putative purchase price for Neff was $935.9 million (equivalent to 6.2 times Neff's 2006 EBITDA of $149.6 million, and double what Odyssey paid for the company two years earlier in a stronger market environment). Odyssey and its co-investors received $366.8 million for stock that cost them $97 million two years prior (including ( ███████ to Odyssey), leaving the Company saddled with a crushing debt burden.

26.     The Sponsors invested only $191 million. Once again, the acquisition was funded by Neff through borrowings. Neff obtained $734 million in new financing: (a) $214.3 million drawn on the First Lien Credit Facility (for which Neff paid approximately $4.6 million

in underwriting and related fees); $290 million in Second Lien Term Debt (for which Neff paid

███████ in underwriting fees); and $230 million in Senior Notes (for which Neff paid over ██

███████ in underwriting fees). BofA received nearly ███████ of these fees. The projections

prepared by the bankers and investment bankers that received these fees suggest heavy or even

exclusive reliance on Odyssey's LBO Projections.

27.    Neff entered the 2007 LBO with $501.8 million of debt, and emerged

from the 2007 LBO with $734.3 million in debt, an additional $232 million of funded debt. An

already highly leveraged balance sheet was leveraged by an additional 45%. By relying so

heavily on leverage to facilitate the transaction, the parties unreasonably, if not recklessly,

rendered Neff insolvent and/or left it with inadequate capital to maintain its viability in a slowing

economy.

C.    **Neff's Insolvency After the 2007 LBO**

28.    Neff was rendered insolvent and undercapitalized by the 2007 LBO.

29.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

6 ██████████████████████.



30.    Neff also emerged from the 2007 LBO undercapitalized.

31.

32.

33.

34.    Predictably, a capital structure that Neff had described as substantially leveraged even before the 2007 LBO could not be sustained through an economic downturn when saddled with nearly a quarter of a billion dollars in additional debt.  Barely a year after the 2007 LBO closed, Lightyear was already searching for means of deleveraging Neff's balance sheet, and pulling it back from the precarious position into which it had been placed by Odyssey, Lightyear and the Board of Directors.  Even those means, however, did not stave off the collapse of Neff's financial house of cards.

**D.    The 2008 Exchange**

35.



36.    The 2008 Exchange was open only to holders of Senior Notes who were "institutional accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act of 1933, as amended).  Reflecting Neff's dire circumstances, virtually all eligible Senior Noteholders tendered their notes.  $195.7 million of Senior Notes were converted.  The holders of the remaining $34.3 million of Senior Notes who did not participate in the 2008 Exchange and who represent the majority of the general unsecured

claims in these cases, stand to recover virtually nothing in these cases, while the tendering Senior

Noteholders will be paid in full in cash on their First Lien Term Loans under the Debtors' Plan.

37.    Although the 2008 Exchange reduced overall indebtedness by $107.8

million and reduced annual debt service payments by approximately $10 million, it was not

enough to stave off bankruptcy only 18 months later. ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████  The Swap Reserve dramatically decreased Neff's borrowing base availability and

hence its liquidity was further constrained. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████  As a result, the Debtors were left without sufficient liquidity to continue operations.

████████████████████████████████████████

██████████████████████.  The Debtors faced a liquidity crisis and embarked

on a course of plotting a prearranged bankruptcy that would wipe out its improvidently assumed

debt load.

**E.    The 2010 Bankruptcy Plan**

38.    By August 2009 the Debtors were seeking more comprehensive solutions

to their debt problems inflicted by the 2005 LBO and the 2007 LBO.  As set forth in the Debtors'

Disclosure Statement, beginning in the fall of 2009, the Debtors established a Restructuring

Advisory Committee, hired Miller Buckfire to begin "an extensive review of strategic

alternatives available in light of the Debtors' current operating environment and leverage constraints," and put the company up for sale again.  On May 16, 2010, they commenced these cases, citing a need to "right-size their capital structure."

39.    The Debtors' first day affidavit posits that the proposed Plan "brings [the Debtors'] capital structure into alignment with their current and future operating prospects by eliminating more than $400 million in prepetition debt." Most of the net deleveraging under the originally proposed plan of reorganization was to be obtained by paying almost nothing to the holders of $298.5 million of Second Lien Term Loans, who were to receive an estimated 3% recovery if they accept the plan. The holders of $35.9 million of Senior Notes would receive an estimated 1% recovery if they accept the plan or $0.00 if they reject the Plan, and the holders of $1.1 million of general unsecured claims would also receive an estimated 1% recovery under the Plan.

40.    Under the Plan Payout Event procedures, as defined in the Plan, a competing bid was submitted for the Debtors, and an auction was held on August 5 and 10, 2010. As a result of the auction, the holders of Second Lien Term Loans will receive approximately 25% of their $290 million in debt claims, but general unsecured creditors are still to get a penny, and only if they accept the Plan.

41.    Put differently, "right-sizing" Neff's capital structure entails shedding an amount of debt roughly equivalent to the debt incurred by Neff for no consideration in the 2005 LBO and the 2007 LBO for payments to shareholders, fees and refinancing and transaction costs. The Plan and the proffered business justification are further evidence that Lightyear's acquisition of Neff from Odyssey in the 2007 LBO left Neff insolvent or with unreasonably small capital. Accordingly, the debt incurred and liens granted in the 2007 LBO for no consideration to Neff

were fraudulent transfers as were the payments to the exiting shareholders made by the Debtors

for Lightyear's benefit.

## RELIEF REQUESTED

42.     By this Motion, pursuant to Bankruptcy Code sections 105, 1003(c)(2) and

(5) and 1109, the Committee seeks entry of an order authorizing it to prosecute the LBO Claims

set forth in the Proposed Complaint and granting related relief.

## BASIS FOR RELIEF

### I.    Legal Standard

43.     While the Bankruptcy Code does not, in express terms, authorize

committees to sue on behalf of a debtor's estate, the Second Circuit, in common with the

majority of circuits reaching the issue, has held 11 U.S.C. §§ 1103(c)(5) and 1109(b) imply a

"qualified right under 11 U.S.C. §§ 1103(c)(5) and 1109(b) for an unsecured creditors'

committee to assert claims where the trustee or debtor in possession unjustifiably failed to bring

suit or abused its discretion in not suing on colorable claims likely to benefit the reorganization

estate." *In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 423-424 (2d Cir. 2008); *Unsecured

Creditors Comm. Of STN Enters. Inc v. Noves (In re STN Enterprises, Inc.)* ("*STN*"), 770 F.2d

901, 904 (2d Cir. 1985) (same); *Adelphia Commc'ns Corp v. Bank of Am., N.A. (In re Adelphia

Commc'ns Corp.) ("Adelphia")*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (same) (citing cases).

*See also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548,

579-80 (3d Cir. 2003) (bankruptcy courts, pursuant to their equitable powers, can confer upon

creditors' committees standing to bring avoidance actions for the benefits of a debtor's estate).

44.     In order to determine whether the debtor in possession has unjustifiably

failed to bring suit so as to give a creditors' committee standing to bring an action, this Court

must determine (1) whether the committee has presented "a colorable claim or claims for relief

that on appropriate proof would support a recovery," and (2) "whether an action asserting such

claim(s) is likely to benefit the reorganization estate." *STN*, 779 F.2d. at 905; *Adelphia*, 330 B.R.

at 374 and n. 19 ("A debtor's failure to bring a claim is deemed to be unjustifiable when the

committee has presented a colorable claim that on appropriate proof would support recovery and

the action is likely to benefit the reorganization estate"); *Official Committee of Unsecured*

*Creditors v. Morgan Stanley & Co., Inc (In re Sunbeam Corp.)*, 84 B.R. 355, 374 (Bankr.

S.D.N.Y 2002) (same).

## II.    The Proposed Complaint Asserts Colorable Claims

45.    "Caselaw construing requirements for 'colorable claims has made it clear

that the required showing is a relatively easy one to make." *Adelphia*, 330 B.R. at 376.  Courts

have explained what is meant by a colorable claim in a variety of ways. *See, e.g. In re G-I*

*Holdings*, 313 B.R. at 631 (Court must decide whether the Committee has asserted "claims for

relief that on appropriate proof would support a recovery"); (*America's Hobby Center*, 223 B.R.

at 288 (standing to sue should be denied only if claims are "facially defective"); *Official Comm.*

*Of Unsecured Creditors v. Austin Fin. Serv. (In re KDI Holdings)*, 277 B.R. 493, 508 (Bankr.

S.D.N.Y. 1999) (observing that the inquiry into whether a claim is colorable is similar to that

undertaken on a motion to dismiss for failure to state a claim); *In re iPCS, Inc.*, 297 B.R. 283,

291-92 (Bankr. N.D. Ga. 2003) (same); *In re Colfor*, No. 96-603006, 1998 Bankr. LEXIS 158, at

*7 (Bankr. N.D. Ohio, Jan. 5, 1998) (claims should be "plausible" or "not without some merit");

*see also Adelphia*, 330 B.R. at 376 (collecting cases).[7]

---

[7] On a motion to dismiss a complaint under Fed.R.Civ.P. 12(b)(6), a court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007), even if the allegations are doubtful in fact. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). The factual allegations must be plausible, *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007); and "raise a right to relief above the speculative level." *Bell Atl. Corp.,* 127 S.Ct. at 1965; *accord ATSI Commcn's, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). "[O]nce a claim has been stated

46.      As set forth below, the Proposed Complaint sets forth better than colorable claims for avoidance of fraudulent and preferential transfers, recovery of illegal distributions, breach of fiduciary duty and aiding and abetting such breach, and equitable subordination.

## A.      The First, Third and Fourth Claims for Fraudulent Transfer are "Colorable"[8]

47.      There is a substantial body of authority reflecting judicial acceptance that leveraged buyouts are subject to challenge as fraudulent conveyances under Sections 548 and 544 of the Bankruptcy Code and under applicable state fraudulent transfer law. *See, e.g., Official Committee of Unsecured Creditors of Tousa Inc. v. Citicorp. North America, Inc. (In re Tousa, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009); *In re Best Products CO.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992 (S.D.N.Y. 1991); *Brandt v. Hicks, Muse & Co., Inc. (In re HealthCo. Int'l)*, 195 B.R. 971 (Bankr. D. Mass. 1996); *In re O'Day Corp.*, 126 B.R. 370 (Bankr. D. Mass. 1991); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (N.D. Ill. 1988); *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in part, vacated in part, sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).

48.      To state claims for fraudulent conveyance arising from a failed leveraged acquisition, a plaintiff must plead that the target's assets were encumbered to secure the loan taken to purchase the company, that the shareholders received the proceeds of the borrowings as payment of the purchase price and that the target company did not receive fair consideration in exchange for the encumbrance of its assets. *Official Comm. Of Unsecured Creditors of Norstan Apparel Shops v. LaHamas (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 78-79 (Bankr.

---

adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 127 S.Ct. at 1969; *accord Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

[8] The Committee herein briefly addresses the legal bases for the claims in the Proposed Complaint. The Committee submits that the appropriate time to brief the issues fully is in response to any motion to dismiss that is filed, after the Committee is granted leave to file and prosecute the Proposed Complaint.

E.D.N.Y. 2007). A "presumption of insolvency" arises from sufficient allegations that the target

did not receive fair consideration in exchange for the encumbrance of its assets. *Id.* at 78. *See*

*also Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 163 (E.D.N.Y. 2000); *United States v.*

*Alfano*, 34 F. Supp. 2d 827, 845 (E.D.N.Y. 1999) (where transfer was not in exchange for

reasonably equivalent value, the transferee has the burden to overcome the presumption of

insolvency by showing that the debtor was solvent after the transfer).[9]

49.    In evaluating the effect of a leveraged acquisition, courts will typically

collapse the individual transactions by which the acquisition is implemented. Instead of focusing

on one of several transactions, courts consider the overall financial consequences these

transactions have on the creditors. *In re Hechinger Inv. Co.*, 327 B.R. 537, 546-47 (Bankr. D.

Del. 2005). To make this determination, courts consider three factors: First, whether all of the

parties involved had knowledge of the multiple transactions; second, whether each transaction

would have occurred on its own; and third, whether each transaction was dependent or

conditioned on other transactions. *Id.* Here, there is no question that the 2007 LBO was an

integrated transaction in which each of the transactions was conditioned on other transactions,

and none would have occurred on its own.

50.    Under New York choice of law principles, with respect to fraudulent

conveyance claims, "the law of the jurisdiction where the tort occurred will generally apply

because that jurisdiction has the greatest interest in regulating behavior within its borders."

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc. of Am. Secs., LLC*, 446 F.Supp.2d

163, 192 (S.D.N.Y. 2006) (quoting *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*,

449 F.3d 377, 384 (2d Cir.2006).) "A tort occurs in 'the place where the injury was inflicted,'

---

[9] Where as here, a complaint asserts claims sounding in constructive fraudulent transfer, Fed. R. Civ. Pr. 9(b) does not apply. *Official Committee of Unsecured Creditors of M. Fabrikant & Sons (In re M. Fabrikant & Sons)*, 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008).

which is generally where the plaintiffs are located." *Id.* (quoting *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 492 (S.D.N.Y.2001)).

51.     Neff is headquartered in Florida, while many of the other participants in the 2007 LBO, including Odyssey and Lightyear, are based in New York.  The law on constructive fraudulent transfers, in any event, is substantially the same.  Under the Uniform Fraudulent Transfer Act ("UFTA"), as adopted in Florida Stat. § 726.105(1)(b), a transfer is fraudulent as to a creditor, whether such creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving reasonably equivalent value and (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (ii) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.  Under Florida Stat. § 726.106(1), a transfer is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving reasonably equivalent value and was insolvent at the time or the debtor became insolvent as a result of the transfer.

52.     To the same effect, under the Uniform Fraudulent Conveyance Act ("UFCA"), as adopted in New York Debtor and Creditor Law ("NYDCL") §§ 270-281, a transfer is fraudulent if, inter alia, it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer (NYDCL § 273), (2) the debtor was engaged or about to be engaged in a business or transaction in which the property remaining in its hands left after the transfer would be unreasonably small capital (NYDCL § 274), or (3) the debtor either intended or believed that it  would incur debts beyond its ability to pay as the debts matured (NYDCL § 275).

53.     Under either state's law, the allegations in the Proposed Complaint are plausible and adequate to sustain the fraudulent transfer claims alleged as the First, Third and Fourth Claims for Relief in the Proposed Complaint, against (1) the First Lien Agent and Second Lien Agent, (2) the Sponsors, and (3) the Shareholder Defendants, respectively.

54.     With respect to the First Claim for Relief against BofA and Wilmington Trust, it is indisputable that the Debtors did not receive reasonably equivalent value or fair consideration in exchange for the liens on the Debtors' assets that were pledged as security for obligations under the First Lien Credit Facility and Second Lien Term Loan.

55.     Even without any presumption of insolvency, the Committee has also alleged facts that are more than sufficient to demonstrate, plausibly, that at the time that the Debtors granted the liens that secured the financing for the 2007 LBO, the Debtors (a) were engaged or about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business, (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they matured, and/or (c) were insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2007 LBO. The company's rapid descent from the 2007 LBO to the 2008 Exchange to bankruptcy, ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ all support conclusions of insolvency and undercapitalization.

56.     Accordingly, the First Claim for Relief presents a colorable claim for the avoidance of the liens held by the First Lien Agent and the Second Lien Agent, as the initial or

immediate transferees of the liens, pursuant to sections 544(b) and 550 of the Bankruptcy Code and applicable state law.

57.    Section 550 also permits the recovery of the value of a fraudulent transfer from an entity for whose benefit the property was transferred.  Here, the liens were granted and payment were made to Odyssey for the benefit of the Sponsors, to enable them to obtain the financing for their acquisition of Neff's equity.  Accordingly, under the same authority, the Third Claim for Relief presents a colorable fraudulent transfer claim against the Sponsors to recover the amount of the transfers made for their benefit.

58.    Finally, the Fourth Claim for Relief against the Shareholder Defendants, to avoid and recover as fraudulent transfers the distributions made to the Shareholder Defendants in the 2007 LBO, is classic relief in an LBO/fraudulent transfer action that is clearly colorable.  To the extent the distributions to exiting shareholders were paid from Neff's assets rather than by the Sponsors, Neff received no consideration for them.  By itself, this traditional claim for relief holds the potential to reverse a significant portion of the over-leveraging of the company, restore a measure of balance to Neff's balance sheet, and provide a substantial recovery for unsecured creditors.

## B.    The Second Claim for Avoidance of Preferential Transfers is Colorable

59.    The Second Claim for Relief in the Proposed Complaint seeks the avoidance of preferential transfers under sections 547 and 550 of the Bankruptcy Code.  As it is predicated on the avoidance or subordination of the First Lien, it is colorable to the same extent as the First Claim for Relief.

60.    Under section 547 of the Bankruptcy Code, a preference is a transfer (1) of property, (ii( to or for the benefit of a creditor, (iii) on account of an antecedent debt, (iv) made while the debtor was insolvent, (iv) made during the preference period (ninety days before the

bankruptcy filing or one full year for insiders), (vi) that enables the creditor to receive more than

it would in a Chapter 7 liquidation of the debtor. 11 U.S.C. § 547(b). The Proposed Complaint

contains alleges each of these elements against BofA. *See* Proposed Complaint ¶¶ 105-108, and

has "put [defendant] on notice for the preference claims." *Official Comm. Of Unsecured*

*Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 355 (Bankr.

S.D.N.Y. 2010). Accordingly, the Committee has asserted colorable claims for avoidance of

preferential.[10]

       61.    To the extent obligations under the First Lien Credit Facility are

unsecured, payments on such obligations within 90 days of the Petition Date permitted the First

Lien Lenders to recover more than they would recover in a chapter 7 liquidation, and thus may

be avoided as preferences and recovered under section 550 of the Bankruptcy Code.

Accordingly, the Second Claim for Relief is colorable.

## C.    The Fifth Claim for Recovery of Unlawful Corporate Distributions is Colorable

       62.    The Fifth Claim for Relief asserts claims against the Shareholder

Defendants and Director Defendants for recovery of illegal corporate distributions pursuant to

sections 160 and 174 of the Delaware General Corporate Law ("DGCL").

       63.    DGCL § 160 provides in relevant part:

(a) Every corporation may purchase, redeem, receive, take or
otherwise acquire, own and hold, sell, lend, exchange, transfer or
otherwise dispose of, pledge, use and otherwise deal in and with its
own shares; provided, however, that no corporation shall:

---

[10] The Ninth Claim for Relief in the Proposed Complaint seeks preservation, pursuant to section 551 of the
Bankruptcy Code of all transfers the Committee requests be avoided. Because, as discussed above, the avoidance
claims asserted in the first through fourth claims for relief are colorable, the Ninth Claim for Relief is also colorable.
For the same reason, the Committee should be granted authority to assert the objection in the Proposed Complaint to
the claims of BofA and Wilmington Trust pursuant to section 502(d) of the Bankruptcy Code. That objection is
premised on the same avoidance actions and asserts that any First Lien Claims and Second Lien Claims are
unsecured and subject to disallowance until any avoidance transfers are repaid or reconveyanced and/or to offset
avoidable transfers made to those defendants.

> (1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . .

DGCL 160(a)(1).

64.    DGCL § 174 provides in relevant part:

> In case of any willful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. Any director who may have been absent when the same was done, or who may have dissented from the act or resolution by which the same was done, may be exonerated from such liability by causing his or her dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done, or immediately after such director has notice of the same. . . . .

DGCL § 174(a),(c).

65.    The Committee alleges, at paragraphs 124-125 of the Proposed Complaint, that each of the Shareholder Defendants received Shareholder Distributions (as that term is defined in the Proposed Complaint) in the 2007 LBO from the purchase or redemption of Neff common stock or options to purchase Neff common stock, and the purchase or redemption occurred when the capital of the corporation was impaired or such purchase or redemption caused impairment of the capital of the corporation.[11]  Further, the Proposed Complaint alleges that each of the Shareholder Defendants had knowledge of facts indicating that such stock purchase or redemption was unlawful, and that its authorization by the Director Defendants was

---

[11] "A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 Del. C § 154 to mean the excess of net assets over the par value of the corporation's issued stock." *Klang v. Smith's Food and Drug Centers, Inc.*, 702 A.2d 150, 153 (Del. 1997).

willful or negligent. Proposed Complaint ¶¶ 126-27. This is a sufficient to allege colorable

claims for illegal corporate distribution against both the Director Defendants and the Shareholder

Defendants. *See* DGCL §§ 160(a)(1), DGCL 174(a). *See also PHP Liquidating Trust v.

Robbins*, 291 B.R. 603, 608 (Bankr. D. Del. 2003) (DGCL 174(c) implies cause of action against

shareholder where shareholder had knowledge that redemption was unlawful); *In re Kettle Fried*

*of America, Inc.*, 513 F.2d 807, 814 (6th Cir. 1975) (same).

**D.    The Sixth Claim for Breach of Fiduciary Duty is Colorable**

66.    The Sixth Claim for Relief in the Proposed Complaint asserts that the

named directors and officers (the "D&O Defendants") and controlling shareholders (Odyssey

and Lightyear, and/or their affiliates) breached their fiduciary duties in authorizing Neff to enter

into the 2007 LBO and to incur the debt and grant the liens to finance the 2007 LBO. Proposed

Complaint ¶¶ 133. The Proposed Complaint has asserted colorable claims under Delaware law

for breach of fiduciary duty.[12]

67.    Directors and officers of a corporation owe fiduciary duties to the

corporation. *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000). Additionally, the

Supreme Court of Delaware has held that "[a] shareholder owes fiduciary duties in two

instances: (1) when it is a 'majority shareholder,' owning more than 50 percent of the shares, or

(2) when it 'exercises control over the business affairs of the corporation.'" *Superior Vision*

*Servs., Inc. v. Reliastar Life Ins. Co.*, No. 1668-N, 2006 Del. Ch. LEXIS 160, at *13-14 (Del. Ch.

April 25, 2006) (stating that "[i]n order to append the label of 'controlling shareholder,'

pervasive control over the corporation's actions is not required; indeed, a plaintiff 'can survive

---

[12] The internal affairs doctrine holds that the law governing a company's breach of fiduciary duty claims is governed by the law of the state of incorporation. *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009) ("As to matters relating to the duties of officers and directors to the corporations they serve . . . the Court must apply the law of the state of incorporation"). Because the Debtors are organized under Delaware law, Delaware law applies to this claim.

the motion to dismiss by alleging actual control with regard to the particular transaction that is

being challenged'") (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344

(Del. 1987)). The Proposed Complaint alleges that at all relevant times prior to the closing of the

2007 LBO, Odyssey was the beneficial owner of a majority of Neff's common stock (Proposed

Complaint ¶131), and that at all times subsequent to the closing of the 2007 LBO, Lightyear was

the beneficial owner of a controlling interest in Neff (Proposed Complaint ¶132). As such, each

owed fiduciary duties to Neff.

68.    In general, the term "fiduciary duty" comprises three sub-duties: the duty

of loyalty, the duty of care, and the related duty to act in good faith. *Skeen v. Jo-Ann Stores,

Inc.*, 750 A.2d 1170, 1172 (Del. 2000). Only the duties of due care and loyalty are discussed

here as only violations of those duties may serve to establish liability. *Stone v. Ritter*, 911 A.2d

362, 370 (Del. 2006) ("The obligation to act in good faith does not establish an independent

fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter

two duties, where violated, may directly result in liability . . . .").

1.    **Breach of the Duty of Due Care**

69.    The fiduciary duty of due care requires that directors of a Delaware

corporation use that amount of care which ordinarily careful and prudent men would use in

similar circumstances, and consider all material information reasonably available in making

business decisions, and that deficiencies in the directors' process are actionable only if the

directors' actions are grossly negligent. *Official Comm. of Unsecured Creditors v. Bay Harbour

Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 146 (quoting *In re Walt Disney Co.

Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)).

70.    The D&O Defendants and controlling shareholders breached their duties

of care decisively. They permitted and authorized the Debtors to enter a heavily leveraged

buyout that, on its face, transferred hundreds of millions of dollars to Neff's equity holders for no

consideration, taking a company with healthy earnings and debt ratios and leveraging it nearly to

or past the point of insolvency, at a time when the subprime mortgage crisis had hit, the company

had failed to meet projections, and an economic slowdown was anticipated. To authorize Neff to

enter this transaction, and to incur an additional $234 million in funded debt in to order to

consummate it, was, in the circumstances alleged, grossly negligent.

### 2.    **Breach of the Duty of Loyalty**

71.    The duty of loyalty is breached when a fiduciary it places its own interests

ahead of those of the corporation and its beneficiaries. "[T]he duty of loyalty mandates that the

best interest of the corporation and its shareholders takes precedence over any interest possessed

by a director, officer or controlling shareholder and not shared by the stockholders generally."

*Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993).

72.    To determine breach of the duty of loyalty, the Court applies an "entire

fairness" test to determine whether the transaction was entirely fair to the Debtors. *See Cede &*

*Co.*, 634 A.2d at 361 (The entire fairness standard of judicial review is far more stringent than

the deference of the business judgment rule and requires "the defendant directors must establish

to the court's satisfaction that the transaction was the product of both fair dealing and fair

price."). The 2007 LBO fails these tests. It transferred hundreds of millions of dollars to the

Shareholder Defendants at the expense of the company, and was made possible only by incurring

a crushing debt load, by the authority of the Board of Directors, voting as directed by the

shareholders or in their own self-interests, but not in the best interests of the company. The 2007

LBO cannot pass the "entire fairness" test. *Id.*

73.    Accordingly, the Sixth Claim for Relief in the Proposed Complaint for

breach of fiduciary duty is colorable.

E.    **The Seventh Claim for Aiding and Abetting Breach of Fiduciary Duty is Colorable**

74.    The Seventh Claim for Relief in the Proposed Complaint asserts colorable

claims against Odyssey, Iron Merger Partnership, Lightyear and Lightyear Fund II, L.P. (to the

extent any are not deemed controlling shareholders) for aiding and abetting the breaches of

fiduciary duty by the D&O Defendants.

75.    The elements of a claim for aiding and abetting breach of fiduciary duty

are "a) that the fiduciary's conduct was wrongful; b) that the defendant had knowledge that the

fiduciary's wrongful conduct was occurring; and c) that the defendant's conduct gave substantial

assistance or encouragement to the fiduciary's wrongful conduct," *Crowthers McCall Pattern,*

*Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y. 1991). *See also Resnick v. Resnick*, 722 F. Supp. 27

(S.D.N.Y. 1989) (denying dismissal of claim that the bank aided and abetted principal in

breaching fiduciary duties to plaintiff).

76.    The Committee plausibly alleges facts satisfying each of these elements:

(a) the breach of fiduciary duty; (b) these defendants were aware of the identity of the D&O

Defendants and that they owed fiduciary duties to the Debtors; (c) these defendants were aware

of the D&O Defendants' breaches of their fiduciary duties to the Debtors; and (d)

notwithstanding this knowledge, these defendants directed, encouraged, assisted and participated

with the D&O Defendants in their breaches of their fiduciary duties. Proposed Complaint ¶¶

137- 40. Accordingly, the Seventh Claim for Relief for aiding and abetting breach of fiduciary

duty is colorable and the Committee should be authorized to prosecute it on behalf of the

Debtors' estates.

**F.     The Eighth Claim for Equitable Subordination is Colorable**

77.     The Eighth Claim for Relief in the Proposed Complaint asserts a colorable claim for equitable subordination of the claims of the Lien Agents pursuant to 11 U.S.C. § 510(c).  Section 510(c) of the Bankruptcy Code provides in relevant part:

> (c)     Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may --
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

78.     Since section 510(c) incorporates the general principles of equitable subordination, courts generally apply the three-prong test established by the Fifth Circuit:

> (i)  The claimant must have engaged in some type of inequitable conduct.
>
> (ii)  The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977) (citations omitted).

79.     Both the First Lien and Second Lien were granted to BofA in its capacity as First Lien Agent and as the original Second Lien Agent.  Wilmington Trust is the successor Second Lien Agent; as such, any claims it asserts in that capacity are subject to any defenses that may exist against BofA.

80.     BofA and Banc of America Securities LLC were among the lead architects of the 2007 LBO, receiving nearly ▮▮▮▮▮▮ in underwriting fees for their roles in arranging

both the $350 million First Lien Credit Facility and the $290 million Second Lien Term Loan.

BofA or an affiliate also held Senior Notes.



81.    BofA's self-interested conduct in connection with the 2007 LBO and the

2008 Exchange was inequitable conduct that unfairly benefitted itself at the expense of the

creditors presently holding unsecured claims, including the individual Senior Noteholders,

reducing their prospects for recovery on account of their claims, and discriminating between

equally situated creditors.  Based thereon, the First Lien Claims and Second Lien Claims should

be equitably subordinated so that all creditors that participated in the financing of the 2007 LBO

may recover *pari passu* from the proceeds of the sale of the company.

**G.    Challenges to the Perfect of the Prepetition Lien
of the Pre-Petition Secured Lenders**

82.    The Committee continues to analyze the perfection of the liens on the

Debtors' assets that were pledged as security for obligations under the First Lien Credit Facility

and the Second Lien Term Loan.  Because, to date, it has not received from the Debtors all the

documents it has requested and that are necessary to complete this task, the Committee's analysis

is not complete, and it has not yet determined whether challenges to perfection exist.

Accordingly, the Committee respectfully requests that it be granted authorization to challenge

perfection in its Proposed Complaint to the extent that prior to expiration of the Challenge

Period, it determines that there are valid bases to do so.

### III.    Demand upon the Debtors to Bring the Claims is Excused Because it Would be Futile

83.    Once a party has shown that it has asserted a colorable claim, to satisfy the

prong that requires the debtor to have unjustifiably refused to pursue the claim, a party seeking

derivative standing may show that: (a) demand was made of the debtor and the debtor

unjustifiably failed to bring suit or abused its discretion in determining not to bring suit, or (2)

demand would be futile. *STN*, 779 F.2d at 901, 904; *In re G-I Holdings*, 313 B.R. at 630.

84.    First, with respect to the LBO Claims against BofA and Wilmington Trust,

the Debtors released the right to bring such claims in the Final DIP Order.  As the court in *In re*

*America's Hobby Center* found, "[p]atently, in ratifying the loan documents, the debtor has

'refused' to sue." *In re America's Hobby Center*, 223 B.R. at 283.  Similarly, the Debtors have

demonstrated their "refusal" to bring claims against their present and former shareholders,

officers, and directors (including Iron Merger, Odyssey's affiliates as their proposed Plan

purports to release any and all claims against them).  Plan, Art. I.A.165.[13]

85.    Further, even assuming, *arguendo*, that the Debtors had not manifested

their refusal to sue their officers, directors and majority shareholders by virtue of the proposed

releases as set out in the Plan, with respect to the LBO Claims against the Debtors' current

officers, directors and majority shareholders, demand would be futile.  It is well established that

---

[13] In any event, as a precaution, by letter dated August 18, 2010 (annexed hereto as Exhibit B), the Committee made demand upon the Debtors contemporaneously with the filing of this Motion, to assert the Claims against Odyssey.

where demand would be futile, a debtor's refusal to pursue claims can be implied even in the

absence of a formal demand because "it cannot be said that a formal request, in order to obtain a

formal refusal, a request that would surely be refused, should be required." *In re G-I Holdings*,

313 B.R. 612, 630 (Bankr. D.N.J. 2004) (citations omitted); *see also In re Nat'l Forge Co.*, 326

B.R. 532, 544  (W.D.Pa. 2005) (holding that bankruptcy court was justified in concluding that

debtor would have declined to file claims against officers and directors because debtor's "key

employees" who presumably would have been instrumental in asserting such claims, were all

named defendants and were beneficiaries of transactions at issue).

      86.    As a bankruptcy court in this district has observed:  "[a]s a practical

matter, in many chapter 11 cases, it may not be feasible for a debtor in possession to conduct an

investigation into the activities of its own board or bring suit against board members, either

present or past." *In re Recoton Corp.*, 307 B.R. 751, 760-61 (Bankr. S.D.N.Y. 2004).  Here, the

Debtors' current directors, officers and majority shareholders -- the key players who would be

instrumental in investigating and prosecuting such claims -- are named as defendants in the

Proposed Complaint for actions taken by them in connection with the 2007 LBO.  Accordingly,

because there is an inherent conflict of interest in any determination the Debtors would make

regarding the LBO Claims, demand is futile and the Debtors' refusal is thus implied.

**IV.**    **The Proposed Litigation Is Likely To Benefit The Estate**

      87.    In determining whether the proposed action would benefit the reorganized

estate, a court should engage in a limited merits assessment to assure "that there is a sufficient

likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that

initiation and continuation of litigation will likely produce." *Adelphia*, 330 B.R. at 374 (quoting

*STN*, 779 F.2d at 905-06).  While a "sufficient likelihood" of success is difficult to quantify, it is

not necessary that the court find that success is more likely than not. *Id.* at 386 ("It is plain that

on *Housecraft* and *STN* motions the Committees do not have to show a likelihood of success on

the merits."). A court need only assure itself that the proposed litigation is not a "hopeless fling"

and that the "prospective rewards can reasonably be expected to be commensurate with the

litigation's foreseeable cost." *See Adelphia*, 330 B.R. at 386. Thus, in *Official Comm. Of*

*Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re: America's Hobby*

*Ctr.)*, 223 B.R. 275, 284 (Bankr. S.D.N.Y. 1998), the court approved the prosecution of claims

by a creditors' committee where it assessed that there was a "fair chance that the benefits to be

obtained from the litigation will outweigh its costs."

     88.    The Second Circuit has stated explicitly that a "mini-trial" on the merits is

not required. *STN*, 779 F.2d at 905-906. "We do not mean to suggest that the court need

undertake a mini-trial. . . . But it should assure itself that there is a sufficient likelihood of

success to justify the anticipated delay and expense to the bankruptcy estate that the initiation

and continuation of litigation will likely produce." *Id.*; *Official Committee of Equity Security*

*Holders of Adelphia Communications Corp.. Adelphia Communications Corp.(In re Adelphia*

*Corp.)*, (371 B.R. 660; 667 (S.D.N.Y. 2007) (same); *Official Committee of Unsecured Creditors*

*of KDI Holdings, Inc. v. Austin Financial Services, Inc.*, 277 B.R. 493, 519 (Bankr. S.D.N.Y.

1999) (same); *Adelphia*, 330 B.R. 364 at 375 (rejecting argument made by several of the

proposed defendants that court should "conduct *a de facto* mini-trial on the merits").

     89.    Successful prosecution of the LBO Claims could undo a significant

portion of the damage done to the Debtors' balance sheet by the 2007 LBO, leading to a

substantial recovery by unsecured creditors that are now being promised a penny on the dollar if

they accept the Plan. The contemplated litigation would have a profound effect on the

availability and distribution of property of the Debtors' estates as these claims are unencumbered

assets that will yield substantial recoveries to unsecured creditors otherwise shut out of the process. The costs of the proposed litigation are dwarfed by the potential recoveries that the claims in the Proposed Complaint could achieve for the Debtors' estate and creditors. The cost-benefit analysis here is similar to the one engaged in *Adelphia*, wherein the court observed that the "[t]he potential recoveries would be enormous; the cost of prosecution will be relatively modest (by the standards of the amount at stake); and the bulk of the Creditors' Committee claims will easily withstand 12(b)(6) motions." *Adelphia*, 330 B.R. at 384. Under such circumstances, the determination of whether the pursuit of the Claims by the Committee would benefit the estate is, "to be blunt about it, an easy one." *Id. See also In re KDI Holdings, Inc.*, 277 B.R. 493, 519 (Bankr. S.D.N.Y. 1999) (success on any of the claims asserted in committee's motion would provide a sufficient recovery to warrant their pursuit by the creditors' committee).

90.    Based upon the foregoing, the Committee should be granted standing to file and prosecute the LBO Claims set forth in the Proposed Complaint.

## NO PRIOR REQUEST

91.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Committee respectfully requests that this Court: (i) enter an order substantially in the form attached hereto as Exhibit B, granting the relief sought herein; and (ii) grant such other and further relief to the Committee as the Court may deem proper.

Dated: New York, New York
       August 18, 2010

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Robert J. Feinstein*
Robert J. Feinstein, Esq.
Alan J. Kornfeld, Esq.
Ilan D. Scharf, Esq.
Beth E. Levine, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777

Counsel for theOfficial Committee of Unsecured
Creditors of Neff Corp., *et al.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., et al.,[1] | Case No. 10-12610 (SCC) |
| Debtors. | Jointly Administered |

## ORDER AUTHORIZING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PURSUE LENDER CLAIMS AND CAUSES OF ACTION OF THE DEBTORS' ESTATES

This matter coming before the Court on the Motion of the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession for an Order, pursuant to Bankruptcy Code sections 105, 1103(c)(2) and 5 and 1109(b), authorizing the Committee to pursue under claims and other causes of action of the Debtors' estates (the "Motion");[2] the Court having reviewed and considered the Motion and accompanying papers and all responses thereto; and upon consideration of any arguments or evidence presented at the hearing on the Motion; the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

HEREBY ORDERED THAT:

1.    The Motion is GRANTED.


Dated: New York, New York
        _____ __, 2010

        _____
        THE HONORABLE SHELLEY C. CHAPMAN
        UNITED STATES BANKRUPTCY JUDGE