James H.M. Sprayregen, P.C.
Ray C. Schrock (admitted *pro hac vice*)
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

    - and -

Anup Sathy, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to the Debtors and Debtors in
Possession

Mark E. McKane (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone:  (415) 439-1400
Facsimile:   (415) 439-1500

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., <u>et al.</u>,[1] | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

<u>**TABLE OF CONTENTS**</u>

Page

I.     **PRELIMINARY STATEMENT** ...................................................................1

II.    **BACKGROUND** ......................................................................................8

     A.     Neff's Prepetition Performance and Conduct Establish that the Committee's Proposed Litigation Is Meritless. ......................................8

         1.     Before Its 2007 LBO, Neff Had a Strong History of High Performance in the Construction Equipment Rental Industry, Even in the Difficult 2002 Downturn..................................................8

         2.     Neff's LBO Marketing Process Yields Three Competitive Bids, Each Pricing Neff at or Above $850 Million.............................11

         3.     In March 2007, Neff Revised Its Projections to Include the Most Recent Actual Performance; the Committee Uses the Wrong Projections in Its Solvency Arguments.......................................12

         4.     Lightyear Engaged in Intensive Due Diligence, Including Its Own Independent Base-Case and Downside Models.........................17

         5.     After Thorough Due Diligence, Lightyear, Sophisticated Debt Investors and Neff's Management Team Supported the LBO..................18

         6.     Contemporaneous, Third Party Valuations from Duff & Phelps Reinforce that Neff Was Solvent After the LBO.......................19

         7.     The Debtors' Financial Advisors in these Proceedings Confirm that Strong Evidence Exists that Neff Was Solvent Upon Completion of the LBO. ..............................................................20

         8.     Neff Continued to Enjoy Strong Performance Throughout 2007 and, While the Market Continued to Turn Down in the First Three Quarters of 2008, Neff Remained Comfortably Liquid...........................21

         9.     In the Fourth Quarter of 2008 the World Experienced the Worst Financial Conditions Since the Great Depression. ...................22

        10.    The 2008 Exchange Was an Opportunistic Transaction that Yielded Substantial Benefits for Neff.......................................23

        11.    Holders of a Substantial Portion of the Unsecured Claims Decided Not to Exchange........................................................24

        12.    The Swap Reserve Had No Connection with the Exchange.....................25

     B.     Neff Wisely Pursued a Prearranged Restructuring Rather than a Speculative, Protracted Litigation that Would Irreparably Injure Its Prospects for Reorganization. ................................................26

C.      The Committee Pursues the Standing Motion as Simply the Latest Effort to Derail the Debtors' Plan. ..................................................................29

III.     STANDARD ...........................................................................................32

A.      The Committee Misstates the Standard Governing the Motion...........................33

1.      The Committee's Demand Futility Argument Misstates the Law ............33

2.      The Committee Misstates the Standard for Determining Whether the Claims Would Benefit the Estates ........................................34

IV.     ARGUMENT...........................................................................................36

A.      The Debtors Justifiably Declined to Pursue the Causes of Action Alleged in the Complaint...............................................................36

1.      In its Role as the Estate's Fiduciary Neff Elected to Maximize Value for Estate by Not Pursuing these Claims after Evaluating the Claims Prepetition and Postpetition...........................36

2.      The $100 Million Increase in Creditor Recoveries Under the Plan Confirms that the Debtors' Chosen Path and the Plan Are in the Best Interest of Creditors. .........................................38

B.      The Committee Does Not Assert Colorable Claims Under the STN Standard. ..............................................................................39

1.      The Committee's Fraudulent Conveyance Claims Are Not Colorable Given the Implausibility of the Allegations and the Protection of the Payments to the Odyssey Shareholders as Section 546(e) Settlement Payments. ....................................39

a.      The Committee's Fraudulent Conveyance Claims Would Not Bring New Money Into the Estate Because the Payments to Shareholders Are Unavoidable Settlement Payments as a Matter of Law.........................................40

b.      Section 546(e)'s Protection of Settlement Payments from State Law Avoidance also Bars the Claim under Delaware General Corporate Law §§ 160(a) and 174...................................42

c.      Allegations that the 2007 LBO Rendered Neff Insolvent and Left it with Unreasonably Small Capital Are Highly Implausible..................................................................43

i.      As Established by an Arms-Length Transaction of $935.9 Million and a Contemporaneous Third-Party Valuation of $911 Million, Neff Was Comfortably Solvent at the Close of the LBO. .......................................45

ii.      As Established by Its $200 Million Equity Cushion and Payment of Debts as they Came Due for Nearly

Three Years, Neff Was Adequately Capitalized at the Close of the LBO. ........................................47

2.    The Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Claims Are Not Colorable ...............................................49

      a.    The Breach of Fiduciary Duty Claim is Not Colorable ...............49

          i.    The Committee Has Not Alleged a Colorable Duty of Care Claim .....................................................................50

              (A)    Neff's Certificate of Incorporation Bars Duty of Care Claims Against the Directors and Shareholders .....................................50

              (B)    The Duty of Care Claim is Not Colorable Because it Fails to Allege Facts Rebutting the Business Judgment Rule ..................................50

          ii.    The Committee Has not Alleged a Colorable Duty of Loyalty Claim ..................................................................52

      b.    The Aiding and Abetting Claims Are Not Colorable ...................54

3.    The Committee's Equitable Subordination Claims Are Not Colorable Given the Inadequate Pleading of Inequitable Conduct and the Implausibility of the Allegations ...................................................55

4.    The Preferences Claim is Not Colorable ..................................................57

C.    The Committee's Proposed Litigation Will Harm Rather than Benefit the Debtors' Estates .............................................................................................58

1.    The Committee's Complaint Presents Weak Claims With a Low Likelihood of Success and an Extremely Low Likelihood of Increasing Stakeholder Value. ...................................................................58

      a.    The Committee's Fraudulent Conveyance Claims Are Unlikely to Succeed. ......................................................................58

      b.    The Committee's Breach of Fiduciary Duty Claims and the Aiding and Abetting Claims Are Unlikely to Succeed. .................60

      c.    The Committee's Equitable Subordination Claims Are Unlikely to Succeed. ......................................................................62

      d.    The Committee's Preference Claim Is Unlikely to Succeed. ........65

2.    The Committee's Litigation Jeopardizes the Value Added Under the Plan and Places Neff at a Serious Risk of Irreparable Harm. ..............66

      a.    The Committee's Litigation Jeopardizes $100 Million in Value Added Under the Plan .......................................................67

      b.    The Debtors' Ability to Compete and Remain Viable is Seriously at Risk if the Litigation Proceeds...................................68

      c.      Protracted Litigation Jeopardizes Debtors' Ability to
Emerge from Bankruptcy ............................................................. 70

D.     The Committee is Attempting to Usurp the Debtors' Exclusive Rights to
Settlement Claims Against the Estates ................................................. 72

**V.**     **CONCLUSION** ................................................................................................ **74**

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

<u>Ashcroft v. Iqbal,</u>
129 S. Ct. 1937 (2009) ............................................................................................ passim

<u>Bell Atlantic Corp. v. Twombly,</u>
550 U.S. 544 (2007) ........................................................................................... 4, 43

<u>Canadian Pacific Forest Prods. Ltd. v. J.D. Irving, Ltd.,</u>
66 F.3d 1436 (Cir. 6th 1995) ............................................................................. 58

<u>Crescent Mach I Partners L.P. v. Turner,</u>
846 A.2d 963 (Del.Ch.2000) ............................................................................. 51

<u>Galef v. Alexander,</u>
615 F.2d 51 (2d. Cir. 1980) ............................................................................... 37

<u>Hechinger Investment Co. of Delaware,</u>
274 B.R. 71 (D. Del. 2002) ........................................................................... 40, 41

<u>In re Adelphia Commc'ns Corp.,</u>
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................ 7

<u>In re Adelphia Commc'ns Corp.,</u>
No. 02-41728, 2004 WL 2186582 (S.D.N.Y. Sept. 27, 2004) ......................................... 35

<u>In re Applied Theory Corp.,</u>
493 F.3d 82 (2d Cir. 2007) ............................................................................ 8, 32

<u>In re Best Prods Co.,</u>
168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................ 72, 74

<u>In re BHS & B Holdings LLC,</u>
420 B.R. 112 (Bankr. S.D.N.Y. 2009) ................................................................ passim

<u>In re Charter,</u>
419 B.R. 221 (Bankr S.D.N.Y. 2009) ................................................................. 23

<u>In re Clark Pipe & Supply Co.,</u>
893 F.2d 693 (5th Cir. 1990) ............................................................................. 57

<u>In re Commodore Int'l Ltd.,</u>
262 F.3d 96 (2d Cir. 2001) ................................................................................ 33

In re Copperfield Investments, LLP,
    421 B.R. 604 (Bankr. E.D.N.Y. 2010) ............................................................. 39

In re Enron Creditors Recovery Corp.,
    422 B.R. 423 (S.D.N.Y. 2009) ............................................................... passim

In re Federated Dep't Stores Inc.,
    1992 WL 605483 (Bankr. S.D. Ohio 1992) ...................................................... 61

In re G-I Holdings, Inc.,
    313 B.R. 612 (Bankr. D.N.J. 2004).) ............................................................. 34

In re Global Service Group, LLC,
    316 B.R. 451 (Bankr. S.D.N.Y. 2004) ........................................................... 56

In re Granite Broad. Corp.,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) ........................................................... 45

In re Hydrogen LLC,
    431 B.R. 337 (S.D.N.Y. 2010) ...................................................................... 57

In re Iridium Operating, LLC,
    373 B.R. 283 (Bankr. S.D.N.Y. 2003) ............................................. 45, 48, 74

In re Kaiser Steel Corp.,
    952 F.2d 1230 (10th Cir. 1991) .................................................................... 41

In re Kalisch,
    413 B.R. 115 (Bankr. S.D.N.Y. 2008) ........................................................... 55

In re Lehigh Valley Prof'l Sports Club, Inc.,
    No. 00-11296, 2000 WL 290187 (Bankr. E.D. Pa. March 14, 2000) ............... 73

In re Metaldyne Corp.,
    No. 09-15412, 2009 WL 2883045 (Bankr. S.D.N.Y. June 23, 2009) ............... 71

In re Mobile Steel Co.,
    563 F.2d 692 (5th Cir. 1977) ....................................................................... 55

In re N.Y. Int'l Hostel, Inc.,
    157 B.R. 748 (Bankr. S.D.N.Y. 1993) ........................................................... 35

In re Situation Mgmt. Sys., Inc.,
    252 B.R. 859 (Bankr. D. Mass. 2000) ........................................................... 73

In re Texaco Inc.,
    81 B.R. 806 (Bankr. S.D.N.Y. 1988) ............................................................. 73

In re USACafes, L.P. Litig.,
    600 A.2d 43 (Del. Ch. 1991).........................................................................55

Jackson Nat.'l Life Ins. Co. v. Kennedy,
    741 A.2d 377 (Del. Ch. 1999)......................................................................55

Jensen v. Schweiker,
    709 F.2d 1227 (8th Cir. 1983) ....................................................................39

Lewis v. Leaseway Trans. Corp.,
    1990 WL 67383 (Del. Ch. 1990) .................................................................52

Lowenschuss v. Resorts Int'l, Inc.,
    181 F.3d 505, 515 (3d Cir.1999)..................................................................41

McGowan v. Ferro,
    Civ. A. 18672-NC, 2002 WL 77712 (Del. Ch. Jan. 11, 2002) ............ 54, 55, 62

MFS/Sun Life Trust High Yield Series v. Van Dusen Airport Services Co.,
    910 F.Supp. 913 (S.D.N.Y. 1995)........................................................ passim

Moody v. Security Pacific Business Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992).................................................................46, 47

Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.
    Chinery,
    330 F.3d 548 (3rd Cir. 2003) ......................................................................37

Official Committee of Unsecured Creditors v. Morgan Stanley & Co.
    284 B.R. 355 (Bankr. S.D.N.Y. 2002).............................................. 32, 33, 35

Ross v. Tognetti,
    No. 03-37171, 2006 WL 2587544 (Bankr. S.D.N.Y. June 21, 2006) ....... 32, 39

Shandler v. DLJ Merchant Banking, Inc.,
    2010 WL 2929654 (Del. Ch. July 26, 2010)................................................50

Smart World Techs., LLC. v. Juno Online Servs., Inc.
    423 F.3d 166 (2d Cir. 2005)............................................................. 33, 37, 58

U.S. v. Winstar Corp.,
    518 U.S. 839 (1996).....................................................................................46

Unsecured Creditors Comm. v. Noyes
    779 F.2d 901 (2d Cir. 1985).................................................................. passim

VFB LLC v. Campbell Soup Co.,
    2005 WL 2234606 (D. Del. 2005) ...............................................................49

**Statutes**

11 U.S.C. § 1104(a)(1) .................................................................................................. 73

11 U.S.C. § 1129(b)(3)(A) ............................................................................................. 30

11 U.S.C. § 546(e) ................................................................................................... 40, 41

11 U.S.C. § 741(9) ........................................................................................................ 41

11 U.S.C. §§ 1107(a) .................................................................................................... 73

11 U.S.C. §§ 1108 ........................................................................................................ 73

DGCL § 102(b)(7) ....................................................................................................... 50

N.Y. DCL §§ 272-275 .................................................................................................. 43

**Rules**

Fed. R. Bankr. P. 3019(a) ............................................................................................. 71

Fed. R. Bankr. P. 9019 ................................................................................... 7, 30, 72, 73

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Neff") hereby file this opposition (the "Opposition") to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates* (the "Standing Motion") [Docket No. 345] seeking authority to prosecute the complaint attached to the Standing Motion as Exhibit A (the "Complaint"). In support of this Objection, the Debtors respectfully state as follows.

## I. PRELIMINARY STATEMENT

1. On September 14, 2010, the Debtors will seek confirmation of their prearranged Plan of Reorganization (the "Plan"). The Plan is a result of an arduous restructuring process that netted significant results for the Debtors and their stakeholders, raising values by over $100 million since Neff undertook its restructuring process approximately one year ago and allowing Neff to exit Chapter 11 as a viable, competitive enterprise with almost 900 employees. Notably, the Debtors chose to pursue the Plan only *after* analyzing the 2007 LBO and 2008 Exchange for potential claims and determining that litigating those claims was not likely to succeed, would likely destroy enterprise value and thwart the Debtors' ability to reorganize.

2. Instead of litigating ill-conceived claims, the Debtors engaged their key constituents entitled to value in a constructive restructuring process. The Debtors have conducted a *de facto*, prepetition auction to secure a committed plan sponsor, obtained critical debtor-in-possession ("DIP") and exit financing and a committed rights offering, secured full recoveries for their First Lien Lenders and swap counterparties, preserved jobs for almost 900 employees, experienced only modest disruption from the loss of customers, vendors or key employees, and conducted a second, postpetition auction that increased cash recoveries for Second Lien Lenders from $10 million to $73 million. All told, from the start of this process,

Neff maximized its enterprise value and increased creditor recoveries **by over $100 million**. The Plan has been overwhelmingly accepted by every creditor constituency other than the Debtors' $35 million, 10% Senior Noteholders ("Noteholders")[2]—the constituency represented on the Committee.[3] The Debtors note, however, that approximately 58% in principal amount of Noteholders voting voted to accept the Plan. By any objective measure, the Debtors' chosen path for this restructuring and their Plan has been very successful.

3. 

---

[2]   The Committee's stakeholders stand behind approximately $550 million of secured debt and are out of the money by approximately $220 million under the Debtors' Plan.

[3]   In total, 10% Senior Noteholders hold less than 7 percent of the Debtors' prepetition funded debt.

[4]   See Ex. 1, Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing [Docket No. 186] ¶¶ 42, 65 (the "DIP Objection"); see also Ex. 2, Official Committee of Unsecured Creditors' Objection to Motion of the Debtors for Entry of an Order Approving the Debtors' Disclosure Statement and Granting Related Relief [Docket No. 227] ¶ 71 (the "Disclosure Statement Objection."

4.      The Standing Motion is the Committee's latest effort to derail the Debtors' Plan. The Court has rightly observed that "there is nothing about the Debtors' Plan that the Committee likes."[5] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████    ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    The Court should deny the Committee's Motion for four independent reasons:

5.      <u>First</u>, the Debtors justifiably declined to pursue the Committee's proposed claims. After receiving input from the Debtors' legal advisors on claims from the 2007 LBO and the 2008 Exchange, the Debtors' Restructuring Committee unanimously agreed that the best restructuring path was not to pursue the claims.[6]  The Restructuring Committee recommended, and the Board agreed, that the Debtors should continue to engage with the participants in its capital structure.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5]  Ex. 3, <u>In re Neff Corp.</u>, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010)  Hr'g Tr. 156:1–3.

[6]  As set forth more fully in the Disclosure Statement, the Debtors' "<u>Restructuring Committee</u>" was formed in August 2009 and is composed of the Debtors' chief executive officer and two specially-appointed independent directors, each with significant restructuring experience.  (<u>See</u> Ex. 4, Disclosure Statement Art. VI.C.2.) Generally, the Restructuring Committee is tasked with providing strategic oversight and guidance to the Debtors' restructuring.  Neither independent director serving on the Restructuring Committee joined the Debtors' Boards of directors until 2009.



The negotiations resulted in the Debtors' prearranged Plan.

6.      The Debtors' achievements to date in these cases are a direct result of their decision to settle these claims and engage with the Committee's potential litigation targets. Since beginning the process of soliciting a plan, the Debtors have increased potential recoveries to creditors by over $100 million. Through the Plan solicitation and auction process the Debtors increased the initial bid (which was already far higher than the estimated recovery in a liquidation analysis) by over $100 million to the current bid.  The increase in value through the process of engagement and negotiation was over 41%.  Moreover, during this process, the Debtors have maintained their enterprise value and only experienced limited operational disruption through the loss of customers, vendors or key employees since filing for bankruptcy. By seeking to pursue this litigation, the Committee jeopardizes all of the Debtors' results.

7.      <u>Second</u>, the Committee does not assert colorable claims.  The Committee's proposed 2007 LBO claims do not survive the plausible pleading requirements in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009).  The Committee's claims are unlikely to succeed on the merits as well.  The Committee ignores, discounts, or attempts to discredit a mountain of contemporaneous evidence that Neff was solvent after the 2007 LBO, including:



- 

In addition, AlixPartners separately analyzed Neff's solvency and confirmed that the likely range of Neff's value was well over $100 million in excess of Neff's debts at the time of the LBO.[7]

8.      The Committee's claims are also not colorable as they are riddled with pleading deficiencies and many are legally barred.  For example, the Committee's fraudulent conveyance claims cannot bring new money into the estate because LBO proceeds paid to former shareholders are unavoidable, Bankruptcy Code Section 546(e) settlement payments.  Likewise, the Committee did not plead any "egregious and severely unfair" conduct that would justify the drastic and unusual remedy of equitable subordination.  <u>In re BHS & B Holdings LLC</u>, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) .

9.

10.

[7] Ex. 15, AlixParters Fraudulent Transfer Analysis.



---

8    <u>See</u> Final DIP Order ¶ 33(iii) (providing that cash collateral and proceeds from DIP Facility may not be used to challenge prepetition liens); DIP Credit Agreement § 6.1(g)(v) (providing for event of default if Final DIP Order or DIP Credit Agreement is modified without lender consent).

9    <u>See</u> First Lien Term Loan Plan Support Agreement § 5(a)(vii), (viii); Backstop Unit Purchase Agreement § 7(a)(ii). The Backstop Unit Purchase Agreement and First Lien Term Loan Plan Support Agreement were filed on May 16, 2010, as <u>Exhibit 1</u> and <u>Exhibit 5</u>, respectively, to the Plan Supplement [Docket No. 34].

10   As the Court is aware, the Debtors' proposed exit facility is conditioned upon the Debtors' successful consummation of a rights offering backstopped by their Plan Sponsors.

11   <u>See</u> Amended Payout Event Procedures § 3 (providing that backup bid remains open for 60 days following Auction).

████████████████████    ████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████

13.    <u>Fourth</u>, the Standing Motion is really an objection to the Debtors' Plan, on a best interests of creditors basis, by a junior, hopelessly out-of-the-money noteholder group that does not like their recovery.   Through this Motion, the Committee is challenging the Debtors' settlement of claims arising from or related to the 2007 LBO or the 2008 Exchange in the Plan. This settlement under the Plan falls squarely within the Debtors' sole and exclusive rights under Sections 1121 and 1123(b)(3) of the Bankruptcy Code, Bankruptcy Rule 9019, and the Debtors' position as their estates' lone fiduciary.   As such, the Committee will have no authority to proceed with its putative Complaint if the Plan is confirmed, and the Standing Motion will be moot.   <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140, 232–35 (Bankr. S.D.N.Y. 2007) (holding that plan-based settlement terminated committee standing), <u>aff'd</u> 544 F.3d 420 (2d Cir. 2008) (Sotomayor, J.).

\*   \*   \*   \*

14.    ███████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

---

12 ████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

██ **BACKGROUND**

    A.    **Neff's Prepetition Performance and Conduct Establish that the Committee's Proposed Litigation Is Meritless.**

        1.    **Before Its 2007 LBO, Neff Had a Strong History of High Performance in the Construction Equipment Rental Industry, Even in the Difficult 2002 Downturn.**

15.    The Debtors have been in the equipment rental business for more than 20 years and remain one of the leading equipment rental companies in the United States. Through approximately 63 branches in 14 states, the Debtors rent a broad variety of construction and industrial equipment, including earthmoving, material handling, aerial, and compaction equipment.[13] ████████████████████████████████████████████████████

████████████████████████████████[14]

16.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[13] ██████████████████████████████████

██ ████████████████████████████████████████████████████

███████ █ ████████████████████████████████████████████████ ██

███████████████████████████████████████████████████████████

████ █ ██████████████████████████████████████████████████████

█████████ █



 ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ █

---

■ ████████████
■ ██ █
■ ██ █
■ █████████
■ ███████████████████████



18. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████ █████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

---

[20] <u>Id.</u>, at NEFF0023163-64.

[21] <u>Id.</u>, at NEFF0023163-65.

**2. Neff's LBO Marketing Process Yields Three Competitive Bids, Each Pricing Neff at or Above $850 Million.**

19. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ██████

██ ███████████████████████████████████████

███████████████████████████████████████████████

█████████ ████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████ █████████

███████████████████████████████████████████████

████████████████████████████████ ████████████████

███████████████████████████████████████████████

███████████████████ █████████████████████████████

21 ████████████████████████████████████

██ █████████████████████████████████████████
████████

██ ████████████████████████

██ █████████████████████████████████████
████████

██ ██████████████████████████



████████████████████████████████████████████████████

██████

██  ████████████████████████████████████████

████████████████████████  ████████████████████

████████████████████  ████████████████████████

████████████████████  ████████████████████████

████████████████████████████████████████████████

████████████████  ████████████████████████████████

████████████████████████████████  ████████████

████████████████████████████████████████████████

██████████████████████████

3.  **In March 2007, Neff Revised Its Projections to Include the Most Recent Actual Performance; the Committee Uses the Wrong Projections in Its Solvency Arguments.**

22.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  ████████████████████████████████████

---

27  ██████████

██  ████████████████████████████████████████

██  ██████████████

██  ██████████████

██  ████████████████

██  ██

██  ██████████████████████████████████████████

████████████████████





██████ █ ███████████████████████████████████████████████████████████████
███

24.    The Committee does not appear to evaluate Neff's LBO Projections anywhere in its Standing Motion and draft Complaint or in the underlying analysis produced to Neff, electing to rely solely on the earlier, outdated 2006 Projections.  In other words, *the Committee's entire analysis of Neff's solvency after the LBO, including the reasonableness of Neff's projections, are based on the <u>wrong</u>, outdated projections*.  The Debtors have not seen in the Complaint, the Standing Motion, or the Committee's expert analyses produced, any analysis of the actual LBO Projections that Neff used.  Moreover, the Committee misstates the facts regarding the revision of projections:  it alleges that "In the first quarter of 2007, Neff's EBITDA and EBITDA margin fell short of Odyssey's LBO Projections…Odyssey's LBO Projections were not revised."[42]  Neff *did* revise its LBO Projections.

25.    ██████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████ ███████████████████████████████████
███████████████████████████████████████ ██████████████████████
█████████████████████████████████████████████████████████████



―――――――――――――――――――――
[41] ██████████████████████████████████████████████████
█ ████████████████████
█ ████████████████████████████████████████████
█ ███████████████████████████████████

███████████████ ████████████████████████████████████████████████

██████                                                    projections.



████████████████████████████████████ ██████ ██████████████
████████████████████████████████████████████████

---

[45] ███████████████████████████████████████████████████

■ ██████████████████████████████



26. 

---

[47] <u>See</u> Ex. 15, AlixParters Fraudulent Transfer Analysis at p. 21.

[48] Ex. 8, at NEFF0028410.



**4.** **Lightyear Engaged in Intensive Due Diligence, Including Its Own Independent Base-Case and Downside Models.**

27.

**5.** **After Thorough Due Diligence, Lightyear, Sophisticated Debt Investors and Neff's Management Team Supported the LBO.**

28. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

   ██ ████████████████████████████████████████████████

████████████████████████████████████████████ ████████

████████████████████████████████ ██████ ██████████████

████ ██ ████████████████████████████████████████████

██████████████████████████████████

   ██ ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████ ██ ████████████████████████████████████████████████

███████████████████████████████████████████████████████

31. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████

**6.** **Contemporaneous, Third Party Valuations from Duff & Phelps Reinforce that Neff Was Solvent After the LBO.**

32. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ █ ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ ████ ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ █

---

59  Ex. 11, Aug. 3, 2010 Irion Dep. 91:25 - 92:17.

60  Ex. 20, NEFF0026105-147.

61  Id., at NEFF0026108.

62  Id., at NEFF0026119-20.

33.     ████████████████████████████████████████

██████████████████████████████████ ████ ██

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ ███████████████████████████████

█████████████

**7.      The Debtors' Financial Advisors in these Proceedings Confirm that Strong Evidence Exists that Neff Was Solvent Upon Completion of the LBO.**

34.     The Debtors also directed AlixPartners, LLP ("AlixPartners") to review the company and rental equipment market as of May 31, 2007 and provide an analysis of the company's value and solvency following the LBO.   AlixPartners conducted a comparable transactions analysis, a comparable company analysis and a review and analysis of the Duff & Phelps May 31, 2007 discounted cash flow analysis.

35.     ████████████████████████████████████████

████████████████████████████████████████

───────────────────────

█  █████████████████

█  ████████████████████████████████████████

█  █████████████████████

█  ███████████████████████



36.     Using the weighted average of the high and low implied values for the comparable transactions analysis, a comparable company analysis and the discounted cash flow sensitivity analysis, AlixPartner's analysis found that ***Neff, as of May 31, 2007, had an enterprise value range of $860 million to $990 million***.[72]

        **8.**    **Neff Continued to Enjoy Strong Performance Throughout 2007 and, While the Market Continued to Turn Down in the First Three Quarters of 2008, Neff Remained Comfortably Liquid.**

37.

---

67

71

72  Id., at p. 12.



**9. In the Fourth Quarter of 2008 the World Experienced the Worst Financial Conditions Since the Great Depression.**

39.

**10.** **The 2008 Exchange Was an Opportunistic Transaction that Yielded Substantial Benefits for Neff**

40. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

██ ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

██ █████████████████████████

██ █████████████████████████

██ ████████████████

██ ████████████

██ ███████████████████

42.　██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ █████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ █████████████████████████████
██████████████████████████████████ ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

**11.** **Holders of a Substantial Portion of the Unsecured Claims Decided Not to Exchange**

43.　██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

■ ████████████████████████████████
■ ████████████████████
■ ██████████████████



**12.    The Swap Reserve Had No Connection with the Exchange**

45.

███████████████████████████████████ ████████████

█████████████████████████████████████████████████

██████████████████████████ 

**B.** **Neff Wisely Pursued a Prearranged Restructuring Rather than a Speculative, Protracted Litigation that Would Irreparably Injure Its Prospects for Reorganization.**

46. █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████

47. █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████ ██████████████████████

██████████████████████████████████████████ 

██ █████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████ ███████████████████

---

91 ███████████████████████████████████
██ ██
██ ██████████████████████████████████████████████
██ ███████████
██ ██
██ █████████████████████



49.

51.     The Debtors' prepetition marketing resulted in a pair of putative plan sponsors who engaged in a de facto competitive prepetition auction process, one of which was a significant First Lien debt holder.[100]  Through the prepetition auction, the Debtors increased the valuation of their estates by roughly $40 million.   The Initial Plan Sponsor's winning bid provided $280 million in value included the uncommonly beneficial combination of *both* $118.9

---

97   Id. at ¶ 40-42.

98   Id. at 132:19-133:9 (Irion).

99   Ex. 3, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 131:7-132:1 (Irion).

100  Id. 59:16-21 (Bojmel).

million in committed equity financing ***and*** freedom to shop the deal to a higher bidder.[101]  With these commitments, Neff filed the Initial Plan in these Chapter 11 cases, providing 100% recovery to the First Lien Term Loan Lenders (cash or equity to non-sponsor holders), $10 million of cash or equity to the Second Lien Term Loan Lenders and a $365,000 cash gift to unsecured creditors.

52.     The Debtors' Initial Plan also contemplated dates for postpetition marketing efforts and a second auction process.  Notwithstanding the value created through the auction process, the company also retained a fiduciary out in the Plan Support Agreement such that the Board was not foreclosed from pursuing any other restructuring alternative in fulfilling its fiduciary duties.[102]

53.     By pursuing a prearranged plan, Neff experienced a relatively soft landing in bankruptcy.  Neff maintained its enterprise value and only experienced limited operational disruption through loss of customers, vendors or key employees since its bankruptcy filing.  This limited disruption is a direct result of Neff's decision to settle claims, secure agreements with its prepetition lenders to provide DIP financing and engage with participants in its capital structure as plan sponsors.

54.     On August 10, 2010, the Debtors completed their postpetition auction between the Initial Plan Sponsor and a group comprised of ███████████████ and certain of the Second Lien Lenders.  The auction was highly competitive, lasting two days and 29 rounds of

---

[101]  Ex. 3, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 64:7-10 (Bojmel).

[102]  Id. 111:14-17 (Bojmel).

bidding.[103]   Under the terms of the successful bid, the Plan Sponsor's commitment has a value of $330 million, providing 100% recovery to the First Lien Term Loan Lenders, a $73 million cash recovery for the Second Lien Lenders and a $365,000 cash gift to unsecured creditors.[104]   By pursuing this restructuring path, Neff increased its value, and creditors' recoveries, by nearly $100 million.

### C.  The Committee Pursues the Standing Motion as Simply the Latest Effort to Derail the Debtors' Plan.

55.    The Court has rightly observed that "there is nothing about the Debtors' Plan that the Committee likes."[105]   From the outset of these chapter 11 cases, the Committee has taken the position that the Debtors should abandon their prearranged Plan, set themselves "adrift in chapter 11," and cling to the prospect of speculative litigation.[106]   As the Court has observed:

> Out of the money by hundreds of millions of dollars . . . the Committee apparently believes that is has no choice but to pursue a strategy that in essence would have the Debtors in the exercise of their business judgment turn away a plan proposal that contains an "insurance policy" . . . that locks in exit financing and [e]nsures the future of the business while unsecured creditors, whose claims total some thirty-six million in the aggregate, pursue massive litigation to attack the LBO and exchange offer that they posit led to this day.[107]

56.    The Committee's tactics have not changed over time.  The Standing Motion is the Committee's latest—and hopefully final—effort to derail the Debtors' prearranged Plan and undertake "massive litigation" at others' expense.

---

[103]   Ex. 45, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. Aug. 10, 2010) Auction Tr. 121:12-122:24.

[104]   Id.

[105]   Ex. 3, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 156:1–3.

[106]   The Committee has attacked the Debtors' Plan from the outset of these chapter 11 cases.  For example, by its June 23, 2010 DIP Objection argued that "the Plan appears not to have been proposed in good faith."  (Ex. 34, DIP Obj. ¶ 33(e).)  Similarly, the Committee's July 5, 2010 Disclosure Statement Objection argued for 13 pages that the Debtors' Plan was "patently unconfirmable."  (See Ex. 35, Disclosure Statement Obj. ¶¶ 60–90.)

[107]   Ex. 3, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 156:3–13.

57. Through the Standing Motion, the Committee has effectively challenged the Debtors' settlement of claims arising from or related to the 2007 LBO or the 2008 Exchange pursuant to Article IV.E (General Settlement of Claims) and Article VIII.A (Compromise and Settlement of Claims, Interests, and Controversies) of the Plan. See 11 U.S.C. § 1129(b)(3)(A); Fed. R. Bankr. P. 9019.

58. On September 2, 2010, Neff's Restructuring Committee and Board considered the Committee's Standing Motion and demand letter.[108] The Restructuring Committee agreed again that the better restructuring path was not to pursue the claims arising out of the 2007 LBO and 2008 Exchange. The Committee's proposed litigation would harm rather than benefit the Debtors' estates. Neff's Board, including a majority of the disinterested members, reaffirmed that the path of negotiating with its creditor constituencies rather than pursuing litigation was correct and justified.

59. The Committee—which is comprised entirely of Noteholders— represents a $34 million class of creditors out of the money by approximately over $215 million. While the Committee has viewed all-out, protracted, LBO litigation as the only chance its constituency had of increasing their recovery, the Committee's support among its own constituency is far from unanimous. *Measured by principal amount, 58% of Noteholders voting voted to accept the Plan*.[109] In other words, 58% of the voting Noteholders by value decided that recovery of $.01 on the dollar was a better deal than the Committee's speculative litigation. Based on the voting

---

[108] In July and August, Neff's advisors, including Kirkland & Ellis and AlixPartners reanalyzed potential claims regarding the 2007 LBO and 2008 Exchange.

[109] As of September 2, 2010, $27.9 million in notes had voted, with $16.5 million voting to accept and $11.4 million voting to reject.

results, none of Neff's other constituency groups, including other unsecured creditor classes, are

interested in pursuing the Committee's litigation in lieu of the Plan.

60. 

---

[110] Ex. 3, <u>In re Neff Corp.</u>, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 132:19-133:9 (Irion).

[111] The Debtors' Backup Bid was provided by certain of its existing Second Lien Lenders and an affiliate of Odyssey Investment Partners. <u>See</u> Ex. 34, *Notice of Backup Bid Pursuant to Amended Payout Event Procedures*, filed on August 19, 2010 [Docket No. 349]. The Debtors do not believe these parties would be willing to re-submit their bid while also being sued by the Committee.

████████████████████████████████████████

████████████████████████████████████

### III.    <u>STANDARD</u>

61.    Because the Committee is seeking standing over the Debtors' objection, standing may be granted only where the Committee has established that:

     a.     the Debtors have unjustifiably failed to bring suit;

     b.     colorable claims exist based on appropriate proof; <u>and</u>

     c.     the proposed litigation will benefit the Debtors' estates as a whole.

<u>Unsecured Creditors Comm. v. Noyes</u> (<u>In re STN Enters.</u>), 779 F.2d 901, 905 (2d Cir. 1985) ("STN"). The Committee must establish each element before standing may be granted. For example, if the Committee fails to demonstrate that its standing will benefit the Debtors' estates in general (as opposed to Noteholders in particular), "the Court could not permit the fraudulent conveyance action to be pursued in this Court, even if the Trustee was unjustified in not seeking to pursue the action and even if the claim was colorable, because there would be no benefit to the estate." <u>Ross v. Tognetti</u> (<u>In re Tognetti</u>), No. 03-37171, 2006 WL 2587544, *8 (Bankr. S.D.N.Y. June 21, 2006) (Morris, J.). "Thus, a finding that allowing a committee to pursue a debtor's claim would be ***necessary and beneficial*** to the resolution of the bankruptcy proceeding is required in all instances." <u>Official Committee of Unsecured Creditors v. Morgan Stanley & Co.</u> (<u>In re Sunbeam Corp.</u>), 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002) (Gonzales, J.) (emphasis added); <u>see</u> <u>Applied Theory</u>, 493 F.3d at 86 ("[C]laims such as those the Committee wishes to pursue depend on a judicial determination that they are likely to benefit the estate.").

62.    This determination requires an examination of the Complaint's merits, the Complaint's probability of success, and the costs (and delays) arising from prosecution of the Complaint. The Committee must establish that "there is a sufficient likelihood of success to

justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." STN, 779 F.2d at 906. Standing should be denied where it would "delay resolution of [a] reorganization proceeding by impeding approval of the pending plan of reorganization." Sunbeam, 284 B.R. at 375. Similarly, standing should be denied where it would be used to pursue a "swing for the fences" litigation strategy to benefit an out of the money constituency to the detriment of the estates. See Adelphia Commcn's Corp. v. Bank of Am., N.A., 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (Gerber, J.).

63. The Committee's burden is also heavier because the Debtors, as debtors in possession, oppose standing. See id. at 671. ("[A] party who seeks to displace the debtor faces a heavier burden in the [latter] case than in the [former]." (internal quotation marks omitted, alterations in original).) This burden recognizes that "[a]s a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative." Smart World Techs., LLC. v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 180 (2d Cir. 2005). Cf. In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001) (setting forth lower standard necessary to obtain standing with debtor consent).

### A. The Committee Misstates the Standard Governing the Motion

64. The Committee fundamentally misstates the standards for both the "unjustifiably failed to bring suit" and the "benefit the Debtors' estates as a whole" elements. Unsurprisingly, the Committee's trumped up legal standard is much more favorable to itself than the actual legal standard.

### 1. The Committee's Demand Futility Argument Misstates the Law

65. The Committee misstates the standard for finding that Debtors' unjustifiably failed to bring suit. Rather than substantively arguing that Neff was unjustified in refusing to

pursue litigation, the Committee contends that standing is warranted purely because any "demand" for the Debtors to pursue the Committee's alleged causes of action would be futile.[112] This approach is simply not correct. Neither of the two cases that it cites on this point, <u>STN</u> and the non-binding <u>G-I Holdings</u>, actually hold that demand futility, in and of itself, is sufficient to support a finding that the Debtors unjustifiably failed to sue. <u>STN</u> does not discuss demands or demand futility at all. <u>STN</u>, 779 F.2d at 901-906. <u>G-I Holdings</u> never states that demand futility in and of itself is enough to establish the Debtors unjustifiably failed to bring suit. Rather, <u>G-I Holdings</u> provides that standing requires a showing that 1) either demand was made and rejected or demand would be futile; ***and also*** 2) that the Board was unjustified in refusing to pursue the litigation. 313 B.R. at 628. Per <u>STN</u>, "In order to decide whether the debtor unjustifiably failed to bring suit . . . the court must also examine . . . whether an action asserting such claim(s) is likely to benefit the reorganization estate." 779 F.2d at 905. Even if a demand on the Neff Board would have been futile, the Committee must establish that that the Debtors were not justified in deciding not to forego the Committee's claims.

> **2. The Committee Misstates the Standard for Determining Whether the Claims Would Benefit the Estates**

66. The Committee cites <u>In re Adelphia Communications Corp.</u>, 330 B.R. 364 (Bankr. S.D.N.Y. 2005), to argue that standing should be granted where "the potential recoveries would be enormous."[113] In other words, the Committee suggests that as long as the theoretical maximum recovery for its claims is higher than the professional fees of litigation, the Committee satisfies the benefit to the estates requirement. This cannot be the correct standard. The

---

[112] <u>See</u> Standing Mot. at ¶¶ 83–86 (citing <u>STN</u>, 779 F.2d at 901, 904; <u>In re G-I Holdings, Inc.</u>, 313 B.R. 612, 630 (Bankr. D.N.J. 2004).)

[113] Standing Mot. ¶ 89 (quoting <u>Adelphia</u>, 330 B.R. at 384).

Committee's purported standard would not discount its claims based upon their paltry chances of success and does not address the enormous destruction of value, and reduction in ultimate creditor recoveries, that protracted litigation would risk. This proffered standard also ignores the STN analysis, which directs the Court to analyze both likelihood of success on the merits and all costs to the estates of delay. STN, 779 F.2d at 906.

67. The Committee's interpretation of Adelphia is also incorrect, and the Adelphia court granted committee standing on a factual record very different from the one before the Court:

| Neff | Adelphia |
|---|---|
| The Debtors evaluate 2007 LBO and 2008 Exchange claims prepetition and decide not to pursue claims. | The debtors elect to pursue litigation themselves. 330 B.R. at 368. |
| The Debtors oppose standing. | Adelphia debtors did not oppose committee standing. See Adelphia, 330 B.R. at 368 |
| Standard playbook of LBO-related claims with small odds of success. Cf. In re N.Y. Int'l Hostel, Inc., 157 B.R. 748, 753 (Bankr. S.D.N.Y. 1993) (denying standing where "[t]he record contains no showing of 'extraordinary circumstances' or abuse of discretion"). | Extraordinary allegations of wrongdoing by Rigas family and insiders. See id. at 370–71, 378.[114] |
| Standing will indefinitely postpone confirmation of a prearranged plan. Cf. Sunbeam, 284 B.R. at 375 (denying standing where litigation "will delay resolution of this reorganization proceeding by impeding approval of the pending plan"). | Standing facilitated massive operational restructuring: "Reorganization would not be a hostage to the determination of this litigation, and no delay to emergence from chapter 11 will result from the pendency of the proposed litigation." Id. at 383.[115] |

---

[114] When the Adelphia committees filed their motions for standing on July 6, 2003, see In re Adelphia Commc'n's Corp., Case No. 02-41729 (REG) (Bankr. S.D.N.Y. July 6, 2003) [Docket Nos. 1855, 1856], members of the Rigas family and certain Adelphia insiders were already subject to criminal and SEC enforcement actions. See In re Adelphia Commc'ns Corp., No. 02-41728, 2004 WL 2186582, at *2 (S.D.N.Y. Sept. 27, 2004) (discussing timeline)

[115] After standing was granted in August 30, 2005, the Adelphia debtors did not confirm their plans for another 16 months. See Adelphia, 368 B.R. at 140 (confirming plan of reorganization on January 30, 2007).

| Creditors overwhelmingly support confirmation versus litigation. Only holders of less than $12 million in unsecured notes (or 2 percent of funded debt) oppose Plan confirmation.[116] | Clear alignment of interests between committees and estates in pursuing litigation. See id. at 383–83. |
|---|---|

68. Importantly, the Adelphia bankruptcy court ultimately withdrew independent standing from the Adelphia equity committee. In the court's view, the equity committee's out of the money position created a significant conflict between its interests and the Adelphia estates' interest in the litigation. See id., 368 B.R. at 275. This ruling was affirmed on appeal: "[T]he Equity Committee is so far out of the money, it would have an inherent conflict of interest in controlling any litigation against the banks. . . . [T]he Equity Committee would always have the incentive to do nothing but swing for the fences." See Adelphia, 371 B.R. at 674, aff'g 360 B.R. 140. The Committee's out of the money position is no different here and, interpreted correctly, the Adelphia decisions reinforce why the Standing Motion should be denied.

## IV. ARGUMENT

### A. The Debtors Justifiably Declined to Pursue the Causes of Action Alleged in the Complaint

#### 1. In its Role as the Estate's Fiduciary Neff Elected to Maximize Value for Estate by Not Pursuing these Claims after Evaluating the Claims Prepetition and Postpetition

69. Standing requires the Committee to establish that the Debtors "unjustifiably" failed to bring suit on account of the causes of action alleged in the Complaint. See STN 779 F.2d at 901. In evaluating the Debtor's decision not to bring suit, this Court should apply the familiar framework of the business-judgment rule. The Second Circuit has explained that "STN . . . makes clear that derivative standing in the bankruptcy context is analogous to derivative

---

[116] The Adelphia capital structure included approximately $9.4 billion in unsecured bond debt, accounting for approximately 58 percent of Adelphia's total funded debt. See Debtors' Fourth Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Nov. 21, 2005) [Docket No. 8973], at pp. 66–68.

standing in shareholder suits," <u>see</u> <u>In re Smart World Technologies, LLC</u>, 423 F.3d 166, 176 (2d Cir 2005), and it is beyond dispute that the business-judgment rule generally limits shareholder standing:

> Among other business decisions, the directors have responsibility for determining whether or not to pursue causes of action available to the corporation. The recognition of this responsibility, and the application to it of the business judgment doctrine have led to the rule that in general a court should not entertain a derivative action where a disinterested majority of the board has determined, in the good faith exercise of its business judgment, that the suit is not in the best interests of the corporation.

<u>Galef v. Alexander</u>, 615 F.2d 51, 57 (2d. Cir. 1980). "The concern that derivative suits [by creditors' committees] might be 'value-dissipating' is adequately served by affording a debtor the deference normally accorded pursuant to the business judgment rule." <u>See</u> <u>Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery</u>, 330 F.3d 548, 575 (3rd Cir. 2003)  This standard also recognizes that the Debtors, as their estates' sole fiduciary, are the proper party to manage legal claims to maximize value for their estates as a whole.  <u>Smart World Techs.</u>, 423 F.3d at 175.

70.    The Committee has not carried its burden.  The Debtors elected to forego the litigation sought by the Committee after an independent and objective consideration of the transactions at issue. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████    █████████████

2. **The $100 Million Increase in Creditor Recoveries Under the Plan Confirms that the Debtors' Chosen Path and the Plan Are in the Best Interest of Creditors.**

71. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████        ████████████████████
██████████████████████████

        ██  ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

        ██  ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[REDACTED]

**B.**     **The Committee Does Not Assert Colorable Claims Under the <u>STN</u> Standard.**

74.     Independent standing requires the Committee to establish a "colorable claim," which is a "claim for relief that on appropriate proof would support a recovery." <u>STN</u>, 779 F.2d 903. A "colorable claim" is one that is "meritorious." <u>Ross v. Tognetti</u> (<u>In re Tognetti</u>), No. 03-37171, 2006 WL 2587544, *8 (Bankr. S.D.N.Y. June 21, 2006) (Morris, J.); <u>see also</u> <u>Jensen v. Schweiker</u>, 709 F.2d 1227, 1230 (8th Cir. 1983). The Court must therefore look beyond the Complaint and determine whether the Committee's allegations are supported by sufficient proof. <u>See</u> <u>Tognetti</u>, 2006 WL 2587544 at *8 (allowing "evidentiary hearing as to whether a colorable fraudulent conveyance claim exists"); <u>In re Copperfield Investments, LLP</u>, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010) (requiring "competent evidence, that the proposed claims are colorable").

         **1.**     **The Committee's Fraudulent Conveyance Claims Are Not Colorable Given the Implausibility of the Allegations and the Protection of the Payments to the Odyssey Shareholders as Section 546(e) Settlement Payments.**

75.     The Creditors' Committee's fraudulent conveyance claims (Counts I, III, IV, and V) fail to meet <u>STN</u>'s "colorable" prong. The Committee's fraudulent conveyance claims cannot

bring new money into the estate because the proceeds of the LBO paid to the shareholders are bankruptcy code Section 546(e) settlement payments and, therefore, unavoidable as a matter of law. The Committee's allegations that the 2007 LBO rendered Neff insolvent and left it with unreasonably small capital are highly implausible.

> **a.     The Committee's Fraudulent Conveyance Claims Would Not Bring New Money Into the Estate Because the Payments to Shareholders Are Unavoidable Settlement Payments as a Matter of Law.**

76.     Only two of the four fraudulent conveyance claims seek to recover new money into the estate: the Third and Fourth Counts. In other words, if the Committee does not succeed on the Third and Fourth Counts, then the proposed expensive and protracted fraudulent conveyance litigation would simply be about the distribution among creditors rather than bringing new value into the estate. The Third Count, which is discussed below, is unprecedented and verges on frivolous. The Fourth Count seeks to recover payments made to Pre-LBO shareholders as fraudulent conveyances.

77.     The Fourth Count, however, is precluded as a matter of law under the Bankruptcy code. Even if the fraudulent conveyance claims were "colorable," the Committee could not recover the payments made to Neff's pre-LBO shareholders because Section 546(e) of the Bankruptcy Code specifically precludes fraudulent conveyance actions to recover the payments made to the pre-LBO shareholders. Those transfers are unavoidable settlement payments under Section 546(e), as a matter of law, and it would be proper for a court to grant a 12(b)(6) motion to dismiss. Hechinger Investment Co. of Delaware, 274 B.R. 71, 75 (D. Del. 2002)

78.     Bankruptcy Code Section 546(e) provides that, "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the

benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, . . . in connection with a securities contract . . . ." 11 U.S.C. § 546(e). A "settlement payment" is defined in the statute as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(9). As the Third Circuit has noted, "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." In re Resorts Int'l, . This broad definition of "settlement payment" for securities transactions was "designed to ensure settlement finality, and therefore market stability." In re Enron Creditors Recovery Corp., 422 B.R. 423, 429 (S.D.N.Y. 2009).

79.



_____

[118] The Committee's suggestion that various prepetition conveyances should be "collapsed" into a single integrated transaction (see Standing Motion ¶ 49; Complaint ¶¶ 93, 111, and 115) does not change the applicability of section 546(e)—see, Hechinger Investment Co. of Delaware, 274 B.R. 71, 75 (D. Del. 2002) (dismissing (Continued…)

80. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████

████████████████████████████████████████

81.     In the Third Count, the Committee asserts a completely novel legal theory by which it would recover from Lightyear—as Neff's purchaser in the LBO—the "value of the liens" Neff granted to Bank of America and Wilmington Trust because the liens "were transferred for the benefit of" Lightyear.[120]  The applicability of the provision under section 550 of the Bankruptcy Code referenced by the Committee is limited to a proscribed relationship such as that between a lender and guarantor of a loan.  See In re Enron, 361 B.R. 36, 49 (Bankr. S.D.N.Y. 2006).  There was no express or implied relationship between the Lightyear funds and the first or Second Lien Lenders the could plausibly support the application of Section 550 of the Code.

> **b.      Section 546(e)'s Protection of Settlement Payments from State Law Avoidance also Bars the Claim under Delaware General Corporate Law §§ 160(a) and 174.**

82.     The Committee's Complaint also alleges a claim (Count V) under §§ 160(a) and 174 to recover purportedly illegal shareholder distributions of proceed from the 2007 LBO.[121] The targets of these recoveries are Neff's pre-LBO shareholders and the payouts they received

---

fraudulent conveyance claims against exiting shareholders pursuant to 546(e), notwithstanding the collapsibility of the LBO); In re Nat'l Forge, 344 br 340, 371(W.D. Pa. 2006) (collapsing series of transactions, then holding that the claims for fraud and fraudulent transfer were bared by the "settlement payment doctrine")—except potentially where actual fraud is alleged, which is not the case here.  (Standing Motion ¶ 48, n. 9).

[119]  Ex. 35, Ex. A to Funds Flow Memo, NEFF0021460-71.

[120]  See Ex. 32, Complaint at ¶ 115.

[121]  Id., ¶¶ 123-128.

for their shares in the LBO. Those claims, however, are barred under Section 546(e). The Hechinger court addressed the issue of Section 546(e)'s preemption of attempts to recover settlement payments under Delaware state law and found that state remedies are categorically preempted: "[T]he Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims." 274 B.R. at 97.

83.     The §§ 160(a) and 174 claims are also independently not colorable because they are predicated on allegations that the 2007 LBO rendered Neff insolvent.[122] As discussed below, the insolvency and impairment allegations are not colorable.

<blockquote>

**c.      Allegations that the 2007 LBO Rendered Neff Insolvent and Left it with Unreasonably Small Capital Are Highly Implausible.**
</blockquote>

84.     The Committee has not adequately pled its fraudulent conveyance claims. Generally, under the applicable state law, the Committee has to establish that the conveyance was "made without fair consideration and (1) the debtor [was] rendered insolvent by the transfer or (2) the transferor [was] left with unreasonably small capital, or (3) the transferor intends or believes that it will incur debts beyond its ability to pay as they mature." MFS/Sun Life Trust High Yield Series v. Van Dusen Airport Services Co., 910 F.Supp. 913 at 938 (S.D.N.Y. 1995), citing New York Debtor and Creditor Law ("NYDCL") §§ 272-275. Because courts generally apply a motion to dismiss standard to determine whether a claim is "colorable", the Committee's fraudulent transfer claims must at least survive the two-pronged pleading test set out in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007 and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

85.     First, under Twombly and Iqbal, a court must accept as true all factual allegations contained in the Complaint, but only after first distinguishing and disregarding "mere conclusory

---

[122]     Id., ¶ 125.

statements" and "legal conclusions couched as factual allegation." <u>Iqbal</u>, 129 S. Ct. at 1949. Second, a court must determine whether the factual allegations allege "a ***plausible*** claim for relief." <u>Id</u>. at 1950. The court should "draw on its judicial experience and common sense" in determining whether a claim is plausible. <u>Id</u>. If the "well-pleaded facts do not permit the court to infer more than the ***mere possibility*** of misconduct," the Complaint should be dismissed. <u>Id</u>.

86.     The Committee's fraudulent conveyance claims depend on two premises, that "Neff was rendered [1] insolvent and [2] undercapitalized by the LBO."[123]  Because those assertions, together with the assertions made under the pleading counts, are conclusory restatements of the legal conclusions the Committee would have to prove, the Court must disregard them and look at the underlying factual allegations.

87.



---

[123] <u>Id</u>., ¶ 64.

[124] <u>Id</u>., ¶ 67.

[125] <u>Id</u>., ¶¶ 67-69.

**i.** **As Established by an Arms-Length Transaction of $935.9 Million and a Contemporaneous Third-Party Valuation of $911 Million, Neff Was Comfortably Solvent at the Close of the LBO.**

88. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

---

[126] <u>Id.</u>, ¶ 70.

90.     ██████████████████████████████████████████████

██████████████████████████████████████████████

████  ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

91.     The Committee's dismissal of Neff's goodwill as a "fiction" is equally unfounded.  Goodwill is the measure of the difference between the actual market price of an enterprise and the value of the distinct parts that make up that dynamic whole.  Stickney & Weil, Financial Accounting: An Introduction to Concepts, Methods, and Uses, 620 (9th ed., 2000). The concept of goodwill is widely recognized as an asset, including by the courts:  "[T]he recognition of goodwill as an asset makes sense:  a rational purchaser in a free market, after all, would not pay a price for a business in excess of the value of that business's assets unless there actually were some intangible 'going concern' value that made up the difference."  U.S. v. Winstar Corp., 518 U.S. 839, 850 (1996).  The Committee's suggestion that the Court discard Neff's going concern value should be summarily dismissed.

92.     ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████  ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████

ii.     **As Established by Its $200 Million Equity Cushion and Payment of Debts as they Came Due for Nearly Three Years, Neff Was Adequately Capitalized at the Close of the LBO.**

93.     ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

---

94. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ █████

███ ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

96.     In any event, the critical question is not whether the transferor's business projections were correct, but whether the "projection[s] were reasonable and prudent at the time [they were] made." Moody, 971 F.2d at 1073; MFS/Sun Life Trust, 910 F. Supp. at 944; In re Iridium Operating LLC, 373 B.R. at 300 ("failure to predict market demand accurately does not imply that [the company] failed to act reasonably or to generate reasonable projections").

97.     Moreover, the adequacy of capital need only be tested within a reasonable period of the transfer at issue:  While a company must be adequately capitalized, it does not need resources sufficient "to withstand any and all setbacks." MFS/Sun Life Trust, 910 F. Supp. at 944. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

---

[128] Ex. 7, April 2007 Moody's Presentation, NEFF0023167-70.

98.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████    ████████████████

█████████████████████████████████

### 2. The Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Claims Are Not Colorable

### a. The Breach of Fiduciary Duty Claim is Not Colorable

99.     The Committee has also failed to identify a colorable claim for breach of fiduciary duty.  In this count, the Committee broadly accuses nearly every person or entity connected with 2007 LBO of breaching fiduciary duties of care and loyalty to Neff.[129]  The Committee's broad-brush approach fails to allege any specific facts that could support a claim for breach.[130]  The Committee's purported claims are not colorable because (1) any claim against a director for breach of the duty of care is barred by Neff's corporate documents (2) the Committee has not stated an actionable breach of the duty of care; and (3) the Committee has not stated any actionable breach of the duty of loyalty.

---

[129] Standing Motion ¶¶ 129-135.

[130] Debtor agrees with the Committee that Delaware law governs the breach of fiduciary duty and aiding and abetting claims.  (Ex. 36, Standing Motion ¶ 66 n.12.)

### i. The Committee Has Not Alleged a Colorable Duty of Care Claim

#### (A) Neff's Certificate of Incorporation Bars Duty of Care Claims Against the Directors and Shareholders

100.     Any claim against a Neff director or shareholder for breach of the fiduciary duty of care is barred by the "§ 102(b)(7) provision" in Neff's Amended and Restated Certification of Incorporation (the "Certificate"). "Under § 102(b)(7) of the Delaware General Corporation Law, shareholders may exculpate directors and officers for liability arising from a breach of fiduciary duty of care," and courts "may take judicial notice of an exculpatory provision at the motion to dismiss stage." BH S & B Holdings LLC, 420 B.R. at 146; Malpiede, 780 A.2d at 1090-96. Delaware courts have interpreted such exculpatory provisions to extend to claims against shareholders accused of controlling the board. Shandler v. DLJ Merchant Banking, Inc., 2010 WL 2929654, *16 (Del. Ch. July 26, 2010). Here, the Certificate provides that "no director of the Corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."[131] Accordingly, the Committee's claims against the director and shareholder Defendants for breach of the duty of care are not colorable.

#### (B) The Duty of Care Claim is Not Colorable Because it Fails to Allege Facts Rebutting the Business Judgment Rule

101.     At bottom, the Committee attacks the wisdom of the 2007 LBO and seeks to have this Court infer gross negligence or disloyalty based on Neff's ultimate Chapter 11 petition. But the Committee does not allege sufficient facts to support a claim that any Defendant breached the fiduciary duty of care. The Committee's Complaint and Motion lack any discussion whatsoever

---

[131] Ex.46, Certificate at ¶ 7.

of the business-judgment rule and the protection it affords officers and directors. "Under Delaware law, to show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant directors have acted on an informed basis and in the honest belief they acted in the best interest of the corporation." In re BH S & B Holdings LLC, 420 B.R. 112, 146 (Bkrtcy. S.D.N.Y. 2009) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.") (internal punctuation omitted).

102.    In order to survive a dismissal on the pleadings, a plaintiff "must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule." BH S & B Holdings LLC, 420 B.R. at 146 (quoting Crescent Mach I Partners L.P. v. Turner, 846 A.2d 963, 984 (Del.Ch.2000)). In other words, the plaintiff must allege specific facts showing that the defendants (1) committed gross negligence by failing to act on an informed basis or (2) acted in bad faith in furtherance of some improper personal interest. See BH S & B Holdings LLC, 420 B.R. at 146-47; Trenwick, 906 A.2d at 192-94.

103.    The Committee has failed to allege any facts sufficient to overcome the presumption of the business-judgment rule. The Committee does not allege any pervasive failure to investigate the LBO that might support a claim for gross negligence under Delaware law. Indeed, the Committee **admits** that the Defendants (1) retained an investment advisor regarding the proposed LBO;[132] (2) generated its own internal projections;[133] (3) received projections from bankers and investment bankers;[134] and (4) had been in the process of analyzing the sale and

---

[132]    Ex. 32, Complaint at ¶ 51.

[133]    Id. at ¶ 52.

[134]    Id. at ¶ 59.

creating projections since as early as October 12, 2006, over seven months before the LBO

closed.[135]

### ii. The Committee Has not Alleged a Colorable Duty of Loyalty Claim

104.    The Committee has also failed to identify a colorable claim for breach of the duty

of loyalty.  To allege a colorable claim, the Committee must identify specific facts demonstrating

a breach of the duty of loyalty, which requires a substantial showing under Delaware law:

> A breach of loyalty claim *requires some form of self-dealing or misuse of corporate office for personal gain*. . . . The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit *not shared by all shareholders*. . . .  At the same time, it is an unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote.... [S]tock ownership, coinciding with a Board decision that may affect the price of those shares, is [not] adequate to show a breach of the duty of loyalty.[136]

105.    BH S & B Holdings, 420 B.R. at 150-51 (internal punctuation and citations

omitted); see also Cede v. Technicolor, Inc., 634 A.2d 345, 363 (Del. 1994).  The fact that

officers or directors own stock subject to the buyout—without more—is not sufficient to raise

the inference that they were conflicted and self-interested.  See Lewis v. Leaseway Trans. Corp.,

1990 WL 67383, at *5 (Del. Ch. 1990) (no lack of independence where "director defendants

[were] alleged to have, as a group, owned or controlled approximately 8% if Leaseway's total

outstanding stock").

---

[135]  Id. at ¶ 52.

[136]  The Committee's entire colorability argument on the breach of loyalty claim is premised on a faulty legal standard.  The Committee represents that "[t]o determine breach of the duty of loyalty, the Court applies an 'entire fairness' test to determine whether the transaction was entirely fair to the Debtors."  Motion at ¶ 72.  The entire-fairness doctrine, however, is a *defense* that only becomes relevant *after* the plaintiff establishes that the defendants were self-interested and the business judgment rule does not apply.  E.g. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993).

106.    The Committee has failed to allege facts constituting a breach of the duty of loyalty on the part of each of the approximately fourteen proposed breach of fiduciary duty defendants.[137]  The Committee has again failed to allege any facts indicating "self-dealing" or any special interest divergent from the rest of the shareholders.  At most, the Complaint alleges that the decision to pursue the 2007 LBO was too risky and motivated by the desire to secure a substantial payout for all shareholders.  This does not present a colorable claim for a breach of the duty of loyalty.  See BH S & B Holdings, 420 B.R. at 150-51.

107.    The Committee's duty of loyalty allegations against the officers and the post-LBO Controlling Shareholder Defendants are borderline frivolous.  First, the Complaint does not identify a single self-interested transaction or an ill-gotten personal gain on the part of the officers or the post-LBO Controlling Shareholders.  The Committee's theory appears to be it was disloyal to allow Neff to take on so much debt.  That theory fails as a matter of law where there are no allegations of self-dealing or bad faith.  See Trenwick, 906 A.2d at 205 (holding that the decision to take on additional debt is protected by the business-judgment rule even where the corporation is *already* insolvent).  The duty of loyalty allegations also fail to pass a basic plausibility threshold.  Iqbal, 129 S. Ct. at 1944.  ████████████████

████████████  ██████████████████████

██████████████  ██  ████████████████████

████████████████████████████████████

---

[137]  Ex. 32, Complaint at ¶¶ 29-42.

[138]  Ex. 32, Complaint at ¶ 57.

[139]  Id. ("In addition, ***$10.6 million of rollover equity*** was contributed by certain management personnel").

### b. The Aiding and Abetting Claims Are Not Colorable

108.    The Complaint also fails to allege a colorable aiding and abetting breach of fiduciary duty claim (Count VII).  A claim for aiding and abetting a breach of fiduciary duty requires *first,* allegations showing that fiduciaries breached their duties to the plaintiff, and *second,* a showing that the aider and abetters "knowingly participate[d] in the breach." Malpiede, 780 A.2d at 1096.  The Committee's Complaint fails at each step.

109.    First, for the reasons stated above, the Committee has failed to plead any actionable breach of duty by any of the directors, officers, or alleged controlling shareholders. The putative aiding and abetting defendants cannot have aided and abetted a non-existent breach.

110.    Second, even if the Committee's breach of fiduciary duty claims were colorable, its aiding and abetting claims independently fail.  Properly pleading an aiding and abetting claim requires allegations of both *knowledge* **and** *participation* in the alleged breach of fiduciary duties.  Malpiede, 780 A.2d at 1097-98.  "Conclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short." McGowan v. Ferro, Civ. A. 18672-NC, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002) (internal quotations omitted) (emphasis in original); Malpiede, 780 A.2d at 1098 (must allege specific facts showing acquirer *participated* in board decisions or conspired with board).  Where as here, there is no specific allegation that the aiders and abetters conspired with the Board, a complaint can survive a motion to dismiss "only if a fiduciary breaches its duty *in an inherently wrongful manner*, and the plaintiff alleges *specific facts* from which that court could reasonably infer knowledge of the breach." McGowan, 2002 WL 77712 at *2 (emphasis added).  Examples of breaches in an "inherently wrongful manner" are limited to gross breaches of loyalty, such as directors

demanding personal side payments in order to support corporate transactions. Id. at *3 (citing In re USACafes, L.P. Litig., 600 A.2d 43 (Del. Ch. 1991); Jackson Nat.'l Life Ins. Co. v. Kennedy, 741 A.2d 377 (Del. Ch. 1999)).

111. In the present case, the Committee does not specifically allege that any of the aiding and abetting defendants conspired with the Board or caused the Board to breach its fiduciary duties. There are no allegations of how the aiding and abetting defendants controlled the Board, which Board members they controlled, or any other specific facts that would establish an aiding and abetting claim. Nor are there allegations of gross breaches of the duty of loyalty, such as side payments to corporate officers or directors. See McGowan, 2002 WL 77712 at *2 (complaint must allege facts showing conspiracy with board or inherently wrongful conduct by directors); see also In re Hydrogen LLC., 431 B.R. 337, 351 (Bankr. S.D.N.Y. 2010) ("a mere naked assertion that Defendants have aided and abetted breaches of fiduciary duty without any further factual enhancement" requires dismissal of claim) (applying Ohio law). The aiding and abetting claims are not colorable.

### 3. The Committee's Equitable Subordination Claims Are Not Colorable Given the Inadequate Pleading of Inequitable Conduct and the Implausibility of the Allegations

112. Equitable subordination requires a finding that (1) the claimant engaged in some inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred some sort of unfair advantage on the claimant; and (3) equitable subordination must be consistent with other provisions of the Bankruptcy Code. In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977). "Equitable subordination is an extraordinary remedy that is to be used sparingly." In re Kalisch, 413 B.R. 115, 133 (S.D.N.Y. Bankr. 2008); In re Enron, 379 B.R. 425, 434 (S.D.N.Y. 2007) (equitable subordination is a "drastic and unusual remedy").

113.     The Committee had not sufficiently pled inequitable conduct.  Where an equitable subordination claim is brought against a non-insider, as is the case here, "courts have required that a claimant's conduct be egregious and severely unfair to other creditors before its claim will be equitably subordinated."  <u>In re BHS & B Holdings LLC</u>, 420 B.R. 112, 156 (S.D.N.Y. Bankr. 2009).  "The conduct required has been described as substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation.  Few cases find that non-insider, non-fiduciary claimants meet this standard."  <u>Id</u>.  (internal citations and quotations omitted).

114.     The Complaint does not plead any inequitable conduct by the First and Second Lienholders with respect to the 2007 LBO.



115.

---



### 4.    The Preferences Claim is Not Colorable

116.    The preferences claim does little more than recite the elements of a claim for preferential transfer and make a conclusory statement that the elements are satisfied.  (Compl. ¶¶ 104-109).    A pleading that offers "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  <u>Iqbal</u>, 129 S.Ct. at 1949.  There are no specific allegations regarding any of the purportedly preferential transfers:  just a list of them, a recitation of the elements, and a conclusory statement that the transfers are voidable preferences.  These preference allegations are similar to those that the Court dismissed as inadequately plead in <u>In re Hydrogen LLC</u>, 431 B.R. 337, 355 (S.D.N.Y. 2010).  There the Court dismissed a preferential transfer claim as inadequately pled where the complaint did not describe the "type of transfer" or identify a specific antecedent debt for which the transfer was made.  <u>Id.</u>  The

---

[141]    Standing Motion, at ¶ 80.

Committee's Complaint similarly fails to meet the basic pleading standard for a colorable claim.[142]

### C. The Committee's Proposed Litigation Will Harm Rather than Benefit the Debtors' Estates

#### 1. The Committee's Complaint Presents Weak Claims With a Low Likelihood of Success and an Extremely Low Likelihood of Increasing Stakeholder Value.

117. At bottom, the <u>STN</u> analysis requires a "determination of probabilities of legal success and financial recovery in event of success." <u>STN</u>, at 905; <u>In re Smart World Techs., LLC</u>, 423 F.3d 166, 177 (2d Cir. 2005) (quoting <u>STN</u>); <u>Canadian Pacific Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)</u>, 66 F.3d 1436, 1438-39 (Cir. 6th 1995) (same). The likelihood that any of the Committee's claims succeed on the merits is minimal.

##### a. The Committee's Fraudulent Conveyance Claims Are Unlikely to Succeed.

118. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

---

[142] Moreover, since the filing of the Standing Motion and the Complaint, the Committee has confirmed that it is not challenging or objecting to the Debtors' preference analysis. The Committee has confirmed that it will not attempt to use the Debtors' decision not to present evidence on preferences against the Debtor in any way in its efforts to oppose the Debtors' confirmation of its Plan.

119. ██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████ ██████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████

██ ██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

[REDACTED]

**b.** **The Committee's Breach of Fiduciary Duty Claims and the Aiding and Abetting Claims Are Unlikely to Succeed.**

122. [REDACTED]

---

[143] See Ex. 14, LBO Projection.

[144] See Ex. 15, AlixParters Fraudulent Transfer Analysis at p. 21.

[145] See Ex. 32, Complaint at ¶ 70.



### c. The Committee's Equitable Subordination Claims Are Unlikely to Succeed.

125. The claim is weak because there is no plausible evidence justifying equitable subordination. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

126. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ The claims of other First

and Second Lienholders cannot be subordinated unless they are shown to have also engaged in

inequitable conduct. <u>In re BHS & B Holdings LLC</u>, 420 B.R. at 156 ("courts have required that

***a claimant's*** conduct be egregious and severely unfair to other creditors before its claim will be

equitably subordinated.") (emphasis added); <u>In re Enron</u>, 379 B.R. at 441 ("focus is on the

claimant personally, not the claim.") ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████

    127.    The 2008 Exchange claims also do not warrant conferring standing on the

Committee. The claims are extraordinarily weak. ██████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ ██ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[147]  Ex. 32, Complaint at ¶ 144.

[148]  Standing Motion ¶ 80.

[149]  Ex. 44, MB 9/29 presentation, NEFF0029462.



129. The fact that the Second Lienholders have not brought any challenges to the Lien speaks volumes about the likelihood of success of Committee's equitable subordination claim. If there was any chance that the equitable subordination argument would succeed, it would be reasonable to expect that the Second Lienholders would pursue it rather than supporting the Plan.

130. Finally, litigation over the Exchange has already been brought and failed based upon similar equitable arguments. In December 2008, a group of Second Lienholders brought a lawsuit in the New York Superior Court and sought to preliminarily enjoin the Exchange based on breach of fiduciary duty and breach of the Intercreditor Agreement arguments.[151] Among

---

[150] Standing Motion ¶ 80.

[151] Ex. 37, December 12, 2008 Complaint.

their arguments was that the Exchange breached various fiduciary and contractual duties to lenders that were to be primed because those lenders were "effectively subordinated" in the Exchange.[152] The Court held a hearing on December 15, 2008, the day the Exchange closed, and did not enjoin it. The Second Lienholders eventually withdrew their motion for a preliminary injunction and dismissed their case.[153]

### d. The Committee's Preference Claim Is Unlikely to Succeed.

131. First, as the Committee concedes, its preference claim is "predicated on the avoidance or subordination of the First Lien."[154] As discussed above, an attempt to void or subordinate the First Lien under the Committee's fraudulent transfer and equitable subordination theories is likely to be an expensive failure. Standing should be denied on the preferences claim as well.

132. Second, the preference claim is independently untenable. The alleged preferences are all either ordinary course payments or not on account of antecedent debt. The three largest alleged preferential transfers comprise 92.7% of the total of $3.94 million in purported preferences. The $1.6 million transfer on April 16, 2010 was not on account of an antecedent debt. That transfer to Bank of America was for DIP financing fees. The $1,219,156.20 payment on April 12, 2010 was an ordinary course quarterly interest payment on the Revolver made on the due date. The $834,365.35 transfer on March 15, 2010 was an ordinary course quarterly interest payment on the Term Loan that was also paid on the due date. The Company has investigated the other transfers alleged in the Complaint, totaling less than $300,000, and

---

[152] Id. ¶ 74.

[153] Ex. 38, January 6, 2009 withdrawal; Ex. 39, March 12, 2009 Voluntary dismissal.

[154] Standing Motion ¶ 59.

determined that none of them are preferential transfers. Most are ordinary course payments as well.

      **2.**      **The Committee's Litigation Jeopardizes the Value Added Under the Plan and Places Neff at a Serious Risk of Irreparable Harm.**

     133.    STN requires the Committee to demonstrate that the costs of its proposed litigation and the delays resulting from its proposed litigation do not outweigh the benefits of pursuing the litigation. See STN, at 905-6 (The court "should assure itself that there is a sufficient *likelihood of success* to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.") (emphasis added)

**a.** ███████████████████████████████████████████
███████████████

135. ███████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████ ███████████████████████████
███████ ██ █████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████ ██ █████████████████
█████████████████████████████████████████████

136. ███████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████



---

[155] Ex. 40, Plan Article IX.A.2.

[156] Ex. 40, Plan Articles I.A.44 and VIII.C, D.

**b.** 

137. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

138. ████████████████████████████████████████
████████████ ████ ████████████████████████████
████████████████████████████████████████████
██████████████████

██ ████████████████████████████████████
████████████████████████████████████████████
████████████████ ██████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ ██ ██
████████████████████████████████████████████

████████ Notably, the Committee's counsel has not offered to pursue these claims on contingency. The Court should consider the Committee's expectation that the estate will pay the

---

[157] Ex. 41, Miller Buckfire Fleet Liquidity Analysis.

[158] Ex. 42 Chart of fees in litigation comparable to Committee's Complaint.

Committee's fees in its analysis of the value of the Committee's claims to the Estate.  See STN, 779 F.2d at 905 ("[I]f they would seek to impose such fees on other creditors or the chapter 11 estate . . . that would obviously affect the cost-benefit analysis the court must make in determining whether to grant leave to sue.") ██████████████████████████

████████████████████████████████████████

    140. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

    141. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[159] Ex. 3_, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 122:6-18; 126:4-14 (Irion).

[160] Ex. 41, Miller Buckfire Fleet Status Analysis.

[161] Id. (noting fleet age of United Rentals' at 45 months and RSC at 42 months).

[162] Ex. 43, July 8, 2010 Irion Dep. 67:8-68:2.

[163] Id.

c.

142.

143. 

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████    ███████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████

**D.**     **The Committee is Attempting to Usurp the Debtors' Exclusive Rights to Settlement Claims Against the Estates**

146.     Without question, the actions, rights, remedies, or claims the Committee seeks to prosecute will be settled, compromised, and enjoined pursuant to the Plan.[164]  This settlement and compromise falls squarely within the Debtors' rights under section 1123(b)(3) of the Bankruptcy Code, Bankruptcy Rule 9019, and the Debtors' position as their estates' lone fiduciary. See In re Best Prods Co., 168 B.R. 35, 71 (Bankr. S.D.N.Y. 1994) (approving settlement and compromise of LBO-related claims through plan confirmation); see also In re Adelphia Commc'ns Corp., 544 F.3d 420, 424 (2d Cir. 2008) (Sotomayor, J.) ("It remains the debtor's duty to wisely manage the estate's legal claims, and this duty is implicit in the debtor's

---

[164]    For example, Article IV.E provides:  "Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan."

role as the estate's only fiduciary." (internal quotation marks omitted, emphasis added)).   As such, the Committee will have no authority to proceed with its putative Complaint if the Plan is confirmed, and the Standing Motion will be moot.  See In re Adelphia Commc'ns Corp., 368 B.R. 140, 232–35 (Bankr. S.D.N.Y. 2007) (holding that plan-based settlement terminated committee standing), aff'd 544 F.3d 420 (2d Cir. 2008) (Sotomayor, J.).

147.    In this respect, the Committee forgets that the Debtors retain exclusive authority to file a Plan pursuant to section 1121 of the Bankruptcy Code.  Like Bankruptcy Rule 9019, the Debtors' statutory exclusivity recognizes that the Debtors are best-situated to foster consensus and maximize value for their estates as a whole:   "Exclusivity is intended to promote the environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated."  In re Lehigh Valley Prof'l Sports Club, Inc., No. 00-11296, 2000 WL 290187, at *3 (Bankr. E.D. Pa. March 14, 2000); see also In re Texaco Inc., 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) ("[A] a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests.").  Cf. 11 U.S.C. §§ 1107(a), 1108 (vesting the debtor in possession with authority to operate the debtor's business).  Thus, exclusivity should be terminated only in the presence of exceptional facts, such as gross mismanagement.  See, e.g., In re Situation Mgmt. Sys., Inc., 252 B.R. 859, 863 (Bankr. D. Mass. 2000).  Cf. 11 U.S.C. § 1104(a)(1) (setting forth conditions under which a trustee may be appointed).  No such facts are present here.[165]

---

[165] The Committee previously sought to terminate the Debtors' statutory exclusivity, wrongly arguing that the Debtors' lacked a "fiduciary out" to consider alternative transaction structures.  (See Ex. 35, Disclosure Statement Objection ¶ 28 & n.4.)  The Court rejected this argument, recognizing that the Debtors' plan support agreements include a clear fiduciary out provision and that the Debtors "will remain receptive to any and all attractive bids should they arise unexpectedly."  Ex. 3, In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 12, 2010) Hr'g Tr. 162:1–2.

148.     Every factor discussed above indicates that Debtors were wise to settle claims in the Plan rather than pursuing litigation.  Courts have recognized the wisdom of settlement of claims such as these:

> The alternative to settling with the Lenders—pursuing the challenge to the Lenders' liens—presented too much risk for the Estate, including the administrative creditors. If the Estate lost against the Lenders (after years of litigation and paying legal fees), the Estate would be devastated, all its cash and remaining assets liquidated, and the Lenders would still possess a lien . . . .

149.     <u>In re Iridium Operating LLC</u>, 478 F.3d 452, 465–66 (2d Cir. 2007); <u>Best Prods.</u>, 168 B.R. at 60 (approving compromise of LBO-claims through plan where "there can be little doubt that the action would have taken a period of years to try to its conclusion").  The Court should deny the Standing Motion and reject the Committee's attempt to interfere with Debtors' considered and reasonable exercise of discretion to settle claims.

## V.     <u>CONCLUSION</u>

150.     The Committee's Standing Motion should be denied.  The Debtors were fully justified in deciding to pursue their prearranged restructuring rather than pursue a speculative, protracted litigation arising from the 2007 LBO and 2008 Exchange that would irreparably injure its prospects for reorganization.  The Debtors' decision has been vindicated:  (1) by engaging with the participants in its capital structure, the Debtors have maximized enterprise value and increased creditor recoveries by over $100 million; and (2) as the Committee's Proposed Complaint now demonstrates, the claims arising out of the LBO and Exchange are not colorable and are unlikely to survive motions to dismiss.   Even if the claims were colorable, they present such a minimal likelihood of success that they do not justify the overwhelming costs that the litigation would impose on the Debtors.  ██████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

151.    For all of the above referenced reasons, the Debtors respectfully request that the

Court deny the Committee's Standing Motion.

New York, New York                          /s/ *Mark E. McKane*
Dated:  September 4, 2010                    James H.M. Sprayregen, P.C.
                                             Ray C. Schrock (admitted *pro hac vice*)
                                             Brian S. Lennon
                                             KIRKLAND & ELLIS LLP
                                             601 Lexington Avenue
                                             New York, New York  10022-4611
                                             Telephone:  (212) 446-4800
                                             Facsimile:  (212) 446-4900

                                             - and -

                                             Anup Sathy, P.C. (admitted *pro hac vice*)
                                             KIRKLAND & ELLIS LLP
                                             300 North LaSalle
                                             Chicago, Illinois  60654
                                             Telephone:  (312) 862-2000
                                             Facsimile:  (312) 862-2200

                                             - and -

                                             Mark E. McKane (admitted *pro hac vice*)
                                             KIRKLAND & ELLIS LLP
                                             555 California Street
                                             San Francisco, California 94104
                                             Telephone:  (415) 439-1400
                                             Facsimile:  (415) 439-1500

                                             Counsel to the Debtors and Debtors in Possession