STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Kenneth Pasquale
Jayme T. Goldstein
Marianne S. Mortimer
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for Wayzata Investment Partners and*
*Apollo Capital Management*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
In re:                                                        )        Chapter 11
                                                                )
NEFF CORP., <u>et al.</u>,[1]                     )        Case No. 10-12610 (SCC)
                                                                )
                                      Debtors.         )        Jointly Administered
———————————————————————— )

**OBJECTION OF WAYZATA INVESTMENT PARTNERS AND**
**APOLLO CAPITAL MANAGEMENT TO THE MOTION OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY**
**OF AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE**
**<u>CERTAIN CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES</u>**

Wayzata Investment Partners ("<u>Wayzata</u>" or the "<u>Purchaser</u>") and Apollo Capital

Management ("<u>Apollo</u>", together with Wayzata, the "<u>First Lien Term Lenders</u>"), as holders of

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.  The Debtors are operating as debtors-in-possession pursuant to sections 1107(a) and 1008 the Bankruptcy Code.

first lien term loans (the "First Lien Term Loans")[2] under that certain Credit Agreement (as amended, modified or otherwise supplemented from time to time), dated as of May 31, 2007 and amended and restated as of December 16, 2008, by and among Neff Corp. ("Neff"), Neff Holdings Corp., certain of its subsidiaries, Bank of America, N.A. ("BofA"), as administrative agent, and the other parties signatory thereto, by and through their undersigned counsel, hereby respectfully submit this objection (the "Objection") to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates [Docket No. 345] (the "Standing Motion"), and in support hereof, respectfully state as follows.

## PRELIMINARY STATEMENT

1.    The Plan[3] that the Debtors would like this Court to approve is an unqualified success and the result of almost ten months of exceptionally hard work by the Debtors, the holders of the First Lien Loans (as defined herein) and the holders of the Second Lien Term Loans (as defined herein) to create new value for the Debtors' estates and maximize creditor recoveries, including: (i) approximately six months of often contentious prepetition negotiations between the Debtors and the stalking horse First Lien Term Lenders – negotiations which culminated in a *de facto* auction between the First Lien Term Lenders and an alternative third-party investor (the "Alternative Bidder"); (ii) an approximately four-month robust marketing process by the Debtors and Miller Buckfire, the Debtors' investment banker, who actively marketed the Debtors' businesses to a large number of interested parties in an attempt to locate the requisite funding for the Debtors' reorganization efforts; and (iii) a two-day auction

---

[2]    The First Lien Term Lenders hold, in the aggregate, approximately 67% of the outstanding principal amount of the First Lien Term Loans.

[3]    Reference is hereby made to the Debtors' *Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 346] (hereinafter, the "Plan"), filed on August 19, 2010.

involving the First Lien Term Lenders and a group that consisted of certain holders of the Second Lien Term Loans and an affiliate of Odyssey Investment Partners, LLC (the "Odyssey Group"), which increased the recovery to the significantly undersecured holders of the Second Lien Term Loans by $63 million.

2.  Taken together, these efforts represent a remarkable achievement, as they culminated in Wayzata (the putative purchaser of the Debtors' businesses) agreeing to fund up to approximately $100 million in additional distributions for creditors in these cases (including a grand total of $73 million to the holders of the Second Lien Term Loans).  Irrespective of this tremendous influx of value that resulted from the Debtors' prepetition and postpetition reorganization efforts, general unsecured creditors holding claims totaling approximately $40 million (including the holders of the Senior Notes (as defined herein)) remain out of the money by approximately $215 million – a point that the Committee (as defined herein), who is not lodging a valuation fight in connection with confirmation, does not seek to dispute.

3.  It is against this backdrop that, with an unyielding sense of entitlement and an insatiable motivation to obtain even a modicum of leverage in these Chapter 11 Cases (as defined herein) at any cost, the Committee nevertheless seeks standing from this Court to prosecute a fraudulent transfer and preference complaint (the "Proposed Complaint") against a host of the Debtors' key creditors that is rife with naked assertions and specious claims devoid of any merit.  Rather than provide any benefit to the Debtors' estates, the causes of action that the Committee seeks to pursue serve solely as the Committee's latest "scorched earth" litigation ploy to extract greater distributions for its woefully out-of-the-money constituents.

4.  As the Debtors set forth in the *Amended Disclosure Statement for the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 266] (the

"Disclosure Statement") and their objection to the Standing Motion [Docket No. 394] (the "Debtors' Objection"), the Debtors continue to operate in an inordinately challenging business environment and still-recovering global economy. As a result, they face the very serious risk that their businesses and ability to compete in the market will be irreparably harmed if the Standing Motion is granted, as they will experience: (i) a significant decline in liquidity due to increased administrative and professional costs resulting from litigation of the Proposed Complaint and a prolonged stay in chapter 11; (ii) a resulting inability to make essential capital expenditures for necessities such as their equipment rental fleet – the heart of their business; and (iii) a particularly damaging loss of customers, vendors and employees. See e.g., Disclosure Statement at Art. XII.C.1 (Bankruptcy Related Risk Factors); C.2 (General Business and Financial Risk Factors); Debtors' Objection at ¶¶ 10, 137-45.

5.     The Debtors commenced these Chapter 11 Cases with the goal of¸ inter alia, deleveraging as expeditiously as possible to prevent an inordinate professional fee burden and the potential destruction of their businesses due to having to fend off increased competition while at the same time being hamstrung by the bankruptcy process – not to make an end run around fraudulent transfer and preference claims through a bankruptcy discharge. To date, the Debtors' prepetition and postpetition reorganization efforts have undoubtedly accomplished their goal of moving quickly to restructure and the Debtors are ready, willing and able to immediately place their chapter 11 experience in the rear view mirror. The Debtors' impediment to doing this, however, is the Proposed Complaint.

6.     With no downside to waging war, the Committee (representing a constituency that makes up only approximately 6% of the Debtors' existing debt) is free to take the proverbial shot at derailing the Debtors' pre-negotiated reorganization in an attempt to extract additional

recoveries for general unsecured creditors in the form of nuisance value. Wayzata (both in its capacity as a First Lien Term Lender and as the plan sponsor and Purchaser) and Apollo, parties with a tremendous financial stake in the Debtors' reorganization, are therefore among those with the most to lose should the Court permit the Committee to litigate the Proposed Complaint. Wayzata, in particular, has agreed to backstop a rights offering under the Plan for approximately $182 million in connection with its proposed acquisition of the Debtors. That investment, however, would be **eliminated** should the Committee be granted the unfettered ability it is seeking to extend out the timeline of these cases for an indeterminate period – Wayzata would undoubtedly terminate its existing obligations under both the PSA (as defined herein) and the Backstop Agreement (as defined herein). This end result would be true for any party seeking to acquire the Debtors, as the erosion of the intrinsic value of the Debtors' businesses is guaranteed in a prolonged litigation.

7.       The Standing Motion simply represents just another example in a long line of unsecured creditors' committees looking to extract hold-up value from a debtor and its largest creditor constituencies by acting as the "tail" attempting to "wag the dog." All of the Debtors' key creditors (including the holders of the First Lien Loans and Second Lien Term Loans) voted overwhelmingly in favor of the Plan and did not lodge confirmation objections. Indeed, the Debtors' senior creditors are extremely supportive of the Debtors' reorganization process to date and the Plan that has resulted from the efforts of the Debtors and their professionals. Although the holders of the Senior Notes who comprise the Committee are desirous of a higher recovery than the $365,000 they may be entitled to share with other general unsecured creditors (an amount, it should be noted, that is also significantly less than the Committee's professionals have billed for their work in this case to date), such holders represent the only constituency in these

cases that is displeased with its recovery. The problem for these Committee-dominating holders of the Senior Notes, however, is that they are not entitled to **any** recovery in these cases by virtue of the operation of the Bankruptcy Code's absolute priority rule.

8. Stripped of its hollow rhetoric, the Standing Motion fails to establish a basis for this Court to grant the Committee standing to pursue its proposed causes of action. It is difficult to decide which aspect of the Standing Motion and Proposed Complaint is more astounding – how the documents burst at the seams with erroneous assumptions, misleading inferences and unsubstantiated claims or how they are practically devoid of actual facts (even after the Committee concluded its time consuming and prohibitively expensive discovery in connection with its purported causes of action). As set forth in this Objection, a party in interest cannot establish a need for derivative standing simply by asserting that its causes of action are colorable and that a debtor has, as of the date of the motion, failed to bring them. Rather, such a party must demonstrate, among other things, that (a) a debtor's failure or refusal to bring such causes of action was unjustifiable and (b) such causes of action are not only colorable but also necessary and beneficial to the Debtors' estates (and not merely to the party in interest or its constituents). See In re STN Enter., 779 F.2d 901, 904 (2d Cir. 1985). At this critical juncture in the Debtors' reorganization cases – on the eve of confirmation of a pre-negotiated and confirmable plan that provides for outstanding value recovery by an overwhelming majority of estate creditors – this showing simply cannot be made. Litigating the Proposed Complaint would be a colossal waste of the Debtors' precious time and resources, serving only to delay and distract the Debtors at a time when they can least afford it. The Debtors and their employees need to spend their undivided attention on continuing to rehabilitate and advance their company, not wasting countless hours backpedaling in an attempt to defend themselves against frivolous and harassing

litigation (or worse yet, watching their company fall apart around them while a small out-of-the-money constituency plays "hold-up value" games).

9. At bottom, the Bankruptcy Court must recognize the Standing Motion for what it is – a thinly veiled attempt by the Committee to hijack the Chapter 11 Cases in order to obtain a greater settlement payment for its minority constituency. The Committee remains unabashed and unrelenting in its quest to exert as much pain as it can on the Debtors and their key creditors at a time when the Debtors are merely weeks away from crossing the chapter 11 finish line. These "guerilla warfare" tactics are not representative of why chapter 11 exists and should not lead to an increased recovery for general unsecured creditors or, more importantly, be tolerated by this Court. For these reasons, and the reasons stated below and in the Debtors' Objection, the Committee's Standing Motion should be denied.

## BACKGROUND

### A. The Debtors' Prepetition Marketing Process.

10. Beginning in December 2009, the Debtors and Miller Buckfire conducted an extensive marketing process whereby they vigorously marketed the Debtors' businesses in an attempt to fund the Debtors' reorganization and maximize creditor recoveries. See Disclosure Statement at Art. VII.B.2; Debtors' Objection at ¶ 51. In addition to contacting a plethora of potential strategic and financial buyers, the Debtors commenced discussions regarding prospective plan and acquisition structures with the First Lien Term Lenders and certain of the Second Lien Term Loan lenders. The First Lien Term Lenders chose to engage in approximately six months of arduous, arm's length negotiations on a potential plan structure with the Debtors (leading up to the commencement of the Debtors' chapter 11 cases (the

"Chapter 11 Cases") on May 16, 2010 (the "Petition Date")), while the Debtors continued to steadfastly market their assets and an investment opportunity in the Debtors.

11.    As negotiations between the Debtors and the First Lien Term Lenders progressed into the Spring of 2010, the Debtors repeatedly informed the First Lien Term Lenders – often to the great frustration of the First Lien Term Lenders – that that the Debtors could not make a determination as to the identity of their ultimate plan sponsor until they were able to fully complete their  marketing process.  Nevertheless, the Debtors and the First Lien Term Lenders continued to move forward in developing a plan of reorganization that would provide the highest possible recovery to the greatest number of the Debtors' creditors.  As part of these discussions, the Debtors and the First Lien Term Lenders agreed that it would be appropriate for the First Lien Term Lenders to provide general unsecured creditors (including holders of the Senior Notes) with a $365,000 "gift" (the "GUC Gift") in order to incentivize those creditors to support the Debtors' reorganization efforts.  This decision to provide general unsecured creditors with any plan recovery at all was made notwithstanding the fact that such a distribution was not supported by either the Debtors' enterprise valuation or the Bankruptcy Code's absolute priority rule.  See Debtors' Objection at ¶ 51.

**B.    The PrePetition _De Facto_ Auction.**

12.    In March 2010, after negotiations between the First Lien Term Lenders and the Debtors appeared to have finally and successfully concluded, the Debtors informed the First Lien Term Lenders about the existence of an alternative plan proposal the Debtors had received from the Alternative Bidder.  An additional month of negotiations subsequently ensued as the Debtors conducted a _de facto_ auction between the First Lien Term Lenders and the Alternative Bidder (the "Prepetition Auction").  See Disclosure Statement at Art. VII.B.2.

13.     Although in the end the Debtors selected the First Lien Term Lenders to be their plan sponsors and stalking horse, the Prepetition Auction ultimately required the First Lien Term Lenders to increase the value that they were providing pursuant to their bid (the "Stalking Horse Bid") by over $30 million – value that flowed directly to the Second Lien Term Loans and the non-Apollo and non-Wayzata holders of the First Lien Term Loans and enhanced those creditors' recoveries in the Chapter 11 Cases.  Notably, however, all parties involved in the Prepetition Auction (including the Alternative Bidder), were similarly cognizant of the fact that the GUC Gift was an extraordinary and wholly unnecessary measure given that the Debtors' general unsecured creditors were not entitled to any recovery.  Accordingly, none of the additional value that the Debtors created as a byproduct of the Prepetition Auction manifested itself as an increase of the GUC Gift.

14.     Following the Prepetition Auction, the Debtors and the First Lien Term Lenders finalized a plan of reorganization and tentative timeline for the Debtors' Chapter 11 Cases whereby the Debtors could significantly and swiftly delever – all in an effort to position the Debtors' companies as nimble competitors in a increasingly challenging market.  In order to continue to try to maximize value for their creditors, the Debtors were careful to negotiate a plan structure that featured a transparent public auction process (hereinafter the "Payout Event Procedures").  See Id.  At the end of the day, the Debtors' strategy was a triumph, as the Payout Event Procedures and the existence of the Stalking Horse Bid created a forum for potential topping bids by alternative plan sponsors whereby millions of dollars of additional value would be provided to the Debtors' key constituents.

C.      **The Plan Support Agreement and Backstop Commitment.**

15.     On or about April 12, 2010,  the prepetition negotiations between the Debtors and the First Lien Term Lenders culminated in the execution of: (i) a commitment letter (the "Commitment Letter"), wherein the First Lien Term Lenders agreed, *inter alia*, to a nine-month commitment to backstop a rights offering in support of the Debtors' Plan in an amount up to $118.9 million (the "Backstop Commitment"); and (ii) a plan support agreement (the "PSA"), whereby the First Lien Term Lenders agreed to, *inter alia*, support a "Qualified Plan" (as such term is defined in the PSA).   In exchange for the First Lien Term Lenders' support of their restructuring, the Debtors agreed to, *inter alia*, meet certain milestones (the "Milestones") in the Chapter 11 Cases, including obtaining an order confirming a Qualified Plan on or before January 26, 2010 (or 255 calendar days from the Petition Date) and consummating a Qualified Plan on or before February 10, 2010 (or 270 calendar days from the Petition Date).  See PSA at § 4(a)(iii).  Failure to meet the Milestones triggers a termination event under the PSA.  See PSA at § 5(a)(i).[4]

---

[4]      On or about August 2, 2010, the Debtors and the First Lien Term Lenders entered into Amendment No. 1 to the PSA (the "PSA Amendment"), which provides for a change in certain of the distribution elections the First Lien Term Lenders are entitled to make under the Plan.  Pursuant to the PSA Amendment, the First Lien Term Lenders also agreed that the Plan is a Qualified Plan.  The PSA Amendment did not alter any of the Milestones.

16. The obligations of the First Lien Term Lenders set forth in Backstop Commitment and the PSA dovetailed extremely well with the Payout Event Procedures. Not only did these commitments provide the Debtors with a baseline platform by which to solicit higher and better bids for the Debtors' businesses and thereby increase the Debtors' enterprise value, they (a) assured vendors, customers and employees that the Chapter 11 Cases would be a conduit to a deleveraged and well capitalized reorganized entity and (b) helped keep the Debtors' reorganization efforts on a fast yet efficient track.

17. Following the Petition Date, on or about July 22, 2010, the Debtors and the First Lien Term Lenders entered into the Backstop Unit Purchase Agreement (the "Backstop Agreement"), further documenting the Backstop Commitment agreed to in the Commitment Letter. Pursuant to the Backstop Agreement, the Backstop Commitment will expire on the earlier of January 7, 2011 or the termination of the PSA (the "Backstop Commitment Termination Date"). See Backstop Agreement at § 7(a)(i). The Backstop Commitment Termination Date and the termination triggers under the Backstop Agreement were very heavily negotiated between the Debtors and the First Lien Term Lenders. Accordingly, and as the Debtors are aware, in the event that the Backstop Commitment Termination Date occurs or the Backstop Agreement otherwise terminates in accordance with its terms before such date, Wayzata[5] is entitled to terminate its commitment to backstop the Debtors' rights offering – potentially leaving the Debtors without a replacement for a primary source of funding for their reorganization efforts (funding, it should also be noted, that was requested by the Debtors' exit lenders as a closing condition for the Debtors' exit facility).

---

[5] Apollo assigned to Wayzata its rights and obligations as a "Backstop Party" on or about August 9, 2010, subsequent to the commencement of the Auction (as defined herein). Wayzata is currently the sole "Backstop Party" under the Backstop Agreement.

D.    **The Committee.**

18.    On May 28, 2010, the United States Trustee formed the Official Committee of Unsecured Creditors (the "Committee"), whose members currently consist of the following: (i) Footprints Asset Management; (ii) Shirley L. Wong; (iii) Richard D. Almandi; (iv) Allen Daniel Barnett; (v) Law Debenture Trust Company of New York ("Law Debenture Trust"); (vi) Dan Camphausen; and (vii) Alan P. Nieman.  Upon information and belief, Law Debenture Trust is the indenture trustee under the Debtors' indenture, dated May 31, 2007, pursuant to which Neff originally issued $230 million (and of which approximately $34 million is outstanding) of unsecured 10% senior notes due June 1, 2015 (the "Senior Notes").  A majority of the Committee's members are themselves holders of the Senior Notes.  See Debtors' Objection at ¶ 59.  Thus, for all intents and purposes, the Committee appears to be controlled by holders of the Senior Notes rather than the Debtors' general unsecured trade creditors – a safe conclusion given that preliminary Plan voting results suggest that the class made up of holders of Senior Notes voted against the Plan while the class containing the Debtors' remaining general unsecured creditors voted in support of confirmation.  See *Certification of James Sean McGuire with Respect to the Tabulation of Votes on the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 391].

19.    While their control over the Committee provides holders of the Senior Notes with a free avenue to repeatedly voice their displeasure regarding the Plan to this Court, the major problem for these holders is that they represent only approximately $34 million of the Debtors' outstanding unsecured debt – debt which sits at the bottom of the Debtors' approximately $600 million capital structure.  As a result, even with the enhanced value that was created by virtue of the Auction (as defined below), the Senior Notes remain out-of-the-money by approximately

$215 million.  See Debtors' Objection at ¶ 59.  Moreover, unlike trade creditors that are likely to continue to do business with the Debtors long after this restructuring has been consummated, the Senior Notes will be extinguished and the holders of those notes will not own any debt of, or equity in, the reorganized company.  Therefore, this very narrow constituency of noteholders is certainly much more interested in obtaining as large a payout as possible than it is in seeing the Debtors prevail in their restructuring efforts.  To that end, the Committee's gameplan since the Petition Date (despite its fiduciary duty to represent *all* general unsecured creditors) has ostensibly been to wage costly and protracted litigation battles with the Debtors and their key creditors at every turn solely in order to create maximum hold-up value for the holders of the Senior Notes.  Indeed, to date, the Committee's professionals have incurred fees that are many multiples of the amount of the GUC Gift.

E.     **The Auction.**

20.     On July 26, 2010, in accordance with the amended Payout Event Procedures attached as Exhibit M to the *Order Approving the Debtors' Amended Disclosure Statement and Granting Related Relief* [Docket No. 267], the Odyssey Group timely submitted a "qualified" competing bid to the Stalking Horse Bid – the existence of which triggered the need for an auction under the Plan between the Odyssey Group and the First Lien Term Lenders.  The auction was a two-day event that transpired on August 5, 2010 and August 10, 2010 (collectively, the "Auction").

21.     During the pendency of the Auction, the Debtors worked professionally, expeditiously and diligently in an attempt to encourage continued incremental bidding by both bidders in a fair and transparent manner – all the while continually maximizing value for the Debtors' estates.  Each bid at the Auction provided increased value for the holders of the Second

Lien Term Loans (the Debtors' most senior creditor class not being paid in full under the Plan). Significantly, the competing bidders were yet again in agreement that the Debtors' enterprise value ran out before it came close to reaching the Debtors' completely underwater general unsecured creditor classes.

22.     By the time that the Auction eventually concluded on the afternoon of August 10th, Apollo had decided to withdraw from the bidding process and Wayzata emerged as the winning bidder vis-à-vis the Odyssey Group.  As part of its successful bid, Wayzata increased cash recoveries to holders of Second Lien Term Loans by $63 million and agreed to increase the aggregate amount of the Backstop Commitment to up to $181.6 million (representing approximately $100 million of additional value provided by Wayzata as compared to the initial prepetition restructuring proposal that the First Lien Term Lenders made to the Debtors).[6]  The overall value that Wayzata's winning bid provides to the Debtors' estates represents an excellent accomplishment by the Debtors and their professionals and goes a long way towards ensuring a successful reorganization of the Debtors' businesses.

**F.     The Standing Motion.**

23.     On August 18, 2010, the Committee filed the Standing Motion in an attempt to prosecute the Proposed Complaint, which concerns multiple causes of action (the "Causes of Action") related to a 2007 leveraged buyout transaction involving the Debtors (the "2007 LBO").[7]  See Proposed Complaint at ¶¶ 91-150.  While they are quite long on reckless

---

[6]     The increase in the Backstop Commitment was memorialized in an amendment to the Backstop Agreement that was entered into between the Debtors and Wayzata on or about September 2, 2010 (the "Backstop Amendment").  The Backstop Amendment did not amend the Commitment Termination Date.

[7]     The Causes of Action include, for example, causes of action: (i) pursuant to sections 544(b) and 550 of the Bankruptcy Code and applicable state law against BofA and Wilmington Trust FSB ("Wilmington Trust") to avoid the liens on the Debtors' first lien asset-based revolving loan (the "ABL") and First Lien Term Loans (collectively with the ABL, the "First Lien Loans"), and second lien term loans (the "Second Lien Term Loans") in connection with the 2007 LBO financing; and (ii) pursuant to section 510(c) of the

14

assumptions and unsupported claims that allegedly transpired with respect to the 2007 LBO and 2008 Exchange, the Standing Motion and the Proposed Complaint are shockingly short on factual support. This is highly surprising given the Committee's extensive investigation and discovery efforts to date (all of which have caused the Debtors to incur costs in the millions of dollars – money which surely could have been more wisely spent by the Debtors on additional distributions to the holders of the Second Lien Term Loans or much needed capital expenditures after their exit from chapter 11).

24.     Simply put, the Standing Motion, coupled with the Committee's objection to confirmation of the Plan, represents the Committee's "last-ditch" effort to obtain an even bigger bite of the apple for its wholly out-of-the-money minority constituency then the overly-generous GUC Gift that such creditors are already eligible to receive. It is indisputable that given its unwavering and unsympathetic desire to make the Debtors and their senior creditors the victims of its "no holds barred" tactics in these Chapter 11 Cases to date, the Committee has completely eroded any credibility and goodwill that it may have possessed with the Debtors' other creditor constituencies. This latest "litigate-to-gain-leverage" maneuver is not going to change that fact, and represents the antithesis of the consensus building that most would agree forms the foundation of the chapter 11 process.

**G.     The Debtors' Objection.**

25.     On September 4, 2010, the Debtors filed the Debtors' Objection, a highly comprehensive objection to the Standing Motion which overwhelmingly demonstrates, on a

---

Bankruptcy Code for equitable subordination of any claims asserted by BofA against the Debtors in its capacity as administrative agent and collateral agent for the holders of the First Lien Loans (the "First Lien Claims") and any claims asserted by Wilmington Trust against the Debtors in its capacity as administrative and collateral agent for the Second Lien Term Loans (the "Second Lien Claims", collectively with the First Lien Claims, the "Claims") in relation to the 2007 LBO and the November 2008 exchange of a portion of the Debtors' Senior Notes into the First Lien Term Loans (the "2008 Exchange").

point-by-point factual basis, that: (i) the Causes of Action are baseless and litigation of the Proposed Complaint would be both an enormous waste of estate resources and a harmful distraction for the Debtors at this critical point in their Chapter 11 Cases; and (ii) approval of the Standing Motion would be extremely detrimental to the Debtors given the likelihood that it would severely restrict their liquidity on a going forward basis and, as a result, likely eliminate their ability to successfully restructure their businesses.

26.     The First Lien Term Lenders hereby join in, adopt, incorporate and fully support the Debtors' Objection and the relief being sought therein.

## OBJECTION

**H.     The Committee's Causes of Action Fail as a Matter of Law.**

27.     In order to succeed on a motion for derivative standing, a creditors' committee must first make a showing that (1) it has a colorable claim for relief that would support a recovery, (2) the debtor or debtor-in-possession has "unjustifiably failed to bring suit or abused its discretion in not suing" and (3) an action asserting the committee's claims "is likely to benefit the reorganization estate."  In re STN Enter., 779 F.2d at 904-05; see also In re Adelphia Commc'ns Corp., 544 F.3d 420, 423-24 (2d Cir. 2008) (same); In re AppliedTheory Corp., 493 F.3d 82, 85-86 (2d Cir. 2007);[8] Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 580 (3d Cir. 2003) (holding that a bankruptcy court can authorize committees to sue derivatively for the "benefit of the estate").  Under this standard, such

---

[8]     The Second Circuit has also found that a committee may obtain derivative standing if "(1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings," In re Commodore Int'l Ltd., 262 F.3d 96, 100 (2d Cir. 2001), or "the committee acts as co-plaintiff with the debtor-in-possession or trustee," In re Adelphia Commc'ns Corp., 544 F. 3d 420, 424 (2d Cir. 2008) (citing In re Housecraft Indus. USA, Inc., 310 F.3d 64, 70-72 (2d Cir. 2002)).  While neither test is applicable in the instant case, it is notable that notwithstanding a debtor's consent for a committee to bring a particular cause of action, both "necessity" and "benefit to the estate" should remain requisite factors in the Court's standing analysis.

committee must at least provide the court with "a predicate for concluding that the claims [the committee is asserting] will, if proven, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling." In re Adelphia Commc'ns Corp., 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005); see also In re STN Enter., 779 F.2d at 905-06 (committee must at least show that "there is a sufficient likelihood of success" to justify the expected delay and cost of the pursuit of such litigation); In re Smart World Tech., LLC, 423 F.3d 166, 177 (2d Cir. 2005) (same) (citation omitted). Although the standard of review for such claims is much like that of a motion to dismiss for failure to state a claim, such does not give a committee license to assert "'sweeping unwarranted averments of fact.'" In re KDI Holdings, Inc., 277 B.R. 493, 502 (Bankr. S.D.N.Y. 1999) (citation omitted); see also In re Adelphia Commc'ns Corp., 330 B.R. at 376 (citations omitted). Accordingly, allegations asserted as part of a committee's request to seek standing must be more than conclusory. In re KDI Holdings, Inc., 277 B.R. at 502.

### i. The Causes of Action Are Facially Void.

28. As set forth in the Debtors' Objection, even viewed through the deferential prism of a motion to dismiss standard, the Causes of Action that the Committee seeks to pursue in the Proposed Complaint have no merit on their face.[9] See Debtors' Objection at ¶¶ 5, 75-116. This is primarily due to the Committee's threshold premise that all leveraged buyout transactions must inherently be fraudulent transfers by their very nature. See Standing Motion at ¶ 47.

---

[9]     It is noteworthy, albeit unsurprising, that the Standing Motion and Proposed Complaint are devoid of any attack on the 2008 Exchange, as the Committee cannot seek to unwind the 2008 Exchange as a matter of fact or law. It is a well-heeled rule in this District that "the granting of a security interest in respect of antecedent debt constitutes reasonably equivalent value or fair consideration" and cannot be considered a fraudulent conveyance pursuant to the Bankruptcy Code or applicable state law. In re AppliedTheory Corp., 330 B.R. 362, 363 (Bankr. S.D.N.Y. 2005) (upholding the *per se* rule that the grant of a security interest in exchange for an antecedent debt is reasonably equivalent value and such transaction "must not be considered a fraudulent conveyance"); see also In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 732 (Bankr. S.D.N.Y. 2008) (holding that "[a] valid antecedent debt provides adequate consideration to support the grant of a security interest").

Clearly this hypothesis is flawed. It is a well-established principle that transactions which are highly leveraged may still be "above board" – and the test to determine whether a transaction is a fraudulent conveyance is a highly factual one. See Mellon Bank, N.A. v. Metro Commc'ns, Inc. et al., 945 F.2d 635, 650 (3rd Cir. 1991) (dismissing a lower court's "surprisingly cavalier" decision "in fashioning what amounts to a *per se* rule that LBO loans collateralized with the target's assets are fraudulent"); Moody v. Sec. Pac. Bus. Credit, Inc., 127 B.R. 958, 998-999 (Bankr. W.D. Pa. 1991) (finding that a leveraged buyout did not equate to a fraudulent conveyance under state law or the Bankruptcy Code). In the present case, as the Debtors have demonstrated in their objection, the Debtors were solvent both before *and after* the 2007 LBO. See Debtors' Objection at ¶¶ 32-36. This fact destroys the credibility of the Causes of Action and renders them non-meritorious.

29.     Given the Committee's glaring inability to substantiate its allegedly valid Causes of Action via supportive fact **or** law, the Committee's Standing Motion and Proposed Complaint must be seen for what they are – a desperate attempt by an out-of-the-money constituency to wreak havoc in these Chapter 11 Cases (regardless of the consequences), on the off chance that its actions will result in an increase to the GUC Gift. The war that the Committee has waged on the Debtors and its key constituents, however, is not merely a "nuisance". It is a cavalier and wasteful "roll of the dice" by parties seeking to play high-stakes poker with house money because they have nothing to lose. Indeed, given that litigation concerning the Standing Motion and Proposed Complaint has already apparently cost the Debtors' estates over a million dollars, one can only speculate just how many millions of dollars it would cost the Debtors should the Committee actually be permitted to prosecute its Causes of Action. It matters little to the Committee if its actions bleed significant sums of money from the Debtors' estates in an attempt

18

to "win the lottery", however, as it is relying on Wayzata (as the Purchaser) to be there in order to pick up the tab. The Committee must not be permitted to play fast and loose with the pockets of the Debtors, its senior creditors and its plan sponsor and this Court should put an end to the Committee's imprudent actions in these Chapter 11 Cases once and for all.

**ii. The Committee's Equitable Subordination Causes of Action Cannot Stand As Against The First Lien Term Lenders' Claims.**

30. To the extent that the Committee insinuates, by seeking to equitably subordinate and discharge the Claims of BofA and Wilmington Trust, that the First Lien Term Lenders' claims can also be equitably subordinated and/or discharged, the Committee's arguments will fail as a matter of law. Equitable subordination of a claim is appropriate only when a plaintiff can prove (1) a claimant "must have engaged in some type of inequitable conduct", (2) such "misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant" and (3) "[e]quitable subordination" of the claim is not "inconsistent with the provisions of the Bankruptcy Act." In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977); see also In re KDI Holdings, Inc., 277 B.R. at 508-09 (same). Here, the Committee alleges no inequitable conduct on the part of the First Lien Term Lenders. Rather, all of the cursory assertions that the Committee makes regarding any such inequitable conduct are related to the conduct of BofA on its own behalf and are therefore outside the scope of BofA's role as agent for the First Lien Term Lenders. See e.g., Standing Motion at ¶¶ 15, 26, 35, 59, 80-81. Under these circumstances, to impute any inequitable conduct to the First Lien Term Lenders where such conduct is alleged to have occurred by BofA on its own behalf would be grossly unfair.

31. Nor can the Committee assert that BofA, through its position as administrative agent, was acting in an agency capacity on behalf of the First Lien Term Lenders such that

equitable subordination of the First Lien Term Lenders' claims through any alleged inequitable conduct by BofA would be warranted. "[M]erely having been given a title does not establish an agreement by one to be subject to another's control. The titles themselves do not set forth legal relationships." In re Sunbeam Corp., 284 B.R. 355, 374-75 (Bankr. S.D.N.Y. 2002) (refusing to impute "alleged inequitable conduct" of a syndication agent to a lender as such conduct was outside the scope of the syndication agent's role and as the syndication agent title, by itself, did not establish an agency relationship with the lender). Even assuming BofA did somehow engage in inequitable conduct in relation to the 2007 LBO and/or the 2008 Exchange, BofA would have done so on its own behalf and not by virtue of its role as agent to the First Lien Term Lenders. As such, the Committee's equitable subordination claims, to the extent they attempt to reach the claims of the First Lien Term Lenders, reflect no basis in fact or law.

32.     Rather than evince any factual or legal basis on which the Committee can rely, the Committee's proposed equitable subordination Causes of Action yet again illustrate the Committee's "Hail Mary" play-calling in these final throes of the Debtors' Chapter 11 Cases. Unable, to date, to coerce an increase to the GUC Gift or other form of settlement from the Debtors or their key constituents through costly and time-consuming discovery and objections to every major request for relief that the Debtors have sought since its appointment, the Committee has shifted gears and is now seeking to obstruct these cases by concocting and threatening to pursue meritless legal theories which test the imagination rather than the limits of the law. Without any credibility behind its futile claims, the Committee's attempt to prosecute the Proposed Complaint entirely in the hopes of extorting additional funds from the Debtors' estates is not one that should be countenanced by this Court.

# I. Any Refusal or Failure by the Debtors to Bring the Committee's Causes of Action was Justified.

33.    As the estate's main fiduciary, a debtor (or debtor-in-possession) stands in the best position to manage its legal claims.  See In re Adelphia Commc'ns Corp., 544 F.3d at 424 (holding that it "remains the debtor's duty to wisely manage the estate's legal claims") (citing In re Smart World Techs., LLC, 423 F.3d at 175); see also In re Recoton Corp., 307 B.R. 751, 760 (Bankr. S.D.N.Y. 2004) (noting that "'[t]he [debtor in possession] has an obligation to pursue all actions that are in the best interests of creditors and the estate'").  In this capacity, the debtor acts as the ultimate "gatekeeper" – preventing "independent avoidance actions by creditors that might prejudice the estate and rival creditors."  Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 568 (3d Cir. 2003).

34.    Notwithstanding the primacy that is placed on the debtor in fulfilling this role, the Second Circuit has recognized that there may be times when a debtor may refuse or fail to bring an action that is indeed colorable and which may benefit the debtor's reorganized estates.  Accordingly, the Second Circuit has provided an exception allowing a committee to bring such claims.  To do so under the STN test, the committee must overcome its burden of showing that the debtor's refusal was *unjustifiable* – effectively rising to the level of a breach of a debtor's statutory duty to wisely manage the estate's legal claims.  See In re STN Enterprises, 779 F.2d at 904 (noting that other courts have allowed derivative standing where the "debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer"); In re Smart World Tech., LLC, 426 F.3d at 176 (holding that "derivative standing in

the bankruptcy context is analogous to derivative standing in shareholder suits; it arises when the debtor unjustifiably refuses to pursue a cause of action").[10]

35.     In determining whether a debtor's actions are unjustifiable, courts will look primarily to the first and third prongs of the STN factors.  See In re STN Enter., 779 F.2d at 905-06; In re Adelphia Commc'ns Corp., 330 B.R. at 374 n.19 (holding that a "debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate") (citations omitted).  However, courts have also considered other factors in making such a determination, such as the following:

> 1) "whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action will be brought"; 2) "whether the creditor's interests are protected despite the debtor's refusal";  and 3) "whether appointing a trustee and allowing the trustee, as opposed to the creditors' committee, to pursue the action or converting the Chapter 11 case to a Chapter 7 case would be more beneficial to the estate."

In re G-I Holdings, Inc., 313 B.R. 612, 643 (Bankr. D.N.J. 2004); see also In re AppliedTheory Corp., 493 F.3d at 86 (denying a committee's standing request because a trustee, as well as the lower bankruptcy court, had concluded that the claims were not likely to benefit the estate); 7 Collier on Bankruptcy ¶ 1109.05[2][b] (rev. 15th ed. 2010) (noting that a debtor's refusal to prosecute a claim at a particular time may be justified, for instance, if the "matter would be disruptive of the reorganization process").

36.     In the case at bar, the Committee cannot demonstrate that the Debtors have *unjustifiably* refused or failed to bring the Causes of Action.   In fact, according to the Committee's own Standing Motion, the Committee never made any formal written demand of

---

[10]     The burden of proof that a debtor's action or inaction was *unjustifiable* lies with the party seeking derivative standing.  See In re Gibson Group, 66 F.3d 1436 (6th Cir. 1995).

the Debtors other than the demand letter it sent to the Debtors on the day it filed the Standing Motion regarding various claims it sought to assert against Odyssey Investment Partners and its affiliates.  See Standing Motion at ¶¶ 6 n.3, 84 n.13.  Rather, the Committee asserts that demand was futile because (i) the Causes of Action were waived by the Debtors in connection with the final order approving the Debtors' postpetition financing (the "Final DIP Order") and (ii) the Debtors possess insurmountable conflicts of interest related to the Causes of Auction.  See Id. at ¶¶ 6, 84-86.

37.    The Committee's excuses as to why it never provided the Debtors with formal demand are red herrings.  First, the waivers that the Debtors provided their DIP lenders pursuant to the Final DIP Order are highly customary for debtors seeking to obtain financing for their reorganization efforts.  Second, the Standing Motion and Proposed Complaint make only vapid assertions as to the Debtors' potential conflicts of interest and provide no proof that the Debtors have failed in their role as fiduciary and should therefore be stripped of their position as gatekeeper for the estates' constituents.  As explained in the Debtors' Objection, the Debtors determined that the Causes of Action (i) had no merit and (ii) would ultimately prove to be nothing more than an expensive and unnecessary distraction to the Debtors' timely and successful reorganization.  See Debtors' Objection at ¶¶ 48-50, 58, 70-73, 117-45.

38.    It is therefore abundantly clear that the Committee's failure to make a demand cannot be attributed to its belief that had such demand been made upon the Debtors, it would have been *unjustifiably* refused.  Rather, such actions can be ascribed directly to the Committee's striking inability to assert any valid claims or tangible theories in connection with the Proposed Complaint and its misguided notion that all leveraged buy-outs are inherently fraudulent conveyances. As noted above, this position is inherently deficient.  Without a further showing

that the Causes of Action are colorable and of any value (other than the pivotal nuisance they potentially provide the Committee's constituents), the Committee cannot fulfill its burden of proof on the second prong of the <u>STN</u> test.

**J.    Pursuit of the Proposed Complaint Would be
Detrimental to the Reorganization of the Debtors' Estates.**

39.    Finally, to obtain standing under the <u>STN</u> test, it is imperative that a standing proponent make a showing that the purported litigation is in the best interests of the reorganized estates.  <u>In re STN Enter.</u>, 779 F.2d at 905.  Without such a showing, committees and creditors could be left to pursue even colorable claims which might serve only to "provide them with *private benefits* but result in a *net loss to the entire estate*."  <u>See</u> <u>In re AppliedTheory Corp.</u>, 493 F.3d at 86 (affirming a bankruptcy court's denial of an unsecured creditor committee's motion for standing to pursue an equitable subordination cause of action after finding that such action was unlikely to benefit the estate) (emphasis added).  Thus, this third prong of the <u>STN</u> test seeks to ensure value maximization of a reorganized estate, and, accordingly, requires a committee to prove that proposed litigation is both "necessary" and "beneficial" to a debtor's estate.  <u>See</u> <u>In re Sunbeam Corp.</u>, 284 B.R. at 374 (holding that "a finding that allowing a committee to pursue a debtor's claim would be necessary and beneficial to the resolution of the bankruptcy proceeding is required in all instances"); <u>see</u> <u>also</u> <u>In re Am.'s Hobby Ctr., Inc.</u>, 223 B.R. 275, 284 (Bankr. S.D.N.Y. 1998) (noting that the inquiry "entails estimating the costs of litigation and weighing those costs against the possible outcomes").

40.    In the instant case, the Committee leaves no doubt that its true intentions lie in pursuing the Causes of Action to obtain additional recoveries from the Debtors' estates solely for its own out-of-the-money constituents rather than for the benefit of the Debtors' general creditor body.  This fact is illustrated by both the Committee's express statements, <u>see</u> Standing Motion

24

at ¶¶ 5, 6, 89 (noting that the Committee is seeking recovery for the benefit of "unsecured creditors"), and the resultant distribution scheme should the Committee somehow successfully obliterate the Debtors' existing capital structure. An unwinding of the liens of the First Lien Loans and Second Lien Term Loans by the Committee, without any attendant elimination of the Intercreditor Agreement,[11] would actually prove detrimental to the holders of the Second Lien Term Loans (who are currently expected to receive approximately 25 cents on the dollar under the Plan) – such holders would be forced to pay over their Plan distributions to holders of the First Lien Loans until such holders were paid in full.[12] As a result, under the Committee's best-case scenario, holders of the Second Lien Term Loans could theoretically receive a significantly *smaller* distribution than they currently expect to receive as a result of the Auction and the Debtors' marketing efforts to date. Allowing such a result would essentially eviscerate the work that has been done to date in ensuring the success of the Debtors' reorganization efforts.

41. Throughout these Chapter 11 Cases, the Debtors, the ABL lenders, the First Lien Term Lenders and the holders of the Second Lien Term Loans, have all worked – albeit competitively at times – towards one goal: to maximize creditor recoveries and ensure the Debtors' successful and expeditious reorganization. An inordinate amount of time and effort has been devoted to the Chapter 11 Cases by these constituents and their respective professionals. As a result of these efforts, over $100 million of real, additional value has been created that

---

[11]     Reference is made to that certain Intercreditor Agreement, dated as of May 31, 2007, among Neff, LYN Holdings Corp., certain subsidiaries of Neff party thereto and Bank of America, N.A. (as amended, modified or otherwise supplemented from time to time) (hereinafter, the "Intercreditor Agreement").

[12]     Section 6.6 of the Intercreditor Agreement provides, *inter alia*, that if any holder of a First Lien Loan is required to turn over to the estate any amounts recoverable under an avoidance action, such holder would be entitled to a reinstatement of its loan obligations with respect to such recovered amounts. See Intercreditor Agreement at § 6.6. Moreover, Section 4.2 of the Intercreditor Agreement provides, *inter alia*, that any recovery by holders of Second Lien Term Loans with respect to proceeds of common collateral must be turned over to the holders of the First Lien Loans until such holders are paid in full on their loan obligations. Id. at § 4.2.

flows to the Debtors' creditors under the Plan. The Committee now threatens to dismantle the Debtors' carefully constructed restructuring plans (and in the process destroy the intrinsic value that has been created) with baseless Causes of Action against the very parties who have helped bring additional value into the Debtors' estates.

42. To the extent that the Standing Motion is allowed and the Debtors' key creditors are pursued by the Committee in its costly and empty litigation, such parties will not stand idly by and continue to financially support the Debtors in a high-risk, low reward scenario. For example, if the Committee was granted the ability to prosecute the Proposed Complaint and extend out the timeline of these cases for an undetermined period of time, the Chapter 11 Cases would easily exceed the generous Milestones established in the PSA as well as the Backstop Commitment Termination Date. As a result, the Debtors likely would lose Wayzata's Backstop Commitment and the concomitant benefits to the Debtors' reorganization that such a significant financing commitment provides. The Debtors' bankruptcy cases would most certainly then free-fall into unmitigated chaos. While such a scenario is of little consequence to the Committee (and, in particular, the holders of the Senior Notes), which stands to lose nothing in the event that such a scenario comes to fruition, it would prove disastrous for the viability and value of the Debtors' businesses. To avoid that risk, one that the Debtors' other constituents must bear, the Committee's Standing Motion must be denied.

**K.**     **If the Committee Succeeds on the Standing Motion, It Should Not Be
Allowed to Settle any of the Causes of Action on the Debtors' Behalf.**

43.     Although the Committee has not sought, in its Standing Motion or otherwise,
authority to settle any of the Causes of Action, any approval by this Court of the Standing
Motion must be conditioned on the Debtors' ability to continue to settle the Causes of Action.
Pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, the authority
to settle claims and causes of action rests with a debtor or trustee in a bankruptcy case.  See Fed.
R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may
approve a compromise or settlement"); 11 U.S.C. § 1107 (conferring on a debtor-in-possession
the rights of a trustee serving in a case under the Bankruptcy Code).  Moreover, as the Second
Circuit has recognized, since claims and causes of action belong to a debtor's estate, they
should be settled by a debtor.  See In re Smart World Techs., LLC, 423 F.3d 166, 182 (2d Cir.
2005) (holding that creditors' rights, such as the right to intervene, do not include the right to
take ownership of an estate's causes of action or the right to commence litigation that belong
solely to the debtor); In re Adelphia Commc'ns. Corp., 544 F.3d at 424 (emphasizing the
debtor's responsibility to manage the legal claims of the estate as the debtor is the estate's legal
representative and only fiduciary).

44.     The Debtors, as fiduciaries of their estates, are in the best position to control any
settlement of the Causes of Action so as to obtain the greatest benefit for all creditors – not just
the Committee's constituents.  Accordingly, to the extent the Committee's Standing Motion is
granted and the Committee is entitled to file the Proposed Complaint, such approval must be
conditioned upon the requirement that the Debtors have ultimate settlement authority with
respect to any of the Causes of Action.

## <u>CONCLUSION</u>

45.     In spite of the many pages of empty arguments articulated by the Committee in its pleadings, the Committee fails to meet the <u>STN</u> test set forth and commonly relied upon in the Second Circuit.  Not only does the Proposed Complaint fail to allege any colorable claims that would merit pursuit, but the Standing Motion fails to explain how the pursuit of the Causes of Action – particularly where the Debtors are just days away from confirming their Plan – would justify the significantly increased expense and burden to the Debtors' reorganization efforts that would ensue.  Rather, litigation of the Causes of Action would only serve to allow the Committee (representing out-of-the-money creditors holding an extremely small portion of the Debtors' outstanding debt) to run roughshod over the Debtors' other major constituencies, and leave the Debtors' estates on the precipice of a chapter 7 liquidation.  For these reasons, the Court should deny the Standing Motion and maintain the Debtors' current path towards a successful reorganization that is undoubtedly in the best interest of the Debtors and their estates.

**WHEREFORE**, based on the foregoing, the First Lien Term Lenders respectfully request that this Court deny the Standing Motion, and grant such other and further relief as this Court deems just and proper under the circumstances.

Dated: September 4, 2010
　　　　New York, New York

                              STROOCK & STROOCK & LAVAN LLP


                              /s/ Kristopher M. Hansen
                              Kristopher M. Hansen
                              Kenneth Pasquale
                              Jayme T. Goldstein
                              Marianne S. Mortimer
                              Stroock & Stroock & Lavan LLP
                              180 Maiden Lane
                              New York, NY  10038
                              Telephone:  (212) 806-5400
                              Fax:  (212) 806-6006

                              *Counsel for Wayzata Investment Partners and*
                              *Apollo Capital Management*