Joel H. Levitin
Kevin J. Burke
Michael R. Carney
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
E-mail: jlevitin@cahill.com
E-mail: kburke@cahill.com
E-mail: mcarney@cahill.com

*Attorneys for Bank of America, N.A., Agent for
the Post-Petition Lenders*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., *et al.*, | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**OBJECTION OF BANK OF AMERICA, N.A., AS AGENT FOR THE POST-PETITION
LENDERS, TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO
PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES**

Bank of America, N.A., in its capacity as the administrative and collateral agent (the

"Agent") under that certain senior secured debtor-in-possession credit agreement dated as of

May 17, 2010, by and among the above-captioned debtors and debtors-in-possession (the

"Debtors") and the lenders that are signatories thereto (the "DIP Lenders"), hereby objects (the

"Objection") to the motion of the official committee of unsecured creditors (the "Committee")

for entry of an order granting the Committee leave to prosecute certain claims on behalf of the

Debtors' estates (the "Motion for Leave") [Docket No. 345]. In support of its Objection, the

Agent respectfully represents as follows:

# PRELIMINARY STATEMENT

1.        Recognizing that there is no value for unsecured creditors in these cases, the Committee has sought this Court's permission to pursue open-ended and meritless litigation in a misguided attempt to garner an undeserved and unwarranted recovery for its constituents. Displeased with its constituents' place in the Debtors' capital structure—and having neither facts nor applicable law on its side—the Committee has concocted purported theories of, *inter alia*, fraudulent conveyance, equitable subordination, and preferential transfer that cannot withstand the most basic scrutiny.

2.        Through the Motion for Leave, the Committee seeks derivative standing to sue, among others, the Agent, as administrative agent for the Debtors' pre-petition first and second lien lenders,[1] to avoid various transactions in connection with a leveraged buyout that occurred in 2007 (the "2007 LBO").  The Committee's basis for derivative standing amounts to little more than an alleged far-flung conspiracy through which, according to the Committee, certain shareholders and lenders enriched themselves, with the aid of the Debtors' officers and directors, at the expense of the Debtors' other creditors by saddling an otherwise healthy company with debt it had no hope of repaying.

3.        Yet the Committee has not offered one shred of credible evidence, much less demonstrated, that the Debtors were insolvent or undercapitalized before or as a result of the 2007 LBO.  Nor has the Committee offered anything other than conclusory allegations as a basis to support its bid to equitably subordinate certain of the Agent's claims related to its participation

---

[1]        The Agent still serves as the administrative agent under the Debtors' pre-petition first lien credit agreement, but was replaced by Wilmington Trust FSB as the administrative agent under the Debtors' pre-petition second lien credit agreement.

in a 2008 exchange offer, which allegations, even if true, would not substantiate such claim. Finally, the Committee seeks to recover certain alleged preferential transfers from the Agent, a claim that the Committee admits is predicated on the avoidance of the 2007 LBO. Even if the 2007 LBO were avoidable, which it is not, the Committee would still not succeed in prosecuting its purported preference claims against the Agent, as any transfers the Committee alleges were preferential either were not made on account of antecedent debt or were made in the ordinary course of business.

4.     To justify the relief requested in the Motion for Leave, the Committee has done little more than (i) cobble together cherry-picked numbers from filings with the Securities and Exchange Commission and elsewhere to paint a picture of insolvency and undercapitalization using the perfect vision of hindsight, (ii) rely on the perceived rhetorical weight of the terms "LBO" and "exchange offer," and (iii) resort to inflammatory and unsupported remarks to disparage certain of the Debtors' pre-petition shareholders, secured lenders, and management. The basis for the Motion for Leave rests on conclusory statements that are misleading, devoid of any factual basis, incomplete, and, in most instances, irrelevant. Hyperbole, innuendo, bootstrapping arguments, and conclusory allegations are not substitutes for facts that support colorable claims.

5.     It is telling that for all the fees and expenses the Agent suspects the Committee has charged the Debtors' estates thus far,[2] purportedly "reviewing thousands of

---

[2]     Counsel to the Committee alone incurred over $525,000 in fees and expenses in June, 2010. The Committee's professionals have not yet, to the Agent's knowledge, submitted their monthly fee statements for July, 2010, as required under the interim compensation order [Docket No. 140].

documents" and re-deposing both the Debtors' Chief Financial Officer and one of the Debtors' financial advisors as part of its "continuing" investigations (Motion for Leave ¶ 14), the Committee does not cite to a single deposition transcript or any other source, aside from public filings with the Securities and Exchange Commission and this Court, to substantiate the allegations in the Motion for Leave and the proposed complaint attached thereto. For all the hyperbole in the Committee's filings to date as to the merit of its claims, the thousands of pages of documents produced, the numerous depositions taken, and the vast amount of resources expended, the only support the Committee cites for the relief requested in the Motion for Leave apparently is information it had access to at the outset of these cases. The conclusion is inescapable: the Committee has uncovered nothing during the course of its investigations (which is, of course, because there never was anything to uncover), and the Committee's allegations that the 2007 LBO is avoidable are no more persuasive or colorable today than when they were first asserted shortly after the Committee was appointed. The Motion for Leave is without merit and should be denied.

6.     Even if the Committee could meet its threshold burden of a colorable claim—which it cannot—the cost-benefit analysis required by applicable authority mandates that the Motion for Leave be rejected. As an initial matter, it is unclear the Committee has considered how it would fund any litigation to avoid the 2007 LBO and prosecute its other claims. The DIP Order caps any funds expended by the Committee investigating and bringing claims at $100,000, and the Debtors may be declared in default of their post-petition financing and lose access thereto if, among other reasons, the agreed budget is violated or cash collateral is used without the DIP Lenders' consent. It is highly unlikely that the DIP Lenders would be willing to fund protracted litigation against themselves.

7.      Assuming the Committee could fund any litigation to avoid the 2007 LBO (by, among other means, convincing Committee counsel to work on a contingency basis), there is no guarantee the DIP Lenders, as Exit Lenders, would agree to fund the Debtors' emergence in the shadow of expensive, hotly contested, and lengthy litigation.  Moreover, it is also unlikely that the Exit Lenders would find acceptable any confirmed plan (one of the conditions to closing the Exit Facility) if such plan did not contain, among other things, enforceable releases for which the DIP Lenders and Exit Lenders bargained.  In short, these cases may unravel—with considerable harm and prejudice to the Debtors, their creditors, and their nearly 900 employees and other stakeholders—if the Committee is permitted to pursue its last-ditch attempt to exact an unwarranted recovery.

## RELEVANT BACKGROUND

8.      On account of the Debtors' severe liquidity problems, the Debtors, in late autumn of 2009, approached the Agent (who at that time served as administrative agent for the pre-petition first and second lien lenders) to explore the possibility of obtaining debtor-in-possession financing ("DIP Financing") for a potential Chapter 11 reorganization.  The Debtors' approach initiated a lengthy series of arms' length negotiations to reach the current terms of the DIP Financing among the Debtors, the Agent, and the DIP Lenders.  The DIP Financing and the form and substance of the documentation of the DIP Financing were heavily negotiated by all parties over the course of nearly a year.  Pursuant to final order entered on June 30, 2010, this Court approved the DIP Financing (the "DIP Order") [Docket No. 207].

9.      A critical aspect of the DIP Financing, in addition to providing the Debtors with much needed liquidity and access to cash during the course of these cases, was the bundling of the DIP Financing with a facility to exit Chapter 11 and provide the reorganized

Debtors with access to cash and liquidity (the "Exit Facility") to emerge from bankruptcy successfully. The Exit Facility would be provided initially by the DIP Lenders (in such capacity, the "Exit Lenders"). The Exit Facility contains numerous conditions to closing, including, among others, that any confirmed Chapter 11 plan be satisfactory to the Exit Lenders.

**OBJECTION**

10.  The Committee cannot meet the standard established by the Court of Appeals for the Second Circuit to obtain derivative standing to prosecute claims on behalf of the Debtors. Specifically, in *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters., Inc.)*, 779 F.2d 901 (2d Cir. 1985), the Second Circuit established the following test to be applied in determining whether a creditors' committee should be granted derivative standing to prosecute claims on behalf of a debtor:

> If the [creditors'] committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery, *the district (or bankruptcy) court's threshold inquiry will still not be at an end.* In order to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action, *the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate.*

*Id.* at 905 (emphasis added).

11.  The *STN* test for derivative standing is therefore comprised of two separate, conjunctive inquiries, namely (i) whether the creditors' committee has asserted a colorable claim and (ii) whether the assertion of such claim is likely to benefit the debtor's estate. *See In re G-I Holdings, Inc.*, 313 B.R. 612, 629 (Bankr. D.N.J. 2004) (the party seeking standing bears the initial burden of demonstrating to the Bankruptcy Court that it has satisfied the requirements for standing); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 560-61 (3d Cir. 2003); *Official Comm. of Unsecured Creditors v. Cablevision Sys., Corp. (In re Valley Media, Inc.)*, No. 01-11353, 2003 WL 21956410, at *2

(Bankr. D. Del. Aug. 14, 2003); *In re Sunbeam Corp.*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002); *In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Chem. Bank v. Pilevsky*, No. 94-6822, 1994 WL 714287, at *3 (S.D.N.Y. Dec. 22, 1994).

12.     Notably absent from the Committee's Motion for Leave and the proposed complaint attached thereto is *any* affidavit or other evidentiary proof.  Indeed, the Committee has proffered nothing to sustain its burden on either element of the test imposed by the Second Circuit in *STN* other than its own self-serving, argumentative statements of supposed fact and apparent snippets of public documents filed with the Securities Exchange Commission and this Court.

**The Committee Has Failed to Established
that Colorable Claims Exist_____**

13.     A "colorable claim" is a "claim for relief that on appropriate proof would support a recovery." *In re STN Enters.*, 779 F.2d at 905.  "The inquiry into whether claims are colorable focuses on whether the claims would survive a defendant's motion to dismiss" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *In re Copperfield Invs., LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010); *America's Hobby Ctr.*, 223 B.R. at 282; *In re G-I Holdings, Inc.*, 313 B.R. at 631, *citing America's Hobby Ctr.*, 223 B.R. at 282.

14.     As is the case in determining a motion to dismiss under Rule 12(b)(6), in considering the Motion for Leave, this Court is not compelled to accept as true "sweeping and unwarranted averments of fact," *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.)*, 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000), nor must this Court accept "unsupported conclusions and unwarranted inferences," *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted).  *See also Kanter v. Barella*, 489 F.3d 170, 178 (3d Cir. 2007) ("[A] court need not credit either 'bald assertions,' or 'legal conclusions' in a complaint

when deciding a motion to dismiss."). The Committee must supply factual allegations strong enough to "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, in the context of a motion to dismiss, the Supreme Court recently explained that there is a difference between pleading the *possibility* of liability and the *plausibility* of liability. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (citation and internal quotation marks omitted). In order for the Motion for Leave to pass muster, it must "permit the court to infer more than the mere possibility of misconduct." *See id.* at 1950.

15. Where, as here, a claim cannot meet the standards articulated above and is otherwise without merit, "allowing another party to pursue the [claim] at the expense of the bankruptcy estate would neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceeding." *In re G-I Holdings*, 313 B.R. at 631, *quoting In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003).

### The Committee's Fraudulent Conveyance Claims Are not Colorable

16. To assert a claim under the Uniform Fraudulent Conveyance Act as enacted in New York (the "NY UFCA") and the Uniform Fraudulent Transfer Act as enacted in Florida (the "FL UFTA"), the Committee must establish the following elements:[3]

---

[3] Whether the NY UFCA or FL UFTA would apply, for the purposes of this Objection, is largely an academic question as the two statutes are substantially the same with respect to the claims the Committee seeks this Court's permission to prosecute. *See Drenis v. Haligannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) (noting that the Uniform Fraudulent Conveyance Act and Uniform Fraudulent Transfer Act are substantially similar); *see also In re Schwartz*, 58 B.R. 923, 926 n.2 (Bankr. S.D.N.Y. 1986) (same).

(continued)

- The Debtors transferred an interest in property;

- The transfer was made for less than a reasonably equivalent value or fair consideration; and

    ▪ The Debtors were insolvent when the transfers were made or were rendered insolvent as a result;

    ▪ The Debtors were engaged in a business for which the property retained was an unreasonably small capital; or

    ▪ The Debtors intended or believed that it would incur debts beyond their ability to pay as such debts matured.

*See* N.Y. Debt. & Cred. Law §§ 272-275; Fla. Stat. Ann. §§ 726.105(1)(b) and 726.106(1). The Committee has failed to present anything other than "bald assertions" and "unwarranted inferences" to this Court to support any element of its purported fraudulent conveyance claim.

17. First, the Committee supports its assertion that the Debtors did not receive reasonably equivalent value or fair consideration for the transfers made as part of the 2007 LBO with nothing other than its own *ipse dixit*: "[I]t is indisputable that the Debtors did not receive reasonably equivalent value or fair consideration for the liens on the Debtors' assets that were pledged as security for obligations under the First Lien Credit Facility or the Second Lien Term Loan." (Motion for Leave ¶ 54.) But nowhere in the Motion for Leave does the Committee elaborate upon how it came to that mistaken conclusion, and the Committee offers no analysis or even touches upon the value of the consideration received for the liens granted as part of the 2007 LBO compared to the value of such liens at the time they were granted. *See In re Nextwave Personal Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999) ("It is uncontested that the question of

---

The Agent reserves its right, however, to dispute which jurisdiction's laws govern at any point in the future, and nothing herein should be construed as the Agent's conceding the applicability of the law of New York, Florida, or any other jurisdiction.

reasonably equivalent value is determined by the 'value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged.'"); *In re Duke Benedict, Inc.*, 265 B.R. 514, 532 (Bankr. S.D.N.Y. 2001) (holding "the focus of the reasonably equivalent value analysis is the value of the property at the time of the transaction.").

18.     Second, the Committee has not asserted sufficient facts to allege credibly that "the fair saleable value" of the Debtors' assets was "less than the amount that will be required to pay [the Debtors'] probable liability on [their] existing debts as they become absolute and matured,"  N.Y. Debt. & Cred. Law § 271, or to meet the similar definition of insolvency under the FL UFTA, Fla. Stat. Ann. § 726.103(1)-(2).  The Committee's attempt to bootstrap its argument that the Debtors must have been insolvent as a result of the 2007 LBO by focusing on events that occurred years before and after its completion is erroneous and ignores the well-established line of cases that hold that the relevant date for determining solvency is the date of the transfer.  *See, e.g.*, *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3rd Cir. 1996) (noting that "[t]he use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike."); *Lippe v. Bairnco*, 249 F. Supp. 2d 357, 380 (S.D.N.Y. 2003) (holding "solvency must be gauged at the time of the transfer and not with the benefit of hindsight").

19.     Third, whether a debtor is unable to pay its debts as they become due is also a forward-looking standard where a court considers—without recourse to hindsight—the reasonableness of a company's projections as to its ability to pay its debts in the future.  *E.g., Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009).  Finally, in deciding whether a transfer may be avoided as constructively fraudulent to creditors, in that it left the debtor with unreasonably small capital to run its business, the question is not whether any projections were

correct in hindsight but whether they were reasonable when made. *Moody v. Security Pac. Bus.*
*Credit, Inc.*, 971 F.2d 1056, 1073 (3rd Cir. 1992); *In re WRT Energy Corp.*, 282 B.R. 343, 411
(Bankr. W.D. La. 2001).

20.    Yet the Committee's entire basis for its conclusion that it should be
granted leave to prosecute its fraudulent conveyance claims amounts to nothing more than
Monday-morning quarterbacking.  Specifically, to demonstrate that the Debtors were insolvent
after the 2007 LBO, the Committee notes that "Neff's actual performance after the 2007 LBO
was well below the rosy projections upon which the transaction was premised."  (Motion for
Leave ¶ 31.)  Moreover, to paint a picture that the Debtors should have foreseen that their
financial health after the 2007 LBO "could not be sustained through an economic downturn"
(Motion for Leave ¶ 34), the Committee suggests that the Debtors should have foreseen, in 2006
and early 2007, a financial crisis that began in August of 2007 that later spread and gathered
intensity in 2008.[4]  (*See* Motion for Leave ¶¶ 21, 22, 30.)

21.    Neither the Debtors nor anyone else could have predicted that, when the
2007 LBO closed on May 31, 2007 (*Id.* ¶ 23.), a mere downturn in housing prices and difficulty
in the subprime mortgage market (to which the Debtors apparently had little exposure) would
snowball into one of the worst financial crises in modern history.  Yet the Committee, in an
effort to imply that the Debtors were somehow on notice of a looming global financial meltdown
prior to the closing of the 2007 LBO, resorts to the misleading statement that the "final quarter of

---

[4]    *See* Mark Jickling, *Causes of the Financial Crisis*, 1-2 (Congressional Research Service,
CRS Report for Congress, No. R40173, 2010), *available at* http://fpc.state.gov/
documents/organization/142771.pdf.

2006 marked the beginning of the subprime mortgage crisis." (*Id.* at 22.) It did not. As one commentator has noted:

> A complete chronology of the recent financial crisis might start in February 2007, when several large subprime mortgage lenders started to report losses. . . . But the definitive trigger came on August 9, 2007, when the large French bank BNP Paribas temporarily halted redemptions from three of its funds because it could not reliably value the assets backed by U.S. subprime mortgage debt held in those funds.[5]

22. The Committee's approach to the 2007 LBO can best be summed up as follows: (i) there was a company (Neff Corp.) that was having financial difficulties, (ii) a restructuring was effected, (iii) the restructuring failed, and, therefore, (iv) there must have been a fraudulent conveyance. The Committee's kind of simplistic reasoning and flawed logic has been rejected by the Court of Appeals for the Third Circuit in *R.M.L.*, in which the court held:

> Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred. . . . We think our analysis appropriately balances a creditor's interest in estate preservation against a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the [Bankruptcy] Code altogether. As we noted above, requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive. . . . The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return.

*R.M.L.*, 92 F.3d at 152. Indeed, as the *R.M.L.* case makes clear, substantial and significant benefits can be found to have resulted from a restructuring at the time it occurred, even if that restructuring should ultimately fail. *Id.* To find otherwise would place a severe damper on out-of-court restructuring efforts—to the detriment of debtors, creditors, stockholders, and

---

[5]     Stephen G. Cecchetti, *Crisis and Responses: The Federal Reserve in the Early Stages of the Financial Crisis*, 23 J. ECON. PERSP. 51, 57 (2009).

employees of troubled companies. The drafters of the NY UFCA and the FL UFTA could not have intended those statutes to have such an effect. The Committee offers no meaningful analysis as to whether, at the time the 2007 LBO occurred, there was a chance for the Debtors to restructure successfully out of court.

23. At bottom, the Committee's argument rests on the perceived rhetorical weight of the term "LBO," presuming that all such transactions implicate avoidable transfers. They do not. *See Kipperman v. Onex Corp.*, No. 05-cv-01242, 2010 WL 761227, at *7-8 (N.D. Ga. March 2, 2010) (leveraged buyouts are not per se fraudulent); *see also*, *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 325-26 (Bankr. D. Del. 2007) (dismissing complaint to avoid LBO as fraudulent transfer). Second guessing financial projections with the benefit of hindsight and maligning the motives of others do not constitute facts sufficient to support a colorable fraudulent conveyance claim. As the Debtors have set forth in their objection to the Motion for Leave, the Committee has failed to allege any credible facts to support its unsound theory that the Debtors were left insolvent or undercapitalized as result of the 2007 LBO.

**The Committee's Claims for Equitable
Subordination Are not Colorable**

24. When determining whether a claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c), the Court of Appeals for the Second Circuit has endorsed the three-pronged test the Court of Appeals for the Ninth Circuit employed in *Spacek v. Thomen (In re Universal Farming Indus.)*, 873 F.2d 1334, 1337 (9th Cir. 1989). *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991). In general, courts will find that equitable subordination is proper where (i) the claimant has engaged in some type of inequitable conduct, (ii) the conduct has injured creditors or gives an unfair advantage to the claimant, and

(iii) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Id.* With respect to non-insiders—such as the Agent—the standard of conduct sufficient to warrant the equitable subordination of claims is "gross misconduct." *In re Teltronics Servs., Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983); *In re Minnesota Kicks, Inc.*, 48 B.R. 93, 106 (Bankr. D. Minn. 1985); *In re Orah Wall Fin. Corp.*, 84 B.R. 442, 444 (Bankr. W.D. Tex. 1986); *In re Blumenberg*, 263 B.R. 704, 721 (Bankr. E.D.N.Y. 2001).

25.     Gross misconduct requires something much more than the mere "self interested conduct" the Committee alleges in the Motion for Leave. (Motion for Leave ¶ 81.) Gross misconduct, rather, is "tantamount to fraud, misrepresentation, overreaching, or spoliation." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1301-02 (10th Cir. 2004); *Blumenberg*, 263 B.R. at 721 ("[A]lthough non-insiders may commit inequitable conduct that justifies equitable subordination in rare instances, 'gross misconduct' or 'an act of moral turpitude' must be demonstrated."). The Committee has not alleged, nor could it legitimately allege, such egregious conduct on the part of the Agent.

26.     That the Agent and the lenders may have received fees in connection with loans that were part of a leveraged buyout or that they agreed to certain amendments with respect to an exchange offer in which certain creditors—by virtue of their being unaccredited investors under U.S. securities laws—could not participate, in no way rises to the level of "gross misconduct" or "moral turpitude" sufficient to equitably subordinate the Agent's claims. (*See* Motion for Leave ¶ 80.) Indeed, even if the Committee's conclusory accusations were true with respect to its equitable subordination claim, which the Agent disputes, there is still absolutely no basis in the law to equitably subordinate the Agent's claims. *See Austin v. Chisick (In re First Alliance Mortgage Co.)*, 298 B.R. 652, 668-69 (C.D. Cal. 2003) (equitable subordination not

appropriate where financial institution engaged in "activities [that] were undertaken at arms-length, in the normal course of business.").

**The Committee Has not Demonstrated a Colorable Claim to Avoid Preferential Transfers**

27. The Committee's claim to avoid certain purported pre-petition transfers to the Agent as preferences fails at the first step: as the Committee admits, its claim to recover allegedly preferential transfers from the Agent is conditioned in its entirety on the avoidance or subordination of the Agent's secured claims (Motion for Leave ¶ 59), a highly unlikely result. Moreover, the Committee's preference claim is baseless in its own right, as any such transfers were, as the Debtors have explained elsewhere, either not on account of an antecedent debt or made in the ordinary course of business. The Committee offers no specific allegations regarding any of the purportedly preferential transfers. It merely provides a list of payments, a recitation of Section 547 of the Bankruptcy Code, and a conclusory statement that certain alleged transfers are avoidable. That is not enough to assert a colorable claim that any avoidable preferential transfers were made to the Agent—even if the Committee could demonstrate that liens granted in connection with the 2007 LBO are avoidable, which it cannot. *See Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 355 (S.D.N.Y. 2010) (dismissing preferential transfer claim where nothing more that "formulaic elements" of Section 547 pleaded).

**The Committee Has Failed to Demonstrate that Prosecution of the Proposed Complaint Would Benefit the Debtors' Estates**

28. As the Second Circuit has explained, in determining whether a creditors' committee should be granted derivative standing to prosecute claims belonging to a debtor's

bankruptcy estate, the court must "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re STN Enters.*, 779 F.2d at 905-06; *see also In re G-I Holdings, Inc.*, 313 B.R. at 629 (same). In making this determination, courts typically rely on a cost-benefit analysis, including a consideration of the likelihood of success in the action, the costs to the estate of prosecuting the action, the potential financial recovery, and the delay in the reorganization process that inevitably would result from such prosecution. *See In re STN Enters.*, 779 F.2d at 905 (the court must focus on "a determination of probabilities of legal success and financial recovery in [the] event of success"); *see also Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 223 (Bankr. W.D. Pa. 2004) ("The Court has had ample opportunity to serve the role as 'gatekeeper' in this case to weigh the potential benefit of the litigation against the costs that might be incurred."); *In re America's Hobby Ctr., Inc.*, 223 B.R. at 282 ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery . . . .").

29. The potential cost to the Debtors' estates and stakeholders outweighs by far any benefit to allowing the Committee to pursue its claims on behalf of its out-of-the-money constituents. As set forth in the Debtors' objection to the Motion for Leave, their business operations cannot withstand the further and substantial delay in exiting Chapter 11, and these cases may unravel in the event they lose their DIP Financing and Exit Financing—a real possibility if the Motion for Leave were granted. It is highly unlikely that the DIP Lenders and Exit Lenders would fund protracted and prohibitively expensive litigation against themselves, and it is doubtful that the Exit Lenders would support any plan modified in such a way to permit the Committee's proposed litigation to go forward. Indeed, if the Committee is permitted to

engage in open-ended and costly litigation, these cases may ultimately result in a liquidation, as opposed to a reorganization. This Court should not permit that to happen.

30.     It is well established that bankruptcy courts prefer that a Chapter 11 debtor exit bankruptcy through reorganization as opposed to liquidation, as a liquidation often is more likely to result in an attendant loss of jobs and possible misuse of economic resources. *See Nat'l Labor Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (citing legislative history); *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999) (finding that "[a] reorganization plan is usually preferable to a liquidation"). Further, when compared to a liquidation, a viable reorganization plan (such as that before this Court) typically provides a greater payment to creditors while preserving the economic life of the entity. *Holley Garden Apartments*, 238 B.R. at 495. That is true here, as the Debtors' liquidation analysis demonstrates.

31.     The Committee's strategy, though ill-conceived, is not surprising. *See U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 124 n.16 (Bankr. D. Del. 2010) ("It has been said that in such vigorously disputed cases, '[j]unior creditors invoke expensive and time-consuming procedures merely to extract a payout exceeding their entitlements.'") (citation omitted). But that does not change the fact that the Committee is engaged in a high-stakes game with other people's money. The risks to the Debtors' businesses, employees, and creditors are real and substantial; the risk to the Committee and its constituents is practically nil. This Court should not let a cadre of out-of-the-money bondholders with nothing left to lose potentially cause the ruin of a troubled company that now has a genuine chance to rehabilitate itself and emerge from Chapter 11 as a going concern.

## JOINDER

32. The Agent also hereby joins the Debtors' objection to the Motion for Leave.

**WHEREFORE**, the Agent respectfully requests that the Court enter an order (i) sustaining the Objection and (ii) granting such other and further relief as may be just and proper under the circumstances.

Dated: New York, New York
          September 4, 2010

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

/s/ Michael R. Carney
Joel H. Levitin
Kevin J. Burke
Michael R. Carney
Eighty Pine Street
New York, New York  10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
E-mail:  jlevitin@cahill.com
E-mail:  kburke@cahill.com
E-mail:  mcarney@cahill.com

*Attorneys for Bank of America, N.A., Agent for the Post-Petition Lenders*