**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., <u>et al.</u>,[1] | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' SECOND AMENDED JOINT PLAN
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE <u>(WITH TECHNICAL MODIFICATIONS)</u>

**Nothing contained herein shall constitute an offer, acceptance or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

James H.M. Sprayregen, P.C.
Ray C. Schrock (admitted *pro hac vice*)
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800

Anup Sathy, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone: (312) 862-2000

Counsel to the Debtors and Debtors in Possession

Dated: ~~August 19~~**September 12,** 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................................................ 1
  A.   Defined Terms ............................................................................................................ 1
  B.   Rules of Interpretation ............................................................................................. 15
  C.   Computation of Time ............................................................................................... 15
  D.   Governing Law ......................................................................................................... 15
  E.   Reference to Monetary Figures ............................................................................... 15
  F.   Controlling Document .............................................................................................. 15

**ARTICLE II. DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS** ..................... 16
  A.   Administrative Claims .............................................................................................. 16
  B.   Accrued Professional Compensation Claims ........................................................... 16
  C.   DIP Claims ................................................................................................................ 17
  D.   Priority Tax Claims .................................................................................................. 17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................ 17
  A.   Summary of Classification ....................................................................................... 17
  B.   Treatment of Claims and Interests .......................................................................... 18
  C.   Special Provision Governing Unimpaired Claims ................................................... 24
  D.   Class Acceptance Requirement ................................................................................ 24
  E.   Elimination of Vacant Classes ................................................................................. 24
  F.   Voting Classes; Presumed Acceptance by Non-Voting Classes .............................. 24
  G.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 24
  H.   Controversy Concerning Impairment ...................................................................... 25

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................................ 25
  A.   Sources of Consideration for Plan Distributions .................................................... 25
  B.   Rights Offering ......................................................................................................... 25
  C.   Exit Facility .............................................................................................................. 25
  D.   The Purchase Agreement ......................................................................................... 26
  E.   General Settlement of Claims .................................................................................. 27
  F.   Section 1145 Exemption ........................................................................................... 27
  G.   Listing of New Common Units .................................................................................. 27
  H.   Release of Liens ........................................................................................................ 27
  I.   Cancellation of Securities and Agreements ............................................................ 27
  J.   Restructuring Transactions ...................................................................................... 28
  K.   Corporate Action ...................................................................................................... 28
  L.   Effectuating Documents; Further Transactions ...................................................... 29
  M.   Exemption from Certain Taxes and Fees ................................................................. 29
  N.   D&O Liability Insurance Policies ............................................................................ 29
  O.   Board Representation ............................................................................................... 29
  P.   Indemnification Provisions ...................................................................................... 30
  Q.   Management Equity Incentive Plan .......................................................................... 30
  R.   Emergence Awards .................................................................................................... 30
  S.   Preservation of Rights of Action ............................................................................. 30
  T.   Wind Down and Dissolution of the Debtors ............................................................ 31
  U.   Liquidator ................................................................................................................. 31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ....................... 32
  A.   Assumption and Assignment of Executory Contracts and Unexpired Leases .......... 32
  B.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........... 32
  C.   Claims Based on Rejection of Executory Contracts and Unexpired Leases ........... 33

i

D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........... 33
E. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................ 33
F. Insurance Policies ............................................................................................................. 34
G. Compensation and Benefit Programs .................................................................................. 34
H. Reservation of Rights ....................................................................................................... 34
I. Nonoccurrence of Effective Date ...................................................................................... 34

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .............................................................. **34**
A. Timing and Calculation of Amounts to Be Distributed ....................................................... 34
B. Distributions Generally; Disbursing Agent ........................................................................ 35
C. Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement ..................... 35
D. Rights and Powers of Disbursing Agent ............................................................................ 35
E. Distributions on Account of Claims Allowed After the Effective Date .................................. 35
F. Delivery of Distributions and Undeliverable or Unclaimed Distributions .............................. 36
G. Compliance with Tax Requirements/Allocations ................................................................ 37
H. Claims Paid or Payable by Third Parties ........................................................................... 37

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ........................................................................................................ **38**
A. Resolution of Disputed Claims ......................................................................................... 38
B. Disallowance of Claims ................................................................................................... 39
C. Amendments to Claims .................................................................................................... 39

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .................... **39**
A. Compromise and Settlement of Claims, Interests, and Controversies .................................... 39
B. Subordinated Claims ....................................................................................................... 40
C. Debtor Release ............................................................................................................... 40
D. Third Party Release ......................................................................................................... 41
E. Exculpation ................................................................................................................... 42
F. Injunction ...................................................................................................................... 42
G. Setoffs .......................................................................................................................... 43

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................................................................................... **43̶44**
A. Conditions Precedent to the Effective Date ........................................................................ 43̶44
B. Waiver of Conditions ...................................................................................................... 44
C. Effective Date ................................................................................................................ 44̶45
D. Effect of Non-Occurrence of Conditions to the Effective Date ............................................ 44̶45

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............................ **45**
A. Payout Event .................................................................................................................. 45
B. Modification and Amendments ......................................................................................... 45
C. Effect of Confirmation on Modifications ........................................................................... 45
D. Revocation or Withdrawal of the Plan .............................................................................. 45

**ARTICLE XI. RETENTION OF JURISDICTION** .............................................................................. **45̶46**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ........................................................................... **47**
A. Immediate Binding Effect ................................................................................................ 47
B. Additional Documents ..................................................................................................... 47̶48
C. Payment of Statutory Fees ............................................................................................... 48
D. Dissolution of the Committee ........................................................................................... 48
E. Reservation of Rights ...................................................................................................... 48
F. Successors and Assigns .................................................................................................... 48
G. Service of Documents ...................................................................................................... 48
H. Term of Injunctions or Stays ........................................................................................... 49

I.      Entire Agreement ....................................................................................................................49
J.      Nonseverability of Plan Provisions .........................................................................................49

K&E ~~17507196~~**17694833**

# INTRODUCTION

Neff Corp. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following joint plan for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.    "*Acquired Assets*" shall have the meaning set forth in Section 2.1 of the Purchase Agreement.

3.    "*Ad Hoc Group*" means that certain ad hoc group of certain holders of First Lien Term Loans.

4.    "*Ad Hoc Group Advisors*" means Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Group, and Houlihan Lokey Howard & Zukin, as financial advisor to the Ad Hoc Group.

5.    "*Ad Hoc Group Advisor Fees*" means all Claims for:  (a) the reasonable documented out-of-pocket costs, fees, expenses, disbursements and charges of the Ad Hoc Group Advisors, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases; and (b) reasonable out-of-pocket expenses incurred by members of the Ad Hoc Group in connection with the Chapter 11 Cases.

6.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) the Backstop Party Fees; (e) the Transaction Expenses, without any requirement for filing fee applications in the Chapter 11 Cases; (f) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; (g) the Ad Hoc Group Advisor Fee Claims, without any requirement for filing fee applications in the Chapter 11 Cases; and (h) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

7.    "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

8.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

9.    "*Agreement Order*" means the Disclosure Statement Order.

10.    "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules

as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

11.　　"*Alternative Transaction*" means any restructuring transaction that is inconsistent with the Backstop Unit Purchase Agreement or the Plan Support Agreement, including (a) a merger, consolidation, business combination, recapitalization or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Plan Support Agreement, (b) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Plan Support Agreement, or (c) a plan of reorganization that does not contemplate a reorganization of the Debtors on the terms set forth in the Plan Support Agreement.

12.　　"*Assumed Liabilities*" shall have the meaning set forth in Section 2.3 of the Purchase Agreement.

13.　　"*Backstop Commitment Percentage*" means, with respect to any Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment of such Backstop Party and the denominator of which is the aggregate Backstop Commitments of all Backstop Parties.

14.　　"*Backstop Commitments*" means, with respect to any Backstop Party, the commitment, on the terms set forth in the Commitment Letter and in the Backstop Unit Purchase Agreement, of such Backstop Party to fund a portion of the Rights Offering Amount to the extent that the Rights Offering is not fully subscribed pursuant to the Plan.  The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.

15.　　"*Backstop Parties*" means those certain entities listed from time to time on Schedule 1 to the Backstop Unit Purchase Agreement.

16.　　"*Backstop Party Fees*" means all Transaction Expenses, the Break-Up Fee, and all Claims for all other amounts that are contemplated to be paid by the Debtors to the Backstop Parties pursuant to the Backstop Unit Purchase Agreement.

17.　　"*Backstop Unit Purchase Agreement*" means that certain Backstop Unit Purchase Agreement, dated as of July 22, 2010, by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, as amended pursuant to that certain amendment dated ~~August [   ],~~ **September 2,** 2010, **Filed at [Docket No. 383],** and as otherwise amended, supplemented or otherwise modified from time to time, substantially in the form attached as Exhibit 1 to the Plan Supplement [Docket No. 34].

18.　　"*Ballot*" means the form distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan approved by the Bankruptcy Court.

19.　　"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

20.　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

21.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

22.     "*Break-Up Fee*" means a Cash fee in the aggregate amount of $3,000,000 payable in accordance with the Backstop Unit Purchase Agreement if the Debtors (a) enter into an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement) with respect to an Alternative Transaction or (b) consummates any Alternative Transaction, in any such case described in clause (a) or clause (b), at any time (x) prior to the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof or (y) within twelve (12) months following the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof.

23.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.     "*Capital Call Agreement*" means that certain capital call agreement by and between the Purchaser and the Persons party thereto as "Investors" thereunder setting forth, among other things, the terms and conditions for such Investors to provide the Purchaser with Cash investments or loans in an aggregate amount not to exceed $16.0 million, as amended, supplemented or otherwise modified from time to time, to be included as an exhibit to the Plan Supplement.

25.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

26.     "*Cash Payment*" means Cash in the amount of $365,000.

27.     "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

28.     "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Neff Corp., et al., Chapter 11 Case No. 10-12610 (SCC), which are currently pending before the Bankruptcy Court.

29.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

30.     "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) the *Order (A) Establishing the Deadline for Filing Proofs of Claim and Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (B) Approving Procedures for Filing Proofs of Claim and Section 503(B)(9) Requests for Payment and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 129] entered on June 8, 2010 or (b) a Final Order of the Bankruptcy Court.

31.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) ~~270~~**180** days after the Claims Bar Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Purchaser, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

32.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

33.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

3

34.     "*Commitment Letter*" means that certain Commitment Letter, dated as of April 12, 2010, pursuant to which the Backstop Parties provided their respective Backstop Commitments on the terms, and subject to the conditions, set forth therein, substantially in the form attached as <u>Exhibit O</u> to the Agreement Order.

35.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on May 28, 2010 and as amended on June 17, 2010.

36.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

37.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

38.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

39.     "*Confirmation Objection Deadline*" means the deadline for Filing objections to the Plan, which ~~date shall in no event be less than seven (7) days prior to the Confirmation Hearing~~**pursuant to the Disclosure Statement Order, is September 1, 2010, at 5:00 p.m. (prevailing Eastern Time)**.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "*Consummation*" means the occurrence of the Effective Date.

42.     "*Cure Cost*" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.     "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Effective Date.

44.     "*Debtor Release*" means the release given by the Debtors to the Debtor Releasees and the Third Party Releasees as set forth in Article VIII.C hereof.

45.     "*Debtor Releasee*" means, collectively, each Debtor and the Debtors' current and former Affiliates, partners, Shareholders, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

46.     "*Debtors*" means, collectively:  Neff Corp.; Neff Finance Corp.; Neff Holdings Corp.; Neff Holdings LLC; Neff Rental, Inc.; and Neff Rental LLC.

47.     "*DIP Agent*" means Bank of America, N.A. in its capacity as administrative agent under the DIP Agreement, or any successor agent appointed in accordance with such agreement.

48.     "*DIP Agreement*" means that certain debtor in possession credit agreement, dated as of May 17, 2010, by and among Neff Corp., as borrower, and the DIP Agent, the DIP Lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time.

49.     "*DIP Claims*" means any and all Claims arising under or related to the DIP Facility as of the Effective Date.

50.     "*DIP Facility*" means that certain $175.0 million debtor in possession credit facility entered into pursuant to the DIP Agreement.

51.     "*DIP Lenders*" means the DIP Agent and the banks, financial institutions, and other lender parties under the DIP Facility.

52.     "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

53.     "*Disbursing Agent*" means, on the Effective Date, the Debtors or their agent and, after the Effective Date, the Purchaser, the Liquidator or any other Entity or Entities designated by the Purchaser to make or facilitate distributions that are to be made after the Effective Date pursuant to the Plan.

54.     "*Disclosure Statement*" means the *Amended Disclosure Statement for the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 13, 2010, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

55.     "*Disclosure Statement Order*" means the *Order Approving the Debtors' Amended Disclosure Statement and Granting Related Relief*, entered on July 13, 2010 [Docket No. 267] approving the Disclosure Statement and granting related relief.

56.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

57.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

58.     "*Emergence Awards*" shall have the meaning set forth in the *Motion of the Debtors for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan* filed on May 25, 2010 [Docket No. 73].

59.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

60.     "*Equity Interest*" means the common stock, limited liability company interests and any other equity, ownership or profits interests of any Debtor and options, warrants, rights or other securities or agreements to acquire the common stock, limited liability company interests or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

61.     "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

62.     "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Purchaser; (c) the Debtor Releasees; (d) the Third Party Releasees; (e) the Exit Facility Agent; (f) the lenders under the Exit Facility; and (g) all of the current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives and successors and assigns of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided that no Non-Released Party will be an Exculpated Party.

63.     "*Exculpation*" means the exculpation provision set forth in Article VIII.E hereof.

64.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

5

65.     "*Exit Facility*" means that new asset based revolving credit facility in the amount of $175.0 million to be entered into by the Debtors pursuant to the agreement to be executed on or before and subject to the occurrence of the Effective Date, including any agreements, amendments, supplements or documents related thereto, on terms reasonably satisfactory to the Debtors and the Purchaser and materially consistent with the Exit Facility Documents, which Exit Facility may be assigned and transferred on the Effective Date by the Debtors to the Purchaser.

66.     "*Exit Facility Agent*" means Bank of America, N.A. in its capacity as administrative agent under the Exit Facility, or any successor thereto.

67.     "*Exit Facility Agreement*" means that certain credit agreement to be entered into as of and subject to the occurrence of the Effective Date by and among Neff Corp., as borrower, and the Exit Facility Agent, the Exit Facility lenders named therein, and the parties thereto, as amended, supplemented or otherwise modified from time to time.

68.     "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility, to be included as an exhibit to the Plan Supplement.

69.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

70.     "*Final DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders*, entered June 30, 2010 [Docket No. 207], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

71.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or the Purchaser, as applicable, reserve the right to waive any appeal period.

72.     "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, and amended and restated as of December 16, 2008, by and among Neff Corp., Neff Holdings Corp. and certain of its subsidiaries, as borrowers, the First Lien Credit Facility Agents, and the First Lien Credit Facility Lenders.

73.     "*First Lien Credit Facility Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent under the First Lien Credit Agreement.

74.     "*First Lien Credit Facility Agents*" means, collectively, (a) the First Lien Credit Facility Administrative Agent, (b) Bank of America, N.A., in its capacity as first lien collateral agent and control agent under the Intercreditor Agreement and agent under the First Lien Security Agreement, or any successor-in-interest thereto, (c) CIBC Inc. and UBS Securities LLC, each in their capacity as co-documentation agents under the First Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the First Lien Credit Agreement.

75.     "*First Lien Credit Facility Lenders*" means collectively the First Lien Term Loan Lenders and the Revolving Credit Facility Lenders.

76.     "*First Lien Security Agreement*" means that certain Security Agreement, dated as of May 31, 2007, as amended and modified from time to time, by and among Neff Corp., LYN Holdings Corp., as grantors and Bank of America, N.A., as agent for the secured parties.

77.     "*First Lien Term Loan*" means the approximately $87.9 million secured term loan provided under the First Lien Credit Agreement.

78.     "*First Lien Term Loan Cash Payment*" means Cash in an amount equal to a Holder's Allowed First Lien Term Loan Claim, including any accrued and unpaid prepetition interest and postpetition interest at the default contract rate; <u>provided</u> <u>that</u> for so long as the Plan Support Agreement has not been terminated, Wayzata may not elect to take and shall not receive the First Lien Term Loan Cash Payment on account of any or all of its Allowed First Lien Term Loan Claim(s).

79.     "*First Lien Term Loan Claim*" means any Claim against any Debtor arising under or related to the First Lien Term Loan.

80.     "*First Lien Term Loan Equity Election*" means the election of a Holder of an Allowed First Lien Term Loan Claim set forth in Article III.B.6(c)(i)(B) hereof.

81.     "*First Lien Term Loan Lenders*" means those financial institutions and other lender parties to the First Lien Credit Agreement from time to time as "Term Loan Lenders" thereunder, each in their capacity as such.

82.     "*First Lien Term Loan Rights Offering Participants*" means all Holders of First Lien Term Loan Claims that are accredited investors or qualified institutional buyers (as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively), as of the Voting Record Date.

83.     "*Former Backstop Parties*" means those certain funds managed or controlled by Apollo Capital Management in their capacities as parties to the Commitment Letter and the Backstop Unit Purchase Agreement.

84.     "*General Unsecured Claim*" means any unsecured Claim against any Debtor that is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Senior Notes Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim. For the avoidance of doubt, General Unsecured Claims shall not include any deficiency claim arising under the Second Lien Term Loan.

85.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

86.     "*Holder*" means any Entity holding a Claim or an Interest.

87.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

88.     "*Indemnification Provision*" means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

89.     "*Indenture Trustee*" means Law Debenture Trust Company of New York as successor in interest to Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Senior Notes Indenture.

90.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

91.     "*Intercompany Contracts*" means any Executory Contract, Unexpired Lease, agreement, contract, or lease between or among the Debtors.

92.     "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor. For the avoidance of doubt, Intercompany Interests excludes Equity Interests in any Debtor held by non-Debtors.

93.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of May 31, 2007, by and among Neff Corp., Bank of America, N.A., as First Lien Collateral Agent, and Wilmington Trust FSB as successor Second Lien Collateral Agent, governing, among other things, the respective rights, remedies, and priorities of Claims and Liens held by such parties, or any similar or related agreement (and as the same may have been modified, amended, or restated).

94.     "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

95.     "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees* [Docket No. 140], entered on June 9, 2010, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

96.     "*Interim DIP Order*" means the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing*, entered May 17, 2010 [Docket No. 41], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

97.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

98.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

99.     "*Liquidator*" means such Entity as may be designated by the Debtors as liquidator pursuant to the Liquidator Agreement and Article IV.U hereof to effectuate the Wind Down.  For the avoidance of doubt, all costs, liabilities, and expenses incurred by the Liquidator shall be paid by the Purchaser.

100.    "*Liquidator Agreement*" means the agreement governing, among other things, the retention and duties of the Liquidator, if applicable, as described in Article IV.U hereof, which shall be in form and substance reasonably acceptable to the Debtor and the Purchaser and to be included as an exhibit to the Plan Supplement.

101.    "*Management Equity Incentive Plan*" means that certain post-Effective Date management equity incentive plan which provides that, among other things, 10% of the New Common Units, on a fully-diluted basis, shall be reserved for issuance in the form of unit options (and/or, at the election of the Backstop Parties, in the form of a class of profits interests participating in 10% of any appreciation in the value of the Purchaser after the Effective Date above certain agreed upon participation thresholds), of which, (x) options to purchase 8% of the New Common Units on a fully diluted basis (and/or 80% of the class of profits interests) will be allocated and issued to participants, as such participants are determined by the Debtors and (y) options to purchase 2% of the New Common Units on a fully diluted basis (and/or 20% of the class of profits interests) will be reserved for future issuances as determined by the New Board in its sole discretion.

102.    "*Neff Corp.*" means Neff Corp., a Delaware corporation and one of the Debtors in the Chapter 11 Cases.

103.    "*New Board*" means the board of managers of the Purchaser as of the Effective Date.

104.    "*New Common Units*" means one or more classes of newly-issued units of common equity of the Purchaser.  As used in this Plan, New Common Units shall include the Rights Offering Units, the New Common Units issuable upon exercise of the Warrants (if issued), and the New Common Units issued under the Management Equity Incentive Plan.

105.    "*Non-Released Parties*" means those Entities to be identified in the Plan Supplement as Non-Released Parties; provided that Non-Released Parties shall not include the First Lien Credit Facility Lenders, the DIP Lenders, the First Lien Credit Agents, the DIP Agent, the Purchaser, the Backstop Parties, the Former Backstop Parties or the Ad Hoc Group.

8

106.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and claims agent for the Debtors.

107.    "*Operating Agreement*" means a limited liability company agreement to be entered into on the Effective Date by and among the Purchaser and the holders of the New Common Units and other interests in the Purchaser (if any), which limited liability company agreement shall contain terms and conditions acceptable to the Backstop Parties.

108.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim.

109.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not: (a) a Revolving Credit Facility Claim; (b) a Secured Swap Claim; (c) a First Lien Term Loan Claim; (d) a Second Lien Term Loan Claim; (e) a DIP Claim; or (f) a Secured Tax Claim.

110.    "*Payout Event*" means an event on or before the Payout Event Deadline where any or all of the Second Lien Term Loan Lenders or any other party have provided the Debtors with sufficient Cash or committed financing, documented to the satisfaction of the Debtors, to (a) indefeasibly pay all of the Allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in Article III.B hereof.

111.    "*Payout Event Deadline*" means July 26, 2010 at 5:00 pm (prevailing Eastern Time), as set forth in the Payout Event Procedures.

112.    "*Payout Event Procedures*" means those procedures governing the process by which Entities may propose higher or better recoveries than those provided under the Plan and any counterproposals thereto approved by the Bankruptcy Court as Exhibit M to the Disclosure Statement Order.

113.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

114.    "*Petition Date*" means May 16, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

115.    "*Plan*" means this *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code **(with Technical Modifications)***, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

116.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Purchase Agreement; (b) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) a list of Non-Released Parties; (e) the Plan Support Agreement; (f) a ~~schedule of Causes of Action to be retained by the Purchaser; (g) a~~ description of the terms of the Exit Facility; (~~h~~**g**) the form of the Management Equity Incentive Plan; (~~i~~**h**) the form of the Warrant Agreement; (~~j~~**i**) the Swap Plan Support Agreements and the Swap Amendments; (~~k~~**j**) the Backstop Unit Purchase Agreement; (~~l~~**k**) a Schedule of Cure Costs; (~~m~~**l**) the form of Liquidator Agreement; (~~n~~**m**) the Payout Event Procedures; (~~o~~**n**) the Operating Agreement; and (~~p~~**o**) the Capital Call Agreement.

117.    "*Plan Support Agreement*" means that certain plan support agreement dated as of April 12, 2010, by and between the Debtors and certain Holders of First Lien Term Loan Claims, as ~~may be~~**amended pursuant to that certain amendment dated August 24, 2010, and as otherwise** amended, supplemented, or otherwise modified from time to time, and which was filed as Exhibit 5 to the Plan Supplement on the Petition Date [Docket No. 34] (with

the principal amount or percentage of any First Lien Term Loans or any other securities of any of the Debtors held by such Holders of First Lien Term Loan Claims redacted).

118.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

119.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.  For the purposes of clarity, with respect to clause (x) of Article III.B.6(c)(i)(B) herein, the term Pro Rata shall mean the proportion that an Allowed First Lien Term Loan Claim of a Holder that elects the First Lien Term Loan Equity Election bears to the aggregate amount of Allowed First Lien Term Loan Claims of all Holders that elect the First Lien Term Loan Equity Election.

120.     "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief.

121.     "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

122.     "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

123.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

124.     "*Purchase Agreement*" means that certain asset purchase agreement filed as <u>Exhibit 6</u> to the Plan Supplement on the Petition Date [Docket No. 34].

125.     "*Purchaser*" means the Buyer, as defined in the Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Purchase Agreement).

126.     "*Releasing Parties*" means, collectively:  (a) the First Lien Credit Facility Agents; (b) the Revolving Credit Facility Lenders; (c) the First Lien Term Loan Lenders; (d) the Second Lien Term Loan Agents; (e) the Second Lien Term Loan Lenders; (f) the DIP Agent; (g) the DIP Lenders; (h) the counterparties to the Secured Swap Agreements; (i) the Indenture Trustee; (j) the Shareholders; (k) the Backstop Parties; (l) the Former Backstop Parties; (m) the Purchaser; and (n) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (z) who are in a Class that is deemed to reject the Plan.

127.     "*Reorganized*" means, with respect to any Debtor, such Debtor on and after the Effective Date.

128.     "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Purchase Agreement including (a) the consummation of the Sale Transaction pursuant to the Purchase Agreement; (b) the consummation of the transactions contemplated by the Backstop Unit Purchase Agreement; (c) the execution and delivery of appropriate agreements or other documents of merger, consolidation, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent

with or reasonably necessary to implement the terms of the Plan and the Purchase Agreement and that satisfy the requirements of applicable law; (d) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Purchase Agreement; and (e) all other actions that the Purchaser determines are necessary or appropriate.

129. "*Revolving Credit Facility*" means the $250.0 million secured revolving credit facility provided under the First Lien Credit Agreement, together with all documents related thereto.

130. "*Revolving Credit Facility Claim*" means any Claim against any Debtor arising under or related to the Revolving Credit Facility; provided that Secured Swap Claims, First Lien Term Loan Claims and any letters of credit which are intended to be reinstated and continue post-petition rather than be paid in full (pursuant to the terms of the DIP Agreement and/or Exit Facility Agreement) shall not constitute Revolving Credit Facility Claims.

131. "*Revolving Credit Facility Lenders*" means those banks, financial institutions, and other lender parties to the Revolving Credit Facility from time to time, each in their capacity as such.

132. "*Rights*" means the non-transferable, non-certificated rights distributed to Rights Offering Participants to purchase New Common Units on the Effective Date at the Rights Exercise Price in an amount equal to the Rights Offering Amount pursuant to the terms and conditions of the Rights Offering, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan and the Warrants, if issued.

133. "*Rights Exercise Price*" means the purchase price per Rights Offering Unit in connection with the Rights Offering equal to (a) the Rights Offering Amount, divided by (b) the total number of Rights Offering Units offered for sale in connection with the Rights Offering.

134. "*Rights Offering*" means that certain offering of Rights to (a) the First Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Rights Offering Amount, which amount shall be reduced on a dollar-for-dollar basis by the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants pursuant to the Rights Offering, and (b) in the event that Class 7 Second Lien Term Loan Claims votes to accept the Plan, the Second Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Second Lien Term Loan Rights Offering Amount.

135. "*Rights Offering Amount*" means Cash in an amount equal to (a) $181,600,000 minus (b) an amount equal to (i) the total amount of Cash that would be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims if all of the Holders of such Claims (other than Wayzata, as a Holder of Allowed First Lien Term Loan Claims) elected to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, pursuant to the Plan, minus (ii) the total amount of Cash that will actually be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims as a result of the Holders of such Claims electing to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, which will, after receipt thereof by the Purchaser, be paid by the Purchaser to the Debtors as a portion of the purchase price under the Purchase Agreement.

136. "*Rights Offering Documents*" means, collectively, all related agreements, documents or instruments in connection with the Rights Offering and the Backstop Unit Purchase Agreement.

137. "*Rights Offering Participants*" means, collectively, the First Lien Term Loan Rights Offering Participants and the Second Lien Term Loan Rights Offering Participants.

138. "*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court as Exhibit J to the Disclosure Statement Order.

139. "*Rights Offering Units*" means the New Common Units offered for sale in connection with the Rights Offering.

140. "*Sale Transaction*" means that certain transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement that contemplates either (a) a taxable transaction whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the Acquired Assets or (b) in the event the Backstop Parties make an election to do so pursuant to the Backstop Unit Purchase Agreement, a reorganization whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the capital stock and/or debt of one or more of the Reorganized Debtors, in either case, in exchange for (i) the assumption of the Assumed Liabilities (with respect to the transaction described in clause (b), above, only to the extent the Purchaser does not acquire, directly or indirectly, substantially all the capital stock of each Reorganized Debtor), (ii) 100% of the New Common Units (subject to dilution by the Rights Offering, the Management Equity Incentive Plan and the Warrants, if issued), (iii) the Warrants, if issued, and (iv) the Cash proceeds received by the Purchaser in connection with the Capital Call Agreement, the Rights Offering and pursuant to the Backstop Unit Purchase Agreement.

141. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan in the form filed with the Bankruptcy Court as <u>Exhibit 9</u> to the Plan Supplement on July 14, 2010 [Docket No. 272], as the same may be amended, modified or supplemented from time to time, and which schedule will be subject to the consent of the Backstop Parties (including with respect to any amendment, modification or supplement).

142. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

143. "*Second Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp., LYN Holdings Corp., and certain of its subsidiaries, as borrowers, the Second Lien Term Loan Agents, and the Second Lien Term Loan Lenders.

144. "*Second Lien Term Loan*" means the $290.0 million secured term loan provided under the Second Lien Credit Agreement.

145. "*Second Lien Term Loan Administrative Agent*" means Wilmington Trust FSB, in its capacity as administrative agent under the Second Lien Credit Agreement.

146. "*Second Lien Term Loan Agents*" means, collectively, (a) the Second Lien Term Loan Administrative Agent, (b) Wilmington Trust FSB, in its capacity as second lien collateral agent under the Intercreditor Agreement, (c) CIBC Inc. and UBS Securities LLC, in their capacity as documentation agents under the Second Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the Second Lien Credit Agreement.

147. "*Second Lien Term Loan Cash Payment*" means Cash in an amount equal to $10,000,000.

148. "*Second Lien Term Loan Claim*" means any Claim of a Second Lien Term Loan Lender against any Debtor related to the Second Lien Term Loans and arising under the Second Lien Credit Agreement, together with all of the security and other documents related thereto. For the avoidance of doubt, Second Lien Term Loan Claim includes any deficiency claim arising under the Second Lien Term Loan.

149. "*Second Lien Term Loan Equity Election*" means 4.55% of the New Common Units issued and outstanding on the Effective Date (subject to dilution by the Management Equity Incentive Plan).

150. "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lender parties to the Second Lien Credit Agreement from time to time, each in their capacity as such.

151. "*Second Lien Term Loan Rights Offering Amount*" means $7.5 million.

152. "*Second Lien Term Loan Rights Offering Participants*" means all Holders of Second Lien Term Loan Claims that are accredited investors or qualified institutional buyers, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, as of the Voting Record Date.

153. "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

154. "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

155. "*Secured Swap Agreements*" means that certain ISDA Master Agreement with Bank of America, N.A. dated June 14, 2007, and that certain ISDA Master Agreement with UBS AG dated June 20, 2007, and each related to the First Lien Credit Agreement.

156. "*Secured Swap Claims*" means Claims against any Debtor arising from amounts due under the Secured Swap Agreements.

157. "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

158. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

159. "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

160. "*Senior Notes*" means those 10% Senior Notes due 2015, issued under the Senior Notes Indenture.

161. "*Senior Notes Claim*" means any Claim against any Debtor arising from or based upon the Senior Notes or the Senior Notes Indenture; provided that Senior Notes Claims shall not include Section 510(b) Claims.

162. "*Senior Notes Indenture*" means that certain indenture dated May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp. as issuer, and certain Affiliates of Neff Corp. as guarantors, and Law Debenture Trust Company of New York, as successor indenture trustee.

163. "*Shareholders*" means Lightyear Capital, LLC, General Electric Pension Trust, and Norwest Equity Partners VIII, LP, and each of their current and former affiliates, officers, directors, managers, members, professionals, and general and limited partners, in their capacity as members of Neff Holdings, LLC.

164. "*Swap Amendments*" means amendments to the Secured Swap Agreements dated May 14, 2010, attached as exhibits to the Swap Plan Support Agreements.

165. "*Swap Plan Support Agreements*" means those certain plan support agreements dated May 14, 2010, by and between the Debtors and the counterparties to the Secured Swap Agreements, as may be amended, supplemented, or otherwise modified from time to time, filed as Exhibit 7 to the Plan Supplement on the Petition date [Docket No. 34].

166. "*Third Party Release*" means the release provision set forth in Article VIII.D hereof.

167.    "*Third Party Releasees*" means, collectively, (a) the First Lien Credit Facility Agents; (b) the First Lien Credit Facility Lenders; (c) provided that the Class 7 Second Lien Term Loan Claims vote to accept the Plan, (i) the Second Lien Term Loan Agents and (ii) the Second Lien Term Loan Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the counterparties to the Secured Swap Agreements; (g) the Indenture Trustee; (h) the Shareholders; (i) the Backstop Parties; (j) the Former Backstop Parties; (k) the Ad Hoc Group; (l) the Purchaser; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), all such Entities' respective current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives, and successors and assigns of each of the foregoing in their respective capacities as such; provided that any Holder of a Claim who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee.

168.    "*Transaction Expenses*" mean the reasonable and documented fees (other than the Commitment Fee and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Commitment Letter, the Backstop Commitments, the Rights Offering, the Backstop Unit Purchase Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Commitment Letter and/or the Backstop Unit Purchase Agreement, including (a) the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and any other advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 and any expenses related thereto.

169.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

170.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

171.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

172.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

173.    "*Voting Record Date*" means the close of business on July 12, 2010.

174.    "*Warrants*" means warrants to purchase New Common Units representing up to 5% of issued and outstanding New Common Units on the Effective Date (immediately after giving effect to the consummation of the Rights Offering and the other transactions contemplated by the Plan) exercisable in Cash at an exercise price implied by a total equity value of the New Common Units equal to $224.0 million pursuant to the Warrant Agreement, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan.

175.    "*Warrant Agreement*" means that certain agreement, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Group, setting forth the terms and conditions of the Warrants, to be included in the Plan Supplement.

176.    "*Wayzata*" means certain funds under the management or control of Wayzata Investment Partners that are Backstop Parties.

177.    "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates following the Effective Date as set forth in Article IV.T hereof.

*B.*     *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

*C.*     *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

*D.*     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided that corporate or limited liability company governance matters relating to the Debtors or the Purchaser, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Purchaser, as applicable.

*E.*     *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F.*     *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement or the Plan and the Purchase Agreement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).

## ARTICLE II.
## DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS

*A.*     *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Purchaser, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of

such Allowed Administrative Claim either: (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims.

Except as otherwise provided in this Article II.A, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Purchaser no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Purchaser or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

In the case of the Ad Hoc Group Advisor Fee Claims, such Ad Hoc Group Advisor Fee Claims will be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) for all reasonable and documented fees and expenses incurred up to the Effective Date, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

B.    *Accrued Professional Compensation Claims*

1.    <u>Final Fee Applications</u>

All final requests for payment of Claims of a Professional shall be filed no later than 60 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

In accordance with Article II.B.3 hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or Acquired Assets, as applicable. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Accrued Professional Compensation Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be distributed to the Purchaser and shall be treated as a reduction in the purchase price paid by the Purchaser for the Debtors' assets.

3.    <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 5 days prior to the anticipated Effective Date; <u>provided</u> <u>that</u> such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors (in consultation with the Purchaser) may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4. <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or Purchaser, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Purchaser, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Purchaser may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims*

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be paid in full in Cash by the Debtors on the Effective Date.

D.    *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim, (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the Debtors (on the Effective Date) or paid by the Purchaser (after the Effective Date), and such Holder, <u>provided</u> that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective Date) or the Purchaser (after the Effective Date), Cash paid by the Purchaser in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than 5 years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Purchaser (after the Effective Date) and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

A.    *Summary of Classification*

All Claims and Interests, other than DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1. <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 4 | Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 5 | Secured Swap Claims | Impaired | Entitled to Vote |
| 6 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 7 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 8 | Senior Notes Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 13 | Equity Interests in the Debtors | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

The treatment and voting rights provided to each Class for distribution purposes is specified below:

1.    Class 1 - Other Priority Claims

   (a)    *Classification*:  Class 1 consists of all Other Priority Claims.

   (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

      (i)    be paid in full in Cash in an amount equal to such Allowed Other Priority Claim by the Debtors on the Effective Date or by the Purchaser in the ordinary course of business after the Effective Date; or

      (ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

   (c)    *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 - Secured Tax Claims

   (a)    *Classification*:  Class 2 consists of all Secured Tax Claims.

   (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Tax Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

K&E 1750719617694833

<div style="margin-left:2em;">

(i)      be paid in full in Cash by the Debtors on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or

(ii)     be paid by the Debtors or the Purchaser (as applicable), commencing on the Effective Date and continuing over a period not exceeding 5 years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Purchaser to prepay the entire amount of such Allowed Secured Tax Claim during such time period; or

(iii)    be paid regular Cash payments by the Debtors (on the Effective Date) or the Purchaser (in the ordinary course of business after the Effective Date), in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

</div>

(c)     *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

3.     <u>Class 3 - Other Secured Claims</u>

(a)     *Classification*:  Class 3 consists of all Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

<div style="margin-left:2em;">

(i)      be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by the Debtors on the Effective Date; or

(ii)     receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

</div>

(c)     *Voting*:  Class 3 is Unimpaired, and Holders of Class 3 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.     <u>Class 4 - Revolving Credit Facility Claims</u>

(a)     *Classification*:  Class 4 consists of all Revolving Credit Facility Claims.

(b)     *Allowance*:  The Revolving Credit Facility Claims shall be Allowed as of the Petition Date in the amount of $153.3 million, plus interest and fees due and owing under the Revolving Credit Facility both prior to and after the Petition Date through the Effective Date, subject

<div style="text-align:center;">19</div>

to such Claims being partially paid in Cash with certain proceeds of the DIP Facility, and such Claims shall not be subject to any request for setoff or recoupment.

(c) *Treatment*: Except to the extent that (i) a Holder of an Allowed Revolving Credit Facility Claim agrees to a less favorable treatment or (ii) such Revolving Credit Facility Claims have been paid in full with proceeds from the DIP Facility or otherwise, in exchange for the full and final satisfaction, settlement, release, and compromise of each and every Allowed Revolving Credit Facility Claim, each Holder of such Claim shall be paid in full in Cash by the Debtors in respect of such Allowed Revolving Credit Facility Claim on the Effective Date, or as soon as reasonably practicable thereafter by the Purchaser or Disbursing Agent.

(d) *Voting*: Class 4 is Unimpaired, and Holders of Class 4 Revolving Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Revolving Credit Facility Claims are not entitled to vote to accept or reject the Plan.

5. Class 5 - Secured Swap Claims

(a) *Classification*: Class 5 consists of all Secured Swap Claims.

(b) *Allowance*: The Secured Swap Claims shall be Allowed in an aggregate amount equal to $22.4 million.

(c) *Treatment*: Except to the extent that a Holder of an Allowed Secured Swap Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Swap Claim, each Holder of such remaining Allowed Secured Swap Claim shall be entitled to the treatment set forth in the applicable Swap Amendment.

(d) *Voting*: Class 5 is Impaired. Therefore, Holders of Allowed Class 5 Secured Swap Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

6. Class 6 - First Lien Term Loan Claims

(a) *Classification*: Class 6 consists of all First Lien Term Loan Claims.

(b) *Allowance*: The First Lien Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $87.9 million, plus interest and fees due and owing under the First Lien Term Loan as of the Effective Date pursuant to the terms of the First Lien Credit Agreement or related documents.

(c) *Treatment*: Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Term Loan Claim, each Holder of such Allowed First Lien Term Loan Claim shall receive:

(i) At the election of such Holder, either:

(A) the First Lien Term Loan Cash Payment; or

(B) such Holder's (x) Pro Rata share of 100% of the New Common Units (subject to dilution by the Rights Offering Units, the Second Lien Term Loan Equity Election, the Warrants, if issued, and the Management Equity Incentive Plan) <u>and</u> (y) Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the

20

Rights Offering Amount less the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants in connection with the Rights Offering; provided that Holders of First Lien Term Loan Claims that are not First Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were First Lien Term Loan Rights Offering Participants; and

(ii)     if Class 8 Senior Notes Claims or Class 9 General Unsecured Claims votes in favor of the Plan, such Holder's Pro Rata share of the Cash Payment; provided that the portion of the Cash Payment to be received by such Holder shall be automatically (without a need for any action on the part of such Holder) transferred by gift to Holders of Allowed Class 8 Senior Notes Claims and/or Allowed Class 9 General Unsecured Claims on a Pro Rata basis if such Class or Classes vote to accept the Plan.

(d)     *Voting*: Class 6 is Impaired. Therefore, Holders of Class 6 First Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)     *Distributions*: Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Cash Payment shall receive its Plan distribution in Cash from the Debtors on the Effective Date. Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

7.     Class 7 - Second Lien Term Loan Claims

(a)     *Classification*: Class 7 consists of all Second Lien Term Loan Claims.

(b)     *Allowance*: The Second Lien Term Loan Claims shall be Allowed in the amount of $298,972,080.10.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Term Loan Claim, each Holder of such Allowed Second Lien Term Loan Claim shall receive:

(i)     **If Class 7 votes to accept the Plan**:

(A)     At the election of each Holder, such Holder's Pro Rata share of either:

(I)     the Second Lien Term Loan Cash Payment; or

(II)     the Second Lien Term Loan Equity Election;

(B)     such Holder's Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Second Lien Term Loan Rights Offering Amount; provided that Holders of Second Lien Term Loan Claims that are not Second Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead

shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were Second Lien Term Loan Rights Offering Participants; and

    (C)    such Holder's Pro Rata share of $63,000,000 in Cash.

  (ii)  **If Class 7 votes to reject the Plan:** Such Holder's Pro Rata share of the Warrants to purchase 5.0% of the New Common Units to be issued and outstanding on the Effective Date.

(d)    *Voting*: Class 7 is Impaired. Therefore, Holders of Class 7 Second Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)    *Distributions*: Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Cash Payment shall receive its Plan distribution in Cash and Rights from the Debtors on the Effective Date. Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units, Cash, and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

8.    <u>Class 8 - Senior Notes Claims</u>

(a)    *Classification*: Class 8 consists of all Senior Notes Claims.

(b)    *Allowance*: The Senior Notes Claims shall be Allowed in the aggregate amount of $35.9 million.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim, each Holder of such Allowed Senior Notes Claim shall receive from the Debtors, on the Effective Date, or the Purchaser or Disbursing Agent, as soon after the Effective Date as reasonably practicable:

  (i)  **If Class 8 votes to accept the Plan:** No recovery on account of such Claims; provided that Holders of Allowed Class 8 Senior Notes Claims shall receive by gift their Pro Rata share of the Cash Payment.

  (ii)  **If Class 8 votes to reject the Plan:** No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(d)    *Voting*: Class 8 is Impaired. Therefore, Holders of Allowed Class 8 Senior Notes Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

9.    <u>Class 9 - General Unsecured Claims</u>

(a)    *Classification*: Class 9 consists of all General Unsecured Claims.

(b)    *Treatment*: Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive from the Debtors, on

the Effective Date, or the Purchaser or Disbursing Agent, as soon after the Effective Date as reasonably practicable:

(i) **If Class 9 votes to accept the Plan:** No recovery on account of such Claims; <u>provided that</u> Holders of Allowed Class 9 General Unsecured Claims shall receive by gift their Pro Rata share of the Cash Payment.

(ii) **If Class 9 votes to reject the Plan:** No recovery on account of such Claims and no Pro Rata share of the Cash Payment.

(c) *Voting*: Class 9 is Impaired. Therefore, Holders of Allowed Class 9 General Unsecured Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

10. <u>Class 10 - Intercompany Claims</u>

(a) *Classification*: Class 10 consists of all Intercompany Claims.

(b) *Treatment*: Holders of Allowed Class 10 Intercompany Claims shall not receive any distribution on account of such Claims; <u>provided that</u> the Debtors or the Purchaser reserve the right to reinstate any Class 10 Intercompany Claims in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 10 is Unimpaired, and Holders of Class 10 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

11. <u>Class 11 - Section 510(b) Claims</u>

(a) *Classification*: Class 11 consists of all Section 510(b) Claims.

(b) *Treatment*: Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims, and Section 510(b) Claims shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

(c) *Voting*: Class 11 is Impaired, and Holders of Class 11 Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 11 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

12. <u>Class 12 - Intercompany Interests</u>

(a) *Classification:* Class 12 consists of all Intercompany Interests.

(b) *Treatment:* Holders of Allowed Class 12 Intercompany Interests shall not receive any distributions on account of such Interests; <u>provided that</u> the Debtors or the Purchaser reserves the right to reinstate any or all Class 12 Intercompany Interests on or after the Effective Date.

(c) *Voting:* Class 12 is Unimpaired, and Holders of Class 12 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 12 Intercompany Interests are not entitled to vote to accept or reject the Plan.

K&E ~~17507196~~**17694833**

13. <u>Class 13 - Equity Interests in the Debtors</u>

    (a)    *Classification*:  Class 13 consists of all Equity Interests in the Debtors.

    (b)    *Treatment*:  Holders of Equity Interests in the Debtors will not receive any distribution on account of such Equity Interests, and Equity Interests in the Debtors (except with respect to any equity interests in any Reorganized Debtor whose equity has been sold to the Purchaser) shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

    (c)    *Voting*:  Class 13 is Impaired, and Holders of Class 13 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 13 Equity Interests are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Purchaser, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

E.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

H.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.*     *Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions. All amounts and securities necessary for the Debtors (on the Effective Date) or the Purchaser or Disbursing Agent (after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the liabilities assumed or consideration paid by the Purchaser to the Debtors in the Sale Transaction (including the Cash proceeds received by the Purchaser and paid to the Debtors in connection with the Rights Offering and/or pursuant to the Backstop Unit Purchase Agreement and/or the Capital Call Agreement, and the New Common Units and Warrants (if required) issued by the Purchaser to the Debtors for distribution under the Plan), the Exit Facility and Cash of the Debtors.  Notwithstanding anything herein to the contrary or in the Purchase Agreement, the Purchaser shall assume all liability for the distributions provided on account of all Allowed Claims against the Debtors as provided herein that are not satisfied by a distribution made by the Debtors on the Effective Date.

*B.*     *Rights Offering*

The Plan contemplates that the Debtors shall raise the Rights Offering Amount through the Rights Offering. On the Effective Date, the Debtors shall consummate the Rights Offering, through which each Rights Offering Participant, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, shall have the opportunity to purchase Rights Offering Units pursuant to the Rights Offering Documents.  The Rights Offering will dilute the New Common Units issued on account of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election pursuant to Article III.B.6 hereof and Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election pursuant to Article III.B.7 hereof.   The Rights Offering will be backstopped by the Backstop Parties in accordance with the terms and conditions of the Backstop Unit Purchase Agreement.    The Rights Offering shall be conducted and implemented in accordance with the Rights Offering Procedures.

*C.*     *Exit Facility*

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Purchaser (or one or more Reorganized Debtor, as applicable) in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Purchaser (and one or more Reorganized Debtor, as applicable) to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents.  The Purchaser may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.  To the extent Revolving Credit Facility Claims are not rolled up or otherwise satisfied by the DIP Facility as of the Effective Date, the remaining Revolving Credit Facility Claims shall be paid in full in Cash with the proceeds from the Exit Facility.

Upon the Confirmation Date, (1) the Purchaser (and one or more Reorganized Debtor, as applicable) is authorized to execute and deliver the Exit Facility Documents and perform its obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, and (2) subject to the occurrence of the Effective Date the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Purchaser (and/or one or more Reorganized Debtor, as applicable) and be enforceable in accordance with their respective terms.

*D.*     *The Purchase Agreement*

1.      <u>Issuance of New Common Units</u>

The Purchaser shall issue the New Common Units to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election in accordance with Article III.B.6 and/or Holders of Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election in accordance with Article III.B.7 hereof.  New Common Units shall also be (1) offered and sold pursuant to the Rights Offering and (2) reserved for the Management Equity Incentive Plan.

Each of the New Common Units issued and distributed pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.      <u>Warrants</u>

If Class 7 does not vote to accept the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Purchaser shall issue the Warrants to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed Class 7 Second Lien Term Loan Claims as of the Voting Record Date in accordance with Article III.B.7 hereof.

3.      <u>Vesting of Assets in the Purchaser</u>

Except as otherwise provided herein or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities (or the equity interests in one or more Reorganized Debtor, as applicable) shall vest in the Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility).  On and after the Effective Date, except as otherwise provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.      <u>Assumption of Liabilities by the Purchaser</u>

The Purchaser shall assume the Assumed Liabilities pursuant to Section 2.3 of the Purchase Agreement, including all (a) distributions under the Plan (other than those distributions made by the Debtors on the Effective Date or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on or after the Effective Date) and (b) costs associated with the Wind Down.  For the avoidance of doubt, and notwithstanding anything herein or in the Purchase Agreement to the contrary, the Purchaser assumes and shall be deemed to assume all liability for the distributions or treatment provided on account of all Claims against, obligations of, or Interests in the Debtors as set forth herein, and the Purchaser shall assume all liability for Administrative Claims and the costs and expenses associated with the Wind Down, including any distributions on account of Allowed Claims thereunder.

5.      <u>Powers of the Purchaser</u>

From and after the Effective Date and continuing through the date of entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear, be heard on and participate in matters brought before the Bankruptcy Court or any other court with jurisdiction over the Chapter 11 Cases; (2) be entitled to notice and opportunity for hearing on all such issues; (3) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; and (4) have the right to object to any and all Claims or Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

F.    *Section 1145 Exemption*

Except as set forth in the immediately succeeding sentence, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Rights, the New Common Units, and the Warrants, shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.  The New Common Units to be issued to the Backstop Parties in connection with the Backstop Unit Purchase Agreement shall be exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities pursuant to the exemptions set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder.  In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including, the Rights, the New Common Units and the Warrants shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval, if any.

G.    *Listing of New Common Units*

None of the New Common Units (including the Rights Offering Units and any New Common Units issuable upon exercise of the Warrants), the Rights or the Warrants will be listed on a national securities exchange and the Purchaser will not be a reporting company under the Securities Exchange Act.

H.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Purchase Agreement, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Purchaser and its successors and assigns.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Claims, Liens, encumbrances or Interests pursuant to the applicable sections of the Bankruptcy Code.

I.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Senior Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; (2) the obligations of the Debtors under the DIP

Facility, the Revolving Credit Facility, the First Lien Term Loan and the Second Lien Term Loan, shall be fully released, settled, and compromised as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including the Senior Notes Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, settled, and compromised.

J.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Purchaser may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan and the Purchase Agreement.  For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein or in the Purchase Agreement shall constitute a change of control under any agreement, contract or document of the Debtors or the Purchaser, as applicable.

K.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, and the Operating Agreement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers or officers of the Debtors, the Reorganized Debtors or the Purchaser, or any other Entity or Person, including: (1) execution of, entry into and performance under the Purchase Agreement; (2) execution of, entry into and performance under the Backstop Unit Purchase Agreement; (3) adoption or assumption, as applicable, and assignment to the Purchaser of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the Purchaser; (5) the execution of and entry into the Exit Facility Documents and the Capital Call Agreement; (6) the issuance and distribution of the Rights as provided herein; (7) the issuance and distribution of the New Common Units as provided herein; (8) the issuance and distribution of the Warrants, if applicable, as provided herein; (9) execution of, entry into and performance under the Operating Agreement; (10) adoption of the Management Equity Incentive Plan; and (11) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by, the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Operating Agreement and each of the foregoing documents or agreements (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement or the Operating Agreement involving the company structure of the Debtors or the Purchaser, and any company action required by the Debtors or the Purchaser in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors or the Purchaser. Consequently, except as provided in the Plan, Intercompany Interests shall be retained, and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers or authorized persons of the Debtors or the Purchaser (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, and the Operating Agreement (or necessary or desirable to effect the transactions contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement and the Operating Agreement) in the name

of and on behalf of the Debtors or the Purchaser, as applicable, including (1) the Exit Facility and the other Exit Facility Documents and (2) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

L.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Purchaser (or one or more Reorganized Debtor, as applicable) and the managers, officers, authorized persons and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Exit Facility Agreement, the Operating Agreement, the Capital Call Agreement and the securities issued pursuant to the Plan, the Operating Agreement, the Purchase Agreement and the Backstop Unit Purchase Agreement, in the name of and on behalf of the Purchaser (or one or more Reorganized Debtor, as applicable), without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement and the Operating Agreement.

M.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Purchase Agreement or Exit Facility Documents shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the Sale Transaction; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; (5) the issuance, distribution and/or sale of any of the New Common Units, the Rights, the Warrants (if issued) and any other securities of the Debtors or the Purchaser; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Purchase Agreement, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan or the Purchase Agreement.

N.      *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

O.      *Board Representation*

The Purchaser shall be managed by the New Board which will consist of 5 members. In accordance with the Operating Agreement, the Backstop Parties shall have the right to appoint four members of the New Board as of the Effective Date. The fifth member of the New Board shall be the Chief Executive Officer of the Purchaser. To the extent known, the Plan Supplement will list the members of the New Board identified as of the date of the filing thereof.

K&E 1750719617694833

If the Purchaser purchases equity in one or more Reorganized Debtors, the board of such Reorganized Debtor as of the Effective Date shall be chosen by the Backstop Parties; provided that the Chief Executive Officer of the Purchaser shall remain as a director or member, as applicable.

P.      *Indemnification Provisions*

Notwithstanding anything herein to the contrary or pursuant to the termination, dissolution, or wind down of any or all of the Debtors, the Debtors (if necessary to continue all Indemnification Provisions in full force) or, as applicable, the Reorganized Debtors, as of the Effective Date, shall be deemed to have assumed all Indemnification Provisions and assigned such provisions to the Purchaser as though such Indemnification Provisions were to have full force and effect; provided that the assumption by the Debtors of the Indemnification Provisions and the assignment thereof to the Purchaser shall not be deemed to be an assumption or assignment of the contract, agreement, resolution, instrument or document in which such Indemnification Provisions are contained, memorialized, agreed to, embodied or created (or any of the other terms or provisions thereof) unless, and only to the extent that, such contract, agreement, resolution, instrument or document is an Acquired Asset. All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions or transactions occurring prior to the Effective Date; provided that notwithstanding anything herein to the contrary, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter.

Q.      *Management Equity Incentive Plan*

On or before the Effective Date, the Purchaser shall adopt the Management Equity Incentive Plan. The Plan Supplement will contain the Management Equity Incentive Plan.

R.      *Emergence Awards*

On the Effective Date, the Emergence Awards will be deemed approved in their entirety without any further action by the Debtors or the Purchaser and the Debtors will be authorized to make all payments with respect to the Emergence Awards on the Effective Date.

S.      *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article VIII.C and Article VIII.E hereof), the Purchaser shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Purchaser's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Purchaser may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Purchaser. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Purchase Agreement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Purchaser, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Purchaser have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Purchaser, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Purchaser expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

T.      *Wind Down and Dissolution of the Debtors*

On and after the Effective Date, the Liquidator will implement, and the Purchaser will oversee and fund, the Wind Down pursuant to the Liquidator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Liquidator shall:  (a) change the business and corporate names of each of the Debtors to new names bearing no resemblance to any of the present names of such Debtor so as to permit the use of such names by the Purchaser; (b) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement; (c) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (d) complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (e) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of this Plan.  The filing by the Liquidator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members, the board of directors or board of managers of each such Debtor.  Notwithstanding anything herein or in the Purchase Agreement, to the contrary, the Purchaser shall assume all liability for all costs, expenses, or claims arising from or related to any Wind Down, including the costs and expenses associated with any Claims resolution or similar process following the Effective Date (whether undertaken pursuant to Article VII hereof or otherwise).  Notwithstanding anything herein to the contrary, the Purchaser or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.  In the event the Backstop Parties make an election, pursuant to the Backstop Unit Purchase Agreement, to pursue the Sale Transaction as a stock purchase rather than an asset purchase, the Debtors and the Backstop Parties agree to work together in good faith to modify this Plan as necessary to reflect such changed structure.

U.      *Liquidator*

Prior to or on the Effective Date, the Liquidator may be designated by the Debtors pursuant to the terms of the Liquidator Agreement for purposes of conducting the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders (subject, at all times, to the oversight of the Purchaser), and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidator.  All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date, or transferred pursuant to the Purchase Agreement, shall be transferred to the Liquidator and managed and distributed by the Liquidator pursuant to the terms of the Liquidator Agreement and shall be held in the name of the Debtors free and clear of all Claims against the Debtors and Interests in the Debtors except for rights to such distributions provided to Holders of Allowed Claims as provided herein.  Any and all costs and expenses incurred by the Liquidator in connection with the Wind Down shall be paid by the Purchaser.

As provided in the Liquidator Agreement, the Entity chosen to be the Liquidator shall have such qualifications and experience to enable the Liquidator to perform its obligations under this Plan and under the Liquidator Agreement.  Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Liquidator, the Purchaser shall designate another Entity to become Liquidator and such Entity will become the successor Liquidator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidator. The Liquidator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidator Agreement by the Purchaser.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.  *Assumption and Assignment of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected, as mutually agreed upon by the Debtors and the Backstop Parties; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject, as mutually agreed upon by the Debtors and the Backstop Parties, of a motion to reject filed on or before the Confirmation Date; (4) is identified as an Executory Contract or Unexpired Lease to be rejected, as mutually agreed upon by the Debtors and the Backstop Parties, pursuant to the Plan Supplement; (5) is not an Acquired Asset; or (6) without limiting the generality of clause (5), is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

On July 14, 2010, the Debtors Filed the Schedule of Rejected Executory Contracts and Unexpired Leases. The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Rejected Executory Contracts and Unexpired Leases in the manner set forth in the Backstop Unit Purchase Agreement. Notwithstanding anything to the contrary in the Plan, unless otherwise approved in advance by the Backstop Parties, the Debtors shall not assume and assign to the Purchaser any employment agreement and employee benefit plan except for those employment agreements and employee benefit plans specifically set forth on Schedule 2.1(e) to the Purchase Agreement and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Purchaser an amendment, consent and acknowledgment agreement described in Section "C" on Schedule 2.1(e) to the Purchase Agreement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date. Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph and or anything contrary herein, the Debtors and the Backstop Parties reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date. Moreover, notwithstanding the foregoing paragraph, after the Effective Date, the Purchaser shall have the right to terminate, amend, or modify any Executory Contracts, Unexpired Leases, leases, or other agreements without approval of the Bankruptcy Court.

B.  *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan or the Purchase Agreement that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Cost or by an agreed-upon waiver of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Purchaser and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

On July 30, 2010, the Debtors caused notices of proposed assumptions and assignments to the Purchaser and proposed Cure Costs and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be served on applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be filed, served and actually received by the Debtors by the Confirmation Objection Deadline. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such matters.

In the event of a dispute regarding: (1) the amount of any Cure Cost; (2) the ability of the Purchaser to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to

K&E ~~17507196~~17694833

assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Purchaser, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or after the Effective Date, the Purchaser, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) the Claims Bar Date established in the Chapter 11 Cases.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.F hereof, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Purchaser expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Purchaser, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or the Purchase Agreement, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan or the Purchase Agreement. Nothing in the immediately preceding sentence shall be deemed to limit, supersede or change the provisions set forth in Article V.G.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.       *Insurance Policies*

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the applicable Debtor under the Plan and the Bankruptcy Code and shall be assumed by the applicable Debtor and assigned to the Purchaser in accordance with the terms of the Purchase Agreement and the Plan.

G.       *Compensation and Benefit Programs*

All employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their respective employees, retirees and directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases and will be rejected unless any of the foregoing is an Acquired Asset in accordance with the Purchase Agreement, in which case the same shall be assumed and assigned to the Purchaser pursuant to the terms of the Purchase Agreement and the Plan.

H.       *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan or the Purchase Agreement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Purchaser has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Purchaser, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

I.       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan.

B.      *Distributions Generally; Disbursing Agent*

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Purchaser, the Liquidator, or such other Entity designated by the Purchaser as a Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement*

Notwithstanding anything to the contrary contained herein: (1) the Purchase Price (as such term is defined in the Purchase Agreement) shall be used solely to make distributions under the Plan, whether or not such distributions are made on the Effective Date or thereafter; and (2) for purposes of distributions to be made of Estate assets received or receivable from the Purchaser pursuant to the Purchase Agreement in the form of the Purchase Price as provided herein, such assets shall be distributed solely by (a) prior to or on the Effective Date, the Debtors and (b) following the Effective Date, the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on behalf of the Debtors.

D.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Purchase Agreement; (b) make all distributions contemplated under the Plan and the Purchase Agreement; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Purchase Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Purchaser.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Purchaser, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order**; provided that if the Debtors or the Purchaser, as applicable, do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not Disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan**.

1.        Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

Distributions to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims shall (a) be made to the First Lien Credit Facility Administrative Agent and/or the Second Lien Term Loan Administrative Agent, as applicable, for the benefit of the respective Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively, as provided herein and under the Purchase Agreement and (b) be deemed completed when made to the First Lien Credit Facility Administrative Agent and the Second Lien Term Loan Administrative Agent, as applicable. Distributions to Holders of Senior Notes Claims shall (x) be made to the Indenture Trustee for the benefit of Holders of Senior Notes Claims and (y) be deemed completed when made to the Indenture Trustee.

Prior to the distribution of New Common Units hereunder, the recipient of such New Common Units shall furnish to the transfer agent identified by the Debtors such identification and tax information as may be required by the Debtors. Additionally, prior to the distribution of New Common Units hereunder, the recipient of such New Common Units shall execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement (and such New Common Units shall be deemed an undeliverable distribution until such execution and delivery); provided, however, that (and without limiting the strict requirement that any such recipient execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement as hereinabove provided) any such recipient shall be automatically bound by, and any New Common Units or other securities to be received by such recipient shall be automatically subject to, the terms of the Operating Agreement whether or not such recipient shall have executed and/or delivered a counterpart of the Operating Agreement. The requirements in this paragraph, except with respect to the Backstop Parties, may be complied with, and the distributions associated therewith made, after the Effective Date.

2.        Minimum; De Minimis Distributions

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Common Units and such fractions shall be deemed to be zero. No cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

3.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Purchaser (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.        Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

5. <u>Surrender of Cancelled Instruments or Securities Relating to Senior Notes Claims</u>

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Senior Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be canceled, except to the extent otherwise provided herein. The Indenture Trustee may (but shall not be required to) request registered Holders to surrender their Senior Notes for cancellation.

G.  *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest; <u>provided that</u> with respect to Allowed Claims receiving distributions from the Debtors under the Plan but that are not being fully paid, such distributions will be allocated first to accrued but unpaid interest, if any, and then to the principal amount of such Claims.

H.  *Claims Paid or Payable by Third Parties*

1.  <u>Claims Paid by Third Parties</u>

The Debtors on or prior to the Effective Date or the Purchaser after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Purchaser or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on account of such Claim, such Holder shall, within 2 weeks of receipt thereof, repay or return the distribution to the Purchaser or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan.

2.  <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy**; provided that if the Debtors or the Purchaser, as applicable, believe a Holder of an Allowed Claim has recourse to an insurance policy and intend to withhold a distribution pursuant to this Article VI.H.2, the Debtors or the Purchaser, as applicable, shall cause the Disbursing Agent to provide written notice to such Holder as to what the Debtors or the Purchaser, as applicable, believe to be the nature and scope of applicable insurance coverage**. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Purchaser, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.     Resolution of Disputed Claims*

1.     Allowance of Claims

On or after the Effective Date, the Purchaser shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan, in the Purchase Agreement or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.     Prosecution of Objections to Claims

The Debtors prior to and on the Effective Date or the Purchaser after the Effective Date, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Purchaser may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  From and after the Effective Date, the Purchaser shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.     Claims Estimation

Prior to and on the Effective Date, the Debtors, and after the Effective Date, the Purchaser, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Purchaser have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Purchaser, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Purchaser, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned

38

Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Debtors or the Purchaser, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Purchaser, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

5.      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

B.      *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtors or the Purchaser under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Purchaser allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Purchaser, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS OR THE PURCHASER, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

C.      *Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A hereof, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Purchaser, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

**ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the

Purchaser may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

## B. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Purchaser, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding anything herein to the contrary, and as provided in Article III.B.11 of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

## C. Debtor Release

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE PURCHASER WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, EACH OF THE DEBTORS AND THE DEBTORS' ESTATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS, INCLUDING UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO

PURSUANT TO THE PLAN; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE PURCHASER HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, <u>AND FURTHER</u>, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE PURCHASER ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

D.      *Third Party Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; <u>PROVIDED</u> <u>THAT</u> THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A DEBTOR RELEASEE OR A THIRD PARTY RELEASEE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY; (2) ARISING UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE

41

RELEASING PARTIES, THE DEBTORS OR THE PURCHASER MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

E.    Exculpation

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Plan Support Agreement, the Disclosure Statement, the Restructuring Transactions, the Rights Offering, the Backstop Unit Purchase Agreement, the issuance, distribution and/or sale of any of the New Common Units (including Rights Offering Units and New Common Units issuable upon exercise of the Warrants), the Rights, the Warrants (if issued) or any other security offered, issued or distributed in connection with this Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

F.    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.E); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING,

PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS ~~FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE~~**OBTAINED ENTRY OF A FINAL ORDER AUTHORIZING SUCH SETOFF AS PROVIDED HEREIN**; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, THE BACKSTOP PARTIES, THE FORMER BACKSTOP PARTIES, THE AD HOC GROUP, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

G.    *Setoffs*

Except as otherwise provided herein, the Debtors or the Purchaser, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Purchaser, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Purchaser of any such Claims, rights, and Causes of Action that the Purchaser may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Purchaser, as applicable, unless such Holder ~~has Filed a motion with~~**obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff; provided that nothing herein shall prejudice or be deemed to have prejudiced the Debtors' or Purchaser's, rights, as applicable, to assert that any Holder's setoff rights were required to have been asserted by motion to** the Bankruptcy Court ~~requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise~~**prior to the Effective Date**.

K&E ~~17507196~~17694833

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      The Plan Support Agreement shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Ad Hoc Group and such Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

3.      The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be in form and substance reasonably acceptable to the Debtors and to the Ad Hoc Group;

4.      The Backstop Party Fees shall have been paid in full in Cash in accordance with the Backstop Unit Purchase Agreement, the Plan Support Agreement, the Plan, and the interim and final orders approving the DIP Facility;

5.      The Exit Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facility shall have occurred;

6.      The Debtors shall have assumed the Backstop Unit Purchase Agreement and the Commitment Letter;

7.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

8.      All documents and agreements necessary to implement this Plan and the Sale Transaction shall have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

9.      The Liquidator shall have been appointed (if applicable), and the Debtors and the Liquidator shall have executed and delivered the Liquidator Agreement;

10.      The Debtors shall have paid in full in Cash all reasonable and documented Ad Hoc Group Advisor Fee Claims; and

11.      All conditions to closing under the Backstop Unit Purchase Agreement and the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

B.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Purchaser.

C.      *Effective Date*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A hereof have been satisfied or waived. "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Payout Event*

As originally Filed on May 17, 2010 and subsequently amended from time to time, the Plan contemplated the possibility of obtaining higher or better distributions to all Classes receiving distributions under the Plan pursuant to a Payout Event. On August 5, 2010, the Debtors commenced an auction subsequent to receiving a competing bid prior to the Payout Event Deadline from an entity proposing to effectuate a Payout Event. Although a Payout Event did not ultimately occur as a result of such competing bid, this modified Plan includes such necessary conforming changes attributable to, among other things, the increased creditor recoveries.

B.      *Modification and Amendments*

Subject to the limitations contained herein and in the Plan Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

C.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

D.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

K&E ~~17507196~~17694833

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Purchaser amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 hereof;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Plan Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     to resolve any disputes arising under the Purchase Agreement, Backstop Unit Purchase Agreement, Warrant Agreement, Liquidator Agreement, Capital Call Agreement (as it relates to any capital call to be made on the Effective Date or to the extent such disputes relate to implementation of the Plan), or Plan Support Agreement;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Purchaser, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan or the Purchase Agreement, each Entity acquiring property under the

Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement. The Debtors or the Purchaser, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Purchase Agreement.

C.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Purchaser (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases.

E.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Purchaser shall be served on:

Neff Corp.
3750 N.W. 87th Avenue, Suite 400
Miami, Florida 33178
Attn.: Mark Irion

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Drive
Chicago, Illinois 60654
Attn.: Anup Sathy, P.C., Ryan Preston Dahl and Wilson L. Tsu

48

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn.: Ray C. Schrock and Brian S. Lennon

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn.:  Kristopher M. Hansen and Jayme T. Goldstein

## H.     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## I.     *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Backstop Unit Purchase Agreement and the Purchase Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## J.     *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

K&E ~~17507196~~17694833

Respectfully submitted, as of the date first set forth above,

Neff Corp. (for itself and all Debtors)

By: _____
Name:   Mark Irion
Title:   Chief Financial Officer of Neff Corp.