**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEFF CORP., <u>et al.</u>,[1] | Case No. 10-12610 (SCC) |
|  | Jointly Administered |
| Debtors. |  |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), having:[2]

    a.    on May 16, 2010 (the "<u>Petition Date</u>"), commenced these chapter 11 cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

    b.    continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    c.    filed, on May 17, 2010, the *Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 4] and the *Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 25], which plan and related documents were subsequently amended;

        i.    filed on July 9, 2010, the *Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 251];

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

[2]    Unless otherwise noted, capitalized terms not defined in the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Confirmation Order</u>"), shall have the meanings ascribed to them in the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code,* dated September 21, 2010, attached hereto as **Exhibit A** (the "<u>Plan</u>"). The rules of interpretation set forth in Article I.B of the Plan shall apply to the Confirmation Order.

ii.     filed on May 17, 2010, that certain plan support agreement dated as of
        April 12, 2010, by and among the Debtors and certain Holders of First
        Lien Term Loan Claims and those certain plan support agreements dated
        May 14, 2010, by and among the Debtors and the counterparties to the
        Secured Swap Agreements, filed as <u>Exhibit 5</u> and <u>Exhibit 7</u>, respectively,
        to the *Supplement to Debtors' Joint Plan Pursuant to Chapter 11 of the
        United States Bankruptcy Code* [Docket No. 34] (collectively, and as the
        same may have been subsequently modified, supplemented, or otherwise
        amended from time to time, the "<u>Plan Support Agreements</u>");

iii.    filed on July 9, 2010, the *Amended Disclosure Statement for the Debtors'
        Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*
        [Docket No. 253];

iv.     filed on July 12, 2010, the *Debtors' Amended Joint Plan Pursuant to
        Chapter 11 of the Bankruptcy Code*, as <u>Exhibit A</u> to the *Notice of Filing of
        Further Amendments to the Debtors' Amended Joint Plan Pursuant to
        Chapter 11 of the Bankruptcy Code* [Docket No. 261] (the
        "<u>July 12 Plan</u>");

v.      received notice of the July 29, 2010, filing of the *Treasurer of Douglas
        County, Colorado's Objections to Confirmation of the Debtors' July 12,
        2010 Amended Plan of Reorganization* [Docket No. 307];

vi.     filed on August 19, 2010, the *Debtors' Second Amended Joint Plan
        Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 346];

vii.    received notice of the August 30, 2010, filing of the *Objection of
        Williamson County, Texas to Confirmation of Debtors' Amended Joint
        Plan of Reorganization* [Docket No. 363];

viii.   received notice of the August 31, 2010, filing of the *Miami-Dade County
        Tax Collector's Objection to Debtors' Second Amended Joint Plan
        Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 372];

ix.     received notice of the August 31, 2010, filing of the *Treasurer of Douglas
        County, Colorado's Objections to Confirmation of the Debtors' August
        19, 2010 Second Amended Plan of Reorganization* [Docket No. 373];

x.      received notice of the August 31, 2010, filing of the *Objection of Ector
        County Appraisal District, Galveston County, Harris County, Montgomery
        County, Round Rock Independent School District, Tarrant County and
        Texas City Independent School District to Debtors' Second Amended Joint
        Plan of Reorganization* [Docket No. 374];

xi.     received notice of the September 1, 2010, filing of the *Eagle
        Mountain-Saginaw Independent School District's Objection to Debtors'
        Second Amended Joint Plan of Reorganization* [Docket No. 376];

xii.    received notice of the September 1, 2010, filing of *Pima County's Objection to Confirmation of Debtors' Second Plan of Reorganization Dated August 19, 2010* [Docket No. 377];

xiii.    received notice of the September 1, 2010, filing of the *Objection of Certain Chartis Companies to (I) Debtors Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and (II) Notice of Filing of Schedule of Cure Costs for Executory Contracts and Unexpired Leases to be Assumed and Assigned by the Debtors as Exhibit 8 to the Supplement to the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 379] (the "Chartis Objection");

xiv.    received notice of the September 3, 2010, filing of *Objection of Official Committee of Unsecured Creditors to Confirmation of Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 384] (the "Committee Objection");

xv.    received notice of the September 7, 2010, filing of *Objection of Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of an Order Extending Their Exclusive Periods to File and Solicit Votes for a Chapter 11 Plan Pursuant to Section 1121(D) of the Bankruptcy Code* [Docket No. 401] (the "Exclusivity Objection");

xvi.    filed on September 12, 2010, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code (With Technical Modifications)* [Docket No. 423] (the "September 12 Plan");

xvii.    filed on September 12, 2010, the *[Proposed] Findings of Fact, Conclusions or Law, and Order Confirming Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 425];

d.    filed, on May 17, 2010, the *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 34] (as the same may have been subsequently modified, supplemented, or otherwise amended from time to time, the "Plan Supplement"), and with amendments to exhibits to the Plan Supplement filed thereafter;

i.    filed on July 14, 2010, the *Schedule of Executory Contracts and Unexpired Leases to be Rejected by the Debtors* ("Schedule of Rejected Executory Contracts and Unexpired Leases") as *Exhibit 9 to the Supplement to the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 272];

ii.    filed, on July 30, 2010, the *Notice of Filing of Schedule of Cure Costs for Executory Contracts and Unexpired Leases to be Assumed and Assigned by the Debtors* as *Exhibit 8 to the Supplement to the Debtors' Amended*

*Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 321] (the "<u>Cure Cost Schedule</u>");

iii.    filed on September 1, 2010, the *Form of Operating Agreement* as *Exhibit 11 to the Supplement to Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 382] (the "<u>Operating Agreement</u>");

iv.    filed on September 3, 2010, the *MEIP Term Sheet* as *Exhibit 13 to the Supplement to the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 389] (the "<u>MEIP</u>");

v.    filed on September 3, 2010, the *Form of Capital Call Agreement* as *Exhibit to the Supplement to Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 390] (the "<u>Capital Call Agreement</u>");

e.    filed, on the May 17, 2010, the *Motion of the Debtors for Entry of an Order Approving the Debtors' Disclosure Statement and Granting Related Relief* [Docket No. 33] (the "<u>Disclosure Statement Motion</u>");

f.    caused solicitation materials and notice of the deadline for objecting to confirmation of the Plan to be distributed beginning on or about July 15, 2010, and continuing thereafter (the "<u>Solicitation Date</u>"), consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Disclosure Statement Order (as defined herein), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "<u>Solicitation Procedures</u>") and related notices, forms, Ballots, and Master Ballots (collectively, the "<u>Solicitation Packages</u>"), as evidenced by, among other things, the *Affidavit of Service of James Sean McGuire* [Docket No. 296], the *Supplemental Affidavit of Service of Jennifer Grageda* [Docket No. 304], the *Supplemental Affidavit of Monika Parel* [Docket No. 324], the *Supplemental Affidavit of Service of Shakira L. Ferguson* [Docket No. 359], and the *Supplemental Affidavit of Service of Greg Barlage* [Docket No. 406] (collectively, the "<u>Solicitation Affidavits</u>");

g.    caused notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>") to be published on August 3, 2010, in *The Wall Street Journal*, as evidenced by the *Affidavit of Publication of Albert Fox in The Wall Street Journal* [Docket No. 333], and caused the Confirmation Hearing Notice to be published in the *Miami Herald* on August 2, 2010, as evidenced by the *Affidavit of Publication of Jeannette Martinez in the Miami Herald* [Docket No. 332] (collectively, the "<u>Publication Affidavits</u>");

h.    caused rights offering materials to be distributed in accordance with the Disclosure Statement Order and the Cash Election and Rights Offering Procedures approved by the Court substantially in the form attached to the

Disclosure Statement Order as Exhibit J (as amended, the "Cash Election and Rights Offering Procedures"), beginning on or about July 22, 2010, consistent with the Plan and the Backstop Unit Purchase Agreement, as evidenced by the *Affidavit of Service of Isidro N. Panizales re Rights Offering Documents Served on July 22, 2010* [Docket No. 331] (the "Cash Election/Rights Offering Affidavit");

i.     caused an auction (the "Auction") to be commenced on August 5, 2010 and closed on August 10, 2010, in compliance with those certain procedures approved by the Court substantially in the form attached to the Disclosure Statement Order as Exhibit M (including the Addendum to Amended Payout Event Procedures provided by the Debtors dated August 5, 2010 (the "Addendum to Payout Event Procedures"), the "Amended Payout Event Procedures"), in which the Successful Bid and the Backup Bid (each as defined in the Amended Payout Event Procedures) were identified, with all necessary parties thereafter provided sufficient notice and receiving the *Notice of Successful Bid Pursuant to Amended Payout Event Procedures* [Docket No. 348] and the *Notice of Backup Bid Pursuant to Amended Payout Event Procedures* [Docket No. 349], as evidenced by Jenna M. Convoy's *Affidavit of Service* [Docket No. 360];

j.     received notice of the August 18, 2010, filing of the *Ex Parte Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal an Unredacted Version of its Motion for Entry of an Order (I) Authorizing the Committee to Pursue Lender Claims and Other Claims and Causes of Action of the Debtors' Estates and (II) Granting Related Relief* [Docket No. 344];

k.     received notice of the August 18, 2010, filing of the *Notice of Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates* (the "Standing Motion") [Docket No. 345];

l.     revised the Plan in accordance with the Disclosure Statement Order, section 1127(a) of the Bankruptcy Code, and Bankruptcy Rule 3019 to reflect the Auction results and filed the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 346] on August 19, 2010;

m.     amended the Rights Offering Procedures to extend the Cash/Election/Rights Offering Expiration Date, amended the Rights Offering Documentation to reflect the Auction results and to be in accordance with the Cash Election and Rights Offering Procedures, and provided proper notice by filing and causing the *Notice of Amended Cash Election and Rights Offering Procedures, Extension of Cash/Election/Rights Offering Expiration Date, and Amended Election Forms* [Docket No. 350];

n.     filed, on September 4, 2010, the *Debtors' Opposition to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the*

*Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates* (the "Standing Objection") [Docket No. 394];

o.  filed, on September 4, 2010, the *Exhibits to Debtors Opposition to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates* [Docket No. 395] (the "Standing Objection Exhibits");

p.  filed, on September 3, 2010, the *Certification of James Sean McGuire with respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 391] (the "Voting Report");

q.  received notice of the September 7, 2010, filing of the *Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of an Order Extending Their Exclusive Periods to File and Solicit Votes for a Chapter 11 Plan Pursuant to Section 1121(D) of the Bankruptcy Code* [Docket No. 401];

r.  filed, on September 12, 2010, the *Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and (B) In Response to Objections Thereto* [Docket No. 418] (the "Confirmation Brief");

s.  filed on September 12, 2010, the *Exhibits to Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and (B) In Response to Objections Thereto* [Docket No. 419]

t.  filed, on September 12, 2010, the *Declaration of Mark Irion in Support of Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 420] (the "Irion Declaration");

u.  filed, on September 12, 2010, the *Declaration of Douglas J. Friske in Support of: (A) Payment of Emergence Awards, and (B) the Implementation of the Debtors' Management Equity Incentive Plan and Emergence Awards Pursuant to the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (the "Towers Declaration, and together, with the Irion Declaration, the "Declarations in Support of Confirmation");

v.  negotiated with the Purchaser[3] and the official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee"), consensual resolutions of

---

[3]    To be clear, "Purchaser" means the Buyer, as defined in the Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Purchase Agreement); provided that solely for purposes of distributions provided on account of Allowed Class 8 Senior Notes Claims, Allowed Class 9 General Unsecured Claims, and the Indenture Trustee Fee Amount and for no other purposes, Purchaser shall include and be deemed to include any

K&E 17739536

the Standing Motion and the Committee Objection, pursuant to which the Committee agreed, among other things, to withdraw the Standing Motion and the Committee Objection;

w.    filed the *Motion of the Debtors Seeking Approval of Immaterial Modifications to the Debtors' Chapter 11 Plan Without the Need for Resolicitation of Votes* [Docket No. 442]; and

x.    filed on September 20, 2010, the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 443].

This Court having:

a.    entered the *Order Approving the Debtors' Amended Disclosure Statement and Granting Related Relief* on July 13, 2010 [Docket No. 267] (the "Disclosure Statement Order");

b.    set September 14, 2010, at 10:00 a.m., prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

c.    reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Standing Motion, all objections to the Standing Motion (including the Standing Objection), the Standing Objection Exhibits, the Declarations in Support of Confirmation, the Voting Report, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases;

d.    held the Confirmation Hearing;

e.    heard the statements, arguments, and objections made by counsel in respect of Confirmation;

f.    considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

g.    overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated;

h.    approved the *Motion of the Debtors Seeking Approval of Immaterial Modifications to the Debtors' Chapter 11 Plan Without the Need for Resolicitation of Votes* [Docket No. 442] (the "Plan Modification Motion"); and

---

Affiliates of the Purchaser in their capacities as First Lien Term Loan Lenders and Second Lien Term Loan Lenders.

i.      taken judicial notice of the papers and pleadings filed in these Chapter 11 Cases.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following Findings of Fact, Conclusions of Law, and Order:[4]

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

A.      **Jurisdiction and Venue.**

1.      Beginning on the Petition Date, the Debtors commenced these Chapter 11 Cases. Venue in the United States Bankruptcy Court for the Southern District of New York (the "Court") was proper as of the Petition Date and remains proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

---

[4]     The findings of fact and the conclusions of law set forth herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.**     **Eligibility for Relief.**

2.     The Debtors were, and are, entities eligible for relief under section 109 of the Bankruptcy Code.

**C.**     **Commencement and Joint Administration of the Chapter 11 Cases.**

3.     On the Petition Date, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   By prior order of the Court, these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 39].   The Debtors have operated their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in these Chapter 11 Cases.

**D.**     **Plan Supplement.**

4.     On May 17, 2010, the Debtors filed the Plan Supplement.   The Debtors filed certain amendments to the Plan Supplement on July 14, 2010 [Docket No. 272], July 30, 2010 [Docket No. 321], September 1, 2010 [Docket No. 382], and September 3, 2010 [Docket Nos. 389, 390].   The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.   The Debtors are authorized to modify the Plan Supplement following entry of the Confirmation Order in accordance with the terms of the Plan.

**E.**     **Modifications to the Plan.**

5.     Any modifications to the Plan described or set forth herein constitute technical changes or changes with respect to particular Claims by agreement with Holders of such Claims, and do not materially or adversely affect or change the treatment of any other Claims or Interests.   Pursuant to Bankruptcy Rule 3019, these modifications do not require additional

K&E 17739536

disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

6.      Without limiting the foregoing, those modifications implemented by the Debtors to the July 12 Plan (and reflected in the Plan), to incorporate the terms of the Successful Bid obtained pursuant to the Amended Payout Event Procedures, and the September 12 Plan (as reflected in the Plan) to effectuate the withdrawal of the Standing Motion and the Committee Objection with prejudice, do not adversely change the treatment of any creditors or the interest of any equity security holder who has not accepted such changes in writing.  Such modifications were also implemented in accordance with section 1127(a) of the Bankruptcy Code, Bankruptcy Rule 3019, and Paragraph 31 of the Disclosure Statement Order.  Therefore, the Debtors are not required to resolicit Holders of Claims against or Interests in the Debtors on account of such modifications.

**F.      Judicial Notice.**

7.      Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

**G.      DIP Orders.**

8.      On May 17, 2010, the Court entered the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing* [Docket No. 41] (the "Interim DIP Order"), which, on an interim basis, among other things: (a) authorized the Debtors to enter into postpetition debtor in possession financing and letters of credit (the "DIP Facility"); (b) authorized the Debtors to use

cash collateral; (c) granted adequate protection to the Debtors' prepetition secured lenders; and (d) scheduled a final hearing. On June 30, 2010, the Court entered a *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders* [Docket No. 207] (the "Final DIP Order"), which authorized the relief granted under the Interim DIP Order on a final basis.

**H.**     **Disclosure Statement Order.**

9.     On July 13, 2010, the Court entered the Disclosure Statement Order, which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed July 12, 2010, as the record date for purposes of determining, among other things, which Holders of Claims or Interests are entitled to vote on the Plan (the "Voting Record Date"); (c) fixed September 1, 2010 at 5:00 p.m. prevailing Pacific Time, as the deadline for voting to accept or reject the Plan (the "Voting Deadline"); (d) fixed September 1, 2010 at 5:00 p.m. prevailing Eastern Time, as the deadline for objecting to the Plan (the "Plan Objection Deadline"); (e) fixed September 14, 2010, at 10:00 a.m. prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing; (f) approved the Solicitation Procedures and the Solicitation Package; (g) approved the Cash Election and Rights Offering Procedures; (h) approved the Amended Payout Event Procedures; (i) approved the Backstop Unit Purchase Agreement, the Break Up Fee, the Indemnification Provisions, and the Transaction Expenses (each as defined in the Disclosure Statement Order) and authorized the Debtors to honor their obligations thereunder; and (j) approved the Commitment Letter and transactions contemplated thereunder.

K&E 17739536

**I.      Transmittal and Mailing of Materials; Notice.**

10.      As evidenced by the Solicitation Affidavits, the Publication Affidavits, and the Voting Report, due, adequate, and sufficient notice of entry of the Disclosure Statement Order, the Plan, the Payout Event Deadline (as defined in the Amended Payout Event Procedures), the Auction, notices of assumptions, transfers and assignments to the Purchaser of the Executory Contracts and Unexpired Leases to be assumed by the Debtors and transferred and/or assigned to the Purchaser in accordance with the terms of the Purchase Agreement (such Executory Contracts and Unexpired Leases, the "Assumed Contracts") and related Cure Costs and for procedures for objecting thereto and resolution of disputes by the Court thereof, the deadline for filing objections to the assumption by the Debtors and the transfer and/or assignment by the Debtors to the Purchaser of any Assumed Contract or the related Cure Cost, the Successful Bid and the Successful Bidder (as defined in the Amended Payout Event Procedures), the Plan Supplement, the Plan Objection Deadline, the Confirmation Hearing, any modifications to the Plan implemented to reflect the results of the Auction, and all deadlines for voting on the Plan, has been given to: (a) all known Holders of Claims and Interests; (b) parties that requested notice in accordance with Bankruptcy Rule 2002; (c) all non-Debtor counterparties to Unexpired Leases and Executory Contracts; and (d) all taxing authorities listed on the Debtors' Schedules or Claims Register; each in substantial compliance with the Disclosure Statement Order and Bankruptcy Rules 2002(b), 3017, and 3020(b), and no other or further notice is or shall be required.   Adequate and sufficient notice of the Plan Objection Deadline, the Confirmation Hearing, as may be continued from time to time, and any applicable bar dates and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.

K&E 17739536

11.     The Debtors caused the Confirmation Hearing Notice to be published once each in *The Wall Street Journal* and the *Miami Herald* at least 28 days prior to the Plan Objection Deadline, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rule 2002(l), as evidenced by the Publication Affidavits.

**J.     Solicitation.**

12.     Votes for acceptance and rejection of the Plan were solicited by the Debtors and, to the extent any such solicitation was made, the Backstop Parties, the Purchaser, and their respective Related Persons (as defined in the Backstop Unit Purchase Agreement) in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations and, as such, such parties shall be entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.    Specifically, the Solicitation Packages approved by the Court in the Disclosure Statement Order (including the Disclosure Statement, the Plan, the Ballots, and the related notices) were transmitted to and served on all Holders of Claims or Interests in Classes that were entitled to vote to accept or reject the Plan and relevant portions of the Solicitation Packages were transmitted to and served on other parties in interest in these Chapter 11 Cases, all in compliance with section 1125 of the Bankruptcy Code, the Disclosure Statement Order, the Solicitation Procedures, and the Bankruptcy Rules.    Transmittal and service were adequate and sufficient, and no further notice is or shall be required.    In addition, Holders of Claims or Interests in Classes that were not entitled to vote to accept or reject the Plan were provided with certain non-voting materials approved by the Court in substantial compliance with the Disclosure Statement Order.    Pursuant to the Disclosure Statement Order, the Debtors were excused from distributing Solicitation Packages to those Entities at addresses from which Disclosure Statement

Hearing notices were returned as undeliverable by the United States Postal Service unless such Entity provided the Debtors, through the Notice and Claims Agent, an accurate address not less than ten (10) calendar days prior to the Solicitation Date, and failure to distribute Solicitation Packages to such Entities did not constitute inadequate notice of the Confirmation Hearing, the Voting Deadline, or a violation of Bankruptcy Rule 3017(d).  If an Entity has changed its mailing address after the Petition Date, the burden was on such Entity, not the Debtors, to advise the Debtors and the Notice and Claims Agent of the new address.  The procedures used to distribute Solicitation Packages to Holders of Claims and Interests were fair, and the distribution thereof was conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

**K.**     **Rights Offering and Cash Election.**

13.     The Debtors and the Purchaser conducted the cash/equity election process and Rights Offering in good faith and in compliance with the Disclosure Statement Order and the Cash Election and Rights Offering Procedures approved by the Court pursuant to the Disclosure Statement Order.

14.     In accordance with the Cash Election and Rights Offering Procedures, only those Holders of First Lien Term Loan Claims or Second Lien Term Loan Claims who were either Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act) or Qualified Institutional Buyers (as defined in Rule 144A promulgated under the Securities Act) were eligible to participate in the Rights Offering, and only such Eligible Holders (as defined in the Cash Election and Rights Offering Procedures) were provided with the applicable Election Form (as defined in the Cash Election and Rights Offering Procedures) to allow such Eligible Holders to participate in the Rights Offering, as set forth in the Cash Election and Rights Offering Affidavit.  Similarly, and as set forth in section 3.5 of the Backstop Unit Purchase

Agreement, each Backstop Party represented and warranted that it is an Accredited Investor. Eligible Holders (as such) were identified by the Debtors through the submission by Holders of First Lien Term Loan Claims or Second Lien Term Loan Claims of a duly completed eligibility questionnaire (which questionnaire had previously been provided by the Debtors to the Administrative Agent to the First Lien Credit Agreement and to the Administrative Agent to the Second Lien Credit Agreement for further distribution to the Holders of First Lien Term Loan Claims and the Holders of Second Lien Term Loan Claims, respectively) indicating that such Holders were Accredited Investors or Qualified Institutional Buyers (the "Eligibility Identification Process").  The participation by the Backstop Parties, the Former Backstop Parties, the Purchaser, and/or any of their respective Related Persons in the Eligibility Identification Process, the Rights Offering, the issuance of Rights, the issuance of New Common Units, and/or the offer, issuance, sale, or purchase of any security offered or sold under the Plan (if any such participation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties, the Former Backstop Parties, the Purchaser, and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

**L.     Voting Report.**

15.     Prior to the Confirmation Hearing, the Debtors filed the Voting Report.  All procedures used to tabulate the Ballots and the Election Forms were fair and conducted in accordance with the Disclosure Statement Order, the Cash Election and Rights Offering Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

16.     As set forth in the Plan and the Disclosure Statement, Holders of Claims in Classes 5, 6, 7, 8, and 9 (collectively, the "Voting Classes") for each Debtor are eligible to vote

on the Plan pursuant to the Solicitation Procedures.  In addition, Holders of Claims in Classes 1, 2, 3, 4, 10, and 12 are Unimpaired and conclusively presumed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims or Interests in Classes 11 and 13 (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan, entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.

17.    As evidenced by the Voting Report, Holders of Claims in Class 8 (together with the Deemed Rejecting Classes, the "Rejecting Classes") voted to reject the Plan.  The Committee Members who voted against the Plan have changed their votes to accept the Plan.  As further evidenced by the Voting Report, all other Voting Classes, specifically Holders of Claims in Classes 5, 6, 7, and 9 voted to accept the Plan (the "Impaired Accepting Classes").

**M.    Auction and Sale Transaction.**

18.    The Debtors caused an Auction to be conducted, which commenced on August 5, 2010.  The Auction was carried out, conducted, and concluded in accordance with the terms and conditions of, and in compliance with, the Amended Payout Event Procedures.  The Auction closed on August 10, 2010, after an investment fund managed or controlled by Wayzata Investment Partners (the "Investment Fund") emerged as the Successful Bidder and a group comprised of an affiliate of Odyssey Investment Partners, LLC and certain of the Debtors' prepetition Second Lien Term Loan Lenders emerged as the Backup Bidder (as defined in the Amended Payout Event Procedures) in accordance with the terms and conditions of, and in compliance with the Amended Payout Event Procedures.  The Backup Bidder, pursuant to the Amended Payout Event Procedures, is required to keep its Backup Bid open and irrevocable through the earlier of (a) the Outside Backup Date (as defined in the Amended Payout Event Procedures) and (b) the closing of the transaction with the Successful Bidder.

K&E 17739536

19.     The announcement and adoption by the Debtors of the Addendum to Payout Event Procedures was permitted pursuant to the terms of the Amended Payout Event Procedures approved by the Court.  The Amended Payout Event Procedures were fair and reasonable.

20.     Good, adequate, and sufficient notice of:  (a) the Sale Transaction, the Auction, the Payout Event Deadline, the Disclosure Statement Order, the Amended Payout Event Procedures, the related notices and the relief requested with respect thereto; and (b) the assumption by the Debtors of the Assumed Contracts and the transfer and/or assignment by the Debtors to the Purchaser of the Assumed Contracts in accordance with the terms of the Purchase Agreement, including the relevant proposed Cure Costs with respect to the Assumed Contracts, has been provided to the applicable creditors and/or parties in interest in compliance with the Disclosure Statement Order, the Cure Cost Schedule, and Bankruptcy Rules 2002(b), 3017, and 3020(b), and  no other or further notice is or shall be required.

21.     A reasonable opportunity to object or be heard with respect to the Sale Transaction (including the terms of the Purchase Agreement and the Backstop Unit Purchase Agreement, and the assumption and assignment and/or transfer of the Assumed Contracts and the amount of Cure Costs), the Payout Event Deadline, the Auction, and the Amended Payout Event Procedures, has been provided to all parties in interest, including, without limitation: (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the Committee; (c) counsel to Bank of America, N.A., as First Lien Credit Facility Administrative Agent for the First Lien Credit Agreement and as Exit Facility Agent for the Exit Facility; (d) counsel to Wilmington Trust FSB as Second Lien Term Loan Administrative Agent for the Second Lien Credit Agreement; (e) Bank of America, N.A. and UBS AG as counterparties under the Secured Swap Agreements; (f) counsel to Law Debenture Trust Company of New York, as

K&E 17739536

Indenture Trustee for the Senior Notes Indenture; (g) counsel to the ad hoc group of the First Lien Term Loan Lenders; (h) counsel to certain of the Second Lien Term Loan Lenders; (i) the Internal Revenue Service; and (j) those parties who have requested notice pursuant to Bankruptcy Rule 2002.  Other parties interested in bidding on the Acquired Assets were provided, upon request, with access to sufficient information to make an informed judgment on whether to bid for the Acquired Assets.

22.     The bidding and related procedures established by the Disclosure Statement Order and the Amended Payout Event Procedures have been complied with in all material respects by the Debtors, the Purchaser, the Backstop Parties and the Former Backstop Parties.

23.     The Debtors have articulated a sound business purpose for, and good and sufficient reasons for this Court to approve the Sale Transaction and all other transactions contemplated by the Purchase Agreement.  The Debtors have demonstrated a sufficient basis for their entry into the Purchase Agreement and the consummation of the Sale Transaction (including the assumption and assignment and/or transfer of the Assumed Contracts) and all other transactions contemplated by the Purchase Agreement under sections 363, 365, 1123, and 1129 of the Bankruptcy Code, and all such actions are appropriate exercises of the Debtors' business judgment.

24.     The Debtors have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the Sale Transaction and all other transactions contemplated by the Purchase Agreement and the Backstop Unit Purchase Agreement, and have taken all corporate or limited liability company (as applicable) action necessary to authorize and approve the Purchase Agreement and the Backstop Unit Purchase Agreement, and the

K&E 17739536

consummation by the Debtors of the Sale Transaction and all other transactions contemplated thereby.

25.    Subject to the applicable provisions of the Bankruptcy Code and other applicable law, upon entry of this Confirmation Order, the Debtors will have the power and authority to execute, deliver, and perform under the Purchase Agreement, the Backstop Unit Purchase Agreement, and all documents and instruments related to either such agreement (including all of the other Debtor Ancillary Agreements (as defined in the Backstop Unit Purchase Agreement)).

26.    No consents or approvals, other than those consents or approvals that are expressly provided for and specifically identified (other than generically or by reference to broad or general categories of consents or approvals) in the Purchase Agreement, are required for the Debtors to consummate the Sale Transaction (including the assumption and assignment and/or transfer of the Assumed Contracts to the Purchaser).

27.    The Cure Costs as set forth in the Cure Cost Schedule and as set forth in the Exhibits to the *Affidavit of Service of Jenna M. Convoy re: Notice of Filing of Schedule of Cure Costs for Executory Contracts and Unexpired Leases to be Assumed and Assigned by the Debtors as Exhibit 8 to the Supplement to the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 335] (collectively, the "Cure Notice") are deemed to be the only amounts necessary to "cure" (within the meaning of section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under the Assumed Contracts, to the extent required by section 365 of the Bankruptcy Code.

28.    Pursuant to and in accordance with the Purchase Agreement and the Plan, the Debtors and the Purchaser, as applicable, upon consummation of the Plan and the Purchase

K&E 17739536

Agreement, will have: (a) "cured" or provided "adequate assurance" of "cure" (each within the meaning of section 365(b) of the Bankruptcy Code), of any "default" (within the meaning of section 365(b) of the Bankruptcy Code) existing or occurring prior to the Confirmation Date under any of the Assumed Contracts; and (b) provided compensation or "adequate assurance" of compensation to any party for any actual pecuniary loss to such party resulting from a "default" existing or occurring prior to the Confirmation Date under any of the Assumed Contracts, and the Purchaser has provided "adequate assurance" of its future performance of and under the Assumed Contracts.

29.    The Debtors conducted the Auction in accordance with, and have otherwise complied in all material respects with, the Disclosure Statement Order, and the Amended Payout Event Procedures.  The Auction process set forth in the Amended Payout Event Procedures afforded a full, fair, and reasonable opportunity for any Entity or Person to make a higher or otherwise better offer to purchase the Acquired Assets.

30.    The Investment Fund's (acting through the Purchaser and in its capacity as a Backstop Party) offer for the Acquired Assets, as embodied in the Purchase Agreement and the Backstop Unit Purchase Agreement, is the highest or otherwise best offer received by the Debtors for the Acquired Assets.

31.    The Debtors have obtained fair and reasonable consideration for the Acquired Assets on account of the Investment Fund's offer.

32.    Consummation of the Sale Transaction to the Purchaser pursuant to the Purchase Agreement will provide the highest or otherwise best value for the Acquired Assets and provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative.

K&E 17739536

33.     The assumption by the Debtors and the assignment and/or transfer by the Debtors to the Purchaser of the Assumed Contracts pursuant to the terms of this Confirmation Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their Estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

34.     The Purchase Agreement, the Backstop Unit Purchase Agreement, and the transactions contemplated in either such agreement were negotiated by the Debtors, the Purchaser, the Backstop Parties, and the Former Backstop Parties without collusion, in good faith, and at arm's-length.  The Debtors, the Purchaser, the Backstop Parties, and the Former Backstop Parties have not engaged in any conduct that would permit the Purchase Agreement, the Backstop Unit Purchase Agreement, the Sale Transaction, or any of the other transactions contemplated by the Purchase Agreement and/or the Backstop Unit Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, neither the Purchaser nor the Investment Fund has acted in a collusive manner with any person and the Purchase Price (as defined in the Purchase Agreement) was not controlled by any agreement among bidders.

35.     The Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code.

36.     The Purchaser is a "good faith purchaser" entitled to the benefits and protections of section 363(m) of the Bankruptcy Code.  Each of the Purchaser and the Backstop Parties will be acting in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement and the Backstop Unit Purchase Agreement.

K&E 17739536

37.     The Debtors have adequately marketed the Acquired Assets for sale, and the consideration to be provided by the Purchaser pursuant to the Purchase Agreement: (a) is fair and reasonable; (b) is the highest or otherwise best offer for the Acquired Assets; and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia.

38.     Neither the Purchase Agreement nor the Backstop Unit Purchase Agreement was entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory or possession thereof, or the District of Columbia.  Neither the Purchaser, the Backstop Parties, nor the Debtors are entering into the transactions contemplated by the Purchase Agreement and/or the Backstop Unit Purchase Agreement fraudulently.

39.     The consummation of the Sale Transaction pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Acquired Assets to the Purchaser, authorized pursuant to the Bankruptcy Code and other applicable law, and vests or will vest the Purchaser with all right, title, and interest in and to the Acquired Assets free and clear of all Liens, Claims, Excluded Liabilities (as defined in the Purchase Agreement), interests, and other encumbrances of any kind or nature whatsoever (except for the Permitted Liens (as defined in the Purchase Agreement) and Liens that constitute Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code because one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  All parties with Liens on, in or related to any of the Acquired Assets, if any, who did not object to the Plan, or who withdrew their objections thereto, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Any holder of a Lien on, in, or related to any of the Acquired Assets who did object either falls within one or

more of the other subsections of section 363(f) of the Bankruptcy Code and is either not entitled to adequate protection or is adequately protected by having its Lien, if any, attach to the proceeds of the Sale Transaction (net of taxes, fees, and expenses incurred in effecting the Sale Transaction) ultimately attributable to the Acquired Assets in which such party alleges an interest, in the same order of priority, and with the same validity, force, and effect that such party had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto.

40.     Except as expressly set forth in the Purchase Agreement, the Purchaser shall have no liability or obligations for any Liens in, on, or related to the Acquired Assets by reason of the assumption by the Debtors of any of the Assumed Contracts or the transfer and/or assignment of the Acquired Assets to the Purchaser.  The Purchaser shall not be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets or the assumption of the Assumed Liabilities, to: (a) be a successor to or continuation of (or other such similarly situated party) any of the Debtors; (b) have, de facto or otherwise, merged with or into, or consolidated with, any of the Debtors; (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors; (d) have a common identity of incorporators, directors, managers, or equity holders with any of the Debtors; and (e) be holding itself out to the public as a continuation of the Debtors.  The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors except for the Assumed Liabilities that are expressly set forth in the Purchase Agreement.

41.     The Sale Transaction constitutes an element of a chapter 11 plan; the Sale Transaction has occurred "under" a plan as such term is used in, and for all purposes of,

section 1146(a) of the Bankruptcy Code; and the Sale Transaction does not circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code.

42.     The legal and factual bases set forth in the Confirmation Brief and at the Confirmation Hearing establish just cause for approval of the Sale Transaction and the related transactions provided for in the Purchase Agreement.

43.     Consummation of the Sale Transaction pursuant to the Purchase Agreement is an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors, their creditors, their Estates, and other parties in interest.

**N.      Qualified Plan.**

44.     The Debtors' Plan is a "Qualified Plan" as defined in each of the Plan Support Agreements.

**O.      Bankruptcy Rule 3016.**

45.     The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

**P.      Burden of Proof.**

46.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.  Each of the witnesses who testified on behalf of the Debtors was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

K&E 17739536

Q.    **Standing.**

47.    On August 18, 2010, the Committee filed the Standing Motion seeking Court authority to pursue certain Claims and Causes of Action on behalf of the Debtors against, among other parties, the Debtors' prepetition lenders and former shareholders.  On September 4, 2010, the Debtors filed the Standing Objection and Standing Objection Exhibits.  On September 12, 2010, the Committee filed the reply to the Standing Objection (the "Standing Reply").

48.    At a hearing beginning on September 14, 2010, the Court considered the Standing Motion, the Standing Objection, the Standing Objection Exhibits, the Standing Reply, the arguments presented by counsel for both the Committee and the Debtors, and the evidence presented at such hearing.

R.    **Resolution of the Standing Motion and the Committee Objection.**

49.    Prior to the conclusion of the Confirmation Hearing, the Committee, in the context of a consensual resolution of all of the issues raised in the Standing Motion and the Committee Objection, agreed to withdraw the Committee Objection and the Standing Motion, deemed without prejudice upon entry of the Confirmation Order and deemed with prejudice upon the occurrence of the Effective Date.

50.    In exchange for the Committee's withdrawal of the Committee Objection and the Standing Motion (and all Claims, Causes of Action, and objections contained therein), (a) Holders of Class 8 Claims shall now be entitled to (x) their Pro Rata share of a Cash "gift" in the amount of $1.8 million and (y) the Indenture Trustee Fee Amount (collectively, as defined in the Plan, the "Senior Notes Payment"), which amounts shall be paid by the Purchaser (or the Disbursing Agent on behalf of the Purchaser) on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ten business days after the Effective Date, (b) Holders of Class 9 Claims shall be entitled to their Pro Rata share of a Cash "gift" in the

amount of $365,000 to be paid by the Purchaser (the "Cash Payment") (or the Disbursing Agent

on behalf of the Purchaser) on the Effective Date or as soon as reasonably practicable thereafter,

and (c) the Indenture Trustee shall receive by gift from the Purchaser (or the Disbursing Agent

on behalf of the Purchaser) on the Effective Date or as soon as reasonably practicable thereafter,

but in no event later than ten business days after the Effective Date, the Indenture Trustee Fee

Amount.[5]   Because no Impaired Class is adversely affected by the terms of the revised Plan,

these modifications do not require additional disclosure under section 1125 of the Bankruptcy

Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they

require that the Holders of Claims or Interests be afforded an opportunity to change previously

cast acceptances or rejections of the Plan.   The Court finds that the resolution of the Standing

Motion and the Committee Objection (and all Claims, Causes of Action, and objections

contained therein) is fair and reasonable and in the best interests of the Debtors' Estates.

**S.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

51.      The Plan complies with all applicable provisions of section 1129 of the

Bankruptcy Code as follows:

**1.      Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

52.      The Plan complies with all applicable provisions of the Bankruptcy Code as

required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

**(i)      Sections 1122 and 1123(a)(1)—Proper Classification.**

53.      The classification of Claims and Interests under the Plan is proper under the

Bankruptcy Code.   Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code,

---

[5]      The Debtors, the Committee, and the Backstop Parties agree that the fees and expenses incurred by the
Indenture Trustee through the Effective Date, in the approximate amount of $400,000 are reasonable.

K&E 17739536

Article III of the Plan provides for the separate classification of Claims and Interests into 13 Classes for each Debtor, based on differences in the legal nature or priority of such Claims against and Interests in each Debtor (other than DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, which are addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not implemented for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

54.     In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code have been satisfied.

### (ii)     Section 1123(a)(2)—Specification of Unimpaired Classes.

55.     Article III of the Plan specifies that Claims in Classes 1, 2, 3, 4, 10, and 12 are Unimpaired under the Plan. Additionally, Article II of the Plan specifies that DIP Claims, Administrative Claims (including Accrued Professional Compensation Claims), and Priority Tax Claims are Unimpaired, although these Claims are not classified under the Plan. Accordingly, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

### (iii)     Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

56.     Article III of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes 5, 6, 7, 8, 9, 11, and 13. Accordingly, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

K&E 17739536

### (iv)     Section 1123(a)(4)—No Discrimination.

57.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan uniformly provides for the same treatment of each Claim or Interest in a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.   Accordingly, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

### (v)     Section 1123(a)(5)—Adequate Means for Plan Implementation.

58.     Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article IV and various other provisions of the Plan specifically provide in detail adequate and proper means for the Plan's implementation, including:   (a) the sources of consideration for distributions under the Plan; (b) the Rights Offering; (c) the Exit Facility; (d) the Purchase Agreement; (e) the Capital Call Agreement; (f) the authorization and issuance of New Common Units; (g) the sale of assets to the Purchaser; (h) the assignment to and assumption of Assumed Liabilities by the Purchaser; (i) the release of Liens; (j) the cancellation of certain securities and agreements; (k) the authorization to effectuate the Restructuring Transactions, including the Sale Transaction; (l) the general authority for all corporate and limited liability company (as applicable) actions necessary to effectuate the Plan; (m) the authorization to assume all of the D&O Liability Insurance Policies; (n) the appointment of the New Board; (o) the assumption and assignment of all Indemnification Provisions as provided by, and subject to the limitations and conditions set forth in, the Plan; (p) the adoption and implementation of the Management Equity Incentive Plan; (q) the adoption and implementation of the Emergence Awards; (r) the preservation of Causes of Action; and (s) the authority to implement the Wind Down pursuant to the Liquidator Agreement.   Moreover, the Debtors, the Purchaser, and the Disbursing Agent, as applicable, will respectively have, immediately upon the Effective Date, sufficient Cash to make all payments

required to be made on the Effective Date pursuant to the terms of the Plan. Accordingly, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

### (vi)   Section 1123(a)(5)(D)—Sale Free and Clear.

59.   Except as otherwise expressly provided in the Plan or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities shall vest in the Purchaser, free and clear of all Liens, Claims, Excluded Liabilities, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility). On and after the Effective Date, except as otherwise expressly provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (vii)   Section 1123(a)(6)—Voting Power of Equity Securities.

60.   Section 5.2(c) of the Operating Agreement, attached as Exhibit 11 to the Plan Supplement, prohibits the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

### (viii)   Section 1123(a)(7)—Selection of Officers and Directors.

61.   The identity and affiliations of the members of the New Board, to the extent known, are listed in Exhibit 10 to the Plan Supplement. The Operating Agreement describes the manner of the selection of the remaining members of the New Board. The selection of the New Board, as set forth in Article IV.O of the Plan and by the Operating Agreement, was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy. Accordingly, the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

K&E 17739536

### (ix)    Section 1123(b)—Discretionary Contents of the Plan.

62.    The Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code.   As set forth below, such discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b) of the Bankruptcy Code is satisfied.

### (a)    Section    1123(b)(1)-(2)—Claims    and    Executory Contracts and Unexpired Leases.

63.    Article V of the Plan provides for the assumption, assumption and assignment, or rejection of the Executory Contracts and Unexpired Leases of the Debtors not previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Court.

64.    Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and transferred and/or assigned to the Purchaser each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease:  (a) was assumed or rejected, as mutually agreed upon by the Debtors and the Backstop Parties; (b) previously expired or terminated pursuant to its own terms; (c) is the subject, as mutually agreed upon by the Debtors and the Backstop Parties, of a motion to reject filed on or before the Confirmation Date; (d) is identified as an Executory Contract or Unexpired Lease to be rejected, pursuant to the Schedule of Rejected Executory Contracts and Unexpired Leases; (e) is not an Acquired Asset; or (f) without limiting the generality of clause (e), is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

K&E 17739536

Without limiting the foregoing: (a) that certain Transaction and Advisory Fee Agreement by and between Neff Corp., Lightyear Capital LLC, Norwest Equity Partners VIII LP, and General Electric Pension Trust (collectively, the "Advisory Counterparties"), dated May 31, 2007, shall be rejected as of the date hereof, provided that the Advisory Counterparties shall have until 30 days following the Effective Date to file a Proof of Claim on account of such rejection; (b) unless otherwise approved in advance by the Backstop Parties, the Debtors shall not assume and assign to the Purchaser any employment agreement and/or employee benefit plan except for those employment agreements and employee benefit plans specifically set forth on, and subject to the terms and conditions described in, Schedule 2.1(e) to the Purchase Agreement and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Purchaser an amendment, consent and acknowledgment agreement described in Section "C" on Schedule 2.1(e) to the Purchase Agreement that is in form and substance reasonably acceptable to the Purchaser; and (c) the entry of this Confirmation Order shall constitute an assumption by the Debtors of the Purchase Agreement, the Backstop Unit Purchase Agreement, and the Commitment Letter.

65. The Debtors filed the Schedule of Rejected Executory Contracts and Unexpired Leases on July 14, 2010. The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Rejected Executory Contracts and Unexpired Leases in the manner set forth in the Backstop Unit Purchase Agreement. This Confirmation Order shall constitute an order of the Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above and set forth in the Plan. The Debtors have provided sufficient notice to each non-debtor counterparty to the Executory Contracts and Unexpired Leases of the assumptions and assignments or rejections described above. The Debtors and the

Purchaser have also provided adequate assurance of future performance as that term is used in section 365 of the Bankruptcy Code. Additionally, the Purchaser will pay all Cure Costs for each of the Assumed Contracts on the Effective Date, or as soon as reasonably practicable thereafter, subject to the terms and conditions set forth in the Purchase Agreement.

66.    Any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease.

> **(b)    Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action.**

67.    **Compromise and Settlement**. Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Purchaser may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

68.    **Subordinated Claims**.    The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.    Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Purchaser, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding anything herein to the contrary, and as provided in Article III.B.11 of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be permanently enjoined, settled, and compromised as provided by the Plan.

69.    **Releases by the Debtors**.    The releases and discharges of Claims and Causes of Action by the Debtors described in Article VIII.C of the Plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment pursuant to Bankruptcy Rule 9019.    The Debtors' pursuit of any such claims against the Debtor Releasees or Third Party Releasees is not in the best interest of the Debtors' Estates' various constituencies as the costs involved likely would outweigh any potential benefit from pursuing such Claims.

70.    The Standing Motion is hereby deemed withdrawn without prejudice upon entry of the Confirmation Order and with prejudice upon the occurrence of the Effective Date.    Upon the Effective Date, any Claim or Cause of Action raised by the Standing Motion is moot.

71.    The Debtor Release is an integral part of the Plan and is in the best interests of the Debtors' Estates.

K&E 17739536

72.    The Debtor Release appropriately offers protection to parties who constructively participated in the Debtors' restructuring process.  Such protections from liability facilitated the participation of many of the Debtors' stakeholders in the negotiations and compromises that led to the Plan.  Additionally, the Debtors' ability to secure postpetition financing would have been compromised, thereby risking the Debtors' ability to attract competing bidders to both the prepetition and postpetition auctions.  Many Debtor Releasees participated and provided substantial and necessary value to the Plan process, including:

    a.    Lightyear Capital, LLC, facilitated the Debtors' chapter 11 Plan, which will wipe out their equity interest in the Debtors;

    b.    Odyssey Investment Partners, which played a key role in creditor recoveries by participating in the Auction that increased recovery to the Debtors' Estates by approximately $63 million; and

    c.    the Debtors' directors and officers, including the chairman of the Board, which guided the Debtors throughout the restructuring process and preserved the value of the business.

73.    The scope of the Debtor Release in the Plan is appropriately narrow given that it expressly excludes any causes of actions arising from the gross negligence and willful misconduct.

74.    **Third Party Releases**.  The Third Party Release set forth in Article VIII.D of the Plan is an essential provision of the Plan.  The Third Party Release is:  (a) in exchange for the good and valuable consideration provided by the Third Party Releasees; (b) a good faith settlement and compromise of the Claims and Causes of Action released by the Third Party Release; (c) in the best interests of the Debtors and all Holders of Claims; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the Third Party Release against any of the Third Party Releasees.  Such releases are given by Holders of Claims

other than Holders of Claims that vote to reject the Plan (not including Committee Members), who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release, or are in a Class deemed to reject the Plan. The Ballots stated that a vote to accept the Plan or abstention from voting constitutes an acceptance and assent to the Third Party Release provisions set forth in Article VIII.D of the Plan. Thus, those Holders of Claims voting to accept the Plan or abstaining from voting were given due and adequate notice that they would be granting the Third Party Release by acting in such a manner.

75.    Under the Plan, no creditor (other than Committee Members) gives a release if such creditor: (a) is in a class deemed to reject the Plan; (b) votes to reject the Plan; or (c) opts out of the release in its ballot. Creditors had a full opportunity to approve or disapprove of the Third Party Release, as each Ballot received by a Holder of a Claim provided that the Third Party Release only applies to (1) the Committee Members and (2) those Holders of Claims who (a) voted to accept the Plan or (b) abstained from voting but did not opt out of the Third Party Release. As such, any Holders of Claims (other than Committee Members) who voted against the Plan will retain any causes of action against the Third Party Releasees. Thus, the Third Party Releases contained in the Plan are consensual in nature.

76.    The Third Party Release is an integral part of the Plan. Like the Debtor Release, the Third Party Release facilitated participation in both the Debtors' Plan and the restructuring process generally. As such, the Third Party Release appropriately offers protection to parties who constructively participated in the Debtors' restructuring process.

K&E 17739536

77.    The scope of the Third Party Release in the Plan is appropriately narrow given that it expressly excludes any causes of actions arising from the gross negligence and willful misconduct.

78.    **Exculpation**.  The Exculpation provisions set forth in Article VIII.E of the Plan are essential to the Plan.  The record in these Chapter 11 Cases fully supports the Exculpation and the Exculpation provisions set forth in Article VIII.E of the Plan and are appropriately tailored to protect the Exculpated Parties (including the Committee Members) from inappropriate litigation.  The Exculpation shall have no effect on the liability of any Entity that results from any such act or omission of such Entity that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any related document, instrument, or agreement.

79.    **Injunction**.  The injunction provisions set forth in Article VIII.F of the Plan are essential to the Plan and are necessary to implement the Plan, and the Restructuring Transactions, and to preserve and enforce the Debtor Releases, the Third Party Releases, and the Exculpation provisions in Article VIII of the Plan, and are narrowly tailored to achieve those purposes.

80.    Each of the Debtor Releases, the Third Party Releases, and the injunction and Exculpation provisions set forth in the Plan:  (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their respective Estates, and their respective creditors; (e) is important

to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in these Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law. The record of the Confirmation Hearing and these Chapter 11 Cases is sufficient to support the Debtor Releases, the Third Party Releases, and the injunction and Exculpation provisions contained in Article VIII of the Plan.

81.    **No Successor Liability**. Except for the Assumed Liabilities, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for, any successor liability or similar liability.

82.    **Preservation of Claims and Causes of Action and Assignment to Purchaser**. Article IV.S of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. Causes of Action not released or exculpated by the Debtors shall be transferred and/or assigned to the Purchaser as provided by the Purchase Agreement, but not for the occurrence of Debt, any Claim, or Cause of Action released or discharged pursuant to the Debtor Release. The provisions regarding Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests.

**2.    Section 1129(a)(2)—Compliance of the Debtors and Others With the Applicable Provisions of the Bankruptcy Code.**

83.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

K&E 17739536

84.     Votes to accept or reject the Plan were solicited by the Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents after the Court approved the adequacy of the Disclosure Statement pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

85.     The Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article VIII.E of the Plan.

86.     The Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

K&E 17739536

### 3.      Section 1129(a)(3)—Proposal of Plan in Good Faith.

87.      The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.

88.      The Plan is the product of arm's-length negotiations between and among other Entities, the Debtors, the Purchaser, the Backstop Parties, the Former Backstop Parties, and each party who signed a Plan Support Agreement.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, these Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to restructure their balance sheet and maximize stakeholder value.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

### 4.      Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.

89.      The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code are satisfied.

K&E 17739536

**5.      Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

90.      The Plan complies with the requirements of section 1129(a)(5) of the Bankruptcy Code because, in the Disclosure Statement, the Plan, and the Plan Supplement, the Debtors have disclosed:  (a) to the extent known, the identity of the members of the New Board, the Chief Financial Officer, and the Chief Executive Officer of the Purchaser; and (b) the nature and compensation for any insider who will be employed or retained by the Purchaser under section 101(31) of the Bankruptcy Code.  The method of appointment of members of the New Board and officers of the Purchaser was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied.

**6.      Section 1129(a)(6)—Approval of Rate Changes.**

91.      The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**7.      Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.**

92.      The other evidence in support of the Plan that was proffered or adduced at or prior to, or in the Declarations in Support of Confirmation, the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; and (d) establishes that, Holders of Allowed Claims or Interests in every Class will recover as much or more under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, than the amount such Holder

-40-

would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

8.      **Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class.**

93.      Classes 1, 2, 3, 4, 10, and 12 are each Classes of Unimpaired Claims or Interests that are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

94.      Because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code.  Thus, although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

9.      **Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

95.      The treatment of DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code are satisfied.

10.      **Section 1129(a)(10)—Acceptance By At Least One Impaired Class.**

96.      As set forth in the Voting Report, the Impaired Accepting Classes have voted to accept the Plan.  Specifically, Holders of Claims in non-vacant Classes 5, 6, 7, and 9 for each Debtor voted to accept the Plan.  Four Impaired Classes, Classes 5, 6, 7, and 9, voted to accept the Plan.  As such, there is at least one Class of Claims that is Impaired under the Plan and has

accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code). Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

### 11. Section 1129(a)(11)—Feasibility of the Plan.

97. The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in affidavits filed in connection with the Confirmation Hearing, including the Irion Declaration: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, except as provided in the Plan; and (e) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan. Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

### 12. Section 1129(a)(12)—Payment of Bankruptcy Fees.

98. Article XII.C of the Plan provides that all fees payable pursuant to section 1930 of the United States Judicial Code, as determined by the Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Debtors (prior to or on the Effective Date) or the Purchaser (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Accordingly, the requirements of section 1129(a)(12) of the Bankruptcy Code have been satisfied.

### 13. Section 1129(a)(13)—Retiree Benefits.

99. Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to

K&E 17739536

section 1114 of the Bankruptcy Code.  Article V.G of the Plan provides that, on and after the Effective Date, all retirement plans set forth on Schedule 2.1(e) of the Purchase Agreement shall be assumed and transferred and/or assigned to the Purchaser.  Accordingly, the requirements of section 1129(a)(13) of the Bankruptcy Code have been satisfied.

**14.    Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Class.**

100.    Notwithstanding the fact that the Rejecting Classes have voted not to accept the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because: (a) the Impaired Accepting Classes have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, including with respect to the Deemed Rejecting Classes.  Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Rejecting Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

**15.    Section 1129(c)—Only One Plan.**

101.    Other than the Plan (including previous versions thereof), no other plan has been filed in these Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**16.    Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act.**

102.    No governmental unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal

purpose of the Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**T.    Satisfaction of Confirmation Requirements.**

103.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**U.    Good Faith.**

104.    The Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business and maximizing the value of each of the Debtors' Estates for the benefit of their stakeholders.  The Plan gives effect to many of the Debtors' restructuring initiatives, including debt reduction.  Accordingly, the Debtors, the Purchaser, the Backstop Parties, the Former Backstop Parties and each party who signed a Plan Support Agreement (and all of their respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, Affiliates, and representatives) have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan, the Purchase Agreement, and the Backstop Unit Purchase Agreement, and the agreements, settlements, transactions, and transfers contemplated thereby (including, without limitation, the entry into and performance under the Exit Facility Documents, the Swap Agreements (as amended pursuant to the Swap Amendments), and the Rights Offering Documents); and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**V.    Disclosure:  Agreements and Other Documents.**

105.    The Debtors have disclosed all material facts regarding: (a) the adoption of the Operating Agreement or similar constituent documents; (b) the identity of known members of

the New Board; (c) the distribution of Cash under the Plan; (d) the offer, issuance and/or sale of Rights and New Common Units; (e) the adoption, execution, and implementation of the other matters provided for under the Plan, the Purchase Agreement and/or the Backstop Unit Purchaser Agreement involving corporate or limited liability company (as applicable) action to be taken by or required of the Debtors or the Purchaser; (f) the Management Equity Incentive Plan; (g) the Rights Offering; (h) securities registration exemptions; (i) the exemption under section 1146(a) of the Bankruptcy Code; (j) the Exit Facility; (k) the entry into the Liquidator Agreement; (l) the Capital Call Agreement; and (m) the adoption, execution, and delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing.

## W.    **Transfers by Debtors; Vesting of Assets Free and Clear.**

106.    Except as otherwise provided in the Plan or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities shall vest in the Purchaser, free and clear of all Liens, Claims, Excluded Liabilities, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility).  On and after the Effective Date, except as otherwise expressly provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## X.    **Conditions to Effective Date.**

107.    Entry of the Confirmation Order shall satisfy the conditions to the Effective Date as set forth in Article IX.A.2 of the Plan, underlined provided, that the Confirmation Order shall not have been stayed, modified, or vacated on appeal.  The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan may be waived only by written consent of the Debtors and the Purchaser.

K&E 17739536

**Y.** **Implementation.**

108.    All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents (including, without limitation, the Operating Agreement, the Plan Support Agreements, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, the Liquidator Agreement, the Exit Facility Documents, and the Rights Offering Documents) have been negotiated in good faith, at arm's length, and are in the best interests of the Debtors, and shall, upon completion of documentation and execution be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

**Z.** **Rights and New Common Units.**

109.    The issuance of Rights and New Common Units is an essential element of the Plan, and is in the best interests of the Debtors, their Estates, and their creditors.

**AA.** **Retention of Jurisdiction.**

110.    The Court properly may retain jurisdiction over the matters set forth in Article XI and other applicable provisions of the Plan.

*   *   *   *   *

K&E 17739536

## II. ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.**     **Order.**

111.    This Confirmation Order confirms the Plan attached hereto as **Exhibit A**.

**B.**     **Objections.**

112.    All objections to Confirmation of the Plan have been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order.  To the extent that any objections (including any reservations of rights contained therein) to Confirmation of the Plan (including approval of the Sale Transaction, the payment or amount of the Cure Costs with respect to any Assumed Contract, or the assumption by the Debtors of any of the Assumed Contracts and the transfer and/or assignment thereof to the Purchaser) have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein or otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, all such objections (including any reservation of rights contained therein) shall be, and hereby are, overruled on the merits.

**C.**     **Findings of Fact and Conclusions of Law.**

113.    The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.   All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation are hereby incorporated herein to the extent not inconsistent herewith.   To the extent that any of the following constitute findings of fact or conclusions of law, they are adopted as such.   To the

K&E 17739536

extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Court at the Confirmation Hearing and incorporated herein) constitute an order of this Court, they are adopted as such.

### D.    Confirmation of the Plan.

114.    The Plan and Plan Supplement (as such may be expressly amended by this Confirmation Order or in accordance with the Plan) and each of their provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to in such papers), and the execution, delivery, and performance thereof, are authorized and approved as finalized, executed, and delivered.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall, as applicable, constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

115.    The terms of the Plan, the Plan Supplement, and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order.  The terms of the Plan, the

Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date.

**E.     Plan Classification Controlling.**

116.    The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan:  (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

**F.     Wind Down and Dissolution of the Debtors.**

117.    On and after the Effective Date, the Liquidator will implement, and the Purchaser will oversee and fund, the Wind Down pursuant to the Liquidator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Liquidator shall:  (a) change the business and corporate names of each of the Debtors to new names bearing no resemblance to any of the present names of such Debtor so as to permit the use of such names by the Purchaser; (b) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement; (c) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of

K&E 17739536

their state of incorporation or formation (as applicable); (d) complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (e) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of this Plan, including, to the extent the Debtors are expected to have any unsatisfied Allowed Claims as of December 31, 2010 (or Claims that may become Allowed Claims entitled to distributions hereunder following December 31, 2010), the formation and implementation, prior to December 31, 2010, of a liquidating trust or similar "pass-through" entity for tax purposes on behalf and for the benefit of Holders of such unsatisfied Allowed Claims.  The filing by the Liquidator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members, the board of directors or board of managers of each such Debtor.  Notwithstanding anything in the Plan or in the Purchase Agreement, to the contrary, the Purchaser shall assume all liability for all costs, expenses, or claims arising from or related to any Wind Down, including the costs and expenses associated with any Claims resolution or similar process following the Effective Date (whether undertaken pursuant to Article VII of the Plan or otherwise) and the formation and implementation of any of a liquidating trust or similar "pass-through" entity formed pursuant to the Wind Down. Notwithstanding anything in the Plan to the contrary, the Purchaser or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.  In the event the Backstop Parties make an election, pursuant

to the Backstop Unit Purchase Agreement, to pursue the Sale Transaction as a stock purchase rather than an asset purchase, the Debtors and the Backstop Parties agree to work together in good faith to modify this Plan as necessary to reflect such changed structure.

**G.**    **Liquidator.**

118.    The Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidator.  All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date, or transferred pursuant to the Purchase Agreement, shall be transferred to the Liquidator and managed and distributed by the Liquidator pursuant to the terms of the Liquidator Agreement and shall be held in the name of the Debtors free and clear of all Claims against the Debtors and Interests in the Debtors except for rights to such distributions provided to Holders of Allowed Claims as provided in the Plan. Any and all costs and expenses incurred by the Liquidator in connection with the Wind Down in accordance with this Confirmation Order and the Liquidator Agreement shall be paid by the Purchaser.

119.    Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Liquidator, the Purchaser shall designate another Entity of its choosing to become Liquidator and such Entity will become the successor Liquidator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidator. The Liquidator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidator Agreement by the Purchaser.

**H.**    **The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

120.    The following releases, injunctions, exculpations, and related provisions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety:

1.     **Releases by the Debtors.**

121.    The Debtor Release provisions set forth in Article VIII.C of the Plan are hereby approved.

2.     **Third Party Releases.**

122.    The Third Party Release provisions set forth in Article VIII.D of the Plan are hereby approved.

3.     **Injunction.**

123.    The injunction provisions set forth in Article VIII.E of the Plan are hereby approved.

4.     **Exculpation.**

124.    The Exculpation provisions set forth in Article VIII.E of the Plan are hereby approved.

5.     **Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications.**

125.    The Debtor Release and Third Party Release provisions set forth in the Plan shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application of any Professional Filed in these Chapter 11 Cases.

I.     **Assumed Contracts and Assumed Liabilities; Cure Costs; "Adequate Assurance".**

126.    Pursuant to sections 105(a), 365 and 1123 of the Bankruptcy Code, as of and subject to the occurrence of the Effective Date and payment (or the provision of "adequate assurance" of payment) of the applicable Cure Costs, to the fullest extent permitted under applicable law, all Assumed Contracts shall be deemed assumed by the applicable Debtor as of the Effective Date and assigned and/or transferred to the Purchaser.

K&E 17739536

127.    The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon and subject to the occurrence of the Closing (as defined in the Purchase Agreement), the Assumed Contracts free and clear of all Liens, Claims, Excluded Liabilities, interests, and other encumbrances of any kind or nature whatsoever (except for the Permitted Liens and Liens that constitute Assumed Liabilities), which Assumed Contracts, by operation of this Confirmation Order, shall be deemed assumed by the applicable Debtor party thereto and assigned and/or transferred to the Purchaser effective as of the Closing Date (as defined in the Purchase Agreement), without a need for any further action of, notice to, or consent or approval from, any Person, and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts and Assumed Liabilities to the Purchaser.

128.    Pursuant to section 365 of the Bankruptcy Code, as of and subject to the occurrence of the Effective Date and payment (or the provision of "adequate assurance" of payment) of the applicable Cure Costs or establishment by the Purchaser of a reserve containing cash in an amount sufficient to pay the full amount asserted as a Cure Cost by the non-Debtor party to any Assumed Contract (or such smaller amount as may be fixed or estimated by the Court), the Debtors or the Purchaser, as applicable, has:  (a) cured and/or provided "adequate assurance" of cure of any monetary default existing prior to the Confirmation Date, under any of the Assumed Contracts; and (b) provided compensation or "adequate assurance" of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Confirmation Date, under any of the Assumed Contracts.  The Purchaser also has provided "adequate assurance" of future performance of the Assumed Contracts, as provided by sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

129.    Unless otherwise set forth herein or in the Plan, the counterparties to the Executory Contracts and the Unexpired Leases of the Debtors, including the Assumed Contracts, shall be forever barred, estopped and enjoined from disputing the Cure Costs as set forth in the Cure Notice and/or from asserting any claim against the Debtors or the Purchaser arising under section 365(b)(1) of the Bankruptcy Code.

130.    Subject to the occurrence of the Effective Date, entry of this Confirmation Order constitutes approval of the assumptions, assumptions and assignments and rejections contemplated by the Plan and the Purchase Agreement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, and the requirements of section 365(b)(l) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

131.    The Assumed Contracts shall be assumed by the applicable Debtor party thereto and transferred and/or assigned to, and following the closing of the Sale Transaction, remain in full force and effect (without amendment or modification) for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assumption, assignment or transfer, or purports to terminate or alter any term of such Assumed Contract as a result of such assumption, assignment or transfer.  Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all of the Debtors' right, title and interest in and to each Assumed Contract.  Each non-Debtor party to an Assumed Contract that has not objected to the assumption, assignment and/or transfer of such Assumed Contract by the Debtors to the Purchaser is deemed to have consented to the assumption, assignment and/or transfer by the Debtors to the Purchaser of the Assumed Contracts.

K&E 17739536

132.    All defaults, breaches or other obligations of the Debtors under the Assumed Contracts incurred, arising or accruing prior to the Confirmation Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were interposed, are deemed satisfied by the Cure Costs with respect to each such Assumed Contract in those amounts set forth in the Cure Notice, and which were satisfied, or shall be satisfied as soon as practicable, by the Purchaser or the Debtors, as applicable.  The Purchaser shall have no liability or obligation with respect to defaults, breaches or other obligations under the Assumed Contracts incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided in the Purchase Agreement or Plan, as applicable.

133.    No non-Debtor party to any Assumed Contract shall be permitted to cancel or terminate any Assumed Contract, or declare a default, claim that additional fees or other payments are due, increase or modify rights, benefits or obligations, or accelerate any obligation, under such Assumed Contract or otherwise take action against the Purchaser as a result of these Chapter 11 Cases, any Debtor's failure to perform any obligation under such Assumed Contract, the consummation of the Sale Transaction or any of the other Restructuring Transactions, or the assumption by the Debtors and the transfer and/or assignment by the Debtors of such Assumed Contract to the Purchaser.

134.    Except as otherwise provided in the Plan, and to the extent that the Cure Cost applicable to any Assumed Contract has been paid or otherwise provided for as required by Section 365(b) of the Bankruptcy Code, the non-Debtor party to such Assumed Contract is hereby forever barred, estopped, and permanently enjoined from asserting any claim, defense,

setoff, counterclaim, or cause of action against the Debtors, their estates, the Purchaser, or the property of each of the foregoing arising from such default.

135.    Any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease.

**J.    Release of Liens.**

136.    Except as otherwise expressly provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Purchaser and its successors and assigns.

137.    Except as otherwise expressly provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Liens, Claims, Excluded Liabilities, encumbrances, or Interests pursuant to the applicable sections of the Bankruptcy Code.  For the avoidance of doubt, that certain parcel of real property located at 128 21st Street, Texas City, Texas, shall be transferred to the Purchaser free and clear of all Liens, Claims, encumbrances, or Interests, with any applicable Liens, Claims, Excluded Liabilities, encumbrances, or Interests in such property, if any, attaching to the Purchase Price subject to any Rights, Claims, and defenses of the Debtors or other parties in interest.

K&E 17739536

**K.**      **Sale Transaction.**

138.      The Sale Transaction, pursuant to the terms and conditions of the Purchase

Agreement and the Plan, is hereby approved pursuant to sections 105(a), 363, 365, 1123, 1129

and 1146 of the Bankruptcy Code.

139.      Objections (and any reservations of rights contained therein) to the Sale

Transaction (including the assumption by the Debtors and the transfer and/or assignment by the

Debtors of any of the Assumed Contracts to the Purchaser), if any, to the extent not withdrawn,

are hereby overruled in their entirety and denied on the merits.

140.      Pursuant to sections 363(b), 1123, and 1129 of the Bankruptcy Code, and by the

terms of this Confirmation Order, the Debtors are authorized to perform their obligations under

and comply with the terms of the Purchase Agreement and the Backstop Unit Purchase

Agreement, and consummate the Sale Transaction, pursuant to and in accordance with the terms

and conditions of the Purchase Agreement and the Backstop Unit Purchase Agreement.

141.      Neither the Purchaser nor any of the Backstop Parties shall be required to seek or

obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of

its remedies under the Purchase Agreement, the Backstop Unit Purchase Agreement, or any other

documents related to the Sale Transaction.  The automatic stay imposed by section 362 of the

Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence;

provided, that this Court shall retain exclusive jurisdiction over any and all disputes with respect

to the Purchase Agreement, the Backstop Unit Purchase Agreement, and all other documents

related to the Sale Transaction.

142.      The Debtors are authorized to execute and deliver, and empowered to perform

under, consummate and implement, the Purchase Agreement and the Backstop Unit Purchase

Agreement, together with all additional instruments, documents, and agreements that may be

reasonably necessary or desirable to implement the Purchase Agreement and/or the Backstop Unit Purchase Agreement, and to take all further actions as may be requested by the Purchaser or the Backstop Parties for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and/or the Backstop Unit Purchase Agreement.

143.    This Confirmation Order, the Purchase Agreement, and the Backstop Unit Purchase Agreement shall be binding in all respects upon all holders of Claims against, or Interests in (whether known or unknown) any Debtor, all non-Debtor parties to the Assumed Contracts, all successors and assigns of the Purchaser, the Backstop Parties, the Former Backstop Parties, the Debtors and their respective affiliates and subsidiaries, and any subsequent examiners or trustees appointed in the Chapter 11 Cases.  Nothing contained in the Plan shall conflict with or derogate from the provisions of this Confirmation Order, the Purchase Agreement, and the Backstop Unit Purchase Agreement, and this Confirmation Order shall control to the extent of such conflict or derogation.

144.    The Purchase Agreement, the Backstop Unit Purchase Agreement, and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms of such agreements, documents, or instruments, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' Estates.

145.    Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Confirmation Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing Date, the Acquired Assets shall be transferred to the

Purchaser, free and clear of all Claims and Liens (other than Permitted Liens and Assumed Liabilities that constitute Liens) of any kind or nature whatsoever, with all such Claims or and Liens of any kind or nature whatsoever attaching to the proceeds of the Sale Transaction (net of taxes, fees, and expenses incurred in effecting the Sale Transaction) ultimately attributable to the applicable Acquired Assets to which such Claims or Liens relate, in order of their respective priorities, with the same validity, force and effect of which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, and in accordance with the provisions of the Plan.

146.   The transfer of the Acquired Assets to the Purchaser pursuant to the Purchase Agreement shall constitute a legal, valid, and effective transfer of the Acquired Assets upon the Closing Date, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Claims and Liens (other than Permitted Liens and Assumed Liabilities that constitute Liens) of any kind or nature whatsoever.  On the Closing Date, this Confirmation Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets or a bill of sale transferring good and marketable title in the Acquired Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

147.   Except as expressly permitted or otherwise expressly provided in the Purchase Agreement, the Plan, or this Confirmation Order, all Persons, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to Executory Contracts and Unexpired Leases, customers, lenders, trade and other

creditors, holding Claims or Liens of any kind or nature whatsoever against or in the Debtors or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date, or the assumption by the Debtors and the transfer and/or assignment by the Debtors of the Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against: (a) the Purchaser; (b) the Purchaser's successors, designees, or assigns or their respective properties, assets, or interests; or (c) the Acquired Assets, such Persons' Claims, Liens, or Interests.

148.    In accordance with the terms of the Purchase Agreement, on the Closing Date, the Purchaser shall be responsible for payment and satisfaction of all Assumed Liabilities; provided, that the Debtors shall be required to use the Cash Proceeds to make distributions under the Plan, whether or not such distributions are made on the Effective Date or thereafter.  As provided in Article VI.D.4 of the Plan, all Persons holding Claims and Interests arising out of or concerning an Assumed Liability, shall be forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Liquidator and any of their property, such Persons' Claims or Interests (as applicable) arising out of or concerning such Assumed Liabilities except for rights of such Persons to distributions from the Purchase Price as provided in the Plan.  The Purchaser is not assuming, and shall not become liable for the payment or performance of, any liabilities or other obligations of any of the Debtors of any nature whatsoever, whether accrued or unaccrued, other than the Assumed Liabilities.

149.    If any Person that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens in or on the Debtors or the

Acquired Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims and Liens which the Person has with respect to the Debtors or such Acquired Assets or otherwise, then (a) the Debtors and the Purchaser (and each of them individually) are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such Person with respect to such Acquired Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Confirmation Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims, Interests and Liens in or on the Acquired Assets of any kind or nature whatsoever.   Each federal, state, and local governmental agency or department is authorized to accept for filing and/or recording any and all documents and instruments to evidence the release of all Claims, Interests and Liens in or on the Acquired Assets or otherwise necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

150.    The consideration provided by the Purchaser for the Acquired Assets under the Purchase Agreement constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia.

151.    The consideration provided by the Purchaser for the Acquired Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

152.    On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and

K&E 17739536

Liens (other than Assumed Liabilities and Permitted Liens) in the Acquired Assets, if any, as such Claims or Liens may have been recorded or may otherwise exist.

153.    This Confirmation Order (a) shall be effective as a determination that, on the Closing Date, all Claims and Liens (other than Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever existing or relating as to the Debtors or the Acquired Assets on or prior to the Closing Date have been unconditionally released, discharged, and terminated, and that the conveyances described herein and/or the Purchase Agreement have been effected, and (b) shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, taxing authorities, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

154.    All non-Debtor Persons who are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to provide access to, and surrender possession of, the Acquired Assets to the Purchaser on the Closing Date (unless otherwise instructed by the Purchaser).

155.    Except for the Assumed Liabilities, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise expressly provided in the Purchase Agreement, the Purchaser shall not be liable for any Claims against or Interests in the Debtors or any of their predecessors or affiliates, and the

Purchaser and each of its affiliates, successors, and assigns shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business, the consummation of the Sale Transaction, or the sale, use, ownership, lease or license of any Debtor's current or former assets, properties on business, on or prior to the Closing Date.

156.    Except as set forth in the Purchase Agreement, each Assumed Contract shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Assumed Contract.

157.    Following the Closing Date, except as expressly set forth herein or in the Purchase Agreement, no holder of a Claim or Lien in or on the Debtors or the Acquired Assets shall interfere with the Purchaser's title to, or use and enjoyment of the Acquired Assets based on or related to such Claim or Lien, or any actions that the Debtors may take in the Chapter 11 Cases.

158.    The failure specifically to include any particular provisions of the Purchase Agreement and/or the Backstop Unit Purchase Agreement in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement and the Backstop Unit Purchase Agreement be authorized and approved in their entirety.

K&E 17739536

159.    The Debtors shall treat the Sale Transaction, and shall not take any position inconsistent with the treatment of the Sale Transaction, as a taxable transaction for all financial accounting and income tax purposes.  At the request of the Purchaser, the Debtors shall make an election under Section 754 of the Code (as defined in the Purchase Agreement) (a "Section 754 Election") with respect to the Sale Transaction effective for the year in which the Closing Date occurs.  The Purchaser will be responsible for preparing and filing all documents and materials necessary in connection with making the Section 754 Election, and each of the Debtors shall cooperate with the Purchaser in connection therewith and will file all tax returns on a basis consistent with the Section 754 Election.

160.    Promptly after the date of this Confirmation Order, Neff Corp., as a member of the Purchaser, shall enter into a limited liability company agreement of the Purchaser (the "Initial LLC Agreement") with the Investment Fund to govern their respective rights and obligations with respect to the Purchaser, unless Neff Corp. resigns and withdraws as a member, the managing member and each other position of or with the Purchaser immediately after the date of this Confirmation Order.  Concurrently with the Closing of the Purchase Agreement, (a) the Initial LLC Agreement shall be amended and restated in its entirety as the Operating Agreement, and (b) unless Neff Corp. has resigned and withdrawn prior to the Closing Date, Neff Corp. shall, automatically and without further action, be deemed to have resigned and withdrawn as a member, the managing member and any other position of or with the Purchaser, effective as of the Closing Date.

**L.    Maintenance of Causes of Action.**

161.    The provisions of Article IV of the Plan are hereby approved in their entirety. Subject to the releases set forth in Article VIII.C and Article VIII.D of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall assign to the

-64-

Purchaser, and the Purchaser shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Purchaser's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Purchaser may pursue such Causes of Action in its sole discretion.

162.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Purchase Agreement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Purchaser, as applicable, will not pursue any and all available Causes of Action against them or that any Causes of Action do not exist. Except with respect to Causes of Action as to which the Debtors or the Purchaser have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Purchaser, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.   Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Purchaser expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**M.    Standing.**

163.    The Standing Motion is hereby withdrawn without prejudice upon entry of the Confirmation Order and with prejudice upon the occurrence of the Effective Date.  For the avoidance of doubt, the Claims and Causes of Action in the Standing Motion can no longer be

K&E 17739536

pursued; provided, that if the Effective Date does not occur for any reason within 60 days after

the Confirmation Date, or the Plan is withdrawn before the expiration of such 60 day period, then

the Committee shall be entitled to reassert the Standing Motion after providing 21 days' written

notice to the Debtors, and nothing in the Confirmation Order shall be deemed a finding of fact or

ruling with respect to the Standing Motion.

**N.    Post-Confirmation Notices, Professional Compensation, and Bar Dates.**

**1.    Notice of Entry of the Confirmation Order.**

164.    In accordance with Bankruptcy Rules 2002 and 3020(c), within 28 days of the

date of entry of the Confirmation Order, the Debtors shall cause the Notice of Confirmation,

substantially in the form attached hereto as **Exhibit B**, to be served by United States mail, first

class postage prepaid, by hand, or by overnight courier service to all parties served with the

Confirmation Hearing Notice; provided, that no notice or service of any kind shall be required to

be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice,

but received such notice returned marked "undeliverable as addressed," "moved, left no

forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have

been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To

supplement the notice described in the preceding sentence, within 28 days of the date of the

Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street

Journal* and once in the *Miami Herald*.  Mailing and publication of the Notice of Confirmation in

the time and manner set forth in this paragraph shall be good, adequate, and sufficient notice

under the particular circumstances and in accordance with the requirements of Bankruptcy Rules

2002 and 3020(c), and no further notice is necessary.

165.    The Notice of Confirmation shall have the effect of an order of the Court, shall

constitute sufficient notice of the entry of the Confirmation Order to such filing and recording

officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

### 2.     Professional Compensation.

166.    The provisions governing Professional compensation set forth at Article II.B of the Plan are approved in their entirety.  Notwithstanding anything in the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees* [Docket No. 140], the Bankruptcy Rules, or General Order M-388 of the Local Bankruptcy Rules for the Southern District of New York to the contrary, any requirement that Professionals submit an interim fee application on or within 150 days of the Petition Date is hereby waived, and such interim fee application may be combined with a final request for payment of Accrued Professional Compensation Claims as provided by Article II.B of the Plan.

### 3.     Other Administrative Claims.

167.    The provisions governing the treatment of Allowed Administrative Claims set forth in Article II.A of the Plan are approved in their entirety.

### 4.     Notice of Subsequent Pleadings.

168.    Except as otherwise may be provided in the Plan or herein, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date shall be limited to the following parties:  (a) the Debtors (including the Liquidator) and their counsel; (b) the United States Trustee; (c) the Purchaser and its counsel; and (d) any party known to be directly affected by the relief sought herein.

**O.**    **Exemption from Securities Laws.**

169.    The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act and applicable state securities laws, and no other non-bankruptcy law applies to the solicitation.

170.    Each of:  (a)(i) the issuance and sale by the Purchaser of the New Common Units to the Debtors pursuant to the Purchase Agreement; (ii) the distribution by the Purchaser of the Rights to the Rights Offering Participants as provided by the Plan; (iii) the distribution by the Debtors of the New Common Units to holders of First Lien Term Loan Claims and Second Lien Term Loan Claims pursuant to the Plan; and (iv) the issuance and sale by the Purchaser of Rights Offering Units to any holder of a Right upon the exercise of such Right shall (in each such case of clauses (a)(i) through (a)(iv)) be (and shall be deemed to be) exempt from the registration and prospectus delivery requirements of section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code; and (b) the issuance and sale by the Purchaser of the Backstop Units (as defined in the Backstop Unit Purchase Agreement) pursuant to the Backstop Unit Purchase Agreement are exempt from the registration and prospectus delivery requirements of section 5 of the Securities Act pursuant to section 4(2) of the Securities Act.

**P.**    **Rights Offering and Cash Election.**

171.    The Debtors conducted the cash/equity election process and Rights Offering in good faith and in compliance with the Disclosure Statement Order and the Cash Election and Rights Offering Procedures.

**Q.**    **Exemptions from Taxation.**

172.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Purchase Agreement (including the Acquired Assets) shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States

K&E 17739536

(including any state, municipality, or county), and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  For the avoidance of doubt, the foregoing exemption includes sales and use taxes or any similar government assessment.  Such exemption specifically applies, without limitation, to:  (a) the Sale Transaction; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) any Restructuring Transaction; (e) the issuance, distribution and/or sale of any of the New Common Units, the Rights, and any other securities of the Debtors or the Purchaser; or (f) the making or delivery of any deed, bill of sale, assignment agreement or other instrument of transfer or conveyance under, in furtherance of or in connection with the Plan or the Purchase Agreement,  including:    (a) any  merger  agreements;  (b) agreements  of  consolidation, restructuring,  disposition,  liquidation,  or  dissolution;  (c) deeds;  (d) bills  of  sale;  or (e) assignments executed in connection with the Sale Transaction or any other Restructuring Transaction.

**R.    Retention of Jurisdiction.**

173.    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain such jurisdiction over these Chapter 11 Cases and all matters, arising out of, or related to, these Chapter 11 Cases, the Plan, and this Confirmation Order, including those matters specifically set forth at Article XI of the Plan.  Without limiting the foregoing, this Court shall also retain jurisdiction to enforce and implement the terms and provisions of, and resolve any disputes arising under or related to, the

K&E 17739536

Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects.

**S.      Appeal; "Good Faith" Purchaser Under Section 363(m).**

174.    This Confirmation Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any Person obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan, and the Debtors and the Purchaser are free to close under the Purchase Agreement at any time.  The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption by Purchaser of the Assumed Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a purchaser in good faith of the Acquired Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

**T.      References to Plan Provisions.**

175.    The failure specifically to include or to refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in the Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

**U.      Treatment of Executory Contracts and Unexpired Leases.**

176.    The Executory Contract and Unexpired Lease provisions of Article V of the Plan shall be, and hereby are, approved in their entirety.

K&E 17739536

**V.    Procedures for Resolving Claims and Disputes.**

177.    The Claims resolution procedures contained in Article VII of the Plan shall be, and hereby are, approved in their entirety.

**W.    Provisions Governing Distributions.**

178.    The distribution provisions of Article VI of the Plan shall be, and hereby are, approved in their entirety.  Notwithstanding anything in the Plan, or any Plan Supplement document to the contrary, the Purchaser shall assume and be deemed to have assumed all liability for the distribution or treatment provided on account of Claims against, obligations of, or Interests in the Debtors to the extent such Claims, obligations, or Interests do not receive a distribution from the Debtors on the Effective Date; provided, that the Debtors shall be required to use the Cash Proceeds to make distributions under the Plan (other than the Senior Notes Payment which distribution shall be made as set forth in Article VI.F.1 of the Plan, and the Cash Payment), whether or not such distributions are made on the Effective Date or thereafter.

179.    The Senior Notes Payment shall be distributed by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ten business days after the Effective Date, in accordance with Article VI.F.1 of the Plan.

180.    The Cash Payment shall be distributed by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable.

181.    Distributions to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims shall (a) be made to the First Lien Credit Facility Administrative Agent and/or the Second Lien Term Loan Administrative Agent, as applicable, for the benefit of the respective Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively, as

-71-

provided in the Plan and under the Purchase Agreement and (b) be deemed completed when made to the First Lien Credit Facility Administrative Agent and the Second Lien Term Loan Administrative Agent, as applicable. Distribution of the Senior Notes Payment to Holders of Senior Notes Claims shall (x) be made by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) to the Indenture Trustee for the benefit of Holders of Senior Notes Claims (subject to any charging lien in favor of the Indenture Trustee) and (y) be deemed completed when made by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) to the Indenture Trustee.

**X.    Provisions Governing Secured Swap Claims.**

182.    Notwithstanding anything herein to the contrary, on the Effective Date the Debtors shall be deemed to have assumed and assigned the Swap Agreements, as amended by the applicable Swap Amendments, to the Purchaser, and the Swap Counterparties shall be deemed to have consented to such assumption and assignment without any further action by the Debtors, the Purchaser, or the Swap Counterparties.

**Y.    Issuance of New Common Units.**

183.    In accordance with the terms of Article IV.D.1 of the Plan, the Purchaser shall issue and deliver the New Common Units described in such Article and such New Common Units shall be distributed as provided in the Plan. Except as set forth in the Operating Agreement, upon issuance, the New Common Units shall be deemed duly authorized, validly issued and fully paid and non-assessable.

184.    In accordance with the terms of Article VI.F of the Plan, prior to the distribution of New Common Units under the Plan: (a) the recipient of such New Common Units shall furnish to the transfer agent, identified by the Debtors, such identification and tax information as may be required by the Debtors; and (b) prior to the distribution of New Common Units, the

K&E 17739536

recipient of such New Common Units shall execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement (and such New Common Units shall be deemed an undeliverable distribution until such execution and delivery); provided, that (and without limiting the strict requirement that any such recipient execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement as provided above) any such recipient shall be automatically bound by, and any New Common Units or other securities to be received by such recipient shall be automatically subject to, the terms of the Operating Agreement whether or not such recipient shall have executed and/or delivered a counterpart of the Operating Agreement. The requirements in this paragraph, except with respect to the Backstop Parties, may be complied with, and the distributions associated therewith made, after the Effective Date.

**Z.    Management Equity Incentive Plan.**

185.    On or before the Effective Date, the Purchaser shall adopt the MEIP.

**AA.    Emergence Awards.**

186.    The provisions governing the Emergence Awards set forth in Article IV.R of the Plan are approved in their entirety.

**BB.    Exclusivity.**

187.    The Debtors' exclusive periods to file a plan of reorganization and solicit votes thereon, pursuant to section 1121(D) of the Bankruptcy Code, are hereby extended through the Effective Date.

**CC.    Other Essential Documents and Agreements.**

188.    The Operating Agreement, the Plan Support Agreements, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, the Liquidator Agreement, the Exit Facility Documents, and the Rights Offering Documents and the transactions contemplated by each of the foregoing are approved in their entirety and, upon

K&E 17739536

execution and delivery of the agreements and documents relating thereto by the applicable parties, the Operating Agreement, the Plan Support Agreements, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, the Liquidator Agreement, the Exit Facility Documents, and the Rights Offering Documents shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of the Court, or other act or action under applicable law, regulation, order or rule. The Debtors, the Purchaser, and the Backstop Parties, as applicable, are authorized, without further approval of the Court or any other party, to execute and deliver all agreements, documents, instruments, securities and certificates relating to such agreements and perform their obligations thereunder, including, without limitation, pay all fees and indemnities due thereunder or in connection therewith.

189.    On or before the Effective Date, the Debtors may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Purchaser, or the Backstop Parties, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**DD.    Return of Deposits.**

190.    All utilities, including any Person who received a deposit or other form of "adequate assurance" of performance pursuant to section 366 of the Bankruptcy Code during these Chapter 11 Cases (collectively, the "Deposits"), whether pursuant to the *Order Determining Adequate Assurance of Payment for Future Utility Services* [Docket No. 125] or otherwise, including, gas, electric, telephone, trash and sewer services, are directed to return such

-74-

Deposits to the Purchaser, either by setoff against postpetition indebtedness or by cash refund, within 30 days following the Effective Date and as of the Effective Date, such utilities are not entitled to make requests for or receive Deposits.

**EE.    Reports.**

191.    After the Effective Date, the Debtors have no obligation to file with the Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order, including, monthly operating reports (even for those periods for which a monthly operating report was not filed prior to the Effective Date), ordinary course professional reports or monthly or quarterly reports for Professionals.

**FF.    Governing Law.**

192.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided, that corporate or limited liability company governance matters relating to the Debtors or the Purchaser, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Purchaser, as applicable.

K&E 17739536

**GG.    Effectiveness of All Actions.**

193.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or stockholders of the Debtors, or the Purchaser and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**HH.    Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

194.    Pursuant to section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law, and any comparable provision of the business corporation or company laws of any other state, the appropriate officers, managers or authorized persons of the Debtors or the Purchaser (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan, the Purchase Agreement, and the Backstop Unit Purchase Agreement (or necessary or desirable to effect the transactions contemplated by the Plan, the Purchase Agreement, or the Backstop Unit Purchase Agreement) in the name of and on behalf of the Debtors or the Purchaser, as applicable, including (a) the Exit Facility and the other Exit Facility Documents and (b) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.K of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.  On and after the Effective Date, the Purchaser and the managers, officers, authorized persons and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities,

instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, and the securities issued pursuant to the Plan, the Purchase Agreement and the Backstop Unit Purchase Agreement, in the name of and on behalf of the Purchaser, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan, the Purchase Agreement or the Backstop Unit Purchase Agreement.

195.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

## II.    **Modifications or Amendments.**

196.    Except as otherwise specifically provided in the Plan, the Plan Support Agreements, the Purchase Agreement, or the Backstop Unit Purchase Agreement the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or

K&E 17739536

omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided, that following entry of the Confirmation Order, any modifications adversely affecting the treatment of Class 8 or Class 9 shall only be made upon written consent of the Committee (and in the case of any modification of the Indenture Trustee Fee Amount, upon written consent of the Indenture Trustee) or otherwise by order of the Court. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

**JJ.** **Effect of Conflict Between Plan, Purchase Agreement and Confirmation Order.**

197. In the event that there is a conflict or ambiguity between the terms of the Plan and: (a) the Disclosure Statement; (b) the terms of any agreement entered into between a Debtor and any party, including the Purchase Agreement; or (c) orders of the Court (other than this Confirmation Order), the Plan shall control over the Disclosure Statement, any such agreements including the Purchase Agreement, or prior orders of the Court.

198. In the event that there is a conflict or ambiguity between the terms of this Confirmation Order or the Purchase Agreement and the terms of the Plan and the Plan Supplement: (a) the Plan and this Confirmation Order shall control over the Purchase Agreement; and (b) this Confirmation Order shall control over the Plan and the Plan Supplement.

**KK.** **Reservation of Rights.**

199. Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be

K&E 17739536

deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**LL.**   **Injunctions and Automatic Stay.**

200.   Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect through and including the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**MM.**   **Nonseverability of Plan Provisions upon Confirmation.**

201.   Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

**NN.**   **Waiver or Estoppel.**

202.   Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Court prior to the Confirmation Date.

K&E 17739536

**OO.    Authorization to Consummate.**

203.    The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.

**PP.    Resolution of Taxing Authority Objections.**

204.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, any liens securing an Allowed Secured Tax Claim held by a Specified Taxing Authority[6] shall remain in full force and effect, on all property securing such Allowed Secured Tax Claim, until all taxes, penalties, and interest secured by such liens pursuant to applicable state law are paid and such liens shall not be primed by any exit financing or otherwise; provided, that nothing in this paragraph shall affect, impair, or otherwise limit the Debtors' or Purchaser's rights to dispute the validity, perfection, priority, or the amount of any Secured Tax Claim or to object to any Secured Tax Claim in accordance with the terms of the Plan.

205.    Any Allowed Secured Tax Claims held by a Specified Taxing Authority shall accrue interest from the Petition Date through the Effective Date pursuant to section 506(b) of the Bankruptcy Code, as well as from the Effective Date until paid in full, at the rate provided under applicable state law as required by section 511 of the Bankruptcy Code.

206.    Failure to make timely payments on account of any Allowed Secured Tax Claims held by a Specified Taxing Authority pursuant to the terms of the Plan shall constitute an event of default (each, a "Specified Taxing Authority Event of Default").    If a Specified Taxing

---

[6]    The following entities (each, a "Specified Taxing Authority" and collectively, the "Specified Taxing Authorities") have lodged an informal or formal objection to the Plan:  County of San Bernardino, California, Douglas County, Colorado, Williamson County, Texas, the Miami-Dade County Tax Collector, Ector County Appraisal District, Galveston County, Harris County, Montgomery County, Round Rock Independent School District, Tarrant County, Texas Independent School District, Eagle Mountain - Saginaw Independent School District, Pima County, Arizona.  For the avoidance of doubt, the provisions of paragraphs 212 through 216 of this Confirmation Order shall apply solely to the Specified Taxing Authorities.

Authority Event of Default is not cured within twenty (20) days after service of written notice of default on the Debtors and the Purchaser and their respective counsel, the Specified Taxing Authority holding such Allowed Secured Tax Claim shall be entitled to exercise all of its rights with respect to such Allowed Secured Tax Claims, against the Debtor or the Purchaser (as applicable), in accordance with applicable state law remedies, subject to all defenses available to the Debtors or the Purchaser (as applicable).

207.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, postpetition taxes for 2010 and the following tax years shall be paid in the ordinary course, prior to delinquency, without the necessity of any Specified Taxing Authority filing an Administrative Claim or request for payment on account of such postpetition taxes.  Failure to make timely payments on account of such postpetition taxes shall constitute a Specified Taxing Authority Event of Default.  If a Specified Taxing Authority Event of Default is not cured as set forth in the paragraph above, a Specified Taxing Authority owed delinquent postpetition taxes shall be entitled to exercise all of its rights with respect to such postpetition taxes against the Debtor or the Purchaser (as applicable), in accordance with applicable state law remedies, subject to all defenses available to the Debtors or the Purchaser (as applicable).

208.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, Article VII.A.3 of the Plan shall not apply to Allowed Secured Tax Claims; provided, that nothing in this paragraph shall affect, impair, or otherwise limit the Debtors' or Purchaser's rights to dispute the validity, perfection, priority, or the amount of any Secured Tax Claim or to object to any Secured Tax Claim in accordance with the terms of the Plan.

**QQ.    Chartis Objection.**

209.    National Union Fire Insurance Company of Pittsburgh, Pa., Insurance Company of the State of Pennsylvania, Illinois National Insurance Company, Lexington Insurance

-81-

Company, Commerce & Industry Insurance Company, Chartis Specialty Lines and American Home Assurance Company (together with any other subsidiary of Chartis, Inc. that provided insurance coverage to Debtors, collectively, "Chartis") filed the Chartis Objection on September 1, 2010. The Chartis Objection is resolved as follows:

a. <u>Setoff.</u> The Chartis Objection shall be deemed to be a timely filed motion by Chartis pursuant to Article VIII.G of the Plan requesting authority to assert all rights of setoff they may have against obligations of any of the Debtors under any of the Assumed Chartis Contracts (as defined below) other than any Excluded Chartis Obligations (as defined below), and such motion is resolved by allowing all such rights of setoff described in the immediately preceding sentence that Chartis may have to continue unimpaired after the Confirmation of the Plan. Chartis shall have the right to use and apply all letters of credit and cash collateral provided to it by the Debtors for obligations of the Debtors under the Assumed Chartis Contracts (other than the Excluded Obligations) without further order of the Court.

b. <u>Arbitration.</u> Chartis shall be deemed to have preserved all its rights to seek arbitration of any dispute between it and the Debtors or their successors, other than disputes that relate to the Plan (including, without limitation, the assumption and assignment of any of the Assumed Chartis Contracts, the Cure Cost applicable to any of the Assumed Chartis Contracts and the treatment of any obligations, rights and/or duties arising under any of the Assumed Chartis Contracts), which disputes shall be resolved exclusively by the Court. Nothing in the Plan or in this Confirmation Order shall be deemed to preclude Chartis from asserting that Chartis has a right to arbitrate disputes described in the immediately preceding sentence.

c. <u>Release of Liens.</u> Article IV.H of the Plan shall not alter or impair the treatment of any of Chartis's claims, if any, pursuant to the Plan, including any rights of setoff, except to the extent that any of the foregoing relate to Excluded Chartis Obligations.

d. <u>Assumption and Cure.</u> All provisions of all Chartis insurance contracts that are to be treated as assumed under Article V.F of the Plan (the "Assumed Chartis Contracts") shall remain in full force and effect, including that certain Binder dated 07/23/2010 with effective date 05/30/2010, and all contracts issued pursuant to that Binder (collectively, the "2010 Renewal Documents"); <u>provided</u> further that:

i. All Assumed Chartis Contracts other than the 2010 Renewal Documents (the "Other Chartis Documents") are deemed assumed by the applicable Debtor party thereto and assigned to the Purchaser on and as of the Effective Date; <u>provided</u>, that the assumption and assignment of any Other

K&E 17739536

Chartis Document that is subject to a default arising on or prior to July 31, 2010 shall be subject to the payment of the Cure Cost, if any, applicable to such Other Chartis Document set forth on the Cure Cost Schedule (each such Cure Cost, a "Chartis Cure Cost"), such that, upon payment of such Chartis Cure Cost, all defaults under such Other Chartis Document that existed as a default prior to July 31, 2010 shall be deemed "cured" (within the meaning of section 365(b) of the Bankruptcy Code).

ii.   All obligations arising under the terms of the 2010 Renewal Documents (such obligations, the "Chartis Renewal Obligations") shall be assigned to and assumed by the Purchaser, shall be unimpaired and shall not be subject to the cure provisions of the Cure Cost Schedule.

iii.   Except for any obligations of any of the Debtors that are in default prior to July 30, 2010 under any of the Other Chartis Documents (the "Excluded Chartis Obligations") and any rights, duties, limitations, exclusions and defenses relating to any of the Excluded Chartis Obligations, upon the Effective Date, and without further order of this Court:

(i)   all Chartis Renewal Obligations and all obligations to pay any Chartis Cure Cost shall become obligations of the Purchaser;

(ii)   all terms and provisions of the Assumed Chartis Contracts shall be in full force and effect between Chartis and the Purchaser;

(iii)   all rights, duties, obligations, limitations, exclusions and defenses arising under or relating to the Assumed Chartis Contracts are preserved without prejudice, and no discharge or injunction arising from these Chapter 11 Cases shall impair the obligations of any party under the Assumed Chartis Contracts;

(iv)   all past, present and future obligations arising under the Assumed Chartis Contracts, including without limitation, obligations for premium, deductibles, retentions or other retrospective obligations, and obligations to pay taxes and fees, and obligations to adjust, defend, settle and pay in connection with any self-insured retention layer, shall be paid and satisfied in the ordinary course of business; and

(v)   Chartis shall not be required to file any further claim in this Court to compel payment of obligations arising under the Assumed Chartis Contracts. No further bar date or other claim filing deadline in these Chapter 11 Cases shall be

applicable to Chartis, and no proceeding to estimate Chartis's Claims shall be applicable to the Assumed Chartis Contracts. The parties to the Assumed Chartis Contracts may hereafter carry out and enforce the Assumed Chartis Contracts in any appropriate proceeding or forum without relief from any stay or from any post-confirmation injunction of general applicability to creditors of the Debtors.

**RR.** **Resolution of Committee Objection.**

210. The Debtors' resolutions of the Standing Motion, the Committee Objection, and all Claims, Causes of Action, and objections contained therein are hereby approved. The Committee Members who voted against the Plan have changed their votes to accept the Plan. Because no Impaired Class is adversely affected by the terms of these resolutions, the Debtors' Plan does not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The resolution of the Committee's Standing Motion and Committee Objection is fair and reasonable and in the best interests of the Debtors' Estates.

211. Notwithstanding anything to the contrary in this Confirmation Order, in the event the Debtors are unable to consummate the Successful Bid and seek to pursue the Backup Bid, the Committee shall have the right to object to consummation of the Backup Bid for the same reasons set forth in the Committee Objection, unless the Backup Bidders agree to provide Holders of General Unsecured Claims and Holders of Senior Notes the same distributions provided under the Plan.

K&E 17739536

**SS.**    **Plan Modification Motion.**

212.    The Plan Modification Motion is hereby granted, and the Debtors shall not be required to resolicit acceptances of the modified Plan or prepare and distribute a new disclosure statement with respect to the modified Plan.

**TT.**    **Exclusivity Objection.**

213.    Entry of this Confirmation Order approving the Plan renders the Committee's Exclusivity Objection moot and the Debtors' exclusive period to file a Plan is hereby extended through the Effective Date of the Plan.  If the Effective Date of the Plan does not occur within 60 days of entry of the Confirmation Order, the Committee may file a motion seeking to terminate the Debtors' exclusive right to file a Plan.

**UU.**    **Dissolution of the Committee.**

214.    On the Effective Date, the Committee shall be dissolved as provided by Article XII.D of the Plan.

**VV.**    **Effect of Non-Occurrence of Conditions to the Effective Date.**

215.    Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A of the Plan have been satisfied or waived.  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

K&E 17739536

**WW.**   **Final Order.**

216.    This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

IT IS SO ORDERED.

New York, New York                              /s/ Shelley C. Chapman
Date: September 21, 2010                     Honorable Shelley C. Chapman

K&E 17739536

## Exhibit A

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NEFF CORP., <u>et al.</u>,[1] | ) Case No. 10-12610 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

## DEBTORS' THIRD AMENDED JOINT PLAN
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

James H.M. Sprayregen, P.C.                     Anup Sathy, P.C. (admitted *pro hac vice*)
Ray C. Schrock (admitted *pro hac vice*)        KIRKLAND & ELLIS LLP
Brian S. Lennon                                 300 North LaSalle Drive
KIRKLAND & ELLIS LLP                            Chicago, Illinois  60654
601 Lexington Avenue                            Telephone:  (312) 862-2000
New York, New York  10022
Telephone:  (212) 446-4800


Counsel to the Debtors and Debtors in Possession

Dated:  September 21, 2010

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649).  The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is:  3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178.  The service address for Neff Holdings LLC is:  375 Park Avenue, New York, New York 10152.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
AND GOVERNING LAW** ...................................................................................................1
    A.    Defined Terms ...............................................................................................................1
    B.    Rules of Interpretation ................................................................................................15
    C.    Computation of Time ..................................................................................................15
    D.    Governing Law ...........................................................................................................15
    E.    Reference to Monetary Figures ..................................................................................16
    F.    Controlling Document ................................................................................................16

**ARTICLE II. DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS** ....16
    A.    Administrative Claims ................................................................................................16
    B.    Accrued Professional Compensation Claims .............................................................17
    C.    DIP Claims ..................................................................................................................17
    D.    Priority Tax Claims .....................................................................................................17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............18
    A.    Summary of Classification .........................................................................................18
    B.    Treatment of Claims and Interests .............................................................................18
    C.    Special Provision Governing Unimpaired Claims .....................................................24
    D.    Class Acceptance Requirement ..................................................................................24
    E.    Elimination of Vacant Classes ...................................................................................24
    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes ................................24
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................25
    H.    Controversy Concerning Impairment .........................................................................25

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ..............................................25
    A.    Sources of Consideration for Plan Distributions ........................................................25
    B.    Rights Offering ...........................................................................................................25
    C.    Exit Facility .................................................................................................................25
    D.    The Purchase Agreement ............................................................................................26
    E.    General Settlement of Claims .....................................................................................27
    F.    Section 1145 Exemption .............................................................................................27
    G.    Listing of New Common Units ...................................................................................27
    H.    Release of Liens .........................................................................................................27
    I.    Cancellation of Securities and Agreements ...............................................................28
    J.    Restructuring Transactions .........................................................................................28
    K.    Corporate Action ........................................................................................................28
    L.    Effectuating Documents; Further Transactions ..........................................................29
    M.    Exemption from Certain Taxes and Fees ...................................................................29
    N.    D&O Liability Insurance Policies ..............................................................................29
    O.    Board Representation ..................................................................................................30
    P.    Indemnification Provisions .........................................................................................30
    Q.    Management Equity Incentive Plan ............................................................................30
    R.    Emergence Awards .....................................................................................................30
    S.    Preservation of Rights of Action ...............................................................................30
    T.    Wind Down and Dissolution of the Debtors ..............................................................31
    U.    Liquidator ...................................................................................................................31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......32
    A.    Assumption and Assignment of Executory Contracts and Unexpired Leases ...........32
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..............32
    C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ...............33

i

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........... 33
E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................ 33
F.    Insurance Policies ................................................................................................................... 34
G.    Compensation and Benefit Programs ....................................................................................... 34
H.    Reservation of Rights .............................................................................................................. 34
I.    Nonoccurrence of Effective Date ............................................................................................. 34

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ................................................................... **34**
A.    Timing and Calculation of Amounts to Be Distributed ............................................................. 34
B.    Distributions Generally; Disbursing Agent ............................................................................... 35
C.    Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement .......................... 35
D.    Rights and Powers of Disbursing Agent ................................................................................... 35
E.    Distributions on Account of Claims Allowed After the Effective Date ....................................... 35
F.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .................................. 36
G.    Compliance with Tax Requirements/Allocations ...................................................................... 37
H.    Claims Paid or Payable by Third Parties .................................................................................. 37

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS** ............................................................................................................................ **38**
A.    Resolution of Disputed Claims ................................................................................................ 38
B.    Disallowance of Claims ........................................................................................................... 39
C.    Amendments to Claims ............................................................................................................ 39

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................... **40**
A.    Compromise and Settlement of Claims, Interests, and Controversies ......................................... 40
B.    Subordinated Claims ............................................................................................................... 40
C.    Debtor Release ........................................................................................................................ 40
D.    Third Party Release ................................................................................................................. 41
E.    Exculpation ............................................................................................................................. 42
F.    Injunction ............................................................................................................................... 42
G.    Setoffs .................................................................................................................................... 43
H.    Special Provision Governing Accrued Professional Compensation Claims and Final Fee
Applications ........................................................................................................................... 44

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
THE PLAN** .......................................................................................................................................... **44**
A.    Conditions Precedent to the Effective Date .............................................................................. 44
B.    Waiver of Conditions .............................................................................................................. 45
C.    Effective Date ......................................................................................................................... 45
D.    Effect of Non-Occurrence of Conditions to the Effective Date .................................................. 45

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............................... **45**
A.    Payout Event .......................................................................................................................... 45
B.    Modification and Amendments ................................................................................................ 45
C.    Effect of Confirmation on Modifications .................................................................................. 46
D.    Revocation or Withdrawal of the Plan ..................................................................................... 46

**ARTICLE XI. RETENTION OF JURISDICTION** .................................................................................... **46**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ................................................................................... **48**
A.    Immediate Binding Effect ........................................................................................................ 48
B.    Additional Documents ............................................................................................................. 48
C.    Payment of Statutory Fees ....................................................................................................... 48
D.    Dissolution of the Committee ................................................................................................... 48
E.    Reservation of Rights .............................................................................................................. 48
F.    Successors and Assigns ........................................................................................................... 48

G.    Service of Documents ...................................................................................49
H.    Term of Injunctions or Stays........................................................................49
I.     Entire Agreement .........................................................................................49
J.     Nonseverability of Plan Provisions ..............................................................49

iii

## INTRODUCTION

Neff Corp. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following joint plan for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "*Acquired Assets*" shall have the meaning set forth in Section 2.1 of the Purchase Agreement.

3.      "*Ad Hoc Group*" means that certain ad hoc group of certain holders of First Lien Term Loans.

4.      "*Ad Hoc Group Advisors*" means Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Group, and Houlihan Lokey Howard & Zukin, as financial advisor to the Ad Hoc Group.

5.      "*Ad Hoc Group Advisor Fees*" means all Claims for: (a) the reasonable documented out-of-pocket costs, fees, expenses, disbursements and charges of the Ad Hoc Group Advisors, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases; and (b) reasonable out-of-pocket expenses incurred by members of the Ad Hoc Group in connection with the Chapter 11 Cases.

6.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) the Backstop Party Fees; (e) the Transaction Expenses, without any requirement for filing fee applications in the Chapter 11 Cases; (f) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; (g) the Ad Hoc Group Advisor Fee Claims, without any requirement for filing fee applications in the Chapter 11 Cases; and (h) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

7.      "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

8.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

9.      "*Agreement Order*" means the Disclosure Statement Order.

10.     "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the

1

Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

11.    "*Alternative Transaction*" means any restructuring transaction that is inconsistent with the Backstop Unit Purchase Agreement or the Plan Support Agreement, including (a) a merger, consolidation, business combination, recapitalization or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Plan Support Agreement, (b) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Plan Support Agreement, or (c) a plan of reorganization that does not contemplate a reorganization of the Debtors on the terms set forth in the Plan Support Agreement.

12.    "*Assumed Liabilities*" shall have the meaning set forth in Section 2.3 of the Purchase Agreement.

13.    "*Backstop Commitment Percentage*" means, with respect to any Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment of such Backstop Party and the denominator of which is the aggregate Backstop Commitments of all Backstop Parties.

14.    "*Backstop Commitments*" means, with respect to any Backstop Party, the commitment, on the terms set forth in the Commitment Letter and in the Backstop Unit Purchase Agreement, of such Backstop Party to fund a portion of the Rights Offering Amount to the extent that the Rights Offering is not fully subscribed pursuant to the Plan.  The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.

15.    "*Backstop Parties*" means those certain entities listed from time to time on Schedule 1 to the Backstop Unit Purchase Agreement.

16.    "*Backstop Party Fees*" means all Transaction Expenses, the Break-Up Fee, and all Claims for all other amounts that are contemplated to be paid by the Debtors to the Backstop Parties pursuant to the Backstop Unit Purchase Agreement.

17.    "*Backstop Unit Purchase Agreement*" means that certain Backstop Unit Purchase Agreement, dated as of July 22, 2010, by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, as amended pursuant to that certain amendment dated September 2, 2010, Filed at [Docket No. 383], and as otherwise amended, supplemented or otherwise modified from time to time, substantially in the form attached as Exhibit 1 to the Plan Supplement [Docket No. 34].

18.    "*Ballot*" means the form distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan approved by the Bankruptcy Court.

19.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

20.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under

2

28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

21.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

22.    "*Break-Up Fee*" means a Cash fee in the aggregate amount of $3,000,000 payable in accordance with the Backstop Unit Purchase Agreement if the Debtors (a) enter into an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement) with respect to an Alternative Transaction or (b) consummates any Alternative Transaction, in any such case described in clause (a) or clause (b), at any time (x) prior to the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof or (y) within twelve (12) months following the termination of the Backstop Unit Purchase Agreement and the Backstop Commitments in accordance with the terms thereof.

23.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.    "*Capital Call Agreement*" means that certain capital call agreement by and between the Purchaser and the Persons party thereto as "Investors" thereunder setting forth, among other things, the terms and conditions for such Investors to provide the Purchaser with Cash investments or loans in an aggregate amount not to exceed $16.0 million, as amended, supplemented or otherwise modified from time to time, to be included as an exhibit to the Plan Supplement.

25.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

26.    "*Cash Payment*" means Cash in the amount of $365,000.

27.    "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

28.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Neff Corp., et al., Chapter 11 Case No. 10-12610 (SCC), which are currently pending before the Bankruptcy Court.

29.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

30.    "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) the *Order (A) Establishing the Deadline for Filing Proofs of Claim and Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (B) Approving Procedures for Filing Proofs of Claim and Section 503(B)(9) Requests for Payment and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 129] entered on June 8, 2010 or (b) a Final Order of the Bankruptcy Court.

31.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Claims Bar Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Purchaser, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

3

32.      *"Claims Register"* means the official register of Claims maintained by the Notice and Claims Agent.

33.      *"Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

34.      *"Commitment Letter"* means that certain Commitment Letter, dated as of April 12, 2010, pursuant to which the Backstop Parties provided their respective Backstop Commitments on the terms, and subject to the conditions, set forth therein, substantially in the form attached as <u>Exhibit O</u> to the Agreement Order.

35.      *"Committee"* means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on May 28, 2010 and as amended on June 17, 2010.

36.      *"Committee Members"* means:  (a) Footprints Asset Management; (b) Shirley L. Wong; (c) Richard D. Alamandi; (d) Allen Daniel Barnett; (e) the Indenture Trustee; (f) Dan Camphausen; and (g) Alan P. Neiman; each solely in their capacity as members of the Committee.

37.      *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.      *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.      *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

40.      *"Confirmation Objection Deadline"* means the deadline for Filing objections to the Plan, which pursuant to the Disclosure Statement Order, is September 1, 2010, at 5:00 p.m. (prevailing Eastern Time).

41.      *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

42.      *"Consummation"* means the occurrence of the Effective Date.

43.      *"Cure Cost"* means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

44.      *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Effective Date.

45.      *"Debtor Release"* means the release given by the Debtors to the Debtor Releasees and the Third Party Releasees as set forth in Article VIII.C hereof.

46.      *"Debtor Releasee"* means, collectively, each Debtor and the Debtors' current and former Affiliates, partners, Shareholders, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

47.      *"Debtors"* means, collectively:  Neff Corp.; Neff Finance Corp.; Neff Holdings Corp.; Neff Holdings LLC; Neff Rental, Inc.; and Neff Rental LLC.

48.      *"DIP Agent"* means Bank of America, N.A. in its capacity as administrative agent under the DIP Agreement, or any successor agent appointed in accordance with such agreement.

4

49.     "*DIP Agreement*" means that certain debtor in possession credit agreement, dated as of May 17, 2010, by and among Neff Corp., as borrower, and the DIP Agent, the DIP Lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time.

50.     "*DIP Claims*" means any and all Claims arising under or related to the DIP Facility as of the Effective Date.

51.     "*DIP Facility*" means that certain $175.0 million debtor in possession credit facility entered into pursuant to the DIP Agreement.

52.     "*DIP Lenders*" means the DIP Agent and the banks, financial institutions, and other lender parties under the DIP Facility.

53.     "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

54.     "*Disbursing Agent*" means, on the Effective Date, the Debtors or their agent and, after the Effective Date, the Purchaser, the Liquidator or any other Entity or Entities designated by the Purchaser to make or facilitate distributions that are to be made after the Effective Date pursuant to the Plan.

55.     "*Disclosure Statement*" means the *Amended Disclosure Statement for the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 13, 2010, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

56.     "*Disclosure Statement Order*" means the *Order Approving the Debtors' Amended Disclosure Statement and Granting Related Relief*, entered on July 13, 2010 [Docket No. 267] approving the Disclosure Statement and granting related relief.

57.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

58.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

59.     "*Emergence Awards*" shall have the meaning set forth in the *Motion of the Debtors for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan* filed on May 25, 2010 [Docket No. 73].

60.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

61.     "*Equity Interest*" means the common stock, limited liability company interests and any other equity, ownership or profits interests of any Debtor and options, warrants, rights or other securities or agreements to acquire the common stock, limited liability company interests or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

62.     "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

63.     "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Purchaser; (c) the Debtor Releasees; (d) the Third Party Releasees; (e) the Exit Facility Agent; (f) the lenders under the Exit Facility; (g) the Committee and the Committee Members; and (h) all of the current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries,

professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives and successors and assigns of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided that no Non-Released Party will be an Exculpated Party.

64.    "*Exculpation*" means the exculpation provision set forth in Article VIII.E hereof.

65.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

66.    "*Exit Facility*" means that new asset based revolving credit facility in the amount of $175.0 million to be entered into by the Debtors pursuant to the agreement to be executed on or before and subject to the occurrence of the Effective Date, including any agreements, amendments, supplements or documents related thereto, on terms reasonably satisfactory to the Debtors and the Purchaser and materially consistent with the Exit Facility Documents, which Exit Facility may be assigned and transferred on the Effective Date by the Debtors to the Purchaser.

67.    "*Exit Facility Agent*" means Bank of America, N.A. in its capacity as administrative agent under the Exit Facility, or any successor thereto.

68.    "*Exit Facility Agreement*" means that certain credit agreement to be entered into as of and subject to the occurrence of the Effective Date by and among Neff Corp., as borrower, and the Exit Facility Agent, the Exit Facility lenders named therein, and the parties thereto, as amended, supplemented or otherwise modified from time to time.

69.    "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility, to be included as an exhibit to the Plan Supplement.

70.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

71.    "*Final DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing and Letters of Credit, (B) Authorizing the Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Pre-Petition Secured Lenders*, entered June 30, 2010 [Docket No. 207], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

72.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or the Purchaser, as applicable, reserve the right to waive any appeal period.

73.    "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, and amended and restated as of December 16, 2008, by and among Neff Corp., Neff Holdings Corp. and certain of its subsidiaries, as borrowers, the First Lien Credit Facility Agents, and the First Lien Credit Facility Lenders.

74.    "*First Lien Credit Facility Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent under the First Lien Credit Agreement.

75.    "*First Lien Credit Facility Agents*" means, collectively, (a) the First Lien Credit Facility Administrative Agent, (b) Bank of America, N.A., in its capacity as first lien collateral agent and control agent under

the Intercreditor Agreement and agent under the First Lien Security Agreement, or any successor-in-interest thereto, (c) CIBC Inc. and UBS Securities LLC, each in their capacity as co-documentation agents under the First Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the First Lien Credit Agreement.

76.    "*First Lien Credit Facility Lenders*" means collectively, the First Lien Term Loan Lenders and the Revolving Credit Facility Lenders.

77.    "*First Lien Security Agreement*" means that certain Security Agreement, dated as of May 31, 2007, as amended and modified from time to time, by and among Neff Corp., LYN Holdings Corp., as grantors and Bank of America, N.A., as agent for the secured parties.

78.    "*First Lien Term Loan*" means the approximately $87.9 million secured term loan provided under the First Lien Credit Agreement.

79.    "*First Lien Term Loan Cash Payment*" means Cash in an amount equal to a Holder's Allowed First Lien Term Loan Claim, including any accrued and unpaid prepetition interest and postpetition interest at the default contract rate; <u>provided</u> <u>that</u> for so long as the Plan Support Agreement has not been terminated, Wayzata may not elect to take and shall not receive the First Lien Term Loan Cash Payment on account of any or all of its Allowed First Lien Term Loan Claim(s).

80.    "*First Lien Term Loan Claim*" means any Claim against any Debtor arising under or related to the First Lien Term Loan.

81.    "*First Lien Term Loan Equity Election*" means the election of a Holder of an Allowed First Lien Term Loan Claim set forth in Article III.B.6(c)(i)(B) hereof.

82.    "*First Lien Term Loan Lenders*" means those financial institutions and other lender parties to the First Lien Credit Agreement from time to time as "Term Loan Lenders" thereunder, each in their capacity as such.

83.    "*First Lien Term Loan Rights Offering Participants*" means all Holders of First Lien Term Loan Claims that are accredited investors or qualified institutional buyers (as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, respectively), as of the Voting Record Date.

84.    "*Former Backstop Parties*" means those certain funds managed or controlled by Apollo Capital Management in their capacities as parties to the Commitment Letter and the Backstop Unit Purchase Agreement.

85.    "*General Unsecured Claim*" means any unsecured Claim against any Debtor that is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Senior Notes Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims shall not include any deficiency claim arising under the Second Lien Term Loan.

86.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

87.    "*Holder*" means any Entity holding a Claim or an Interest.

88.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

89.    "*Indemnification Provision*" means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

7

90.      *"Indenture Trustee"* means Law Debenture Trust Company of New York as successor in interest to Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Senior Notes Indenture.

91.      *"Indenture Trustee Fee Amount"* means the reasonable and documented fees and expenses due and owing to the Indenture Trustee pursuant to the Senior Notes Indenture without any requirement of the Indenture Trustee or its counsel to file fee applications or formal requests for payment in these Chapter 11 Cases.  For the fees and expenses incurred by the Indenture Trustee through the Effective Date in the approximate amount of $400,000, the Committee, the Debtors, and the Backstop Parties agree that such amount is reasonable.

92.      *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

93.      *"Intercompany Contracts"* means any Executory Contract, Unexpired Lease, agreement, contract, or lease between or among the Debtors.

94.      *"Intercompany Interest"* means an Equity Interest in a Debtor held by another Debtor.  For the avoidance of doubt, Intercompany Interests excludes Equity Interests in any Debtor held by non-Debtors.

95.      *"Intercreditor Agreement"* means that certain Intercreditor Agreement, dated as of May 31, 2007, by and among Neff Corp., Bank of America, N.A., as First Lien Collateral Agent, and Wilmington Trust FSB as successor Second Lien Collateral Agent, governing, among other things, the respective rights, remedies, and priorities of Claims and Liens held by such parties, or any similar or related agreement (and as the same may have been modified, amended, or restated).

96.      *"Interests"* means, collectively, Equity Interests and Intercompany Interests.

97.      *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees* [Docket No. 140], entered on June 9, 2010, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

98.      *"Interim DIP Order"* means the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing*, entered May 17, 2010 [Docket No. 41], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time.

99.      *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

100.      *"Lien"* shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

101.      *"Liquidator"* means such Entity as may be designated by the Debtors as liquidator pursuant to the Liquidator Agreement and Article IV.U hereof to effectuate the Wind Down.  For the avoidance of doubt, all costs, liabilities, and expenses incurred by the Liquidator shall be paid by the Purchaser.

102.      *"Liquidator Agreement"* means the agreement governing, among other things, the retention and duties of the Liquidator, if applicable, as described in Article IV.U hereof, which shall be in form and substance reasonably acceptable to the Debtor and the Purchaser and to be included as an exhibit to the Plan Supplement.

103.      *"Management Equity Incentive Plan"* means that certain post-Effective Date management equity incentive plan which provides that, among other things, 10% of the New Common Units, on a fully-diluted basis, shall be reserved for issuance in the form of unit options (and/or, at the election of the Backstop Parties, in the form of a class of profits interests participating in 10% of any appreciation in the value of the Purchaser after the Effective Date above certain agreed upon participation thresholds), of which, (x) options to purchase 8% of the New Common Units on a fully diluted basis (and/or 80% of the class of profits interests) will be allocated and issued to participants, as such participants are determined by the Debtors and (y) options to purchase 2% of the New Common

8

Units on a fully diluted basis (and/or 20% of the class of profits interests) will be reserved for future issuances as determined by the New Board in its sole discretion.

104.    "*Neff Corp.*" means Neff Corp., a Delaware corporation and one of the Debtors in the Chapter 11 Cases.

105.    "*New Board*" means the board of managers of the Purchaser as of the Effective Date.

106.    "*New Common Units*" means one or more classes of newly-issued units of common equity of the Purchaser.  As used in this Plan, New Common Units shall include the Rights Offering Units, the New Common Units issuable upon exercise of the Warrants (if issued), and the New Common Units issued under the Management Equity Incentive Plan.

107.    "*Non-Released Parties*" means those Entities to be identified in the Plan Supplement as Non-Released Parties; provided that Non-Released Parties shall not include the First Lien Credit Facility Lenders, the DIP Lenders, the First Lien Credit Facility Agents, the DIP Agent, the Purchaser, the Backstop Parties, the Former Backstop Parties or the Ad Hoc Group.

108.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and claims agent for the Debtors.

109.    "*Operating Agreement*" means a limited liability company agreement to be entered into on the Effective Date by and among the Purchaser and the holders of the New Common Units and other interests in the Purchaser (if any), which limited liability company agreement shall contain terms and conditions acceptable to the Backstop Parties.

110.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim.

111.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not:  (a) a Revolving Credit Facility Claim; (b) a Secured Swap Claim; (c) a First Lien Term Loan Claim; (d) a Second Lien Term Loan Claim; (e) a DIP Claim; or (f) a Secured Tax Claim.

112.    "*Payout Event*" means an event on or before the Payout Event Deadline where any or all of the Second Lien Term Loan Lenders or any other party have provided the Debtors with sufficient Cash or committed financing, documented to the satisfaction of the Debtors, to (a) indefeasibly pay all of the Allowed First Lien Term Loan Claims in full in Cash on the Effective Date, including any accrued but unpaid interest (including postpetition interest at the default contract rate) and (b) treat all other Claim Holders no less favorably than as otherwise provided in Article III.B hereof.

113.    "*Payout Event Deadline*" means July 26, 2010 at 5:00 pm (prevailing Eastern Time), as set forth in the Payout Event Procedures.

114.    "*Payout Event Procedures*" means those procedures governing the process by which Entities may propose higher or better recoveries than those provided under the Plan and any counterproposals thereto approved by the Bankruptcy Court as Exhibit M to the Disclosure Statement Order.

115.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

116.    "*Petition Date*" means May 16, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

K&E 17723384

117.    "*Plan*" means this *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

118.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Purchase Agreement; (b) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) a list of Non-Released Parties; (e) the Plan Support Agreement; (f) a description of the terms of the Exit Facility; (g) the form of the Management Equity Incentive Plan; (h) the form of the Warrant Agreement; (i) the Swap Plan Support Agreements and the Swap Amendments; (j) the Backstop Unit Purchase Agreement; (k) a Schedule of Cure Costs; (l) the form of Liquidator Agreement; (m) the Payout Event Procedures; (n) the Operating Agreement; and (o) the Capital Call Agreement.

119.    "*Plan Support Agreement*" means that certain plan support agreement dated as of April 12, 2010, by and between the Debtors and certain Holders of First Lien Term Loan Claims, as amended pursuant to that certain amendment dated August 24, 2010, and as otherwise amended, supplemented, or otherwise modified from time to time, and which was filed as <u>Exhibit 5</u> to the Plan Supplement on the Petition Date [Docket No. 34] (with the principal amount or percentage of any First Lien Term Loans or any other securities of any of the Debtors held by such Holders of First Lien Term Loan Claims redacted).

120.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.  For the purposes of clarity, with respect to clause (x) of Article III.B.6(c)(i)(B) herein, the term Pro Rata shall mean the proportion that an Allowed First Lien Term Loan Claim of a Holder that elects the First Lien Term Loan Equity Election bears to the aggregate amount of Allowed First Lien Term Loan Claims of all Holders that elect the First Lien Term Loan Equity Election.

122.    "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief.

123.    "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

124.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

125.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126.    "*Purchase Agreement*" means that certain asset purchase agreement filed as <u>Exhibit 6</u> to the Plan Supplement on the Petition Date [Docket No. 34].

127.    "*Purchaser*" means the Buyer, as defined in the Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or

10

obligations under the Purchase Agreement); provided that solely for purposes of distributions provided on account of Allowed Class 8 Senior Notes Claims, Allowed Class 9 General Unsecured Claims, and the Indenture Trustee Fee Amount and for no other purposes, Purchaser shall include and be deemed to include any Affiliates of the Purchaser in their capacities as First Lien Term Loan Lenders and Second Lien Term Loan Lenders.

128.    "*Releasing Parties*" means, collectively: (a) the First Lien Credit Facility Agents; (b) the Revolving Credit Facility Lenders; (c) the First Lien Term Loan Lenders; (d) the Second Lien Term Loan Agents; (e) the Second Lien Term Loan Lenders; (f) the DIP Agent; (g) the DIP Lenders; (h) the counterparties to the Secured Swap Agreements; (i) the Indenture Trustee; (j) the Shareholders; (k) the Backstop Parties; (l) the Former Backstop Parties; (m) the Purchaser; (n) the Committee, including the Committee Members (regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third Party Release set forth in Article VIII.D hereof); and (o) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (other than any of the Committee Members) (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (z) who are in a Class that is deemed to reject the Plan.

129.    "*Reorganized*" means, with respect to any Debtor, such Debtor on and after the Effective Date.

130.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Purchase Agreement including (a) the consummation of the Sale Transaction pursuant to the Purchase Agreement; (b) the consummation of the transactions contemplated by the Backstop Unit Purchase Agreement; (c) the execution and delivery of appropriate agreements or other documents of merger, consolidation, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Purchase Agreement and that satisfy the requirements of applicable law; (d) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Purchase Agreement; and (e) all other actions that the Purchaser determines are necessary or appropriate.

131.    "*Revolving Credit Facility*" means the $250.0 million secured revolving credit facility provided under the First Lien Credit Agreement, together with all documents related thereto.

132.    "*Revolving Credit Facility Claim*" means any Claim against any Debtor arising under or related to the Revolving Credit Facility; provided that Secured Swap Claims, First Lien Term Loan Claims and any letters of credit which are intended to be reinstated and continue post-petition rather than be paid in full (pursuant to the terms of the DIP Agreement and/or Exit Facility Agreement) shall not constitute Revolving Credit Facility Claims.

133.    "*Revolving Credit Facility Lenders*" means those banks, financial institutions, and other lender parties to the Revolving Credit Facility from time to time, each in their capacity as such.

134.    "*Rights*" means the non-transferable, non-certificated rights distributed to Rights Offering Participants to purchase New Common Units on the Effective Date at the Rights Exercise Price in an amount equal to the Rights Offering Amount pursuant to the terms and conditions of the Rights Offering, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan and the Warrants, if issued.

135.    "*Rights Exercise Price*" means the purchase price per Rights Offering Unit in connection with the Rights Offering equal to (a) the Rights Offering Amount, divided by (b) the total number of Rights Offering Units offered for sale in connection with the Rights Offering.

136.    "*Rights Offering*" means that certain offering of Rights to (a) the First Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Rights Offering Amount, which amount shall be reduced on a dollar-for-dollar basis by the

K&E 17723384

aggregate amount invested by the Second Lien Term Loan Rights Offering Participants pursuant to the Rights Offering, and (b) in the event that Class 7 Second Lien Term Loan Claims votes to accept the Plan, the Second Lien Term Loan Rights Offering Participants to purchase Rights Offering Units, on the Effective Date and at the Rights Exercise Price, in an amount up to the Second Lien Term Loan Rights Offering Amount.

137.    "*Rights Offering Amount*" means Cash in an amount equal to (a) $181,600,000 <u>minus</u> (b) an amount equal to (i) the total amount of Cash that would be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims if all of the Holders of such Claims (other than Wayzata, as a Holder of Allowed First Lien Term Loan Claims) elected to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, pursuant to the Plan, <u>minus</u> (ii) the total amount of Cash that will actually be paid in respect of Allowed First Lien Term Loan Claims and Allowed Second Lien Term Loan Claims as a result of the Holders of such Claims electing to receive the First Lien Term Loan Cash Payment and Second Lien Term Loan Cash Payment, respectively, which will, after receipt thereof by the Purchaser, be paid by the Purchaser to the Debtors as a portion of the purchase price under the Purchase Agreement.

138.    "*Rights Offering Documents*" means, collectively, all related agreements, documents or instruments in connection with the Rights Offering and the Backstop Unit Purchase Agreement.

139.    "*Rights Offering Participants*" means, collectively, the First Lien Term Loan Rights Offering Participants and the Second Lien Term Loan Rights Offering Participants.

140.    "*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court as <u>Exhibit J</u> to the Disclosure Statement Order.

141.    "*Rights Offering Units*" means the New Common Units offered for sale in connection with the Rights Offering.

142.    "*Sale Transaction*" means that certain transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement that contemplates either (a) a taxable transaction whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the Acquired Assets or (b) in the event the Backstop Parties make an election to do so pursuant to the Backstop Unit Purchase Agreement, a reorganization whereby the Purchaser and/or one or more of its wholly-owned Affiliates will acquire the capital stock and/or debt of one or more of the Reorganized Debtors, in either case, in exchange for (i) the assumption of the Assumed Liabilities (with respect to the transaction described in clause (b), above, only to the extent the Purchaser does not acquire, directly or indirectly, substantially all the capital stock of each Reorganized Debtor), (ii) 100% of the New Common Units (subject to dilution by the Rights Offering, the Management Equity Incentive Plan and the Warrants, if issued), (iii) the Warrants, if issued, and (iv) the Cash proceeds received by the Purchaser in connection with the Capital Call Agreement, the Rights Offering and pursuant to the Backstop Unit Purchase Agreement.

143.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan in the form filed with the Bankruptcy Court as <u>Exhibit 9</u> to the Plan Supplement on July 14, 2010 [Docket No. 272], as the same may be amended, modified or supplemented from time to time, and which schedule will be subject to the consent of the Backstop Parties (including with respect to any amendment, modification or supplement).

144.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

145.    "*Second Lien Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp., LYN Holdings Corp., and certain of its subsidiaries, as borrowers, the Second Lien Term Loan Agents, and the Second Lien Term Loan Lenders.

146.     "*Second Lien Term Loan*" means the $290.0 million secured term loan provided under the Second Lien Credit Agreement.

147.     "*Second Lien Term Loan Administrative Agent*" means Wilmington Trust FSB, in its capacity as administrative agent under the Second Lien Credit Agreement.

148.     "*Second Lien Term Loan Agents*" means, collectively, (a) the Second Lien Term Loan Administrative Agent, (b) Wilmington Trust FSB, in its capacity as second lien collateral agent under the Intercreditor Agreement, (c) CIBC Inc. and UBS Securities LLC, in their capacity as documentation agents under the Second Lien Credit Agreement, and (d) General Electric Capital Corporation, in its capacity as syndication agent under the Second Lien Credit Agreement.

149.     "*Second Lien Term Loan Cash Payment*" means Cash in an amount equal to $10,000,000.

150.     "*Second Lien Term Loan Claim*" means any Claim of a Second Lien Term Loan Lender against any Debtor related to the Second Lien Term Loans and arising under the Second Lien Credit Agreement, together with all of the security and other documents related thereto.  For the avoidance of doubt, Second Lien Term Loan Claim includes any deficiency claim arising under the Second Lien Term Loan.

151.     "*Second Lien Term Loan Equity Election*" means 4.55% of the New Common Units issued and outstanding on the Effective Date (subject to dilution by the Management Equity Incentive Plan).

152.     "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lender parties to the Second Lien Credit Agreement from time to time, each in their capacity as such.

153.     "*Second Lien Term Loan Rights Offering Amount*" means $7.5 million.

154.     "*Second Lien Term Loan Rights Offering Participants*" means all Holders of Second Lien Term Loan Claims that are accredited investors or qualified institutional buyers, as such terms are defined in Rules 501 and 144A promulgated under the Securities Act, as of the Voting Record Date.

155.     "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

156.     "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

157.     "*Secured Swap Agreements*" means that certain ISDA Master Agreement with Bank of America, N.A. dated June 14, 2007, and that certain ISDA Master Agreement with UBS AG dated June 20, 2007, and each related to the First Lien Credit Agreement.

158.     "*Secured Swap Claims*" means Claims against any Debtor arising from amounts due under the Secured Swap Agreements.

159.     "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

K&E 17723384

160.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

161.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

162.    "*Senior Notes*" means those 10% Senior Notes due 2015, issued under the Senior Notes Indenture.

163.    "*Senior Notes Claim*" means any Claim against any Debtor arising from or based upon the Senior Notes or the Senior Notes Indenture; provided that Senior Notes Claims shall not include Section 510(b) Claims.

164.    "*Senior Notes Indenture*" means that certain indenture dated May 31, 2007, as the same may have been amended from time to time, by and between Neff Corp. as issuer, and certain Affiliates of Neff Corp. as guarantors, and Law Debenture Trust Company of New York, as successor indenture trustee.

165.    "*Senior Notes Payment*" means Cash in the amount of $1,800,000 plus the Indenture Trustee Fee Amount.

166.    "*Shareholders*" means Lightyear Capital, LLC, General Electric Pension Trust, and Norwest Equity Partners VIII, LP, and each of their current and former affiliates, officers, directors, managers, members, professionals, and general and limited partners, in their capacity as members of Neff Holdings, LLC.

167.    "*Swap Amendments*" means amendments to the Secured Swap Agreements dated May 14, 2010, attached as exhibits to the Swap Plan Support Agreements.

168.    "*Swap Plan Support Agreements*" means those certain plan support agreements dated May 14, 2010, by and between the Debtors and the counterparties to the Secured Swap Agreements, as may be amended, supplemented, or otherwise modified from time to time, filed as Exhibit 7 to the Plan Supplement on the Petition date [Docket No. 34].

169.    "*Third Party Release*" means the release provision set forth in Article VIII.D hereof.

170.    "*Third Party Releasees*" means, collectively, (a) the First Lien Credit Facility Agents; (b) the First Lien Credit Facility Lenders; (c) provided that the Class 7 Second Lien Term Loan Claims vote to accept the Plan, (i) the Second Lien Term Loan Agents and (ii) the Second Lien Term Loan Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the counterparties to the Secured Swap Agreements; (g) the Indenture Trustee; (h) the Shareholders; (i) the Backstop Parties; (j) the Former Backstop Parties; (k) the Ad Hoc Group; (l) the Purchaser; (m) the Committee, including the Committee Members; and (n) with respect to each of the foregoing Entities in clauses (a) through (m) (other than with respect to a final fee application of a Professional), all such Entities' respective current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives, and successors and assigns of each of the foregoing in their respective capacities as such; provided that any Holder of a Claim (other than a Committee Member) who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee.

171.    "*Transaction Expenses*" mean the reasonable and documented fees (other than the Commitment Fee and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Commitment Letter, the Backstop Commitments, the Rights Offering, the Backstop Unit Purchase Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Commitment Letter and/or the Backstop Unit Purchase Agreement, including (a) the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and any other advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 and any expenses related thereto.

14

172.      "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

173.      "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

174.      "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

175.      "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

176.      "*Voting Record Date*" means the close of business on July 12, 2010.

177.      "*Warrants*" means warrants to purchase New Common Units representing up to 5% of issued and outstanding New Common Units on the Effective Date (immediately after giving effect to the consummation of the Rights Offering and the other transactions contemplated by the Plan) exercisable in Cash at an exercise price implied by a total equity value of the New Common Units equal to $224.0 million pursuant to the Warrant Agreement, which New Common Units shall be subject to dilution by the Management Equity Incentive Plan.

178.      "*Warrant Agreement*" means that certain agreement, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Group, setting forth the terms and conditions of the Warrants, to be included in the Plan Supplement.

179.      "*Wayzata*" means certain funds under the management or control of Wayzata Investment Partners that are Backstop Parties.

180.      "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates following the Effective Date as set forth in Article IV.T hereof.

B.      *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving

effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided that corporate or limited liability company governance matters relating to the Debtors or the Purchaser, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Purchaser, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement or the Plan and the Purchase Agreement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).

# ARTICLE II.
## DIP CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Purchaser, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims.

Except as otherwise provided in this Article II.A, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Purchaser no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Purchaser or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

In the case of the Ad Hoc Group Advisor Fee Claims, such Ad Hoc Group Advisor Fee Claims will be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) for all reasonable and documented fees and expenses incurred up to the Effective Date, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

B.      *Accrued Professional Compensation Claims*

1.      Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than 60 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

2.      Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates or Acquired Assets, as applicable.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  When all Accrued Professional Compensation Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be distributed to the Purchaser and shall be treated as a reduction in the purchase price paid by the Purchaser for the Debtors' assets.

3.      Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 5 days prior to the anticipated Effective Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtors (in consultation with the Purchaser) may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or Purchaser, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Purchaser, as applicable.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Purchaser may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *DIP Claims*

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be paid in full in Cash by the Debtors on the Effective Date.

D.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim, (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the Debtors (on the Effective Date) or paid by the Purchaser (after the Effective Date), and such Holder, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later

17

date, or (3) at the option of the Debtors (on the Effective Date) or the Purchaser (after the Effective Date), Cash paid by the Purchaser in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than 5 years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Purchaser (after the Effective Date) and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

A.      *Summary of Classification*

All Claims and Interests, other than DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 4 | Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 5 | Secured Swap Claims | Impaired | Entitled to Vote |
| 6 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 7 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 8 | Senior Notes Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 13 | Equity Interests in the Debtors | Impaired | Deemed to Reject |

B.      *Treatment of Claims and Interests*

The treatment and voting rights provided to each Class for distribution purposes is specified below:

18

1.  Class 1 - Other Priority Claims

  (a)  *Classification*:  Class 1 consists of all Other Priority Claims.

  (b)  *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

    (i)  be paid in full in Cash in an amount equal to such Allowed Other Priority Claim by the Debtors on the Effective Date or by the Purchaser in the ordinary course of business after the Effective Date; or

    (ii)  otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

  (c)  *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.  Class 2 - Secured Tax Claims

  (a)  *Classification*:  Class 2 consists of all Secured Tax Claims.

  (b)  *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Tax Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

    (i)  be paid in full in Cash by the Debtors on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or

    (ii)  be paid by the Debtors or the Purchaser (as applicable), commencing on the Effective Date and continuing over a period not exceeding 5 years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Purchaser to prepay the entire amount of such Allowed Secured Tax Claim during such time period; or

    (iii)  be paid regular Cash payments by the Debtors (on the Effective Date) or the Purchaser (in the ordinary course of business after the Effective Date), in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

  (c)  *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

K&E 17723384

3.  <u>Class 3 - Other Secured Claims</u>

    (a)    *Classification*:  Class 3 consists of all Other Secured Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Purchaser, as applicable:

        (i)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by the Debtors on the Effective Date; or

        (ii)    receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code; or

        (iii)    otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

    (c)    *Voting*:  Class 3 is Unimpaired, and Holders of Class 3 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.  <u>Class 4 - Revolving Credit Facility Claims</u>

    (a)    *Classification*:  Class 4 consists of all Revolving Credit Facility Claims.

    (b)    *Allowance*:  The Revolving Credit Facility Claims shall be Allowed as of the Petition Date in the amount of $153.3 million, plus interest and fees due and owing under the Revolving Credit Facility both prior to and after the Petition Date through the Effective Date, subject to such Claims being partially paid in Cash with certain proceeds of the DIP Facility, and such Claims shall not be subject to any request for setoff or recoupment.

    (c)    *Treatment*:  Except to the extent that (i) a Holder of an Allowed Revolving Credit Facility Claim agrees to a less favorable treatment or (ii) such Revolving Credit Facility Claims have been paid in full with proceeds from the DIP Facility or otherwise, in exchange for the full and final satisfaction, settlement, release, and compromise of each and every Allowed Revolving Credit Facility Claim, each Holder of such Claim shall be paid in full in Cash by the Debtors in respect of such Allowed Revolving Credit Facility Claim on the Effective Date, or as soon as reasonably practicable thereafter by the Purchaser or Disbursing Agent.

    (d)    *Voting*:  Class 4 is Unimpaired, and Holders of Class 4 Revolving Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 Revolving Credit Facility Claims are not entitled to vote to accept or reject the Plan.

5.  <u>Class 5 - Secured Swap Claims</u>

    (a)    *Classification*:  Class 5 consists of all Secured Swap Claims.

20

(b)     *Allowance*:  The Secured Swap Claims shall be Allowed in an aggregate amount equal to $22.4 million.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Secured Swap Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Swap Claim, each Holder of such remaining Allowed Secured Swap Claim shall be entitled to the treatment set forth in the applicable Swap Amendment.

(d)     *Voting*:  Class 5 is Impaired.  Therefore, Holders of Allowed Class 5 Secured Swap Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

6.   Class 6 - First Lien Term Loan Claims

(a)     *Classification*:  Class 6 consists of all First Lien Term Loan Claims.

(b)     *Allowance*:  The First Lien Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $87.9 million, plus interest and fees due and owing under the First Lien Term Loan as of the Effective Date pursuant to the terms of the First Lien Credit Agreement or related documents.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Term Loan Claim, each Holder of such Allowed First Lien Term Loan Claim shall receive, at the election of such Holder, either:

(i)      the First Lien Term Loan Cash Payment; or

(ii)     such Holder's (x) Pro Rata share of 100% of the New Common Units (subject to dilution by the Rights Offering Units, the Second Lien Term Loan Equity Election, the Warrants, if issued, and the Management Equity Incentive Plan) and (y) Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Rights Offering Amount less the aggregate amount invested by the Second Lien Term Loan Rights Offering Participants in connection with the Rights Offering; provided that Holders of First Lien Term Loan Claims that are not First Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were First Lien Term Loan Rights Offering Participants.

(d)     *Voting*:  Class 6 is Impaired.  Therefore, Holders of Class 6 First Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

(e)     *Distributions*:  Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Cash Payment shall receive its Plan distribution in Cash from the Debtors on the Effective Date.  Each Holder of an Allowed Class 6 First Lien Term Loan Claim who elects the First Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

21

7.   Class 7 - Second Lien Term Loan Claims

    (a)   *Classification*:  Class 7 consists of all Second Lien Term Loan Claims.

    (b)   *Allowance*:  The Second Lien Term Loan Claims shall be Allowed in the amount of $298,972,080.10.

    (c)   *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Term Loan Claim, each Holder of such Allowed Second Lien Term Loan Claim shall receive:

        (i)   **If Class 7 votes to accept the Plan**:

            (A)   At the election of each Holder, such Holder's Pro Rata share of either:

                (I)   the Second Lien Term Loan Cash Payment; or

                (II)   the Second Lien Term Loan Equity Election;

            (B)   such Holder's Pro Rata share of 100% of the Rights to purchase Rights Offering Units in an amount up to the Second Lien Term Loan Rights Offering Amount; <u>provided</u> that Holders of Second Lien Term Loan Claims that are not Second Lien Term Loan Rights Offering Participants shall not participate in the Rights Offering, but instead shall receive New Common Units with a value equal to the value of the Rights (as reasonably determined by the Debtors and the Ad Hoc Group) such Holders would have been eligible to purchase if they were Second Lien Term Loan Rights Offering Participants; <u>and</u>

            (C)   such Holder's Pro Rata share of $63,000,000 in Cash.

        (ii)   **If Class 7 votes to reject the Plan:**  Such Holder's Pro Rata share of the Warrants to purchase 5.0% of the New Common Units to be issued and outstanding on the Effective Date.

    (d)   *Voting*:  Class 7 is Impaired.  Therefore, Holders of Class 7 Second Lien Term Loan Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

    (e)   *Distributions*:  Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Cash Payment shall receive its Plan distribution in Cash and Rights from the Debtors on the Effective Date.  Each Holder of an Allowed Class 7 Second Lien Term Loan Claim who elects the Second Lien Term Loan Equity Election shall receive its Plan distribution in New Common Units, Cash, and Rights (i) from the Debtors on the Effective Date or (ii) from the Purchaser or Disbursing Agent as soon as reasonably practicable after the Effective Date.

8.   Class 8 - Senior Notes Claims

    (a)   *Classification*:  Class 8 consists of all Senior Notes Claims.

    (b)   *Allowance*: The Senior Notes Claims shall be Allowed in the aggregate amount of $35.9 million.

K&E 17723384

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim, each Holder of such Allowed Senior Notes Claim shall receive by gift from the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable (but in any event no later than ten Business Days following the Effective Date) such Holder's Pro Rata share of the Senior Notes Payment, exclusive of the Indenture Trustee Fee Amount.  The Indenture Trustee shall receive by gift from the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable (but in any event no later than ten Business Days following the Effective Date) the Indenture Trustee Fee Amount.

(d)    *Voting*:  Class 8 is Impaired.  Therefore, Holders of Allowed Class 8 Senior Notes Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

9.    Class 9 - General Unsecured Claims

(a)    *Classification*:  Class 9 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive by gift from the Purchaser or Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable such Holder's Pro Rata share of the Cash Payment.

(c)    *Voting*:  Class 9 is Impaired.  Therefore, Holders of Allowed Class 9 General Unsecured Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan.

10.    Class 10 - Intercompany Claims

(a)    *Classification*:  Class 10 consists of all Intercompany Claims.

(b)    *Treatment*:  Holders of Allowed Class 10 Intercompany Claims shall not receive any distribution on account of such Claims; provided that the Debtors or the Purchaser reserve the right to reinstate any Class 10 Intercompany Claims in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 10 is Unimpaired, and Holders of Class 10 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.    Class 11 - Section 510(b) Claims

(a)    *Classification*:  Class 11 consists of all Section 510(b) Claims.

(b)    *Treatment*:  Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims, and Section 510(b) Claims shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 11 is Impaired, and Holders of Class 11 Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore,

23

Holders of Class 11 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

12. Class 12 - Intercompany Interests

   (a)   *Classification:*  Class 12 consists of all Intercompany Interests.

   (b)   *Treatment:*  Holders of Allowed Class 12 Intercompany Interests shall not receive any distributions on account of such Interests; provided that the Debtors or the Purchaser reserves the right to reinstate any or all Class 12 Intercompany Interests on or after the Effective Date.

   (c)   *Voting:*  Class 12 is Unimpaired, and Holders of Class 12 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 12 Intercompany Interests are not entitled to vote to accept or reject the Plan.

13. Class 13 - Equity Interests in the Debtors

   (a)   *Classification*:  Class 13 consists of all Equity Interests in the Debtors.

   (b)   *Treatment*:  Holders of Equity Interests in the Debtors will not receive any distribution on account of such Equity Interests, and Equity Interests in the Debtors (except with respect to any equity interests in any Reorganized Debtor whose equity has been sold to the Purchaser) shall be settled, cancelled, released, compromised, and extinguished as of the Effective Date.

   (c)   *Voting*:  Class 13 is Impaired, and Holders of Class 13 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 13 Equity Interests are not entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Purchaser, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.   *Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

E.   *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.   *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

24

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions.  All amounts and securities necessary for the Debtors (on the Effective Date) or the Purchaser or Disbursing Agent (after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the liabilities assumed or consideration paid by the Purchaser to the Debtors in the Sale Transaction (including the Cash proceeds received by the Purchaser and paid to the Debtors in connection with the Rights Offering and/or pursuant to the Backstop Unit Purchase Agreement and/or the Capital Call Agreement, and the New Common Units and Warrants (if required) issued by the Purchaser to the Debtors for distribution under the Plan), the Exit Facility and Cash of the Debtors.  Notwithstanding anything herein to the contrary or in the Purchase Agreement, the Purchaser shall assume all liability for the distributions provided on account of all Allowed Claims against the Debtors as provided herein that are not satisfied by a distribution made by the Debtors on the Effective Date.

B.      *Rights Offering*

The Plan contemplates that the Debtors shall raise the Rights Offering Amount through the Rights Offering.  On the Effective Date, the Debtors shall consummate the Rights Offering, through which each Rights Offering Participant, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, shall have the opportunity to purchase Rights Offering Units pursuant to the Rights Offering Documents.  The Rights Offering will dilute the New Common Units issued on account of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election pursuant to Article III.B.6 hereof and Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election pursuant to Article III.B.7 hereof.  The Rights Offering will be backstopped by the Backstop Parties in accordance with the terms and conditions of the Backstop Unit Purchase Agreement.  The Rights Offering shall be conducted and implemented in accordance with the Rights Offering Procedures.

C.      *Exit Facility*

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Purchaser (or one or more Reorganized Debtor, as applicable) in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Purchaser (and one or more Reorganized Debtor, as applicable) to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents.  The Purchaser may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.  To the extent Revolving Credit Facility Claims are not rolled up or

25

otherwise satisfied by the DIP Facility as of the Effective Date, the remaining Revolving Credit Facility Claims shall be paid in full in Cash with the proceeds from the Exit Facility.

Upon the Confirmation Date, (1) the Purchaser (and one or more Reorganized Debtor, as applicable) is authorized to execute and deliver the Exit Facility Documents and perform its obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, and (2) subject to the occurrence of the Effective Date the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Purchaser (and/or one or more Reorganized Debtor, as applicable) and be enforceable in accordance with their respective terms.

D.     The Purchase Agreement

1.     Issuance of New Common Units

The Purchaser shall issue the New Common Units to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed First Lien Term Loan Claims that elect the First Lien Term Loan Equity Election in accordance with Article III.B.6 and/or Holders of Allowed Second Lien Term Loan Claims that elect the Second Lien Term Loan Equity Election in accordance with Article III.B.7 hereof.  New Common Units shall also be (1) offered and sold pursuant to the Rights Offering and (2) reserved for the Management Equity Incentive Plan.

Each of the New Common Units issued and distributed pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.     Warrants

If Class 7 does not vote to accept the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Purchaser shall issue the Warrants to the Debtors pursuant to the Purchase Agreement for distribution to Holders of Allowed Class 7 Second Lien Term Loan Claims as of the Voting Record Date in accordance with Article III.B.7 hereof.

3.     Vesting of Assets in the Purchaser

Except as otherwise provided herein or in the Purchase Agreement, on the Effective Date, the Acquired Assets and the Assumed Liabilities (or the equity interests in one or more Reorganized Debtor, as applicable) shall vest in the Purchaser, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, specifically granted to secure the Exit Facility).  On and after the Effective Date, except as otherwise provided in the Plan, the Purchaser may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.     Assumption of Liabilities by the Purchaser

The Purchaser shall assume the Assumed Liabilities pursuant to Section 2.3 of the Purchase Agreement, including all (a) distributions under the Plan (other than those distributions made by the Debtors on the Effective Date or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on or after the Effective Date) and (b) costs associated with the Wind Down.  For the avoidance of doubt, and notwithstanding anything herein or in the Purchase Agreement to the contrary, the Purchaser assumes and shall be deemed to assume all liability for the distributions or treatment provided on account of all Claims against, obligations of, or Interests in the Debtors as set forth herein, and the Purchaser shall assume all liability for Administrative Claims and the costs and expenses associated with the Wind Down, including any distributions on account of Allowed Claims thereunder.

26

5.    Powers of the Purchaser

From and after the Effective Date and continuing through the date of entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear, be heard on and participate in matters brought before the Bankruptcy Court or any other court with jurisdiction over the Chapter 11 Cases; (2) be entitled to notice and opportunity for hearing on all such issues; (3) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; and (4) have the right to object to any and all Claims or Interests.

E.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

F.    *Section 1145 Exemption*

Except as set forth in the immediately succeeding sentence, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Rights, the New Common Units, and the Warrants, shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. The New Common Units to be issued to the Backstop Parties in connection with the Backstop Unit Purchase Agreement shall be exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities pursuant to the exemptions set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder. In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including, the Rights, the New Common Units and the Warrants shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval, if any.

G.    *Listing of New Common Units*

None of the New Common Units (including the Rights Offering Units and any New Common Units issuable upon exercise of the Warrants), the Rights or the Warrants will be listed on a national securities exchange and the Purchaser will not be a reporting company under the Securities Exchange Act.

H.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Purchase Agreement, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Purchaser and its successors and assigns.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Claims, Liens, encumbrances or Interests pursuant to the applicable sections of the Bankruptcy Code.

27

I.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Senior Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; (2) the obligations of the Debtors under the DIP Facility, the Revolving Credit Facility, the First Lien Term Loan and the Second Lien Term Loan, shall be fully released, settled, and compromised as to the Debtors, and the Purchaser shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including the Senior Notes Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, settled, and compromised.

J.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Purchaser may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan and the Purchase Agreement. For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein or in the Purchase Agreement shall constitute a change of control under any agreement, contract or document of the Debtors or the Purchaser, as applicable.

K.    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, and the Operating Agreement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers or officers of the Debtors, the Reorganized Debtors or the Purchaser, or any other Entity or Person, including: (1) execution of, entry into and performance under the Purchase Agreement; (2) execution of, entry into and performance under the Backstop Unit Purchase Agreement; (3) adoption or assumption, as applicable, and assignment to the Purchaser of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the Purchaser; (5) the execution of and entry into the Exit Facility Documents and the Capital Call Agreement; (6) the issuance and distribution of the Rights as provided herein; (7) the issuance and distribution of the New Common Units as provided herein; (8) the issuance and distribution of the Warrants, if applicable, as provided herein; (9) execution of, entry into and performance under the Operating Agreement; (10) adoption of the Management Equity Incentive Plan; and (11) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by, the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Operating Agreement and each of the foregoing documents or agreements (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement or the Operating Agreement involving the company structure of the Debtors or the Purchaser, and any company action required by the Debtors or the Purchaser in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors or the Purchaser. Consequently, except as provided in the Plan, Intercompany Interests shall be retained, and the legal,

28

equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers or authorized persons of the Debtors or the Purchaser (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Capital Call Agreement, and the Operating Agreement (or necessary or desirable to effect the transactions contemplated by the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement and the Operating Agreement) in the name of and on behalf of the Debtors or the Purchaser, as applicable, including (1) the Exit Facility and the other Exit Facility Documents and (2) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Purchaser (or one or more Reorganized Debtor, as applicable) and the managers, officers, authorized persons and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement, the Exit Facility Agreement, the Operating Agreement, the Capital Call Agreement and the securities issued pursuant to the Plan, the Operating Agreement, the Purchase Agreement and the Backstop Unit Purchase Agreement, in the name of and on behalf of the Purchaser (or one or more Reorganized Debtor, as applicable), without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan, the Purchase Agreement, the Backstop Unit Purchase Agreement and the Operating Agreement.

M.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Purchase Agreement or Exit Facility Documents shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the Sale Transaction; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; (5) the issuance, distribution and/or sale of any of the New Common Units, the Rights, the Warrants (if issued) and any other securities of the Debtors or the Purchaser; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Purchase Agreement, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan or the Purchase Agreement.

N.    *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

29

O.       Board Representation

The Purchaser shall be managed by the New Board which will consist of 5 members.  In accordance with the Operating Agreement, the Backstop Parties shall have the right to appoint four members of the New Board as of the Effective Date.  The fifth member of the New Board shall be the Chief Executive Officer of the Purchaser.  To the extent known, the Plan Supplement will list the members of the New Board identified as of the date of the filing thereof.

If the Purchaser purchases equity in one or more Reorganized Debtors, the board of such Reorganized Debtor as of the Effective Date shall be chosen by the Backstop Parties; provided that the Chief Executive Officer of the Purchaser shall remain as a director or member, as applicable.

P.       Indemnification Provisions

Notwithstanding anything herein to the contrary or pursuant to the termination, dissolution, or wind down of any or all of the Debtors, the Debtors (if necessary to continue all Indemnification Provisions in full force) or, as applicable, the Reorganized Debtors, as of the Effective Date, shall be deemed to have assumed all Indemnification Provisions and assigned such provisions to the Purchaser (though such Indemnification Provisions were to have full force and effect; provided that the assumption by the Debtors of the Indemnification Provisions and the assignment thereof to the Purchaser shall not be deemed to be an assumption or assignment of the contract, agreement, resolution, instrument or document in which such Indemnification Provisions are contained, memorialized, agreed to, embodied or created (or any of the other terms or provisions thereof) unless, and only to the extent that, such contract, agreement, resolution, instrument or document is an Acquired Asset.  All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions or transactions occurring prior to the Effective Date; provided that notwithstanding anything herein to the contrary, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter.

Q.       Management Equity Incentive Plan

On or before the Effective Date, the Purchaser shall adopt the Management Equity Incentive Plan.  The Plan Supplement will contain the Management Equity Incentive Plan.

R.       Emergence Awards

On the Effective Date, the Emergence Awards will be deemed approved in their entirety without any further action by the Debtors or the Purchaser and the Debtors will be authorized to make all payments with respect to the Emergence Awards on the Effective Date.

S.       Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article VIII.C and Article VIII.E hereof), the Purchaser shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Purchaser's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Purchaser may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Purchaser.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Purchase Agreement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Purchaser, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Purchaser have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Purchaser, as applicable, expressly reserve all rights to prosecute any and all Causes

30

of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Purchaser expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

T.      *Wind Down and Dissolution of the Debtors*

On and after the Effective Date, the Liquidator will implement, and the Purchaser will oversee and fund, the Wind Down pursuant to the Liquidator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Liquidator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors. After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving. As soon as practicable after the Effective Date, the Liquidator shall: (a) change the business and corporate names of each of the Debtors to new names bearing no resemblance to any of the present names of such Debtor so as to permit the use of such names by the Purchaser; (b) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement; (c) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (d) complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (e) take such other actions as the Liquidator may determine to be necessary or desirable to carry out the purposes of this Plan, including, to the extent the Debtors are expected to have any unsatisfied Allowed Claims as of December 31, 2010 (or Claims that may become Allowed Claims entitled to distributions hereunder following December 31, 2010), the formation and implementation, prior to December 31, 2010, of a liquidating trust or similar "pass-through" entity for tax purposes on behalf and for the benefit of Holders of such unsatisfied Allowed Claims. The filing by the Liquidator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members, the board of directors or board of managers of each such Debtor. Notwithstanding anything herein or in the Purchase Agreement, to the contrary, the Purchaser shall assume all liability for all costs, expenses, or claims arising from or related to any Wind Down, including the costs and expenses associated with any Claims resolution or similar process following the Effective Date (whether undertaken pursuant to Article VII hereof or otherwise) and the formation and implementation of any of a liquidating trust or similar "pass-through" entity formed pursuant to the Wind Down. Notwithstanding anything herein to the contrary, the Purchaser or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date. In the event the Backstop Parties make an election, pursuant to the Backstop Unit Purchase Agreement, to pursue the Sale Transaction as a stock purchase rather than an asset purchase, the Debtors and the Backstop Parties agree to work together in good faith to modify this Plan as necessary to reflect such changed structure.

U.      *Liquidator*

Prior to or on the Effective Date, the Liquidator may be designated by the Debtors pursuant to the terms of the Liquidator Agreement for purposes of conducting the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders (subject, at all times, to the oversight of the Purchaser), and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidator. All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date, or transferred pursuant to the Purchase Agreement, shall be transferred to the Liquidator and managed and distributed by the Liquidator pursuant to the terms of the Liquidator Agreement and shall be held in the name of the Debtors free and clear of all Claims against the Debtors and Interests in the Debtors except for rights to such distributions provided to Holders of Allowed Claims as provided herein. Any and all costs and expenses incurred by the Liquidator in connection with the Wind Down shall be paid by the Purchaser.

As provided in the Liquidator Agreement, the Entity chosen to be the Liquidator shall have such qualifications and experience to enable the Liquidator to perform its obligations under this Plan and under the

31

Liquidator Agreement.  Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Liquidator, the Purchaser shall designate another Entity to become Liquidator and such Entity will become the successor Liquidator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidator. The Liquidator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidator Agreement by the Purchaser.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Assignment of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected, as mutually agreed upon by the Debtors and the Backstop Parties; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject, as mutually agreed upon by the Debtors and the Backstop Parties, of a motion to reject filed on or before the Confirmation Date; (4) is identified as an Executory Contract or Unexpired Lease to be rejected, as mutually agreed upon by the Debtors and the Backstop Parties, pursuant to the Plan Supplement; (5) is not an Acquired Asset; or (6) without limiting the generality of clause (5), is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

On July 14, 2010, the Debtors Filed the Schedule of Rejected Executory Contracts and Unexpired Leases. The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Rejected Executory Contracts and Unexpired Leases in the manner set forth in the Backstop Unit Purchase Agreement.  Notwithstanding anything to the contrary in the Plan, unless otherwise approved in advance by the Backstop Parties, the Debtors shall not assume and assign to the Purchaser any employment agreement and employee benefit plan except for those employment agreements and employee benefit plans specifically set forth on Schedule 2.1(e) to the Purchase Agreement and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Purchaser an amendment, consent and acknowledgment agreement described in Section "C" on Schedule 2.1(e) to the Purchase Agreement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date.  Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph and or anything contrary herein, the Debtors and the Backstop Parties reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date.  Moreover, notwithstanding the foregoing paragraph, after the Effective Date, the Purchaser shall have the right to terminate, amend, or modify any Executory Contracts, Unexpired Leases, leases, or other agreements without approval of the Bankruptcy Court.

B.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan or the Purchase Agreement that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Cost or by an agreed-upon waiver of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Purchaser and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

On July 30, 2010, the Debtors caused notices of proposed assumptions and assignments to the Purchaser and proposed Cure Costs and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be served on applicable counterparties.  Any objection by a counterparty to an Executory Contract or

32

Unexpired Lease to a proposed assumption or related Cure Cost must be filed, served and actually received by the Debtors by the Confirmation Objection Deadline. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such matters.

In the event of a dispute regarding: (1) the amount of any Cure Cost; (2) the ability of the Purchaser to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Purchaser, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or after the Effective Date, the Purchaser, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) the Claims Bar Date established in the Chapter 11 Cases.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.F hereof, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Purchaser expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Purchaser, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or the Purchase Agreement, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan or the Purchase Agreement. Nothing in the immediately preceding sentence shall be deemed to limit, supersede or change the provisions set forth in Article V.G.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      Insurance Policies

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the applicable Debtor under the Plan and the Bankruptcy Code and shall be assumed by the applicable Debtor and assigned to the Purchaser in accordance with the terms of the Purchase Agreement and the Plan.

G.      Compensation and Benefit Programs

All employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their respective employees, retirees and directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases and will be rejected unless any of the foregoing is an Acquired Asset in accordance with the Purchase Agreement, in which case the same shall be assumed and assigned to the Purchaser pursuant to the terms of the Purchase Agreement and the Plan.

H.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan or the Purchase Agreement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Purchaser has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Purchaser, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

I.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding

34

anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan.

B.      *Distributions Generally; Disbursing Agent*

All distributions under the Plan that are to be made on the Effective Date other than the Senior Notes Payment and the Cash Payment shall be made by the Debtors as Disbursing Agent. The Senior Notes Payment shall be distributed by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable in accordance with Article VI.F.1 hereof (but in any event no later than ten Business Days following the Effective Date). The Cash Payment shall be distributed by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) on the Effective Date or as soon after the Effective Date as reasonably practicable. All other distributions under the Plan shall be made after the Effective Date by the Purchaser, the Liquidator, or such other Entity designated by the Purchaser as a Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Distributions of the Purchase Price Paid Pursuant to the Purchase Agreement*

Notwithstanding anything to the contrary contained herein: (1) the Purchase Price (as such term is defined in the Purchase Agreement) shall be used solely to make distributions under the Plan, whether or not such distributions are made on the Effective Date or thereafter; and (2) for purposes of distributions to be made of Estate assets received or receivable from the Purchaser pursuant to the Purchase Agreement in the form of the Purchase Price as provided herein, such assets shall be distributed solely by (a) prior to or on the Effective Date, the Debtors and (b) following the Effective Date, the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on behalf of the Debtors.

D.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Purchase Agreement; (b) make all distributions contemplated under the Plan and the Purchase Agreement; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Purchase Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Purchaser.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Purchaser, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order; provided that if the Debtors or the Purchaser, as applicable, do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

F.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

Distributions to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims shall (a) be made to the First Lien Credit Facility Administrative Agent and/or the Second Lien Term Loan Administrative Agent, as applicable, for the benefit of the respective Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively, as provided herein and under the Purchase Agreement and (b) be deemed completed when made to the First Lien Credit Facility Administrative Agent and the Second Lien Term Loan Administrative Agent, as applicable.  Distribution of the Senior Notes Payment to Holders of Senior Notes Claims shall (x) be made by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) to the Indenture Trustee for the benefit of Holders of Senior Notes Claims (subject to any charging lien in favor of the Indenture Trustee) and (y) be deemed completed when made by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) to the Indenture Trustee.

Prior to the distribution of New Common Units hereunder, the recipient of such New Common Units shall furnish to the transfer agent identified by the Debtors such identification and tax information as may be required by the Debtors.  Additionally, prior to the distribution of New Common Units hereunder, the recipient of such New Common Units shall execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement (and such New Common Units shall be deemed an undeliverable distribution until such execution and delivery); provided, however, that (and without limiting the strict requirement that any such recipient execute and deliver to the Debtors and the Purchaser a counterpart of the Operating Agreement as hereinabove provided) any such recipient shall be automatically bound by, and any New Common Units or other securities to be received by such recipient shall be automatically subject to, the terms of the Operating Agreement whether or not such recipient shall have executed and/or delivered a counterpart of the Operating Agreement.  The requirements in this paragraph, except with respect to the Backstop Parties, may be complied with, and the distributions associated therewith made, after the Effective Date.

2.    Minimum; De Minimis Distributions

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Common Units and such fractions shall be deemed to be zero.  No cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

36

3.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.    After such date, all unclaimed property or interests in property shall revert to the Purchaser (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

5.    Surrender of Cancelled Instruments or Securities Relating to Senior Notes Claims

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Senior Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be canceled, except to the extent otherwise provided herein.    The Indenture Trustee may (but shall not be required to) request registered Holders to surrender their Senior Notes for cancellation.

G.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.    Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest; provided that with respect to Allowed Claims receiving distributions from the Debtors under the Plan but that are not being fully paid, such distributions will be allocated first to accrued but unpaid interest, if any, and then to the principal amount of such Claims.

H.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Purchaser after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim.    To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Purchaser or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) on account of such Claim, such Holder shall, within 2 weeks of receipt thereof, repay or return the distribution to the Purchaser or the Liquidator (or such other entity designated by the Purchaser as the Disbursing Agent) to the extent the Holder's total recovery on account of such

37

Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan.

2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that if the Debtors or the Purchaser, as applicable, believe a Holder of an Allowed Claim has recourse to an insurance policy and intend to withhold a distribution pursuant to this Article VI.H.2, the Debtors or the Purchaser, as applicable, shall cause the Disbursing Agent to provide written notice to such Holder as to what the Debtors or the Purchaser, as applicable, believe to be the nature and scope of applicable insurance coverage. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Purchaser, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A. *Resolution of Disputed Claims*

1. Allowance of Claims

On or after the Effective Date, the Purchaser shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan, in the Purchase Agreement or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2. Prosecution of Objections to Claims

The Debtors prior to and on the Effective Date or the Purchaser after the Effective Date, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Purchaser may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. From and after the Effective Date, the Purchaser shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3. Claims Estimation

Prior to and on the Effective Date, the Debtors, and after the Effective Date, the Purchaser, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the

Bankruptcy Code, regardless of whether the Debtors or the Purchaser have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Purchaser, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Purchaser, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

    4.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Debtors or the Purchaser, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Purchaser, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

    5.    Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

*B.*    *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtors or the Purchaser under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Purchaser allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Purchaser, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS OR THE PURCHASER, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

*C.*    *Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A hereof, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Purchaser, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

K&E 17723384

## ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Purchaser may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Purchaser, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III.B.11 of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.      *Debtor Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE PURCHASER WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, EACH OF THE DEBTORS AND THE DEBTORS' ESTATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR ANY THIRD PARTY RELEASEE, THE

40

RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS, INCLUDING UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.   NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE PURCHASER HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE PURCHASER ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

D.     *Third Party Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PURCHASE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE PURCHASER, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE RIGHTS OFFERING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, OR RELATED

41

AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A DEBTOR RELEASEE OR A THIRD PARTY RELEASEE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY; (2) ARISING UNDER THE PURCHASE AGREEMENT, THE EXIT FACILITY AGREEMENT, THE BACKSTOP UNIT PURCHASE AGREEMENT, THE WARRANT AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; OR (4) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE PURCHASER MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

E.      *Exculpation*

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Plan Support Agreement, the Disclosure Statement, the Restructuring Transactions, the Rights Offering, the Backstop Unit Purchase Agreement, the issuance, distribution and/or sale of any of the New Common Units (including Rights Offering Units and New Common Units issuable upon exercise of the Warrants), the Rights, the Warrants (if issued) or any other security offered, issued or distributed in connection with this Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

F.      *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE

K&E 17723384

TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.E); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS OBTAINED ENTRY OF A FINAL ORDER AUTHORIZING SUCH SETOFF AS PROVIDED HEREIN; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, THE BACKSTOP PARTIES, THE FORMER BACKSTOP PARTIES, THE AD HOC GROUP, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED</u> <u>THAT</u> NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; <u>PROVIDED</u>, <u>FURTHER</u>, <u>THAT</u> NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

G.      Setoffs

Except as otherwise provided herein, the Debtors or the Purchaser, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Purchaser, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u> <u>that</u> neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Purchaser of any such Claims, rights, and Causes of Action that the Purchaser may possess against

such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Purchaser, as applicable, unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff; provided that nothing herein shall prejudice or be deemed to have prejudiced the Debtors' or Purchaser's, rights, as applicable, to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

H.      *Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications*

For the avoidance of doubt, the foregoing Debtor Release and Third Party Release shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      The Plan Support Agreement shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Ad Hoc Group and such Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

3.      The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be in form and substance reasonably acceptable to the Debtors and to the Ad Hoc Group;

4.      The Backstop Party Fees shall have been paid in full in Cash in accordance with the Backstop Unit Purchase Agreement, the Plan Support Agreement, the Plan, and the interim and final orders approving the DIP Facility;

5.      The Exit Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facility shall have occurred;

6.      The Debtors shall have assumed the Backstop Unit Purchase Agreement and the Commitment Letter;

7.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

8.      All documents and agreements necessary to implement this Plan and the Sale Transaction shall have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

9.      The Liquidator shall have been appointed (if applicable), and the Debtors and the Liquidator shall have executed and delivered the Liquidator Agreement;

44

10.  The Debtors shall have paid in full in Cash all reasonable and documented Ad Hoc Group Advisor Fee Claims; and

11.  All conditions to closing under the Backstop Unit Purchase Agreement and the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

B.     *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Purchaser.

C.     *Effective Date*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A hereof have been satisfied or waived.  "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.     *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Payout Event*

As originally Filed on May 17, 2010 and subsequently amended from time to time, the Plan contemplated the possibility of obtaining higher or better distributions to all Classes receiving distributions under the Plan pursuant to a Payout Event.  On August 5, 2010, the Debtors commenced an auction subsequent to receiving a competing bid prior to the Payout Event Deadline from an entity proposing to effectuate a Payout Event.  Although a Payout Event did not ultimately occur as a result of such competing bid, this modified Plan includes such necessary conforming changes attributable to, among other things, the increased creditor recoveries.

B.     *Modification and Amendments*

Subject to the limitations contained herein and in the Plan Support Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided however that, following entry of the Confirmation Order, any modifications adversely affecting the treatment of Class 8 (including the Indenture Trustee Fee Amount) or Class 9 shall only be made upon written consent of the Committee (and in the case of any modification of the Indenture Trustee Fee Amount, upon written consent of the Indenture Trustee) or otherwise by order of the Bankruptcy Court.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

C.      *Effect of Confirmation on Modifications*

      Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

D.      *Revocation or Withdrawal of the Plan*

      The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

      1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

      2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

      3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Purchaser amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

      4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

      5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

      6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

      7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 hereof;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Plan Support Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.      enforce all orders previously entered by the Bankruptcy Court;

22.      to resolve any disputes arising under the Purchase Agreement, Backstop Unit Purchase Agreement, Warrant Agreement, Liquidator Agreement, Capital Call Agreement (as it relates to any capital call to be made on the Effective Date or to the extent such disputes relate to implementation of the Plan), or Plan Support Agreement;

23.      hear any other matter not inconsistent with the Bankruptcy Code;

K&E 17723384

24. enter an order concluding or closing the Chapter 11 Cases; and

25. enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Purchaser, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan or the Purchase Agreement, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement. The Debtors or the Purchaser, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Purchase Agreement.

C. *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Purchaser (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D. *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases.

E. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

K&E 17723384

G.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Purchaser shall be served on:

> Neff Corp.
> 3750 N.W. 87th Avenue, Suite 400
> Miami, Florida 33178
> Attn.: Mark Irion
>
> <u>with copies to:</u>
>
> Kirkland & Ellis LLP
> 300 North LaSalle Drive
> Chicago, Illinois  60654
> Attn.: Anup Sathy, P.C., Ryan Preston Dahl and Wilson L. Tsu
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attn.: Ray C. Schrock and Brian S. Lennon
>
> Stroock & Stroock & Lavan LLP
> 180 Maiden Lane
> New York, New York 10038
> Attn.:  Kristopher M. Hansen and Jayme T. Goldstein

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Backstop Unit Purchase Agreement and the Purchase Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

K&E 17723384

Respectfully submitted, as of the date first set forth above,

Neff Corp. (for itself and all Debtors)

By:      */s/ Mark Irion*
Name:    Mark Irion
Title:     Chief Financial Officer of Neff Corp.

50

**<u>Exhibit B</u>**

**Notice of Confirmation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NEFF CORP., et al.,[1] | ) | Case No. 10-12610 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## NOTICE OF ENTRY OF CONFIRMATION ORDER AND OCCURRENCE OF EFFECTIVE DATE OF DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on September 20, 2010, the debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") filed the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 443] (the "Plan") in the United States Bankruptcy Court for the Southern District of New York (the "Court").[2]

**PLEASE TAKE FURTHER NOTICE** that on September **[XX]**, 2010, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [**Docket No. XXX**] (the "Confirmation Order"). The Plan and Confirmation Order are available free of charge at the Debtors' restructuring website: www.kccllc.net/neff.

**PLEASE TAKE FURTHER NOTICE** that requests for payment of Administrative Claims must be filed and served on the Purchaser no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neff Holdings LLC (0571); Neff Corp. (6400); Neff Finance Corp. (3639); Neff Holdings Corp. (0431); Neff Rental, Inc. (0403); and Neff Rental LLC (3649). The location of the Debtors' corporate headquarters and the service address for all the Debtors except Neff Holdings LLC is: 3750 N.W. 87th Ave., Suite 400, Miami, Florida 33178. The service address for Neff Holdings LLC is: 375 Park Avenue, New York, New York 10152.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Administrative Claims against the Debtors, the Purchaser, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that objections to requests for payment of Administrative Claims must be filed and served on the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the filing of the applicable request for payment of Administrative Claims, if applicable.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan for all Debtors occurred on September [**DATE**], 2010.

New York, New York
Dated:  September [**DATE**], 2010

James H.M. Sprayregen, P.C.
Ray C. Schrock (admitted *pro hac vice*)
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

Anup Sathy, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to the Debtors and Debtors in Possession

K&E 17739536